No. 23-16164

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Hawaiʻi
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

---

## OPENING BRIEF OF DEFENDANT-APPELLANT ANNE E. LOPEZ

---

ANNE E. LOPEZ
  *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
  *Solicitor General*
NICHOLAS M. MCLEAN
  *First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
  *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
    *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
    *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as the Attorney General of the State of Hawai'i*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION............................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................3

STATEMENT OF AUTHORITIES .........................................................3

STATEMENT OF THE CASE...................................................................3

    I.     Legal Background ........................................................................3

        A.    The Supreme Court's Decision in *Bruen* ....................................3

        B.    Act 52 ..........................................................................6

    II.    Procedural Background ..................................................................7

SUMMARY OF THE ARGUMENT .........................................................9

REVIEWABILITY AND STANDARD OF REVIEW...........................14

ARGUMENT ........................................................................................16

    I.     The District Court Erred in Concluding That Plaintiffs
        Were Likely to Succeed on Their Challenges to Act 52.....................16

        A.    The District Court Erred in Concluding That Plaintiffs Had
            Standing with Respect to Each of the Challenged Provisions..16

        B.    The District Court Erred in Concluding That Plaintiffs Were
            Likely to Succeed on Their Challenge to the Sensitive-Place
            Provisions...........................................................................19

        C.    The District Court Erred in Concluding That Plaintiffs Were
            Likely to Succeed on Their Challenge to the Private Property
             Default Rule. ......................................................................48

    II.    The District Court Erred in Its Application of the
        Remaining Preliminary Injunction Factors. .......................................56

    III.   In the Alternative, this Court Should Narrow the
        Injunction...........................................................................59

CONCLUSION ..................................................................................................59

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ....................................................58

*Andrews v. State*, 50 Tenn. 165 (1871) ............................................. 28, 47

*Application of Ashford*, 440 P.2d 76 (Haw. 1968) ...............................34

*Application of Sanborn*, 562 P.2d 771 (Haw. 1977) .............................34

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ................................20

*Blum v. Yaretsky*, 457 U.S. 991 (1982) .................................................50

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) .......... 25, 35

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022) ............................................................................15

*Carney v. Adams*, 141 S. Ct. 493 (2020) ..............................................16

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ........................50

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... passim

*E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019) ......................59

*English v. State*, 35 Tex. 473 (1872) ............................................. 28, 46

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) ...........................35

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..........................27

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ..................56

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012)............. 13, 50

*Goldstein v. Hochul*, No. 22-cv-8300 (VSB), 2023 WL 4236164 (S.D.N.Y. June 28, 2023) ................................................................................... 34, 58

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023)................................ 14, 15

*Hill v. State*, 53 Ga. 472 (1874) ..................................................... 28, 47

## TABLE OF AUTHORITIES—CONTINUED

Page

*Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023)......................................18

*Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023)................................................................................................... 18, 31

*LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947 (9th Cir. 2021).......16

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991)..............15

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010)....................................................17

*Mahoney v. Sessions*, 871 F.3d 873 (9th Cir. 2017).................................................35

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. CV TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023)................................................................. 39, 41, 56

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................58

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) .......... passim

*Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (en banc) ....................................35

*NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), *vacated and reh'g en banc granted*, 72 F.4th 1346 (11th Cir. 2023) ..........................................................................27

*NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ...........................................................................................................20

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ..............................................18

*Owens v. State*, 3 Tex. App. 404 (Tex. App. 1878)..........................................28, 46

*Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc)...............57

*Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976)..........................10, 17

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................................16

*State v. Shelby*, 2 S.W. 468 (Mo. 1886)...........................................................28, 47

*State v. Torres*, 75 P.3d 410 (N.M. App. 2003)......................................................27

iv

# TABLE OF AUTHORITIES—CONTINUED

Page

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) .......................................58

*Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182 (E.D. Cal. 2015) .........59

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023).......................................4, 21

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011)...........................................20

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019)................................... passim

*United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017).........................................20

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)....................................20

*United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022).......................................................................................21

*Willis v. City of Seattle*, 943 F.3d 882 (9th Cir. 2019) ..........................................59

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ...............................................................15

*Zaitzeff v. City of Seattle*, 484 P.3d 470 (Wash. App. 2021)...................................36

**Constitutional Provisions**

U.S. Const. amend. II.............................................................................................3

**Statutes**

HRS § 134-A(a)(1).................................................................................... passim

HRS § 134-A(a)(12).................................................................................. passim

HRS § 134-A(a)(4).................................................................................... passim

HRS § 134-A(a)(9).................................................................................... passim

HRS § 134-E ............................................................................................ passim

## TABLE OF AUTHORITIES—CONTINUED

Page

**Other Authorities**

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1 (2021)...........40

Brian DeLay, *The Myth of Continuity in American Gun Culture* (Aug. 19, 2023) (unpublished manuscript), https://ssrn.com/abstract=4546050 ..........................24

Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L. Rev. E-Supplement I.-60 (2022).........................23

Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*, Smithsonian Mag. (June 23, 2016), https://perma.cc/2JD6-C752.......................38

Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459 (2019) ................................................................... 23, 37

Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People,"* Notre Dame L. Rev. (forthcoming), https://ssrn.com/abstract=4521030............24

Declaration of Hendrik Hartog, *Koons v. Platkin*, No. CV 22-7464 (RMB/AMD) (D.N.J. Feb. 13, 2023), ECF No. 84 ........................................................... 54, 55

Dep't of Bus., Econ. Dev. & Tourism, Rsch. & Econ. Analysis Div., *Visitor Recovery Continued Through Jul 2023* (Aug. 31, 2023), https://perma.cc/2SXR-XFYP....................................................................................................................38

*Enclose*, Black's Law Dictionary (11th ed. 2019)...................................................55

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ...................................................................................................................27

Haunani H. Kane et al., *Vulnerability Assessment of Hawai'i's Cultural Assets Attributable to Erosion Using Shoreline Trend Analysis Techniques*, 28 J. Coastal Rsch. 533 (2012) .....................................................................................36

Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (2005) ...........................................................................32

## TABLE OF AUTHORITIES—CONTINUED

Page

James Mak, *Developing a Dream Destination: Tourism and Tourism Policy Planning in Hawaiʻi* (2008) ................................................................38

John Davenport & Julia L. Davenport, *The Impact of Tourism and Personal Leisure Transport on Coastal Environments: A Review*, 67 Estuarine, Coastal & Shelf Sci. 280 (2006) ............................................................38

John J. Donohue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* (Natʼl Bureau of Econ. Rsch., Working Paper No. 30190, June 2023), https://perma.cc/QD3C-4DBF ............................................57

Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4408228 ........................31

*Land*, Black's Law Dictionary (11th ed. 2019) ........................................55

Laura F. Edwards, *The People and Their Peace* (2009)............................33

*More Than 2,200 Non-Self Defense Deaths Involving Concealed Carry Killers Since 2007, Latest Violence Policy Center Research Shows*, Violence Pol'y Ctr. (Apr. 21, 2022), https://perma.cc/MXW4-AWYD ..............................57

Paul M. Reeping et al., *State Gun Laws, Gun Ownership, and Mass Shootings in the US*, BMJ (Mar. 6, 2019), https://perma.cc/C2BS-KCWT ..........................57

*Plantation*, Oxford English Dictionary (3d ed. June 2006)......................55

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)....................................32

State of Hawaiʻi, *Fact Sheet: Benefits of Hawaiʻi's Tourism Economy*, https://perma.cc/4MT8-VTS7 ............................................38

Testimony Before the H. Comm. on Fin. (Apr. 5, 2023), https://perma.cc/XB5Q-2VBV ..........................................................7

Testimony Before the H. Comm. on Judiciary & Hawaiian Affs. (Mar. 21, 2023), https://perma.cc/Y7D8-USQD......................................7, 44

# TABLE OF AUTHORITIES—CONTINUED

Page

Testimony Before the S. Comm. on Pub. Safety & Intergovernmental & Mil. Affs. (Feb. 6, 2023), https://perma.cc/R5AA-6KCV ...................................................... 7

*Unintentional Shootings*, EFSGV, https://perma.cc/8WJ8-2XHC ......................... 57

William J. Novak, *The People's Welfare* (1996) ..................................................... 32

**INTRODUCTION**

The extraordinary injunction issued by the district court prohibits the Hawai'i Attorney General from enforcing the State's prohibitions on carrying guns in bars, restaurants, parks, beaches, and banks. The injunction also prohibits enforcement of Hawai'i's private property default rule, which honors individuals' right to decide for themselves whether to authorize others to carry firearms on their property. The injunction is based upon faulty legal analysis and incorrect historical assumptions, and it must be vacated. Although the district court purported to apply the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), nothing in *Bruen* requires invalidating the crucial public safety measures at issue in this case.

To begin, a panoply of threshold issues should have precluded the district court from awarding such sweeping relief. Plaintiffs, for example, lack standing with respect to several of the provisions they challenge. And one significant component of the injunctive relief granted by the district court—enjoining Hawai'i's restriction on carrying firearms in bars—was not even requested by Plaintiffs.

On the merits, the district court's Second Amendment analysis was fundamentally flawed. The sensitive-place restrictions at issue are "presumptively lawful," *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008); *see*

*Bruen*, 142 S. Ct. at 2133, and the private property default rule likewise regulates conduct that falls outside the scope of the Second Amendment. In any event, the historical record makes clear that the challenged restrictions are consistent with this Nation's historical tradition of firearms regulation.

Accordingly, Defendant-Appellant Anne E. Lopez, in her official capacity as the Attorney General of the State of Hawaiʻi, respectfully requests that this Court vacate the district court's injunction.

## STATEMENT OF JURISDICTION

Plaintiffs-Appellees challenge the constitutionality of sections 134-A(a)(1), (4), (9), (12), and 134-E of the Hawaiʻi Revised Statutes based on the First and Second Amendments to the U.S. Constitution. Accordingly, the district court had jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights).

