No. 23-16164

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of Hawaiʻi
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

---

## EXCERPTS OF RECORD (VOLUME 1 OF 6)

---

ANNE E. LOPEZ
    *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
    *Solicitor General*
NICHOLAS M. MCLEAN
    *First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
    *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
    *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
    *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as
Attorney General of the State of Hawaiʻi*

ANNE E. LOPEZ (7609)
 Attorney General of the State of Hawai'i
KALIKO'ONĀLANI D. FERNANDES (9964)
 Solicitor General
NICHOLAS M. MCLEAN (10676)
 First Deputy Solicitor General
Department of the Attorney General
 State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Tel.: (808) 586-1360
Email: kaliko.d.fernandes@hawaii.gov

NEAL K. KATYAL*
DANA A. RAPHAEL*
 Special Deputy Attorneys General
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel.: (202) 637-5600
Email: neal.katyal@hoganlovells.com

MARY B. MCCORD*
RUPA BHATTACHARYYA*
 Special Deputy Attorneys General
Institute for Constitutional
 Advocacy & Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: (202) 661-6607
Email: mbm7@georgetown.edu

BEN GIFFORD*
 Special Deputy Attorney General
Institute for Constitutional
 Advocacy & Protection
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
Tel.: (202) 662-9835
Email: bg720@georgetown.edu

*Pro Hac Vice

Attorneys for Defendant Anne E. Lopez, in her official capacity as
the Attorney General of the State of Hawai'i

KEVIN GERARD O'GRADY (8817)
Law Office of Kevin O'Grady, LLC
1164 Bishop Street
Suite 1605
Honolulu, Hawai'i 96813
Tel.: (808) 521-3367
Email: Kevin@KevinOGradyLaw.com

ALAN ALEXANDER BECK (9145)
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
Tel.: (619) 905-9105
Email: Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs Jason Wolford, Alison Wolford, Atom Kasprzycki, and
Hawaii Firearms Coalition

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

JASON WOLFORD; ALISON
WOLFORD; ATOM KASPRZYCKI;
HAWAII FIREARMS COALITION,

          Plaintiffs,

   v.

ANNE E. LOPEZ, in her official
capacity as the Attorney General of the
State of Hawaiʻi,

          Defendant.

Civil No. 1:23-cv-00265-LEK-WRP

**JOINT STIPULATION TO
CONVERT TEMPORARY
RESTRAINING ORDER TO
PRELIMINARY INJUNCTION
AND TO STAY FURTHER
PROCEEDINGS IN THE DISTRICT
COURT PENDING APPEAL**

District Judge:
Hon. Leslie E. Kobayashi

Magistrate Judge:
Hon. Wes Reber Porter

## JOINT STIPULATION TO CONVERT TEMPORARY RESTRAINING ORDER TO PRELIMINARY INJUNCTION AND TO STAY FURTHER PROCEEDINGS IN THE DISTRICT COURT PENDING APPEAL

Pursuant to Local Rule 10.5, Plaintiffs Jason Wolford, Alison Wolford,

Atom Kasprzycki, and Hawaii Firearms Coalition, and Defendant Anne E. Lopez,

in her official capacity as the Attorney General of the State of Hawaiʻi, by their

respective counsel, hereby agree and stipulate that the District Court's August 8,

2023, Order Granting in Part and Denying in Part Plaintiffs' Motion for Temporary

Restraining Order and Preliminary Injunction, Dkt. 66, shall be converted to a

preliminary injunction, on the same basis and for the same reasons as those given

in the August 8 Order. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th

Cir. 2017) (per curiam).  After the District Court converts the temporary

restraining order to a preliminary injunction, the parties shall, within forty-eight (48) hours, file a stipulated motion to voluntarily dismiss the appeal from the temporary restraining order, pursuant to Federal Rule of Appellate Procedure 42(b)(1), with each party responsible for bearing its own costs and fees in connection with that appeal.  Defendant expressly reserves its right to appeal—and intends to appeal—the preliminary injunction.  The parties agree that Defendant's request that the temporary restraining order be stayed pending appeal shall be construed as a request that the preliminary injunction be stayed pending appeal. *See* Dkt. 67 (motion); *see also* Dkt. 79 (reply).  The parties also agree that Plaintiffs' opposition to Defendant's request for a stay of the temporary restraining order, now construed as a request to stay the preliminary injunction, shall be construed as Plaintiffs' opposition to Defendant's request that the preliminary injunction be stayed pending appeal.  *See* Dkt. 78 (opposition).

The parties hereby agree and stipulate that all further deadlines and proceedings in this Court will be stayed during the pendency of Defendant's appeal from the preliminary injunction.

DATED: Washington, DC, September 6, 2023.

*/s/ Ben Gifford*

KALIKOʻONĀLANI D. FERNANDES
  Solicitor General
NICHOLAS M. MCLEAN
  First Deputy Solicitor General

3

1-ER-0005

NEAL K. KATYAL*
MARY B. MCCORD*
BEN GIFFORD*
RUPA BHATTACHARYYA*
DANA A. RAPHAEL*
  Special Deputy Attorneys General

* *Pro Hac Vice*

*Attorneys for Defendant*

DATED: Honolulu, Hawaiʻi, September 6, 2023.


/s/ Kevin O'Grady

KEVIN GERARD O'GRADY
ALAN ALEXANDER BECK

*Attorneys for Plaintiffs*


APPROVED AND SO ORDERED:

DATED: Honolulu, Hawaiʻi, September 6, 2023



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge


*Wolford et al. v. Lopez*, 1:23-cv-00265-LEK-WRP; JOINT STIPULATION TO
CONVERT TEMPORARY RESTRAINING ORDER TO PRELIMINARY
INJUNCTION AND TO STAY FURTHER PROCEEDINGS IN THE DISTRICT
COURT PENDING APPEAL

**1-ER-0006**

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI,  HAWAII FIREARMS COALITION,<br><br>              Plaintiffs,<br><br>     vs.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII;<br><br>              Defendant. | CV 23-00265 LEK-WRP |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

An alarming increase in violent crimes involving firearms in Hawai`i has heightened public concerns about guns and safety.[1]  State officials recently responded by enacting a law prohibiting the carrying or possessing of firearms in certain defined locations and premises, such as banks, beaches, and bars.  See generally Act 52 (June 2, 2023) (to be codified at Haw. Rev. Stat. Chapter 134) ("Act 52" and "the Act").  Whether a firearm regulation is consistent with the constitutional protection of the Second Amendment to carry

---

[1] See, e.g., Kirstin Downey, An Increase in 'Violent, Brazen' Crime Raises Concerns on Oahu, HONOLULU CIVIL BEAT (Aug. 30, 2022), https://www.civilbeat.org/2022/08/an-increase-in-violent-brazen-crime-raises-concerns-on-oahu/ (last visited Aug. 8, 2023).

handguns publicly for self-defense has been recently articulated in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022).  It is this powerful collision between Hawai`i officials' concern for the safety and welfare of its citizens and "the Second and Fourteenth Amendments['] [protections of] an individual's right to carry a handgun for self-defense outside the home" that is before this Court today.  See Bruen, 142 S. Ct. at 2122

In their present motion, Plaintiffs Jason Wolford ("J. Wolford"), Alison Wolford ("A. Wolford"), Atom Kasprzycki ("Kasprzycki"), and Hawaii Firearms Coalition ("HRC" and collectively "Plaintiffs") seek to enjoin the State of Hawai`i from enforcing certain provisions of the Act that prohibit carrying handguns in particular areas.[2]  These areas are: parking areas adjacent to buildings or offices owned, leased, or used by the State or a county; restaurants or bars serving alcohol, and their adjacent parking areas; beaches and parks, and their adjacent parking areas; and banks or financial institutions, and their adjacent parking areas.  In addition, Plaintiffs seek to

_____

[2] On June 23, 2023, Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion").  [Dkt. no. 7.]  Plaintiffs filed their reply on July 21, 2023.  [Dkt. no. 61.]  The instant Order addresses only Plaintiffs' request for a temporary restraining order ("TRO"). Plaintiffs' request for a preliminary injunction will be subsequently and separately briefed, heard, and ruled on.

enjoin enforcement of the Act's provision that prohibits carrying handguns on the private property of another person (for instance, a home, community association, or condominium) unless the property owner or manager gives unambiguous written or verbal authorization, or posts a sign on the property expressing authorization.  Hawai`i, acting through its attorney general, opposes the TRO Motion.[3]

Plaintiffs' TRO Motion is hereby granted in part and denied in part for the reasons set forth below, insofar as the following challenged provisions (or portions thereof) are enjoined:

-the portions of Haw. Rev. Stat. § 134-A(a)(1) that prohibit carrying firearms in parking areas owned, leased, or used by the State or a county which share the parking area with non-governmental entities, are not reserved for State or county employees, or do not exclusively serve the State or county building;

-the entirety of Haw. Rev. Stat. §§ 134-A(a)(4) and (a)(12);

-the portions of Haw. Rev. Stat. § 134-A(a)(9) prohibiting the carrying of firearms in beaches, parks, and their adjacent parking areas; and

---

[3] On July 14, 2023, Defendant Anne E. Lopez, in her official capacity as the Attorney General of the State of Hawai`i ("the State"), filed its Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining (ECF No. 7) ("Memorandum in Opposition.").  [Dkt. no. 55.]  Because Plaintiffs sue Defendant Anne E. Lopez in her official capacity as the State of Hawai`i Attorney General, [Complaint at ¶ 5,] their claims are against the State, see Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State." (citation omitted)).  This matter came on for hearing on July 28, 2023.

**1-ER-0009**

-the portion of Haw. Rev. Stat. § 134-E that prohibits carrying
  firearms on private properties held open to the public.

The TRO Motion is denied in all other respects.

## BACKGROUND

Plaintiffs filed their Verified Complaint for
Declaratory and Injunctive Relief ("Complaint") on June 23,
2023.  [Dkt. no. 1.]  Plaintiffs' Complaint and TRO Motion
challenge five State of Hawai`i laws on the grounds that the
laws violate either the First Amendment, Second Amendment,
and/or Fourteenth Amendment of the United States Constitution.
Specifically, Plaintiffs challenge the following Hawai`i laws:
(1) Haw. Rev. Stat. § 134-A(a)(1); (2) Haw. Rev. Stat. § 134-
A(a)(4); (3) Haw. Rev. Stat. § 134-A(a)(9); (4) Haw. Rev. Stat.
§ 134-A(a)(12); and (5) Haw. Rev. Stat. § 134-E.  See Complaint
at ¶¶ 57–58; TRO Motion, Mem. in Supp. at 3.  Plaintiffs,
however, take care to state that they

> do not challenge the prohibitions in all areas
> under [the Act], instead, [they] challenge only a
> limited subset that impose particularly egregious
> restrictions on their Second Amendment right to
> bear arms.

[Complaint at ¶ 42.]

On June 2, 2023, Hawai`i Governor Josh Green, M.D.,
signed into law Hawai`i Senate Bill No. 1230 - A Bill for an Act
Relating to Firearms.  The Act was passed "to clarify, revise,
and update Hawaii's firearms laws to mitigate the serious

4

hazards to public health, safety, and welfare associated with
firearms and gun violence, while respecting and protecting the
lawful exercise of individual rights." Act 52, § 1 at pgs. 1-2.
Amongst other things, and relevant here, the Act "defines
locations and premises within the State where carrying or
possessing a firearm is prohibited . . . ." Id. at pg. 2. The
Act further provides: "In prohibiting carrying or possessing
firearms in certain locations and premises within the State,
this Act is intended to protect areas in which carrying or
possessing dangerous weapons has traditionally been restricted,
such as schools and other places frequented by children,
government buildings, polling places, and other analogous
locations." Id.

   Chapter 134 of the Hawai`i Revised Statutes relates to
Hawaii's regulations and laws for firearms, ammunition, and
dangerous weapons. Part I concerns the general regulations
provided in Haw. Rev. Stat. Chapter 134. Under Chapter 134
part 1, the chief of police of a county within the State may
grant licenses to carry a pistol or revolver – either concealed
or unconcealed – if an applicant meets certain requirements.
See generally Haw. Rev. Stat. § 134-9. Section 2 of the Act
amended part I of Chapter 134 to include the following language,
in pertinent part:

5

§ 134-A   **Carrying or possessing a firearm in certain locations and premises prohibited; penalty.**  (a)  A person with a license issued under section 134-9, or authorized to carry a firearm in accordance with title 18 United States Code section 926B or 926C, shall not intentionally, knowingly, or recklessly carry or possess a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, while in any of the following locations and premises within the State:

  (1)  Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for court proceedings, legislative business, contested case hearings, agency rulemaking, or other activities of state or county government;

  . . . .

  (4)  Any bar or restaurant serving alcohol or intoxicating liquor as defined in section 281-1 for consumption on the premises, including adjacent parking areas;

  . . . .

  (9)  Any beach, playground, park, or adjacent parking area, including any state park, state monument, county park, tennis court, golf course, swimming pool, or other recreation area or facility under control, maintenance, and management of the State or a county, but not including an authorized target range or shooting complex;

  . . . .

        (12) The premises of any bank or financial
            institutions as defined in
            section 211D-1, including adjacent
            parking areas;

      . . . .

    . . . .

       (f)  Any person who violates this section
shall be guilty of a misdemeanor.

Act 52, § 2 at pgs. 3-6, 10 (emphases in original and some

emphases and quotation marks omitted).  Section 2 of the Act

further provides:

    **§ 134-E  Carrying or possessing a firearm
on private property of another person without
authorization; penalty.** (a)  A person carrying a
firearm pursuant to a license issued under
section 134-9 shall not intentionally, knowingly,
or recklessly enter or remain on private property
of another person while carrying a loaded or
unloaded firearm, whether the firearm is operable
or not, and whether the firearm is concealed or
unconcealed, unless the person has been given
express authorization to carry a firearm on the
property by the owner, lessee, operator, or
manager of the property.

    (b)  For purposes of this section, express
authorization to carry or possess a firearm on
private property shall be signified by:

       (1)  Unambiguous written or verbal
           authorization; or

       (2)  The posting of clear and conspicuous
           signage at the entrance of the building
           or on the premises,

by the owner, lessee, operator, or manager of the
property, or agent thereof, indicating that
carrying or possessing a firearm is authorized.

7

(c)  For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person" means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner, lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided that nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d)  This section shall not apply to a person in an exempt category identified in section 134-ll(a).

