No. 23-16164

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII
FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of
Hawaiʻi,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of Hawaiʻi
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

---

## EXCERPTS OF RECORD (VOLUME 2 OF 6)

---

ANNE E. LOPEZ
*Attorney General of the State of Hawaiʻi*
KALIKO‘ONĀLANI D. FERNANDES
*Solicitor General*
NICHOLAS M. MCLEAN
*First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
*Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
    *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
    *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as*
*Attorney General of the State of Hawaiʻi*

ANNE E. LOPEZ (7609)
 Attorney General of the State of Hawai'i
KALIKO'ONĀLANI D. FERNANDES (9964)
 Solicitor General
NICHOLAS M. MCLEAN (10676)
 First Deputy Solicitor General
Department of the Attorney General
 State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Tel.: (808) 586-1360
Email: kaliko.d.fernandes@hawaii.gov

NEAL K. KATYAL*
DANA A. RAPHAEL*
 Special Deputy Attorneys General
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel.: (202) 637-5600
Email: neal.katyal@hoganlovells.com

MARY B. MCCORD*
RUPA BHATTACHARYYA*
 Special Deputy Attorneys General
Institute for Constitutional
 Advocacy & Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: (202) 661-6607
Email: mbm7@georgetown.edu
*Pro Hac Vice

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as
the Attorney General of the State of Hawai'i

(*Additional Counsel on Next Page*)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,<br><br>     Plaintiffs,<br><br><br>v. | Civil No. 1:23-cv-00265-LEK-WRP<br><br>**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR STAY PENDING APPEAL AND, IN THE ALTERNATIVE, TEMPORARY ADMINISTRATIVE STAY; CERTIFICATE OF COMPLIANCE** |

| | |
|---|---|
| ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i,<br><br>            Defendant. | **WITH WORD LIMITATIONS; CERTIFICATE OF SERVICE**<br><br><u>District Judge</u>:<br>Hon. Leslie E. Kobayashi<br><br><u>Magistrate Judge</u>:<br>Hon. Wes Reber Porter |

*Continued from previous page*

BEN GIFFORD*
  Special Deputy Attorney General
Institute for Constitutional
  Advocacy & Protection
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
Tel.: (202) 662-9835
Email: bg720@georgetown.edu

*Pro Hac Vice*

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................1

II.     THE STATE IS LIKELY TO SUCCEED ON THE MERITS .......................1

        A.      THIS COURT'S ORDER IS APPEALABLE. ....................................1

        B.      PLAINTIFFS LACK STANDING TO CHALLENGE
                HRS §§ 134-A(a)(1), 134-A(a)(12), AND 134-E................................2

        C.      THE SENSITIVE-PLACE PROVISIONS
                CHALLENGED BY PLAINTIFFS ARE
                CONSTITUTIONAL. .............................................................5

        D.      THE DEFAULT RULE IS CONSTITUTIONAL. ............................11

III.    IRREPARABLE INJURY............................................................13

IV.     A STAY IS IN THE PUBLIC INTEREST ....................................14

V.      ANY INJUNCTIVE RELIEF SHOULD BE NARROWED
        PENDING APPEAL.................................................................15

VI.     CONCLUSION.........................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ............................................................. 2, 13

*Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).......................................................................... 8, 11, 13

*Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022) ......................................13

*Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015) ...........................3, 9

*Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022)....................................13

*Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ............................................................................................................13

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) .......................5

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................................5

*Duncan v. Becerra*, No. 17-cv-1017-BEN-JLB, 2019 WL 1510340 (S.D. Cal. Apr. 4, 2019) ..............................................................................................................14

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ..................1, 2

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996)..........16

*Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022).....................................7

*Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ................................................................................................................7

*Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023)......................................7

*Koons v. Platkin*, No. CV 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023) .........................................................................................................7, 8

*L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011)......................16

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010)....................................................3

*Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .................13

2-ER-0103

*McCormack v. Hiedeman*, 694 F.3d 1004 (9th Cir. 2012) ............................. 15, 16

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ...........................5

*Nken v. Holder*, 556 U.S. 418 (2009) .....................................................14

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ..................................4

*Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc) ...............15

*Regents of the University of California v. U.S. Department of Homeland Security*, 908 F.3d 476 (9th Cir. 2018)..................................................16

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019)...................................... 3, 7, 9

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam)..........................2

**Statutes**

5 U.S.C. § 706(2) ................................................................16

HRS § 134-A(a)(1).......................................................... 2, 3, 9

HRS § 134-A(a)(12).......................................................... 3, 10

HRS § 134-A(a)(4)...............................................................9

HRS § 134-A(a)(8).............................................................10

HRS § 134-A(a)(9) ......................................................... 9, 10

HRS § 134-E ............................................................... 3, 4, 11

**Other Authorities**

Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L. Rev. E-Supplement I.-60 (2022) ..........................6

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) .. ................................................................................6

Declaration of Hendrik Hartog, *Koons v. Platkin*, No. CV 22-7464 (RMB/AMD) (D.N.J. Feb. 13, 2023), ECF No. 84 ...................................12

John J. Donohue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* (Nat'l Bureau of Econ. Rsch., Working Paper No. 30190, June 2023), https://perma.cc/QD3C-4DBF ............................................................................15

*More Than 2,200 Non-Self Defense Deaths Involving Concealed Carry Killers Since 2007, Latest Violence Policy Center Research Shows*, Violence Pol'y Ctr. (Apr. 21, 2022), https://perma.cc/MXW4-AWYD..............................................15

**2-ER-0105**

## I.    INTRODUCTION

This Court's Order prohibits the State from enforcing numerous provisions of an important public safety law.  As the State explained in its Motion, ECF No. 67-1, a stay pending appeal is warranted because the State is likely to succeed on the merits; it is irreparably harmed by its inability to enforce duly enacted public safety statutes; the issuance of a stay will not injure Plaintiffs; and a stay is in the public interest.  None of the arguments raised in Plaintiffs' Opposition, ECF No. 78, counsels against the entry of a stay.  At a minimum, this Court should enter a temporary administrative stay while the State renews its request for emergency relief in the Ninth Circuit.

## II.   THE STATE IS LIKELY TO SUCCEED ON THE MERITS

### A.    THIS COURT'S ORDER IS APPEALABLE.

Plaintiffs argue that this Court's Order is not appealable.  *See* ECF No. 78 at 1-3.  As Plaintiffs recognize, however, "where a TRO has the same effect as a preliminary injunction, it is appealable."  *Id.* at 3 (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018)).  And as the State explained in its emergency stay motion before the Ninth Circuit, a TRO "possesses the qualities of a preliminary injunction" when it was "strongly challenged in adversarial proceedings before the district court" and when "it has or will remain in force for longer than the fourteen-day period identified in Federal Rule of Civil Procedure 65(b)."  *Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017) (per

2-ER-0106

curiam) (internal quotation marks omitted).  Here, "[t]he parties vigorously

contested the legal basis for the TRO in written briefs and oral arguments," *id.*; *see*

ECF Nos. 7-1, 55, 61, 62, and more than fourteen days have elapsed since the

Order was entered.  Indeed, "[t]he district court's order has no expiration date."

*Washington*, 847 F.3d at 1158; *see* ECF No. 66 at 90-91.  Furthermore, where, as

here, "the Government argues in this court that emergency relief is necessary to

support [its] interests," it is appropriate to "treat the district court's order as an

appealable preliminary injunction."  *E. Bay Sanctuary Covenant*, 932 F.3d at 763

(citing *Washington*, 847 F.3d at 1158).  This Court's Order is therefore appealable.

*See Abbott v. Perez*, 138 S. Ct. 2305, 2319 (2018) ("[T]he label attached to an

order is not dispositive. . . .  [W]here an order has the practical effect of granting or

denying an injunction, it should be treated as such for purposes of appellate

jurisdiction." (internal quotation marks omitted)).

## B.   PLAINTIFFS LACK STANDING TO CHALLENGE HRS §§ 134-A(a)(1), 134-A(a)(12), AND 134-E.

As the State argued at the TRO hearing and in its Stay Motion, Plaintiffs

lack standing to challenge HRS § 134-A(a)(1) because the parking lots in which

they wish to carry firearms are not covered by that provision.  *See* Tr. 17-18 (July

28, 2023); ECF No. 67-1 at 5 n.3.  Plaintiffs therefore have not shown "an

intention to engage in a course of conduct . . . proscribed by a statute," or a

"realistic danger of sustaining a direct injury as a result of the statute's operation or

enforcement." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (internal quotation marks omitted).  Plaintiffs argue that the State's interpretation of HRS § 134-A(a)(1) "has been produced solely for purposes of this litigation," ECF No. 78 at 21, but the State explained at the TRO hearing, *see* Tr. 17-18 (July 28, 2023), that its position is based on legislative intent, constitutional avoidance, and the rule of lenity, as well as the persuasive reasoning of the D.C. Circuit's decision in *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), and the Tenth Circuit's decision in *Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015).

Plaintiffs also lack standing to challenge HRS § 134-A(a)(12) because they have not identified any financial institutions that would allow them to carry firearms on their property.  *See* ECF No. 67-1 at 3-4.  Plaintiff Kasprzycki argues that he has standing to challenge HRS § 134-A(a)(12) because his business shares a parking lot with a bank.  *See* ECF No. 78 at 4.  But as explained immediately above and at the TRO hearing, *see* Tr. 17-18 (July 28, 2023), the prohibition on carrying firearms in parking areas adjacent to sensitive places (including banks) applies only to parking areas that exclusively serve those places—not to shared parking areas like the one in which Plaintiff Kasprzycki wishes to carry.

Finally, Plaintiffs lack standing to challenge HRS § 134-E because any injury they suffer from not being able to carry firearms on non-sensitive private property without the owner's consent is traceable only to the owner's choice to

2-ER-0108

withhold that consent, and it is redressable only by the owner's decision to provide that consent. Plaintiffs quote abstract language from *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), but the actual reasoning of that case is plainly distinguishable, as the State explained in its Motion, *see* ECF No. 67-1 at 5-6. Plaintiffs now argue that the declarations submitted by owners of non-sensitive businesses—which say that "[i]f H.R.S. § 134-E . . . were repealed, enjoined or otherwise no longer in effect, I would allow members of the public, *including the Plaintiffs in this case*, to carry handguns in my business and on my property," *see, e.g.*, ECF No. 61-3 at 29 (emphasis added)—do not provide Plaintiffs with consent to carry in those businesses. *See* ECF No. 78 at 7-8. As explained in the State's Motion, however, *see* ECF No. 67-1 at 6, these declarations do in fact provide the "express authorization" required by HRS § 134-E. Plaintiffs' contrary position appears to be that the declarant business owners will give others permission to carry firearms on their property only if they are not *required* to give permission in order for others to carry firearms on their property. If that is the case, then any injury suffered by Plaintiffs is still the result of the business owners' decision to withhold consent (albeit in a manner approaching gamesmanship), rather than the result of state action.[1]

---

[1] The State renews its argument that the Court should not have considered the declarations submitted with Plaintiffs' reply. *See* ECF No. 67-1 at 4 n.1. The State also renews its argument that Plaintiffs lack standing to challenge HRS § 134-E

2-ER-0109

## C. THE SENSITIVE-PLACE PROVISIONS CHALLENGED BY PLAINTIFFS ARE CONSTITUTIONAL.

Even if Plaintiffs had standing, their challenges to Act 52's sensitive-place provisions would fail.

Plaintiffs make several sweeping arguments in their Opposition. As in their TRO briefing, *see* ECF No. 7-1 at 13; ECF No. 61 at 9-10, Plaintiffs suggest that schools and government buildings are not sensitive places, *see* ECF No. 78 at 8, even though *Bruen* and *Heller* explicitly recognized that they are, *see N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022) (approvingly citing "*Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008))); *see also* ECF No. 66 at 56-57 (this Court's Order, describing *Bruen* as "recognizing undisputed lawfulness of prohibitions in places such as legislatures, polling places, courthouse[s], schools,

---

because they have failed to show either that they would not ask permission before carrying on private property or that asking for permission would be burdensome. *See id.* at 5 n.2. Plaintiffs argue that "the burden of being required to ask for consent is enough of a burden to confer standing," ECF No. 78 at 6, but the case that they cite for that proposition, *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009), dealt with the distinct situation in which a plaintiff brings a denial-of-equal-treatment claim, *id.* at 1351-52. This case does not involve the denial of equal treatment. Furthermore, Plaintiffs never alleged in their complaint or stated in the declarations accompanying their motion for a TRO that having to seek consent would burden them, and they should not be permitted to fill those gaps with statements from counsel in a brief.

and government buildings").  More radically, Plaintiffs argue for the first time in

their Opposition that a place is not sensitive unless the government provides

"security akin to that provided before entering courthouses or the TSA-secured

areas of an airport, i.e., armed government guards and metal detectors at a

minimum at every point of entry."  ECF No. 78 at 9.  This theory, raised for the

first time in Plaintiffs' Opposition, has no basis in history.  *See, e.g.*, Cornell Decl.

¶ 42, ECF No. 55-2 (explaining that "[t]he sensitive places doctrine did not, as

some gun rights advocates have erroneously suggested, depend on the fact that

government could provide comprehensive security, such as modern court houses

which have metal detectors and armed guards"); Carina Bentata Gryting & Mark

Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places*

*Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L.

Rev. E-Supplement I.-60, I.-62 (2022) ("[T]he 'metal detector and security guard'

principle for identifying sensitive places is inconsistent with the original public

understanding of the Second Amendment, both at its ratification and at its

incorporation via the Fourteenth Amendment.").  Plaintiffs' argument to the

contrary depends on a historically inaccurate assertion in a single law review

article, *see* ECF No. 78 at 9 (citing David B. Kopel & Joseph G.S. Greenlee, *The*

*"Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13

Charleston L. Rev. 205, 290 (2018)), ipse dixit, *see id.* (claiming, without support,

2-ER-0111

that "[a]t the Founding, comprehensive security meant officials who were armed and able to control every point of access"), and two district court decisions that have been stayed in relevant part by courts of appeals, *see id.* at 9-10 (quoting *Koons v. Platkin*, No. CV 22-7464 (RMB/AMD), 2023 WL 3478604, at *90 (D.N.J. May 16, 2023), *stayed in relevant part*, No. 23-1900 (3d Cir. June 20, 2023); *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022), *stayed in relevant part*, No. 22-2933 (2d Cir. Dec. 7, 2022)).[2]  To be sure, *some* sensitive places have historically provided government security.  *See* ECF No. 78 at 8-9 & n.2.  But many others did not.  Notably, "[m]any 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in *Heller* . . . —are open to the public, without any form of special security or screening." *Class*, 930 F.3d at 465.  In light of this, Plaintiffs

---

[2] Plaintiffs argue that "[t]he State's reliance on the partial stay in the Third Circuit is misplaced, as it omits that the Third Circuit *denied* the stay motion as to a law identical to H.R.S. § 134-e insofar as it restricted carry on private property except with the owner's permission." ECF No. 78 at 2.  But the State omitted nothing. *See, e.g.*, ECF No. 67-1 at 1 (noting that "the Second and Third Circuits have recently stayed district court orders enjoining similar laws *pertaining to sensitive places*" (emphasis added)); *id.* (describing the Third Circuit's order in *Koons* as "staying [the district court's] order *in part*" (emphasis added)); *id.* at 8 (describing the district court's order in *Koons* as "stayed in part, as to most of the sensitive places at issue").  It is Plaintiffs whose reliance is misplaced, as they continue to cite passages from district court decisions that have been deemed likely incorrect by two different courts of appeals.

cannot possibly establish that the provision of such security is a prerequisite to a location's status as sensitive.[3]

In addition to these errors, Plaintiffs renew their mistaken arguments that they have met their burden under *Bruen*'s plain text inquiry, *see* ECF No. 78 at 10-12; that 1791 is the only relevant time period for evaluating historical analogues, *see id.* at 12-13; and that *Bruen* requires courts to interpret the Constitution by calculating the percentage of the population to which historical laws applied, *see id.* at 13-14.  Plaintiffs also renew their argument, which this Court endorsed, that the government's role as a proprietor is irrelevant to the Second Amendment following *Bruen*.  *See id.* at 16-17; ECF No. 66 at 55-56.  The State has already explained why each of these arguments is wrong, and it will not repeat those explanations at length here.  *See, e.g.*, ECF No. 55 at 7-8 (sensitive-place restrictions fall outside of the scope of the Second Amendment); *id.* at 4-6 & n.7 (courts can consider analogues from 1868, and even from later time periods); *id.* at 6 n.8 (*Bruen* does not require courts to count States or calculate population percentages); *id.* at 11 (courts, including the Supreme Court, have long recognized

---

[3] Both *Koons*, 2023 WL 3478604, at *82, and *Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700, at *65 (N.D.N.Y. Nov. 7, 2022)—on which Plaintiffs heavily rely—rejected challenges to laws designating playgrounds as sensitive places.  The State is unaware of many (if any) playgrounds that provide comprehensive government security.

2-ER-0113

that the government enjoys increased regulatory flexibility when acting as a proprietor). The State is likely to succeed on appeal with respect to Plaintiffs' misguided contentions.

The State is also likely to succeed on appeal with respect to Plaintiffs' challenges to each of the enjoined sensitive-place provisions. As discussed above and in the State's Motion, *see supra* pp. 2-3; ECF No. 67-1 at 7 n.6, HRS § 134-A(a)(1) prohibits firearms only in parking areas that exclusively serve government buildings and that are therefore sensitive to the same extent as the government buildings themselves. *See Class*, 930 F.3d at 464; *Bonidy*, 790 F.3d at 1125, 1126-27. And each of the remaining provisions has ample historical support. *See* ECF No. 55 at 8-10 (bars and restaurants); *id.* at 14-16 (parks and beaches); *id.* at 17-18 (banks and financial institutions).

Plaintiffs do not meaningfully respond to the arguments raised in the State's Motion. With respect to bars and restaurants, *see* HRS § 134-A(a)(4), Plaintiffs ignore the Reconstruction Era laws cited by the State, *see* ECF No. 78 at 19, and they assert, without support, that the purpose of the Founding Era laws "was not to ensure public safety," *id.*[4] Moving to parks and beaches, *see* HRS § 134-A(a)(9),

---

[4] Plaintiffs have no response to the State's argument that this Court erred by enjoining HRS § 134-A(a)(4) as applied to bars, when Plaintiffs challenged the provision only as applied to restaurants. *See* ECF No. 67-1 at 6 n.5.

2-ER-0114

Plaintiffs fail to engage with the State's substantive criticisms of this Court's decision—including that the Court appears to have enjoined that provision based in part on a mathematical error, *see* ECF. No. 67-1 at 12-13 & n. 9—and they instead make an argument, inconsistent with *Heller* and *Bruen*, that "there is no historical tradition of disallowing the carry of firearms where children congregate." ECF No. 78 at 17.[5]  Finally, with respect to banks, *see* HRS § 134-A(a)(12), Plaintiffs suggest that even government buildings are not necessarily sensitive—contrary to *Heller* and *Bruen*—and they baselessly accuse the State of trying to mislead the Court by relying on Founding Era analogues that restricted firearms in sensitive commercial centers.  *See* ECF No. 78 at 19-20 & n.5.[6]

---

[5] Plaintiffs appear to concede in this portion of their argument that schools are sensitive places, *see* ECF No. 78 at 18, contrary to the position they take earlier in their Opposition that only legislative assemblies, polling places, and courthouses are sensitive, *see id.* at 8.  Plaintiffs attempt to distinguish schools from other places where children gather on the ground that "when children are at school, their teachers and other school staff are acting *in loco parentis*," and "[p]art of their job is to care for their students as a parent would, including keeping them safe."  *Id.* at 18.  The State has a strong interest, however, in keeping children safe wherever they congregate, whether at schools, summer camps, child care facilities, playgrounds, beaches, or parks, *see* HRS §§ 134-A(a)(8), (9).

[6] As the State explained at the TRO hearing, even though some Founding Era laws that restricted firearms in fairs and markets contained a terror requirement, "it nevertheless is significant that those laws[,] holding the terror requirement to the side[,] isolated fairs and markets as unique places."  Tr. 20 (July 28, 2023).  Indeed, the district court's decision in *Antonyuk*, on which Plaintiffs rely, also found the focus on fairs and markets to be significant, notwithstanding any terror

2-ER-0115

### D.     THE DEFAULT RULE IS CONSTITUTIONAL.

Plaintiffs' challenge to the default rule is also likely to fail on appeal.  As explained above, Plaintiffs lack standing to challenge HRS § 134-E, and as discussed in the State's earlier filings, Plaintiffs' challenge is unlikely to succeed under either the textual or historical prongs of the *Bruen* test.  *See* ECF No. 55 at 18-21; ECF No. 67-1 at 15-16.[7]  This Court correctly noted that, "where a business revokes a licensee or invitee's permission to enter the business's property, the business is no longer a public place to that licensee or invitee," and "[t]he licensee or invitee's conduct would not be covered by the Second Amendment's plain text in such a scenario."  ECF No. 66 at 45.  The logical conclusion from that is the Second Amendment's plain text likewise fails to cover an individual's conduct where a business withholds consent under HRS § 134-E.

The Court also erred in dismissing the State's historical analogues on the ground that they "concerned private property like residential lands, which were not generally held open to the public."  ECF No. 66 at 79.  As Professor Hendrik Hartog, an expert for the State of New Jersey, explained in a declaration filed in *Koons v. Platkin*, No. CV 22-7464 (RMB/AMD) (D.N.J. Feb. 13, 2023), ECF

_____

requirement that these early laws may have had.  *See* 2022 WL 16744700, at *37 n.66.

[7] Plaintiffs' First Amendment argument is also meritless, as this Court correctly held.  *See* ECF No. 66 at 81-82.

No. 84 (Hartog Decl.), the 1771 New Jersey law cited by the State in this litigation[8]

"extended to all varieties of real property, including the typical 'businesses' of the

times," Hartog Decl. ¶ 32; *id.* ¶ 34 ("Thus, under the 1771 law, if one entered a

blacksmith's shop, one needed the permission of the blacksmith or his agents if

one meant to enter the space armed.").  Likewise, although the 1722 New Jersey

law cited by the State in this litigation applied to "Improved or Inclosed Lands in

any Plantation,"[9] Professor Hartog explained in his *Koons* declaration that: "The

language of 'improved or inclosed' in the 1722 Act was not a limitation of the

provision to fenced-in land.  Rather, it would have marked two ways an owner

would have given notice of his possession of the property at issue.  Fencing-in was

one way to give such notice of possession, but there were others, such as recording

in county deed books and paying of taxes."  Hartog Decl. ¶ 36.  This Court thus

should not have concluded, based on contemporary dictionary definitions of

"enclose," "land," and "plantation," that the State's analogues "concerned private

property like residential lands, which were not generally held open to the public."

ECF No. 66 at 79.[10]

---

[8] Declaration of Nicholas M. McLean Ex. 42, ECF No. 55-75.

[9] Declaration of Nicholas M. McLean Ex. 40, ECF No. 55-73.

[10] In their discussion of the default rule, Plaintiffs again fault the State for
purportedly relying on the Third Circuit's stay order in *Koons*.  *See* ECF No. 78 at
14.  As noted above, *see supra* note 2, the State has not relied on *Koons* in

## III.   IRREPARABLE INJURY

As explained in the Motion, the State "suffers . . . irreparable injury"

whenever it is barred "from effectuating statutes enacted by representatives of its

people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

chambers) (internal quotation marks omitted); *see also Abbott v. Perez*, 138 S. Ct.

2305, 2324 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly

inflicts irreparable harm on the State . . . ."). The harm from a sovereign entity's

inability to enforce its laws is especially profound here, in light of the "law

enforcement and public safety interests" implicated by firearms and gun violence.

*King*, 567 U.S. at 1303.

Plaintiffs argue in their Opposition that "[t]his Court should find that the

State not promptly opposing Plaintiffs' preliminary injunction hollows any claim

of irreparable harm in this matter." ECF No. 78 at 24. But the State has moved

with urgency at each step of this litigation, including by promptly moving this

---

connection with the default rule. To the contrary, it is Plaintiffs who rely on
improper sources, *see* ECF No. 78 at 15-16 & n.4, as their discussion of the default
rule draws heavily from *Antonyuk* and *Christian v. Nigrelli*, No. 22-CV-695 (JLS),
2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022)—both of which have been stayed
in relevant part pending appeal by the Second Circuit, *see* No. 22-2908 (2d Cir.
Dec. 7, 2022); No. 22-2987 (2d Cir. Dec. 12, 2022).

2-ER-0118

Court and the Ninth Circuit for a stay of this Court's TRO order[11] pending appeal. *See* ECF No. 67-1; No. 23-16094 (9th Cir.), Dkt. 3.

## IV.   A STAY IS IN THE PUBLIC INTEREST

As explained in the State's Motion, "[t]here is an immeasurable societal benefit of maintaining the immediate status quo while the process of judicial review takes place." *Duncan v. Becerra*, No. 17-cv-1017-BEN-JLB, 2019 WL 1510340, at *2 (S.D. Cal. Apr. 4, 2019); *see* ECF No. 67-1 at 17.  Plaintiffs argue that the status quo should be measured "[a]t the time of the filing of this lawsuit." ECF No. 78 at 25.  But a stay "suspends judicial alteration of the status quo," *Nken v. Holder*, 556 U.S. 418, 429 (2009) (cleaned up), and the "judicial alteration" here was this Court's Order enjoining enforcement of the challenged provisions, which had taken effect over a month prior.  Plaintiffs also argue that the State has failed to "rebut the statistical evidence the Court relied on showing Americans with CCW permits are overwhelmingly law-abiding."  ECF No. 78 at 25.  But Plaintiffs' purported evidence—which was raised for the first time in their reply brief, *see* ECF No. 61 at 15—is irrelevant.  As a preliminary matter, concealed carry permit holders have been responsible for thousands of deaths nationwide over the past

---

[11] The Court's Order made clear that "Plaintiffs' request for a preliminary injunction will be subsequently and separately briefed, heard, and ruled on."  ECF No. 66 at 2 n.2.

14

decade and a half.  *See More Than 2,200 Non-Self Defense Deaths Involving Concealed Carry Killers Since 2007, Latest Violence Policy Center Research Shows*, Violence Pol'y Ctr. (Apr. 21, 2022), https://perma.cc/MXW4-AWYD; *see also Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring) (observing that "examples abound of 'law-abiding citizens' . . . who place the public safety in jeopardy," and discussing several high-profile examples where "shooters all were legally entitled to carry their concealed firearms, which they used to kill others").  Furthermore, recent studies suggest that widespread concealed carrying increases crime through a variety of mechanisms, including not just violence by permit holders, but also decreased law enforcement effectiveness and increased gun theft.  *See* John J. Donohue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* 2-3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30190, June 2023), https://perma.cc/QD3C-4DBF.  Mitigating some of these harms by limiting the carrying of guns in sensitive locations is in the public interest.

## V.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWED PENDING APPEAL

It is well settled that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."  *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (emphasis added) (internal quotation marks omitted).  "This rule applies with special force where," as here,

2-ER-0120

"there is no class certification."  *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d

644, 664 (9th Cir. 2011); *accord Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92

F.3d 1486, 1501 (9th Cir. 1996) ("[I]njunctive relief generally should be limited to

apply only to named plaintiffs where there is no class certification . . . .").  "A

district court abuses its discretion by issuing an overbroad injunction," and "[a]t

least one Supreme Court decision suggests that federal courts should only enjoin

enforcement of criminal statutes against the plaintiffs before the court."

*McCormack*, 694 F.3d at 1019 (internal quotation marks omitted).

Plaintiffs quote *Regents of the University of California v. U.S. Department

of Homeland Security*, 908 F.3d 476, 512 (9th Cir. 2018), for the proposition that

nationwide injunctions are "commonplace in APA cases."  ECF No. 78 at 23.  But

this is not an APA case.  *See* 5 U.S.C. § 706(2) (expressly authorizing courts to

"hold unlawful and set aside agency action").  Plaintiffs also argue that a statewide

injunction is necessary to vindicate Plaintiff Hawaii Firearms Coalition's rights.

*See* ECF No. 78 at 23. But the Coalition did not move for a TRO or PI, *see* ECF

No. 7 at 2, and it identifies no members aside from Plaintiffs who have stated that

they intend to carry firearms in any of the locations covered by Act 52, *see* ECF

No. 1-8.

2-ER-0121

## VI.   CONCLUSION

The State respectfully requests that this Court stay its Order pending appeal.

In the alternative, the State renews its request for a temporary administrative stay

while the State renews its request for emergency relief in the Ninth Circuit.  *See*

ECF No. 67-1 at 18.

DATED: Honolulu, Hawai'i, September 1, 2023.

*/s/ Ben Gifford*
_____

KALIKO'ONĀLANI D. FERNANDES
  Solicitor General
NICHOLAS M. MCLEAN
  First Deputy Solicitor General

NEAL K. KATYAL*
MARY B. MCCORD*
BEN GIFFORD*
RUPA BHATTACHARYYA*
DANA A. RAPHAEL*
  Special Deputy Attorneys General

*Pro Hac Vice*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney
General of the State of Hawai'i

18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi,<br><br>Defendant. | Civil No. 1:23-cv-00265-LEK-WRP<br><br>CERTIFICATE OF SERVICE |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was

served electronically through the Court's CM/ECF system upon the following:

KEVIN GERARD O'GRADY
Law Office of Kevin O'Grady
1164 Bishop Street, Suite 1605
Honolulu, HI 96813
Phone: (808) 521-3367
E-mail: Kevin@KevinOGradyLaw.com

ALAN ALEXANDER BECK
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
Phone: (619) 905-9105

E-mail: Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION

DATED: Honolulu, Hawaiʻi, September 1, 2023.

