No. 23-16164

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of Hawai'i
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

---

## EXCERPTS OF RECORD (VOLUME 3 OF 6)

---

ANNE E. LOPEZ
  *Attorney General of the State of Hawai'i*
KALIKO'ONĀLANI D. FERNANDES
  *Solicitor General*
NICHOLAS M. McLEAN
  *First Deputy Solicitor General*
STATE OF HAWAI'I
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
  *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
   *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
   *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as*
*Attorney General of the State of Hawaiʻi*

ANNE E. LOPEZ (7609)
 Attorney General of the State of Hawaiʻi
KALIKOʻONĀLANI D. FERNANDES (9964)
 Solicitor General
NICHOLAS M. MCLEAN (10676)
 First Deputy Solicitor General
Department of the Attorney General
 State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Tel.: (808) 586-1360
Email: kaliko.d.fernandes@hawaii.gov

NEAL K. KATYAL*
DANA A. RAPHAEL*
 Special Deputy Attorneys General
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel.: (202) 637-5600
Email: neal.katyal@hoganlovells.com

MARY B. MCCORD*
RUPA BHATTACHARYYA*
 Special Deputy Attorneys General
Institute for Constitutional
 Advocacy & Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: (202) 661-6607
Email: mbm7@georgetown.edu
*Pro Hac Vice Motion Pending

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as
the Attorney General of the State of Hawaiʻi

(Additional Counsel on Next Page)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,<br><br>                    Plaintiffs,<br><br><br>v. | Civil No. 1:23-cv-00265-LEK-WRP<br><br>**DEFENDANT ANNE E. LOPEZ'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER (ECF NO. 7); DECLARATION OF NICHOLAS M. MCLEAN; DECLARATION OF SAUL CORNELL; DECLARATION** |
| --- | --- |

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi; MAUI COUNTY,

        Defendants.

**OF BRENNAN RIVAS; DECLARATION OF TERENCE YOUNG; DECLARATION OF PATRICK MCCALL; DECLARATION OF LAURA H. THIELEN; EXHIBITS; CERTIFICATE OF SERVICE**

<u>District Judge</u>:
Hon. Leslie E. Kobayashi

<u>Magistrate Judge</u>:
Hon. Wes Reber Porter

<u>TRO Hearing</u>:
July 28, 2023 at 10:30 AM

## ADDITIONAL COUNSEL

BEN GIFFORD*
  Special Deputy Attorney General
Institute for Constitutional
  Advocacy & Protection
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
Tel.: (202) 662-9835
Email: bg720@georgetown.edu

*Pro Hac Vice Motion Pending

## TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................1

II. LEGAL STANDARD .................................................................................2

III. ARGUMENT..............................................................................................3

    A. PLAINTIFFS' CLAIMS ARE UNLIKELY TO SUCCEED ...............3

        1. Hawaiʻi's sensitive-place restrictions are constitutional. ...............................................................3

            a. Bars and restaurants serving alcohol ...............................7

            b. Public parks and beaches.................................10

            c. Banks and financial institutions.....................16

            d. Parking lots adjacent to government buildings .............18

        2. The private property default rule is constitutional....................18

        3. Plaintiffs' facial challenge cannot succeed..............................23

    B. PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM ...............24

    C. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST STRONGLY WEIGH AGAINST ISSUING A TRO ....................................................................................................25

IV. CONCLUSION..........................................................................................25

3-ER-0386

## TABLE OF AUTHORITIES

**Cases**

*Aholelei v. DPS*,
488 F.3d 1144 (9th Cir. 2007) ................................................................23

*Altman v. Cnty. of Santa Clara*,
No. 20-cv-02180 (N.D. Cal. Apr. 10, 2020) ........................................24

*Andrews v. State*,
50 Tenn. 165 (1871) .............................................................................18

*Application of Ashford*,
50 Haw. 314, 440 P.2d 76 (1968) .......................................................11

*Application of Sanborn*,
57 Haw. 585, 562 P.2d 771 (1977) ......................................................11

*Bauer v. Becerra*,
858 F.3d 1216 (9th Cir. 2017) ...............................................................8

*Blum v. Yaretsky*,
457 U.S. 991 (1982) .............................................................................20

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) ...................................................... 11, 18

*California Rifle & Pistol Ass'n, Inc. v. City of Glendale*,
No. 2:22-cv-07346-SB-JC, 2022 WL 18142541 (C.D. Cal. Dec. 5, 2022).........23

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) .........................................................................20

*Dahl v. Swift Distrib., Inc.*,
No. 10-cv-00551 SJO (RZx), 2010 WL 1458957 (C.D. Cal. Apr. 1, 2010) .......24

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................... 6, 8, 18

*Frey v. Nigrelli*,
No. 21-cv-05334 (NSR), 2023 WL 2473375
(S.D.N.Y. Mar. 13, 2023) ......................................................... 5, 17, 19

*GeorgiaCarry.Org, Inc. v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012) .................................................................. 19, 20

*Goldstein v. Hochul*,
  No. 22-cv-8300 (VSB), 2023 WL 4236164 (S.D.N.Y. June 28, 2023) ...............5

*Grandinetti v. Alexander*,
  No. 16-cv-00480 LEK-KSC, 2017 WL 4855390 (D. Haw. Oct. 26, 2017) .........2

*Hill v. State*,
  53 Ga. 472 (1874) ...............................................................................................18

*Jarvis v. JP Morgan Chase Bank, N.A.*,
  No. 10-cv-4184-GHK (FMOx), 2010 WL 2927276
  (C.D. Cal. July 23, 2010) ...................................................................................14

*Koons v. Platkin*,
  No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023) ..... 22, 23

*Mahoney v. Sessions*,
  871 F.3d 873 (9th Cir. 2017)..............................................................................11

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
  No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023)................... passim

*McCormack v. Hiedeman*,
  694 F.3d 1004 (9th Cir. 2012) ...........................................................................23

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022)............................................................................. passim

*NIFLA v. Becerra*,
  138 S. Ct. 2361 (2018)........................................................................................22

*Nordyke v. King*,
  681 F.3d 1041 (9th Cir. 2012) ...........................................................................11

*NRA v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023) ............................................................................5

*NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  700 F.3d 185 (5th Cir. 2012)................................................................................8

iii

3-ER-0388

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985) ...............................................................24

*Or. Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-cv-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ...................24

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) ...............................................................................22

*Safari Club Int'l v. Bonta*,
    No. 2:22-cv-01395-DAD-JDP, 2023 WL 184942 (E.D. Cal. Jan. 12, 2023).......2

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ...............................................................................7

*State v. Spencer*,
    876 P.2d 939 (Wash. App. 1994) ...........................................................25

*Tracy Rifle & Pistol LLC v. Harris*,
    118 F. Supp. 3d 1182 (E.D. Cal. 2015).....................................................25

*UnifySCC v. Cody*,
    No. 22-cv-01019-BLF, 2022 WL 686310 (N.D. Cal. Mar. 8, 2022) .................24

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ................................................................4

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011) ...............................................................8

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019) ........................................................ 7, 11, 18

*United States v. Focia*,
    869 F.3d 1269 (11th Cir. 2017) ..............................................................8

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010).....................................................................8

*United States v. Masciandaro*,
    648 F. Supp. 2d 779 (E.D. Va. 2009) ................................................. 12, 18

iv

3-ER-0389

*United States v. Reyna*,
 No. 3:21-cr-41 RLM-MGG, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022).......3

*United States v. Tallion*,
 No. 8:22-po-01758-AAQ, 2022 WL 17619254 (D. Md. Dec. 13, 2022)..............3

*Winter v. NRDC, Inc.*,
 555 U.S. 7 (2008) ...........................................................................................2

*Zaitzeff v. City of Seattle*,
 484 P.3d 470 (Wash. App. 2021) ................................................................12

**Statutes**

HRS § 134-A.............................................................................................7, 16

HRS § 134-E ............................................................................................16, 21

HRS § 184-5.................................................................................................10

**Rules**

FRE 201(b)..................................................................................................14

HAR § 13-146-19.........................................................................................10

HAR § 13-146-41.........................................................................................10

HAR § 3-111-12...........................................................................................24

HAR § 3-111-3.............................................................................................24

**Other Authorities**

About PALS for Parents Program,
 https://www.mauicounty.gov/DocumentCenter/View/139258/ABOUT
 -PALS-for-Parents.......................................................................................12

County of Maui, Parks & Recreation Webpage,
 https://www.mauicounty.gov/119/Parks-Recreation ...........................12

Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural
 Place*, Smithsonian Mag.,
 https://www.smithsonianmag.com/history/inventing-beach-unnatural-
 history-natural-place-180959538 (June 23, 2016)................................13

**3-ER-0390**

Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459 (2019) ..................................................7

Dep't of Bus., Econ. Dev. & Tourism, Rsch. & Econ. Analysis Div., *U.S. Visitors Continued Surpassing 2019 Level in May* (June 29, 2023), https://www.hawaiitourismauthority.org/media/11194/may-2023-visitor-statistics-6-28-2023-final.pdf.........................................14

Haunani H. Kane et al., *Vulnerability Assessment of Hawaiʻi's Cultural Assets Attributable to Erosion Using Shoreline Trend Analysis Techniques*, 28 J. Coastal Rsch. 533 (2012) .........................................12

James Mak, *Developing a Dream Destination: Tourism and Tourism Policy Planning in Hawaiʻi* 13 (2008)....................................................13

John Davenport & Julia L. Davenport, *The Impact of Tourism and Personal Leisure Transport on Coastal Environments: A Review*, 67 Estuarine, Coastal & Shelf Sci. 280 (2006) .........................................13

State of Hawaiʻi, Dep't of Bus., Econ. Dev. & Tourism, *Visitor Satisfaction Study Q1 2023*, 32-33, https://www.hawaiitourismauthority.org/media/11034/q1_2023_hta_vsat_final.pdf.......................................................................13

State of Hawaiʻi, *Fact Sheet: Benefits of Hawaiʻi's Tourism Economy*, https://www.hawaiitourismauthority.org/media/11158/tourism-econ-impact-fact-sheet-may-2023.pdf.........................................................13

Statement of Chris J. Sadayasu, Director of Department of Business, Economic Development, and Tourism before the House Committee on Finance, in consideration of SB 1230, https://www.capitol.hawaii.gov/sessions/session2023/Testimony/SB1230_HD1_TESTIMONY_FIN_04-05-23_.PDF ................................16

3-ER-0391

## I.     **INTRODUCTION**

To address the dangers of firearms and gun violence, the Hawaiʻi

Legislature recently passed Act 52—a crucial public safety measure that, among

other things, designates certain locations as sensitive places where guns may not be

carried. Plaintiffs[1] challenge four sensitive-place provisions: restrictions on

carrying guns in (1) bars and restaurants serving alcohol, (2) public parks and

beaches, (3) banks, and (4) parking lots adjacent to government buildings.[2]

Plaintiffs also challenge Act 52's requirement that individuals not carry firearms

on others' private property without authorization—a rule that honors people's right

to decide for themselves whether guns may be carried on their property.

Plaintiffs ask this Court to issue a TRO enjoining these provisions on an

emergency basis,[3] but fail to establish their entitlement to the extraordinary relief

they seek. Indeed, Plaintiffs cannot establish *any* of the preconditions for injunctive

relief: They have no likelihood of success on the merits, will suffer no irreparable

---

[1] Plaintiffs are three Maui residents and an organization, the Hawaii Firearms Coalition ("Plaintiffs"). *See* ECF No. 1 ("Complaint") ¶¶ 1-4.

[2] HRS § 134-A(a)(4) (bars/restaurants); HRS § 134-A(a)(9) (parks/beaches); HRS § 134-A(a)(12) (banks/financial institutions); HRS § 134-A(a)(1) ("parking areas" "adjacent" to government buildings); Declaration of Nicholas M. McLean Ex. 1 (copy of Act 52). Except where otherwise indicated, references to "Ex." are to the exhibits attached to the McLean Declaration.

[3] This memo addresses Plaintiffs' motion for a TRO only. The parties will further develop the record and brief the request for a preliminary injunction separately.

**3-ER-0392**

harm, and the balance of the equities and public interest overwhelmingly favor

denying their request, not granting it.

## II.   <u>LEGAL STANDARD</u>

For a court to grant a TRO, "the moving party must demonstrate that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that

an injunction is in the public interest." *Grandinetti v. Alexander*, No. 16-cv-00480

LEK-KSC, 2017 WL 4855390, at *1 (D. Haw. Oct. 26, 2017) (cleaned up).[4] This

"extraordinary remedy . . . may only be awarded upon a clear showing that the

plaintiff is entitled to such relief," and is "never awarded as of right." *Winter v.*

*NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008). And where, as here, the interim relief

sought "is identical to the ultimate relief sought . . . courts generally disfavor the

granting of injunctive relief." *Safari Club Int'l v. Bonta*, No. 2:22-cv-01395-DAD-

JDP, 2023 WL 184942, at *21 (E.D. Cal. Jan. 12, 2023).

---

[4] "If a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a [TRO] may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1099 (D. Haw. 2015) (cleaned up).

### III.   ARGUMENT

#### A.   PLAINTIFFS' CLAIMS ARE UNLIKELY TO SUCCEED

##### 1.   Hawai'i's sensitive-place restrictions are constitutional.

Tested against the framework the Supreme Court has established for Second Amendment claims, Plaintiffs are unlikely to prevail. Under *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), a plaintiff challenging a gun regulation must first establish that "the Second Amendment's plain text covers [his] conduct." *Id.* at 2126. It is not enough for Plaintiffs to simply say they wish to carry firearms for self-defense, *see* TRO Mot. 6-7; they must meet their textual burden as to their *specific* course of conduct—here, carrying firearms into each of the particular types of locations they cite. *See, e.g.*, *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 WL 17619254, at *5 (D. Md. Dec. 13, 2022) ("[T]he question is whether the Second Amendment includes a right to carry weapons onto government complexes like the NIH campus.").[5]

---

[5] *See id.* at *6 ("*Bruen* does not alter the conclusion that the location the regulation affects remains relevant to assessing whether the Second Amendment covers the conduct."); *United States v. Reyna*, No. 3:21-cr-41 RLM-MGG, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text—a plain text that is more complex than mere possession. To do otherwise would be to compare the regulated conduct to the Second Amendment's bare and oversimplified text— keeping and bearing arms, without the original public meaning emphasized in *Heller* and [*Bruen*].").

3-ER-0394

If a plaintiff meets that textual burden, the government must show that its regulation "is consistent with this Nation's historical tradition of firearm regulation."[6] *Bruen*, 142 S. Ct. at 2126. This inquiry "will often involve reasoning by analogy"—"determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by asking "whether the two regulations are relevantly similar." *Id.* at 2132 (cleaned up). The Supreme Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but stated that prior cases "point[ed] toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. This historical analysis is not a "regulatory straightjacket" and does not require "a modern-day regulation [to be] a dead ringer for historical precursors." *Id.* at 2133. The government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* *Bruen* also establishes that "cases implicating unprecedented societal concerns . . . may require a more nuanced approach" to the historical inquiry. *Id.* at 2132.

In conducting the historical analysis, Plaintiffs would restrict this Court to "the Founding, centering on 1791." TRO Mot. 7. But *Bruen* explicitly left open

---

[6] Where—as here—specific sensitive-place provisions are plainly supported by historical authorities and analogues, courts can also assume step 1 is met and reject the claim at step 2. *Cf. United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) ("assum[ing], without deciding, that step one of the *Bruen* test is met," and "find[ing]" a law "constitutional under step two" based on "history and tradition").

3-ER-0395

whether the analysis should be focused on 1791 (when the Bill of Rights was adopted) or 1868 (when the Fourteenth Amendment was ratified), *Bruen*, 142 S. Ct. at 2138, and numerous courts have properly held that "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States," *NRA v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023).[7]

Nor is 1868 a cut-off; later historical analogues can also provide guidance. *See, e.g.*, *Frey v. Nigrelli*, No. 21-cv-05334 (NSR), 2023 WL 2473375, at *13 (S.D.N.Y. Mar. 13, 2023) (considering "municipal gun regulations from 1750 to the late 19th century" and noting that *Heller* "indicat[ed] that post-enactment history that sheds light on the public understanding of a legal text is a critical tool of constitutional interpretation" (cleaned up)). This is especially true when addressing a technology (*e.g.*, airplanes) or social phenomenon (*e.g.*, large crowds

---

[7] *See Bondi*, 61 F.4th at 1322 n.9 ("Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." (cleaned up)); *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) ("[H]istorical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment."). Furthermore, "*Bruen* considered evidence from both the founding era (the years around 1791) and reconstruction era (the years around 1868)." *Goldstein v. Hochul*, No. 22-cv-8300 (VSB), 2023 WL 4236164, at *11 (S.D.N.Y. June 28, 2023).

of tourists congregating at public beaches) that did not emerge until our more recent history.[8]

Prior to *Bruen*, *District of Columbia v. Heller*, 554 U.S. 570 (2008), recognized that certain regulations—including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"—were "presumptively lawful." *Id.* at 626-27 & n.26. *Bruen* expanded *Heller*'s list of illustrative sensitive places to include "legislative assemblies, polling places, and courthouses," stating that it was "aware of no disputes regarding the lawfulness of such prohibitions." 142 S. Ct. at 2133.[9] *Bruen* also explained that courts may look to the examples identified in *Heller* and *Bruen* and "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

*Heller* and *Bruen*'s examples yield several principles that justify a place's designation as sensitive: among these, a place may be deemed sensitive if the government is acting as a proprietor, or if "the people found there or the activities

---

[8] Nor did *Bruen* "impose any specific requirement that the historical statutes considered must have applied to a certain number of states or a certain percentage of the relevant population." *Maryland*, 2023 WL 4373260, at *16.

[9] Justice Kavanaugh's concurrence in *Bruen*—joined by the Chief Justice— further emphasized that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful." 142 S. Ct. at 2162 (cleaned up).

3-ER-0397

that take place there" are particularly susceptible to the risks of gun violence. *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (cleaned up).[10]

### a.     Bars and restaurants serving alcohol

Plaintiffs' challenge to the restriction on carrying guns in bars and restaurants serving alcohol, HRS § 134-A(a)(4), cannot succeed. To start, Plaintiffs lack standing because they have not identified any bar or restaurant that has authorized (or would authorize) Plaintiffs to carry a gun into their premises. The fact that Plaintiffs identify certain bars and restaurants where they unilaterally wish to carry firearms, Complaint ¶¶ 59(h), 60(h), 61(h), is insufficient. That is because Plaintiffs have not shown that their alleged injuries "fairly can be traced to the challenged action of the defendant," as opposed to "the independent action of some third party not before the court," or that any injury caused by not being allowed to carry firearms on private property "is likely to be redressed by a favorable decision." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 41-42 (1976).

On the merits, the Legislature acted within its constitutional authority in designating bars and restaurants serving alcohol as sensitive locations. *First*, because Plaintiffs have not adequately established that the Second Amendment's

---

[10] Schools, for example, are sensitive because children are especially vulnerable to gun violence. Government buildings—including legislative assemblies, polling places, and courthouses—are sensitive in part because they are essential to the protection of other constitutional rights. *See* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019).

3-ER-0398

text covers possessing firearms in bars or restaurants serving alcohol, Plaintiffs fail

to satisfy their threshold burden. "[L]aws forbidding the carrying of firearms in

sensitive places" are "presumptively lawful," *see Heller*, 554 U.S. at 626-27 &

n.26, such that they fall outside the scope of the Second Amendment.[11]

   *Second*, even if Plaintiffs had satisfied their initial textual burden, the

prohibition on carrying firearms in places that sell intoxicating liquor comports

with a longstanding tradition of regulation. Inebriated individuals bearing firearms

pose obvious risks to fellow patrons and staff, particularly in crowded places. *See*

*State v. Torres*, 75 P.3d 410, 413 (N.M. App. 2003) (recognizing "obvious danger

in the combination of firearms and liquor consumption"). To guard against these

dangers, governments before and after the Founding recognized the commonsense

proposition that it is wise to separate guns and alcohol. A 1746 New Jersey law

prohibited the selling of "any strong Liquor" to members of the militia, Ex. 2, and

a 1756 Delaware law provided that "no Captain or other Officer shall Appoint any

place of Meeting for his Company . . . within the Distance of half a mile of any Inn

---

   [11] Post-*Heller*, courts have held that "presumptively lawful regulatory measures"
could be upheld under the first step of the then-governing Second Amendment test,
which asked whether the challenged law regulated conduct that fell outside the
scope of the Second Amendment, and which *Bruen* endorsed as "broadly
consistent with *Heller*." 142 S. Ct. at 2127; *see Bauer v. Becerra*, 858 F.3d 1216,
1221 (9th Cir. 2017); *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir.
2017); *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185,
196 (5th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011);
*United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010).

or Tavern," Ex. 3. A Maryland law passed the same year prohibited "any Person of

the Militia" from getting "drunk on any Muster-day," and banned the sale of "any

Strong Liquor at any Place of training or at any other Place within Five Miles of

any Place of training." Ex. 4. And a 1780 Pennsylvania law prohibited "any non-

commissioned officer or private" from parading drunk, and provided that "[n]o

company or battalion shall meet at a tavern on any of the days of exercise, nor shall

march to any tavern before they are discharged." Ex. 5.[12] Other measures excluded

"common drunkards" from the militia,[13] and regulated the interaction of firearms

and alcohol.[14] And in the nineteenth century, an 1853 New Mexico law prohibited

people from carrying "fire arms or other deadly weapons, whether they be shown

or concealed upon their persons" in a "Ball or Fandango, . . . or room adjoining

said ball where Liquors are sold." Ex. 19. An 1879 New Orleans ordinance forbade

---

[12] Additionally, laws from the mid-nineteenth century prohibited "any intoxicating liquor" from being "kept or sold . . . on or near the ground of any . . . military muster." *See* Ex. 6 (1852 Vt.); Ex. 7 (1853 R.I.). An 1859 Connecticut law prohibited the sale of liquor "within one mile of any military parade-ground, muster-field or encampment." Ex. 8.

[13] *E.g.*, Ex. 9 (1837 Mass.); Ex. 10 (1837 Me.); Ex. 11 (1840 R.I.).

[14] *See* Ex. 12 (1851 Chicago law providing that "no permit [to keep or sell gunpowder] shall be granted to any retailer of intoxicating liquors"); Ex. 13 (similar 1858 Minnesota law); Ex. 14 (1867 Kansas law prohibiting firearm possession by intoxicated individuals); Ex. 15 (similar 1883 Missouri law); Ex. 16 (similar 1883 Wisconsin law); Ex. 17 (1890 Oklahoma law prohibiting officers from carrying arms "while under the influence of intoxicating drinks"); Ex. 18 (1878 Mississippi law forbidding sale of weapons, including firearms, to "any . . . person intoxicated").

3-ER-0400

"any person to carry a dangerous weapon, concealed or otherwise, into any . . .

tavern." Ex. 20. Similarly, an 1890 Oklahoma law prohibited firearms in "any

place where intoxicating liquors are sold." Ex. 17. These laws demonstrate a strong

tradition of restricting firearms in places people gather, often in close proximity,

and consume alcohol.

### b.    Public parks and beaches

Plaintiffs are also unlikely to prevail on their claim that the Legislature's

designation of parks and beaches as sensitive locations is unconstitutional.[15] There

are three reasons why the parks and beaches provisions of Act 52 are

constitutional: (1) the text of the Second Amendment does not cover Plaintiffs'

proposed course of conduct; (2) the State and county have authority to regulate

these locations as proprietors; and (3) there are ample historical analogues that

demonstrate that these restrictions are constitutional under *Bruen*.

*First*, for the reasons previously set forth, Plaintiffs again fail to establish

that the specific course of conduct they wish to undertake is covered by the text of

the Second Amendment.

---

[15] Notably, restrictions on firearms in Hawaiʻi State Parks are not new. For decades it has been unlawful in State Parks to "use or possess . . . firearms . . . or other implements designed to discharge missiles," HAR § 13-146-19(a), except for hunting purposes as provided by law, *id.* § 13-146-41. These regulations, adopted in 1990, have the force of law. HRS § 184-5. The fact that these restrictions have existed for many years further underscores that, with respect to State Parks, Plaintiffs' request for emergency temporary injunctive relief should be denied.

*Second*, public parks and beaches are owned by the government and thus are subject to its authority to administer those locations as a proprietor.[16] The government's role as proprietor weighs in favor of upholding a regulation. For example, in *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012), the *en banc* Ninth Circuit upheld a county ordinance against a Second Amendment challenge because (among other things) it applied "only on County property." *Id*. at 1044. *Nordyke* drew on the principle—already recognized by the Supreme Court in other contexts—that "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation." *Id*. at 1045 (cleaned up).[17] Like the ordinance in *Nordyke*, Act 52's parks and beaches provisions focus on government property.

And whether assessed at step 1 (the threshold textual step) or at step 2 (the historical analysis), the nature of public parks and beaches clearly demonstrates

---

[16] Under Hawai'i law, all areas makai of the upper reaches of the wash of the waves are public land, *Application of Ashford*, 50 Haw. 314, 314-15, 440 P.2d 76, 77 (1968), "held in public trust by the State," *Application of Sanborn*, 57 Haw. 585, 593-94, 562 P.2d 771, 776 (1977).

[17] Other courts have recognized this principle in the context of Second Amendment challenges. *See Class*, 930 F.3d at 464 ("[T]he government—like private property owners—has the power to regulate conduct on its property."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126-27 (10th Cir. 2015) ("The government often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office)[.]"), *quoted with approval in Mahoney v. Sessions*, 871 F.3d 873, 880 (9th Cir. 2017).

3-ER-0402

that they are sensitive locations. Children and families congregate at parks and beaches,[18] just as they do at schools. Indeed, many parks contain playgrounds and are located next to schools.[19] Numerous organized activities in public parks involve children, including the Summer Fun program in Honolulu and the PALS program on Maui.[20] Parks and beaches often host crowded gatherings, like concerts, fairs, competitions, and cultural exhibitions, and they are places where important expressive activities occur.[21]

Hawaiʻi's beaches provide for a range of cultural opportunities (including religious activities and traditional practices) and represent "a focal point of modern lifestyle as well as cultural tradition."[22] Moreover, in the decades since the

---

[18] *See* https://www.mauicounty.gov/119/Parks-Recreation; https://www.mauicounty.gov/DocumentCenter/View/139258/ABOUT-PALS-for-Parents.

[19] Thielen Decl. ¶ 6; McCall Decl. ¶ 5.

[20] Thielen Decl. ¶ 6; McCall Decl. ¶¶ 16-18.

[21] Thielen Decl. ¶¶ 9-11. *See Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021) (although *Heller* did "not list parks as sensitive areas, the public safety concerns underlying the sensitive area distinction also apply here, particularly the concern about protecting children"); *cf. United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) (applying *Heller*; "National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities"; "the examples given [in *Heller*]—schools and government buildings—plainly suggest that motor vehicles on National Park land fall within any sensible definition of a 'sensitive place'").

[22] Haunani H. Kane et al., *Vulnerability Assessment of Hawaiʻi's Cultural Assets Attributable to Erosion Using Shoreline Trend Analysis Techniques*, 28 J. Coastal Rsch. 533, 533 (2012).

12

development of mass tourism, the status of beaches—throughout the United States and in Hawaiʻi in particular—has been transformed.[23] "Tourism, as it now exists in Hawaii, is essentially a post-World War II phenomenon."[24] It was not until the twentieth century that beaches achieved their current status as a centerpiece of mass tourism.[25] Today, Hawaiʻi's beaches are the most popular recreational tourist activity in the State and lie at the center of a $19.29 billion tourism industry—Hawaiʻi's largest industry and a central pillar of the State's economy.[26] The unique

---

[23] Plaintiffs cannot simply assert that "beaches have always existed in the United States." TRO Mot. 20. In the late nineteenth and twentieth centuries, the status of beaches in economic, cultural, and social life fundamentally changed. *See, e.g.*, Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*, Smithsonian Mag., https://www.smithsonianmag.com/history/inventing-beach-unnatural-history-natural-place-180959538 (June 23, 2016) ("A day at the beach is a cultural ritual. But it hasn't always been this way."); *id*. ("[B]y 1840, the beach meant something new to Europeans"—"a sought-after 'escape' from the city and the drudgery of modern life.").

[24] James Mak, *Developing a Dream Destination: Tourism and Tourism Policy Planning in Hawaiʻi* 13 (2008). "There was a visitor industry in Hawaii before 1959, of course, but the difference in degree is sufficiently great as to constitute a difference in kind." *Id.*

[25] *See* John Davenport & Julia L. Davenport, *The Impact of Tourism and Personal Leisure Transport on Coastal Environments: A Review*, 67 Estuarine, Coastal & Shelf Sci. 280, 280 (2006) ("Mass tourism is a modern phenomenon[.]").

[26] State of Hawaiʻi, Dep't of Bus., Econ. Dev. & Tourism, *Visitor Satisfaction Study Q1 2023*, 32-33, https://www.hawaiitourismauthority.org/media/11034/q1_2023_hta_vsat_final.pdf; State of Hawaiʻi, *Fact Sheet: Benefits of Hawaiʻi's Tourism Economy*, https://www.hawaiitourismauthority.org/media/11158/tourism-econ-impact-fact-sheet-may-2023.pdf ($19.29 billion in visitor spending in 2022). In May 2023 alone, 801,569 visitors arrived in the State of Hawaiʻi and spent $1.69 billion. The island of Maui welcomed 240,407 visitors in May 2023, and those visitors spent $523.9 million. *See* Dep't of Bus., Econ. Dev. & Tourism, Rsch. & Econ. Analysis

modern status of public beaches—as places where, among other things, large crowds of families and children now assemble from all over the world for recreation—implicates "unprecedented societal concerns" that "require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132.[27]

There is a robust historical tradition of restricting guns in places like parks and beaches.[28] "[N]umerous historical statutes and ordinances from the time period before and following the ratification of the Fourteenth Amendment imposed such restrictions in relation to parks." *Maryland*, 2023 WL 4373260, at *11 (citing a range of authorities, including those which "categorically bar the carrying of firearms in parks"); *id.* at *12 ("Where there is a distinct foundation of historical precedent demonstrating that prohibitions on carrying firearms in public parks, places of recreation, and social gatherings are part of the Nation's historical tradition of firearm regulation, . . . Plaintiffs are not likely to succeed on the merits

---

Div*., U.S. Visitors Continued Surpassing 2019 Level in May* (June 29, 2023), https://www.hawaiitourismauthority.org/media/11194/may-2023-visitor-statistics-6-28-2023-final.pdf. This data is subject to judicial notice. FRE 201(b); *Jarvis v. JP Morgan Chase Bank, N.A.*, No. 10-cv-4184-GHK (FMOx), 2010 WL 2927276, at *1 (C.D. Cal. July 23, 2010) ("Judicial notice may be taken of documents available on government websites.").

[27] *Cf. Maryland*, 2023 WL 4373260, at *14 (more nuanced approach warranted because "hospitals were only beginning to become prevalent at the time of the ratification of the Fourteenth Amendment" and "did not resemble their modern counterparts until the twentieth century").

[28] As a practical matter, moreover, many beaches are inseparable from public parks. *See* Thielen Decl. ¶ 7.

of their challenges . . . ." (cleaned up)). This tradition dates back to when public

parks first proliferated in the United States in the 1800s.[29] In 1858, the Board of

Commissioners of New York's Central Park adopted an ordinance that forbade

"[a]ll persons . . . [t]o carry fire-arms or to throw stones or other missiles within"

the park. Ex. 21. The Commissioners of Prospect Park followed in 1866 with a

similar ordinance. Ex. 22. In 1868, Pennsylvania passed a law that "[n]o person

shall carry fire arms, or shoot birds in [Fairmount] Park [in Philadelphia] or within

fifty yards thereof, or throw ston[e]s or other missiles therein." Ex. 23. During the

Reconstruction era, governments continued to pass laws banning guns in public

parks. *E.g.*, Ex. 24 (1872 San Francisco ordinance); Ex. 25 (1873 Chicago

ordinance); Ex. 26 (1875 South Park, Illinois ordinance); Ex. 27 (1881 St. Louis

ordinance); Ex. 28 (1886 Boston ordinance). This demonstrates a tradition of

prohibiting firearms in locations like those identified in HRS § 134-A(a)(9).

"Whether viewed as direct historical precedent or historical analogues, these

statutes and ordinances demonstrate a historical tradition of restricting the carrying

of firearms in places where individuals gather for recreation or social activities[.]"

---

[29] Plaintiffs incorrectly suggest (at TRO Mot. 19) that public parks date back to the establishment of the Boston Common in the 1600s. "There were no modern-style parks in the era of the Second Amendment. The oldest urban public space in America, the Boston Common, was used primarily as a pasture, a place of execution, and a site for the militia to muster and drill." Cornell Decl. ¶ 55.

15

*Maryland*, 2023 WL 4373260, at *12. *See* Young Decl. ¶¶ 28, 35, 42 (finding no evidence supporting carriage of firearms in urban, state, or national parks).

### c.      Banks and financial institutions

Plaintiffs' challenge to Act 52's provision on banks and financial institutions, HRS § 134-A(a)(12), also fails. As with bars and restaurants serving alcohol, Plaintiffs lack standing because they provide no allegations or evidence that any financial institution has authorized (or would authorize) carrying firearms on its premises. The financial institutions identified by Plaintiffs are private, so even if the banks provision did not exist, Plaintiffs still would not be able to take guns onto those premises without authorization. *See* HRS § 134-E. Because Plaintiffs have not shown that any bank or financial institution authorizes (or would authorize) firearms on its property, their challenge to HRS § 134-A(a)(12) should be rejected for lack of standing alone.

Moreover, banks and financial institutions plainly are sensitive locations where carrying firearms may be restricted. As the Hawaiʻi Bankers Association testified during legislative hearings on Act 52, "the elevated risk of danger in bank crimes that involve firearms" means that "it makes good policy sense and is appropriate to restrict firearms on bank premises."[30]

---

[30] https://www.capitol.hawaii.gov/sessions/session2023/Testimony/SB1230_HD1_TESTIMONY_FIN_04-05-23_.PDF.

**3-ER-0407**

Even if the Court were to conclude (or assume) that Plaintiffs satisfy their initial textual burden with regard to banks and financial institutions—for the same reasons noted above, they have not—Act 52's restriction on guns in banks and financial institutions is constitutional because it fits within a long historical tradition of prohibiting firearms in sensitive commercial centers. *See Frey*, 2023 WL 2473375, at *16 (noting "a number of laws between 1328 to 1903 that show a historical tradition of banning firearms in 'fairs' or 'markets'"). "[A] 1786 law in Virginia and a 1792 law in North Carolina" both contained a prohibition on carrying firearms in "'fairs' and 'markets.'" *Id.* (citing Ex. 29 and Ex. 30). These prohibitions align with longstanding English law, including the 1328 Statute of Northampton. *See id.*; Ex. 31. Professor Saul Cornell explains that "[t]he English tradition of bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics. Indeed, it was the very fact that individuals congregated in large numbers and moved about freely, engaging in productive economic, cultural, and political activities that was the reason arms were prohibited from these locations." Cornell Decl. ¶ 42. In the nineteenth century, governments enacted laws that restricted carrying firearms in places where people regularly assembled for commercial or social purposes. *See id.*

3-ER-0408

¶ 46.[31] These laws were viewed as both constitutional and commonsensical when

passed,[32] and they support prohibiting guns in banks and financial institutions.

### d.  Parking lots adjacent to government buildings

Plaintiffs also challenge HRS § 134-A(a)(1), which prohibits guns in parking

areas adjacent to government buildings. TRO Mot. 23-24. *Heller* and *Bruen*

establish that "government buildings" are sensitive places where firearms may be

"altogether prohibited." *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Parking

lots adjacent to government buildings are properly deemed sensitive to the same

extent as the buildings themselves, as persuasive post-*Heller* cases have held.

*Class*, 930 F.3d at 464; *Bonidy*, 790 F.3d at 1125. Plaintiffs' challenge fails.[33]

### 2.  The private property default rule is constitutional.

---

[31] *See, e.g.*, Ex. 32 (1817 New Orleans law forbidding weapons in public ball rooms); Ex. 19 (1853 New Mexico law prohibiting firearms in balls and fandangos); Ex. 33 (1869 Tennessee law prohibiting pistols at "any fair, race course, or other public assembly"); Ex. 34 (1870 Georgia law prohibiting firearms at "any . . . public gathering"); Ex. 35 (1870 Texas law prohibiting firearms in any "ball room, social party or other social gathering"); Ex. 36 (1875 Missouri law prohibiting firearms at social gatherings or any other non-military "public assemblage of persons"); Ex. 37 (1889 Arizona law; no firearms at any "place where persons are assembled for amusement" or "any other public assembly").

[32] "The principle justifying such a decision, excluding arms from sensitive places such as fair and markets, was ancient and informed Founding era laws as well as those enacted in the era of the Fourteenth Amendment." Cornell Decl. ¶ 46; *see Andrews v. State*, 50 Tenn. 165, 182 (1871); *Hill v. State*, 53 Ga. 472, 475 (1874); Rivas Decl. ¶¶ 25-32.

[33] Places "where motor vehicles travel," like parking lots, are in some respects "even more sensitive" because they are "frequented by large numbers of strangers, including children." *Masciandaro*, 648 F. Supp. 2d at 790 (emphasis omitted).

Plaintiffs also challenge HRS § 134-E, which governs carrying firearms on private property without the consent of the owner, lessee, operator, or manager of the property.[34] As a threshold matter, Plaintiffs lack standing because property owners could prohibit firearms even if HRS § 134-E were enjoined, leaving Plaintiffs in the exact same position.[35] But even if Plaintiffs had standing, they would not succeed for three reasons. First, carrying a gun on private property without the owner's consent falls outside the Second Amendment's plain text. Second, HRS § 134-E is consistent with the Nation's tradition of firearms regulation. And third, HRS § 134-E does not compel speech.

*First*, the Second Amendment does *not* include a right to carry guns on others' property without their consent. Under *Bruen*, the threshold inquiry requires an analysis of the Second Amendment's text that is "informed by history," 142 S. Ct. at 2127, including the principles of "property law, tort law, and criminal law" that "provide[d] the canvas on which our Founding Fathers drafted the Second Amendment," *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). Private property rights were exalted by the Founders, and a property owner's right to exclude was "one of the most essential sticks in the

---

[34] Plaintiffs challenge the default rule only as to private property held open to the public—not as to other private property. TRO Mot. 15-16.

[35] Moreover, because Plaintiffs "fail[] to provide any statement . . . indicating that [they] will not seek permission before carrying in a private property," they "fail[] to establish injury-in-fact." *Frey*, at 2023 WL 2473375, at *9.

3-ER-0410

bundle of [property] rights," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072

(2021) (cleaned up). At common law, entering the land of another without

permission was trespass. *See GeorgiaCarry.Org*, 687 F.3d at 1262. States long

reinforced private property rights through the criminal offense of trespass. *Id.* at

1263 (recounting this history). "[T]here is no constitutional infirmity when a

private property owner exercises" their "right to control who may enter, and

whether that invited guest can be armed, and the State vindicates that right." *Id*. at

1264. How the right to exclude is applied, and how landowners signify

authorization, is a matter for Hawaiʻi property law—not federal constitutional law.

HRS § 134-E does no more than vindicate the traditional right to exclude by

preventing Plaintiffs from carrying firearms onto private property absent the

owner's consent. Setting a default rule does not substitute the State's judgment for

that of property owners. It merely establishes a background presumption, and

property owners retain the right to dictate the terms of entry onto their property as

they wish. *See* TRO Mot. 16 ("Plaintiffs here do not challenge that right of a

private property owner."). This is not unconstitutional. *See Blum v. Yaretsky*, 457

U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be

said that the State is *responsible* for the specific conduct of which the plaintiff

complains."). Nothing in *Bruen* changes this conclusion. The Court's ruling that

individuals have a right to carry firearms "in public" does not address whether they

3-ER-0411

have a presumptive right to do so on someone else's private property, and *Bruen* nowhere suggested that the Second Amendment trumps private property rights.

*Second*, the historical record demonstrates that HRS § 134-E is consistent with the Nation's tradition of firearms regulation. There is extensive historical support for prohibitions on carriage on private property without consent, and for government regulation of this conduct. *See* Exs. 38-45. These regulations are "well-established and representative historical analogue[s]." *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). Many, in fact, are better characterized as "historical *twin[s]*" of Hawaiʻi's default rule, surpassing *Bruen*'s requirements. *Id.* Indeed, with respect to the relative burdens imposed by the regulations, some of the historical examples required permission in writing, *see, e.g.*, Exs. 41, 42, while Hawaiʻi's law is more flexible, allowing for "[u]nambiguous written *or verbal* authorization," HRS § 134-E(b)(1) (emphasis added). And with respect to justification, Hawaiʻi's restriction, like its historical predecessors, is rooted in respect for private property rights. Moreover, contrary to Plaintiffs' assertion (TRO Mot. 12-13), these regulations were not aimed solely at hunting or poaching on private land; rather, they generally regulated carriage onto private property without consent *in addition to*, in some cases, regulating hunting. *E.g.*, Ex. 39 (proscribing "carry[ing] any gun *or* hunt[ing]" (emphasis added)); Ex. 40 (same). This historical record demonstrates HRS § 134-E's constitutionality.

*Third*, Plaintiffs' argument that the default rule violates the First Amendment by compelling Plaintiff Kasprzycki to speak is unavailing. TRO Mot. 4, 18-19; Complaint ¶ 65. The compelled speech doctrine applies only if government action "compel[s] individuals to speak a *particular* message" and, in so doing, alters a person's own message. *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (emphasis added). That includes "situation[s] in which an individual must personally speak the government's message," or where the government "force[s] one speaker to host or accommodate another speaker's message," *Rumsfeld v. FAIR*, 547 U.S. 47, 63 (2006). Neither is the case here. Act 52 does not compel property owners to speak at all, let alone send a message on behalf of any entity. Property owners are free to express their views about whether they prefer firearms on their property. They can choose to allow firearms and say so, or choose to say nothing. Either way, the government is not "telling [them] what they *must* say." *Id.* at 61 (emphasis added). Even *Koons*, the outlier decision on which Plaintiffs heavily rely in their Motion, rejected a similar First Amendment claim. *See Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604, at *70 (D.N.J. May 16, 2023) ("[T]he Default Rule does not compel property owners to speak a particular message, so it is not a regulation of speech within the scope of the First Amendment's protection."). The default must be one of two things: either firearms presumptively may be carried on others' private property unless the owner objects,

or they presumptively may not be carried unless the owner consents. Either presumption would place some property owners in the same position as Plaintiff Kasprzycki and pose the same "problem" he seeks to remedy.[36] *Id.* ("[T]he Default Rule sets a background rule and construes the sound of silence."). Because HRS § 134-E does not compel any message, the First Amendment challenge fails.[37]

### 3. Plaintiffs' facial challenge cannot succeed.

Finally, Plaintiffs are not entitled to facial relief. "A facial challenge is a claim that the law or policy at issue is unconstitutional in all its applications." *California Rifle & Pistol Ass'n, Inc. v. City of Glendale*, No. 2:22-cv-07346-SB-JC, 2022 WL 18142541, at *6 (C.D. Cal. Dec. 5, 2022) (cleaned up). Plaintiffs would have to establish that the provisions they challenge cannot be applied to *anyone*—a showing Plaintiffs have not even attempted to make.[38]

---

[36] Act 52's allocation of the private property default was "based on the legislature's assessment of public sentiment and broadly shared preferences within the State." Ex. 1; *see also* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 186 (Winter 2020) (finding strong public support for "no-carry" default rules based on nationwide survey data). Because Hawaiʻi residents prefer a no-carry default for carrying firearms onto others' private property, by Plaintiffs' logic, HRS § 134-E would "compel" less "speech" than any alternative.

[37] The only First Amendment theory Plaintiffs identify in their Complaint and Motion is a "compelled speech" challenge, and only that theory is addressed here.

[38] Any injunctive relief, if issued, should thus apply only to Plaintiffs and the challenged provisions. *McCormack v. Hiedeman*, 694 F.3d 1004, 1019-20 (9th Cir. 2012). Moreover, nominal/compensatory damages (Complaint at 66) are barred by the Eleventh Amendment. *Aholelei v. DPS*, 488 F.3d 1144, 1147 (9th Cir. 2007).

### B. PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM

Plaintiffs have also not demonstrated irreparable harm. Plaintiffs point to their "deprivation of constitutional rights," TRO Mot. 24 (cleaned up), but that presumes Plaintiffs have established a constitutional violation. They have not. *See Maryland*, 2023 WL 4373260, at *16 ("[T]he likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim.").[39] Plaintiffs' delay in seeking a TRO also undermines their assertion of irreparable harm. *See, e.g.*, *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("[D]elay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). Despite knowing as early as May 4 that the bill that became Act 52 passed both houses of the Legislature, Plaintiffs waited until June 23—three weeks after Act 52 was signed by the Governor—to request a TRO. Such delays militate against emergency relief.[40]

---

[39] Neither the Supreme Court nor the Ninth Circuit has adopted Plaintiffs' theory that the deprivation of Second Amendment rights is "irreparable harm per se." TRO Mot. 24; *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *18 (D. Or. Dec. 6, 2022).

[40] *E.g.*, *Altman v. Cnty. of Santa Clara*, No. 20-cv-02180 (N.D. Cal. Apr. 10, 2020), ECF No. 22 (10-day delay); *Dahl v. Swift Distrib., Inc.*, No. 10-cv-00551 SJO (RZx), 2010 WL 1458957, at *4 (C.D. Cal. Apr. 1, 2010) (17 days). Courts measure delays from when plaintiffs were on notice of alleged harm. *UnifySCC v. Cody*, No. 22-cv-01019-BLF, 2022 WL 686310, at *2 (N.D. Cal. Mar. 8, 2022) (starting clock when challenged policy announced). And for some locations—*e.g.*, State Parks and parking lots adjacent to State facilities—restrictions have been in place for years. HAR § 3-111-12; *id.* § 3-111-3. This underscores the lack of irreparable harm.

3-ER-0415

### C.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST STRONGLY WEIGH AGAINST ISSUING A TRO

The balance of the equities and public interest overwhelmingly favor the State. As the Legislature found, "there are compelling interests in protecting public health, safety, and welfare from the serious hazards associated with firearms and gun violence." Ex. 1. The "interest in protecting public safety warrants permitting the relevant parts of [Act 52] to remain in effect until a final determination is made on their constitutionality." *Maryland*, 2023 WL 4373260, at *17. "The costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime . . . would be grave." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015). Members of the public "have a strong interest in being able to use public areas without fearing for their lives." *State v. Spencer*, 876 P.2d 939, 942 (Wash. App. 1994).

### IV.  CONCLUSION

Plaintiffs' Motion should be denied.

DATED: Honolulu, Hawaiʻi, July 14, 2023.

*/s/ Nicholas M. McLean*

KALIKOʻONĀLANI D. FERNANDES
  Solicitor General
NICHOLAS M. MCLEAN
  First Deputy Solicitor General

NEAL K. KATYAL*
MARY B. MCCORD*
BEN GIFFORD*
RUPA BHATTACHARYYA*
DANA A. RAPHAEL*
  Special Deputy Attorneys General

25

**3-ER-0416**

*\* Pro Hac Vice Motions Pending*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi

**3-ER-0417**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, | Civil No. 1:23-cv-00265-LEK-WRP |
| Plaintiffs, | **DECLARATION OF NICHOLAS M. MCLEAN** |
| vs. | |
| ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi; MAUI COUNTY, | |
| Defendants. | Hon. Leslie E. Kobayashi |
| | Hon. Wes Reber Porter |

## <u>DECLARATION OF NICHOLAS M. MCLEAN</u>

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1.     I am the First Deputy Solicitor General in the Department of the Attorney General, State of Hawaiʻi, and I am one of the attorneys representing Anne E. Lopez, in her official capacity as Attorney General for the State of Hawaiʻi, in this action.

2.     I make this Declaration in Support of Defendant Anne E. Lopez's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order (ECF No. 7) ("**TRO Opp.**").

**3-ER-0418**

3.      Attached as **Exhibit 1** is a true and correct copy of the full text of Act

52, as signed into law by Governor Josh Green on June 2, 2023, which is cited in

the TRO Opp. at pp. 1, 25.

## DECLARATIONS

4.      True and correct copies of the following declarations are attached as

Exhibits to the TRO Opp.:

   a. Declaration of Professor Saul Cornell, including one exhibit attached
      thereto;

   b. Declaration of Dr. Brennan Gardner Rivas, including 25 exhibits
      attached thereto;

   c. Declaration of Professor Terence Young, including one exhibit
      attached thereto;

   d. Declaration of Director Patrick McCall; and

   e. Declaration of Director Laura H. Thielen.

## HISTORICAL LAWS

5.      In the following paragraphs, I include the full citations for the

historical laws cited in the TRO Opp.  Each law cited is attached hereto as an

Exhibit.  Following the signature page of this declaration, for the Court's

convenience, I have appended a chart which includes the relevant excerpted text

from each of these laws, organized by subject matter.

6.      Attached as **Exhibit 2** is 1746 N.J. Laws 301-12 (An Act for better

settling and regulating the Militia of this Colony of New Jersey, for the repelling

2

Invasions, and suppressing Insurrections and Rebellions, ch. 84, § 26), which is cited in the TRO Opp. at p. 8.

7.    Attached as **Exhibit 3** is An Act for Establishing a Militia in this Government (Delaware, 1756), *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service, pt. 3, 10-15 (Arthur Vollmer, ed. 1947), which is cited in the TRO Opp. at p. 8.

8.    Attached as **Exhibit 4** is An Act for regulating the Militia of the Province of Maryland (1756), *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service, pt. 5, 83-108 (Arthur Vollmer, ed. 1947), which is cited in the TRO Opp. at p. 8.

9.    Attached as **Exhibit 5** is An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (1780), ch. 902, § 45 (§ 57, P.L.); §48 (§ 60, P.L.), 12th rule, *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service, pt. 11, 75-104 (Arthur Vollmer, ed. 1947), which is cited in the TRO Opp. at pp. 8-9.

10.    Attached as **Exhibit 6** is 1852 Vt. Acts & Resolves 19-30 (Act No. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking), § 15, which is cited in the TRO Opp. at p. 9.

11.     Attached as **Exhibit 7** is 1853 R.I. Acts & Resolves 232-42 (An Act for the more effectual suppression of Drinking Houses and Tippling Shops), § 10, which is cited in the TRO Opp. at p. 9.

12.     Attached as **Exhibit 8** is 1859 Conn. Pub. Acts 61-63 (An Act in Addition to and in Alteration of "An Act for forming and conducting the Military Force") ch. 82, § 5, which is cited in the TRO Opp. at p. 9.

13.     Attached as **Exhibit 9** is 1837 Mass. Acts 273-76 (An Act concerning the Militia), § 1, which is cited in the TRO Opp. at p. 9.

14.     Attached as **Exhibit 10** is 1837 Me. Laws 421-27 (An Act additional to an Act to organize, govern and discipline the Militia of this State), ch. 276, § 5, which is cited in the TRO Opp. at p. 9.

15.     Attached as **Exhibit 11** is 1840 R. I. Acts & Resolves 3-32 (An Act to regulate the Militia), § 14, which is cited in the TRO Opp. at p. 9.

16.     Attached as **Exhibit 12** is Ordinance (Regulating the keeping and conveying [of] Gun Powder and Gun Cotton), ch. 16, § 6, *reprinted in* George Manierre, The Revised Charter and Ordinances of the City of Chicago 123-25 (Chicago, Daily Democrat Off. 1851), which is cited in the TRO Opp. at p. 9.

17.     Attached as **Exhibit 13** is An Ordinance to Regulate the Sale of Gunpowder, ch. 21, § 4, *reprinted in* The Charter and Ordinances of the City of St.

Paul 167-68 (Saint Paul, Daily Pioneer Off. Print 1863), which is cited in the TRO Opp. at p. 9.

18.　　Attached as **Exhibit 14** is 1867 Kan. Sess. Laws 25 (An Act to prevent the carrying of Deadly Weapons), ch. 12, § 1, which is cited in the TRO Opp. at p. 9.

19.　　Attached as **Exhibit 15** is 1883 Mo. Laws 76 (An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled "Of Crimes and Criminal Procedure), § 1, which is cited in the TRO Opp. at p. 9.

20.　　Attached as **Exhibit 16** is 1883 Wis. Sess. Laws 290 (An Act to prohibit the use and sale of pistols and revolvers), ch. 329, § 3, which is cited in the TRO Opp. at p. 9.

21.　　Attached as **Exhibit 17** is 1890 Okla. Sess. Laws. 495-96 (Concealed Weapons), ch. 25, art. 47, §§ 4, 7, which are cited in the TRO Opp. at pp. 9, 17.

22.　　Attached as **Exhibit 18** is 1878 Miss. Laws 178-79 (An Act to prevent the carrying of concealed weapons, and for other purposes), ch. 46, § 2, which is cited in the TRO Opp. at p. 9.

23.　　Attached as **Exhibit 19** is 1853 N.M. Laws 67-69 (An Act Prohibiting the carrying of a certain class of Arms, within the Settlements and in Balls), § 3, which is cited in the TRO Opp. at pp. 9, 17.

24.     Attached as **Exhibit 20** is 1879 New Orleans, La., Gen. Ordinances (Concealed weapons or otherwise in balls or theatres), tit. I, ch. 1, art. 1, *reprinted in* Jewell's Digest of the City Ordinances Together with the Constitutional Provisions, Act of the General Assembly and Decisions of the Courts Relative to Government of the City of New Orleans 1-2 (Edwin L. Jewell, ed.,  New Orleans, L. Graham & Son 1882), which is cited in the TRO Opp. at p. 9.

25.     Attached as **Exhibit 21** is 1858 N.Y.C., N.Y. *in* Minutes of Proceedings of the Board of Commissioners of the Central Park for the Year ending April 30, 1958, at 166-68 (New York, Wm. C. Bryant & Co. 1858), which is cited in the TRO Opp. at p. 15.

26.     Attached as **Exhibit 22** is 1873 Brooklyn, N.Y., Park Ordinances (Ordinance No. 1), art. 1, § 4, *reprinted in* Annual Reports of the Brooklyn Park Commissioners 1861-1873, at 136 (1873), which is cited in the TRO Opp. at p. 15.

27.     Attached as **Exhibit 23** is 1868 Pa. Laws 1083-90 (A Supplement to an act entitled "An Act appropriating ground for public purposes in the City of Philadelphia"), § 21, pt. II, which is cited in the TRO Opp. at p. 15.

28.     Attached as **Exhibit 24** is 1872 S.F., Cal., Park Comm'rs' Ordinances No. 2 (An Ordinance to Provide for the Regulation and Government of the Avenue and Public Parks in the City and County of San Francisco, in Charge of the Park Commissioners), § 2, pt. 2, *reprinted in* Municipal Reports for the Fiscal Year

1874-75, at 886-89 (S.F., Spaulding & Barto 1875), which is cited in the TRO

Opp. at p. 15.

29.    Attached as **Exhibit 25** is 1873 Chi., Ill., Rev. Ordinances, ch. 31, § 6,

*in* Laws and Ordinances Governing the City of Chicago 88-91 (Murray F. Tuley,

ed., Chi., Bulletin Prtg. Co. 1873), which is cited in the TRO Opp. at p. 15.

30.    Attached as **Exhibit 26** is 1875 S. Park, Ill., S. Park Ordinances (an

act to provide for the location and maintenance of a park for the towns of Chicago,

Hyde Park, and Lake), § 6, *in* Laws and Ordinances Governing the Village of Hyde

Park Together with Its Charter and General Laws Affecting Municipal

Corporations 309-12 (Consider H. Willett, ed., Chi., Hazlitt & Reed 1876), which

is cited in the TRO Opp. at p. 15.

31.    Attached as **Exhibit 27** is 1881 St. Louis, Mo., art. 10, § 3, *in* The

Revised Ordinance of the City of St. Louis 635-36 (M.J. Sullivan, ed., St. Louis,

Times Prtg. House 1881), which is cited in the TRO Opp. at p. 15.

32.    Attached as **Exhibit 28** is 1886 Park Ordinances, § 3 *reprinted in* City

of Boston, Dept. of Parks, Thirteenth Annual Report of Bd. of Comm'n'rs 86

(Boston 1888), which is cited in the TRO Opp at p. 15.

33.    Attached as **Exhibit 29** is 1786 Va. Acts 35 (An Act forbidding and

punishing Affrays), which is cited in the TRO Opp. at p. 17.

34.     Attached as **Exhibit 30** is 1792 N.C., ch. 3, *reprinted in* A Collection of the Statutes of the Parliament of England in Force in the State of North Carolina 60-61 (Francis Xavier Martin, ed., New Bern, Editor's Press, 1792), which is cited in the TRO Opp. at p. 17.

35.     Attached as **Exhibit 31** is the 1328 Statute of Northampton, 2 Edw. 3, c.3 (1328), *reprinted in* Statutes of the Realm, vol. 1, 257-61 (London, Dawsons of Pall Mall, 1965), which is cited in the TRO Opp. at p. 17.

36.     Attached as **Exhibit 32** is 1817 New Orleans, La. (An Ordinance respecting public Balls), art. 1, *in* General Digest of the Ordinances and Resolutions of the Corporation of New Orleans 370-71 (New Orleans, Jerome Bayon 1831), which is cited in the TRO Opp. at p. 17.

37.     Attached as **Exhibit 33** is 1869 Tenn. Pub. Acts 23-24 (An Act to Amend the Criminal laws of the State), ch. 22, § 2, which is cited in the TRO Opp. at p. 17.

38.     Attached as **Exhibit 34** is 1870 Ga. Laws 421 (An act to preserve the peace and harmony of the State and for other purposes), tit. XVI, no. 285, § 1, which is cited in the TRO Opp. at p. 17.

39.     Attached as **Exhibit 35** is 1870 Tex. Gen. Laws 63 (An Act Regulating the Right to Keep and Bear Arms), ch. 46, § 1, which is cited in the TRO Opp. at p. 17.

3-ER-0425

40.     Attached as **Exhibit 36** is 1875 Mo. Laws 50-51 (An Act to prevent the carrying of weapons in public assemblies of the people, and to repeal "An act to prevent the carrying [of] concealed weapons," approved March 26, 1874), § 1, which is cited in the TRO Opp. at p. 17.

41.     Attached as **Exhibit 37** is 1889 Ariz. Sess. Laws 16-18  (An Act Defining and Punishing Certain Offenses Against the Public Peace), no. 13, § 3, which is cited in the TRO Opp. at p. 17.

42.     Attached as **Exhibit 38** is 1715 Md. Laws 88-91 (An Act for the speedy trial of criminals, and ascertaining their punishment in the county courts when prosecuted there, and for payment of fees due from criminal persons), ch. 26, § VII, which is cited in the TRO Opp. at pp. 20-21.

43.     Attached as **Exhibit 39** is 1721 Pa. Laws, ch. 248, § III, 3 (An Act to prevent the killing of deer out of season, and against carrying of guns or hunting by persons not qualified), *reprinted in* 3 James T. Mitchell & Henry Flanders, The Statutes at Large of Pennsylvania from 1682 to 1801 254-57 (Pa., Clarence M. Busch, 1896), which is cited in the TRO Opp. at pp. 20-21.

44.     Attached as **Exhibit 40** is 1722 N.J. Laws 141-42 (An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified), which is cited in the TRO Opp. at pp. 20-21.

3-ER-0426

45.      Attached as **Exhibit 41** is 1763 N.Y. Laws, ch. 1233, § 1 (An Act to prevent hunting with Fire-arms in the City of New York, and the Liberties Thereof), *reprinted in* 1 Laws of New-York from the Year 1691 to 1773 Inclusive 441-42 (N.Y., Hugh Gaine 1774), which is cited in the TRO Opp. at pp. 20-21.

46.      Attached as **Exhibit 42** is 1771 N.J. Laws 343-347 (An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns), ch. 540, § 1, which is cited in the TRO Opp. at pp. 20-21.

47.      Attached as **Exhibit 43** is 1865 La. Acts 14-16 (An Act To prohibit the carrying of fire-arms on premises or plantations of any citizen, without the consent of the owner), no. 10, § 1, which is cited in the TRO Opp. at pp. 20-21.

48.      Attached as **Exhibit 44** is 1866 Tex. Gen. Laws 90 (An Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizens without the consent of the owner), ch. 91,  § 1, which is cited in the TRO Opp. at pp. 20-21.

49.      Attached as **Exhibit 45** is 1893 Or. Laws 79 (An Act To Prevent a Person from Trespassing upon any Enclosed Premises or Lands not His Own Being Armed with a Gun, Pistol, or other Firearm, and to Prevent Shooting upon or from the Public Highway), § 1, which is cited in the TRO Opp. at pp. 20-21.

**3-ER-0427**

I declare under penalty of perjury that the foregoing is true and correct.

DATED:   Honolulu, Hawaiʻi, July 14, 2023.

*/s/ Nicholas M. McLean*
NICHOLAS M. MCLEAN

11

**3-ER-0428**

## RELEVANT EXCERPTS FROM HISTORICAL LAWS EXHIBITS

| Ex. No. | TRO Opp. Page | Citation | Key Language | Pincite[1] |
|---|---|---|---|---|
| | | | **II.A.1.a  Bars and restaurants serving alcohol** | |
| **Ex. 2** | 8 | 1746 N.J. Laws 301-12 (An Act for better settling and regulating the Militia of this Colony of New Jersey, for the repelling Invasions, and suppressing Insurrections and Rebellions, ch. 84, § 26) | "[N]o Innholder, or any other Person . . . shall presume to sell any strong Liquor, to any of the Persons so listed, in such Days or Times that they are obliged to appear in Arms, at the Place of Mustering or Training, or within a Mile thereof, until after they are dismissed for that Day . . . ." | 1746 N.J. 311 |
| **Ex. 3** | 8-9 | An Act for Establishing a Militia in this Government (Delaware, 1756), *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service, pt. 3, 10-15 (Arthur Vollmer, ed. 1947) | "[N]o Captain or other Officer shall Appoint any place of Meeting for his Company . . . within the Distance of half a mile of any Inn or Tavern under the Penalty of Forty Shillings for every such Offence and . . . no person or persons shall presume to keep a Booth or tent or expose to sale at or Bring on any Pretence whatsoever any strong Liquor to such place of Meeting under the Penalty or Forty shillings for every such offence." | 1756 Del. 13 |
| **Ex. 4** | 9 | An Act for regulating the Militia of the Province of Maryland (1756) *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective | "[A]ny Person of the Militia who shall get drunk on any Muster-day before or at Muster shall forfeit the Sum of Ten Shillings . . . and any Person who shall presume to vend Sell or Dispose of any Strong Liquor at any Place of training or at any other Place within Five Miles of any Place of training to any Person belonging to the | 1756 Md. 93 |

---

[1] The pincite contains the year of the law excerpted, the state in which it was enacted, and the page of the source document on which the excerpted language may be found.

12

| | | | | |
|---|---|---|---|---|
| | | | Militia on any Muster day except between the Time of Discharge from such Training for that day and the Sun sitting thereof Such Person so vending selling or disposing of Such Strong Liquors Shall forfeit and pay the Sum of Five Pounds. . . ." | |
| **Ex. 5** | 9 | An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (1780), ch. 902, § 45 (§ 57, P.L.); §48 (§ 60, P.L.), 12th rule, *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service, pt. 11, 75–104 (Arthur Vollmer, ed. 1947) | § 47 (§ 57, P.L.): "[I]f any non-commissioned officer or private shall, on any occasion of parading the company to which he belongs, appear with his arms and accoutrements in an unfit condition, or be found drunk . . . he shall be disarmed and . . . fined in any sum not exceeding the price of ten days' labor, nor less than one days' labor."; § 48 (§ 60, P.L.): "12th. No company or battalion shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged ; and any person who shall bring any kind of spiritous liquor to such place of training shall forfeit such liquors so brought . . . ." | 1780 Pa. 97, 100 |
| **Ex. 6** | 9 | 1852 Vt. Acts & Resolves 19-30 (Act No. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking), § 15 | "It shall be the duty of any sheriff . . . if he shall have information that any intoxicating liquor is kept or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, except dwelling houses, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place without warrant, and if such officer shall find upon the premises any intoxicating liquor, he shall seize and apprehend the keeper or keepers of such place, and take them, with the liquor so found and seized, forthwith, or as soon as conveniently may be, before some justice of the peace of the town in which the same was found . . . and upon proof that such liquor is intoxicating, that the same was found in the possession of the accused, in a tent, shanty, or other place as aforesaid, he or they shall be sentenced to imprisonment . . . for thirty days . . . ." | 1852 Vt. 25 |
| **Ex. 7** | 9 | 1853 R.I. Acts & Resolves 232-42 (An Act for the more | "It shall be the duty of any . . . police officer, of any city or town, if he shall have information that any ale, wine, rum, or other strong | 1853 R. I. 238 |

13

3-ER-0430

| | | | |
|---|---|---|---|
| **Ex. 8** | effectual suppression of Drinking Houses and Tippling Shops), § 10 | or malt liquors, or any mixed liquors as aforesaid, are kept for sale or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place, and if such officer shall find upon the premises any ale, wine, rum, or other strong or malt liquors, or any mixed liquors as aforesaid, he shall seize them and apprehend the keeper or keepers of such place, and take them with the liquors and the vessels containing them, so found and seized, forthwith or as soon as may be convenient, before some justice of the peace, or court . . . and upon proof that said liquors are either ale, wine, rum, or other strong or malt liquors, or mixed liquors as aforesaid, that they were found in the possession of the accused, in a tent, shanty or other place as aforesaid, for sale, he or they shall be sentenced to imprisonment in the county jail of the same county for twenty days . . . ." | |
| 9 | 1859 Conn. Pub. Acts 61-63 (An Act in Addition to and in Alteration of "An Act for forming and conducting the Military Force") ch. 82, § 5 | If any booth shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling, the officer commanding said parade-ground, muster-field or encampment, the sheriff or deputy-sheriff of the county, or any justice of the peace, selectman, or constable of the town in which such booth, shed, tent, or other temporary erection is situated, upon having notice or knowledge that the same is so used or occupied, shall notify the owner or occupant thereof to vacate and close the same immediately; and if said owner or occupant shall refuse or neglect so to do said commanding officer . . . may forthwith abate such booth . . . as a nuisance, and may pull down or otherwise destroy the same, with the assistance of any force, civil or military." | 1859 Conn. 62 |

14

| | | | |
|---|---|---|---|
| Ex. 9 | 9 | 1837 Mass. Acts 273-76 (An Act concerning the Militia), § 1 | "Every able-bodied white male resident within this Commonwealth, who is, or shall be, of the age of eighteen, and under the age of forty-five years, excepting idiots, lunatics, common drunkards, vagabonds, paupers and persons convicted of any infamous crimes, shall be enrolled in the militia. . . ." | 1837 Mass. 273 |
| Ex. 10 | 9 | 1837 Me. Laws 421-27 (An Act additional to an Act to organize, govern and discipline the Militia of this State), ch. 276, § 5 | "That no idiot, lunatic, common drunkard, vagabond, pauper, nor any person convicted of any infamous crime, nor any other than white, able-bodied, male citizens, shall be eligible to any office in the Militia." | 1837 Me. 424 |
| Ex. 11 | 9 | 1840 R. I. Acts & Resolves 3-32 (An Act to regulate the Militia), § 14 | "No idiot, lunatic, common drunkard, vagabond, pauper, nor person convicted of any infamous crime, nor any other than able bodied white male citizens, shall be eligible to any military office . . . ." | 1840 R.I. 9 |
| Ex. 12 | 9 | Ordinance (Regulating the keeping and conveying [of] Gun Powder and Gun Cotton), ch. 16, § 6, *reprinted in* George Manierre, The Revised Charter and Ordinances of the City of Chicago 123-25 (Chicago, Daily Democrat Off. 1851) | "[N]o permit [to keep or sell gunpowder] shall be granted to any retailer of intoxicating liquors or to any intemperate person." | 1851 Chi... Ill. 124 |
| Ex. 13 | 9 | An Ordinance to Regulate the Sale of Gunpowder, ch. 21, § 4, *reprinted in* The Charter and Ordinances of the City of St. Paul 167-68 (Saint Paul, Daily Pioneer Off. Print 1863) | "[N]o permit [to keep or sell gunpowder] shall be granted to any retailer of intoxicating liquors or to any intemperate person." | 1858 St. Paul, Minn. 167 |
| Ex. 14 | 9 | 1867 Kan. Sess. Laws 25 (An Act to prevent the carrying of Deadly Weapons), ch. 12, § 1 | "Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the Government of the United States, who shall be found within the limits of this State, carrying | 1867 Kan. 25 |

15

| | | | |
|---|---|---|---|
| **Ex. 15** | 9 | 1883 Mo. Laws 76 (An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled "Of Crimes and Criminal Procedure"), § 1 | on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor . . . ." "If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or . . . shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment." | 1883 Mo. 76 |
| **Ex. 16** | 9 | 1883 Wis. Sess. Laws 290 (An Act to prohibit the use and sale of pistols and revolvers), ch. 329, § 3 | "It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver." | 1883 Wis. 290 |
| **Ex. 17** | 9-10 | 1890 Okla. Sess. Laws. 495-96 (Concealed Weapons), ch. 25, art. 47, § 4; § 7 | § 4: "[I]f any public officer be found carrying . . . arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person."; § 7: "It shall be unlawful for any person, except a peace officer, to carry into . . . any place where intoxicating liquors are sold . . . any of the weapons designated in sections one and two [including "pistol[s]" and "revolver[s]"] of this article." | 1890 Okla. 495, 496 |
| **Ex. 18** | 9 | 1878 Miss. Laws 175-76 (An Act to prevent the carrying of concealed weapons, and for other purposes), ch. 46, § 2 | "[I]t shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described, or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars . . . ." | 1878 Miss. 175 |
| **Ex. 19** | 9 | 1853 N.M. Laws 67-69 (An Act Prohibiting the carrying of a certain class of Arms, within the Settlements and in Balls), § 3 | "Sheriff . . . will not permit any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons, whether they be shown or concealed upon their persons . . . ." | 1853 N.M. Laws 69 |

16

Case 1:23-cv-00265-LEK-WRP   Document 55-1   Filed 07/14/23   Page 17 of 23   PageID.548

| | | | | |
|---|---|---|---|---|
| **Ex. 20** | 9-10 | 1879 New Orleans, La., Gen. Ordinances (Concealed weapons or otherwise in balls or theatres), tit. I, ch. 1, art. 1, *reprinted in* Jewell's Digest of the City Ordinances Together with the Constitutional Provisions, Act of the General Assembly and Decisions of the Courts Relative to Government of the City of New Orleans 1-2 (Edwin L. Jewell, ed., New Orleans, L. Graham & Son 1882) | "[I]t shall not be lawful for any person to carry a dangerous weapon, concealed or otherwise, into any theatre, public hall, tavern, picnic ground, place for shows or exhibitions, house or other place of public entertainment or amusement." | 1879 New Orleans, La. 1 |

### IIA.1.b  Public parks and beaches

| | | | | |
|---|---|---|---|---|
| **Ex. 21** | 15 | 1858 N.Y.C., N.Y. *in* Minutes of Proceedings of the Board of Commissioners of the Central Park for the Year ending April 30, 1958, at 166-68 (New York, Wm. C. Bryant & Co. 1858) | "All persons are forbidden . . . [t]o carry fire-arms . . . within [Central Park]." | 1858 N.Y.C., N.Y. 166 |
| **Ex. 22** | 15 | 1873 Brooklyn, N.Y., Park Ordinances (Ordinance No. 1), art. 1, § 4, *reprinted in* Annual Reports of the Brooklyn Park Commissioners 1861-1873, at 136 (1873) | "All persons are forbidden . . . [t]o carry firearms . . . within [Prospect Park.]" | 1858 Brooklyn, NY 136 |
| **Ex. 23** | 15 | 1868 Pa. Laws 1083-90 (A Supplement to an act entitled "An Act appropriating ground | "No person shall carry fire arms . . . in [Fairmount Park, Philadelphia] or within fifty yards thereof . . . ." | 1868 Pa. 1088 |

17

| | | | |
|---|---|---|---|
| | | for public purposes in the City of Philadelphia"), § 21, pt. II | |
| **Ex. 24** | 15 | 1872 S.F., Cal., Park Comm'rs' Ordinances No. 2 (An Ordinance to Provide for the Regulation and Government of the Avenue and Public Parks in the City and County of San Francisco, in Charge of the Park Commissioners), § 2, pt. 2, *reprinted in* Municipal Reports for the Fiscal Year 1874-75, at 886-89 (S.F., Spaulding & Barto 1875) | "Within [Golden Gate and Buena Vista Parks] all persons are hereby forbidden: . . . To carry . . . firearms." | 1872 S.F., Cal. 887 |
| **Ex. 25** | 15 | 1873 Chi., Ill. Rev. Ordinances, ch. 31, § 6, *in* Laws and Ordinances Governing the City of Chicago 88-91 (Murray F. Tuley, ed., Chi., Bulletin Prtg. Co. 1873) | "All persons are forbidden to carry firearms . . . within any one of the public parks." | 1873 Chi., Ill. 88 |
| **Ex. 26** | 15 | 1875 S. Park, Ill., S. Park Ordinances (an act to provide for the location and maintenance of a park for the towns of Chicago, Hyde Park, and Lake), § 6, *in* Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations 309-12 | "All persons are forbidden to carry fire arms . . . within [South Park]." | 1875 S. Park, Ill. 310 |

18

Case 1:23-cv-00265-LEK-WRP   Document 55-1   Filed 07/14/23   Page 19 of 23   PageID.550

| | | | | |
|---|---|---|---|---|
| | | (Consider H. Willett, ed., Chi., Hazlitt & Reed 1876) | | |
| Ex. 27 | 15 | 1881 St. Louis, Mo., art. 10, § 3, *in* The Revised Ordinance of the City of St. Louis 635-36 (M.J. Sullivan, ed., St. Louis, Times Prtg. House 1881) | "No person shall … use or have in his possession ready for use in any street, alley, walk or park of the city of St. Louis, any sling, cross bow and arrow, air gun or other contrivance for ejecting, discharging or throwing any fragment, bolt, arrow, pellet, or other missile[.]" | 1881 St. Louis, Mo. 635 |
| Ex. 28 | 15 | 1886 Park Ordinances, § 3 *reprinted in* City of Boston, Dept. of Parks, Thirteenth Annual Report of Bd. of Comm'n'rs 86 (Boston 1888) | "[W]ithin the Public Parks . . . it is forbidden . . . to discharge or carry fire-arms. . . ." | 1886 Boston, Mass. 86 |

## II.A.1.c  Banks and financial institutions

| | | | | |
|---|---|---|---|---|
| Ex. 29 | 17 | 1786 Va. Acts 35 (An Act forbidding and punishing Affrays) | "[N]o man . . . [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison by any Justice . . . ." | 1786 Va. 35 |
| Ex. 30 | 17 | 1792 N.C., ch. 3, *reprinted in* A Collection of the Statutes of the Parliament of England in Force in the State of North Carolina 60-61 (Francis Xavier Martin, ed., New Bern, Editor's Press, 1792) | "[N]o man . . . [shall] go nor ride armed by night nor by day, in fairs, markets . . . ." | 1792 N.C. 60 |
| Ex. 31 | 17 | 1328 Statute of Northampton, 2 Edw. 3, c.3 (1328), *reprinted in* Statutes of the Realm, vol. 1, 257-61 (London, Dawsons of Pall Mall, 1965) | "[N]o man . . . [shall] go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." | 1328 Northampton 258 |

19

3-ER-0436

| | | | | |
|---|---|---|---|---|
| Ex. 32 | 18 | 1817 New Orleans, La. (An Ordinance respecting public Balls), art. 1, *in* General Digest of the Ordinances and Resolutions of the Corporation of New Orleans 370-71 (New Orleans, Jerome Bayon 1831) | "It shall not be lawful for any person to enter into a public ballroom with any . . . Weapon . . . ." | 1817 New Orleans, LA 371 |
| Ex. 19 | 18 | 1853 N.M. Laws 67-69 (An Act Prohibiting the carrying of a certain class of Arms, within the Settlements and in Balls), § 3 | "Sheriff . . . will not permit any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons, whether they be shown or concealed upon their persons . . . ." | 1853 N.M. Laws 69 |
| Ex. 33 | 18 | 1869 Tenn. Pub. Acts 23-24 (An Act to Amend the Criminal laws of the State), ch. 22, § 2 | "[I]t shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry . . . any pistol, dirk, bowie-knife, Arkansas tooth-pick, or weapon in form, shape or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon." | 1869 Tenn. 23-24 |
| Ex. 34 | 18 | 1870 Ga. Laws 421 (An act to preserve the peace and harmony of the State and for other purposes), tit. XVI, no. 285, § 1 | "[N]o person . . . [is] permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds." | 1870 Ga. 421 |
| Ex. 35 | 18 | 1870 Tex. Gen. Laws 63 (An Act Regulating the Right to Keep and Bear Arms), ch. 46, § 1 | "[I]f any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, . . . or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher knife, or fire-arms, whether know as a six- | 1870 Tex. 63 |

20

3-ER-0437

| | | | |
|---|---|---|---|
| **Ex. 36** | 18 | 1875 Mo. Laws 50-51 (An Act to prevent the carrying of weapons n public assemblies of the people, and to repeal 'An act to prevent the carrying [of] concealed weapons,' approved March 26, 1874), § 1 | shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor . . . ." "Whosoever shall . . . go into any church or place where people have assembled for religious worship, or into any school room, or into any place where people be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for other than militia drill, or meetings called under the militia law of this state having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot, or other deadly weapon, shall be deemed guilty of a misdemeanor . . . ." | |
| **Ex. 37** | 18 | 1889 Ariz. Sess. Laws 16-18 (An Act Defining and Punishing Certain Offenses Against the Public Peace), no. 13, § 3 | "If any person shall go into any . . . place where persons are assembled for amusement . . ., or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering . . . or to any other public assembly, and shall have or carry about his person a pistol or other firearm . . . he shall be punished by a fine of not less than fifty nor more than five hundred dollars . . . ." | 1889 Ariz. 17 |

**II.A.2.  Private property default rule**

| | | | |
|---|---|---|---|
| **Ex. 38** | 21 | 1715 Md. Laws 88-91 (An Act for the speedy trial of criminals, and ascertaining their punishment in the county courts when prosecuted there, and for payment of fees due from criminal persons), ch. 26, § VII | "That if any person or persons whatsoever, that have been convicted of any of the crimes aforesaid, or other crimes, or that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, . . . without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco . . . ." | 1715 Md. 90 |
| **Ex. 39** | 21 | 1721 Pa. Laws, ch. 248, § III, 3 (An Act to prevent the killing of | "[I]f any person or persons shall presume . . . to carry any gun or hunt on the improved or inclosed lands of any plantation other | 1721 Pa. 255 |

21

| Ex. | | | | |
|---|---|---|---|---|
| | | deer out of season, and against carrying of guns or hunting by persons not qualified," *reprinted in* 3 James T. Mitchell & Henry Flanders, The Statutes at Large of Pennsylvania from 1682 to 1801 254-57 (Pa., Clarence M. Busch, 1896) | than his own, unless he have license or permission from the owner of such lands or plantation . . . he shall for every such offense forfeit the sum of ten shillings." | |
| **Ex. 40** | 21 | 1722 N.J. Laws 141–42 (An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified) | "[I]f any Person or Persons shall presume . . . to carry any Gun, or Hunt on the Improved or Inclosed Lands in any Plantation, and on other than his own, unless he have License or Permission from the owner of such Lands or Plantation, and shall be thereof Convicted . . . [he] shall, for every such Offence forfeit the Sum of Fifteen Shillings . . . ." | 1722 N.J. 141 |
| **Ex. 41** | 21 | 1763 N.Y. Laws, ch. 1233, § 1 (An Act to prevent hunting with Fire-arms in the City of New York, and the Liberties Thereof), *reprinted in* 1 Laws of New-York from the Year 1691 to 1773 Inclusive 441-42 (N.Y., Hugh Gaine 1774) | "[I]f any Person or Persons whatsoever, other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants, do and shall . . . carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatever, within the City of New-York, or the Liberties thereof, without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor . . . ." | 1763 N.Y. 442 |
| **Ex. 42** | 21 | 1771 N.J. Laws 343-347 (An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns), ch. 540, § 1 | "[I]f any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor . . ." | 1771 N.J. 344 |
| **Ex. 43** | 21 | 1865 La. Acts 14-16 (An Act To prohibit the carrying of fire-arms on premises or plantations of any | "[I]t shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order . . . ." | 1865 La. 14 |

22

| | | | | 1866 Tex. 90 |
|---|---|---|---|---|

|  | citizen, without the consent of the owner), no. 10, § 1 | | | |
|---|---|---|---|---|
| **Ex. 44** | 21 | 1866 Tex. Gen. Laws 90 (An Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizens without the consent of the owner), ch. 91, § 1 | "[I]t shall not be lawful for any person or persons to carry firearms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor . . . ." | 1866 Tex. 90 |
| **Ex. 45** | 21 | 1893 Or. Laws 79 (An Act To Prevent a Person from Trespassing upon any Enclosed Premises or Lands not His Own Being Armed with a Gun, Pistol, or other Firearm, and to Prevent Shooting upon or from the Public Highway), § 1 | "It shall be unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." | 1893 Or. 79 |

23

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, | Civil No. 1:23-cv-00265-LEK-WRP |
| Plaintiffs, | |
| v. | |
| ANNE E. LOPEZ, in her official capacity as Attorney General of the State of Hawaiʻi; MAUI COUNTY, | |
| Defendants. | |

## EXPERT DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare under penalty of perjury that the following is true

and correct:

1.      I have been asked by the Department of the Attorney General for the

State of Hawaiʻi to provide an expert opinion on the history of firearms regulation

in the Anglo-American legal tradition, with a particular focus on how the Founding

era understood the right to bear arms, as well as the understanding of the right to

bear arms held at the time of the ratification of the Fourteenth Amendment to the

United States Constitution. In *New York State Rifle & Pistol Ass'n v. Bruen*, the

U.S. Supreme Court underscored that text, history, and tradition are the foundation

1

of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. My declaration explores these issues in some detail. Finally, I have been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.      This declaration is based on my own personal knowledge, research and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

Law School, the University of Pennsylvania Law School, Columbia Law School,

Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,

Leiden University, and McGill University.[1]

4.      My writings on the Second Amendment and gun regulation have been

widely cited by state and federal courts, including the majority and dissenting

opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law

reviews and top peer-reviewed legal history journals. I authored the chapter on the

right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-

authored the chapter in *The Cambridge History of Law in America* on the Founding

era and the Marshall Court, the period that includes the adoption of the

Constitution and the Second Amendment.[3] Thus, my expertise not only includes

the history of gun regulation and the right to keep and bear arms, but also extends

to American legal and constitutional history broadly defined.

5.      I have provided expert witness testimony in *Rocky Mountain Gun*

*Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo. 2014);

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739-59 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518-44 (Christopher Tomlins & Michael Grossberg eds., 2008).

3-ER-0443

*Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty. 2018),

*Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal. 2014), *Miller v. Smith*, No. 2018-cv-

3085 (C.D. Ill. 2018); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal. 2019);

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal. 2019); *Worth v. Harrington,* No. 21-

cv-1348 (D. Minn. 2021); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.

2019); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. 2017); *Renna v.

Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-

ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE (C.D. Cal. 2017);

*B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal. 2021);

*Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022);

*Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022); *Nastri v.

Dykes*, No. 3:23-cv-00056 (D. Conn. 2023); and *Nat'l Assoc. for Gun Rts. v. Lopez*,

No. 1:22-cv-00404 (D. Haw. 2022).

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.     The opinion I provide in this declaration is based on my review of the

complaint filed in this lawsuit, plaintiffs' motion for temporary restraining order

and preliminary injunction, the laws at issue in this lawsuit, and my education,

expertise, and research in the field of legal history. The opinions contained herein

are made pursuant to a reasonable degree of professional certainty.

4

3-ER-0444

## SUMMARY OF OPINIONS

7.     Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding.

8.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights. In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

3-ER-0445

generations.[5] No legal principle was more important to the common law than the concept of the peace.[6] As one early American justice of the peace manual noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7] Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8] Any approach to the Second Amendment that ignores the importance of the peace to Founding era constitutional and legal thought is both anachronistic and profoundly distorted.[9]

9.      Early American constitutionalism built on Lockean theory, a fact evident in many early state constitutions. Thus, Pennsylvania, the first state to assert a right to bear arms, also unambiguously preceded the statement of that principal with an assertion closely tracking Locke: "That all men are born equally free and independent, and have certain natural, inherent and inalienable rights,

---

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60-61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] EDWARDS, *supra* note 6.

3-ER-0446

amongst which are, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety."[10] The right of self-defense and property rights were each viewed as fundamental, inalienable, and foundational in the Founding era.[11] Although the right associated with property and self-defense could not be alienated (a term that was itself derived from English property law) both rights were subject to robust regulation.[12]

   10.   In *Bruen*, Justice Kavanaugh reiterated *Heller*'s[13] invocation of Blackstone's authority as a guide to how early Americans understood their legal inheritance from England.[14] In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased, a natural

---

[10] 5 FEDERAL AND STATE CONSTITUTIONS 3082 (F. Thorpe ed. 1909); PA. CONST., DECL. OF RIGHTS, Art. I (1776); *more generally, see* WILLI PAUL ADAMS, THE FIRST AMERICAN CONSTITUTIONS: REPUBLICAN IDEOLOGY AND THE MAKING OF STATE CONSTITUTIONS IN THE REVOLUTIONARY ERA (1980).

[11] Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J. L. & PUB. POL'Y 568 (2017).

[12] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[13] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[14] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937).

response to new challenges posed by changes in technology and society. As had been true in England, the newly independent states exercised their broad police powers to address longstanding issues and any novel problems created by firearms in American society.

11. American law, including the regulation of firearms, sought to protect ordered liberty. As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[15] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.

12. The members of the Founding generation lived in a pre-modern rural society. There were no modern style police forces to keep the peace. Even after the creation of modern style police forces in the period before the Civil War, firearms were rarely carried routinely in public outside of the South and frontier regions. Indeed, none of the nation's early police forces in Boston, New York, and Philadelphia issued firearms to those charged with enforcing the peace and protecting society from criminals.

---

[15] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799) (text available in the Evans Early American Imprint Collection) (emphasis in original).

**3-ER-0448**

13.     Few of the institutions modern Americans take for granted existed in Founding era America. Outside of major cities there were few hospitals and even fewer museums, and these were private institutions that served the public. There was no modern-style mass transportation. All forms of transport were privately owned.

14.     Although many public spaces existed in early America, modern style parks did not emerge until the nineteenth century. The development of such spaces in period before the Civil War was itself a response to the greater urbanization of the nation and a perception that America needed to create havens of tranquility to offset the negative impacts of the market revolution. From their inception, these new public spaces prohibited firearms.

## I.   THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER: RIGHTS AND REGULATION*

15.     The United States Supreme Court's decisions in *Heller*, *McDonald*[16], and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid

---

[16] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

3-ER-0449

approaching history, text, and tradition with an "ahistorical literalism."[17] Legal

texts must not be read in a decontextualized fashion detached from the web of

historical meaning that made them comprehensible to Americans living in the past.

Instead, understanding the public meaning of constitutional texts requires a solid

grasp of the relevant historical contexts.[18]

16.     Moreover, as *Bruen* makes clear, history neither imposes "a

regulatory straitjacket nor a regulatory blank check."[19] The Court acknowledged

that when novel problems created by firearms are at issue the analysis must reflect

this fact: "other cases implicating unprecedented societal concerns or dramatic

technological changes may require a more nuanced approach." *Bruen* differentiates

between cases in which contested regulations are responses to long standing

problems and situations in which modern regulations address novel problems with

no clear historical analogues from the Founding era or the era of the Fourteenth

Amendment.

17.     In the years between *Heller* and *Bruen*, historical scholarship has

expanded our understanding of the history of arms regulation in the Anglo-

---

[17] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019)
(Thomas, J.) (criticizing "ahistorical literalism").

[18] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist
Translation*, 84 FORDHAM L. REV. 935 (2015).

[19] *Bruen*, 142 S. Ct. at 2133.

American legal tradition, but much more work needs to be done to fill out this picture.[20] Indeed, such research is still ongoing: new materials continue to emerge; and in the year since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[21]

18.   Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[22]

19.   The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's

---

[20] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[21] *Symposium—The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[22] *Bruen*, 142 S. Ct. at 2132-33.

conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text. [23] The inclusion of rights guarantees in Founding era constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[24]

20.    Rather than limiting rights, regulation was the essential means of preserving rights, including self-defense.[25] In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its

---

[23] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how they impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation); Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233-34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s-1830s, at 2 (2019); Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

[24] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. CRIM. L. & CRIMINOLOGY 203, 206 (2016).

[25] *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85 (2017).

3-ER-0452

state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[26] The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties. Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[27]

21.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[28] The most basic right of all in Founding era constitutionalism was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[29] The first state constitutions clearly articulated

---

[26] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[27] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONST. COMMENT. 988 (1999).

[28] *Heller*, 554 U.S. at 634-35; Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008).

[29] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *see generally* Aaron T. Knapp, *The*

3-ER-0453

such a right — including it alongside more familiar rights such as the right to bear arms.[30] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." Although Justice Scalia's observation on the scope of the right to bear arms has figured prominently in recent Second Amendment jurisprudence, the equally important right of the people to regulate their internal police has not been similarly acknowledged by many lower courts. This asymmetry is not only inconsistent with Founding era conceptions of law and constitutionalism, but also not consistent with *Heller*, a point that Chief Justice Roberts and Justice Kavanaugh have each asserted in their interpretations of *Heller* and subsequent jurisprudence. In short, an asymmetrical approach to gun rights and regulation, favoring the former over the latter, is precluded by *Heller* and not consistent with *Bruen*'s focus on text, history, and tradition. The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this key point. The

---

*Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008).

[30] PA. CONST. OF 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); VT. DECLARATION OF RIGHTS, art. V (1777).

14

right to bear arms was seldom interpreted (outside of a few outlier cases in the

South) as precluding robust regulation of arms and gun powder.

## II.   FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.     Guns have been regulated from the dawn of American history.[31] At the

time *Heller* was decided, there was little scholarship on the history of gun

regulation and a paucity of quality scholarship on early American gun culture.[32]

Fortunately, a burgeoning body of scholarship has illuminated both topics,

deepening scholarly understanding of the relevant contexts needed to implement

*Bruen*'s framework.[33] Indeed, in the year following *Bruen* new sources have come

to light and new scholarship as well.[34]

23.     The common law that Americans inherited from England always

acknowledged that the right of self-defense was not unlimited but existed within a

well-delineated jurisprudential framework. The entire body of the common law

was designed to preserve the peace, and the right of self-defense existed within this

---

[31] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[32] *Id.*

[33] Ruben & Miller, *supra* note 20, at 1.

[34] *See Atkinson v. Garland*, 70 F.4th 1018, 1036 (7th Cir. 2023) (Wood, J., dissenting) (citing new scholarship by Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 WASH. U. L. REV. (forthcoming 2023) (manuscript at 27)).

larger framework.[35] Statutory law, both in England and America, functioned to further secure the peace and public safety. Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[36]

24.    Recent historical research has illuminated the nature of Founding era gun culture and the history of regulation. There was no analogue to the types of gun violence that plague modern America. The nature of firearms technology and early American society militated against guns as the preferred tool for most forms of interpersonal violence.[37]

25.    Weapons in the Founding era were muzzle loaded guns that were not particularly accurate and took a long time to load. The black powder used in these firearms was corrosive and attracted moisture like a sponge: two facts that militated against storing weapons loaded. Given the state of firearms technology in

---

[35] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[36] *McDonald*, 561 U.S. at 785 (plurality opinion) (noting that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment" (cleaned up)).

[37] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

the Founding era, it is not surprising that recent scholarship has demonstrated that there was not a widespread gun violence problem in the era of the Second Amendment.[38]

26.   History is marked by change and the history of guns is no exception. Changes in firearms technology and American society in the nineteenth century led to the emergence of America's first gun violence problems. The response of states to the emergence of new firearms that threatened the peace was a plethora of new laws. The first notable expansion of regulation occurred during the period after the War of 1812, when cheap, reliable, and easily concealable pistols were produced for the first time in American history. More than 90% of the firearms in circulation in the Founding era were long guns, so pistols were not a serious problem for the Founders.[39]

27.   In short, when addressing changes in technology, consumer behavior, and faced with novel threats to public safety, states used their ample authority under the police power to enact laws to address these problems. Apart from a few

---

[38] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[39] Sweeney *supra* note 37.

3-ER-0457

outlier cases in the South, courts upheld such limits on the unfettered exercise of a right to keep and bear arms.[40]

28.    Weapons that posed a particular danger were regulated and, in some cases, prohibited. Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.[41]

29.    Anglo-American law treated unusually dangerous weapons as legitimate targets for strong regulation. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as "dangerous and unusual" and more typically as "dangerous or unusual." Although some modern commentary on the Second Amendment have misread the Blackstonian principle as asserting that weapons must be both dangerous and unusual to justify government regulation, the term dangerous and unusual was not conjunctive, but a Latinate construction familiar to early American lawyers, hendiadys. Thus, the best translation of the term in modern parlance would be "unusually dangerous." Indeed, this reading is the only

---

[40] On southern gun rights exceptionalism, *see* Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[41] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

3-ER-0458

parsing of the texts of Blackstone and Hawkins that reconciles the two author's treatment of the scope of government authority to regulate arms.[42]

30.     As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of a form of interest balancing undertaken by the people themselves in framing the federal constitution and the first ten amendments. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complementary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits the diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to

_____

[42]   This phrase was an example of an archaic grammatical and rhetorical form hendiadys; *see* Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VA. L. REV. 687 (2016). Thus, the term was not conjunctive and is best rendered as "unusually dangerous."

3-ER-0459

bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy." Richard Burns, in his influential eighteenth-century legal dictionary, illustrated the concept of infringement by discussing the differences between the anarchic liberty associated with the state of nature and the well-regulated liberty associated with civil society and the rule of law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty. Regulation was therefore not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.  In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the text of the two Amendments was seen to set up very different frameworks for thinking about the rights they protect. Members of the Founding generation would have understood that legislatures could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long such regulations did not negate the underlying *right*. In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[43] In keeping with the clear public meaning of the Second Amendment's

---

[43] UVILLER & MERKEL, *supra* note 26.

text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goal of public safety.

### III.   THE POLICE POWER AND FIREARMS REGULATION, 1776-1868

31.   The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[44] The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[45] By the early nineteenth century, the term "police" was a fixture in American law.[46] Thus, an 1832 American encyclopedia confidently asserted that police, "in the

---

[44] PA. CONST. OF 1776, Ch. I, art iii.

[45] For other examples of constitutional language similar to Pennsylvania's provision, *see* N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES: GENERAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS; PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[46] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2 n.2 (1904).

3-ER-0461

common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[47] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

32.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[48] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[49]

---

[47] 10 ENCYCLOPEDIA AMERICANA 214 (Francis Lieber ed. 1849).

[48] Harry N. Scheiber, *State Police Power*, *in* 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[49] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

33.     Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible. Brutus, a leading Anti-Federalist, emphatically declared that: "[I]t ought to be left to the state governments to provide for the protection and defence [sic] of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[50] Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power, "such as unlicensed public houses, nuisances, and many other things of the like nature."[51] State police power authority was at its pinnacle in matters relating to guns or gun powder.[52]

34.     Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were separate in the Founding era but were mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation

---

[50] Brutus, *Essays of Brutus VII*, *reprinted in* 2 THE COMPLETE ANTIFEDERALIST 358, 400-05 (Herbert J. Storing ed., 1981).

[51] Tench Coxe, *A Freeman*, PA. GAZETTE (Jan. 23, 1788), *reprinted in* FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[52] Cornell, *supra* note 35.

of the connection between these two formerly distinct rights, fusing the two

together as one single constitutional principle. This change reflected two profound

transformations in American politics and law between 1776 and 1868. First, the

judicial concept of police power gradually usurped the older notion of a police

right grounded in the idea of popular sovereignty. As a result, state constitutions no

longer included free standing affirmations of a police right. Secondly, the

constitutional "mischief to be remedied" that arms bearing provisions addressed

had changed as well. Constitution writers in the era of the American Revolution

feared powerful standing armies and sought to entrench civilian control of the

military. By contrast, constitution writers in the era of the Fourteenth Amendment

were no longer haunted by the specter of tyrannical Stuart Kings using their

standing army to oppress American colonists. In place of these ancient fears, a new

apprehension stalked Americans: the proliferation of unusually dangerous weapons

and the societal harms they caused. The Reconstruction-era constitutional solution

cast aside the eighteenth-century language that was steeped in fears of standing

armies and substituted in its place new language affirming the state's police power

authority to regulate arms, particularly in public.[53]

---

[53] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

| Pennsylvania Constitution (1776) | Texas Constitution (1868) |
|---|---|
| "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."<br><br>"That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power."[54] | "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe.[55] |

**Private Property and the Founding Era's Default Rule about Arms**

35.    There was no right to carry firearms onto the property of others in the Founding era. Indeed, had such a right existed, it would have undermined the peace, not preserved it. The castle doctrine, which included one's domicile and curtilage, meant individuals could respond with deadly force to perceived threats.[56]

---

[54] PA. CONST. OF 1776, amend. III, XIII.

[55] TEX. CONST. OF 1868, Art. I, § 13. For similarly expansive constitutional provisions enacted after the Civil War, *see infra* Table One.

[56]  On the history of stand your ground, *see* Richard Maxwell Brown, NO DUTY TO RETREAT: VIOLENCE AND VALUES IN AMERICAN HISTORY AND SOCIETY (1994).

36.     Anglo-American constitutionalism was founded on the Lockean trinity of life, liberty, and property. Property rights in the Founding era were not only highly esteemed, but English common law doctrine gave individuals broad authority over their lands and powerful tools to enforce their claims against those who committed trespass. It would have been unthinkable to members of the Founding generation that any person could enter another's land armed, without permission or appropriate legal authority. The limits on peace officers underscore this fact. Entry on private property by a constable, sheriff, or justice of the peace without proper legal authority was a trespass. Moreover, it is important to note that peace officers in the Founding era were not typically armed with firearms so even when serving legal process, justices of the peace, sheriffs, and constables did not typically enter private property with firearms.  The most notable exceptions to this principle were situations where one was in pursuit of a felon or a dangerous animal.[57]

37.     The default rule enacted by Hawaiʻi simply restores property to its rightful place alongside life and liberty in the Founding era's Lockean vision of

_____

[57] Stuart Bruchey, *The Impact of Concern for the Security of Property Rights on the Legal System of the Early American Republic*, 1980 WIS. L. REV. 1135, 1136; James W. Ely, Jr., THE GUARDIAN OF EVERY OTHER RIGHT: A CONSTITUTIONAL HISTORY OF PROPERTY RIGHTS 30-32 (3d ed. 2008); William J. Novak, *Common Regulation: Legal Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081-83 (1994).

liberty. Blackstone's discussion of the centrality of property to English common law is apposite and offers a foundation for understanding why a restoration of the default rule prohibiting entering another's lands while armed is consistent with Founding era constitutionalism.

> The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land. . . . The laws of England are therefore, in point of honor and justice, extremely watchful in ascertaining and protecting this right.[58]

The practical implication of this robust view of property rights was considerable. In a celebrated English case where the Lord Chief Justice of the King's Bench summarized the implications of this view for English law: "our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbor's ground, he must justify it by law."[59]

38.    The default rule prohibiting firearms on private property adopted by Hawai'i simply restores the legal rule in place at the Founding, a rule rooted in English common law. The prohibition on entering another's land without

---

[58] 1 WILLIAM BLACKSTONE, COMMENTARIES 134-35.

[59] *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765).

3-ER-0467

permission was part of the background assumptions against which the right to keep and bear arms would have been understood by those who wrote it and enacted the Second Amendment into law.

39.   Blackstone's extensive discussion of the law of trespass elaborated this understanding and was well known to members of the Founding generation, including those who wrote and enacted the Second Amendment and similar state analogues. Judge Zephaniah Swift, author of one of the first legal treatises written after the adoption of the Second Amendment, summarized this Blackstonian consensus when he wrote: "every unwarrantable entry upon the lands and tenements of another, without his consent, is deemed a breaking of his close, and is an injury."[60]

40.   Pennsylvania and New Jersey each enacted laws drawing on this tradition to pass broad restrictions on traveling armed onto private lands without permission:

> Be it enacted, That if any person or persons shall presume, at any time after the publication of this act, to carry any gun, or hunt on any enclosed or improved lands of any of the inhabitants of this province, other than his own, unless he shall have license or permission from the owner of such lands, or shall presume to fire a gun on or near any of the king's highways, and shall be thereof convicted, either upon view of any Justice of the Peace within this province, or by the oath or affirmation of

---

[60] 2 ZEPHANIAH SWIFT, A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 74 (1795).

any one or more witnesses, before any Justice of the Peace, he shall, for every such offence, forfeit the sum of forty shillings.[61]

41.    The restoration of the common law default rule by Hawaiʻi therefore fits squarely within the long tradition of the regulation of arms under Anglo-American law.

### The Historical Meaning of Sensitive Places and Limits on Arms

42.    The sensitive places doctrine described in *Heller* derives from well-established principles in Anglo-American law, including the Statute of Northampton (and its many analogs) and the common law itself. The sensitive places doctrine did not, as some gun rights advocates have erroneously suggested, depend on the fact that government could provide comprehensive security, such as modern court houses which have metal detectors and armed guards.[62] Founding era court houses did not enjoy anything remotely analogous to these types of security measures. The English tradition of bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics.

---

[61] 1 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten 229 (1810); Charles Nettleton, Laws of the State of New-Jersey 26 (1821).

[62]  David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 203, 290 (2018).

3-ER-0469

Indeed, it was the very fact that individuals congregated in large numbers and moved about freely, engaging in productive economic, cultural, and political activities that was the reason arms were prohibited from these locations.[63]

43.     An early American justices of the peace manual captured the common law's understanding of "sensitive places" when it reminded readers that constables, sheriffs, and other peace officers had the authority to arrest those who "shall go or ride armed with unusual and offensive weapons . . . among any great Concourse of the People."[64]

44.     A good illustration of how early American governments understood sensitive places is provided by an early Louisiana law, prohibiting "any person to enter into a public ball-room with any cane, stick, sword or any other weapon" and requiring weapons be checked before entering a ball room. New Mexico enacted a similar statute. The law prohibited "any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with firearms or other deadly weapons, whether they be shown or concealed upon their

---

[63] JEROME BAYON, GENERAL DIGEST OF THE ORDINANCES AND RESOLUTIONS OF THE CORPORATION OF NEW ORLEANS 371 (1831) (art. 1).

[64] J. DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (Newbern, James Davis 1774)

3-ER-0470

persons."[65] In both cases the laws prohibited arms in places where people gathered

in large numbers and engaged in forms of recreation.

45.     Public universities in the early republic offer another good example

of the potential scope of permissible firearms regulations consistent with the notion

of sensitive places. Bans on guns on college campuses were another example of the

strict regulation of arms in places where large numbers of people congregated. The

University of Georgia, one of the nation's oldest public institutions of higher

education, passed a sweeping prohibition of guns on its campus: "[N]o student

shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane[,] or any other

offensive weapon in College or elsewhere, neither shall they or either of them be

allowed to be possessed of the same out of the college in any case whatsoever."[66]

The University of North Carolina, likewise, enacted a total prohibition on

possessing firearms. The law provided: "No Student shall keep a dog, or firearms,

or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk,

---

[65] 1852 N.M. Laws 67, § 3.  Although *Bruen* suggested that evidence from the territories was not probative, subsequent research published after the decision has established that territories were in fact the only locations in nineteenth century America in which the Second Amendment applied prior to the Fourteenth Amendment, a fact that has gained judicial notice in the litigation spawned by *Bruen*, *see Atkinson*, 70 F.4th at 1036 (Wood, J., dissenting) ("Taking the Court at its word, new historical research should be welcome . . . .")

[66] The Minutes of the Senate Academicus, 1799-1842, (Univ. Ga. Librs. 2008), https://tinyurl.com/3nxp4uwv.

sword-cane, or any deadly weapon."[67]    The regulations enacted by the University

of Virginia are particularly telling in this regard. In 1819, Thomas Jefferson helped

establish the state-supported University of Virginia. University of Virginia, About

the University, https://www.virginia.edu/aboutuva (last accessed Nov. 4, 2022).

While both Jefferson and James Madison were serving on the six-person

University of Virginia Board of Visitors—the decision-making body for the

university—the Board took an exceedingly strict view of guns on the Virginia

campus, resolving: "No Student shall, within the precincts of the University,

introduce, keep or use any spirituous or vinous liquors, keep or use weapons or

arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school

with a stick, or any weapon."[68]

### Reconstruction: Constitutional Continuity and Social Change

---

[67] Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North-Carolina 15 (Raleigh, Off. of the Raleigh Reg. 1838), https://tinyurl.com/2p8cte3h. In 1859, the University of North Carolina expanded the reach of its prohibition on carrying deadly weapons, applying it not just to the college, but also "within the village of Chapel Hill." Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North Carolina 31 (James M. Henderson 1859), https://docsouth.unc.edu/true/unc/unc.html.

[68] Meeting Minutes of the University Board of Visitors, Oct. 4, 1824, https://tinyurl.com/543s44xk; *see also* Laws & Regulations of the College of William & Mary 19 (1830), https://tinyurl.com/2p93s7hd

3-ER-0472

46.     During the Reconstruction era, many states enacted a variety of laws building on the history of sensitive place restrictions. Thus, Reconstruction era laws did not represent a new constitutional principle different than the common law restrictions that existed for centuries, but an application of the same legal principles to new circumstances brought about by changes in firearms technology, consumer behavior, and the demographic changes associated with greater urbanization. The principle justifying such a decision, excluding arms from sensitive places such as fair and markets, was ancient and informed Founding era laws as well as those enacted in the era of the Fourteenth Amendment.

47.     One of the most comprehensive statutes enacted during the era of the Fourteenth Amendment was adopted in Texas. The law prohibited firearms in a variety of public venues, building on a tradition that had existed for centuries.

> Section 1: If any person shall go into any church or religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentle- men, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind, such persons so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined

in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same: *Provided*, That nothing contained in this section shall apply to locations subject to Indian depredations: *And provided further*, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.[69]

48.    Texas not only adopted a broad range of modern style gun regulations, including this law, but further noted that the state's highest court recognized that such an exercise of the police power was entirely constitutional. The Texas regime was not an outlier, but was consistent with the dominant conception of the right to bear arms in both the Founding era and the period of Fourteenth Amendment. What distinguished Texas from other states was not its robust use of the police power, but the level of gun violence that precipitated the need for such regulations.[70] The first state constitutions enacted after the American Revolution

---

[69] 2 GEORGE WASHINGTON PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST. CAREFULLY ANNOTATED. 1322 (3d ed. 1873).

[70] Justice Thomas dismissed the probative value of any evidence from Reconstruction-era Texas as an outlier. But subsequent historical research has demonstrated that Texas was well within the constitutional mainstream of post-Civil War America. *See* Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study* 55 U.C. DAVIS L. REV. 2603 (2022). The important evidence presented in this article only appeared after *Bruen* was argued. Rivas has demonstrated that Republicans enacted tough gun laws that were enforced in a racially neutral fashion until the Jim Crow era reversed the gains achieved during Reconstruction. For additional support for Rivas' conclusions, *see*

34

3-ER-0474

typically separated the right of the people to regulate their internal police from specific statements about the right to bear arms.[71] The Founding era formulation of the right to bear arms was distinct from the right of the people to regulate their internal police. The new state constitutions adopted during Reconstruction omit references to the dangers of standing armies and the need for civilian control of the military. In place of these textual references, state constitutions fused the right to regulate arms and the right to bear them into a single constitutional principle.[72]

49.    The new textual formulation of the right to keep and bear arms did not alter the constitutional principles framing firearms regulation; these remained unchanged. What had changed was that a new set of circumstances had created an unprecedented set of public safety concerns for states. The new danger Americans faced during and after Reconstruction was the proliferation of firearms and more aggressive cultural norms about carrying them in public, particularly in urban areas.[73]

---

Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928*, 55 U.C. DAVIS L. REV. 2545 (2022).

[71] Cornell, *supra* note 53.

[72] *See, e.g.*, UTAH CONST. OF 1896, art. I, § 6.

[73]  RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

3-ER-0475

50.     The debates in the Texas constitutional convention during

Reconstruction illustrate how changed practices led to new regulations. There is no

evidence that anyone attending the state ratification conventions in the Founding

era traveled to these gatherings armed. By contrast there was a palpable fear of gun

violence among the delegates who participated in the Reconstruction era Texas

state constitutional convention.  In fact, this fear was so great that the convention

passed a resolution prohibiting weapons in the convention hall. "[T]he convention

do order that no person shall hereafter be allowed in this hall, who carries belted on

his person, revolvers or other offensive weapons."[74] Another delegate reminded the

convention's members that the constitutional right to bear arms ought not be

confused with the pernicious practice of habitually arming. The right, he cautioned,

ought not "be construed as giving any countenance to the evil practice of carrying

private or concealed weapons about the person."[75] Although the level of gun

violence in Texas was especially grave, other states and the western territories were

all dealing with problems posed by the proliferation of handguns. As a result of this

---

[74] 1 CONSTITUTIONAL CONVENTION, JOURNAL OF THE RECONSTRUCTION CONVENTION, WHICH MET AT AUSTIN, TEXAS, JUNE 1,1868, at 248 (Tracy, Siemering & Co. 1870).

[75] *Id.* at 152; *see generally* Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95 (2016).

broad societal trend, firearms regulation increased dramatically during the era of the 14ᵗʰ Amendment across the nation.[76]

**Table One**
**Post-Civil War State Constitutional**
**Arms Bearing Provisions about Regulation**

| Date | State | Provision |
|------|-------|-----------|
| 1868 | Georgia | GA. CONST. OF 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. OF 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. OF 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. OF 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |
| 1875 | Missouri | MO. CONST. OF 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. OF 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military |

---

[76] Spitzer, *supra* note 31.

| | | |
|---|---|---|
| | | should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
| 1876 | Colorado | COLO. CONST. OF 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |
| 1876 | Texas | TEX. CONST. OF 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
| 1877 | Georgia | GA. CONST. OF 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |
| 1879 | Louisiana | LA. CONST. OF 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
| 1885 | Florida | FLA. CONST. OF 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. OF 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. OF 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |

3-ER-0478

| 1890 | Mississippi | MISS. CONST. OF 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |
| 1891 | Kentucky | KY. CONST. OF 1891, § 1(7): The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. OF 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |

51.     The new focus on regulation embodied in these revised state arms bearing provisions was not a departure from traditional views of the robust scope of police power authority to regulate arms in the interests of public safety. This power was ancient and widely acknowledged as fundamental to Anglo-American law. Nor did the adoption of the Fourteenth Amendment change this fact. The recasting of these state constitutional texts represented an important shift in emphasis and a change in constitutional style, not substance.[77]

52.     One of the motivating forces behind the push for the Fourteenth Amendment was the enactment of repressive black codes across the South, which often included restrictions on the right to keep and bear arms. Paramilitary violence

---

[77] John Bingham, Speech, *in* CINCINNATI DAILY GAZETTE (Sept. 2, 1867), *as quoted in* Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?* 50 SANTA CLARA L. REV. 1043, 1058 (2010).

against free people of color and Republicans in the South was among the most

pressing threats to Reconstruction.[78] In response to the South Carolina Black

Codes, Union General Daniel Sickles issued General Order No. 1.[79] Sickles not

only affirmed a right to bear arms, but also reasserted the right to regulate arms,

including bans on concealed carry. Crucially, Sickles restated the prevailing

consensus that the right to bear arms did not sanction a right to travel armed onto

private property. In *Bruen,* Justice Thomas singled out Sickles General Order No. 1

as the quintessential embodiment of the meaning of the right to keep and bear

arms, noting that Sickles' views were consistent with both the ideals of 1791 and

1868.[80] General Order No. 1 offers one of the clearest pieces of evidence that the

Hawaiʻi default rule about private property reflects a constitutional consensus

deeply rooted in text, history, and tradition. Sickles' language was unambiguous on

this point: "[t]he constitutional rights of all loyal and well-disposed inhabitants to

bear arms will not be infringed; nevertheless this shall not be construed to sanction

---

[78] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019).

[79] *See* Darrell A. H. Miller, Peruta, *The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. F. 238, 241 (2014).
[80] 142 S. Ct. at 2152.

the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent."[81]

53.     The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters in Ohio that after the adoption of this Amendment, states would continue to bear the primary responsibility for "local administration and personal security."[82] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact whatever reasonable measures were necessary to promote public safety and the common good.[83]

54.     It would be difficult to overstate the significance of the growing perception among legislative bodies across the nation that America needed to enact strong laws to deal with the increased threat gun violence posed in post-Civil War America.  Indeed, the number of laws enacted skyrocketed, as did the number of states passing such laws.[84] States fulfilled their role as laboratories of democracy

---

[81] A HANDBOOK OF POLITICS FOR 1868, at 36-38 (Edward McPherson ed., 1868).

[82] Bingham, *supra* note 77.

[83] For a discussion of how the courts wrestled with the meaning of the Fourteenth Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 148-51 (1998).

[84] Spitzer, *supra* note 31.

by implementing a range of regulations aimed at curbing the problem of gun violence: limiting the sale of firearms, taxing particular types of weapons perceived to pose threats to public safety, imposing limits on the access of minors to weapons, and restricting the public places one might carry arms.[85] Texas banned "[a]ny person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing."[86] The law aimed to preserve the peace and prevent the intimidation of free persons, the exact opposite of the claims of gun rights advocates who have insisted that gun control during Reconstruction was tainted by an insidious racist agenda.[87]

### Parks

---

[85] *Id.*

[86] *An Act to Regulate the Keeping and Bearing of Deadly Weapons, Apr. 12, 1871, reprinted in* PASCHAL, *supra* note 69.

[87] Gun rights advocates have simply ignored the most recent scholarship on gun control and race relations during Reconstruction, including the new literature on gun regulation and enforcement. For more, see the discussion in Frassetto, *supra* note 75, at 102-04, and Rivas, *supra* note 70.

3-ER-0482

55.     There were no modern-style parks in the era of the Second Amendment. The oldest urban public space in America, the Boston Common, was used primarily as a pasture, a place of execution, and a site for the militia to muster and drill.[88] Yet, even when used for militia purposes, these public spaces were tightly regulated. Colonial Massachusetts prohibited coming to muster with a loaded firearm.[89] The Boston Commons and other similar urban spaces in existence during the Founding era shared little with modern parks. There was little need in the sparsely settled colonies to set aside areas for preservation or recreation given that the population of the colonies was expanding rapidly and remained hemmed in by various Indian nations reluctant to cede any further territory to Europeans. Moreover, by the time of the adoption of the Second Amendment, the nation was still 90% rural, and the majority of the population was engaged in agricultural pursuits.[90]

---

[88] Steven R. Pendery, *Probing the Boston Common*, 43 ARCHAEOLOGY 42-47 (1990); SUZANNE SCHELD ET AL., RETHINKING URBAN PARKS: PUBLIC SPACE AND CULTURAL DIVERSITY 19-20 (2009); MICHAEL RAWSON, EDEN ON THE CHARLES: THE MAKING OF BOSTON 73 (2014).

[89] RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 98 (1853); 1866 Mass. Acts 197, An Act Concerning the Militia, § 120. The prohibition on bringing a loaded gun to muster stretches from 1632 to 1866 making it one of the longest standing regulations on firearms in the early Republic.

[90] FORREST MCDONALD, E PLURIBUS UNUM: THE FORMATION OF THE AMERICAN REPUBLIC, 1776-1790, at 72 (1965); Peter C. Mancall, *Economic History of the*

43

56.     The creation of parks as we now know them began in the middle of

the nineteenth century and was influenced by the slow impact of romanticism and

the Transcendentalist ideas of visionaries such as Henry David Thoreau. The new

idea of parks as places of relaxation, repose, and recreation gradually inspired a

new attitude toward nature and public spaces. This new vision inspired urban

planners, landscape architects, and government officials to embark upon an

ambitious series of new parks. By the middle of the century these new public

spaces, best exemplified by New York's Central Park, had become places of refuge

from the congestion, grime, and stresses of city life. The creation of large urban

public parks in the 1850s posed new challenges for those eager to preserve the

peace and public safety: among the pressing issues was the regulation of

firearms.[91] The expansion of urban parks, the creation of new state parks, and

eventually the involvement of the federal government in land preservation

intensified in the post-Civil War period.

---

*United States: Precolonial and Colonial Periods*, *in* OXFORD RESEARCH
ENCYCLOPEDIA OF ECONOMICS AND FINANCE (2021),
https://oxfordre.com/economics/view/10.1093/acrefore/9780190625979.001.0001/
acrefore-9780190625979-e-480.

[91] GALEN CRANZ, THE POLITICS OF PARK DESIGN: A HISTORY OF URBAN PARKS IN
AMERICA 19 (1989).

44

3-ER-0484

57.     From the outset modern parks banned firearms.  Millions of Americans, including the entire population of the nation's five largest cities, lived under a firearms regulatory regime that prohibited firearms in parks. During the era of the Fourteenth Amendment, there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.

**Table Two**

**Post-Civil War Limits on Public Carry in the Nation's Five Largest Cities**

| Rank | City | Population (1900)[92] | Date of Law | Gun Prohibition in Parks |
|---|---|---|---|---|
| 1 | N.Y. | 3,437,202 | 1861 | X |
| 2 | Chicago | 1,698,575 | 1881 | X |
| 3 | Phila. | 1,293,697 | 1869 | X |
| 4 | St. Louis | 575,238 | 1883 | X |
| 5 | Boston | 560,892 | 1886 | X |

Nor were such bans limited to the nation's largest municipalities.[93] For example, during this period, San Francisco enacted an ordinance prohibiting guns in its

---

[92] 1 U.S. CENSUS OFF., CENSUS REPORTS 1xix tbl. XXII (1901).

[93] A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887, at 513 (1887); The Revised Municipal Code of Ohio 196 (1899); Report of the Board of Park Commissioners of the City of Rochester, N.Y., 1888 to 1898, at 98 (1898); The Municipal Code of the City of Spokane, Washington: Comprising the Ordinances of the City ... Revised to October 22, 1896, at 316 (1896); Annual Report of the Park Commissioners of the City of Lynn for the Year Ending December 20, 1892, at 45 (1893); Charter and Ordinances of the City of New Haven: Together with Legislative Acts Affecting

parks, as did the cities of Boulder and St. Paul.[94] Statutes prohibiting possession of arms in these important public spaces were enacted in major urban areas of every region of the nation. As Table Two vividly illustrates, limits on arms in public parks were the norm in America in the era of the Fourteenth Amendment.

58.    There was a close connection between the urban park movement and the rise of state parks. The primary architect behind New York's Central Park, Frederick Olmsted, also took a leading role in the creation of California's Yosemite State Park in the 1860s. Although Congress ceded the land to the state, the expense and difficulty of managing it led to the state returning control of the park to the federal government several decades later.[95] The federal government's decision to create Yellowstone in 1872 added yet another type of park to America's roster of public spaces.

---

Said City 293 (1898); A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh 496 (1897); The Revised Ordinances of the City of Danville (1883); Law and Ordinances governing the Village of Hyde Park (1875); The Municipal Code of Chicago 391 (1881).

[94] San Francisco Municipal Reports 499 (1874); Ordinances of the City of Boulder 157 (1899); Proceedings of the Common Council of the City of Saint Paul 133 (1892).

[95] NEY C. LANDRUM, THE STATE MOVEMENT IN AMERICA: A CRITICAL REVIEW (2013). On the creation of Yellowstone, *see* https://www.loc.gov/collections/national-parks-maps/articles-and-essays/yellowstone-the-first-national-park/

3-ER-0486

59.     The federal government also passed laws limiting firearms in its

parks. Such regulations are especially important because federal lands were

indisputably governed by the Second Amendment, irrespective of the incorporation

doctrine.[96] The Secretary of the Interior underscored the danger posed by firearms

in parks when he wrote this about Yellowstone: "Absolute prohibition of firearms

in the park is recommended."[97] Accordingly, the federal government prohibited

guns in the park.[98]

60.     The federal government also prohibited firearms in numerous other

national parks in the early twentieth century, prior to the adoption of nationwide

federal regulations in June 1936.[99] For example, in Hawaiʻi National Park—which

at the time operated as a single park encompassing Haleakalā on Maui as well as

Mauna Loa and Kīlauea on the Big Island—the federal government made clear that

---

[96] REPORT OF THE DEPARTMENT OF THE INTERIOR . . . [WITH ACCOMPANYING DOCUMENTS] 499 (1899); REPORT OF THE SECRETARY OF THE INTERIOR FOR THE FISCAL YEAR 125 (1900).

[97] THE ABRIDGMENT: CONTAINING MESSAGES OF THE PRESIDENT OF THE UNITED STATES TO THE TWO HOUSES OF CONGRESS WITH REPORTS OF DEPARTMENTS AND SELECTIONS FROM ACCOMPANYING PAPERS 618 (1893).

[98] ANNUAL REPORT OF THE SUPERINTENDENT OF THE YELLOWSTONE NATIONAL PARK TO THE SECRETARY OF THE INTERIOR .... UNITED STATES: U.S. GOVERNMENT PRINTING OFFICE 19 (1898).

[99] FIREARMS REGULATION IN THE NATIONAL PARKS, 1897-1936 (2008), http://npshistory.com/publications/ranger/np-firearms-regs-history.pdf.

"[f]irearms are prohibited in the park except on written permission of the superintendent."[100]

61.    The emergence of modern style parks in the middle of the nineteenth century was a response to profound changes in American society, particularly urbanization. These places of repose and recreation were designed to offer Americans places to escape the increasingly chaotic world they encountered in the expanding cities of the nineteenth century. From the outset, the regulations governing these spaces prohibited firearms. State parks were motivated by similar impulses. Indeed, Frederick Olmsted, one of the leading landscape architects of the period also took a prominent role in helping to create these important public spaces. When the federal government organized its first national parks, it also tightly regulated the carriage of arms in public lands. Given that arms have been tightly regulated, and in many instances prohibited in parks since their creation, Hawaiʻi's statute limiting guns in parks is well within the long history of firearms regulation in America.

---

[100] UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, RULES AND REGULATIONS: HAWAII NATIONAL PARK 14 (1927) http://npshistory.com/brochures/havo/1927.pdf ("Firearms are prohibited in the park except on written permission of the superintendent, who also has authority to waive inquiry as to the possession of firearms by visitors traveling through the park to places beyond.").  Hawaiʻi National Park was created in 1916. *See generally* National Park Service, Federal Laws Specific to Hawaiʻi Volcanoes National Park, https://www.nps.gov/havo/learn/management/mgmtdocs_fedlaws.htm.

3-ER-0488

**IV.  CONCLUSION**

62.     The Hawaiʻi law at issue in this case is analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

**3-ER-0489**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *See* 28 U.S.C. 1746.

Executed on July 13, 2023 at Redding, CT.

_____
Saul Cornell

**3-ER-0490**

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

### Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

1 | S a u l   C o r n e l l

EXHIBIT 1 (Cornell)

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 <u>Choice</u> Outstanding Academic Book
- 2000 Pulitzer Nomination History

| **Book Publications** |
|---|

<u>The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution</u>
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

<u>The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller</u>
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

<u>Visions of America: A History of the United States</u> [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

<u>"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control</u> (Oxford University Press, 2006) (paperback edition  2008)

<u>Whose Right to Bear Arms Did the Second Amendment Protect?</u> (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

<u>The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828</u>  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, <u>Retrieving the American Past:  Documents and Essays on American History</u>, (Pearson, 1994-2008)

### <u>Scholarly Articles, Book Chapters, and  Essays:</u>

"History and Tradition or Fantasy  and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"
 55  <u>University  of California, Davis Law Review</u>  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 <u>Yale Law & Policy Review Inter Alia</u> 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55* University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace," 80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story"</u> <u>American</u> <u>Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:  The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age</u> <u>of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

**Book Reviews:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>American Studies</u> <u>Journal of the Early Republic</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>American Quarterly</u>
- <u>American Journal of Legal History</u>
- <u>Law and History Review</u>

**Journal Manuscript Referee:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>Diplomatic History</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>Law and History Review</u>
- <u>Harvard Law Review</u>
- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

**3-ER-0496**

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

### Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up: The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You: Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History? Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification," paper presented at "Possible Pasts: Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism," Columbia Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?" Indiana University School of Law, Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers? Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights: a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years," Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke: Brothers in Liberty?" Liberty Fund Conference, Houston, TX (1991)

"Mere Parchment Barriers? Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

**3-ER-0501**

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, American Quarterly (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

### Federal Courts:

United States of America,  v. Graylan Steve Johnson, United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

United States v. Posey, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

United States v. Combs, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

United States v. Barber, United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

Range v. Att'y Gen. United States, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022) .

United States v. Medrano, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

United States v. Coleman, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

United States v. Goins, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

Reese v. Bureau of Alcohol Tobacco Firearms & Explosives, United States District Court, W.D. Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th  Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th  Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


### Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).


### Law Review Symposia Organized

**3-ER-0506**

### Second Amendment:

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev*. 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev*. 2545 (2022).

### New Originalism:

"The New Originalism" 82 *Fordham L. Rev*. 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev*. 915 (2015).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI

|  |  |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, | No. 1:23-cv-00265-LEK-WRP |
| Plaintiffs, | |
| v. | |
| ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi; MAUI COUNTY, | |
| Defendants. | |

### DECLARATION OF DR. BRENNAN GARDNER RIVAS

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I hold a Ph.D. in history from Texas Christian University, awarded in 2019.  My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; last year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*.

1

3.      I am currently completing a book manuscript, based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

4.   I have provided expert analysis and expert witness testimony in *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 17-1017-BEN-JLB (S.D. Cal.); *Angelo v. District of Columbia*, No. 1:22-cv-02256-RC (D. D.C.); *Christian v. Nigrelli*, No. 22-cv-00695 (JLS) (W.D. N.Y.); *Frey v. Nigrelli*, No. 21 Civ. 5334 (NSR) (S.D. N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-5403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-CV-7463 (RMB) (AMD) (D. N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Ore.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Chavez v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.) (f/k/a *Jones v. Bonta*); *Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC (E.D. Cal.); *Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.). I am currently working on potential expert witness reports and declarations that may be provided in other jurisdictions. I have been deposed and testified at trial in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.).

5.      A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

2

3-ER-0509

6.      I have been retained by the State of Hawaiʻi to render expert opinions in this case. I make this declaration on the basis of my training, professional expertise, and research. For my work in this case, I am being compensated at a rate of $200/hour for preparatory work and $325/hour for court work.

7.      For this engagement, I was asked to provide expert testimony about historical gun regulations that pertained to public carry laws, sensitive places, and nineteenth century gun regulations in Texas.

8.      I have compiled relevant sources to the best of my ability given the expedited nature of the briefing schedule on Plaintiffs' Motion for Temporary Restraining Order. If given more time, I could likely provide the Court with a more comprehensive understanding of relevant historical gun regulations.

9.      This declaration proceeds in four parts: an overview of the general history of public carry restrictions in the North American colonies and the United States; an explication of a sensitive places law enacted in Texas in 1870-1871 and description of the socio-political context that prompted its enactment; an explanation of how and why there is reason to believe that as-yet unidentified municipal ordinances on this subject existed in the United States; and a brief discussion of why more time is necessary to explore the history of urban gathering places with a view toward the legality and propriety of carrying weapons there.

**The History of Public Carry Laws in America**

10.     Americans of the late eighteenth and nineteenth centuries had laws that broadly prohibited the carrying of firearms and other deadly weapons in public. Early versions of these regulations, particularly those enacted in the eighteenth century by colonial and early American legislatures, tended to draw

3-ER-0510

heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.[1] The Statute of Northampton generally prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers nor in no Part elsewhere."[2] The public spaces specifically named and protected under the Statute were the very public areas that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, formed the very heart of community life.

11.     This tradition was absorbed into American law, where numerous colonies and states enacted similar measures that forbade someone to "go or ride" armed in public spaces. An early example provided that individuals shall neither "go nor ride armed by night nor by day, in fair or markets, or in other places, in

---

[1] Patrick J. Charles, "The Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60, no. 1 (2012), 7-40; Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55, no. 5 (June 2022), 2560-2566.

[2] 2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B); *see also* 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other… shall be judged Treason").

4

terror of the Country,[3] upon pain of being arrested and committed to prison."[4] Under this scheme, no one was permitted to carry arms into public areas without having a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety.[5]

---

[3] In *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2144-50 (2022), the Supreme Court suggested that the phrases "to the terror of the country" and "to the terror of the people" cabined these early statutes to prohibiting firearm carry only in a threatening manner. But the latest research, published after *Bruen*, shows that, according to common law, the act of carrying deadly weapons in public spaces was inherently terrifying and therefore a breach of the peace. *See* Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022, forthcoming), draft p.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ") [draft available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490].

[4] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (Ex. D). A non-exhaustive list of additional examples includes: 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace.") (Ex. E); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) (Ex. F) ("…nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure"); see also 1821 Me. Laws 285, ch. 76, § 1 (Ex. G) (simplified to a requirement that officials "cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State").

[5] The peace bond was one of many processes inspired by America's common law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73-74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham*

12.     In the nineteenth century, the language of American public carry regulations began to shift away from the inherited language of common law, and toward more explicit statutory prohibitions. These public carry laws generally prohibited the concealment of certain specified weapons in public spaces, and are therefore known as concealed-carry laws. The approach of prohibiting the carrying of concealed weapons spread rapidly, including in slaveholding states and those removed from the Atlantic coast.[6]

13.     The language of concealed carry laws might at first suggest that open carry of firearms was accepted and commonplace, but that was not the case. Individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities.[7] For example, in 1843, an appellate court in North Carolina stated, "No man amongst us carries [a firearm] about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn

---

*Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[6] Examples include: 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 (Ex. H) ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"); Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837 (Ex. I) ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twenty-five dollars…").

[7] Mark Anthony Frassetto, "The Myth of Open Carry," *U.C. Davis Law Review* 55 (June 2022).

6

or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."[8] And a Louisiana case from 1856 held that a partially visible weapon was a violation of the concealed carry law because it was "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[9]

14.    Public carry laws in force during the late eighteenth and nineteenth centuries, whether they employed language from English common law or took the shape of concealed-carry laws, applied to public spaces in American communities large and small.

## Firearm Prohibitions in Texas during the Reconstruction Era

15.    In 1870, the State of Texas enacted a law prohibiting individuals from carrying firearms in a broad range of sensitive places. [10] The statute provided:

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ballroom, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying

---

[8] *State v. Huntley*, 25 N.C. 418 (1843).

[9] *State v. Smith*, 11 La. Ann. 633 (1856).

[10] 1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J).

the same; provided, that nothing contained in this section shall apply to locations Subject to Indian depredations ; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

16.    The historical context surrounding the 1870 Texas law is crucial to understanding its purpose. Several social and cultural forces converged during Reconstruction to make that period especially tumultuous in Texas and the South more broadly. One critical part of lawmakers' responses to these new societal concerns was to prohibit arms in certain public spaces, especially those that featured large gatherings of people. Although not all states enacted legislation similar to the 1870 law, those other states were not confronted with the unique social concerns in Texas that resulted in passage of the 1870 law.

17.    In Texas, the defeat of the Confederate cause led to political instability, racial violence, and a profound distrust of government institutions. Confederate sympathies there still ran high because Texans had not been conquered or occupied by U.S. Army forces during the war.

18.    Meanwhile, revolvers were flooding American consumer markets. After Samuel Colt's patent on his revolver design expired in 1857, other manufacturers began producing similar models for the United States military during the Civil War. After the war, demobilization ended those contracts, and gunmakers turned to American consumers to buy their pistols. The net result was more and cheaper pistols throughout the country,[11] including in areas plagued by violence and social dislocation, such as postbellum Texas.

---

[11] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as $1.40. For example, *see* digitized Sears and Roebuck catalog (1898), pp. 365-367. Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (*see* p. 367).

19.     Another factor involved in Texas's experience with gun regulation involved demographic changes. Since the 1820s, Texas had consistently drawn immigrants from other parts of the United States, but that growth accelerated rapidly after statehood and the conclusion of the U.S.-Mexican War. In just the three years between 1847 and 1850, the population grew from an estimated 142,000 to 212,295 (a growth of nearly fifty percent). By the time of the 1860 census, the population reached 604,215.[12] Even during the Civil War, tens of thousands of people moved to Texas, and the pace of migration accelerated rapidly between 1870 and 1900 as the state's population of roughly 800,000 grew to more than 3,000,000.[13] Many (and possibly most) of these newly engrafted Texans intended to farm or ranch, meaning that they would live outside of the towns and market centers; but rail construction enabled industrial development and the formation of towns, which led to a period of urbanization in postbellum Texas.[14] The market towns of Texas—rail stops and county seats—created more opportunities for altercations that could result in violence and crime.

20.     Following the Civil War, Texans from all walks of life, from fire-eating secessionists to reluctant Confederates and dedicated unionists, all recognized that there was a gun problem in their state. The governor elected in 1866, who represented a coalition of Confederate sympathizers called Conservatives, specifically asked the legislature to do something about the

---

Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (*see* p. 365). For the 1898 Sears & Roebuck catalog online, *see* https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

[12] On population figures in Texas between 1847 and 1860, *see* Randolph B. Campbell, *Gone to Texas: A History of the Lone Star State* (New York: Oxford University Press, 2003), 205.

[13] On population figures in Texas between 1870 and 1900, *see* Campbell, *Gone to Texas*, 304.

[14] Texas went from having only 9 urban centers of 2,500 residents or more in 1870 to having 42 in 1900. *See* Campbell, *Gone to Texas*, 307.

problem. He said he did not believe "that it was intended by the Constitution to convey the idea that men and boys, vagabonds and vagrants, were to be licensed to have arms about their persons on all occasions."[15] He proposed a tax on all "pistols and weapons carried about the person," though disagreements about rates, terms, and other details prevented the proposal from being enacted.[16]

21.     During the late 1860s, the Conservatives fell from power in favor of a fledgling Republican party composed of Freedpeople and Unionists. They, too, agreed that there was a gun problem in Texas, and they determined to do something about it. Republican leaders at the convention agreed with the Conservatives about the need for gun regulation, but their experiences of persecution at the hands of secessionists, Confederates, Conservatives and others (all of whom ultimately coalesced into a resurgent Democratic party) made it a priority for them. Republicans in 1868 did much the same thing that we do now: they gathered as much information as possible about crime in order to understand the problem they faced and inform the route they might take to address it. They created a special Committee on Lawlessness and Violence that requested all counties to send information about crimes committed since 1865. Not all counties participated, but the committee's reports told a "frightful story of blood."[17] The committee ultimately uncovered 939 homicides between 1865 and the summer of 1868, a disproportionate number of which involved Freedpeople killed at the hands of whites.[18] Convention delegates also received the annual report from military

---

[15] *House Journal* (1866), 199-200.

[16] *Id.*

[17] *Journal of the Reconstruction Convention* (1868-1869), 194.

[18] *Journal of the Reconstruction Convention* (1868-1869), 193-203, 194. White and black Texans were murdered in about equal numbers, which is itself a dramatic overrepresentation of the state's African American population, which constituted about 30% of the state overall. To make

authorities, which told of the rise of the Ku Klux Klan, conspiracies to intimidate Black voters, and declared that "the civil law east of the Trinity river is almost a dead letter."[19] The information gathered by Republicans in 1868 and 1869 became the evidentiary foundation for a law-and-order platform that their candidates promoted in upcoming campaigns.[20]

22.    As a result of these factors, the legislative session that met in 1870 enacted a law for the state that prohibited all firearms and weapons in certain public spaces. A member of the state senate introduced the bill that ultimately became the 1870 sensitive spaces law, which made it a misdemeanor for anyone to "have about his person" deadly weapons at public gatherings. The prohibited weapons were "A bowie knife, dirk or butcher knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind." It is important to note that this bill included the terms "firearms" and "gun," which would have applied to rifles and shotguns as well as pistols. Even more exhaustive than the list of prohibited weapons was that of the social settings in which public carry would be illegal: "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place

---

matters worse, the overwhelming majority of freedman deaths were committed by whites (373 of 429), yet only ten white deaths came at the hands of freedmen.

[19] *See* Report and Declaration of Special Committee on the condition of the State concerning elections, in *Journal of the Reconstruction Convention* (1868-1869), 107-115.

[20] *Journal of the Reconstruction Convention* (1868-1869), 194.

where people may be assembled to muster or perform any other public duty, or any other public assembly . . . ."[21]

23.    The primary exemption created by the 1870 sensitive spaces law was a proviso for "any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."[22] This would have effectively limited the carrying of weapons to peace officers and active-duty soldiers or militiamen engaged in their duties. Armed soldiers or other officials frequently guarded polling stations in Texas during Reconstruction due to the high incidence of voter fraud. The drafters in 1870 likely also envisioned sheriffs, deputies, marshals, and constables who were loyal to the United States as well as the new State Police force and active-duty members of the militia.[23]

24.    Subsequent iterations of the 1870 law incorporated the same exception, though they deviated slightly from the original language and structure. A later reenactment of the same law embedded the exception within one of the several clauses that made up the list of weapon-free spaces. It prohibited the carrying of weapons in various public spaces "or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,)… ."[24] The context surrounding the exception clearly indicates that the drafters intended it to cover the carrying of arms to militia musters or by duly authorized persons performing a public duty; in other words,

---

[21] 1870 Tex. Gen Laws 63, Ch. 46, § 1 (Ex. J).

[22] *Id.*

[23] On the Texas State Police, an organization that existed during Republican rule in Texas, *see* John G. Johnson, "State Police," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/state-police, published by the Texas State Historical Association.

[24] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K).

the exception applied to peace officers as well as soldiers and militiamen in actual service. When state lawmakers issued a revised penal code in 1879, the exception was relocated to a subsequent article which read: "The preceding article shall not apply to peace officers or other persons authorized or permitted by law to carry arms at the places therein designated."[25] Even though the format and phrasing of the exception changed, its substance did not—the exception was for peace officers and active-duty militia. The exception would not have reached ordinary, civilian gunowners, as there was no general gun permitting scheme in Texas at the time.

25.    Realizing that the sensitive places statute was not enough to sufficiently curb the violence in their communities, the Texas legislature in 1871 enacted a more comprehensive deadly weapons prohibition that incorporated the sensitive places law passed one year earlier.[26] Section 1 of the 1871 law prohibited both concealed and open carry of deadly weapons in public altogether while Section 3 expanded the prohibition on carrying deadly weapons in sensitive places. Lawmakers added as sensitive places assemblies for "amusement," like "any circus, show, or public exhibition of any kind," as well as those assemblies "for educational or scientific purposes."[27] In 1879, the statute and its several sections were reformatted in the penal code as a chapter concerning the unlawful carrying of arms.[28] The sensitive places law and its exception became Articles 320 and 321.

26.    In 1872, a series of convictions for unlawfully carrying arms made their way to the state supreme court. The Defendant William Daniels had been

---

[25] Penal Code of the State of Texas, (1879), Title X, Offenses Against the Public Peace, Chapter 4, Unlawfully Carrying Arms, § 321 (Ex. L).

[26] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K).

[27] *Id.*

[28] Penal Code of the State of Texas, § 318-323 (Ex. L).

13

convicted under Section 3 of the 1871 deadly weapon law, which was the updated sensitive places provision. He had gone to a church service with the handle of a butcher knife visible in his waistband. Two other appellants, William English and G. W. Carter, had been convicted under Section 1, which prohibited carrying deadly weapons (open or concealed) upon one's person or in one's saddlebags. The three cases were consolidated into one case, called *English v. State*[29], which addressed certain questions about Texans' constitutional and fundamental rights to carry weapons. A distinguished attorney who later joined the state supreme court argued that the 1871 deadly weapon law violated the Second Amendment to the US Constitution, that it violated the Article I, Sec. 13 of the Texas Constitution of 1869[30], and that it deprived Texans of their customary right to self-defense.[31] The court profoundly disagreed with these claims.

27.    The Chief Justice stated emphatically that "No kind of travesty, however subtle or ingenious could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit."[32] The court went on to say that: "[W]e do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the state or federal constitution. We confess it appears to us little short of

---

[29] *English v. State*, 35 Tex. 473 (1872).

[30] "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."

[31] The opinion did not mention it, but Section 2 of the law provided that anyone convicted of publicly carrying a prohibited weapon could plead self-defense at trial; that exception did not technically apply to the sensitive places provision outlined in Section 3.

[32] *English*, 35 Tex. 473.

ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[33]

28.     The decision in *English* ultimately rested upon state police power to affirm the constitutionality of the deadly weapon law. The court held that whatever conduct offends against public morals or public decency comes within the range of legislative authority.[34] The goal of a weapon-free public sphere, then, justified the enactments required to achieve it. Furthermore, the justices did not believe that the Texas law deviated from the national norm. "It is not our purpose to make an argument in justification of the law. The history of our whole country but too well justifies the enactment of such laws. This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration."[35] A subsequent court, this one staffed with Democrats rather than Republicans, reaffirmed the constitutionality of the deadly weapon law in a case decided in 1875.[36]

29.     In the late 1870s and throughout the 1880s, Texas appellate judges consistently applied the sensitive places law without questioning its

---

[33] *Id* at 478-79.

[34] *Id.* at 473.

[35] *Id.* at 479.

[36] *State v. Duke*, 42 Tex. 455 (1875).

15

constitutionality. In 1878 they decided that a Justice of the Peace court qualified as a "public assembly" when it was in session hearing a cause.[37] The same year, the court determined that a man deputized to carry out a specific arrest did not qualify as a peace officer exempt from the weapon ban at polling places.[38] In 1889, a teacher feared that local residents would interfere with an entertainment event taking place at his school, so he took a pistol with him (and ended up brandishing it). Texas appellate judges forcefully condemned the idea that teachers were authorized to carry weapons in schoolhouses, saying that "such an effect could not be other than pernicious, and should not be tolerated."[39]

30.    Texas judges also evaluated the sensitive-places cases that involved claims of self-defense and the carrying of weapons to assemblies on private property. Their handling of these questions shows that nineteenth-century Texas courts prioritized the safety of the general public over the specific concerns or preferences of individual weapon-carriers. In two separate cases (one in 1877 and another in 1878), Texas appellate judges determined that the exception to the deadly weapon law for self-defense applied exclusively to Section 1 of the 1871 statute relating to open and concealed carry, not to Section 3 relating to gatherings and assemblies.[40] A person fearing an imminent and deadly attack could carry a

---

[37] *Summerlin v. State*, 1878 3 Tex. Ct. App. 444 (1878).

[38] *Snell v. State*, 4 Tex. App. 171 (1878)

[39] *Alexander v. State*, 11 S.W. 628 (Tex. App. 1889). The passage is worth quoting in full: "We can not believe that it was the purpose and intent of the Legislature to permit school teachers to carry prohibited weapons upon their persons in their school rooms among their pupils, or on the occasion of public assemblies in such school rooms. The law does not in terms accord them such a privilege, and, without a clearly expressed exception in such case, this court will not sanction a defense, the effect of which would be to authorize every school teacher in the State to carry prohibited weapons upon his person in our school rooms. Such an effect could not be other than pernicious, and should not be tolerated."

[40] *Livingston v. State*, 3 Tex. Ct. App. 74 (1877); *Owens v. State*, 3 Tex. Ct. App. 404 (1878).

16

3-ER-0523

weapon in violation of Section 1 and argue self-defense at trial if or when he/she was arrested for such behavior; but a person carrying a weapon under such circumstances could not then venture into any of the gathering places enumerated in Section 3 because doing so posed too great a danger to the safety of the general public. The court stated, "Nor does it matter how much or with what good reason I may be in dread of an immediate and pressing attack upon my person from a deadly enemy; the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where his attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed."[41]

31.    In one of these cases, the defendant was tasked with being a "door-keeper and general manager, with authority to preserve peace and good order" at a ball, and toward that end, the owner of the establishment (a woman) had provided him a pistol to keep on his person throughout the evening. The court affirmed his conviction, saying that the exceptions for carrying weapons in one's home or place of business did not apply when other people were gathered there in assemblages that fell under Section 3. The court reasoned that: "The fact that I am owner of the premises gives me no right to carry deadly weapons to the terror, annoyance, and danger of a social gathering which I may have invited to my own house, however much I may be protected in carrying them when no one is there or likely to be endangered by them but my own family."[42]

32.    The majority opinion in *NYSRPA v. Bruen* treated the 1871 Texas statute as an outlier, but its discussion was limited to Section 1 of that law banning

---

[41] *Owens v. State*, 3 Tex. Ct. App. 404 (1878).

[42] *Id.*

17

open and concealed carry of arms in public altogether.[43] Section 3 of the 1871 law prohibiting carry in sensitive places was not unique. *English* recognized as much when it concluded, "This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas."[44] That conclusion was not wrong as many states around that time enacted similarly broad sensitive places prohibitions. For example, in 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[45] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[46] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to the sensitive places law from Texas.[47] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on

---

[43] 142 S. Ct. at 2153.

[44] *English*, 35 Tex. at 479.

[45] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," §2 (Ex. M). The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

[46] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20-50), imprisonment (10-20 days), or both.

[47] *Revised Statutes of the State of Missouri* (1879), ch.24, §1274 (Ex. O); 1890 Okla. Stat. 495-96 (Ex. P).

campuses or within two miles of them (effectively disarming college students within the limits of college towns).[48] Other laws prohibited the carrying of weapons at or near polling places, churches, and parks.[49]

## Additional Research into Municipal Ordinances

33.    In addition to state legislatures, other jurisdictions had authority to regulate the carry of firearms and other weapons in public spaces.[50] For instance, the statewide 1870 sensitive places law from Texas was quite similar to a municipal ordinance from that same year in the city of San Antonio, one of the leading metropolitan and commercial centers in Texas. That ordinance prohibited

---

[48] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," §1030 (Ex. Q). "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85, §2 (Ex. R). "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars."

[49] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (Ex. S) (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317-1318 (Ex. T) (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (Ex. U) (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 §1 (Ex. V) (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks) (Ex. X).

[50] *See Id.*, especially examples from City of Boulder and Counties of Kent and Calvert, Maryland.

3-ER-0526

the carrying of "a bowie-knife, dirk, or butcher-knife or any fire arms or arms, whether known as six-shooter, gun or pistol of any kind," or any "brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence" into a series of public spaces within the city. The list included: "any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering, for amusement or instruction, composed of males and females, or to any election precinct in the city, on the day or days of an election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any bar-room, drinking saloon or any other place where people resort for business or amusement or shall join or accompany any public procession . . . ."[51]

34.     It is likely that yet more municipal governments (in Texas and throughout the country) enacted sensitive places ordinances. These local laws are much more challenging to identify in the historical record, though, because compilations of historical ordinances have often not been preserved or digitized. The best access to municipal ordinances is often local newspapers, many of which have not been digitized, are no longer extant, or are incomplete. A thorough search of newspaper databases may yield more examples of municipal sensitive places laws, and yet more may be contained in the pages of old newspapers housed in archival collections or on microfilm. Identifying additional examples of these regulations would be a time-consuming process.

---

[51] "An Ordinance," *San Antonio Express* (San Antonio, Texas), December 23, 1870 (Ex. Y).

**Additional Time Needed for Further Research**

35.     As with any historical research project, my work in this area is still ongoing. In addition to the time-consuming process of identifying municipal sensitive places ordinances, yet more avenues are available to further research and contextualize the gun regulations enumerated in this declaration. More can be done to ascertain the immediate social and political context of sensitive places laws enacted in jurisdictions outside of Texas. There may be more analogous statutes that have not yet been captured by historians working on this topic. Moreover, local law enforcement in early American cities may have treated the carrying of weapons in public spaces as a disturbance of the peace rather than an unlawful act of arms-carrying.

36.     At the time of the Founding, there were relatively few large cities, and those were significantly smaller in geographic and demographic size in 1791 than they were in 1868. American towns and cities developed differently based upon the period in which they were established and the time frame in which their rapid growth occurred, and the relative number of gathering places outside of public spaces such as courthouses and open-air markets varied based upon the trajectory of that development. A deeper look at the urbanized areas of the United States at various points in time is needed to properly contextualize historical sensitive-place regulations, and to more thoroughly understand Americans' historical views about the propriety and legality of carrying weapons to gathering spaces, entertainment venues, and public assemblies.

**Conclusion**

37.     Many American jurisdictions had public carry laws that generally prohibited people from carrying deadly weapons within the confines of towns and

**3-ER-0528**

cities. Even though a sizeable number of these laws specifically prohibited *concealed* carry, the open carrying of pistols, bowie knives and other such weapons was not commonplace.

38.     American jurisdictions also enacted special ordinances and statutes designed to protect public gathering places beyond simply courthouses and polling places. Some protected schools and college campuses, others applied to entire commercial districts and city centers during electoral proceedings, and yet more provided for the disarming of *all* public gatherings. Taking regulatory action to protect people assembled for entertainment, recreation, education, and civic purposes from potential violence is not unusual or ahistorical.

39.     More time is needed to provide a comprehensive overview of this subject. There are likely as-yet unidentified analogous historical laws, particularly municipal ordinances. More research needs to be done surrounding the development of American towns and cities, the relative number and size of analogous sensitive places outside of government buildings, and the historical views of Americans regarding the propriety and legality of carrying weapons in those analogous spaces at earlier points in time.

3-ER-0529

I certify that pursuant to 28 U.S.C. § 1746 and under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

*Brennan Gardner Rivas*
Brennan Gardner Rivas
July 12, 2023

3-ER-0530

# Brennan Gardner Rivas
### Curriculum Vitae · June 2023

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
    University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
    2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
    the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
    1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
    on the Place of Guns in American Law and Society* (New York: Oxford University Press,
    forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
    (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
    Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
    Journal of the Early Republic*, forthcoming, 2023.
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
    Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
    Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
    *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

1

EXHIBIT A (Rivas)

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures
"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)
"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"
"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers
"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records
"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Firearm Issues Research Grant, 2023-2024
~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues
Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history
Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books
The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students
Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

2

3-ER-0532

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long
Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the
Great Plains and trans-Mississippi West
Status: Research and writing in progress

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                    2019-2020
   "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
   "American History since 1877: The Quest for Equality" (HIST 10613)
   "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                              2017-2018
   American History to 1877 (HIST 10603)
   American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West,
Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-
Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy
and Protection, Georgetown Law, Washington, D. C., June 2023
"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-
Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia,
Pennsylvania, January 2023
"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*,"
Current Perspectives on the History of Guns and Society Symposium, Wesleyan University,
Middletown, Connecticut, October 2022
"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations,"
Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina,
November 2021
"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at
the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis,
California, October 2021
"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021
"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical
Association Annual Meeting, Corpus Christi, Texas, February 2019
"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños
Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018
"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern
Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

3

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service
Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development
Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
~ Provide honest and confidential information to prospective graduate students
Graduate Student Mentor, 2015
~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert
*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.
*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.
*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.
*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.
*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.
*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.
*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.
*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.
*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.
*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.
*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.
*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.
*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)
*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.
*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.
*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.
*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

## Professional Memberships
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

## Languages
Spanish (Proficient)

4

**3-ER-0534**

Latin (Proficient)

5

**3-ER-0535**

258     2° Edw. III. *Stat. Northampt.* c. 2—5.     A.D. 1328.

*2 Ed. I. c. 3.*

Grandfather to our Lord the King that now is, wherein is contained, that Justices assigned to take Assises, if they be Laymen, shall make Deliverance; and if the one be a Clerk, and the other a Layman, that the Lay Judge, with another of the Country associate to him, shall deliver the Gaols: Wherefore it is enacted, That such [Justices'] shall not be made against the Form of the said Statute; and that the Assises, Attaints, and Certifications be taken before the Justices commonly assigned, which should be good Men and lawful, having Knowledge of the Law, and none other, after the Form of another Statute made in the Time of the said [King Edward the First;'] and that the Oyers and Terminers shall not be granted but before Justices of the one Bench or the other, or the Justices Errants, and that for great [hurt,] or horrible Trespasses, and of the King's special Grace, after the Form of the Statute thereof ordained in Time of the said Grandfather, and none otherwise.

**Justices of Assise and Gaol-delivery.**

**Oyers and Terminers.**

**III. Riding or going armed in Affray of the Peace.**

ITEM, It is enacted, That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also [upon a Cry made for Arms to keep the Peace, and the same in such places where such Acts happen,'] be so hardy to come before the King's Justice, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs, and other Ministers (') in their Bailiwicks, Lords of Franchises, and their Bailiffs in the same, and Mayors and Bailiffs of Cities and Boroughs, within the same Cities and Boroughs, and Borough-Holders, Constables, and Wardens of the Peace within their Wards, shall have Power to execute this Act. And that the Justices assigned, at their coming down into the Country, shall have Power to enquire how such Officers and Lords have exercised their Offices in this Case, and to punish them whom they find that have not done that which pertained to their Office.

**IV. The Statute of Lincoln, 9 Edw. II. concerning Sheriffs, &c. confirmed.**

ITEM, Because the Peace cannot be well kept without good Ministers, as Sheriffs, Bailiffs, and Hundreders, which ought to do Execution as well of the King's Privities as of other Things touching our Lord the King and his People; It is ordained and established, That the Statute made in the time of King Edward, Father to the King that now is, at Lincoln, containing that Sheriffs, Hundreders, and Bailiffs shall be of such People as have Lands in the same Shires or Bailiwicks, shall be observed in all Points after the Form thereof; and that Sheriffs and Bailiffs of Fee shall cause their Counties and Bailiwicks to be kept by such as have Lands therein.

**V. The Statute of Westminster the Second, 13 Edw. I. chapter 39. concerning the Delivery of Writs to the Sheriff, confirmed.**

ITEM, Where it was ordained by the Statute of Westminster the Second, that they which will deliver their Writs to the Sheriff, shall deliver them in the full County, or in the Rere County, and that the Sheriff or under Sheriff shall thereupon make a Bill; It is accorded and established, that at what Time or Place in the County a Man doth deliver any Writ to the Sheriff or to the Under-Sheriff, that they shall receive the same Writs, and make a Bill, after the form contained in the same Statute, without taking any Thing therefore ; and if they refuse to make a Bill, others that be present shall set to their Seals; and if the Sheriff or Under-Sheriff do not return the said Writs, they shall be punished after the form contained in the same Statute ; and also the Justices of Assises shall have power to enquire thereof at every Man's Complaint, and to award Damages, as having respect to the Delay, and to the loss and peril that might happen.

*' Commissions*      *' Grandfather*
*' upon a Proclamation of Deeds of Arms in time of Peace, and that in Place where such Deeds are.'—See Lib. Rub. Scac. Westm. fo. 122 b. a Writ reciting a Grant of K. Richard I. to [all Tenentes] viri in Angl in vi. allegiari Inf Sar & Wiltef: Inf Warrewich & Kenelingworth: Inf Stanford & Warneford: Inf Brudele & Mirebl: Inf Bike & Tykehill. Ita qd pax fre fue no infringat, n' poterant Justiciarii miorabilr Nec de fe re-tit nos depend m6 rerl'.*     *' of the King*

ñře Seign' le Roi qore est, en quele est contenuz q̃ les Justices as assises p̃ndre assignez sils soient lais, facent les delivances ; et si lun soit clerc, & lautre lais, q̃ le dit lais, associe a lui un autre du pais, facent la delivance des gaols ; p qoi accorde est & establi, q̃ tiels Justiceries ne soient mes g̃ntees contre la forme du dit estatut, & q̃ les assises, atteintes, & certifications soient p̃ses devant les Justices cõmunement assignez, q̃ soient bones gents & loialx & conissantz de la lei, & nemie autres ; solonc la forme dun autre statut fait en temps meisme le ael ; et q̃ les oiers & t̃miners ne soient grantees forsq̃ -.-- devant les Justices de lun Baunk & de lautre, ou les Justices errantz ; & ce p' led & orrible trespas, & de lespeciale g̃ce le Roi, solonc forme de estatut de ce ordene en temps meisme le ael; & nemie autrement.

Ensement accorde est & establi, q̃ nul, g̃nt ne petit de quele condicion qil soit, sauve les s̃vantz le Roi en la p̃sence le Roi, & les Ministres le Roi, en fesantz execucion des mandementz le Roi, ou de lour office, & ceux qi sont en lour compaignies, eidantz as ditz ministres, & auxint au cri de fait darmes fe pees, & ce en lieux ou tiels faitz se ferront, soit si hardi de venir devant les Justices le Roi, ou autres Ministres le Roi enfesant lour office, a force & armes; ne force mesner en affrai de la pees, ne de chivaucher ne daler arme, ne de nuit ne de jour, en faires, marchees, nen p̃sence des Justices, ne dautres Ministres, ne nule part aillours, sur peine de p̃dre lour armures au Roi & de lour corps a la prisone a la volunte le Roi. Et q̃ Justices le Roi en lour p̃sences, viscountes & autres Ministres le Roi en lour baillies, seign's des fraunchises & lour bailliffs en yceles, & Meirs & Bailliffs des Citees & Burghs deinz meismes les Citees & Burghs, Burghaldres, conestables, & gardeins de la pees deinz lour gardes, eient poair affaire execucion de cest acord. Et q̃ les Justices assignees, a lour venu en pais, eient poair denquere coment tiels Ministres & seign's ont use lour office en ce, & de punir ceux qils trovont, qi nount mie fait ce q̃ a lour office appent.

Et p̃ce q̃ la pees ne poet mie estre bien garde saunz bons ministres, come Viscountes, Bailliffs, & Hundreders qi deivent faire execucion, auxbien des p̃vetez le Roi come dautres choses tochantes le Roi & son poeple, acorde est & establi q̃ lestatut fait en temps le Roi Edward, piere le Roi qore est, a Nicole, contenant q̃ Viscontes, Hundreders & Bailliffs soient des gentz entre tres en meismes les Countez, ou baillies, soit garde en touz pointz solonc la forme dycel, & auxint q̃ les Viscountes & Bailliffs de fee, facent garder meismes lour Countez & Baillies p gentz eantz t̃res en yceles.

Ensement la ou ordine est, p statut de Westmont̃ le second, q̃ ceux q̃ livet volent lour briefs as viscountes, les livent en plein Counte, ou en rerecounte, & q̃ the conte ou southviscounte facent sur ce bille; acorde est & establi q̃ a quele heure ou a quel lieu deinz le Counte home livre a viscountes, ou a southviscounte, brief, qils resceivent & facent bille en la forme contenue en le dit estatut, & ce sanz rien p̃ndre ; et sils refusent de faire bille, mettent autres lour seal sils refusent de faire bille, mettent autres lour seal qi s̃ront p̃sentz ; et si le Viscounte ou le Southviscounte ne retorne mie les briefs, soient puniz solonc la forme contenue en le dit estatut; & jadumeins eient les Justices as assises p̃ndre assignee poair denquer de ce a chescuny pleinte & de agarder damages, eant regard au delai, & a les p̃tes & pils qi p̃ront avenir.

Generated on 2023-02-09 20:35 GMT / https://hdl.handle.net/2027/pst.000017915496
http://www.hathitrust.org/access_use#pd-google
Public Domain, Google-digitized

Digitized by Google     Original from PENN STATE

**EXHIBIT B (Rivas)**

**3-ER-0536**

THE

# STATUTES

OF

# THE REALM.

PRINTED BY COMMAND

OF HIS MAJESTY

# KING GEORGE THE THIRD.

IN PURSUANCE OF AN ADDRESS OF

## THE HOUSE OF COMMONS

## OF GREAT BRITAIN.

From Original Records and Authentic Manuscripts.

VOLUME ONE

EXHIBIT C (Rivas)

*A.D.*1351-2.            25° Edw. III. *Stat.* 5. c. 1, 2.            319

In Margine Rotuli.

Statutū apud Westm̄ in p̄liamento in festo S̄c̄i Hillarīi anno regni
Regis E. f̄c̄ii vicesimo q̄into tento, f̄c̄m.

### A STATUTE made at WESTMINSTER;
In the Parliament holden in the Feast of Saint Hilary;
In the TWENTY-FIFTH Year of the Reign of K. EDWARD the THIRD.

*Ex magno Rot. Stat. in Turr. Lond.* m. 16.

STATUTE THE FIFTH.

AU plement somonz a Westm̄, en la feste de Seint
Hiller lan du regne nr̄e Seign' le Roi Edward
Denglet̄re vintisme quint, & de France douzisme,
nr̄e ê' le Roi del assent des Prelatz, Ducs, Countes,
Barons, & de tout la comunalte de son Roialme
Denglet̄re, au dit plement somonz, al hon' de Dieu
& de Seinte Eglise, & en amendement de son dit Roi-
alme, ad ordeine & establi les choses soutzescriptes.

En p̄mes, p̄ce q̄ treḡ'untz & tresour'goouees da-
mages & grevances sont faites au poeple p̄ les pn̄o's
& p̄veo's des vitailles p̄ les hosteux nr̄e ê' le Roi, &
ma dame la Roigne, & de lo' enfantz, &c est accorde
& assentuz en le dit plement, q̄ les pn̄o's & p̄veio's
des bledz p' les ditz hosteux les p̄ignent p̄ mesure
rase, selonc ceo q̄ hõme use pmy le Roialme. Et q̄
touz bledz, feyns, litere & bestaill, & touz aut̄s vi-
tailles & choses queçlqes, queles sont aprendre p̄ meis-
mes les hosteux, soient p̄'ses a la veroie value, p̄ les
Constables & aut̄s bons gentz des villes ou tieles
prises se feront, sans ce q̄ p̄ manaces, ou duresces
soient les preisours chaces a mettre autre pris q̄ lour
plement ne voet, & come court c̄oement en les p̄chenis
marchees : et q̄ entre les Purveours et ceux des queux
les biens p̄ront prises, en la p̄sence des Constables &
preisours, soient tailles tantost faites, saunz ceo q̄ les
gentz des queux les biens p̄ront prises soient aillours
traitz ou c̄vaillee ; & meismes les tailles ensealee des
seals les p̄ours des choses issint prises, p̄ les queles
tailles gre soit fait as ceux des queux les choses p̄ront
issint prises : et si nul pnour ou P̄veour p' les ditz
hosteux face p̄ autre mañe, soit meintenant arestu p̄
la villee ou la prise ēra faite, et mesne a la p̄chenine
gaole, et si de ceo soit atteint, soit la fait de lui come
de laron, si la quantite des biens le demand ; selonc
ceo q̄n un estatut fait en temps mesme nr̄e ê' le Roi
lan de son regne quint, & en un autre estatut fait
en temps laiel nr̄e Seign' le Roi s' tieles prises, est con-
tenuz plus au plein: et q̄ desore soit contenua es
c̄missions des tieux P̄veours et pnours, lement et la
peine contenuz es cest estatut : et q̄ mesle c̄mission soit
faite s̄enḡ, soulement sous les ḡnt ou prive sealx le
Roi ; ne q̄ nul hõme soit tenuz de obeier a autre c̄mis-
sion nen autre mañe q̄ n'est dit en avant; et q̄ meisme
lestatut tiegne lieu en tout̄z pointz dev̄a chescun
pnour & p̄veour, de chescune mañe des vitailles et
chescune p̄ce du Roialme de quele condition q̄l soit.

Auxint p̄ceo q̄ div̄ses opinions ount este einz ces
heures qeu cas, q̄nt il avient doit estre dit treson, &
en quel cas noun, le Roi a la requeste des Seign's & de
la Cōe, ad fait declarissement q̄ ensuit, Cest assavoir;

AT the Parliament summoned at Westminster in the
Feast of St. Hilary, the Year of the Reign of our
Lord King Edward the Third [after the Conquest,]
of England the Five and twentieth, and of France the
Twelfth ; our said Lord the King, by the assent of the
Prelates, Earls, Barons, and of all the Commonalty of
his Realm of England summoned to the Parliament, to
the honour of God and Holy Church, and in Amend-
ment of his said Realm, hath ordained and established
the Things underwritten.

FIRST, Forasmuch as great and outrageous damage
and grievance hath been done to the People by the
Takers and Purveyors of Victuals, for the Houses of
our Sovereign Lord the King, the Queen, and their
Children ; It is accorded and assented in the said Parlia-
ment, That the Takers (*) of Corn for the said Houses
shall take the same by Measure striked according as it
is used through the Land. And that such Corn, Hay,
Litter, Beastail and all other Victuals and Things, which
shall be taken for the said Houses, shall be [taken °]
by the very Value, by the Constable and other good
People of the Towns where such Taking shall be made,
without that that the Praisers by Menace or Duresse
shall be driven to set any other Price than their Oath
will, and as commonly runneth in the next Markets.
And that betwixt the Purveyors and them whose Goods
shall be taken in the presence of the Constables and
Praisers, Tallies be made incontinently, without that that
the People whose Goods shall be taken, shall be drawn
or travelled elsewhere, and the same Tallies sealed with
the Seals of the Takers of the Things so taken, by
which Tallies Gree shall be made to them whose Goods
shall be so taken ; and if any Purveyor or Taker for
the said Houses, do in any other Manner, he shall be
[maintenant °] arrested by the Town where the Taking
shall be made, and brought to the next Gaol ; and if
he be thereof attainted, it shall be done of him as of a
Thief, if the Quantity of the Goods the same require ;
according as in a Statute made in the Time of our So-
vereign Lord the King that now is, the Fifth Year of his
Reign, and in another Statute made in the Time of the
King's Grandfather upon such Takings, is contained
more at the full : and that from henceforth in the
Commissions of such Takers and Purveyors, the Intent
and Pain limited in this Statute shall be contained :
and that no Commission be made, but only under the
King's great Seal or Privy Seal ; nor that no Man be
bound to obey [any such Commissions, other or in what
Manner *] than is aforesaid ; and that the same Statute
take place in all Points against every Taker and Pur-
veyor of every Manner of Victual in every part of the
Realm, of what Condition soever he be.

ITEM, Whereas divers Opinions have been before
this Time [in what Case Treason shall be said, and in
what not ; '] the King, at the Request of the Lords and
of the Commons, hath made a Declaration in the Man-
ner as hereafter followeth, that is to say ; When a Man

I
Corn shall
be taken by
Purveyors
by Measure
striked.

Things taken
by Purveyors
shall be
appraised
at the very
Value.

Tallies of
the Goods
taken.

Punishment
for undue
Purveyance
as under Stat.
5 E. III. c. 2.

Purveyors'
Commissions
shall be under
the Great or
Privy Seal.

II.
Declaration
what Offences
shall be
adjudged
Treason.

* and Purveyors
° prayed
' any other Commissions, or in other manner MS. Tr. 2.
' immediately
' what case should be adjudged Treason, and what not 4

Case: 23-16164, 10/05/2023, ID: 12805489, DktEntry: 7-4, Page 159 of 298

Case 1:23-cv-00265-LEK-WRP   Document 55-7   Filed 07/14/23   Page 3 of 3   PageID.653

*(marginal notes, left column):*

Compassing the Death of the King, Queen, or their eldest Son; violating the Queen, or the King's eldest Daughter unmarried, or his eldest Son's Wife; levying War; adhering to the King's Enemies; counterfeiting the King's Seals, or importing counterfeit Money; killing the Chancellor, Treasurer, or Judges in Execution of their Duty. The King shall have the Forfeiture of all the Offenders' Lands. Petit Treason. Forfeiture of the Lands to the Lords. New Questions of Treasons shall be decided in Parliament.

doth compass or imagine the Death of our Lord the King, or of our Lady his [Queen] or of their eldest Son and Heir; or if a Man do violate the King's [Companion,] or the King's eldest Daughter unmarried, or the Wife of the King's eldest Son and Heir; or if a Man do levy War against our Lord the King in his Realm, or be adherent to the King's Enemies in his Realm, giving to them Aid and Comfort in the Realm, or elsewhere, and thereof be [probably] attainted of open Deed by [the People] of their Condition: And if a Man counterfeit the King's Great or Privy Seal, or his Money; and if a Man bring false Money into this Realm, counterfeit to the Money of England, as the Money called Lushburgh, or other, like to the said Money of England, knowing the Money to be false, to merchandise or make Payment in Deceit of our said Lord the King and of his People; and if a Man slea the Chancellor, Treasurer, or the King's Justices of the one Bench or the other, Justices in Eyre, or Justices of Assise, and all other Justices assigned to hear and determine, being in their Places, doing their Offices: And it is to be understood, that in the Cases above rehearsed, [that] ought to be judged Treason which extends to our Lord the King, and his Royal Majesty: And of such Treason the Forfeiture of the Escheats pertaineth to our Sovereign Lord, as well of the Lands and Tenements holden of other, as of himself: And moreover there is another manner of Treason, that is to say, when a Servant slayeth his Master, or a Wife her Husband, or when a Man secular or Religious slayeth his Prelate, to whom he oweth Faith and Obedience; and [of such Treason the Escheats ought to pertain] to every Lord of his own Fee: And because that many other like Cases of Treason may happen in Time to come, which a Man cannot think nor declare at this present Time; It is accorded, That if any other Case, supposed Treason, which is not above specified, doth happen before any Justices, the Justices shall tarry without any going to Judgement of the Treason, till the [Cause] be shewed [and declared before the King and his Parliament,] whether it ought to be judged Treason or [other] Felony. And if percase any Man of this Realm ride armed [covertly] or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance, it is not the Mind of the King nor his Council, that in such Case it shall be judged Treason, but shall be judged Felony or Trespass, according to the Laws of the Land of old Time used, and according as the Case requireth. And if in such Case, or other like, before this Time any Justices have judged Treason, and for this Cause the Lands and Tenements have comen into the King's hands as Forfeit, the chief Lords of the Fee shall have the Escheats of the Tenements holden of them, whether that the same Tenements be in the King's hands, or in others, by Gift or in other Manner; Saving always to our Lord the King the Year, and the Waste, and the Forfeitures of Chattels, which pertain to him in the Cases above named; and that [the Writs] of *Scire facias* be granted in such Case against the Land-tenants, without other Original, and without allowing [any Protection] in the said Suit; and that of the Lands which be in the King's hands, Writs be granted to the Sheriffs of the Counties where the Lands be, to deliver them out of the King's hands without Delay.

*(marginal notes):*

Certain Offences not Treason. In such Cases already happened, the Chief Lords shall have the Escheats. Saving the King's Year and Waste. *Scire facias* to Tenements, &c.

**III.** Challenge of an Indictor upon an Inquest.

ITEM, It is accorded, That no Indictor shall be put in Inquests upon Deliverance of the Indictees of Felonies or Trespass, if he be challenged for that same cause by him which is so indicted.

*(footnotes, left):*

¹ Wife
¹ proveably MS. Tr. 2.
² each Manner of Treason giveth Forfeitures of Escheats
³ of new, MS. Tr. 2.
⁴ before the King in his Parliament, and it be declared
⁵ else
⁶ Writs

¹ of
¹ People       ¹ it
⁴ Case

⁷ openly
¹¹ the Protection of our Lord the King

*(right column — Law French):*

q'nt hôme fait compasser ou ymaginer la mort n̄re Seign' le Roi, ma dame sa compaigne, ou de lour fitz primer & heir; ou si hôme violast la compaigne le Roi, ou leisnesce fill le Roi nient marie, ou la compaigne leisne fitz & heir du Roi; & si hôme leve de guerre contre n̄re dit Seign' le Roi en son Roialme, ou soit aherdant as enemys n̄re Seign' le Roi en le Roialme, donant a eux eid ou confort en son Roialme ou p aillours, & de ceo p̄vablement soit atteint de o̅v̅t faite p̄ gentz de lour condicion: et si hôme contre-face [les g'nt ou prive seals le Roi,] ou sa monoie, et si hôme apport faus monoie en ceste Roialme contrefaite a la monoie Dengletre, sicome la monoie appelle [Lueynburgh] ou autre semblable a la dite monoie Dengletre, sachant la monoie estre faus, p' marchander, ou paiement faire en deceit n̄re dit Seign' le Roi & son poeple; et si hôme tuast Chanceller, Tresorer, ou Justice n̄re Seign' le Roi del un Bauñk ou del autre, Justice en Eir & des assises & oiutre aut's Justices assignes a oier & t'miner esteantz en lours places en seantz lours offices: et fait a entendre q̄n les cases susnomes doit estre ajugge treson [q̄ s'estent²] a n̄re Seign' le Roi & a sa roial majeste; et de tiele maññ de treson la forfait'e des eschetes appertient a n̄re Seign' le Roi, si bien des t'res & tentz tenuz des aut's, come de lui meismes: et oveqs, ceo il y ad autre maññ de treson, c'est assavoir q'nt un s'vant tue son meistre, une fême q̄ tue son baron, q'nt hôme seculer ou de religion tue son Prelat, a qi il doit foi & obedience; & tiele maññ de treson donn forfait'e des eschetes a chescun Seign' de son fee propre; et p' ceo q̄ plusors aut's cases de semblable treson p'ront esche er en temps a venir, queux hôme ne p'ra penser ne declarer en p̄sent, assentu est q̄ si autre cas suppose treson q̄ nest especifie p amount aviegne de novel devant ascunes Justices, demoerge la Justice saunz aler au juggement de treson, tanq̄ p devant n̄re Seign' le Roi [en²] son plement soit le cas monstree & desclarre le quel ceo doit estre ajugge treson ou autre felonie. Et si p cas ascun hôme de cest Roialme chivach arme descovert ou secrement od gentz ar-mees contre ascun autre, p' lui tuer ou derober, ou p' lui p̄ndre & retenir tanq̄ face fyn ou raunceon p' sa deliverance avoir, nest pas lentent du Roi & de son conseil q̄ en tiel cas soit ajugge treson, einz soit ajugge felonie ou t'spas solonc la lei de la t're aun-cienement usee, & solonc ceo q̄ le cas demand: et si en tiel cas, ou autre semblable devant ces heures, ascune Justice eit ajugge treson, & p celle cause les t'res & tefa soient devenuz en la main n̄re Seign' le Roi come forfaits, cient les chiefs Seign's de fee lours eschetes des tefz de eux tenuz, le quel q̄ les tefa soient en la main n̄re Seign' le Roi, ou en la main des aut's, p doun ou en autre maññ; Saivant totefoitz a n̄re Seign' le Roi l'an & le wast, & aut's forfait'es des chateux q̄ a lui attienent en les cases susnomez; et q̄ briefs de *Scire fac̄* v̅s les t'res tenantz soient g'ntez en tieu cas, saunz autre originale & saunz al-lower la p̄tecion n̄re Seign' le Roi en la dite seute; et q̄ de les t'res q̄ sont en la main le Roi, soit g'nte brief as vicontes des Countees la ou les t'res s'ront de oster la main le Roi saunz outre delaie.

Auxint acorde est, q̄ nul enditour soit mys en en-quest s' la delivrance del endite de t'spas ou de felonie, si soit chalange p tiele cause p celui qest endite.

*(footnotes, right):*

¹ le grant seal le Roi, *Rot. Parl.* 25 *E.*3. *P. II. nu.* vii. (17.)
¹ Lusseburgh *Rot. Parl.*       ³ q̄ es estent *Rot. Parl.*
² &c *Rot. Parl.*

3-ER-0539

# A C T S

PASSED AT A

# General Assembly

OF THE

# COMMONWEALTH

# V I R G I N I A,

BEGUN and held at the PUBLIC BUILDINGS in the CITY
of RICHMOND, on *Monday* the fixteenth Day of *Octo-
ber*, in the Year of our LORD, One Thoufand Seven
Hundred and Eighty-fix.



R I C H M O N D,
PRINTED BY DIXON, HOLT, NICOLSON AND DAVIES.

EXHIBIT D (Rivas)

3-ER-0540

[ 35 ]

same offenders come not as afore is said, and the proclamation made and returned, they shall be convict and attainted of the riot, assembly, or rout aforesaid: And moreover the Justices of Peace in every county or corporation, where such riot, assembly, or rout of people shall be made, in case the same be made in their presence, or if none be present, then the Justices having notice thereof, together with the sheriff, under sheriff, or serjeant, of the same county or corporation, shall do execution of this act, every one upon pain of twenty pounds, to be paid to the Commonwealth, as often as they shall be found in default of the execution of the said act ; and on such default of the justices and sheriff, under sheriff, or serjeant, a commission shall go from the General Court at the instance of the party grieved, to enquire as well of the truth of the case, and of the original matter for the party complainant, as of the default or defaults of the said justices, sheriff, under sheriff, or serjeant, in this behalf supposed, to be directed to sufficient and indifferent persons at the nomination of the judges ; and the said commissioners presently shall return into the General Court the inquests and matters before them in this behalf taken and found : But no persons convicted of a riot, rout, and unlawful assembly, shall be imprisoned for such offence by a longer space of time than one year. Persons legally convicted of a riot, rout, or unlawful assembly, otherwise than in the manner directed by this act, shall be punished by imprisonment and amercement, at the discretion of a jury, under the like limitation.

## CHAP. XLIX.

### An ACT forbidding and punishing AFFRAYS.

BE it enacted by the General Assembly, That no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the courts of justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the justices of any court, or either of their Ministers of Justice, doing their office, with force and arms, on pain to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison by any justice on his own view, or proof by others, there to abide for so long a time as a jury, to be sworn for that purpose by the said Justice, shall direct, and in like manner to forfeit his armour to the Commonwealth ; but no person shall be imprisoned for such offence by a longer space of time than one month.

## CHAP. L.

### An ACT against CONSPIRATORS.

BE it declared and enacted by the General Assembly, That conspirators be they that do confederate and bind themselves by oath, covenant, or other alliance, that every of them shall aid and bear the other falsely and maliciously, to move or cause to be moved any enticement or information against another on the part of the Commonwealth, and those who are convicted thereof at the suit of the Commonwealth, shall be punished by imprisonment and amercement, at the discretion of a jury.

## CHAP. LI.

### An ACT against conveying or taking PRETENSED TITLES.

BE it enacted by the General Assembly, That no person shall convey or take, or bargain to convey or take, any pretensed title to any lands or tenements, unless the person conveying or bargaining to convey, or those under whom he claims shall have been in possession of the same, or of the reversion or remainder thereof one whole year next before ; and he who offendeth herein knowingly, shall forfeit the whole value of the lands or tenements ; the one moiety to the Commonwealth, and the other to him who will sue as well for himself as for the Commonwealth : But any person lawfully possessed of lands or tenements, or of the reversion or remainder thereof, may nevertheless take or bargain to take the pretensed title of any other person, so far and so far only as it may confirm his former estate.

## CHAP. LII.

### An ACT to punish BRIBERY and EXTORTION.

BE it enacted by the General Assembly, That no Treasurer, Keeper of any Public Seal, Councillor of State, Counsel for the Commonwealth, Judge, or Attorney at law, practising either in the General Court, High Court of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner, Escheator, nor any officer of the Commonwealth, shall, in time to come, take, in any form, any manner of gift, brokage, or reward for doing his office, other than is, or shall be allowed by some act of General Assembly, passed after the institution of the Commonwealth, that is to say, after the fifteenth day of May, in the year of our Lord, one thousand seven hundred and seventy six ; and he that doth, shall pay unto the party grieved, the treble value of that he hath received, shall be amerced and imprisoned at the discretion of a jury, and shall be discharged from his office forever; and he who will sue in the said matter, shall have suit as well for the Commonwealth as for himself, and the third part of the amercement.

CHAP.

# REVISED STATUTES

OF THE

## Commonwealth of Massachusetts.

# EXHIBIT E (Rivas)

THE

# REVISED STATUTES

OF THE

## Commonwealth of Massachusetts,

PASSED NOVEMBER 4, 1835;

TO WHICH ARE SUBJOINED,

AN ACT IN AMENDMENT THEREOF, AND AN ACT EXPRESSLY TO
REPEAL THE ACTS WHICH ARE CONSOLIDATED THEREIN,

BOTH PASSED IN FEBRUARY 1836;

AND TO WHICH ARE PREFIXED,

## THE CONSTITUTIONS

OF THE

### United States and of the Commonwealth of Massachusetts.

PRINTED AND PUBLISHED, BY VIRTUE OF A RESOLVE OF NOV. 3, 1835;

UNDER THE SUPERVISION AND DIRECTION OF

THERON METCALF AND HORACE MANN.



### Boston:
PUBLISHED BY DUTTON & WENTWORTH, STATE PRINTERS.
37 Congress Street.

1836.

750                    CHAP. 134.   SECT. 10—18.            [PART IV.

said, may, on giving the security required, appeal to the court of com-
mon pleas, next to be held in the same county, or, in the city of
Boston, to the municipal court.

On appeal,   SECT. 10.   The magistrate, from whose order an appeal is so
witnesses to   taken, shall require such witnesses, as he may think necessary to sup-
recognize.   port the complaint, to recognize for their appearance at the court to
which the appeal is made.

Proceedings on   SECT. 11.   The court, before which such appeal is prosecuted,
appeal.   may affirm the order of the justice, or discharge the appellant, or
may require the appellant to enter into a new recognizance, with suf-
ficient sureties, in such sum, and for such time, as the court shall think
proper, and may also make such order, in relation to the costs of
prosecution, as may be deemed just and reasonable.

Recognizance,   SECT. 12.   If any party appealing shall fail to prosecute his ap-
when to remain   peal, his recognizance shall remain in full force and effect, as to any
in force.   breach of the condition, without an affirmation of the judgment or or-
der of the magistrate, and shall also stand as a security for any costs,
which shall be ordered, by the court appealed to, to be paid by the
appellant.

Persons com-   SECT. 13.   Any person, committed for not finding sureties, or re-
mitted for not   fusing to recognize, as required by the court or magistrate, may be
recognizing,   discharged by any judge or justice of the peace, on giving such se-
how discharged.   curity as was required.

Recognizances   SECT. 14.   Every recognizance, taken pursuant to the foregoing
to be transmit-   provisions, shall be transmitted by the magistrate to the court of com-
ted to the court.   mon pleas for the county, or, in the city of Boston, to the municipal
court, on or before the first day of the next term, and shall be there
filed of record by the clerk.

— when to be   SECT. 15.   Every person who shall, in the presence of any mag-
required on   istrate mentioned in the first section of this chapter, or before any
view of the   court of record, make an affray, or threaten to kill or beat another, or
court or magis-   to commit any violence or outrage against his person or property, and
trate.   every person, who in the presence of such court or magistrate, shall
contend with hot and angry words, to the disturbance of the peace,
may be ordered, without process or any other proof, to recognize for
keeping the peace, or being of good behavior, for a term not exceed-
ing three months, and in case of refusal, may be committed, as before
directed.

Persons who go   SECT. 16.   If any person shall go armed with a dirk, dagger,
armed may be   sword, pistol, or other offensive and dangerous weapon, without rea-
required to find   sonable cause to fear an assault or other injury, or violence to his
sureties for the   person, or to his family or property, he may, on complaint of any
peace, &c.   person having reasonable cause to fear an injury, or breach of the
1794, 26, § 2.   peace, be required to find sureties for keeping the peace, for a term
not exceeding six months, with the right of appealing as before pro-
vided.

Court may re-   SECT. 17.   Whenever, upon a suit brought on any such recog-
mit part of pen-   nizance, the penalty thereof shall be adjudged forfeited, the court may
alty.   remit such portion of the penalty, on the petition of any defendant,
7 Mass. 397.   as the circumstances of the case shall render just and reasonable.
1810. 80.

Surety may   SECT. 18.   Any surety in a recognizance to keep the peace, or
surrender his   for good behavior, or both, shall have the same authority and right

Case 1:23-cv-00265-LEK-WRP   Document 55-10   Filed 07/14/23   Page 1 of 3   PageID.659

# A
# COLLECTION

## OF THE

# STATUTES

### OF THE PARLIAMENT OF

# ENGLAND

#### IN FORCE IN THE STATE OF

# NORTH-CAROLINA.



PUBLISHED ACCORDING TO A RESOLVE OF THE GENERAL ASSEMBLY.

By FRANCOIS-XAVIER MARTIN, Esq.

COUNSELLOR AT LAW.

*NEWBERN:*

FROM THE EDITOR'S PRESS.

1792.

EXHIBIT F (Rivas)

3-ER-0545

( 60 )

## C H A P.    VIII.

*Nothing shall be taken for Beaupleader.*

ITEM, Whereas some of the realm have grievously complained, that they be grieved by Sheriffs, naming themselves the King's approvers, which take money by extortion for Beaupleader, the King will, that the statute of Marlebridge shall be observed and kept in this point.

## C H A P.    XIV.

*None shall commit Maintenance.*

ITEM, Because the King desireth that common right be administered to all persons, as well poor as rich, he commandeth and defendeth, that none of his Counsellors, nor of his house, nor none other of his Ministers, nor no great man of the realm by himself, nor by other, by sending of letters, nor otherwise, nor none other in this land, great nor small, shall take upon them to maintain quarrels nor parties in the country, to the let and disturbance of the common law.

Statutes made at Northampton, tribus Septimanis Paschae, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

## C H A P.    I.

*A Confirmation of the Great Charter and the Charter of the Forest.*

[*Unnecessary to be inserted.*]

## C H A P.    III.

*No Man shall come before the Justices, or go or ride armed.*

ITEM, It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's

( 61 )

Ministers doing their office with force and arms, nor bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.    And that the King's Justices in their presence, Sheriffs and other ministers, in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables and wardens of the peace within their wards shall have power to execute this act. And that the Justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

## C H A P.   V.

*The Manner how Writs shall be delivered to the Sheriff to be executed.*

ITEM where it was ordained by the statute of Westminster the second, that they which will deliver their writs to the Sheriff shall deliver them in the full county, or in the rere county, and that the Sheriff or Under-Sheriff shall thereupon make a bill : it is accorded and established, that at what time or place in the county a man doth deliver any writ to the Sheriff or to the Under-Sheriff, that they shall receive the same writs, and make a bill after the form contained in the same statute, without taking any thing therefore.    And if they refuse to make a bill, others that be present shall set to their seals, and if the Sheriff or Under-Sheriff do not return the said writs, they shall be punished after the form contained in the said statute.    And also the Justices of Assize shall have power to enquire thereof at every man's complaint, and to award damages, as having respect to the delay, and to the loss and peril that might happen.

## C H A P.   VI.

*Justices shall have Power to punish Breakers of the Peace.*

ITEM, as to the keeping of the peace in time to come, it is ordained and enacted that the statutes made in time past, with the statute of Winchester, shall be observed and kept in every point : and where it is contained in the end of said statute of Winchester, that the Justices assigned shall have power to enquire of defaults, and to report to the King in his next parliament, and the King to remedy it, which no man hath yet seen, the same Justices shall have power to punish the offenders and disobeyers.

O

# LAWS

OF THE

# STATE OF MAINE;

TO WHICH ARE PREFIXED

THE

CONSTITUTION OF THE U. STATES

AND OF SAID STATE,

# WITH AN APPENDIX.

━━━◦❯─

HALLOWELL:
PUBLISHED BY CALVIN SPAULDING.
••••••••••••
1822.
GOODALE, GLAZIER & CO.—PRINTERS.

## EXHIBIT G (Rivas)

3-ER-0548

POWER OF JUSTICES.                                285

## CHAPTER LXXVI.

### An Act describing the power of Justices of the Peace in Civil and Criminal Cases.

SEC. 1. **B**E *it enacted by the Senate, and House of Representatives, in Legislature assembled,* That it shall be within the power, and be the duty of every Justice of the Peace within his county, to punish by fine not exceeding five dollars, all assaults and batteries that are not of a high and aggravated nature, and to examine into all homicides, murders, treasons, and felonies done and committed in his county, and commit to prison all persons guilty, or suspected to be guilty of manslaughter, murder, treason or other capital offence ; and to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State, or such others as may utter any menaces or threatening speeches ; and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties to appear and answer for his offence, at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county, at the discretion of the Justice, and as the nature or circumstances of the case may require ; and for his keeping the peace, and being of the good behaviour, until the sitting of the Court he is to appear before ; and to hold to bail all persons guilty or suspected to be guilty of lesser offences which are not cognizable by a Justice of the Peace ; and require sureties for the good behaviour of dangerous and disorderly persons ; and commit all such persons as shall refuse so to recognize, and find such surety or sureties as aforesaid ; and take cognizance of, or examine into all other crimes, matters and offences, which by particular laws are put within his jurisdiction.

*General jurisdiction of Justices of the Peace, and their duty in criminal cases, in arresting, trying, recognizing and committing offenders.*

SEC. 2. *Be it further enacted,* That all fines and forfeitures accruing for the breach of any bye-law, in any town within this State, may be prosecuted for, and recovered before any Justice of the Peace in the town or county where the offence shall be committed, by complaint or information, in the same way and manner other criminal offences are prosecuted before the Justices of the Peace within this State.

*Breaches of the bye-laws of towns may be prosecuted before Justices of the Peace.*

SEC. 3. *Be it further enacted,* That any person aggrieved at the sentence given against him, by any justice of the Peace, may appeal therefrom to the next Circuit Court of Common Pleas to be held within the same county, and shall, before his appeal is granted, recognize to the State in such reasonable sum, not less than twenty dollars, as the Justice shall order, with sufficient surety or sureties for his prosecuting his appeal ; and shall be held to produce the copy of the whole process, and all writings filed before the Justice, at the Court appeal-

*Persons aggrieved may appeal to the C. Court of Com. Pleas.*

*Must recognize with sureties,*

*and produce copies of case at C. C. Common Pleas.*

3-ER-0549

**286**                    POWER OF JUSTICES.

*Failing to prosecute his appeal, his default to be entered.*

ed to.   And if he shall not there prosecute his appeal, and produce the copies as aforesaid, the Court shall order his default to be noted upon their record.   And the said Court may order the same case to be laid before the Grand Jury, or may issue an attachment against the body of such appellant, and cause him thereby to be brought before them, and when he is so in Court, shall affirm the sentence of the Justice against him, with all additional costs.

*Court may order such case to be laid before Grand Jury, or arrest appellant, and affirm sentence, &c.*

SEC. 4.  *Be it further enacted*, That each Justice shall have authority to command the assistance of every Sheriff, Deputy Sheriff, Constable, and all other persons present at any affray, riot, assault or battery, and may fine any person refusing such assistance, in a sum not exceeding six dollars ; to be disposed of for the use of the town where the offence shall be committed ; and levied by warrant of distress on the offender's goods and chattels, and for want thereof on his body.

*Justices may command assistance of sheriff, deputies and constables at riots, affrays, &c.*

SEC. 5. *Be it further enacted*, That any Justice of the Peace for the preservation thereof, or upon view of the breach thereof, or upon view of any other transgression of law, proper to his cognizance, done or committed by any person or persons whatever, shall have authority, (in the absence of the Sheriff, Deputy Sheriff or Constable,) to require any person or persons to apprehend and bring before him such offender or offenders.   And every person so required, who shall refuse or neglect to obey the said Justice, shall be punished in the same manner as for refusing or neglecting to assist any Sheriff, Deputy Sheriff or Constable in the execution of his office as aforesaid.   And no person who shall refuse or neglect to obey such Justice, to whom he shall be known, or declare himself to be a Justice of the Peace, shall be admitted to plead excuse on any pretence of ignorance of his office.

*Justices may, on their own view, (in absence of sheriffs, deputies or constables,) require any person to apprehend offenders.*

*Penalty for refusing to obey such Justice.*

*If the Justice be known or declared—plea of ignorance of his office not admissible.*

SEC. 6. *Be it further enacted*, That Justices of the Peace within their respective counties, be, and they are hereby authorized and empowered to grant subpoenas for witnesses in all criminal causes pending before the Supreme Judicial Court and Circuit Court of Common Pleas, and before themselves or any other Justice : *Provided*, That no Justice of the Peace shall grant subpoenas for witnesses to appear in any Court, except before himself, to testify on behalf of the State, unless by the request of the Attorney General or County Attorney. And all Sheriffs, Constables and other officers are directed and empowered to serve any warrant issuing from a Justice of the Peace.

*Justices may grant subpoenas for witnesses in criminal cases :*

*But not on behalf of the State without consent of Attorney General, or County Attorney, except before himself.*

SEC. 7. *Be it further enacted*, That the Justices of the Peace shall account annually with the Treasurer of the State, the Treasurer of their respective counties, and the town Treasurer, as the case may be, for all fines by them received or imposed, upon pain of forfeiting the sum of thirty dollars, to be sued for and recovered by the Treasurer of the State, the county or town Treasurer for the time being, to which the said fines may respectively belong.

*Justices to account annually to State, County and Town Treasurers for all fines, &c.*

*Penalty for neglect.*

POWER OF JUSTICES.                                      287

SEC. 8.  *Be it further enacted,* That all civil actions, where-in the debt or damage does not exceed twenty dollars, (and wherein the title of real estate is not in question, and special-ly pleaded by the defendant,) shall, and may be heard, tried, adjudged and determined by any Justice of the Peace within his county ; and the Justices are severally empowered to grant summons, capias and attachment, at the request of any per-son applying for the same, directed to some proper officer within the same county, empowered by law to execute the same.  And such summons or capias and attachment shall be duly served by such officer, seven days at the least before the day therein set for trial, otherwise the party sued shall not be held to answer thereon ; and if after such process shall be duly served, the party sued, after being duly called, shall not appear to answer to the same suit, the charge against him in the declaration shall be taken to be true, and the Justice shall give judgment against him for such damages as he shall find the plaintiff to have sustained, with costs ; and if the person sued shall appear to defend the suit or oppose the same, the Justice shall award such damages as he shall find the plaintiff to have sustained : *Provided,* That no more damages than the sum of twenty dollars shall be awarded in any action origin-ally brought or tried before a Justice of the Peace ; but if the plaintiff shall not support his action, shall fail to prosecute, or become nonsuit, the Justice shall award to the party sued, his reasonable costs, taxed as the law directs.  And upon all judgments given by a Justice of the Peace in civil actions, he shall award execution thereon in form by law prescribed.

*Justice's juris-diction in civil actions, (where title to real es-tate is not in question,) to extend to 20 dollars.*

*Justices may is-sue summons, capias. attach-ment, &c.*

*—to be served seven days be-fore trial.*

*Proceedings be-fore Justice.*

*Judgment, &c. if plaintiff pre-vail.*

*Damages not to exceed 20 dol-lars.*

*Judgment in case defendant prevail.*

*Execution.*

SEC. 9.  *Be it further enacted,* That the amount of the sum or several sums, specified, expressed or supposed to be de-manded by the plaintiff in his declaration, shall not be con-sidered as any objection against the Justice's jurisdiction, pro-vided the ad damnum, or damage is not laid or stated to ex-ceed twenty dollars.

*Justice to have jurisdiction where the ad damnum does not exceed 20 dollars.*

SEC. 10.  *Be it further enacted,* That any party aggrieved at the judgment of any Justice of the Peace, in a civil action, where both parties have appeared and plead, may appeal therefrom to the next Circuit Court of Common Pleas to be held within the same county ; and shall before his appeal is allowed, recognize with a surety or sureties, in such reasona-ble sum as the Justice shall order, not exceeding thirty dol-lars, to pay all intervening damages and costs, and to prose-cute his appeal with effect ; and shall be held to produce a copy of the whole case, at the Court appealed to, and both parties shall be allowed to offer any evidence upon the trial at the Circuit Court of Common Pleas, in the same manner as if the cause had been originally commenced there.  And no other appeal shall be had on such action after one trial at the Circuit Court of Common Pleas.  And the Circuit Court of Common Pleas, when any person recognized as before men-

*Party aggriev-ed may appeal to C. C. Com-Pleas.*

*—Must recog-nize to prose-cute.*

*and produce co-pies at C. C. C.*

*Proceedings in that Court.*

*No further ap-peal.*

*Defendant in trespass failing to bring for-*

3-ER-0551

288                                    POWER OF JUSTICES.

*ward the action according to his remonstrance—Plaintiff to have his damages.* tioned to bring forward an action of trespass, doth neglect to do it, upon complaint thereof made in writing by the plaintiff, shall give judgment for such sum in damages, as the plaintiff hath declared for, together with all reasonable costs which accrued both in the same Court and before the Justice. And

*Appellant failing to prosecute, on complaint judgment may be affirmed.* the Circuit Court of Common Pleas shall, when any appellant thereto shall fail to prosecute his appeal, or if he shall neglect to produce a copy of the case, affirm the former judgment upon the appellee's complaint, and award such additional damages as shall have arisen in consequence of the said appeal, and cost.

*In action of trespass when defendant pleads title to real estate—mode of proceeding before Justice.* SEC. 11. *Be it further enacted,* That when an action of trespass shall be brought before any Justice of the Peace, and the defendant shall plead the general issue, he shall not be allowed to offer any evidence that may bring the title of real estate in question. And when the defendant in any such action shall plead the title of himself or any other person in justification, the Justice upon having such plea plead, shall order the defendant to recognize to the adverse party in a reasonable sum, with sufficient surety or sureties to enter the said action at the next Circuit Court of Common Pleas to be holden within the same county, and to prosecute the same in the same manner as upon an appeal from a Justice's judgment; and if such pleader shall refuse so to recognize, the Justice shall render judgment against him, in the same manner as if he had refused to make answer to the same suit. And either

*Appeal allowed in such cases from C. C. C. Pleas to S. J. Court.* party in such cause, shall be allowed to appeal from the judgment of the Circuit Court of Common Pleas, in the same manner as if the suit had been originally commenced there.

*General issue may be plead in all actions before Justices and special matter given in evidence except where title is relied on by defendant.* SEC. 12. *Be it further enacted,* That in all civil actions triable before a Justice of the Peace, except such actions of trespass wherein the defendant means to avail himself, by pleading the title of himself or any other person under whom he claims in justification of the trespass or trespasses alleged to be committed on real estate; the defendant shall be entitled to all evidence, under the general issue, which by law he might avail himself of under any special plea in excuse or justification, any law, usage or custom to the contrary notwithstanding.

*Justices may grant subpœnas in all civil actions.* SEC. 13. *Be it further enacted,* That each Justice of the Peace may grant subpœnas for witnesses in all civil actions and causes pending before the Supreme Judicial Court, Circuit Court of Common Pleas, Court of Sessions, and before him or any other Justices, and in all civil actions and causes

*May adjourn their Courts by proclamation.* pending before arbitrators or referees. And every Justice of the Peace shall have power by public proclamation to adjourn the trial of any action brought before him, from time to time, when equity may require it;

*No Justice to be of counsel in any suit before himself.* but he shall not be of counsel to either party, or undertake to advise or assist any party in suit before him.

3-ER-0552

POWER OF JUSTICES.                               289

SEC. 14.  *Be it further enacted*, That when an executor or administrator shall be guilty of committing waste, whereby he is rendered unable to pay the judgment recovered before any Justice of the Peace, against the goods and estate of the deceased in his hands, out of the same, the Justice may proceed against the proper goods and estate of such executor or administrator,  in the same manner as the  Circuit Court of Common Pleas are empowered to do.

*In case of waste by executor or administrator, Justice may proceed as C. C. C. Pleas may in such cases.*

SEC. 15.  *Be it further enacted*, That each Justice of the Peace shall keep a fair record of all his proceedings ; and when any Justice of the Peace shall die before a judgment given by him is paid and satisfied, it shall be in the power of any Justice of the Peace in the same county to grant a scire facias upon the same judgment, to the party against whom such judgment was rendered up, for him to show cause if any he hath, why execution should not be issued against him. And although the costs and debt awarded by the deceased Justice when added together, shall amount to more than twenty dollars, it shall be no bar upon such scire facias, but judgment shall be given thereon for the whole debt and cost, together with the cost arising upon the scire facias.  *Provided always*, That either party may appeal from the judgment as in other personal actions, where judgment is given by a Justice of the Peace.   And every Justice of the Peace who shall have complaint made to him, that a judgment given by a Justice of the same county then deceased, remains unsatisfied, shall issue his summons to the person in whose possession the record of the same judgment is, directing him to bring and to produce to him the same record ; and if such person shall contemptuously refuse to produce the same record, or shall refuse to be examined respecting the same, upon oath, the Justice may punish the contempt by imprisonment, until he shall produce the same, or until he submits to be examined as aforesaid ; and when the Justice is possessed of such record, he shall transcribe the same upon his own book of records, before he shall issue his scire facias ; and shall deliver the original back again to the person who shall have produced it, and a copy of such transcription, attested by the transcribing Justice, shall be allowed in evidence in all cases, where an authenticated copy of the orignal might be received.

*Justice to keep record of his proceedings.*

*When Justice shall die before a judgment given by him is satisfied what proceedings to be had.*

*Appeal allowed to either party.*

*Justice to whom complaint is made in such cases, may summon the person possessing the record to produce it.*

*Punishment for refusal so to do.*

*Duty of the Justice when the record is produced, to transcribe it into his own records. Copy of such transcript to be evidence.*

SEC. 16.  *Be it further enacted*, That all Justices of the Peace before whom actions may be commenced under former commissions, and such commissions shall expire before judgment shall be rendered thereon, or judgment being rendered, the same remains in whole or in part unsatisfied, such Justices of the Peace who shall hereafter have their said commissions seasonably renewed, and being duly qualified agreeably to the Constitution of this State, to act under such commissions, be and they hereby are authorized and empowered to render judgment, and issue execution on all such ac-

*Justices, whose commissions expire before judgment or satisfaction, may proceed, under a new commission, seasonably obtained, to render judgment, &c.*

37

290                    RECOVERY OF DEBTS.

tions, commenced as aforesaid, in the same manner as if the commissions under which such actions may be commenced, were in full force.

[Approved March 15, 1821.]

———— :00: ————

## CHAPTER LXXVII.

An Act providing a speedy Method of recovering Debts, and for preventing unnecessary costs attending the same.

**Justices may take recognizances for debts.** SEC. 1. BE *it enacted by the Senate and House of Representatives, in Legislature assembled,* That every Justice of the Peace in this State shall have power within his county to take recognizances for the payment of debts of any person who shall come before him for that purpose; which recognizance may be in substance as follows:—

**Form of recognizance.** Know all men, that I, A. B. of       , in the County of       , do owe unto C. D. of       , the sum of       , to be paid to the said C. D. on the       day of       ; and if I shall fail of the payment of the debt aforesaid, by the time aforesaid, I will and grant that the said debt shall be levied of my goods and chattels, lands and tenements, and in want thereof of my body. Dated at       , this       day of       , in the year of our Lord       . Witness, my hand and seal       A. B.

       ss. Acknowledged the day and year last abovesaid. Before E. F. Justice of the Peace.

**To be recorded by the Justice.** SEC. 2. *Be it further enacted,* That every Justice of the Peace taking any such recognizance, shall immediately record the same at large in a book to be kept by him for that purpose; and after the same is recorded, may deliver it to the Conusee; **Execution may issue thereon within 3 years.** and upon the Conusee's lodging the same with the said Justice, at any time within three years from the time when the same is payable, and requesting a writ of execution, it shall be the duty of such Justice to issue a writ of execution thereon for such sum as shall appear to be due on the same; which writ of execution shall be in substance as follows:

· State of Maine.

(SEAL.) To the Sheriff of the County of       , or his deputy, or either of the Constables of the town of       , in said County,                                    Greeting.

**Form of execution.** Because A. B. of       , in the County of       , on the       day of       , in the year of our Lord       before E. F. Esq. one of the Justices of the Peace for the said County of       , · acknowledged that he was indebted to C. D. of       , in the county of       in the sum of       which he ought to have paid on the       day of       , and       remains unpaid as it is said       : We command you therefore, that of the goods, chattels or real estate of the said A. B. within your precinct, you cause to be paid and satisfied unto the said C. D. at the value

# A C T S

PASSED

## *AT THE SECOND SESSION*

OF THE

FIRST LEGISLATURE

OF THE

## STATE OF LOUISIANA,

# EXHIBIT H (Rivas)

172

greeable to the assessment; and the said trustees shall at the end of the time for which they were elec-

**Render account**

ted, render an account of the same to the parish judge, and should any sums be unappropriated, the same shall be paid into the hands of the parish judge in trust for the succeeding trustees, and in case of de-

**Penalty for default.**

fault of the trustees whose term of time is thus expired, it shall be the duty of the parish judge to summon them to a settlement, enter judgment and issue execution for arrearages if necessary.

SECT. 3. *And be it further enacted,* That the trus-

**Clerk and collector.**

tees shall appoint one clerk and one collector, whose term of service shall expire at the same time with that of the trustees, which said officers shall be en-

**Fees.**

titled to such fees as the said trustees may deem proper to allow them.

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
APPROVED, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

## AN ACT

*Against carrying concealed weapons, and going armed in public places in an unnecessary manner.*

**Preamble**

Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner, therefore;

SECT. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened,* That from and after the passage of this act, any person who shall be found with any

**Penalty for carrying concealed weapons.**

concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine not to exceed fifty dol-

## 173

esclaves) et pour son usage, d'une piastre sur chaque mille piastres, suivant le tableau des taxes; et lesdits administrateurs, à l'expiration du terme pour lequel ils auront été élus, en rendront compte au juge de la paroisse, et, s'il restait en caisse des fonds disponibles, ils seront versés entre les mains du juge de paroisse qui les gardera jusqu'à la nomination d'autres administrateurs, et si lesdits administrateurs, à l'expiration du terme pour lequel ils auront été élus, négligeaient de rendre le compte susdit, il sera du devoir du juge de paroisse de les sommer de rendre leurs comptes et de les poursuivre en justice et de lancer contre eux des mandats d'exécution pour les sommes arriérées, s'il le juge nécessaire.

*Redition de compte.*

*Peines pour défaut.*

SECT. 3. *Et il est de plus decreté,* Que lesdits administrateurs nommeront un commis et un collecteur de taxe, dont le tems de service finira en même tems que celui des administrateurs et qui auront droit à la compensation que les administrateurs jugeront à propos de leur accorder.

*Commis et collecteur.*

*Compensation.*

STEPHEN A. HOPKINS,
*Orateur de la Chambre des Représentans,*
J. POYDRAS,
*Président du Senat.*

Approuvé le 25 Mars 1813.
WM C. C. CLAIBORNE,
*Gouverneur de l'Etat de la Louisiane.*

### ACTE
*Pour défendre de porter des armes cachées et de se présenter armé d'une manière inutile dans les endroits publics.*

Vu qu'il s'est commis dernièrement des assassinats et qu'il a été essayé d'en commettre d'autres de manière à causer de sérieuses allarmes aux habitans paisibles et bien disposés de cet etat, et vu qu'on doit en grande partie attribuer la cause de ces assassinats à la coûtume pernicieuse et condamnable de porter dans des endroits publics, des armes cachées et dangereuses, ou de s'y rendre armé d'une manière inutile,

*Preambule.*

SECT. 1ère. *Il est décrété par le sénat et la chambre des Représentans de l'Etat de la Louisiane réunis en Assemblée Générale,* Qu'à dater de la passation de cet acte, toute personne qui sera trouvée armée d'aucune arme cachée, tels que poignard, dague, couteau, pistolet ou toute autre arme meurtrière dans son habit ou ailleurs sur lui qui ne seront point ostensibles, toute personne coupable de cette contravention, sera, sur conviction du fait, devant un juge de paix, condamné à une amende qui n'excédera pas

*Peines encontreux qui portent des armes cachées.*

3-ER-0557

## 174

How dis- lars nor less than twenty dollars, one half to the use
tributed. of the state, and the balance to the informer; and
should any person be convicted of being guilty of a
For the second offence before any court of competent jurisdic-
second of- tion, shall pay a fine not less than one hundred dol-
fence. lars to be applied as aforesaid, and be imprisoned for
a time not exceeding six months.

SECT. 2. *And be it further enacted,* That should
Penalty any person stab or shoot, or in any way disable ano-
for stabbing ther by such concealed weapons, or should take the
&c. life of any person, shall on conviction before any com-
petent court suffer death, or such other punishment
as in the opinion of a jury shall be just.

SECT. 3. *And be it further enacted,* That when
any officer has good reason to believe that any person
Suspect- or persons have weapons concealed about them, for
ed persons the purpose of committing murder, or in any other
may be way armed in such a concealed manner, on proof
searched. thereof being made to any justice of the peace, by
the oath of one or more credible witnesses, it shall
be the duty of such judge and justice to issue a war-
rant against such offender and have him searched,
and should he be found with such weapons, to fine
Fine. him in any sum not exceeding fifty dollars nor less
Sureties than twenty dollars, and to bind over to keep the
of the peace of the state, with such security as may appear
peace. necessary for one year; and on such offender failing to
give good and sufficient security as aforesaid; the
said justice of the peace shall be authorised to com-
mit said offender to prison for any time not exceeding
twenty days.

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
APPROVED, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## AN ACT

*To establish a permanent seat of justice in and for
the parish of St. Tammany.*

SECT. 1. *Be it enacted by the senate and house of
representatives of the state of Louisiana, in general
assembly convened,* That Thomas Spell, Robert Ba-
Commis- dony, Benjamin Howard, Joseph Hertraire and Ben-
sioners.

3-ER-0558

## 175

cinquante piastres et qui ne sera pas moindre de vingt piastres, dont moitié au profit de l'etat, et le reste au profit du dénonciateur; et toute personne convaincue de récidive devant toute cour de juridiction compétente, sera condamnée à une amende qui ne pourra être moindre de cent piastres dont il sera disposé comme ci-dessus et à un emprisonnement qui ne pourra excéder six mois.

*Distribution.*

*Récidive.*

SECT. 2. *Et il est de plus décrété*, Que toute personne qui poignardera, blessera ou tirera en aucune manière sur toute autre personne ou personnes avec des armes ainsi cachées, ou qui leur ôtera la vie, sur conviction du fait devant toute cour de jurisdiction compétente, sera condamnée à mort ou à toute autre peine que le jury pourra trouver juste dans son opinion.

*Peine de mort.*

SECT. 3. *Et il est de plus décrété*, Que lorsque tout officier public a des raisons suffisantes de croire qu'une ou plusieurs personnes portent des armes cachées dans l'intention de commettre un meurtre, ou que d'aucune manière cette personne ou personnes portent des armes cachées, sur preuve authentique du fait et sur le témoignage d'une ou plusieurs personnes dignes de foi, devant un juge-de-paix, il sera du devoir dudit juge-de-paix de faire conduire pardevant lui le coupable, le faire fouiller, et en cas qu'il soit trouvé sur lui des armes cachées, il aura le pouvoir de le condamner à une amende qui ne pourra excéder cinquante piastres, ni être moindre de vingt piastres et de lui faire donner telle caution qu'il pourra trouver convenable pour conserver la tranquilité de l'etat pendant une année, et si ledit coupable ne fournit pas bonne et suffisante caution, ledit juge-de-paix est autorisé de le faire emprisonner pour un tems qui ne pourra excéder vingt jours.

*Pouvoir de fouiller.*

*Amende.*

*Caution.*

STEPHEN A. HOPKINS,
*Orateur de la Chambre des Représentans,*
J. POYDRAS,
*Président du Sénat,*

Approuvé 25 Mars 1813.
WM. C. C. CLAIBORNE,
*Gouverneur de l'Etat de la Louisiane.*

### ACTE

*Pour fixer d'une manière permanente le lieu des séances de la cour de paroisse de St.-Tammany.*

SECT. 1ère. *Il est décrété par le sénat et la chambre des représentans de l'état de la Louisiane réunis en assemblée générale,* Que Thomas Spell, Robert Badony, Benjamin Howard, Joseph Kerraire et

*Commissaires.*

3-ER-0559

# REVISED STATUTES

OF

# THE STATE OF ARKANSAS,

ADOPTED

## AT THE OCTOBER SESSION

OF THE

GENERAL ASSEMBLY OF SAID STATE, A. D. 1837,

IN THE YEAR OF OUR INDEPENDENCE THE SIXTYSECOND, AND OF THE
STATE THE SECOND YEAR.

REVISED BY WILLIAM McK. BALL AND SAM. C. ROANE

NOTES AND INDEX BY ALBERT PIKE.

PUBLISHED BY AUTHORITY OF THE GENERAL ASSEMBLY.

BOSTON:
WEEKS, JORDAN AND COMPANY, PUBLISHERS.
1838.

EXHIBIT I (Rivas)

ENTERED according to Act of Congress, on the 10th day of March, A. D. 1838, in the
Clerk's Office, for the State of Arkansas.

---

BOSTON:
TUTTLE, DENNETT AND CHISHOLM, PRINTERS,
No. 17 School Street.

**280**      CRIMINAL JURISPRUDENCE.  [CHAP. XLIV.

SEC. 12. Every person who shall be convicted of any misde-
meanor, the punishment of which is not defined in this or some other
statute, shall be punished by imprisonment, not exceeding one year,
or by fine not exceeding two hundred and fifty dollars, or by fine and
imprisonment both.

SEC. 13. Every person who shall wear any pistol, dirk, butcher
or large knife, or a sword in a cane, concealed as a weapon, unless
upon a journey, shall be adjudged guilty of a misdemeanor, and upon
conviction thereof, in the county in which the said offence shall have
been committed, shall be fined in any sum not less than twentyfive
dollars, nor more than one hundred dollars, one half to be paid into
the county treasury, the other half to the informer, and shall also be
imprisoned not less than one, nor more than six months.

ART. II.—LIBEL.

| SECTION | SECTION |
|---|---|
| 1. Definition of. | 5. Publisher or printer required to testify. |
| 2. Punishment of. | 6. Punishment of publisher or printer re-fusing to testify. |
| 3. The truth of the libel may be given in evidence. | 7. Their testimony not to be used against themselves. |
| 4. Proclaiming a person a coward, for not fighting a duel, &c. | |

SEC. 1. A libel is a malicious defamation, expressed either by
writing, printing, or by signs or pictures, or the like, tending to blacken
the memory of one who is dead, or to impeach the honesty, integrity,
veracity, virtue or reputation, or to publish the natural defects, of one
who is living, and thereby expose him to public hatred, contempt and
ridicule.

SEC. 1. Every person, whether writer, printer or publisher, con-
victed of the crime of libel, shall be fined in any sum not exceeding
five thousand dollars, and may also be imprisoned, not exceeding one
year, at the discretion of the jury who shall pass on the case ; and
when any such case shall be decided without the intervention of a jury,
then at the discretion of the court.

SEC. 3. In all prosecutions for libel, under the provisions of the
preceding sections, the truth thereof may be given in evidence in
justification.

SEC. 4. If any person shall, in any newspaper, handbill or other
advertisement, written or printed, publish or proclaim any other person
as a coward, or use any other opprobrious or abusive language, for not

# GENERAL LAWS

OF THE

## TWELFTH LEGISLATURE,

OF THE

# STATE OF TEXAS.

CALLED SESSION.

BY AUTHORITY.



AUSTIN:

PRINTED BY TRACY, SIEMERING & CO.

1870.

EXHIBIT J (Rivas)

GENERAL LAWS.                63

## CHAPTER XLVI.

#### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1.   *Be it enacted by the Legislature of the State of Texas*, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same ; provided, that nothing contained in this section shall apply to locations subject to Indian depredations ; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2.   That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

———————

## CHAPTER XLVII.

#### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1.   *Be it enacted by the Legislature of the State of Texas*, That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

64                          GENERAL LAWS.

county of Hill ; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

SEC. 2.  That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

SEC. 3.  That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

SEC. 4.  That this act be in force from and after passage.

Approved August 12, 1870.

———————

CHAPTER XLVIII.

AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas,* That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 13, 1870.

SEC. 2.  That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

SEC. 3.  That this act shall take effect from and after its passage.

Approved August 12, 1870.

———————

# GENERAL LAWS

#### OF THE

## TWELFTH LEGISLATURE

#### OF THE

# STATE OF TEXAS.

### FIRST SESSION—1871

### BY AUTHORITY



AUSTIN:
PRINTED BY J. G. TRACY, STATE PRINTER.
1871.

EXHIBIT K (Rivas)

GENERAL LAWS.                                25

# CHAPTER XXXIV.

AN ACT TO REGULATE THE KEEPING AND BEARIING OF DEADLY
WEAPONS.

SECTION 1.  *Be it enacted by the Legislature of the State of
Texas,* That any person carrying on or about his person, saddle, or
in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane,
spear, brass-knuckles, bowie-knife, or any other kind of knife manu-
factured or sold for the purposes of offense or defense, unless he has
reasonable grounds for fearing an unlawful attack on his person, and
that such ground of attack shall be immediate and pressing; or
unless having or carrying the same on or about his person for the
lawful defense of the State, as a militiaman in actual service, or as
a peace officer or policeman, shall be guilty of a misdemeanor, and,
on conviction thereof shall, for the first offense, be punished by
fine of not less than twenty-five nor more than one hundred dollars,
and shall forfeit to the county the weapon or weapons so found on
or about his person; and for every subsequent offense may, in addi-
tion to such fine and forfeiture, be imprisoned in the county jail for
a term not exceeding sixty days; and in every case of fine under
this section the fines imposed and collected shall go into the treasury
of the county in which they may have been imposed; *provided,* that
this section shall not be so construed as to prohibit any person from
keeping or bearing arms on his or her own premises, or at his or
her own place of business, nor to prohibit sheriffs or other revenue
officers, and other civil officers, from keeping or bearing arms while
engaged in the discharge of their official duties, nor to prohibit per-
sons traveling in the State from keeping or carrying arms with their
baggage; *provided further,* that members of the Legislature shall
not be included under the term "civil officers" as used in this act.

SEC. 2.   Any person charged under the first section of this act,
who may offer to prove, by way of defense, that he was in danger of
an attack on his person, or unlawful interference with his property,
shall be required to show that such danger was immediate and press-
ing, and was of such a nature as to alarm a person of ordinary
courage; and that the weapon so carried was borne openly and not
concealed beneath the clothing; and if it shall appear that this dan-
ger had its origin in a difficulty first commenced by the accused, it
shall not be considered as a legal defense.

SEC. 3.   If any person shall go into any church or religious
assembly, any school room, or other place where persons are assem-

26                    GENERAL  LAWS.

bled for amusement or for educational or scientific purposes, or into
any circus, show, or public exhibition of any kind, or into a ball
room, social party, or social gathering, or to any election precinct
on the day or days of any election, where any portion of the people
of this State are collected to vote at any election, or to any other
place where people may be assembled to muster, or to perform any
other public duty, (except as may be required or permitted by law,)
or to any other public assembly, and shall have or carry about his
person a pistol or other firearm, dirk, dagger, slung shot, sword
cane, spear, brass-knuckles, bowie-knife, or any other kind of knife
manufactured and sold for the purposes of offense and defense, unless
an officer of the peace, he shall be guilty of a misdemeanor, and, on
conviction thereof, shall, for the first offense, be punished by fine of
not less than fifty, nor more than five hundred dollars, and shall for-
feit to the county the weapon or weapons so found on his person;
and for every subsequent offense may, in addition to such fine and
forfeiture, be imprisoned in the county jail for a term not more than
ninety days.

  SEC. 4.  This act shall not apply to, nor be enforced in any
county of the State, which may be designated, in a proclamation of
the Governor, as a frontier county, and liable to incursions of hostile
Indians.

  SEC. 5.  All fines collected under the provisions of this act shall
be paid into the treasury of the county, and appropriated exclu-
sively to the keeping in repair and maintenance of public roads, and
all weapons forfeited to the county under the provisions of this act
shall be sold as may be prescribed by the county court, and the pro-
ceeds appropriated to the same purpose.

  SEC. 6.  It shall be the duty of all sheriffs, constables, marshals,
and their deputies, and all policemen, and other peace officers, to ar-
rest any person violating the first or third sections of this act, and
to take such person immediately before a justice of the peace of the
county where the offense is committed, or before a mayor or recorder
of the town or city in which the offense is committed, who shall in-
vestigate and try the case without delay.  On all such trials the ac-
cused shall have the right of a trial by jury, and of appeal to the
district court; but, in case of appeal, the accused shall be re-
quired to give bond with two or more good and sufficient sureties in a
sum of not less than one hundred nor more than two hundred dol-
lars, if convicted under the first section and in a sum of not less
than two hundred nor more than one thousand dollars, if convicted
under the third section of this act; said bond to be payable to the
State of Texas, and approved by the magistrate, and conditioned that
the defendant will abide the judgment of the district court that may

3-ER-0568

GENERAL LAWS.                    27

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

SEC. 7.   Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

SEC. 8.   That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

SEC. 9.   It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April ·12, 1871.

———

CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

SECTION 1.   *Be it enacted by the Legislature of the State of Texas,* That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Robertson county, Texas.

SEC. 2.   That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.

# THE

# PENAL CODE

OF THE

# STATE OF TEXAS

PASSED BY THE

## SIXTEENTH LEGISLATURE,

FEBRUARY 21, 1879,

TOOK EFFECT JULY 24, 1879.

———⟐———

GALVESTON:
A. H. BELO & CO., STATE PRINTERS,
1879.

EXHIBIT L (Rivas)

42            TITLE IX.—OFFENSES AGAINST PUBLIC PEACE.—CH. 3, 4.

who continue so unlawfully assembled, or engaged in a riot, after being
warned to disperse, shall be punished by the addition of one-half the
penalty to which they would otherwise be liable, if no such warning had
been given.

-------

## CHAPTER THREE.

### AFFRAYS AND DISTURBANCES OF THE PEACE.

| | Article | | Article |
|---|---|---|---|
| "Affray" defined | 313 | Shooting in public place | 316 |
| Disturbance of the peace | 314 | Horse-racing on public road or street | 317 |
| "Public place" defined | 315 | | |

**"Affray" defined.**
P.C. 381.

ARTICLE. 313.  If any two or more persons shall fight together in a pub-
lic place, they shall be punished by fine not exceeding one hundred dollars.

**Disturbance of the peace.**
(Act June 20, 1876, p. 24.)
P.C. 382.

ART. 314.  If any person shall go into any public place, or into or near
any private house, or along any public street or highway near any private
house, and shall use loud and vociferous or obscene, vulgar or indecent
language, or swear, or curse, or expose his person, or rudely display any
pistol or other deadly weapon in such public place, or upon such public
street or highway, or near such private house, in a manner calculated to
disturb the inhabitants thereof, he shall be fined in a sum not exceeding
one hundred dollars.

**"Public place" defined.**
P.C. 383.

ART. 315.  A public place within the meaning of the two preceding
articles, is any public road, street or alley, of a town or city, inn, tavern,
store, grocery, work-shop, or any place to which people commonly resort
for purposes of business, recreation or amusement.

**Shooting in public place.**
(Act Nov. 12, 1866, p. 210.)

ART. 316.  If any person shall discharge any gun, pistol, or fire-arms of
any description, on or across any public square, street or alley in any city,
town or village in this state, he shall be fined in a sum not exceeding one
hundred dollars.

**Horse-racing on public road or street.**
(Act May 19, 1873, pp. 83–4.)

ART. 317.  Any person who shall run, or be in any way concerned in
running any horse race in, along, or across any public square, street or
alley in any city, town or village, or in, along or across any public road
within this state, shall be fined in a sum not less than twenty-five nor
more than one hundred dollars.

-------

## CHAPTER FOUR.

### UNLAWFULLY CARRYING ARMS.

| | Article | | Article |
|---|---|---|---|
| Unlawfully carrying arms | 318 | Arrest without warrant | 322 |
| Not applicable, when and to whom | 319 | Officer failing to arrest, punishable | 323 |
| Carrying arms in church or other assembly | 320 | Not applicable to frontier counties | 325 |
| Not applicable, to whom | 321 | | |

**Unlawfully carrying arms.**
(Act April 12, 1871, p. 25.)

ARTICLE 318.  If any person in this state shall carry on or about his
person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot,
sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife
manufactured or sold for purposes of offense or defense, he shall be pun-
ished by fine of not less than twenty-five nor more than one hundred
dollars; and, in addition thereto, shall forfeit to the county in which he
is convicted, the weapon or weapons so carried.

**Not applicable when and to whom.**
(Act April 12, 1871, p. 25.)

ART. 319.  The preceding article shall not apply to a person in actual
service as a militiaman, nor to a peace officer or policeman, or person sum-
moned to his aid, nor to a revenue or other civil officer engaged in the
discharge of official duty, nor to the carrying of arms on one's own prem-

TITLE IX.—OFFENSES AGAINST PUBLIC PEACE.—CH. 4.          43

ises or place of business, nor to persons traveling, nor to one who has
reasonable ground for fearing an unlawful attack upon his person, and the
danger is so imminent and threatening as not to admit of the arrest of
the party about to make such attack, upon legal process.

ART. 320.   If any person shall go into any church or religious assem- *Carrying arms in church or other assembly*
bly, any school room, or other place where persons are assembled for *(Act April 12, 1871, p. 25.)*
amusement or for educational or scientific purposes, or into any circus,
show, or public exhibition of any kind, or into a ball-room, social party,
or social gathering, or to any election precinct on the day or days of any
election, where any portion of the people of this state are collected to vote
at any election, or to any other place where people may be assembled to
muster, or to perform any other public duty, or to any other public assem-
bly, and shall have or carry about his person a pistol or other fire-arm,
dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife,
or any other kind of a knife manufactured and sold for the purposes of
offense and defense, he shall be punished by fine not less than fifty nor
more than five hundred dollars, and shall forfeit to the county the weapon
or weapons so found on his person.

ART. 321.   The preceding article shall not apply to peace officers, or *Not applicable to whom. (Act April 12, 1871, p. 25.)*
other persons authorized or permitted by law to carry arms at the places
therein designated.

ART. 322.   Any person violating any of the provisions of articles 318 *Arrest without warrant. Officer failing to arrest*
and 320, may be arrested without warrant by any peace officer, and car- *punished. (Act April 12, 1871, p. 25.)*
ried before the nearest justice of the peace for trial; and any peace officer
who shall fail or refuse to arrest such person on his own knowledge, or
upon information from some credible person, shall be punished by fine not
exceeding five hundred dollars.

ART. 323.   The provisions of this chapter shall not apply to or be *Not applicable to frontier counties.*
enforced in any county which the governor may designate, by proclama- *(Act April 12, 1871, p. 25.)*
tion, as a frontier county and liable to incursions by hostile Indians.

# ACTS

## OF THE

# STATE OF TENNESSEE,

### PASSED BY THE FIRST SESSION OF

## THE THIRTY-SIXTH GENERAL ASSEMBLY

### FOR THE YEARS 1869-70.

----

PUBLISHED BY AUTHORITY.

----

NASHVILLE, TENN.:
JONES, PURVIS & CO., PRINTERS TO THE STATE.
1870.

# EXHIBIT M (Rivas)

3-ER-0573

23

## CHAPTER XXI.

AN ACT to Amend An Act, passed on the 13th of March, 1868,
entitled "An Act to amend the revenue laws of the State."

SECTION 1.  *Be it enacted by the General Assembly of
the State of Tennessee,* That An Act to amend the revenue
laws of the State, passed on the 13th day of March, 1868, Hotels and
be so amended as to impose a tax of fifty cents on each Livery Stable
room except two in a hotel or tavern,  and a tax of fifty
cents on each  stall in a livery stable, or stable kept by
hotel  or tavern keepers,  instead of one dollar, as now
imposed by law.

SEC. 2.  *Be it further enacted,* That this Act take effect
from and after its passage.

W. O'N. PERKINS,
*Speaker of the House of Representives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed November 27, 1869.

———

## CHAPTER XXII.

AN ACT to Amend the Criminal Laws of the State.

SECTION 1.  *Be it enacted by  the General  Assembly of
the State of Tennessee,* That all voters in this State shall be To vote in
required to vote in the civil district or ward in which they or Ward.
may reside.   Any person violating this Act shall be guilty
of a misdemeanor, and upon conviction thereof shall not be
fined less than twenty nor more than fifty dollars ; *Provided,*
that sheriffs and  other officers holding  elections shall be
permitted to  vote at any ward or precinct in which they
may hold an election.

SEC. 2.  *Be it further enacted,* That it shall not be law-
ful for any qualified voter or other person attending any
election in this State, or for any person attending any fair, Deadly
race course, or other public assembly of the people, to carry Weapons.
about his person, concealed  or otherwise, any pistol, dirk,
bowie-knife, Arkansas tooth-pick, or weapon in form, shape

3-ER-0574

24

or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

**Penalty.** SEC. 3. *Be it further enacted,* That all persons convicted under the second section of this Act shall he punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the Court.

**Liquor Shops.** SEC. 4. *Be it further enacted,* That no liquor shop in this State, shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.

**Grand Juries.** SEC. 5. *Be it further enacted,* That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these Acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling and offenses now prescribed by law.

**Judges.** SEC. 6. *Be it further enacted,* That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

SEC. 7. *Be it further enacted,* That there shall be no property exempt from execution for fines and costs for this **Proviso.** offense; *Provided,* That, if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this Act shall be so construed as to prevent any voter from voting in any other civil district or ward in his county or town, for State or county officers, at the time prescribed by law.

SEC. 8. *Be it further enacted,* That this Act shall take effect from and after its passage.

<div align="center">

W. O'N. PERKINS.
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

</div>

Passed December 1, 1869.

3-ER-0575

# ACTS AND RESOLUTIONS

OF THE

## GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN ATLANTA, GEORGIA,

AT THE

# SESSION OF 1870.

COMPILED AND PUBLISHED BY AUTHORITY.

ATLANTA, GEORGIA:
PRINTED BY THE PUBLIC PRINTER.
1870.

## EXHIBIT N (Rivas)

PUBLIC LAWS.—PENAL CODE—AMENDMENTS TO.                    421

To preserve the peace and harmony of the people of this State, etc.

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

SECTIONS.
1. Carrying deadly weapons to certain places prohibited.
2. Violation—misdemeanor—penalty.
3. Chain-gang punishment prohibited.
4. Punishment in lieu of chain-gang.

SECTIONS.
5. Section 415 of the Code changed—nolle prosequi.
6. All indictments, etc., submitted to a jury.

(No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. *(Carrying deadly weapons to certain places prohibited. Exception.)*

SEC. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. *(Violation a misdemeanor—penalty)*

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

(No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words "to work in a chain-gang on the public works," and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That the words "to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, *(Chain-gang punishment prohibited.)*

422       PUBLIC LAWS.—PENAL CODE—AMENDMENTS TO.

| To repeal Section 415 of the Revised Code. |
| --- |

stricken from said section, and chain-gangs shall no longer exist, or be tolerated in the State of Georgia, for persons convicted of misdemeanors.

*Punishment in lieu of chain-gang.* SEC. 2. *Be it further enacted,* That said section be further amended, by substituting for the words herein stricken out, the words "to work on the city or town streets, or county roads, not longer than six months; but in no case shall such prisoners be chained or otherwise confined in a gang, but shall be guarded."

SEC. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and they are hereby, repealed.

Approved October 27, 1870.

───────

(No. 287.)

*An Act to repeal section four hundred and fifteen (415) of Irwin's Revised Code, in relation to entering nolle prosequis, and to prescribe the mode of settlement in criminal cases.*

*Section 415 of Code, as to nolle prosequi, repealed.* SECTION 1. *Be it enacted, etc.,* That section four hundred and fifteen (415) of Irwin's Revised Code of Georgia, which said section authorizes Solicitors-General in this State to enter a *nolle prosequi* on indictments, be, and the same is hereby repealed, and no *nolle prosequi* shall be allowed, except it be in open court, for some fatal defect in the bill of indictment, to be judged of by the court, *Judge shall order second bill.* in which case the presiding Judge shall order another bill of indictment to be forthwith submitted to the grand jury.

*All indictments submitted to jury.* SEC. 2. *And be it further enacted by the authority aforesaid,* That all cases of indictments, or special presentments, shall be submitted to and passed upon by the jury, under the direction of the presiding Judge, unless there is a settlement thereof between the *Settlement when good.* prosecutor and defendant, which settlement shall be good and valid only by the approval and order of the court on examination into the merits of the case.

SEC. 3. *And be it further enacted, etc.,* That all laws and parts of laws conflicting with this act be, and the same are hereby, repealed.

Approved October 28, 1870.

THE

# REVISED STATUTES

OF THE

## STATE OF MISSOURI.

# 1879.

TO WHICH ARE PREFIXED THE DECLARATION OF INDEPENDENCE, WASHINGTON'S
FAREWELL ADDRESS, ARTICLES OF CONFEDERATION, CONSTITUTION OF THE
UNITED STATES, ACT OF CONGRESS FOR THE FORMATION OF A STATE
GOVERNMENT, ORDINANCE OF THE CONVENTION ASSENTING THERETO,
AND CONSTITUTION OF MISSOURI: WITH AN APPENDIX CONTAIN-
ING CERTAIN ACTS OF CONGRESS, AND PRACTICAL FORMS,
REQUIRED TO BE PUBLISHED THEREIN.

REVISED AND PROMULGATED BY THE XXXTH GENERAL ASSEMBLY.

### VOLUME ONE.

COLLATED AND ANNOTATED BY JOHN A. HOCKADAY, THOMAS H. PARRISH,
BENJAMIN F. McDANIEL AND DANIEL H. McINTYRE, COMMITTEE
APPOINTED FOR THAT PURPOSE.

PUBLISHED BY AUTHORITY OF CHAPTER 45, ARTICLE V, OF THE REVISED STATUTES OF THE STATE OF MISSOURI.

CITY OF JEFFERSON:
CARTER & REGAN, STATE PRINTERS AND BINDERS.
1879.

EXHIBIT O (Rivas)

224                    CRIMES AND CRIMINAL PROCEDURE.                [CHAP. 24.

SEC. 1271.  *Abandonment of children.*—If any father or mother of any child under the age of six years, or any other person to whom such child shall have been confided, shall expose such child in a street, field or other place, with intent wholly to abandon it, he or she shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not less than six months.  (G. S. 781, § 39.)

SEC. 1272.  *Mistreatment of apprentices.*—If any master or mistress of an apprentice or other person having the legal care and control of any infant, shall, without lawful excuse, refuse or neglect to provide for such apprentice or infant, necessary food, clothing or lodging, or shall unlawfully and purposely assault such apprentice or infant, whereby his life shall be endangered, or his health shall have been or shall be likely to be permanently injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment. (New section.)

SEC. 1273.  *Abandonment of wife or child.*—If any man shall, without good cause, abandon or desert his wife, or abandon his child or children under the age of twelve years born in lawful wedlock, and shall fail, neglect or refuse to maintain and provide for such wife, child or children, he shall, upon conviction, be punished by imprisonment in the county jail not more than one year, or by a fine of not less than fifty, nor more than one thousand dollars, or by both such fine and imprisonment.  No other evidence shall be required to prove that such husband was married to such wife, or is the father of such child or children, than would be necessary to prove such fact or facts in a civil action.  (Laws 1867, p. 112, amended—*m*.)

SEC. 1274.  *Carrying deadly weapons, etc.*—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the county jail not exceeding three months, or by both such fine and imprisonment.  (Laws 1874, p. 43; laws 1875, p. 50, and laws 1877, p. 240, amended.)

SEC. 1275.  *Above section not to apply to certain officers.*—The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.  (New section.)

SEC. 1276.  *Fire arms not to be discharged near court house.*—Hereafter it shall be unlawful for any person in this state, except he be a sheriff or other officer in the discharge of official duty, to discharge or fire off any

---

(*m*)  Wife held to be a competent witness to prove fact of abandonment.   43 Mo. 429.   The fact that the defendant has brought suit for divorce is no defense.   52 Mo. 172.

3-ER-0580

ART. 3.]          CRIMES AND CRIMINAL PROCEDURE.          225

gun, pistol or fire arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes. (Laws 1879, p. 90, § 1.)

SEC. 1277. *Punishment.*—Any person, guilty of a violation of the preceding section, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than five dollars nor more than twenty dollars, or by imprisonment in the county jail not exceeding twenty days. (Laws 1879, p. 91, § 2.)

SEC. 1278. *Immediate vicinity defined.*—The term immediate vicinity, as used in this article, shall be construed and held to mean a distance not exceeding two hundred yards. (Laws 1879, p. 91, § 3.)

SEC. 1279. *Intoxicated stage driver.*—Every person who, whilst actually employed in driving any stage, coach, wagon, omnibus, hack or other vehicle, shall be intoxicated to such a degree as to endanger the safety of any person therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction, be punished by fine not less than twenty nor more than one hundred dollars. (G. S. 814, § 31.)

SEC. 1280. *Intoxicated pilot or engineer.*—Every person who, whilst actually employed in discharging the duties of a pilot or engineer on any steamboat, or of a conductor or engineer on railroad cars, shall be intoxicated to such a degree as to endanger the safety of such steamboat or cars, or of any person or passenger therein, shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or in the county jail not exceeding one year, or by fine not exceeding one thousand dollars. (G. S. 814, § 32.)

SEC. 1281. *Drunken conductor, whilst in charge of train.*—If any person shall, while in charge of a locomotive engine running upon the railroad of any such corporation, or while acting as the conductor of a car, or train of cars, on any such railroad, be intoxicated, he shall be deemed guilty of a misdemeanor. (G. S. p. 342, § 40.)

SEC. 1282. *Punishment for certain offenses.*—Every person who shall be convicted of murder in either degree, or manslaughter in the first degree, or who shall be convicted and sentenced to the penitentiary for any of the offenses specified in sections twelve hundred and fifty-three, twelve hundred and fifty-four, twelve hundred and fifty-five, twelve hundred and fifty-six, twelve hundred and fifty-seven, twelve hundred and fifty-eight, twelve hundred and fifty-nine, twelve hundred and sixty, twelve hundred and sixty-one, twelve hundred and sixty-two and twelve hundred and sixty-six, shall be forever disqualified from voting at any election, or holding any office of honor, trust or profit under the laws of this state, or of any city, or town thereof, or sitting as a juror in any case. (G. S. 782, § 40, am'd.)

---

## ARTICLE III.

### OFFENSES AGAINST PUBLIC AND PRIVATE PROPERTY.

SECTION
1283. Arson in first degree.
1284. Dwelling house, defined.
1285. Arson in second degree.
1286. Building containing public records.
1287. Arson in third degree.
1288. Burning brewery, etc.
1289. Burning boat or vessel.
1290. Arson in fourth degree.
1291. Punishment for arson.
1292. Burglary in first degree.
1293. Burglary in second degree.
1294. Burglary, second degree, continued.
1295. Burglary, second degree, continued.

SECTION
1296. Burglary, second degree, continued.
1297. Burglary, second degree, continued.
1298. Burglary, second degree, continued.
1299. What breaking not burglary.
1300. Burglary in first and second degrees, how punished.
1301. Burglary and larceny.
1302. Robbery in first degree.
1303. Robbery in second degree.
1304. Robbery in third degree.
1305. Robbery, how punished.
1306. Attempt to blackmail, how punished.
1307. Grand larceny defined.

R S—15

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

EXHIBIT P (Rivas)

CRIMES AND PUNISHMENT.                                    495

(2430) § **6.** Every person who, with intent to extort any <u>Chap. 25.</u> money or other property from another, sends to any person any _Sending_ letter or other writing, whether subscribed or not, expressing or _threatening letter._ implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

(2431) § **7.** Every person who unsuccessfully attempts by means _Attempting to_ of any verbal threat such as is specified in the second section of _export money._ this article, to extort money or other property from another is guilty of a misdemeanor.

ARTICLE 47.—CONCEALED WEAPONS.

| SECTION. | SECTION. |
|---|---|
| 1. Prohibited weapons enumerated. | 6. Degree of punishment. |
| 2. Same. | 7. Public buildings and gatherings. |
| 3. Minors. | 8. Intent of persons carrying weapons. |
| 4. Public officials, when privileged. | 9. Pointing weapon at another. |
| 5. Arms, when lawful to carry. | 10. Violation of certain sections. |

(2432) § **1.** It shall be unlawful for any person in the Terri- _Prohibited_ tory of Oklahoma to carry concealed on or about his person, sad- _weapons enumerated._ dle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

(2433) § **2.** It shall be unlawful for any person in the Terri- _Same._ tory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

(2434) § **3.** It shall be unlawful for any person within this _Minors._ Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

(2435) § **4.** Public officers while in the discharge of their _Public officials,_ duties or while going from their homes to their place of duty, or _when privileged._ returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: _Provided, however,_ That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

(2436) § **5.** Persons shall be permitted to carry shot-guns or _Arms, when_ rifles for the purpose of hunting, having them repaired, or for kill- _lawful to carry._ ing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

(2437) § **6.** Any person violating the provisions of any one of _Degree of_ the foregoing sections, shall on the first conviction be adjudged _punishment._ guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent con-

496                          CRIMES AND PUNISHMENT.

**Chap. 25.**  viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

**Public buildings and gatherings.**  (2438) § **7.**  It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

**Intent of persons carrying weapons.**  (2439) § **8.**  It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

**Pointing weapons at another.**  (2440) § **9.**  It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

**Violation of section seven.**  (2441) § **10.**  Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

### ARTICLE 48.—FALSE PERSONATION AND CHEATS.

| SECTION. | SECTION. |
|---|---|
| 1.  False impersonation, punishment for. | 7.  False representation of charitable purposes. |
| 2.  False impersonation and receiving money. | 8.  Falsely representing banking corporations. |
| 3.  Personating officers and others. | 9.  Using false check. |
| 4.  Unlawful wearing of grand army badge. | 10.  Holding mock auction. |
| 5.  Fines, how paid. | |
| 6.  Obtaining property under false pretenses. | |

**Punishment for false impersonation.**  (2442) § **1.**  Every person who falsely personates another, and in such assumed character, either:

First.  Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second.  Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third.  Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth.  Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

# THE ANNOTATED CODE

—OF THE—

## GENERAL STATUTE LAWS

—OF—

# THE STATE OF MISSISSIPPI,

—PREPARED BY—

R. H. THOMPSON, GEORGE G. DILLARD,
and R. B. CAMPBELL,

—AND—

Reported to and amended and adopted by the Legislature at its Regular
Session in 1892.

—————

PUBLISHED BY AUTHORITY OF THE LEGISLATURE.

—————

NASHVILLE, TENN.:
MARSHALL & BRUCE, LAW PUBLISHERS.
1892.

EXHIBIT Q (Rivas)

1025–1029                          CRIMES AND MISDEMEANORS.

**1025** (2766). **The same; opening graves for certain purposes.**—Every person who shall open a grave or other place of interment with intent to move the dead body of any human being for the purpose of selling the same, or for the purpose of dissection, or to steal the coffin or any part thereof, or the vestments or other articles interred with the dead body, or any of them, shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding two years, or in the county jail not more than six months, or by fine of not more than three hundred dollars, or both.

**1026** (2985). **Deadly weapons; carrying of concealed.** (Laws 1888, p. 89).—Any person who carries concealed, in whole or in part any bowie-knife, dirk-knife, butcher-knife, pistol, brass or metallic knuckles, slung-shot, sword, or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and, on conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, or be imprisoned in the county jail not less than one month nor more than three months, or both.

**1027.** **The same; not applicable to certain persons.**—Any person indicted or charged for a violation of the last section may show as a defense—

(*a*) That he was threatened, and had good and sufficient reason to apprehend a serious attack from an enemy, and that he did so apprehend; or

(*b*) That he was traveling and was not a tramp, or was setting out on a journey, and was not a tramp; or

(*c*) That he was a peace officer or deputy in the discharge of his duties; or

(*d*) That he was at the time in the discharge of his duties as a mail carrier; or

(*e*) That he was at the time engaged in transporting valuables for an express company or bank; or

(*f*) That he was in lawful pursuit of a felon.

And the burden of proving either of said defenses shall be on the accused.

The "traveling or setting out on a journey" in the statute means a travel of such distance as to take one beyond the circle of his friends and acquaintances. McGuirk v. State, 64 Miss., 209.

The pursuit of a fugitive daughter, begun without knowing where it will lead, is "traveling on a journey." Haywood v. State, 66 Miss., 402.

"Threatened with an attack" does not contemplate mere denunciation, but menace such as to cause a reasonable apprehension of an attack that might properly be resisted with the deadly weapon. Tipler v. State, 57 Miss., 685.

Even if the accused be "threatened" and entertain the "apprehension," it will be no defense if he carried the weapon for some other reason, and for some other purpose. McGuirk v. State, 64 Miss., 209.

The threats must not be too remote. McGuirk v. State, 64 Miss., 210.

The act of 1888, amendatory of the Code, 1880, on the subject of carrying weapons concealed, was ex post facto in its application to offenses previously committed. (1) It cut off a defense, and (2) it changed, but did not mitigate, the penalty. Lindsey v. State, 65 Miss., 542; Hodnett v. State, 66 Miss., 26.

The statute makes the fact of carrying a weapon concealed criminal, regardless of intent. Strahan v. State, 68 Miss., 347.

**1028** (2986). **The same; and cartridges not sold to infant or drunk person.**—It shall not be lawful for any person to sell, give, or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon the carrying of which concealed is prohibited, or pistol cartridge; and, on conviction thereof, he shall be punished by a fine not less than twenty-five dollars nor more than two hundred dollars, or imprisoned in the county jail not exceeding three months, or both.

**1029** (2987). **The same; father not to suffer infant son to have or carry.**—Any father who shall knowingly suffer or permit any son under the age of sixteen

326

CRIMES AND MISDEMEANORS.                    1030–1034

years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

**1030** (2988). **The same; college students not to have, etc.**—A student of any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher, instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both.

**1031** (2804). **The same; exhibiting in rude, angry, or threatening manner, etc.**—If any person, having or carrying any dirk, dirk-knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in a sum not exceeding five hundred dollars or be imprisoned in the county jail not exceeding three months, or both. In prosecutions under this section it shall not be necessary for the affidavit or indictment to aver, nor for the state to prove on the trial, that any gun, pistol, or other fire-arm was charged, loaded, or in condition to be discharged.

The omission of the word "manner," after the words "rude, angry, and threatening," in an indictment, is a formal defect, and may be amended as such. In such indictment it is unnecessary to aver that the defendant was "carrying" the weapon. Gamblin v. State, 45 Miss., 658.

**1032** (2769). **Disturbance of family; noises and offensive conduct.**—A person who willfully disturbs the peace of any family or person by an explosion of gunpowder or other explosive substance, or by loud or unusual noise, or by any tumultuous or offensive conduct, shall be punished by fine and imprisonment, or either; the fine not to exceed one hundred dollars, and the imprisonment not to exceed six months in the county jail.

What constitutes the offensive conduct, or the nature or character of the offensive conduct, should be stated in the affidavit or indictment. Finch v. State, 64 Miss., 461.

This section and the next one are intended to protect the peace of families. An affidavit or indictment averring the disturbance merely of an individual, charges no offense under either section. Brooks v. State 67 Miss., 577.

**1033** (2770). **The same; using abusive, etc., language, etc.**—Any person who enters the dwelling-house of another, or the yard or curtilage thereof, or upon the public highway, or any other place near such premises, and in the presence or hearing of the family of the possessor or occupant thereof, or of any member thereof, or of any female, makes use of abusive, profane, vulgar, or indecent language, or is guilty of any indecent exposure of his person at such place, shall be punished for a misdemeanor.

Place is material. An indictment charging the use of abusive language in a yard, is not sustained by proof of its use near the yard. Quin v. State, 65 Miss., 479.

**1034** (2767). **Disturbance of worship; proceedings and penalty.**—If any person shall willfully disturb any congregation of persons lawfully assembled for reli-

327

# ACTS AND RESOLVES

PASSED BY THE

## GENERAL ASSEMBLY

OF THE

# STATE OF VERMONT,

AT THE

## TWELFTH BIENNIAL SESSION, 1892.



PUBLISHED BY AUTHORITY.

BURLINGTON:
THE FREE PRESS ASSOCIATION, PRINTERS AND BINDERS.
1892.

EXHIBIT R (Rivas)

1892.]                 PUBLIC ACTS.                 95

SEC. 5.  This act shall take effect on the first day of May, 1893.

Approved November 22, 1892.

---

No. 84.—AN ACT IN AMENDMENT OF SECTION 4074 OF THE REVISED LAWS, RELATING TO GAMES.

*It is hereby enacted by the General Assembly of the State of Vermont :*

Section four thousand and seventy-four of the Revised Laws is hereby amended by inserting therein, after the word "billiard table," in the first line of said section, the words "pool table."

Approved November 15, 1892.

---

No. 85.—AN ACT AGAINST CARRYING CONCEALED WEAPONS.

*It is hereby enacted by the General Assembly of the State of Vermont :*

SECTION 1.  A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.

SEC. 2.  A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.

Approved November 19, 1892.

---

No. 86.—AN ACT TO PREVENT FRAUD AT AGRICULTURAL FAIRS AND EXHIBITIONS OF HORSES.

| SECTION. | SECTION. |
|---|---|
| 1. Societies authorized to hold public fairs may offer premiums or purses for competition of horses in respect to speed, and may make rules for the conduct of their exhibitions. | 2. Societies may classify horses respecting previous exhibitions of speed. |
| | 3. Penalty for entering disguised horse, representing animal to be another horse; or entering horse in a class in which he is not eligible. |
| | 4. When to take effect. |

*It is hereby enacted by the General Assembly of the State of Vermont:*

SECTION 1.  Agricultural societies, corporations and associations, authorized under the laws of this State to hold public fairs

96              PUBLIC ACTS.              [A. D.

for the competition of horses or horse kind in respect to speed, are hereby authorized to offer premiums or purses for success in such competition, and to conduct and manage their exhibitions in accordance with their own rules and regulations, publicly advertised, and not in conflict with the laws of this State.

SEC. 2.   Such societies, corporations and associations are hereby authorized to establish and designate classes of horses or horse kind, with respect to the previous exhibitions of speed of such animals, or to any other reasonable and lawful grounds of classification, particularly set forth in such publicly advertised rules or regulations.

SEC. 3.   Whoever, for the purpose of competing for any purse or premium, offered by any such society, corporation or association within this State, shall knowingly and designedly enter or drive any horse or animal of the horse kind that shall have been painted or disguised ; or who, for such purpose, shall falsely and fraudulently represent any animal of the horse kind to be another or different animal from the one it really is ; or who knowingly or designedly, for the purpose of competing for any such premium or purse, shall enter or drive any horse, or animal of the horse kind, in a class where it is not entitled to be entered, under the said rules and regulations of the society, corporation or association offering such premium or purse, shall be deemed guilty of an offense under section four thousand one hundred and fifty-four (4154) of the Revised Laws of Vermont ; and upon conviction, shall be punished by a fine of not more than five hundred dollars, or by imprisonment not exceeding six months.

SEC. 4.   This act shall take effect from its passage.

Approved November 16, 1892.

No. 87.—AN ACT TO PREVENT FRAUD IN THE SALE OF LARD.

*It is hereby enacted by the General Assembly of the State of Vermont :*

SECTION 1.   No manufacturer or other person shall sell, deliver, prepare, put up, expose or offer for sale any lard, or any article intended for use as lard, which contains any ingredient but the pure fat of swine, in any tierce, bucket, pail, or other vessel or wrapper, or under any label bearing the words "pure," "refined," "family," or either of them, alone or in combination with other words, unless every vessel, wrapper or label, in or under which such article is sold, delivered, prepared, put up or exposed for sale, bears on the top or outer side thereof, in letters not less than one-half inch in length and plainly exposed to view, the words "compound lard."

# CONSTITUTION

ADOPTED BY THE

## State Constitutional Convention

OF THE

## STATE OF LOUISIANA,

### MARCH 7, 1868.

Printed by the New Orleans Republican, in accordance with a resolution of
the Constitutional Convention, adopted March 7th, 1868.

NEW ORLEANS:
PRINTED AT THE REPUBLICAN OFFICE, 67 ST. CHARLES STREET.
1868.

EXHIBIT S (Rivas)

145

No. 100.]                      AN ACT

To regulate the conduct and to maintain the freedom and purity of elections; to
prescribe the mode of making, and designate the officers who shall make the
returns thereof; to prevent fraud, violence, intimidation, riot, tumult, bribery
or corruption at elections or at any registration or revision of registration; to
limit the powers and duties of the sheriffs of the parishes of Orleans and
Jefferson; to prescribe the powers and duties of the Board and officers of the
Metropolitan Police in reference to elections; to prescribe the mode of enter-
ing on the rolls of the Senate and House of Representatives the names of
members; to empower the Governor to preserve peace and order, to enforce
the laws; to limit the powers and duties of the Mayors of the cities of New
Orleans and Jefferson with regard to elections; to prohibit District or Parish
Judges from issuing certain writs to Commissioners of Election; to make an
appropriation for the expenses of the next revision of the registration and
of the next election; and to enforce article one hundred and three of the
constitution.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That all
elections for State, parish and judicial officers, members of the Gen-
eral Assembly, and for members of Congress shall be held on the
first Monday in November, and said elections shall be styled the gen-
eral elections. *(margin: Time of holding elections.)*

They shall be held in the manner and form, and subject to the
regulations hereinafter prescribed, and no other.

SEC. 2. *Be it further enacted, etc.,* That elections for Represent-
atives in the General Assembly shall be held on the first Monday of
November, one thousand eight hundred and seventy, and every two
(2) years thereafter; and all elections to supply the place of Sena-
tors in the General Assembly, whose terms of service shall have
expired, shall be held at the same time as herein provided for the
election of Representatives. *(margin: Elections for Representatives in the General Assembly. Elections for State senators.)*

SEC. 3. *Be it further enacted, etc.,* That all elections shall be held in
each parish at the several election polls or voting places to be estab-
lished as is hereinafter prescribed. *(margin: When held.)*

SEC. 4. *Be it further enacted, etc.,* That all elections shall be
completed in one day, and the polls shall be kept open at each poll
or voting place, from the hour of six in the morning until six o'clock
in the afternoon. *(margin: When completed—polls open.)*

SEC. 5. *Be it further enacted, etc.,* That each parish in this State,
except the parishes of Orleans and Jefferson, is hereby fixed as an
election precinct, and the supervisor of registration in each of said
parishes shall direct what number of polls or voting places shall be
established in each precinct, fix the places of holding the election,
and appoint commissioners of election for each poll or voting place.
In the city of New Orleans, each ward shall constitute a precinct,
and in the remaining part of the parish of Orleans, the supervisor
of registration for the said parish shall fix both the precincts and
voting places in each precinct, and in the parish of Jefferson, the
supervisor of registration shall fix both the precincts and the voting
places in each precinct; in the parishes of Orleans and Jefferson the
supervisor of registration of each parish shall appoint commissioners
of election therefor, as in the other parishes. Any duly registered
voter may vote at any poll or voting place within his precinct. *(margin: Election precincts. Voting places.)*

SEC. 6. *Be it further enacted, etc.,* That the elections at each poll
or voting place shall be presided over by three commissioners of
election, residents of the parish, who shall be able to read and write,
to be appointed by the supervisor of registration for the parish, *(margin: Commissioners of election.)*

19

146

who shall, before entering upon the discharge of their duties, take
**Oath.** and subscribe the oath or oaths prescribed for State officers. Should
only one of the commissioners appointed be present, he shall appoint
**Absence.** another, and both together shall appoint a third, and the commis-
sioners so appointed shall take the oath, and perform all the duties
of commissioners of election in the same manner as if they had
been appointed by the supervisor of registration.

SEC. 7. *Be it further enacted, etc.,* That it shall be the duty of
**Duties of com-** the commissioners of election to receive the ballots of all legal voters
**missioners.** who shall offer to vote, and deposit the same in the ballot box to be
provided for that purpose. The commissioners shall deposit the
ballot of each voter in the ballot box in the full and convenient
view of the voter himself.

SEC. 8. *Be it further enacted, etc.,* That in all cases the vote of
**Votes—how** the person offering to vote shall be taken from the hand of the voter
**taken and** by one of the commissioners of election, and any commissioner of
**deposited.** election receiving a vote from the hands of any person other than
the voter, shall be deemed guilty of a misdemeanor, and upon con-
viction thereof shall be fined not less than one hundred dollars nor
more than three hundred dollars; and any person taking a vote from
a voter for the purpose of handing the same to the commissioner of
election, shall be deemed guilty of a misdemeanor, and, upon convic-
tion thereof, shall be fined not less than one hundred dollars nor more
**Penalty.** than three hundred dollars; *Provided,* That any voter shall have
the right to deposit his own vote in the ballot box with his own
hand.

SEC. 9. *Be it further enacted, etc.,* That any commissioner of
election, constable, police officer or election officer, who shall see any
person taking from the hands of a voter his ballot with intent to
pass it to the commissioners of election, or attempting so to pass
such ballot, shall forthwith arrest such person and convey him at
least one quarter of a mile from the polls, and keep him there under
guard until the close of the polls.

SEC. 10. *Be it further enacted, etc.,* That the commissioners of
**Order and de-** election shall preserve order and decorum at the election, and shall
**corum.** commit to prison, or if at any place over one mile from the parish
prison, to the custody of the officer, who shall convey the prisoner to
a place at least a quarter of a mile from the polls, any disorderly
person or persons for a term not to extend beyond the hour of closing
the polls, provided he be permitted to vote before being imprisoned.
It shall be the duty of the commissioners of election, or any of them,
**Arrest of disor-** to issue a warrant forthwith for the arrest of such person or persons,
**derly persons.** and the officer making the arrest shall commit such person or persons
as above provided until the close of the polls. Such warrants may
be directed to any sheriff, constable or police officer, and shall be
executed immediately by such officer. As soon as practicable after
the closing of the polls, such person or persons shall be brought
before the proper magistrate for examination, who shall proceed
forthwith to examine the case.

SEC. 11. *Be it further enacted, etc.,* That it shall be the duty of the
**Lists of persons** commissioners of election at each poll or voting place to keep a
**voting.** list of the names of the persons voting at such poll or voting place,
which list shall be numbered from one to the end, and said lists of
voters, with their names and number as aforesaid, signed and sworn
to as correct by such commissioners, shall be delivered to the super-

147

visor of registration at the same time the box containing the ballots is delivered to him.

SEC. 12. *Be it further enacted, etc.*, That any commissioner of election shall have power to administer oaths and affirmations to persons offering to vote at any election conducted by them, and to examine such persons under oath touching their right to vote at such election; and in all cases the supervisor of registration for the parish shall appoint one of the commissioners of election to keep a record of the voters during the election, and another to receive the votes, and whenever a vote is received the commissioner of election keeping the record shall call the name of the voter aloud, and shall mark the letter "V" opposite said name on the record.

*Oaths and affirmations.*

*Commissioner to receive votes.*

*Record of persons voting—how kept.*

SEC. 13. *Be it further enacted, etc.*, That all supervisors of registration, assistant supervisors of registration, commissioners of election, and officers attending supervisors of registration or commissioners of election, shall be free from arrest during the time of registration or of the revision of the registration, or of holding the election, or in going to or returning from the place of registration or poll or voting place, unless he or they shall be charged with an offense punishable with death or imprisonment in the penitentiary.

*Officers of election free from arrest.*

*Exception.*

SEC. 14. *Be it further enacted, etc.*, That each commissioner of election shall receive as compensation the sum of five dollars per day for the number of days he is actually employed in the discharge of the duties of his office, for which he shall make a written and specific account, which shall be examined, and if found correct shall be approved and countersigned by the supervisor of registration of the parish and by the Governor, and upon presentation of such account to the Auditor of Public Accounts, said Auditor shall issue his warrant upon the Treasurer for the amount named therein. All proper expenses incurred for the rent of polling or voting places, and the hire of such furniture and incidental expenses necessary for the holding an election, shall be paid by the city or parish authorities in which the elections are held, upon the presentation of a detailed account, duly sworn to and approved by the supervisors of registration for the parish.

*Compensation of commissioners.*

*Expenses.*

SEC. 15. *Be it further enacted, etc.*, That any person duly appointed as a commissioner of election, who shall refuse or fail to serve as such, shall be fined in the sum of one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

*Failure of commissioners to act—penalty.*

SEC. 16. *Be it further enacted, etc.*, That no person shall be permitted to vote at any election to be held in this State, who has not been duly registered as a qualified voter in accordance with law.

*Person must be registered in order to vote.*

SEC. 17. *Be it further enacted, etc.*, That any voter shall vote in the parish wherein he resides, except in the parishes of Orleans and Jefferson, wherein he shall vote at the election precinct in which he shall be a registered voter.

*Where a person may vote.*

SEC. 18. *Be it further enacted, etc.*, That all the names of persons voted for by each voter shall be written or printed on one ticket, on which the names of the persons voted for, together with the office for which they are voted for, shall be accurately specified; and should two (2) or more tickets be folded together, the tickets so folded shall be rejected. The commissioners of election shall require every person offering to vote to exhibit his certificate of registration, and when the vote of such person is received, the commissioners of election shall write on or stamp on such certificate or affidavit the

*Tickets.*

*Certificate of registration to be stamped.*

148

Penalty for
erasure of stamp

word "voted," and the date of the vote, which shall be signed by one of the commissioners; and any person being guilty of erasing or altering any stamp or mark thus made by the commissioners of election, or any one of them, shall upon conviction be deemed guilty of a misdemeanor, and fined and imprisoned at the discretion of the court.

Oaths of voters
may be required
as to previous
voting.

Penalty for re-
fusing to admin-
ister oath.

SEC. 19. *Be it further enacted, etc.,* That the commissioners shall have the right to require that any person attempting to vote shall be put on his oath, and made to declare whether he has voted at another poll or voting place, and in case such person shall make a false oath, he shall be subjected to the penalties provided by law for perjury. And it is hereby made the duty of any commissioner of election, upon the request of any voter, to administer the oath herein required, and any commissioner of election refusing or neglecting to administer the oath, when so requested, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one hundred dollars, and by imprisonment for a term of not less than three months.

As to certificate
of registration.

SEC. 20. *Be it further enacted, etc.,* That any person offering to vote may be required by the commissioners to make oath and declare that he is the person to whom was issued the registration certificate, or other paper upon which he offers to vote, and that he has not voted at any other poll or voting place; and in case he shall make a false oath, he shall be liable to the pains and penalties of perjury prescribed by law.

Printed lists of
registered voters
to be furnished
to Commission-
ers.

SEC. 21. *Be it further enacted, etc.,* That the supervisor of registration for each parish throughout the State shall furnish to the commissioners of election, at each poll or voting place within his parish, a written or printed list, in alphabetical order, of all the registered voters, and the number of the certificate of registration of each voter of the precinct in which the poll or voting place may be situated; and it shall be the duty of the commissioners of election, as soon as a voter has deposited his vote, to erase his name from said list. Any person, except a commissioner of election, who shall mark, disfigure or erase any part of said list, shall be immediately arrested and confined until the close of the polls. It is made the duty of all supervisors and assistant supervisors of registration, commissioners of election, and public officers, to enforce the penalty of this section.

Erasure penal-
ties.

SEC. 22. *Be it further enacted, etc.,* That the police jury of each parish in the State, except the parish of Orleans, shall furnish to the supervisor of registration as many ballot boxes as may be requisite for the holding of all elections in the parish, and in the parish of Orleans it shall be the duty of the Common Council of the city of New Orleans to furnish the supervisor of registration as many ballot boxes as may be necessary for the holding of all elections in the parish.

Ballot boxes, by
whom furnished.

SEC. 23. *Be it further enacted, etc.,* That it shall be the duty of the supervisor of registration of each parish to provide for each election poll or voting place within the parish, one suitable ballot box, at the expense of the parish, if not furnished by the parish.

One for each
poll.

SEC. 24. *Be it further enacted, etc.,* That it shall be the duty of the supervisor of registration in each parish, at least ten days before any election, to cause to be printed and posted up in conspicuous places throughout his parish, and at or near the polls or voting

Law to be posted

149

places, a sufficient number of copies of the provisions of this law imposing penalties for offenses against the freedom and purity of elections.

SEC. 25. *Be it further enacted, etc.*, That the State Registrar of Voters shall furnish to all supervisors of registration all printed blanks and instructions, in conformity with this act, which may be necessary for conducting elections and making returns thereof, which shall be printed by some person to be appointed by the Governor, Lieutenant Governor and Speaker of the House of Representatives, and paid for at the rates allowed for the State printing. The printing shall be measured and approved by the officers aforesaid, and the Auditor of Public Accounts shall issue his warrants therefor upon the State Treasurer only when so approved, in such sums as may be convenient, of not less than fifty dollars nor more than one hundred dollars each. *(margin: Blanks and instructions. How paid for, etc.)*

SEC. 26. *Be it further enacted, etc.*, That all elections held in this State to fill any vacancies shall be conducted and managed, and returns thereof shall be made in the same manner as *(if)* [is] provided for general elections. *(margin: Returns of elections to fill vacancies.)*

SEC. 27. *Be it further enacted, etc.*, That the supervisor of registration for the parish shall conduct all city, town, parish or charter elections, which may be held in his parish, and forward statements thereof to the returning officers in the same manner and form as is prescribed for general elections. *(margin: City, town, parish and charter elections.)*

SEC. 28. *Be it further enacted, etc.*, That the Governor shall commission all officers elect, except members of the General Assembly and the Governor. *(margin: Commissions of officers elect.)*

SEC. 29. *Be it further enacted, etc.*, That in any parish, precinct, ward, city or town, in which during the time of registration or revision of registration, or on any day of election, there shall be any riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, at any place within said parish, or at or near any poll or voting place, or place of registration or revision of registration, which riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, shall prevent, or tend to prevent, a fair, free, peaceable and full vote of all the qualified electors of said parish, precinct, ward, city or town, it shall be the duty of the commissioners of election, if such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, occur on the day of election, or of the supervisor of registration, or any assistant supervisor of registration of the parish, if they occur during the time of registration or revision of registration, to make in duplicate, and under oath, a clear and full statement of all the facts relating thereto, and of the effect produced by such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences in preventing a fair, free, peaceable and full registration or election, and of the number of qualified electors deterred by such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, from registering or voting, which statement shall also be corroborated, under oath, by three respectable citizens, qualified electors of the parish. *(margin: Statement of riots and disturbances to be made.)*

When such statement is made by a commissioner of election or assistant supervisor of registration, he shall forward both copies to the supervisor of registration, immediately on the close of the election. The supervisor of registration shall forward one copy of

3-ER-0596

150

all such statements, whether made by himself or by a commissioner of election, or by an assistant supervisor of registration, to the Governor, and shall deposit one copy with the clerk of a District Court of the parish.

**Writs of injunction, etc.**

Sec. 30. *Be it further enacted, etc.,* That no parish or district judge shall interfere, by writ of injunction or mandamus, or order of court to compel any commissioner of election to do any act or prohibit him from doing any act in his official capacity as commissioner of election, or relating in any manner to the conduct of the election.

**Penalty.**

Any judge so interfering shall be guilty of a misdemeanor in office, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars and imprisonment in the parish prison for not less than three months; *Provided,* That nothing in this section

**Proviso.**

shall be so construed as to exempt any commissioner from a suit for damages or prosecution for violation of the law.

**Prosecution of judge, wrongfully granting certain writs.**

Sec. 31. *Be it further enacted, etc.,* That it shall be the duty of the Governor to cause the Attorney General, or in case of his failure or refusal, to employ competent counsel to prosecute any judge who shall violate the provisions of the foregoing section of this act. In the parish of Orleans such prosecutions shall be before the district court having criminal jurisdiction. Whenever the judge of a district court having jurisdiction of such prosecutions shall be prosecuted for such an offense, the Governor shall appoint some practicing attorney to prosecute the cause. Any attorney so employed, as above directed by the Governor, shall, for each successful prosecution in which he shall have been engaged, receive as compensation a sum to be fixed by the Governor, the judge of a district court and two judges of the Supreme Court, which shall be paid to him upon the warrant of the Governor and such judges, out of any funds in the treasury not otherwise appropriated.

**Members of Congress.**

Sec. 32. *Be it further enacted, etc.,* That all general elections for members of Congress shall be held at the same time, and conducted in the same manner, as is provided for the general elections.

**Returns for Congressional Representatives.**

Sec. 33. *Be it further enacted, etc.,* That as soon as possible after the expiration of the time of making the returns of the election for representatives in Congress, a certificate of the returns of the election for such representatives shall be entered on record by the Secretary of State, and signed by the Governor, and a copy thereof, subscribed by said officers, shall be delivered to the person so elected, and another copy transmitted to the House of Representatives of the Congress of the United States, directed to the clerk thereof.

**Vacancy in office of Representative in Congress.**

Sec. 34. *Be it further enacted, etc.,* That in case of vacancy, by death or otherwise in the said office of Representatives in Congress, between the general elections, it shall be the duty of the Governor by proclamation, to cause an election to be held according to law, to fill the vacancy.

**Presidential elections.**

Sec. 35. *Be it further enacted, etc.,* That in every year in which an election shall be held for electors of President and Vice President of the United States, such election shall be held on the Tuesday next after the first Monday in the month of November, in accordance with an act of the Congress of the United States, approved January twenty-third, one thousand eight hundred and forty-five, entitled "An Act to establish a uniform time for holding elections for electors of President and Vice President, in all States of the Union;" and

161

such elections shall be held and conducted, and returns made thereof in the manner and form prescribed by law for the general elections.

Sec. 36. *Be it further enacted, etc.,* That whenever the seat of any senator or representatives shall become vacant, and there shall be a session of the General Assembly then sitting or to be held before the next general election, it shall be the duty of the Governor, within five days after being officially informed of such vacancy, to issue his writ of election, directed to the supervisors of registration in and for the parish or parishes in which such vacancy may exist, whose duty it shall be, within three days after its receipt, to give public notice that an election will be held to fill such vacancy on a day to be named by them, which day shall not be less than eight nor more than fifteen days after the publication of such notice, if such election be held during or within fifteen days next preceding a session of the General Assembly, but if not, then the election shall be held not less than twenty nor more than thirty days after the publication of such notice, and shall be held and conducted, and the returns thereof made in the manner and form provided by law for general elections.

Sec. 37. *Be it further enacted, etc.,* That in all future elections for senators, representatives, sheriffs, coroners, clerks of the district courts and other officers, if there should be an equal number of votes given to two or more candidates for the same office, the election for such office or offices thus not filled shall be again returned to the people in the parish or district, as the case may be, public notice of ten days to be first given in the same manner as in the general elections.

Sec. 38. *Be it further enacted, etc.,* That the provisions of this act, except as to the time of holding elections, shall apply in the election of all officers whose election is not otherwise provided for.

Sec. 39. *Be it further enacted, etc.,* That it shall be the duty of the Governor, at least six weeks before every general election, to issue his proclamation, giving notice thereof, which shall be published in the official journal of the State, and copies thereof forwarded to the several supervisors of registration throughout the State.

Sec. 40. *Be it further enacted, etc.,* That notice of every general election held under the provisions of this act shall be given at least thirty days before the election, by notices posted up in each precinct, or if there be an official newspaper published in the parish, by publishing the notice in such paper.

Sec. 41. *Be it further enacted, etc.,* That the supervisors of registration, or commissioners of election, shall, on the day of election, close all drinking saloons, dram shops, groggeries or places where liquor is sold by the glass or bottle, situated within a radius of two miles of any poll or voting place. And said supervisors or commissioners of election shall have the power to call on any sheriff, constable or police officer to enforce this regulation. If such sheriff, constable or police officer shall refuse to obey any order issued under the authority of this section, the commissioner or supervisor giving the order shall summarily arrest and imprison such sheriff, constable or police officer, such imprisonment not to extend beyond the hour of closing the polls. And such sheriff, constable and police officer so refusing to obey such order shall be deemed guilty of a misdemeanor in office, and upon conviction thereof, shall be punished by imprisonment for a term not to exceed six months, nor less than three months, and by a fine of not more than ($500) five hundred dollars, nor less than ($100) one hundred dollars.

3-ER-0598

152

**Peace officers to issue warrant for closing drinking houses.** SEC. 42. *Be it further enacted, etc.,* That the Governor, any justice of the peace, alderman, mayor, judge, or any State officer who may be present at, or have knowledge of any drinking saloon, dram shop, groggery, or place where liquor is sold by the glass or bottle, which is open contrary to the provisions of the foregoing section within the limits therein prescribed, may in writing order any police officer or constable to seize any such liquors, or any carriages or vessels containing the same, or any booths or tents erected within said limits for the purpose of exposing such intoxicating liquors for sale.

**Officers to seize liquors.** SEC. 43. *Be it further enacted, etc.,* That the constable or police officer to whom such order shall be delivered, shall thereupon seize all such liquor, carriages, vessels, and the materials of any such tent or booth and hold and detain the same until twenty-four hours after the close of the election, then to be delivered on demand to the owner or the person from whom they were taken, on the payment of ten dollars for the safe keeping of said articles.

**Sale of liquors, etc.** SEC. 44. *Be it further enacted, etc.,* That if these effects be not thus demanded, the same shall be sold at public auction by the police officer or constable making the seizure, and the proceeds of such sale, after deducting costs of sale and safe keeping, shall be paid to the owner of the articles sold, or the person from whom the same were taken.

**Registered voter not to be challenged as to residence.** SEC. 45. *Be it further enacted, etc.,* That no voter whose name is registered according to law shall be challenged at the polls on any question of residence, but it shall be the duty of the commissioners of elections to require every person whose name appears on the registration books to prove his identity if required by the commissioners of election; and any commissioner of election who shall receive a second vote on the same day by virtue of the same certificate of registration, and any person who shall offer to vote a **Voting twice.** second time upon any certificate of registration, shall be deemed guilty of a misdemeanor, and on conviction thereof be fined or imprisoned, or both, at the discretion of the court, but the fine shall not exceed one hundred dollars in each case, nor the imprisonment one year, and the like punishment shall, on conviction, be inflicted on **Endorsement on certificate.** any commissioner of election who shall neglect or refuse to make the endorsement required as aforesaid, on the said registration certificate.

**Wrongful issue of naturalization certificates.** SEC. 46. *Be it further enacted, etc.,* That if any clerk of a court, or deputy of any such clerk, or any other person, shall affix the seal of office to any naturalization paper or permit the same to be affixed, or give out, or cause or permit the same to be given out, in blank, whereby it may be fraudulently used, or furnish a naturalization certificate to any person who shall not have been duly examined and sworn in open court, in the presence of some of the judges thereof, according to the act of Congress, or shall aid in, connive at, or in any way permit the issue of fraudulent naturalization certificates, he shall be guilty of a misdemeanor; or if any one shall fraudulently use any such certificate of naturalization, knowing it to have been fraudulently issued, or shall vote, or attempt to vote thereon, or if any one shall vote, or attempt to vote, on any certificate of naturalization not issued to him, he shall be guilty of a misdemeanor; and either or any of the persons, their aiders or abettors, guilty of either of the misdemeanors aforesaid, shall, on conviction, be fined in a sum not exceeding one thousand dollars, and imprisoned in the penitentiary for a period not exceeding three days.

Sec. 47. *Be it further enacted, etc.,* That if any person, on oath or affirmation, in or before any court in the State, or officer authorized to administer oaths, shall, to procure a certificate of naturalization for himself or any other person, willfully depose, declare or affirm any matter to be fact, knowing the same to be false, or shall in like manner deny any matter to be fact, knowing the same to be true, he shall be deemed guilty of perjury, and any certificate of naturalization issued in pursuance of any such deposition or affirmation, shall be null and void; and it shall be the duty of the court issuing the same, upon proof being made before it that it was fraudulently obtained, to take immediate measures for recalling the same for cancellation; and any person who shall vote, or attempt to vote, on any paper so obtained, or who shall in any way aid in, connive at, or have any agency whatever in the issue, circulation or use of any fraudulent naturalization certificate, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall undergo an imprisonment in the penitentiary for not more than two years, and pay a fine, not more than one thousand dollars, for every such offense, or either or both, at the discretion of the court.

Sec. 48. *Be it further enacted, etc.,* That at all general elections the names of all candidates to be voted for in the cities of New Orleans and Jefferson shall be written or printed on one ticket, or slip of paper, and the number of the ward and election precinct in which the ticket is to be voted, shall be printed or written on the outside fold thereof.

Sec. 49. *Be it further enacted, etc.,* That the supervisors of registration in the parishes of Orleans and Jefferson shall, during registration and at least within six days preceding any general election, furnish to the Board of Metropolitan Police Commissioners a copy of the lists of registered voters in each precinct in said parishes.

Sec. 50. *Be it further enacted, etc.,* That the Board of Metropolitan Police Commissioners shall forthwith proceed by means of the police to inquire into and report to said supervisors the names of all persons falsely, fraudulently or improperly registered; and to this end the Board of Metropolitan Police Commissioners shall divide each ward into convenient subdivisions or blocks, and shall assign to each subdivision one or more police officers, whom they shall direct and cause to compare the names of the actual residents of said subdivisions or blocks with the names of the registered voters thereof, and to report to them the names of all persons whom they shall find to be falsely, fraudulently or improperly registered, and the Board of Metropolitan Police Commissioners shall report the same in an alphabetical list, with the names and residences thereof as registered, to the supervisors of registration of said parishes of Orleans and Jefferson, respectively, who shall immediately make publication thereof in the official journal of the State, with notice to all such persons to appear forthwith at the office of the supervisor of registration of said parishes, respectively, and show cause why their names should not be erased from the registry list. If any such person shall appear and show to the satisfaction of the Supervisor of Registration that he has been unjustly reported as falsely, fraudulently or improperly registered, or show other sufficient cause why his name should remain on the registry list, his name shall not be erased; otherwise the supervisor of registration shall cause all

20

164

names so reported to be erased from the registry list, and no person whose name is so erased shall **vote** at that election.

**Mayor prohibited from conducting elections in Orleans and Jefferson.**

Sec. 51. *Be it further enacted, etc.,* That the mayors of the cities of New Orleans and Jefferson are hereby prohibited from appointing commissioners or (thair) [other] officers to hold or conduct any election whatever, and from doing any act toward the holding or conducting of any election.

Any mayor who shall do any act contrary to the provisions of this section shall be deemed guilty of a misdemeanor in office, and, upon conviction thereof, shall be punished by imprisonment for not less than three months, and by a fine of not less than three hundred dollars. Any citizen may prosecute any person violating this section.

**Sheriffs not to interfere in elections in Orleans and Jefferson and St. Bernard**

Sec. 52. *Be it further enacted, etc.,* That it shall be unlawful for the sheriffs of the parishes of Orleans, Jefferson and St. Bernard, or either of them, to appoint any deputies to conduct or in any manner to interfere with the elections in said parishes, or to station any deputies or their officers at any poll or voting place or at any office of registration, for the purpose of receiving or carrying the ballot boxes, or to do any act toward conducting the elections, or toward maintaining or preserving the peace on the day of election. The whole care of the peace and order of the cities of New Orleans, Jefferson and Carrollton, and in the parishes of Orleans, Jefferson and St. Bernard, on the days of election, shall be in the charge of the Metropolitan Police, subject to the orders of the Governor.

**Penalty.**

Any sheriff who shall do any act contrary to the provisions of this section shall be deemed guilty of a misdemeanor in office, and, upon conviction thereof, shall be removed from office, and be imprisoned for not less than three months, and be fined not less than three hundred dollars. Any citizen may prosecute any person violating the provisions of this section.

**Sealing of ballot boxes.**

Sec. 53. *Be it further enacted, etc.,* That immediately upon the close of the polls on the day of election, the commissioners of election at each poll or voting place shall seal the ballot box by pasting slips of paper over the key hole and the opening in the top thereof, and fastening the same with sealing wax on which they shall impress a seal, and they shall write the names of the commissioners on the said slips of paper; they shall forthwith convey the ballot box so sealed to the office of, and deliver said ballot box to the supervisor of registration for the parish, who shall keep his office open for that purpose from the hour of the close of the election until all the votes from the several polls or voting places of the precinct shall have been received and counted. The supervisor of registration shall immediately upon the receipt of said ballot box note its condition and the state of the seals and fastenings thereof, and shall then in the presence of the commissioners of election and three citizens freeholders of the parish for such poll or voting place, open the ballot box and count the ballots therein, and make a list of all the names of the persons and offices voted for, the number of votes for each person, the number of ballots in the box, and the number of ballots rejected, and the reason therefor. Said statement shall be made in triplicate, and each copy thereof shall be signed and sworn to by the commissioners of election of the poll and by the supervisor of registration. As soon as the supervisor of registration shall have made

**Delivery of ballot boxes.**

**Counting of ballots.**

**Statement of votes.**

135

the statement above provided for for each poll in his precinct or
parish, and it shall have been sworn to and subscribed as above
directed, the supervisor of registration shall inclose in an envelop
of strong paper or cloth, securely sealed, one copy of such state-
ment from each poll and one copy of the list of persons voting at
each poll, and one copy of any statements as to violence or disturb-
ance, bribery or corruption, or other offenses specified in section
twenty-nine of this act, if any there be, together with all memoranda
and tally lists used in making the count and statement of the votes,
and shall send such package by mail, properly and plainly addressed,
to the Governor of the State. The supervisor of registration shall
send a second copy of said statement to the Governor of the State
by the next most safe and speedy mode of conveyance, and shall
retain the third copy in his own possession.

SEC. 54. *Be it further enacted, etc.,* That the Governor, the Lieu-
tenant Governor, the Secretary of State, and John Lynch and T. C.
Anderson, or a majority of them, shall be the returning officers for
all elections in the State, a majority of whom shall constitute a
quorum and have power to make the returns of all elections. In
case of any vacancy by death, resignation or otherwise by either of
the board, then the vacancy shall be filled by the residue of the board
of returning officers. <span style="float:right">Returning offi-<br>cers.</span>

The returning officers shall, after each election, before entering
upon their duties, take and subscribe to the following oath before
a judge of the Supreme or any District Court:

I, A. B., do solemnly swear (or affirm) that I will faithfully and
diligently perform the duties of a returning officer as prescribed by <span style="float:right">Oath.</span>
law; that I will carefully and honestly canvass and compile the
statements of the votes and make a true and correct return of the
election. So help me God.

Within ten days after the closing of the election said returning
officers shall meet in New Orleans to canvass and compile the state- <span style="float:right">Meeting.</span>
ments of votes made by the supervisors of registration, and make
returns of the election to the Secretary of State. They shall continue
in session until such returns have been completed. The Governor
shall at such meeting open, in the presence of the said returning
officers, the statements of the supervisors of registration, and the
said returning officers shall, from said statements, canvass and com- <span style="float:right">Compiled re-<br>turns.</span>
pile the returns of the election in duplicate. One copy of such
returns they shall file in the office of the Secretary of State, and of
one copy they shall make public proclamation by printing in the
official journal and such other newspapers as they may deem proper,
declaring the names of all persons and offices voted for, the number
of votes for each person, and the names of the persons who have
been duly and lawfully elected. The returns of the elections thus
made and promulgated shall be *prima facie* evidence in all courts
of justice and before all civil officers until set aside, after a contest
according to law of the right of any person named therein to hold
and exercise the office to which he shall by such return be declared
elected.

The Governor shall within thirty days thereafter issue commis-
sions to all officers thus declared elected who are required by law to <span style="float:right">Commissions.</span>
be commissioned.

SEC. 55. *Be it further enacted, etc.,* That in such canvass and com-
pilation the returning officers shall observe the following order: <span style="float:right">Duties of retur-<br>ing officers.</span>
They shall compile first the statements from all polls or voting

156

places at which there shall have been a fair, free and peaceable registration and election. Whenever from any poll or voting place there shall be received the statement of any supervisor of registration, assistant supervisor of registration, or commissioner of election, in form as required by section twenty-nine of this act, on affidavit of three or more citizens, of any riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, which prevented or tended to prevent a fair, free, and peaceable and full vote of all qualified electors entitled to vote at such poll or voting place, such returning officers shall not canvass, count or compile the statement of votes from such poll or voting place until the statements from all other polls or voting places shall have been canvassed and compiled. The returning officers shall then proceed to investigate the statements of riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences at any such poll or voting place, and if from the evidence of such statements they shall be convinced that such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, did not materially interfere with the purity and freedom of the election at such poll or voting place, or did not prevent a sufficient number of qualified voters thereat from registering or voting to materially change the result of the election, then, and not otherwise, said returning officers shall canvass and compile the vote of such poll or voting place with those previously canvassed and compiled; but if said returning officers shall not be fully satisfied thereof, it shall be their duty to examine further testimony in regard thereto, and to this end they shall have power to send for persons and papers. If, after such examination, the said returning officers shall be convinced that said riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences did materially interfere with the purity and freedom of the election at such poll or voting place, or did prevent a sufficient number of the qualified electors thereat from registering and voting, to materially change the result of the election, then the said returning officers shall not canvass or compile the statement of the votes of such poll or voting place, but shall exclude it from their returns.

The returning officers may appoint such clerks as may be necessary, for a length of time not to exceed thirty days, who shall be paid five dollars per day each for the time actually served, which time shall be specified in a written account, subscribed and sworn to by such clerk, and approved by the returning officers. The Auditor of Public Accounts shall issue his warrant upon the treasury for the amount of such account so subscribed and sworn to and approved.

Sec. 56. *Be it further enacted, etc.,* That it shall be the duty of the Secretary of State to transmit to the Clerk of the House of Representatives and the Secretary of the Senate of the last General Assembly a list of the names of such persons as, according to the returns, shall have been elected to either branch of the General Assembly, and it shall be the duty of said clerk and secretary to place the names of the representatives and senators elect, so furnished, upon the roll of the House and of the Senate respectively, and those representatives and senators whose names are so placed by the clerk and secretary, respectively, in accordance with the foregoing provisions, and none other, shall be competent to organize the House of Representatives or Senate. Nothing in this act shall be

construed to conflict with article thirty-four of the constitution of the State.

SEC. 57. *Be it further enacted, etc.,* That should any of the returning officers named in this act be a candidate for any office at any election, he shall be disqualified to act as returning officer for that election, and a majority of the remaining returning officers shall summon some respectable citizen to act as returning officer in place of the one so disqualified. — Candidates not to be returning officers.

SEC. 58. *Be it further enacted, etc.,* That any civil officer or other person who shall assume or pretend to act in any capacity as a commissioner or other officer of election, to receive or count votes, to receive returns or ballot boxes, or to do any other act toward the holding or conducting of elections, or the making returns thereof, in violation of or contrary to the provisions of this act, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the penitentiary for a term not to exceed three years nor less than one year, and by a fine not exceeding three hundred dollars nor less than one hundred dollars. — Intrusion into office.

SEC. 59. *Be it further enacted, etc.,* That any person or persons who shall obstruct, hinder, or by violence or threats of violence, abusive language, or other species of intimidation, interfere with a supervisor or assistant supervisor of registration or commissioner of election, or with any person or persons duly appointed to execute orders of the supervisor of registration or commissioners of elections, in the discharge of their duties, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding three hundred dollars nor less than one hundred dollars, and by imprisonment for a period not exceeding three months nor less than one month. — Intimidation, etc.

SEC. 60. *Be it further enacted, etc.,* That any person or persons who shall counsel, aid, connive at, abet, encourage or participate in any riots, tumults, acts of violence, intimidation, or armed disturbance at or near the office of any supervisor or assistant supervisor of registration, on any day of registration or revision of registration, or at or near any poll or voting place, on any day of election, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a period not exceeding two years nor less than six months. — Abetting acts of violence.

SEC. 61. *Be it further enacted, etc.,* That any person who shall register or cause to be registered his name, or that of any other person as a legal voter, in violation of law, or vote, or induce or cause another to vote, in violation of the laws, or of the constitutional provisions in such cases made and provided, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine of not more than five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a period not less than one year nor more than three years. — False registry and voting.

SEC. 62. *Be it further enacted, etc.,* That any person or persons who shall purchase or cause to be purchased the registration papers or certificate of registration of any person duly registered according to law, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a term not less than one year nor more than three years. — Purchase of registration papers, etc.

158

**Sec. 63.** *Be it further enacted, etc.,* That any person who shall vote or attempt to vote on any false or fraudulent paper or certificate of registration, or upon any paper or certificate of registration issued to a person other than the one voting or attempting to vote on said paper or certificate of registration, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a term not less than one year nor more than three years.

*False certificates, etc.*

**Sec. 64.** *Be it further enacted, etc.,* That any person who shall induce, by offer of reward, by threats of violence, or otherwise, any person to vote or attempt to vote on any false or fraudulent paper or certificate of registration, or upon any papers or certificate of registration belonging to a person other than the one voting or attempting to vote on said paper or certificate of registration, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a period not exceeding three years nor less than one year.

*Bribery and violence.*

**Sec. 65.** *Be it further enacted, etc.,* That any person who shall vote or attempt to vote more than once at the same election, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the penitentiary for a term of not less than three years.

*Twice voting.*

**Sec. 66.** *Be it further enacted, etc.,* That it shall be the duty of any commissioner of election to forthwith arrest any person who shall vote or attempt to vote more than once, and commit him to the parish prison, and to immediately file an information against such person with the district attorney or district attorney *pro tempore* whose duty it shall be to prosecute such person before the proper court; and upon his failure so to do, the Attorney General shall appoint some attorney to prosecute such person, and also to prosecute such district attorney or district attorney *pro tempore* for such failure. Any supervisor of registration, commissioner of election, district attorney, or district attorney *pro tempore* who shall refuse, neglect or fail to comply with the provisions of this section of this act, shall be deemed guilty of a misdemeanor in office, and upon conviction thereof shall be removed from office, and punished by a fine of not less than one hundred dollars, and imprisonment for not less than three nor more than six months.

*Arrest of offenders.*

**Sec. 67.** *Be it further enacted, etc.,* That any person who shall, by threats of discharge from employment, of withholding wages, or proscription in business, influence or attempt to influence any voter in the casting of his vote at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, which shall go to the school fund of the parish, and by imprisonment in the parish prison for not less than three months.

*Influencing voters.*

**Sec. 68.** *Be it further enacted, etc.,* That any person who shall discharge from his employment any laborer, employe, tenant or mechanic, who shall have been working for such person under contract, written or oral, for a specified time before such time shall have expired, or who shall withhold from any laborer, employe, tenant or

*Discharge from employment of voter.*

3-ER-0605

159

mechanic any part of the wages due to such laborer, employe, tenant or mechanic, on account of any vote which such laborer, employe, tenant or mechanic has given or purposes to give, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than five hundred dollars, one half of which shall go to the school fund of the parish in which the offense was committed, and by imprisonment in the parish prison for not less than three months.

SEC. 69. *Be it further enacted, etc.,* That any person who shall molest, disturb, interfere with, or threaten with violence, any commissioner of election or person in charge of the ballot boxes, while in charge of the same, between the time of the close of the polls and the time that said ballot boxes are delivered to the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *[margin: Interference with commissioners, etc.]*

SEC. 70. *Be it further enacted, etc.,* That any person not authorized by this law to receive or count the ballots at an election, who shall, during or after any election, and before the votes have been counted by the supervisors of registration, disturb, displace, conceal, destroy, handle or touch any ballot, after the same has been received from the voter by a commissioner of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court. *[margin: Disturbing the counting of ballots.]*

SEC. 71. *Be it further enacted, etc.,* That any person not authorized by this law to take charge of the ballot boxes at the close of the election who shall take, receive, conceal, displace or [in] any manner handle or disturb any ballot box at any time between the hour of the closing of the polls and the transmission of the ballot box to the supervisor of registration, or during such transmission, or at any time prior to the counting of the votes by the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *[margin: Interference with ballot boxes.]*

SEC. 72. *Be it further enacted, etc.,* That if any person shall by bribery, menace, willful falsehood, or other corrupt means, directly or indirectly attempt to influence any elector of this State in the giving his vote or ballot, or to induce him to withhold the same, or disturb or hinder him in the free exercise of the right of suffrage at any election in this State, he shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five hundred dollars, and be imprisoned in the parish prison for a term not exceeding six months, and shall also be ineligible to any office in the State for the term of two years. *[margin: Interference with free exercise of right of suffrage.]*

SEC. 73. *Be it further enacted, etc.,* That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dol- *[margin: Weapons.]*

160

lars, and by imprisonment in the parish jail for not less than one month; provided, that the provisions of this section shall not apply to any commissioner or officer of the election or supervisor or assistant supervisor of registration, police officer or other person authorized to preserve the peace on days of registration or election.

**Liquors.**

Sec. 74. *Be it further enacted, etc.*, That no person shall give, sell or barter any spirituous or intoxicating liquors to any person on the day of election, and any person found guilty of violating the provisions of this section shall be fined in a sum of not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

**Corruptly voting.**

Sec. 75. *Be it further enacted, etc.*, That whoever, knowing that he is not a qualified elector, shall vote or attempt to vote at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Double vote.**

Sec. 76. *Be it further enacted, etc.*, That whoever shall knowingly give or vote two or more ballots folded as one at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Bribery to influence voters.**

Sec. 77. *Be it further enacted, etc.*, That whoever, by bribery or by a promise to give employment or higher wages to any person, attempts to influence any voter at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish prison for not less than three months.

**Obtaining illegal voting.**

Sec. 78. *Be it further enacted, etc.*, That whoever willfully aids or abets any one, not legally qualified, to vote or attempt to vote at any election, shall be fined in a sum of not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Disorderly houses.**

Sec. 79. *Be it further enacted, etc.*, That whoever is disorderly at any poll or voting place during an election, shall be fined in a sum not less than twenty dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Meetings of citizens.**

Sec. 80. *Be it further enacted, etc.*, That whoever shall molest, interrupt or disturb any meeting of citizens assembled to transact or discuss political matters, shall be fined in a sum not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Any sheriff, constable or police officer present at the violation of this section shall forthwith arrest the offender or offenders, and convey him or them, as soon as practicable, before the proper court.

**Imprisonment.**

Sec. 81. *Be it further enacted, etc.*, That the court imposing any fine, as directed in sections seventy-four, seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine and eighty of this act, shall commit the person so fined to the parish prison until the fine is paid; *Provided*, That said imprisonment shall not exceed six months.

**Perjury.**

Sec. 82. *Be it further enacted, etc.*, That in cases where any oath or affirmation shall be administered by any supervisor of registration, assistant supervisor of registration or commissioner of election, in the performance of his duty as prescribed by law, any person swearing or affirming falsely in the premises shall be deemed guilty of perjury, and subjected to the penalties provided by the law for perjury.

**Duty of Governor to insure peace.**

Sec. 83. *Be it further enacted, etc.*, That the Governor shall take all necessary steps to secure a fair, free and peaceable election; and shall, on the days of election, have paramount charge and con-

161

trol of the peace and order of the State, over all peace and police officers, and shall have the command and direction in chief of all police officers, by whomsoever appointed, and of all sheriffs and constables in their capacity as officers of the peace.

Sec. 84. *Be it further enacted, etc.* That to defray the expenses of the next revision of registration, and of the next general election, there is hereby appropriated out of any funds in the treasury not otherwise appropriated, the sum of fifty thousand dollars ($50,000), or so much thereof as may be necessary.

Sec. 85. *Be it further enacted, etc.,* That all laws or parts of laws contrary to the provisions of this act, and all laws relating to the same subject matter are hereby repealed, and that this act shall take effect from and after its passage.

(Signed)         MORTIMER CARR,
       Speaker of the House of Representatives.

(Signed)         OSCAR J. DUNN,
       Lieutenant Governor and President of the Senate.

Approved March 16, 1870.

(Signed)         H. C. WARMOTH,
       Governor of the State of Louisiana.

A true copy:

    GEO. E. BOVEE,
       Secretary of State.

———

[No. 101.]           AN ACT

To define and regulate the cost of the Clerks, Sheriffs, Recorders and Notaries Public throughout the State of Louisiana, and providing forfeitures and penalties for overcharging or failing to perform their duties, and the mode of collecting their fees.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That the clerks of the district courts throughout the State shall be entitled to demand and receive the following fees of office, and no more; and they shall not be entitled to charge any other fees of office than those specially set forth therein, for any services as clerks which they may be required to render:

For indorsing, registering and filing petition, for all, ten cents.

For indorsing, registering and filing answer, for all, ten cents.

For issuing citation, with copy of same, with certificate and seal on each, fifty cents, one charge for both.

For issuing attachment, with copy of same, with certificates and seals on both, one dollar, one charge for both.

For issuing *fieri facias,* with seal, fifty cents.

For issuing writ of seizure and sale, with seal, one dollar.

For issuing writ of sequestration, with copy of same, with certificates and seals, one dollar, one charge for both.

For issuing writ of *certiorari,* with copy of same, with certificates and seals, one dollar, one charge for both.

21

3-ER-0608

# A DIGEST

OF THE

# LAWS OF TEXAS:

## CONTAINING THE LAWS IN FORCE,

AND

## THE REPEALED LAWS

ON WHICH RIGHTS REST,

FROM 1864 TO 1872,

### CAREFULLY ANNOTATED.

BY GEORGE W. PASCHAL,

OF AUSTIN, TEXAS,

LATE REPORTER OF THE SUPREME COURT OF TEXAS, AUTHOR OF PASCHAL'S ANNOTATED
CONSTITUTION, PASCHAL'S DIGEST OF DECISIONS, ETC., ETC.

### Third Edition—Volume II.

8.
WASHINGTON, D. C.:
W. H. & O. H. MORRISON,
LAW BOOKSELLERS AND PUBLISHERS.
1873.

EXHIBIT T (Rivas)

Digitized by Google

Original from
HARVARD UNIVERSITY

Generated on 2023-02-16 14:51 GMT  /  https://hdl.handle.net/2027/hvd.h13e66
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

3-ER-0609

Case: 23-16164, 10/05/2023, ID: 12805489, DktEntry: 7-4, Page 230 of 298

se 1:23-cv-00265-LEK-WRP   Document 55-24   Filed 07/14/23   Page 2 of 3   PageID.

CRIMINAL CODE.                                                    1317

ceeding one thousand dollars, and imprisoned in the penitentiary for a period not exceeding three years.

CHAPTER IV.—RIOTS AND UNLAWFUL ASSEMBLIES AT ELECTIONS, VIOLENCE USED TOWARDS ELECTORS. *11 July, 1870. Art. 6476 for caption.*

ART. 6485. [28] Any person who may, by threats, intimidation, or violence, resist or impede a registrar, or board of appeals or revision, in the discharge of their duties, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine of not less than fifty, nor more than one hundred dollars, and by imprisonment of not less than sixty days, or more than six months, in the county jail. *Punishment of threats and intimidation impeding registration. Art. 6684.*

ART. 6486. [28] Any registrar who, by violence or threats, is impeded in the discharge of his duty, shall report the same to the sheriff, who shall furnish a sufficient force to enable him to proceed in the discharge of his duty. *Registrars to report violence.*

ART. 6487. [38] Any person or persons who shall disturb the registrars or boards of revision in the full and fair discharge of their duties, by acts of intimidation, by inciting or encouraging a tumult or mob, or who shall cause such disturbance, or encourage, or abet any tumult, mob, or violence in the vicinity of any place of registry, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding five hundred dollars, or by imprisonment in the penitentiary for a period not exceeding two years, nor less than six months *Disturbers of registrars punished. Fine or imprisonment.*

ART. 6488. [46] (cl. 1) Any person who shall, by threats of discharge from employment, of withholding wages, or of proscription in business, influence, or attempt to influence, any voter in the casting of his vote at any election, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than five hundred dollars, one-half of which shall go to the informer, and the other half to the school fund of the state, and by imprisonment in the county prison for not less than three months. *Intimidation of voter by threats punished as misdemeanor. Art. 1893. Fine not less than $500, and 3 months imprisonment.*

ART. 6489. [43] (cl. 2) Any person who shall discharge from his employment any laborer, employé, tenant, or mechanic, who shall have been working for such person under contract, written or oral, for a specified time, before such time shall have expired, or who shall withhold from any laborer, employé, tenant, or mechanic, any part of the wages due to such laborer, employé, tenant, or mechanic, on account of any vote which such laborer, employé, tenant, or mechanic has given, or purposes to give, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine of not less than five hundred dollars, one-half of which shall go to the informer, and the other half to the school fund of the state, and by imprisonment in the county jail for not less than three months. *Punishment for discharging laborer on account of his vote, made a misdemeanor, and punished by fine not less than $500 and 3 months' imprisonment.*

ART. 6490. [55] (1) It shall be unlawful for any person to carry any gun, pistol, bowie-knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election. (2) Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the county jail for not less *Carrying weapons at election punished. Art. 1801. Penalty for violating this section.*

Generated on 2023-02-10 14:52 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google        Original from
HARVARD UNIVERSITY

**3-ER-0610**

**1318**                 CRIMINAL CODE.

**Officers of election and police exempted.** than one month: *Provided*, That the provisions of this section shall not apply to any officer of the election, police officer, or other person authorized to preserve the peace on the days of election.

**Selling liquor on days of election.** ART. 6491. [56] No person shall give, sell, or barter any spirituous or intoxicating liquor to any person on the days of election ; and any person found guilty of violating the provisions of this section shall be fined in a of sum not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

**School fund.**

**15 Aug., 1870; art. 6481 for caption. Disturbing election by mob punished. Arts. 1891-1894.** ART. 6492. [49] Any person or persons who shall disturb an election, by inciting or encouraging a tumult or mob, or shall cause such disturbance in the vicinity of any poll or voting place, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by a fine not exceeding five hundred dollars, nor less than two hundred dollars, and by imprisonment in the penitentiary for a period not exceeding two years, nor less than six months.

**11 July, 1870. Art. 6476 for caption.** CHAPTER V.—MISCELLANEOUS OFFENSES AFFECTING THE RIGHT OF SUFFRAGE.

**Alterations, changes, and mutilations of registration books punished by fine or imprisonment. Art. 1900.** ART. 6493. [26] If any person shall alter, change, mutilate, or in any manner deface any book of registration, or shall take and carry away the same from the office of the clerk of the district court, registrar, or judge of election, or other place where the same may be lawfully deposited, or from the lawful possession of any person whomsoever, with intent to destroy, suppress, alter, or conceal, or in any wise mutilate or destroy the same, so as to prevent the lawful use of such book or books of registration, such person shall be deemed guilty of felony, and, upon conviction thereof, shall be punished as prescribed in section twenty-five of this act.

**Art. 6480.**

**Punishment for false registration and illegal voting. Perjury. Art. 1898.** ART. 6434. [32] (cl. 1) Any person who shall take and subscribe the registration oath falsely shall, upon conviction thereof, be punished as provided by law for the crime of perjury, and any person who shall knowingly and willfully vote, or attempt to vote, upon the registration certificate of another, or of one who may be dead, shall, upon conviction thereof, forfeit and pay a fine of five hundred dollars, and in default thereof shall be imprisoned in the county jail for a term not exceeding one year.

**Penalty.**

**Giving false name punished by fine or imprisonment.** ART. 6495. [32] (cl. 2) Any person giving a false name, with intent to deceive a registrar, shall, upon conviction thereof, be deemed guilty of a misdemeanor, and fined in a sum not to exceed one hundred dollars, or be punished by imprisonment in the county jail for a term not to exceed one year.

**15 Aug., 1870. Art. 6481 for caption. Disturbing ballots punished by fine or imprisonment.** ART. 6496. [47] Any person not authorized by this law to receive or count ballots at an election, who shall, during or after any election, and before the votes have been counted by the judges of election, disturb, displace, conceal, destroy, handle, or touch any ballot, after the same has been received from the voter by the judge of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court.

**At discretion.**

**Repeaters punished by fine and imprisonment. Art. 1897.** ART. 6497. [48] Any person who shall vote, or attempt to vote, more than once at the same election, shall be deemed guilty of a felony, and, upon conviction thereof, shall be pun-

Generated on 2023-02-18 14:52 GMT  /  https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by  Google

Original from
HARVARD UNIVERSITY

**3-ER-0611**

20013470

# THE MARYLAND CODE.

# Public Local Laws,

CODIFIED BY

## JOHN PRENTISS POE.

ADOPTED BY THE GENERAL ASSEMBLY OF MARYLAND
MARCH 14, 1888.

*Including also the Public Local Acts of the Session of 1888
incorporated therein.*



BY AUTHORITY OF THE STATE OF MARYLAND.

## VOLUME II,

CONTAINING ARTICLE 11, FREDERICK COUNTY, TO ARTICLE 24,
WORCESTER COUNTY.

BALTIMORE:
KING BROS., PRINTERS AND PUBLISHERS.
1888.

EXHIBIT U (Rivas)

1874, ch. 250.

**99.** It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

Ibid.

**100.** The fines collected under the preceding section shall be paid by the officer collecting the same, to the school commissioners of the county, for school purposes.

Ibid.

**101.** Any constable of said county, or the sheriff thereof, who shall refuse to arrest any person violating section 99, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof before the circuit court shall be fined not less than twenty nor more than fifty dollars, and shall forthwith be discharged from office.

### FENCES.

P. L. L., (1860,) art. 14, sec. 91.

**102.** Wherever joint fences have been or may be established in said county, for the mutual advantage of different owners or possessors of adjoining lands, each party shall keep in good repair his proper proportion thereof, in manner following, that is to say: all post and rail or plank fences shall be at least four feet six inches high, and not more than four inches between the lower and second, and not more than five inches between the second and third rails; and all worm or other fences shall be five feet high; the height of said fences to be in every case computed from the ground or base of any embankment upon which they may be erected.

Ibid. sec. 92.

**103.** If either of the parties so making or keeping a joint fence shall not comply with the provisions of the preceding

92

# LAWS

### OF THE

# STATE OF MARYLAND,

#### MADE AND PASSED AT A SESSION OF THE GENERAL ASSEMBLY,

Begun and held at the City of Annapolis, on the Sixth day of January,
and ended on the Fifth day of April, 1886.

## 1886



PUBLISHED BY AUTHORITY.

### BALTIMORE:
## JOHN MURPHY & CO.
*Publishers of the New Revised Code of Maryland, Hinkley's Testamentary Law, &c.*
182 BALTIMORE STREET.

GEORGE T. MELVIN, STATE PRINTER.
1886.

## EXHIBIT V (Rivas)

3-ER-0614

HENRY LLOYD, Esquire, Governor.                    315

G. L. Copeland; and also to issue his warrant
upon the Treasurer for the sum of sixty dol-
lars, payable to the order of Abram Zarks;
and also to issue his warrant upon the Treas-
urer for the sum of sixty dollars, payable to
the order of C. E. Gordon; the said sums of
money having been paid for State license erro-
neously issued to said persons by the Clerk of
the Circuit Court of Anne Arundel county.

Sec. 2. *And be it enacted,* That this act shall     Effective.
take effect from the date of its passage.

Approved April 7, 1886.

----

CHAPTER 189.

AN ACT to prevent the carrying of guns, pis-
tols, dirk-knives, razors, billies or bludgeons
by any person in Calvert county, on the days
of election in said county, within one mile
of the polls.

Section 1. *Be it enacted by the General As-
sembly of Maryland,* That from and after the
passage of this act, it shall not be lawful for
any person in Calvert county to carry, on the
days of election and primary election, within
three hundred yards of the polls, secretly, or
otherwise, any gun, pistol, dirk, dirk-knife,
razor, billy or bludgeon, and any person violat-     Unlawful to
ing the provisions of this act, shall be deemed      carry weapons
guilty of a misdemeanor, and on conviction           to the polls.
thereof by the Circuit Court of Calvert county
having criminal jurisdiction thereof, or before
any Justice of the Peace in said county, shall
be fined not less than ten nor more than fifty
dollars for each offence, and on refusal or
failure to pay said fine, shall be committed to
the Jail of the county until the same is paid.

Sec. 2. *And be it enacted,* That the fines col-
lected under this act shall be paid by the offi-

# ACTS

AND

## JOINT RESOLUTIONS

PASSED BY

# THE GENERAL ASSEMBLY

OF THE

## STATE OF VIRGINIA

DURING THE

### SESSION OF 1877-78.

RICHMOND:
R. F. WALKER, SUPERINTENDENT PUBLIC PRINTING.
1878.

EXHIBIT W (Rivas)

**304**                                     ACTS OF ASSEMBLY.

Penalty | ished by a fine not exceeding one hundred dollars, or by imprisonment in jail not exceeding six months.

### Cruelty to animals; profanity and drunkenness.

Cruelty to animals

15. If a person cruelly beat or torture any horse, animal or other beast, whether his own or that of another, he shall be fined not exceeding fifty dollars.

Penalty

Profanity and drunkenness

16. If any person, arrived at the age of discretion, profanely curse or swear, or get drunk, he shall be fined by a justice one dollar for each offence.

Penalty

### Violation of the Sabbath.

Violation of Sabbath

17. If a person, on a Sabbath day, be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business, except in household or other work of necessity or charity, he shall forfeit two dollars for each offence; every day any servant or apprentice is so employed constituting a distinct offence.

Penalty

### Exceptions as to the mail, and as to certain persons.

Transportation of mail excepted

Exception as to certain religionists

18. No forfeiture shall be incurred under the preceding section for the transportation on Sunday of the mail, or of passengers and their baggage.   And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business and labor on that day: provided he does not compel an apprentice or servant, not of his belief, to do secular work or business on Sunday, and does not on that day disturb any other person.

Proviso

Sale of intoxicating liquors prohibited between certain hours

19. No bar-room, saloon, or other place for the sale of intoxicating liquors, shall be opened, and no intoxicating bitters or other drink shall be sold in any bar-room, restaurant, saloon, store, or other place, from twelve o'clock on each and every Saturday night of the week, until sunrise of the succeeding Monday morning; and any person violating the provisions of this section, shall be deemed guilty of a misdemeanor, and, if convicted, shall be punished by fine not less than ten nor more than five hundred dollars; and shall, moreover, at the discretion of the court, forfeit his license: provided that this law shall not apply to any city having police regulations on this subject, and an ordinance inflicting a penalty equal to the penalty inflicted by this section.

Penalty

Proviso

Disturbance of religious worship

20. If a person willfully interrupt or disturb any assembly met for the worship of God, or being intoxicated, if he disturb the same, whether willfully or not, he shall be confined in jail not more than six months, and fined not exceeding one hundred dollars, and a justice may put him under restraint during religious worship, and bind him for not more than one year to be of good behavior.

Penalty

**3-ER-0617**

ACTS OF ASSEMBLY.                                         305

21. If any person carrying any gun, pistol, bowie-knife, *Carrying dangerous weapons at a place of worship or on Sunday* dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises, shall be fined not less than twenty dollars. *Penalty* If any offence under this section be committed at a place of religious worship, the offender may be arrested on the order *Offenders subject to arrest without warrant* of a conservator of the peace, without warrant, and held until warrant can be obtained, but not exceeding three hours. It shall be the duty of justices of the peace, upon their own *Duty of justice where he knows of offence under this section* knowledge, or upon the affidavit of any person, that an offence under this section has been committed, to issue a warrant for the arrest of the offender.

*Protection of religious assemblies; prohibition against sale of liquors or other things near such meetings; proviso.*

22. If any person shall erect, place, or have any booth, *Sale of liquors, &c., prohibited* stall, tent, carriage, boat, vessel, vehicle, or other contrivance whatever, for the purpose or use of selling, giving, or otherwise disposing of any kind of spirituous and fermented liquors, or any other articles of traffic; or shall sell, give, barter, or otherwise dispose of any spirituous or fermented liquors, or any other articles of traffic within three miles of any camp-meeting, or other place of religious worship, during the time of holding any meeting for religious worship at such place, such person, on conviction before a justice of the peace, for the first offence, shall be fined not less than ten *Penalty* dollars, nor more than twenty dollars, and stand committed to jail until the fine and costs are paid; and for the second *Penalty for second offence* offence, shall be fined as aforesaid, and be imprisoned not less than ten nor more than thirty days.

23. If any person shall commit any offence against the *Additional penalty* provisions of the preceding section, he shall, in addition to the penalties therein mentioned, forfeit all such spirituous or fermented liquors, and other articles of traffic, and all the chests and other things containing the same, belonging to and in the possession of the person so offending, together with such booth, stall, tent, carriage, boat, vessel, vehicle, or other contrivance or thing prepared and used in violation of said section; and it shall be the duty of any sheriff, deputy sheriff, *Duty of sheriffs, &c., to arrest offender and seize the property* or constable, if he sees any person violating the preceding section, to arrest the offender and carry him before a justice of the peace. The sheriff, deputy sheriff, or constable, when he arrests the offender, shall seize the property hereby declared to be forfeited, or shall seize the same on a warrant against the offender, if such offender cannot be found; and the justice of the peace before whom such offender is convicted, or before whom the warrant is returned that the offender cannot be found, shall enter judgment of condemnation against such property, and issue a fieri facias for the *Judgment of condemnation*

39

3-ER-0618

**306**                           ACTS OF ASSEMBLY.

Fi. fa. to Issue
Proviso

sale thereof: provided the person who has been returned not found, and whose property has been condemned in his absence, may appear at any time before the sale of the property and have the case tried as if he had appeared at the return of the warrant.

To whom provisions not to apply

24. The provisions of the two preceding sections shall not apply to any licensed tavern-keeper, merchant, shop-keeper, farmer, or other person in the usual and lawful transaction of his ordinary business, in the usual place of transacting such business, or to any person having permission, in writing from the superintendent of such meeting, to sell such articles as may be named in such permission: provided this permission shall not extend to the sale of any spirituous or fermented liquors.

Proviso

### Right of appeal.

Right of appeal preserved

25. Nothing in this chapter shall prevent the courts of record from exercising their common law or statutory jurisdiction in all cases for disturbing public worship: provided that the party convicted under the twenty-second or twenty-third sections of this chapter shall have the right to appeal to the next county court for the county where the conviction is had, upon giving bail for his appearance at court, and upon such appeal shall be entitled to a trial by jury: and provided further, that when any person or persons are proceeded against under the twenty-second or twenty-third sections of this chapter, he or they shall not be held to answer for the same offence before any grand jury or court of record, except as herein provided.

Proviso

Persons proceeded against not subject to answer before grand jury

### Temporary police force for religious meetings.

Temporary police authorized

26. The supervisor, or any justice of the magisterial district where the meeting is held, shall have power to appoint a temporary police to enforce the provisions of this chapter.

------

## CHAPTER VIII.

### OF OFFENCES AGAINST PUBLIC HEALTH.

### Selling unsound provisions.

Sale of unsound provisions

1. If a person knowingly sell any diseased, corrupted, or unwholesome provisions, whether meat or drink, without making the same known to the buyer, he shall be confined in jail not more than six months, and fined not exceeding one hundred dollars.

Penalty

Case 1:23-cv-00045-xxx-xxxx   Document 66-16   Filed 07/14/23   Page 1 of 1   PageID 764

# REVISED

# ORDINANCES

— OF THE —

# CITY OF BOULDER

Published by Authority of the City.

OSCAR F. A. GREENE,

COMPILER.

1899:
Printed by Ricketts & Kerr, at The News Office,
BOULDER, COLORADO.

EXHIBIT X (Rivas)

thirty-two in township one north of range seventy west, is hereby named and shall hereafter be known as VALVER-DAN PARK.

**510. Washington Park.**

Sec. 5. That the city property in the west half of the south-west quarter of section twenty-five in township one north of range seventy-one west, shall be named and here-after known as WASHINGTON PARK.

PARKS.

An Ordinance for the Protection of the Several Parks Belonging to the City and of the Buildings and Reservoirs and Trees and Other Improvements at and Within Said Parks, and to Pro-vide Penalties for Injuring the Same.
Passed October 4, 1898.

(With amendment as noted.)

**511. No firearms or shooting in.**

Section 1. Any person other than the police officers of the city who shall take or carry or cause to be taken or carried into any of the parks belonging to the City of Boulder, any gun, pistol, revolver, or other firearm, or who shall shoot any firearm at or towards or over or into or upon any of said parks, shall be deemed guilty of a misdemeanor. (As amended August 2, 1899.)

**512. No powder or explosives in.**

Sec. 2. Any person who shall take or carry or cause to be taken or carried into any of said parks, any powder of any quality or kind or any explosive or dangerous or inflammable or combustible substance, shall be deemed guilty of a misdemeanor.

**513. No fires or explosives.**

Sec. 3. Any person who shall start any fire or cause or permit to be started any fire in any of said parks, not

Greene, Oscar F. A. Revised Ordinances of the City of Boulder. Authority of the City, Ricketts & Kerr, 1899. The Making of Modern Law: Primary Sources, link.gale.com/apps/doc/ DT0106029343/MMLP?u=efgssf&sid=bookmark-MMLP&pg=2. Accessed 13 July 2023.

# An Ordinance,

## Concerning the carrying of Arms or Deadly Weapons.

Be it ordained by the City Council of the City of San Antonio,

SECTION I. That if any person shall, within the Corporate limits of the City of San Antonio, go into any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering, for amusement or instruction, composed of ladies and females, or to any election precinct in the city, on the day or days of any election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any bar-room, drinking saloon or any other place where people resort for business or amusement, or shall join or accompany any public procession, having about his or her person, a bowie-knife, dirk, or butcherknife or any fire arms or arms, whether known as six-shooter, gun or pistol of any kind, or having about his or her person, what is known as brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence. Such person shall be deemed guilty of a misdemeanor, and upon conviction thereof, before the Recorder of the city, shall be fined not less than five dollars nor more than one hundred dollars and costs, and in default of payment, shall be confined in the city prison, or placed at hard labor on the public works of the city, for not less than five days, nor more than thirty days, to be determined by the Recorder; Provided, this Ordinance shall not apply to any legally authorized conservator of the peace, when he may be in the lawful discharge of his duty.

SEC. 2. It shall be the duty of the Police of the city to strictly enforce this Ordinance, and promptly to arrest and disarm any person violating the same; Provided, that in all cases where arms are taken possession of by the police, as herein provided, they shall be returned to the owner when he leaves the city.

SEC. 3. This ordinance shall take effect and be in force from and after its publication.

APPROVED, San Antonio, December 14th, A. D. 1870.

WM. C. A. THIELEPAPE,
Mayor City of San Antonio.

Attest :
G. W. BARTHOLOMEW, Jr., City Clerk.

20-12-70d10t.

EXHIBIT Y (Rivas)

3-ER-0623

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,<br><br>    Plaintiffs,<br><br>  v.<br><br>ANNE E. LOPEZ, in her official capacity as Attorney General of the State of Hawaiʻi; MAUI COUNTY,<br><br>    Defendants. | Civil No. 1:23-cv-00265-LEK-WRP |

## <u>DECLARATION OF TERENCE YOUNG</u>

I, Terence Young, declare under penalty of perjury that the following is true and correct:

1.      Since fall 2020, I have been Emeritus Professor of Geography in the Department of Geography & Anthropology, California Polytechnic State University, Pomona.

2.      I was an Assistant, Associate, and full Professor of Geography, Department of Geography & Anthropology, California Polytechnic State University, Pomona between fall 2002 and spring 2020.  During the same period, I was also an adjunct in the university's Regenerative Studies program.  Before fall

3-ER-0624

2002, I held academic positions as a geographer at California State University,

Long Beach, University of Southern California, UCLA, Clemson University,

George Washington University, and Mary Washington University.  In 1996-1997, I

was Acting Director of Studies in Landscape Architecture, Dumbarton Oaks

Library and Research Center, Harvard University, Washington, DC.

3.     I earned a Bachelor of Arts in Anthropology at UC Berkeley (1973), a

Master of Arts in Geography at UCLA (1987), and a Ph.D. in Geography at UCLA

(1991).[1]

4.     As a scholar, I have studied the history and historical geography of the

American park movement, including from its earliest years, the meanings,

purposes, developments, designs, and usages of various types of protected areas

since I began work on my doctoral degree in fall 1987.  In my professional

capacity, I authored award-winning scholarly books, book chapters, and journal

articles concerning American protected areas and the American park movement.

These publications have been cited by authors in multiple disciplines, including

history, geography, anthropology, natural resources management, and more.

5.     I am aware of this lawsuit, have reviewed the Complaint

("Complaint") filed by Jason Wolford, Alison Wolford, Atom Kasprzychi, and the

---

[1] For a full CV, please see Exhibit 1 to this Declaration.

Hawaii Firearms Coalition ("Plaintiffs") in this matter, and am familiar with the claims and allegations of the Complaint.

6.    I am being compensated for services performed in the above-entitled case at an hourly rate of $200 for reviewing materials and preparing reports; and $400 per hour for depositions and court appearances.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

7.    The testimony in this Declaration is based upon a combination of my professional training, research, and work experiences in my various academic roles, and upon my personal review of relevant documents, rules, regulations, and historical sources of information regarding the public parks and forests.  Any information in this Declaration that I obtained from those outside sources is consistent with my own understanding.

## Overview of Opinions

8.    When the American park movement launched in the 1850s, it drew on the idea that American urban society was flawed and that urban parks could repair and reform it.  Specifically, urban parks would foster a healthier, wealthier, more democratic, and less criminal urban society.  Backed by a Romantic ideology, this social transformation occurred because parks contained natural scenery, which when quietly and passively contemplated, was thought to improve someone's mind and body, and thus society.  Any features or actions in a park that interfered with

natural scenery contemplation were excluded from a park.  In keeping with a

park's purpose and its function as a society-improving device, firearms were

specifically prohibited.

9.      Near the end of the nineteenth century, a rationalistic ideology joined

the earlier Romantic one.  The new ideology emphasized such active recreation in

parks as baseball and bicycling because these were also thought to lead to a

healthier, wealthier, more democratic and less criminal society.  However, the new

ideology did not eliminate the passive contemplation of natural scenery.  Instead,

urban parks were re-designed to provide separate spaces for active play and for

quiet contemplation.  These two uses of public urban parks continue to this day,

each with its own spaces.

10.      In the late nineteenth and early twentieth centuries, America's natural

national parks were also created to protect landscape of natural scenery.  Like their

urban counterparts, they were romantic places for quiet and passive contemplation

in order to improve urban society.  Later, national parks also became places for

active recreation, but it was never as important as in the urban parks.  Today's

national parks remain places for the contemplation of natural scenery and for

active play.

11.     At roughly the same time that national parks were being created, state parks appeared.  Like urban and national parks, they were protected to be places for contemplating natural scenery and for active play.  They remain so to this day.

### Growth of the Nineteenth Century Parks Movement

#### Urban Parks

12.     The development of the American park system and the park movement evolved over decades and centuries in response to existing societal concerns and circumstances.

13.     English colonial settlements typically centered on a small communal area, which might include a "green" and a meeting house.  On the outskirts of the settlement, a larger, otherwise unusable tract of land would be set aside as a town common, but *not* as a park in the modern sense.  Instead, commons were undesigned spaces that all a settlement's residents could use for such activities as animal grazing or military drills.  The Boston Common began in this fashion.  A 1775 map of Boston identifies the Commons and locations within it for an artillery battery, marine barracks, and a burying ground.  In addition to this regular urban pattern, at least one notable variant emerged in Philadelphia, PA and Savannah, GA.  In lieu of a small central space and a larger marginal space, these settlements included public squares distributed among private residential lots, but again they

5

were not modern parks because they were undesigned and used for such public

urban activities as military drills (Pregill and Volkman, 1999; Page, 1775).

14.     The colonial situation continued largely unchanged into the early

American Republic.  During the early American Republic, dedicated greenspaces

in urban areas were limited and, where they existed, they did not exceed three

square miles.  The early American greenspaces usually took the form of public

squares in places like Philadelphia and Savannah or commons agricultural spaces

like the Boston Common.  Urban public spaces remained scarce and limited to

small, undesigned squares and commons while such cities as Boston, Philadelphia,

and New York developed as economic institutions dedicated to commerce.  These

growing agglomerations were necessarily compact, usually about three square

miles, densely built, and crowded.

15.     The notion that such swelling cities needed larger greenspaces began

in the pre-Civil War years as increasing numbers of Americans concluded the

existing open spaces were inadequate.  These initial urban greenspace proponents

embraced the "rural" cemeteries that first appeared on the margins of cities during

the 1830s.  The most celebrated of these was Mt. Auburn Cemetery in Boston,

which was launched in 1831.  These sites had designed sections that included

naturalistic scenery, but they were not parks in the modern sense.  Rather, they

were didactic landscapes containing monuments with moral lessons.  Moreover,

3-ER-0629

they were owned and managed by private, non-profit organizations and often too far from city centers to be accessible to working people (Schuyler, 1986; Linden-Ward, 1989).

16.    The creation of large urban parks began at this time and in these locations for cultural reasons that go back to the early Republic when a national mistrust of and suspicion about urban life was prevalent.  Thomas Jefferson, for example, had argued in 1787's *Notes on the State of Virginia* that the ideal society would flourish where the economy was agricultural and the settlements small and dispersed.  Invoking a geographic contrast, Jefferson promulgated a valorized rural-urban imaginary that regarded the former as healthy and positive while casting the latter as damaging and negative.  Farmers, he insisted, were the backbone of America.  "Those who labor in the earth are the chosen people of God, if ever he had a chosen people, whose breasts he has made his peculiar deposite (sic) for substantial and genuine virtue."  Manufacturing and cities, in contrast, were sources of vice.  Drawing a particularly repulsive word picture, Jefferson suggested that "The mobs of great cities add just so much to the support of pure government, as sores do to the strength of the human body."  The roots of the republican nation, urged Jefferson, lay in the rejection of urban life (Jefferson, 1829, 171-173; Young, 2022).

7

17.     Until the middle of the Nineteenth Century, the vast majority of Americans lived in rural settings, but in the pre-Civil War years, industrialization increased rapidly, surface transportation encouraged urban spreading, and cities grew in area and population numbers.  This concentration of people accentuated social problems, making them more obvious to more people.  Cities became increasingly perceived as socially degraded places in contrast to virtuous rural America.  In line with this perception, cities were condemned as unhealthy, impoverished, undemocratic, and crime ridden.  A range of solutions were proposed to remedy these urban vices (Boyer, 1978), including municipal parks. In a large park, urban residents could "retreat" from the city to be back in touch with nature, which would lead to social reform and improvement.  Parks, proponents and supporters argued, would produce a virtuous society characterized by health, wealth, equality, and little crime (Young, 2004).

18.     As cities developed into primary engines of commerce in the American economy their populations necessarily grew.  For example, from 1830 to 1860, the population of New Haven grew from 10,000 to 39,000, Boston from 61,000 to 178,000, Philadelphia from 80,000 to 566,000, and New York from 203,000 to 814,000.

19.     The modern public park and greenspace movement that would generate urban, regional, state, and national protected areas was born in the 1840s

3-ER-0631

and 1850s when proponents applied the lessons of cemeteries to argue for large

public parks areas in America's cities.  At first, a handful of existing urban spaces,

for instance, the Fairmount Gardens that surrounded Philadelphia's waterworks,

were opened to the public and "ornamented …with a degree of taste and elegance"

(Schuyler, 1986, 102).  Nonetheless, the turning point arrived in 1857-1858 when

New York City held a design competition for its new Central Park, which

Frederick Law Olmsted and Calvert Vaux won, and that park's development

began.  The first major protected area in the modern American public park

movement, New York's Central Park would become a model for many subsequent

urban parks.  Before the Nineteenth Century ended, America's best-known urban

parks had appeared, including Boston's Franklin Park, Brooklyn's Prospect Park,

Philadelphia's Fairmount Park, Chicago's Washington and Jackson Parks, San

Francisco's Golden Gate Park, Los Angeles's Griffith Park, and San Diego's

Balboa Park.  The initiation and development of each park was unique, but they

occurred where supported by a significant portion of the population, were all

relatively large in area, generally over 500 acres, and shared a common purpose –

the improvement of American society (Schuyler, 1986; Young, 2004).

20.    Park proponents and supporters were more environmentally

deterministic than we are today.  They believed that society's characteristics were

strongly shaped by its physical environments.  Urban environments of noise,

3-ER-0632

traffic, pollution, crowding, and ugly buildings led to a vicious society, while an

urban park's "natural" environment, in contrast, would lead to a virtuous one.  For

example, according to an 1867 Newark, New Jersey park report, a park was

designed to produce "a certain [positive] effect upon the mind and the character of

those who approach it" (Schuyler and Turner Censer, 1992, 211).  Forty years

later, a City Beautiful leader, Charles Mulford Robinson, made a similar link

between society and its surroundings.  "Social problems are to a large degree

problems of the environment."  Create parks where adults and children can find

"brightness, entertainment, and fellowship without throwing them into

temptation… and many of sociology's hardest problems will be solved"

(Robinson, 1909, 245).  Urban vice did not occur because society was evil by

nature but because its members were out of touch with nature, a source of

goodness.  Public urban parks were devices for social reform.  They succeeded best

where features common to urban environments and urban ways of life were

excluded (Young, 2004).

21.    New York's Central Park was the first major attempt to achieve this

goal and was based on an 1858 design by Frederick Law Olmsted and Calvert

Vaux. Before the Nineteenth Century ended, America's best-known urban parks

had appeared, including Boston's Franklin Park, Brooklyn's Prospect Park,

Philadelphia's Fairmount Park, Chicago's Washington and Jackson Parks, San

10

Francisco's Golden Gate Park, Los Angeles's Griffith Park, and San Diego's

Balboa Park.  The initiation and development of each park was unique, but they

occurred where supported by a significant portion of the population, were all

relatively large in area, generally over 500 acres, and shared a common purpose –

the improvement of American society (Schuyler, 1986; Young, 2004).

22.     The foundation for the ideology of the early urban park proponents

and supporters lies in Romanticism and the Romantic Movement.  While the

philosophy and movement had diverse expressions, it can be broadly recognized

by a rejection of rationalism, a regard for history and a focus on perception and

beauty, particularly that of nature.  Moreover, the movement embraced the belief

that a group of people's character or nationality grew organically and emerged

over a long period of time.  In addition, Romanticism contributed to the growth of

democracies, to a belief in progress and to the more open societies that are

common features of modern life (Barzun 1961).  Romantic park supporters, like

many contemporary artists and scientists (Novak 1995), saw nature as an

interrelated world of mind, body, and being, an organic whole that included God,

people, and the physical world.  Social problems resulted from the physical

disjunction that developed between nature and people in any city large enough to

be dominated by streets and buildings.  Ignoring the benefits from urban life, they

viewed the city as a dangerous environmental aberration that could lead to the

dissolution of society.  Parks were the necessary corrective because they brought

nature, which was God's handiwork, balanced and inherently good, back into

cities.  As the minister Henry Ward Beecher enunciated in 1869, for "the

multitude," natural beauty was a gift of God "without price." It could "confer

pleasure and profit from merely the looking at it" (Beecher, 281-284).

     23.    Nature was not a simple, unconsidered object in this era.  Park

designers and their supporters believed it could occur in three landscape art

categories or "genres" on park landscapes: the "Beautiful" (also called the

"Pastoral" by Frederick Law Olmsted), the "Picturesque," and the "Sublime."

Each was yoked to a set of unique attributes.  Smallness, roundness, smoothness,

delicacy, and color best captured the Beautiful, making it the preferred genre for

parks with extensive lawns or water features bordered by shrubs and trees.  The

Sublime countered the Beautiful, being linked to terror, obscurity, difficulty,

power, vastness, majesty, and infinity, but it remained beyond the ability of urban

park designers because their landscapes were too restricted to create it.  However,

it informed the selection of and lay behind the drive for national parks.  The

Picturesque mediated the two extremes, expressing the pleasure gained by abrupt,

unexpected, or rude forms and textures, as well as the roughness that could exist at

any scale.  Many large urban parks incorporated picturesque elements as a

stimulating contrast to beautiful ones, but picturesque rarely dominated (Novak, 1995; Young 2004).

24.    And, like some landscape scene in a painting, a municipal park's "naturalistic" landscape was intended to support only pastoral and picturesque activities.  As built, large urban parks were places for "passive recreation," which meant sitting, strolling, slow horse riding, and other quiet activities while contemplating the scenery.  Activities that were fast moving, active, boisterous, or worse ran counter to a park's purpose.  In support of these aesthetics, Parade Grounds were isolated from the park proper in both Olmsted and Vaux's Prospect Park and in Olmsted's unbuilt 1866 plan for San Francisco (Graff 1985; Young 2018).  Places for military exercises and displays, Parade Grounds were spaces "for citizens to demonstrate their commitment to defense of their government" (Rosenzweig and Blackmar, 1992, 143).  According to Olmsted (1990b, 532), these places were necessary, but they should not conflict with "the safety or the quiet of those not interested in them."  That is, a park's visitors.  Consequently, Parade Grounds were closed off or moved away from a park proper.  They were, argued Schuyler (1986, 131), "locations for functions that, while essential in a city, would be antithetical to the tranquility of a naturalistic landscape."

25.    Moreover, in March 1858, one month before Central Park's first Commissioners (1858, 166) awarded a plan for the new park, they adopted a set of

rules and regulations that forbade "all persons" from carrying "fire-arms" in the park. Aligned with these rules and regulations, and as a practical matter, they also created a force of Park Keepers in 1859 to control activities deemed inappropriate. "A woods shared by 'thousands' demanded a different kind of care than woods visited by a few," noted David Thacher before quoting the New York Times of February 21, 1859: "Nature in the neighborhood of large towns needs rules and regulations to enable her to do herself justice, just as certainly as in the country she does better without them" (Thacher, 2015, 591). Proponents and supporters of large urban parks understood that the heavy use of the nature in a park that would result from its being easily accessible necessarily mandated rules and regulations to control and direct visitors in order to allow nature to reform society.

26.     Beginning in the 1880s and 1890s, an increasing number of American urban park advocates and supporters embraced a new rationale for municipal parks, what I term "rationalistic" parks. American cities continued to be plagued by poverty, disease, undemocratic acts, and crime, but these new park proponents did not abandon the idea of urban social improvement through parks. Instead, they stepped back from the romantic idea that scenic park landscapes alone reformed society and embraced a more Darwinian and mechanistic view of nature. As their perspective grew in importance, the value of nature contemplation somewhat retreated, and parks were re-imagined as favored settings for organized play and

14

other leisure-time activities.  Flower gardens, museums, baseball diamonds, and children's playgrounds became common parks features as rationalistic park proponents pursued their formula for encouraging the good society.  These advocates saw romantically designed parks as underdeveloped rather than mis-designed, so they did not seek to remove and replace the features of romantic-era parks.  Instead, they wished to share space in the large parks by introducing the features they believed would reform society.  In addition, municipal park authorities created numerous, generally smaller greenspaces throughout cities in order to bring the reforming abilities of parks into neighborhoods.  Visitors would no longer have to travel long distances to the large parks.  These small parks utilized both romantic and rationalistic characteristics and were more tools in the effort to improve urban society (Young, 2004).

27.    Today, the romantic and rationalistic ideals still thrive in America's urban parks.

28.    At no point did my research reveal any evidence that supported the passive carrying of firearms for self-defense in these urban parks.  Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of urban parks as promoted by those ideals.

**National Parks**

15

29.    The emergence and development of America's national parks followed an ideological arc quite similar to urban parks and for much the same purpose – the improvement of American society.  Like urban parks, national park advocates and supporters initially embraced Romanticism.  The creation of American national parks and state parks (see below) began in 1864 when President Lincoln signed legislation ceding the Yosemite Valley and Mariposa Big Tree Grove to the state of California for "public use, resort, and recreation; [and] inalienable for all time" (Dilsaver, 2016a, 4).  Frederick Law Olmsted, who lived in California at the time, was appointed a commissioner on the new park's board and supervised the creation of the report for its administration.  In addition to this "skillful" plan for the park's administration, "he advocated a policy of establishing national parks across the nation and laid the foundation for our current national park system" (Freeman, 1989, 172).

30.    For Olmsted, the creation of national parks was not a gift but a duty.  "It is the main duty of government, if it is not the sole duty of government, to provide means of protection for all its citizens in the pursuit of happiness" (Olmsted, 1990a, 502).  Where Romantic urban parks had employed the Beautiful and the Picturesque, California's Yosemite Park improved society through a blend of the Beautiful and the Sublime.  The new park was, argued Olmsted, a "union of the deepest sublimity with the deepest beauty of nature, not in one feature or

16

3-ER-0639

another, not in one part or one scene or another, not any landscape that can be framed by itself, but all around and wherever the visitor goes, constitutes the Yo Semite the greatest glory of nature" (Olmsted, 1990a, 500). Immersed in the park's natural beauty, visitors were improved through passive interaction with the scenery. "[T]he enjoyment of scenery," stated Olmsted, "employs the mind without fatigue and yet exercises it, tranquilizes it and yet enlivens it; and thus, through the influence of the mind over the body, gives the effect of refreshing rest and reinvigoration to the whole system" (Olmsted, 1990a, 504). Consequently, Olmsted thought the principal duty of the park's commissioners was "to give every advantage practicable to the mass of the people to benefit by that which is peculiar to this ground" (Olmsted, 1990a, 506). At the same time, he cautioned that constraints had to be applied to the "mass" of visitors in order for the park to benefit society both in the present and in the future. "[I]t should be remembered that in permitting the sacrifice of anything that would be of the slightest value to future visitors to the convenience, bad taste, playfulness, carelessness, or wanton destructiveness of present visitors, we probably yield in each case the interest of uncounted millions to the selfishness of a few individuals" (Olmsted, 1990a, 507). Finally, he pointed to the uniqueness that had "caused Congress to treat [Yosemite Valley and Mariposa Big Tree Grove] differently from other parts of the public

3-ER-0640

domain" and to that which would guide the creation of subsequent national parks.
"This peculiarity consists wholly in its natural scenery" (Olmsted, 1990a, 506).

31.    In less than a decade, the first, officially designated "national park"
was created in 1872: Yellowstone.  A large, protected area of approximately 2.2
million acres, its origin lay in the Romantic path of scenery identified by Olmsted.
"Yellowstone's awesome natural phenomena had inspired a political phenomenon"
(Sellars, 1997, 7).  In the authorizing act, the park was "hereby reserved and
withdrawn from settlement, occupancy or sale… and dedicated and set apart as a
public park or pleasuring ground for the benefit and enjoyment of the people."
Placed under the Interior Secretary, the act directed the Secretary "to make and
publish such rules and regulations as he may deem necessary or proper for the care
and management of the same."  Among these, the Secretary "shall provide against
the wanton destruction of the fish and game found within said park" and he
"generally shall be authorized to take all such measures as shall be necessary or
proper to fully carry out the objects and purposes of this act" (Dilsaver, 2016b, 20-
21).  Over the next 40 years, Congress and the President designated (and
sometimes transferred) numerous natural preserves under federal jurisdiction,
including Sequoia, Yosemite, Mount Rainier, Glacier, and Rocky Mountain
National Parks.  Like the original Yosemite cession and Yellowstone National
Park, these subsequent parks were large, relatively distant from most of America's

3-ER-0641

population because they were out west while the people were back east, and "preserved largely for their aesthetic qualities," which like urban parks, were thought to improve society (Mackintosh, 2005, 14).

32.     The rationalistic rationale began to inform national park features and usage toward the end of the Nineteenth and the beginning of the Twentieth Centuries.  As the public, which increasingly lived in America's cities, came to expect urban parks to be both scenic and places for museums, bicycling, and other forms of active play, they also came to see county, state, and national parks as serving the same purpose.  Consequently, Interior Secretary Franklin K. Lane (Dilsaver, 2016c, 37) instructed National Park Service Director Stephen T. Mather that "All outdoor sports which may be maintained consistently with the observation of the safeguards thrown around the national parks be law will be heartily endorsed and aided wherever possible.  Mountain climbing, horseback riding, walking, motoring, swimming, boating, and fishing will ever be the favorite sports.  Wintersports will be developed in the parks that are accessible throughout the year."  In contrast, however, "Hunting will not be permitted in any national park."

33.     The American Civic Association (ACA), a private, eastern-based organization that had originated in the nineteenth century and promoted the creation of all parks as social reforming devices, incorporated all types of parks—

19

municipal, county, state, or national—in their reform agenda because they believed

that any given park comprised the local expression of a more durable concept, that

all parks were socially impactful when they shared three important features: nature,

scenery, and play, which when combined properly, created the ideal of the park.

According to the ACA's president, J. Horace McFarland (1912, 3), this park

performed a valuable social function; it "act[s] immediately and favorably on the

health and the orderliness of the community, and consequently increase[s]

materially the average of individual efficiency.  In other words, they pay dividends

in humanity."  That is, such parks at every geographic scale reformed a rapidly

urbanizing America.  National parks, like urban parks, would foster a virtuous

society characterized by health and wealth.  The ACA further claimed that national

parks would foster democracy and patriotism among Americans (Young, 1996).

34.    Today, the same rationales applicable to urban parks guide the

public's expectations and inform the actions of national park proponents and

supporters.

35.    Again, at no point in my research did I discover any evidence of

support for the passive carrying of firearms for self-defense in national parks.

Such encouragement would have been inconsistent with romantic and rationalistic

ideals and antithetical to the social purpose of national parks as promoted by those

ideals.

**State Parks**

36.     America's state parks today appear in every state and in types that

vary from state to state and sometimes even within a single state.  The history of

their designation and development reveals a halting and uneven pattern, but it

nonetheless followed the same ideological arc that guided the unfolding of urban

and national parks, and for much the same purpose – the improvement of society.

Like national park advocates and supporters, state park activists thought striking

scenic places would lead to a society that was healthier, wealthier, more

democratic and more socially coherent.

37.     Before California eventually returned Yosemite valley and grove to

the federal government in 1906 for inclusion in Yosemite National Park, it had

inspired such scenic state parks as Palisades and Watkins Glen in New York and

Mount Mitchell in North Carolina, as well as "sites uniquely worth preserving" in

Connecticut, Indiana, Iowa, and Wisconsin (Cutler, 1989, 195).  Most state parks,

however, did not appear until the Twentieth Century when, as J. Horace McFarland

(1910, 9) noted, they came to be seen as the logical extension between city or

county parks and national parks.  "If, when a natural wonder is found to be of

national importance and to need national protection, it may properly be controlled

by the nation, surely a location or opportunity too large for local or municipal

control may as properly be controlled by the state."  During the first quarter of the

Twentieth Century, state parks came to incorporate both romantic and rationalistic features as people increasingly saw them as places for the passive admiration of the scenery and for play. Nevertheless, state parks were not common.

38.    After 1921, the pace of state park creation increased. Park proponents kept recommending new sites for designation, but they often did so to the new National Park Service. The Park Service recognized that many of these recommendations had merit, but they did not rise to the level of national significance so instead of just rejecting the recommendations, it organized the National Conference on Parks to facilitate the designation of these sites protected by the states. The conference transformed the state park movement, stimulating more widespread interest in their creation.

39.    Furthermore, the National Park Service developed a plan during the Great Depression to create "a healthier and happier citizenry by developing a nationwide system of state parks. The goal was to 'cure the ills of society' by constructing a park within fifty to one hundred miles" of the American populace. And, since a rationalistic park ideology was premier by the 1930s, "one of the primary principles of the plan was to place recreational parks within the reach of every citizen" (Smith, 2013, 207). Working with the Civilian Conservation Corps, the Park Service dramatically increased the number of state parks by building 800 between 1933 and 1942.

3-ER-0645

40.     Hawaii's state parks began to develop at this time. The Hawaii

Territorial Planning Board, with the cooperation of the National Park Service,

undertook "a comprehensive report on existing and proposed park sites" in 1939,

but was never completed (Lombardi, 1959, 5). Ten years later, the Legislature

established a "Territorial Park System" that would consist of sites that expressed

the values associated with urban and national parks. A Hawaiian park was to be

"an area which by reason of location, natural features, scenic beauty or legendary,

historical or scientific interest, possesses distinctive physical, aesthetic,

intellectual, creative, or social values" (Hawaii, 1949, 56). According to Landrum

(2004, 262), Akaka Falls and five other territorial parks were created in 1952 and

several more came along in following years. In 1959, the Territorial Planning

Office, again with the assistance of the National Park Service, produced a

comprehensive state parks proposal entitled, "A Territorial Parks System for

Hawaii," which came in response to a 1957 mandate from the Legislature to "plan

and recommend means for establishing a comprehensive system of Territorial

Parks throughout the Territory for the use and enjoyment of both residents and

visitors" (Lombardi, 1959, 5). At the time, the Territory had no "active and

effective Division of Parks" and only 13 parks, two "protected areas," two

lookouts, two hunting camps and one historical display (Lombardi, 1959, 20, 9).

The proposal recommended a program that would complete in 1965 and include

3-ER-0646

"48 parks, four hunting camps, two museums, one Hawaiian Village, and 51

historic sites." This expanded system would encompass 56,950 acres, "or roughly

nine times the present area for Territorial Parks" (Lombardi, 1959, 23). The

outcome, argued the report, would provide Hawaii with parks that provided the

same services as state parks elsewhere in the country. "[D]evelop and conserve (or

preserve) on a Territory-wide basis, her natural scenic, historical, cultural, and

ecological resources for her own people's needs; and how such resources can be

used productively to enhance economic development via the tourist industry"

(Lombardi, 1959, 20).

41.     While this 1959 proposal clearly noted the value of state parks for

ecological protection, ideas concerning the design of state parks along ecological

lines to support and restore ecosystems and to indirectly improve the lives of the

people who depended on them appeared at different times in different states.

However, in some it came to be as important as play and scenery, for example,

California, by the 1960s (Engbeck, 1980).

42.     For the third time, at no point in my research did I discover any

evidence of support for the passive carrying of firearms for self-defense in state

parks. Such encouragement would have been inconsistent with romantic and

rationalistic ideals and antithetical to the social purpose of state parks as promoted

by those ideals.

***

43.     This Declaration is presented in a form that is much different from academic writings.  It reflects an accurate recounting of my research and conclusions regarding this historical period and the subject matter discussed. However, given the time constraints at issue in this case, as well as the fact it was prepared in connection to a pending lawsuit, it is not drafted at the level of depth that would be expected for academic writing. This declaration was prepared in approximately one week, so the research was limited to my own office bookshelves and short searches on the internet.  If I had more time to travel to libraries and to more thoroughly review primary documents, I would likely be able to frame a more focused case with greater detail. Thus, I reserve the opportunity to supplement this declaration to reflect any additional research or context that may be necessary as this case proceeds.

I certify that pursuant to 28 U.S.C. § 1746 and under penalty of perjury that

to the best of my knowledge, information, and belief, the foregoing is true and

correct.

Executed on July __13__, 2023 at ___CAmbria, CAlifornia___ .

Terence Young

**3-ER-0649**

## **Works Cited**

Barzun, Jacques. 1961. Classic, Romantic and Modern, 2nd Ed., Boston: Little, Brown & Co.

Beecher, Henry Ward. 1869. Eyes and Ears, Boston: Fields, Osgood, and Co.

Board of Commissioners. 1858. Minutes of the Proceedings of the Board of Commissioners of the Central Park, for the Year Ending April 30, 1858, New York: Wm. C. Bryant & Co.

Boyer, Paul. 1978. Urban Masses and Moral Order in America, 1820-1920, Cambridge: Harvard University Press.

City and County of Honolulu, Park Rules and Regulations, Chapter 10. 2023. https://www.honolulu.gov/parks/program/182-site-dpr-cat/3850-cityrules-dpr.html  Accessed July 9, 2023.

City and County of Honolulu, Revised Ordinances of Honolulu, Effective March 31. 2023.  Cincinnati: American Legal Publishing, https://codelibrary.amlegal.com/codes/honolulu/latest/honolulu/0-0-0-1  Accessed July 9, 2023.

Cutler, Phoebe. 1989. "State Parks" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 194-199.

3-ER-0650

Dilsaver, Lary M. 2016a. "An Act Authorizing a Grant to the State of California of the 'Yo-Semite Valley,' and of the land Embracing the 'Mariposa Big Tree Grove." Approved June 30, 1864 (13 Stat. 325)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 4-5.

Dilsaver, Lary M. 2016b. "An Act to Set Apart a Certain Tract of Land Lying Near the Headwaters of the Yellowstone River as a Public Park, Approved March 1, 1872 (17 Stat. 32)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 20-21.

Dilsaver, Lary M. 2016c. "Secretary Lane's Letter on National Park Management, May 13, 1918" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 35-39.

Engbeck Jr., Joseph H. 1980. State Parks of California, from 1864 to the Present, Portland: C.H. Belding.

Freeman, Raymond L. 1989. "National Parks" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 172-175.

Graff, M.M. 1985. Central Park-Prospect Park: A New Perspective, New York: Greensward Foundation.

Hawaii. 1949. "Series A-32: ACT 183-An Act to Establish a Territorial Park System Under the Control and Management of the Board of Commissioners of Agriculture and Forestry; to Define the Functions, Powers and Duties of the Board

3-ER-0651

Relating Thereto; to Provide for a Territorial Park Fund; Providing Penalties;

Amending Sections 6138 and 6768 and Repealing Sections 1964 and 4905 to 4907,

Inclusive, of the Revised Laws of Hawaii 1945" in XX:XX, 56-61.  ????

Jefferson, Thomas. 1829 (1787). Notes on the State of Virginia, Boston:

Wells & Lilly.

Landrum, Ney. 2004. The State Park Movement in America: A Critical

Review, Columbia: University of Missouri Press.

Linden-Ward, Blanche. 1989. "Cemeteries" in American Landscape

Architecture: Designers and Places, Washington, DC: Preservation Press, 120-125.

Lombardi, Frank. 1959. "A Territorial Parks System for Hawaii: A Report

Prepared by the Territorial Planning Office in Cooperation with the Board of

Agriculture and Forestry, with the Assistance of the National Park Service."

[Honolulu]: The Office.

Mackintosh, Barry. 2005. The National Parks: Shaping the System, Rev.

Ed., Harpers Ferry: Harpers Ferry Center.

McFarland, J. Horace. 1910. "Are State Parks Worth While?" typed

manuscript, J. Horace McFarland Papers, Pennsylvania Historical and Museum

Commission, Harrisburg.

3-ER-0652

McFarland, J. Horace. 1912. "Are National Parks Worth While?" typed manuscript, J. Horace McFarland Papers, Pennsylvania Historical and Museum Commission, Harrisburg.

Novak, Barbara. 1995. Nature and Culture: American Landscape and Painting, 1825-1875, Rev. Ed., New York: Oxford.

Olmsted, Frederick Law. 1990a (1865). "Preliminary Report upon the Yosemite and Big Tree Grove" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 488-516.

Olmsted, Frederick Law. 1990b (1866). "Preliminary Report in Regard to a Plan of Public Pleasure Grounds for the City of San Francisco" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 518-546.

Page, Thomas Hyde. 1775. "A plan of the town of Boston with the intrenchments &ca. of His Majesty's forces in 1775, from the observations of Lieut. Page of His Majesty's Corps of Engineers, and from those of other gentlemen." Washington, DC: Library of Congress: https://commons.wikimedia.org/wiki/File:Boston,_1775small1.png

3-ER-0653

Pregill, Philip and Nancy Volkman. 1999. Landscapes in History: Design and Planning in the Easter and Western Traditions, Second Ed. New York: John Wiley & Sons, Inc.

Robinson, Charles Mulford. 1909. Modern Civic Art; or, The City Made Beautiful, 3rd Ed., New York: G.P. Putnam's Sons.

Rosenzweig, Roy and Elizabeth Blackmar. 1992. The Park and the People: A History of Central Park, Ithaca: Cornell University Press.

Schuyler, David. 1986. The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America, Baltimore: The Johns Hopkins University Press.

Schuyler, David and Turner Censer, Jane, Eds. 1992. The Papers of Frederick Law Olmsted, Volume VI: The Years of Olmsted, Vaux & Company, 1865-1874, Baltimore: The Johns Hopkins University Press.

Sellars, Richard West. 1997. Preserving Nature in the National Parks, A History, New Haven: Yale University Press.

Smith, Langdon. 2013. "Democratizing Nature Through State Park Development" Historical Geography 41: 207-223.

Thacher, D. 2015. "Olmsted's police" Law and History Review 33(3): 577-620.

3-ER-0654

Young, Terence. 1996. "Social Reform Through Parks: The American Civic Association's Program for a Better America" Journal of Historical Geography 22(4): 460-472.

Young, Terence. 2004. Building San Francisco's Parks, 1850-1930, Baltimore: The Johns Hopkins University Press.

Young, Terence. 2018. "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in The American Environment Revisited, Geoffrey L. Buckley and Yolonda Youngs, Eds. Lanham: Rowman & Littlefield, 145-160.

Young, Terence. 2022. "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21:

http://journals.openedition.org/tourisme/4790

3-ER-0655

# CURRICULUM VITAE

Terence George Young
672 Warwick Street
Cambria, CA 93428
626-716-5927 (cell)
tgyoung@cpp.edu
https://www.cpp.edu/faculty/tgyoung/

**POSITIONS HELD**

<u>Academic</u>

**2020 – present** – Professor Emeritus of Geography, Department of Geography & Anthropology, California State Polytechnic University, Pomona, California 91768

**2011 – 2020** – Professor of Geography, Department of Geography & Anthropology (and Adjunct Professor, Lyle Center for Regenerative Studies through 2013), California State Polytechnic University, Pomona, California 91768

**2006 – 2011 -** Associate Professor of Geography, Department of Geography & Anthropology and Adjunct Associate Professor, Lyle Center for Regenerative Studies, California State Polytechnic University, Pomona, California 91768

**2002 – 2006 -** Assistant Professor of Geography, Department of Geography & Anthropology and Adjunct Assistant Professor, Lyle Center for Regenerative Studies, California State Polytechnic University, Pomona, California 91768

**2001 – 2002** - Visiting Assistant Professor, Department of Geography, California State University, Long Beach, California 90840 (renewable)

**2001 – 2002** - Research Assistant Professor, Department of Geography, University of Southern California, Los Angeles, California 90089

**2000 – 2001** - Visiting Lecturer, Department of Geography, University of California, Los Angeles, California, 90095 (Spring Quarter each year)

**1999 – 2000** - Visiting Lecturer, Department of Geography, University of Southern California, Los Angeles, California 90089 (Fall Semester each year)

**1992 – 1999** - Assistant Professor of Geography, Department of History and Adjunct Assistant Professor, Department of Parks, Recreation, and Tourism Management, Clemson University, South Carolina 29634 (On leave 1995-1997)

**1998** - Visiting Lecturer, Departments of Geography, George Washington University, Washington, D.C. 20052 and Mary Washington College, Fredericksburg, Virginia 22401

**1992** - Visiting Lecturer, Department of Geography, University of California, Los Angeles 90095

<u>Research</u>

**2000 – 2001** - Research Associate, Sustainable Cities Program, University of Southern California, Los Angeles



EXHIBIT 1 (Young)

3-ER-0656

Administration

**2001 – 2002** - Project Manager, Sustainable Cities Program, University of Southern California, Los Angeles

**1996 – 1997** - Acting Director, Studies in Landscape Architecture, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC 20007

Consultations

**2023** – On the history and ideology of American parks in relation to firearms regulation in Jason Wolford, Alison Wolford, Atom Kasprzycki, Hawaii Firearms Coalition v. Anne E. Lopez, US District Court for the District of Hawaii, for Attorney General's Office, Honolulu, HI

**2023** – On the history and ideology of American parks in relation to firearms regulation in David J. Nastri v. Katie Dykes, US District Court for the District of Connecticut, for Attorney General's Office, Hartford, CT

**2013 – 2015** – "Geographies of Wonder: Americans and the National Park Idea," an exhibit celebrating the centennial of the US National Park Service, Peter Blodgett, curator, Huntington Library & Collections, San Marino, CA

**2008 – 2017** – "City of White Gold," A documentary on San Francisco in the Silver Age, Geordie Lynch, independent filmmaker, 218 Larkspur Plaza Drive, Larkspur, CA 94939 (A trailer and more information was available at: http://www.cityofwhitegold.com, but is now gone.)

**1999 – 2000** - California League of Conservation Voters-Education Fund, 10780 Santa Monica Blvd., Suite 210, Los Angeles, CA 90025

**EDUCATION**

**Ph.D.** - University of California, Los Angeles, 1991 (Cultural-Historical Geography)
**M.A.** - University of California, Los Angeles, 1987 (Biogeography)
**B.A.** - University of California, Berkeley, 1973 (Anthropology)

**PUBLICATIONS**

Periodicals – In Print

**2021** – "From Competition to Cooperation: A History of Canada-US National Park Relations" *Environment and History* 27(4): 607-634 (co-authored with Alan MacEachern and Lary Dilsaver)

**2018** – "Murray's Rush: The Adirondack Beginning of American Camping" *NY Archives Magazine* 18(1): 11-17

**2014** – "The End of Camping: Coming Home to the City" *BOOM: A Journal of California* 4(3): 70-75

   – "'Green and Shady Camps': E.P. Meinecke and the Restoration of America's Public Campgrounds" *The George Wright Forum* 31(1): 69-76

**2011** – "Collecting and Diffusing 'the World's Best Thought': International Cooperation by the National Park Service" *The George Wright Forum* 28(3): 269-278 (co-authored with Lary Dilsaver)

**2010** – "On Camping and Its Equipment" *Environmental History* 15(1, January 2010): 120-128

2


EXHIBIT 1 (Young)

3-ER-0657

**2009** – "'A Contradiction in Democratic Government': W.J. Trent, Jr. and the Struggle for Non-Segregated National Park Campgrounds" *Environmental History* 14(4, October 2009): 651-682

**2008** – "Four Visions of Nature in American Protected Areas" *Past Place* 16(2, Spring/Summer): 8-10 (Newsletter of the Historical Geography Specialty Group, Association of American Geographers)

**2007** – "U.S. Parks and Protected Areas: Origins, Meanings and Management" *Historical Geography* 35: 5-9 (co-authored with Lary Dilsaver)

**2006** – "German Influences on San Francisco's Nineteenth-Century Greenspace" *Die Gartenkunst* 18(1): 69-80

**2006** – "False, Cheap and Degraded: When History, Economy, and Environment Collided at Cades Cove, Great Smoky Mountains National Park" *Journal of Historical Geography* 32(1): 169-189

**2001** - "Place Matters" *Annals of the Association of American Geographers* 91(4): 681-682 (This is the introduction to a "Forum" of papers I originally organized at the 1998 meeting of the Association of American Geographers in Boston.)

      - "Moral Order, Language, and the Failure of the 1930 Recreation Plan for Los Angeles County" *Planning Perspectives* 16(4): 333-356

**2000** - "Belonging not Containing: The Vision of Bioregionalism" *Landscape Journal* 19(1): 46-49

**2000** - "Camping In America: From 1869 to the Present" *Arroyo View* 12(2): 9

**1998** - "From Manure to Steam: The Transformation of Greenhouse Heating In the United States, 1870-1900" *Agricultural History* 72(3): 574-596

**1996** - "Social Reform Through Parks: The American Civic Association's Program for a Better America" *Journal of Historical Geography* 22(4): 460-472

**1995** - "Modern Urban parks" *Geographical Review* 85(4): 544-560

      - "'I am my own authority': the landscape gardening of William Frederick Poppey" *Journal of Garden History* 15(4): 226-230

      - "Modern Cities and Nature" *The Society for Philosophy and Geography Newsletter* 1(2): 4-5

**1994** - "Trees, The Park, and Moral Order: The Significance of Golden Gate Park's First Plantings" *Journal of Garden History* 14(3): 158-170

**1993** - "San Francisco's Golden Gate Park and the Search for a Good Society, 1865-1880" *Forest and Conservation History* 37(1): 4-13

Periodicals – Online

**2022** – "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21: http://journals.openedition.org/tourisme/4790

**2020** – "Pandemics & Public Lands" *National Parks Traveler* (August 26): https://www.nationalparkstraveler.org/2020/08/essay-pandemics-public-lands

**2018** – "E.P. Meinecke and the Development of the Modern Auto Campground" *IdeAs - Idées d'Amériques* 12(Automne/Hiver): https://journals.openedition.org/ideas/3502

– "Why Americans Invented the RV" in *What It Means to be American: A Conversation Hosted by the Smithsonian and Arizona State University* (September 4). Available at: http://www.zocalopublicsquare.org/2018/09/04/americans-invented-rv/ideas/essay/

**2017** – "The Religious Roots of America's Love for Camping" *What It Means to be American: A Conversation Hosted by the Smithsonian and Arizona State University* (October 12).  Available at: http://www.whatitmeanstobeamerican.org/encounters/the-religious-roots-of-americas-love-for-camping/

**2003** – "It's Not As Complicated As People Think" *LA Forum for Architecture and Urban Design Online Newsletter 5: Constructing Nature* (Spring 2003).  Available at: http://www.laforum.org/programs/pub/forum_issue_5_parks

Periodical – Special Issue Edited

**2007** – "US Parks and Protected Areas" for *Historical Geography* 35: 5-213 (co-edited with Lary Dilsaver)

**2000** - "Bioregionalism and Its Influence in Europe and the United States" for *Landscape Journal* 19(1, Spring): 46-88

Books – Authored

**2017** – *Heading Out: A History of American Camping*, Cornell University Press (Winner of the American Association of Geographers' J.B. Jackson Prize for 2018; Winner of the Western History Association's Hal K. Rothman Prize for 2018)

**2004 –** *Building San Francisco's Parks: 1850-1930,* The Johns Hopkins University Press

Books – Edited

**2002 -** *The Landscapes of Theme Parks: Antecedents and Variations*, Terence Young and Robert Riley, eds., Dumbarton Oaks Library and Research Center Press

Reports – Authored

**2000** - *Creating Community Greenspace: A Handbook for Developing Sustainable Open Spaces in Central Cities*, The California League of Conservation Voters-Education Fund: Los Angeles, CA

Book Chapters

**2018** – "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in *The American Environment Revisited: Environmental Historical Geographies of the U.S.* (Lanham: Rowman & Littlefield), 145-160

**2014** – "The Passionate Geographer" in *North American Odyssey: Historical Geographies for the Twenty-first Century* (Lanham: Rowman & Littlefield), 315

**2008** – "Urban Parks, Leisure and the Good Society" in *Loisir et Liberté en Amérique du Nord*, P. Lagayette, Editor (Paris: Université Paris-Sorbonne, Paris IV), 59-71

**2006** – "Four Visions of Nature Conservation and Democracy in the United States" in *Naturschutz und Demokratie!?*, J. Wolschke-Bulmahn and G. Groening, Editors (Hannover, Germany: Centre of Garden Art + Landscape Architecture), pp. 215-220

**3-ER-0659**

**2004** - 'Historical Geography of the Environment' in *Geography in America at the Dawn of the 21st Century*, C. Wilmott and G. Gaile, Editors (NY: Oxford University Press), pp. 153-154

**2002** - "Grounding the Myth: Theme Park Landscapes in an Era of Commerce and Nationalism" in *The Landscapes of Theme Parks: Antecedents and Variations,* T. Young and R. Riley, Editors. (Washington: Dumbarton Oaks Library and Research Center), pp. 1-10

**2002** - "Virtue and Irony in a U.S. National Park" in *The Landscapes of Theme Parks: Antecedents and Variations,* T. Young and R. Riley, Editors. (Washington: Dumbarton Oaks Library and Research Center), pp. 155-179

**1999** - "Confronting Sustainability" in *Sustainable Landscape Design In Arid Climates*, William O'Reilly, Ed. (Geneva: The Aga Khan Trust for Culture), pp. 6-9

Encyclopedia Entries:

**2001** -"Urban Parks" in *The Oxford Companion to United States History*, P. Boyer, Editor In Chief (New York: Oxford University Press), p. 582

**1998**  - "Golden Gate Park" in *Encyclopedia of Urban America: Cities and Suburbs*, Two Volumes, N.L. Shumsky, editor (ABC-Clio Publishing), p. 328

Book Reviews:

**2021** – *Camping Grounds: Public Nature in American Life from the Civil War to the Occupy Movement* by Phoebe S.K. Young for H-Environment, URL: https://www.h-net.org/reviews/showrev.php?id=56824

**2018** – *On the Trail: A History of American Hiking* by Silas Chamberlin for *Agricultural History* 92(3): 439-440

**2017** – *Trout Culture: How Fly Fishing Forever Changed the Rocky Mountain West* by Jen Corrinne Brown for *Environmental History* 22: 180-182

**2015** – *Inventing Stanley Park: An Environmental History* by Sean Kheraj for *Pacific Historical Review* 84: 97-98

**2014 –** *Vacationland: Tourism and Environment in the Colorado High Country* by William Philpott for *Environmental History* 19: 589-590

**2013** – *Observation Points: The Visual Poetics of National Parks* by Thomas Patin, Ed. for *Journal of Historical Geography* 42: 220

**2011** – *Campsite: Architecture of Duration and Place* by Charlie Hailey for *Geographical Review* 101(3): 467-469

   – *Pilgrims of the Vertical: Yosemite Rock Climbers and Nature at Risk* by Joseph E. Taylor III for *Journal of Historical Geography* 37: 511-512

**2010** – *A Marvelous Hundred Square Miles: Black Hills Tourism, 1880-1941* by Suzanne Barta Julin for *Environmental History* 15(4): 788-789

**2008** – *National Park, City Playground: Mount Rainier National Park in the Twentieth Century* by Theodore Catton for *Environmental History* 13(2): 376-377

**2007** – *The Invention of the Park: From the Garden of Eden to Disney's Magic Kingdom* by Karen R.

Jones and John Wills for *Journal of Cultural Geography* 24(2): 113-114

**2006** – *Cumberland Island National Seashore: A History of Conservation Conflict* by Lary M. Dilsaver for *Geographical Review* 96(2): 322-325.

**2004** – *Republic of Shade: New England and the American Elm* by Thomas J. Campanella for *Environmental History* 9(4): 741-2

**2001** - *Enduring Roots: Encounters with Trees, History, and the American Landscape* by Gayle Brandow Samuels for *Planning Perspectives* 16(4): 409-410

**2001**- *The Los Angeles River: Its Life, Death, and Possible Rebirth* by Blake Gumprecht for *Technology and Culture* 42(2): 361-363

　- *How the Canyon Became Grand* by Stephen Pyne for *Professional Geographer* 53(1): 132-134

**2000** - *The World of André Le Nôtre* by Thierry Mariage for *Geographical Review* 90(3): 133-34

**1997** - *Invented Cities* by Mona Domosh for *Annals of the Association of American Geographers* 87(3): 539-540

**1996** - *Southern California Gardens* by Victoria Padilla for *Journal of Garden History* 16(3): 225-226

**1995** - *The American Environment: Interpretations of Past Geographies*, edited by Lary M. Dilsaver and Craig E. Colten for *Journal of Historical Geography* 21(1): 105-107

　- *The Ecological City: Preserving and Restoring Biodiversity*, edited by Rutherford H. Platt, Rowan A. Rowntree, and Pamela C. Muick for *The Annals of the Association of American Geographers* 85(2): 395-397

　- *Geography and the Human Spirit* by Anne Buttimer for *Environment and Planning A* 27(11): 1865-1866

**1993** - *Hard Places: Reading the Landscape of America's Historic Mining Districts* by Richard V. Francaviglia for *Technology and Culture* 34: 422-424

Websites-Co-authored:

**2004** – "Pomona Valley: Assessing Natural Boundaries and Greenspace" by Montgomery McIntosh, Terence Young, and Richard Worthington at http://www.csupomona.edu/~tgyoung/Pomona_valley/pvindex.htm

**EXHIBITS CURATED**

**1997** - "Urban Parks in America" Studies In Landscape Architecture, Dumbarton Oaks, Washington DC

**1996** - "Le Jardin d'Anglais" Studies In Landscape Architecture, Dumbarton Oaks, Washington DC

**TELEVISION APPEARANCES**

**2000** - "Camping Technology" on *Modern Marvels*, The History Channel, June 5.

**RADIO APPEARANCES**

**2011** – Discussant about "The Parks of San Francisco: What's in Store for our Urban Oases" on "City

6

**3-ER-0661**

Visions Radio" at KALW – 91.7 FM, San Francisco, California, January 24

**PODCASTS**

**2021** – "William Coffin Coleman and The History of the Coleman Company" on The RV Atlas, June 25, available at: https://thervatlas.com/podcast/william-coffin-coleman-and-the-history-of-the-coleman-company/

**2020** – "Pandemics & the National Parks" on National Parks Traveler, August 23, available at: https://www.nationalparkstraveler.org/podcast/2020-08-23-national-parks-traveler-episode-80-pandemics-and-national-parks

**2019** – "Heading Out: A History of American Camping" on Writing Westward Podcast, March 8, available at: http://reddcenter.byu.edu/Blogs/redd-center-blog/Post/writing-westward-podcast-episode-007---terenc

**2017** – "Heading Out: The History of Camping" on The Art of Manliness, August 3, available at: http://www.artofmanliness.com/2017/08/03/podcast-327-heading-history-camping/


**ADMINISTRATION**

**2000-2002** - Project Manager, Environmental Sciences, Policy and Engineering Sustainable Cities Program, University of Southern California, Los Angeles.  I was responsible for the administration and timely completion of "Toward a Sustainable Los Angeles: 'A Nature Services' Approach," a $380,000 grant to investigate the applicability of an environmental GIS (CITYgreen) to the urbanized landscape of Southern California as well as its usefulness as a tool in Public Participation Planning in an older, densely populated, ethnically diverse neighborhood.  Funding came from the Haynes Foundation of Los Angeles.

**1996-1997** - Acting Director, Studies in Landscape Architecture, Dumbarton Oaks, Harvard University.  This research program is one of three at Dumbarton Oaks.  It is international in scope with its focus on the critical and historical study of landscape.  I was responsible for the department to Dumbarton Oaks's Director.  Among other things, my duties included public and professional contacts, supervising a staff of four (two librarians, an administrative assistant, and a departmental assistant), selecting and supervising research fellows, public and professional outreach, budgeting, purchase of more than 900 rare and contemporary monographs, treatises, prints, and journals, developing museum exhibitions, organizing and moderating four one-day conferences (one in collaboration with the National Gallery and the Aga Khan Trust for Culture, and one with the American Institute for Contemporary German Studies) and one two-day conference, and editing a scholarly monograph of the presentations at the two-day conference.


**TEACHING**

Undergraduate:
Biogeography
California
Cultural Geography
Cultural Geography of the Environment
Ethnicity in the American City
Environmental Geography
Geographical Foundations (History and Philosophy of Geography)
Geography of Cultural and Historical Landscapes
Geography of US and Canada
Geography of World Cities
Historical Geography (Upper-Division introductory course)
Historical Geography: Diffusion of Europeans and their Environments
Introduction to Geography (Physical and Human)

7

**3-ER-0662**

Introduction to Human Geography
Introduction to Cultural Geography
Introduction to Physical Geography
Parks and Protected Areas
Protected Areas in a Regenerative World (Regenerative Studies Program)
Tourism in a Globalizing World
Urban Geography
World Regional Geography

Graduate:
Historical Geography of the United States
Protected Areas in a Regenerative World (Regenerative Studies Program)
Regenerative Concepts and Social Practices (Regenerative Studies Program)
Topics in Geography: Camping in America
Urban Geography: Utopianism in American Urban Planning

Post-graduate:
US National Parks, Forests and other protected areas – An Overview
Social & Legislative Aspects of US National Parks & Forests

**2005** – "Sustainable Tourism" at School for Hospitality and Tourism, Bulawayo Polytechnic University, Bulawayo, Zimbabwe, May 2-4

## AWARDS & GRANTS

Awards

**2018** – J.B. Jackson Prize from the American Association of Geographers for *Heading Out: A History of American Camping* published by Cornell University Press

- Hal K. Rothman Prize from the Western History Association for *Heading Out: A History of American Camping* published by Cornell University Press

Fellowships

**2005-2006** – Lyle Center Faculty Fellowship, California State Polytechnic University, Pomona ($4,500)

**2001** - Huntington Fellowship, The Huntington Library, Art Collections, and Botanical Gardens, San Marino, CA (five months @ $2,000/mo.)

**1999** - W. M. Keck Foundation and Andrew W. Mellon Foundation Fellow, The Huntington Library, Art Collections, and Botanical Gardens, San Marino, CA (two months @$2,300/mo.)

**1995-1996** - Postdoctoral fellow, National Museum of American History, Smithsonian Institution, Washington, DC (twelve months)

**1991-1992** - Postdoctoral fellow, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC (Fall Semester)

Grants

**2023 –** California State University Emeritus and Retired Faculty & Staff Association, Research Grant of $600.00 for travel to Washington, DC.  Title: "The African Student Program, 1961-1969."

**–** Brigham Young University, The Redd Center, John Topham and Susan Redd Butler Off-Campus

8

**3-ER-0663**

Faculty Research Award of $2,000.00 for travel to Washington, DC and Amherst, MA.  Title: "'To Learn the Value of Conservation': Diffusing America's Protected-Area Methods to Post-Colonial Africa, 1961-1974."

**2013 –** Association of American Geographers, Research Grant of $1,000.00 for travel to Washington, DC and Yellowstone National Park.  Title: "US National Park Service Cooperation with Canada and In Africa."

**2008 – 2018 –** US National Park Service, Park History Program, Washington, DC – Volunteers in Parks Program – $4,600.00 and continuing for travel and research expenses.  Titles: "International Cooperation and the National Park Service" and "Yosemite State Park and the US National Parks"

**2008-2009** - California State Polytechnic University – Pomona, Research, Scholarship, and Creative Activities Grant of $4,736.00 for one course release to compose a scholarly article for a journal *Environmental History*. Title: "The Smooth Way to Rough It: Pilgrimage, McDonaldization and the Evolution of Camping Equipment."

**2008-2009** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $400.00 to travel to a conference: American Society for Environmental History, Presentation title: "'A Clearer Picture of this Country': Airstream Trailers and the (Re)Discovery of America"

**2007-2008** – California State Polytechnic University – Pomona, International Center Faculty Travel Grant of $1,000.00 to travel to a conference: Common Ground, Converging Gazes: Integrating the Social and Environmental in History in Paris, France, Presentation title: "Going Home to Wilderness: Nature, Camping and American Sustainability"

**2007-2008** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $600.00 to travel to a conference: Designing the Parks, Presentation title: "E.P. Meinecke and the Modernization of Autocamping"

**2005-06** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $1,250.00 to support research travel, Title: "William J. Trent, jr. and The Struggle to Eliminate Segregated Campgrounds in U.S. National Parks."

**2006** – Benson Ford Research Center, The Henry Ford, Dearborn, MI – Clark Travel to Collections Grant of $1,200.00 to support travel to and research at the Research Center.

**2005** – The Adirondack Museum, Blue Mountain Lake, NY – Warder and Julia Cadbury Research Grant of $1,500.00 and housing to support travel to and research at the museum.

**2004-05** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $2,000.00 to support research travel, Title: "William H.H. Murray and the origins of American camping."

**2004-05** - California State Polytechnic University – Pomona, Research, Scholarship, and Creative Activities Mini-grant of $4,276.00, Title: "The Garage in the Forest: E.P. Meinecke and the Origin of the Auto Campground."

**2003-04** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $800.00 to support research travel, Title: "E.P. Meinecke's Modern Auto Campground"

**2002-03** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $560.00 to support research travel, Title: "A Campground Policy: E.P. Meinecke and the Development of the American Campground"

**2002-03** - California State Polytechnic University – Pomona, Academic Affairs Research Mini-grant of $3,568.00, Title: "Culture, History, & Environmental Management in a U.S. National Park"

**3-ER-0664**

**2003** – Pomona College – Mellon Professional Activities Grant of $2,900.00, Title: "Pomona Valley Greenspace"

**1999** - Association of American Geographers Research Grant of $500.00 for field photographs.  Title: "Camping in America."

**1998** - An Association of American Geographers Annual Meeting Enrichment Grant of $400.00 to defray the participation expenses of Professor Edward Casey (Philosophy, SUNY-Stony Brook) in the Annual Meeting of the AAG in Boston, Massachusetts

- A Cultural Geography Specialty Group (AAG) Grant of $250.00 to defray the participation expenses of Professor Edward Casey (Philosophy, SUNY-Stony Brook) in the Annual Meeting of the AAG in Boston, Massachusetts

- An Historical Geography Specialty Group (AAG) Grant of $250.00 to defray the participation expenses of Professor Edward Casey (Philosophy, SUNY-Stony Brook) in the Annual Meeting of the AAG in Boston, Massachusetts

**1997** - A Graham Foundation Grant of $5,875.00 for travel, map production, photo reproduction, and permissions in preparation for the publication of *Building San Francisco's Parks, 1850-1930*

**1994** - A National Endowment for the Humanities Faculty Development Grant of $544.00 for travel to present a paper at the biannual meeting of the American Society for Environmental History in Las Vegas, Nevada

- Association of American Geographers Research Grant of $500.00 for travel to collections and photo reproductions.  Title: "The American Civic Association and the U.S. National Parks, 1900-1940"

**1993** - A National Endowment for the Humanities Faculty Development Grant of $1,000.00 for electronic database searches, photo reproductions and travel to collections.  Title: "The American Civic Association and the U.S. National Park Service, 1900-1940"

- A National Endowment for the Humanities Faculty Development Grant of $1,527.00 to travel to collections.  Title: "Country for the City: The Urban Motivations for National Parks"

- Clemson University Teaching Award Grant of $1,860.00 to purchase equipment for Geography laboratories

**1992** - Clemson University Library Grant of $1,200.00 for Humanities Acquisitions in Geography

Sabbatical Leave

**2013-2014** – California State Polytechnic University, Pomona to research and write three professional articles about wilderness and international cooperation

**2006-2007** – California State Polytechnic University, Pomona to research and write *Heading Out: American Camping Since 1869*

**CONFERENCES ORGANIZED**

**1998** - "Environmentalism in Landscape Architecture," a two-day symposium at Dumbarton Oaks, Washington DC

- "Designing Nature: Landscape Architecture in the U.S. National Parks" a one-day conference at

10

Dumbarton Oaks, Washington, DC

   - "Modernism and the Pastoral" a one-day conference at Dumbarton Oaks, Washington, DC

**1997** - "Perspectives on the Study of Garden History," a two-day symposium at Dumbarton Oaks, Washington DC

   - "The Landscapes of Suburbia" a one-day conference at Dumbarton Oaks, Washington, DC

   - "Bioregionalism and Its Influence in Europe and the United States" a one-day conference at Dumbarton Oaks, Washington, DC (co-organized with the American Institute for Contemporary German Studies, Washington, DC)

   -"Landscape Architecture and the Health of the Public" a one-day conference at Dumbarton Oaks, Washington, DC

**1996** - "Sustainable Landscape Design in Arid Climates" a one-day roundtable at Dumbarton Oaks, Washington, DC (co-organized with The Center for Advanced Studies in the Visual Arts/National Gallery of Arts, Washington, DC and the Aga Khan Trust for Culture, Geneva, Switzerland)

## PRESENTATIONS

Papers:

**2023** – Annual Meeting of the American Association of Geographers, Denver, CO, March 24: "Diffusing America's 'Effective Methods' to Africa"

**2022** – Annual Meeting of the Association of Pacific Coast Geographers, Bellingham, WA, October 7: "'To Learn the Value of Conservation and Preservation': Diffusing America's Approach to Protected Areas through the African Student Program, 1961-1965"

   – Annual Meeting of the European Society for Environmental History, Bristol, UK, July 4: "'Nature is not something optional': Essentialism and the History of American Urban Greening" (presented via Zoom)

   – Annual Meeting of the American Society for Environmental History, Eugene, OR, March 26: "An Appreciation for Conservation and Wildlife Management": The National Park Service's African Student Program, 1961-1965"

   – Annual Meeting of the American Association of Geographers, New York, NY, February 25: "The Potential African Leaders of Tomorrow": The National Park Service's African Student Program, 1961-1965 (presented via Zoom)

**2021** – Annual Meeting of the American Association of Geographers, Seattle, WA, April 8: "Essential Nature: Biophilia and the Greening of American Cities" (presented via Zoom)

**2019** – Annual Meeting of the Western History Association, Las Vegas, Nevada, Friday, October 18: "'To Keep in Touch with the Real America': The Wally Byam Foundation's Trailer-Camping Program of National Discovery and Re-Discovery"

**2018** – Annual meeting of the American Association of Geographers, New Orleans, LA, April 10: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"

   – Annual meeting of the American Society for Environmental History, Riverside, CA, March 17: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"

**3-ER-0666**

**2017** – Annual meeting of the Association of Pacific Coast Geographers, Chico, CA, October 27: "'The Most Elaborate and Valuable Apparatus': Transnational Politics and the Linking of Canadian and American Park Agencies"

    – Annual meeting of the American Association of Geographers, Boston, MA, April 7: Roundtable in honor of Nicholas Entrikin

    – Annual meeting of the American Association of Geographers, Boston, MA, April 7: "For what did Lavoy Finicum die?"

    – Biennial meeting of the George Wright Society, Norfolk, VA, April 3: "Yosemite and the Origins of America's National Parks"

**2016** – Annual meeting of the Association of Pacific Coast Geographers, Portland, OR, October 7: "Yosemite and the Origins of America's National Parks"

    – Annual meeting of the American Association of Geographers, San Francisco, CA, April 1: "*In Media Res*: California as National Park-State Park Intersection"

**2015** – Annual meeting of the Association of Pacific Coast Geographers, Palm Springs, CA, October 23: "Christian Nationalism and the Antimodern Origins of the Pacific Crest Trail"

    – Triennial meeting of the International Conference of Historical Geographers, London, United Kingdom, July 6: "Frederick Law Olmsted's Abandoned San Francisco Park Plan"

    – Biennial meeting of the George Wright Society, Oakland, CA, March 30: "Renewing Our Faith and Ideals: Christian Nationalism and the Origins of the Pacific Crest Trail"

    – Annual meeting of the American Society for Environmental History, Washington, DC, March 21: "'An Outstanding Feature of Our Relations': The Melding of Canadian and US Park Management after World War II"

**2013** – Annual meeting of the Association of American Geographers, Los Angeles, CA, April 9: "'To Think and Feel and Become Sanctified': Camping as American Pilgrimage"
    – Biennial meeting of the George Wright Society, Denver, CO, March 11: "'The Illusion of Wildness' in America's Automobile Campgrounds"

**2012** – Annual meeting of the Association of American Geographers, New York, NY, February 25: "'The Cord that Binds the Necklace': The Development and Meaning of the Pacific Crest Trail"

**2011** – Annual meeting of the Association of Pacific Coast Geographers, San Francisco, CA, October 1: "Renewing Our Faith and Ideals: Pacific Crest Trail as Sacred Path"

    – Biennial meeting of the European Society for Environmental History, Turku, Finland, June 28: "Exporting Yellowstone: The Office of International Affairs and the US National Park Service's Diffusion of Park Management around the World"

    – Annual meeting of the American Society for Environmental History, Phoenix, AZ, April 17: "'I Am Especially Interested in Yellowstone and Glacier': NPS Interactions with Canada and the World"

    – Annual meeting of the Association of American Geographers, Seattle, WA, April 13: "'I Am Especially Interested in Yellowstone and Glacier': Diffusing America's National Park Management to Canada and the World"

    – Biennial meeting of the George Wright Society, New Orleans, LA, March 15: "Exporting

Yellowstone: The Office of International Affairs and the US National Park Service's Diffusion of Park Management around the World"

**2010** – Annual meeting of the Association of American Geographers, Washington, DC, April 16: "The Authenticity of Backpacking"

– Annual meeting of the American Society for Environmental History, Portland, OR, March 11: "Backpacking as Authentic Reconnection to Nature"

**2009** – Annual meeting of the Social Science History Association, Long Beach, CA, November 12: "Smoothing Out the Roughness: McDonaldization and the Evolution of Camping Equipment"

– Faculty Seminar in Regenerative Studies, John T. Lyle Center for Regenerative Studies, California Polytechnic State University – Pomona, November 7: "In Gaia's Garden: Reflections on John Lyle's Approach to Protected Areas"

– Annual meeting of the Association of Pacific Coast Geographers, San Diego, CA, October 2: "Smoothing Out the Roughness: Modernity and the Development of Camping Equipment"

– Annual meeting of the Association of American Geographers, Las Vegas, NV, March 24: "'A Clearer Picture of this Country': Trailering to (Re)Discover America"

– Annual meeting of the American Society for Environmental History, Tallahassee, FL, February 26: "'A Clearer Picture of this Country': Airstream Trailers and the (Re)Discovery of America"

**2008** – Common Ground, Converging Gazes: Integrating the Social and Environmental in History, École des Haute Études en Sciences Sociales, Paris, France, September 12: "Going Home to Wilderness: Parks, Camping and a Sustainable American Society"

– Annual meeting of the Association of American Geographers, Boston, MA, April 18: "'A Contradiction in Democratic Government': W.J. Trent and the Struggle to Desegregate National Park Campgrounds"

– Annual meeting of the American Society for Environmental History, Boise, ID, March 14: "Liberalizing Local Society: W.J. Trent, Jr. and the Fight to Desegregate National Park Campgrounds"

**2007** – Annual meeting of the Association of Pacific Coast Geographers, Long Beach, CA, October 20: "Seeing God in the Original: William H.H. Murray and the Origin of American Camping"

**2006** – Trienniel meeting of the International Conference of Historical Geographers, Hamburg, Germany, August  22: "To See God in the Original: William H.H. Murray and the Origins of American Camping"

– Annual meeting of the Association of American Geographers, Chicago, IL, March 10: "Practical Pilgrimage: How W.H.H. Murray Opened the Adirondacks to Tourism"

**2005** – Annual Meeting of the American Society for Environmental History, Houston, TX, March 19: "Going 'Home' to Wilderness: The Logic of American Camping"

**2004** – Nature Conservation and Democracy?!, Zentrum fur Gartenkunst + Landschaftsarchitektur, Universitat Hannover, Konigswinter, Germany, November 19: "Scene, Setting, System, and Story: Four Visions of Nature Conservation and Democracy in the United States"

- Leisure and Liberty, Universite Paris Sorbonne, Paris France, November 13: "Urban Parks, Leisure and the Good Society"

   - Annual Meeting of the American Society for Environmental History, Victoria, BC, April 2: "The Garage in the Forest: E.P. Meinecke and the Modern Auto Campground"

   - Annual Meeting of the Association of American Geographers, Philadelphia, PA, March 19: "E.P. Meinecke and the Modern Auto Campground"

**2003** – Annual Meeting of the Association of American Geographers, New Orleans, LA, March 5: "Camping, A Pilgrimage to Nature"

**2002** – Annual Meeting of the Association of Pacific Coast Geographers, San Bernardino, California, October 5: "Nature's Pilgrims: American Camping From 1869 to the 1990s"

   - Convivial Design in a Remote-Controlled World, Pomona College, Claremont, CA: "Parks, Playgrounds and Beaches for the Millions"

   - Annual Meeting of the Association of American Geographers, Los Angeles, CA: "GIS and Public Participation Planning: Recommendations from Hollywood, California"

   - Annual Meeting of the American Society for Environmental History, Denver, CO: "Nature's Pilgrims: American Camping from 1869 to 1940"

**2001** - Annual Meeting of the American Society for Environmental History, Durham, NC: "Culture, History, and the Environmental Management of Cades Cove"

**1999** - Biennial Meeting of the Society for American City and Regional Planning History, Washington, DC: "Moral Order, Language, and the Failure of the 1930 Los Angeles Recreation Plan"

**1998** - Roundtable on Landscape Architecture and the National Parks, Studies in Landscape Architecture, Dumbarton Oaks, Washington, DC: "Ritual and Campgrounds in U.S. National Parks"

   - Annual Meeting of the Association of American Geographers (AAG), Boston, MA: "Parks, Playgrounds, and Beaches: The Plan for a Healthy and Prosperous Los Angeles"

**1997** - Annual Symposium, Studies in Landscape Architecture, Dumbarton Oaks, Harvard University, Washington, DC: "Down the Garden Past"

   - Annual Meeting of the AAG, Fort Worth, TX: "The Ritual of American Camping"

   - Biennial Meeting of the American Society for Environmental History (ASEH), Baltimore, MD: "Imagining the Profitable Greenhouse: Heating Adoption and the Florification of the American Urban Landscape"

**1996** - Annual Conference on DC Historical Studies, Washington DC: "The Message of Landscape"

   - Annual Meeting of the AAG, Charlotte, NC: "Administration, Development, and Access: The American Civic Association's Motivations for a National Park Service"

   - Annual Meeting of the AAG, Charlotte, NC: "Nature as a Source of Goodness" (Panel)

   - Annual Symposium, Studies in Landscape Architecture, Dumbarton Oaks, Harvard University, Washington, DC: "Virtue and Irony at Cades Cove"

**1995** - Annual Meeting of the AAG, Chicago, IL: "The American Civic Association and the National Park Service"

14

**3-ER-0669**

- Biennial Meeting of the ASEH, Las Vegas, NV: "Moral Order and the Origins of the National Park Service"

**1993** - Annual Meeting of the AAG, Atlanta, GA: "Viewing the Wilderness, or Recognizing Determinism in Two Environmental Movements"

**1992** - Annual Meeting of the AAG, San Diego, CA: "Creating Nature: The Use of Succession as a Technological Practice"

- Moderator and presenter at a colloquium on the nursery business and landscape architecture presented by Studies in Landscape Architecture, Dumbarton Oaks, Harvard University, Washington, DC. Presentation title: "The Historic Relationship between the Business of Ornamental Horticulture and the Art of Landscape Architecture"

**1991** - Annual Meeting of the AAG, Miami, FL: "From Local to National Parks: The Changing Scale of an American Interpretation of Nature"

- Fellows' Series at Dumbarton Oaks, Harvard University, Washington, DC: "`To Recognize the Good in the New:' Technology and Landscape in Nineteenth Century California"

<u>Invited Lectures & colloquia:</u>

**2020** – Keynote Speaker – "Outdoor Imaginaries: Camping in Modern America," Tourist Imaginaries and Mobility in the United States Conference, American Studies Program, University of Versailles Saint-Quentin-en-Yvelines, Versailles, France, February 6

**2019** – "'Roughing It Smoothly': American Autocamping in the Early Twentieth Century," Ohio University, Athens, OH, November 5

– "Modernity & Nature in America," Dumbarton Oaks Graduate Seminar, Washington, DC, May 21

– "Heading Out: To Walk in the Woods" at the Huntington Westerners, Pasadena, CA, May 4

**2018** – "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Montana State University, November 1

– "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Idaho State University, October 30

– "To Feel at Home in the Wild: E.P. Meinecke's Modern Autocampground" at Dumbarton Oaks, Washington, DC, October 17

– "Heading Out: To Walk in the Woods" at the Historical Society of Crescenta Valley, La Crescenta, CA, August 20

– "Heading Out: To Walk in the Woods" at the Pasadena Museum of History's At Home Series, May 22

– "Three California Connections" at Flintridge Bookstore, La Canada-Flintridge, CA, March 22

**2017** – "Values, Conflicts and America's Protected Lands" at Department of Geography and Environmental Studies, California State University San Bernardino, November 16 (for Geography Awareness Week)

**3-ER-0670**

– "The Value of Parks" in the District Planning and Compliance Course, California State Parks at the California Citrus Historic State Park, Riverside, CA, October 9

– "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" at the Kelly Adirondack Center, Union College, Schenectady, NY, August 9

– "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" for the public lecture series of the Adirondack Experience, Blue Mountain Lake, NY, August 7

– "Smoothing Out the Roughness: The Evolution of Camping Gear," National Museum of American History, Smithsonian Institution, Washington, DC, August 1

**2014** – "Swept Up in 'Murray's Rush': The Adirondack Beginnings of Camping in America" for the public lecture series of the Adirondack Museum, Blue Mountain Lake, NY, July 28

**2010** – "Camping: Between 'Roughing It' and Comfort" for Ontario Museum of History and Art, Ontario, CA, July 8

**2008** – "The Meaning of Golden Gate Park" for the Studio for Urban Projects, San Francisco, CA, October 18

- "Into the Wild: William H.H. Murray and the Beginning of American Camping" for the public lecture series of the Adirondack Museum, Blue Mountain Lake, NY, July 21

– "The Garage in the Forest: E.P. Meinecke's Modern Campground Program" for the Western History Workshop, Autry Center for the American West, Los Angeles, CA, February 7

**2007** – "Sequoias, Cars and the Transformation of Camping" for the California Historical Society, San Francisco, CA, December 6

– "Into the Wild" for the North American Environmental History Seminar, Huntington Library, San Marino, CA, March 10

**2006** – "Camping as American Palliative" for John Lyle Center for Regenerative Studies, Cal Poly Pomona, May 25

– "'A Recreation Ground for the Citizens': Frederick Law Olmsted's Abandoned San Francisco Park Plan" for California Studies Association, UC Berkeley, CA, April 20

- "A Park System for National Reform" for Pilgrim Congregational Church, Pomona, CA, February 7

**2005** – "German Influences on the Nineteenth-Century Greenspace of San Francisco" for the German Historical Institute and Bavarian American Academy, Munich, Germany, June 17

– "A Park System for National Reform" for Ontario Museum of History and Art, Ontario, CA, May 25

**2004** – "Building San Francisco's Parks" for Strybing Arboretum at the Conservatory of Flowers, Golden Gate Park, San Francisco, March 4

**2003** – "Liberty, Nature, and Public Places in the Writings of Alexis de Tocqueville and Frederick Law Olmsted", a Liberty Fund colloquia, Oak Park, Illinois, October 23-26, which came with a $900.00 stipend and all expenses paid.

- "Historical Geography of San Francisco's Parks" for California Council for the Humanities, San

16

**3-ER-0671**

Francisco, CA, June 25

   - "How Did We Get Here?: A Brief History of American Park Design" in Going Native: Planning and Maintaining Parks for a Changing Los Angeles, a conference organized by the USC Center for Sustainable Cities for the Los Angeles Department of Recreation and Parks, May 14

**2001** – San Gabriel Valley Council of Governments, Industry, CA

   - Sierra Club, Angeles Chapter, West Los Angeles Group

**2000** - Department of Geography, University of Southern California

   - Interdisciplinary Studies, California State University-Dominguez Hills

   - Sierra Club, Angeles Chapter, Pasadena Group

   - Sierra Club, Angeles Chapter, Palos Verdes/South Bay Group

   - Historic Preservation Program, University of Southern California

**1999** - University of California, Los Angeles, California Geographic Alliance, Institute for Teaching Advanced Placement Human Geography

   - California State University-Hayward, Department of Geography

   - Texas A&M University, College Station, Department of Geography

   - Clemson University, Department of Parks, Recreation and Tourism Management

**1998** - San Francisco State University, Department of Geography and Human Environmental Studies

**1997** - Louisiana State University, Baton Rouge, Department of Geography and Anthropology

**1996** - University of Delaware, Newark, History Workshop in Technology, Society, and Culture

   - Smithsonian Institution, Washington, DC, National Museum of American History

   - University of Maryland, College Park, Department of Geography

**1995** - University of Tennessee, Knoxville, Department of Geography

   - Clemson University/Tri-County Technical College, Anderson, SC, SCUREF Program in Environmental Education

**1994** - Smithsonian Institution, Washington, DC, National Museum of American History

   - University of South Carolina, Spartanburg, Department of Psychology

**1993** - University of South Carolina, Columbia, Department of Geography

   - Clemson University, Department of Parks, Recreation, and Tourism Management

**1992** - University of Wisconsin, Madison, Department of Geography

**1991** - University of California, Los Angeles, Folklore and Mythology Program

- University of California, Los Angeles, Department of Geography

Commenter/Discussant

**2019** – Session Title: ""Getting Here: Travel, Capitalism, and Leisure in the Evolving West," Annual Meeting of the Western History Association, Las Vegas, NV, October 18

**2014** – Discussant concerning "925,000 Campsites," an exhibit by Martin Hogue, SUNY-Syracuse at WUHO, Woodbury University's Hollywood Art Gallery, Los Angeles, California, October 5

**2013** – Session Title: "Down and Out in Parks and Protected Areas: Social, Cultural and Historical Approaches," Annual Meeting of the Association of American Geographers, Los Angeles, California, April 10

**2007** – Session Title: "Constructed Nature: Urban Parks as Public Space/Civic Culture – Historical Perspectives," Annual Meeting of the Association of American Geographers, San Francisco, California, April 20

**2003** – Session Title: "Prehistoric Landscapes and Finite Resources," Haynes Foundation Conference: A Sustainable Future? Environmental Patterns and the Los Angeles Past, California Institute of Technology, Pasadena, California, September 19.  Available on the web at: http://today.caltech.edu/theater/03_04/la_sustainability/

**2000** - Session Title: "Playing Out-of-Doors between the Wars: The Role of Outdoor Recreation in Re-creating American Nature, 1919-1945," Annual Meeting of the American Historical Association, Chicago, Illinois

**1999** - Session Title: "When You Went to See Nature, What Did You See?," Annual Meeting of the American Society for Environmental History, Tucson, Arizona

Scholarly Fieldtrips

**2007** – "Los Angeles Against the Mountains" at the annual meeting of the Association of Pacific Coast Geographers, Long Beach, California, October 18

- "The Great Sand Waste: An Historical Look at Golden Gate Park" at the annual meeting of the Association of American Geographers, San Francisco, California, April 19

**SERVICE**

Departmental Assignments

**2010 – 2013** – Departmental Website Administrator

Departmental Committees

**2019** – DRTP member

**2014 – 2020** – Chair, Faculty Presentations

**2014 – 2019** – Chair, Temporary Faculty RTP

**2007- 2009** – Policies and Procedures

18

**3-ER-0673**

**2002-2007** – Computer Lab Committee

**2002-2003** – Ad Hoc Committee on Combining GEO 200 and GEO 461

College Committees

**2012 – 2013, 2014 - 2015** – CLASS RTP Committee

**2003-2006, 2007- 2010** – Curriculum (co-member from our department with Michael Reibel in 2003-04)

**2004-2006** – International Education Committee

University Committees

**2002-2006, 2007 - 2013** – Course Grade Appeals

**2003-2005** – Faculty/Staff Affairs

**2002-2003** – Outstanding Staff Awards

Ph.D. Committees

Robert Dye, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC

Kathleen Mengak, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC

M.A./M.S./M.L.A. Committees

Angelica Rocha, Regenerative Studies Program, California State Polytechnic University – Pomona (Co-chair of committee) (MS awarded 2019)

Norma Saldana, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2019)

Crystal Weintrub, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2014)

Rachel Boldt (nee Camp), Regenerative Studies Program, California State Polytechnic University – Pomona (Chair of committee) (MS awarded 2012)

April Garbat, Department of Landscape Architecture, California Polytechnic State University – Pomona (MLA awarded 2011)

Jacob Feldman, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2011)

Martin Hogue, Department of Landscape Architecture, University of Toronto (MLA degree awarded 2010)

Leslie Johnson, Department of Art, California State University – Long Beach (MA degree awarded 2007)

Doug Kent, Regenerative Studies Program, California State Polytechnic University – Pomona (MS degree

**3-ER-0674**

awarded 2006)

Keith Miller, Department of Geography, California State University – Long Beach (MA degree awarded 2003)

Undergraduate Support

McNair Scholars Program, California State Polytechnic University – Pomona, Advisor for Jennifer Stevens, 2004-2005

McNair Scholars Program, California State Polytechnic University - Pomona, Advisor for Stephanie Marley, 2003-2004

Presentations Organized:

Individuals:

**2017** - Professor Gert Gröning from the Institute for the History and Theory of Design, University of the Arts, Berlin, Germany to present a public lecture at California State Polytechnic University – Pomona entitled "Aspects of the Creation of the Prince Pückler Estate at Bad Muskau, Germany – A UNESCO World Heritage Site"

   - Professor Brian Pompeii from the California Polytechnic State University, San Luis Obispo to present a public lecture at California State Polytechnic University – Pomona entitled "Unmet needs in a creeping hazard:  The Great California Drought in Tulare County"

**2015** - Professor Gert Gröning from the Institute for the History and Theory of Design, University of the Arts, Berlin, Germany to present a public lecture at California State Polytechnic University – Pomona entitled "Allotment Gardens in Germany"
   - Professor Lary Dilsaver from the University of South Alabama, Mobile, AL to present a public lecture at California State Polytechnic University – Pomona entitled "The Evolving Perception of Arid Lands and the Management of Joshua Tree National Park"

**2003** – Professor Gert Gröning from the Institute for the History and Theory of Design, University of the Arts, Berlin, Germany to present a public lecture at California State Polytechnic University – Pomona entitled, "Nazism and Landscape Architecture, A Strange Connection" as well as studios in the Landscape Architecture Department.  Co-organized with Professor Joan Woodward, Department of Landscape Architecture.

**1998** - Professor Edward Casey from the Department of Philosophy, State University of New York, Stony Brook to give a lecture at the Annual Meeting of the Association of American Geographers, Boston, MA. Professors J. Nicholas Entrikin (Geography, UCLA), Edward Relph (Geography, University of Toronto), and Edward Soja (Urban Planning, UCLA) responded.

**1994** - Professor Gert Groening from the Fachbereich Architektur, Hochschule der Kuenste Berlin, Germany to give a lecture at Clemson University on Nazi ideology and landscape architecture.

Series:

**2010** – "Sustainability and …", An eight week series of speakers during spring quarter for the John T. Lyle Center for Regenerative Studies, California Polytechnic University – Pomona

Group:

**2017** – "People, Politics, and Place in the Historic Shaping of America's Western National Parks" (One

**3-ER-0675**

session of four speakers and a discussant) at the biennial meeting of the George Wright Society, Norfolk, VA, April 3

**2015** – "The Many Consequences of Seeing 'Nature'" (One session of five speakers) at the biennial meeting of the George Wright Society, Oakland, CA, March 30

**2015** – "The Internationalization of Nature Protection in North America" (One session of four speakers and a discussant) at the annual meeting of the American Society for Environmental History, Washington, DC, March 21

**2013** – "Bargaining with Distant Places: Historical and Cultural Aspects of Real and Virtual Travel" (One session of 4 speakers and a discussant) at the annual meeting of the Association of American Geographers, Los Angeles, CA, April

**2011** – "Seeing the Park in the Trees: Historical Approaches to Parks and Protected Areas" (One session of 5 speakers) co-organized with Yolonda Youngs, Oklahoma State University) at the annual meeting of the Association of American Geographers, Seattle, WA, April 13

**2010** – "To Protect and Serve: Explorations into the Nature-Culture Dialectic in America" (Four sessions of 16 speakers co-organized with Yolonda Youngs, Oklahoma State University and Geoff Buckley, Ohio University) at the annual meeting of the Association of American Geographers, Washington, DC, April 16

**2009** – "Parks Gone Wild: Exploring the Boundaries of Nature Protection" (Two sessions of 8 speakers co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of American Geographers, Las Vegas, NV, March 24

**2008** – "Conversations with the Arch Amenity" (Three sessions of 12 speakers co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of American Geographers, Boston, MA, April 18
    – "The Shifting Good of National Parks" at the annual meeting of the American Society for Environmental History, Boise, ID, March 14

**2007** – "Going Wild, Going Out of Bounds: Reshaping the American Encounter with Wilderness" (co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of Pacific Coast Geographers, Long Beach, CA, October 20

    - "North American Parks and Protected Areas" (Three sessions of 12 speakers co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of American Geographers, San Francisco, California, April 21

**2005** – "Ideology and Recreational Environments" at the annual meeting of the American Society for Environmental History, Houston, Texas, March 19.

**2004** – "Natural Camps, Natural Scenes and Naturists: Popular Environmentalism in the 1930s and Beyond" at the annual meeting of the American Society for Environmental History, Victoria, BC, April 2.

**2003** – "Desire, Escape, Identity, and Relevance: The Allure and (Ab)use of Tourist and Recreational Environments" at the Annual Meeting of the Association of American Geographers, New Orleans, LA, March 5.

**2002** – "Suburbanization in Southern California" at the Annual Meeting of the California Studies Association, San Juan Capistrano, CA

**2002** - "Managing the Rivers and Coast of Southern California" at the Annual Meeting of the California Studies Association, San Juan Capistrano, CA

**3-ER-0676**

**2002** - "Toward a Sustainable Los Angeles: A 'Nature's Services' Approach" at the Annual Meeting of the Association of American Geographers, Los Angeles, CA

**1996** - "Accessing America's Parks" at the Annual Meeting of the Association of American Geographers (AAG), Charlotte, NC

**1996** - "The Uses of Nature" at the Annual Meeting of the AAG, Charlotte, NC

**1993** - "Rethinking Environmental Determinism: New Perspectives on a Geographical Taboo" at the Annual Meeting of the AAG, Atlanta, GA

Manuscripts and proposals reviewed for:

*Agricultural History*
*Association of Pacific Coast Geographers Yearbook*
*California History*
Center for American Places/University of Chicago Press
*cultural geographies*
*Ecumene*
*Environmental History*
*Gender, Place and Culture*
*Geographical Review*
*GeoJournal*
*Historical Geography*
*Journal of Cultural Geography*
*Journal of Historical Geography*
*Journal of Planning History*
*Journal of Urban Design*
*Land Use Policy*
*Landscape Journal*
*Landscape Research*
Louisiana State University Press
National Science Foundation
*Pacific Historical Review*
*Park Stewardship Forum*
*Philosophy and Geography*
*Society and Space*
*Studies in the History of Gardens and Designed Landscapes*
US National Park Service
University of Massachusetts Press
University of Virginia Press
*Western Historical Quarterly*

Other

**2021-present** – Advisory Member, Publications Committee, George Wright Society

**2022-present** – Secretary, Association of Pacific Coast Geographers

**2023-2024** –  Chair, Protected Areas Specialty Group, American Association of Geographers

**2020-2023** –  Vice Chair, Protected Areas Specialty Group, American Association of Geographers

**2013-2017** – Member, Editorial Board, *Environmental History*

22

**3-ER-0677**

**2013-2014** – Local Arrangements Committee for American Society for Environmental History's 2014 annual meeting in San Francisco, CA

**2012-2013** – Local Arrangements Committee for Association of American Geographers 2013 annual meeting in Los Angeles, CA

**2008-2011** – Publications Committee, Association of American Geographers

**2006-2007** – WINGS Advisory Board, Earth Science and Anthropology Department, Los Angeles Valley College, Valley Glen, CA (Project funded by USDA)

**2003-2004** – Program Committee for the 2004 meeting of the California Studies Association, Loyola Marymount University, Westchester, California

**2002-2006** – Steering Committee, California Studies Association

**2002** - Program Committee for the annual meeting of the Association of American Geographers, Los Angeles, California

**2002** - Program Committee for the annual meeting of the California Studies Association, Orange County, California

**2001** - Member, Technical Advisors, World of Ecology Exhibition, Los Angeles County Museum of Natural History

**2001** - Program Committee for the annual meeting of the American Society for Environmental History, Durham, North Carolina

**1999 to 2008** - Editorial Board, *Historical Geography*

**1995 to 1999** - Book Review Editor, *Historical Geography*

**1996** - Member, Teller Committee, Association of American Geographers

**1994 to 1998** - Director & Awards Committee Chair, AAG-Cultural Geography Specialty Group

**1993 to 1995** - Bibliographic compiler for the AAG-Historical Geography Specialty Group newsletter, *Past Place*

**1993-1994** - Judge for the AAG-Historical Geography Specialty Group student paper competition

**1993-1994** - Judge for the AAG-Cultural Geography Specialty Group student paper competition

## PROFESSIONAL MEMBERSHIPS

American Society for Environmental History
American Association of Geographers
Association of Pacific Coast Geographers
European Society for Environmental History
George Wright Society

23

**3-ER-0678**