On August 8, 2023, the district court issued a temporary restraining order enjoining the challenged provisions. 1-ER-0096-0097. On September 6, 2023, the district court converted its TRO into a preliminary injunction. 1-ER-0003-0006. The Attorney General timely filed a Notice of Appeal on September 7, 2023. 6-ER-1362-1365. Pursuant to 28 U.S.C. § 1292(a)(1) (interlocutory orders granting injunctions), this Court has jurisdiction over the appeal.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the district court err in concluding that Plaintiffs were likely to prevail on their challenges to HRS §§ 134-A(a)(1), (4), (9), (12), and 134-E?

2.      Did the district court err in its application of the remaining preliminary injunction factors?

## STATEMENT OF AUTHORITIES

This case implicates the Second Amendment to the United States Constitution, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

The Attorney General sets forth the pertinent statutes, ordinances, rules, and regulations in an Addendum.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    The Supreme Court's Decision in *Bruen*

The Supreme Court has made clear that certain gun regulations are "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133; *id.* at 2162 (Kavanaugh, J., concurring), such that they fall outside the scope of the Second Amendment.  For example, *Heller* endorsed "laws forbidding the carrying of firearms in sensitive places such as schools and government

buildings," and the Supreme Court underscored that this list did "not purport to be exhaustive." 554 U.S. at 626-27 & n.26.

*Bruen* revised the legal framework applicable to Second Amendment challenges, but it reaffirmed the presumptive lawfulness of sensitive-place restrictions. Under *Bruen*'s "two-part test," *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023), plaintiffs challenging firearms regulations must first show that "the Second Amendment's plain text covers [their] conduct," *Bruen*, 142 S. Ct. at 2126. If the text does not cover a plaintiff's conduct, the challenge fails. If the text does cover a plaintiff's conduct, then "the Constitution presumptively protects that conduct," and the burden shifts to the government to demonstrate at *Bruen*'s second step that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

To assess a challenged law's consistency with the Nation's historical tradition of firearm regulation, *Bruen* instructed courts to employ "analogical reasoning," *i.e.*, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by asking "whether the two regulations are relevantly similar." *Id.* at 2132 (internal quotation marks omitted). The Supreme Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it stated that prior cases "point[ed] toward at least two metrics: how and why the

regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. This historical analysis is not a "regulatory straightjacket" and does not require "a modern-day regulation [to be] a dead ringer for historical precursors." *Id.* at 2133. The government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* Moreover, *Bruen* recognized that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the historical inquiry. *Id.* at 2132. After all, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*

With respect to sensitive places, *Bruen* adopted *Heller*'s non-exhaustive list—schools and government buildings—and added "legislative assemblies, polling places, and courthouses." *Id.* at 2133. Crucially, the Court stated that it was "aware of no disputes regarding the lawfulness of such prohibitions," and therefore "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.*; *see id.* at 2162 (Kavanaugh, J., concurring) ("laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" (quoting *Heller*, 554 U.S. at 626-27 & n.26)). *Bruen* also explained that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations

prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133 (majority opinion) (emphasis in original).

### B.    Act 52

In the wake of *Bruen*, the Hawai'i Legislature undertook a comprehensive reevaluation of its firearms laws.  Taking the lessons of *Bruen* to heart, the Legislature enacted an important public safety measure—Act 52—designed to mitigate the serious risks of firearms and gun violence, while also respecting the limits imposed by the Supreme Court.

As relevant here, Act 52 prohibits firearms in government buildings, *see* HRS § 134-A(a)(1); bars and restaurants serving alcohol, *see id.* § 134-A(a)(4); parks and beaches, *see id.* § 134-A(a)(9); banks and financial institutions, *see id.* § 134-A(a)(12); and parking areas adjacent to the foregoing.  The Act also prohibits carrying firearms on the private property of another person without express authorization.  *See id.* § 134-E.

In considering the bill that became Act 52, the Legislature reviewed voluminous testimony from affected stakeholders.  Hundreds of Hawai'i residents testified that they would feel less safe going to establishments like restaurants, or taking their families to parks and beaches, if concealed carry license holders with firearms might be at those locations.  *See, e.g.*, Testimony Before the S. Comm. on

6

Pub. Safety & Intergovernmental & Mil. Affs. 55-271 (Feb. 6, 2023),

https://perma.cc/R5AA-6KCV. And groups ranging from the Building Owners

and Managers Association of Hawaiʻi to the Healthcare Association of Hawaii

wrote in support of the bill's provisions restricting firearms in sensitive places.

*See, e.g.*, Testimony Before the H. Comm. on Fin. 31, 43 (Apr. 5, 2023),

https://perma.cc/XB5Q-2VBV. These groups included the Hawaii Bankers

Association and the Hawaii Credit Union League, which cited the elevated risk of

robbery and other crime if firearms were permitted in banks and financial

institutions. *See id.* at 50; Testimony Before the H. Comm. on Judiciary &

Hawaiian Affs. 53, 59 (Mar. 21, 2023), https://perma.cc/Y7D8-USQD.

On May 2, 2023, the bill that became Act 52 passed both houses of the

Hawaiʻi Legislature, 1-Add-078-079, and on June 2, the Governor signed Act 52

into law, 1-Add-001. The provisions at issue in this case took effect on July 1. 1-

Add-077.

## II.   Procedural Background

On June 23, 2023, Plaintiffs filed their Complaint, 5-ER-1137-1207, and

their Motion for Temporary Restraining Order and Preliminary Injunction, 5-ER-

1069-1071, challenging HRS §§ 134-A(a)(1), (4), (9), and (12), and 134-E.

Plaintiffs argued that these provisions violated the Second Amendment, and that

§ 134-E also compelled speech in violation of the First Amendment. Defendant

opposed Plaintiffs' motion.  3-ER-0383-0417.

On August 8, the district court issued an Order Granting in Part and Denying in Part Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 1-ER-0007-0097, which "addresse[d] only Plaintiffs' request for a temporary restraining order," 1-ER-0008 n.2.  Although the order purported to grant Plaintiffs' motion in part, the district court awarded Plaintiffs all the relief they sought, indefinitely enjoining enforcement of: HRS § 134-A(a)(1), as applied to parking lots shared by governmental and non-governmental entities; HRS § 134-A(a)(4), in its entirety; HRS § 134-A(a)(9), as applied to parks and beaches; HRS § 134-A(a)(12), in its entirety; and HRS § 134-E, as applied to private property held open to the public.  1-ER-0096-0097.  The court concluded that Plaintiffs were likely to succeed on their Second Amendment challenges to each of these provisions and that the remaining injunction factors weighed in Plaintiffs' favor. 1-ER-0095.[1]

On September 6, the district court, pursuant to a stipulation by the parties, converted the August 8 order to a preliminary injunction on the same basis and for the same reasons as those provided in the August 8 order.  1-ER-0003-0006.  On September 7, the Attorney General filed a Notice of Appeal.  6-ER-1362-1365.

---

[1]  The district court rejected Plaintiffs' First Amendment claim, correctly concluding that HRS § 134-E does not compel speech.  *See* 1-ER-0095-0096.

## SUMMARY OF THE ARGUMENT

The sweeping injunction issued by the district court prohibits the Hawaiʻi Attorney General from enforcing the State's law—grounded in its strong interests in public safety—prohibiting the carrying of guns in bars, restaurants, parks, beaches, and banks.[2] The district court also enjoined enforcement of Hawaiʻi's private property default rule, which honors the right of individuals to decide for themselves whether to authorize others to carry firearms on their property. The district court's order contains numerous threshold errors and rests on faulty legal analysis and incorrect historical assumptions. It must be vacated.

**I.A.** The district court erred in concluding that Plaintiffs had standing for each of their challenges. With respect to the restriction on guns in government parking lots, HRS § 134-A(a)(1), Plaintiffs failed to show an injury in fact because their proposed conduct is not proscribed by the statute. Plaintiffs' contrary interpretation of the provision is mistaken, and the Attorney General has already disclaimed enforcement of the provision in the manner Plaintiffs suggest applies to their conduct.

With respect to the restriction on guns in banks and financial institutions,

---

[2] Specifically, the district court enjoined the State from enforcing restrictions on carrying firearms in certain government parking lots, HRS § 134-A(a)(1); bars and restaurants serving alcohol, HRS § 134-A(a)(4); parks and beaches, HRS § 134-A(a)(9); and banks and financial institutions, HRS § 134-A(a)(12).

HRS § 134-A(a)(12), and the private property default rule, HRS § 134-E, Plaintiffs failed to establish that their alleged injuries "fairly can be traced to the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). Plaintiffs provided no allegations or evidence that any bank or financial institution has authorized (or would authorize) firearms on its premises. As a result, any injury Plaintiffs suffer from not being able to carry firearms in financial institutions is caused by financial institutions' decisions to exclude them. Nor, with respect to HRS § 134-E, can Plaintiffs establish an injury from not being allowed to carry firearms on private property without consent, when any such injury is caused by the independent decision of a third party—*i.e.*, the owner's decision to withhold that consent.

    **I.B.** The district court misapplied *Bruen* in determining that Plaintiffs were likely to succeed on the merits of their Second Amendment challenge to the sensitive-place provisions at issue.

    **1.** As a threshold matter, the district court erred by concluding that the plain text of the Second Amendment covers any and all places held open to the public. The court ignored the Supreme Court's admonition that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. Plaintiffs failed to overcome that presumption, and

they failed to show that their specific intended conduct—carrying firearms in government parking lots, restaurants serving alcohol, parks and beaches, and banks and financial institutions—falls within the scope of the Second Amendment at all.

**2.** The district court also fundamentally misapplied *Bruen*'s historical inquiry in several respects:

- The district court applied a much stricter legal test than *Bruen* prescribes, in practice demanding a historical twin for each of the challenged provisions.

- The district court rejected a number of the authorities identified by the Attorney General—*even historical twins*—based on its imposition of arbitrary and unwarranted population thresholds that find no basis in *Bruen*.