(e)  Any person who violates this section shall be guilty of a misdemeanor.

Id. § 2 at pgs. 14-16 (emphases in original and some emphases and quotation marks omitted).[4]  In short, § 134-A(a) lists

---

[4] Although these statutes have not yet been numerated in the Hawai`i Revised Statutes, for simplicity this Court will cite to the nomenclature used in Act 52.

8

**1-ER-0014**

"sensitive places" where individuals with a license to carry firearms are prohibited from carrying their firearms. Section 134-E creates a default rule that individuals with a license to carry firearms cannot carry their firearms on private property unless the owner of that property gives them consent. These pertinent provisions became effective on July 1, 2023. See id. § 18 at pg. 76.

J. Wolford, A. Wolford, and Kasprzycki ("the Individual Plaintiffs") are individuals living in the County of Maui. See Complaint at ¶¶ 1-3. They allege that each was granted, and now possess, a permit to carry a firearm pursuant to § 134-9. See id. at ¶¶ 59(E) (as to J. Wolford), 60(E) (as to A. Wolford), 61(E) (as to Kasprzycki). HFC is an organization incorporated under Hawai`i law with its principal place of business in Honolulu, Hawai`i. It has thirty-three members with valid concealed carry permits. HFC brings this suit on behalf of its members with a concealed carry permit issued by any county in Hawai`i. [Id. at ¶ 4.] The Individual Plaintiffs are members of HFC. [Id. at ¶ 51.] The Individual Plaintiffs allege they are impacted by the challenged regulations because they each attend and frequent beaches, parks, and their adjacent parking areas, bars and restaurants serving alcohol and their adjacent parking areas, banks and their adjacent parking areas, and parking areas adjacent to

9

government buildings, all within the County of Maui.  See generally id. at ¶¶ 59-61.  As such, Plaintiffs contend §§ 134-A(a)(1), (4), (9), and (12) are unconstitutional restrictions on their ability to carry their firearms in these respective places, in violation of the Second and Fourteenth Amendment.

Further, Kasprzycki owns and operates his own business along with the associated business property/space.  His business is open to the public.  See id. at ¶¶ 62-63, 66b.[5]  Kasprzycki states that some of his clients do not support the concealed carrying of firearms.  Kasprzycki does not wish to involve his business in any issues related to the Second Amendment.  [Id. at ¶¶ 64-65.]  He alleges that, "[o]nce H.R.S. § 134-E goes into effect, [he] will not put up a sign or otherwise give prior written or verbal consent to carry a firearm.  But for H.R.S. § 134-E Kasprzycki would allow people to carry firearms in his business."  [Id. at ¶ 65.]  Accordingly, Kasprzycki and HFC contend § 134-E compels speech in violation of the First Amendment.

Plaintiffs bring this action against the State for injunctive and declaratory relief under 42 U.S.C. § 1983,

---

[5] Plaintiffs' Complaint has two consecutive paragraphs numbered 66.  For clarity, the Court refers to the first paragraph 66 as "paragraph 66a" and the second paragraph 66 as "paragraph 66b."

alleging the State violated, and continues to violate, their First, Second, and Fourteenth Amendment rights by restricting certain conduct of individuals with a license to carry firearms. They bring facial and as-applied challenges to §§ 134-A(a)(1), (a)(4), (a)(9), (a)(12), and 134-E.  In the TRO Motion, Plaintiffs seek a TRO to enjoin the challenged laws.  See TRO Motion at 2.

## STANDARD

"[T]he legal standards applicable to TROs and preliminary injunctions are 'substantially identical.'" Washington v. Trump, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (quoting Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

> A party moving for preliminary injunctive relief must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) that the balance of harm tips in the movant's favor, and (4) that the injunction is in the public interest.  See All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  "The first factor—likelihood of success on the merits—is the most important factor."  California by & through Becerra v. Azar, 950 F.3d 1067, 1083 (9th Cir. 2020) (en banc) (citation and quotation marks omitted). Additionally, when a party seeks a preliminary injunction against the government, as is the case here, the balance of the equities and public interest factors merge.  See Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)).

**1-ER-0017**

Chamber of Com. of the U.S. v. Bonta, 62 F.4th 473, 481 (9th Cir. 2023).

## DISCUSSION

I.   **The Second Amendment and the United States Supreme Court**

    A.   **Prior to the Twenty-First Century**

Ratified in 1791, the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  To this Court's knowledge, the Supreme Court's first mention of the people's right to bear arms was in the infamous case Dred Scott v. Sandford, 60 U.S. 393 (1857).  There, the Supreme Court held that, because Dred Scott was black, he was not a United States citizen and, as such, he was not entitled to any of the rights guaranteed to United States citizens under the United States Constitution.  See id. at 404-05.  The Supreme Court reasoned, in part, that slaveholder states could not have regarded black people as citizens because then

> it would give them the full liberty of speech in
> public and in private upon all subjects upon
> which its own citizens might speak; to hold
> public meetings upon political affairs, and **to
> keep and carry arms wherever they went.**  And all
> of this would be done in the face of the subject
> race of the same color, both free and slaves, and
> inevitably producing discontent and
> insubordination among them, and endangering the
> peace and safety of the State.

1-ER-0018

Id. at 417 (emphasis added).  A possible implication of the Supreme Court's statement is that United States citizens could "keep and carry arms wherever they went."  See id.  To that end, this Court notes two vital points: (1) to the extent that the Supreme Court intended to make any holding regarding the right to bear arms in Dred Scott, its statement was purely dictum;[6] and (2) Dred Scott is no longer good law because it was superseded by the Thirteenth and Fourteenth Amendments.

In United State v. Cruikshank, the Supreme Court held that the Second Amendment contains the right "of bearing arms for a lawful purpose.  This is not a right granted by the Constitution.  Neither is it in any manner dependent upon that instrument for its existence."  92 U.S. 542, 553 (1875) (internal quotation marks omitted).  The Supreme Court further held that the Second Amendment "is one of the amendments that has no other effect than to restrict the powers of the national government . . . ."  Id.  In other words, the Second Amendment does not create a right; rather, it protects a preexisting right from federal overreach.

---

[6] "A statement is dictum when it is made during the course of delivering a judicial opinion, but . . . is unnecessary to the decision in the case and is therefore not precedential." Cetacean Cmty. v. Bush, 386 F.3d 1169, 1173 (9th Cir. 2004) (alteration in Cetacean Cmty.) (brackets, citation, and internal quotation marks omitted).

In _Presser v. Illinois_, the Supreme Court reaffirmed the holding in _Cruikshank_ and held that a military code which prohibited "bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, d[id] not infringe the right of the people to keep and bear arms." 116 U.S. 252, 264-65 (1886). The Supreme Court further concluded that states could not "prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government." _Id._ at 265. In dictum, the Supreme Court in _Robertson v. Baldwin_, mentioned that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons . . . ." 165 U.S. 275, 281-82 (1897).

Forty-two years later, the Supreme Court in _United States v. Miller_, stated that: "With obvious purpose to assure the continuation and render possible the effectiveness of [Militias (as set forth in Article I, Section 8 of the United States Constitution),] the declaration and guarantee of the Second Amendment were made." 307 U.S. 174, 178 (1939). Thus, the Supreme Court concluded that the Second Amendment "must be interpreted and applied with that end in view." _Id._ Under that interpretation, the Supreme Court held that the Second Amendment

14

did not guarantee the right to keep and bear "a shotgun having a barrel of less than eighteen inches in length" because there was insufficient evidence to show that such a firearm had "some reasonable relationship to the preservation or efficiency of a well regulated militia." Id. (internal quotation marks and citation omitted). The Supreme Court did not decide another Second Amendment case until almost seventy years later.

**B.   In the Twenty-First Century**

In 2008, the Supreme Court in District of Columbia v. Heller, held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). The Supreme Court came to its conclusion by analyzing the text of the amendment. After its textual analysis, it reviewed some historical background to determine whether that historical background comported with its conclusion; it held that it did. See, e.g., id. at 592-95.

The Supreme Court emphasized, however, that "the right secured by the Second Amendment is not unlimited." Id. at 626. It cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." Id.

15

Although the Supreme Court conducted some historical analysis of the people's right to bear arms, the majority did not provide any reasoning or analysis as to why those enumerated prohibitions pass "constitutional muster," see id. at 629; indeed, it presumed them to be constitutional restrictions, see id. at 627 n.26 ("We identify these **presumptively** lawful regulatory measures only as examples; our list does not purport to be exhaustive." (emphasis added)). The Supreme Court in the end held that a Washington, D.C. ban on firearms in the home violated the Second Amendment. See id. at 628–29. Following on the heels of Heller, in 2010, the Supreme Court in McDonald v. City of Chicago, held that the Second Amendment rights recognized in Heller were incorporated against the states through the Fourteenth Amendment. See 561 U.S. 742, 791 (2010).[7]

After Heller and McDonald, many courts implemented a two-step test to review challenges to regulations that invoked protections secured by the Second Amendment. The two-step test required courts to: (1) determine if the challenged law affected protected conduct under the Second Amendment; and, if so, then (2) apply the appropriate level of scrutiny, based upon the extent to which the challenged law implicates the Second

---

[7] Justice Scalia's concurring opinion begins on page 791, but, for clarity, this cite is to the majority opinion ending on that page.

Amendment right.  *See, e.g.*, <u>Young v. Hawaii</u>, 992 F.3d 765, 783-84 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022).

In 2022, the Supreme Court issued its decision in <u>New York State Rifle & Pistol Ass'n v. Bruen</u>, 142 S. Ct. 2111 (2022).  There, the Supreme Court relied on <u>Heller</u> and <u>McDonald</u> and held that the two-step test – sometimes called "means-end scrutiny" – utilized by lower courts was wrong and declined to adopt it.  <u>See Bruen</u>, 142 S. Ct. at 2125–26.  Instead, it held

> that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." <u>Konigsberg v. State Bar of Cal.</u>, 366 U.S. 36, 50, n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961).

<u>Id.</u> at 2126.

After establishing this constitutional standard for reviewing challenges under the Second Amendment, the Supreme Court applied it to a challenge to a New York regulation.  That regulation required applicants who sought a license to conceal carry a firearm outside of the home to prove that they had a "proper cause" to be issued such a license.  <u>See id.</u> at 2123.

17

The Supreme Court determined that the plain text of the Second Amendment covered the conduct that the challenged law regulated because the Second Amendment "presumptively guarantees . . . a right to bear arms in public for self-defense." Id. at 2135 (internal quotation marks omitted).  Because "the Second Amendment guarantees a general right to public carry," the Supreme Court stated the government had "the burden . . . to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." Id. at 2135.  It further stated that, "[o]nly if [the government] carr[ies] that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect [the challenger's] proposed course of conduct." Id.

The Supreme Court then reviewed the historical evidence that the government provided.  It clustered the historical evidence into five categories: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." Id. at 2135–36. The Supreme Court did not find the government's evidence regarding any of these categories convincing.  As to the first category, it stated that, "[a]t the very least, we cannot conclude from this historical record that, by the time of the

18

founding, English law would have justified restricting the right
to publicly bear arms suited for self-defense only to those who
demonstrate some special need for self-protection." Id. at
2142.  As to the second category, it concluded that "in the
century leading up to the Second Amendment and in the first
decade after its adoption, there is no historical basis for
concluding that the pre-existing right enshrined in the Second
Amendment permitted broad prohibitions on all forms of public
carry." Id. at 2145.

> For the third category, it summarized:
>
> The historical evidence from antebellum America
> does demonstrate that **the manner** of public carry
> was subject to reasonable regulation.  Under the
> common law, individuals could not carry deadly
> weapons in a manner likely to terrorize others.
> Similarly, although surety statutes did not
> directly restrict public carry, they did provide
> financial incentives for responsible arms
> carrying.  Finally, States could lawfully
> eliminate one kind of public carry—concealed
> carry—so long as they left open the option to
> carry openly.

Id. at 2150 (emphasis in Bruen).

> In beginning its discussion of the fourth category,
the Supreme Court relied on Dred Scott, stating that Dred Scott
"indirectly affirmed the importance of the right to keep and
bear arms in public." Id.  It further explained that Chief
Justice Taney, writing for the Court in Dred Scott, "recognized
. . . that public carry was a component of the right to keep and

bear arms–a right free blacks were often denied in antebellum America." Id. at 2151. It is important to reiterate that Dred Scott's discussion of a right to bear arms is dictum. See supra Discussion Section I.A. Moreover, to the extent that the mention of a right to bear arms in Dred Scott provides any historical insight into the legal bounds of the Second Amendment, it should be cautioned that it is equally plausible that Chief Justice Taney exaggerated certain rights in a pursuit to justify the enslavement of black Americans. In any event, after some additional historical analysis, the Supreme Court in Bruen concluded that, "[a]s for Reconstruction-era state regulations, there was little innovation over the kinds of public-carry restrictions that had been commonplace in the early 19th century." Id. at 2152.

Finally, in assessing the fifth category, the Supreme Court stated that the late-19th century evidence, particularly as to evidence regarding the newer western states, "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." Id. at 2154. The Supreme Court ultimately held that:

> At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to "all Americans" the right to bear commonly used arms

> in public subject to certain reasonable, well-
> defined restrictions. Heller, 554 U.S. at 581,
> 128 S. Ct. 2783. Those restrictions, for
> example, limited the intent for which one could
> carry arms, the manner by which one carried arms,
> or the exceptional circumstances under which one
> could not carry arms, such as before justices of
> the peace and other government officials. Apart
> from a few late-19th-century outlier
> jurisdictions, American governments simply have
> not broadly prohibited the public carry of
> commonly used firearms for personal
> defense. . . .

Id. at 2156.

### C. Framework for Analyzing this Nation's Historical Tradition

Bruen's directive is clear: once an individual's conduct is covered by the plain text of the Second Amendment, the burden is on the government to establish that the regulation is consistent with this Nation's historical tradition of firearm regulation. See id. at 2129–30. The exception being, of course, exclusion of firearms in traditionally "sensitive places." Then, and only then, is a gun regulation constitutional. Although the burden is on the government to proffer evidence that the regulation is consistent with this Nation's historical tradition of firearm regulation, a reviewing court must analyze the government's proffered historical evidence. A core element of this analysis is assessing how "the Second Amendment's historically fixed meaning applies to new circumstances . . . ." Id. at 2132. This task "will often

21

involve reasoning by analogy" and "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are **relevantly similar**." Id. (emphasis added) (citation and internal quotation marks omitted).