*/s/ Ben Gifford*

| | |
|---|---|
| KALIKOʻONĀLANI D. FERNANDES | NEAL K. KATYAL* |
|   Solicitor General | MARY B. MCCORD* |
| NICHOLAS M. MCLEAN | BEN GIFFORD* |
|   First Deputy Solicitor General | RUPA BHATTACHARYYA* |
| | DANA A. RAPHAEL* |
| |   Special Deputy Attorneys General |

*\* Pro Hac Vice*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION,<br><br>Plaintiffs,<br><br>vs.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br>Defendant. | Civil No. 1:23-cv-00265-LEK-WRP<br><br>OPPOSITION TO MOTION FOR STAY PENDING APPEAL AND, IN THE ALTERNATIVE, TEMPORARY ADMINISTRATIVE STAY; CERTIFICATE OF SERVICE |

## OPPOSITION TO MOTION FOR STAY PENDING APPEAL AND, IN THE ALTERNATIVE, TEMPORARY ADMINISTRATIVE STAY

## Contents

I.    **Introduction** .................................................................1

II.   **The State Has Not Shown a Likelihood of Success on the Merits** ..........2

III.  **Standing** ....................................................................3

IV.  **This Court Did Not Abuse Its Discretion In Reviewing the Business Declarations** ...............................................................4

V.    **The State Has Not Shown a Strong Showing of Success on the Merits** ..8

VI.  **The Second Amendment Presumptively Protects Plaintiffs' Conduct** .10

VII.  **Default Rule** ...............................................................14

VIII. **Proprietorship** ............................................................16

IX.  **Parks and Beaches** .......................................................17

X.    **Restaurants and Bars that Serve Alcohol** ...............................18

XI.  **Banks** .......................................................................19

XII.  **Parking Lot Interpretation** .............................................21

XIII. **This Court Should Not Narrow the Scope of the Injunction** ...............22

XIV. **Irreparable Harm** .........................................................23

XV.  **Public Interest/Balance of Equities** ...................................25

i

**XVI.   This Court Should Not Grant an Administrative Stay** .........................25

**XVII.  Conclusion** ...................................................................................25

ii

**2-ER-0128**

## Table of Authorities

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) .....................................................1

*Alaska v. Federal Subsistence Bd*., 544 F.3d 1089 (9th Cir. 2008).........................21

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987).......................................................22

*Christian v. Nigrelli*, No. 1:22-cv-695, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ........................................................................................................................15

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ........................6

*Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 110 S. Ct. 2447 (1990)................5

*District of Columbia v. Heller*, 554 U.S. 570 (2008)....................................11, 12, 14

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) .................3, 23

*Espinoza v. Mont. Dep't of Rev.,* 140 S. Ct. 2246 (2020).........................................13

*Frey v. Nigrelli*, No. 21-cv-05334 (NSR), 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023) ..........................................................................................................................7

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ....................................................13

*GE v. Joiner*, 522 U.S. 136, 118 S. Ct. 512 (1997)....................................................5

*Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974)............................................1

*Hardaway v. Nigrelli*, No. 22-cv-771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ...................................................................................................................9, 10

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992)…….17

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ...................................................22

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) ................................25

*Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023) ....................................14

*Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235

(D.N.J. May 16, 2023) .....................................................................11, 15

*Long Island R. Co. v. International Ass'n of Machinists*, 874 F.2d 901 (2d Cir.

1989) .......................................................................................24

*Maya v. Centex Corp.*, 658 F.3d 1060, (9th Cir. 2011) .............................................3

*Milliken v. Bradley*, 433 U.S. 267, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977) ..........22

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).................... passim

*Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009) ..........1, 2

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).....................................................3

*Pharmacia Corp. v. Alcon Labs.*, Inc., 201 F.Supp.2d 335 (D.N.J.2002) ...............24

*Presidio Historical Ass'n. v. Presidio Trust*, 811 F.3d 1154 (9th Cir. 2016) ..........22

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) .........................................................13

*Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, 908 F.3d 476,

(9th Cir. 2018) ..............................................................................23

*Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1998)........................24

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013).............................................25

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, (2006) .......4

iv

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ..............................................21

*Teter v. Lopez*, No. 20-15948, 2023 U.S. App. LEXIS 20312 (9th Cir. Aug. 7,

2023) ................................................................................. 16, 19

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ...................................13

*United States v. Daniels*, No. 22-60596, 2023 U.S. App. LEXIS 20870 (5th Cir.

Aug. 9, 2023) ......................................................................... 18, 19

*United States v. Kokinda*, 497 U.S. 720 (1990)…………………………………..17

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 101 S. Ct. 1830, 68 L. Ed. 2d 175

(1981) ..................................................................................7

*Virginia v. Moore*, 553 U.S. 164 (2008)...................................13

*Wolford v. Lopez*, No. CV 23-00265 LEK-WRP, 2023 U.S. Dist. LEXIS 138190

(D. Haw. Aug. 8, 2023) ...............................................................7

*Worth v. Harrington,* No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023)

............................................................................13

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021).........................................22

*Yukutake v. Connors*, No. 19-00578 JMS-RT, 2021 U.S. Dist. LEXIS 181883 (D.

Haw. Sep. 23, 2021) ...................................................................2

*Yukutake v. Connors*, No. 19-00578 JMS-RT, 2021 U.S. Dist. LEXIS 181883 (D.

Haw. Sep. 23, 2021) ...................................................................2

*Yukutake v. Lopez*, No. 22-00323 JAO-KJM, 2023 U.S. Dist. LEXIS 5476 (D.

Haw. Jan. 10, 2023).....................................................................................5

## **Statutes**

H.R.S. § 134-E ................................................................................. 2, 7, 8

H.R.S. § 134-51................................................................................5

H.R.S. § 134-A(a)(1).........................................................................21

## **Other Authorities**

1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) ..............9

1 LAWS OF THE STATE OF NEW YORK 176 (2d ed., Albany: Websters &

Skinner 1807)..........................................................................9

2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds.,

1797) ..................................................................................9

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611

(Watkins ed.,1800).....................................................................9

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42

(Davis ed., 1796).......................................................................9

*Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*,

SSRN (Oct. 1, 2022). ..................................................................12

2-ER-0132

Daniel J. Elazar, *Banking and Federalism in the Early American Republic*, 28

Huntington Libr. Q. 301 (1965)............................................................20

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:*

*Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205,

(2018) .......................................................................................................9

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No*

*Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020)...........16

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the*

*Critical Period for Historical* ................................................................12

PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Stanley

Ray ed., 1904)..........................................................................................9

THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke,

ed. 1790) ..................................................................................................8

VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE

STATE OF MARYLAND:  NOVEMBER SESSION 1791 (Green ed., 1795) ....9

## Constitutional Provisions

U.S. CONST. amend. II……………………………………………………passim

U.S. CONST. amend III……………………………………………...……11

U.S. CONST. amend. IV ........................................................................11

vii

## I.     Introduction

Defendant Lopez's ("State" or "Hawaii") motion to stay should be denied. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433-34, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)). The State has failed to do so. The State cannot suffer harm from an inability to enforce unconstitutional laws.  Even if this were not the case, the State could have requested an expedited briefing and hearing schedule and oppose the PI but has chosen not to. Furthermore, the State has not shown a likelihood of success on appeal. Temporary restraining orders ("TRO") are typically not appealable. The State has not made a showing that an appeal would fall within any exception to this rule.[1]

Even if the Ninth Circuit reaches the merits, the State has not shown that the Ninth Circuit will overturn this Court's well-reasoned opinion. "Because the Defendant has made a weak showing on the first two factors, the third and fourth factors are irrelevant." *Yukutake v. Connors*, No. 19-00578 JMS-RT, 2021 U.S.

---

[1] A TRO "should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing". *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974). Here, this Court properly granted a TRO on a law that had yet to go into effect at the time of the filing of the TRO which only lasts until a preliminary injunction can be heard.

**2-ER-0134**

Dist. LEXIS 181883, at *39 (D. Haw. Sep. 23, 2021).  However, even if they were

relevant, the State simply cannot show that it is in the public interest or equitable to

allow it to continue to enforce unconstitutional laws. The State's reliance on the

partial stay in the Third Circuit is misplaced, as it omits that the Third Circuit

*denied* the stay motion as to a law identical to H.R.S. § 134-e insofar as it restricted

carry on private property except with the owner's permission.

In the Ninth Circuit, "Courts consider the following factors when deciding

whether to issue a stay pending appeal: "(1) whether the stay applicant has made a

strong showing that he is likely to succeed on the merits; (2) whether the applicant

will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the

public interest lies." *Yukutake v. Connors*, No. 19-00578 JMS-RT, 2021 U.S. Dist.

LEXIS 181883, at *9 (D. Haw. Sep. 23, 2021) (quoting *Nken v. Holder*, 556 U.S.

418, 433-34, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)) (internal quotation marks

omitted)). For the reasons laid out below, the State's motion should be denied.

## II.    <u>The State Has Not Shown a Likelihood of Success on the Merits</u>

In order to satisfy the standard for a motion to stay, a moving party must

show a likelihood of success on the merits. Here, the State has not even shown that

its proposed appeal will even be heard.  "Ordinarily, a TRO is not an

appealable order." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018).  It is true that there is an exception to this rule "where a TRO has the same effect as a preliminary injunction, it is appealable" *Id*. However, here the State has made no argument that this is the case. Thus, the State has not even shown an appeal is procedurally proper.  Therefore, it has failed to show there is a likelihood of success on the merits. Assuming the Ninth Circuit reaches the merits, the State has not made a *strong showing* it will prevail on appeal.

## III.   Standing

Plaintiffs have standing as this Court already found. As that matter was recently addressed in the TRO motion, Plaintiffs will not duplicate those arguments. However, Plaintiffs maintain that they have standing, as this Court found, because the State is prohibiting them from carrying in the various challenged places.  The State claims that this Court's reliance on *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) was misplaced.  However, *O'Handley*'s reasoning is applicable here. "[T]he traceability requirement is less demanding than proximate causation, and thus the "causation chain does not fail solely because there are several links" or because a single third party's actions intervened.  *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citation and internal

quotation marks omitted)).  Here, Plaintiffs' injury is traceable to the State because it is the entity that maintains a legal regime that makes it illegal to carry a handgun.

As this Court correctly found, there is no need to determine whether individual businesses would allow Plaintiffs to carry if the laws were enjoined. However, even if this were true, it is not necessary for Plaintiffs to provide "allegations or evidence that any financial institution has authorized (or would authorize) carrying firearms on its premises". State's Motion to Stay at 3. As alleged in the Complaint and reply, Kasprzycki owns the portion of the building his business is in. He would like to carry in the parking lot of his business, but he shares the parking lot with a bank. Complaint ¶ 61. Therefore, there can be no dispute that he has a right to challenge the bank restriction. As a tenant in common with the bank with an equal possessory interest in the parking lot, Kasprzycki does not need to seek permission from the bank. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Therefore, even under the State's standing theory, Plaintiffs have standing as to banks and other financial institutions. Furthermore, this Court did not abuse its discretion in accepting the business declarations.

## IV.    This Court Did Not Abuse Its Discretion In Reviewing the Business Declarations

4

"[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings." *GE v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517 (1997) That is the standard that will be used to review this Court's decision to review the business declarations on appeal, should the current appeal be heard.  Under abuse of discretion review, a trial court's decisions are only overturned by an appellate court when they are "clearly erroneous". *Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 401, 110 S. Ct. 2447, 2458 (1990).  The State has made no argument that this Court's use of the declarations was clearly erroneous. And they cannot because the Court properly admitted the declarations into the record. The declarations were submitted as a direct response to a legal argument raised in Hawaii's opposition to Plaintiff's TRO motion. This Court and others routinely allow litigants to submit evidence to rebut newly made argument *See e.g.* "*Yukutake v. Lopez*, No. 22-00323 JAO-KJM, 2023 U.S. Dist. LEXIS 5476, at *20 (D. Haw. Jan. 10, 2023). ("[I]n response to Defendant's specific argument in reply that Plaintiffs have not put forth more recent examples of enforcement, Plaintiffs cite two recent examples of prosecutions under HRS § 134-51's prohibition on billies."). *See also California Rifle & Pistol Ass'n, Inc. v. City of Glendale,* No. 2:22-CV-07346-SB-JC, 2022 WL 18142541, at *3 (C.D. Cal. Dec. 5, 2022) ("Defendants object to these declarations as evidence improperly raised for the first time in a reply brief. Dkt. No. 26. Because Defendants challenged Plaintiffs' standing in their opposition, Plaintiffs

2-ER-0138

were permitted to submit rebuttal evidence in their reply. L.R. 7-10. Defendants'

objection is overruled.") Most importantly, "[d]ue to the urgency of obtaining a

preliminary injunction at a point when there has been limited factual development,

the rules of evidence do not apply strictly to preliminary injunction proceedings."

*Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir.

2013). The State cites an example where a different court may have applied its

discretion differently. It does not follow from that that this Court abused its

discretion by accepting the business declarations.  It was within this Court's

discretion to accept the business declaration into the record and the State has not

shown how that discretion was applied in a clearly erroneous manner. Thus, the

State has not made a strong showing that this Court's decision to accept the

business declarations will be overturned on appeal.

   The State's remaining standing argument is similarly reviewed on abuse of

discretion review. It is unnecessary for Plaintiffs to present evidence that they

would not ask for consent to carry in private business in order to have standing.

Moreover, even if they did and Plaintiffs had not provided evidence, Plaintiffs

would still have standing.  That is because the burden of being required to ask for

consent is enough of a burden to confer standing to Plaintiffs. *Common*

*Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Requiring a

registered voter either to produce photo identification to vote in person or to cast

an absentee or provisional ballot is an injury sufficient for standing."). The court in *Frey v. Nigrelli*, No. 21-cv-05334 (NSR), 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023)'s analysis simply was wrong.  However, even if it was correct, Plaintiffs have alleged sufficient information in their declarations to show that they would not seek consent.  This Court found that "[i]ndividual Plaintiffs' declarations imply that before § 134-E became effective they would not seek explicit permission from those businesses." *Wolford v. Lopez*, No. CV 23-00265 LEK-WRP, 2023 U.S. Dist. LEXIS 138190, at *31-32 (D. Haw. Aug. 8, 2023).  Thus, this Court made a factual finding that Plaintiffs declarations show that they would not seek consent from a private business owner.  That factual finding is reviewed on abuse of discretion review. That finding is not clearly erroneous.  This is especially true at the preliminary injunction stage. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); And the State has made no argument that it was.  Thus, the State has not made a strong showing that this Court's standing ruling will be overturned on appeal.

Even the State had made a strong showing, the Declaration of Gregory L. Howeth; very clearly states "I have otherwise not given consent to the public to carry firearms on my property and/or business." *See* No. [61-4]. And Plaintiffs

have all alleged in their supplemental declaration that they would go armed to Mr.

Howeth's shop but for HRS §134-E. *See* Doc. No. [61-4]. Therefore, even if it

were necessary for Plaintiffs to have alleged they would not ask for consent, and it

were found they had not (despite this Court having found they had), Plaintiffs

would still have standing.  Finally, the State claims that the businesses have given

express consent to Plaintiffs in their declarations.  That just isn't true based on a

plain reading of the declarations. This Court was eminently correct in finding that

Plaintiffs have standing as to all the laws challenged.

## V.     <u>The State Has Not Shown a Strong Showing of Success on the Merits</u>

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) the

Supreme Court has endorsed only three sensitive places "where weapons were

altogether prohibited," namely "legislative assemblies, polling places, and

courthouses." *Id* at 2133. The Court stated explicitly that "courts can use analogies

to *those* historical regulations of 'sensitive places' to determine that modern

regulations prohibiting the carry of firearms in new and analogous sensitive places

are constitutionally permissible." *Id.* (emphasis added). The foremost factor that is

the linchpin between these few locations is the long tradition of the government

exclusively providing comprehensive security, *see, e.g.* THE PUBLIC LAWS OF

THE STATE OF SOUTH CAROLINA 271 (Grimke, ed. 1790) ("The said sheriffs

shall by themselves, or their lawful deputies respectively, attend all the courts

hereby appointed, or directed to be held, within their respective districts."),[2]

because, for example, government officials are "at acute personal risk of being

targets of assassination," David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive*

*Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13

CHARLESTON L. REV. 205, 290 (2018); *see also Hardaway v. Nigrelli*, No. 22-

cv-771, 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022). At the Founding,

comprehensive security meant officials who were armed and able to control every

point of access. Today, it means security akin to that provided before entering

courthouses or the TSA-secured areas of an airport, i.e., armed government guards

and metal detectors at a minimum at every point of entry. Security Administration

---

[2] Other examples of Founding Era regulations in these places: VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND:  NOVEMBER SESSION 1791, at *2 (Green ed., 1795) (appointing sergeant at arms and door-keeper for state legislature); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Stanley Ray ed., 1904) ("sergeant-at-arms" and "door-keeper" for legislature); 1 LAWS OF THE STATE OF NEW YORK 176 (2d ed., Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons… . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796) (court's "serjeant at arms"); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed.,1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); 1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) (polling places); 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (polling places).

2-ER-0142

(TSA) officers, air marshals, police officers, metal detectors, and luggage scanners all check people and their baggage for weapons and dangerous devices, like explosives."); *Hardaway*, 2022 WL 16646220, at *14 (explaining sensitive places are "typically secured locations"). That the government can prohibit firearms in these sensitive places makes sense. The historic central purpose of the Second Amendment is ensuring Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 142 S. Ct. at 2150. But when the government secures a location and protects Americans, there is less of a need for ordinary, law-abiding Americans to be ready to defend themselves. Governments may bar the carrying of firearms in only "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2138 (emphasis added). The exception cannot become the rule.

## VI.   The Second Amendment Presumptively Protects Plaintiffs' Conduct

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct" and the burden falls on the State to prove its modern restriction is consistent with this Nation's historical tradition of firearm regulation. *Id.* at 2126. In this case, the textual inquiry is straightforward. The Supreme Court has defined all of the Second Amendment's key terms. "The

2-ER-0143

people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any distinction between locations at all. That makes the Second Amendment unlike other Amendments. *See e.g.,* U.S. CONST. amend. III; U.S. CONST. amend. IV. And it means that any locational restrictions on Second Amendment rights must come from history, not from the plain text.

The Supreme Court's binding determination of the meaning of these words and phrases definitively resolves the question of whether Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. Plaintiffs and their members are Americans who seek to carry bearable arms for self-defense. As in *Bruen*, these undisputed facts end the textual inquiry: "the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." 142 S. Ct. at 2134. "The right to armed self-defense follows the individual everywhere he or she lawfully goes." *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235, at *128 (D.N.J. May 16, 2023). Accordingly, "the burden falls on [the State] to show that [the challenged ban] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The State is simply wrong in arguing none of the

2-ER-0144

provisions of SB 1230 burden the Second Amendment. And as the submitted map of Maui County demonstrates, SB 1230 bans carry in roughly 96.4% of the publicly accessible land in Maui County. *See* Doc. No [61-2]. While that figure includes parts of SB 1230 that are not challenged in this lawsuit, it is doubtful that the State would concede any of SB 1230 burdens Second Amendment conduct.  It simply can't be that the Second Amendment right extends outside the home and virtually all the publicly accessible land is excluded and that still does not burden Second Amendment conduct. First, the relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S. Ct. at 2135–36; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw.[3] That is because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35). Although the Court in *Bruen* noted an academic debate surrounding whether courts should look to 1868 and Reconstruction (when the Fourteenth Amendment was adopted), the

---

[3] As Smith explains,  *"*[n]o Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is *only* to confirm that subsequent authorities remained *consistent with the public understanding in 1791*".

2-ER-0145

Court found no need to address the point as the result with respect to carry was the same. *Id.* at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." (emphasis added)). But the analysis of the Court was focused on 1791. *See Worth v. Harrington,* No. 21-cv-1348, 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"). The emphasis on Founding era evidence is fully in accord with past Supreme Court precedent. For example, in *Espinoza v. Mont. Dep't of Rev.*, the Court held that "more than 30" provisions of state law enacted "in the second half of the 19th  Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding era practice. 140 S. Ct. 2246, 2258–59 (2020); *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020); *Timbs v. Indiana*, 139 S. Ct. 682, 687–88 (2019); *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019); *Virginia v. Moore*, 553 U.S. 164, 168 (2008). Second, historical analogues must be "well-established" and "representative." Historical "outlier" requirements of a few jurisdictions or of territorial governments are to be disregarded. *Bruen*, 142 S. Ct. at 2133, 2153, 2147 n.22 & 2156. This means regulations from only a handful of states or those that cover only a small portion of

2-ER-0146

the population or only persist for a few years are not enough to demonstrate that modern regulations are consistent with the Second Amendment. *Id.* at 2155. *Bruen* categorically rejected reliance on laws enacted in the Territories, including expressly "Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are *most unlikely* to reflect 'the origins and continuing significance of the Second Amendment'" *Id*. at 2154 (quoting *Heller*, 554 U.S. at 614) (emphasis added). Third, the historical analogues must be "relevantly similar," which is to say that they must burden ordinary, law-abiding citizens' right to carry for self-defense in a similar manner and for similar reasons. *Id*. at 2132. Therefore, this Court did not artificially constrain its analysis despite what the State argues. Rather it faithfully followed *Bruen* and properly enjoined the laws at issue in this case.

## VII.  <u>Default Rule</u>

The State's reliance on the Third Circuit's stay order is deeply flawed. The Third Circuit expressly did not enjoin New Jersey's Default Rule.  *See Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023).  Thus, the Third Circuit's opinion supports this Court *not* staying the TRO at least as to the Default Rule. And Hawaii otherwise simply has not made a strong showing that it shall prevail on appeal. Plaintiffs are not challenging property owners' right to exclude firearms owners, so the State's rhetoric regarding the solicitude of the right to exclude is wholly beside the point. What is at issue is whether the *State* can change the historical

14

presumption that people can carry firearms on private property open to the public. The answer is no because history is entirely on Plaintiffs' side. The Anti-Carry Default is the *exact opposite* of this Nation's traditional regulatory approach, which has entrusted "private property owners" with principal responsibility to exercise the "right to exclude others from their property" throughout American history. *Christian v. Nigrelli*, No. 1:22-cv-695, 2022 WL 17100631, at *9 (W.D.N.Y. Nov. 22, 2022). The historical default rule has been that "carrying on private property" is "generally permitted absent *the owner*'s prohibition." *Id.* (emphasis added). This concept is basic to the law of trespass. "[T]he well-developed concept of implied license, which operates to grant permission to enter another's premises according to custom or other indicia of consent" creates a presumption that people can carry on private property. *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235, at *181 (D.N.J. May 16, 2023) Accordingly, the traditional rule has been that, unless the owner affirmatively "withdraw[s] consent," the right to carry for self-defense thus extends to private property open to the public. *Id*. at 128.

Even the academic proponents behind the Anti-Carry Default have conceded that it is a novel and significant departure from this Nation's history of firearm regulation. In their book expanding on anti-carry default rules, the proponents stated that "[a]n implied condition of every invitation [onto another's property] is that the invitee is welcome to bring a firearm." *Id*. at 124 n.35. In fact, as of 2020,

2-ER-0148

"*no state* ha[d] adopted generalized 'no carry' defaults for retail establishments."

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No*

*Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020) (emphasis

added). In the Second Amendment analysis, the fact a law is unprecedented is

nearly dispositive that it is unconstitutional. The State's historical evidence below

comprised of hunting regulations from the Founding and hunting regulations from

Reconstruction. Neither set of enactments are sufficient analogues because they do

not burden the right to self-defense for similar reasons ("why") or in a similar

manner ("how") as the Anti-Carry Default. "As *Bruen* put it, the "how" of the

proffered state statutes is different—they regulate different conduct." *Teter v.*

*Lopez*, No. 20-15948, 2023 U.S. App. LEXIS 20312, at *25 (9th Cir. Aug. 7,

2023). Hawaii has not made a strong showing of success on appeal, and cannot

overturn the now *four* district courts that have ruled such default rules

unconstitutional, without any reaching the opposite conclusion.[4]

## VIII.  <u>Proprietorship</u>

---

[4] Besides this Court, these are: *Antonyuk*, 2022 WL 16744700, at *79;
*Christian v. Nigrelli,* No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652 at *9
(W.D.N.Y. Nov. 22, 2022); *Koons*, 2023 WL 3478604, at *67.

16

The State attempts to take a shortcut through this historical inquiry by asserting that the Legislature can restrict firearms at places where the Government is the proprietor. But the State fails to explain how its atextual government-as-proprietor exception is consistent with the first principles of the Second Amendment, namely that it is history and analogies to historical regulations alone that demonstrate the constitutionality of modern firearms restrictions. Moreover, as with other rights, the State does not have a blank check to restrict Plaintiffs' Second Amendment rights under the guise of "proprietorship." *See United States v. Kokinda*, 497 U.S. 720, 725 (1990); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). Instead, the State is limited by the relevant constitutional provision and implementing case law. Both here and below, the State presented *zero* historical evidence of "proprietorship" serving as a basis for the *government* to exclude firearms in a manner consistent with the Second Amendment. Under *Bruen*, that is the end of the matter.

## IX.   <u>Parks and Beaches</u>

The State has not made a strong showing it will reverse this Court's well-reasoned opinion on parks and beaches.  The State's legal theory would make an exception that would swallow the rule that carry is typically to be allowed.  As an initial matter, there is no historical tradition of disallowing the carry of firearms where children congregate.  Making a Brightline rule that carry can be banned

2-ER-0150

anywhere children might congregate would allow the government to ban carry everywhere. Paradoxically, children do not congregate in most of the places covered by Hawaii law. Many of Hawaii's beaches and parks are remote locations that receive very little traffic such as Waihou Spring Trail and Polipoli Spring State Park which Plaintiff Kasprzycki frequents regularly. *See* Doc. No [61-5]. The comparison to schools the State insists on also misses a critical point: when children are at school, their teachers and other school staff are acting *in loco parentis*. Part of their job is to care for their students as a parent would, including keeping them safe. A park or beach has no such responsible adults, besides the parents of the children themselves who have a right to carry in part to defend their children. This is a critical difference in "how" the restrictions operate under *Bruen*.

## X.     Restaurants and Bars that Serve Alcohol

This Court was correct to not allow the State to rely on colonial militia laws. regulating the use of alcohol while on militia duty. "Founding-era statutes concerning guns and alcohol were few. They were also limited in scope and duration. The laws that did exist had two primary concerns: (1) the misuse of weapons while intoxicated and (2) the discipline of state militias." *United States v. Daniels*, No. 22-60596, 2023 U.S. App. LEXIS 20870, at *14 (5th Cir. Aug. 9, 2023). The State argues that "there is no reason to believe that trained militia members would pose greater risks in proximity to alcohol than other members of

the public". Motion at 10. Whether or not that is true is beside the point.  The purpose of these laws was to maintain military discipline.  It was not to ensure public safety. And of course, the historical law did not prohibit non-servicemen from peaceably carrying their arms in bars, pubs, or taverns. Thus, the how and why were different. "At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public." *Id* at *16. "Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence." *Id* at *22. What remains are a handful of outlier municipal and territorial ordinances. "[O]ne solitary statute is not enough to demonstrate a *tradition* of an arms regulation."  *Teter v. Lopez*, No. 20-15948, 2023 U.S. App. LEXIS 20312, at *25-26 (9th Cir. Aug. 7, 2023).  Similarly, the handful of ordinances produced is insufficient to produce a historical tradition.

## XI.    <u>Banks</u>

The State claims that banks at the time of the Founding were government instrumentalities. Even if this were true, that is insufficient to uphold a flat ban on carrying at private banks in the modern era.   As shown above, most government buildings did not ban the carrying of firearms in the relevant historical period.  The State is required to show a historical tradition of banning carry in banks.  That, it has not done.  More to the point, even the State's own sources show that some

19

banks were privately owned. *See* Daniel J. Elazar, *Banking and Federalism in the Early American Republic*, 28 Huntington Libr. Q. 301, 303-04 (1965) ("the great majority of American banks" in the early Republic "were either state-owned joint stock companies in which the state was a major shareholder or were controlled by the state through special charter provisions,"). Moreover, for those where the state had an ownership interest, this does not support any tradition of the government being able to prohibit carry in those locations. A state-owned or controlled entity is, by definition, a separate legal personality from the government. Its buildings are not government buildings. Hawaii's argument that carry can be banned in private banks because some banks were historically controlled by the government holds no water. And its attempt to analogize to other places is invalid because banks existed in the 18th century, so analogical reasoning is not permitted. *Bruen*, 142 S. Ct. at 2131. But even if they could be considered, Hawaii's attempts to analogize to fairs or markets similarly fail. Hawaii even cites historical laws that supposedly banned carry in fairs and markets, including a Virginia law from 1786. This very law was discussed in *Bruen*. *See Bruen* 142 S. Ct. at 2145 (emphasis added). Indeed, New York's lawyers were taken to task by Justice Alito at *Bruen*'s oral argument for attempting to mislead on this point as to a similar North Carolina law from 1814.[5]

---

[5] *See* Transcript of Oral Argument, *New York State Rifle & Pistol Association Inc. v. Bruen* (20-843). Oyez. Retrieved at <https://www.oyez.org/cases/2021/20-843> (as of August 11, 2023) ("I'm not accusing you personally of anything. But,

2-ER-0153

## XII.   <u>Parking Lot Interpretation</u>

This Court correctly found that Hawaii's interpretation of its parking lot ban was incorrect. "Section 134-A(a)(1) as written does not stand for what the State now claims it does." *Wolford v. Lopez*, LEXIS 138190, at \*36 This interpretation has been produced solely for purposes of this litigation.  The Attorney General's office has not published an official opinion endorsing this position. It is extremely telling that Hawaii did not raise this interpretation in their opposition to the motion for a TRO. Rather they waited until oral argument to offer their novel interpretation of state law. Hawaii's filing is nothing more than a transparent attempt to avoid liability. The Supreme Court has "warn[ed] against accepting as 'authoritative' an Attorney General's interpretation of state law." *Stenberg v. Carhart*, 530 U.S. 914, 940 (2000). Indeed, this circuit has refused to accord deference to more limited "litigation positions" in other contexts. *Alaska v. Federal Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008) (holding that the court owed "no deference" to an agency's non-binding "litigation position" interpretation that was "developed during the course of the present case."); *Presidio Historical Ass'n.*

---

on page 23, you say that in founding-era America, legal reference guides advised local officials to "arrest all such persons as in your sight shall ride or go armed." And this is a citation to John Haywood, A Manual of the Laws of North Carolina, 1814. So I looked at this manual, and what it actually says is "you shall arrest all such persons as in your sight shall ride or go armed offensively." And somehow that word "offensively" got dropped…").

*v. Presidio Trust*, 811 F.3d 1154, 1166 (9th Cir. 2016) (rejecting any "special deference" to "a convenient litigating position" where it was proffered "the first time on appeal"). The Attorney General's position taken in this litigation is even less entitled to deference here as it was transparently issued for the purpose of this litigation. "An interpretation that is a "convenient litigating position" or a "*post hoc* rationalizatio[n]" does not merit deference. *Id.* (internal quotation marks and citation omitted). "The general rule, then, is not to give deference to agency interpretations advanced for the first time in legal briefs." *Id.* at 2417 n.6 (citation omitted). *Young v. Hawaii*, 992 F.3d 765, 870 (9th Cir. 2021) (R. Nelson, Dissenting) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019)). Here, because Hawaii advanced their current interpretation of the challenged laws for purposes of this litigation and because it conflicts with a plain reading of the statute, this Court properly rejected it.