- In performing this flawed population-threshold analysis with respect to historical restrictions on guns in parks, the district court discounted relevant legal authorities banning firearms in parks in New York and Pennsylvania because (according to the district court) those States covered "only about 4% of this Nation['s]" population in 1860. 1-ER-0068 & n.17. But the very source cited by the district court states that New York and Pennsylvania accounted for nearly *22%* of the Nation's population, not *4%*.

11

- The district court inappropriately constrained the universe of analogues on which the Attorney General was permitted to rely, discounting many post-1870 authorities that illustrate the scope of the Nation's historical tradition of firearms regulation.

- The district court ignored the crucial fact that there is no indication of contemporary sources arguing that the many historical regulations identified by the Attorney General were unconstitutional at the time—the exact reason why *Bruen* "assume[d] it settled" that locations such as legislative assemblies, polling places, and courthouse "were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S. Ct. at 2133.

- The district court ignored the important reasons and concerns that justified the challenged provisions, even where those concerns were relevant because they spoke to "why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*

- The district court failed to appreciate that some of the places in which Plaintiffs wish to carry firearms are sensitive for the additional reason that they "implicat[e] unprecedented societal concerns"—such as the recent development of mass tourism at Hawai'i's beaches—that "require a more nuanced approach." *Id.* at 2132.

- The district court enjoined enforcement of HRS § 134-A(a)(4) as to both bars and restaurants, even though Plaintiffs challenged the provision only as to restaurants.

**I.C.**   The district court erred by concluding that Plaintiffs were likely to succeed on their Second Amendment challenge to the private property default rule.

**1.**   The district court erred in holding that the plain text of the Second Amendment covers the carrying of firearms on *private property* held open to the public. *Bruen*'s threshold inquiry requires an analysis of the Second Amendment's text that is "informed by history." 142 S. Ct. at 2127. This includes the principles of "property law, tort law, and criminal law" that "provide[d] the canvas on which our Founding Fathers drafted the Second Amendment." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). At common law, entering the land of another without permission was unlawful, and States have long reinforced private property rights through the criminal offense of trespass. Thus, at the time of the Founding, "the public understanding of the Second Amendment," *Bruen*, 142 S. Ct. at 2136 (cleaned up), respected and accorded deference to private property owners' ability to control access to their own premises. HRS § 134-E does no more than vindicate this traditional, common law right to exclude.

**2.**   There is also an extensive historical tradition supporting prohibitions on carrying firearms on private property without consent. This includes analogues

13

from both the Founding and Reconstruction Eras, many of which are historical twins of HRS § 134-E. The district court discounted these historical analogues on the ground that they did not concern property held open to the public, but cited no historical evidence for that conclusion, Plaintiffs never argued for it, and persuasive scholarly commentary indicates that the district court was incorrect.

**II.**    The district court erred in holding that Plaintiffs were irreparably harmed, and that the balance of the equities and the public interest weighed in favor of enjoining the challenged provisions. Among other errors, the district court dismissed the State's weighty interests in enforcing its duly enacted laws and protecting public safety.

## REVIEWABILITY AND STANDARD OF REVIEW

The Attorney General opposed Plaintiffs' claims in its Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order. 3-ER-0383-0417. The district court ruled on Plaintiffs' claims in its August 8 Order. 1-ER-0007-0097.

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023) (emphasis in original) (internal quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely

to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).

Although "[t]his court reviews the district court's decision to grant or deny a preliminary injunction for abuse of discretion," "[t]he district court's interpretation of the underlying legal principles . . . is subject to de novo review and a district court abuses its discretion when it makes an error of law." *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (internal quotation marks omitted). "A district court's decision is based on an erroneous legal standard if: (1) the court did not employ the appropriate legal standards that govern the issuance of a preliminary injunction; or (2) in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in the litigation." *Id*. (internal quotation marks omitted). Furthermore, "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged," and "[a]n overboard injunction is an abuse of discretion." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

## ARGUMENT

I.    **The District Court Erred in Concluding That Plaintiffs Were Likely to Succeed on Their Challenges to Act 52.**

A.    **The District Court Erred in Concluding That Plaintiffs Had Standing with Respect to Each of the Challenged Provisions.**

The district court erred in concluding that Plaintiffs had standing for each of their challenges.  To establish standing, Plaintiffs must show an "injury in fact" that is "fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (internal quotation marks omitted).  "[A]s the party invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing these elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  At this preliminary stage, Plaintiffs "must make a clear showing of each element of standing." *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (internal quotation marks omitted).

Beginning with HRS § 134-A(a)(1), Plaintiffs failed to show an injury in fact.  HRS § 134-A(a)(1) restricts firearms in "[a]ny building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas." 1-Add-005.  Plaintiffs challenged this provision only to the extent it covers parking lots shared by government buildings and other sensitive places at issue in this lawsuit.  *See* 5-ER-1070.  But as the Attorney General explained, HRS § 134-A(a)(1) does not apply to such parking lots.  *See* 2-ER-0209-0210 (TRO Hr'g Tr. 17-18).  Instead, HRS § 134-A(a)(1), properly interpreted, applies only to parking

16

lots that exclusively serve government buildings.  *See id.*  Because Plaintiffs do not seek to carry firearms in parking lots that exclusively serve government buildings, they have not shown "an intention to engage in a course of conduct . . . proscribed by a statute," nor "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (internal quotation marks omitted).

Plaintiffs also failed to show, with respect to several of the challenged provisions, that their alleged injuries "fairly can be traced to the challenged action of the defendant," as opposed to "the independent action of some third party not before the court."  *Simon*, 426 U.S. at 41-42.  With respect to HRS § 134-A(a)(12), Plaintiffs provided no allegations or evidence that any financial institution has authorized (or would authorize) firearms on its premises.  As a result, any injury Plaintiffs suffer from being unable to carry firearms in financial institutions is caused not by any action of the State, but by financial institutions' decisions to exclude them[3]—decisions that Plaintiffs acknowledge are permissible.  *See* 5-ER-1096 ("Plaintiffs here do not challenge that right of a private property owner.").  Likewise, with respect to HRS § 134-E, any injury Plaintiffs claim to suffer from not being allowed to carry firearms on private property without consent is caused

---

[3] This is particularly true given that financial institutions' decisions to withhold authorization independently deprive Plaintiffs of the ability to carry firearms on their premises under HRS § 134-E.

by the owner's choice to withhold that consent. The Act changes nothing about the rights of individuals to control their property: other than those places designated as sensitive in HRS § 134-A, business owners who wish to allow firearms on their property may do so. For similar reasons, even a favorable decision from this Court with respect to HRS § 134-E cannot redress Plaintiffs' claimed injuries.

The district court erroneously relied on *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), in concluding that Plaintiffs had met the traceability and redressability requirements for standing. *O'Handley* is a very different case. There, this Court held that censorship of a Twitter user's speech was traceable to the actions of a government official who had flagged the speech for Twitter as false and misleading. *See id.* at 1161-62. Critically, the plaintiff alleged that Twitter had censored his speech because the government official had flagged it. *See id.* at 1153-55. Here, by contrast, Plaintiffs do not allege that banks or owners of non-sensitive private property have chosen to prohibit them from carrying guns because of any request by the State.[4]

---

[4] In concluding that Plaintiffs had standing, the district court also relied on *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023). But the relevant portion of *Koons* has been stayed by the Third Circuit pending appeal, *see Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023), meaning that the court has determined that the plaintiffs there are unlikely to succeed on the merits of their claim.

Similarly, the district court mistakenly relied on declarations from owners of businesses to conclude that Plaintiffs have standing to challenge HRS § 134-E. *See* 2-ER-0319-0360. Each business owner declared that: "If H.R.S. § 134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, *including the Plaintiffs* in this case, to carry in my business and on my property." *E.g.*, 2-ER-0321 (emphasis added). These business owners thus provided through their declarations the very "express authorization to carry a firearm" that HRS § 134-E requires. Accordingly, these declarations do nothing but underscore Plaintiffs' lack of standing to challenge HRS § 134-E.[5]

**B.      The District Court Erred in Concluding That Plaintiffs Were Likely to Succeed on Their Challenge to the Sensitive-Place Provisions.**

The district court erred in concluding that Plaintiffs were likely to succeed on the merits of their Second Amendment challenge to HRS §§ 134-A(a)(1), (4), (9), and (12). First, Plaintiffs failed to show that the plain text of the Second Amendment covers their specific course of conduct. Second, the Attorney General

---

[5] Plaintiffs appeared to take the position in the district court that the declarant business owners would give others permission to carry on their property only if they were not required by HRS § 134-E to give permission in order for others to carry on their property. *See* 2-ER-0141. If that is the case, then any injury suffered by Plaintiffs is still the result of the declarants' decision to withhold consent (albeit in a manner approaching gamesmanship), rather than the result of any action by the State.

more than satisfied its burden of demonstrating that the challenged regulations are consistent with the Nation's historical tradition of firearms regulation.

**1.    The District Court Erred in Concluding That Plaintiffs' Conduct Falls Within the Plain Text of the Second Amendment.**

The district court erred in concluding that "the Second Amendment's plain text covers [Plaintiffs'] conduct." *Bruen*, 142 S. Ct. at 2126. Whereas *Bruen* recognized a right to carry firearms in *public*, *see id.* at 2156, the district court went much further and held with respect to HRS §§ 134-A(a)(4) and (12) that the Second Amendment presumptively protects the right to carry firearms on *all property* held open to the public, *see* 1-ER-0047. This expansion was unwarranted.

The district court also ignored the Supreme Court's admonition that sensitive-place restrictions are "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26, and failed to engage with post-*Heller* decisions explaining that such restrictions fall outside the scope of the Second Amendment, *see, e.g.*, *Bauer v. Becerra*, 858 F.3d 1216, 1220-21 (9th Cir. 2017); *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017); *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010). These decisions held that "presumptively lawful regulatory measures"

could be upheld under the first step of the then-governing Second Amendment test, which *Bruen* endorsed as "broadly consistent with *Heller*." 142 S. Ct. at 2127. Under these courts' reasoning—which *Bruen* left undisturbed—"the public understanding of the Second Amendment," *id.* at 2136 (cleaned up), did not include a right to carry firearms in sensitive places. *See Heller*, 554 U.S. at 592 ("The very text of the Second Amendment implicitly recognizes the pre-existence of the right . . . .").[6]

### 2. HRS §§ 134-A(a)(1), (4), (9), and (12) Are Consistent with the Nation's Historical Tradition of Firearms Regulation.