In assessing whether regulations are "relevantly similar under the Second Amendment," courts should look "toward at least two metrics: **how** and **why** the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132-33 (emphases added). But, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory black check." Id. at 2133. "[A]nalogical reasoning requires only that the government identify a well-established and representative **analogue**, not a historical **twin**. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Id. (emphases in Bruen).

Relevant here, "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—" the Supreme Court stated it was "aware of no disputes regarding the lawfulness of such prohibitions." Id. (citations omitted). The Supreme Court

22

assumed, then, that it was "settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.  And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in **new** and analogous sensitive places are constitutionally permissible."  Id. (emphasis in Bruen).

Moreover, "when it comes to interpreting the Constitution, not all history is created equal.  'Constitutional rights are enshrined with the scope they were understood to have **when the people adopted them**.'"  Id. at 2136 (emphasis in Bruen) (quoting Heller, 554 U.S. at 634–35, 128 S. Ct. 2783).  The Supreme Court stated that "courts must be careful when assessing evidence concerning English common-law rights"; it stated, for example: "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."  Id.  It also "guard[ed] against giving postenactment history more weight than it can rightly bear."  Id.  While it is true that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision[,] . . . . to the extent that history contradicts what the text says, the text controls."  Id.

23

at 2137 (citations and internal quotation marks omitted).  That
is, "post-ratification adoption or acceptance of laws that are
**inconsistent** with the original meaning of the constitutional
text obviously cannot overcome or alter that text."  Id.
(emphasis in Bruen) (quotation marks and citations omitted).

The Supreme Court also "acknowledge[d] that there is
an ongoing scholarly debate on whether courts should primarily
rely on the prevailing understanding of an individual right when
the Fourteenth Amendment was ratified in 1868 when defining its
scope (as well as the scope of the right against the Federal
Government)."  Id. at 2138 (citations omitted).  But, it did
"not address this issue . . . because . . . the public
understanding of the right to keep and bear arms in both 1791
and 1868 was, for all relevant purposes, the same with respect
to public carry."  Id.  With this framework and understanding,
this Court turns to the instant case.

II.  **Preliminary Matters**

    A.  **Standing**

The State contends Plaintiffs lack standing to
challenge Haw. Rev. Stat. §§ 134-A(a)(4), (a)(12), and 134-E.
See Mem. in Opp. at 7, 16, 19.  Because standing goes to the
issue of whether this Court has jurisdiction to hear the case,
the State's argument must be addressed.  See Spokeo, Inc. v.
Robins, 578 U.S. 330, 338 (2016) (stating that the standing

1-ER-0030

doctrine "ensure[s] that federal courts do not exceed their authority . . . ." (citation omitted)).  To establish the "irreducible constitutional minimum of standing," a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Id. at 338 (quotation marks and citations omitted).  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  Id. at 339 (citation and internal quotation marks omitted).

        Here, Plaintiffs possess standing to challenge §§ 134-A(a)(4), (a)(12), and 134-E.  As to § 134-A(a)(4), which prohibits carrying firearms in bars and restaurants that serve alcohol, the State argues Plaintiffs "have not identified any bar or restaurant that has authorized (or would authorize) [them] to carry a gun into their premises."  [Mem. in Opp. at 7.]  The State's argument fails because § 134-A(a)(4) flatly bans the carrying of firearms in bars and restaurants that serve alcohol.

        The Individual Plaintiffs allege they frequently visit and will continue to visit bars and restaurants that serve alcohol.  See Complaint at ¶¶ 59(H) ("Jason Wolford has in the

25

past regularly frequented the following areas which are . . .

restaurants that serves alcohol or intoxicating liquor . . . on

the premises, and he has, in the past carried a concealed arm

with his permit in the locations referenced herein, and he

intends to . . . in the future, own, possess, and carry a

firearm with his concealed carry permit in these locations and

locations like them."); 60(H) (same as to A. Wolford); 61(H)

(same as to Kasprzycki).  Because they frequently visit these

spaces in their ordinary daily lives, the Individual Plaintiffs

sufficiently establish that they face imminent harm that is

concrete and particularized.  See Haw. Rev. Stat. § 134-A(f)

(stating a violation of § 134-A constitute misdemeanors).  The

harm is fairly traceable to the State's conduct because the

Individual Plaintiffs face criminal penalties if they are found

to be carrying a firearm in that prohibited spaces.  See

O'Handley v. Weber, 62 F.4th 1145, 1161 (9th Cir. 2023) ("[T]he

traceability requirement is less demanding than proximate

causation, and thus the causation chain does not fail solely

because there are several links or because a single third

party's actions intervened." (citations and internal quotation

marks omitted)).  Stated another way, "[i]t is possible to draw

a causal line from" the State implementing the challenged

provision to Plaintiffs' potential criminal penalties for

26

violating the challenged provisions, "even if [the causal line] is one with several twists and turns."  See id. at 1161–62.

The State's argument appears to also rely on § 134-E. That is, because § 134-E requires private commercial owners to give express permission to carry firearms on their property, if a private owner gives permission to carry firearms on their property, then an individual is not penalized and, thus, there is no harm.  But, § 134-E does not negate the default ban set forth in § 134-A(a)(4).  Before the enactment of § 134-A(a)(4), the Individual Plaintiffs – as licensed firearm carriers – could conceal carry into bars and restaurants serving alcohol without facing criminal penalty.  Although the owners of those establishments could prohibit the Individual Plaintiffs from carrying in their establishments, the Individual Plaintiffs did not face criminal penalties.

Despite the possibility that a commercial owner could override the prohibition set forth in § 134-A(a)(4), without more, such a third-party's possible intervention does not destroy the causal chain needed to show traceability.  See O'Handley, 62 F.4th at 1161; see also Winsor v. Sequoia Benefits & Ins. Servs., LLC, 62 F.4th 517, 525 (9th Cir. 2023) (stating a plaintiff must allege "a substantial probability" that the defendant caused the alleged harm (citation and internal quotation marks omitted)).  Finally, the Individual Plaintiffs'

27

injury can also be redressed by a favorable judicial decision because a favorable judicial decision would enjoin the restriction set forth in § 134-A(a)(4) and the accompanying criminal penalty for any violation.  The Individual Plaintiffs therefore have standing to challenge § 134-A(a)(4).[8]

The State contests Plaintiffs' standing to challenge § 134-A(a)(12) for the same reason as it provided for § 134-A(a)(4).  See Mem. in Opp. at 16 ("As with bars and restaurants serving alcohol, Plaintiffs lack standing because they provide no allegations or evidence that any financial institution has authorized (or would authorize) carrying firearms on it premises.").  This Court's analysis in finding that the Individual Plaintiffs have standing to challenge § 134-A(a)(4) equally applies to this argument and, therefore, the Individual Plaintiffs have standing to challenge § 134-A(a)(12).[9]  See Complaint at ¶¶ 59(I) ("Jason Wolford has in the past regularly

---

[8] In a similar case involving challenges to a New Jersey regulation for, among other things, restrictions on "sensitive places" including bars and restaurants serving alcohol, the district court similarly found that the plaintiffs had standing to challenge that particular "sensitive place" regulation.  See Koons v. Platkin, Civil No. 22-7464 (RMB/AMD), 2023 WL 3478604, at *46 (D.N.J. May 16, 2023), appeal filed, 2023 WL 3478601 (June 9, 2023).

[9] Although the State does not contest the Individual Plaintiffs' standing as to the other challenged provisions under § 134-A(a), the Individual Plaintiffs have standing to challenge those provisions for the same reason they have standing to challenge §§ 134-A(a)(4) and (a)(12).

28

frequented . . . banks or financial institutions . . . and has in the past carried a concealed arm with his permit and intends to . . . in the future, own, possess, and carry a firearm with his concealed carry permit in these locations and locations like them."); 60(I) (same as to A. Wolford); 61(I) (same as to Kasprzycki).

The State argues Plaintiffs lack standing to challenge § 134-E because "property owners could prohibit firearms even if HRS § 134-E were enjoined, leaving Plaintiffs in the exact same position." [Mem. in Opp. at 19.] It also contends that, "because Plaintiffs 'fail[] to provide any statement . . . indicating that [they] will not seek permission before carrying in a private property,' they 'fail to establish an injury-in-fact.'" [Id. at 19 n.35 (alterations in original) (quoting Frey v. Nigrelli, 21 CV 05334 (NSR), 2023 WL 2473375, at *9 (S.D.N.Y. Mar. 13, 2023)).[10]] The Individual Plaintiffs submitted supplemental declarations stating they have been to private businesses in the County of Maui while carrying a concealed firearm and would continue to frequent those businesses but for the threat of prosecution under § 134-E. See Reply, Exh 5 at PageID.1328-30 (Suppl. Decl. of Jason Wolford) at ¶¶ 3-4; id. at

---

[10] An appeal has been filed. Frey v. Bruen, No. 23-365 (2d Cir. Mar. 16, 2023).

PageID.1331-33 (Suppl. Decl. of Alison Wolford) at ¶¶ 3-4; id. at PageID.1334-36 (Suppl. Decl. of Atom Kasprzycki) at ¶¶ 8-9.

The State's first argument is not persuasive because, although private businesses could prohibit firearms on their premises, some would not.  Plaintiffs provide declarations from some business owners, each stating that the business owner has not displayed a sign allowing the public to carry firearms on the premises, but if § 134-E was no longer in effect, the business owner would allow the public to conceal-carry firearms on the premises.  See generally Reply, Exh. 3 (collection of declarations from Maui business owners).  The State's second argument also fails because the Individual Plaintiffs have proffered some evidence that, but for § 134-E, they would conceal-carry their firearms on private businesses' properties.  Further, the Individual Plaintiffs' declarations imply that before § 134-E became effective they would not seek explicit permission from those businesses.  Plaintiffs would conceal carry in businesses in their ordinary daily lives and were not faced with criminal penalty.  Insofar as businesses did not display a sign prohibiting the carrying of firearms on their premises, the Individual Plaintiffs could conceal carry freely and the businesses would unlikely be aware that the Individual Plaintiffs were conceal carrying.

Accordingly, the Individual Plaintiffs have standing to challenge § 134-E. Because the Individual Plaintiffs have standing to pursue their challenges to §§ 134-A(a)(4), (a)(12), and 134-E, this Court does not address HFC's standing. See Leonard v. Clark, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." (citation omitted)).

### B.   Facial and As-Applied Challenges

Plaintiffs raise facial and as-applied challenges to the challenged provisions. See, e.g., Complaint at ¶¶ 73–77. "A facial challenge is . . . a claim that the law or policy at issue is unconstitutional in all its applications." Bucklew v. Precythe, 139 S. Ct. 1112, 1127 (2019). "[A] plaintiff can only succeed in a facial challenge by establish[ing] that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in all of its applications." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008) (some alterations in Wash. State Grange) (citation and internal quotation marks omitted).

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Sabri

v. United States, 541 U.S. 600, 609 (2004)
(internal quotation marks and brackets omitted).
Facial challenges also run contrary to the
fundamental principle of judicial restraint that
courts should neither "'anticipate a question of
constitutional law in advance of the necessity of
deciding it'" nor "'formulate a rule of
constitutional law broader than is required by
the precise facts to which it is to be applied.'"
Ashwander v. TVA, 297 U.S. 288, 346-347 (1936)
(Brandeis, J., concurring) (quoting Liverpool,
New York & Philadelphia S.S. Co. v. Commissioners
of Emigration, 113 U.S. 33, 39 (1885)). Finally,
facial challenges threaten to short circuit the
democratic process by preventing laws embodying
the will of the people from being implemented in
a manner consistent with the Constitution. We
must keep in mind that "'[a] ruling of
unconstitutionality frustrates the intent of the
elected representatives of the people.'" Ayotte
v. Planned Parenthood of Northern New Eng., 546
U.S. 320, 329 (2006) (quoting Regan v. Time,
Inc., 468 U.S. 641, 652 (1984) (plurality
opinion)). . . .

Id. at 450-51 (some alterations in Wash. State Grange).

     "An as-applied challenge, meanwhile, focuses on the

statute's application to the plaintiff, and requires the court

to only assess the circumstances of the case at hand."

Rodriguez Diaz v. Garland, 53 F.4th 1189, 1203 (9th Cir. 2022)

(citation and internal quotation marks omitted). "Facial and

as-applied challenges differ in **the extent to** which the

invalidity of a statute need be demonstrated." Isaacson v.

Horne, 716 F.3d 1213, 1230 (9th Cir. 2013) (emphasis in

Isaacson) (quotation marks and citation omitted). "While a

successful challenge to the facial constitutionality of a law

invalidates the law itself, a successful as-applied challenge invalidates only the particular application of the law." Italian Colors Rest. v. Becerra, 878 F.3d 1165, 1175 (9th Cir. 2018) (citation and internal quotation marks omitted).

Importantly, though, the Ninth Circuit has also stated:

> "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010). Instead, the distinction matters primarily as to the remedy appropriate if a constitutional violation is found. Id. The substantive legal tests used in facial and as-applied challenges are "invariant[.]" . . .

Isaacson, 716 F.3d at 1230 (some alterations in Isaacson).

## III. **Likelihood of Success on the Merits**

"To establish a substantial likelihood of success on the merits, [a plaintiff] must show 'a fair chance of success.'" In re Focus Media, Inc., 387 F.3d 1077, 1086 (9th Cir. 2004) (quoting Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)). This Court reviews each challenged provision in turn to determine whether Plaintiffs establish a likelihood of success on the merits on their respective facial and as-applied challenges.

### A.   Haw. Rev. Stat. § 134-A(a)(1) – Government Buildings and Adjacent Parking Areas

Plaintiffs request a TRO to enjoin the portion of § 134-A(a)(1) that prohibits people from carrying a firearm in parking areas adjacent to government buildings.  See TRO Motion, Mem. in Supp. at 24.  During the hearing for the TRO Motion, Plaintiffs' counsel clarified Plaintiffs' challenge to § 134-A(a)(1).  Plaintiffs' counsel stated that Plaintiffs were not seeking to enjoin the portion of § 134-A(a)(1) that covers all parking areas adjacent to government buildings.  Instead, Plaintiffs seek to enjoin § 134-A(a)(1) insofar as it prohibits carrying firearms in the parking areas mentioned in their Complaint and parking areas similar to those listed areas.