### XIII.  <u>This Court Should Not Narrow the Scope of the Injunction</u>

"[T]he scope of [a] remedy is determined by the nature and extent of the . . . violation." *Milliken v. Bradley*, 433 U.S. 267, 270, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977).  An injunction may extend "benefit or protection" to nonparties "if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987). Here, Hawaii law is unconstitutional as it is generally applied. If it is unconstitutional to Plaintiffs,

22

2-ER-0155

then it is unconstitutional to all other law-abiding citizens with concealed carry permits. And it is the most practical manner to give Plaintiffs relief because otherwise Plaintiffs would have to try to explain to police officers that they have a special exemption to a generally applicable law. The relief granted is the most effective way to give Plaintiffs relief. "Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, 908 F.3d 476, 512 (9th Cir. 2018)."Further, the Government "fail[ed] to explain how the district court could have crafted a narrower [remedy]" that would have provided complete relief to the Organizations." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018). Plaintiff Hawaii Firearms Coalition is also a named plaintiff in this matter. And Hawaii Firearms Coalition seeks relief for all its members. The State's request to narrow the injunction to the three named Plaintiffs would deny Plaintiff Hawaii Firearms Coalition the request sought and granted in the TRO.

## XIV.  <u>Irreparable Harm</u>

The state has demonstrated a lack of urgency by not moving towards its preliminary injunction opposition. This Court has already provided a mechanism for the State to end the temporary restraining order. In its TRO order, this Court stated "these rulings could be changed at the preliminary injunction stage because

23

2-ER-0156

the State may be able to proffer adequate evidence to meet its burden as to any of the challenges." *Wolford v. Lopez*, LEXIS 138190, at *93-94. Rather than immediately working towards developing the historical record sufficient to follow this Court's instructions, the State instead focuses its efforts on the current motion. That shows a lack of urgency which the Ninth Circuit has shown is sufficient to deny a preliminary injunction. *Pharmacia Corp. v. Alcon Labs*., Inc., 201 F.Supp.2d 335, 383 (D.N.J.2002) (delay in seeking preliminary injunction "knocks the bottom out of any claim of immediate and irreparable harm"). This Court should find that the State not promptly opposing Plaintiffs' preliminary injunction hollows any claim of irreparable harm in this matter. *See Long Island R. Co. v. International Ass'n of Machinists*, 874 F.2d 901, 905 (2d Cir. 1989) ("the matter of the [TROs] could be reviewed after decision on the motions for preliminary injunctions."). In stark contrast to the State's position, Plaintiffs will suffer true irreparable harm if this motion is granted. "[T]he irreparability of harm may not be casually suspended pending appeal." *Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1998). "[T]he grant of a stay of a preliminary injunction pending appeal will almost always be logically inconsistent with a prior finding of irreparable harm…." *Id*. Because the record here shows not irreparable harm but instead a bid for early appellate review, the State's motion should be denied.

2-ER-0157

## XV.   **Public Interest/Balance of Equities**

The State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). The State also did not even attempt to rebut the statistical evidence the Court relied on showing Americans with CCW permits are overwhelmingly law-abiding.

## **This Court Should Not Grant an Administrative Stay**

This Court should not grant an administrative stay. At the time of the filing of this lawsuit, the status quo was for Plaintiffs to be able to carry in all the challenged locations.  Thus, denying an administrative stay would maintain the status quo as of the time of the filing of the lawsuit. Moreover, a stay is a form of equitable relief. Plaintiffs have an interest in being able to defend themselves which highly outweighs any potential interest the State may have in an administrative stay.

## XVI.   **Conclusion**

The motion to stay should be denied.

2-ER-0158

Dated: August 25, 2023.

Respectfully submitted,


/s/ *Kevin O'Grady*

Kevin Gerard O'Grady

Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com


/s/ *Alan Beck*

Alan Alexander Beck

Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com
Counsel for Plaintiffs

2-ER-0159

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) Civil Action No. 1:23-cv-00265-<br>) LEK-WRP<br>) |
| Plaintiffs, | )<br>)<br>) CERTIFICATE OF SERVICE |
| v. | )<br>) |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII. MAUI COUNTY, | )<br>) Judge: Leslie Kobayashi<br>) Trial: N/A<br>) Hearing: N/A<br>) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on the date noted below, the foregoing document was filed with this Court's ECF system, which generated a notice of filing, and a true and correct copy of the foregoing Opposition to Defendant's motion to stay  and Certificate of Service was emailed to the following counsel for Defendants:

NICHOLAS MCLEAN ESQ
NEAL KATAYAL ESQ
BEN GIFFORD ESQ
DANA A. RAPHAEL ESQ
Deputy Attorneys General
Department of the Attorney
 General, State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Email:      Nicholas.mclean@hawaii.gov
            Neal.katayal@hognlovells.com
            BG720@georgetown.edu
            Dana.raphael@hoganlovells.com

Dated: <u>Friday, August 25, 2023</u>.

Respectfully submitted,

*Counsel for Plaintiff*

/s/<u>*Kevin Gerard O'Grady*</u>
Kevin O'Grady

*/s/ Alan Beck*
Alan Alexander Beck

ANNE E. LOPEZ (7609)
  Attorney General of the State of Hawaiʻi
KALIKOʻONĀLANI D. FERNANDES (9964)
  Solicitor General
NICHOLAS M. MCLEAN (10676)
  First Deputy Solicitor General
Department of the Attorney General
  State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Tel.: (808) 586-1360
Email: kaliko.d.fernandes@hawaii.gov

NEAL K. KATYAL*
DANA A. RAPHAEL*
  Special Deputy Attorneys General
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel.: (202) 637-5600
Email: neal.katyal@hoganlovells.com

MARY B. MCCORD*
RUPA BHATTACHARYYA*
  Special Deputy Attorneys General
Institute for Constitutional
  Advocacy & Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: (202) 661-6607
Email: mbm7@georgetown.edu
*Pro Hac Vice

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as
the Attorney General of the State of Hawaiʻi

(Additional Counsel on Next Page)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,<br><br>                    Plaintiffs,<br><br><br>          v.<br><br>(caption continued) | Civil No. 1:23-cv-00265-LEK-WRP<br><br>**MOTION FOR STAY PENDING APPEAL AND, IN THE ALTERNATIVE, TEMPORARY ADMINISTRATIVE STAY; MEMORANDUM IN SUPPORT OF MOTION; CERTIFICATE OF SERVICE** |

ANNE E. LOPEZ, in her official
capacity as the Attorney General of the
State of Hawai'i,

               Defendant.

District Judge:
Hon. Leslie E. Kobayashi

Magistrate Judge:
Hon. Wes Reber Porter

## ADDITIONAL COUNSEL

BEN GIFFORD*
  Special Deputy Attorney General
Institute for Constitutional
  Advocacy & Protection
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
Tel.: (202) 662-9835
Email: bg720@georgetown.edu

*Pro Hac Vice

## MOTION FOR STAY PENDING APPEAL AND, IN THE ALTERNATIVE, TEMPORARY ADMINISTRATIVE STAY

Pursuant to Rule 8 of the Federal Rules of Appellate Procedure, Rules 7 and 62 of the Federal Rules of Civil Procedure, and this Court's inherent authority, Defendant ANNE E. LOPEZ, in her official capacity as Attorney General of the State of Hawai'i ("the Attorney General"), respectfully moves for a stay pending appeal of this Court's *Order Granting in Part and Denying in Part Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* filed on August 8, 2023 (ECF No. 66) (the "Order").  For the reasons set forth in the attached memorandum in support, a stay is warranted to maintain the status quo and minimize disruptive effects of the Order while the Attorney General pursues an appeal.  Should the Court decline to grant a stay pending appeal, the Attorney General requests, in the alternative, that this Court enter a temporary administrative stay to permit application to the Court of Appeals for a stay pending appeal.

This motion is made following a conference of counsel pursuant to LR7.8 that took place on August 10, 2023.  Plaintiffs, through counsel, oppose this motion.  Because time is of the essence, the Attorney General respectfully requests that the seven-day waiting period under LR7.8, insofar as it applies to this Motion, be waived.

1

**2-ER-0165**

DATED: Honolulu, Hawaiʻi, August 11, 2023.

*/s/ Ben Gifford*

KALIKOʻONĀLANI D. FERNANDES
  Solicitor General
NICHOLAS M. MCLEAN
  First Deputy Solicitor General

NEAL K. KATYAL*
MARY B. MCCORD*
BEN GIFFORD*
RUPA BHATTACHARYYA*
DANA A. RAPHAEL*
  Special Deputy Attorneys General

*\* Pro Hac Vice*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi

2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi,<br><br>　　　　　Defendant. | Civil No. 1:23-cv-00265-LEK-WRP<br><br>MEMORANDUM IN SUPPORT OF MOTION |

**MEMORANDUM IN SUPPORT OF MOTION**

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................1

II.    STANDARD OF REVIEW .............................................................2

III.   THE STATE IS LIKELY TO SUCCEED ON THE MERITS ......................2

      A.    PLAINTIFFS LACK STANDING WITH RESPECT TO
             SEVERAL OF THE CHALLENGED PROVISIONS ........................3

      B.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON
             THEIR CHALLENGE TO THE SENSITIVE-PLACE
             PROVISIONS ........................................................................6

      C.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON
             THEIR CHALLENGE TO THE DEFAULT RULE .........................15

IV.   IRREPARABLE INJURY................................................................17

V.    A STAY IS IN THE PUBLIC INTEREST ...................................................17

VI.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWED
     PENDING APPEAL........................................................................18

VII.  IF THIS COURT DENIES A STAY PENDING APPEAL, IT
     SHOULD GRANT AN ADMINISTRATIVE STAY PENDING
     A MOTION FOR STAY PENDING APPEAL FILED IN THE
     NINTH CIRCUIT .........................................................................18

VIII. CONCLUSION...........................................................................19

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) ........................................................................16

*Al Otro Lado v. Wolf*,
   945 F.3d 1223 (9th Cir. 2019) .............................................................18

*Antonyuk v. Hochul*,
   1:22-cv-0986 (GTS/CFH), 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) .........8

*Antonyuk v. Hochul*,
   No. 22-2908 (2d Cir. Dec. 7, 2022) .......................................................1

*Anyonyuk v. Nigrelli*,
   No. 22A557 (U.S. Jan. 11, 2023)...........................................................1

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) .............................................................9

*California Rifle & Pistol Ass'n, Inc. v. City of Glendale*,
   No. 2:22-cv-07346-SB-JC, 2022 WL 18142541 (C.D. Cal. Dec. 5, 2022)...........9

*Carney v. Adams*,
   141 S. Ct. 493 (2020) ..........................................................................3

*Christian v. Nigrelli*,
   No. 22-2987 (2d Cir. Dec. 12, 2022) ....................................................1

*Duncan v. Becerra*,
   No. 17-cv-1017-BEN-JLB, 2019 WL 1510340 (S.D. Cal. Apr. 4, 2019)...........17

*East Bay Sanctuary Covenant v. Barr*,
   934 F.3d 1026 (9th Cir. 2019) .............................................................18

*Frey v. Nigrelli*,
   No. 21-cv-05334 (NSR), 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023) ..............5

*GeorgiaCarry.Org, Inc. v. Georgia*,
   687 F.3d 1244 (11th Cir. 2012) .............................................................8

*Koons v. Att'y Gen.*,
    No. 23-1900 (3d Cir. June 20, 2023) .................................................... 1

*Koons v. Platkin*,
    No. 22-7464 (RMB/AMD), 2023 WL 3478604
    (D.N.J. May 16, 2023) ................................................. 6, 8, 10

*LA All. for Hum. Rts. v. County of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ......................................... 3

*Lopez v. Candaele*,
    630 F.3d 775, 794 (9th Cir. 2010) ......................................... 5

*Mahoney v. Sessions*,
    871 F.3d 873 (9th Cir. 2017) ......................................... 9

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
    No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023) ........................... 13

*Maryland v. King*,
    567 U.S. 1301 (2012) ......................................... 16, 17

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ......................................... 7, 10, 12, 13

*NOSSK, Inc. v. Fitness Anywhere LLC*,
    No. 21-cv-08914-BLF, 2022 WL 1093662 (N.D. Cal. Apr. 12, 2022) ................. 4

*O'Handley v. Weber*,
    62 F.4th 1145 (9th Cir. 2023) ......................................... 5

*Quinones v. UnitedHealth Grp. Inc.*,
    782 F. App'x 646 (9th Cir. 2019) ......................................... 4

*Quinones v. UnitedHealth Grp. Inc.*,
    No. CV 14-00497 LEK-RLP, 2017 WL 2802721 (D. Haw. June 28, 2017) ........ 4

*Simon v. Eastern Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ......................................... 3

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ......................................... 3

2-ER-0170

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ..................................................................9

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) (per curiam) ...........................................2

**Statutes**

HRS § 134-E .................................................................................................6

**Rules**

LR7.2.............................................................................................................4

**Other Authorities**

Daniel J. Elazar, *Banking and Federalism in the Early American
  Republic*, 28 Huntington Libr. Q. 301 (1965).......................................11

Lev Menand, *Why Supervise Banks? The Foundations of the American
  Monetary Settlement*, 74 Vand. L. Rev. 951 (2021) ............................12

## MEMORANDUM IN SUPPORT OF MOTION

I.    INTRODUCTION

The Hawaiʻi Attorney General ("Attorney General" or "the State") respectfully requests that this Court stay its Order dated August 8, 2023, enjoining the State from enforcing HRS §§ 134-A(a)(1), (4), (9), (12), and 134-E (ECF No. 66).  Specifically, the State requests that the Court stay its Order pending appeal of the Order to the Ninth Circuit.  In the alternative, the State respectfully requests that the Court enter a temporary administratively stay of its Order to give the State the opportunity to seek appellate relief on an expedited basis in the Ninth Circuit.

As explained below, a stay is warranted because the State is likely to succeed on the merits; it is irreparably harmed by its inability to enforce duly enacted laws; the issuance of a stay will not injure Plaintiffs; and a stay is in the public interest.  Notably, the Second and Third Circuits have recently stayed district court orders enjoining similar laws pertaining to sensitive places.  *See Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022) (staying district court order), *application to vacate stay denied sub nom. Anyonyuk v. Nigrelli*, No. 22A557 (U.S. Jan. 11, 2023); *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022); *Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023) (staying order in part).  This Court should do the same, and allow appellate review to proceed in an orderly fashion.

1

## II.     STANDARD OF REVIEW

Courts consider four factors when deciding whether to grant a stay of a temporary restraining order:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (per curiam) (internal quotation marks and citation omitted).  The State has satisfied each of these factors.

## III.    THE STATE IS LIKELY TO SUCCEED ON THE MERITS

As explained in its Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order (ECF No. 55) (Opposition), the State is likely to succeed on the merits for several reasons.  *First*, Plaintiffs did not demonstrate standing in their Motion with respect to HRS §§ 134-A(a)(4), (12), and 134-E. Even if the declarations submitted with Plaintiffs' reply brief (ECF Nos. 61-3, 61-3, 61-5) are considered, and they should not be, Plaintiffs have not shown standing with respect to HRS §§ 134-A(a)(12) and 134-E.  *Second*, Plaintiffs are unlikely to succeed on their challenges to any of the sensitive-place provisions in Act 52. They have failed to show that their proposed course of conduct is covered by the plain text of the Second Amendment, and in any event the State has demonstrated

2

that the challenged restrictions are consistent with the Nation's historical tradition of firearms regulation. *Third*, and for similar reasons, Plaintiffs are unlikely to succeed on their challenge to the private property default rule.

### A.    PLAINTIFFS LACK STANDING WITH RESPECT TO SEVERAL OF THE CHALLENGED PROVISIONS

To establish standing, Plaintiffs must show an "injury in fact" that is "fairly traceable to the challenged conduct" and is "likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (internal quotation marks and citations omitted). Plaintiffs bear the burden of establishing these elements, *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), and on a motion for a temporary restraining order, Plaintiffs "must make a clear showing of each element of standing," *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (internal quotation marks and citations omitted).

Here, Plaintiffs have not shown with respect to several of the challenged provisions that their alleged injuries "fairly can be traced to the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). With respect to HRS § 134-A(a)(12), Plaintiffs have provided no allegations or evidence that any financial institution has authorized (or would authorize) carrying firearms on its premises. As a result, any injury Plaintiffs suffer from being unable to carry firearms in financial institutions is caused not by

3

any action of the State, but by financial institutions' decisions to exclude them—decisions that Plaintiffs acknowledge are permissible.[1]  *See* ECF No. 7-1 at 16 ("Plaintiffs here do not challenge that right of a private property owner.").

Likewise, with respect to HRS § 134-E, any injury Plaintiffs claim to suffer from not being allowed to carry firearms on private property without the owner's consent is caused by the owner's choice to withhold that consent.  The Act changes nothing about the rights of private owners to control their property: other than those places designated as sensitive in § 134-A, business owners who wish to allow firearms on their property may do so.  For similar reasons, a favorable

---

[1] When they filed their Motion, Plaintiffs failed to provide allegations or evidence that any restaurants serving alcohol had authorized or would authorize them to carry firearms on their premises.  For the first time with their Reply, Plaintiffs submitted declarations from such restaurants, along with supplemental declarations from Plaintiffs stating that they intended to visit these restaurants.  *See* ECF Nos. 61-4, 61-5.  That evidence and argument should not have been considered. *See Quinones v. UnitedHealth Grp. Inc.*, No. CV 14-00497 LEK-RLP, 2017 WL 2802721, at *3 (D. Haw. June 28, 2017) ("Plaintiff may not raise new arguments in his Reply."), *aff'd*, 782 F. App'x 646 (9th Cir. 2019); LR7.2 ("Any argument raised for the first time in the reply shall be disregarded."); *NOSSK, Inc. v. Fitness Anywhere LLC*, No. 21-cv-08914-BLF, 2022 WL 1093662, at *8 n.2 (N.D. Cal. Apr. 12, 2022) ("Since [exhibits] constitute[d] new evidence introduced for the first time on reply that [Defendant] did not have an opportunity to respond to, the Court declines to consider these exhibits in support of [Plaintiff's] motion for preliminary injunction.").

4

decision from this Court with respect to HRS § 134-E cannot redress Plaintiffs'
claimed injuries.[2]

 This Court erred in concluding that Plaintiffs had standing to bring each of
their challenges.[3]  The Court (at 26) relied on *O'Handley v. Weber*, 62 F.4th 1145
(9th Cir. 2023), in which the Ninth Circuit held that censorship of a Twitter user's
speech was fairly traceable to the actions of a government official who had flagged
the speech for Twitter's removal from the platform.  *See id.* at 1161-62.  But
*O'Handley* is distinguishable.  The plaintiff there alleged that Twitter had taken his
posts down at the request of the government official.  *See id.* at 1154.  Here, by
contrast, Plaintiffs do not allege that financial institutions or owners of non-

---

[2] Moreover, because Plaintiffs "fail[] to provide any statement . . . indicating that
[they] will not seek permission before carrying [on] private property," or even
allege that having to seek consent would be burdensome, they "fail[] to establish
injury-in-fact[.]"  *Frey v. Nigrelli*, No. 21-cv-05334 (NSR), 2023 WL 2473375, at
*9 (S.D.N.Y. Mar. 13, 2023).  Courts should "[t]ak[e] the record and [Plaintiffs']
arguments as [they] find them," "not manufacture arguments for [a party]," *Lopez
v. Candaele*, 630 F.3d 775, 794 (9th Cir. 2010), by implying arguments that
Plaintiffs do not make themselves.  *See* ECF No. 66 at 30.

[3] Plaintiffs lack standing to challenge HRS § 134-A(a)(1).  As this Court
acknowledged, their challenge is "much narrower than initially raised in the TRO
motion," and is limited only to the two parking areas listed in their complaint and
"similar" areas, ECF No. 66 at 34-35, which the State explained at the TRO
hearing were not covered by HRS § 134-A(a)(1).  Plaintiffs therefore have not
shown "an intention to engage in a course of conduct . . . proscribed by a statute,"
nor a "realistic danger of sustaining a direct injury as a result of the statute's
operation or enforcement."  *Lopez*, 630 F.3d at 785 (citations omitted).

sensitive private property have chosen to prohibit them from carrying firearms because of any request by the State.[4]

For the first time with their Reply brief, Plaintiffs submitted declarations from business owners who claim that they would allow Plaintiffs to carry firearms on their property in the absence of the default rule (ECF No. 61-3). These declarations are unavailing. Each business owner has declared that: "If H.R.S. § 134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, *including the Plaintiffs* in this case, to carry in my business and on my property." *E.g.*, ECF No. 61-3 at 3 (emphasis added). But HRS § 134-E simply requires that property owners "give[] express authorization to carry a firearm"—which these business owners have now provided through their declarations.

## B.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CHALLENGE TO THE SENSITIVE-PLACE PROVISIONS

Even if Plaintiffs had standing, they would be unlikely to succeed on the merits of their Second Amendment challenge to HRS §§ 134-A(a)(4),[5] (9), and

---

[4] In concluding that Plaintiffs have standing, this Court (at 28 n.8) also relied on the district court's decision in *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023). But the relevant portion of *Koons* has been stayed by the Third Circuit pending appeal, meaning that the court has determined that the plaintiffs there are unlikely to succeed on the merits of their claim.

[5]  The Court enjoined "the entirety of [§] 134-A(a)(4)," ECF No. 66 at 91, even though Plaintiffs sought an injunction of that provision only "to the extent it bans the carry of handguns in *restaurants* and their parking lots," ECF No. 7 at 2

2-ER-0177

(12).[6]  As the State explained in its Opposition, Plaintiffs have failed to show that

the plain text of the Second Amendment covers the specific course of conduct in

which they wish to engage. And in any event, the State has satisfied its burden

under *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), of

demonstrating that each of the challenged regulations is consistent with the

Nation's historical tradition of firearms regulation.

The State incorporates by reference each argument made in its Opposition,

and it will not repeat all of them here.  A few aspects of this Court's Order warrant

discussion, however, as they bear on the State's likelihood of success.

First, the Court erred in concluding that "[t]he Second Amendment's plain

text . . . naturally encompasses places that are generally held open to the public."

ECF No. 66 at 41.  Even if the "definition of 'bear' naturally encompasses public

carry," *id.* (quoting *Bruen*, 142 S. Ct. at 2134), and even if "it follows that there is

nothing in the Second Amendment's plain text that makes a distinction between

---

(emphasis added); *see* ECF No. 7-1 at 21-22; ECF No. 61 at 11-12.  Enjoining
enforcement of HRS § 134-A(a)(4) as to bars is unwarranted because that Plaintiffs
did not seek that relief.

[6]  This Court also enjoined HRS § 134-A(a)(1) as to "parking areas owned, leased,
or used by the State or a county which share the parking area with non-
governmental entities, are not reserved for State or county employees, or do not
exclusively serve the State or county building[.]"  ECF No. 66 at 91.  Issuing a
TRO with respect to that provision is unwarranted because the State *disclaimed*
Plaintiffs' incorrect interpretation of HRS § 134-A(a)(1) as regulating such parking
lots.

2-ER-0178

public places," *id.*, nothing in the Second Amendment's plain text extends the

scope of the right from public to private property.  As explained in

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), which the

State discussed in its Opposition (at 18-19), the scope of the Second Amendment

right was understood at the Founding to be circumscribed by the rights of private

property owners.  This Court reached a contrary conclusion by relying, in part (at

44-45), on recent district court decisions in *Antonyuk v. Hochul*, 1:22-cv-0986

(GTS/CFH), 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), and *Koons v. Platkin*,

No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023).  But these

decisions have been stayed pending appeal by the Second Circuit (stayed in full)

and Third Circuit (stayed in part, as to most of the sensitive places at issue),

meaning that those courts have determined that the plaintiffs are unlikely to

succeed.  *See supra* n.4.  Furthermore, this Court acknowledged (at 45) that there is

no Second Amendment right to carry on private property open to the public where

permission has been revoked, meaning that sensitive-place restrictions can be

constitutionally applied where a business owner has prohibited the carrying of

firearms.  *See GeorgiaCarry.Org*, 687 F.3d at 1260-61 (rejecting facial challenge

to prohibition on carrying firearms in houses of worship because ban could be

constitutionally applied where place of worship prohibited carrying firearms).[7]  At

a minimum, then, Plaintiffs' facial challenge to Act 52's sensitive-place provisions

fails because Plaintiffs have failed to show that the Act "is unconstitutional in all

its applications." *California Rifle & Pistol Ass'n, Inc. v. City of Glendale*, No.

2:22-cv-07346-SB-JC, 2022 WL 18142541, at *6 (C.D. Cal. Dec. 5, 2022)

(cleaned up; citation omitted).

     Relatedly, this Court erred in holding (at 54-56) that the Second

Amendment's plain text presumptively protects the right to carry on government

property when the government is acting as a proprietor.  As the State explained in

its Opposition (at 11 & n.17), "the government—like private property owners—has

the power to regulate conduct on its property."  *See United States v. Class*, 930

F.3d 460, 464 (D.C. Cir. 2019); *see also Bonidy v. U.S. Postal Serv.*, 790 F.3d

1121, 1126-27 (10th Cir. 2015) ("The government often has more flexibility to

regulate when it is acting as a proprietor . . . ."), *quoted with approval in Mahoney

v. Sessions*, 871 F.3d 873, 880 (9th Cir. 2017).  That power is not unlimited, but it

does exist, and this Court erred in concluding (at 55-56) that the government's role

as proprietor "in a post-*Bruen* world makes no difference" and "has no place under

---

[7] As discussed below, the Court's acknowledgement that there is no right to carry
on private property without permission also implies that HRS § 134-E is
constitutional because it does not burden conduct protected by the Second
Amendment's plain text.

9

the first step of the *Bruen* analysis." Indeed, *Class* was decided at the first step of

the then-governing Second Amendment test, which *Bruen* endorsed as "broadly

consistent with *Heller*." 142 S. Ct. at 2127. And the only post-*Bruen* decision of

which the State is aware that adopts a similar position to this Court is *Koons*, 2023

WL 3478604, at *51-54, which has been stayed in relevant part pending appeal by

the Third Circuit. *See supra* n.4.

Properly understood, the plain text of the Second Amendment does not

cover any of the conduct regulated by HRS §§ 134-A(a)(1), (4), (9), and (12). But

even if it did, the State amply demonstrated that each of these provisions is

consistent with the Nation's historical tradition of firearms regulation. Only by

incorrectly discounting the historical evidence proffered by the State did this Court

reach a contrary conclusion. The State will not attempt in this Motion to defend

each of the historical analogues that it identified in its Opposition, but it will

discuss several errors in this Court's application of the *Bruen* standard.

First, despite acknowledging that "[a]nalogical reasoning requires only that

the government identify a well-established and representative *analogue*, not a

historical *twin*," ECF No. 66 at 22 (quoting *Bruen*, 142 S. Ct. at 2133), this Court

essentially required the State to find a "dead ringer," *Bruen*, 142 S. Ct. at 2133, for

each of the challenged provisions. With respect to HRS § 134-A(a)(4), for

example, the Court deemed irrelevant 1700s-era laws that prohibited not just

10

2-ER-0181

selling alcohol *to* militia members, but also selling alcohol *near* militia members. The Court stated (at 47) that these laws were "unpersuasive in finding that there was a national historical tradition of prohibiting members of the public—rather than members of the militia—from public carrying in places serving alcohol," but there is no reason to believe that trained militia members would pose greater risks in proximity to alcohol than other members of the public.

Likewise, with respect to HRS § 134-A(a)(12), the Court discounted centuries of prohibitions on firearms in commercial centers. The Court reasoned (at 72-73) that financial institutions are not like historical commercial centers because they are not as congested as some of those centers, but congestion is not the only relevant point of similarity. As Professor Saul Cornell explained in his declaration supporting the State's opposition, "bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics. Indeed, it was the very fact that individuals congregated in large numbers *and moved about freely, engaging in productive economic, cultural, and political activities* that was the reason arms were prohibited from these locations." Cornell Decl. ¶ 42.[8]

--------

[8] The State notes, moreover, that although banks have existed since the Founding, they were understood at that time to be government instrumentalities. *See, e.g.*, Daniel J. Elazar, *Banking and Federalism in the Early American Republic*, 28 Huntington Libr. Q. 301, 303-04 (1965) ("the great majority of American banks" in the early Republic "were either state-owned joint stock companies in which the

2-ER-0182

Second, the Court artificially constrained the universe of historical

analogues on which the State was permitted to rely, in a manner that made it

impossible for the State to satisfy its burden under *Bruen*'s second step.  With

respect to HRS § 134-A(a)(4), for example, the Court disregarded (at 49-51) three

regulations that can appropriately be described as "historical twins," on the ground

that these regulations were enacted by a city and two territories, and this Court

understood *Bruen* "to dismiss any law enacted unless it was done in a state where a

significant percentage of the people . . . resided at the time that the Fourteenth

Amendment was enacted."  ECF No. 66 at 51.  Likewise, in the context of HRS

§ 134-A(a)(9), the Court dismissed local ordinances banning firearms in the

Nation's first modern parks because those jurisdictions covered "only about 4% of

this Nation,"[9] and because some ordinances were passed "from 1872 through

1886," which the Court deemed too late to shed light on the meaning of the

---

state was a major shareholder or were controlled by the state through special
charter provisions," and "[t]he Bank of the United States was controlled in this
same manner by the federal government"); Lev Menand, *Why Supervise Banks?
The Foundations of the American Monetary Settlement*, 74 Vand. L. Rev. 951, 983
(2021) (the Bank of the United States (founded in 1791), the Bank of New York
(1784), and Massachusetts Bank (1784) were "parastatal monopolies, part-owned
by the government").  Thus, government buildings—described as a presumptively
"settled" sensitive location in *Bruen*—supply the relevant analogue.  *See* 142 S. Ct.
at 2133.

[9] The source cited by the Court (at 62 n.17) indicates that New York and
Pennsylvania had 21.6% of the Nation's population.

Fourteenth Amendment.  ECF No. 66 at 61-62.  *But see id.* at 66 n.20 (treating an 1870 enactment as "'during' the Fourteenth Amendment's ratification for the sake of argument.").[10]  The Court erred in relying on population estimates and in limiting the universe of permissible analogues to pre-1868 (or perhaps pre-1870) state laws.  It is true that *Bruen* rejected New York's reliance on territorial laws where those laws "contradict[ed] the overwhelming weight of other, more contemporaneous historical evidence," 142 S. Ct. at 2155 (cleaned up; citation omitted), and the Court noted, as a rhetorical point, that the territorial laws at issue "governed less than 1% of the American population," *id.*, but the Court did not thereby instruct judges to calculate percentages in order to determine whether historical laws were representative or well established.  And in this case, unlike in *Bruen*, there is no "contemporaneous historical evidence" that contradicts the laws the State has proffered.[11]

Finally, this Court erred in its description of the role that analogy plays in the *Bruen* analysis.  In its discussion of HRS § 134-A(a)(9), for example, the Court

---

[10] The Court discounted *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023), for relying on "only one local ordinance" and "only one state law" enacted before or during ratification of the Fourteenth Amendment.  ECF No. 66 at 66.  But *Maryland Shall Issue* also discussed an 1831 New Orleans ordinance, an 1852 New Mexico law, an 1870 Tennessee law, and an 1870 Texas law.  *See* 2023 WL 4373260, at *11.