The district court also erred in its application of *Bruen*'s historical inquiry. As explained below, the Attorney General satisfied its burden of demonstrating that the challenged provisions are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Each challenged provision is supported by a robust tradition of regulations that "impose[d] a comparable burden on the right of armed self-defense" and that were "comparably justified." *Id.* at

---

[6] It is not enough simply to say—as Plaintiffs did before the district court, *see* 5-ER-1086-1087—that Plaintiffs wish to carry firearms for self-defense. Plaintiffs must show that their specific "proposed course of conduct"—carrying firearms into the challenged sensitive locations—"falls within the Second Amendment." *Alaniz*, 69 F.4th at 1128 (internal quotation marks omitted); *see, e.g., United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text . . . .").

2133. Indeed, some of the historical regulations are better described as "historical *twin[s]*," even though *Bruen* makes clear that no such "twin" is necessary for the Attorney General to prevail. *Id.*

Furthermore, the Supreme Court has recognized that certain locations, including "schools and government buildings," *Heller*, 554 U.S. at 626, and "legislative assemblies, polling places, and courthouses," *Bruen*, 142 S. Ct. at 2133, have historically been "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* And *Bruen* stated that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original). The locations enumerated by *Heller* and *Bruen* yield several principles that justify a place's designation as sensitive, including that the government is acting as a proprietor, *see United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), and that "the people found there or the activities that take place there" are particularly susceptible to the risks of gun violence, *see id.* at 465 (internal quotation marks omitted). Schools, for example, are sensitive because children are especially vulnerable to gun violence. And government buildings—including legislative assemblies, polling places, and courthouses—are sensitive in part because their functioning without disruption is essential to the protection of other

constitutional rights. *See* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019). These principles, drawn from the examples in *Heller* and *Bruen*, further justify several of the challenged restrictions.

There is no basis to suggest, moreover—as Plaintiffs did below—that the universe of sensitive places is limited to those locations in which the government provides "security akin to that provided before entering courthouses or the TSA-secured areas of an airport, i.e., armed government guards and metal detectors at a minimum at every point of entry." 2-ER-0142; *see* 3-ER-0469 (Cornell Decl. ¶ 42) (explaining that "[t]he sensitive places doctrine did not, as some gun rights advocates have erroneously suggested, depend on the fact that government could provide comprehensive security, such as modern court houses which have metal detectors and armed guards"); Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L. Rev. E-Supplement I.-60, I.-62 (2022) ("[T]he 'metal detector and security guard' principle for identifying sensitive places is inconsistent with the original public understanding of the Second Amendment, both at its ratification and at its incorporation via the Fourteenth Amendment."). To the contrary, "[m]any 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in [*Heller*]—are open to

the public, without any form of special security or screening." *Class*, 930 F.3d at 465.

Finally, *Bruen* noted that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the historical inquiry. 142 S. Ct. at 2132. This insight provides additional support for each of the challenged sensitive-place restrictions. Hawaiʻi's beaches, for example, are sensitive for the added reason that they have undergone significant changes in the decades since the development of mass tourism. *See infra* pp. 37-39. And all the challenged locations are sensitive—in addition to the reasons below—because of transformations in firearms technology. At the time of the Founding, "repeating firearms"—guns capable of firing multiple bullets in a row without being manually reloaded—were "experimental curiosities" that had not yet "achieved commercial significance or military relevance." Brian DeLay, *The Myth of Continuity in American Gun Culture* 22 (Aug. 19, 2023) (unpublished manuscript), https://ssrn.com/abstract=4546050. Today, an AR-15 with a bump stock "can fire four hundred rounds a minute." Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People*," Notre Dame L. Rev. (forthcoming) (manuscript at 18-19), https://ssrn.com/abstract=4521030. At the Founding, firearms were "accurate to only about one hundred" yards. *Id.* at 19. Today, an "assault rifle can still penetrate steel" at that distance. *Id.* These

24

"dramatic technological changes" increase the number of people and the types of activities that are particularly susceptible to the risks of firearms, and they correspondingly "require a more nuanced approach" to determining whether a given location should be deemed sensitive. *Bruen*, 142 S. Ct. at 2132.

### a. HRS § 134-A(a)(1): parking lots adjacent to government buildings

In addition to the district court's error in determining that Plaintiffs had standing to challenge HRS § 134-A(a)(1), *see supra* section I.A, there was no reason for the court to pass on Plaintiffs' challenge to the provision's alleged application to shared parking lots because, properly interpreted, the provision prohibits firearms only in parking lots dedicated exclusively to government buildings. That is plainly constitutional. *Heller* and *Bruen* both recognized that "government buildings" are sensitive places where firearms may be "altogether prohibited." *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. And parking lots that exclusively serve government buildings are sensitive to the same extent as the buildings themselves. *See Class*, 930 F.3d at 464 ("[B]ecause the Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government, we consider the lot as a single unit with the Capitol building, and conclude that the lot is a 'sensitive' place where firearms prohibitions are presumptively lawful."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) ("We conclude,

on the facts of this case, that the parking lot should be considered as a single unit with the postal building itself to which it is attached and which it exclusively serves.").

### b. HRS § 134-A(a)(4): bars and restaurants serving alcohol

HRS § 134-A(a)(4) restricts firearms in "[a]ny bar or restaurant serving alcohol or intoxicating liquor . . . for consumption on the premises, including adjacent parking areas." 1-Add-005. Although Plaintiffs challenged this provision only "to the extent it bans the carry of handguns in *restaurants* and their parking lots," 5-ER-1070 (emphasis added), the district court went beyond the claims before it to enjoin enforcement of HRS § 134-A(a)(4) not only as to restaurants, but as to bars as well, *see* 1-ER-0097. This portion of the district court's injunction should be vacated on that basis alone.[7]

The district court's discussion of bars and restaurants also incorrectly applied *Bruen*'s historical analysis. As noted above, one of the historical justifications for the sensitive-place restrictions identified in *Heller* and *Bruen* is that "the people found there or the activities that take place there" are particularly susceptible to the risks of gun violence. *Class*, 930 F.3d at 465 (internal quotation

---

[7] The restaurants provision was severable from the bars provision. *See* 1-Add-076 (Act 52's severability clause).

marks omitted). Locations where alcohol is sold implicate both of these concerns. Where a business sells alcohol, there is a risk to patrons and staff that inebriated individuals will hurt themselves or others. There is also a risk that intoxicated guests will be unable to defend themselves against an armed aggressor. And these risks are heightened when, as is often the case in bars and restaurants, an establishment is crowded. *See State v. Torres*, 75 P.3d 410, 413 (N.M. App. 2003) (noting "obvious danger in the combination of firearms and liquor consumption").

To guard against these risks, governments have long restricted firearms in places where people gather, often in close proximity, and consume alcohol. In the district court, the Attorney General introduced several nineteenth-century laws—which are nearly identical to HRS § 134-A(a)(4)—that banned firearms in locations where alcohol was sold.[8] An 1853 New Mexico law prohibited people from carrying "fire arms or other deadly weapons, whether they be shown or concealed upon their persons" in a "Ball or Fandango, . . . or room adjoining said

---

[8] This Court should reject any argument by Plaintiffs that the universe of historical analogues must focus on the Founding Era. Numerous courts have appropriately looked to nineteenth century sources, and this Court should do the same. *E.g.*, *NRA v. Bondi*, 61 F.4th 1317, 1322-23 & n.9 (11th Cir. 2023), *vacated and reh'g en banc granted*, 72 F.4th 1346 (11th Cir. 2023); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *see generally* Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) ("The view is ascendant among originalists who hold that the Fourteenth Amendment requires states to respect some or all of the individual rights listed in the first eight amendments that those rights ought to be understood *as they were understood in 1868*.").

ball where Liquors are sold." 1-Add-262. Likewise, an 1879 New Orleans ordinance forbade "any person to carry a dangerous weapon, concealed or otherwise, into any . . . tavern." 1-Add-265. And an 1890 Oklahoma law prohibited firearms in "any place where intoxicating liquors are sold." 1-Add-253.

Additionally, other nineteenth-century laws more broadly restricted the carrying of firearms in places where people regularly assembled for commercial or social purposes, which could include assemblies of persons in bars and restaurants. *See, e.g.*, 1-Add-316 (1817 New Orleans law forbidding weapons in public ball rooms); 1-Add-325 (1870 Texas law prohibiting firearms in any "ball room, social party or other social gathering"); 1-Add-327 (1875 Missouri law prohibiting firearms at social gatherings or any other non-military "public assemblage of persons"); 1-Add-333 (1889 Arizona law prohibiting firearms at any "place where persons are assembled for amusement" or "any other public assembly"). There is no indication that these laws were controversial or viewed as unconstitutional at the time they were enacted.[9]

These laws are part of a broader tradition of government regulation, reaching back to and before the Founding, reflecting the commonsense wisdom of

---

[9] *See, e.g., English v. State*, 35 Tex. 473, 478-79 (1872); *Hill v. State*, 53 Ga. 472, 475 (1874); *Andrews v. State*, 50 Tenn. 165, 182 (1871); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886); *Owens v. State*, 3 Tex. App. 404, 407 (Tex. App. 1878).

separating guns and alcohol. For example, a 1746 New Jersey law prohibited selling "any strong Liquor" to members of the militia, 1-Add-090, and a 1756 Delaware law likewise provided that "no Captain or other Officer shall Appoint any place of Meeting for his Company . . . within the Distance of half a mile of any Inn or Tavern," 1-Add-097. A Maryland law passed the same year prohibited "any Person of the Militia" from getting "drunk on any Muster-day," and banned the sale of "any Strong Liquor at any Place of training or at any other Place within Five Miles of any Place of training." 1-Add-112. And a 1780 Pennsylvania law prohibited "any non-commissioned officer or private" from parading drunk, 1-Add-151, while also providing that "[n]o company or battalion shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged," 1-Add-154. Laws passed in the middle of the nineteenth century similarly prohibited "any intoxicating liquor" from being "kept or sold . . . on or near the ground of any . . . military muster." 1-Add-166 (1852 Vt.); *see* 1-Add-180 (1853 R.I.). For example, an 1859 Connecticut law prohibited the sale of liquor "within one mile of any military parade-ground, muster-field or encampment." 1-Add-188.