Specifically, Plaintiffs challenge the following parking areas and/or parking areas similar to them: the parking area adjacent to Ace Hardware and Ross which shares a parking area with the County of Maui Department of Motor Vehicles ("Maui DMV"); see Complaint at ¶¶ 59(J)(i), 60(J)(i); see also Complaint, Exh. 5 (map depicting the parking area of Ace Hardware, Ross, and the Maui DMV); and the parking area adjacent to D.T. Fleming Beach Park in the County of Maui which shares a parking area with a county or State lifeguard building, see

1-ER-0040

Complaint at ¶¶ 60(F)(vii), 61(G)(iv).[11]  This Court therefore construes Plaintiffs' challenge as an as-applied challenge and not a facial challenge.  In the hearing on the TRO Motion, counsel for the State maintained that the State's position concerning § 134-A(a)(1) is that the word "adjacent" in that provision related to parking areas means "parking areas that exclusively serve a particular place."  It appears, then, that the State's position is that a parking area is adjacent to a government building if the parking area exclusively serves the government building.  Section 134-A(a)(1) as written does not stand for what the State now claims it does.  The State, however, appears to concede that the parking areas adjacent to government buildings which are listed in the Complaint are not considered areas protected by § 134-A(a)(1).

Plaintiffs' challenge to § 134-A(a)(1) is much narrower than initially raised in the TRO Motion.  In light of the parties' updated positions, this Court will only address the limited challenge to § 134-A(a)(1) insofar as it prohibits carrying firearms in parking areas adjacent to government buildings where the parking area: (1) does not exclusively serve the government building; (2) is not reserved for government

---

[11] During the hearing on the TRO Motion, Plaintiffs' counsel also stated they are not challenging the prohibition of carrying firearms in parking areas that are reserved for government employees.

employees, *i.e.*, non-government employees use the parking area; and (3) shares a parking area with a non-governmental building. Although the State appears to concede that some of Plaintiffs' challenged areas are not sensitive places – particularly the two parking areas listed in the Complaint – this Court must analyze the challenged areas, nonetheless, because Plaintiffs challenge portions of § 134-A(a)(1) as written.

This Court begins with determining whether the regulated conduct in the challenged portion of § 134-A(a)(1) is covered by the plain text of the Second Amendment. Section 134-A(a)(1) prohibits, in part, a person who is licensed to carry or possess a firearm from carrying or possessing a firearm in "parking areas" that are "owned, leased, or used by the State or a county . . . ." Haw. Rev. Stat. § 134-A(a)(1). To the extent that the challenged parking areas are shared with non-government buildings, do not exclusively serve the government building, and are not reserved for government employees, they are generally public spaces.[12] It is clear, therefore, that the plain text of the Second Amendment covers the regulated conduct set forth in § 134-A(a)(1), as narrowly construed for the present challenge,

---

[12] Neither party explicitly addresses privately owned parking areas that are held open to the public. This Court does not address that issue here, but this Court's discussions regarding Haw. Rev. Stat. §§ 134-A(a)(4) and 134-E are applicable to privately owned parking areas that are held to the public. See *infra* Discussion Sections III.B, III.E.

36

because the Supreme Court has conclusively held that "[t]he Second Amendment's plain text . . . presumptively guarantees . . . a right to 'bear' arms in public for self-defense." See Bruen, 142 S. Ct. at 2135.  The question, then, is whether the challenged parking areas are sensitive places such that the State may permissibly limit the general right to carry firearms publicly for self-defense.

Importantly, Heller and Bruen did not concern the issue of determining the legal bounds of "sensitive places." But more importantly, the parties are not in dispute as to the specific areas being challenged by Plaintiffs.  That is, the parties agree that the specific parking areas that Plaintiffs seek to enjoin the State from enforcing its firearms ban are **not** sensitive places.

At this stage, the State fails to meet its burden in rebutting Plaintiffs' narrow challenge to § 134-A(a)(1).  In fact, the State at oral argument conceded to Plaintiffs' position.  For the sake of completeness, however, this Court addresses the State's lack of evidence.  In its memorandum in opposition, the State fails to cite to any historical evidence regarding possible analogues to restrictions on parking areas that some government buildings use (limited in scope to the aforementioned areas).  This Court is "not obligated to sift the historical materials for evidence to sustain" the State's law.

37

See Bruen, 142 S. Ct. at 2150.  "That is [the State's] burden."
See id.  In lieu of historical analogues, the State cites in a
footnote to a case from the Eastern District of Virginia for the
proposition that some parking areas could or should be viewed as
sensitive spaces because they are used by many people including
children.  See Mem. in Opp. at 18 n.33 (citing United States v.
Masciandaro, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009)).

Masciandaro, however, is not binding on this Court, is
not relevant, and, in light of Bruen, is no longer good law.
There, the district court conducted the now-rejected "means-end
scrutiny" analysis and, as such, no historical analysis was
properly conducted.  See Masciandaro, 648 F. Supp. 2d at 789
(stating the challenged regulation survived strict scrutiny,
intermediate scrutiny, or an undue burden analysis).  Although
the district court concluded that parking lots "are even more
sensitive" because "parking lots are extensively regulated
thoroughfares frequented by large numbers of strangers,
including children," see id. at 790, the district court did not
assess any evidence of historical analogues.  The district
court, of course, did not have the benefit of the Bruen analysis
in informing its decision, and therefore the State's reliance on
Masciandaro is unhelpful here.

Section 134-A(a)(1) does not differentiate between
government parking areas.  It is possible that a parking area

1-ER-0044

adjacent to a post office is not a constitutionally protected
sensitive place whereas the parking area adjacent to the State's
legislative building is a constitutionally protected sensitive
place.  This Court makes no finding as to this possibility, but
the State's concessions during the hearing on the TRO Motion
show that the State understands this important distinction.
Section 134-A(a)(1) in its current form does not reflect the
State's now-held understanding.

      Because the State fails to "justify" the portion of
§ 134-A(a)(1) that regulates the challenged government parking
areas by "demonstrat[ing] that the regulation is consistent
with this Nation's historical tradition of firearm regulation,"
it is likely that "the Constitution presumptively protects that
conduct."  See Bruen, 142 S. Ct. at 2125.  Accordingly,
Plaintiffs have a likelihood of success on the merits as to
their as-applied challenge to § 134-A(a)(1); namely, the
challenge to the portions of § 134-A(a)(1) that prohibit
carrying firearms in parking areas owned, leased, or used by the
State or county which share the parking area with non-
governmental entities, are not reserved for State or county
employees, and/or do not exclusively serve the State or county
building.

      This Court notes that this conclusion is, and should
be, narrowly construed.  The two parking areas listed in the

1-ER-0045

Complaint, and similarly situated parking areas next to a government building, fall within the category of areas being challenged.  The parking area shared by the Maui DMV, Ace Hardware, and Ross meet at least some of these criteria because that parking area is shared with non-governmental entities.  As to the parking area next to the lifeguard station at D.T. Fleming Beach Park, that parking area is also covered by some of these criteria because the parking area does not exclusively serve the lifeguard station; that is, members of the public also use that parking area when they go to the beach.  To the extent that there are other parking areas adjacent to a government building that meet some of these challenged criteria, this Court does not address the State's argument that those areas are sensitive places under § 134-A(a)(1) because the State has not proffered evidence or cited any legal authority to support their contention.

> **B.   Haw. Rev. Stat. § 134-A(a)(4) – Bars and Restaurants Serving Alcohol and Adjacent Parking Areas**

Plaintiffs also seek a TRO to enjoin § 134-A(a)(4) in its entirety.  <u>See</u> TRO Motion, Mem. in Supp. at 21–22.  This Court therefore analyzes this challenge as a facial and as-applied challenge.  Section 134-A(a)(4) prohibits a person with a license to carry a firearm from carrying a firearm in "[a]ny bar or restaurant serving alcohol or intoxicating

40

liquor . . . for consumption on the premises, including adjacent parking areas[.]"  The State argues Plaintiffs fail to satisfy their burden of showing that the plain text of the Second Amendment covers the conduct regulated in § 134-A(a)(4).  See Mem. in Opp. at 7–8.  The State is incorrect.

 "The Second Amendment's plain text . . . presumptively guarantees  . . . a right to bear arms **in public** for self-defense."  Bruen, 142 S. Ct. at 2135 (emphasis added) (internal quotation marks omitted).  In analyzing the text of the Second Amendment, the Supreme Court held that the "definition of 'bear' naturally encompasses **public** carry."  Id. at 2134 (emphasis added).  Because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms[,]" id., it follows that there is nothing in the Second Amendment's plain text that makes a distinction between public places.  The Second Amendment's plain text, therefore, also naturally encompasses places that are generally held open to the public.  To be sure, Bruen uniformly rejected the respondents' argument that a state is permitted "to condition handgun carrying in **areas frequented by the general public** on a showing of a nonspeculative need for armed self-defense in those areas."  See id. at 2135 (emphasis added) (citation and internal quotation marks omitted); see also id. at 2148 ("[T]he surety laws [of the mide-19th century] did not **prohibit** public carry in

41

**locations frequented by the general community.**" (first emphasis in <u>Bruen</u>)).  Put differently, for the respondents in <u>Bruen</u> to justify the regulation, they needed to show that prohibiting the carrying of firearms in areas frequented by the general public was consistent with this Nation's historical tradition.  The Supreme Court held that they did not make such a showing.

While bars and restaurants are private businesses, they are generally held open to the public, *i.e.*, they are frequented by the general public.  Members of the public have a general invitation or license to enter those businesses' properties.  That invitation or license is not absolute, of course, and may be revoked if, for example, an invitee or licensee is engaging in unlawful behavior or behavior that the business deems unacceptable.  But, the general rule is that members of the public are welcome to enter those establishments.  Thus, the conduct of carrying a firearm in a bar or restaurant that serves alcohol is covered by the plain text of the Second Amendment because those establishments are public to the extent that members of the public are invitees or licensees who may enter those establishments during business hours, unless their invitation or license is revoked.

Although not dispositive of the issue, this understanding of the word "public" also comports with the common use of the word "public" in this general context.  See *Public*,

**1-ER-0048**

BLACK'S LAW DICTIONARY (11th ed. 2019) ("Open or available for all to use, share, or enjoy."). The use of the word "public" or derivations of this word in some Hawai`i laws further illustrates this common understanding of the word. Hawaii's disorderly conduct law, for instance, includes businesses in its definition of "public place." See Haw. Rev. Stat. § 711-1101(1) ("A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person: . . . . (e) Impedes or obstructs, for the purpose of begging or soliciting alms, any person in any **public place** . . . ." (emphasis added)); Haw. Rev. Stat. § 711-1100 ("**'Public place'** means a place to which the public or a substantial group of person has access and includes . . . **places of amusement or business** . . . ." (emphases added)).

Hawaii's law prohibiting discriminatory practices in public places incorporates a similar definition. See Haw. Rev. Stat. § 489-3 ("Unfair discriminatory practices that deny, or attempt to deny, a person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a **place of public accommodation** on the basis of race; sex, including gender identity or expression; sexual orientation; color; religion; ancestry; or disability, including the use of a service animal, are prohibited." (emphasis added));

43

Haw. Rev. Stat. § 489-2 ("'Place of public accommodation' means a **business** . . . of any kind whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the **general public** as customers, clients, or visitors. . . ." (emphases added)).  So does Hawaii's laws governing intoxicating liquors.  See Haw. Rev. Stat. § 281-1 ("'Public place' means any publicly owned property or **privately owned property open for public use or to which the public is invited for entertainment or business purposes.**" (emphasis added)).

Some federal laws similarly classify private businesses held open to the public as public places.  See, e.g., 42 U.S.C. § 2000a(a)-(b) (statue prohibiting discrimination or segregation in places of public accommodations and including within "a place of public accommodation" "establishments which serve[] the public" whose "operations affect commerce").  In sum, based on a common understanding of the word "public," it is not controversial for Second Amendment purposes to classify certain private businesses held open to the public – *e.g.*, bars and restaurants serving alcohol – as public places.

Indeed, some district courts have reached the same conclusion that certain locations (and specifically bars and restaurants serving alcohol) held open to the public are covered by the Second Amendment's right to bear arms in public.  See,

e.g., Koons, 2023 WL 3478604, at *58 ("Plaintiffs' right to
carry for self-defense in public naturally encompasses entry
onto the property of another, **provided** that such property is
held open to the public and entry is otherwise lawful."
(emphasis in Koons)); Antonyuk v. Hochul, 1:22-CV-0986
(GTS/CFH), 2022 WL 16744700, at *71 (N.D.N.Y. Nov. 7, 2022)
("The Court finds that the Second Amendment's plain text covers
the conduct in question (i.e., carrying a concealed handgun for
self-defense in public in any establishment issued a license for
on-premise consumption pursuant to . . . the alcoholic beverage
control law where alcohol is consumed) . . . ." (first
alteration in Antonyuk) (internal quotation marks omitted)),
*stayed*, 2022 WL 18228317 (2d Cir. Dec. 7, 2022).

        It is important to note, however, that this conclusion
is not without caveats.  The right to bear arms in public is
"not a right to keep and carry any weapon whatsoever in any
manner whatsoever and for whatever purpose."  See Bruen, 142 S.
Ct. at 2128 (quotation marks and citation omitted).  In cases
where a business revokes a licensee or invitee's permission to
enter the business's property, the business is no longer a
public place to that licensee or invitee.  The licensee or
invitee's conduct would not be covered by the Second Amendment's
plain text in such a scenario.  Similarly, if a business is
closed or otherwise restricts access to the public, the business

would not be considered to be held open to the public.  This Court's conclusion is narrow; it only concludes that, to the extent that the conduct regulated by § 134-A(a)(4) is covered by the plain text of the Second Amendment, Plaintiffs have met their burden.

Because the plain text of the Second Amendment covers Plaintiffs' conduct of carrying a firearm in a bar or restaurant that serves alcohol, it is presumptively protected under the Constitution.  The burden shifts to the State to justify its regulation by showing that such a regulation is consistent with this Nation's historical tradition of firearm regulation.  The State attempts to establish § 134-A(a)(4)'s constitutionality by citing to "[a] 1746 New Jersey law prohibit[ing] the selling of 'any strong Liquor' to members of the militia[.]"  [Mem. in Opp. at 8 (quoting Mem in Opp., Decl. of Nicholas M. McLean ("McLean Decl."), Exh. 2 (1746 N.J. Laws 301-12 (An Act for better settling and regulating the Militia of this Colony of New Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions, ch. 84)) at § 26).]