[11] Understood in this way, the State maintains that the relevant passages in *Bruen* are less "confounding" than this Court suggested.  *See* ECF No. 66 at 51.

13

2-ER-0184

acknowledged that "children and families congregate at beaches and parks in Hawai'i; beaches and parks are integral and highly valued in Hawaiian culture; and beaches and parks are critical components of Hawaii's economy," but the Court reasoned that "these considerations by themselves do not matter under the *Bruen* analysis." ECF No. 66 at 56. The Court also concluded that "[t]he record is absent of analogies to historical 'sensitive places' for parks and beaches." *Id.* at 57. This is incorrect. As discussed above (and in its Opposition), the State *did* identify historical analogues (indeed, historical twins) for prohibitions on firearms in parks and beaches. But even if no such analogues existed, the State could look to the sensitive places identified in *Heller* and *Bruen* and justify HRS § 134-A(a)(9) as analogous to *those* places. Contrary to this Court's reasoning, it *does* "matter under the *Bruen* analysis" that "children and families congregate at beaches and parks in Hawai'i," because that makes beaches and parks analogous to schools, which are concededly sensitive. *Id.* at 56. *See* Thielen Decl. ¶ 6, ECF No. 55-33 (describing extensive use of Honolulu parks by children and for educational programs). Indeed, this Court recognized in its discussion of banks that "[p]olicy concerns might be relevant insofar as they help the government identify a well-established and representative historical analogue to the regulation at issue." ECF No. 66 at 69 (internal quotation marks and citation omitted).

14

2-ER-0185

### C.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CHALLENGE TO THE DEFAULT RULE

For similar reasons, Plaintiffs—in addition to lacking standing—are unlikely to succeed on the merits of their Second Amendment challenge to HRS § 134-E.[12] As noted above, this Court acknowledged that "where a business revokes a licensee or invitee's permission to enter the business's property, the business is no longer a public place to that licensee or invitee," and "[t]he licensee or invitee's conduct would not be covered by the Second Amendment's plain text in such a scenario."  ECF No. 66 at 45.  Likewise, the Court explained that even for private property presumptively held open to the public, "[t]hat presumption can change, for instance, if an owner of the private property rescinds a general license or invitation to enter the property: such as limiting entrance to members or prohibiting certain attire."  *Id.* at 76.  It follows from these premises that when a private property owner withholds consent for individuals to carry firearms on his property, the Second Amendment's plain text does not cover the right to carry firearms on his property.  Because all that HRS § 134-E does is prohibit individuals from carrying firearms on private property without consent, it does not burden conduct that is covered by the Second Amendment's plain text.

---

[12] Plaintiffs' compelled speech argument also fails, as this Court recognized.  *See* ECF No. 66 at 81-82.

15

2-ER-0186

Even if the plain text of the Second Amendment did protect the right to carry

firearms on private property without consent, the State has put forth more than

enough historical analogues to justify HRS § 134-E.  This Court rejected all but

one of those analogues on the ground that they "concerned private property like

residential lands, which were not generally held open to the public."  ECF No. 66

at 79.  But the Court cited no evidence for that conclusion, aside from three entries

in two twenty-first-century dictionaries.  *See id.*  In any event, as above, this Court

erred by requiring the State to identify a "historical twin," as historical laws

requiring permission to carry firearms on private property are clearly analogous to

HRS § 134-E, regardless of whether those historical laws dealt with "enclosed"

lands, "plantations," or other kinds of property.

## IV.   IRREPARABLE INJURY

The State "suffers . . . irreparable injury" whenever it is barred "from

effectuating statutes enacted by representatives of its people."  *Maryland v. King*,

567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see*

*also Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) ("[T]he inability to enforce

its duly enacted plans clearly inflicts irreparable harm on the State[.]").  After

careful consideration of the Second Amendment's limits and the State's safety

needs, the Legislature enacted a law protecting sensitive places where people are

particularly susceptible to the risks of gun violence.  And the Legislature honored

private property rights by establishing that individuals cannot carry firearms onto private property without the owner's consent.  This Court's Order prevents the democratic branches from exercising their judgment regarding how best to keep residents safe while respecting their rights.  And the harm is especially profound here, in light of the "law enforcement and public safety interests" implicated by firearms and gun violence.  *King*, 567 U.S. at 1303.  By allowing loaded guns in places that serve alcohol, as well as banks, parks, and beaches, an injunction against the enforcement of Act 52 threatens public safety.

## V.    A STAY IS IN THE PUBLIC INTEREST

The public interest favors staying the Order. "There is an immeasurable societal benefit of maintaining the immediate status quo while the process of judicial review takes place." *Duncan v. Becerra*, No. 17-cv-1017-BEN-JLB, 2019 WL 1510340, at *2 (S.D. Cal. Apr. 4, 2019).  Here, the immediate status quo is one in which the State retains its ability to enforce the challenged provisions, which were effective for over a month prior to this Court's Order. As set forth in the Opposition, the public interest favors enforcement of Act 52, not enjoining it.

As both the Second and Third Circuits recently found in similar challenges to similar laws, a stay pending appeal is warranted.

17

2-ER-0188

## VI.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWED PENDING APPEAL

Although the Court's Order should be stayed in its entirety, at a minimum it should be narrowed to apply only to Plaintiffs.  "[I]njunctive relief must be tailored to remedy the specific harm alleged." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (cleaned up; citation omitted).  Furthermore, as noted above and in the State's Opposition, Plaintiffs have failed to demonstrate that they are entitled to facial relief on any of their claims.

## VII.   IF THIS COURT DENIES A STAY PENDING APPEAL, IT SHOULD GRANT AN ADMINISTRATIVE STAY PENDING A MOTION FOR STAY PENDING APPEAL FILED IN THE NINTH CIRCUIT

If this Court denies a stay pending appeal, the State requests that the Court issue an administrative stay of its Order while the Ninth Circuit considers whether to grant a stay pending appeal.  Under Ninth Circuit law, an administrative or temporary stay is "intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits[.]" *Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019).  Granting an administrative or temporary stay while the State's motion for stay pending appeal is before the Ninth Circuit would maintain the status quo in this case and minimize disruption and confusion.

18

2-ER-0189

## VIII.  CONCLUSION

For these reasons, the State respectfully requests that this Court stay its

Order pending appeal to the Ninth Circuit, or, in the alternative, enter a temporary

administrative stay to permit application to the Court of Appeals for a stay pending

appeal on an expedited basis.

DATED: Honolulu, Hawaiʻi, August 11, 2023.

*/s/ Ben Gifford*

KALIKOʻONĀLANI D. FERNANDES  NEAL K. KATYAL*
 Solicitor General      MARY B. MCCORD*
NICHOLAS M. MCLEAN     BEN GIFFORD*
 First Deputy Solicitor General  RUPA BHATTACHARYYA*
           DANA A. RAPHAEL*
            Special Deputy Attorneys General

       * *Pro Hac Vice*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney
General of the State of Hawaiʻi

19

2-ER-0190

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, | Civil No. 1:23-cv-00265-LEK-WRP |
| Plaintiffs, | CERTIFICATE OF SERVICE |
| v. | |
| ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai‘i, | |
| Defendant. | |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was

served electronically through the Court's CM/ECF system upon the following:

KEVIN GERARD O'GRADY
Law Office of Kevin O'Grady
1164 Bishop Street, Suite 1605
Honolulu, HI 96813
Phone: (808) 521-3367
E-mail: Kevin@KevinOGradyLaw.com

ALAN ALEXANDER BECK
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
Phone: (619) 905-9105

E-mail: Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION

DATED: Honolulu, Hawai'i, August 11, 2023.

/s/ Ben Gifford

KALIKO'ONĀLANI D. FERNANDES
  Solicitor General
NICHOLAS M. MCLEAN
  First Deputy Solicitor General

NEAL K. KATYAL*
MARY B. MCCORD*
BEN GIFFORD*
RUPA BHATTACHARYYA*
DANA A. RAPHAEL*
  Special Deputy Attorneys General

*Pro Hac Vice*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i

1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3
     JASON WOLFORD, et al.,        ) CV 23-00265 LEK-WRP
4                                  )
              Plaintiffs,          )
5                                  ) Honolulu, Hawaii
        vs.                        ) July 28, 2023
6                                  )
     ANNE E. LOPEZ, et al.,        ) [7]PLAINTIFFS' MOTION FOR
7                                  ) TEMPORARY RESTRAINING ORDER
              Defendants.          ) AND PRELIMINARY INJUNCTION
8    _____)

9
                    TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE LESLIE E. KOBAYASHI
               UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Plaintiffs:        ALAN A. BECK, ESQ.
13                              Law Office of Alan Beck
                                2692 Harcourt Drive
14                              San Diego, California 92123

15                              KEVIN GERARD O'GRADY, ESQ.
                                Law Office of Kevin O'Grady, LLC
16                              1164 Bishop Street, Suite 1605
                                Honolulu, Hawaii 96813
17
     For the Defendants:        BEN GIFFORD
18                              MARY B. MCCORD
                                SPECIAL DEPUTY ATTORNEYS GENERAL
19                              Institute for Constitutional
                                Advocacy & Protection
20                              Georgetown University Law Center
                                PO Box 211178
21                              Brooklyn, New York 11221
                                *Pro Hac Vice*
22
                                DANA A. RAPHAEL, SOLICITOR GENERAL
23                              Hogan Lovells US LLP
                                555 Thirteenth Street, N.W.
24                              Washington, DC 20004
                                *Pro Hac Vice*
25