Also part of this historical tradition are measures excluding "common drunkards" from the militia, *e.g.*, 1-Add-191 (1837 Mass.); 1-Add-199 (1837 Me.); 1-Add-211 (1840 R.I.), as well as those regulating the interaction of firearms and

alcohol.  An 1851 Chicago law, for example, provided that "no permit [to keep or sell gunpowder] shall be granted to any retailer of intoxicating liquors or to any intemperate person."  *See* 1-Add-237.  And an 1858 St. Paul, Minnesota ordinance stated that "no permit [to keep or sell gunpowder] shall be granted to any retailer of intoxicating liquors."  *See* 1-Add-242.  An 1867 Kansas law prohibited the carrying of firearms while intoxicated, *see* 1-Add-244, as did laws passed in 1883 in Missouri and Wisconsin, *see* 1-Add-246; 1-Add-248; *see also* 1-Add-252 (1890 Oklahoma law prohibiting officers from carrying arms "while under the influence of intoxicating drinks").  And an 1878 Mississippi law forbade the sale of weapons, including firearms, to any "person intoxicated."  1-Add-255.

In rejecting these analogues, the district court fundamentally misapplied *Bruen*'s historical inquiry.[10]

*First*, despite acknowledging that the government need only "identify a well-established and representative *analogue*" of the regulation at issue, "not a historical *twin*," 1-ER-0028 (quoting *Bruen*, 142 S. Ct. at 2133), the district court essentially required the Attorney General to find a "dead ringer," *Bruen*, 142 S. Ct. at 2133. The court concluded, for example, that the 1700s-era laws cited above were

---

[10] These same analytical errors were repeated throughout the district court's Second Amendment analysis, including the court's analysis of parks, banks and financial institutions, and the private property default rule, discussed below.

"unpersuasive in finding that there was a national historical tradition of prohibiting members of the public—rather than members of the militia—from public carrying in places serving alcohol." 1-ER-0053. That narrow view of the historical record is at odds with the Supreme Court's guidance in *Bruen*.[11] Additionally, there is no reason to believe that trained militia members would pose greater risks in proximity to alcohol than other members of the public.

*Second*, the district court artificially constrained the universe of historical sources and analogues in a manner that would make it virtually impossible for *any* state regulation to satisfy the *Bruen* test. The district court disregarded the New Mexico, New Orleans, and Oklahoma laws cited above—even though those regulations can appropriately be described as historical twins—because it understood *Bruen* "to dismiss any law enacted unless it was done in a state where a significant percentage of the people . . . resided at the time that the Fourteenth Amendment was enacted." 1-ER-0057. *Bruen* imposed no such requirement. *Bruen* noted, rhetorically, that certain territorial laws "governed less than 1% of the

---

[11] *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. (forthcoming 2023) (manuscript at 42-43), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4408228 (criticizing the district court's decision in *Koons*, which has been stayed in relevant part pending appeal by the Third Circuit, for dismissing several of the same analogues that the Attorney General offered in support of HRS § 134-A(a)(4), and explaining that the *Koons* court "fail[ed] to comply with *Bruen*'s admonition that analogical reasoning does not require finding a historical *twin*" (internal quotation marks omitted)).

American population," 142 S. Ct. at 2155, but it nowhere instructed judges to limit their historical analysis through arbitrary population thresholds.

The district court's exclusive focus on state laws was also misguided, as much firearm regulation during the Founding and Reconstruction Eras took place at the local level. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 516 (2004) ("In contrast to modern law where many states have pre-empted the right of localities to restrict firearms, local regulation was quite common in pre-Civil War America."); *see also* William J. Novak, *The People's Welfare* 1 (1996) (emphasizing the "plethora of bylaws, ordinances, statutes, and common law restrictions regulating nearly every aspect of early American economy and society"). And much of that regulation either was never recorded or was lost to time. *See* 3-ER-0527 (Rivas Decl. ¶ 34) (noting that "compilations of historical ordinances have often not been preserved or digitized"). At the Founding in particular, justices of the peace often enforced the law based on what they had read in legal manuals, which were not enacted as positive law, and which "varied over time and by colony." Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 369 (2005). Courts often decided cases without issuing written decisions, and even where they did, those decisions often were not preserved. *See* Laura F. Edwards, *The People and Their Peace* 39

32

(2009). Even legislative enactments often were not compiled at the time of the Founding. *See id.* The upshot is that recorded state laws and judicial decisions interpreting those laws make up only a subset of "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, and the district court mistakenly relied on them to the exclusion of local regulations.

*Third*, the district court improperly discounted post-1870 materials from its historical analysis, despite the *Bruen* Court's observation that post-ratification evidence can help "settle the meaning" of constitutional provisions. *Id.* at 2136 (internal quotation marks omitted).[12]

*Fourth*, the district court's historical analysis ignored the crucial fact that there is no evidence from contemporary sources that the many historical regulations identified by the Attorney General were viewed as unconstitutional at the time—the exact reason why *Bruen* "assume[d] it settled" that locations such as legislative assemblies, polling places, and courthouses "were 'sensitive places'

---

[12] The post-1868 sensitive-place laws at issue in this case do not represent a situation where "later history contradicts what the [constitutional] text says." *Bruen*, 142 S. Ct. at 2137; *see infra* pp. 42-43.

where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133.[13]

In sum, the district court's analytical framework was wholly untethered from the discussions of sensitive places in *Heller* and *Bruen*, and reversal is warranted.

### c.    HRS § 134-A(a)(9): parks and beaches

The district court committed several additional errors in enjoining HRS § 134-A(a)(9), the provision of Act 52 governing parks and beaches.

*First*, the parks and beaches at which Plaintiffs seek to carry firearms are publicly owned, *see* 6-ER-1318-1322, ¶¶ 8-9; 6-ER-1333-1337, ¶¶ 8-9; 6-ER-1347-1349, ¶¶ 8-9, and thus subject to Hawaiʻi's authority to regulate as a proprietor.[14]  As noted above, one of the historical justifications for the sensitive-place restrictions identified in *Heller* and *Bruen* is that the government enjoys

---

[13] For example, the Supreme Court was able to conclude that schools were "settled" sensitive locations based on a "limited historical record of firearm regulation on school grounds."  *Goldstein v. Hochul*, No. 22-cv-8300 (VSB), 2023 WL 4236164, at *11 n.13 (S.D.N.Y. June 28, 2023).  "A review of the article cited by the [Supreme] Court found that the historical evidence supporting the finding that schools were a sensitive place was limited to: (1) an arms ban at the University of Virginia in 1824, (2) outlawing of certain places of amusement within three miles of campus at the College of New Jersey in 1853, and (3) a Mississippi law barring students from carrying concealed weapons at any university college, or school in 1878."  *Id*. at *11 n.12 (internal quotation marks omitted).

[14]  Under Hawaiʻi law, all areas seaward of the upper reaches of the wash of the waves are public land, *Application of Ashford*, 440 P.2d 76, 77 (Haw. 1968), that are "held in public trust by the State," *Application of Sanborn*, 562 P.2d 771, 776 (Haw. 1977).

increased regulatory flexibility when it acts as a proprietor rather than a sovereign. The district court suggested that the government's role as proprietor "in a post-*Bruen* world makes no difference," 1-ER-0061, but several courts have explained in the years following *Heller* why that role is significant, and their reasoning remains good law following *Bruen*. In *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012), for example, this Court, sitting *en banc*, upheld a county ordinance against a Second Amendment challenge because, among other things, it applied "only on County property." *Id*. at 1044; *see id.* at 1045 (explaining that "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation" (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008))). The Tenth Circuit reached a similar conclusion in *Bonidy v. U.S. Postal Service*, explaining that "[t]he government often has more flexibility to regulate when it is acting as a proprietor . . . than when it is acting as a sovereign." 790 F.3d at 1126, *quoted with approval in Mahoney v. Sessions*, 871 F.3d 873, 880 (9th Cir. 2017). And the D.C. Circuit likewise reasoned in *United States v. Class* that "the government—like private property owners—has the power to regulate conduct on its property." 930 F.3d at 464. The government's status as a proprietor supports the State's ability to restrict firearms in public parks and beaches.

*Second*, parks and beaches are sensitive because of "the people found there" and "the activities that take place there." *Id.* at 465 (internal quotation marks omitted). With respect to the people found there, children and families congregate at parks and beaches, just as they do at schools, which the Supreme Court has expressly recognized are sensitive. Indeed, many parks contain playgrounds and are located next to schools. 4-ER-0691-0696 (Thielen Decl. ¶ 6); 4-ER-0682 (McCall Decl. ¶ 5). And numerous organized activities in public parks involve children. *See* 4-ER-0691-0696 (Thielen Decl. ¶ 6); 4-ER-0686-0687 (McCall Decl. ¶¶ 16-18); *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021) (although *Heller* did "not list parks as sensitive areas, the public safety concerns underlying the sensitive area distinction also apply here, particularly the concern about protecting children"). With respect to the activities that take place there, parks and beaches often host crowded gatherings, like concerts, fairs, competitions, and cultural exhibitions, and they are places where important expressive activities occur. *See* 4-ER-0699-0701 (Thielen Decl. ¶¶ 9-11). Hawaiʻi's beaches also provide for a range of cultural opportunities (including religious activities and traditional practices) and represent "a focal point of modern lifestyle as well as cultural tradition."[15] These characteristics implicate First Amendment and other

---

[15] Haunani H. Kane et al., *Vulnerability Assessment of Hawaiʻi's Cultural Assets Attributable to Erosion Using Shoreline Trend Analysis Techniques*, 28 J. Coastal Rsch. 533, 533 (2012).

constitutional concerns, and they accordingly justify the designation of parks and beaches as sensitive. *See* Miller, *Constitutional Conflict and Sensitive Places*, *supra*.