That law is not relevant here because it restricted militia members from being sold strong liquors.  Such a law may be important to ensure militia members are not intoxicated for the protection and security of the state, but it does not implicate the general public's right to bear arms.  Prohibiting

46

militia members from being sold certain types of alcohol is not closely analogous to restricting all individuals who are licensed to publicly carry a firearm from entering a bar or restaurant serving alcohol.

The State also cites to a 1756 Delaware law and a 1756 Maryland law that similarly restricted either militia officers from meeting near an inn or tavern, or militia members from being intoxicated on "any Muster-day."   See id. at 8-9 (citing McClean Decl., Exh. 3 (An Act for establishing a Militia in this Government (Delaware, 1756), *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service(Arthur Vollmer, ed. 1947)), pt. 3 at 10-15, Exh. 4 (An Act for Regulating the Militia of the Province of Maryland (1756), *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service (Arthur Vollmer, ed. 1947)), pt. 5 at 83-108).   Those laws are also unpersuasive in finding that there was a national historical tradition of prohibiting members of the public – rather than members of the militia – from public carrying in places serving alcohol.

The same principle holds true for the State's reliance on a 1780 Pennsylvania law that prohibited non-commissioned officers or privates from "parading drunk" and militia companies or battalions from meeting at taverns on days of military exercises.   See id. at 9 (citing McLean Decl., Exh. 5 (An Act

47

for the Regulation of the Militia of the Commonwealth of
Pennsylvania (1780), ch. 902), § 45 (§ 57, P.L.); § 48 (§ 60,
P.L.), 12th rule, *reprinted in* The Selective Serv. Sys., 2
Backgrounds of Selective Service (Arthur Vollmer, ed. 1947),
pt. 11 at 75-104).  Other citations to similar militia laws also
fail for the same reason.  See id. at 9 n.13.

The State further cites multiple laws from the mid- to
late-19th century that regulated firearm possession by
intoxicated individuals.  See id. at 9 n.14.  For instance, an
1867 Kansas law prohibited "any person under the influence of
intoxicating drink" from "carrying on his person a pistol . . .
or other deadly weapon . . . ."  [McLean Decl., Exh. 14 (An Act
to prevent the carrying of Deadly Weapons, ch. 12) at § 1).]  An
1883 Missouri law also prohibited any person from carrying a
firearm or other deadly weapon "when intoxicated or under the
influence of intoxicating drinks."  [Id., Exh. 15 (An Act to
amend section 1274, article 2, chapter 24 of the Revised
Statutes of Missouri, entitled "Of Crimes and Criminal
Procedure") at § 1.[13]]  An 1883 Wisconsin law made it "unlawful
for any person in a state of intoxication, to go armed with any
pistol or revolver."  [Id., Exh. 16 (1883 Wis. Sess. Laws 290

_____

[13] This Act also prohibited the concealed carrying of
firearms as well as carrying firearms in churches, schools, an
election precinct on election day, courtrooms during court
sessions, among other prohibitions.

(An Act to prohibit the use and sale of pistols and revolvers),
ch. 329) at § 3.]

Although this Court declines to make a finding as to
whether those laws conclusively establish a national historical
tradition of regulating intoxicated individuals from carrying
firearms, even if such a conclusion were assumed, § 134-A(a)(4)
is broader than those laws.  Section 134-A(a)(4) prohibits
people from carrying firearms in bars and restaurants that **serve
alcohol**.  It includes individuals carrying in those
establishments regardless of whether they are **consuming** alcohol.
The historical laws cited by the State do not reach as far as
§ 134-A(a)(4).  Those laws, therefore, do not show a national
historical tradition of regulating people from carrying firearms
in establishments serving alcohol irrespective of whether the
individual carrying is consuming alcohol.  For that reason,
reliance on those laws is unpersuasive to support the
restriction set forth in § 134-A(a)(4).

The State also relies on a few laws prohibiting people
from carrying firearms where alcohol is sold.  An 1853 New
Mexico law, for instance, prohibited people from carrying
firearms in a "Ball or Fandango" and "room adjoining said ball
where Liquors are sold . . . ."  [McLean Decl., Exh. 19 (1853
N.M. Laws 67-69 (An Act Prohibiting the carrying of a certain
class of Arms, within the Settlements and in Balls)) at § 3).]

49

An 1879 New Orleans city ordinance made it unlawful "for any person to carry a dangerous weapon, concealed or otherwise, into any . . . tavern . . . ." [Id., Exh. 20 (1879 New Orleans, La., Gen. Ordinances (Concealed weapons or otherwise in balls or theatres), tit. I, ch. 1, art. 1, *reprinted in* Jewell's Digest of the City Ordinances Together with the Constitutional Provisions, Act of the General Assembly and Decisions of the Courts Relative to Government of the City of New Orleans (Edwin L. Jewell, ed., New Orleans, L. Graham & Son 1882)) at 1-2.] An 1890 Oklahoma law made it unlawful for a person to carry a firearm into "any place where intoxicating liquors are sold . . . ." [Id., Exh. 17 (1890 Okla. Sess. Laws. at 495-96, ch. 25, art. 47 (Concealed Weapons)) at § 7.[14]] These legal restrictions focus on the availability or access to alcohol or intoxicating liquor (not the consumption) and therefore they are comparable to the statute at issue.

Courts have been cautioned that "the bare existence of [some] localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." See Bruen, 142 S. Ct. at 2154. This Court therefore does not give much weight to the State's reliance on

---

[14] This Act also prohibited the concealed carrying of firearms in addition to prohibiting carrying firearms in sensitive areas such as churches, schools, political conventions, public assemblies, and other areas.

**1-ER-0056**

the 1879 New Orleans city ordinance, which only represents one city ordinance and was enacted after the ratification of the Fourteenth Amendment.  In assessing the 1853 New Mexico law and the 1890 Oklahoma law here, this Court notes Bruen's warning against giving such western territorial laws too much weight because, at the time of the 1890 census, "Arizona, Idaho, **New Mexico, Oklahoma,** and Wyoming combined to account for only 420,000 of [the roughly 62 million people living in the United States at the time]—about two-thirds of 1% of the population." See id. (emphases added) (citation omitted).

This is confounding.  On one hand, Bruen emphasizes the need to sift through historical evidence to assess the tradition of firearm regulations.  On the other, Bruen seems to dismiss any law enacted unless it was done in a state where a significant percentage of the people – insofar as they counted as living in the United States – resided at the time that the Fourteenth Amendment was enacted.[15]  This is also a curious way of evaluating the weight of territorial laws.  Where did the people in the territories, other than the native people who were not counted in the census, come from?  Some were foreigners but

---

[15] For instance, Native Americans were not counted as part of the census until the Census Act of 1879.  See Censuses of American Indians, U.S. CENSUS BUREAU https://www.census.gov/history/www/genealogy/decennial_census_records/censuses_of_american_indians.html (last visited Aug. 8, 2023).

1-ER-0057

many were American citizens seeking the opportunity to own land.
See, e.g., the Homestead Act of 1862, ch. 75, 12 Stat. 392
(codified at 43 U.S.C. §§ 161–284) (repealed 1976).

The word "tradition" is defined as "an inherited,
established, or customary pattern of thought, action, or
behavior (such as a religious practice or a social custom)."
*Tradition*, Merriam-Webster.com, https://www.merriam-
webster.com/dictionary/tradition (last visited Aug. 8, 2023).
Should this Court consider territorial laws as reflecting the
"Nation's historical tradition" because many of the people who
moved to the territories came from the states and brought
traditional thoughts and ways – legal governance, marriage,
agricultural practices, and the like – and enacted laws in the
territories reflecting those traditions?  That is, where New
Mexico, Oklahoma, and New Orleans enacted similar prohibitions,
does that reflect the national attitude at that time?  Laws
restricting the carrying of firearms have been described by some
legal scholars as being "widely enacted" by 1867.  See, e.g.,
Robert J. Spitzer, *Gun Law History in the United States and
Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 63–64
(2017).  If there is evidence of such laws being widely enacted,
although in territories rather than states, is the Court
necessarily compelled to discount these laws because the

52

majority national population resided in the states and not in the territories?  Bruen leaves these questions unanswered.

At this point in the matter before this Court, the State has offered few relevant laws and, therefore, this Court cannot conclude on the current record that the State has met its burden in establishing that § 134-A(a)(4) is consistent with this Nation's historical tradition of gun regulation.  That is, the State has failed to show there is a national historical tradition of prohibiting individuals from carrying firearms in bars and restaurants that serve alcohol and their adjacent parking areas.  Accordingly, and based solely on the evidence presented at this point, Plaintiffs are likely to succeed on the merits of their facial and as-applied challenge to § 134-A(a)(4).

**C.   Haw. Rev. Stat. § 134-A(a)(9) –
     Beaches, Parks, and Adjacent Parking Areas**

Plaintiffs request a TRO to enjoin the portions of § 134-A(a)(9) that prohibit carrying firearms at any beach, park, and adjacent parking area.  See TRO Motion, Mem. in Supp. at 19.  The State first argues that the conduct of carrying a firearm at beaches and parks is not covered by the plain text of the Second Amendment.  See Mem. in Opp. at 10.  The Court rejects the State's argument because beaches and parks in Hawai`i are public areas owned by the State.  See, e.g., Haw.

Rev. Stat. § 115-1 ("The purpose of this chapter is to guarantee the right of **public access** to the sea, shorelines, and inland recreational areas . . . ." (emphasis added)).  Because beaches, parks, and their adjacent parking areas are public areas, the carrying of firearms in those areas is covered by the plain text of the Second Amendment.  The burden shifts to the State to offer evidence that § 134-A(a)(9) is consistent with this Nation's historical tradition of gun regulation.

The State contends that, because it owns public parks and beaches, its "role as proprietor weighs in favor of upholding a regulation."  [Mem. in Opp. at 11.]  The State cites Nordyke v. King, 681 F.3d 1041 (9th Cir. 2012) (en banc), to support its contention, but that case is inapposite.  That case concerned an exception to a city ordinance that prohibited the carrying and possession of firearms on county property.  See Nordyke, 681 F.3d at 1044.  At issue was an exception to the general prohibition, which allowed the possession of a firearm on country property by an authorized participant of an event such as a gun show provided that, when an authorized participant was not in actual possession of the firearm, the firearm was secured.  See id.  The plaintiffs challenged the exception on Second Amendment grounds, but the Ninth Circuit held that the ordinance was constitutional because it "regulates the sale of firearms at Plaintiffs' gun shows only minimally, and only on

County property."  Id.  It further held that the plaintiffs
could not succeed on their claim "no matter what form of
scrutiny applies to Second Amendment claims."  Id. at 1045.  The
Ninth Circuit in Nordyke, however, predates Bruen and thus could
not apply Bruen's holding that the Second Amendment protects the
right to bear arms **in public**.  This Court therefore cannot apply
Nordyke's reasoning to the instant case.

The State asks this Court to make the distinction
"'between the government exercising the power to regulate or
license, as lawmaker, and the government acting as proprietor,
to manage its internal operation.'"  [Mem. in Opp. at 11
(quoting Nordyke, 681 F.3d at 1045 (cleaned up)).]  The State
makes this distinction to argue that it may regulate conduct on
its property when it is acting as a proprietor.  See id. at 11
n.17 (citations omitted).  This distinction in a post-Bruen
world makes no difference.  What matters at the first step of
the inquiry is whether the regulated conduct is covered by the
Second Amendment's plain text.

Relevant here, the determinative issue at the first
step is whether the conduct concerns the public carrying of
firearms irrespective of the proprietary interest the government
possesses.  If the government's capacity to act as a proprietor
was a determinative factor in the first step of the analysis,
then the fundamental right of public carry – as expressed fully

55

in Bruen – would be jeopardized.  Indeed, under such a theory, an argument could be made that the government possesses the unfettered power to restrict public carrying of firearms in many – if not most – public places because it has a proprietary interest in those areas.  Whether the government acted as a proprietor may have been relevant when assessing Second Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the Bruen analysis.

Next, the State argues "the nature of public parks and beaches clearly demonstrates that they are sensitive locations" because "[c]hildren and families congregate at parks and beaches" and "[p]arks and beaches often host crowded gatherings, like concerts, fairs, competitions, and cultural exhibitions, and they are places where important expressive activities occur."  [Mem. in Opp. at 11–12 (footnotes omitted).]  It is beyond question that: children and families congregate at beaches and parks in Hawai`i; beaches and parks are integral and highly valued in Hawaiian culture; and beaches and parks are critical components of Hawaii's economy.  Alas, these considerations by themselves do not matter under the Bruen analysis.  The Supreme Court recognizes that firearms can be prohibited in "sensitive places" consistent with the Second Amendment.  See Bruen 142 S. Ct. at 2133 (recognizing undisputed lawfulness of prohibitions in places such as legislatures,

56

polling places, courthouse, schools, and government buildings). But, for firearms to be prohibited in parks and beaches consistent with the Second Amendment, the State must come forth with "analogies to those historical regulations of 'sensitive places'" so this Court can "determine [whether] modern regulations prohibiting the carry of firearms in **new** and analogous sensitive places are constitutionally permissible." See id. (emphasis in Bruen). The record is absent of analogies to historical "sensitive places" for parks and beaches.

The State does not provide any evidence that this Nation has a historical tradition of regulating or prohibiting the carrying of firearms on beaches. Instead, it appears to analogize gun regulations regarding beaches with gun regulations regarding parks. Fair enough, this Court will therefore consider the issue of beaches and parks as operating under the same analysis. The State begins with the proposition that "[t]here were no modern-style parks in the era of the Second Amendment." See Mem. in Opp., Expert Decl. of Saul Cornell ("Cornell Decl.") at ¶ 55;[16] see also id. at ¶ 56 ("The creation of parks as we now know them began in the middle of the nineteenth century . . . ."). Plaintiffs, however, point to

---

[16] Saul Cornell is "the Paul and Diane Guenther Chair in American History at Fordham University." [Cornell Decl. at ¶ 3.]

reports that the Boston Common, established in 1634, served as a site for informal socialization, recreation, sports, entertainment, and celebrations.  See TRO Motion, Mem. in Supp. at 19 (quoting Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021)).  They further argue the City Hall Park in New York City "began as a 'public common' in the 17th century," and "New York's Bowling Green Park was established 'for the Recreation & Delight of the Inhabitants of [New York] City' in 1733." Id. at 19-20 (alteration by Plaintiffs) (quoting *The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation, available at https://on.nyc.gov/3hBZXfe (last visited June 23, 2022)).