2-ER-0193

2

```
1    APPEARANCES CONTINUED:

2    For the Defendants      NICHOLAS MATTHEW MCLEAN
     (continued):           FIRST DEPUTY SOLICITOR GENERAL
3                           KALIKO'ONALANI D. FERNANDES
                            SOLICITOR GENERAL
4                           Office of the Attorney General-Hawaii
                            425 Queen Street
5                           Honolulu, Hawaii 96813

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Official Court Reporter:  Debra Read, RDR
                              United States District Court
22                            300 Ala Moana Boulevard
                              Honolulu, Hawaii 96850
23                            readit3949@gmail.com

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

3

1   FRIDAY, JULY 28, 2023                    10:32 A.M.

2          THE COURTROOM MANAGER:  I'll go ahead and bring the

3   public in, do a few public reminders, and then call in the

4   judge.

5          If you're an observer on the call, please keep your line

6   muted at all times.  All hearings are strictly prohibited from

7   being recorded or broadcast, in whole or in part, in any

8   fashion.

9          If you're joining in from the public line, please ensure

10  that your line is muted.  My understanding is that you can all

11  hear your own conversations on the line, but you can't as well,

12  as the proceeding, so if you could mute yourself, that would be

13  great to assist with other people who are listening in on the

14  call.

15         Let's see.  When addressing the Court, please make sure

16  that you unmute yourself.  When you're not addressing the

17  Court, please mute yourself during that progress.

18         All right?  Thank you.  One moment, I'll call the judge.

19         Hi, Your Honor.  Can you hear me?

20         THE COURT:  I can.  You may go ahead and call the

21  case.  Thank you.

22         THE COURTROOM MANAGER:  Thank you.

23         The United States District Court for the District of

24  Hawaii with the Honorable Leslie E. Kobayashi, United States

25  District Judge presiding, is now in session.

UNITED STATES DISTRICT COURT

4

1          Civil No. 23-00265 LEK-WRP, Jason Wolford, et al., versus

2     Anne E. Lopez.

3          This matter is set for -- on a plaintiffs' motion for

4     TRO.

5          Counsel, please make your appearances for the record,

6     starting with plaintiffs' counsel.

7          MR. BECK:  Alan Beck for the plaintiffs, Your Honor.

8     Good morning.

9          THE COURT:  Good morning, Mr. Beck.

10         Mr. O'Grady.

11         MR. O'GRADY:  Good morning, Your Honor.

12         Kevin O'Grady on behalf of the plaintiffs.

13         THE COURT:  All right.  And on behalf of the State

14    of Hawaii and Attorney General Lopez?

15         MS. FERNANDES:  Good morning, Your Honor.

16         Kaliko'onalani Fernandes, Solicitor General, for

17    defendant Anne Lopez.

18         I have with me here today Nicholas McLean, First Deputy

19    Solicitor General, and Mary McCord, Ben Gifford, and Dana

20    Raphael, Special Deputy Attorneys General.  Mr. Gifford will be

21    handling today's argument.

22         THE COURT:  All right.  Well, good morning to all of

23    you, and thank you for designating and letting me know that

24    Mr. Gifford will be addressing the oral argument.

25         So we'll first start, of course, with counsel for

1   Mr. Wolford.  I did want to assure all counsel that, you know,

2   we have looked closely at *Bruen* and its -- you know, it's prior

3   Supreme Court cases with regard to the Second Amendment, so I'd

4   like to assure you that you don't need to go into the framework

5   with regard to the analysis.

6        And if you could address the specifics, with regard to

7   Mr. Wolford's counsel, I particularly have a few questions, and

8   I'll start with the parking areas adjacent to buildings or

9   offices owned, leased, or used by the state or county, and

10  adjacent grounds and parking areas.

11       So my question is directed with regard to an

12  acknowledgement that the buildings that they're adjacent to are

13  sensitive places.  The Supreme Court has recognized that.  They

14  haven't told us why or what the analysis is for sensitive

15  places, but have merely stated it.

16       And so what we're talking about these adjacent areas, my

17  question is -- and I'm happy to hear your other arguments with

18  regard to it -- but specifically are these adjacent parking

19  areas akin to curtilage under a Fourth Amendment analysis?  Is

20  it an extension of a sensitive place?  And if so, whose burden

21  is it?

22       Does the State even have to come forth with any argument

23  because assuming court's already informed us that the buildings

24  themselves are sensitive places and these are adjacent and

25  therefore an extension of that?  Or, do I look at, for

6

1   instance, *United States v. Dunn*, a Supreme Court case talking

2   about the four factors of the curtilage question:  One,

3   proximity of the area claimed to be curtilage; two, whether

4   there is included in an closure surrounding the home; three,

5   the nature of the uses to which the area's put; and, four,

6   steps taken by the resident to protect the area from

7   observation by people passing by?  Clearly they're all on

8   point, the four factors, but some concept like that.

9        I do note like the state capital, the adjacent parking

10  areas are actually within the footprint, you know, of the

11  capital, and yet you have something like where city hall is

12  where there's a walkway that connects the parking areas.

13       So if you could address that with regard to the parking

14  areas, and then I have a couple other areas I'd like you to

15  address, but then I'm sure you have other arguments to make.

16       So who will be arguing on behalf of Mr. Wolford?  All

17  right, Mr. Beck, please.

18            MR. BECK:  Good morning, Your Honor.

19       As a additional matter, I'd like to clarify our -- what

20  we're challenging today in regards to parking lots and

21  government buildings.

22            THE COURT:  Okay.

23            MR. BECK:  We -- we have specific locations, for

24  example, KT Flemming Beach.  And just an additional matter, I

25  am not that familiar with Maui, so I want to just say that in

UNITED STATES DISTRICT COURT

2-ER-0198

7

1  advance, but there's a beach all my clients go to and that

2  beach has a life guard building, not a life guard tower but

3  actual government building on it, and that's one location.

4  Another location is the DMV.  And there are -- there's

5  a -- that they simply want to go to.

6      We're not -- on that issue we're not making a broad

7  challenge to the parking lot of every government building.

8  It's -- and taking the beach at the parking lot at KT Flemming

9  Beach, for example, we don't believe that it's a sensitive

10  place.  However, assuming it is for purposes of addressing the

11  Court's question, I think that maybe the *Dunn* case isn't

12  exactly analogous, but I think the analysis in the *Class* case,

13  which the defendants cite to, actually gives us a lot

14  of -- illuminates this issue.

15      In *Class*, the DC Court of Appeals made a special

16  carve-out for that specific parking lot because it was right

17  next to the capitol building.  It was a government

18  employees' -- only government employees could park there.  And

19  in that situation, they deemed that special parking lot to be a

20  government -- to be a sensitive place.  And a similar argument

21  might be made for, say, a capital building parking lot where

22  only the -- where only employees can go to.  I'm -- I don't

23  want to get too specific, but, you know, I mean, just an

24  example, the capital building, it has -- at the bottom level

25  there's a parking lot.  I'm talking about the Hawaii capital

**2-ER-0199**

1  building.

2          THE COURT:  Right.  I understand.

3          MR. BECK:  And, you know, there's a good argument

4  potentially if we were challenging that specific location where

5  that might be a location where the government might want to not

6  have firearms taken to it.  We're not conceding that; we're

7  just simply saying that's a much different challenge than what

8  we are discussing here.

9          We're discussing a isolated building that's at a beach,

10  just as one example, and people that -- with the parking lots

11  clearly open to the public and people are wanting to go to the

12  beach and there happens to be a building right there.

13          Another example is if -- at certain parks, you know,

14  there might be a ranger station or something like that where,

15  you know, it's a very large park, you know, and there happens

16  to be within that -- within that park a building and then on

17  the other side there's a parking lot.  And that's much

18  different analysis than what the court used in *Class*.

19          Also in *Bondi* which the State also cites to -- in *Bondi*

20  the court used a -- made it clear that, one, it was applying

21  intermediate scrutiny, but in addition to that, the parking lot

22  in *Bondi*, even under intermediate scrutiny which has now been

23  abrogated because of *Bruen*, they were actually conducting

24  business in that parking lot as part of the Postal Service's

25  just day-to-day, you know, operations.

1        THE COURT: Understood. So am I to understand your

2 argument that you're limiting to these two specific locations,

3 and because you're really arguing that the government activity

4 that's going on in these locations that are adjacent to the

5 parking lots aren't really sensitive areas, so therefore, it

6 can't -- there cannot be a carve-out or something that might be

7 related to, and further, that these parking areas are open to

8 the general public as opposed to limited to the specific

9 purpose of conducting government business such as like a poll

10 place, or court, or et cetera?

11        MR. BECK: Yes, Your Honor, except we're not

12 limiting it just to those two places. In our complaint we have

13 a number of other places, for example, in the parks, just an

14 example. I mean, I think the most glaring is KT Flemming

15 Beach, but there are other areas within our complaint. I

16 just -- and many of the parks we're going to they have maybe,

17 say, a ranger station, just an example, you know, and what we

18 want is to make sure we get complete relief if our -- if,

19 assuming this Court rules in our favor, just for example in the

20 park ban, we don't want them to not be able to carry there just

21 because there happens to be a -- a park -- a ranger station or

22 something along that line.

23      But the general statement that Your Honor's making is

24 correct in the sense that we're not simply challenging, saying

25 the parking lot at the federal courthouse, just as an

1    example --

2              THE COURT:  Right.

3              MR. BECK:  -- you know.

4              THE COURT:  Understood.  Okay.  Anything else with

5    regard to that?  And then I wanted to move on to the bars and

6    restaurants.

7              MR. BECK:  There's a -- one point I just would like

8    to make that I didn't address in my brief is the State said

9    there's a administrative -- this is in the irreparable harm

10   section of their argument which is why I overlooked it.

11   There's a footnote that says that there were preexisting

12   restrictions in government parking lots, and that's -- and I

13   looked up that administrative code, and all it says in there is

14   that there were -- you only could carry if done so in a lawful

15   manner.  So a person with a CCW prior to implementation of

16   SB 1230 would have been able to legally carry in a government

17   parking lot.

18             THE COURT:  All right.  Thank you for that

19   clarification.

20        All right.  So turning then to the bar or restaurants, so

21   the State has, you know, come up with some examples, and I

22   understand what you're saying with regard to the, you know,

23   forbidding, you know, members of the military and so forth

24   drinking, so I agree with you with regard to those.  But then

25   they've brought up some other ones from territories at the time

11

1  barring the sale of alcohol in certain locations that one could

2  infer are analogous to bars or restaurants serving alcohol.

3       So I guess two things.  I understand -- and I don't want

4  to put words in your mouth that, you know, you're saying

5  territorial law really shouldn't be taken into account or has

6  less weight -- but where are we in terms of how many historical

7  analogs does the State need to come up with?  Is it the number?

8  Is it when it occurred?  Is it the weight because it's happened

9  in the colonies as opposed to the territories?  What's your

10 position with regard to that?

11      MR. BECK:  Well, as a preliminary matter, I think

12 that we are bound by 1791.  The primary support that the State

13 had in their brief is the *Bondi* case, the 11th Circuit.  And it

14 was actually the same day -- I don't fault them for -- within

15 the hour of them filing their brief the 11th Circuit had

16 abrogated that and it's taken that case en banc.

17      And so beyond that, there's not really a lot of support

18 for the proposition that 1868, the ratification of the

19 Fourteenth Amendment, should be used, and I think the most

20 practical thing -- reason is it doesn't make a lot of sense for

21 the federal government to be under one standard and for the

22 states to be under another standard 'cause at least the theory

23 for using the 1868 is that's when the Bill of Rights was

24 incorporated to the states.  So there can't be any real valid

25 argument that the federal government would use 1868 as the

1    proper time frame.

2        And if the courts -- this Court -- you know, if courts in

3    general were to start using 1868, then that would mean that

4    there's two different standards of time frames to be used, one

5    for the federal government and one for the state government.

6    There's no other area of constitutional law where that applies.

7        And, you know, I know you've already read my briefing so

8    I won't go into details of the statute, but we already have a

9    lot of quotations regarding that.  So I think that's our first

10   here.

11       And in the -- as for how many, I think we need to have a

12   majority of the -- of colonial states, colonies -- maybe they

13   could have been territories -- you know, colonies prior to

14   1790.  You know what I mean, Your Honor.

15           THE COURT:  Yes, I do.

16           MR. BECK:  Yeah.  But, you know, I think it has to

17   be a majority.  We have a citation from the Supreme Court where

18   this was after, I think -- yeah, this is a modern era case.

19   We're discussing 13 states isn't enough to create a tradition.

20   And, yeah, this is the one where there was 50 states.  I mean,

21   so I think we know that whatever that percentage is, it has to

22   be greater than that, and it just seems that from the Supreme

23   Court's standpoint they're looking for a real tradition.  A

24   tradition is going to be something that's majority, something

25   that was widely accepted during the founding era, Your Honor.

1       And I believe there was a third issue that you wanted me

2  to address, but I can't remember, Your Honor.

3       THE COURT:  No, I think that's fine.  That's great.

4       And then my last area, and then I'll let you argue

5  whatever or point out to me whatever you want, my questions are

6  with regard to the beaches.

7       So during the founding era, you know, beaches were used

8  much differently than they currently are and particularly here

9  in Hawaii.  So there really -- there's not going to be a

10  historical analog, that's for sure.

11       And I understand your folks' position is that you want me

12  to look at it in the same analysis as parks, and then you have

13  those examples with the Boston Commons, et cetera.

14       But where there is a location that really didn't exist,

15  has no counterpart in -- to its modern-day location,

16  particularly when it involves, you know, commercial and

17  recreational use, is it of any value or consideration for the

18  court to look at cultural practices and history for states

19  where, like Hawaii, beaches have played an integral role in the

20  community, government, and society?  Is that something that I

21  should consider as part of the analysis, or you think that

22  because it wasn't part of the colonies at the time that it

23  should be of no matter?

24       MR. BECK:  Well, I think, Your Honor, that because

25  we're challenging a state law that bans carry completely on

14

1  beaches and that's, you know, at Waikiki, that's at Sandy's,

2  you know, that's any beach, especially on the outer islands

3  where it's much more rural than Oahu, it's -- we can't take in

4  the specific cultural practices.

5      I think that would be a little bit of a different

6  analysis, though, if the state law had a ban on -- well, little

7  bit of a cop-out -- but polling places that happen to be on

8  beaches.  That's not a good example.  But if they had a -- I

9  know we're post *Bruen*.  I don't mean it in that sense.  If the

10 law was crafted in a way where it wasn't all beaches but

11 instead it was these specific beaches when -- or in these

12 specific circumstances that traditionally people were able to

13 carry, you know, and cited to those specific historical

14 practices, or maybe even other cultural practices.

15     But here in a situation where it's just simply a carte

16 blanche ban on all beaches, I think we are bound to simply look

17 at what was happening at beaches in general, you know, at 1791.

18 And if the State were to come back, it would be a little bit of

19 a different law that wasn't quite so expansive, and let's just

20 say, you know, you can't carry when this specific event is

21 going on, then they can, you know, cite back, Hey, there's a

22 historical tradition here of not allowing carry at this type of

23 event on a beach or specifically analogize some other way, you

24 know.

25     But in light of the fact this is just simply a broad ban

1  on beaches, I don't think that's something we can do in this

2  particular circumstance, Your Honor.

3          THE COURT:  Okay.  I think I understand your

4  argument.  For instance, the City of Refuge on the island of

5  Hawaii, historically, you know, people were given protection

6  and safety and no one was allowed to bring any kind of weapon

7  in that area, and if you reached the City of Refuge, then you

8  couldn't be arrested or punished or what have you.  You had a

9  period of grace and -- but no one was allowed to bring weapons.

10         So what I hear you saying -- I'm not saying you're

11  conceding this as to that area and that beach -- but that if it

12  was specifically identified and based on those cultural

13  reasons, then you're saying there might be a case for it.

14         But where you're saying if they have a general ban on all

15  beaches, it'd be inappropriate for the court to take a look at

16  the historical and cultural significance of beaches and how it

17  was used during the same period of time, you know, 1791.

18         MR. BECK:  Yeah, that's essentially my argument.

19  You know, I mean, what popped into my head is because we're

20  talking about Maui County.

21         THE COURT:  Yes.

22         MR. BECK:  Molokai, there's that particular -- with

23  the priest -- there's a particular county --

24         THE COURT:  Father Damien, you mean?

25         MR. BECK:  Yes, Your Honor.

16

1          THE COURT:  You talking about Kalaupapa?

2          MR. BECK:  Yes, I mean, something like that.  I

3   mean, this is completely beyond the scope of this case but --

4          THE COURT:  Right.

5          MR. BECK:  -- I'm just simply saying that, you know,

6   if there was some -- if the legislature came back and came back

7   with a -- something that wasn't just plain beach ban, this is

8   an analysis we could really look into, but I just don't think

9   that's the case here, Your Honor.

10         THE COURT:  Understood.  Anything else that you wish

11  to argue before the court before I turn to the State's counsel?

12         MR. BECK:  Just on the topic of beaches, Your Honor?

13         THE COURT:  Anything else with regard to your

14  petition for a temporary restraining order.

15         MR. BECK:  Well, I just -- I know I pointed this out

16  in the briefing, but I just want to be very clear that the

17  State's position is in -- that carry's been banned in state

18  parks since 1990, that's simply not the case.

19         I looked up the administrative code, and any argument on

20  irreparable harm failing because of that just can't be

21  done -- isn't valid because the ban was you couldn't carry in a

22  way that would harass animals.  It was perfectly valid up until

23  the passage of SB 1230 to carry with a -- in a lawful, safe

24  manner with the CCW, Your Honor.

25         And -- but beyond that, I'll -- I'm hopeful the Court

UNITED STATES DISTRICT COURT

2-ER-0208

 1   will let me reply afterwards, Your Honor.

 2              THE COURT:  I will.  Thank you.

 3              MR. BECK:  Yes.  Thank you, Your Honor.

 4              THE COURT:  All right.  Mr. Gifford.

 5              MR. GIFFORD:  Thank you, Your Honor.

 6        Do you have any preliminary questions for me, or may I

 7   respond to some of the points that were addressed by Mr. Beck?

 8              THE COURT:  Yes, if you could respond particularly

 9   with regard to the parking areas adjacent to any government

10   building first, that would be helpful.

11              MR. GIFFORD:  Yes, Your Honor.

12        The State's position with respect to parking lots

13   adjacent is that the term adjacent means parking lots that

14   exclusively serve a particular place.  So consistent with *Class*

15   and *Bonidy*, which analyzed this issue in a manner that it's

16   still good after *Bruen*, was not disrupted by the *Bruen*

17   framework, both cases are instructive here.

18        If a location is sensitive that a parking lot is adjacent

19   to that place, that parking lot exclusively serves the place in

20   the way that the parking lots did in *Class* and *Bruen*.  And

21   given the better interpretation of adjacent, the clearer

22   interpretation consistent with the rule of lenity,

23   constitutional avoidance, and legislative intent that the State

24   advances, plaintiffs' conduct is not even covered by the

25   adjacent parking lots clause within the relevant provisions

1    that they challenge, so the Court need not address the merits

2    of those arguments.

3         However, if the Court were to address the merits, then we

4    believe that the parking lots adjacent to government buildings

5    are sensitive for the same reasons that the courts held in

6    *Class* and *Bonidy*.

7         Does that address Your Honor's questions on parking lots?

8         THE COURT:  Yeah.  So if I'm to understand you, you

9    know, along the lines of *Class* then, I would look at what kind

10   of activities are conducted in the adjacent -- so adjacent

11   isn't just a geographical reference then; you're saying a

12   physical connection.  You're saying that there's adjacent

13   meaning where the business of the sensitive areas take place

14   also in the parking lot, that's what's meant adjacent to.

15        MR. GIFFORD:  Correct, Your Honor.  And that means

16   that the parking lots that the plaintiffs have highlighted,

17   such as the parking lot that is shared by the DMV and the Ross

18   and the Ace Hardware, would not be a sensitive place because it

19   does not exclusively serve the DMV.  Likewise, the parking lot

20   that's shared by plaintiff Kasprzycki's business and the

21   financial institution located in the same parking lot of his

22   business would not be a sensitive place because it is not

23   exclusively serving that bank.

24        THE COURT:  Okay.  Fair enough.  Thank you.  I

25   appreciate that.  That's a great clarification.

UNITED STATES DISTRICT COURT

1    All right.  So maybe this is the time -- good time to

2  segue to banks and financial institutions.  So I understand

3  what your arguments are.  You brought, you know, historical

4  examples.  And so are markets and fairs the same as banks and

5  financial institutions?

6    MR. GIFFORD:  We believe that they are analogous to

7  banks and financial institutions.  And I'd like to just flag at

8  the outset that plaintiffs have not shown that they have

9  standing to challenge the bank's provision because even in

10  their late-breaking declarations submitted with their reply,

11  which the State does not believe the Court should consider

12  because those declarations were not submitted with the moving

13  papers, the plaintiffs have not identified any banks that have

14  said that plaintiffs would be permitted to carry.

15    We also -- our position is that the bank provision cannot

16  be challenged even -- or the plaintiffs' challenge, rather, to

17  that provision fails at the first step of *Bruen* because the

18  plaintiffs have failed to show that the scope of the Second

19  Amendment covers their right to carry in financial institutions

20  in the first place.

21    But even if the Court were to analyze the question of the

22  second step, we believe that the tradition going back to the

23  1300s of restricting firearms in fairs and markets and other

24  commercial centers would provide a ready analog.

25    Judge Román's opinion in the *Frey* decision in the

UNITED STATES DISTRICT COURT

1   Southern District of New York which analogized Times Square to

2   fairs and markets is instructive on this point.  And I'd like

3   to clarify that while plaintiffs try to disparage those early

4   fairs and markets laws as containing a terror requirement, it

5   nevertheless is significant that those laws holding the terror

6   requirement to the side isolated fairs and markets as unique

7   places.  And even Judge Suddaby in the *Antonyuk* decision on

8   which the plaintiffs rely recognized that fairs and markets

9   were unique places and indicated that if the plaintiffs in that

10   case had had standing to challenge the Times Square

11   prohibition, that he would have reached the same outcome that

12   Judge Román did in the *Frey* case.

13        And we also think just from the common sense perspective

14   and as the banks testified in support of this law, it would be

15   I believe shocking to the ordinary person to learn that the

16   state is unable to prohibit firearms in banks.

17        THE COURT:  Well, it may be that the individual

18   financial institutions can do so.  I mean, they're private

19   businesses, but they are -- they've invited the public to come

20   in.  So it may be that the state can't prohibit that, but it

21   may be on an individual basis that these banks and financial

22   institutions could do so; isn't that correct?

23        MR. GIFFORD:  The State agrees that financial

24   institutions can prohibit individuals from carrying firearms

25   onto their property, but the State as well possesses the power

1  to prohibit firearms in sensitive places, and given the long

2  tradition going back to the 1300s of prohibiting firearms in

3  commercial centers such as fairs and markets, and then there's

4  beyond that the entire robust tradition of 19th century

5  prohibitions on all manner of commercial and social places

6  where the proprietors privately could have prohibited firearms

7  themselves, the State believes that there is an ample -- ample

8  support for the banks and financial institutions provision.

9        THE COURT:  Okay.  You know -- and I understand your

10 common sense argument -- unfortunately, that wasn't included

11 anywhere in *Bruen* in terms of what the government or, you know,

12 your client's burden is in terms of, you know, demonstrating

13 overcoming the Second Amendment constitutional right.

14       MR. GIFFORD:  The point is well taken, Your Honor.

15 I believe that the common sense merely reinforces the long

16 tradition of regulation in these sorts of commercial spaces

17 going back to the 1300s.

18       THE COURT:  Okay.  I appreciate that.  And what

19 about the argument that the cutoff is 1791 so I shouldn't be

20 looking at anything?

21       MR. GIFFORD:  Thank you, Your Honor.  I'd like to

22 address that point in several respects.

23       I think the first is to dispel with the argument that

24 we've somehow relied on the now-vacated decision in *Bonidy* in a

25 way that affects our case at all.  That was one of myriad cases

22

1    that has found 1868 to be relevant, and that it's vacated makes

2    no difference to our argument.

3         The overwhelming majority of courts have found that 1868

4    is relevant.  Even the *Antonyuk* decision on which the

5    plaintiffs rely found that 1868 was relevant.  The *Maryland*

6    *Shall Issue* decision found that 1868 was relevant, the *Frey*

7    decision, and then numerous pre-*Bruen* decisions as well.

8         And with respect to the point that the content of the

9    Second Amendment and the Fourteenth Amendment right to bear

10   arms needs to be the same so that the right has the same

11   content with respect to the state and federal government, we

12   absolutely agree, but we believe that the content of that right

13   is determined as of 1868, and we think that the relevant

14   portion of Justice Thomas's opinion in *Bruen* speaks clearly to

15   that.  It cites and quotes at length from an article by Kurt

16   Lash which essentially explains that in 1868 the states that

17   ratified the Fourteenth Amendment breathed contemporary

18   meaning into that amendment and so breathes contemporary

19   meaning into the Second Amendment with respect to both the

20   states and the federal government.

21        And in a sense it's a theory of reversing corporation

22   against the federal government with respect to the Second

23   Amendment, but clearly it pegs the content of the Second

24   Amendment as applied against the states to an 1868

25   understanding.  And as we've explained and shown through the

1  laws from the middle of the century, but before and after 1868,

2  there is a wealth of relevant and analogous restrictions.

3          THE COURT:  Uh-huh.  Okay.  Fair enough.

4          So moving on to bars and restaurants serving alcohol, you

5  know, there's been this whole contention -- well, first of all,

6  I would say I tend to agree with regard to the general laws

7  about forbidding alcohol to militia and so forth, that's a

8  little far removed in terms of what we're talking about.

9          But you have presented, you know, laws in the

10 territories, Kansas, and then also a Connecticut law, so one of

11 the colonies barring or criminalizing possession of pistols by

12 intoxicated persons, talking about linking it up to the sale of

13 alcohol.  And then you have, of course, referred to different

14 areas about serving alcohol in fandangos and other places, so I

15 understand your argument about 1868.

16         And then I come back to the, you know -- you know, I

17 guess it's how many angels can dance, you know, on the top of a

18 pin -- the head of a pin, you know, how many historical analogs

19 does the State need to bring forth in order to make a

20 sufficient argument to overcome its burden?

21         MR. GIFFORD:  I'd like to make a few points in

22 response to that question because I think that the plaintiffs

23 have misread our history.  And while the State's position is

24 that the laws prohibiting individuals from drinking and

25 carrying guns are analogous, the State believes that they do

1  inform our analysis here because the concerns of mixing alcohol

2  and firearms were the same then as they are now.

3      There are other laws that we cite, and this is on pages 8

4  and 9 of our brief, that are from the mid-1700s from states as

5  well that prohibit, for example, the sale of liquor anywhere

6  near a training ground, and so there those words specifically

7  prohibiting individuals from drinking and carrying firearms,

8  although the laws also did that.

9      And so really there's a tradition going back to the

10  mid-1700s, including the states as well and not just

11  territories, of prohibiting the sale of alcohol in proximity to

12  firearms regardless of whether those carrying the firearms were

13  drinking.

14      With respect to the number of laws, I believe that

15  Mr. Beck said that a majority of states need to have adopted

16  such laws.  The *Bruen* court did not impose anywhere near such a

17  high hurdle when explaining why the places that it understood

18  and assumed it settled to be sensitive were, in fact,

19  sensitive.  Some of those laws which the Court cited secondary

20  scholarship for were two laws in Maryland in the mid-1600s that

21  supported the designation of polling places as sensitive, maybe

22  one or two laws somewhere else.  There were very few laws, and

23  it was the fact that those laws were long established and had

24  not been challenged that was sufficient for the designation of

25  those places that we know are sensitive.  So that there's no

25

1  indication that a majority of states or colonies need to have

2  had such a law on the books.

3      And furthermore, the notion that territorial laws can be

4  disregarded altogether or that laws that cover a substantial

5  but nonmajoritarian population can be disregarded is

6  inconsistent with the *Bruen* decision.  *Bruen* was saying simply

7  that where the weight of history cuts in one direction, a few

8  later laws from territories that cover less than one percent of

9  the population can't swing the analysis in the opposite

10  direction, and it was not saying that these laws deserve no

11  weight or that courts should be doing a percentage analysis.

12      THE COURT:  Thank God, 'cause I don't want to do a

13  percentage analysis.  It's enough that I have to look at

14  historical references and figure out whether or not -- or what

15  weight to give them.

16      All right.  I appreciate that.  Anything else with regard

17  to that?

18      MR. GIFFORD:  On the bars and restaurants point, no,

19  Your Honor, although I would just like to again reiterate the

20  initial standing argument and the initial step one argument

21  because we think that the declarations that were submitted

22  should not be considered at this stage.  But I would also like

23  to address the beaches point and the parkland point.

24      THE COURT:  Yes.

25      MR. GIFFORD:  With respect to the parkland

1   point -- and again, we think that plaintiffs have delayed too

2   long simply to challenge this law on a TRO basis given that

3   they had two months from the time the bill was passed and

4   three weeks from the time that the law was signed.

5       But with respect to the state parks prohibition, Hawaii

6   Administrative Rule 13-146-19(a) says no firearms, I'm

7   paraphrasing, except as provided herein, and then (b) says you

8   can possess firearms in accordance with 13-146-41.  And that

9   says yes, you can't molest or kill animals unless you're

10  authorized.  So it's saying simply you cannot possess firearms;

11  that's the rule.  And then the exception is you can possess

12  them if you're authorized to hunt.  There's nothing in there

13  that the State has found that would suggest that there is some

14  embedded permission to carry for self-defense if you have a

15  concealed carry permit.

16      And so although not necessary to find that plaintiffs

17  have delayed too long to show irreparable harm, we -- the

18  State's position is that that is just another reason in order

19  to find that the State -- that the plaintiffs have delayed too

20  long.  So that was one point that I wanted to address that

21  Mr. Beck raised.

22      Another is the point that Mr. Beck made with respect to

23  beaches.  I believe that the -- to the extent that the

24  declaration specified the beaches that the plaintiffs want to

25  visit and specify how populated those beaches are, they're all

1  indicated to be moderately or very populated, so I don't even

2  think on this record that plaintiffs have demonstrated an

3  intent to visit an isolated beach.

4      But regardless, the analogs that we found and that we've

5  put forth to the Court and the expert evidence from software

6  now from Terence Young doesn't look to the density of parks and

7  beaches when determining the purpose for designating those as

8  sensitive.

9      The purpose of designating those locations as sensitive

10 is that they were meant to be places of quiet reflection and

11 enjoyment of nature, and that that enjoyment was disrupted by

12 the presence of firearms as it was by the presence of

13 projectiles, and even, according to Professor Young, of sports

14 and athletic activities which had to be taken and done in other

15 parts of the parks.

16     And the idea that there has been open natural space

17 forever is simply too reductive when one is trying to

18 understand the rise of the modern American parks movement and

19 the rise of modern American beaches.  The experience in Hawaii

20 with respect to beaches is a perfect illustration of this.

21     There has been beach land for a long time.  There has not

22 been modern beach tourism for a long time.  But even the modern

23 American parks movement, although it's taken for granted that

24 parks seem to exist everywhere, really didn't rise until the

25 mid-1800s, and our experts have explained that their kind of

1    earlier antecedents, such as the Boston Common, were not parks

2    in the modern conception of parks.  Even the article that

3    plaintiffs cite for that proposition that Boston Common was

4    somehow a relevant space is called *Before Parks* and it's

5    talking about spaces that predated modern American parks.

6        So when one looks to the beginning of modern American

7    parks, both urban parks, state parks, and national parks, one

8    is looking at parks like New York's Central Park, or Brooklyn's

9    Prospect Park, or Philadelphia's Fairmount Park, and all of

10   those parks.  And I believe the thought that parks in the five

11   most populous American cities with -- and this is in the

12   Cornell declaration -- all banned firearms in their parks.  So

13   to describe those as outliers I think is misleading and

14   certainly not consistent with the *Bruen* analysis.

15       One other point that I would like to make because on --

16   on the declaration, because I know that plaintiffs submitted a

17   number with their reply brief, is that plaintiffs have

18   submitted a declaration that purports to rebut Professor

19   Cornell's declaration, and at the preliminary injunction stage

20   we would like an opportunity to supplement all of our

21   declarations, but particularly the declaration submitted by

22   Professor Cornell, in order to respond to the purported

23   rebuttal declaration from -- from the expert, Mr. Cramer.

24       THE COURT:  Fair enough.  We'll be setting dates

25   with regard to that in terms of submission of affidavits and

1   declarations.

2          MR. GIFFORD:  Thank you, Your Honor.  And if Your

3   Honor wouldn't mind, I'd like to just address a few other

4   points --

5          THE COURT:  Yes, please.

6          MR. GIFFORD:  -- that were not addressed by

7   Mr. Beck.

8          THE COURT:  Yes.

9          MR. GIFFORD:  One of the first points that I think

10  is crucial to understanding this case is the plaintiffs' lack

11  of standing.  As discussed, plaintiffs have submitted some

12  11th-hour declarations that should not be considered with

13  respect to sensitive places.

14      But with respect to the default rule, plaintiffs have

15  failed to show standing for a more fundamental reason which is

16  that they cannot show traceability or redressability because

17  any injury they have is traceable to the decision of the

18  private property owner not to allow plaintiffs on to their

19  property.

20      As the State understands the late-breaking declarations

21  that the plaintiffs have submitted, these are private property

22  owners who are saying We welcome plaintiffs as gun owners to

23  carry guns on our property, but we won't allow them on as long

24  as 134-E is on the books.

25      The State understands that to be an express grant of

1  permission, in which case the plaintiffs have not suffered any

2  injury from their failure or their inability to go on to this

3  private property.  To the extent it's an exclusion, it's -- the

4  State believes something approaching gamesmanship because there

5  seems to be a preference to allow the plaintiffs on and only a

6  possible denial in the hopes of creating a case.

7       Plaintiffs argue that it's novel to require them to show,

8  to allege that they would be permitted to carry in any of the

9  places that they would like to carry absent the restrictions

10  that they challenge, but there's nothing novel about requiring

11  plaintiffs to allege and prove standing.  That's a bedrock

12  Article III principle.  And none of the other decisions

13  post-*Bruen* of which we're aware have addressed the first step

14  standing arguments that we're making here, particularly with

15  respect to the default rule.

16      The plaintiffs rely on a few decisions repeatedly, such

17  as the *Antonyuk* decision and the *Koons* decision.  Those didn't

18  address the precise arguments we're raising here, and even to

19  the extent that they come close, those decisions have both been

20  stayed by the appellate courts pending appeal.

21      I'd like to clarify one point about how we understand the

22  first step of the *Bruen* test to work.  The plaintiffs seem to

23  say that all that matters is the dictionary definition of the

24  words "bear" and "arms," and as long as you are carrying some

25  sort of weapon, then you've satisfied *Bruen*'s first step.  If

1  that were the case, then it would be trivially easy to satisfy

2  *Bruen*'s first step.  Plaintiff would be bearing arms regardless

3  of whether he wanted to bring a rifle to a shooting range or a

4  hand grenade into a school.  And there needs to be more content

5  than that when one is trying to understand *Bruen*'s first step.

6         Even the *Koons* decision and the *Antonyuk* decision on

7  which the plaintiffs rely, which again have been stayed in full

8  or in large part to the extent they ruled against the State,

9  understood that there must be some sort of locational

10  restriction in the text of the Second Amendment such that the

11  Second Amendment even at step one would not allow individuals

12  to carry on to private property close to the public without the

13  owner's consent.

14         And I think that the Eleventh Circuit's decision in the

15  *GeorgiaCarry.org* decision -- *GeorgiaCarry.org* case addressed

16  this exact point, and although it's pre-*Bruen*, it was doing a

17  step one analysis which *Bruen* endorsed, is probably consistent

18  with *Heller*, and the court there explained that there is no

19  right -- it is not within the scope of the Second Amendment to

20  carry firearms on private property without the owner's consent.

21         I believe that those are -- we've talked through most of

22  the step two arguments with respect to bars, parks, and

23  beaches, and financial institutions, and so I think that I

24  don't have anything further to say on the second step of *Bruen*

25  as it applies to the places that plaintiffs are challenging.

1    I would like to say with respect to the second step as it

2    applies to the private property default rule, if the Court

3    decides to analyze the private property default rule at step

4    two -- and we believe that we would win at steps one and two --

5    there is a long tradition going back to the early 1700s of

6    prohibiting individuals from carrying guns on other's property

7    without consent.  And the plaintiffs argue that these laws

8    dealt only with hunting, but it's apparent from the text of the

9    laws which we have submitted that these laws imposed distinct

10   prohibitions on hunting and carrying without consent.

11   I'd also like to address Plaintiff Kasprzycki's compelled

12   speech claims because we believe Plaintiff Kasprzycki is not

13   being compelled to say anything, and unlike in other compelled

14   speech cases, Plaintiff Kasprzycki is not required to speak a