The district court recognized that "children and families congregate at beaches and parks in Hawai'i," and that "beaches and parks are integral and highly valued in Hawaiian culture," but reasoned that "these considerations by themselves do not matter under the *Bruen* analysis." 1-ER-0062. That was incorrect. *See Bruen*, 142 S. Ct. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense *and whether that burden is comparably justified* are central considerations when engaging in an analogical inquiry." (cleaned up) (emphasis added)). As the district court acknowledged elsewhere in its order, "[p]olicy concerns might be relevant insofar as they help the government identify a well-established and representative historical analogue to the regulation at issue." 1-ER-0075 (internal quotation marks omitted). And with respect to parks and beaches, the policy concerns underlying their designation as sensitive are analogous to those underlying historical firearms restrictions in the sensitive places identified in *Heller* and *Bruen*.

*Third*, Hawai'i's beaches have undergone significant transformations in the decades since the development of mass tourism, implicating "unprecedented societal concerns." *Bruen*, 142 S. Ct. at 2132. The district court ignored this point

altogether.  It is of course true, as Plaintiffs argued, that "beaches have always existed in the United States," 5-ER-1100, but the status of beaches in economic, cultural, and social life fundamentally changed in the late nineteenth and twentieth centuries, especially in Hawaiʻi.  *See* Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*, Smithsonian Mag. (June 23, 2016), https://perma.cc/2JD6-C752; James Mak, *Developing a Dream Destination: Tourism and Tourism Policy Planning in Hawaiʻi* 13 (2008) ("Tourism, as it now exists in Hawaii, is essentially a post-World War II phenomenon.").  It was not until the twentieth century that beaches achieved their current status as a centerpiece of mass tourism.  *See* John Davenport & Julia L. Davenport, *The Impact of Tourism and Personal Leisure Transport on Coastal Environments: A Review*, 67 Estuarine, Coastal & Shelf Sci. 280, 280 (2006).  Today, Hawaiʻi's beaches are the most popular recreational tourist activity in the State and lie at the center of a nearly $20 billion tourism industry—Hawaiʻi's largest industry and a central pillar of the State's economy.[16]  The unique modern status of public

---

[16]  State of Hawaiʻi, *Fact Sheet: Benefits of Hawaiʻi's Tourism Economy*, https://perma.cc/4MT8-VTS7 ($19.29 billion in visitor spending in 2022).  In July 2023 alone, 932,713 visitors arrived in the State of Hawaiʻi and spent $2.05 billion. The island of Maui welcomed 293,681 visitors in July 2023, and those visitors spent $623.4 million.  *See* Dep't of Bus., Econ. Dev. & Tourism, Rsch. & Econ. Analysis Div., *Visitor Recovery Continued Through Jul 2023* (Aug. 31, 2023), https://perma.cc/2SXR-XFYP.

beaches—as places where, among other things, large crowds of families and children assemble from all over the world for recreation—implicates "unprecedented societal concerns" that "require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132; *cf. Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. CV TDC-21-1736, 2023 WL 4373260, at *14 (D. Md. July 6, 2023) (more nuanced approach warranted because "hospitals were only beginning to become prevalent at the time of the ratification of the Fourteenth Amendment" and "did not resemble their modern counterparts until the twentieth century").

Moreover, there is a robust historical tradition of restricting guns in places like parks and beaches.[17] This tradition dates back to when public parks first proliferated in the United States in the 1800s. Plaintiffs suggested before the district court that public parks date back to the establishment of the Boston Common in the 1600s, *see* 5-ER-1099, but that is incorrect. To the contrary, "[t]here were no modern-style parks in the era of the Second Amendment," and the Boston Common "was used primarily as a pasture, a place of execution, and a site for the militia to muster and drill." 3-ER-0483 (Cornell Decl. ¶ 55). "[M]odern style parks did not emerge until the nineteenth century." 3-ER-0449 (Cornell Decl. ¶ 14); *see* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and*

---

[17] Indeed, as a practical matter, many beaches are inseparable from public parks. *See* 4-ER-0696 (Thielen Decl. ¶ 7).

*Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 2 (2021) ("Public parks were part of a nineteenth-century explosion of interest in beautifying and improving towns and cities . . . ."); *see also* 5-ER-1099 (Plaintiffs' motion for a TRO and PI, approvingly citing Beamish, *supra*). And "[f]rom their inception, these new public spaces prohibited firearms." 3-ER-0449 (Cornell Decl. ¶ 14).

In 1858, for example, the Board of Commissioners of New York's Central Park—"[t]he first major protected area in the modern American public park movement" and "a model for many subsequent urban parks," 3-ER-0632 (Young Decl. ¶ 19)—adopted an ordinance that forbade "[a]ll persons . . . [t]o carry fire-arms or to throw stones or other missiles within" the park. 1-Add-268. The Commissioners of Prospect Park followed in 1866 with a similar ordinance. *See* 1-Add-273. And in 1868, Pennsylvania passed a law that "[n]o person shall carry fire arms or shoot birds in [Fairmount Park] or within fifty yards thereof, or throw ston[e]s or other missiles therein." 1-Add-280. During the nineteenth century, governments continued to pass laws banning guns in public parks. *E.g.*, 1-Add-285 (1872 San Francisco ordinance); 1-Add-289 (1873 Chicago ordinance); 1-Add-295 (1875 South Park, Illinois ordinance); 1-Add-300 (1881 St. Louis

40

ordinance); 1-Add-303 (1886 Boston ordinance).[18]  This trend continued as modern parks further developed and proliferated in the early twentieth century. *See* 2-Add-436 to 3-Add-745.  These laws are part of a tradition of prohibiting firearms in locations like those identified in HRS § 134-A(a)(9).  Indeed, "[w]hether viewed as direct historical precedent or historical analogues, these statutes and ordinances demonstrate a historical tradition of restricting the carrying of firearms in places where individuals gather for recreation." *Maryland Shall Issue*, 2023 WL 4373260, at *12; *see* 3-ER-0638, 3-ER-0643, 3-ER-0647 (Young Decl. ¶¶ 28, 35, 42) (finding no evidence supporting the carrying of firearms in urban, state, or national parks).

The district court dismissed these historical regulations because the ordinances banning firearms in the Nation's first modern parks in New York and

---

[18]  *See also* 2-Add-368 (1878 Phoenixville, Pennsylvania ordinance); 2-Add-370 (1883 Danville, Illinois ordinance); 2-Add-373 (1887 Reading, Pennsylvania ordinance); 2-Add-376 (1888 Salt Lake City, Utah ordinance); 2-Add-379 (1888 St. Paul, Minnesota ordinance); 2-Add-381 (1890 Trenton, New Jersey ordinance); 2-Add-384 (1890 Williamsport, Pennsylvania ordinance); 2-Add-387 (1891 Grand Rapids, Michigan ordinance); 2-Add-389 (1891 Springfield, Massachusetts ordinance); 2-Add-391 (1892 Lynn, Massachusetts ordinance); 2-Add-395 (1892 Spokane, Washington ordinance); 2-Add-398 (1893 Pittsburgh, Pennsylvania ordinance); 2-Add-400 (1893 Wilmington, Delaware ordinance); 2-Add-410 (1895 Canton, Illinois ordinance); 2-Add-417 (1895 Detroit, Michigan local act); 2-Add-421 (1896 Indianapolis, Indiana ordinance); 2-Add-424 (1896 Rochester, New York ordinance); 2-Add-428 (1898 Kansas City, Missouri ordinance); 2-Add-432 (1898 New Haven, Connecticut ordinance); 2-Add-435 (1899 Boulder, Colorado ordinance).

Pennsylvania covered States with "only about 4% of this Nation['s]" population. 1-ER-0067-0068.  But according to the very population estimates the district court cited, these States had nearly *22%* of the Nation's population, not 4%.  *See* 1-ER-0068 n.17 (U.S. population in 1860 was 31,443,321, with 3,880,735 people residing in New York, and 2,906,215 in Pennsylvania).  And even putting this significant miscalculation aside, the district court should not have relied on population totals at all.  *See supra* pp. 31-32.

The district court also rejected the historical analogues cited above because some of the later ordinances were passed "from 1872 through 1886," which the district court deemed too late to shed light on the meaning of the Fourteenth Amendment.  1-ER-0068.  *But see* 1-ER-0072 n.20 (treating an 1870 enactment as "'during' the Fourteenth Amendment's ratification for the sake of argument"). *Bruen* did not restrict the universe of permissible analogues to pre-1868 (or pre-1870) state laws, as the district court did.  *Bruen* simply discounted laws that "*contradict[ed]* the overwhelming weight of other, more contemporaneous historical evidence."  142 S. Ct. at 2155 (emphasis added) (internal quotation marks omitted).  And here, unlike in *Bruen*, there is *no* contemporaneous historical evidence that contradicts the laws the Attorney General has proffered.  Nor is there evidence suggesting that these laws were considered unconstitutional (or even

controversial) in the nineteenth century. *See, e.g.*, 3-ER-0522-0523 (Rivas Decl. ¶ 29); 3-ER-0455-0488 (Cornell Decl. ¶¶ 22-61); *infra* pp. 46-47.