     The question becomes whether parks at the ratification of the Second Amendment were sufficiently similar to today's parks.  If so, then an assessment must be made as to whether, at the time of the Second Amendment's ratification, guns were regulated in a similar manner as the State's gun regulation concerning parks.  The State appears to argue that parks, as we view them today, did not become common place until around 1850 and, therefore, the relevant historical period to scrutinize in determining the historical tradition of gun regulation involving parks should begin in 1850.  This Court addresses each scenario; namely, it addresses whether there is a historical tradition of

gun regulation, at the time of the Second Amendment's ratification, limiting public carry at parks when parks are (1) viewed similarly with modern parks or (2) not viewed similarly with modern parks.  Under either scenario, however, the State fails to meet its burden.

If, during the time of the Second Amendment's ratification, parks were sufficiently analogous to parks today, as Plaintiffs contend, then the State has not proffered evidence that there was a historical tradition of prohibiting the carrying of firearms in parks.  Plaintiffs have proffered some evidence that shows some cities in the 1700's had some form of a public park.  Because the State has not presented any evidence, it has not met its burden.  See Koons, 2023 WL 3478604, at *83 ("Despite the existence of such common lands since the colonial period, the State has failed to come forward with any laws from the 18th century that prohibited firearms in areas that today would be considered parks.").

If, during the time of the Second Amendment's ratification, parks were not sufficiently analogous to modern parks, as the State argues, then it urges this Court to consider the gun laws around the mid-19th century – when parks became more akin to modern parks – to determine whether § 134-A(a)(9) is consistent with those laws.  The State's position is misplaced.  The test in Bruen does not direct courts to look at

59

when a historical place became akin to the modern place being regulated.  Rather, the focus is on "determining whether a historical **regulation** is a proper analogue for a distinctly modern firearm **regulation**" which "requires a determination of whether two **regulations** are relevantly similar."  See Bruen, 142 S. Ct. at 2132 (emphases added) (citation and internal quotation marks omitted).  The distinction is subtle, yet materially significant.  See, e.g., id. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." (emphasis, citation, and internal quotation marks omitted)).

As such, the inquiry must start with comparing the challenged regulation and a historical analogue that is relevantly similar, if one exists.  For purposes of the TRO Motion, the Court finds that parks around 1791 were not comparable to modern parks.  The States' burden is thus to demonstrate a historical tradition of gun regulation prohibiting the carrying of firearms in public spaces that were relevantly similar to parks.  The State relies on: an 1858 ordinance adopted by the Board of Commissioners of New York's Central Park prohibiting people from carrying firearms within the park; an 1866 ordinance adopted by the Commissioners of Prospect Park in

the City of Brooklyn with a similar prohibition as the 1858
ordinance; and an 1868 Pennsylvania law prohibiting people from
carrying firearms or shooting birds in Fairmount Park in
Philadelphia.  See McLean Decl., Exhs. 21 (1858 N.Y.C., N.Y. *in
Minutes of Proceedings of the Board of Commissioners of the
Central Park for the Year ending April 30, 1958, (New York,
Wm. C. Bryant & Co. 1858)) at 166-68, 22 (1873 Brooklyn, N.Y.,
Park Ordinances (Ordinance No. 1), *reprinted in* Annual Reports
of the Brooklyn Park Commissioners 1861-1873 (1873) at 136,
art. 1) at § 4, 23 (1868 Pa. Laws 1083-90 (A Supplement to an
act entitled "An Act appropriating ground for public purposes in
the City of Philadelphia"), pt. II) at § 21.

     The 1858 and 1866 ordinances were local ordinances,
not state laws, passed by the respective board of commissioners,
both within New York.  Local ordinances reflect the citizenry's
values in the most basic and essential way.  Moreover, since the
parks were under local – not state – governance, it is not
surprising that state laws were silent about permissible conduct
in the parks.  The two ordinances were enacted by one of the
most populous states at the time, but the two ordinances reflect
only New York's historical tradition of gun regulations.  Taking
these ordinances into account along with the 1868 Pennsylvania
law, the State's evidence establishes that, at the time of the
Fourteenth Amendment's ratification in 1868, only about 4% of

this Nation had a historical tradition of prohibiting carrying firearms in parks. [17]  Even if the laws established a tradition of regulating carrying firearms in certain parks in Pennsylvania and New York, this Court cannot conclude that these laws sufficiently establish this Nation's historical tradition of gun regulation in parks by 1868.

Finally, the State cites numerous local ordinances that regulated firearms in parks, but those ordinances are from 1872 through 1886.  See Mem. in Opp. at 15 (citations omitted). Because those local ordinances were passed after the Fourteenth Amendment's ratification in 1868, the Court is constrained in considering them as to the Nation's historical tradition of gun regulation at the time of either the Second Amendment's ratification or the Fourteenth Amendment's ratification.  See Bruen, 142 S. Ct. at 2136 ("[W]e must also guard against giving postenactment history more weight than it can rightly bear"). [18]

---

[17] The population of the United States was 31,443,321 in 1860 with New York's population reported as 3,880,735 and Pennsylvania's population reported as 2,906,215.  See U.S. Census Bureau, https://www2.census.gov/library/publications/decennial/1900/volume-1/volume-1-p2.pdf (last visited Aug. 8, 2023), at Table VII (Population of states and territories, arranged geographically: 1790 to 1900), pg. xxii.

[18] The Supreme Court in Bruen "avoid[ed] another ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 or when the Bill of Rights was ratified in 1791."  142 S. Ct. at 2163 (Barrett, J.,

(. . . continued)

The State further contends "[t]here is a robust historical tradition of restricting guns in places like parks and beaches." [Mem. in Opp. at 14.]  It relies on a recent District of Maryland case, Maryland Shall Issue, Inc. v. Montgomery County, --- F. Supp. 3d ----, Civil Action No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023),[19] to support its position.  There, the district court found that the plaintiffs were not likely to succeed on the merits of their challenge to a Maryland regulation prohibiting the carrying of firearms at public parks, recreational facilities, and multipurpose exhibition facilities.  See Md. Shall Issue, 2023 WL 4373260, at *12.  After reviewing some historical laws, the district court concluded that those laws "demonstrate that there is 'historical precedent' from before, during, and after the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms in parks." Id. at *11 (quoting Bruen, 142 S. Ct. at 2131–32).  To the extent that the State relies on Maryland Shall Issue to support § 134-A(a)(9)'s restriction on

concurring) (citation and internal quotation marks omitted).  Regardless of that debate, the reliance on local ordinances that were enacted **after the ratification** of the Fourteenth Amendment cannot sufficiently assist in determining the prevailing understanding of the right to bear arms in public **at the time of ratification**.

[19] An appeal has been filed.  Md. Shall Issue, No. 23-1719 (4th Cir. July 10, 2023).

1-ER-0069

publicly carrying firearms in parks and on beaches, this Court respectfully disagrees with that district court's finding that the laws it reviewed demonstrate a national historical tradition of prohibiting carrying firearms in parks.

The district court there relied on the following laws and ordinances:

> an **1857 ordinance** stating that "[a]ll persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles" within Central Park in New York City, see First Annual Report on the Improvement of the Central Park, New York at 106 (1857); an **1870 law** enacted by the Commonwealth of Pennsylvania stating that "[n]o persons shall carry fire-arms" in Fairmount Park in Philadelphia, Pennsylvania, see Acts of Assembly Relating to Fairmount Park at 18, § 21.II (1870); an **1895 Michigan state law** providing that "No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles" within a park in the City of Detroit, see 1895 Mich. Local Acts at 596, § 44; and a **1905 ordinance** in Chicago, Illinois stating that "all persons are forbidden to carry firearms or to throw stones or other missiles within any of the Parks . . . of the City," 1905 Chi. Revised Mun. Code, ch. XLV, art. I, § 1562. Similar restrictions were enacted to bar the carrying of firearms in (I) Saint Paul, Minnesota, see Annual Reports of the City Officers and City Boards of the City of Saint Paul at 689 (**1888**); (2) Williamsport, Pennsylvania, see **1891** Williamsport, Pa. Laws and Ordinances at 141, § 1; (3) Wilmington, Delaware, see **1893** Wilmington, Del. Charter, Part VII, § 7; (4) Reading, Pennsylvania, see A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (**1897**); (5) Boulder, Colorado, see **1899** Boulder, Colo. Revised Ordinances at 157, § 511; (6) Trenton, New Jersey, see **1903** Trenton, N.J. Charter and

**1-ER-0070**

Ordinances at 390; (7) Phoenixville, Pennsylvania, see A Digest of the Ordinances of Town Council of the Borough of Phoenixville at 135, § 1 (**1906**); (8) Oakland, California, see **1909** Oakland, Cal. Gen. Mun. Ordinances at 15, § 9; (9) Staunton, Virginia, see **1910** Staunton, Va. Code, ch. II, § 135; and (10) Birmingham, Alabama, see **1917** Birmingham, Ala. Code, ch. XLIV, § 1544.

On a state level, in **1905**, Minnesota prohibited the possession of firearms within state parks unless they were unloaded and sealed by a park commissioner. 1905 Minn. Laws, ch. 344, § 53. In **1917**, Wisconsin prohibited bringing a "gun or rifle" into any "wild life refuge, state park, or state fish hatchery lands" unless it was unloaded and in a carrying case. 1917 Wis. Sess. Laws, ch. 668, § 29.57(4). In **1921**, North Carolina enacted a law prohibiting the carrying of firearms in both private and public parks without the permission of the owner or manager of that park. See 1921 N.C. Sess. Laws 53–54, Pub. Laws Extra Sess., ch. 6, §§ 1, 3.

Md. Shall Issue, 2023 WL 4373260, at *11 (alterations in Md. Shall Issue) (emphases added) (some citations omitted).

In finding that the cited laws demonstrated a national historical tradition of carrying firearms in parks, the district court relied on only one local ordinance that was in effect prior to the Fourteenth Amendment's ratification. The other sixteen laws or ordinances were passed after the Fourteenth Amendment's ratification, and nine of those laws were passed in the twentieth century. Of the sixteen laws and ordinances passed after the Fourteenth Amendment's ratification, fifteen of

those were passed **at least** twenty years after the Fourteenth Amendment's ratification.

Put another way: out of the seventeen laws the district court reviewed, only one local ordinance was enacted before the Fourteenth Amendment's ratification and only one state law was enacted "during" the time of the Fourteenth Amendment's ratification.[20]  This Court is not convinced that evidence of one local ordinance and one state law is sufficient to find that there was a national historical tradition of prohibiting the carrying of firearms in parks at the time of the Fourteenth Amendment's ratification.  As to the other fifteen laws passed at least twenty years after the Fourteenth Amendment's ratification, this Court is constrained from placing too much "weight" on "postenactment history" given <u>Bruen</u>'s directive to determine whether the modern prohibition against the carrying of firearms has a historical analogue that was clearly established at either the Second Amendment's ratification or the Fourteenth Amendment's ratification.  <u>See</u> <u>Bruen</u>, 142 S. Ct. at 2136.

---

[20] The 1870 Commonwealth of Pennsylvania law was enacted around two years after the Fourteenth Amendment's ratification, but this Court will consider the enactment as "during" the Fourteenth Amendment's ratification for the sake of argument.

Additionally, the ten most populated cities reviewed by the district court – New York City, Chicago, Philadelphia, Detroit, St. Paul, Wilmington, Trenton, Oakland, Birmingham, and Williamsport – amounted to roughly 9.3% of the total population of the United States in 1900.[21]  See U.S. CENSUS BUREAU, https://www2.census.gov/library/publications/decennial/1900/volume-1/volume-1-p2.pdf (last visited Aug. 8, 2023), at Table XXII (Population of cities having 25,000 inhabitants or more in 1900, arranged according to population: 1880 to 1900), pgs. lxix-lxx. This is certainly more than 4%, but what percentage that must be reached to find national representation and whether the general population of the United States must be considered when, presumably, there were at least some states, cities, or counties that did not have parks at the time are inquiries not considered in Bruen.  Based on the record before it, this Court cannot find that the laws and ordinances cited in Maryland Shall Issue, which covered, at most, less than ten percent of the United States' population, are sufficient to restrict this Nation's history and tradition of an individual's right to carry firearms

_____

[21] Although some of the ordinances or laws were enacted before or after 1900, this Court uses 1900 as a general time period to illustrate that these laws and ordinances did not reflect the state of the law applicable to the vast majority of the Nation.

in public.[22]  The State's reliance on <u>Maryland Shall Issue</u> is
therefore unpersuasive.

The State fails to meet its burden to show that there
is a national historical tradition prohibiting carrying firearms
in parks.  Because the State argues beaches are analogous to
parks to support its restriction on beaches, the State also
fails to meet its burden showing that there is a national
historical tradition prohibiting carrying firearms on beaches.
Finally, the State does not provide any evidence that
prohibiting carrying firearms in parking areas adjacent to parks
and beaches is consistent with this Nation's history and
tradition of gun regulation.  Accordingly, Plaintiffs are likely
to succeed on the merits of their facial and as-applied
challenge to the portions of § 134-A(a)(9) that prohibit
carrying firearms at beaches, parks, and their adjacent parking
areas.  <u>See</u> <u>Koons</u>, 2023 WL 3478604, at *85 ("Plaintiffs have
thus established a reasonable likelihood of success on their
Second Amendment challenge to Chapter 131's prohibition on
handguns at parks, beaches, and recreation areas, as well as the

---

[22] This Court is wary about calculating the percentage of
states' populations and it does not think comparing percentages
is dispositive.  This Court also does not make a finding as to
what percentage of the Nation's population is needed to be under
similar regulations to find a historical tradition, but less
than ten percent is likely too low of a percentage to represent
the Nation's population as a whole.

state regulation banning handguns at state parks."); Antonyuk,
2022 WL 16744700, at *67 (similar finding).

> **D.    Haw. Rev. Stat. § 134-A(a)(12) – Banks,**
> **Financial Institutions, and Adjacent Parking Areas**

Plaintiffs also request a TRO to enjoin § 134-A(a)(12)
in its entirety.  See TRO Motion, Mem. in Supp. at 23.  That
provision prohibits carrying a firearm on "[t]he premises of any
bank or financial institution . . . , including adjacent parking
areas[.]"  Haw. Rev. Stat. § 134-A(a)(12).