15   specific message as a condition of opening his business to the

16   public.  Instead, he may operate his business and simply remain

17   silent on the issue of guns.

18   Even the *Koons* case, on which plaintiffs rely heavily,

19   rejected this compelled speech argument, and there's no

20   distinction within *Koons* that could be made as to speech with

21   respect to property that goes open to the public and closed to

22   the public, which is a distinction that plaintiffs try to draw.

23   The *Antonyuk* decision did accept the compelled speech

24   arguments that plaintiffs are making, but then it was stayed by

25   the Second Circuit meaning that the Second Circuit has found

1    that that claim is likely to fail.

2        Furthermore, if Plaintiff Kasprzycki were correct that

3    the default rule compelled speech by requiring him to express

4    consent to allow guns on his property, then the opposite rule

5    would compel even more speech because it would require Hawaii

6    businesses, the majority of which oppose guns on their

7    property, to express their lack of consent in order to prohibit

8    guns.  And this is detailed in a very helpful way in the amicus

9    brief that Honolulu submitted in support of our opposition.

10       And there's just one final point I would like to make

11   with respect to scope of relief, which is that plaintiffs

12   cannot obtain facial relief here because they cannot show that

13   there is no set of circumstances in which the challenged

14   provisions can be constitutionally applied.  They argue that

15   they can bring an overbreadth challenge, but overbreadth

16   challenges are limited to the First Amendment context, and they

17   are disfavored even there.

18       The plaintiffs cite Judge Seabright's decision in

19   *Yukutake* and the Supreme Court's decisions in *Heller* and *Bruen*,

20   but none of those cases applied an overbreadth framework, so

21   plaintiffs can only bring an as-applied challenge here, and for

22   the reasons that I've discussed, their challenge fails.

23       I'd welcome any further questions from the Court.

24          THE COURT:  I don't have any.  Thank you.

25       I'll turn to Mr. Beck and give him the final word.

1          MR. GIFFORD:  Thank you, Your Honor.

2          MR. BECK:  I -- I won't address everything that

3    Mr. Gifford said because most of it has been addressed in our

4    briefing, but I do have a few points to make.

5          As to the declarations, as an initial matter we don't

6    actually think the Court needs to use the declarations because

7    we have standing apart from that.

8          However, Judge Otake in *Yukutake v. Lopez*, which was --

9    is a standing decision that she decided in -- it was about

10   January or February -- it was this year -- had a -- accepted

11   submissions made after a -- in a reply in a situation just like

12   that where we filed these as supplemental authority because the

13   State made a new argument in I think it was a reply brief.  So

14   there's -- Judge Otake's reasoning was fully applicable here in

15   this situation because it was just raised in their response for

16   the first time.  We addressed that in the reply with the

17   declarations.

18         As for the issue of restaurants, we are not challenging

19   the State's ability to ban people who are actually drinking

20   from carrying a firearm, and all the State's historical sources

21   are dealing with people who are actually drinking.

22         Our clients want to order a pizza and -- while not

23   drinking -- and, you know, just simply eat there.  And it

24   doesn't -- it's not really relevant whether someone is having a

25   beer, you know, a few tables down.  So on -- and there's

1    already a Hawaii law that bans operating firearms while

2    intoxicated, so that wouldn't go away.

3           THE COURT:  Well, so that's a little finer point.

4    So the -- so under the *Bruen* analysis that the court's supposed

5    to conduct, the State has brought forth examples of laws that

6    tie the sale of alcohol to individuals, you know, for

7    consumption and banning firearms.  And it doesn't seem -- and I

8    may have missed it, so point it out to me -- that any of these

9    laws indicate, well, it's -- but if people are just eating and

10   they're not consuming -- it didn't seem to be the consumption

11   of alcohol, but the sale of alcohol, you know, impliedly for

12   consumption.

13       So I think you're drawing a very fine distinction saying,

14   well, as long as you go to the restaurant and you have the

15   intent of not consuming alcohol but just eating, consuming food

16   or nonalcoholic beverages, then the state shouldn't be able to

17   forbid you from carrying a firearm.

18           MR. BECK:  Well, I -- Your Honor, well, at least I'm

19   saying we're not challenging that right here.  And, you know,

20   that's a much different situation.  If -- if this is 1791, I go

21   and I -- and I'm ordering a drink, I mean, there's a safe

22   assumption that I want to drink that drink --

23           THE COURT:  Right.

24           MR. BECK:  -- you know.  And --

25           THE COURT:  But it's not so much ordering a drink;

1   it's going to an establishment that serves alcohol, whether or

2   not you order it.  And that's the situation that we find

3   ourselves in under the current law that you're seeking the TRO,

4   right?  It's -- it's a bar or restaurant serving alcohol for

5   consumption on premises, not, you know, a supermarket where

6   you're going to take it out or a liquor store.  It's for

7   consuming it on the premises, and they've given me these

8   historical analogs where there's been a distinction between

9   banning firearms where there's the consumption of alcohol.

10          MR. BECK:  You know, I -- my recollection of reading

11  those statutes was these all pertain to situations where people

12  are actively ordering or drinking alcohol.  I don't recall

13  seeing any statutes that just simply forbid carrying a firearm,

14  you know, being within close proximity to the service of

15  alcohol.  I generally don't --

16          THE COURT:  I don't think there's any fandango,

17  ballroom, or what have you where alcohol is or intoxicating

18  liquors are consumed or sold -- I can't remember the exact

19  words -- and so I'm with you on that.

20          But that seemed to be the connection this place -- I

21  mean, they've cited all these other prior cases about

22  specifically banning firearms or not allowing firearms where --

23  to an intoxicated, you know, militia or so forth.

24          But there was also the Oklahoma law banning firearms at

25  any place where intoxicating liquors are sold, 1890 Oklahoma

1    Territory Statute.  So laws such as that, sort of this

2    connection of the place where these are sold, you know, with

3    the inference they're consumed there, you know, and that's

4    specifically this -- this law is specifically tailored for

5    consumption on premises and adjacent parking lots, so serving

6    alcohol for consumption on premises and adjoining parking lots.

7            I realize the distinction that you're making.  They're

8    going to go to a place where the restaurants and bars may sell

9    alcohol for consumption on the premises and they're not going

10   to consume it and they want to be able to carry firearms

11   because they're not consuming alcohol; they're going to be

12   eating or drinking nonalcoholic beverages.

13           MR. BECK:  Yes, Your Honor.  I -- without -- just as

14   a -- don't have a -- without conceding that --

15           THE COURT:  Okay.

16           MR. BECK:  -- those statutes are specifically, you

17   know, prohibiting carrying guns within restaurants, I mean.

18           THE COURT:  Okay.

19           MR. BECK:  One, I mean, that's a territorial law

20   which is specifically forbidden from *Bruen*, and it's 1890 which

21   is a little bit late even if we're talking about -- even if

22   1868 were used, and again, you know, our position is 1791 is

23   the year.

24           THE COURT:  Right.

25           MR. BECK:  If it's just one that the State was able

UNITED STATES DISTRICT COURT

2-ER-0229

1   to find, that just simply wouldn't be enough and, you know.

2          THE COURT:  Understood.  That's the only one I have

3   in my notes that I can talk to.  I remember there was a

4   Louisiana -- I mean a New Orleans law that you pointed to, but

5   I guess you would say that's also a territory as opposed to one

6   of the colony states.  Understood.  I think I understand your

7   argument.

8          I didn't mean to interrupt you.  Is there anything else

9   you want to add or clarify?

10          MR. BECK:  Just we addressed -- no, just the last

11  thing is the Eleventh Circuit *GeorgiaCarry* case.  The Eleventh

12  Circuit very specifically said that they would frame that

13  argument in a situation where there was

14  affirmative -- affirmative denial to carry, and does a person

15  have a right to come onto a land where they've affirmatively

16  not been told they can't carry.  I say this a little more

17  articulately within the briefing.  It's within the footnotes,

18  though, so I just wanted to raise that so it's not overlooked.

19          But beyond that, that's the remainder of my argument,

20  Your Honor.

21          THE COURT:  Thank you very much.

22  Well, I thank --

23          MR. BECK:  Thank you very much.

24          THE COURT:  -- all counsel for their briefing and

25  their oral arguments, very helpful to the court.  The court

1   will take the matter under advisement and issue its written

2   order as soon as possible.  And I'm not going to give a

3   specific date for that, but we recognize, you know, that you

4   folks are looking forward to the decision and it is a motion

5   for temporary restraining order, so we will move with all

6   cautious speed as much as possible.

7          All right.  Wish all of you a very good Friday.

8          There being nothing further before the court, we stand

9   adjourned.  Good day, everyone.

10             THE COURTROOM MANAGER:  This Honorable Court is now

11  in recess.

12             (Proceedings concluded at 11:28 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3            I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10
             DATED at Honolulu, Hawaii, August 14, 2023.
11

12

13                    */s/ Debra Read*

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25


                     UNITED STATES DISTRICT COURT

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION<br><br>Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:23-cv-00265-LEK-WRP

2-ER-0233

## Contents

I.     **Introduction** ............................................................................... 1

II.    **Plaintiffs Have Standing** ........................................................... 1

III.   **Plaintiffs May Bring a Facial Challenge** ................................. 5

IV.   **Compelled Speech** ..................................................................... 6

V.     **Banks** ........................................................................................... 7

VI.   **Parks and Beaches** ..................................................................... 8

VII.   **Restaurants that Serve Alcohol** .............................................. 11

VIII.   **Government Parking Lots** ....................................................... 12

IX.   **Default Rule** ............................................................................. 13

X.     **Other Preliminary Injunction Prongs** .................................... 14

XI.   **Conclusion** ............................................................................... 15

**2-ER-0234**

## Table of Authorities

*Antonyuk v. Hochul,* No. 122-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ........................................................................................................ 2,6, 14

*Bennett v. Spear,* 520 U.S. 154 (1997). ....................................................2

*Bonidy v. United States Postal Serv.,* 790 F.3d 1121 (10th Cir. 2015) ...............9, 13

*Bowsher v. Synar,* 478 U.S. 714 (1986) ........................................................5

*Brown v. Enter. Merchs. Ass'n,* 564 U.S. 786 n.3 (2011) ............................................4

*Common Cause/Georgia v. Billups,* 554 F.3d 1340 (11th Cir. 2009) .......................3

*Christian v. Nigrelli,* No. 22-cv-695, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ........................................................................................................2, 3

*Constitution Party v. Aichele,* 757 F.3d 347 (3d Cir. 2014) ......................................2

*Elrod v. Burns,* 427 U.S. 347, 373, 96 S. Ct. 2673 (1976 .......................................15

*Foti v. City of Menlo Park,* 146 F.3d 629 (9th Cir. 1998) .........................................5

*Fotoudis v. City & Cnty. of Honolulu,* 54 F. Supp. 3d 1136 (D. Haw. 2014 ...........15

*G & V Lounge v. Mich. Liquor Control Comm'n,* 23 F.3d 1071 (6th Cir. 1994) .....15

*Gannett Co., Inc. v. DePasquale,* 443 U.S. 368 (1978). ...........................................15

*GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d 1244 (11th Cir. 2012) ......................14

*Gordon v. Holder,* 721 F.3d 638 (D.C. Cir. 2013) ...................................................15

*Huntington Branch, NAACP v. Huntington,* 689 F.2d 391 (2d Cir. 1982) ...............3

*Jones v. Bonta,* 34 F.4th 704 (9th Cir. 2022) ..........................................................15

*Koons v. Platkin,* No. 22-7464, 2023 WL 3478604 (D.N.J. May 16, 2023) ..........2, 6

*Maryland Shall Issue, Inc. v. Montgomery Cnty.,* No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023) .................................................................2

*Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789 (1984) ................5

*N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2144 (2022) ........... Passim

*Nordyke v. King,* 681 F.3d 1041 (9th Cir. 2012) .......................................................9

*NRA v. Bondi,* 61 F.4th 1317 (11th Cir. 2023), en banc granted (July 14, 2023) ........1

*Preminger v. Principi,* 422 F.3d 815 (9th Cir. 2005). ...............................................15

*Project 80s v. Pocatello,* 942 F.2d 635 (9th Cir. 1991) ..............................................6

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47 n.2 (2006) ..5

*Toll Bros., Inc. v. Twp. of Readington,* 555 F.3d 131 (3d Cir. 2009) .........................2

*United States v. Class,* 930 F.3d 460 (D.C. Cir. 2019) ..................................... 12, 13

*United States v. Ewing,* 638 F.3d 1226 (9th Cir. 2011) ..............................................1

*United States v. Kokinda,* 497 U.S. 720 (1990) .........................................................9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252 (1977) ............3

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,* 529 U.S. 765, (2000) .........3

*Yukutake v. Conners,* 554 F. Supp. 3d 1074 (D. Haw. 2021) ...............................5, 11

*Zaitzeff v. City of Seattle, 17 Wash. App. 2d 1, 18, 484 P.3d 470 (2021)*.................*10*

**Statutes**

1786, VA, Ch. 49, An Act Forbidding and Punishing Affrays.................................10

H.R.S. § 134-A(a)(4)..........................................................................................5

H.R.S. §134-E ...................................................................................................5

HAR § 13-146-19(a) .........................................................................................14

HAR §13-146-4.................................................................................................14

**Other Authorities**

https://dlnr.hawaii.gov/ecosystems/files/2013/09/HRS13-146_State-Parks.pdf.....11

https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-forbidding-and-
punishing-affrays/ (last visited 7/17/2023).............................................................8

https://www.mauimallvillage.com/directory/ ........................................................12

Constitutional Provisions

Article III...........................................................................................................3, 7

**2-ER-0236**

## I.      Introduction

Defendant's response falls short for a number of reasons, particularly its failure to address the federal courts which have enjoined laws similar to those at issue here. It heavily relies on the 11th Circuit's vacated opinion in *NRA v. Bondi*, 61 F.4[th] 1317 (11th Cir. 2023), en banc granted (July 14, 2023). It fails to come forth with the necessary historical analogues to justify its carry restrictions. And as shown below and in the attached Declarations of Clayton Cramer, Hawaii as well as its historians misrepresents the holdings of numerous cases, laws and legal doctrines. *See* Exhibit 1 Declarations of Clayton Cramer. And they've done this to impose a legal regime that bans carry in nearly all of the publicly accessible land in the County of Maui. *See* Exhibit 2 Map of Maui County.

## II.      Plaintiffs Have Standing

A recurring theme of the State's brief is Plaintiffs lack of standing regarding various private property carry bans because they have not shown private businesses would allow them to carry. It produces no evidence, however, that any businesses mentioned in the complaint currently bans carry. That is true as well for banks and restaurants that serve alcohol, and plaintiffs are unaware of any evidence otherwise. Even if this were not the case, the State does not cite a single case that supports this novel standing theory. "*Article III* standing is jurisdictional." *United States v. Ewing*, 638 F.3d 1226, 1230 (9th Cir. 2011). That means every court which reached the

2-ER-0237

merits in similar Second Amendment cases has implicitly found that the litigants had standing. Not a single court in the nation has endorsed the State's novel standing theory.[1] Although undeveloped, the State's theory is ultimately one of traceability and redressability. Plaintiffs' injury is clearly traceable to state law because the law restricts carry in the challenged locations. "[I]njury produced by determinative or coercive effect upon the action of someone else" is sufficient for traceability. *Bennett v. Spear*, 520 U.S. 154, 169, (1997).

> Moreover, there is room for concurrent causation in the analysis of standing, *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (holding that if a petition witness residency requirement was "at least in part responsible for frustrating [plaintiff's] attempt to fully assert his First Amendment rights in Virginia, the causation element of *Lujan* is satisfied")

*Constitution Party v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014). Plaintiffs' injury is thus plainly traceable to the State law.

Furthermore, Plaintiffs' claims are redressable. "Redressability is not a demand for mathematical certainty. It is sufficient to establish a "substantial likelihood that the requested relief will remedy the alleged injury in fact." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 143 (3d Cir. 2009) (quoting *Vt. Agency of*

---

[1] *See e.g., Koons v. Platkin*, No. 22-7464, 2023 WL 3478604 (D.N.J. May 16, 2023), *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023), *Antonyuk v. Hochul*, No. 122-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *Christian v. Nigrelli*, No. 22-cv-695, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022).

2

*Nat. Res. v. United States ex rel. Stevens,* 529 U.S. 765, 771 (2000)). *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) is dispositive. There, a developer and individual plaintiffs challenged a village zoning ordinance which precluded the development of low-income housing project. The Court found standing because "[t]he challenged action of the Village stands as an absolute barrier to constructing the housing for which [the developer] had contracted, a barrier which could be removed if injunctive relief were granted. *Id* at 254.

Similarly, Plaintiffs here have standing because "[i]nvalidation of the challenged ordinance, therefore, would tangibly improve the chances of" them carrying in the various locations they declared they want to carry in. *Huntington Branch, NAACP v. Huntington*, 689 F.2d 391, 395 (2d Cir. 1982). Moreover, the need to ensure consent before engaging in constitutionally protected conduct is itself a burden on that conduct and thus an injury in fact. *Cf. Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing."). It is the Anti-Carry Default that prohibits firearm carry on the property absent such consent—in other words, that exercises on the government's behalf the property owner's traditional right of exclusion. *See Christian*, 2022 WL 17100631, at *9 (noting that "carrying on private property" is "generally permitted absent the owner's prohibition"); *cf. Brown v.*

2-ER-0239

*Enter. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (noting that laws "ma[king] [it] criminal to admit a person under 18 to church" would "not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto," and as such would be subject to constitutional challenge).

Moreover, Plaintiffs submit the declarations of several Maui business owners who have not put up signs but declare if H.R.S. §134-E were removed, they would allow the public to carry in their business.[2] They also have submitted declarations from the owners of restaurants that serve alcohol who declare that if H.R.S. § 134-A(a)(4) were removed, they would allow the public to carry in their restaurant.[3] Each Plaintiff has declared that if H.R.S. §134-E were enjoined they would carry at each of these businesses. *See* Exhibit 5 Supplemental Declarations of Plaintiffs. Thus, the State's concerns have largely been removed.  As to the ban on bank parking lots, Kasprzycki owns the portion of the building his business is in. He would like to carry in the parking lot of his business, but he shares the parking lot with a bank. Complaint ¶ 61.[4] Therefore, there can be no dispute that he has a right to challenge the bank restriction. As a joint tenant with an equal possessory interest in the parking lot, Kasprzycki does not need to seek permission from the bank. "[T]he presence

---

[2]  *See* Exhibit 3 Declarations of Maui Businesses
[3] *See* Exhibit 4 Declarations of Maui Restaurants
[4] The bank Kasprzyscki shares a business with is Valley Isle Community Federal Credit Union.  It was mistakenly identified as Bank of Hawaii in the complaint. *See* Exhibit 5 Supplemental Declarations of Plaintiffs

4

**2-ER-0240**

of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). This Court "need not consider the standing issue as to the" other Plaintiffs. *Bowsher v. Synar,* 478 U.S. 714, 721 (1986). However, if it did, the other Plaintiffs would have standing for the reasons stated above.

### III.   **Plaintiffs May Bring a Facial Challenge**

Plaintiffs may bring a facial challenge against the State's carry bans. "An ordinance may be facially unconstitutional in one of two ways: "either [] it is unconstitutional in every conceivable application, or [] it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984)). Judge Seabright recently found two provisions of Hawaii's registration law "facially unconstitutional" because they violated the Second Amendment in their typical application. *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1080 n.6 (D. Haw. 2021). The State's position contradicts the holdings of *Heller* and *Bruen*. The D.C. law which prohibited the ownership of handguns assuredly was constitutional as to convicted murderers as was the New York law at issue in *Bruen*. Yet in both cases, the Supreme Court had no problem striking those laws as facially unconstitutional.[5]

---

[5] If this Court disagrees, it should give relief on Plaintiffs' as-applied challenge.

**2-ER-0241**

## IV.   **Compelled Speech**

The State ignores the only Court to rule on a similar law and misrepresents

the holding in *Koons*. There the Court limited its analysis "to property that is *not* held

open to the public" because it had already found the Default Rule violated the

Second Amendment. *Koons*, at *212. Therefore, *Koons* has no persuasive value with

regard to Plaintiffs' compelled speech claim because here Plaintiffs are challenging

Hawaii's Default Rule as it pertains to property that is held open to the public.

The only court to rule on a compelled speech claim regarding a law similar to

Hawaii's is the *Antonyuk* court. There, the Court found New York law which is

identical to Hawaii's

> appears to compel Plaintiffs' speech another way: by **coercing** them, as
> busy store owners, to conspicuously speak the state's controversial
> message (visible to neighbors and passersby on the sidewalk or street)
> if (1) they want to welcome onto their property all license-holding
> visitors who the State has spooked with a felony charge, but (2) they
> are otherwise unable to give express consent to those visitors for some
> reason.

*Antonyuk,* at *237 (footnotes omitted).[6] This Court should follow *Antonyuk* and find

that a law which requires a storeowner to display a sign or give consent to allow

firearm owners to carry unconstitutionally compels speech.

---

[6] *See, also., Project 80s v. Pocatello*, 942 F.2d 635, 639 (9th Cir. 1991) ("Under the
Idaho Falls and Pocatello ordinances, residents who wish to receive uninvited
door-to-door solicitors must post a 'Solicitors Welcome' sign. The government's
imposition of affirmative obligations on the residents' first amendment rights to
receive speech is not permissible").

## V.    Banks

This case presents the question whether it is constitutional for the State to deny Kasprzycki the right to carry a handgun in the parking lot of his private business. Kasprzycki owns an architecture business. Complaint ¶¶ 62, 65. His office shares a parking lot with a bank. Complaint ¶ 61. That means he is barred from carrying a handgun in his own parking lot. Furthermore, there is no "unprecedented social concern" or "dramatic technological changes" with respect to carrying handguns in banks, because banks existed in the 18th and 19th centuries, and bank robberies occurred then too. This means the State may not engage in analogical reasoning and is instead limited to identifying laws close to or identical to its modern regulation because "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Historically, there were no bans on carry imposed by the government in banks or their parking lots, and thus there is no historical justification for Hawaii's bank restriction. The only historical laws Hawaii produced are two the State claims banned carrying in markets and fairs. Even if this were true, restrictions on carrying in markets and fairs are not distinctly similar to carrying in a bank or a bank's parking lot. Banks are enclosed buildings and their parking lots often have no one in them,

2-ER-0243

especially late at night when an individual is going to withdraw money from an ATM, or is leaving his business late at night and entering a parking lot that happens to be shared with a bank. This is not distinctly similar or even analogous to a market or fair. Moreover, the laws Hawaii cites did not prohibit carrying in markets or fairs. The 1786 law Virginia law prohibited carrying "in fairs or markets, or in other places, **in terror of the county**." *See* 1786, VA, Ch. 49, An Act Forbidding and Punishing Affrays (emphasis added).[7] This law only prohibited carrying weapons in a dangerous manner meant to terrorize people. Hawaii should know this. First, the plain language of the statute says this. And second, this law was specifically discussed in *Bruen*. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2144 (2022). "They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id at* 2145. Hawaii also cites a North Carolina 1792 law that was also discussed in *Bruen* and discounted by the majority as Justice Breyer explained "because they were modeled on the Statute of Northampton, which [the majority] believes prohibited only public carriage with the intent to terrify." *Id* at 2185. Thus, neither of the two laws cited actually prohibited the carry of arms at markets and fairs. Hawaii has failed to meet to justify its law.

## VI.   **Parks and Beaches**

---

[7] https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-forbidding-and-punishing-affrays/ (last visited 7/17/2023).

2-ER-0244

Hawaii's primary argument in defending its ban on beaches and parks is that it does not need to respect Plaintiffs' rights on its own land.  That is not correct. Applied to the First Amendment, that would mean Hawaii can ban protests on all public land. Even when acting as a proprietor, Hawaii "is a state actor rather than a private business, so its actions must comply with the Constitution." *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015). Hawaii's reliance on *Nordyke* is completely misplaced. In *Nordyke*, "Plaintiffs' Second Amendment challenge was based solely on their inability to conduct a successful gun show on county property." *Nordyke v. King*, 681 F.3d 1041, 1045 (9th Cir. 2012) (O'Scannlain concurring). In the midst of litigation, the Defendant interpreted its ordinance to allow for the sale of firearms. *Id at* 1044. Thus, the Ninth Circuit found there was no Second Amendment violation. That is the entirety of the Ninth Circuit's holding. There is nothing within *Nordyke* that supports Hawaii's theory. In fact, the cases it cites support the opposite conclusion. *Id.* at 1045. *See e.g., United States v. Kokinda*, 497 U.S. 720, 725, (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]") Hawaii's argument proves too much. Hawaii also "owns" sidewalks and streets, but the government cannot simply ban firearm carry there. *See Bruen*,142 S. Ct. at 2135. What is relevant is not the mere fact of government ownership. *Bruen* gave

9

specific examples of types of government buildings where firearms could be prohibited: legislative assemblies, polling places, and courthouses. By analogy "to those historical regulations," the State can potentially justify new sensitive places. *Id.* at 2133 (emphasis added). It has not.

Hawaii cites to no Founding Era laws that banned firearms in beaches or parks.[8] That alone is enough for the Court to find Hawaii has failed to satisfy its burden to justify its law. What it has cited to are a handful of outlier city ordinances from the mid to late 1800s. Outlier regulations are not to be credited. *Bruen*, at 2133, 2153, 2156, 2147 n.22.[9] Even if this Court were to find Hawaii's ban justified as to urban parks, that does not justify their wholesale ban on beaches and parks in Hawaii, especially on the outer islands, which are much less urban than on the mainland. Many of the beaches and parks Plaintiffs frequent are located away from town such as Launiupoko Beach Park and Rice Park.[10] Complaint ¶¶ 60, 61.

---

[8] The State's reliance on *Zaitzeff v. City of Seattle*, 17 Wash. App. 2d 1, 18, 484 P.3d 470 (2021) is misplaced. There the court found carrying in parks is part of the Second Amendment right and applied the now rejected "intermediate scrutiny." *Id.* at 479.

[9] *Bruen* rejected New York's reliance on three colonial statutes (1686 East New Jersey, 1692 Massachusetts, 1699 New Hampshire), *id.* at 2142–44, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *id.* at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West Virginia), *id.* at 2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *id.* at 2154–55, and one19th-century Western State law (1881 Kansas), *id.* at 2155–56.

[10] Spelled as Launiopoko in the complaint.

Additionally, Kasprzycki goes to Waihou Spring Trail and Polipoli Spring State Park. *See* Exhibit 5 Supplemental Declarations of Plaintiffs. Contrary to Hawaii's position, state law previously allowed for carrying a firearm for self-defense with a valid permit. HAR § 13-146-19(a) says "Firearms and other weapons may be used or possessed if in accordance with section 13-146-4". And HAR §13-146-4 simply prohibits harassing animals.[11] Hawaii has failed to justify its park and beach ban.

## VII.   Restaurants that Serve Alcohol

Many of the historical laws Hawaii relies upon are laws regulating the colonial militia. Judge Seabright already rejected Hawaii's attempt to use militia law to justify the laws in *Yukutake*. "[T]he purpose and scope of these colonial-era militia laws are too dissimilar to the State of Hawaii's current registration requirement to support such a finding." *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1087 (D. Haw. 2021). Hawaii's restrictions on carrying in restaurants and their parking lots is meant to serve the Government's interest—not in military preparedness—but in protecting "public safety" and is thus not distinctly similar to the militia laws. *Id.*

Furthermore, Hawaii law prohibits people who are not drinking from carrying. None of the laws it cites disarmed sober people simply for being in a restaurant that served alcohol. Even if these laws could be used to justify this prohibition, they do

---

[11] Available at https://dlnr.hawaii.gov/ecosystems/files/2013/09/HRS13-146_State-Parks.pdf

nothing to justify the ban on carrying in the parking lots of restaurants. Plaintiff Jason

Wolford regularly goes to Maui Mall which has several establishments which serve

alcohol.[12] Complaint ¶ 59. No justification exists for prohibiting him from carrying

his handgun while traveling to Whole Foods or O'Reilly Auto Parts simply because

a restaurant serving alcohol happens to share a parking lot with those establishments.

## VIII.  <u>Government Parking Lots</u>

All Plaintiffs wish to carry in the parking lot of DT Flemming beach park.

*See* Complaint at ¶ ¶ 59, 60, 61. The parking lot at DT Flemming beach is not a

sensitive place. The parking lot of Ross and Ace Hardware is not a sensitive place

simply because it is shared with the Maui DMV. Hawaii cites two cases for

support. Both have been abrogated by *Bruen* and are distinguishable on their own

terms. *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) holds government

parking lots generally are not sensitive places, but the unique nature of the parking

lot at issue there required a special carve out. There, the litigant was found in a

special "Maryland Avenue parking lot [that] may be used during working hours

only by Capitol employees with a permit." *Id at* 464. It is located "less than 1,000

feet away from the entrance to the Capitol, and a block away from the Rayburn

House Office Building." *Id.* These factors caused the Court to conclude that

parking lot was "sufficiently integrated with the Capitol for *Heller I*'s sensitive

---

[12] https://www.mauimallvillage.com/directory/

places" to apply. *Id.* If Class "wanted to carry a gun in his car but abide by the ban," he could have done so but ***parked elsewhere***. *Id* at 465-66. (emphasis added). It was the parking lot's special features which made it "distinguishable" from other nearby areas. *Id at* 466. The parking lot of DT Fleming Beach Park plainly does not share these features. Nor does the Ross and Ace Hardware parking lot shared with the DMV. Hawaii also relies on *Bonidy v. United States Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) which found the government could ban carry in the parking lot of a post office. The 10th Circuit justified its decision because the parking lot operated as a "single unit with the postal building itself to which it is attached and which it exclusively serves." *Id* at 1125. Moreover, that case upheld the parking lot carry ban by applying "intermediate scrutiny," *Id.* at 1126, and is now abrogated.

## IX.   **Default Rule**

As with the challenged "sensitive-place" restrictions, the State asserts "Plaintiffs fail to make the predicate showing that the Second Amendment's text confers a right to carry firearms into another's building absent their consent." And as with the challenged "sensitive-place" restrictions, that assertion is incorrect. There are no locational restrictions in the Second Amendment's text. As a result, the text supports no distinction between the right to carry firearms in locations the State might characterize as "public" and locations the State might characterize as "private." *Accord Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's

2-ER-0249

text draws a home/public distinction with respect to the right to keep and bear arms."). In either case, Hawaii must justify any restriction with evidence of a relevantly similar regulatory tradition. And in any event, Plaintiffs are challenging restrictions on privately owned property otherwise open to the public—e.g., grocery stores and gas stations—and that would be properly characterized as "public" spaces even if such a distinction were relevant. The State lacks any valid, "distinctly similar" historical analogues for the Anti-Carry Default from either the Founding or the Reconstruction era. *Id.* at 2133. This means that the laws use distinctly similar means to achieve similar purposes. Instead, the State cites to a handful of early American laws which the *Antonyuk* Court already recognized dealt with hunting on others' property. *see* 2022 WL 16744700, at *79 Hawaii construes these laws as dealing with gun carriage in general, but their plain purpose was to deal with poaching. The cited laws simply are not distinctly similar as *Bruen* requires. Finally, the three other district courts to decide this issue with New York and New Jersey's default rule all support Plaintiffs' position here, a point the State avoids addressing.[13]

## X.    <u>Other Preliminary Injunction Prongs</u>

---

[13] Hawaii's reliance on *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) is misplaced.  The Eleventh Circuit framed that case as one that pitted the right to carry against the right to exclude, holding that "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship *against the owner's wishes*," a right that Plaintiffs do not assert. *Id* at 1265. (emphasis added)

Plaintiffs are suffering irreparable harm because they are suffering an ongoing violation of their constitutional rights.[14][15] Hawaii's remaining argument regarding Plaintiffs' perceived delay in filing is specious. Plaintiffs filed their complaint on June 23, 2023, and SB 1230 did not go into effect until July 1, 2023.  As to the remaining factors, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013).[16]  As amici Hawaii Rifle Association, et al. demonstrated, Americans with CCW permits are incredibly unlikely to break the law. *See* Doc. No. [53] at *20-25.

## XI.   <u>Conclusion</u>

The temporary restraining order should issue.

Dated: <u>July 21, 2023</u>.


Respectfully submitted,


*Counsel for Plaintiffs*
<u>*/s/ Alan Beck*</u>
Alan Alexander Beck

---

[14] As to the Second Amendment, *see e.g.*, *Jones v. Bonta*, 34 F.4th 704, 732 (9th Cir. 2022), *op. vacated on reh'g on other grounds*, 47 F.4th 1124 (9th Cir. 2022). *Fotoudis v. City & Cnty. of Honolulu*, 54 F. Supp. 3d 1136, 1145 (D. Haw. 2014).
[15] "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976)
[16] "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 383)).

# Exhibit 1
# Declarations of
# Clayton Cramer

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) |
| Defendant | ) ) |

Civil Action No. 1:23-cv-00265-LEK-WRP

i

# Table of Authorities

### Cases

Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840) .......................19

Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251 (Ky. 1822) ......................19

Commonwealth v. Leach, 1 Mass. 59 (1804). ...........................................................3

Commonwealth v. Vrooman, 164 Pa. 306, 316 (Penn. 1894). ................................6

In re Brickey, 8 Idaho 597, 70 P. 609, 610, 101 Am. St. Rep. 215, 1 Ann. Cas. 55
    (1902)..................................................................................................................21

McDonald v. City of Chicago, 561 U.S. 742, 779 (2010) .....................................20

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140
    (2022)....................................................................................................................2

Simpson v. State, 5 Yerg. 356 (Tenn. 1833)...........................................................19

State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844)................................................3

State v. Reid, 1 Ala. 612 (1840)..............................................................................19

Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D.
    Pa. 1795). ..............................................................................................................4

### Statutes

1 The Public Records of the Colony of Connecticut, 1636-1776 15 (1850) .............9

5 Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay
    479 (1886), ch. 21 ...............................................................................................10

9 Statutes at Large of Pennsylvania 30 (1903) ........................................................2

Charles J. Hoadly, ed., Records Of The Colony And Plantation Of New Haven, From 1638 To 1649  25-26 (1857) ..........................................................9

Clayton      E.      Cramer,      Militia      Statutes, https://claytoncramer.com/primary/primary.html#MilitiaLaws ...........................9

U.S. Const., Art. I, § 9, cl. 3 .......................................................................10

**Other Authorities**

1 American State Papers. Class V. Military Affairs. 159-62 (1832). .........................9

2 Massachusetts Digest: Being a Digest of the Decisions of the SUPREME JUDICIAL COURT OF MASSACHUSETTS, FROM THE YEAR 1804 TO THE YEAR 1857. 661 (1863) ................................................................3

Albert Bushnell Hart and Mabel Hill, *Camps and Firesides of the Revolution* 230 (1918) ............................................................................18

An ACT to suppress the disorderly practice of FIRING GUNS, &c., Pennsylvania Gazette, Dec. 28, 1774. .....................................................15

By the last Post from New York…, Pennsylvania Gazette, Aug. 31, 1749. ...........13

Eliza Lucas Pinckney, Elise Pinckney, ed., The Letterbook of Eliza Lucas Pinckney 42, 42 n. 55 (1997) .............................................................13

2-ER-0255

Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798-1870 34 (1948)................................................................................................11

Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972) .....11

H. Richard Uviller & William G. Merkel, The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent 150 (2002). ..........................................9

Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209 (1956)................................................................................11

James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 *The Papers of James Madison* 153 (1962)..................................................17

John Thomas Scharf, 1 History of Western Maryland 130 (1882). ........................18

John Winthrop, 2 Winthrop's Journal: "History of New England", 27, 153, 180, 275 (1908)................................................................................13

John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83. ................................................16

Last Friday one Hunt, a lime seller in this…, Pennsylvania Gazette, Apr. 20, 1749. ................................................................................................13

Last Monday Capt. Tyng in the Massachusetts…, Pennsylvania Gazette, Aug. 15, 1745. ................................................................................................14

2-ER-0256

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980) .................................................................... 11

Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina iii (1792) ...................................................................... 2

Monday Evening last a very melancholy, Pennsylvania Gazette, Oct. 31, 1745 .... 13

Monday Evening last a very melancholy…, Pennsylvania Gazette, Oct. 31, 1745 .................................................................................................................... 13

Pennsylvania Gazette, August 31, 1749 ................................................................ 12

Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840) .............................. 11

Richard Burn and John Burn, A New Law Dictionary 79 (1792). ........................... 8

Richard Maxwell Brown, The South Carolina Regulators 35, 40, 54 (1963) ......... 13