### d. HRS § 134-A(a)(12): banks and financial institutions

As explained above, the district court erred in concluding that Plaintiffs had standing to challenge HRS § 134-A(a)(12)—which restricts firearms on "[t]he premises of any bank or financial institution . . . including adjacent parking areas," 1-Add-007—because they failed to identify a single bank or financial institution that would allow them to carry firearms on its premises in the absence of the provision. The district court doubly erred by rejecting the Attorney General's showing that HRS § 134-A(a)(12) falls within a centuries-long tradition of prohibiting firearms in sensitive commercial centers. This tradition dates back at least to the Statute of Northampton of 1328, which provided, among other things, that individuals generally could not "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 1-Add-311. Although *Bruen* interpreted the Statute of Northampton to apply only where an individual acted to terrify others, *see* 142 S. Ct. at 2140-42, the inclusion of "Fairs" and "Markets"—quintessential centers of commerce—is what matters here. Concern for the dangers posed by firearms in these locations made its way across the Atlantic, as the relevant language from the Statute of Northampton can be found verbatim in Founding Era laws. *See, e.g.*, 1-Add-305

43

(1786 Virginia law providing that "no man . . . [shall] go nor ride armed by night nor by day, in fairs or markets"); 1-Add-307-308 (1792 North Carolina law providing that "no man . . . [shall] go nor ride armed by night nor by day, in fairs [or] markets").

The district court discounted historical prohibitions on firearms in commercial centers, reasoning that financial institutions are not like historical commercial centers because they are not as congested as some of those centers. *See* 1-ER-0078-0079. But congestion is not the only relevant point of similarity. As Professor Saul Cornell explained, "bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics. Indeed, it was the very fact that individuals congregated in large numbers *and moved about freely, engaging in productive economic, cultural, and political activities* that was the reason arms were prohibited from these locations." 3-ER-0469-0470 (Cornell Decl. ¶ 42) (emphasis added). Similar interests underlay Hawaiʻi's restriction on carrying firearms in banks. *See* Testimony Before the H. Comm. on Judiciary & Hawaiian Affs. 53 (Mar. 21, 2023), https://perma.cc/Y7D8-USQD (testimony on behalf of Hawaii Bankers Ass'n) ("Given the elevated risk of danger in bank crimes that involve firearms, it makes good policy sense and is appropriate to restrict concealed firearms on bank premises."); *id.* at 59 (testimony on behalf of Hawaii Credit Union League) ("Credit unions and banks already have

a high risk of being robbed, and allowing concealed firearms into these establishments would definitely raise this risk, along with putting their staff and members in danger.").

The threat to productive economic activity in centers of commerce has been exacerbated, moreover, by the rapid advancements in firearms technology discussed above. *See supra* pp. 24-25; *Bruen*, 142 S. Ct. at 2132 (noting that "dramatic technological changes may require a more nuanced approach"). Even if historical commercial centers were often congested, any risks posed by eighteenth- or nineteenth-century firearms in those locations are surpassed by the risks that modern firearms—with their exponentially greater firing rates, ranges, and power—pose in congested and uncongested commercial centers alike.

Hawai'i's decision to restrict firearms in banks and financial institutions is further supported by numerous nineteenth-century laws—which went far beyond what HRS § 134-A(a)(12) does here—that prohibited the carrying of firearms in places where people regularly assembled for commercial or social purposes.[19] *See, e.g.*, 1-Add-316 (1817 New Orleans law forbidding weapons in public ball rooms); 1-Add-262 (1853 New Mexico law prohibiting firearms in balls and fandangos); 1-

---

[19] "The principle justifying such a decision, excluding arms from sensitive places such as fair and markets, was ancient and informed Founding era laws as well as those enacted in the era of the Fourteenth Amendment." 3-ER-0473 (Cornell Decl. ¶ 46).

Add-319 (1869 Tennessee law prohibiting pistols at "any fair, race course, or other public assembly"); 1-Add-322 (1870 Georgia law prohibiting firearms at "any . . . public gathering"); 1-Add-325 (1870 Texas law prohibiting firearms in any "ball room, social party or other social gathering"); 1-Add-327-328 (1875 Missouri law prohibiting firearms at social gatherings or any other non-military "public assemblage of persons"); 1-Add-333 (1889 Arizona law prohibiting firearms at any "place where persons are assembled for amusement" or "any other public assembly").

These laws were viewed as both constitutional and commonsensical when passed. As the Texas Supreme Court explained in an 1871 decision, "it appears to us little short of ridiculous, that any one should claim the right to carry upon his person" a range of weapons "into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." *English v. State*, 35 Tex. 473, 478-79 (1872).[20] A few years later, the Georgia Supreme Court likewise opined that

---

[20] *Bruen* described *English* as an "outlier[]," *see* 142 S. Ct. at 2153, but only in the context of addressing an 1871 Texas statute, challenged in that case, that prohibited the public carry of weapons without "reasonable grounds for fearing an unlawful attack," *see* 2-Add-364. *Bruen* did not discuss the passage in *English* dealing with places of public assembly where weapons could be banned. *See* 3-ER-0524-0526 (Rivas Decl. ¶ 32); *see also Owens*, 3 Tex. App. at 407 (seeing "no excuse" for "wearing deadly weapons" in places of public assembly, because "lives of innocent people there assembled [may be] placed in jeopardy or sacrificed").

46

"carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (1874). Contemporaneous decisions from other state supreme courts reached similar conclusions. The Tennessee Supreme Court, for example, recognized that "a man may well be prohibited from carrying his arms to church, or other public assemblage." *Andrews v. State*, 50 Tenn. 165, 182 (1871). And the Missouri Supreme Court stated—in a decision approvingly cited by *Bruen*, *see* 142 S. Ct. at 2155 n.30—that regulating firearms in a public "assemblage of persons" was "in perfect harmony with the constitution," in light of the need "to promote personal security" and "to check and put down lawlessness." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886); *see id.* (stating that restrictions on the "time and place" of carrying weapons are constitutional because "the legislature may . . . regulate the manner in which arms may be borne," and that such restrictions are "but a reasonable regulation of the use of such arms, and to which the citizen must yield, and a valid exercise of the legislative power"). These decisions, and the laws that they interpreted, are strong evidence that prohibitions on firearms in sensitive places such as banks and financial institutions—where persons regularly assemble for important commercial purposes—are constitutional.

47

Finally, while banks have existed since the Founding, they were understood at that time to be government instrumentalities. *See, e.g.*, Daniel J. Elazar, *Banking and Federalism in the Early American Republic*, 28 Huntington Libr. Q. 301, 303-04 (1965) ("the great majority of American banks" in the early Republic "were either state-owned joint stock companies in which the state was a major shareholder or were controlled by the state through special charter provisions," and "[t]he Bank of the United States was controlled in this same manner by the federal government"); Lev Menand, *Why Supervise Banks? The Foundations of the American Monetary Settlement*, 74 Vand. L. Rev. 951, 982-83 (2021) (the Bank of the United States (founded in 1791), the Bank of New York (1784), and Massachusetts Bank (1784) were "parastatal monopolies, part-owned by the government"). Government buildings—described as a presumptively "settled" sensitive location in *Bruen*, 142 S. Ct. at 2133—thus also supply a relevant analogue justifying the restrictions in HRS § 134-A(a)(12).

### C. The District Court Erred in Concluding That Plaintiffs Were Likely to Succeed on Their Challenge to the Private Property Default Rule.

The district court also erred in determining that Plaintiffs were likely to succeed on their challenge to HRS § 134-E, which prohibits carrying firearms on

the private property of another person without express authorization.[21]  As explained above, *see supra* section I.A, Plaintiffs lack standing to challenge HRS § 134-E because any injury they claim to suffer from not being able to carry firearms on another's property without consent is caused by that person's decision to withhold such consent.  And even if Plaintiffs had standing, their challenge would fail on the merits because: (1) the plain text of the Second Amendment does not protect a right to carry firearms on private property without consent, and (2) the Attorney General has demonstrated that HRS § 134-E is consistent with a historical tradition of firearms regulation stretching back to and before the Founding.

> ### 1. The District Court Erred in Concluding That Plaintiffs' Conduct Falls Within the Plain Text of the Second Amendment.

As with the challenged sensitive-place restrictions, *see supra* section I.B.1, the district court erred in concluding with respect to the private property default rule that Plaintiffs' conduct falls within the plain text of the Second Amendment. *Bruen*'s threshold inquiry requires an analysis of the Second Amendment's text that is "informed by history," *Bruen*, 142 S. Ct. at 2127, including the principles of "property law, tort law, and criminal law" that "provide[d] the canvas on which our

---

[21]  Plaintiffs challenged HRS § 134-E only as applied to private property held open to the public.  *See* 5-ER-1095-1096.

Founding Fathers drafted the Second Amendment," *GeorgiaCarry.Org*, 687 F.3d at 1264. Private property rights were exalted by the Founders, and a property owner's right to exclude was "one of the most essential sticks in the bundle of [property] rights," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (internal quotation marks omitted). At common law, entering the land of another without permission was unlawful, and States have long reinforced private property rights through the criminal offense of trespass. *See GeorgiaCarry.Org*, 687 F.3d at 1262; *id.* at 1263 (recounting this history). "[T]here is no constitutional infirmity when a private property owner exercises" its "right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right." *Id*. at 1264. How the right to exclude is applied, and how landowners signify authorization, is a matter of Hawai'i property law, not federal constitutional law.

HRS § 134-E does no more than vindicate the traditional right to exclude by preventing Plaintiffs from carrying firearms onto private property without consent. Setting a default rule does not substitute the State's judgment for that of property owners. It merely establishes a background presumption, and property owners retain the right to dictate the terms of entry onto their property as they wish. *See* 5-ER-1096 ("Plaintiffs here do not challenge that right of a private property owner."). This is not unconstitutional. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the

50

State is *responsible* for the specific conduct of which the plaintiff complains."). Nothing in *Bruen* changes this conclusion. The Supreme Court's ruling that individuals have a right to carry firearms "in public" does not address whether they have a presumptive right to do so on the *private property* of another, and *Bruen* nowhere suggested that the Second Amendment trumps private property rights.