The State argues "banks and financial institutions
plainly are sensitive locations where carrying firearms may be
restricted[,]" in part because "[a]s the Hawai`i Bankers
Association testified during legislative hearings on Act 52,
'the elevated risk of danger in bank crimes that involve
firearms' means that 'it makes good policy sense and is
appropriate to restrict firearms on bank premises.'"  [Mem. in
Opp. at 16 (citation omitted).]  Bankers may raise good policy
concerns related to allowing guns in their businesses, but
policy concerns like these, by themselves, are irrelevant under
Bruen when state restrictions on carrying firearms are under
consideration.  Policy concerns might be relevant insofar as
they help the government "identify a well-established and
representative historical analogue" to the regulation at issue.
Bruen, 142 S. Ct. at 2133 (emphasis omitted).  The State,

however, does not argue how these policy concerns negate the
Second Amendment's plain text. As with § 134-A(a)(4) – the
provision prohibiting carrying firearms in restaurants and bars
serving alcohol – the plain text of the Second Amendment covers
carrying firearms in banks because they are held open to the
public. See supra Discussion Section III.B. Thus, insofar as
banks are held open to the public and do not revoke the general
license or invitation to enter, they are public places for
purposes of the Second Amendment. The onus is on the State to
rebut the presumption that carrying firearms in banks is
constitutionally protected conduct.

> In Bruen, the Supreme Court stated:
>
> > The test that we set forth in Heller and
> > apply today requires courts to assess whether
> > modern firearms regulations are consistent with
> > the Second Amendment's text and historical
> > understanding. In some cases, that inquiry will
> > be fairly straightforward. For instance, **when a
> > challenged regulation addresses a general
> > societal problem that has persisted since the
> > 18th century, the lack of a distinctly similar
> > historical regulation addressing that problem is
> > relevant evidence that the challenged regulation
> > is inconsistent with the Second Amendment**. . . .

142 S. Ct. at 2131 (emphasis added). Here, the inquiry is
"fairly straightforward" because banks and firearms existed at
the time of the Second Amendment's ratification. Plaintiffs
point to a few banks that existed around the time of the
founding. See TRO Motion, Mem. in Supp. at 23 (citing Todd

70

**1-ER-0076**

Wallack, Which bank is the oldest? Accounts vary, THE BOSTON GLOBE
(Dec. 20, 2011, 12:00 AM),
https://www.bostonglobe.com/business/2011/12/20/oldest-bank-
america-accounts-vary/WAqvIlmipfFhyKsx8bhgAJ/story.html).  The
State does not challenge Plaintiffs' contention.  It is likely
that "the elevated risk of danger in bank crimes that involve
firearms" has persisted since 1791.  See Mem. in Opp. at 16
(quotation marks and citation omitted).  The State's lack of
evidence regarding regulations prohibiting carrying firearms in
banks is telling and suggests "that the challenged regulation is
inconsistent with the Second Amendment."  See Bruen, 142 S. Ct.
at 2131.  The State also does not make any argument that this
Court should analogize to different historical regulations
because banks at the time of the Second Amendment's ratification
are substantially different than modern banks.  Without more,
the State has not met its burden.

        Despite the existence of banks and firearms at the
time of the Second Amendment's ratification, the State urges
this Court to consider historical evidence that purportedly
shows a tradition of prohibiting the carrying of firearms in
fairs and markets.  See Mem. in Opp. at 17 (citations omitted).
Because the State does not establish that prohibiting the
carrying of firearms in banks or financial institutions is a
"modern regulation[] that w[as] unimaginable at the founding,"

see Bruen, 142 S. Ct. at 2132, this Court need not consider whether § 134-A(a)(12) is "relevantly similar" to a historical analogue, see id. (quotation marks and citation omitted).  Yet, for the sake of completeness, this Court addresses the State's reliance on historical regulations that it contends is relevantly similar to § 134-A(a)(12).

     The State cites a case from the Southern District of New York, Frey, 2023 WL 2473375, to support its position that there is "a long historical tradition of prohibiting firearms in sensitive commercial centers."  See Mem. in Opp. at 17. Relevant to the State's reliance on Frey, the district court there considered whether a regulation prohibiting carrying firearms in the Time Square area was constitutional under the Second Amendment.  See 2023 WL 2473375, at *16-17.  In finding that the plaintiffs did not establish a substantial likelihood of success on the merits to challenge the regulation, the district court relied in part on a 1786 Virginia law and a 1792 North Carolina law which "contain[ed] a 'fairs' and 'markets' prohibition . . . ."  See id. at *16.  The district court noted that it was persuaded with the defendants' argument that the regulation was "in line with the historical tradition of banning firearms in locations where **large groups of people congregated for commercial, social, and cultural activities**."  Id. at *17 (emphasis added).

Here, the State likewise depends on the 1786 Virginia law and the 1792 North Carolina law.  See Mem. in Opp. at 17. It appears, then, that the State contends banks and financial institutions are relevantly similar to large gathering places like fairs, markets, or Time Square.[23]  This Court finds that the State fails to establish such an analogue.  The State does not argue or show that there is a feature that sufficiently connects banks to fairs or markets.  Unlike in Frey, where the district court found that Time Square was similarly relevant to historical fairs and markets because of the large congregation of people, here banks are not likely to be so congested or heavily congregated such that they are akin to a place like Time Square.  If they are similar in that regard, the State fails to establish the similarity.  The State instead asks this Court to take its word for it.  This Court cannot do so.

In addition, the State fails to make any showing that similar prohibitions in adjacent parking areas are consistent with this Nation's historical tradition of gun regulation. Because the State has failed to show that § 134-A(a)(12) is consistent with this Nation's historical tradition of gun

---

[23] The State also cites to a string of laws from the 1800s that prohibited carrying firearms in social gatherings, see Mem. in Opp. at 18 n.31, but those laws are unavailing for a substantially similar reason as the 1786 Virginia law and the 1792 North Carolina law.

regulation, Plaintiffs have a likelihood of success on the
merits of their facial and as-applied challenge to § 134-
A(a)(12).

     **E.**    **Haw. Rev. Stat. § 134-E – Private
             Property and Express Authorization**

        Plaintiffs' final request is a TRO to enjoin § 134-E
because, as they argue, it violates the Second Amendment right
to carry firearms in public, and the portion of § 134-E
requiring private property owners to give express authorization
to carry on their property violates the First Amendment.  <u>See</u>
TRO Motion, Mem. in Supp. at 14-18.  This Court turns first to
Plaintiffs' Second Amendment challenge.

          **1.**    **<u>Second Amendment Challenge</u>**

        The State contends the conduct that § 134-E regulates
– <i>i.e.</i>, carrying a firearm on private property without express
authorization – is not covered by the Second Amendment's plain
text.  <u>See</u> Mem. in Opp. at 19.  Plaintiffs argue § 134-E "enacts
. . . a presumption against carrying firearms in property open
to the public." [TRO Motion, Mem. in Supp. at 15.]  The parties
are both correct to a certain extent.  Section 134-E regulates
carrying firearms on private properties that are, at least
sometimes, held open to the public, such as some "commercial,
industrial, agricultural, institutional, or undeveloped
propert[ies] . . . ."  <u>See</u> Haw. Rev. Stat. § 134-E(c).  To the

**1-ER-0080**

extent that § 134-E regulates private properties held open to the public, it is covered by the Second Amendment's plain text. See *supra* Discussion Sections III.B., III.D.  The portion of § 134-E that regulates private property not held open to the public – *e.g.*, residential properties – is not covered by the Second Amendment's plain text.

The State argues "HRS § 134-E does no more than vindicate the traditional right to exclude by preventing Plaintiffs from carrying firearms onto private property absent the owner's consent."  [Mem. in Opp. at 20.]  But, § 134-E is not needed to "**vindicate** the traditional right to exclude," see id. (emphasis added), because since the time of the founding, "[o]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbor's close without his neighbor's leave," see Florida v. Jardines, 569 U.S. 1, 8 (2013) (quotation marks and citation omitted).  The State asserts "the Second Amendment does **not** include a right to carry guns on others' property without their consent," see Mem. in Opp. at 19 (emphasis in original), but that is inaccurate.  The Second Amendment guarantees a right to carry a firearm in public, which includes private properties held open to the public so long as those places are not sensitive areas as evidenced by this Nation's historical tradition.  If an owner of a private property that is held open to the public revokes a general

75

license or invitation, then the property is no longer held open to the public and, therefore, the right to carry on that property is not presumptively protected under the Second Amendment.  Similarly, because the Second Amendment concerns the public carrying of firearms, it is silent as to private property not held open to the public.

In other words, and contrary to the State's assertion, the Second Amendment **does** grant a presumptive right to carry on **some** private property, insofar as the private property is held open to the public.  That presumption can change, for instance, if an owner of the private property rescinds a general license or invitation to enter the property: such as limiting entrance to members or prohibiting certain attire.  There is no conflict between the two rights – the right to bear arms and the right to exclude others from one's property – both of which preexisted the ratification of the Bill of Rights.  See, e.g., Bruen, 142 S. Ct. at 2142 ("[B]y the time of the founding, the right to keep and bear arms was understood to be an individual right protecting against both public and private violence." (citation and internal quotation marks omitted)); Jardines, 569 U.S. at 7–8.

What § 134-E does, and what cannot be constitutionally permitted, is remove the presumption of the right to carry a firearm on private property held open to the public.  Under

76

§ 134-E, conduct that was presumptively protected under the Second Amendment is now presumptively not protected.  Such a change runs afoul of the Second Amendment's "guarantee[] to all Americans [of] the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."  See Bruen, 142 S. Ct. at 2156 (citation and internal quotation marks omitted).

The State argues "[t]here is extensive historical support for prohibitions on carriage on private property without consent, and for governmental regulation of this conduct." [Mem. in Opp. at 21.]  In support of its contention, the State cites three laws from the mid- to late-19th century:

-an 1865 Louisiana law prohibiting "any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor"; [id., Exh. 43 (1865 La. Acts 14-16 (An Act To prohibit the carrying of fire-arms on premises or plantations of any citizen, without the consent of the owner), no. 10), § 1;]

-an 1866 Texas law prohibiting "for any person or person to carry fire-arms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor"; [id., Exh. 44 (1866 Tex. Gen. Laws 90 (An Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizens without the consent of the owner), ch. 92) at § 1;] and

-an 1893 Oregon law prohibiting "any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof," [id., Exh. 45 (1893 Or. Laws 79 (An Act To Prevent a Person from Trespassing upon any Enclosed Premises or Lands not His Own Being Armed with a Gun,

Pistol, or other Firearm, and to Prevent Shooting upon or
from the Public Highway)) at § 1].

The State also cites to five laws from the 1700's:

-a 1715 Maryland law that was passed "to prevent the abusing,
    hurting or worrying of any stock of hogs, cattle or horses,
    with dogs, or otherwise," and prohibited "any person . . .
    that ha[s] been convicted of any of the crimes aforesaid,
    or other crimes, . . . that shall shoot, kill or hunt, or
    be seen to carry a gun, upon any person's land, whereon
    there shall be a seated plantation, without the owner's
    leave . . . ."; [id., Exh. 38 (1715 Md. Laws 88-91 (An Act
    for the speedy trial of criminals, and ascertaining their
    punishment in the county courts when prosecuted there, and
    for payment of fees due from criminal persons), ch. 26) at
    § VII;]

-a 1721 Pennsylvania law prohibiting "any person or persons"
    from "carry[ing] any gun or hunt[ing] on the improved or
    inclosed lands of any plantation other than his own, unless
    he have license or permission from the owner . . . .";
    [id.; Exh. 39 (1721 Pa. Laws, ch. 246, (An Act to prevent
    the killing of deer out of season, and against carrying of
    guns or hunting by persons not qualified)) at § III,
    *reprinted in* 3 James T. Mitchell & Henry Flanders, The
    Statutes at Large of Pennsylvania from 1682 to 1801  (Pa.,
    Clarence M. Busch, 1896);]

-a 1722 New Jersey law prohibiting "any Person or Persons" from
    "carry[ing] any Gun, or Hunt[ing] on the Improved or
    Inclosed Lands in any Plantation, and on other than his
    own, unless he have Lisence or Permission from the
    owner . . . ."; [id.; Exh. 40 (1722 N.J. Laws 141-42 (An
    Act to prevent the Killing of Deer out of Season, and
    against Carrying of Guns and Hunting by Persons not
    qualified) at 141;]

-a 1763 New York law prohibiting "any Person or Persons
    whatsoever, other than the Owner, Proprietor, or Possessor"
    from "carry[ing], shoot[ing], or discharg[ing] any Musket,
    Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or
    through any Orchard, Garden, Corn-Field, or other inclosed
    Land, whatsoever, within the City of New York . . . without
    License in Writing first had and obtained for that Purpose
    from such Owner, Proprietor, or Possessor . . . ."; [id.,
    Exh. 41 (1763 N.Y. Laws, ch. 1233 (An Act to prevent

hunting with Fire-Arms in the City of New York, and the Liberties Thereof)) at § 1, *reprinted in* 1 Laws of New-York from The Year 1691, to 1773 Inclusive 441-42 (N.Y., Hugh Gaine 1774);] and

-a 1771 New Jersey law prohibiting "any Person or Persons" from "carry[ing] any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessors . . . . ," [id., Exh. 42 (1771 N.J. Laws 343-347, ch. 540 (An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns)) at § 1)].

These eight laws do not support the State's contention that this Nation has a historical tradition of prohibiting the carrying of firearms on private property held open to the public. Those laws concern prohibiting carrying firearms on enclosed premises or plantations. The definitions of the relevant words in those laws are helpful in establishing that the laws concerned private property like residential lands, which were not generally held open to the public. The word "enclose" means "[t]o surround or encompass; to fence or hem in all sides." *Enclose*, Black's Law Dictionary (11th ed. 2019). In relation to land, "enclosed land" means "[l]and that is actually enclosed and surrounded with fences." *Land*, Black's Law Dictionary (11th ed. 2019). Moreover, the word "plantation" means "[a]n estate or large farm . . . ." *Plantation*, Oxford English Dictionary (3d ed. Revised June 2006). Because those eight laws prohibited carrying firearms on private property that consisted of fenced off lands or estates, the laws did not likely concern private

property that was generally held open to the public.
Accordingly, the conduct regulated in those laws are not covered
by the Second Amendment's plain text.

The only law out of those eight laws that does not use
the words "enclosed," "inclosed," or "plantation," is the 1771
New Jersey law which prohibited persons from carrying firearms
on "any [l]ands" not their own.  See McLean Decl., Exh. 42.
Even assuming this meant any private property regardless of
whether it was held open to the public, one New Jersey law does
not show that such a law was "representative" of the laws
applicable throughout the Nation.  See Bruen, 142 S. Ct. at
2133.  The State's reliance on these laws is therefore
unpersuasive.  The State has not established that the portion of
§ 134-E that prohibits carrying firearms on private property
held open to the public is consistent with this Nation's
historical tradition of gun regulation.  Because the State has
not met its burden, Plaintiffs are likely to succeed on the
merits of their challenge to § 134-E to the extent that § 134-E
prohibits carrying firearms on private property held open to the
public.  Plaintiffs are not likely to succeed on the merits of
their challenge to § 134-E to the extent that § 134-E prohibits
carrying firearms on private properly not held open to the
public.  Plaintiffs' facial challenge is therefore unlikely to

succeed, but their as-applied challenge regarding private property held open to the public is likely to succeed.

### 2. **First Amendment Challenge**

Plaintiffs next contend § 134-E(b) requires them to engage in compelled speech in violation of the First Amendment. See TRO Motion, Mem. in Supp. at 18-19. Section 134-E prohibits carrying firearms on private property unless the property owner gives "express authorization." Haw. Rev. Stat. § 134-E(b). Plaintiffs argue § 134-E "requires property owners and lessees to espouse a belief one way or the other on the carriage of firearms outside the home by requiring them to expressly consent or post a sign." [TRO Motion, Mem. in Supp. at 19.] Plaintiffs are mistaken.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2371 (2018). This includes laws that "compel[] individuals to speak a particular message" so as to "alter the content of their speech." See id. (brackets, quotation marks, and citations omitted). Compelled-speech violations "result[] from the fact that the complaining speaker's own message [is] affected by the speech it [is] **forced** to accommodate." See Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 63 (2006) (emphasis added).

81

1-ER-0087

Here, Plaintiffs', and particularly Kasprzycki's,
message is not affected by any speech they are forced to
accommodate.  Kasprzycki is not forced to speak at all.  If he
chooses to allow clients to carry firearms on his business's
property, then he may do so.  He determines whether he wants to
give express authorization.  He is not required to say anything.
There is no coercion.  There is no specific message Plaintiffs
must speak.  Therefore, § 134-E does not regulate speech within
the scope of the First Amendment.  Plaintiffs are not likely to
succeed on the merits of their facial and as-applied challenge
to § 134-E on the ground that it compels speech in violation of
the First Amendment.

**IV.  Irreparable Harm**

"A plaintiff seeking preliminary relief must
'demonstrate that irreparable injury is likely in the absence of
an injunction.'"  <u>California v. Azar</u>, 911 F.3d 558, 581 (9th
Cir. 2018) (quoting <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555
U.S. 7, 22, 129 S. Ct. 365 (2008) (emphasis omitted)).
"Irreparable harm is traditionally defined as harm for which
there is no adequate legal remedy, such as an award of damages."
<u>Ariz. Dream Act Coal. v. Brewer</u>, 757 F.3d 1053, 1068 (9th Cir.
2014) (citation omitted).  The Ninth Circuit "has ruled that
speculative injury does not constitute irreparable injury
sufficient to warrant granting a preliminary injunction.  A

82

plaintiff must do more than merely allege imminent harm
sufficient to establish standing; a plaintiff must **demonstrate**
immediate threatened injury as a prerequisite to preliminary
injunctive relief." Boardman v. Pac. Seafood Grp., 822 F.3d
1011, 1022 (9th Cir. 2016) (emphasis in Boardman) (brackets,
citation, and internal quotation marks omitted). "A threat of
irreparable harm is sufficiently immediate to warrant
preliminary injunctive relief if the plaintiff is likely to
suffer irreparable harm before a decision on the merits can be
rendered." Id. at 1023 (citing Winter, 555 U.S. at 22, 129 S.
Ct. 365 (quoting 11A Charles A. Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 2948.1 (2d ed. 1995))).

Plaintiffs argue they will face irreparable harm per
se because their constitutional rights have been violated. See
TRO Motion, Mem. in Supp. at 24. The Court finds that
Plaintiffs have sufficiently established they will likely face
immediate irreparable harm. "It is well established that the
deprivation of constitutional rights 'unquestionably constitutes
irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002
(9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96
S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). The Ninth Circuit does
"not require a strong showing of irreparable harm for
constitutional injuries." Cuviello v. City of Vallejo, 944 F.3d
816, 833 (9th Cir. 2019).

Neither the Supreme Court nor the Ninth Circuit have addressed whether a violation of the Second Amendment "unquestionably constitutes irreparable injury." See Melendres, 695 F.3d at 1002 (quotation marks and citation omitted).  In Elrod, the Supreme Court held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  427 U.S. at 373 (citation omitted).  The Ninth Circuit in Melendres applied the same principle to violations of the Fourth Amendment's protection against unreasonable searches and seizures.  See 695 F.3d at 1002.  So has the Ninth Circuit for violations of the Fifth Amendment's Due Process Clause.  See Hernandez v. Sessions, 872 F.3d 979, 994–95 (9th Cir. 2017).  A court in this district also applied the same principle to violations of the Fifth Amendment's Takings Clause, made applicable to the State by the Fourteenth Amendment.  See Haw. Legal Short-Term All. v. City and Cnty. of Honolulu, Case No. 22-cv-247-DKW-RT, 2022 WL 7471692, at *11 (D. Hawai`i Oct. 13, 2022).

This Court finds no reason not to apply the principle relied on in Elrod, Melendres, Hernandez, and Hawai`i Legal to violations of the Second Amendment because "[t]he constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."  See Bruen, 142 S. Ct. at

84

2156 (citation and internal quotation marks omitted).  To the extent that this Court finds that Plaintiffs are likely to succeed on the merits on some of their challenges, this Court also finds that they will likely face irreparable harm for the probable violation of their Second Amendment rights.

Additionally, Plaintiffs sufficiently establish that the irreparable harm is immediate because they intend to continue to carry their firearms in accordance with their permits in places where carrying firearms are now prohibited. They are therefore likely to be in violation of the challenged provisions now that they are in effect, and will likely face criminal penalties.

The State contends that a finding of immediate irreparable harm is unwarranted because Plaintiffs purportedly delayed in filing their TRO Motion.  See Mem. in Opp. at 24. Specifically, the State asserts Plaintiffs delayed because they did not file their action until three weeks after Governor Green signed the Act into law.  Plaintiffs state they did not delay because they filed their action eight days before the challenged provisions became effective.  See Reply at 15.

> It is generally recognized that a "long delay
> before seeking a preliminary injunction implies a
> lack of urgency and irreparable harm," Oakland
> Tribune, Inc. v. Chronicle Publishing Co., 762
> F.2d 1374, 1377 (9th Cir. 1985), but "[d]elay by
> itself is not a determinative factor in whether
> the grant of interim relief is just and proper."

1-ER-0091

> Aguayo ex rel. N.L.R.B. v. Tomco Carburetor Co.,
> 853 F.2d 744, 750 (9th Cir. 1988). "Usually,
> delay is but a single factor to consider in
> evaluating irreparable injury"; indeed, "courts
> are loath to withhold relief **solely on that
> ground**." Arc of Cal. v. Douglas, 757 F.3d 975,
> (9th Cir. 2014) (emphasis added) (quoting Lydo
> Enters., Inc. v. City of Las Vegas, 745 F.2d
> 1211, 1214 (9th Cir. 1984)).

Cuviello, 944 F.3d at 833 (alteration and emphasis in Cuviello).

Filing before the challenged provisions became effective is not

likely to result in an unreasonable delay. But, even assuming

that Plaintiffs delayed to a certain extent in bringing the TRO

Motion, in light of the likelihood of success on the merits and

the likelihood of immediate irreparable harm, this Court

declines to withhold relief on that basis only. Thus,

Plaintiffs have shown that they will likely face immediate

irreparable harm.

**V.    Balancing of the Equities and Public Interest**

"Generally, public interest concerns are implicated

when a constitutional right has been violated, because all

citizens have a stake in upholding the Constitution." Preminger

v. Principi, 422 F.3d 815, 826 (9th Cir. 2005) (citation

omitted); see also Melendres, 695 F.3d at 1002 ("[I]t is always

in the public interest to prevent the violation of a party's

constitutional rights." (quotation marks and citation omitted)).

The State argues the interest in protecting public

safety strongly weighs against issuing a TRO because of the

dangers and safety concerns associated with firearms. See Mem.
in Opp. at 25. In their Reply, Plaintiffs rely on an amicus
brief submitted by Amici Gun Owners of America, Inc., Second
Amendment Law Center, Hawaii Rifle Association, California Rifle
& Pistol Association, Inc., Gun Owners of California, and Gun
Owners Foundation to rebut the safety issues the State raises.[24]
See Reply at 15; see also the GOA Amici's amicus brief in
support of Plaintiffs' TRO Motion, filed 7/14/23 (dkt. no. 53)
("GOA Amicus Brief"). According to the GOA Amicus Brief, the
vast majority of individuals in the United States with concealed
carry permits are law-abiding. See GOA Amicus Brief at 20-25
(discussing the statistics of people with concealed carry
permits to support the proposition that people with concealed
carry permits are significantly less likely to commit gun-
related crimes). Although the State raises important safety
concerns, it fails to demonstrate that the public safety
concerns overcome the public's interest in preventing
constitutional violations.

This is particularly relevant for this analysis
because the challenged provisions only affect those individuals
who have been granted a permit to carry firearms, either openly
or concealed. See, e.g., Haw. Rev. Stat. § 134-A(a) (stating

---

[24] For the sake of simplicity, this Court refers to this
group of Amici as "the GOA Amici."

87

that the statute, including the twelve enumerated sensitive
areas, apply to "[a] person with a license issued under
section 134-9, or authorized to carry a firearm in accordance
with title 18 United States Code section 926B or 926C . . . .");
see also Haw. Rev. Stat. § 134-9 (listing the requirements an
applicant must meet to be issued a carry permit, which is
granted by the chief of police of a county).  Further,
Plaintiffs allege that, prior to Bruen, the counties within the
State "had only issued less than a half-dozen carry concealed
permits in the prior decades[.]"  [Complaint at ¶ 28 (citing
Young v. County of Hawaii, 142 S. Ct. 2895).]  As such, the
challenged provisions only impact a substantially small subset
of gun owners and, thus, the State's public safety argument is
not persuasive.  Although it is possible post-Bruen that more
conceal carry permits are eventually issued in Hawai`i, that
alone does not negate Plaintiffs' position that the vast
majority of conceal carry permit holders are law-abiding.  See,
e.g., GOA Amicus Brief at 21-22 (stating that Texas in 2020 had
1,4441 convictions for aggravated assault with a deadly weapon
but only four of those convictions were people with valid
concealed carry permits – roughly 0.278% of the total).

        Based on the foregoing, this Court finds that the
balance of the equities and the public interest weigh in favor
of issuing a TRO.  The public has an interest in preventing

constitutional violations, and the State has not established a
factual basis for the public safety concerns regarding permit-
carrying gun-owners who wish to exercise their Second Amendment
right to carry a firearm in public.

**VI.   <u>Summary of this Court's Ruling</u>**

Plaintiffs have established a substantial likelihood
of success on the merits of their: as-applied challenge to
§ 134-A(a)(1); facial and as-applied challenges to §§ 134-
A(a)(4), (a)(12), and the portions of § 134-A(a)(9) prohibiting
the carrying of firearms in beaches, parks, and their adjacent
parking areas; and as-applied challenge to § 134-E on the ground
that it violates the Second Amendment, applicable to the State
through the Fourteenth Amendment.  For these challenges,
Plaintiffs have also sufficiently established that they will
face immediate irreparable harm and that the public interest and
the balancing of the equities weigh in favor of issuing a TRO.
Accordingly, the TRO Motion is granted in part, to the extent
that these challenged provisions (or challenged portions of the
respective provisions) are enjoined.

Conversely, insofar as Plaintiffs have abandoned their
facial challenge to § 134-A(a)(1), they have not established a
substantial likelihood of success on the merits of that
challenge.  Plaintiffs also have not established a substantial
likelihood of success on the merits of their: facial challenge

1-ER-0095

to § 134-E on the ground that it violates the Second Amendment, applicable to the State through the Fourteenth Amendment; and facial and as-applied challenge to § 134-E on the ground that it violates the First Amendment, applicable to the State through the Fourteenth Amendment.  Because Plaintiffs fail to establish a substantial likelihood of success on the merits of these challenges, Plaintiffs' TRO Motion is denied as to those challenges.

This Court notes, however, that these rulings could be changed at the preliminary injunction stage because the State may be able to proffer adequate evidence to meet its burden as to any of the challenges.  Thus, it is important to understand that the State's failure to provide sufficient evidence as to some of the challenges at this stage is not necessarily fatal at the preliminary injunction stage, assuming the State is able to provide more evidence to meet its burden under <u>Heller</u> and <u>Bruen</u>.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction,[25] filed June 23, 2023, is HEREBY GRANTED IN PART AND DENIED IN PART. The TRO Motion is GRANTED to the extent that the following provisions are enjoined:

---

[25] Again, this Order only addresses the portion of the motion seeking a TRO.

-the portions of § 134-A(a)(1) that prohibit carrying firearms
    in parking areas owned, leased, or used by the State or a
    county which share the parking area with non-governmental
    entities, are not reserved for State or county employees,
    or do not exclusively serve the State or county building;

-the entirety of §§ 134-A(a)(4) and (a)(12);

-the portions of § 134-A(a)(9) prohibiting the carrying of
    firearms in beaches, parks, and their adjacent parking
    areas; and

-the portion of § 134-E that prohibits carrying firearms on
    private properties held open to the public.

The TRO Motion is DENIED in all other respects.

        IT IS SO ORDERED.

        DATED AT HONOLULU, HAWAII, August 8, 2023.



                                        /s/ Leslie E. Kobayashi
                                        Leslie E. Kobayashi
                                        United States District Judge

JASON WOLFORD, ET AL. VS. ANNE E. LOPEZ, ETC.; CV 23-00265 LEK-
WRP; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION

1-ER-0097