William M. Burwell, Address Delivered Before the Society of Alumni of the University of Virginia 446-47 (1847) ................................................................. 10

**<ins>Declaration of Clayton Cramer in Rebuttal of Saul Cornell</ins>**

**COMES NOW**, Clayton Cramer, and states as follows:

1. I am a natural person, an adult, United States of America citizen. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. This Declaration is being submitted to rebut the declaration submitted by Saul Cornell in *Wolford Et. Al. v. Lopez* No. 1:23-cv-00265-LEK-WRP

## I.    Introduction

3.    This Rebuttal Declaration to Prof. Cornell demonstrates multiple errors that demonstrate a limited knowledge of the colonial period.

## II.    Qualifications

4.    My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A

**2-ER-0258**

comprehensive list of my scholarly works and citations can be found at
https://claytoncramer.com/scholarly/journals.htm.

5.      In several cases, my work has been cited in defense of laws limiting
firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc.
2021), King v. Sessions (E.D.Penn. 2018).

6.      I am being compensated for services performed in the above-entitled
case at an hourly rate of $150 for expert declarations. My compensation is not
contingent on the results of my analysis or the substance of any testimony.

## III.   Carrying Over English Common Law

7. At pp. 5-6, Cornell asserts "Each of the new states, either by statute or
judicial decision, adopted multiple aspects of the common law, focusing primarily
on those features of English law that had been in effect in the English colonies for
generations."    His footnote lists "9 STATUTES AT LARGE OF
PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER
MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF
ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61
(Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804)."

8. "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30" carried over
English law but with the important provision:

2-ER-0259

all and every person and persons whosoever are hereby enjoined and required to yield obedience to the said laws as the case may require *until the said laws or acts of general assembly respectively, shall be repealed or altered* or until they expire by their own limitation and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted.[1]  [emphasis added]

9. Certainly, the Pennsylvania Constitution of 1790, with its guarantee of a right to keep and bear arms,[2] qualifies as alteration of English common law concerning arms.

10. "FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792)."  The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[3]  North Carolina's 1776 Constitution

---

[1] 9 STATUTES AT LARGE OF PENNSYLVANIA 30 (1903).
[2] Penn. Const., Art. IX, § 21 (1790).
[3] Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA iii (1792).

2-ER-0260

guarantees "That the people have a right to bear arms, in defense of the State"[4]
Again, this guarantee concerning the right to bear arms overrode English common
law. Furthermore pp. 60-61 in Martin's collection is the Statute of Northampton
disqualified for relevance by Bruen.[5]

11. When the North Carolina Supreme Court heard State v. Newsom (1844),
one of the claims made by the black defendant was that the 17th article the Bill of
Rights of North Carolina protected his right to carry a shotgun. The North
Carolina Supreme Court in deciding in this case, did not question whether the right
to keep and bear arms was individual in nature. Instead, they ruled that the
defendant's color was the deciding principle, taking precedence over the text.
Referring to the authors of the North Carolina Constitution: "They must have felt
the absolute necessity of the existence of a power somewhere, to adopt such rules
and regulations, as the safety of the community might, from time to time, require."[6]

12. "*Commonwealth v. Leach*, 1 Mass. 59 (1804)": The decision did nothing
to make English common law applicable in Massachusetts:

> Hooker, for the prosecution, conceded that justices of the peace
> were officers created by statute, and that their jurisdiction and

---

[4] North Carolina Const. Art. XVII (1776).
[5] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022).
[6] State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844).

2-ER-0261

powers were wholly dependent upon the statutes; 2 Hawk. P. C. c. 8, 13 , &c. …

In this act, the term *common law* cannot mean the common law of *England*, because justices of the peace there are not common law officers; it must, therefore, mean our common law; and on this subject, our common law must be precisely what the *statute* law of *England* was at the time of the emigration of our ancestors from that country. The statutes which were previous to that time enacted in England, and which define or describe the authorities, powers, and jurisdiction of justices of the peace, give to them, expressly, cognizance of divers offences which were offences at common law; among which are trespasses.[7] [emphasis in original]

13. Clearly, only *some* parts of English law were common with Massachusetts law.  Where Massachusetts law had differed, English law was no longer valid.

14. A later digest of Massachusetts decisions includes "*Commonwealth v. Leach*, 1 Mass. 59 (1804)" in its list of "English Statutes Adopted Here."[8]  Only individual s*tatutes*, not necessarily all of common law applied in Massachusetts, or there would be no need to have a detailed list.

15. Cornell has attributed this carryover of English law as it was in 1776 to "[e]ach of the new states" from sources in three states, none of which fits his claim.  Cornell does not understand his sources.

_____

[7] Commonwealth v. Leach, 1 Mass. 59 (1804).

[8] 2 Massachusetts Digest: Being a Digest of the Decisions of the Supreme Judicial Court Of Massachusetts, From The Year 1804 to the Year 1857. 661 (1863).

2-ER-0262

16. The U.S. Supreme Court has also emphasized how little significance English common law has compared to a constitution: "Legislation is the exercise of sovereign authority. High and important powers are necessarily vested in the Legislative body; whose acts, under some forms of government, are irresistible and subject to no controul. In England, from whence most of our legal principles and legislative notions are derived, the authority of the Parliament is transcendant and has no bounds."[9]

## IV.   Conserving the Peace

17. Prof. Cornell on p. 6 quotes Blackstone's COMMENTARIES about how the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society." True enough, but Blackstone's quote is from a discussion of:

> [S]ubordinate magistrates, whom I am to consider justices of the peace… Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[10]

18. While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective

---

[9] Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).
[10] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).

description, and irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

19. When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence…"[11] Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

> The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[12]

20. If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

21. At p. 13:

> The most basic right of all at the time of Founding was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police

---

[11] Id., at 143.
[12] Id., at 121.

2-ER-0264

power, the Founding generation viewed this concept as a right, not a power. The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms. Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."

22. The Pennsylvania Constitution included a guarantee of a right to keep and bear arms,[13] a guarantee "[N]o part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives"[14] and a guarantee of "a right to freedom of speech, and of writing, and publishing their sentiments."[15] These seem to be pretty large exceptions to Cornell's imagined right "to legislate for the common good." Perhaps Cornell's understanding of state police power is wrong or at least more limited than he imagines?

23. Pennsylvania Supreme Court decisions portray the state's police power somewhat more narrowly than Cornell: "*Its exercise may be limited by the frame or constitution of a particular government*, but its natural limitations, in the absence of a written constitution, are found in the situation and necessities of the

_____

[13] Penn. Const. Art. 11 (1776).
[14] Penn. Const. Art. 8 (1776).
[15] Penn. Const. Art. 12  (1776).

2-ER-0265

state, and these must be judged of in the first instance by the government itself."[16]
[emphasis added]

24. What the people, and ideally the legislature as well, consider what was needed "for the common good has been restrained by both state constitution bills of rights and the U.S. Bill of Rights from the very beginning.  Rep. James Madison, author of the Bill of Rights, is also remembered for his MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN arguing that Virginia should disestablish the Anglican Church:

> Either then, we must say that the will of the Legislature is the only measure of their authority, and that, in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: either we must say that they may control the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary powers of the State; nay, that they may despoil us of our right of suffrage, and erect themselves into an independent and hereditary assembly: or, we must say, that they have no authority to enact into law the bill under consideration.[17]

25. If Cornell really believes in this right of the states to legislate on all matters related to the police power, 'such as unlicensed public houses, nuisances, and many other things of the like nature,'" I look forward to his defense of state

---

[16] Commonwealth v. Vrooman, 164 Pa. 306, 316 (Penn. 1894).

[17] James Madison, A MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN; WRITTEN IN 1784-5, AT THE REQUEST OF THE RELIGIOUS SOCIETY OF BAPTISTS IN VIRGINIA 41 (1828).

2-ER-0266

laws mandating racially segregated public schools and public accommodations, censorship of dirty books, prohibitions on sodomy, one man/one woman marriage laws, and bans on transgender sports.  It is hard to consider a person a legal scholar or historian who does not understand that the American experiment in democracy has always been restrained by a recognition that majorities can and do make mistakes.  This is the reason that every state constitution today, many of the Revolutionary state constitutions, and the U.S. Constitution has a Bill of Rights.

26. At pp. 19, Cornell quotes the Second Amendment and asserts, "Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state."  The first clause of the Second Amendment references not well-regulated arms but a "well-regulated militia."

27. Heller pointed out that, "The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose."[18]  Either Cornell is misreading the Second Amendment's text or he is unfamiliar with the Heller decision.  In either case, he has demonstrated his lack of expertise in this subject.

28. At p. 19:

_____

[18] D.C. v. Heller, 554 U.S. 570, 577 (2008).

> In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits the diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy."

29. In support of this claim, Cornell at p. 20 cites Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term. If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject.[19]

30. Cornell makes a strong claim but it is a distinction without a difference. In what way is limiting free speech *just a bit* (e.g., prohibiting criticism of the U.S. Government) different from limiting the right to bear arms *just a bit* (e.g., prohibiting open carry). Of course *just a bit* has a non-boolean aspect to it. Would prohibiting possession of all rifles destroy the right? What about prohibiting possession of handguns? What about knives? At what point does regulation not destroy the right?

31. At p. 8, quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they

---

[19] Richard Burn and John Burn, A NEW LAW DICTIONARY 79 (1792).

effect [sic] our persons and property."  The relevance of this quote to this case seems confused.  The plaintiffs are not arguing for no government or a "destitution of all law," but a disagreement about *this* law.  Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

32. At p. 12, Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."  What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power.  The recent consequences of panic after 9/11 should be a reminder that even well-intentioned polity's can blow it.

33. Cornell continues: "In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order."  Cornell's source for this claim?  "H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002)."  P. 150 makes no such claim.  It is a discussion of the

2-ER-0269

meaning of the Second Amendment that directly contradicts Cornell's claims. Review of militia censuses cited in UVILLER & MERKEL,[20] shows that militia censuses show the number of militiamen by state, broken down by rank.[21] There is no record of who was a member or what arms each person possessed. Cornell is just making this stuff up. Mustering the militia required no such recordkeeping. Colonial and state militia laws did not keep track of who was armed. They imposed a duty to be armed and to show up with those arms on muster day or face fines.[22] I am unaware of any safe storage laws of this period, and Cornell cites only a secondary source for a rather important claim. I have a pretty complete

---

[20] H. Richard Uviller & William G. Merkel, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002)

[21] 1 American State Papers. Class V. Military Affairs. 159-62 (1832).

[22] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall beare Armes that are above the age of sixteene yeeres except they doe tender a sufficient excuse [to] the Corte & the Cort allowe the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 25-26 (1857) ("It is ordered that every one that beares armes shall be compleatly furnished with armes (viz), a muskett, a sworde, bandaleers, a rest, a pound of powder, 20 bullets fitted to their muskett, or 4 pound of pistoll shott or swan shott att least, and be ready to show them in the markett place upon Munday the 16th of this Month before Captaine Turner and Leiutennant Seely under the penalty 20 s fine for every default or absen[ce].")

collection of colonial and Revolutionary militia laws[23] and there are no such provisions that I can find.

34. At p. 13: "The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties."

35. In 1777, Pennsylvania responded to concerns that Loyalists might be a fifth column by passing a law that provided that those of militia age refusing to swear an oath of loyalty to the Revolutionary governments were prohibited from "holding any office or place of trust in this state, serving on juries, suing for any debts, electing or being elected, buying, selling or transferring any lands, tenements or hereditaments, and shall be disarmed by the lieutenant or sub-lieutenant of the city or counties respectively."

36. Massachusetts' similar Test Act:

> That every male person above sixteen years of age, resident in any town or place in this colony, who shall neglect or refuse to subscribe a printed or written declaration, of the form and tenor hereinafter prescribed, upon being required thereto by the committee of correspondence, inspection and safety, shall be disarmed, and have taken from him, in manner hereafter directed, all such arms, ammunition and warlike implements, as, by the

---

[23]     Clayton     E.     Cramer,     *Militia     Statutes*, https://claytoncramer.com/primary/primary.html#MilitiaLaws, last accessed July 15, 2023/

2-ER-0271

strictest search, can be found in his possession or belonging to him…[24]

37. Like its cousins in other states, refusing the oath disqualified one for any public office, work as a minister, voting, or teaching.[25]  Cornell could easily use these wartime emergency acts as justification today for restrictions on transferring property, voting, teaching, or preaching the gospel.

38. Abuses of civil liberties were widespread during the chaos of the Revolution.  Thomas Jefferson drafted a bill of attainder passed by the Virginia Legislature in 1778.[26]  In Cornell's model, the U.S. Constitution's prohibition on Bills of Attainder[27] can be safely ignored.

39. On p. 17:

> The first notable expansion of regulation occurred during the period after the War of 1812, when cheap, reliable, and easily concealable pistols were produced for the first time in American history. More than 90% of the firearms in circulation in the Founding era were long guns, so pistols were not a serious problem for the Founders.

40. How common were pistols before the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was

_____

[24] 5 Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay 479 (1886), ch. 21.
[25] Ibid., 481.
[26] William M. Burwell, Address Delivered Before the Society of Alumni of the University of Virginia 446-47 (1847).
[27] U.S. Const., Art. I, § 9, cl. 3.

15

a civilian market for them in at least some cities; and that pistol ownership was unremarkable.  An analysis of all Plymouth Colony probate inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[28]

41. On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Calvarymen were obligated to provide themselves with "a case of pistols, and a carabine."  Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols."  [29] (How many pistols were in one case?  At least one.)

42. While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige.  Only a few pre-Revolutionary War American-made pistols have survived.[30]  Surviving pistols made for William Smith of Farmington, Connecticut

---

[28] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.

[29] Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840).

[30] Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792 312 (1980); Frank Klay, THE SAMUEL E. DYKE COLLECTION OF KENTUCKY PISTOLS 4-15 (1972); Felicia Johnson Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 34 (1948).

2-ER-0273

by Medad Hills in 1771 were equipped with American-made barrels, and apparently English locks.[31]

43. Advertising and news reports show that merchants offered pistols for sale in Colonial America. Such ads appear in the *Boston Gazette* as early as 1720. Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[32]

44. A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749. A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as they said, got the six Pair at some other Place."[33]   In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[34] as did Henry Deabarear, who sold "pistols for holsters and the pocket…."   Philadelphia merchants advertised pistols

---

[31] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).

[32] BOSTON GAZETTE issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742, May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

[33] PENNSYLVANIA GAZETTE, August 31, 1749.

[34] September 4, 1772 and September 14, 1773, WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).

17

for sale repeatedly from 1744 onward.[35]   A 1745 ad in the PENNSYLVANIA

GAZETTE, offered "ship muskets, *pistols* , cutlashes and poleaxes, gunpowder, lead,

shot and bullets, English and French gun flints."[36] [emphasis added]

45. Pistols appear in journals and newspaper articles throughout the colonial

period—and while the crimes committed with them are sometimes shocking, the

*presence* of pistols is never remarkable.  Governor John Winthrop made several

references to pistols in New England in the nineteen years that his journal covers.

One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire)

that led the factions to arm themselves and march; at least one member Winthrop

identified as armed with a pistol.  There were murders with pistols at Stamford,

Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at

Cape Sable in 1646.[37]   Pistols appear in other places in Winthrop's Journal.[38]

Winthrop never expressed any surprise over the presence of pistols.

---

[35] *Pennsylvania Gazette*, November 1, 1744; September 26, 1745; October 3, 1745;
October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748;
September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759;
February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764;
August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.
[36] *Just imported by Hamilton, Wallace and Company, in the Ship*, PENNSYLVANIA
GAZETTE, Sep. 26, 1745, Oct. 3, 1745.
[37] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153,
180, 275 (1908).
[38] Id., at 95, 151,

2-ER-0275

46. An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[39] [emphasis in original]

47. Many eighteenth century accounts also mention pistols.  Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[40]  In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopt on the Road, and his Money demanded, by two Men with Pistols…."[41]  There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse

―――――――――――――

[39] *NEW YORK, October 28. Monday Evening last a very melancholy*, PENNSYLVANIA GAZETTE, OCT. 31, 1745.
[40] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).
[41] *By the last Post from New York…,* PENNSYLVANIA GAZETTE, Aug. 31, 1749.

of and accidental deaths from pistols; they are never described as surprising.[42]
Pistols appear among the South Carolina Regulators and the criminals to whom
they administered frontier justice.[43]   Nor was there any surprise when pistols
appear in the hands of the law-abiding, such as a description of Rev. Whitfield
preaching in Massachusetts, "he was attended by many Friends with Muskets and
Pistols on Account of the Indians…."[44]

48. Pistols appear in news reports: This came from New York in 1775,
describing events before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which
> was refused him; and whilst struggling to enter the door, he
> received a blow upon his head, which leveled him with the ground:
> Having recovered a little, he arose and discharged a *pistol* among
> the opposers, and commanded the Court party to fire also; when, as
> Mr. Langdon supposes, about five of them fired. Mr. French, one of
> the opposers, was killed by a ball's being lodged in his head, and
> two more of the same party were also wounded. The sheriff and the
> Court party then entered the courthouse. The populace without
> discharged a gun and two *pistols* .[45] [emphasis added]

---

[42] *Monday Evening last a very melancholy…,*  PENNSYLVANIA GAZETTE, Oct. 31,
1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr.
20, 1749.
[43] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).
[44] *Last Monday Capt. Tyng in the Massachusetts…,* PENNSYLVANIA GAZETTE, Aug.
15, 1745.
[45] *MR. Mark Langdon, from Westminster, in the…,* VIRGINIA GAZETTE, Apr. 22,
1775.

2-ER-0277

49. Other news accounts report pistols being used.[46]

50. A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not proofed (as English law required) thus creating a risk to his reputation.[47]  A 1766 ad in the SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass barrel pistols."[48]

51. Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities. This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off any *handgun, pistol*, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province…."[49] [emphasis added]

---

[46] BY THE LAST POST FROM NEW YORK…, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[47] *To the Publick,*  SOUTH CAROLINA GAZETTE, DEC. 26, 1743.
48 GUERIN & WILLIAMSON,Have just imported in the London, Supplement to the South Carolina Gazette; and Country Journal, Jun. 24, 1766,  Jul. 1, 1766, Jul. 8, 1766
[49] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, DEC. 28, 1774.

2-ER-0278



PAUL REVERE'S VERY COMPACT POCKET PISTOL[50]

52. My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[51]  Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers. Still, it is pretty apparent that Cornell's claim about the scarcity of pistols is utterly wrong and shows a limited knowledge of the period for which he has "expert" opinions.

**B. Black Powder**

53. At pp. 16-17:

_____

[50] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[51] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

2-ER-0279

The nature of firearms technology and early American society militated against guns as the preferred tool for most forms of interpersonal violence.

Weapons in the Founding era were muzzle loaded guns that were not particularly accurate and took a long time to load. . The black powder used in these firearms was corrosive and attracted moisture like a sponge: two facts that militated against storing weapons loaded. Given the state of firearms technology in the Founding era, it is not surprising that recent scholarship has demonstrated that there was not a widespread gun violence problem in the era of the Second Amendment.

54. This is a perfectly logical statement, but the documents left by colonial Americans show that they did not follow it very consistently. Colonial Americans kept black powder firearms loaded with tragic results. Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to follow this very logical action:

At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[52]

55. And:

Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one

---

[52] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.

2-ER-0280

man within one inch of his belly, yet missed the bone, then the shot
(being goose shot) scattered a little and struck the second man
under his right side upon his breast, so as above 40 shot entered his
body, many into the capacity of his breast.[53]

56. These incidents of firearms kept loaded when not in active use resulting
in serious misadventure are in *one* book.  How many of these loaded firearms sat
quietly in their place, never accidentally discharging?  How many incidents are in
books that I have not read?   Perhaps if Cornell was well-read in colonial
documents, he would know enough about colonial practices to be an expert.   The
relevance of this claim to the proposed law is unclear.

57. Finally, there is one more piece of evidence that Americans kept
firearms loaded when not ready for use.  In 1783, Massachusetts passed a statute
that shows firearms were kept loaded regularly enough to justify a law regulating
the practice.

58. The preamble "WHEREAS the depositing of loaded arms in the houses
of the town of Boston, is dangerous to the lives of those who are disposed to exert
themselves when a fire happens to break out in the said town" establishes that it
was a fire safety measure.

Sect. 2. And be it further enacted by the authority aforesaid, That
all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades,
and iron shells of any kind, that shall be found in any dwelling-

---

[53] Id. 2:55.

house, out-house, stable, barn, store, ware-house, shop, or other
building, charged with, or having any dwelling in them any gun-
powder, shall be liable to be seized by either of the Firewards of the
said town…

59. You were free to keep small arms, cannon, small artillery, bombs, and
grenades at home, as long as they were unloaded.  Why was there a need for such a
law unless firearms (and artillery) were at least occasionally left loaded?  Would
we pass a law today ordering that you not leave children unsupervised at a pool if
no one did this?

**Accuracy**

60. Cornell's claim on p. 16: "Weapons in the Founding era were muzzle
loaded guns that were not particularly accurate…" is false.  A letter that James
Madison wrote on June 19, 1775 to William Bradford in Philadelphia:

> The strength of this Colony will lie chiefly in the rifle-men of the
> Upland Counties, of whom we shall have great numbers.  You
> would be astonished at the perfection this art is brought to.  *The
> most inexpert hands rec[k]on it an indifferent shot to miss the
> bigness of a man's face at the distance of 100 Yards.  I am far from
> being among the best & should not often miss it on a fair trial at
> that distance.*  If we come into an engagement, I make no doubt but
> the officers of the enemy will fall at the distance before they get
> [within] 150 or 200 Yards.  Indeed I believe we have men that
> would very often hit such a mark 250 Yds.  Our greatest
> apprehensions proceed from the scarcity of powder but a little will
> go a great way with such as use rifles.[54] [emphasis added]

---

[54] James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 *The
Papers of James Madison* 153 (1962).

61. Frederick County, Maryland raised two companies of riflemen to join the army forming outside of Boston.  An eyewitness account of Captain Michael Cresap's rifle company of "upwards of 130 men" described a demonstration:

> to show the gentlemen of the town their dexterity at shooting.  A clapboard, with a mark the size of a dollar, was put up; they began to fire off-hand, and the bystanders were surprised, so few shots being made that were not close to or in the paper.
>
> When they had shot for a time in this way, some lay on their backs, some of their breast or side, others ran twenty or thirty steps, and, firing, appeared to be equally certain of the mark.  With this performance the company was more than satisfied, when a young man took up the board in his hand, not by the end, but by the side, and holding it up, his brother walked to the distance, and very coolly shot into the white; laying down his rifle, he took up the board, and, holding it as was held before, the second brother shot as the former had done.
>
> By this exercise I was more astonished than pleased.  But will you believe me, when I tell you, that one of the men took the board, and placing it between his legs, stood with his back to the tree, while another drove the center?[55]

62. Other accounts of Cresap's company also report on their marksmanship:

> [W]e mention a fact which can be fully attested by several of the reputable persons who were eye-witnesses of it. Two brothers in the company took a piece of board five inches broad and seven inches long, with a bit of white paper, about the size of a dollar, nailed in the centre; and while one of them supported this board perpendicularly between his knees, the other, at the distance of upwards of sixty yards, and without any kind of rest, shot eight bullets through it successively, and spared a brother's thigh!

--------

55 John Thomas Scharf, 1 HISTORY OF WESTERN MARYLAND 130 (1882).

26

2-ER-0283

Another of the company held a barrel stave perpendicularly in his hands with one edge close to his side, while one of his comrades, at the same distance, and in the manner before mentioned, shot several bullets through it, without any apprehension of danger on either side.

The spectators appearing to be amazed at these feats, were told that there were upwards of fifty persons in the same company who could do the same thing; that there was not one who could not plug nineteen bullets out of twenty, as they termed it, within an inch of the head of a tenpenny nail. In short, to prove the confidence they possessed in their dexterity at these kind of arms, some of them proposed to stand with apples on their heads, while others at the same distance, undertook to shoot them off; but the people who saw the other experiments declined to be witnesses of this.[56]

63. Cornell should spend a bit more time reading what colonial Americans wrote and less of what people write with whom he already agrees.

## V.   Firearms Regulation in Antebellum America

64. Starting at page 23, Cornell seems to have stopped citing any sources, except himself, presumably because has only his own arm-waving as a source.

Secondly, the constitutional "mischief to be remedied" that arms bearing provisions addressed had changed as well. Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of unusually

---

56 "From The Virginia Gazette (1775)" in Albert Bushnell Hart and Mabel Hill, CAMPS AND FIRESIDES OF THE REVOLUTION 230 (1918).

2-ER-0284

dangerous weapons and the societal harms they caused. The Reconstruction-era constitutional solution cast aside the eighteenth-century language that was steeped in fears of standing armies and substituted in its place new language affirming the state's police power authority to regulate arms, particularly in public.

65. The specter changed from tyrannical Stuart kings to Klansmen and tyrannical Southern state governments, but Cornell pretends that the weapons laws enacted as part of the Black Codes had no influence on the Fourteenth Amendment.

66. Cornell might have benefitted from reading the primary sources concerning Reconstruction and the incorporation of the right to keep and bear arms through the Fourteenth Amendment, as historians try to do, instead of relying on his own arm-waving. Of course, Cornell would also benefit from reading the many decisions that decided the "scope of state power to regulate arms," often explicitly recognizing a right to open carry based on their state constitutions, and in some cases the Second Amendment, not the rarely mentioned "police power."[57]

---

[57] Just a *few* examples: Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251 (Ky. 1822) (struck down a ban on carrying concealed weapons based on state constitution); . Simpson v. State, 5 Yerg. 356 (Tenn. 1833) (struck down a conviction for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make," because "the freemen of this state have a right to keep and to bear arms for their common defence." Tenn. Const. Article 11, sec. 26); Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840) (upheld a ban on

28

## VI.   Post-1868 Evidence

67. Cornell insists at p. 41: "As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good."   Had Cornell read McDonald v. Chicago (2010) he would know that it was precisely the racial discrimination of the Black Codes that caused the 14th Amendment to limit state authority in this area.[58]   This was the basis by which McDonald incorporated the Second Amendment against the states.[59]

---

concealed carry of a Bowie knife because the Tennessee Constitution only protected weapons of war: "The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution."); State v. Reid, 1 Ala. 612 (1840) (" A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); Owen v. State, 31 Ala. 387 (1858) (upheld a ban on concealed carry, but "That section was not designed to destroy the right, guarantied by the constitution to every citizen, "to bear arms in defense of himself and the State"; nor to require them to be so borne, as to render them useless for the purpose of defense."); 3 Iredell 418, 423 (N.C. 1843) (Upholding a conviction of a bully running around armed and threatening people: "For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.")
[58] McDonald v. City of Chicago, 561 U.S. 742, 779 (2010)
[59] Id. at 790.

29

68. As contrary evidence, in Table One Cornell cites post-Fourteenth Amendment state constitution arms provisions and either does not know, or neglects to mention that the 1889 Idaho guarantee: "IDAHO CONST. OF 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law," was construed narrowly in the decision In re Brickey (Ida. 1902).   The Idaho Supreme Court decided the territorial-era prohibition on carrying a loaded weapon in the town of Lewiston, was contrary to both the 1889 Constitution and the Second Amendment. "Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it."[60]

69. Cornell proceeds to deny Bruen's incorporation of the Second Amendment through the Fourteenth Amendment where at p. 39: "The new focus on regulation embodied in these revised state arms bearing provisions was not a departure from traditional views of the robust scope of police power authority to regulate arms in the interests of public safety. This power was ancient and widely

─────────────────

[60] In re Brickey, 8 Idaho 597, 70 P. 609, 610, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902).

2-ER-0287

acknowledged as fundamental to Anglo-American law. Nor did the adoption of the

Fourteenth Amendment change this fact."   So constitutions adopted after the

Fourteenth Amendment take precedence over an amendment that the Court has

recognized as a limit on state power?

70. Cornell at pp. 40-41 quotes General Sickles' General Order No. 1 as

evidence that the right to keep and bear arms could be limited on private property:

"nor to authorize any person to enter with arms on the premises of another against

his consent."   Certainly, any property owner is authorized to post a "No arms

allowed" notice.  A requirement that a property owner must provide an affirmative

statement of permission is far different.

71. On p. 43: "Colonial Massachusetts prohibited coming to muster with a

loaded firearm."   This would be odd because target practice was common at

musters.  Consulting Cornell's source: "RECORDS OF THE GOVERNOR AND

COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 98 (1853)"

shows no such order.  His citation to "1866 Mass. Acts 197, An Act Concerning

the Militia, § 120" does seem to be such a law:

> SECTION 120. A soldier who unnecessarily or without order from
> a superior officer comes to any parade with his musket, rifle or
> pistol loaded with ball, slug or shot, or so loads the same while on
> parade, or unnecessarily or without order from a superior officer

2-ER-0288

> discharges the same when going to, returning from or upon parade,
> shall forfeit not less than five nor more than twenty dollars.[61]

72. This statute refers not to a muster but a parade.  Assuming that the 19th century definition of parade is similar to today, this seems like a safety measure.

73. His claim in n. 89: "The prohibition on bringing a loaded gun to muster stretches from 1632 to 1866 making it one of the longest standing regulations on firearms in the early Republic." Citing a single act in 1866 which does not clearly refer to a muster does not support this claim.

74. At pp. 45-46 Cornell lists city parks that prohibited "public carry." Curiously, the only such ordinance in his Table 2 before 1868 is New York City's 1861 measure.  He provides no citation for such an ordinance.  All the smaller cities that Cornell lists in n. 93 have ordinance dates after 1868.  In any case, Bruen takes precedence.

## VII.   Summary

75. Cornell misrepresents the broadness of the carryover of English law to the American colonies.

76. He misrepresents Blackstone about the importance of conserving the peace; argues for a unlimited democracy that the Bill of Rights exists to prevent;

---

[61] 1866 Mass. Acts 197, An Act Concerning the Militia, § 120.

2-ER-0289

77.    Cornell argues for an unlimited power of the states to regulate everything with no power of the Bill of Rights to counter such abuses of majority power.

78. Cornell attempts to use post-1868 laws contrary to Bruen's clear instructions.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

_____

Clayton Cramer

33

**2-ER-0290**

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:23-cv-00265-LEK-WRP ) ) |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) |
| Defendant | ) ) |

i

## **Table of Authorities**

### CASES

Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251, 252, 253 (1822)...............7

Cockrum v. State, 24 Tex. 394, 401, 402, 403 (1859)...............................7

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857)......................................7

English v. State, 35 Tex. 473, 479, 480, 14 Am. Rep. 374 (1872)...........................8

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022)..8

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022)..3

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022)..4

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022)..5

Smith v. State, 11 La. An. 633, 634 (1856) ................................7

State v. Chandler, 5 La. An. 489, 490, 491 (1850) ....................................7

State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843)....................6

State v. Huntly, 418, 420 (N.C. 1843). .......................................4

### STATUTES

1 Laws of the Republic of Texas 24 (1838)..................................................8

1821 Maine Laws ch. 76 at 353. .............................................5

Va. Laws ch. 21 at 278 (1786)...............................................3

### OTHER AUTHORITIES

2-ER-0292

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in

the State of North Carolina, iii (1792)....................................................................4

**2-ER-0293**

## Declaration of Clayton Cramer in Rebuttal of Brennan Rivas

**COMES NOW**, Clayton Cramer, and states as follows:

1. I am a natural person, an adult, United States of America citizen. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. This Declaration is being submitted to rebut the declaration submitted by Dr. Rivas in *Wolford Et. Al. v. Lopez* No. 1:23-cv-00265-LEK-WRP

## I.    Introduction

3. This Expert Declaration and Report analyzes Dr. Rivas' expert report concerning the "historical gun regulations that pertained to public carry laws, [and] sensitive places."  Rivas also puts a lot of work into examining Texas law on this subject without demonstrating that Texas was in many respects then as even now, an outlier to American tradition.

**2-ER-0294**

## II. Qualifications

4. My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons regulation. My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

5. In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

6. I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## III. The History of Public Carry Laws in America

7. Rivas starts out by overruling the Supreme Court, rejecting Bruen's findings on public carry laws. At ¶10:

2

2-ER-0295

Americans of the late eighteenth and nineteenth centuries had laws that broadly prohibited the carrying of firearms and other deadly weapons in public. Early versions of these regulations, particularly those enacted in the eighteenth century by colonial and early American legislatures, tended to draw heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.

8. Bruen is very clear that the Statute of Northampton and all the colonial and early Republic laws supposedly derived from it are irrelevant to interpretation of the Second Amendment:

> At the very least, we cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection.[1]

9. Having started on the wrong foot, Rivas trips over herself demonstrating that she is not a scholar. At ¶11 her footnote 4 attempts to demonstrate that states adopted laws prohibiting carrying of arms. "1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (Ex. D)." This is 1786 ch. 21:

> CHAP. 21
> An act for giving further time to officers, soldiers, sailors, and marines, to settle their arrears of pay and depreciation, with the auditor of public accounts.[2]

---

[1] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022).
[2] Va. Laws ch. 21 at 278 (1786).

3

2-ER-0296

10. It appears that Rivas meant 1786 Va. Ch. 49, at 334, which is the Statute of Northampton (1328).  (It really helps to check primary sources, at least if you are an "expert.")  Again, progeny of the Statute of Northampton rejected by Bruen.

11. Still in n. 4:

> 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace.")

12. This a surety bond law, also rejected by Bruen:

> *Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.[3]

13. "Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)"  As the title makes clear, this was not a statute passed by the North Carolina Legislature. The North Carolina Legislature tasked Martin to sift through all *existing* British statutes that might have some applicability to North Carolina. "I began at Magna

---

[3] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022)

Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[4]

14. Curiously, when the North Carolina Supreme Court decided State v. Huntly (N.C. 1843), a case which charged the defendant under the Statute of Northampton, the opinion held that "whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, (ch. 1st, sect. 2,) that the statutes of England or Great Britain shall cease to be of force and effect here."[5] One might expect that if this statute had been adopted legislatively, as Rivas claims, that it might have merited mention.

15. "1821 Me. Laws 285, ch. 76, § 1" Rivas at least quotes enough of the text to demonstrate that this is more progeny of Statute of Northampton.  The section that she did *not* quote in full is:

> to cause to be staid and arrested, all affrayers, rioters, disturbers or
> breakers of the peace, and such as shall ride or go armed

---

[4] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).
[5] State v. Huntly, 418, 420 (N.C. 1843).

2-ER-0298

offensively, *to the fear or terror* of the good citizens of this State, or *such others as may utter any menaces or threatening speeches*;[6] [emphasis added]

16. Nor does she quote from the section which says what persons so jailed must do to regain their freedom:

> shall require of the offender to find sureties to appear and answer for his offence, at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county, at the discretion of the Justice, and as the nature or circumstances of the case may require[7]

17. At ¶11, again Bruen specifically rejects the relevance of surety laws:

> *Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.[8]

18. At ¶13: "The language of concealed carry laws might at first suggest that open carry of firearms was accepted and commonplace, but that was not the case. Individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities."  Her source for this claim is *State v. Huntley*, 25 N.C. 418 (1843).

---

[6] 1821 Maine Laws ch. 76 at 353.
[7] Id.
[8] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022).

2-ER-0299

19. State v. Huntley (N.C. 1843) involved prosecution of a bully:

> His Honor instructed the jury, that if the facts charged in the indictment were proven to their satisfaction, the defendant had been guilty of a violation of the law, and that they ought to render their verdict accordingly. In the investigation before the jury it appeared, among other things, that *the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barrelled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him"*; on some, that "he had waylaid the house of James H. Ratcliff in the night about daybreak, and if he had shown himself he would have killed him; that he showed himself once, but for too short a time to enable him to do so, and that *he mistook another man for him, and was very near shooting him*."[9] [emphasis added]

20. Huntley was not simply armed, but also making death threats; he came close to shooting someone he mistook for the object of his wrath. To call this "to the terror of the people" seems quite clear. Yet the North Carolina Supreme Court while upholding the conviction made it clear that riding around armed violated no laws:

> [I]t is to be remembered that the carrying of a gun per se constitutes no offence. *For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun*. It is the wicked purpose—and the mischievous result—which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as

---

[9] State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843).

naturally will terrify and alarm, a peaceful people.[10]   [emphasis added]

21. She also cites *State v. Smith*, 11 La. Ann. 633 (1856).  Her quotation is misleading.  The Louisiana Supreme Court decided that: "A partial concealment of the weapon, which does not leave it in full open view, is a violation of the statute." Rivas' quotation concerns what the decision called "to the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."  If you were openly carrying a weapon and it was partially covered, this was the "unusual case"; not open carry which was not prohibited or concealed carry which the law prohibited.

22. Rivas also has either cherry-picked her sources, or she knows little of the case law on this.  Multiple antebellum decisions recognized a right to carry arms, protected by either the state constitution's arms provision or more rarely, the Second Amendment.[11]

---

[10] Id.

[11] State v. Chandler, 5 La. An. 489, 490, 491 (1850) (upholding a concealed carry ban, but: "It interfered with no man's right to carry arms (to use its own words), "in full open view," which places men upon an equality.  This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves"); Smith v. State, 11 La. An. 633, 634 (1856) ("The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States.  The arms there spoken of are such as are borne by a people in war, or at least carried openly."); Dred Scott v. Sandford, 60 U.S. 393, 417 (1857) ("It would

8

23. At ¶28, Rivas uses English v. State (Tex. 1872) to justify a very narrow definition of sensitive places.  First of all, the statute and decision both postdate the ratification of the 14ᵗʰ Amendment, which one of the dates Bruen has indicated have significance to determining the meaning of the Second Amendment as incorporated against the states.

> The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right. With these principles in mind, the Court concludes that respondents have failed to meet

give to persons of the negro race, who were recognized as citizens in any one State of the Union,… and to keep and carry arms wherever they went."); Cockrum v. State, 24 Tex. 394, 401, 402, 403 (1859) (Responding to defendant's claim that a sentence enhancement for use of a Bowie knife in manslaughter violated his rights under the Second Amendment: "The object of the first clause cited, has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed.  The clause cited in our Bill of Rights, has the same broad object in relation to the government, and in addition thereto, secures a personal right to the citizen.  The right of a citizen to bear arms, in the lawful defence of himself or the State, is absolute…. A law cannot be passed to infringe upon or impair it, because it is above the law, and independent of the law-making power."); Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251, 252, 253 (1822) (Striking down a ban on concealed carry of arms: "That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defense of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons, concealed in the manner described in the act, they may, nevertheless, bear arms in any other admissible form.  But to be in conflict with the constitution, *it is not essential that the act should contain a prohibition against bearing arms in every possible form; it is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution*." [emphasis added])

2-ER-0302

their burden to identify an American tradition justifying New York's proper-cause requirement.[12]

24. English was decided based on the Texas Constitution's right to keep and bear arms provision; Bruen's use of the Second Amendment trumps English for that reason.

25. Rivas puts great emphasis on how the 1871 Texas law was intended to protect the freedmen. It is therefore interesting to see how English ends:

> The law under consideration has been attacked upon the ground that it was contrary to public policy, and deprived the people of the necessary means of self-defense; that it was an innovation upon the customs and habits of the people, to which they would not peaceably submit. We do not think the people of Texas are so bad as this, and we do think that the latter half of the nineteenth century is not too soon for Christian and civilized states to legislate against any and every species of crime. Every system of public laws should be, in itself, the purest and best system of public morality. We will not say to what extent the early customs and habits of the people of this state should be respected and accommodated, where they may come in conflict with the ideas of intelligent and well-meaning legislators. A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system. Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snevi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of those nations blended together into a system by no means to be compared with the sound philosophy and pure morality of the common law.[13]

---

[12] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022).

[13] English v. State, 35 Tex. 473, 479, 480, 14 Am. Rep. 374 (1872).

26. The arms provision of the Texas Constitution of 1836 is clearly of American, not Spanish origin:

> Fourteenth. Every citizen shall have the right to bear arms in defence of himself and the republic. The military shall at all times and in all cases be subordinate to the civil power. Fifteenth. The sure and certain defence of a free people is a well regulated militia; and it shall be the duty of the legislature to enact such laws as may be necessary to the organizing of the militia of this republic.[14]

27. At ¶28: "The court held that whatever conduct offends against public morals or public decency comes within the range of legislative authority." This train left the station with Lawrence v. Texas (2004) and Roe v. Wade (1973), both appropriately enough originating in Texas. Is there anything that can withstand the Bill of Rights that "offends against public morals or public decency"?

28. At ¶29: "In the late 1870s and throughout the 1880s, Texas appellate judges consistently applied the sensitive places law without questioning its constitutionality." Did they ever question the constitutionality of segregated schools? This is not a very persuasive argument, except to the last remaining segregationist.

29. At ¶32, Rivas argues that Bruen's treatment of Texas law as an outlier was wrong because a number of other states passed similar laws after 1868. This simply demonstrates that Rivas wants to overrule Bruen.

---

[14] 1 Laws of the Republic of Texas 24 (1838).

2-ER-0304

30. In addition to the errors in Rivas ¶15 and beyond discussion of firearms prohibition in Texas, this time period postdates the 1868 ratification of the 14th Amendment and the Second Amendment as incorporated against the states, making this discussion irrelevant.

**IV. Summary**

31. Rivas claims that public carry of firearms was generally prohibited in towns and even if open carry was legal, it was not commonplace.  The first statement is false.  The second is probably unknowable.  The most commonplace actions of life are seldom recorded.

32. Rivas asserts that protection of "public gathering places" was the norm or at least not outliers, yet her evidence is all post-1868 and largely in the Reconstruction South.

33. At ¶39: "More time is needed to provide a comprehensive overview of this subject. There are likely as-yet unidentified analogous historical laws, particularly municipal ordinances. More research needs to be done surrounding the development of American towns and cities, the relative number and size of analogous sensitive places outside of government buildings, and the historical views of Americans regarding the propriety and legality of carrying weapons in those analogous spaces at earlier points in time."  Get back to us when you have

12

2-ER-0305

evidence.  So far, what Rivas has is a desire to overturn Bruen largely with claims already rejected by Bruen.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

_____

Clayton Cramer

2-ER-0306

# Exhibit 2
# Map of Maui County

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION<br><br>Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br>Defendant | Civil Action No. 1:23-cv-00265-LEK-WRP |

## SUPPLEMENTAL DECLARATION OF ATOM KASPRZYCKI

**COMES NOW**, Atom Kasprzycki and states as follows:

1.  I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii and County Maui.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2.  I am a licensed architect by trade.

3.  The attached maps were created by myself and my staff while working under my supervision.

4.  The maps were created using publicly available information obtained from the County of Maui Real Property Assessment Division website, Hawaii Department of Transportation website, Maui County Shoreline Access website, Google maps, and other open source information. See the following links: https://qpublic.schneidercorp.com/Application.aspx?AppID=1029&LayerID=21689&PageTypeID=1&PageID=9248&Q=816427170&KeyValue=340080530000 , https://hidot.hawaii.gov/highways/ , https://www.mauishorelineaccess.net

5.  I certify that the maps are accurate to the best of my knowledge.

2-ER-0309

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 21, 2023.

_____

Atom Kasprzycki



**Maui County Accessible Areas Map Key**

Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public

Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed

Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed

Kalawao County, Molokai - Excluded

Sheet Number: 01

## Maui County Accessible Areas Map - Pre SB1230

Maui County Pre SB-1230

0 1 2 3 4 5    10    20 Miles

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=1029&LayerID=10298&PageTypeID=1&PageID=21689&PageID=9248&Q=816427170&KeyValue=340080530000

2-ER-0311

Sheet Number: 02

**Maui County Accessible Areas Map Key**

| | |
|---|---|
| | Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public |
| (green) | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed |
| (red) | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed |
| (hatched) | Kalawao County, Molokai - Excluded |



# Maui Island Accessible Areas Map - Pre SB1230

**Public Area Summary Pre SB-1230**

| | |
|---|---|
| Maui County: | 1,137 Square Miles |
| Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public: | 814 Square Miles |
| Remaining Property (11.4 Square Miles +/- of public sidewalks and roadways included): | 323 Square Miles |

| | |
|---|---|
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed: | 318.3 Square Miles (98.5 % of Remaining Property) |
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed: | 4.7 Square Miles ( 1.5 % of Remaining Property) |

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=1029&LayerID=216899&PageTypeID=1&PageID=92488&Q=816427170&KeyValue=340080530000

**2-ER-0312**

Sheet Number: 03

**Maui County Accessible Areas Map Key**

| | |
|---|---|
| | Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed |
| | Kalawao County, Molokai - Excluded |



# Molokai Island Accessible Areas Map - Pre SB1230

| Public Area Summary Pre SB-1230 | |
|---|---|
| Maui County: | 1,137 Square Miles |
| Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public: | 814 Square Miles |
| Remaining Property (11.4 Square Miles +/- of public sidewalks and roadways included): | 323 Square Miles |
| | |
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed: | 318.3 Square Miles (98.5 % of Remaining Property) |
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed: | 4.7 Square Miles ( 1.5 % of Remaining Property) |

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=1029&LayerID=10298&PageTypeID=1&PageID=216899&PageTypeID=1&PageID=92448&Q=8164271708&KeyValue=340080530000

**2-ER-0313**

**Maui County Accessible Areas Map Key**

| | |
|---|---|
| | Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public |
| | Federal, State, County and Private Property Open to the Public |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed |
| | Kalawao County, Molokai - Excluded |



**Public Area Summary Pre SB-1230**

Maui County:
Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public:     1,137 Square Miles
Remaining Property (11.4 Square Miles +/- of public sidewalks and roadways included):     814 Square Miles
     323 Square Miles

Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed:     318.3 Square Miles (98.5 % of Remaining Property)
Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed:     4.7 Square Miles ( 1.5 % of Remaining Property)

Special Note for Lanai: Private property hunting and recreation areas excluded.

# Lanai Island Accessible Areas Map - Pre SB1230

Sheet Number: 04

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=1028&LayerID=10298&PageTypeID=1&PageID=21689&PageTypeID=9248&Q=816427170&KeyValue=340080530000

Sheet Number: 05



**Maui County Accessible Areas Map Key**

Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public

Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed

Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed

Kalawao County, Molokai - Excluded

Maui County Post SB-1230

0 1 2 3 4 5    10    20 Miles

1

# Maui County Accessible Areas Map - Post SB1230

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=1029&LayerID=10298&PageTypeID=1&PageID=21689&Q=92448&Q=8164271708KeyValue=340080530000

**2-ER-0315**

Sheet Number: 06



**Maui County Accessible Areas Map Key**

| | |
|---|---|
| | Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed |
| | Kalawao County, Molokai - Excluded |

Public Area Summary Post SB-1230

Maui County:
Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public:    1,137 Square Miles
Remaining Property (11.4 Square Miles +/- of public sidewalks and roadways included):    814 Square Miles
    323 Square Miles

Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed:    11.4 Square Miles ( 3.6 % of Remaining Property)
Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed:    311.6 Square Miles (96.4 % of Remaining Property)

## Maui Island Accessible Areas Map - Post SB1230

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=10298&LayerID=216899&PageTypeID=1&PageID=9248&Q=816427170&KeyValue=340080530000

**2-ER-0316**

Case 1:23-cv-00265-LEK-WRP   Document 61-2   Filed 07/21/23   Page 11 of 12
PageID.1276

Sheet Number: 07

**Maui County Accessible Areas Map Key**

| | |
|---|---|
| | Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed |
| | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed |
| | Kalawao County, Molokai - Excluded |



**Public Area Summary Post SB-1230**

| | |
|---|---|
| Maui County: | |
| Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public: | 1,137 Square Miles |
| Remaining Property (11.4 Square Miles +/- of public sidewalks and roadways included): | 814 Square Miles |
| | 323 Square Miles |
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed: | 11.4 Square Miles ( 3.6 % of Remaining Property) |
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed: | 311.6 Square Miles (96.4 % of Remaining Property) |

# Molokai Island Accessible Areas Map - Post SB1230

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=1029&LayerID=10298&PageTypeID=1&PageID=9248&Q=816427170&KeyValue=340080530000

**2-ER-0317**

Case 1:23-cv-00265-LEK-WRP   Document 61-2   Filed 07/21/23   Page 12 of 12
PageID.1277

**Maui County Accessible Areas Map Key**

| | |
|---|---|
| | Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public |
| (green) | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed |
| (red) | Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed |
| (hatched) | Kalawao County, Molokai - Excluded |

Sheet Number: 08



Public Area Summary Post SB-1230

| | |
|---|---|
| Maui County: | |
| Federal, State, County and Private Property Not Open to the Public or Not Accessible by the Public: | 1,137 Square Miles |
| Remaining Property (11.4 Square Miles +/- of public sidewalks and roadways included): | 814 Square Miles |
| | 323 Square Miles |
| | |
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Allowed: | 11.4 Square Miles ( 3.6 % of Remaining Property) |
| Federal, State, County and Private Property Open to the Public: Concealed Carry Weapon (CCW) Not Allowed: | 311.6 Square Miles (96.4 % of Remaining Property) |

Special Note for Lanai: Private property hunting and recreation areas excluded

# Lanai Island Accessible Areas Map - Post SB1230

Note: The information contained in this map is approximated and has been obtained from the County of Maui Real Property Assessment Division website and other open source information.
See the following link: https://qpublic.schneidercorp.com/Application.aspx?AppID=1029&LayerID=10298&PageTypeID=1&PageID=21689&Q=816427170&KeyValue=340080530000

**2-ER-0318**

# Exhibit 3
# Declaration of Maui Businesses

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) | |
| Defendant. | ) | |

## DECLARATION OF Jody Boeringa

**COMES NOW**, Jody Boeringa, and states as follows:

1.  I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2.  I am the owner of Kula Glass Company.  It is a commercial glass business located at 289 Pakana St., Wailuku, HI 96793.

3.  I have not put a sign up in my business allowing the public to carry firearms on my property.

4.  If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

    **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 18, 2023.

Signature _____

2-ER-0321

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

**2-ER-0322**

## DECLARATION OF *MARTIN V COOPER*

**COMES NOW**, *MARTIN V COOPER*, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of *CWA VENTURES LLC* It is a *ARCHITECTURAL DESIGN* business located at *146 PAPA PL, WAILUKU, HI*.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

   **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July *19*, 2023.

2-ER-0323

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, )<br><br>Defendant. ) | Civil Action No. 1:23-cv-00265-LEK-WRP |

2-ER-0324

## DECLARATION OF YOUR NAME

COMES NOW, your name, and states as follows:    *Christopher Egan*

1. I am a natural person, an adult ~~male~~/female, United States of America

   citizen, resident of the State of Hawaii.  If called as a witness in this matter, I

   would provide the following testimony and I make this declaration based on

   personal knowledge, except where otherwise stated;

2. I am the owner of *Fine Art Visions LLC*.  It is a *Retail Sales* business

   located at *815 Front Street, Lahaina Hi. 96761*

3. I have not put a sign up in my business allowing the public to carry firearms

   on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect,

   I would allow members of the public who have concealed carry permits,

   including the Plaintiffs in this case, to carry in my business and on my

   property.

   **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July *17*, 2023.

Signature _____

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) ) | |
| Defendant. | ) | |

## DECLARATION OF Rudolf S. King

**COMES NOW**, Rudolf S. King, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of King Screen Printing.  It is a screen printing business located at 12 Ulupono Street in Lahaina.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 17, 2023.

Signature _____

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) | |
| Defendant. | ) | |

### **DECLARATION OF Cole Loewen**

**COMES NOW**, Cole Loewen, and states as follows:

1. I am a natural person, an adult male, a sovereign born American of the United States of America , resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of Hawaii Fabrication LLC.  It is a welding/fabrication business located at 1000 Limahana Pl. Ste. i, Lahaina Hawaii 96761.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

   **FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 18, 2023.

Signature _Cole Loewen_

**2-ER-0329**

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) | |
| Defendant. | ) | |

## DECLARATION OF DOUGLAS G. PITZER

**COMES NOW**, Douglas G. Pitzer, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of Pitzer Built Construction, LL.  It is a General Contractor Construction business located at 142 Kupuohi St. F-4 Lahaina, Hi 96761.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July ___, 2023.

Signature _____

2-ER-0331

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) ) |
| Defendant. | ) |

Civil Action No. 1:23-cv-00265-LEK-WRP

## DECLARATION OF YOUR NAME

COMES NOW, *Spice Ray Prince* your name, and states as follows:

1. I am a natural person, an adult (male)/female, United States of America citizen, resident of the State of Hawaii. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of *ISLAND SPICE HAWAII CLOTHING/HERBAL/ HALE PARFUM*. It is a *FRAGRANCE* business located at *277 Wili Ko pl #8 Lahaina, HI 96761*

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July *18*, 2023.

Signature *Spice Ray Prince*

2-ER-0333

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION<br><br>Plaintiffs,<br><br>v.<br><br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:23-cv-00265-LEK-WRP

## <u>DECLARATION OF KIMO CLARK</u>

**COMES NOW**, Kimo Clark, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of Truth Excavation LLC.  It is a Excavation business located at164 Wahikuli Rd, Lahaina HI 96761.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

    **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

    Executed on July 18TH , 2023.


    Signature  *Kimo Clark*

2-ER-0335

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

## <u>DECLARATION OF Jeff Drechsel</u>

**COMES NOW**, Jeff Drechsel, and states as follows:

1. I am a natural person, an adult male, United States of America citizen,
   resident of the State of Hawaii.  If called as a witness in this matter, I would
   provide the following testimony and I make this declaration based on
   personal knowledge, except where otherwise stated;

2. I am the owner of Zuma Development.  It is a Construction business located
   at 11 Ulupono Street Lahaina, HI 96761.

3. I have not put a sign up in my business allowing the public to carry firearms
   on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect,
   I would allow members of the public who have concealed carry permits,
   including the Plaintiffs in this case, to carry in my business and on my
   property.

   **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 18, 2023.

Signature _____

**2-ER-0337**

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, ) ) ) ) ) ) | |
| Defendant. ) | |

## DECLARATION OF Matthew Wilbert

**COMES NOW,** Matthew Wilbert, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of Akanni Fire Protection LLC. It is a Construction business located at Home office: 215 malehilehu St. Kahului, HE, 96732. Shop: Central Maui Baseyard 2000 Main Veterans HWY.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

2-ER-0339

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, )<br><br>Defendant. ) | Civil Action No. 1:23-cv-00265-LEK-WRP |

**2-ER-0340**

### DECLARATION OF Glenn Ross

**COMES NOW**, Glenn Ross, and states as follows:

1.  I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2.  I am the owner of Island Lock and Safe.  It is a Retail and Locksmith business located at 1036 Limahana Place, #2I, Lahaina, HI 96761.

3.  I have not put a sign up in my business allowing the public to carry firearms on my property.

4.  If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

2-ER-0341

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, ) ) ) ) ) ) | |
| Defendant. ) | |

## DECLARATION OF DUANE J. GOMES

**COMES NOW**, Duane J. Gomes, and states as follows:

1.  I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2.  I am the owner of J2C Hawaii, dba Obachans.  It is a locally owned candy business located at 1870-A Mill St, Wailuku, HI 96793.

3.  I have not put a sign up in my business allowing the public to carry firearms on my property.

4.  If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 2023.

Signature _____

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION<br><br>Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br><br>Defendant | Civil Action No. 1:23-cv-00265-LEK-WRP |

## <u>DECLARATION OF DAVIN ASATO</u>

**COMES NOW**, Davin Asato and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am a Pastor at Grace Bible Church Maui It is a church located at 635 Hina Avenue 96732. It is open to the public.

3. Our church has not put a sign up at church allowing the public to carry firearms in the church or on our property.

4. If H.R.S. §134-E, i.e., the law which requires us to put up a sign or give consent for members of the public to be able to carry firearms at our church, were repealed or enjoined or otherwise no longer in effect, our church would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in the church and on church property.

**FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 1̲8̲, 2023.

Davin Asato

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, )<br><br>Defendant. ) | Civil Action No. 1:23-cv-00265-LEK-WRP |

# DECLARATION OF GREGORY L. HOWETH

**COMES NOW**, Gregory L. Howeth, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of Lahaina Dive and Surf LLC.  It is a recreational SCUBA company that operates a retail store, training facility, and charter boats. It is located in Lahaina, Hawaii which is in Maui County and it is open to the public. It is located at 143 Dickenson St, Suite 100, Lahaina HI, 96761.

3. I own the property that my business is located on.

4. I have not put a sign up in my business or property that says the public may carry firearms in my business.  And I have otherwise not given consent to the public to carry firearms on my property and/or business.

5. If H.R.S. §134-E i.e., the law which currently requires me to put up a sign or otherwise give consent for the public to carry handguns in my business. were repealed, enjoined or otherwise no longer in effect, I would allow members of the public, including the Plaintiffs in this case, to carry handguns in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 16, 2023.

Gregory L. Howeth

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| ATOM KASPRZYCKI, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| v. | ) ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) | |
| Defendant | ) ) ) | |

**<u>DECLARATION OF YOUR NAME</u>**

**COMES NOW,** James Patch ~~your name~~, and states as follows:

1. I am a natural person, an adult (male)/female, United States of America citizen, resident of the State of Hawaii. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of The Fish Market Maui. It is a 23 year Retail business located at 3600 Lwr Honoapiilani Rd #2 Lahaina, HI. 96761

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

**FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 17, 2023.

Signature _James Patch_

DocuSign Envelope ID: A0EA09A8-95C1-4D47-894B-D1AED765E46E

Case 1:23-cv-00265-LEK-WRP   Document 61-3   Filed 07/21/23   Page 33 of 42
PageID.1310

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| ATOM KASPRZYCKI, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| v. | ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) | |
| Defendant | ) ) | |

## DECLARATION OF TYLER COONS

**COMES NOW**, Tyler Coons, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of  Welcome Hawaii Properties.  It is a real estate business located at 40 Kupuohi St. Ste 103A Lahaina, HI 96761.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

   **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 17, 2023.

Signature_____

DocuSigned by:

B11C06D57FFC42E...

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, ) ) ) ) ) ) | |
| Defendant. ) | |

**2-ER-0353**

### DECLARATION OF YOUR NAME

**COMES NOW**, your name, and states as follows:

I am a natural person, an adult male/female, United States of America

citizen, resident of the State of Hawaii.  If called as a witness in this matter, I

would provide the following testimony and I make this declaration based on

personal knowledge, except where otherwise stated;

I am the owner of _Hi-Tech Surf Sports_ It is a _RETAIL_ business

located at _425 KOLOA ST, KAHULUI_ .

I have not put a sign up in my business allowing the public to carry firearms

on my property.

If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect,

I would allow members of the public who have concealed carry permits,

including the Plaintiffs in this case, to carry in my business and on my

property.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July _20_, 2023.

Signature _____

2-ER-0354

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) ) | |
| Defendant. | ) | |

## DECLARATION OF YOUR NAME

**COMES NOW,** your name, and states as follows:

I am a natural person, an adult male/female, United States of America

citizen, resident of the State of Hawaii.  If called as a witness in this matter, I

would provide the following testimony and I make this declaration based on

personal knowledge, except where otherwise stated;

I am the owner of Hi.Tech Surf Sports. It is a ReTAIL business

located at 58 Baldwin Ave, Paia.

I have not put a sign up in my business allowing the public to carry firearms

on my property.

If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect,

I would allow members of the public who have concealed carry permits,

including the Plaintiffs in this case, to carry in my business and on my

property.

**FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July ___, 2023.

Signature _____

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, ) ) ) ) ) ) | |
| Defendant. ) | |

## DECLARATION OF YOUR NAME

**COMES NOW**, your name, and states as follows:

I am a natural person, an adult male/female, United States of America

citizen, resident of the State of Hawaii.  If called as a witness in this matter, I

would provide the following testimony and I make this declaration based on

personal knowledge, except where otherwise stated;

I am the owner of _Hi-Tech SurfSports_. It is a _Retail_ business

located at _2021 S. Kihei Rd., Kihei_.

I have not put a sign up in my business allowing the public to carry firearms

on my property.

If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect,

I would allow members of the public who have concealed carry permits,

including the Plaintiffs in this case, to carry in my business and on my

property.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July ___, 2023.

Signature _____

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, )<br><br>Defendant. ) | Civil Action No. 1:23-cv-00265-LEK-WRP |

## DECLARATION OF Noah Drazkowski

**COMES NOW**, Noah Drazkowski, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of All About Fish Maui.  It is a Retail business located at 3600 Lower Honoapiilani Road, Ste. F, Lahaina, HI 96761.

3. I have not put a sign up in my business allowing the public to carry firearms on my property.

4. If H.R.S. §134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, including the Plaintiffs in this case, to carry in my business and on my property.

   **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

   Executed on July 17, 2023.


   Signature

   *Noah Drazkowski*

2-ER-0360

# Exhibit 4
# Declaration of Maui Restaurants

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION ) ) ) ) ) | |
| Plaintiffs, ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| v. ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, ) ) ) ) ) | |
| Defendant ) ) | |

## DECLARATION OF____David Fincher_____

**COMES NOW**, 7/19/23, and states as follows:

1.  I am a natural person, an adult, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2.  I am the owner of  DOWN THE HATCH.  It is a restaurant that serves alcohol.  It is located at 658 Front St, Lahaina HI.

3.  If H.R.S. § 134-A(a)(4) i.e., Hawaii's restriction on carrying firearms by concealed carry permit holders in restaurants that serve alcohol and their parking lots were repealed or enjoined or otherwise no longer in effect, I would allow members of the public, including the Plaintiffs in this case, to carry in my business, on my property and parking lot.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

_____*WDF*_____

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, )<br><br>Defendant ) | Civil Action No. 1:23-cv-00265-LEK-WRP |

2-ER-0364

## DECLARATION OF____David Fincher_____

**COMES NOW**, 7/19/23, and states as follows:

1. I am a natural person, an adult, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of  MALA OCEAN TAVERN.  It is a restaurant that serves alcohol.  It is located at 1307 Front St, Lahaina HI.

3. If H.R.S. § 134-A(a)(4) i.e., Hawaii's restriction on carrying firearms by concealed carry permit holders in restaurants that serve alcohol and their parking lots were repealed or enjoined or otherwise no longer in effect, I would allow members of the public, including the Plaintiffs in this case, to carry in my business, on my property and parking lot.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

_____WDF_____

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 1:23-cv-00265- LEK-WRP |
| v. | ) ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) | |
| Defendant | ) ) | |

## DECLARATION OF_____

**COMES NOW**, _Alexa Caskey__, and states as follows:

1. I am a natural person, an adult, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am the owner of _Moku Roots LLC_.  It is a restaurant that serves alcohol.  It is located at _335 Keawe st Lahaina hi 96761_.

3. If H.R.S. § 134-A(a)(4) i.e., Hawaii's restriction on carrying firearms by concealed carry permit holders in restaurants that serve alcohol and their parking lots were repealed or enjoined or otherwise no longer in effect, I would allow members of the public, including the Plaintiffs in this case, to carry in my business, on my property and parking lot.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July _19, 2023.

___

# Exhibit 5
# Supplemental
# Declaration of
# Plaintiffs

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, )<br><br>Defendant ) | Civil Action No. 1:23-cv-00265-LEK-WRP |

## SUPPLEMENTAL DECLARATION OF JASON WOLFORD

**COMES NOW**, Jason Wolford and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am a Plaintiff in this case.

3. In the past, I have gone to the following business while carrying a concealed weapon and my carry concealed weapon permit and would continue to frequent these businesses, the adjacent area and parking areas, while armed with a concealed firearm and with my concealed firearm permit but for state law and the threat of criminal prosecution: Island lock and Safe, Lahaina Diversity Surf, Down the Hatch, Grace Bible Maui, Mala Ocean Tavern. If H.R.S. §134-E, i.e., the law which requires Hawaii businesses to put up a sign or give consent for members of the public to be able to carry firearms were repealed or enjoined or otherwise no longer in effect, I would carry at all these places. Kula Glass Company, CWA Ventures LLC, Hawaii Fabrication LLC, Pitzer Built Construction, LLC, Island Spice Hawaii Hale Parfum, Zuma Development, Akamai Fire Protection LLC –Down the Hatch, Mala Ocean Tavern, Island Lock and Safe, Grace Bible Church Maui,

Lahaina Dive and Surf LLC, All About Fish Maui, Fine Art Visions LLC,

King Screen Printing, The Fish Market Maui, Truth Excavation LLC,

Welcome to Hawaii Properties and J2C Hawaii, LLC.

4.  If H.R.S. § 134(a)(4) i.e., the law which bans the carry of firearms by

members of the public were repealed, enjoined or otherwise no longer in

effect I would carry a firearm at the following restaurants that serve alcohol

Down the Hatch, Mala Ocean Tavern and Moku Roots LLC.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July _20_, 2023.

Jason Wolford

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION<br><br>Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:23-cv-00265-LEK-WRP

## SUPPLEMENTAL DECLARATION OF ALISON WOLFORD

**COMES NOW**, Alison Wolford and states as follows:

1. I am a natural person, an adult female, United States of America citizen, resident of the State of Hawaii and County Maui.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am a Plaintiff in this case.

3. In the past, I have gone to the following business while carrying a concealed weapon and my carry concealed weapon permit and would continue to frequent these businesses, the adjacent area and parking areas, while armed with a concealed firearm and with my concealed firearm permit but for state law and the threat of criminal prosecution: Akamai Fire Protection, Down the Hatch, Mala Ocean Tavern, Island Lock and Key, Grace Bible Church Maui, Lahaina Dive and Surf, The Fish Market Maui

4. If H.R.S. §134-E, i.e., the law which requires Hawaii businesses to put up a sign or give consent for members of the public to be able to carry firearms at our church, were repealed or enjoined or otherwise no longer in effect, I would carry at all these places. Kula Glass Company, CWA Ventures LLC, Hawaii Fabrication LLC, Pitzer Built Construction, LLC, Island Spice Hawaii Hale Parfum, Zuma Development, Akamai Fire Protection LLC –

Down the Hatch, Mala Ocean Tavern, Island Lock and Safe, Grace Bible Church Maui, Lahaina Dive and Surf LLC, All About Fish Maui, Fine Art Visions LLC, King Screen Printing, The Fish Market Maui, Truth Excavation LLC, Welcome to Hawaii Properties and J2C Hawaii, LLC.

5.  If H.R.S. § 134(a)(4) i.e. the law which bans the carry of firearms by members of the public were repealed, enjoined or otherwise no longer in effect I would carry a firearm at the following restaurants that serve alcohol Down the Hatch, Mala Ocean Tavern and Moku Roots LLC.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 20 , 2023.

Alison Wolford

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAII**

|  |  |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) ) |
| Plaintiffs, | ) ) ) ) |
| v. | ) Civil Action No. 1:23-cv-00265- ) LEK-WRP ) ) |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) |
| Defendant | ) ) |

**SUPPLEMENTAL DECLARATION OF ATOM KASPRZYCKI**

**COMES NOW**, Atom Kasprzycki and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of Hawaii and County Maui.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. I am a Plaintiff in this case.

3. In addition to the parks and beaches I listed in my first declaration I also frequent the following beaches and parks on a regular basis.

4. I have in the past regularly frequented the following beaches, parking lots and adjacent areas, listed below, and have, as a carry concealed license holder since 2022, and will in the future, own, possess, and carry a firearm with my concealed carry permit.  I have every intention and desire to continue to carry my personal firearm in and at all these locations in the future, and places like them, but I will decline to do so because of the credible fear of arrest and prosecution due to SB1230.  I intend to and will use my carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230;

5. I frequent Waihou Spring Trail and the adjacent areas and parking areas. This park is across the street from my home in Olinda. I go there one to two times a month. I have frequented it in the past while carrying a concealed

2-ER-0376

weapon and my permit.  I would continue to frequent this trail/park, adjacent area and parking areas, in the future armed with a concealed firearm and with my concealed carry permit but for state law and the threat criminal prosecution.

6. In the complaint and in my previous declaration the bank in my business's parking lot was mistakenly identified as the Bank of Hawaii.  It is Valley Isle Community Federal Credit Union.

7.  I frequent Polipoli Spring State Park and the adjacent area and parking areas two to six times a year. I have frequented this park while carrying a concealed weapon and my carry concealed weapon permit.  I would continue to frequent Polipoli Spring State Park, the adjacent area and parking areas, while armed with a concealed firearm and with my concealed firearm permit but for state law and the threat of criminal prosecution;

8. In the past, I have gone to the following business while carrying a concealed weapon and my carry concealed weapon permit and would continue to frequent these businesses, the adjacent area and parking areas, while armed with a concealed firearm and with my concealed firearm permit but for state law and the threat of criminal prosecution: Pitzer Built Construction, LLC, Island Spice Hawaii Hale Parfum, Zuma Development, Island Lock and Safe, All About Fish Maui, The Fish Market Maui, Truth Excavation LLC,

2-ER-0377

Welcome to Hawaii Properties, Hi-Tech Surf Sports, Down the Hatch, Mala Ocean Tavern and Moku Roots LLC.

9. If H.R.S. §134-E, i.e., the law which requires Hawaii businesses to put up a sign or give consent for members of the public to be able to carry firearms, were repealed or enjoined or otherwise no longer in effect, I would carry at all these places. Kula Glass Company, CWA Ventures LLC, Hawaii Fabrication LLC, Pitzer Built Construction, LLC, Island Spice Hawaii Hale Parfum, Zuma Development, Akamai Fire Protection LLC, Island Lock and Safe, Grace Bible Church Maui, Lahaina Dive and Surf LLC, All About Fish Maui, Fine Art Visions LLC, King Screen Printing, The Fish Market Maui, Truth Excavation LLC, Welcome to Hawaii Properties, Hi-Tech Surf Sports and J2C Hawaii, LLC.

10. If H.R.S. § 134(a)(4) i.e. the law which bans the carry of firearms by members of the public were repealed, enjoined or otherwise no longer in effect I would carry a firearm at the following restaurants that serve alcohol Down the Hatch, Mala Ocean Tavern and Moku Roots LLC.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 2023.

Atom Kasprzycki

2-ER-0378

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1136 Union Mall, Suite 808
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com


Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | Civil Action No. 1:23-cv-00265-LEK-WRP |
| Plaintiffs, | |
| v. | CERTIFICATE OF SERVICE |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | Judge: N/A<br>Trial: N/A<br>Hearing: N/A |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that on the date noted below, the foregoing document was filed with this Court's ECF system, which generated a notice of filing, and a true and correct copy of the foregoing Reply Brief and Certificate of Service was emailed to the following counsel for Defendants:

.    NEAL KUMAR KATYAL
     NICHOLAS MCLEAN Esq
     Deputy Attorneys General
     Department of the Attorney
     General, State of Hawaii
     425 Queen Street
     Honolulu, HI  96813
     Email:    neal.katyal@hoganlovells.com
               Nicholas.mclean@hawaii.gov


Dated: July 21, 2023.

                     Respectfully submitted,

                          *Counsel for Plaintiff*

                          /s/*Kevin Gerard O'Grady*
                          Kevin O'Grady

                          */s/ Alan Beck*
                          Alan Alexander Beck

2

**2-ER-0380**