The district court thus went astray at the outset in holding that the Second Amendment covers the right to carry firearms on private property held open to the public. But the court's conclusion also contradicted its own reasoning elsewhere in its order. The district court correctly acknowledged that "where a business revokes a licensee or invitee's permission to enter the business's property, the business is no longer a public place to that licensee or invitee," and "[t]he licensee or invitee's conduct would not be covered by the Second Amendment's plain text in such a scenario." 1-ER-0051. Likewise, the court explained that even for private property presumptively held open to the public, "[t]hat presumption can change, for instance, if an owner of the private property rescinds a general license or invitation to enter the property: such as limiting entrance to members or prohibiting certain attire." 1-ER-0082. It follows from these principles that when private property owners withhold consent for individuals to carry firearms on their property, the Second Amendment does not include a right to carry firearms on that property. Because all that HRS § 134-E does is prohibit individuals from carrying

firearms on private property without consent, it does not burden conduct that is covered by the Second Amendment.

**2.      HRS § 134-E Is Consistent with the Nation's Historical Tradition of Firearms Regulation.**

The district court also erred by dismissing the extensive historical support that the Attorney General presented for prohibitions on carrying firearms on private property without consent.  Beginning with the decades leading up to the Founding, a 1715 Maryland law prohibited "carry[ing] a gun, upon any person's land, . . . without the owner's leave."  1-Add-337.  And a 1721 Pennsylvania law made it unlawful for anyone to "carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner."  1-Add-341.  A New Jersey law passed the following year likewise made it an offense for anyone to "carry any Gun, or Hunt on the Improved or Inclosed Lands in any Plantation, and on other than his own, unless he have License or Permission from the owner."  1-Add-345; *see* 1-Add-351 (1771 New Jersey law making it unlawful for anyone to "carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor").  And a 1763 New York law made it unlawful to "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land

52

whatsoever . . . without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor." 1-Add-349.

During the Reconstruction Era, the tradition continued: an 1865 Louisiana law made it unlawful "for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." 1-Add-356. An 1866 Texas law forbade "any person or persons to carry fire-arms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor." 1-Add-360. And an 1893 Oregon law made it "unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." 1-Add-362.

These regulations are "well-established and representative historical analogue[s]." *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). Many are better characterized as "historical *twin[s]*" of HRS § 134-E, surpassing *Bruen*'s requirements. *Id.* Indeed, with respect to the relative burdens imposed by the regulations, some of the examples highlighted above required permission in writing, *see, e.g.*, 1-Add-349; 1-Add-351, whereas Hawaiʻi's law is more flexible, allowing for "[u]nambiguous written *or verbal* authorization," HRS § 134-E(b)(1) (emphasis added). And with respect to justification, Hawaiʻi's restriction, like its

53

predecessors, is rooted in respect for private property rights.  Professor Hendrik

Hartog has explained that "[t]he aim of these provisions was to protect the

powerful right of the property owners to prevent armed individuals from coming

on to their property without license."  Declaration of Hendrik Hartog ¶ 22, *Koons*,

No. CV 22-7464 (RMB/AMD) (D.N.J. Feb. 13, 2023), ECF No. 84 ("Hartog

Decl.").  Moreover, contrary to Plaintiffs' arguments before the district court, *see*

5-ER-1092-1093, these regulations were not aimed solely at hunting or poaching

on private land.  Rather, they generally regulated carrying firearms onto private

property without consent, and they *also*, in some cases, regulated hunting.  *E.g.*, 1-

Add-341 (proscribing "carry[ing] any gun *or* hunt[ing]" (emphasis added)); 1-Add-

345 (same); *see* Hartog Decl. ¶ 23 ("It was common for 18th and early 19th century

statutes to have multiple goals.").

    The district court dismissed all but one of the Attorney General's historical

analogues on the ground that they "concerned private property like residential

lands, which were not generally held open to the public."  1-ER-0085.  This was

error.  As Professor Hartog has explained, the 1771 New Jersey law cited by the

Attorney General in this litigation (*see* 1-Add-351) "extended to all varieties of

real property, including the typical 'businesses' of the times," Hartog Decl. ¶ 32;

*see id.* ¶ 34 ("Thus, under the 1771 law, if one entered a blacksmith's shop, one

needed the permission of the blacksmith or his agents if one meant to enter the

space armed."). Likewise, although the 1722 New Jersey law cited by the Attorney General applied to "Improved or Inclosed Lands in any Plantation," *see* 1-Add-345, Professor Hartog explained that: "The language of 'improved or inclosed' in the 1722 Act was not a limitation of the provision to fenced-in land. Rather, it would have marked two ways an owner would have given notice of his possession of the property at issue. Fencing-in was one way to give such notice of possession, but there were others, such as recording in county deed books and paying of taxes." Hartog Decl. ¶ 36.

Rather than engaging in any historical analysis, the district court simply observed that the Attorney General's analogues "concern prohibiting carrying firearms on enclosed premises or plantations," 1-ER-0085, and it looked to the definitions of the words "enclose," "land," and "plantation" in twenty-first-century dictionaries. *See id.* (citing *Enclose*, Black's Law Dictionary (11th ed. 2019); *Land*, Black's Law Dictionary (11th ed. 2019); *Plantation*, Oxford English Dictionary (3d ed. June 2006)). This approach was misguided. Contemporary dictionary definitions of isolated terms do not determine the meaning of centuries-old laws (as Professor Hartog's analysis makes clear). In any event, the district court misapplied *Bruen*—as it did in its analysis of HRS §§ 134-A(a)(1), (4), (9), and (12)—by requiring the Attorney General to proffer analogues that were identical to the challenged restriction in every respect. Historical laws requiring

permission to carry firearms on private property are analogous to HRS § 134-E, regardless of whether those laws dealt with "enclosed" lands, "plantations," or other kinds of private property.

## II. The District Court Erred in Its Application of the Remaining Preliminary Injunction Factors.

The district court also incorrectly assessed the remaining preliminary injunction factors.

On irreparable harm, the district court erred because, as already discussed, it incorrectly concluded that Plaintiffs were likely to succeed on the merits. *See Maryland Shall Issue*, 2023 WL 4373260 at *16 ("[T]he likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim."). With respect to many of their challenges, Plaintiffs have failed to show that they are harmed at all, let alone irreparably. *See supra* section I.A; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("A party who fails to show a substantial likelihood of standing is not entitled to a preliminary injunction." (internal quotation marks omitted)).

With respect to the balance of the equities and the public interest, the district court incorrectly dismissed the State's weighty interests in enforcing its duly enacted laws and protecting public safety. *See* 1-ER-0092-0095. The district court relied on the premise that "the vast majority of individuals in the United States with concealed carry permits are law-abiding," 1-ER-0093, but concealed carry

permit holders have been responsible for thousands of deaths nationwide over the past decade and a half, *see More Than 2,200 Non-Self Defense Deaths Involving Concealed Carry Killers Since 2007, Latest Violence Policy Center Research Shows*, Violence Pol'y Ctr. (Apr. 21, 2022), https://perma.cc/MXW4-AWYD; *see also Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring) (observing that "examples abound of 'law-abiding citizens' . . . who place the public safety in jeopardy," and discussing several high-profile examples where "shooters all were legally entitled to carry their concealed firearms, which they used to kill others"). Furthermore, recent studies suggest that widespread concealed carrying increases crime through a variety of mechanisms, including not just violence by permit holders, but also decreased law enforcement effectiveness and increased gun theft. *See* John J. Donohue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* 2-3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30190, June 2023), https://perma.cc/QD3C-4DBF; *see also* Paul M. Reeping et al., *State Gun Laws, Gun Ownership, and Mass Shootings in the US* 1, BMJ (Mar. 6, 2019), https://perma.cc/C2BS-KCWT (finding that "States with more permissive gun laws and greater gun ownership had higher rates of mass shootings"). And for all gun owners, regardless of their law-abiding nature, there is a documented risk of mistake and escalation. *See, e.g.*, *Unintentional Shootings*, EFSGV, https://perma.cc/8WJ8-2XHC (reporting that "nearly 500 people die from

unintentional firearm injuries" each year, and that "unintentional firearm injuries account for 37% of all nonfatal firearm injuries").

Contrary to the district court's decision, the balance of the equities and the public interest overwhelmingly favor the State. The State "suffers . . . irreparable injury" whenever it is barred "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (internal quotation marks omitted); *see Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."). This harm is especially significant here given the "law enforcement and public safety interests" implicated by firearms and gun violence. *King*, 567 U.S. at 1303; *see Goldstein*, 2023 WL 4236164, at *19 (observing that "[t]he Supreme Court recognized the connection between regulating firearms and public safety in *Heller*"). As the Legislature found in passing Act 52, "there are compelling interests in protecting public health, safety, and welfare from the serious hazards associated with firearms and gun violence." 1-Add-002. The district court failed to "give due weight to the serious consideration of the public interest" reflected in Act 52. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009). And here, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime . . . would be grave. These costs would affect members of the public, and

58

they would affect the Government which is tasked with managing handgun violence." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015). These considerations warranted the denial of an injunction, and the district court was incorrect to discount them.

### III.     In the Alternative, this Court Should Narrow the Injunction.

The district court's injunction should be vacated. But at a minimum, it should be narrowed to apply only as to Plaintiffs, only as to restrictions they challenged, and only to the extent that the challenged restrictions cover their intended conduct. It is a "well-established rule that injunctive relief must be tailored to remedy the specific harm alleged," *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotation marks omitted), and the district court erred by granting relief that extends far beyond the parties to this case. Furthermore, the district court erred by awarding facial relief with respect to several of the challenged provisions, *see* 1-ER-0095, because Plaintiffs failed to show that these provisions were "unconstitutional in all of [their] applications." *Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019); *see id.* (facial "challenges are considered the most difficult to mount successfully").

### CONCLUSION

The Court should vacate the district court's preliminary injunction.

Dated:  October 5, 2023

ANNE E. LOPEZ
   *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
   *Solicitor General*
NICHOLAS M. MCLEAN
   *First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
   *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

Respectfully submitted,

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
DANA A. RAPHAEL
   *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

BEN GIFFORD
   *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

## STATEMENT OF RELATED CASES

The Attorney General is not aware of any related cases pending in this Court.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 23-16164

I am the attorney or self-represented party.

**This brief contains** | 13,735 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [            ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Neal Kumar Katyal | **Date** | 10/05/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 5, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal