No. 23-16164

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Hawai'i
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

---

## EXCERPTS OF RECORD (VOLUME 5 OF 6)

---

ANNE E. LOPEZ
  *Attorney General of the State of Hawai'i*
KALIKO'ONĀLANI D. FERNANDES
  *Solicitor General*
NICHOLAS M. MCLEAN
  *First Deputy Solicitor General*
STATE OF HAWAI'I
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
  *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

5-ER-0976

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
    *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
    *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as*
*Attorney General of the State of Hawaiʻi*

# L A W S

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF PENNSYLVANIA,

PASSED AT THE

## SESSION OF 1868,

In the Ninety-second Year of Independence.

## WITH AN APPENDIX.

BY AUTHORITY.

HARRISBURG:

SINGERLY & MYERS, STATE PRINTERS.

1868.

EXHIBIT 23 (McLean)

OF THE SESSION OF 1868.                    1083

## No. 1019.

### A Supplement

To an act, entitled "An Act to incorporate the Farmers' Coal and Iron
Company," approved the seventeenth day of April, Anno Domini
one thousand eight hundred and sixty-six.

SECTION 1. *Be it enacted by the Senate and House of Represen-*
*tatives of the Commonwealth of Pennsylvania in General Assem-*
*bly met, and it is hereby enacted by the authority of the same,*
That said company shall have the power and authority to **Authorized to**
build a bridge across the Susquehanna river, so that the same **construct**
may be a toll and railroad bridge, and charge and receive **bridge.**
tolls for crossing the same.

SECTION 2. That it shall be lawful for any other chartered **Other corpora-**
company to subscribe to the capital stock of this company or **tions may sub-**
to loan the said company money. **scribe to capital**
**stock.**

SECTION 3. That said company shall have the right to ex- **May extend**
tend their railroad and branches, and cross at grade the tracks **railroad, &c.**
of any railroads now made or hereafter to be made, in such
manner as to connect with any other railroads or to any land-
ings on any canal or slack-water navigation.

<div align="center">

ELISHA W. DAVIS,
Speaker of the House of Representatives.

JAMES L. GRAHAM,
Speaker of the Senate.

</div>

APPROVED—The fourteenth day of April, Anno Domini one
thousand eight hundred and sixty-eight.

<div align="center">

JNO. W. GEARY.

</div>

---

## No. 1020.

### A Supplement

To an act, entitled "An Act appropriating ground for public purposes
in the city of Philadelphia," approved the twenty-sixth day of March,
Anno Domini one thousand eight hundred and sixty-seven.

SECTION 1. *Be it enacted by the Senate and House of Represen-*
*tatives of the Commonwealth of Pennsylvania in General Assem-*
*bly met, and it is hereby enacted by the authority of the same,*
That the boundaries of the Fairmount park, in the city of **Boundaries of**
Philadelphia, shall be the following, to wit: Beginning at a **Fairmount park**
point in the north-easterly line of property, owned and occu- **defined.**

1084                          LAWS OF PENNSYLVANIA.

pied by the Reading Railroad Company, near the city bridge over the river Schuylkill at the falls, where said north-easterly line is intersected by the line dividing property of H. Duhring from that of F. Stoever and T. Johnson ; extending from thence in a south-westerly direction upon said dividing line and its prolongation to the middle of the Ford road ; from thence by a line passing through the south-east corner of Forty-ninth and Lebanon streets to George's run ; thence along the several courses of said run to a point fourteen hundred and eighty-seven and a half feet from the middle of the Pennsylvania railroad, measured at right angles thereto ; thence by a straight line through the north-east corner of Forty-third and Hancock streets to the northerly side of Girard avenue, near Fortieth street ; thence by the said northerly side of Girard avenue to the easterly side of the Junction railroad, as now used ; thence by the said easterly side of the Junction railroad and the Pennsylvania railroad to the north side of Haverford street ; thence by the northerly side of said Haverford street to the westerly side of Bridgewater street ; thence by said Bridgewater street to the north line of Bridge street ; thence by said Bridge street to the west abutment of the Suspension bridge ; thence by the north-westerly side of the Suspension bridge and Callowhill street to the angle in said street, on the south-westerly side of Fairmount basin ; thence by the northerly side of Callowhill and Biddle streets to the westerly side of Twenty-fifth street ; thence by the said Twenty-fifth street to the south-westerly side of Pennsylvania avenue ; thence by the south-westerly side of Pennsylvania avenue to the west side of Thirty-third street ; thence along the westerly side of Thirty-third street to the south-westerly line of Ridge avenue ; thence along said Ridge avenue to the south-westerly line of South Laurel Hill cemetery, (north of Huntingdon street ;) thence by and along said property line to such a distance from the shore line of the river Schuylkill as will permit the location of a carriage road one hundred feet wide upon its margin ; thence along said river shore and its several courses, as may be most practicable, at the same distance as above specified, (provided said distance shall not exceed one hundred and fifty feet,) to a point opposite the intersection of the Ridge turnpike and School lane ; thence northwardly to a point on the south-westerly side of said turnpike road, opposite to the south-easterly side of School lane ; thence by the south-westerly side of the Ridge turnpike road and to its several courses to the south-easterly side of the Wissahickon creek ; thence by the several courses of the said south-easterly side of Wissahickon creek to the Schuylkill river ; thence across the watercourse of said river to the north-easterly line of the Reading Railroad Company's property, as now occupied and in use at the city boundary line ; thence along said north-easterly line as now occupied and used by said railroad company, to the place of beginning, excepting nevertheless thereout the several water works and their appurtenances which are included within these boundaries, and such uses of the premises immediately adjacent to the same, and such other portions of

OF THE SESSION OF 1868.                                  1085

the ground as are described in the plan, as the city of Phila-
delphia may from time to time require for the purposes of
its water department.

SECTION 2. That there shall be laid out and constructed a **Road to be laid**
road of easy and practicable grades extending from the inter- **out.**
section of the northerly line of the park by Belmont avenue,
on the westerly side of the river Schuylkill, to the head of
Roberts hollow, and thence along said hollow and the river
Schuylkill to the foot of City avenue, laid out, with the ground
contiguous thereto for ornamentation, of such width, and so
constructed as the commissioners of Fairmount park, appoint-
ed under authority of the act of the general assembly of the
commonwealth, may determine: and such road and its con- **Road and con-**
tiguous ground are hereby declared to be a part of the afore- **tiguous ground**
said park; and said park commissioners are hereby authorized **declared part of**
and required to ascertain, by a proper survey, the limits **park.**
thereof, which survey they shall file in the survey depart-
ment of the city of Philadelphia; and it shall also be the **Park commis-**
duty of said park commissioners to appropriate the shores of **sioners to ap-**
the Wissahickon creek, on both sides of the same, from its **propriate shores**
mouth to the Paul's Mill road, and of such width as may **of Wissahickon**
embrace the road now passing along the same; and may **creek.**
also protect the purity of the water of said creek, and by
passing along the crest of the heights which are on either side
of said creek, may preserve the beauty of its scenery; the said **To cause sur-**
park commissioners are hereby authorized and required to **veys of grounds**
cause a proper survey to be made of said grounds upon the **to be made out**
Wissahickon, and to file said survey in the survey department **and filed.**
of the city of Philadelphia; and the grounds and creek hereby
appropriated, are declared to be a part of Fairmount park.

SECTION 3. That the title to and ownership of the ground **Title to ground**
within said boundaries shall be vested in the city of Philadel- **within aforesaid**
phia, excepting therefrom so much as shall be required by **boundaries**
the Schuylkill Navigation Company, the Philadelphia and **vested in city.**
Reading, the Junction and Connecting Railroad Companies,
for the execution of their franchises as now provided by law.

SECTION 4. So much of the ground as was embraced in the **Claim of city to**
act to which this is a supplement, approved the twenty-sixth **portion of**
day of March, one thousand eight hundred and sixty-seven, **ground em-**
and is not included in the above boundaries, is hereby re- **braced in for-**
leased from all claim of title by the said city, with the same **mer act, re-**
effect as if it had never been included. **leased.**

SECTION 5. That all the grounds taken within the bounda- **Grounds subjec**
ries of the Fairmount park, by the first section of this act, **to control of**
shall be subject to all the powers and control given by the **park commis-**
act to which this is a supplement to the city of Philadelphia; **sioners.**
and the park commissioners, designated by or appointed under
said act, and the owners of all ground taken for the park, and **Owners to be**
others interested therein, shall be compensated as in said act **compensated.**
is directed and provided.

SECTION 6. The said commissioners shall have power and **Commissioners**
authority, from time to time, to vacate any street or road **may vacate**
within the boundaries of the park, (excepting Girard avenue,) **streets, &c.**
and to open for public use such other roads, avenues and
streets therein as they may deem necessary.

1086                          LAWS OF PENNSYLVANIA,

**Councils to cause alteration of plans of survey of certain wards, &c.**

SECTION 7. The councils of the city of Philadelphia shall cause, under the supervision of the department of surveys, such alterations of the plan of survey of the Twenty-fourth ward as lies between Fairmount park, as by this act established, the Pennsylvania railroad and the City avenue, and of the contiguous parts of the Twentieth and Twenty-eighth wards as may become necessary or expedient by reason of the extension as aforesaid of the limits of the Fairmount park, and cause the same to be established in manner as now provided by law for revising or laying out plans of survey in and for the city of Philadelphia; and shall lay out an avenue as one of the streets of the city, of the width of not less than one hundred feet, as a boundary of the park, on the south-west, west and north-west sides thereof, extending from Girard avenue to the river Schuylkill, at or near the Falls bridge, and also upon the eastern side of the river from the intersection of Pennsylvania avenue and Thirty-third street northward along the boundary of said park to the river Schuylkill.

**Avenue to be laid out as a boundary of park,**

**Jurisdiction of commissioners, how far to extend.**

SECTION 8. The jurisdiction of the commissioners of the park shall extend to the breadth of the footway next the park, in all avenues or streets which shall bound upon the park, and they shall direct the manner in which such footways shall be laid out, curbed, paved, planted and ornamented, which footways shall not be less than twenty feet in width on any avenue or street of the width of one hundred feet, and of like proportion upon any street or avenue of a greater or less width, unless otherwise directed by the commissioners.

**Compensation for buildings.**

SECTION 9. The said park commissioners or jury, who shall assess the compensation to the owners for the ground taken, shall ascertain and make compensation for buildings as well as the ground taken; but all buildings and machinery and fixtures not required by the park commission shall be removed by the owners thereof whenever payment of the compensation awarded them shall be made or tendered to them, and upon such payment or tender the park commissioners shall forthwith take possession of the premises; if any owner or lessee of ground taken cannot be found, notice of the taking and valuation of his land shall be given by advertisement in two daily papers published in Philadelphia six times, and in the Legal Intelligencer twice, and the amount awarded in such case to the owner or lessee shall remain in the city treasury until such owner shall produce the decree of the court having jurisdiction in the premises, ordering the said moneys to be paid to him or his legal representatives.

**Proceedings where owners or lessees of ground taken cannot be found**

**Commissioners and jury may make partial or special reports.**

SECTION 10. The said commissioners and jury may make partial or special reports from time to time to the court as they may be ready to do so, and the court may act upon such reports separately, and the powers of the jury shall continue, unless limited by the court or they be required by the court to make report, until they shall have reported on all the cases on which they have been appointed, although a term or terms of the courts shall have intervened; and jurors, not to exceed six in number, may be appointed upon one or more cases according to the order of the court made; and whenever any report of the said commissioners or of the jury shall have been

## OF THE SESSION OF 1868.

confirmed by the court, the valuation made shall be forthwith payable by the city of Philadelphia.

SECTION 11. The city of Philadelphia shall be authorized and required to raise, by loans from time to time, such sums of money as shall be necessary to make compensation for all grounds heretofore taken or to be taken for said Fairmount park, and for the laying out and construction thereof for public use, for the permanent care and improvement thereof, and for all culverts and other means for preserving the Schuylkill water pure for the use of the citizens of said city, and shall annually assess taxes for keeping in repair and good order the said park, and shall also provide for the payment of the interest on all said loans and the usual sinking fund for the redemption thereof. *City to effect loans to make compensation for grounds taken, &c.*

SECTION 12. The said park commissioners shall from time to time appoint such officers, agents and subordinates as they may deem necessary for the purposes of this act and the act to which this is a supplement, and they shall prescribe the duties and the compensation to be paid them; and so much of the second section of the act to which this is a supplement, as requires that the secretary shall be chosen from the commissioners, be and the same is hereby repealed. *Commissioners to appoint officers, agents, &c.*

SECTION 13. It shall be lawful for said park commissioners to acquire title to the whole or any tract of land, part of and which shall fall within the boundaries mentioned in the first section of this act, and to take conveyance thereof in the name of the city of Philadelphia; and such part thereof as shall lie beyond or within the said park limits again to sell and convey in absolute fee simple to any purchaser or purchasers thereof by deeds, to be signed by the mayor under the seal of the city, to be affixed by direction of councils, either for cash or part cash, and part to be secured by bond and mortgage to the city, paying all cash into the city treasury: *Provided,* That the proceeds of such sales shall be paid into the sinking fund for the redemption of the loan created under the provisions of this act: *Provided also,* That no commissioner nor any officer under the park commission shall in any wise be directly or indirectly interested in any such sale of lands by the commissioners as aforesaid; and if any commissioner or officer aforesaid shall act in violation of this proviso, he shall, if a commissioner, be subject to expulsion, if an officer, to be discharged by a majority of votes of the board of park commissioners, after an opportunity afforded of explanation and defence. *May acquire and sell lands situate in part within boundaries mentioned. Proviso. Proviso.*

SECTION 14. The said board of commissioners shall annually hereafter, in the month of December, make to the mayor of the city of Philadelphia a report of their proceedings and a statement of their expenditures for the preceding year. *To make report to mayor annually.*

SECTION 15. The said park commissioners shall have exclusive power to lease from year to year all houses and buildings within the park limits, which may be let without prejudice to the interests and purposes of the park by leases, to be signed by their president and secretary, and to collect the rents and pay them into the city treasury. *May lease houses, &c., within park limits.*

1088                              LAWS OF PENNSYLVANIA,

**Buildings erected on grounds by boat clubs, &c., relative to.**
SECTION 16. All houses and buildings now built or to be built on any part of the park grounds, by or for boat or skating clubs, or zoological or other purposes, shall be taken to have rights subordinate to the public purposes intended to be subserved by acquiring and laying out the park, and shall be subject to the regulations of said park commissioners under licenses, which shall be approved by the commission and signed by the president and secretary, and will subject them to their supervision and to removal or surrender to the city whensoever the said commissioners may require.

**Commissioners may accept property upon trusts.**
SECTION 17. The said park commissioners shall have power to accept in the name and behalf of the city of Philadelphia devises, bequests and donations of lands, moneys, objects of art and natural history, maps and books, or other things, upon such trusts as may be prescribed by the testator or donor: *Provided*, Such trusts be satisfactory to the commission and compatible with the purposes of said park.

**Proviso.**

**Debts to bind commissioners, how created.**
SECTION 18. None of the park commissioners nor any person employed by them shall have power to create any debt or obligation to bind said board of commissioners, except by the express authority of the said commissioners at a meeting duly convened.

**Management, &c., of park**
SECTION 19. The said park commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount park, and to maintain the same in good order and repair, and to construct all proper bridges, buildings, railways and other improvements therein, and to repress all disorders therein under the provisions hereinafter contained.

**May license laying down of passenger railways.**
SECTION 20. That the said park commissioners shall have authority to license the laying down and the use for a term of years from time to time of such passenger railways as they may think will comport with the use and enjoyment of the said park by the public, upon such terms as said commissioners may agree, all emoluments from which shall be paid into the city treasury.

**Rules and regulations.**
SECTION 21. The said park shall be under the following rules and regulations, and such others as the park commissioners may from time to time ordain:

I. No person shall turn cattle, goats, swine, horses or other animals loose into the park.

II. No person shall carry fire arms or shoot birds in the park or within fifty yards thereof, or throw stons or other missiles therein.

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the park.

IV. No person shall drive or ride therein at a rate exceeding seven miles an hour.

V. No one shall ride or drive therein upon any other than upon the avenues and roads.

VI. No coach or vehicle used for hire shall stand upon any part of the park for the purpose of hire, nor except in waiting for persons taken by it into the park, unless, in either case, at points designated by the commission.

OF THE SESSION OF 1868.                                    1039

VII. No wagon or vehicle of burden or traffic shall pass through the park, except upon such road or avenue as shall be designated by the park commissioners for burden transportation.

VIII. No street railroad car shall come within the lines of the park without the license of the park commission.

IX. No person shall expose any article for sale within the park without the previous license of the park commission.

X. No person shall take ice from the Schuylkill within the park without the license of the said commission first had, upon such terms as they may think proper.

XI. No threatening, abusive, insulting or indecent language shall be allowed in the park.

XII. No gaming shall be allowed therein, nor any obscene or indecent act therein.

XIII. No person shall go in to bathe within the park.

XIV. No person shall fish or disturb the water-fowl in the pool or any pond, or birds in any part of the park, nor discharge any fire-works therein, nor affix any bills or notices therein.

XV. No person shall have any musical, theatrical or other entertainment therein without the license of the park commissioners.

XVI. No person shall enter or leave the park except by such gates or avenues as may be for such purpose arranged.

XVII. No gathering or meeting of any kind assembled through advertisement shall be permitted in the park without the previous permission of the commission, nor shall any gathering or meeting for political purposes in the park be permitted under any circumstances.

XVIII. That no intoxicating liquors shall be allowed to be sold within said park.

SECTION 22. Any person who shall violate any of said rules and regulations, and any others which shall be ordained by the said park commissioners for the government of said park, not inconsistent with this act or the laws and constitutions of this state and United States, the power to ordain which rules and regulations is hereby expressly given to said commissioners, shall be guilty of a misdemeanor, and shall pay such fine as may be prescribed by said park commissioners, not to exceed five dollars for each and every violation thereof, to be recovered before any alderman of said city, as debts of that amount are recoverable; which fines shall be paid into the city treasury: *Provided*, That if said park commissioners should license the taking of ice in said park, or the entry of any street railroad car therein, or articles for sale, or musical entertainments, it may be with such compensation as they may think proper, to be paid into city treasury: *And provided*, That any person violating any of said rules and regulations shall be further liable to the full extent of any damage by him or her committed, in trespass or other action; and any tenant or licensed party who shall violate the said rules, or any of them, or consent to or permit the same to be violated on his or her or their premises, shall forfeit his or her or their lease or license, and shall be liable to

*[marginal notes:]* Penalty for violating rules and regulations.

Proviso.

Proviso.

69

1090                    LAWS OF PENNSYLVANIA,

be forthwith removed by a vote of the park commission; and every lease and license shall contain a clause making it cause of forfeiture thereof for the lessee or party licensed to violate or permit or suffer any violation of said rules and regulations, or any of them; it shall be the duty of the police appointed to duty in the park, without warrant, forthwith to arrest any offender against the preceding rules and regulations whom they may detect in the commission of such offence, and to take the person or persons so arrested forthwith before a magistrate having competent jurisdiction.

**Profits realized, to be paid into city treasury.**   SECTION 23. All rents, license, charges and fees, all fines, proceeds of all sales, except of lands purchased, and profits of whatsoever kind, to be collected, received or howsoever realized, shall be paid into the city treasury as a fund to be exclusively appropriated by councils for park purposes, under the direction of said commission: *Provided*, That moneys or property given or bequeathed to the park commissioners upon specified trusts shall be received and receipted for by their treasurer, and held and applied according to the trusts specified.

**Proviso.**

**Councils may approve approaches to park.**   SECTION 24. That the councils of the city of Philadelphia be and they are hereby authorized to widen and straighten any street laid upon the public plans of said city, as they may think requisite to improve the approaches to Fairmount park.

**Act not to affect proceedings pending in court.**   SECTION 25. That nothing in this act contained shall suspend or affect any proceeding pending in court under any existing law, but the same shall be proceeded in as if this act had not been passed.

**Damages, how ascertained, &c.**   SECTION 26. The damages for ground and property taken for the purpose of this act shall be ascertained, adjusted and assessed in like manner as is prescribed by the act to which this is a supplement.

**Commissioners to employ park force to maintain order.**   SECTION 27. The said park commissioners shall employ, equip and pay a park force adequate to maintain good order therein and in all houses thereupon; which force shall be subject to the orders of the mayor upon any emergency, and so far as said force shall consist of others than the hands employed to labor in the park, it shall be appointed and controlled as the other police of the city.

**City solicitor to appoint additional assistant.**   SECTION 28. There shall be an additional assistant appointed by the city solicitor, whose duty it shall be, under the direction of the city solicitor, to attend to the assessments of damages, and to such other business of a legal nature connected with the park as said commissioners may require.

                         GEO. T. THORN,
              Speaker of the House of Representatives pro tem.

                         JAMES L. GRAHAM,
                              Speaker of the Senate.

    APPROVED—The fourteenth day of April, Anno Domini one thousand eight hundred and sixty-eight.

                         JNO. W. GEARY.

5-ER-0986



LITTAUER LIBRARY

LI 1E2C P

# SAN FRANCISCO, Cal.—

# MUNICIPAL REPORTS

FOR THE

## FISCAL YEAR 1874-5, ENDING JUNE 30, 1875.

PUBLISHED BY ORDER OF THE

## BOARD OF SUPERVISORS.



SAN FRANCISCO:

SPAULDING & BARTO, PRINTERS, "SCIENTIFIC PRESS" JOB PRINTING OFFICE,
414 CLAY STREET.
1875.

EXHIBIT 24 (McLean)

886                          ORDINANCES OF THE

four months, nor more than six months, or by both such fine or imprisonment;
and one-half of any fine that may be collected for a violation of any of the
provisions of this order, shall be paid to the persons making the complaint.

## ORDER NO. 1,226.

### PROHIBITING THE CARRYING OF CONCEALED DEADLY WEAPONS.

[Approved July 9, 1875.]

*The People of the City and County of San Francisco do ordain as follows :*

SECTION 1.  It shall be unlawful for any person, not being a public officer
or traveler, or not having a permit from the Police Commissioners of this
City and County, to wear or carry, concealed, in this City and County, any
pistol, dirk or other dangerous or deadly weapon.

Every person violating any of the provisions of this order shall be deemed
guilty of a misdemeanor and punished accordingly.  Such persons, and no
others, shall be termed "travellers" within the meaning of this order, as may
be actually engaged in making a journey at the time.

The Police Commissioners may grant written permission to any peaceable
person, whose profession or occupation may require him to be out at late
hours of the night, to carry concealed deadly weapons for his own protection.

NOTE.—General Orders, as amended, to November 1st, 1875.

## PARK COMMISSIONERS' ORDINANCES.

### ORDINANCE No. 1.

[Adopted October 27th, 1870.]

*The Park Commissioners do ordain as follows:*

No person shall trespass on the grounds within the limits of the Avenue,
Golden Gate and Buena Vista Parks.

No person shall cut or remove from said Avenue and Parks, any trees,
shrubs, stakes, wood, turf, grass or soil.

It shall be the duty of the custodian of the Park to arrest all trespassers,
and all parties violating this Ordinance.

Digitized by Google

PARK COMMISSIONERS.    887

ORDINANCE No. 2.

(Adopted September 24th, 1872.)

AN ORDINANCE TO PROVIDE FOR THE REGULATION AND GOVERNMENT OF THE
AVENUE AND PUBLIC PARKS IN THE CITY AND COUNTY OF SAN FRANCISCO,
IN CHARGE OF THE PARK COMMISSIONERS.

SECTION 1. The objects of this Ordinance are those grounds which are
known as Golden Gate and Buena Vista Parks, and the Avenue leading to
said Golden Gate Park, all particularly described in the first section of an
Act of the Legislature of the State of California, entitled "An Act to provide
for the improvement of Public Parks in the City of San Francisco," approved
April 4th, 1870.

SEC. 2. Within the said grounds all persons are hereby forbidden:

1. To turn in or let loose any cattle, horses, goats, sheep, or swine.

2. To carry and especially to discharge firearms.

3. To cut, break, or in any way injure or deface any trees, shrubs, plants,
buildings, fences, or structures of any kind.

4. To bathe in, or otherwise pollute the water of any pond, lake, or pool.

5. To chase, set snares for, catch, or destroy any rabbits, quails, or other
wild quadrupeds or birds.

6. To make or kindle a fire of any kind.

7. To camp, lodge, or tarry over night.

8. To ride or drive any horse or other animal, with vehicle or without,
elsewhere than on the roads or drives for such purposes provided.

9. To indulge in riotous, boisterous, or indecent conduct, or language.

10. To drive or ride at a furious speed.

SEC. 3. No dray, truck, wagon, cart, or other vehicle carrying, or if not
carrying, employed regularly in carrying goods, merchandise, manure, soil,
or other articles, shall be allowed to travel upon the drive of said avenue for
any other purpose than to cross immediately at the regular street intersec-
tions, nor upon the drives of said parks. For the present the road now and
heretofore commonly traveled to and from "The Central Macadamized Toll
Road," is excepted from this rule. But all such vehicles shall be driven over
the least worked portion of such excepted road as directed by the Superinten-
dent or any of the Park police officers hereinafter mentioned, unless com-
pelled to turn out in obedience to the "rule of the road," as hereinafter
laid down.

The provisions of this subdivision shall also apply to light vehicles regularly
driven for business purposes between the country beyond the parks and
the city.

SEC. 4. The rule of the road for equestrians or vehicles meeting upon the
avenue or park drives shall be: PASS TO THE RIGHT.

Digitized by Google

888                ORDINANCES OF THE

SEC. 5.  There is hereby established a Pound, to be located within the
Park limits, for the impounding of the animals mentioned in the first sub-
division of section two of this ordinance, and of all strays found trespassing
upon said grounds.  All such animals shall be driven or carried to the Pound
and there kept enclosed at a charge to their owners at the rate of one dollar
per day or fraction of a day, for each animal so impounded.  No animal thus
in custody shall be released except on proof of property and on production of
a receipt signed by the Secretary of the Board of Park Commissioners, coun-
tersigned by the Park Superintendent.

If unclaimed for three days, all such animals shall be impounded in the
City Pound.  [This Section amended by Ordinance No. 5.]

SEC. 6.  All moneys accruing from the Pound charges aforesaid, and also
from fines collected from offenders against of the provisions of this
ordinance, shall be placed in the "Park Improvement Fund," and duly ac-
counted for.  [This Section amended by Ordinance No. 5.]

SEC. 7.  1.  When the number of participants in any picnic or other
organized party, about to enter these grounds will exceed ten persons, they,
or one of them, shall communicate their intention to the keeper of the gate-
way at which they enter, or to the keeper of the Stanyan street entrance,
pending the appointment of keepers for the other gates.

2.  Any company, society or organization of any kind, being desirous of
resorting to these grounds in a body, the number of individuals in which will
exceed twenty-five, for the purpose of picnicing; any military or other or-
ganized company desirous of parading within the same; any base ball, cricket,
or sporting club desirous of using the grounds set aside for their peculiar pur-
poses, shall at least one day prior to the proposed date of the excursion,
report, or cause to be reported, such intention to the Secretary of the Park
Commissioners, or to the Superintendent of the Parks and Avenues.

3.  All waste material, scraps, litter or rubbish of any kind brought upon
these grounds by such picnic or other parties, shall be promptly collected
and removed by them or their employees.  In the event of the non-observance
of this regulation, the actual cost of thoroughly performing the necessary
duty by the Park force shall be charged, and a bill for the same be presented
to the representatives of the organization so offending.

4.  The representatives of any such organized party which shall have re-
sorted to these grounds will be held responsible for the damage done through
any transgression of these ordinances by any member of the same, when the
offending individual in person cannot be identified.

SEC. 8.  The Superintendent of the Parks and Avenue is hereby instructed
to enforce and cause to be enforced the provisions of this Ordinance.

SEC. 9.  Power and authority are hereby given to the Park-Keeper, the
Head Gardener, the Foreman and the Foreman Teamster, to arrest and detain
and deliver to the proper authorities, or in their discretion eject from the


Digitized by Google

PARK COMMISSIONERS.                    889

grounds, all persons wilfully or knowingly offending against the provisions
of this Ordinance, or any other Ordinance hereafter to be passed by said
Board for the regulation, use and government of said Parks and Avenue.

SEC. 10.   The Superintendent is herby clothed with the powers enumerated
in Section 9 of this Ordinance.

SEC. 11.   Whenever it may be necessary to appoint assistant keepers, there
shall be delivered to each of them a certificate of appointment, signed by a ma-
jority of said Board, sealed and attested by the Secretary.  Said assistant keepers
shall possess all the powers enumerated in Section 9 of this Ordinance, but
shall exercise the same under the direction of the Superintendent, and report
to him forthwith any action which they may take under the same.

SEC. 12.   The Park Keeper, the Head Gardener, the Foreman Teamster,
and such assistant keepers as may be appointed as aforesaid, shall constitute
the Park Police, and shall provide themselves with a badge of office consist-
ing of a metallic star, inscribed with the words "Park Police," and the
initials of the words indicating their particular office.   A roll number shall be
added to the initials on the badges of the assistant keepers.

SEC. 13.   The Secretary of said Board shall, within five days after the pas-
sage of this ordinance, make and certify an accurate copy of the same, and
cause the same to be published, as required by law, for ten days, Sundays
excepted, and this ordinance shall take effect fifteen days after its passage.

———

ORDINANCE No. 3.

[Adopted May 23, 1873.]

SECTION 1.   The object of this ordinance, is that ground known as the Golden
Gate Park, as described in the first section of an Act of the Legislature of the
State of California, entitled " An Act to provide for the improvement of Pub-
lic Parks in the City of San Francisco," approved April 4th, 1870,

SEC. 2.   All vehicles used regularly for business purposes in hauling mate-
rial or produce over the roads in the said Park, shall rest upon tires at least
three and one-half (3½) inches wide.

SEC. 3.   All trucks or wagons, other than those fitted with steel springs,
used regularly in transporting heavy loads of material of any description
over the said roads, shall rest upon tires at least five (5) inches wide.

SEC. 4.   The Secretary of said Board shall, within five days after the pas-
sage of this ordinance, make and certify an accurate copy of the same, and


Digitized by Google

# LAWS

AND

# ORDINANCES

GOVERNING THE

## CITY OF CHICAGO.

[PUBLISHED BY AUTHORITY OF THE COMMON COUNCIL OF THE CITY.]

COMPILED AND ARRANGED BY

MURRAY F. TULEY,

Counsel to the Corporation.

CHICAGO.
PUBLISHED BY THE BULLETIN PRINTING COMPANY.
132, 134 & 136 MONROE STREET.
1873.

## EXHIBIT 25 (McLean)

88                    REVISED ORDINANCES.                    [CH.

# CHAPTER 31.

## PARKS AND PUBLIC GROUNDS.

SECTION.
1.  Names established.
2.  What games are prohibited in—Penalty.
3.  Duty of board of public works to superintend
4.  Ingress and egress regulated.
5.  Animals to be excluded.
6.  Firearms, etc., prohibited in – Injury to shrubbery.
7.  Hindering employes prohibited.
8.  Speed in driving regulated.
9.  Animals, etc., to keep on drives.
10. Obstruction of ways prohibited.
11. Hacks, etc., not to ply for hire.
12. Peddling in. prohibited.
13. Certain vehicles prohibited.
14. Fortune telling, gaming, indecency, etc., prohibited.
15. Power to close part of parks.

SECTION.
16. When parks to be open.
17. Right to open and close parks.
18. Conduct of visitors regulated.
19. Bathing, fishing, etc. in forbidden.
20. Fireworks prohibited.
21. Perambulators on walks.
22. Posting bills forbidden.
23. Processions, fire apparatus, etc. prohibited. when.
24. Funeral processions prohibited.
25. Fires prohibited.
26. To keep off grass, except when.
27. Power of police in.
28. Chapter applies to public squares.
29. Penal clause.
30. Use of grass grown.

**1. NAMES ESTABLISHED.]** *Rev. Ord.* 1866. The several public parks, squares and grounds in the city of Chicago, shall be known and designated by the names applied thereto respectively on the map of the city of Chicago published by Mr. J. Van Vechten in the year 1872.

**2. GAMES IN PROHIBITED—PENALTY.]** No person shall play at ball, cricket, or at any other game or play whatever, in any of the inclosed public parks or grounds in this city, under the penalty of five dollars for every offense.

**3. BOARD OF PUBLIC WORKS—DUTY OF.]** It shall be the duty of the board of public works to superintend all inclosed public grounds and keep the fences thereof in repair, the walks in order and the trees properly trimmed, and improve the same according to plans approved by the common council. They shall likewise cause printed or written copies of the prohibitions of this chapter to be posted in the said grounds or parks.

**4. WALLS AND FENCES.]** *Ord. Jan.* 11, 1869. No person shall enter or leave any of the public parks of the city of Chicago, except by their gateways; no person shall climb or walk upon their walls or fences.

**5. ANIMALS TO BE EXCLUDED.]** Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of the said parks by any person.

**6. FIREARMS AND MISSILES PROHIBITED—PROTECTION OF SHRUBBERY.]** All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of

Digitized by Google

31.]                     PARKS AND PUBLIC GROUNDS.                     89

the buildings, fences, bridges, or other construction or property, within or upon any of the said parks.

**7.** HINDERING EMPLOYES.] No person shall converse with, or in any way hinder those engaged in their construction.

**8.** SPEED OF DRIVING.] No animal shall travel on any part of either of the said parks at a rate exceeding six miles per hour.

**9.** VEHICLES AND ANIMALS ON DRIVES.] No vehicle, or horse, or other animal shall be permitted on the foot walks, the same being devoted exclusively to pedestrians; nor shall any vehicle, horse or animal of burden go upon any part of either of the parks, except upon the carriage drives and upon such places as are appropriated for carriages at rest.

**10.** OBSTRUCTION OF WAYS.] No animal or vehicle shall be permitted to stand upon the drives or carriage roads of any of the public parks of the city, or any part thereof, to the obstruction of the way, or to the inconvenience of travel, nor shall any person solicit passengers within either of said parks.

**11.** HACKS, ETC., NOT TO PLY FOR HIRE.] No hackney coach, carriage' or other vehicle for hire, shall stand upon either of the parks of the city of Chicago for the purpose of taking in any other passengers, or persons, than those carried to the park by said coach, carriage or vehicle.

**12.** PEDDLING IS NOT ALLOWED.] No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the board of public works, nor shall any hawking or peddling be allowed therein.

**13.** PROHIBITED VEHICLES.] No omnibus or wagon with or without passengers, nor any cart, dray, wagon, truck or other vehicle carrying goods, merchandise, manure, soil or other article, or solely used for the carriage of goods, merchandise, manure or other articles, shall be allowed to enter any part of either of the said parks. This, however, does not apply to vehicles engaged in the construction of such parks, nor private family wagons.

**14.** BOISTEROUS LANGUAGE—FORTUNE TELLING—GAMING—INDECENCY.] No threatening, abusive, insulting or indecent language shall be allowed therein whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

**15.** POWER TO CLOSE PART OF PARKS.] In case of any emergency, where life or property is endangered, all persons, if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants, and remain off the same until permission is given to return.

**16.** PARKS—WHEN OPEN.] Lincoln park and Union park shall be open daily to the public during the months of December, January and February from seven o'clock in the morning until eleven o'clock in the evening; during the months of March, April, May, October and November from six o'clock in the morning until ten o'clock in the evening, and during the months of June, July, August and September, from five o'clock in the morning until eleven o'clock in the evening.

**17.** POWER TO OPEN AND CLOSE PARKS.] The superintendent may, for

Digitized by Google

90                        REVISED ORDINANCES.                    [CH.

cause, direct that any of the entrances to either of the said parks be closed
at any time, and may, on special occasions, also direct that any of the said
parks or any portion thereof, remain open at other times than those above
specified.

**18.** DUTY OF VISITORS.] No person other than employes in the park
shall enter or remain in it except when it is open as above specified. No
person other than employes shall bring upon any of the public parks any
tree, shrub or plant, nor any newly plucked branch or portion of a tree,
shrub or plant.

**19.** BATHING, FISHING, ETC.] No person shall bathe or fish in, or go,
or send, or ride any animal in any of the waters of either of the said public
parks, or waters of Lake Michigan in front of any of said parks, nor disturb
any of the fish, water fowl or other birds in any of said parks, or any deer,
sheep or other animal belonging to and preserved therein, nor throw, or place
any article or thing in the waters within either of said parks.

**20.** FIREWORKS PROHIBITED.] No person shall fire, discharge or set off
in any of said public parks any rocket, cracker, torpedo, squib, balloon, snake,
chaser or double-header, nor any fireworks or thing under any other name,
composed of the same or similar material, or of the same or similar character
as the fireworks above specified.

**21.** PERAMBULATORS.] No person shall place or propel any invalid's
chairs or perambulators upon any portion of said parks except upon the
walks.

**22.** POSTING BILLS.] No person shall post or otherwise affix any bills,
notice or other paper, upon any structure or thing within either of said parks,
nor upon any of the gates or inclosures thereof.

**23.** MUSIC—FLAGS, ETC.—PROCESSIONS—FIRE APPARATUS.] No per-
son shall, without the consent of the board of public works, play upon any
musical instrument, nor shall any person take into, or carry or display in
the said public parks, any flag, banner, target or transparency. No military
or target company, civic or other, be permitted to parade, drill or per-
form therein any military or other evolutions or movements. No fire engine,
hook and ladder truck, hose cart or other machine on wheels commonly used
for the extinguishing of fires, shall be allowed on any part of said parks,
without the previous consent of the board of public works.

**24.** FUNERAL PROCESSIONS PROHIBITED.] No funeral procession or
hearse or other vehicle carrying the body of a deceased person shall be al-
lowed upon any part of a public park.

**25.** FIRES PROHIBITED.] No person other than employes shall light,
make or use any fire thereon.

**26.** TO KEEP OFF GRASS.] No person on foot shall go upon the grass,
lawn or turf of the parks, except when and where the word "common" is
posted, by order of the board of public works, indicating that persons
are at liberty at that time and place to go on the grass.

**27.** POLICE, POWER OF.] *Rev. Ord.* 1866. Any member of the city
police shall have power to arrest any person who shall not desist from any
violation hereof, when directed, and cause him to be committed for examina-
tion.



**28.** APPLICATION TO SQUARES.] *Ord. Jan.* 11, 1869. The foregoing sections of this chapter, so far as applicable, shall apply to all the public squares of the city of Chicago.

**29.** PENALTY.] Any person who shall violate any or either of the provisions of this chapter, or any section, or clause, or any provision of any section thereof, or who shall neglect, or fail, or refuse to comply with any, or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars, nor more than one hundred dollars.

**30.** USE OF GRASS.] *Rev. Ord.* 1866. The fire marshal may cause any grass fit for hay, growing or grown upon any of the public parks or grounds, to be cut and cured, under the direction of the board of public works and appropriated for the use of the teams used by the fire department.

# CHAPTER 32.

## PAWNBROKERS.

SECTION.
1. To be licensed—Penalty.
2. Definition of the word pawnbroker.
3. How license obtained—Fee—Bond.
4. When license to expire.

SECTION.
5. Registration of licenses.
6. Pawnbroker's record—Penalty for not keeping.
7. Inspection of record—Penalty for refusing.
8. Dealing with minors prohibited—Penalty.

**1.** TO BE LICENSED—PENALTY.] *Rev. Ord.* 1866. No person or persons shall carry on or conduct the business or calling of a pawnbroker, within the city of Chicago, without having first obtained a license so to do, under a penalty of not less than twenty dollars nor more than one hundred dollars for each offense.

**2.** PAWNBROKER DEFINED.] Any person who loans money on deposit, or pledge of personal property, bonds, notes or other securities, or who deals in the purchasing of personal property or choses in action, on condition of selling the same back again at a stipulated price, is hereby defined and declared to be a pawnbroker.

**3.** LICENSE—HOW OBTAINED—FEE—BOND.] The mayor is hereby authorized to grant a pawnbroker's license to any person of good character who may apply therefor, on the following conditions: The person so applying shall first pay to the collector a sum of money in proportion to the sum of one hundred dollars per annum for the time such license shall be granted, and shall execute a bond to the city of Chicago in the sum of five hundred dollars conditioned that the said applicant will in every particular conform to the requirements of this chapter, and with the requirements or provisions of any ordinance hereafter to be passed concerning pawnbrokers, and thereupon the clerk shall issue a license in due form, under the corporate seal,



# LAWS AND ORDINANCES

GOVERNING THE

# VILLAGE OF HYDE PARK

TOGETHER WITH ITS

## CHARTER AND GENERAL LAWS

AFFECTING MUNICIPAL CORPORATIONS; SPECIAL ORDINANCES AND
CHARTERS UNDER WHICH CORPORATIONS HAVE VESTED RIGHTS
IN THE VILLAGE. ALSO, SUMMARY OF DECISIONS OF THE
SUPREME COURT RELATING TO MUNICIPAL CORPO-
RATIONS, TAXATION AND ASSESSMENTS.

---

PRINTED AND PUBLISHED BY
AUTHORITY OF THE PRESIDENT AND BOARD OF TRUSTEES
OF THE VILLAGE OF HYDE PARK.

---

REVISED AND ARRANGED
By CONSIDER H. WILLETT,
VILLAGE ATTORNEY.



CHICAGO
HISTORICAL
SOCIETY

HYDE PARK:
1876.

EXHIBIT 26 (McLean)

5-ER-0997

SOUTH PARK.                                                309

§ 2.   The bonds authorized to be issued by the act of which this is amendatory and supplemental, may be issued, sold, and the proceeds applied for acquiring said lands, and for any and all purposes in the said act mentioned.  Said bonds shall be retired and canceled as fast as the money for that purpose can be obtained, by the collection of the money due upon the special assessment provided for in section seven of the act hereinbefore mentioned, and a sufficient amount of any bonds that may be issued by the city of Chicago under any law now in force or hereinafter enacted, and received by said commissioners, shall be applied to the purpose of retiring the bonds authorized by said act.

§ 3.   The ninth section of said act is hereby so amended that the words "during the current year," shall read "during the next succeeding year."

§ 4.   That the twelfth section of said act be and the same is hereby amended so as to read as follows: The said commissioners, or either of them, may be removed from office by the judge of the circuit court of Cook county, upon the petition presented to him in term time, or in vacation, by one hundred freeholders of said towns of South Chicago, Hyde Park and Lake, if it shall appear after hearing proof before said judge, that the said commissioners, or either of them, have been guilty of misdemeanor or malfeasance in office under this act; and if the said judge shall remove any one or more of said commissioners from office for any cause before the expiration of their term of office, he is hereby authorized and empowered to fill the vacancy or vacancies thus created by appointing other commissioners in their place, who shall serve during the unexpired terms of the commissioners so removed.

§ 5.   The commissioners to be appointed under said act are hereby vested with the same powers and duties as are conferred by said act in relation to lands designated for parks, over all streets running longitudinally along and adjoining any and all of the proposed parks, or strips of land designated in said original act, as are conferred by said act in relation to such parks and strips of land, as may be necessary to improve and keep in repair the same, in connection with the said parks or strips of land without obstructing the fences or other structures, free access to the said streets from existing roads and streets, and by owners of land abutting on the same.

§ 6.   The elections held in the towns of South Chicago, Hyde Park and Lake, on the twenty-third day of March, A. D. 1869, under and by virtue of the eighteenth section of the act to which this is an amendment, are hereby legalized and confirmed, and said act shall be held and deemed to have been regularly and legally adopted by the legal voters of said towns, and shall remain in full force and effect, and shall be liberally construed in all courts, with a view to carry out and enforce the intent and meaning of the same.

§ 7.   This act is hereby declared a public act, and shall take effect and be in force from and after its passage.


## SOUTH PARK ORDINANCES.

Whereas, by an act of the general assembly of the State of Illinois, entitled an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, it is provided as follows, to-wit:

310                    SOUTH PARK ORDINANCES.

"The said board shall have full and exclusive powers to govern, manage and
direct said park ; to lay out and regulate the same ; to pass ordinances for the
regulation and government thereof ; to appoint such engineers, surveyors, clerks,
and other officers, including a police force, as may be necessary ; to define and
prescribe their respective duties and authority ; to fix the amount of their com-
pensation ; and, generally, in regard to said park, they shall possess all the
powers and authority now by law conferred upon or possessed by the common
council of the city of Chicago, in respect to public squares and places in said
city."

*Therefore, be it ordained by the South Park Commissioners as follows:*

§ 1.   The said park, which is under the management and direction of the
South Park Commissioners, shall be, and the same is hereby designated, as the
South Park.

§ 2.   No person shall, without the consent of the superintendent, play at ball,
cricket, or any other game or play whatever, in said park.

§ 3.   No person shall climb or walk upon any wall or fence of said park.

§ 4.   Cattle, horses, goats, swine, or other animals, or domestic fowls, shall
not be turned into said park, or allowed to run at large therein.

§ 5.   No dog or bitch, or domestic fowl, belonging to any officer or employee
of said commissioners residing within the limits of said park, shall be permitted
to run at large.

§ 6.   All persons are forbidden to carry fire arms, or to throw stones or other
missiles within said park.  All persons are forbidden to cut, break, or in any
way injure or deface the trees, shrubs, plants, turf, or any of the buildings,
fences, bridges, or other construction or property within or upon said park.

§ 7.   No person shall converse with, or in any manner hinder those engaged
in constructing or repairing said park.

§ 8.   No animal shall be driven or ridden in said park, at a rate of speed
exceeding eight miles per hour.

§ 9.   No vehicle, or horse, or other animal, shall be permitted on the foot
walks, the same being assigned exclusively to pedestrians ; nor shall any vehicle,
or horse or other animal of burden, go or be taken upon any part of said park,
except upon the carriage drives and upon such places as are appropriated for
carriages at rest.

§ 10.   No vehicles or animals shall be permitted to stand upon the drive or
carriage roads of said park, or of any part thereof, to the obstruction of the way,
or the inconvenience of travel ; nor shall any person solicit passengers within
said park without consent of the board.

§ 11.   No person shall, within said park, expose for sale any article or thing,
nor shall any hawking or peddling be allowed therein.

§ 12.   No omnibus, wagon, cart, dray, truck, or other vehicle for carrying
goods, merchandise, manure, or other articles, except such as are engaged in
repairing or constructing said park, shall be allowed to enter the same.

§ 13.   No language, abusive, insulting, obscene, or calculated to occasion a
breach of the peace, shall be permitted in said park, nor shall persons tell for-
tunes, play at any game of chance, at any table or instrument, be drunk, or do
any indecent acts therein.

SOUTH PARK ORDINANCES.                    311

§ 14.  No person shall bathe or fish, or go or send, or ride any animals into
the waters of said park, nor shall any person disturb any fish, fowl or other
animals kept therein, or throw or place any article or thing into the waters or
upon the grounds thereof.

§ 15.  No person shall discharge, or set, or touch off, or enkindle, or operate
any manner of fire, or fireworks in the said park.

§ 16.  No person shall, in the said park, post or fix any notice or bill; nor
shall such be posted or fixed on any tree, fence, or any place therein.

§ 17.  No person shall, in the said park, play any musical instrument, nor
carry or display any flags, banners, transparencies, or target.

§ 18.  No band or company shall be permitted to parade, drill, or perform
any movements, evolutions or ceremony in said park without the consent of the
park commissioners.

§ 19.  No funeral procession, or hearse carrying a deceased body, shall be in
the said park permitted.

§ 20.  No horse or other animal shall be permitted to go upon any grass or
lawn, nor shall any person be permitted to go thereon except where the word
" common " shall be posted to indicate the permission so to do.

§ 21.  Any member of the South Park police shall have power to arrest, and
commit for examination, any person who shall not, when directed, desist from
any violation thereof.

§ 22.  Any person who shall disobey, or neglect, fail, or refuse to comply
with this ordinance, or any section thereof, except when otherwise herein pro-
vided, shall, on conviction thereof, pay a fine of not less than *five*, or more than
one hundred dollars.

§ 23.  The police force of said South Park Commissioners, shall consist of
one captain, three sergeants, and such number of policemen as shall from time
to time be appointed, and they shall hold their respective offices during the
pleasure of the park commissioners.  The captain of police shall have the gen-
eral charge of the police force, subject to such rules and regulations as shall
from time to time be established, and it shall be his duty to report to the com-
missioners, in writing, the delinquency of any member of the police force, and
may suspend any such member, until such delinquency shall be acted upon by
the commissioners.

§ 24.  The several members of the police force, when on duty, shall devote
their time and attention to discharge of the duties of their station according to
the ordinance, rules, and regulations and directions of the superintendent, and
it shall be their duty, to the best of their ability, to preserve order, peace, and
quiet, and to enforce the laws and the ordinances of said commissioners, and
they shall not engage in conversation with an employée of the park during work-
ing hours, except in the line of duty; they shall have power to arrest any per-
sons in the park found in the act of violating any law or ordinance, or abetting
and aiding in any such violation, and shall take all such persons so arrested, as fol-
lows, to-wit: when the offense is committed in that portion of the park situated
in the town of Hyde Park, to some justice or magistrate in Hyde Park; when
the offense is committed in that portion of the park situated in the town of
Lake, to some justice or magistrate in said town of Lake; and when the offense

312                    SOUTH PARK ORDINANCES.

is committed in that portion of the park situated in the town of South Chicago, to some justice of the peace in said town of South Chicago.

§ 25.   Whoever, in said park, shall resist any member of the police force in the discharge of his duty, or shall in any way interfere with, or hinder or prevent him from discharging his duty, as such member, or shall offer or endeavor to do so; and whoever shall in any manner assist any person in custody of any member of the police force to escape, or attempt to escape, from such custody, or shall rescue, or attempt to rescue, any person in custody, shall be fined not less than five dollars, or more than one hundred dollars.

§ 26.   The superintendent, in cases of emergency, is hereby authorized and empowered to appoint special policemen, and such special policemen shall have the same power and authority of regular policemen, provided the appointment of such special policeman shall in no case continue for a period exceeding twenty-four hours.

§ 27.   The sergeant of police shall perform the duties of the captain when the latter shall be absent from duty.

§ 28.   The police force shall be uniformed as follows: Gray frock coat, pants and vest, and cap with brass buttons, and black cord on leg of the pants.

§ 29.   Any person who shall falsely represent or personate any of the members of the police force, or who shall maliciously, with intent to deceive, use or imitate any of the signs, signals, or devices adopted and used by the police department, or shall wear in public the uniform adopted as the police uniform, after having been removed or suspended, shall be subject to a fine of not less than five dollars nor more than one hundred.

§ 30.   These ordinances shall take effect and be in force from and after the 19th day of November, 1875.

Source Citation

Willett, Consider H., and Ordinances, Etc. Hyde Park . Board of Trustees. Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments. Hazlitt & Reed, 1876. The Making of Modern Law: Primary Sources, link.gale.com/apps/doc/DT0106130236/MMLP?u=efgssf&sid=bookmark-MMLP&pg=309. Accessed 6 July 2023.

**Gale Document Number:**GALE|DT0106130236

# THE

# REVISED ORDINANCE

### OF THE

## CITY OF ST. LOUIS,

##### TOGETHER WITH

THE CONSTITUTION OF THE UNITED STATES, CONSTITUTION
OF THE STATE OF MISSOURI, THE SCHEME FOR THE
SEPARATION OF THE GOVERNMENTS OF THE
CITY AND COUNTY OF ST. LOUIS, THE
CHARTER OF THE CITY, AND A
DIGEST OF THE LAWS AP-
PLICABLE TO THE
CITY.

*9155*

M. J. SULLIVAN, Reviser.

ST. LOUIS:
TIMES PRINTING HOUSE, FIFTH AND CHESTNUT.
1881.

EXHIBIT 27 (McLean)

Generated on 2023-07-13 21:05 GMT / https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

ART. XI.]          MISDEMEANORS.                    635

## ARTICLE XI.

### PROTECTION OF BIRDS.

| SECTION | SECTION |
|---|---|
| 1. Disturbance of birds or nests prohibited. | 4. Penalty for throwing same. |
| 2. Penalty for disturbing same. | 5. Protection of all birds, except hawks, &c., intended. |
| 3. Throwing stones, wood, &c., prohibited. | 6. Duty of police. |

SECTION 1.   All persons are forbidden to molest, injure or disturb in any way, any small bird in the city of St. Louis, or the nest, young or brood of any small bird in said city. <span style="float:right">Birds, or nests not to be disturbed. Ord. 8436, sec. 1.</span>

SEC. 2.   If any person shall willfully injure, molest, take or disturb in any way, any small bird in the city of St. Louis, or the nest, eggs, young or brood of any such small bird, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall forfeit and pay to said city not less than five dollars for each bird so by him injured, molested, taken or disturbed, and not less than twenty dollars for each nest of eggs or brood of young of any such small bird in the city of St. Louis, so by him injured, molested taken or disturbed. <span style="float:right">Penalty for disturbing birds or nests. Ibid. sec. 2.</span>

SEC. 3.   No person shall throw from his hand any fragment of stone, wood, metal or other missile capable of inflicting injury, in any street, alley, walk or park of the city of St. Louis, or use or have in his possession ready for use in any street, alley, walk or park of the city of St. Louis, any sling, cross bow and arrow, air gun or other contrivance for ejecting, discharging or throwing any fragment, bolt, arrow, pellet, or other missile of stone, metal, wood or other substance capable of inflicting injury or annoyance. <span style="float:right">Throwing stones, wood, &c., prohibited. Ibid. sec. 3.</span>

SEC. 4.   If any person shall throw from his hand, in any alley, street, walk or park of the city of St. Louis, any missile of wood, stone, metal or other substance, or sub- <span style="float:right">Penalty. Ibid. sec. 4.</span>

Generated on 2023-07-13 21:05 GMT  /  https://hdl.handle.net/2027/nyp.33433014885702
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
NEW YORK PUBLIC LIBRARY

**5-ER-1004**

636                                   REVISED ORDINANCE.     [CHAP. XXV.

stances capable of inflicting injury or annoyance, or use or have in his possession, ready for use in any street, alley, walk or park of the city of St. Louis, any sling, air gun, cross bow and arrow, or other contrivance for ejecting, discharging or throwing any missile, pellet, fragment or bolt of stone, metal, wood or other substance, or substances capable of causing injury or annoyance, he shall be deemed guilty of a misdemeanor, and on conviction thereof, be punished by a fine of not less than one nor more than twenty dollars for each offense.

All birds to be protected, except hawks, &c. Ibid. sec. 5.

SEC. 5.   The birds intended to be protected by this article shall be and are defined as all varieties of birds except hawks, vultures and owls.

Duty of police. Ibid. sec. 6.

SEC. 6.   It is made the special duty of the police force of the city of St. Louis, to enforce the provisions of this article, and arrest and bring to trial, all offenders against the same ; and any member of the police force conniving at any breach of the foregoing provisions, by failing to arrest or report the offender, shall, on conviction thereof, be subject to a fine of not less than five dollars.

Generated on 2023-07-13 21:05 GMT  /  https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

# City of Boston.

## DEPARTMENT OF PARKS.

### THIRTEENTH ANNUAL REPORT

OF THE

## BOARD OF COMMISSIONERS

FOR THE

### YEAR 1887.



PRINTED FOR THE DEPARTMENT.
1888.

EXHIBIT 28 (McLean)

86

## PARK ORDINANCES.

IN BOARD OF PARK COMMISSIONERS, Aug. 20, 1886.

*Voted*, That the following rules, under the title of Ordinances, be adopted for the use and government of the Public Parks. *Provided, however*, that said rules shall not invalidate any pending prosecution or procedure, or any liability of any person for breach of any previous rule.

The Board of Park Commissioners of the City of Boston, by virtue of its authority to make rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with the prior consent of the Board, it is forbidden : —

1. To cut, break, injure, deface, defile or ill use any building, fence, or other construction, or any tree, bush, plant or turf, or any other thing or property.

2. To have possession of any freshly-plucked tree, bush or plant, or portion thereof.

3. To throw stones or other missiles ; to discharge or carry fire-arms, except by members of the Police Force in the discharge of their duties ; to discharge or carry fire-crackers, torpedoes, or fire-works ; to make fires ; to play musical instruments ; to have any intoxicating beverages ; to sell, offer or expose for sale, any goods or wares ; to post or display signs, placards, flags, or advertising devices ; to solicit subscriptions or contributions ; to play games of chance, or have possession of instruments of gambling ; to make orations, harangues or loud outcries ; to enter into political canvassing of any kind ; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act ; to bathe or fish ; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To allow cattle, horses, or other animals, to pass over or stray upon the Park lands ; provided that this shall not apply to



# A C T S

PASSED AT A

# General Assembly

OF THE

# COMMONWEALTH

# VIRGINIA.

BEGUN and held at the PUBLIC BUILDINGS in the CITY of RICHMOND, on *Monday* the sixteenth Day of *October*, in the Year of our LORD, One Thousand Seven Hundred and Eighty-six.



R I C H M O N D;

PRINTED BY DIXON, HOLT, NICOLSON AND DAVIES.

EXHIBIT 29 (McLean)

[ 35 ]

fame offenders come not as afore is faid, and the proclamation made and returned, they fhall be convict and attainted of the riot, affembly, or rout aforefaid : And moreover the Juftices of Peace in every county or corporation, where fuch riot, affembly, or rout of people fhall be made, in cafe the fame be made in their prefence, or if none be prefent, then the Juftices having notice thereof, together with the fheriff, under fheriff, or ferjeant, of the fame county or corporation, fhall do execution of this act, every one upon pain of twenty pounds, to be paid to the Commonwealth, as often as they fhall be found in default of the execution of the faid act ; and on fuch default of the juftices and fheriff, under fheriff, or ferjeant, a commiffion fhall go from the General Court at the inftance of the party grieved, to enquire as well of the truth of the cafe, and of the original matter for the party complainant, as of the default or defaults of the faid juftices, fheriff, under fheriff, or ferjeant, in this behalf fuppofed, to be directed to fufficient and indifferent perfons at the nomination of the judges ; and the faid commiffioners prefently fhall return into the General Court the inquefts and matters before them in this behalf taken and found : But no perfons convicted of a riot, rout, and unlawful affembly, fhall be imprifoned for fuch offence by a longer fpace of time than one year. Perfons legally convicted of a riot, rout, or unlawful affembly, otherwife than in the manner directed by this act, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury, under the like limitation.

### CHAP. XLIX.

#### An ACT forbidding and punifhing AFFRAYS.

BE it enacted by the General Affembly, That no man, great nor fmall, of what condition foever he be, except the Minifters of Juftice in executing the precepts of the courts of juftice, or in executing of their office, and fuch as be in their company affifting them, be fo hardy to come before the juftices of any court, or either of their Minifters of Juftice, doing their office, with force and arms, on pain to forfeit their armour to the Commonwealth, and their bodies to prifon, at the pleafure of a court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terrour of the county, upon pain of being arrefted and committed to prifon by any juftice on his own view, or proof by others, there to abide for fo long a time as a jury, to be fworn for that purpofe by the faid Juftice, fhall direct, and in like manner to forfeit his armour to the Commonwealth; but no perfon fhall be imprifoned for fuch offence by a longer fpace of time than one month.

### CHAP. L.

#### An ACT againft CONSPIRATORS.

BE it declared and enacted by the General Affembly, That confpirators be they that do confederate and bind themfelves by oath, covenant, or other alliance, that every of them fhall aid and bear the other falfely and malicioufly, to move or caufe to be moved any enticement or information againft another on the part of the Commonwealth, and thofe who are convicted thereof at the fuit of the Commonwealth, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury.

### CHAP. LI.

#### An ACT againft conveying or taking PRETENSED TITLES.

BE it enacted by the General Affembly, That no perfon fhall convey or take, or bargain to convey or take, any pretenfed title to any lands or tenements, unlefs the perfon conveying or bargaining to convey, or thofe under whom he claims fhall have been in poffeffion of the fame, or of the reverfion or remainder thereof one whole year next before ; and he who offendeth herein knowingly, fhall forfeit the whole value of the lands or tenements ; the one moiety to the Commonwealth, and the other to him who will fue as well for himfelf as for the Commonwealth : But any perfon lawfully poffeffed of lands or tenements, or of the reverfion or remainder thereof, may neverthelefs take or bargain to take the pretenfed title of any other perfon, fo far and fo far only as it may confirm his former eftate.

### CHAP. LII.

#### An ACT to punifh BRIBERY and EXTORTION.

BE it enacted by the General Affembly, That no Treafurer, Keeper of any Public Seal, Councillor of State, Counfel for the Commonwealth, Judge, or Attorney at law, practifing either in the General Court, High Court of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner, Efcheator, nor any officer of the Commonwealth, fhall, in time to come, take, in any form, any manner of gift, brokage, or reward for doing his office, other than is, or fhall be allowed by fome act or General Affembly, paffed after the inftitution of the Commonwealth, that is to fay, after the fifteenth day of May, in the year of our Lord, one thoufand feven hundred and feventy fix ; and he that doth, fhall pay unto the party grieved, the treble value of that he hath received, fhall be amerced and imprifoned at the difcretion of a jury, and fhall be difcharged from his office forever; and he who will fue in the faid matter, fhall have fuit as well for the Commonwealth as for himfelf, and the third part of the amercement.

CHAP.

# A
# COLLECTION
## OF THE
# STATUTES
### OF THE PARLIAMENT OF
# ENGLAND
#### IN FORCE IN THE STATE OF
# NORTH-CAROLINA.



PUBLISHED ACCORDING TO A RESOLVE OF THE GENERAL ASSEMBLY.

By FRANCOIS-XAVIER MARTIN, Esq.

COUNSELLOR AT LAW.

NEWBERN:

FROM THE EDITOR's PRESS.

1792.

EXHIBIT 30 (McLean)

5-ER-1010

( 60 )

## C H A P.    VIII.

*Nothing shall be taken for Beaupleader.*

ITEM, Whereas some of the realm have grievously complained, that they be grieved by Sheriffs, naming themselves the King's approvers, which take money by extortion for Beaupleader, the King will, that the statute of Marlebridge shall be observed and kept in this point.

---

## C H A P.    XIV.

*None shall commit Maintenance.*

ITEM, Because the King desireth that common right be administered to all persons, as well poor as rich, he commandeth and defendeth, that none of his Counsellors, nor of his house, nor none other of his Ministers, nor no great man of the realm by himself, nor by other, by sending of letters, nor otherwise, nor none other in this land, great nor small, shall take upon them to maintain quarrels nor parties in the country, to the let and disturbance of the common law.

---

Statutes made at Northampton, tribus Septimanis Pafchae, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

---

## C H A P.    I.

*A Confirmation of the Great Charter and the Charter of the Forest.*

[Unneceffory to be inserted.]

---

## C H A P.    III.

*No Man shall come before the Justices, or go or ride armed.*

ITEM, It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's

( 61 )

Minifters doing their office with force and arms, nor bring no force in an affray of peace,
nor to go nor ride armed by night nor by day, in fairs, markets, nor in the prefence of
the King's Juftices, or other minifters,  nor in no part elfewhere,  upon pain to forfeit
their armour to the King,  and their bodies to prifon at the King's pleafure.   And that
the King's Juftices in their prefence, Sheriffs and other minifters,  in their bailiwicks,
Lords of Franchifes,  and their bailiffs in the fame,  and Mayors and Bailiffs of cities and
boroughs,  within the fame cities and boroughs,  and borough-holders,  conftables  and
wardens of the peace within their wards fhall have power to execute this act. And that the
Juftices affigned,  at their coming down into the country,  fhall have power to enquire
how fuch officers and lords have exercifed their offices in this cafe,  and to punifh them
whom they find that have not done that which pertain to their office.

---

### C H A P.    V.

*The Manner how Writs fhall be delivered to the Sheriff to be executed.*

ITEM where it was ordained by the ftatute of Weftminfter the fecond, that they which
will deliver their writs to the Sheriff fhall deliver them in the full county, or in the
rere county, and that the Sheriff or Under-Sheriff fhall thereupon make a bill : it is ac-
corded and eftablifhed,  that at what time or place in the county a man doth deliver any
writ to the Sheriff or to the Under-Sheriff,  that they fhall receive the fame writs,  and
make a bill after the form contained in the fame ftatute, without taking any thing there-
fore.   And if they refufe to make a bill, others that be prefent fhall fet to their feals,
and if the Sheriff or Under-Sheriff do not  return the faid writs, they fhall be punifhed
after the form contained in the faid ftatute.   And alfo the Juftices of Affize fhall have
power to enquire thereof at every man's complaint, and to award damages, as having ref-
pect to the delay, and to the lofs and peril that might happen.

---

### C H A P.    VI.

*Juftices fhall have Power to punifh Breakers of the Peace.*

ITEM, as to the keeping of the peace in time to come, it is ordained and enacted that
the ftatutes made in time paft, with the ftatute of Winchefter,  fhall be obferved and
kept in every point : and where it is contained in the end of faid ftatute of Winchefter,
that the Juftices affigned fhall have power to enquire of defaults, and to report to the
King in his next parliament, and the King to remedy it, which no man hath yet feen, the
fame Juftices fhall have power to punifh the offenders and difobeyers.

O

# THE

# STATUTES

## OF

# T H E   R E A L M.

PRINTED  BY  COMMAND

OF HIS MAJESTY

## KING   GEORGE   THE   THIRD.

IN PURSUANCE OF AN ADDRESS OF

### THE HOUSE OF COMMONS

#### OF GREAT BRITAIN.

From Original Records and Authentic Manuscripts.

VOLUME THE FIRST.

MDCCCX

REPRINTED 1963

DAWSONS  OF  PALL  MALL

LONDON

EXHIBIT 31 (McLean)

Digitized by Google

Original from
PENN STATE

A.D.1326-7.    1° Edw. III. Stat. 2. c. 15—17.    257

escrits de venir au Roi a force & armes, en chescun temps q̃ls furent maundez, sur peine de vie & de membre, & de q̃nt q̃l p̃roient forfaire ; p foure des queux escrits plusours de la fre ount este diuersement destruitz ; Le Roi eyaunt regard q̃ tieux escrits furent faitz a deshonour du Roi, desicome chescun feust tenu de faire su Roi come a seign' lige ceo q̃ a luy appendoit sanz escrit, Voet q̃ tieux escritz desormes ne soient faitz ; et q̃ ceux q̃ ceux sont faitz, p la veue de Chanceller & Tresorer, soient monstrez au Roi ; & le Roi fra dampner̃ ceux q̃ sont faitz contre droit & reson.

Ism pur la peeÿ meultz garder & meyntener, le Roi veot qen chescun Counter q̃ bones gentz & loialx, queux ne sont mye meyntenours de malveis baretz en payis, soient assignez a la garde de la peece.

Ism le Roi comaunde q̃ les vscontes & Baillifs des franchises, & toutz autŕs q̃ pnent enditementz a lor tourns, ou aillíours ou enditementz ŝrount faitz, preignent tieux enditementz p roule endente dount Lune pŕie demeorge Ûs les enditours, & lautre ptie deÛs cely q̃ prendra Lenqueste, issint q̃ les enditementz ne soient baselæz come avant ces houres ount este, & issint q̃ un de lenqueste peut monstrer lune ptie de lendenture a la Justice q̃'nt il vendra p' la deliv̄aunce faire.

Memorand q̃ ista duo statuta P̃cedencia misæa fuerunt in Hibñ in forma patenti, cum quodam bŕi inferi² seqñ.

themselves by Writing, to come to the King with Force and Arms, whensoever they should be sent for, upon Pain of Life and Limb, and to forfeit all that ever they might forfeit ; by virtue of which Writings divers of this Land have been often destroyed : The King, considering that such Writings were made to the King's dishonour, sithence that every Man is bound to do to the King, as to his Liege Lord, all that pertaineth to him without any manner of Writing, Willeth, that from henceforth no such Writing be made ; and that such as be made, by the sight of the Chancellor and Treasurer, shall be shewed to the King ; and the King shall cause all such as be made against Right and Reason to be cancelled.

None shall be bound by Writing to come with Arms to the King.

ITEM, For the better keeping and maintenance of the Peace, the King will, that in every County good Men and lawful, which be [no Maintainers of Evil, or Barretors¹] in the Country, shall be assigned to keep the Peace.

XVI. Keepers of the Peace in each County.

ITEM, The King commandeth, That the Sheriffs and Bailiffs of Franchises, and all other that do take Indictments in their Turns, or elsewhere, where Indictments ought to be made, shall take such Indictment by Roll indented, whereof the one Part shall remain with the Indictors, and the other Part with him that taketh the Inquest ; so that the Indictments shall not be imbezilled as they have been in times past ; and so that one of the Inquest may shew the one part of the Indenture to the Justices, when they come to make Deliverance.

XVII. Indictments shall be taken by Indenture.

¹ No Maintainers of cursed Barretors MS. Tr. 2.

Be it Remembered, that the two preceding Statutes were sent into Ireland in form of Letters Patent, with a certain Writ hereunder following.¹

² See Memorandum at the End of Stat. 5 Edw. III.

## Anno 2° EDWARDI. III.   A.D.1328.

### Statutu editu apud Noȝh't', anno r. R. E. t'cii post conquestu sc'do.

### STATUTE made at NORTHAMPTON;

In the Second Year of the Reign of K. EDWARD the Third after the Conquest.

Ex magno Rot. Stat. in Turr. Lond. m. 28.

Nŕe seign' le Roi Edward, le tierz aṗs le conqueste, a son plement tenuz a Norht as trois semeine de Pasch, Lan de son regne secund, desiraunt q̃ la peex de sa t're, & les leis & estatuz avant ces heures ordenez & usez, soient gardez & meintenuz en touz poynzz, Al hon' de dieu & de seinte eglise, & a c̃e ṗfit du poeple, p assent des Prelatz, Countez & Barons & autres g̃ntz, & tote la c̃e du roialme, au dit plement somons, ordeñz & establit en mesime le plement les choses southescrites en la forme q̃ sensuit.

En primes q̃ la g̃nte Chartre & la Chartre de la foreste soient tenuz en touz pointz.

Ensement p' ceo q̃ messesours ount este esbaudiz de ce q̃ chartres de pdoun ont este si legerement g̃ntees avant ces heures, des homicides, robiez, felonies & autres trespas countre la peex ; acorde est & establit q̃ tiels chartres ne soient mes g̃ntees fors qen cas ou le Roi le peut faire p son s̃ment, cest assavoir en cas ou home tue autre soi defendant, ou p infortune : Et auxint ont este esbaudizr de ceo q̃ Justiceries as deliv̄ances des gaoles, & a oier & t'miner, ont estee g̃ntees as gentz p̃cures countre forme de lestatut fait en temps le Roi Edward, ael

OUR Lord King Edward, the Third after the Conquest, at his Parliament holden at Northampton, at the three weeks of Easter, in the second year of his Reign, desiring that the Peace of his Land, and his Laws and Statutes, ordained and used before this Time, may be kept and maintained in all Points ; to the Honour of God and of Holy Church, and to the common Profit of the People, by Assent of the Prelates, Earls, Barons, and other great Men, and all the Commonalty summoned to the same Parliament, hath ordained and established in the said Parliament these Things underwritten, in Form following.

FIRST, That the Great Charter, and the Charter of the Forest, be observed in all Points.

I. The Charter.

ITEM, Whereas Offenders have been greatly encouraged, because [the¹] Charters of Pardon have been so easily granted in times past, of Manslaughters, Robberies, Felonies, and other Trespasses against the Peace ; It is ordained and enacted, That such Charter shall not be granted, but only where the King may do it by his Oath, that is to say, where a Man slayeth another in his own defence, or by Misfortune : And also they have been encouraged, because that [² the Justices of Gaol-delivery, and of Oyer and Terminer, have been procured by great Men¹] against the Form of the Statute made in the xxvij year of the reign of King Edward,

II. Pardons for Felony.

¹ that
² Commissions of Gaol Delivery and of Oier and Terminer have been granted to Persons procured

Generated on 2023-07-11 23:30 GMT / https://hdl.handle.net/2027/pst.000017915496
http://www.hathitrust.org/access_use#pd-google
Public Domain, Google-digitized

Digitized by Google

Original from
PENN STATE

5-ER-1014

258            2° Edw. III. *Stat. Northampt.* c. 2—5.            A.D. 1328.

Generated on 2023-07-11 23:30 GMT  /  https://hdl.handle.net/2027/pst.000017915496
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

17 Ed. I. c. 3.

Grandfather to our Lord the King that now is, wherein is contained, that Justices assigned to take Assises, if they be Laymen, shall make Deliverance; and if the one be a Clerk, and the other a Layman, that the Lay Judge, with another of the Country associate to him, shall deliver the Gaols: Wherefore it is enacted, That such [Justices'] shall not be made against the Form of the said Statute; and that the Assises, Attaints, and Certifications be taken before the Justices commonly assigned, which should be good Men and lawful, having Knowledge of the Law, and none other, after the Form of another Statute made in the Time of the said [King Edward the First;'] and that the Oyers and Terminers shall not be granted but before Justices of the one Bench or the other, or the Justices Errants, and that for great [hurt,] or horrible Trespasses, and of the King's special Grace, after the Form of the Statute thereof ordained in Time of the said Grandfather, and none otherwise.

**Justices of Assise and Gaol-delivery.**

**Oyers and Terminers.**

ITEM, It is enacted, That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also [upon a Cry made for Arms to keep the Peace, and the same in such places where such Acts happen,'] be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs, and other Ministers (*) in their Bailiwicks, Lords of Franchises, and their Bailiffs in the same, and Mayors and Bailiffs of Cities and Boroughs, within the same Cities and Boroughs, and Borough-Holders, Constables, and Wardens of the Peace within their Wards, shall have Power to execute this Act. And that the Justices assigned, at their coming down into the Country, shall have Power to enquire how such Officers and Lords have exercised their Offices in this Case, and to punish them whom they find that have not done that which pertained to their Office.

**III. Riding or going armed in Affray of the Peace.**

ITEM, Because the Peace cannot be well kept without good Ministers, as Sheriffs, Bailiffs, and Hundreders, which ought to do Execution as well of the King's Privities as of other Things touching our Lord the King and his People; It is ordained and established, That the Statute made in the time of King Edward, Father to the King that now is, at Lincoln, containing that Sheriffs, Hundreders, and Bailiffs shall be of such People as have Lands in the same Shires or Bailiwicks, shall be observed in all Points after the Form thereof; and that Sheriffs and Bailiffs of Fee shall cause their Counties and Bailiwicks to be kept by such as have Lands therein.

**IV. The Statute of Lincoln, 9 Edw. II. concerning Sheriffs, &c. confirmed.**

ITEM, Where it was ordained by the Statute of Westminster the Second, that they which will deliver their Writs to the Sheriff, shall deliver them in the full County, or in the Rere County, and that the Sheriff or under Sheriff shall thereupon make a Bill; It is accorded and established, that at what Time or Place in the County a Man doth deliver any Writ to the Sheriff or to the Under-Sheriff, that they shall receive the same Writs, and make a Bill, after the form contained in the same Statute, without taking any Thing therefore; and if they refuse to make a Bill, others that be present shall set to their Seals; and if the Sheriff or Under-Sheriff do not return the said Writs, they shall be punished after the form contained in the same Statute; and also the Justices of Assises shall have power to enquire thereof at every Man's Complaint, and to award Damages, as having respect to the Delay, and to the loss and peril that might happen

**V. The Statute Westminster the Second, 13 Edw. I. chapter 39. concerning the Delivery of Writs to the Sheriff, confirmed.**

nře Seignr le Roi qore est, en quele est contenuz q̃ les Justices as assises p̃ndre assignez s'ils soient lais, facent les deliṽances; et si lun acit clerc, & lautre lais, q̃ le dit lais, associe a lui un autre du pais, facent la deliṽance des gaols; p̃ qoi acorde est & establi, q̃ tielx Justiceries ne soient mes g̃ntees contre la forme du dit estatut, & q̃ les assises, atteintes, & sificatiõns soient p̃ses devant les Justices cõmunement assignez, q̃ soient bones gentz & loialx & cõnissantz de la lei, & nemie autres; solonc la forme dun autre statut fait en temps meisme le ael; et q̃ les oiers & t̃miners ne soient grantees forsq, · - - devant les Justices de lun Baunk & de lautre, ou les Justices errantz; & ce p̃ led & orrible trespas, & de lespeciale g̃ce le Roi, solonc forme de statut de ce ordene en temps meisme le ael; & nemie autrement.

Ensement acorde est & establi, q̃ nul, g̃nt ne petit de quele condiciõn qil soit, sauve les s̃vantz le Roi en la p̃sence le Roi, & les Ministres le Roi, ensesantz execuciõn des mandementz le Roi, ou de lour office, & ceux qi sont en lour compaignies, eidantz as ditz ministres, & auxint au cri de fait dermes de pees, & ce en lieux ou tielx faitz ne ferront, soit si hardi de venir devant les Justices le Roi, ou autres Ministres le Roi enfesant lour office, a force & armes; ne force mesner en affrai de la pees, ne de chivaucher ne daler arme, ne de nuit ne de jour, en faires, marchees, nen p̃sence des Justices, ne dautres Ministres, ne nule part aillours, sur peine de p̃dre lour armures au Roi & de lour corps a la prisone a la volunte le Roi. Et q̃ Justices le Roi en lour p̃sences, viscountes & autres Ministres le Roi en lour baillies, seign̄s des fraunchises & lour baillifs en yceles, & Meirs & Baillifs des Citees & Burghs deinz meismes les Citees & Burghs, Burghaldres, conestables, & gardeins de la pees deinz lour gardes, eient poair affaire execuciõn de cest acord. Et q̃ les Justices assignez, a lour venu en pais, eient poair denquere coment tielx Ministres & seign̄s ont use lour office, en ce, & de punir ceux qils trovõnt, q̃ nount mie fait ce q̃ a lour office appent.

Et p̃ce q̃ la pees ne poet mie estre bien garde saunz bons ministres, come Viscountes, Baillifs, & Hundreders qi deivent faire execuciõn, auxbien des p̃vetz le Roi come dautres choses tochantes le Roi & son people, acorde est & establi q̃ lestatut fait en temps le Roi Edward, piere le Roi qore est, a Nicole, contenant q̃ Viscontes, Hundreders & Baillifs soient des gentz eantz t̃res en meismes les Countez, ou baillies, soit garde en touz pointz solonc la forme dycel, & auxint q̃ les Viscountes & Baillifs de fee, facent garder meismes lour Countez & Baillies p̃ gentz eantz t̃res en yceles.

Ensement la ou ordine est, p̃ statut de Westm̃ le second, q̃ ceux q̃ liṽer volent lour briefs as viscountes, les liṽent en plein Counte, ou en rerecounte, & q̃ viscounte ou southviscounte facent sur ce bille; acorde est & establi q̃ a quele heure ou a quel lieu deinz le Counte home livre a viscountes, ou a southviscountes, briefs qils rescoivent & facent bille en la forme contenue en le dit estatut, & ce saunz rien p̃ndre; et sils refusent de faire bille, mettent autres lour seals qi sont p̃sentz; et si le Viscounte ou le Southviscounte ne retorne mie les briefs, soient puniz solonc la forme contenue en le dit estatut; & jadumeins eient les Justices as assises p̃ndre assignez poair denquer de ce a chescuny pleinte & de agarder damages, eant regard au delai, & a les p̃tes & pils qi p̃rront avenir.

* *Commissioners*        ' *Grandfather*
' *upon a Proclamation of Deeds of Arms in times of Peace, and that in Places where such Deeds are.* 12 Edw.—See Lib. Rub. Scac. Westm. fo. 122 b. a Writ reciting a Grant of K. Richard I. to q̃ Constables sint in Angl in—a Just as Inb Sarð & Wiltesð: Int Werrewich & Kenelingworth Int Stanford & Warneford: Int Brudele & Mireða: Int Blie & Tykehull. Ita q̃ pax t̃re sue ita infringat, a' potestat Justiciar minorabit' Nec de li re-its n'is dapna inferre.'?                ' *of the King*

Digitized by Google

Original from
PENN STATE

5-ER-1015

Generated on 2023-07-11 23:30 GMT / http://hdl.handle.net/2027/psu.000017915496
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

A.D. 1328.  2° Edw. III. *Stat. Northampt.* c. 6—12.  259

Et q'nt a la garde de la pees en temps avenir, acorde est & establi q les estatus faites en temps passez, oveoq lestatut de Wyncestf, soient tenuz & garden en touz points; ajouste au dit estatut de Wyncestf, la ou contenuz est en la fin, q Justices assignez eient poair denquere des defautes & des reporter au Roi en plement, dont home nad esu issue, q les ditz Justices assignez eient poair de punir les desobeissantz & contrevenantz.

Et q'nt au punissement de felonies, roties, homicides, trespas & oppssions du poeple, faite en temps passe; acorde est q nre Seign' le Roi assigne Justices en div's lieus de sa tre, ove le Baunk le Roi p ailleurs, come estoit faite en temps de son dit ael, des gntz de la tre qi sont de gnt poair, oveoq aucuns des Justices de lun Baunk ou de lautre, ou autres sages de la lei, denquere, auxibien a seute de ptie, come a la seute le Roi, et doier & t'miner totes maners des felonies, roties, homicides, larcins, oppssions, conspiracies, & grevances faitz au poeple, countre la lei, Les estatuz & la custume de la tre, auxibien p ministres le Roi come p autres, qi qils soient, & ce auxibien dedeinz fraunchises come dehors. Et auxint denquere des Vicontes, Coroners, Southeschetours, Hundreders, Bailifis, Constables, & toux autres Ministres deinz franchise & dehors, & lour southministres, & doier & t'miner a la seute le Roi & de ptie. Et nre Seign' le Roi & touz les g'ntz du Roialme en plein plement ont empris de meintenir la pees, garder & sauver les Justices le Roi, p la ou ils veignent, & deider p eux & les leurs, q les juggementz & les executions ne soient pas arestuz, mes executz, & q le mesfesours ne soient privy eux covtz ne meintenus en p've nen apt: Mes nest pas lentencion du Roi ne de son conseil q p ceste acord pjudice aveigne a les g'ntz de la tre, eantz franchises, ne a la Citee de Loundres, ne as autres Citees ne Burghs, ne a les Cynkportz en droit de lour fraunchises.

Ensement acorde est & establi q mande ne soit, p le g'nt seal ne p le petit seal, a destourber ou delayer coe droit; & meoq, tiele mandementz veignent q p tant les Justices ne s'essent pas de faire droit en nul point.

Ensement est acorde & establi q les estaples p deces & p delaa, ordenez p les Rois en temps passe, & les peines sur ce ordeinees, cessent; & q touz marchantz aliens & p'vecz peussent aler & venir od lour marchandises en Engletre, solonc la tenour de la g'nte Charrer; & q a' ceo briefs soient mandez a touz les vicontes Dengletre & as Meires & bailifis des bones villes ou mestier s'ra.

Ensement come le Roi Edward, piere le Roi qore est, pdona a son poeple anciennemte & issues forfaite, jesqs al vintisme an du regne son piere ael le Roi qore est, le Roi p ees de son poeple ad pdone tout les fins q ont este faite en Chauncellerie p' briefs avoir, tanq al vintisme an avantdit.

Et p' ce q p remuement du coe Bank les plez bien sovent ont demore saunz jour, a g'ntz damage, & en pil de deshitance des pluseurs; acorde est & establi q desore en avant les Justices, avant ce q le Bank se remua, soient garniz p temps, issint queux peussent ajorner lespties al p temps q eles ne pdent mie lour pces.

Et come touz les Countez Dengletre furent anciennemt assis a ceine ferme, & adonqs furent touz les Hundredz & les Wapentakes, en les meins des vicountes, aporcionez a cele ferme, et puis furent approwours mandez en div's Contez, les queux encrustrent les fermes dascuns Hundredz & Wapentakez, et puis les Rois en div's temps ont g'ntez as div's gentz pties des Hundredz & Wapentakez, p' les auncienes fermes tantsoulement, & jatardeis les vicontes sont chargez entierement del

**VI.** *The Statute of Wynton, 7 Edw. I. confirmed.*

ITEM, As to the keeping of the Peace in Time to come, It is ordained and enacted, that the Statutes made in Time past, with the Statute of Winchester, shall be observed and kept in every point; [and where it is contained in the End of the said Statute of Winchester,*] that the Justices assigned shall have Power to enquire of Defaults, and to report to the King in his Parliament, [and the King to remedy it,*] which no Man hath yet seen (*) the same Justices shall have Power to punish the Disobeyers and Resisters.

**VII.** *Justices assigned to enquire of Felonies, Robberies, &c.*

ITEM, As to the Punishment of Felonies, Robberies, Manslaughters, Trespasses, and Oppressions of the People committed in times past: It is accorded that our Sovereign Lord the King, shall assign Justices in divers places of this Land, [within the King's Bench, and elsewhere,*] as it was done in the Time of his said Grandfather, of great Men of the Land, which be of great Power, with some of the Justices of the one Bench, or of the other, [with*] other learned Men in the Law, to enquire as well at the Suit of the Party, as at the King's Suit, and to hear and determine all manner of Felonies, Robberies, Manslaughters, Theft, Oppressions, Conspiracies, and Grievances done to the People against the Law, Statutes, and Customs of the Land, as well by the King's Ministers, as by other whatsoever they be, and that as well within Franchises as without. And also to enquire of Sheriffs, Coroners, [Under Sheriffs,*] Hundreders, Bailiffs, Constables, and all other Ministers within Liberties and without, and of their under-ministers; and to hear and determine at the King's Suit; and also the Party's. And our Sovereign Lord the King, and all the great Men of the Realm in the full Parliament, have taken upon them [to maintain and keep the peace; and they and theirs to save the King's Justices, and aid them where they come, so that the judgement*] and executions be not let, but executed; and the Offenders be not hid by them, nor maintained privily nor apertly: but the intent of the King and his Council is not, that by this Act any prejudice should ensue to the great Men of the Land having Liberties, nor the City of London, nor to other Cities nor Burghs, nor to the Five Ports in the right of their Franchise.

**VIII.** *Commands shall not be in delay of Justice.*

ITEM, It is accorded and established, That it shall not be commanded by the great Seal nor the little Seal to disturb or delay common Right; and though such Commandments do come, the Justices shall not therefore leave to do right in any point.

**IX.** *All Staples shall cease.*

ITEM, It is enacted, That the Staples beyond the Sea and on this Side, ordained by Kings in Times past, and the Pains thereupon provided, shall cease; and that all Merchant Strangers and privy, may go and come with their Merchandises into England, after the Tenor of the Great Charter; and that Writs thereupon shall be sent to all Sheriffs of England, and to Mayors and Bailiffs of good Towns, where need shall require.

**X.** *Pardon of Fines for Writs in Chancery.*

ITEM, Whereas King Edward, Father to the King that now is, did pardon his People of Issues and Amerciaments, that were forfeit till the twenty year of the Reign of his Father, Grandfather to the King that now is: The King for ease of his People, hath pardoned all the Fines that have been made in the Chancery, for to have Writs till the xx. year aforesaid.

**XI.** *The Common Bench not to be removed without Warning.*

ITEM, Whereas by removing of the Common Bench, the Pleas have oftentimes abiden without Day, to the great hurt, and peril of Disherison of divers; It is enacted, That from henceforth the Justices before that the Common Bench be removed, shall be warned by a Time, so that they may adjourn the Parties by such Time that they shall not lose their Process.

**XII.** *Hundreds and Wapentakes shall be annexed to Counties, and not let to Ferm.*

ITEM, Whereas all the Counties in England were in old Time assessed to a certain Ferm, and then were all the Hundreds and Wapentakes in the Sheriffs Hands rated to this Ferm; and after were Approvers sent into divers Counties, which did increase the Ferme of some Hundreds and Wapentakes; and after, the Kings at divers Times have granted to many Men part of the same Hundreds and Wapentakes for the old Ferms only; and now late the Sheriffs be wholly charged of the

---

* *add to the said Statute of Winchester, where it is contained at the end thereof*

* *Not in the Original.*   * *for such of that*
* *with the King's Bench holden,*   * *or*   * *Sub-Eschcators*
[* *to maintain the peace, to keep and save the King's Justices wheresoever they come, and to aid by themselves, and theirs, that the Judgements*

Digitized by Google   Original from PENN STATE

Case 1:23-cv-00265-LEK-WRP    Document 55-64    Filed 07/14/23    Page 5 of 6    PageID.1127

260     2° Edw. III. *Stat. Northampt.* c. 12—16.     A.D. 1328.

Increase, which amounteth to a great Sum, to the great hurt of the People, and Disherison of the Sheriffs and their Heirs: It is ordained, That the Hundreds and Wapentakes let to Ferm by the King that now is, be it for Term of Life or otherwise, which were sometimes annexed to the Ferms of the Counties where the Sheriffs be charged, shall be joined again to the Counties; and that the Sheriffs and their Heirs have Allowance for the Time that is past; and that from henceforth such Hundreds and Wapentakes shall not be given nor severed from the Counties.

**XIII. Trespass in the late King's Time.**

ITEM, It is accorded and enacted, that like process shall be made of Trespass done in the Time of King Edward, father to the King that now is, as of Trespass done in the Time of the King that now is.

**XIV. Measure and Assise of Cloths imported.**

ITEM, It is enacted by our Sovereign Lord the King, and his Council, that from the Feast of Saint Michael, next coming forward, all Cloths in such Places where they shall be put to Land, shall be measured by the King's Aulnegeours in the presence of the Mayor and Bailiffs, where there is a Mayor, and where no Mayor is, in presence of the Bailiffs of the same Places; that is to say, the Length of every Cloth of Ray, by a Line of seven Yards, four times measured by the List, and the Breadth of every Ray Cloth six Quarters of measure by the Yard; and of coloured Cloths the Length shall be measured by the Back, by a Line of six Yards and a half, four times measured, and the breadth six Quarters and an half measured by the yard without [defolding'] the Cloths; and that the Mayor and Bailiffs where a Mayor is, or the Bailiffs where no Mayor is, of the Towns or Places where such Cloths shall come, shall be ready to make Proof what time they shall be required by the Meter, without taking any thing of the Merchants; and Cloths which be of the said Assise, shall be marked by the Mayor and Bailiffs, where a Mayor is, or by the Bailiffs where there is no Mayor, as well as by the Aulnegeour; and that all the Cloths which shall be found defective of the same Assise, shall be forfeit to the King, and prised at their true Value in the presence of the said Mayor and Bailiffs; and to remain with the Aulnegeours by Indenture between them, to answer to the King of the said Cloths so forfeit; and that the Mayor and Bailiffs shall deliver the Indentures made of such Cloths forfeit, every year into the Exchequer, the morrow after the Feast of Saint Michael, for to charge the said Aulnegeour; and at the same time shall the Aulnegeour be put to answer at the Exchequer of the said Forfeitures. It is in the King's mind and his Counsels, that this act shall extend to such Cloths as shall come into the Land after the Feast of Saint Michael; and this act shall be published and proclaimed throughout the Realm, so that no Merchant, Privy nor Strange, shall be surprised by this Statute.

**XV. Keeping of Fairs, for the Time limited by Charter, &c.**

ITEM, It is established, That it shall be commanded to all the Sheriffs of England, and elsewhere where need shall require, to cry and publish within Liberties and without, that all the Lords which have Fairs, be it for yielding certain Ferm for the same to the King, or otherwise, shall hold the same for the Time that they ought to hold it, and no longer; that is to say, such as have them by the King's Charter granted them, for the Time limited by the said Charters; and also they that have them without Charter, for the Time that they ought to hold them of right. And that every Lord at the beginning of his Fair shall there do cry and publish how long the Fair shall endure; to the Intent that Merchants shall not be at the same Fairs over the Time so published, upon pain to be grievously punished towards the King; for the said Lords shall not hold them over the due Time, upon pain to seize the Fairs into the King's hands, there to remain till they have made a Fine to the King for the Offence, after it be duly found, that the Lords held the same Fairs longer than they ought, or that the Merchants have sitten above the Time so cried and published.

**XVI. See Stat. 13 Edw. II.**

ITEM, Whereas in a Statute made at York, in the Time of the Father of our Lord the King that now is, it is contained that Inquests and Juries, which be and shall be hereafter taken, requiring no great Examination, 'defouling *MS.* 1 r. 2 — some old Printed Copies read "*marring.*"

[right column — Law French text]

encrees q̃ amount a g̃ote sũme, a g̃at damage du poeple & desheritance de vicountes & de lour heirs: acorde est & establi q̃ des Hundredz & Wapentakes bailles a ferme p̃ le Roi qore est, soit il a l'ime de vie ou autrement, q̃ auncienement furent annex as fermes des Countes ou les vicountes sont chargez, soient rejoints as Countes; et q̃ de temps passe cient les vicountes ou lour heires allowance; & q̃ desore en avant ceux Wapentakes, ne Hundredz ne soient donez ne sevez des Countes.

Ensement est acorde & establi q̃ a tieu pcess soit fait des trespas fait en temps le Roi Edward, piere le Roi qore est, come de de trespas fait en temps le Roi qore est.

Ensement est acorde & establi p̃ nr̃e Seign' le Roi & son conseil, q̃ de la seint Michel psechein avenir en avant, touz les draps es lieux ou ils liront mis a Tre, soient aunez p̃ le auneour le Roi, en psence des Meire & Baillifs ou Meire y est, ou des baillifs ou meire nyest, de meisme les lieux; cest assavoir la longure de chescun drap̃ de Raye p̃ une corde de sept aunes quatrefoitz mesure p̃ le list, & la laoure de chescun drap̃ de Reye sis q̃rters de les; mesure p̃ laune; et de draps de colour la longure soit mesure p̃ le dos p̃ un corde de sis aunes & demi q̃trefoitz mesure; & la laoure sis quart's & demi mesure p̃ laune sanz defoler les drap̃s; et q̃ Meire & Baillifs ou Meire y est, ou Baillifs ou Meire nest pas, des villes ou lieux ou les drap̃s vendront, soient p̃ʒtz a faissi faire, quele heure qils soient requis p̃ launeour, sanz rien p̃ndre des marchaunts; et q̃ touz les drap̃s q̃ liront trovez de la dite assise, soient fichez auxibien p̃ Meire & Baillifs ou Meire y est, ou p̃ baillifs ou Meire nest pas, come p̃ launeour, et les drap̃ q̃ ne liront pas trovez de lassise avantdite, soient forfaitz au Roi, & p̃sez a la Vr̃eie value, en psence des ditz Meire & Baillifs, & demeurgent deṽs launeour p̃ endenture entre eux faite, a respondre des ditz draps issint forfaitz au Roi; et q̃ les ditz Meire & Baillifs, les endentures issint faites de deux draps forfaitz, facent liṽer chescun an a Lescheq̃r a lendemeyn de Seint Michel, p̃ charger le dit auneour; & a meisme le temps soit le dit auneour a Lescheq̃r a respondre des dites forfaitures. Et est lentencion de nr̃e dit Seign' le Roi & de son conseil q̃ cest acord se tiegne des drap̃s q̃ vendront en la t̃re ap̃s la dite feste de Seint Michel; & q̃ cest acord soit publie & crie p̃tout le Roialme, Issint q̃ les Marchaunts ne p̃vez nestraunges soient supp̃s p̃ meisme lacord.

Ensement est acorde & establi q̃ maunde soit a touz les vicountes Denglet're, & p̃ aillours ou mester l'ra, a crier & publier, deinz f'ranchises & dehors, q̃ touz les Seign's q̃ feires enount, soit il p̃ rendre ferme est rendant au Roi, ou autrement, les tiegnent p̃ le temps qils devont, & nemie outre; cest assavoir ceux q̃ les ount p̃ chres des Rois p̃ les temps a eux g̃untez p̃ les dites chres; et ceux q̃ les ount sanz chre p̃ temps queux ils les devient tenir de droit. Et q̃ chescun Seign' au commencement de sa feire face crier & publier en ycele come longement sa feire se tendra, Issint q̃ les Marchantz ne seessent es dites feires outre le temps issint publiez, sur peine destre grevement puniz deṽs le Roi; ne q̃ les ditz Seign's outre les droitz temps les tiegnent, sur peine ap̃ndre les feires en la meyn le Roi, a demorer tanqils eient fait fin au Roi p̃ la trespas, ap̃s ceo q̃ trove s̃ra duement q̃ les Seign's les ount tenus plus longement qils devont, ou q̃ les marchaunts ount sis outre le temps issint publiez & criez.

Et come un estatut fait a Everk, en temps le piere nr̃e Seign' le Roi Qore est, soit contenuz q̃ les enquestes & jurees qe sont & s̃ront ap̃ndre, q̃ ne sont mie de g̃nt examinement, soient p̃ses devant

Digitized by Google — Original from PENN STATE

**5-ER-1017**

Case 1:23-cv-00265-LEK-WRP   Document 55-64   Filed 07/14/23   Page 6 of 6   PageID.1128

*A.D.*1328.   2° EDW. III. *Stat. Northampt.* c.16, 17.   261

un Justice de la place ou la plee est, associe a lui un pdhõme du pais, Chivaler ou autre, issint q̃ ẽtein jour soit done en Bank, & ẽtein jour & lieu en pais en þcence de þies, si le demandant le þe; & auxint les enquestes & jurees en plee de l̃re, qe demandent g̃nt examinement, soient þses en pais en la forme suedite devant deux Justices du Bank: acorde est & establi q̃ totes tiels enquestes, q̃ sont ou en lange avenir a þndre õroni, en plee de l̃re, soient þses auxibien a la þere le tenant come le demandant; tout lautre þcen acorde en dit estatut, en tieu cas sauve & garde.

Auxint est acorde & establi q̃ brief de deceit soit meintenu & lieu tiegne, auxibien en cas de garnissement q̃ touche plee du l̃re, ou tieu garnissement est done, come en cas de somons en plee de l̃re.

I̧t Vic̃ Norñt, saltm. Quoddam statutũ p nos & conciliũ n̄r̄m in pleno pliamento n̄r̄o apud Norhamptoñ convocato, ad emendaðem stat̃ populi regni n̄r̄i, editũ, sigillo n̄r̄o consignatũ tibi mittim̄ ; mandantes q̃d statutũ illud, & oñes articulos in eo contentos, in pleno Coñi tuo & in Civitatibus, Burgis, villis m̃catoriis, & aliis locis in balliva tua ubi expedire videris, tam infra lib̃tates q̃m ext̃, legi & publice pclamari & observari fac̃. T.R. apud Norñt xxii die Junii.

Eodem modo mand̃ est singulis vicecomitibz p Angl̃. Memorand̃ q̃d istud statutum missum fuit in Hib̃n in forma patenti cum quodam b̃r̃i inferius seq̃a.

shall be taken before one Justice of the Place where the Plea is, adjoining to him one discreet Man of the Country, Knight, or other, so that a certain Day be given in the Bench, and a certain Day and Place in the Country, in the presence of the Parties, if the Demandant pray the same; and also the Inquests and Juries in Plea of Land, which require great Examination, shall be taken in the Country in the said Form before Two Justices of the Bench: It is accorded and enacted, That all such Inquests which are, or in Time to come shall be taken, in Plea of Land, shall be taken as well at the Request of the Tenant as the Demandant; all other Process according to the said Statute in such Case saved and kept. *Inquests in the Country shall be granted on Request of the Tenant.*

ITEM, It is enacted, That a Writ of Deceit shall be maintainable, and hold Place, as well in the Case of Garnishment touching Plea of Land, where such Garnishment is given, as in case of Summons in Plea of Land. [Dated at Northampton.] *XVII. Writ of Deceit.*

The King to the Sheriff of Northampton, Greeting. A certain Statute, by Us and our Council, in our full Parliament called at Northampton, for the Amendment of the State of the People of our Realm, set forth, We do send to you under our Seal; Commanding that the same Statute, and all the Articles therein contained, in your full County Court, and in the Cities, Boroughs, Market Towns, and other Places in your Bailiwick, where you shall see meet, as well within Liberties as without, you do cause to be read and to be publicly proclaimed and observed. Witness the King at Northampton the twenty-second day of June.

In the same manner it was commanded to the several Sheriffs throughout England.

Be it Remembered, that this Statute was sent into Ireland, in form of Letters Patent with a certain Writ hereunder following.[†]

[†] *See Memorandum at the end of Stat. 5 Edw. III.*

---

## Anno 4° EDWARDI. III. A.D.1330.

### Statutũ editũ apud Westm̃, anno regni R. E. t̃cii post conquest̃ quarto.

### STATUTE made at WESTMINSTER;

In the FOURTH Year of the Reign of K. EDWARD the THIRD after the Conquest.

*Ex magno Rot. Stat. in Turr. Lond. m. 27.*

AU Parlement somons a Westmostier, le Lundy þscheyn ap̃s la feste de Seinte Kat̃ine, lan du regne n̄r̄e Seigñ le Roi Edward, tierz ap̃s le Conquest, quart, Si sont les choses soutzescriptes, a la requeste de la Cõmunalte, assentuz & acordez p n̄r̄e Seigñ le Roi, Prelatz, Countes, Barons, & autres g̃ntz de mesme le plement, les queux choses n̄r̄e Seigñ le Roi voet qen touz les Counteez de Engl̃et̃re soient mandez, a publier & fermement garder.

Adep̃mes acorde est q̃ la G̃nde Chart̃e & la Chart̃e de la Foreste, & les estatuz faitz en temps des p̃genitours n̄r̄e Seigñ le Roi, & auxint en son temps demeigne, soient gardez & meyntenuz en touz pointz.

Ensement est acorde q̃ bones gentz & sages, autres q̃ des places si h̃ome les puisse trover suffisantz, soient assignez en touz les Counteez Denglet̃re ap̃ndre les assises, jurrez & þtificacions, & a deliṽer les gaoles; et q̃ les ditz Justices preignent les assises, jurez, & t̃tificacions, & deliṽent les gaoles, au meyns troiz foitz p an, & plus sovent si mester t̃ra, & soient auxint assignez

AT the Parliament, summoned at Westminster, the Monday next after the Feast of Saint Katherine, in the Fourth Year of the Reign of King Edward, the Third after the Conquest, these Things underwritten, at the request of the Commons be established and enacted by our Lord the King, his Prelates, Earls, and Barons, and other (') of the same Parliament; which Things our Lord the King will (') to be published, and surely observed in all his Counties of England.

FIRST, It is accorded, That the Great Charter, and the Charter of the Forest, and all other Statutes, made as well in the time of the King's Progenitors, as in the King's time that now is be kept and maintained in all Points. *I. Charters and Statutes confirmed.*

ITEM, It is ordained, that good and discreet Persons, other than of the Places, if they may be found sufficient, shall be assigned in all the Shires of England, to take Assises, Juries, and Certifications, and to deliver the Gaols; and that the said Justices shall take the Assises, Juries, and Certifications, and deliver the Gaols, at the least three times a Year, and more often, if need be; also there shall be assigned good and lawful Men *II. Justices of Assise, Gaoldelivery, and Justices of the Peace.*

' *great men*   ' *that they be sent*

Generated on 2023-07-11 23:30 GMT / https://hdl.handle.net/2027/pst.000017915496
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

 



MAY 8 1906

# GENERAL DIGEST

OF THE

# ORDINANCES AND RESOLUTIONS

OF THE

## Corporation of New-Orleans.

MADE BY ORDER OF THE CITY COUNCIL,

BY THEIR SECRETARY,

D. AUGUSTIN, ESQ. COUNSELLOR AT LAW.

PRINTED BY JEROME BAYON,

CORNER OF CHARTRES AND ST. LOUIS STREETS.

1831.

Generated on 2023-07-07 18:16 GMT / https://hdl.handle.net/2027/nyp.33433014832483
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

EXHIBIT 32 (McLean)

## THEATRES AND BALLS. 371

trate invited by the Mayor to replace him thereto in case of his absence. Provided that the place so reserved for the Mayor or other persons sent in his place shall be furnished without said managers being entitled to any compensation, and they shall adhere to this condition before obtaining a license to open their theatres.

ART. 14. The Mayor, as often as he may deem it necessary, shall examine whether the theatres, places of public resort be constructed with the requisite solidity, and carefully kept in repair, so that the public may assemble there without danger ; and he shall take suitable measures to prevent the accidents that might result from any negligence in that respect on the part of the proprietors, tenants or other persons having the management or direction of the said theatres, places of public spectacles, or other places of public resort.

ART. 15. The manager, acting manager or other person having the management or direction of a theatre, shall place and constantly keep, within the play-house, several large tubs, and at least one fire-engine in good repair, which must be filled on days of performance ; and on failure of complying with this requisite, and until the manager shall have complied with it, the Mayor shall order the theatre to be and remain shut up.

ART. 16. By virtue of the powers granted by law to the Mayor and City Council, the Mayor shall cause to be shut up any place of public resort, whenever the maintenance of order, the public safety or tranquillity may require it.

*Approved, June 8, 1816.*

### An Ordinance respecting public Balls.

THE CITY COUNCIL ORDAINS AS FOLLOWS :

ART. 1. It shall not be lawful for any person to enter into a public ball-room with any cane, stick, sword or any other weapon, and every person having either a cane, stick, sword or any other weapon, shall, before he enter the ball-room, deposite the same at the office which shall be at the door of the entrance of said ball-room, where there will be a person appointed to receive and take care of such articles which he shall carefully keep, affixing to each article a number, a check of which he shall give to the owner ; and said articles shall not be returned to the persons respectively depositing them, until said persons are quitting the balls and produce their checks.

ART. 2. Every person entering in any public ball-room, in contravention to the above provision, shall pay a fine of five dollars ; and every person giving a public ball without having previously established an office at the door of the entrance of said ball-room, and without appointing a person to receive and take care, in the manner aforesaid, of the articles before mentioned shall pay a fine of twenty-five dollars, and if the offence is repeated, the offender shall forfeit the right to hold any further permission to give such public balls.



Generated on 2023-07-06 16:31 GMT  /  https://hdl.handle.net/2027/nyp.33433014832483
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

ART. 3. Every person who shall commit any disorder, tumult, violence, insult, indecency, or shall commit an assault or battery in a public ball-room shall be taken before the Mayor, or any other justice of the peace, to be dealt with according to law.

ART. 4. Any person giving a public ball, who shall prolong the duration of the same beyond the hour fixed by the license or permit which he must obtain, for this purpose, of the Mayor of this city, shall pay a fine of twenty-five dollars, for each and every offence.

*Approved October* 27, 1817.

*An Ordinance to authorize the Mayor to appoint constables for the police of the theatres, public exhibitions and balls.*

THE CITY COUNCIL ORDAINS AS FOLLWS:

ART. 1. The Mayor shall nominate and appoint a sufficient number of men to be constables, and to form, under that denomination, a guard for the theatres, public exhibitions and balls, in order there to receive and execute the orders and directions of the Mayor, or of the commissaries of police, as to what concerns the maintenance of good order in the aforesaid premises: provided always, that the said constables shall be employed as a guard only at authorised theatres, spectacles and balls, and that their number shall not exceed five men for each of said theatres, exhibitions and balls.

ART. 2. The constables on guard at said theatres or exhibitions, shall be paid by the managers, acting-managers or other persons having the direction of the exhibition, at the rate of one dollar for each constable, every time of performance; and every constable on duty at a ball, shall be entitled to require from the person keeping such balls, the said compensation of one dollar, when the ball ends at midnight, and that of two dollars in case of any ball authorised for a later hour of the night.

ART. 3. In no case shall the above mentioned service be at the expense of the city, nor shall any of the men composing the city guard, be employed on that duty, unless in case of any disturbance breaking out in any of the aforesaid places, and then only till tranquillity be restored.

ART. 4. All persons are forbidden to oppose or obstruct any of the aforesaid constables in the legal execution of his office, or to utter against them invectives or opprobrious language in the discharge of their duty; and every person herein offending, shall pay a fine of from ten to fifty dollars for every such offence.

*Approved, November* 5, 1817.

*An Ordinance laying a tax on public balls and public exhibitions.*

THE CITY COUNCIL ORDAINS AS FOLLOWS:

ART. 1. It shall not be lawful for any person to give any public ball, either to white persons or free persons of colour, at any place within the extent of the city, or to exhibit any inferior spectacle where the public are admitted for money, such as a circus, for equestrian exhibitions, panoramas,

Generated on 2023-07-06 18:32 GMT / https://hdl.handle.net/2027/nyp.33433014832483
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

# ACTS

OF THE

# STATE OF TENNESSEE,

PASSED BY THE FIRST SESSION OF

# THE THIRTY-SIXTH GENERAL ASSEMBLY

## FOR THE YEARS 1869-70.

PUBLISHED BY AUTHORITY.

NASHVILLE, TENN.:
JONES, PURVIS & CO., PRINTERS TO THE STATE.
1870.

EXHIBIT 33 (McLean)

23

## CHAPTER XXI.

AN ACT to Amend An Act, passed on the 13th of March, 1868,
entitled "An Act to amend the revenue laws of the State."

SECTION 1. *Be it enacted by the General Assembly of
the State of Tennessee,* That An Act to amend the revenue
laws of the State, passed on the 13th day of March, 1868, <span style="float:right">Hotels and</span>
be so amended as to impose a tax of fifty cents on each <span style="float:right">Livery Stable</span>
room except two in a hotel or tavern, and a tax of fifty
cents on each stall in a livery stable, or stable kept by
hotel or tavern keepers, instead of one dollar, as now
imposed by law.

SEC. 2. *Be it further enacted,* That this Act take effect
from and after its passage.

<div style="text-align:center">
W. O'N. PERKINS,<br>
<em>Speaker of the House of Representives.</em><br>
D. B. THOMAS,<br>
<em>Speaker of the Senate.</em>
</div>

Passed November 27, 1869.

----

## CHAPTER XXII.

AN ACT to Amend the Criminal Laws of the State.

SECTION 1. *Be it enacted by the General Assembly of
the State of Tennessee,* That all voters in this State shall be <span style="float:right">To vote in<br>Civil District</span>
required to vote in the civil district or ward in which they <span style="float:right">or Ward.</span>
may reside. Any person violating this Act shall be guilty
of a misdemeanor, and upon conviction thereof shall not be
fined less than twenty nor more than fifty dollars; *Provided,*
that sheriffs and other officers holding elections shall be
permitted to vote at any ward or precinct in which they
may hold an election.

SEC. 2. *Be it further enacted,* That it shall not be law-
ful for any qualified voter or other person attending any
election in this State, or for any person attending any fair, <span style="float:right">Deadly</span>
race course, or other public assembly of the people, to carry <span style="float:right">Weapons.</span>
about his person, concealed or otherwise, any pistol, dirk,
bowie-knife, Arkansas tooth-pick, or weapon in form, shape

5-ER-1023

24

or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

Penalty.

Sec. 3.   *Be it further enacted,* That all persons convicted under the second section of this Act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the Court.

Liquor Shops.

Sec. 4.   *Be it further enacted,*  That no liquor shop in this State, shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.

Grand Juries.

Sec. 5.   *Be it further enacted,* That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these Acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling and offenses now prescribed by law.

Judges.

Sec. 6.   *Be it further enacted,* That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

Proviso.

Sec. 7.   *Be it further enacted,* That there shall be no property exempt from execution for fines and costs for this offense; *Provided,* That, if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this Act shall be so construed as to prevent any voter from voting in any other civil district or ward in his county or town, for State or county officers, at the time prescribed by law.

Sec. 8.   *Be it further enacted,* That this Act shall take effect from and after its passage.

W. O'N. PERKINS.
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed December 1, 1869.

# ACTS AND RESOLUTIONS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN ATLANTA, GEORGIA,

AT THE

## SESSION OF 1870.

COMPILED AND PUBLISHED BY AUTHORITY.

ATLANTA, GEORGIA:
PRINTED BY THE PUBLIC PRINTER.
1870.

EXHIBIT 34 (McLean)

PUBLIC LAWS.—PENAL CODE—AMENDMENTS TO.                  421

To preserve the peace and harmony of the people of this State, etc.

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

| SECTIONS. | SECTIONS. |
|---|---|
| 1. Carrying deadly weapons to certain places prohibited. | 5. Section 415 of the Code changed—nolle prosequi. |
| 2. Violation—misdemeanor—penalty. | 6. All indictments, etc., submitted to a jury. |
| 3. Chain-gang punishment prohibited. | |
| 4. Punishment in lien of chain-gang. | |

(No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. *[margin: Carrying deadly weapons to certain places prohibited. Exception.]*

SEC. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. *[margin: Violation a misdemeanor—penalty]*

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

(No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words " to work in a chain-gang on the public works," and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That the words "to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, *[margin: Chain-gang punishment prohibited.]*

422        PUBLIC LAWS.—PENAL CODE—AMENDMENTS TO.

To repeal Section 415 of the Revised Code.

stricken from said section, and chain-gangs shall no longer exist, or be tolerated in the State of Georgia, for persons convicted of misdemeanors.

Punishment in lien of chain-gang.  SEC. 2. *Be it further enacted,* That said section be further amended, by substituting for the words herein stricken out, the words "to work on the city or town streets, or county roads, not longer than six months; but in no case shall such prisoners be chained or otherwise confined in a gang, but shall be guarded."

SEC. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and they are hereby, repealed.

Approved October 27, 1870.

---

(No. 287.)

*An Act to repeal section four hundred and fifteen (415) of Irwin's Revised Code, in relation to entering nolle prosequi, and to prescribe the mode of settlement in criminal cases.*

Section 415 of Code, as to *nolle prosequi,* repealed.  SECTION 1. *Be it enacted, etc.,* That section four hundred and fifteen (415) of Irwin's Revised Code of Georgia, which said section authorizes Solicitors-General in this State to enter a *nolle prosequi* on indictments, be, and the same is hereby repealed, and no *nolle prosequi* shall be allowed, except it be in open court, for some fatal defect in the bill of indictment, to be judged of by the court, Judge shall order second bill.  in which case the presiding Judge shall order another bill of indictment to be forthwith submitted to the grand jury.

All indictments submitted to jury.  SEC. 2. *And be it further enacted by the authority aforesaid,* That all cases of indictments, or special presentments, shall be submitted to and passed upon by the jury, under the direction of the presiding Judge, unless there is a settlement thereof between the Settlement when good.  prosecutor and defendant, which settlement shall be good and valid only by the approval and order of the court on examination into the merits of the case.

SEC. 3. *And be it further enacted, etc.,* That all laws and parts of laws conflicting with this act be, and the same are hereby, repealed.

Approved October 28, 1870.

# GENERAL LAWS

OF THE

## TWELFTH LEGISLATURE,

OF THE

# STATE OF TEXAS.

CALLED SESSION.

BY AUTHORITY.



AUSTIN:
PRINTED BY TRACY, SIEMERING & CO.
1870.

EXHIBIT 35 (McLean)

GENERAL LAWS.                    63

## CHAPTER XLVI.

AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

## CHAPTER XLVII.

AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

# LAWS OF MISSOURI.

## GENERAL AND LOCAL LAWS

PASSED AT THE

REGULAR SESSION

OF THE

## TWENTY-EIGHTH GENERAL ASSEMBLY,

BEGUN AND HELD AT

### THE CITY OF JEFFERSON, WEDNESDAY, JANUARY 6, 1875.

*BY AUTHORITY.*



JEFFERSON CITY:
REGAN & CARTER, STATE PRINTERS AND BINDERS.
1875.

EXHIBIT 36 (McLean)

50                            GENERAL LAWS.

same is hereby amended so as to read as follows: Section 56. Every person who shall willfully and maliciously break, destroy or injure the door or window of any dwelling house, shop, store, or other house or building, or sever therefrom, or from the gate, fence or inclosure, or any part thereof, any material of which it is formed, or sever from the freehold any produce thereof, or anything attached thereto, or pull down, injure or destroy any gate, post, railing or fence, or any part thereof, or cut down, lap, girdle, or otherwise injure or destroy any fruit or ornamental or shade tree, being the property of another, or who shall cut down, lap, girdle, or otherwise injure or destroy any ornamental or shade tree standing or growing on any common or public ground, or any street, alley, sidewalk or promenade, or who shall, without the consent of the owner, cut down, destroy or carry any timber or trees whatsoever, being on any land not his own, and not the property of the United States, or who shall buy or in any way receive any timber, wood or trees that shall have been cut down upon or carried away from the lands of another, without the consent of the owner thereof, knowing the same to have been so cut down or taken away as aforesaid, or who shall willfully break, destroy or injure any goods, wares, merchandise or other personal property of another, shall, upon conviction, be adjudged guilty of a misdemeanor.

SEC. 2.   This act to take effect and be in force from and after its passage.

Approved March 18, 1875.

---

CRIMES AND PUNISHMENTS: CARRYING CONCEALED WEAPONS.

AN ACT to prevent the carrying of weapons in public assemblies of the people, and to repeal "An act to prevent the carrying concealed weapons," approved March 26, 1874.

SECTION                              SECTION
  1. General provisions; penalty.      3. Act to take effect.
  2. Inconsistent act repealed.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   Whoever shall, in this state, go into any church or place where people have assembled for religious worship, or into any school room, or into any place where people be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for other than militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot, or other deadly weapon, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the county jail not to exceed six months, or by a fine

CRIMES AND PUNISHMENTS—ELECTIONS.                    51

not less than ten nor more than one hundred dollars, or by both such
fine and imprisonment: *Provided*, That this act shall not apply to
any person whose duty it is to bear arms in the discharge of duties
imposed by law.

SEC. 2.  All acts and parts of acts inconsistent with this act are
hereby repealed.

SEC. 3.  This act shall take effect and be in force from and after
its passage.

This bill having remained with the Governor ten days (Sundays
excepted), and the General Assembly being in session, it has become
a law this thirtieth day of March, A. D. eighteen hundred and sev-
enty-five.

MICH'L K. McGRATH, *Secretary of State.*

---

ELECTIONS: REGULATING BALLOTS, POLL-BOOKS, ETC.

AN ACT to amend sections 14 and 17 of chapter 2 of the General Statutes of Missouri,
relating to elections, the same being sections 14 and 17 of chapter 51 of Wag-
ner's Statutes.

| SECTION | SECTION |
|---|---|
| 1. Ballots, how prepared. | 3. Inconsistent acts repealed. |
| 2. Ballots, how to be counted. | 4. Act to take effect. |

*Be it enacted by the General Assembly of the State of Missouri, as
follows:*

SECTION 1.  That section fourteen of the above recited act be
amended so as to read as follows: Section 14.  Each voter at any
election shall, in full view, deliver to one of the judges of election a
single ballot, which shall be a piece of white paper, on which shall be
written or printed the names of the persons voted for, with a designa-
tion of the office which he or they may be intended to fill: *Provided*,
That in counties having a population of one hundred thousand and
over, said ballot shall not bear upon it any device whatever, nor shall
there be any writing or printing thereon, except the names of per-
sons, and the designations of the office to be filled, leaving a margin
on either side of the printed matter for substituting names.  Each bal-
lot may bear a plain written or printed caption thereon, composed of
not more than three words, expressing its political character, but on
all such ballots the said caption or headlines shall not, in any manner,
be designed to mislead the voter as to the name or names thereunder.
Any ballot not conforming to the provisions of this act shall be con-
sidered fraudulent, and the same shall not be counted.

SEC. 2.  That section seventeen of the above recited act be
amended so as to read as follows:  Section 17.  After the poll-books
are signed in the manner hereinafter provided in the form of the poll-
books, the ballot boxes shall be opened and the tickets shall be taken

# SESSION LAWS

### OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

### OF THE

## TERRITORY OF ARIZONA.

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

EXHIBIT 37 (McLean)

# CERTIFICATE.

TERRITORY OF ARIZONA,     } ss
OFFICE OF THE SECRETARY.

   I, Charles M. Bruce, Secretary of the Territory of Arizona,
do hereby certify that the Acts herein contained of the Fifteenth,
Sixteenth, Seventeenth, Eighteenth and Nineteenth Sessions of
the Legislative Assembly of Arizona are printed and bound as
required by Section 1 of an Act of the Nineteenth Legislative
Assembly of Arizona, entitled: An Act Providing for the
Printing of the Session Laws of the Territory of Arizona, and
approved the 18th day of March, A. D. 1897.



Witness my hand and Seal of the
Territory of Arizona, given at Phoenix,
this twenty-first day of April, A. D.
Eighteen Hundred and Ninety-Seven.

    CHARLES M. BRUCE,

      SECRETARY OF ARIZONA.

Entered according to Act of Congress in the year 1897,
By the Territory of Arizona,
In the office of the Librarian of Congress, at Washington.

16                    LAWS OF ARIZONA.

Sec. 3.   This Act shall take effect from and after its passage.

Approved March 18, 1889.

No. 12.                    AN ACT

Concerning the Transaction of Judicial Business on Legal Holidays.

*Be it enacted by the Legislative Assembly of the Territory of Arizona:*

Section 1.   No Court of Justice shall be open, nor shall any Judicial business be transacted on any Legal Holiday, except for the following purposes:

1.   To give, upon their request, instructions to a Jury when deliberating on their verdict.

2.   To receive a verdict or discharge a Jury.

3.   For the exercise of the powers of a magistrate in a criminal action, or in a proceeding of a criminal nature; provided, that the Supreme Court shall always be open for the transaction of business; and provided further, that injunctions, attachments, claim and delivery and writs of prohibition may be issued and served on any day.

Sec. 2.   All Acts and parts of Acts in conflict with this Act are hereby repealed.

Sec. 3.   This Act shall be in force and effect from and after its passage.

Approved March 18, 1889.

No. 13.                    AN ACT

Defining and Punishing Certain Offenses Against the Public Peace.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

Section 1.   If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.

Sec. 2.   The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer

LAWS OF ARIZONA. 17

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5. Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6. Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties

18          LAWS OF ARIZONA.

shall notify the keepers of hotels, boarding houses and drink-
ing saloons in their respective Counties of their duties under
this law, and if after such notification any keeper of a hotel,
boarding house or drinking saloon, shall fail to keep notices
posted as required by this Act, he shall, on conviction thereof
before a Justice of the Peace, be fined in the sum of five dol-
lars to go to the County Treasury.

SEC. 8.   All Acts or parts of Acts in conflict with this Act
are hereby repealed.

SEC. 9.   This Act shall take effect upon the first day of
Apr 1, 1889.

Approved March 18, 1889.

———

No. 14.               AN ACT

To Amend Paragraph 492, Revised Statutes.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   That Paragraph 492, Chapter 5, Title 13, of
the Revised Statutes, be amended so as to read as follows: "If
he fail to attend in person or by deputy any term of the Dis-
trict Court, the Court may designate some other person to
perform the duties of District Attorney during his absence from
Court, who shall receive a reasonable compensation to be certi-
fied by the Court, and paid out of the County Treasury, which
the Court shall by order direct to be deducted from the salary
of the District Attorney, if the absence of such Attorney is
not excused by such Court."

SEC. 2.   That all Acts and parts of Acts in conflict with
this Act be, and the same are, hereby repealed.

SEC. 3.   That this Act shall take effect and be in force
from and after its passage.

Approved March 19, 1889.

———

No. 15.               AN ACT

To Provide for the Payment of Boards of Supervisors of the
Counties within the Territory of Arizona.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   Each member of the Board of Supervisors
within this Territory shall be allowed as compensation for their
services Five Dollars per day for each day's actual attendance
at the sitting of said Board, at which sitting any County busi-
ness is transacted; and twenty cents per mile actually traveled

88                                 1 GEORGE I.

*April,*                          CHAP. XXVI.
*1715.*

An ACT for the speedy trial of criminals, and ascer-
taining their punishment in the county courts when
prosecuted there, and for payment of fees due from
criminal persons.

A Supplementary act, May 1766, ch. 6.

Preamble.

WHEREAS many acts of assembly have been hereto-
fore made against thieving and stealing, which at this
present are not sufficient to prevent the committing those
crimes, or to punish them when committed ;

Justices of
the county
courts, of
what crimes
they may
hold plea.

II. BE IT THEREFORE ENACTED, *by the King's most excel-
lent majesty, by and with the advice and consent of his majesty's
Governor, Council and Assembly of this province, and the au-
thority of the same,* That it shall and may be lawful to and for
the several justices of the county courts of this province to hold
plea of, adjudge, and in lawful manner determine, all thiev-
ing and stealing of any goods or chattels whatsoever, not being
above the value of one thousand pounds of tobacco (robbery,
burglary, and house-breaking excepted,) (*a*) and every person
or persons legally convicted of any such thieving and stealing
(except before excepted,) by testimony of one sufficient evi-
dence, not being the party grieved, before any such county
court as aforesaid, shall and may cause to be punished, by pay-
ing fourfold of the value of the goods so thieved or stolen as
aforesaid, and the stolen goods returned to the party or par-
ties grieved thereby, and by putting in the pillory, and whip-
ping so many stripes as the court before whom such matter is
tried, shall adjudge, not exceeding forty ; which court shall
always adjudge the value of the goods so thieved and stolen as
aforesaid ; and if any such person, so convicted, have
not sufficient goods and chattels, or be a servant, whereby
he is incapable to have goods and chattels to satisfy and pay
the said fourfold, in every such case, such person or persons
shall receive the corporal punishment as aforesaid, and satisfy
the fourfold, and fees of conviction, by servitude.

Time of ser-
vice, when
to com-
mence.

III. AND BE IT HEREBY ENACTED AND DICLARED, *by the
authority, advice and consent aforesaid,* That the time of ser-
vice of a free person convict as aforesaid, not having goods
and chattels as aforesaid, shall commence from the time of his
conviction as aforesaid ; and the time of service of a servant,
convict as aforesaid, shall commence at the expiration of such
time of servitude, to which, at the time of his conviction, he
stood bound, which time of servitude, for satisfaction for the

(*a*) By 1785, ch. 87, section 7, the justices of the county courts are
empowered, (unless in cases particularly directed by law to be tried in
the general court) to try all persons who have committed any manner of
offence, although it may subject such person to the pains of death.

EXHIBIT 38 (McLean)
Digitized from Best Copy Available

### JOHN HART, Esq. Governor.

89

stolen goods, and fees accrued as aforesaid, shall be adjudged by such county court, either to the party grieved, or any other person the court shall order such convict to, that will then and there pay, or secure to be paid, the fourfold and costs aforesaid, at the discretion of the court ; and if any person or persons shall receive or take part of such stolen goods, or assist the person so stealing as aforesaid to make away or conceal them, being legally convicted as aforesaid, shall suffer the same corporal pains with the party stealing as aforesaid, any law, statute, usage or custom to the contrary notwithstanding.

IV. AND, If any person or persons have been once convicted of any such thieving and stealing, (except before excepted,) and shall after be again presented for thieving and stealing of any goods or chattels, laid to be above the value of twelve-pence, it shall not be tried and determined by any county court, but the party presented, upon such presentment, shall be proceeded against in the provincial court as a felon for simple felony, but shall not be punished by death, but only paying the fourfold, branding with a hot iron, or such other corporal punishment as the court shall adjudge, saving life ; and such presentment shall be, by the clerk of every such county court, immediately sent to the then next provincial court, together with a transcript of his former conviction, if such conviction was in the same court where the presentment aforesaid shall be, or otherwise, made known to the attorney-general in what other court such former conviction was, if to him known, under the penalty of five hundred pounds of tobacco to our sovereign lord the king, his heirs and successors, for the support of government ; and the parties witnesses against such felons, if in court at the time of such presentment, shall be bound over to give evidence as aforesaid, or otherwise, if not in court, an account of their names and places of dwelling to be sent to the attorney-general, to be summoned against the then next provincial court, in order to such trial ; and the party presented, if in court, to be bound over also, by due course of law, to answer such presentment, or, if not in court, proceeded against by due course of law as aforesaid.

V. AND BE IT FURTHER ENACTED, *by the authority, advice and consent aforesaid,* That any person or persons whatsoever that shall kill any unmarked swine above three months old, if not upon his or their own land, or not in company with his or their own stock, shall and is hereby adjudged an hog stealer, and shall be liable to restore fourfold, and suffer such corporal pains as against the first offence in this act mentioned.

VI. AND, to prevent any person or persons concealing or disfiguring the mark of any swine killed as aforesaid, BE IT FURTHER ENACTED, *by the authority advice and consent aforesaid,* That if any person or persons killing any such unmarked swine in the woods, or elsewhere, and shall wilfully disfigure the mark, or cut off the ears of such swine, so as to con-

*April,*
*1715.*

Persons again prosecuted must be tried in the provincial court, if the presentment charges them with stealing above the value of 12 pence.

Penalty for killing unmarked swine.

For disfiguring their mark, &c.

f2

Digitized from Best Copy Available

90                                    1 GEORGE I.

*April,*
*1715.*

And on persons convicted for hunting, &c.

ceal the true and real mark, or whether it were marked or not, shall be deemed and adjudged a hog stealer within the purview of this act, and shall suffer accordingly.

VII. AND, to prevent the abusing, hurting or worrying of any stock of hogs, cattle or horses, with dogs, or otherwise, BE IT ENACTED, That if any person or persons whatsoever, that have been convicted of any of the crimes aforesaid, or other crimes, or that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco, one half to our sovereign lord the king, his heirs and successors, the other half to the party grieved, or those who shall sue for the same, to be recovered in any county court of this province by action of debt, bill, plaint or information, wherein no essoin, protection or wager of law to be allowed.

Criminals to pay their own fees, by servitude, if not otherwise capable.

VIII. AND BE IT FURTHER ENACTED, *by the authority, advice and consent aforesaid,* That from henceforth no sheriff, gaoler, clerk, crier, or other officer, shall charge either their own county, to which they belong, or the public, with any fees for any criminal committed to the charge of the said sheriff or gaoler, having sufficient estate in this province wherewith to pay the same, or being capable to pay the same by servitude, but that such criminals, being discharged by order and due course of law, shall pay their own fees to the sheriff, gaoler, clerk and crier, and other officers, being such as they may demand according to law, either out of his estate, or by servitude, or otherwise.

Vide 1781, ch 11.

Proviso.

IX. PROVIDED ALWAYS, That this act shall not extend to malefactors that are executed, or to such other persons who are banished, having no estate in this province, or to servants criminals, for whom the county shall pay such fees as are due by the acts of assembly to the sheriff, gaoler, clerk, crier, or other officers of such court where such criminal shall be convicted.

Officers fees, how to be paid.

X. AND BE IT FURTHER ENACTED, *by the authority aforesaid,* That all officers' fees due by law from (*a*) criminal servants, shall be paid by the county where the facts shall be committed ; and that all and every such criminal servants for

(*a*) By the act of 1727, ch. 2, all fees due on the prosecution of imported servants, were to be paid by the masters, &c. of such servants, and not by the public or county ; and the owners (unless in case of conviction and execution for capital offences,) to have recompence for such fees, by such servitude of the servants (not exceeding three years) as should be thought reasonable by the county court, &c. By May, 1766, ch. 6, the legal fees on the prosecution of any negro, or other slave, in any county court, (whether convicted or acquitted,) shall be paid by and assessed in the levy of the respective counties where prosecuted.

Digitized from Best Copy Available

**JOHN HART**, Esq. Governor.                    91

whom the county shall pay the fees due by law to such officers as aforesaid, shall, after the end and expiration of their time of servitude to their master or mistress, satisfy and pay unto the commissioners of the county who paid such fees for them to the sheriff, and other officers as aforesaid, for the use of the county, such sums as they have paid as aforesaid : and the several commissioners of the several counties shall, and are hereby empowered to make inquisition after all such servants, criminals, for whom the county hath defrayed the said fees to the sheriff, and other officers as aforesaid ; and they, the said commissioners, according to their best discretion, shall cause to be entered rules for the servants to make such reasonable satisfaction to the county as they shall think fit, and in such manner as they shall find convenient.

XI. And, for the better security of the county which shall pay such fees for such criminal servants as aforesaid, Be it enacted, *by the authority aforesaid,* That the master, mistress or dame of all such servants, be and are hereby enjoined and required, at the expiration of the time of such servant's servitude to such master, or mistress or dame, to render and deliver up to the sheriff of the county, for the use of the county aforesaid, such servants criminals as aforesaid, under the penalties to such master, mistress or dame, refusing or neglecting to deliver up such servants as aforesaid, of making satisfaction to the county for all such fees as by the county aforesaid have been paid for such criminal as aforesaid ; and such sheriff to whom such criminal servant shall be delivered as aforesaid, is hereby required to receive and secure such servants criminals as aforesaid, so that he be and appear at the then next county court to be held for the said county, to be disposed of as the said court shall consider.

*Vide list of acts respecting crimes and punishments, 1692, ch. 16.*

## CHAP. XXVII.

An ACT for the punishing the offences of adultery and fornication.

Other acts : 1749, ch. 12—Nov. 1781, ch. 13—1785, ch. 47.—1796, ch. 54.

Be it enacted, *by the King's most excellent majesty, by and with the advice and consent of his majesty's Governor, Council and Assembly of this province, and the authority of the same,* That after the end of this session of assembly, whosoever shall, directly or indirectly, entertain, provide for, or cause to be entertained or provided for, any lewd woman or women, or that shall frequent her or their company, after that admonition to him or them be given by the minister, or the vestry, or the churchwarden or churchwardens of the parish where such person or persons shall inhabit, shall be adjudged

*Margin notes:*
April, 1715.

Masters, &c. to deliver up servants, criminals under penalty of paying the fees, paid for the criminal by the county.

Certain persons to be adjudged fornicators, &c.

Digitized from Best Copy Available

*Pennsylvania Laws, Statutes, etc. Compilations*

# THE

# Statutes at Large

OF

# PENNSYLVANIA

FROM

# 1682 to 1801

COMPILED UNDER THE
AUTHORITY OF THE ACT OF MAY 19 1887 BY
JAMES T MITCHELL AND HENRY FLANDERS
COMMISSIONERS

## VOLUME III
1712 to 1724

CLARENCE M BUSCH
STATE PRINTER OF PENNSYLVANIA
1896

## EXHIBIT 39 (McLean)

Generated on 2023-07-06 21:55 GMT / https://hdl.handle.net/2027/hvd.h136dn
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

254                    *The Statutes at Large of Pennsylvania.*          [172¹

five shillings, one-half to the use of the poor of the said city,
and the other half to the use of him or them who shall prose-
cute and cause such offender to be as aforesaid convicted:
which forfeitures shall be levied by distress and sale of the of-
fender's goods as aforesaid; and for want of such distress, if the
offender refuse to pay the said forfeiture, he shall be committed
to prison for every such offense the space of two days, without
bail or mainprise.

Provided, That such conviction be made within ten days
after such offense committed. And if such offender be a negro
or Indian slave, he shall, instead of imprisonment, be publicly
whipped, at the discretion of the magistrate.

> Passed August 26, 1721. Apparently never considered by the
> Crown, but allowed to become a law by lapse of time in accordance
> with the proprietary charter. See Appendix IV, Section II, and
> Hill's letter and Fane's opinion in Appendix V, Section I, and the
> Acts of Assembly passed August 14, 1725, Chapter 287; February 6,
> 1730-31, Chapter 322; March 29, 1735-36, Chapter 338; February 9,
> 1750-51, Chapter 388; March 26, 1762, Chapter 481; March 9, 1771,
> Chapter 624; March 21, 1772, Chapter 648; December 24, 1774, Chap-
> ter 705; November 25, 1779, Chapter 867; March 28, 1787, Chapter
> 1279; September 29, 1787, Chapter 1318; April 13, 1791, Chapter
> 1573; April 11, 1793, Chapter 1698; April 18, 1794, Chapter 1713;
> April 18, 1795, Chapter 1857; March 29, 1802, P. L. 127; March 29,
> 1803, P. L. 542; April 4, 1807, P. L. 132; March 30, 1812, P. L. 182;
> March 14, 1818, P. L. 189; March 29, 1824, P. L. 152; February 10,
> 1832, P. L. 64; June 13, 1836, P. L. 551; March 16, 1847, P. L. 473;
> April 11, 1848, P. L. 504; April 8, 1851, P. L. 382; April 14, 1851,
> P. L. 549; March 20, 1856, P. L. 137; May 5, 1864, P. L. 841; March
> 23, 1865, P. L. 744; March 12, 1866, P. L. 160; June 2, 1870, P. L.
> 1319; April 17, 1878, P. L. 23; June 10, 1881, P. L. 111; June 11, 1885,
> P. L. 111.

---

## CHAPTER CCXLVI.

§ AN ACT TO PREVENT THE KILLING OF DEER OUT OF SEASON, AND
AGAINST CARRYING OF GUNS OR HUNTING BY PERSONS NOT QUALI-
FIED.

[Section I.] Be it enacted by Sir William Keith, Baronet,
Governor of the Province of Pennsylvania, &c., by and with the
advice and consent of the freemen of the said Province in Gen-
eral Assembly met, and by the authority of the same, That if

Generated on 2023-07-06 21:54 GMT / https://hdl.handle.net/2027/hvd.hl3e6n
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

1721]     *The Statutes at Large of Pennsylvania.*                255

any person or persons, after the publication hereof, shall kill
or destroy any buck, doe, fawn, or any other sort of deer what-
soever, at any other time or season except only betwixt the first
day of July and first day of January, he shall forfeit and pay
for every such buck, doe, fawn, or other deer so killed or de-
stroyed as aforesaid, the sum of twenty shillings; one-half
thereof to the poor of the township where the offense is com-
mitted, and the other half to him who shall inform or sue for
the same, before any justice of the peace of this province, who is
hereby empowered and authorized to hear and determine the
same, and to convict the offender, by the oath or affirmation
of one or more witnesses.

Provided, That such conviction be made within two months
after such offense is committed.

And for the better conviction of offenders against this act:

[Section II.] Be it enacted, That every person in whose cus-
tody shall be found, or who shall expose to sale any green deer
skins, fresh venison, or deer's flesh, at any other time of the
year than what is before excepted, and shall be convicted there-
of as aforesaid, shall be deemed guilty of the said offense. And
that the same green deer skins, fresh venison or deer's flesh
so found as aforesaid shall be held to be good evidence in the
cases aforesaid.

Provided always, That nothing contained in this act shall be
deemed or construed to extend to any free native Indians carry-
ing guns, hunting, killing, and having in their custody any
skins or deer's flesh for their own use, anything in this act to
the contrary notwithstanding.

And whereas divers abuses, damages and inconveniencies
have arose by persons carrying guns and presuming to hunt
on other people's lands, for remedy whereof for the future:

[Section III.] Be it enacted by the authority aforesaid, That
if any person or persons shall presume, at any time after the
sixteenth day of November, in this present year one thousand
seven hundred and twenty-one, to carry any gun or hunt on the
improved or inclosed lands of any plantation other than his
own, unless he have license or permission from the owner of
such lands or plantation, and shall be thereof convicted, either

Generated on 2023-07-06 21:54 GMT  /  https://hdl.handle.net/2027/hvd.hl3660
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Digitized by 

Original from
HARVARD UNIVERSITY

256          *The Statutes at Large of Pennsylvania.*          [1721

upon view of any justice of the peace within this province, or by the oath or affirmation of any one or more witnesses, before any justice of the peace, he shall for every such offense forfeit the sum of ten shillings.  And if any person whatsoever, who is not owner of fifty acres of land and otherwise qualified in the same manner as persons are or ought to be by the laws of this province for electing of members to serve in assembly, shall, at any time after the said sixteenth day of November, carry any gun, or hunt in the woods or uninclosed lands, without license or permission obtained from the owner or owners of such lands, and shall be thereof convicted in manner aforesaid, such offender shall forfeit and pay the sum of five shillings for every such offense.

[Section IV.] And be it further enacted by the authority aforesaid, That no person whatsoever shall presume to shoot at or kill with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses within the limits of the said city, upon the forfeiture of five shillings for every such offense, to be convicted in manner aforesaid.

All which penalties and forfeitures shall go, one moiety to the informer, and the other to the poor of the township where such offense is committed.  But if convicted upon view of a justice of the peace, the whole forfeiture shall be to the use of the poor.  And if the offender refuse to pay, the same shall be levied by distress and sale of the offender's goods, by warrant under the hand and seal of the justice before whom such offender shall be convicted, returning the overplus, if any be, the charge of distraining being first deducted.  And for want of such distress he shall be committed to prison, where the forfeiture is twenty shillings, for the space of ten days; and, where the forfeiture is ten shillings, for the space of five days; and, if the forfeiture is five shillings, for the space of two days, without bail or mainprise.

Passed August 26, 1721.  Apparently never considered by the Crown, but allowed to become a law by lapse of time in accordance with the proprietary charter.  See Appendix IV, Section II, and Hill's letter and Fane's opinion in Appendix V, Section I, and

Generated on 2023-07-06 21:54 GMT  /  https://hdl.handle.net/2027/hvd.hl3d6i
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

1721]    *The Statutes at Large of Pennsylvania.*    257

the Acts of Assembly passed February 6, 1730-31, Chapter 323; January 27, 1749-50, Chapter 383. Repealed by Act passed April 9, 1760, Chapter 456.

## CHAPTER CCXLVII.

AN ACT FOR THE WELL TANNING AND CURRYING OF LEATHER, AND REGULATING OF CORDWAINERS, AND OTHER ARTIFICERS, USING AND OCCUPYING LEATHER WITHIN THIS PROVINCE.

Whereas very great abuses have been committed by tanners, cutters and other persons, using and working of leather within this government, and the prices of leather become very exorbitant and burdensome to the people of this province: To the intent therefore that a reasonable and indifferent course for the true and well tanning, currying and working of leather, may be from henceforth established and appointed, and yet the persons using the several crafts and mysteries aforesaid may not be more strictly bound or limited than the necessary regard of the welfare and general commodity of all His Majesty's subjects within the said province requireth:

[Section I.] Be it enacted by Sir William Keith, Baronet, Governor of the Province of Pennsylvania, &c., by and with the advice and consent of the freemen of the said Province in General Assembly met, and by the authority of the same, That from and after the twenty-fifth day of November next, in this present year of our Lord one thousand seven hundred and twenty-one, if any person or persons using, or which shall use, the mystery or faculty of tanning, or any person or persons importing, or who shall import, any leather into this province, shall at any time or times hereafter offer or put to sale any kind of leather which shall be insufficiently and not thoroughly tanned, so that the same, by the triers of leather lawfully appointed by virtue of this present act, for the time being, shall be found to be insufficiently not thoroughly tanned, that then all and every such person and persons so offending shall forfeit such leather, as shall be found insufficiently and not thoroughly tanned, unless the party importing the same will give



Original from
HARVARD UNIVERSITY

# THE

# L A W S,

### AND

### Acts of the General Assembly

Of His Majesties Province of *Nova Cæsarea* or

# New-Jersey,

As they were Enacted by the Governour, Council and General
Assembly, for the Time being, in divers Sessions, the first of
which began in *November*, 1703.



Printed and Sold by *William Bradford*, Printer to the Kings Most Excellent
Majesty for the Province of *New-Jersey*, 1717.

EXHIBIT 40 (McLean)

*Anno Regni Octavo Georgii Regis.* 14

---

### An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified.

BE it Enacted by the Governour Council and General Assembly, and it is hereby Enacted by the Authority of the same, That if any Person or Persons, after the Publication hereof, shall kill or Destroy any wild Buck, Doe or Fawn, or any other Sort of Deer whatsoever, at any Time in the Months of *January, February, March, April, May* or *June,* every such Person shall, for every such Offence, forfeit and pay the Sum of *Thirty Shillings,* for every such Buck, Doe or Fawn, or other Deer, so killed or destroyed as aforesaid, contrary to the true Intent and Meaning of this Act; one half thereof to the Poor of the Township or Precinct where the Offence is committed, and the other half to him who shall Inform or Sue for the same before any Justice of the Peace of this Province, who is hereby impowered and Authorized to hear and determine the same, and to convict the Offender by the Oath or Affirmation of one or more Witness. *Provided,* That such Conviction be made within two Months after such Offence committed:

And for the better Convicting of Offenders against this Act, *Be it Enacted by the Authority aforesaid,* That every Person in whose Custody shall be found, or who shall expose to Sale, any Green Deer Skins, Fresh Venison or Deers Flesh, at any Time in any of the Months of *January, February, March, April, May,* or *June* afore-mentioned, and shall be convicted thereof, as aforesaid; shall be deemed Guilty of the said Offence.

*Provided always,* That nothing contained in this Act shall be deemed or construed to hinder any Person from killing any Kind of Deer, within his Field where Corn is Growing, at any Time in the Month of *January,* nor to extend to any Free Native Indians Carrying Guns, Hunting, Killing or having in their Custody any Skins or Deers Flesh for their own Use, any Thing in this Act to the contrary notwithstanding.

And whereas divers Abuses have been committed, and great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to Hunt on other Peoples Land; for Remedy whereof for the Future, *Be it Enacted by the Authority aforesaid,* That if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or Hunt on the Improved or Inclosed Lands in any Plantation, and on other than his own, unless he have Licence or Permission from the owner of such Lands or Plantation, and shall be thereof Convicted, either upon the View of any Justice of the Peace within this Province, or by the Oath or Affirmation of any one or more Witnesses, before any Justice of the Peace, he shall, for every such Offence, forfeit the Sum of *Fifteen Shillings,* with Costs attending such Conviction. And if any Person whatsoever, who is not Owner of one Hundred Acres of Land, or otherwise Qualified, in the same Manner as Persons are or ought to be, for Electing of Representatives to serve in General Assembly, shall at any Time, after the Publication hereof, carry any Gun, or Hunt in the Woods or Uninclosed Lands, without Licence or Permission obtained from the Owner or Owners of such

Lands,

5-ER-1049

142                 *Anno Regni Octavo Georgii Regis.*

Lands, and shall be thereof Convicted, in manner aforesaid, such Offender shall forfeit and pay the Sum of *Ten Shillings*, with Costs as aforesaid, for every such Offence.   All which Penalties and Forfeitures shall go one Moiety to the Informer, and the other to the Poor of the Township or Precinct where the Offence is committed ; but if convicted upon View of a Justice of the Peace, the whole Forfeiture shall be to the Use of the Poor.   And if the Offender refuse to pay the same, with Costs, as aforesaid, shall be levyed on by Distress and Sale of the Offenders Goods, by Warrant under the Hand and Seal of the Justice before whom such Offender shall be Convicted, returning the Over-plus, if any be, the Charge of Distraining being first deducted.   And for want of Effects whereon to make such Distress, every Person so offending contrary to the true Intent and Meaning of this Act, shall be committed to Prison, when the Forfeiture is *Thirty Shillings*, for the Space of fifteen Days, and when the Forfeiture is *Fifteen Shillings*, for the space of eight Days ; and when the Forfeiture is *Ten Shillings*, for the space of five Days, without Bail or Mainprize.

*And be it Enacted by the Authority aforesaid,*   That every Justice of the Peace, before whom any Person or Persons is convicted of having committed any of the Offences in and by this Act prohibited, is hereby directed and required to Issue his Warrants for the bringing such Offender before him, and in Case of the want of Effects whereon to make Distress, to make out his *Mittimus* to commit such Offender to the Goal of the County in which such Conviction is made; and the Sheriff, Under-Sheriff or Goal-keeper is hereby directed and required to keep the said Offender in close Goal, according to the Direction of this Act and Tenor of such *Mittimus* to such Sheriff, Under-Sheriff or Goaler directed.   And every Justice of the Peace neglecting or refusing to Issue such Warrant, or make such *Mittimus*, and every Sheriff, Under-Sheriff or Goal-keeper who shall not receive such Offender and him keep in close Goal, according to the true Intent and Meaning of this Act, shall, for every such Neglect or Refusal, or undue discharge of his Office in the Premises, forfeit the Sum of *Six Pounds*, to be recovered in any Court of Record within this Province, in which there shall be no Essoyn or Protection, the one half to such person as shall sue for and prosecute the same to Effect, the other half to the Kings Majesty, His Heirs and Successors, for and towards the Support of the Government of this province.

*And be it further Enacted by the Authority aforesaid,*   That this Act nor any part thereof, shall be construed to extend to N gro, Indian or Mullato Slaves, so as to commit them to prison, during the Time in this Act limitted, in case they should be Guilty of any of the Offences in this Act prohibited, but that and in such case such Indian, Negro or Mullato slave killing and destroying any Deer as aforesaid, or currying or Hunting with any Gun, without Licence from his Master, shall, at the Publick Whiping post, on the bare Back, be Whipt, not exceeding twenty Lashes for every such Offence, for which Whipping the Master shall pay to the Whipper the Sum of *Three Shillings*, and pay no greater or other Cost whatsoever, any Thing in this Act to the contrary hereof in any wise notwithstanding.

*The fore-going five Acts were Published the fifth of May,* 1722.



# L A W S

OF

# NEW-YORK,

FROM

The Year 1691, to 1773 inclusive.

Published according to an Act of the

## GENERAL ASSEMBLY.

### VOLUME the FIRST.

Quum Leges Aliæ super alias accumulatæ, eas de integro retractare, et in Corpus sanum et habile redigere, ex Usu sit.

BACON.

## NEW-YORK:

Printed by Hugh Gaine, Printer to the King's Most Excellent Majesty in the Province of New-York,

MDCCLXXIV.

UNIV. OF MICH. LAW LIBRARY

Generated on 2023-07-07 02:13 GMT / https://hdl.handle.net/2027/mdp.35112803945380
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

EXHIBIT 41 (McLean)

5-ER-1051

Case 1:23-cv-00265-LEK-WRP    Document 55-74    Filed 07/14/23    Page 2 of 3    PageID.1162

## CADWALLADER COLDEN, Esq; Lieut. Governor. 441

also be neceffary to annex to the faid Certificate, an Affidavit of the following Tenor, fworn to before any Magiftrate in the City of *New-York*: A. B. being duly fworn, depofeth and faith, *That he certainly knows* [or has Affidavits to prove, as the Cafe may be] *that the* Hemp *mentioned in the above, or the annexed Certificate, was all raifed after the firft of* March, One *thoufand feven hundred and fixty-four, in the Colony of* New-York, *in the County of* [here mentioning the County] *and that no Bounty has yet been paid for it, or any Part of it, to the beft of his Knowledge and Belief:* And further faith not. The Infpectors above mentioned, before they enter on the Execution of their Office, fhall take an Oath, faithfully to difcharge the Duty of Infpectors, according to the Meaning of this Act.

[The Reft of this Act is OBSOLETE.]

4th *GEORGE* III. A. D. 1763.
Form of Affidavit to be fworn to before the Bounty fhall be paid.

---

### C H A P. MCCXXIX.

*An* A C T *to regulate the guaging of Wine, Rum, and other Spirituous Liquors, Molaffes, and other Purpofes therein mentioned.*
Pafs'd the 20th December, 1763.

Expired 1ft January, 1771.

---

### C H A P. MCCXXX.

*An* ACT *to lay a Duty of Tonnage on Veffels for defraying the Expence of the Light-Houfe on Sandy-Hook.*
Pafs'd the 20th December, 1763.

Continued Chap. 1277.
Expired 1ft January, 1772.
Provided for Ch. 1515.

---

### C H A P. MCCXXXI.

*An* ACT *impowering* John Cruger, Robert R. Livingfton, Philip Livingfton, Leonard Lifpenard, *and* William Bayard, *Efquires, to receive from the Colony of* Pennfilvania, *the Sum of Four Thoufand Three Hundred and Sixty-eight Pounds Two Shillings and Six-pence, Sterling, overpaid to the faid Colony, out of the Parliamentary Grant for the Service of the Year One thoufand feven hundred and fixty.*
Pafs'd the 20th December, 1763.

This Money being received and paid into the Treafury, the Act is therefore Obfolete.

---

### C H A P. MCCXXXII.

*An* ACT *to continue an Act, entitled, An Act for the Relief of Infolvent Debtors, and for repealing the Acts therein mentioned, with an Addition thereto.*
Pafs'd the 20th December, 1763.

See Chap. 1148.
Continued Ch. 1309.

---

### C H A P. MCCXXXIII.

*An* A C T *to prevent hunting with Fire-Arms in the City of* New-York, *and the Liberties thereof.*
Pafs'd the 20th December, 1763.

WHEREAS it has long been the Practice of great Numbers of idle and diforderly Perfons in and about the City of *New-York*, and the Liberties thereof, to hunt with Fire-Arms, and to tread down the Grafs, and Corn and other Grain ftanding and growing in the Fields and Inclofures there, to the great Danger of the Lives of his Majefty's Subjects, the Ruin and Deftruction of the moft valuable Improvements, the grievous Injury of the Proprietors, and the great Difcouragement of their Induftry.

Preamble.

5 T                                                                    I. In

Generated on 2023-07-07 02:17 GMT  /  https://hdl.handle.net/2027/mdp.35112203945300
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google                    Original from
UNIVERSITY OF MICHIGAN

## 442    LAWS of *NEW-YORK*.

**4th GEORGE III.**
**A. D. 1763.**

**Penalty for entering with Fire-Arms into any inclofed Land within this City or its Liberties.**

**Or paffing thro' Orchards, &c. without Arms.**

**Before whom Offenders to be convicted.**

I. In order therefore the more effectually to punifh and prevent fuch Abufes as aforefaid, **Be it Enacted** *by his Honour the Lieutenant Governor, the Council, and the General Affembly, and it is hereby Enacted by the Authority of the fame,* That if any Perfon or Perfons whatfoever, other than the Owner, Proprietor, or Poffeffor, or his or her white Servant or Servants, do and fhall, at any Time or Times from and after the Publication of this Act, carry, fhoot, or difcharge any Mufket, Fowling-Piece, or other Fire-Arm whatfoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclofed Land whatfoever, within the City of *New-York*, or the Liberties thereof, without Licence in Writing firft had and obtained for that Purpofe from fuch Owner, Proprietor, or Poffeffor of fuch Orchard, Garden, Corn-Field, or other inclofed Land ; or fhall enter into, or pafs through any Orchard, Garden, Corn-Field or Mowing-Ground, in any of the aforefaid Places without Fire-Arms, and thereof fhall be convicted before any Member of his Majefty's Council, either of the Juftices of the Supreme Court, or the Mayor, Recorder, or any one of the Aldermen of the City of *New-York*, for the Time being, by the Oath of one credible Witnefs, or by Confeffion of the Party offending, he, fhe, or they fo offending, fhall feverally forfeit and pay for every fuch Offence, the Sum of *Twenty Shillings* ; to be recovered and applied in the Manner herein after directed.

**Forfeitures how to be recovered and applied.**

II. **And be it further Enacted** *by the Authority aforefaid,* That every Fine and Forfeiture, which fhall accrue upon or by Virtue of this Act, fhall be recovered, with reafonable Cofts, not exceeding *Ten Shillings*, by any Perfon or Perfons who fhall fue, and profecute for the fame ; One Half of fuch Fine and Forfeiture when recovered and received, to be applied to his, her, or their own Ufe; and the other Half thereof to be paid by him, her, or them, to the Church Wardens of the faid City for the Time being, for the Ufe of the Poor thereof.

**Offenders to be imprifoned if the Fines are not paid,**

**Provifo.**

III. **And be it further Enacted** *by the Authority aforefaid,* That every Offender, who fhall incur any fuch Fine or Forfeiture as aforefaid, fhall, by Warrant under the Hand and Seal of any Member of his Majefty's Council, Juftice of the Supreme Court, or the Mayor, Recorder, or Aldermen before whom he or they fhall be convicted, ftand and be committed to the Common Goal of the faid City, there to remain for the Space of three Months, unlefs the Fine or Forfeiture, with Cofts, be fooner paid. **Provided always,** That the Members of his Majefty's Council, and the Juftices of the Supreme Court, fhall be at Liberty to act in the Execution of this Law or not, as to them fhall feem fitting.

C H A P.  MCCXXXIV.

**Expired 1ft January, 1770. Provided for Ch. 1441.**

*An* ACT *to eftablifh the Rates to be taken for Wharfage of Ships and other Veffels ufing the Wharfs within the Limits therein mentioned,*
Paf's'd the 20th December, 1763.

C H A P.  MCCXXXV.

**Obfolete.**

*An* ACT *to raife, levy, and collect, the Sum of* Sixty-one Pounds Nineteen Shillings, *in the City and County of* New-York, *for Services performed by the Coroner of the faid City and County.*
Paf's'd the 20th December, 1763.

C H A P.

Generated on 2023-07-07 02:17 GMT  /  https://hdl.handle.net/2027/mdp.35112203945300
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

WILLIAM FRANKLIN, Esquire, GOVERNOR.                343

## At a GENERAL ASSEMBLY held at

Burlington from the Twentieth Day of November to the
Twenty-first Day of December 1771, in the Twelfth Year
of the Reign of King George the Third, the following
Laws were passed.

### SESSION the FOURTH.

### CHAP. DXXXIX.

*An* ACT *to continue and amend an Act, entitled, An Act
for better settling and regulating the* Militia *of this Colo-
ny of* New-Jersey; *for the repelling Invasions, and suppres-
sing Insurrections and Rebellions.**

Passed Dec. 21, 1771.

**W**HEREAS the Act passed in the Nineteenth Year of the Reign     Preamble.
of our late Sovereign Lord King *George* the Second, entitled,
*An* Act *for better settling and regulating the Militia of this Colony of*
New-Jersey; *for the repelling Invasions, and suppressing Insurrections and*
Rebellions, will expire at the End of this Session of Assembly;

*Sect.* 1. BE IT ENACTED *by the Governor, Council and General Assem-*   Limitation
*bly, and it is hereby Enacted by the Authority of the same,* That the said
Act, entitled, *An* Act *for better settling and regulating the Militia of
this Colony of* New-Jersey; *for the repelling Invasions, and suppressing In-
surrections and Rebellions,** shall be, and hereby is, continued, and every
Article and Clause therein contained shall be and remain in full Force,
from the Publication hereof, to the first Day of *May* which will be in
the Year of our Lord One Thousand Seven Hundred and Seventy-seven,
and from thence to the End of the next Session of the General Assembly
of this Colony, and no longer.

2. AND WHEREAS it has been a Custom of late, in some of
the Counties of this Colony, to choose the Militia Officers Constables;
for preventing the same for the Future, BE IT ENACTED *by the Autho-*   Commission-
*rity aforesaid,* That, during the Continuance of this Act, it shall not be   ed Officers
lawful for any Court of General Quarter-Sessions of the Peace, or for   not to be cho-
any of the Inhabitants of this Colony, at their annual Town-meetings,   sen Consta-
to appoint or choose any commissioned Officer, while in Commission,   bles.
to be a Constable; any Law, Usage or Custom to the contrary not-
withstanding.

### · CHAP. DXL.

*An* ACT *for the Preservation of* Deer *and other Game, and
to prevent trespassing with Guns.*

Passed Dec. 21, 1771.

**W**HEREAS the Laws heretofore passed in this Colony for the   Preamble.
Preservation of Deer and other Game, and to prevent trespass-
ing

* Chap. CC.

Digitized from Best Copy Available

EXHIBIT 42 (McLean)

5-ER-1054

344     XII   G E O R G E   III.   *A. D.*   1771.

ing with Guns, Traps and Dogs, have, by Experience, been found in-
sufficient to anfwer the falutary Purpofes thereby intended ; Therefore,

*No Perfon to carry a Gun on Lands not his own, except, &c.*

Sect. 1. BE IT ENACTED *by the Governor, Council and General Af-
fembly of this Colony of* New-Jerfey, *and it is hereby Enacted by the Au-
thority of the fame,* That if any Perfon or Perfons fhall prefume, at
any Time after the Publication hereof, to carry any Gun on any
Lands not his own, and for which the Owner pays Taxes, or is in his
lawful Poffeffion, unlefs he hath Licenfe or Permiffion in Writing from
the Owner or Owners or legal Poffeffor, every fuch Perfon fo offending,
and convicted thereof, either upon the View of any Juftice of the Peace
within this Colony, or by the Oath or Affirmation of one or more Wit-
neffes, before any Juftice of the Peace of either of the Counties, Cities or
Towns-corporate of this Colony, in which the Offender or Offenders
may be taken or refide, he, fhe or they, fhall, for every fuch Offence, for-
feit and pay to the Owner of the Soil, or his Tenant in Poffeffion, the

*Penalty.*

Sum of *Forty Shillings ;* with Cofts of Suit ; which Forfeiture fhall
and may be fued for and recovered by the Owner of the Soil, or Te-
nant in Poffeffion, before any Juftice of the Peace in this Colony, for
the Ufe of fuch Owner or Tenant in Poffeffion.

*No Perfon to drive Deer or other Game, except, &c.*

2. AND BE IT ENACTED *by the Authority aforefaid,* That if any
Perfon fhall prefume, at any Time after the Publication of this Act,
to hunt or watch for Deer with a Gun, or fet in any Dog or Dogs to
drive Deer, or any other Game, on any Lands not his own, and for
which the Owner or Poffeffor pays Taxes, or is in his lawful Poffeffion,
unlefs he hath Licenfe or Permiffion in Writing from fuch Owner or
Owners or legal Poffeffor ; every fuch Perfon fo offending, and being
convicted thereof in Manner aforefaid, fhall, for every fuch Offence,
forfeit and pay to the Owner of the Soil, or Tenant in Poffeffion, the

*Penalty.*

Sum of *Forty Shillings,* with Cofts of Suit ; provided, that nothing
herein contained fhall be conftrued to extend to prevent any Perfon
carrying a Gun upon the King's Highway in this Colony.

*Penalty on Non-Refi-dents.*

3. AND BE IT FURTHER ENACTED *by the Authority aforefaid,* That
if the Perfon or Perfons offending againft this Act be Non-Refidents
of this Colony, he or they fhall forfeit and pay for every fuch Offence
*Five Pounds,* and fhall forfeit his or their Gun or Guns to any Perfon
or Perfons who fhall inform and profecute the fame to Effect, before
any Juftice of the Peace in any County of this Colony, wherein the
Offender or Offenders may be taken or apprehended.

*Penalty for killing, &c. Deer out of Seafon.*

4. AND BE IT ENACTED *by the Authority aforefaid,* That if any
Perfon or Perfons fhall kill, deftroy, hunt or take any Doe, Buck,
Fawn, or any Sort of Deer whatfoever, at any other Time or Seafon,
except only between the firft Day of *September* and the firft Day of
*January* yearly and every Year, he, fhe or they fo offending, fhall for-
feit and pay the Sum of *Forty Shillings* for each and every Offence ;
to be fued for, recovered and applied as hereafter is directed.

*What fhall be Evidence of fuch Kill-ing, &c.*

5. AND, for the better and more effectual convicting of Offenders
againft this Act, BE IT ENACTED *by the Authority aforefaid,* That any
and every Perfon or Perfons in whofe Cuftody fhall be found, or who
                                         fhall

5-ER-1055

## WILLIAM FRANKLIN, Esquire, GOVERNOR.     345

shall expose to Sale, any green Deerskins, or fresh Venison killed at any Time after the first Day of *January*, and before the first Day of *September* aforesaid, and shall be thereof convicted by the Oath or Affirmation of one or more credible Witnesses, shall be deemed guilty of offending against this Act, and be subjected to the Penalties of killing Deer out of Season.

6. AND WHEREAS great Numbers of idle and disorderly Persons make a Practice of hunting on the waste and unimproved Lands in this Colony, whereby their Families are neglected, and the Publick is prejudiced by the Loss of their Labour, BE IT THEREFORE EN-ACTED *by the Authority aforesaid*, That, from and after the first Day of *January* next, no Person or Persons whatsoever (except such Persons as are by the Laws of this Colony qualified to vote for Representatives in General Assembly, in Right of their Freeholds, and their Sons being of the Age of eighteen Years or upwards, and living with their Parent or Parents, or being Freeholders) shall, on any Pretence whatever, hunt on the waste and unimproved Lands in this Colony ; and if any Person or Persons, not qualified as aforesaid, shall presume to hunt as aforesaid, he or they so offending shall forfeit and pay, for every such Offence, the Sum of *Twenty Shillings* ; to be recovered by Action of Debt, with Costs, by any Person who shall sue for the same ; to be applied one Half to the Prosecutor, and the other Half to the Use of the Poor of the Township or Precinct where the Fact was committed. *[margin: Who may hunt on un-improved Lands. / Penalty on Offenders.]*

7. AND BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall set any Trap or other Device whatsoever, larger than what is usually and commonly set for Foxes and Muskrats, such Person, setting such Trap or other Device, shall pay the Sum of *Five Pounds*, and forfeit the Trap or other Device, shall suffer three Months Imprisonment, and shall also be liable to make good all Damages any Person shall sustain by setting such Trap or other Device, and the Owner of such Trap or other Device, or Person to whom it was lent, shall be esteemed the Setter thereof, unless it shall be proved, on Oath or Affirmation, what other Person set the same, or that such Trap or other Device was lost by said Owner or Person to whom it was lent, and absolutely out of his Power ; and if the Setter of the Trap or other Device be a Slave, and it be his own voluntary Act, he shall (unless the Master or Mistress shall pay the Fine) in Lieu of such Fine, be publickly whipped with thirty Lashes, and committed till the Costs are paid ; and that the said Trap or other Device shall be broken and destroyed in the View and Presence of the Justice of the Peace before whom they are brought : And if any Person or Persons shall have Possession of, or there shall be found in his or their House, any Trap or Traps, Device or Devices whatsoever, for taking of Deer, such Person or Persons shall be subjected to the same Penalty as if he or they were convicted of setting such Trap or Traps, or other Device. *[margin: Penalty on setting Traps, &c. / Penalty on a Slave setting such Trap, &c. / Penalty on keeping such Trap, &c.]*

8. AND, for encouraging the Destruction of such Traps and Devices, BE IT ENACTED *by the Authority aforesaid*, That if any Person shall seize any Trap or other Device for the taking Deer, and shall carry such Trap or other Device to any Magistrate of the County where such Trap or Device was seized, such Person shall be entitled to *[margin: Reward for seizing a Trap, &c.]*

4 Q        an

an Order from the said Magistrate to the Collector of such County, to pay him the Sum of *Ten Shillings*, out of any Money in his Hands raised for the Use of the County ; which Sums shall be allowed to such Collector on the Settlement of his Accounts.

**Penalty on a Smith making or mending such Trap, &c.**

9. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That every Smith or other Artificer, who shall hereafter make or mend any such Trap or other Device aforesaid, he shall forfeit and pay the Sum of *Forty Shillings* ; and the Person carrying such Trap or other Device to the Artificer aforesaid, shall forfeit and pay the Sum of *Twenty Shillings.* And every Person who shall bring into this Colony any such Trap or Device as aforesaid shall forfeit and pay the Sum of *Forty Shillings.* And if the Person who shall carry the same to the Smith or Artificer shall be so poor as that he shall not be able to pay the Forfeiture aforesaid, he shall be committed to the common Gaol, until he shall prove who is Owner of such Trap or Device, or who delivered the same to him ; and in such Case the Forfeiture aforesaid shall be levied on the Goods, or in Failure of Goods, on the Body of the Owner of such Trap or Device, or the Person who delivered the same to the Pauper, and the Trap or Device shall be forfeited and destroyed.

**Penalty on bringing such Trap, &c. into the Colony.**

**Penalty for setting loaded Guns.**

10. AND WHEREAS a most dangerous Method of setting Guns has too much prevailed in this Province, BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of *Six Pounds* ; and on Non-payment thereof shall be committed to the common Gaol of the County for six Months.

**Application of Penalties.**

11. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That the Fines and Forfeitures in this Act expressed, and not particularly appropriated, shall be paid, one Half to the Prosecutor, and the other Half to and for the Use of the Poor of the Town, Precinct or District, where the Offence is committed ; and that the Execution of this Act, and every Part thereof, shall be within the Cognizance and Jurisdiction of any one Magistrate or Justice of the Peace, without any Reference to the Act for Trial of small Causes in this Colony.

**Jurisdiction given to one Magistrate.**

**This Act not to affect Parks.**

12. AND BE IT ENACTED, That nothing in this Law shall be construed to extend to restrain the Owners of Parks, or of tame Deer, from killing, hunting or driving their own Deer.

**Penalty on Magistrate neglecting his Duty.**

13. AND BE IT ALSO ENACTED *by the Authority aforesaid*, That if any Justice of the Peace or other Magistrate, within this Province, shall have Information of any Persons offending against this Act, in killing Deer out of Season, setting and making Traps, Non-Residents killing Deer, and Persons setting of Guns, and shall not prosecute the same to Effect within two Months after such Information, he shall forfeit and pay the Sum or Sums to which the Offender against this Act would have been liable.

14. AND

Digitized from Best Copy Available

WILLIAM FRANKLIN, Esquire, Governor.          347

14. AND BE IT ENACTED *by the Authority aforesaid*, That the Jus- This Act to be published and executed. tices at every Quarter-Sessions of the Peace shall cause this Act to be publickly read; and give in Charge to the Grand-Jury to particularly inquire and present all Persons for killing Deer out of Season, setting or making Traps, and all Non-Residents killing, destroying, hunting and taking any Sort of Deer, and all Persons setting of Guns; and, upon Conviction for either of the said Offences, the said Justices shall set and impose the Fines and Penalties herein before-mentioned, with Costs of Suit.

15. AND BE IT ENACTED *by the Authority aforesaid*, That if any Appeal given to next Sessions. Person or Persons whatsoever, whether the Accused or Accuser, Plaintiff or Defendant, shall think themselves aggrieved by any of the Judgments given by the said Justices or other Magistrates, for any Suit commenced by Virtue of this Act; then it shall and may be lawful for such Person or Persons to appeal, on giving sufficient Security for the Forfeitures and Costs, to the next Court of General Quarter-Sessions, held for such County where such Judgment shall be given; which Court is hereby empowered to hear and determine all and every such Appeal or Appeals.

16. AND BE IT ENACTED *by the Authority aforesaid*, That if any Penalty for watching in the Night near a Road. Person or Persons, within this Colony, shall, after the Publication of this Act, watch with a Gun, on any uninclosed Land within two Hundred Yards of any Road or Path, in the Night Time, whether the said Road is laid out by Law or not, or shall stand or station him or themselves upon or within two Hundred Yards of any Road as aforesaid, for shooting at Deer driven by Dogs, he or they so offending, shall, on Conviction, forfeit and pay the Sum of *Five Pounds* for every such Offence; to be recovered by Action of Debt, or Presentment of the Grand-Jury as aforesaid, and pay all Damages.

17. PROVIDED ALWAYS, That the sixth Section of this Act shall Not to affect Indians, nor Essex, Bergen, Morris or Sussex. not be construed to affect any Native *Indian;* and that nothing in this Act shall be construed to prevent the Inhabitants of *Essex, Bergen, Morris* and *Sussex*, from making, having in their Houses, or setting Traps of five Pounds Weight or more for Bears, Wolves, Foxes, or any other wild Beasts, Deer only excepted.

18. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That Repeal of Former Laws. all former Laws made in this Colony for the Preservation of Deer and other Game, and to prevent trespassing with Guns, and regulating the Size of Traps, shall be, and they are hereby repealed.

CHAP.   DXLI.

An ACT *declaring the River* Delaware *a common* Highway, *and for improving the* Navigation *in the said River.*

Passed Dec. 21, 1771.

WHEREAS the improving the Navigation in Rivers is of great Preamble. Importance to Trade and Commerce; AND WHEREAS the River *Delaware*

Digitized from Best Copy Available

# ACTS

## PASSED BY THE GENERAL ASSEMBLY

### OF THE

# STATE OF LOUISIANA,

### AT THE

# EXTRA SESSION,

## HELD AND BEGUN IN THE CITY OF NEW ORLEANS,

### ON THE 23d OF NOVEMBER, 1865.

PUBLISHED BY AUTHORITY.

NEW ORLEANS:
J. O. NIXON, STATE PRINTER,
1866.

EXHIBIT 43 (McLean)

14

incurred by his Excellency, J. Madison Wells, Governor of the State of Louisiana, in fitting up the Mechanics' Institute for the use of the General Assembly, the said amount to be paid on the warrant of the Auditor of Public Accounts, to the following persons, and as follows:

C. W. Grandjean, two thousand three hundred and twenty-seven dollars and eighteen cents.................$2,327 18

Allen Hill, two thousand and seventy-six dollars and fifty cents.................................... 2,076 50

A. Brosseau & Co., one thousand six hundred and thirty-nine dollars and ninety-two cents................ 1,639 92

Selby & Donlan, two hundred and eighty-four dollars and thirty-five cents.............................. 284 35

J. P. Coulon, three hundred and seventy-one dollars and sixty-five cents............................... 371 65

P. Ward, one hundred dollars........................... 100 00

John Gauche, twenty dollars and fifty cents............ 20 50

Sampson & Kean, thirty dollars........................ 30 00

G. W. R. Bailey, two hundred dollars.................. 200 00

   Total..................................$7,050 10

SEC. 2.  Be it enacted, &c., That this act shall take effect from and after its passage.

DUNCAN S. CAGE,
Speaker of the House of Representatives.
ALBERT VOORHIES,
Lieutenant Governor and President of the Senate.
Approved December 18, 1865.

J. MADISON WELLS,
Governor of the State of Louisiana.

A true copy:
J. H. HARDY,
Secretary of State.

---

No. 10.]                    AN ACT

To prohibit the carrying of fire-arms on premises or plantations of any citizen, without the consent of the owner.

SECTION 1.  Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened, That it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order; and any person or persons so offending shall be fined a sum not less than one dollar nor more than ten dollars, or imprisoned not less than one day nor more than ten days in the parish jail, or both, at the discretion of any court of competent jurisdiction.

*Penalty.*

15

préparer, pour l'usage de l'Assemblée Générale, les salles de l'Insti-
tut des Artisans. Le susdit montant sera payé sur le mandat de
l'Auditeur des Comptes Publics, aux personnes ci-après désignées,
ainsi que suit:

| | |
|---|---:|
| C. W. Grandjean, deux mille trois cent vingt-sept piastres et dix-huit cents | $2,327 18 |
| Allen Hill, deux mille soixante-seize piastres et cinquante cents | 2,076 50 |
| A. Brousseau & Cie., mille six cent trente-neuf piastres et quatre-vingt-douze cents | 1,639 92 |
| Selby & Donlaw, deux cent quatrevingt-quatre piastres et trente-cinq cents | 284 35 |
| J. P. Coulon, trois cent soixante-onze piastres et soixante-cinq cents | 371 65 |
| P. Ward, cent piastres | 100 00 |
| John Gauche, vingt piastres et cinquante cents | 20 50 |
| Sampson & Keen, trente piastres | 30 00 |
| G. W. R. Bailey, deux cents piastres | 200 00 |
| Total | $7,050 10 |

Sec. 2. Décrètent de plus: Cet acte sortira son effet à compter de
son adoption.

DUNCAN S. CAGE,
Orateur de la Chambre des Représentants.
ALBERT VOORHIES,
Lieutenant-Gouverneur et Président du Sénat.
Approuvé le 18 décembre 1865.
J. MADISON WELLS,
Gouverneur de l'Etat de la Louisiane.
Pour copie conforme:
J. H. HARDY,
Secrétaire d'Etat.

———

No. 10.]                    ACTE

Défendant le port d'armes à feu dans le domaine ou l'habitation de tout citoyen sans le consente-
ment du propriétaire.

SECTION 1. Le Sénat et la Chambre des Représentants de l'Etat de
la Louisiane, réunis en Assemblée Générale, décrètent: La loi défend
à toute personne de porter des armes à feu dans le domaine ou l'habi-
tation de tout citoyen, sans le consentement du propriétaire, excepté [*Peine contre le port illégal d'armes à feu.*]
dans l'accomplissement légitime d'un ordre civil ou militaire; toute
contravention à cette loi sera punie d'une amende d'au moins une
piastre et de dix au plus, ou d'un emprisonnement d'un jour au
moins, et qui n'en excèdera pas dix, dans la prison de paroisse; les
deux peines pourront être infligées à la fois, à la discrétion de toute
cour de juridiction compétente.

16

Repealing
clause.

Sec. 2.  Be it further enacted, &c., That all laws, or parts of laws, to the contrary notwithstanding, be and the same are hereby repealed.

DUNCAN S. CAGE,
Speaker of the House of Representatives.
ALBERT VOORHIES,
Lieutenant Governor and President of the Senate.
Approved December 20, 1865.

J. MADISON WELLS,
Governor of the State of Louisiana.

A true copy:
J. H. Hardy,
Secretary of State.

---

No. 11.]                          AN ACT

To Prevent Trespassing.

Persons offend-
ing against this
Act, before
whom tried.

Section 1.  Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened, That whosoever shall enter upon any plantation without the permission of the owner or agent, shall be deemed guilty of a misdemeanor, and shall be liable to be arrested and brought before any court of competent jurisdiction, and upon proof of the fact shall be fined in a sum not exceeding one hundred dollars,  or imprisoned for a term not exceeding one month, and may, moreover, be required to give bond for good behavior during six months.

Fine.

Repealing
clause.

Sec. 2.  Be it further enacted, &c., That all laws, or parts of laws, contrary to the provisions of this act, be and the same are hereby repealed.

Sec. 3.  Be it further enacted, &c., That this act shall take effect from and after its passage.

DUNCAN S. CAGE,
Speaker of the House of Representatives.
ALBERT VOORHIES,
Lieutenant Governor and President of the Senate.
Approved December 20, 1865.

J. MADISON WELLS,
Governor of the State of Louisiana.

A true copy:
J. H. Hardy,
Secretary of State.

---

No. 12.]                          AN ACT

To amend and re-enact the one hundred and twenty-first section of an act entitled "An Act relative to crimes and offences," approved March 14, 1855.

Section 1.  Be it enacted by the Senate and House of Representatives of the State of Louisiana in General Assembly convened, That

5-ER-1062

# THE CONSTITUTION, AS AMENDED,

AND

## ORDINANCES OF THE CONVENTION OF 1866,

TOGETHER WITH THE PROCLAMATION OF THE GOVERNOR DE-
CLARING THE RATIFICATION OF THE AMENDMENTS
TO THE CONSTITUTION,

AND THE

# GENERAL LAWS

OF THE

## REGULAR SESSION OF THE ELEVENTH LEGISLATURE

OF THE

### STATE OF TEXAS.

BY AUTHORITY.

AUSTIN:
PRINTED AT GAZETTE OFFICE, BY JO. WALKER, STATE PRINTER.
1866.

EXHIBIT 44 (McLean)

90                   GENERAL LAWS.

ported to and confirmed by the County Judge; and that this
Act take effect and be in force from and after its passage.
Approved November 5, 1866.

---

## CHAPTER XCI.

### An Act concerning Disorganized Counties.

SECTION 1.  Be it enacted by the Legislature of the State of
Texas, That all counties that have heretofore been legally or-
ganized, and that have lost their county organization by reason
of Indian incursions, or from any other cause, shall be, for all
judicial purposes, and for the registration of deeds, mortgages
and all other instruments that are now or may hereafter be re-
quired or allowed by law to be recorded, attached to the or-
ganized county, whose county seat is nearest the county seat of
such disorganized county, and so remain attached until such dis-
organized county shall again be legally organized.
SEC. 2.  That this Act take effect and be in force from and
after its passage.
Approved November 5, 1866.

---

## CHAPTER XCII.

### An Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizen without the consent of the owner.

SECTION 1.  Be it enacted by the Legislature of the State of
Texas, That it shall not be lawful for any person or persons to
carry fire-arms on the enclosed premises or plantation of any
citizen, without the consent of the owner or proprietor, other
than in the lawful discharge of a civil or military duty, and any
person or persons so offending shall be fined a sum not less than
one nor more than ten dollars, or imprisonment in the county jail
not less than one day nor more than ten days, or both, in the
discretion of the Court or jury before whom the trial is had.
Passed November 6, 1866.

5-ER-1064

# THE STATE OF OREGON.

# GENERAL AND SPECIAL LAWS

AND

## JOINT RESOLUTIONS AND MEMORIALS

PASSED AND ADOPTED BY THE

### SEVENTEENTH REGULAR SESSION,

## 1893.

Begun on the ninth day of January, A. D. 1893, and ended on the
eighteenth day of February thereof.



SALEM, OREGON:
FRANK C. BAKER, STATE PRINTER.
1893.

## EXHIBIT 45 (McLean)

GENERAL LAWS,                              79

of Multnomah. All acts and parts of acts in conflict with this act
are hereby repealed.

Section 2. The county court of Multnomah county, Oregon,
shall procure or cause to be procured properly attested copies of
the records of Clackamas county, Oregon, affecting the title to real
estate situated in the territory described in section one of this act,
and have the same recorded in the records of Multnomah county,
Oregon, and thereafter such records shall be recognized and become
a part of the official records of said Multnomah county, Oregon.

Filed in the office of the secretary of state, February 20, 1893.

AN ACT                              [ s. b. 15.]

To Prevent a Person from Trespassing upon any Enclosed Premises or Lands
not His Own Being Armed with a Gun, Pistol, or other Firearm, and to
Prevent Shooting upon or from the Public Highway.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. It shall be unlawful for any person, other than an
officer on lawful business, being armed with a gun, pistol, or other
firearm, to go or trespass upon any enclosed premises or lands with-
out the consent of the owner or possessor thereof.

Section 2. It shall be unlawful for any person to shoot upon or
from the public highways.

Section 3. It shall be unlawful for any person, being armed
with a gun or other firearm, to cause, permit, or suffer any dog,
accompanying such person, to go or enter upon any enclosed prem-
ises without the consent of the owner or possessor thereof; *provided,*
that this section shall not apply to dogs in pursuit of deer or var-
mints.

Section 4. Any person violating the provisions of this act shall
be deemed guilty of a misdemeanor, and upon conviction thereof
shall be punished by a fine not less than fifteen dollars nor more
than fifty dollars, and in default of the payment of the fine imposed
shall be committed to the county jail of the county in which the
offense is committed, one day for every two dollars of the said fine.

Section 5. Justices of the peace for the proper county shall have
jurisdiction of the trial of offenses herein defined.

Filed in the office of the secretary of state, February 20, 1893.

5-ER-1066

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, | Civil No. 1:23-cv-00265-LEK-WRP |
| | **CERTIFICATE OF SERVICE** |
| Plaintiffs, | |
| v. | |
| ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi; MAUI COUNTY, | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was

served electronically through the Court's CM/ECF system upon the following:

KEVIN GERARD O'GRADY
Law Office of Kevin O'Grady
1164 Bishop Street, Suite 1605
Honolulu, HI 96813
Phone: (808) 521-3367
E-mail: Kevin@KevinOGradyLaw.com

ALAN ALEXANDER BECK
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
Phone: (619) 905-9105
E-mail: Alan.alexander.beck@gmail.com

1

**5-ER-1067**

Attorneys for Plaintiffs JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION

DATED: Honolulu, Hawaiʻi, July 14, 2023.

*/s/ Nicholas M. McLean*

KALIKOʻONĀLANI D. FERNANDES
  Solicitor General
NICHOLAS M. MCLEAN
  First Deputy Solicitor General

NEAL K. KATYAL*
MARY B. MCCORD*
BEN GIFFORD*
RUPA BHATTACHARYYA*
DANA A. RAPHAEL*
  Special Deputy Attorneys General

*\* Pro Hac Vice Motions Pending*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi

2

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1136 Union Mall, Suite 808
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) Civil Action No. _____ |
| Plaintiffs, | ) ) ) |
| v. | ) MOTION FOR TEMPORARY ) RESTRAINING ORDER AND |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII. MAUI COUNTY, | ) PRELIMINARY INJUNCTION ) ) ) ) ) |
| Defendants. | ) ) |
| _____ | ) |

**Motion for Temporary Restraining Order and Preliminary Injunction**

5-ER-1069

Comes now the Plaintiffs Jason Wolford, Alison Wolford and Atom Kasprzycki pursuant to Rule 65 of the F.R.C.P. and moves this Court for a temporary restraining order and a preliminary injunction enjoining;

1.  H.R.S. §134-A (9) which prohibits carry in parks and beaches and their parking lots.

2. H.R.S. §134-A (4) to the extent it bans the carry of handguns in restaurants and their parking lots.

3. H.R.S. §134-A (12) prohibition on the carrying of handguns in banks, financial institutions and their parking lots.

4. H.R.S. §134-E which prohibits "[c]arrying or possessing a firearm on private property of another person without authorization" in its entirety.

5. H.R.S. §134-A (1) to the extent that duplicates the ban on carry challenged elsewhere in this lawsuit (e.g. the parking lot of parks, beaches and banks that have government buildings).

2

**5-ER-1070**

Dated: June 23, 2023.



Respectfully submitted,

*Counsel for Plaintiff*

/s/*Kevin Gerard O'Grady*
Kevin O'Grady

*/s/ Alan Beck*
Alan Alexander Beck

3

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | Civil Action No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII. MAUI COUNTY, | ) ) ) ) | RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| Defendants. | ) ) ) | |

## **Table of Contents**

I.   Introduction .......................................................................................... 1

II.  Statement of the Case ........................................................................... 2

III. Impact on Plaintiffs ............................................................................. 3

IV.  ARGUMENT ......................................................................................... 4

  A. Standard for a Temporary Restraining Order/Preliminary Injunction ............. 4

  B. Plaintiffs Have a Strong Likelihood of Success on the Merits ....................... 5

   1. Plaintiffs' conduct is covered by the Second Amendment's plain text ......... 6

   2. Controlling considerations under *Bruen* ....................................... 7

   3. H.R.S. §134-E Violates the Second Amendment ..................................... 14

   4. H.R.S. §134-E Requires Unconstitutional Compelled Speech ................... 18

   5. The Park and Beach Ban is Unconstitutional ..................................... 19

   6. Hawaii's Carry Ban in Restaurants That Serve Alcohol and Their Parking Lots is Unconstitutional ....................................................... 21

   7. Hawaii's Ban on Carry in Banks and Their Parking Lots is Unconstitutional 23

   8. Hawaii's Ban on the Carry in Government Parking Lots is Unconstitutional 23

V.   Plaintiffs Will Suffer Irreparable Harm .............................................................24

VI.   Granting the TRO/PI is in the Public Interest ................................................25

VII.   Conclusion .....................................................................................................25

**5-ER-1074**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205 (2013) .........21

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................7

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ....7

*Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700, at \*66 (N.D.N.Y. Nov. 7, 2022)(*"Antonyuk III"*) ................................................................ 22, 24

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017) .............23

*Christian v. Nigrelli*, 22-CV-695 (JLS), 2022 WL 17100631, at \*7 (W.D.N.Y. Nov. 22, 2022) ............................................................................. 9, 17, 18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .........................................8, 10

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ..........................27

*Elrod v. Burns*, 427 U.S. 347 (1976) .....................................................................26

*Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020) ...................11

*Ezell v. City of Chi.,* 651 F.3d 684. 700 (7th Cir. 2011) ..........................................27

*Fisher v. Kealoha,* 2012 U.S. Dist. LEXIS 90734, \*40, 2012 WL. .......................27

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ...................................................12

*Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220, at \*13 (W.D.N.Y. Nov. 3, 2022) ......................................................................................9

*Heller v. District of Columbia*, 670 F.3d 1224 (D.C. Cir. 2011) ....................... 13, 20

*Heller*, 554 U.S. at 614) ........................................................................14

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009)..............................27

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ..................................13

*Koons v. Attorney General of New Jersey*, Case No. 23-1900, Doc. 29, Order (3rd Cir.

    June 20, 2023) ..................................................................17

*Koons v. Platkin*, 22-CV-7463 (RMB/AMD), 2023 WL 3478604, at *62 (D.N.J.

    May 16, 2023) .................................................................. passim

*Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235 (D.N.J.

    May 16, 2023) ..................................................................16

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ...................................................13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................11

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ..................................26

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ..............................26

*Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120 (D. Idaho 2014), *appeal*

    *dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15, 2017) ....................................23

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)..................... passim

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361(2018) ....................21

*Nken v. Holder*, 556 U.S. 418, 433-34, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)

    ....................................................................................17

*People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158 (2018) ................................23

**5-ER-1076**

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005). ...........................................27

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ...............................................12

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ...........................................27

*Royal Inv. Grp., LLC v. Wang*, 183 Md.App. 406, 961 A.2d 665 (2008) ...............18

*Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp.3d 675 (N.D. Ill. 2021) .......23

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ...................................................12

*Tipple v. County of San Diego*, 2006 U.S. Dist. LEXIS 106905, *5-6 ....................7

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .................................27

*Virginia v. Moore*, 553 U.S. 164 (2008)....................................................12

*Winter v. Nat. Res. Def. Council, Inc*., 55 U.S. 7 (2008)..........................................7

*Worth v. Harrington,* 2023 WL 2745673 at *11 (D. Minn. Mar. 31, 2023) ........10, 11

*Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018).........................................4

*Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018).........................................3

## Statutes

H.R.S. § 134-9.................................................................................4

H.R.S. § 134-A (a)(1)..........................................................................26

H.R.S. §134-2....................................................................................4

H.R.S. §134-A....................................................................................22

H.R.S. §134-A (1) ..............................................................................5

H.R.S. §134-A (12) ..........................................................................5, 25

H.R.S. §134-A (4) ...................................................................................5

H.R.S. §134-A (9) ...................................................................................5

H.R.S. §134-A(4) ...................................................................................23

H.R.S. §134-E ................................................................................ passim

**Other Authorities**

https://en.wikipedia.org/wiki/BNY_Mellon#cite_ref-Globe2011_7-3 ...................25

https://www.aba.com/about-us/our-story/aba-history/1782

    1799#:~:text=Future%20Treasury%20Secretary%20Alexander%20Hamilton,ope

    rating%20today%20as%20BNY%20Mellon. .......................................25

Jenna Bridges, *Louisiana panel approves permitless concealed carry for adults*,

    4WWL CBS (May 17, 2023), https://bit.ly/430FSSS ............................5

*Permitless Carry States*, bit.ly/3OxbWJD (last accessed June 22, 2023) ................5

Wallack, Todd (December 20, 2011). "Which bank is the oldest? Accounts vary -

    The Boston Globe". The Boston Globe ...............................................25

**Treatises**

*'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for*

    *Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not*

    *1868*, SSRN, Oct. 1, 2022.......................................................................10

11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ...................................................................................................26

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021) ....22

Christine Sismondo, America Walks Into a Bar: A Spirited History of Taverns, Saloons, Speakeasies and Grog Shops 15 (Oxford 2011) ...................................24

Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020)...............19

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw.......10

OMRI BEN-SHAHAR & JOHN A. E. POTTOW, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651, 653 (2006) ......................................................................19

Philip J. Cook, et al., *Gun Control After* Heller, 56 U.C.L.A. L. Rev. 1041, 1082 (2009) ...................................................................................................................5

The Autobiography of Benjamin Franklin 148 (Smyth, ed., 1907) .......................24

*The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation......22

Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47, 48 (1961) ...................................................................................22

**Constitutional Provisions**

U.S. CONST. amend. III ....................................................................................8

U.S. CONST. amend. IV ....................................................................................8

**5-ER-1080**

## I.     Introduction

The Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142

S. Ct. 2111 (2022), compelled the State of Hawaii to issue permits to carry concealed

handguns. Prior to *Bruen*, carry permits were almost never granted. *See Young v.*

*Hawaii*, 896 F.3d 1044, 1071 n.21 (9th Cir. 2018) ("Hawaii counties appear to have

issued only *four* concealed carry licenses in the past *eighteen years. See* 2000 Haw.

Att'y Gen. Reps., *Firearm Registrations in Hawaii, 2000 et seq*;").  As a direct

response to *Bruen*, on June 2, 2023, the Governor of Hawaiʻi, signed Senate Bill

1230 into law as Act 52 ("SB 1230"). SB 1230 includes several provisions which

together ban the carrying of handguns in the vast majority of the State. These

provisions go into effect on July 1, 2023.

Plaintiffs are three Maui County residents who have been issued permits to

carry concealed handguns by the Maui County Police Department ("MPD") and

organizations that has members who possess such permits.  They challenge Hawaii's

prohibition on the carry of handguns in several areas they frequent. All would carry

handguns to defend themselves at those locations but for Hawaii law. To that end,

Plaintiffs seek a temporary restraining order and a preliminary injunction to enjoin

enforcement of SB1230's restrictions on carrying on private property open to the

public, beaches, parks, restaurants that are licensed to serve alcohol, banks, financial

institutions and the parking lots of all the aforementioned.

## II.    Statement of the Case

In Hawaii, carrying a handgun is generally prohibited.  Obtaining a handgun carry permit "acts as a limited exception to the State of Hawaii's "Place[s] to Keep" statutes, which generally require that gun owners keep their firearms at their "place of business, residence, or sojourn." H.R.S. §§ 134-23, 134-24, 134-25."" *Young v. Hawaii*, 896 F.3d 1044, 1048 (9th Cir. 2018). SB 1230 specifically targets permit holders and restricts where individuals—who have met Hawaii's background check and training requirements—are allowed to carry.

In Hawaii, handgun carry permits are issued by the county Chiefs of Police pursuant to H.R.S. § 134-9. Just to acquire a handgun in Hawaii, all gun owners are fingerprinted, thoroughly investigated by the police and are required to undergo training. H.R.S. §134-2.  Among other requirements, state law requires the county chiefs of police to promulgate additional standards to determinate that a carry permit applicant is "qualified to use the firearm in a safe manner" and "[a]ppear[s] to be a suitable person to be so licensed". *See* H.R.S. §134-9.  In Maui County, carry permit applicants must pass a shooting test to qualify for a carry permit. Complaint ¶ 31. Indeed, 27 States in the United States do not require a permit to carry in public.[1]

---

[1] Those States are Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming. *Permitless Carry States*, bit.ly/3OxbWJD (last accessed June 22, 2023) (listing these States with

Permit holders, nationwide, are disproportionately law-abiding. *See* Philip J. Cook, et al., *Gun Control After* Heller, 56 U.C.L.A. L. Rev. 1041, 1082 (2009). SB 1230 adds restrictions to where duly licensed individuals may carry a handgun.  Plaintiffs specifically challenge: 1. H.R.S. §134-A (9) which prohibits carry in parks and beaches and their parking lots; 2. H.R.S. §134-A (4) to the extent it bans the carry of handguns in restaurants and their parking lots; 3. H.R.S. §134-A (12) prohibition on the carrying of handguns in banks, financial institutions and their parking lots; 4. H.R.S. §134-E which prohibits "[c]arrying or possessing a firearm on private property of another person without authorization" in its entirety; 5. H.R.S. §134-A (1) to the extent that duplicates the ban on carry challenged elsewhere in this lawsuit (e.g. the parking lot of parks and beaches that have government buildings).

### III.     Impact on Plaintiffs

Each individual plaintiff has a valid concealed carry permit issued to them by the Maui County Police Department. Complaint ¶¶ 59, 60, 61. Associational plaintiff Hawaii Firearms Coalition has members who have been issued concealed carry permits in Maui and elsewhere in Hawaii. Complaint ¶ 4.

---

corresponding statutory citations). A 28th State, Louisiana, limits permitless carry to those with military service. *Id.* The legislature is currently considering expanding permitless carry to all adults. *See* Jenna Bridges, *Louisiana panel approves permitless concealed carry for adults*, 4WWL CBS (May 17, 2023), https://bit.ly/430FSSS.

Plaintiffs all regularly visit places within Maui County that are impacted by H.R.S. §134-E, parks, beaches, restaurants that serve alcohol, banks and the accompanying parking lots of all of the aforementioned. And but for the challenged laws would carry while visiting these locations within Maui County. Complaint ¶ ¶ 59, 60, 61. Plaintiff Kasprzycki is additionally burdened by H.R.S. §134-E because he is a private business owner who owns the property his business is located in which is open to the public. Complaint ¶ ¶ 62, 64, 66, 67. H.R.S. §134-E compels him to post a sign or otherwise share his view on firearm carry in order to allow others to carry on his property. That he is unwilling to do. Complaint ¶ 65. But for the challenged law, he would allow others to carry on his property. *Id*.

### IV.   ARGUMENT

#### A. Standard for a Temporary Restraining Order/Preliminary Injunction

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in favor of injunction; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 55 U.S. 7, 20 (2008)). Alternatively, an "injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the*

4

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted). The standard for issuing a temporary restraining order is the same as that for issuing a preliminary injunction. *Tipple v. County of San Diego*, 2006 U.S. Dist. LEXIS 106905, *5-6.

### B. Plaintiffs Have a Strong Likelihood of Success on the Merits

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129–30. It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127; *see also id.* at 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined.

### 1. Plaintiffs' conduct is covered by the Second Amendment's plain text

If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any distinction between locations at all. That makes the Second Amendment unlike other Amendments. *See* U.S. CONST. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). And it means that any locational restrictions on Second Amendment rights must come from history, not from the plain text.

The Supreme Court's binding determination of the meaning of these words and phrases definitively resolves the question of whether Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. Plaintiffs and their members are Americans who seek to carry bearable arms for self-defense. As in

6

*Bruen*, these undisputed facts end the textual inquiry: "the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." 142 S. Ct. at 2134. Accordingly, under *Bruen*'s unambiguous directions, "the burden falls on [the State] to show that [the challenged ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *see also Koons v. Platkin*, 22-CV-7463 (RMB/AMD), 2023 WL 3478604, at *62 (D.N.J. May 16, 2023); *Christian v. Nigrelli*, 22-CV-695 (JLS), 2022 WL 17100631, at *7 (W.D.N.Y. Nov. 22, 2022); *Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220, at *13 (W.D.N.Y. Nov. 3, 2022).

## 2. Controlling considerations under *Bruen*

The State bears a burden that it will not be able to meet for the challenged provisions because there is no historical tradition of analogous regulations that demonstrate these provisions are consistent with the Second Amendment. In *Bruen*, the Supreme Court set out several requirements to determine whether a tradition of historical regulations is sufficiently analogous to justify a modern restriction.

First, the relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135–36; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw. That is because "'[c]onstitutional rights are

**5-ER-1087**

enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S. Ct. at 2136, quoting *Heller*, 554 U.S. at 634–35. Although the Court in *Bruen* noted an academic debate surrounding whether courts should look to 1868 and Reconstruction (when the Fourteenth Amendment was adopted), the Court found no need to address the point as the result with respect to carry was the same. *Bruen*, 142 S. Ct. at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." (emphasis added)).

But there can be no doubt that the actual analysis of the Court is focused on l791. See *Worth v. Harrington,* 2023 WL 2745673 at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"). The Court noted that its past precedents had "assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137. The Court likewise stated that the courts should "guard against giving post-enactment history more weight than it can rightly bear." *Id.* at 2136. Justice Barrett, in her concurring opinion, stressed this point, noting that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill

8

of Rights." *Id.* at 2163 (Barrett, J., concurring). And the Court "made no small effort to distance itself from even *Heller's* reliance on post-enactment history except to the extent that such history was consistent with the founding era public meaning. *Worth*, 2023 WL 2745673 at *11, (citing *Bruen*, 142 S. Ct. at 2136–37). *Bruen*'s characterization of the Court's precedents as assuming that 1791 is the proper answer is an understatement. In *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), for example, the Court held that "more than *30*" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding Era practice. *Id.* at 2258–59 (emphasis added).

Second, *Bruen* reiterated that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137. In *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010), the Court decisively rejected a different standard for States under the Second Amendment, holding that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment" (internal quotation marks omitted). There should be no dispute that 1791 is controlling as to the federal government and, since the standard is the same, there can be no reasonable dispute that standard is likewise applicable to the States.

*Bruen* relied on two very recent decisions, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Timbs v. Indiana*, 139 S. Ct. 682 (2019), to illustrate the point. *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track" approach to incorporation. The relevant historical benchmark for the Court's analysis was 1791. *Ramos* 140 S. Ct. at 1396 (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791). Similarly, in *Timbs*, the Court held that the Excessive Fines provision of the Eighth Amendment was incorporated as against the States. 139 S. Ct. at 686–87. The Court once again looked to the scope of the right as it existed in 1791. *Id.* at 687–88 (discussing "colonial-era provisions" and the "constitutions of eight States"). The Court's other precedents are in accord. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). That this case challenges State-imposed restrictions and not federal law is thus irrelevant.

In all events, "to the extent later history contradicts" the text of the Second

5-ER-1090

Amendment, "the text controls." *Bruen*, 142 S. Ct. at 2137. "Thus, 'post-ratification

adoption or acceptance of laws that are inconsistent with the original meaning of the

constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137 (quoting

*Heller v. District of Columbia*, 670 F.3d 1224, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh,

J., dissenting)). Moreover, 20th century and late 19th century statutes and regulations

"cannot provide much insight into the meaning of the Second Amendment when it

contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 & n.28. Thus, restrictions on

the right to keep and bear arms dating after the Civil War and after the adoption of the

Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot

be used alone to provide the appropriate historical analogue required by *Bruen*. In other

words, only "enduring" and "well-established" restrictions with roots in the Founding

are relevant in assessing whether the challenged restrictions comport with the Second

Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar

of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Third, the historical analogues the State points to must be "representative."

Historical "outlier" requirements of a few jurisdictions or of territorial governments

are to be disregarded. *Bruen*, 142 S. Ct. at 2133, 2153, 2147 n.22 & 2156. This means

regulations from only a handful of states or those that cover only a small portion of the

population are not enough to demonstrate that modern regulations are consistent with

the Second Amendment. *Id.* at 2155 (rejecting regulations applying to only 1% of the

5-ER-1091

American population); *see also Koons*, 2023 WL 3478604 at \*78, \*85 (finding

regulations covering 10% and 15% of American population insufficient). *Buren* also

categorically rejected reliance on laws enacted in the Territories, including expressly

"Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are *most unlikely*

to reflect 'the origins and continuing significance of the Second Amendment' and we

do not consider them 'instructive.'" *Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 554

U.S. at 614) (emphasis added).

Fourth, the historical analogues must be "relevantly similar," which is to say

that they must burden ordinary, law-abiding citizens' right to carry for self-defense in

a similar manner and for similar reasons. *Bruen*, 142 S. Ct. at 2132. *Bruen* held that

the inquiry into whether an analogue is proper is controlled by two "metrics" of "how

and why" any restriction was historically imposed during the Founding era. *Id.* at 2133.

"[W]hether modern and historical regulations impose a comparable burden on the right

of armed self-defense and whether that burden is comparably justified are '*central*'

considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). For

example, poaching and hunting restrictions are thus generally insufficient to

demonstrate the constitutionality of a modern-day restriction that regulates carrying

firearms during day-to-day life. Both *how* hunting laws burdened the right to carry

firearms for self-defense (when hunting) and *why* they did so (to regulate hunting, to

reduce the taking of certain animals in certain places during certain seasons) have little

5-ER-1092

or nothing to do with restricting the right of self-defense in modern-day Hawaii. *See, e.g.*, *Koons*, 2023 WL 3478604 at *64–*65.

In attempting to "affirmatively prove" that its restrictions on public carry are consistent with the Nation's historical tradition, Hawaii may refer to historical analogues, such as restrictions on carrying in "sensitive places" at the Founding and claim those meet *Bruen*'s "how" and "why" standard. 142 S. Ct. at 2127, 2133. The Supreme Court has endorsed only three such places "where weapons were altogether prohibited," naming "legislative assemblies, polling places, and courthouses." *Id.* at 2133. While *Bruen* cites *Heller*'s suggestion that sensitive places may include "schools and government buildings," the Court focused on only "legislative assemblies, polling places, and courthouses" for purposes of conducting the inquiry into analogues. *Id.* The Court stated explicitly that "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). Accordingly, "sensitive places" cannot be construed "too broadly," *i.e.*, beyond what the historical tradition at the Founding demonstrates, and these certainly do not authorize restrictions that "would in effect exempt cities" or entire States "from the Second Amendment." *Id*. at 2134. Sensitive places may not be used to "eviscerate the general right to publicly carry arms for self-defense." *Id*. After all, governments may bar the carrying of firearms

5-ER-1093

in only "exceptional circumstances." *Id*. at 2145. The exception cannot become the rule.

Fifth, the historical analysis required by the Supreme Court is a legal inquiry that examines legal history, which is appropriately presented in briefs. *See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "*legal* questions" that judges can address) (emphasis in original); *see also id*. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend upon any of the factual questions raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court. With these analytical guideposts established by *Bruen*, the State cannot meet its burden to justify the challenged restrictions on carrying firearms.

### 3.    H.R.S. §134-E Violates the Second Amendment

H.R.S. §134-E is unconstitutional. It is important to note that a trial court in New Jersey recently enjoined a law virtually identical to Hawaii's *See Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235 (D.N.J. May 16, 2023) ("Koons II"). And the Third Circuit just refused to grant a motion to stay of that trial court's preliminary injunction as to New Jersey's version of H.R.S. §134-E. *See Koons v. Attorney General of New Jersey*, Case No. 23-1900, Doc. 29, Order (3rd Cir. June 20, 2023) ("Koons III") (attached). A party must show a likelihood of success on the merits to be granted a stay. *Nken v. Holder*, 556 U.S. 418, 433-34,

129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)). Thus, in denying New Jersey's motion, the Third Circuit has implicitly found the relevant law is likely unconstitutional.

SB 1230 enacts, for the first time in Hawaii's history, a presumption against carrying firearms in property open to the public. Hawaii will be unable to demonstrate that this new Anti-Carry Default "permissibly regulates the right to carry for self-defense in public." *Koons*, 2023 WL 3478604 at *68. The main reason is that the Anti-Carry Default is the *exact opposite* of this Nation's traditional regulatory approach, which has entrusted "private property owners" with principal responsibility to exercise the "right to exclude others from their property" throughout American history. *Christian*, 2022 WL 17100631 at *9. The historical default rule has been that "carrying on private property" is "generally permitted absent *the owner*'s prohibition." *Id.* (emphasis added).

This concept is basic to the law of trespass. "[T]he well-developed concept of implied license . . . operates to grant permission to enter another's premises according to custom or other indicia of consent." *Koons*, 2023 WL 3478604 at *58. As to property otherwise open to the public, "the public has the implied consent to enter, unless such consent is conditioned or subsequently revoked by the property owner." *Id*; *see also Royal Inv. Grp., LLC v. Wang*, 183 Md.App. 406, 961 A.2d 665, 688 (2008) ("Consent may be express or implied."). *Bruen* confirms that there is a "general right to publicly carry arms for self-defense." 142 S. Ct. at 2134. That

5-ER-1095

"general right" necessarily means that "[t]he right to armed self-defense follows the individual everywhere he or she lawfully goes" in public outside of the "exceptional circumstances" when a government may bar firearms. *Koons*, 2023 WL 3478604 at *61; *Bruen*, 142 S. Ct. at 2155. The right to carry for self-defense thus extends to private property open to the public, "presumptively," unless the owner affirmatively "withdraw[s] consent." *Koons*, 2023 WL 3478604 at *61. Plaintiffs here do not challenge that right of a private property owner. Given this basic and well-established premise of trespass law, the State will be unable to point to any relevant historical tradition of firearm regulation from the Founding suggesting otherwise. *See, e.g., Koons*, 2023 WL 3478604 at *68 (granting restraining order against New Jersey on a similar law); *Christian*, 2022 WL 17100631 at *9.

This is unsurprising as the academic proponents behind the Anti-Carry Default conceded that it would be novel and be a significant departure from this Nation's history of firearm regulation. In their book expanding on anti-carry default rules, the proponents stated that "[a]n implied condition of every invitation [onto another's property] is that the invitee is welcome to bring a firearm." *Koons*, 2023 WL 3478604 at *58 n.35. In fact, as of 2020, "*no state* ha[d] adopted generalized 'no carry' defaults for retail establishments." Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020) (emphasis added).

16

5-ER-1096

The reason Hawaii has sought to change the default rule is plain: "[g]iven the inertial tendency to stick with the status quo, lawmakers should expect that a 'prohibited-unless permitted' default would radically expand the private spaces where guns could not be carried." *Id.* After all, a "default rule" of interaction with strangers, i.e., members of the public coming to a property open to the public, is particularly "sticky." *See generally* OMRI BEN-SHAHAR & JOHN A. E. POTTOW, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651, 653 (2006), https://bit.ly/3pWXM6Y (last visited June 23, 2023). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the default rule *even when* they would otherwise take a different position. *Id.* at 651–54. Thus, Hawaii can expect many owners of property, who would otherwise allow or be indifferent to lawful carrying of firearms on their property, to simply stick with the new default. As they do so, the Anti-Carry Default "might have knockon effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." Ayres & Jonnalagadda, 48 J L. MED. & ETHICS at 184. This is likely for individual Plaintiffs, who have all declared that they would drastically reduce their carry for self-defense when the Anti-Carry Default goes into effect. Complaint at ¶¶ 59, 60, 61.

At bottom, Hawaii may have policy reasons that it seeks to change the default rule for carrying firearms in property open to the public as a means to stop

5-ER-1097

individuals from exercising their rights. But the Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Because of "this balance—struck by the traditions of the American people," *id*., — "certain policy choices" have been definitively taken "off the table," *Heller*, 554 U.S. at 636. Among these policy choices is establishing a presumption against carrying in buildings open to the public because the Second Amendment itself establishes a presumption that Plaintiffs and other licensed, law-abiding citizens have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. Hawaii may not flip a presumption codified in the Constitution. But that is exactly what Hawaii has done by dictating that all buildings open to the public are now presumptively off-limits without conspicuous signage or express consent. No historical analysis can support such a law.

### 4. H.R.S. §134-E Requires Unconstitutional Compelled Speech

The First Amendment prohibits the State from telling people what they must say. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *See also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 213 (2013). The private property sign or other form of consent requirement in H.R.S.

5-ER-1098

§134-E impermissibly compels the speech of property owners and lessees. It requires property owners and lessees to espouse a belief one way or the other on the carriage of firearms outside the home by requiring them to expressly consent or post a sign. Plaintiff Atom Kasprzycki owns an architecture business. He also owns sections of the building which his business is in. Complaint at ¶ 62. Plaintiff Kasprzycki would allow the carry of handguns on his property, but he does not want to have to post a sign on his property explicitly saying so or otherwise have to expressly give consent. Complaint at ¶ 63. Hawaii's requirement that he do so prior to allowing people to carry handguns on his property violates his First Amendment rights.

## 5. The Park and Beach Ban is Unconstitutional

There is nothing new about parks and beaches and there is nothing new about potential violence in parks or public green spaces set aside by the government generally. The carry ban in parks, beaches and their parking lots is unconstitutional. Boston Common is considered "America's oldest park" and was established in 1634. Not only was it commonly used for militia purposes (making it *not* a gun-free zone), "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021). In New York, City Hall Park began as a "public

5-ER-1099

common" in the 17th century. *The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation, available at https://on.nyc.gov/3hBZXfe (last visited June 23, 2022). New York's Bowling Green Park was established "for the Recreation & Delight of the Inhabitants of [New York] City" in 1733. *Id.* In the South, Savannah was planned around public squares—open green spaces which became the landscaped parks that residents know today. *See* Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47, 48 (1961) (noting Savannah's squares started initially as "open, unplanted plazas" and were "remodel[ed] . . . around 1800 . . . into landscaped neighborhood parks"). And of course, public beaches have always existed in the United States. Despite the existence of parks and beaches dating to the Founding, there is no relevantly similar historical tradition of banning firearms by ordinary, law-abiding citizens. Moreover, much of the land covered by H.R.S. §134-A are "vast expanses" of the great outdoors "where people are generally free to roam." *Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700, at *66 (N.D.N.Y. Nov. 7, 2022)(*"Antonyuk III"*). And the State will simply be unable to point to any historical tradition of banning firearms in the parks or beaches.

Even prior to *Bruen*, courts had rejected such locations as "sensitive places." *See*, *e.g*., *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) (holding that State parks and State forests were not "sensitive places" and that

the State's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158, 1176 (2018) (holding that an Illinois statute that banned the possession of a firearm within 1000 feet of a public park violated the Second Amendment, rejecting the argument that the area was a "sensitive" place); *Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120, 1123–25 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15, 2017), (rejecting the government's argument that U.S. Army Corps of Engineers' outdoor recreation sites were sensitive places); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp.3d 675, 690–96 (N.D. Ill. 2021) (finding a forest preserve district was not a "sensitive place").

### 6. Hawaii's Carry Ban in Restaurants That Serve Alcohol and Their Parking Lots is Unconstitutional

H.R.S. §134-A(4) also prohibits  the carry of handguns in locations licensed to sell or dispense alcohol, namely bars and restaurants as well as their parking lots. With this and its other location-specific prohibitions, Hawaii has made it doubly illegal to carry into such locations, first by prohibiting all carry of firearms into private property without express consent or signage and second, by banning carry in such places *regardless* of the owner's wishes. The State will be unable to support this restriction with historical evidence from the Founding.

It should be undisputed that "taverns, inns, public houses, 'tippling houses,' 'victualing houses,' or 'ordinaries'" existed during the Founding. *Antonyuk III,* 2022

**5-ER-1101**

WL 16744700 at *74. In fact, Benjamin Franklin engaged in "constant study" at a library that he founded to avoid the "amusement" that he would otherwise find "in taverns, games, or frolics of any kind." Benjamin Franklin, The Autobiography of Benjamin Franklin 148 (Smyth, ed., 1907). While Franklin sought to regulate his private habits, other members of the Founding generation sought to regulate these institutions by public means. "In all states" during the Founding era, "tavern legislation was involved and constantly changing." Christine Sismondo, America Walks Into a Bar: A Spirited History of Taverns, Saloons, Speakeasies and Grog Shops 15 (Oxford 2011). Nevertheless, we are unaware of any ban on mere possession of firearms in these places. The absence of any Founding era analogues is dispositive. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. And even if there were, there certainly were never regulations which prohibited the carry of firearms in the parking lot of a place that sold alcohol. Establishments licensed to serve alcohol have existed for centuries. Nevertheless, the State will be unable to demonstrate a historical tradition of "criminaliz[ing]" an ordinary, law-abiding citizen's "*mere* presence at those locations with a handgun." *Koons*, 2023 WL 3478604 at *86.

**5-ER-1102**

### 7.  Hawaii's Ban on Carry in Banks and Their Parking Lots is Unconstitutional

H.R.S. §134-A (12) bans the carry of handguns on the premises of any bank or financial institution including adjacent parking areas. Plaintiffs wish to carry both at their banks and in the parking lot of their banks. Banks have always existed in the United States. And historically, the government always allowed private banks to determine for themselves whether or not individuals could carry firearms there.  The first bank in the U.S. was the Bank of North America in Philadelphia, which was chartered by the Continental Congress in 1781; Alexander Hamilton, Thomas Jefferson and Benjamin Franklin were among its founding shareholders. Wallack, Todd (December 20, 2011). "Which bank is the oldest? Accounts vary - The Boston Globe". The Boston Globe.[2] In February 1784, The Massachusetts Bank in Boston was chartered. *Id.*[3] Thus, banks have existed in this country since the time of the Founding.  However, plaintiffs have not found any historical laws banning the carry of firearms at banks.   And there certainly were none in the parking lot of banks either.  Thus, this Court should find both the restriction on carry at banks and separately the ban on carry in their parking lots unconstitutional.

### 8.  Hawaii's Ban on the Carry in Government Parking Lots is Unconstitutional

---

[2] See also https://www.aba.com/about-us/our-story/aba-history/1782 1799#:~:text=Future%20Treasury%20Secretary%20Alexander%20Hamilton,opera ting%20today%20as%20BNY%20Mellon.

[3] *See also* https://en.wikipedia.org/wiki/BNY_Mellon#cite_ref-Globe2011_7-3

23

**5-ER-1103**

H.R.S. § 134-A (a)(1) bans the carry of handguns in any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas. Plaintiffs challenge the ban in government parking lots.  This law also prohibits the carry of handguns in the parking lots of several places Plaintiffs frequent in addition to the laws challenged above.  Complaint at ¶¶ 59, 60, 61. For all the reasons raised above, H.R.S. § 134-A (a)(1) is unconstitutional.

### V.   <u>Plaintiffs Will Suffer Irreparable Harm</u>

The remaining preliminary injunction factors follow readily. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The Ninth Circuit has imported the First Amendment "irreparable-if-only-for-a-minute" rule to other rights and, in doing so, has held deprivation of those rights is irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The Second Amendment should be treated no differently. *Ezell v. City of Chi.,* 651 F.3d 684. 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable and having no adequate

remedy at law."). This Court has found Second Amendment violations constitute irreparable harm. *Fisher v. Kealoha,* 2012 U.S. Dist. LEXIS 90734, *40, 2012 WL.

## VI.        Granting the TRO/PI is in the Public Interest

The last two preliminary injunction elements merge when the government is the defendant. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). As the Ninth Circuit has made clear, "all citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). The State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable . . . to allow the state . . . to violate the requirements of federal law." (citations omitted)). On the other hand, granting an injunction will end the ongoing violation of Plaintiff's rights.

## VII.   Conclusion

The motion should be granted.

Dated: June 23, 2023.

Respectfully submitted,

Counsel for Plaintiff

/s/*Kevin Gerard O'Grady*
Kevin O'Grady

*/s/ Alan Beck*
Alan Alexander Beck

26



# Exhibit 1

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

BCO-080-E

No. 23-1900

Ronald Koons; Nicholas Gaudio; Jeffrey M. Muller;
Gil Tal; Second Amendment Foundation, Inc.; Firearms Police Coalition, Inc.;
Coalition of New Jersey Firearm Owners; New Jersey Second Amendment Society

v.

Attorney General New Jersey and Superintendent New Jersey State Police

President of the New Jersey State Senate, Speaker of the New Jersey General Assembly,
Intervenors in District Court

(D.N.J. No. 1:22-cv-07464)

Aaron Siegel; Jason Cook; Joseph Deluca; Nicole Cuozzo;
Timothy Varga; Christopher Stamos; Kim Henry;
Association of New Jersey Rifle and Pistol Clubs, Inc.

v.

Attorney General New Jersey; Superintendent New Jersey State Police

President of the New Jersey State Senate; Speaker of the New Jersey General Assembly;
Intervenors in District Court

(D.N.J. No. 1:22-cv-07463)

Present: KRAUSE, PORTER, and CHUNG Circuit Judges

1. Emergency Motion for Stay Pending Appeal

2. Response by Siegel Plaintiffs-Appellees to Motion for Stay Pending Appeal

3. Response by Koons Plaintiffs-Appellees to Motion for Stay Pending Appeal

4. Reply in Support of Motion for Stay Pending Appeal

Respectfully,
Clerk/sb

**5-ER-1108**

_____ORDER_____
The Emergency Motion for Stay Pending Appeal is hereby GRANTED in part and
DENIED in part.  The requested stay is GRANTED as to the preliminary injunction of
N.J. Stat. Ann. §§ 2C:58-4.6(a)(6), (a)(9), (a)(10), (a)(12), (a)(15), (a)(17), (a)(18),
(a)(21), as we conclude the applicable factors warrant such a stay, *see In re Revel AC,
Inc.*, 802 F.3d 558, 568 (3d Cir. 2015).[1]  The requested stay is otherwise DENIED.

The Clerk's Office is instructed to issue an expedited briefing schedule forthwith.

<div style="text-align:right">

By the Court,

s/ Cheryl Ann Krause
Circuit Judge

</div>

Dated: June 20, 2023
SB/JK/cc:      All Counsel of Record

---

[1] Judge Porter dissents from this aspect of the order and would have denied the
Emergency Motion for Stay Pending Appeal.

<div style="text-align:right">

**5-ER-1109**

</div>

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No. _____ |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII. MAUI COUNTY, ) ) ) ) ) ) ) | |
| Defendants ) | |

<u>**DECLARATION OF ALAN BECK**</u>

**COMES NOW**, Alan Beck, and states as follows:

1. I am a natural person, an adult male, United States of America citizen, resident of the State of California and am competent to provide this declaration. I make this declaration based on personal knowledge, except where otherwise stated.

2. I am one of the attorneys representing the Plaintiffs in this matter.

3. On June 22, 2023, I emailed the following attorneys at the Hawaii Attorney General's office. Caron M. Inagaki, Esq, Robert Tadao Nakatsuji, Esq. and Nicholas Mclean Esq. I informed them that myself and my co-counsel Kevin O'Grady would be filing a temporary restraining order against certain provisions of SB 1230 later that day. A true and correct copy of that email is attached to this declaration.

4. On June 21, 2023, I called the Maui Department of the Corporation Counsel's main telephone line and spoke to their receptionist. I asked her to put me through to their litigation counsel. She was unable to do so because I did not have an open case with their office. I asked her to provide me with their litigation counsel's email. She said the only email she was able to provide me was their general email address. I found the names of Sonya Toma, Esq. and Victoria J. Takayesu, Esq. on the Maui Department of the

Corporation Counsel website as the contacts for that department. I found their email addresses on the Hawaii State Bar Website.

5. I have previously litigated cases against the State of Hawaii and Attorney General Lopez. And based upon that experience, I know the attorneys I emailed as described below are among the attorneys at the Hawaii Attorney General's Office that handle cases like the one at issue in this litigation.

6. On June 22, 2023, I emailed the following attorneys at the Maui Department of the Corporation Counsel, Sonya Toma and Victoria J. Takayesu as part of the same email as I used to contact the Attorney General's office. I also emailed the Maui Department of the Corporation Counsel general email address. I informed them that I would be filing a temporary restraining order later that day against SB 1230's sensitive places restrictions and I was giving them notice pursuant to Rule 65 of the F.R.C.P. A true and accurate copy of that email is attached to this declaration.

7. I also informed counsel for both Defendants that Kevin and I were in the process of finalizing the temporary restraining order and other associated documents.

8. I requested that both parties provide me with the email address of the correct person to send the documents to at their respective offices.

9. Later that day at 10:12 a.m. H.S.T., I called the Hawaii Attorney General's Office, Appellate Division and spoke to Mr. Nicholas Mclean, Esq. He confirmed receipt of the aforementioned email and we discussed the temporary restraining order that is about to be filed.  He requested that I send a copy of the temporary restraining order once it was finalized.

10. At 11:44 a.m. H.S.T. on June 22, 2023, Counsel for Attorney General Lopez, Nickolas Mclean, Esq., emailed me confirming receipt of my original email and told me to email him once the temporary restraining order and other documents were finalized.  A true and correct copy of that email is attached to this declaration.

11. On June 22, 2023, Counsel for the Department of the Corporation Counsel for the County of Maui, Thomas Kolbe, Esq., emailed me and confirmed receipt of the email I sent to Victoria J. Takayesu and Sonya Toma. He requested that I copy him and Victoria J. Takayesu on future email communications and to email a copy of the filed temporary restraining order and other documents.  A true and correct copy of that email is attached to this declaration.

12. On June 23, 2023 I emailed Nicholas Mclean, Victoria Takayesu and Thomas Kolbe the finalized complaint, temporary restraining order and other associated documents. A true and correct copy of that email is attached to this declaration.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on June 23, 2023.

<u>s/Alan Beck</u>

Alan Beck

| From: | Alan Beck |
|---|---|
| To: | Paralegal 1; Kevin O"Grady |
| Subject: | Fwd: [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP |
| Date: | Thursday, June 22, 2023 11:12:13 PM |

---------- Forwarded message ---------
From: **Thomas Kolbe** <Thomas.Kolbe@co.maui.hi.us>
Date: Thu, Jun 22, 2023 at 6:51 PM
Subject: RE: [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP
To: Victoria Takayesu-hamilton <Victoria.Takayesu-hamilton@co.maui.hi.us>,
<alan.alexander.beck@gmail.com>
Cc: corpcoun <corpcoun@co.maui.hi.us>


HI Alan, for now, please respond to both Victoria (Tori) and me.  I did not see any
attachments to your email and understood that it was just a notice that the TRO filing would
be forthcoming.  If we are missing something, please resend.  thanks


**From:** Alan Beck <alan.alexander.beck@gmail.com>
**Sent:** Thursday, June 22, 2023 3:41 PM
**To:** Victoria Takayesu-hamilton <Victoria.Takayesu-hamilton@co.maui.hi.us>
**Cc:** Thomas Kolbe <Thomas.Kolbe@co.maui.hi.us>; corpcoun corpcoun
<corpcoun@co.maui.hi.us>; Caron.M.Inagaki@hawaii.gov; nicholas.mclean@hawaii.gov;
Robert.T.Nakatsuji@hawaii.gov; kevin@kevinogradylaw.com
**Subject:** Re: [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP


Dear Victoria.


Since you responded, unless corrected, I will assume you are the correct person to send the
TRO to.  Thank you for your response. However, I did notice that the email was blank.  Did
something get omitted?


-Alan


On Thu, Jun 22, 2023 at 6:35 PM Victoria Takayesu-hamilton <Victoria.Takayesu-
hamilton@co.maui.hi.us> wrote:

**5-ER-1115**

Victoria J. Takayesu

Corporation Counsel

Department of the Corporation Counsel

200 S. High Street

Wailuku, HI 96793

Ph. (808) 270-7740

Fax: (808) 270-7152

email: victoria.takayesu-hamilton@co.maui.hi.us

This message is covered by the Electronic Communications Privacy Act, Title 18, United States Code, 2510-2521. This e-mail and any attached files are deemed privileged and confidential, and are intended solely for the use of the individual(s) or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or believe that you have received this message in error, please delete this e-mail and any attached files from all locations in your computer, server, network, etc. and notify the sender IMMEDIATELY at (808) 270-7582. Any other re-creation, dissemination, forwarding or copying of this e-mail and any attached files is strictly prohibited and may be unlawful. Receipt to anyone other than the named recipient(s) is not a waiver of any attorney-client, work product, or other applicable privilege.

E-mail is an informal method of communication and is subject to possible data corruption, either accidentally or intentionally. Therefore, it is normally inappropriate to rely on legal advice contained in an e-mail without obtaining further confirmation of said advice.

**From:** McLean, Nicholas <nicholas.mclean@hawaii.gov>
**Sent:** Thursday, June 22, 2023 11:45 AM
**To:** Sonya Toma <Sonya.H.Toma@co.maui.hi.us>; Victoria Takayesu-hamilton <Victoria.Takayesu-hamilton@co.maui.hi.us>; CORPCOUN@mauicounty.gov corpcoun <corpcoun@co.maui.hi.us>; Alan Beck <alan.alexander.beck@gmail.com>; Caron M Inagaki <Caron.M.Inagaki@hawaii.gov>; Robert T Nakatsuji <Robert.T.Nakatsuji@hawaii.gov>; Kevin O'Grady <kevin@kevinogradylaw.com>
**Subject:** RE: [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP

Hi Alan,


Thank you for letting us know.  We acknowledge receipt of your email.  As we discussed, please send a courtesy copy of any filings to me by email.


Please don't hesitate to reach out if you have any questions.


Best regards,

Nick



**Nicholas M. McLean**

First Deputy Solicitor General

Department of the Attorney General | Ka 'Oihana O Ka Loio Kuhina

State of Hawai'i

Phone: 808.586.1360

Email:  nicholas.mclean@hawaii.gov


Confidentiality Notice:  This email message (and any attachments) is for the sole use of the intended recipient(s). It may contain confidential and/or privileged information. It might also be protected from disclosure under the Hawai'i Uniform Information Practices Act (UIPA) or other laws or regulations. Any review, use, disclosure, or distribution by unintended recipients is prohibited.  If you are not the intended recipient, please contact the sender immediately in a separate e-mail and destroy the original message and any copies.


---

**From:** Alan Beck <alan.alexander.beck@gmail.com>
**Sent:** Thursday, June 22, 2023 4:18 AM
**To:** Inagaki, Caron M <Caron.M.Inagaki@hawaii.gov>; Nakatsuji, Robert T <Robert.T.Nakatsuji@hawaii.gov>; McLean, Nicholas <nicholas.mclean@hawaii.gov>; Sonya.h.toma@co.maui.hi.us; Victoria.Takayesu-hamilton@co.maui.hi.us; CORPCOUN@mauicounty.gov; Kevin O'Grady <kevin@kevinogradylaw.com>

**Subject:** [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP

Dear Counsel for Attorney General Lopez and the County of Maui;

Rule 65 of the Federal Rules of Civil Procedure requires that I give my opposing counsel notice prior to filing a temporary restraining order. Myself and Attorney Kevn O'Grady represent several residents of Maui who will be impacted by SB 1230's implementation on July 1st, 2023. Kevin and I plan on filing a restraining order against certain parts of SB 1230's sensitive places law later today. We are in the process of finalizing the motion and various associated documents. Once they are finalized, who should I send them to for Attorney General Lopez? And who should I send them to for the County of Maui?

Respectfully,

-Alan

| From: | Alan Beck |
|---|---|
| To: | Paralegal 1; Kevin O'Grady |
| Subject: | Fwd: [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP |
| Date: | Thursday, June 22, 2023 11:45:26 AM |

---------- Forwarded message ---------
From: **McLean, Nicholas** <nicholas.mclean@hawaii.gov>
Date: Thu, Jun 22, 2023 at 2:44 PM
Subject: RE: [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP
To: Alan Beck <alan.alexander.beck@gmail.com>, Inagaki, Caron M
<Caron.M.Inagaki@hawaii.gov>, Nakatsuji, Robert T <Robert.T.Nakatsuji@hawaii.gov>,
Sonya.h.toma@co.maui.hi.us <Sonya.h.toma@co.maui.hi.us>, Victoria.Takayesu-
hamilton@co.maui.hi.us <Victoria.Takayesu-hamilton@co.maui.hi.us>,
CORPCOUN@mauicounty.gov <CORPCOUN@mauicounty.gov>, Kevin O'Grady
<kevin@kevinogradylaw.com>

Hi Alan,

Thank you for letting us know.  We acknowledge receipt of your email.  As we discussed,
please send a courtesy copy of any filings to me by email.

Please don't hesitate to reach out if you have any questions.

Best regards,

Nick

**Nicholas M. McLean**

First Deputy Solicitor General

Department of the Attorney General | Ka ʻOihana O Ka Loio Kuhina

State of Hawaiʻi

Phone: 808.586.1360

Email:  nicholas.mclean@hawaii.gov

**5-ER-1119**

Confidentiality Notice: This email message (and any attachments) is for the sole use of the intended recipient(s). It may contain confidential and/or privileged information. It might also be protected from disclosure under the Hawaiʻi Uniform Information Practices Act (UIPA) or other laws or regulations. Any review, use, disclosure, or distribution by unintended recipients is prohibited.  If you are not the intended recipient, please contact the sender immediately in a separate e-mail and destroy the original message and any copies.

**From:** Alan Beck <alan.alexander.beck@gmail.com>
**Sent:** Thursday, June 22, 2023 4:18 AM
**To:** Inagaki, Caron M <Caron.M.Inagaki@hawaii.gov>; Nakatsuji, Robert T <Robert.T.Nakatsuji@hawaii.gov>; McLean, Nicholas <nicholas.mclean@hawaii.gov>; Sonya.h.toma@co.maui.hi.us; Victoria.Takayesu-hamilton@co.maui.hi.us; CORPCOUN@mauicounty.gov; Kevin O'Grady <kevin@kevinogradylaw.com>
**Subject:** [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP

Dear Counsel for Attorney General Lopez and the County of Maui;

Rule 65 of the Federal Rules of Civil Procedure requires that I give my opposing counsel notice prior to filing a temporary restraining order.  Myself and Attorney Kevn O'Grady represent several residents of Maui who will be impacted by SB 1230's implementation on July 1st, 2023.  Kevin and I plan on filing a restraining order against certain parts of SB 1230's sensitive places law later today.  We are in the process of finalizing the motion and various associated documents.  Once they are finalized, who should I send them to for Attorney General Lopez?  And who should I send them to for the County of Maui?

Respectfully,

-Alan



Alan Beck <alan.alexander.beck@gmail.com>

---

## Notice of TRO Pursuant to Rule 65 of FRCP
1 message

**Alan Beck** <alan.alexander.beck@gmail.com>                               Thu, Jun 22, 2023 at 7:18 AM
To: "Inagaki, Caron M" <Caron.M.Inagaki@hawaii.gov>, "Nakatsuji, Robert T" <Robert.t.nakatsuji@hawaii.gov>, "McLean, Nicholas" <Nicholas.mclean@hawaii.gov>, Sonya.h.toma@co.maui.hi.us, Victoria.Takayesu-hamilton@co.maui.hi.us, CORPCOUN@mauicounty.gov, Kevin O'Grady <kevin@kevinogradylaw.com>

Dear Counsel for Attorney General Lopez and the County of Maui;

Rule 65 of the Federal Rules of Civil Procedure requires that I give my opposing counsel notice prior to filing a temporary restraining order.  Myself and Attorney Kevn O'Grady represent several residents of Maui who will be impacted by SB 1230's implementation on July 1st, 2023.  Kevin and I plan on filing a restraining order against certain parts of SB 1230's sensitive places law later today.  We are in the process of finalizing the motion and various associated documents.  Once they are finalized, who should I send them to for Attorney General Lopez?  And who should I send them to for the County of Maui?

Respectfully,

-Alan

 Gmail

**Alan Beck <alan.alexander.beck@gmail.com>**

## Notice of TRO Pursuant to Rule 65 of FRCP

**Thomas Kolbe** <Thomas.Kolbe@co.maui.hi.us>                              Thu, Jun 22, 2023 at 6:41 PM
To: corpcoun <corpcoun@co.maui.hi.us>, Sonya Toma <Sonya.H.Toma@co.maui.hi.us>, Victoria Takayesu-hamilton
<Victoria.Takayesu-hamilton@co.maui.hi.us>, alan.alexander.beck@gmail.com, Caron.M.Inagaki@hawaii.gov,
nicholas.mclean@hawaii.gov, Robert.T.Nakatsuji@hawaii.gov, kevin@kevinogradylaw.com
Cc: Candace Stahl <Candace.Stahl@co.maui.hi.us>, Michele White <Michele.White@co.maui.hi.us>, Tabitha Martins
<Tabitha.Martins@co.maui.hi.us>

Alan, the County also acknowledges your email and likewise would appreciate courtesy copies of any filings via email.
Thank you, tom.

---

**From:** McLean, Nicholas <nicholas.mclean@hawaii.gov>
**Sent:** Thursday, June 22, 2023 11:44 AM
**To:** CORPCOUN@mauicounty.gov corpcoun <corpcoun@co.maui.hi.us>; Kevin O'Grady <kevin@kevinogradylaw.com>;
Victoria Takayesu-hamilton <Victoria.Takayesu-hamilton@co.maui.hi.us>; Sonya Toma <Sonya.H.Toma@co.maui.hi.us>;
Robert T Nakatsuji <Robert.T.Nakatsuji@hawaii.gov>; Caron M Inagaki <Caron.M.Inagaki@hawaii.gov>; Alan Beck
<alan.alexander.beck@gmail.com>
**Subject:** RE: [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP

Hi Alan,

Thank you for letting us know.  We acknowledge receipt of your email.  As we discussed, please send a courtesy copy of
any filings to me by email.

Please don't hesitate to reach out if you have any questions.

Best regards,

Nick

**Nicholas M. McLean**

First Deputy Solicitor General

Department of the Attorney General | Ka ʻOihana O Ka Loio Kuhina

State of Hawaiʻi

Phone: 808.586.1360

Email:  nicholas.mclean@hawaii.gov

Confidentiality Notice: This email message (and any attachments) is for the sole use of the intended recipient(s). It may contain confidential and/or privileged information. It might also be protected from disclosure under the Hawai'i Uniform Information Practices Act (UIPA) or other laws or regulations. Any review, use, disclosure, or distribution by unintended recipients is prohibited. If you are not the intended recipient, please contact the sender immediately in a separate e-mail and destroy the original message and any copies.

**From:** Alan Beck <alan.alexander.beck@gmail.com>
**Sent:** Thursday, June 22, 2023 4:18 AM
**To:** Inagaki, Caron M <Caron.M.Inagaki@hawaii.gov>; Nakatsuji, Robert T <Robert.T.Nakatsuji@hawaii.gov>; McLean, Nicholas <nicholas.mclean@hawaii.gov>; Sonya.h.toma@co.maui.hi.us; Victoria.Takayesu-hamilton@co.maui.hi.us; CORPCOUN@mauicounty.gov; Kevin O'Grady <kevin@kevinogradylaw.com>
**Subject:** [EXTERNAL] Notice of TRO Pursuant to Rule 65 of FRCP

Dear Counsel for Attorney General Lopez and the County of Maui;

Rule 65 of the Federal Rules of Civil Procedure requires that I give my opposing counsel notice prior to filing a temporary restraining order. Myself and Attorney Kevn O'Grady represent several residents of Maui who will be impacted by SB 1230's implementation on July 1st, 2023. Kevin and I plan on filing a restraining order against certain parts of SB 1230's sensitive places law later today. We are in the process of finalizing the motion and various associated documents. Once they are finalized, who should I send them to for Attorney General Lopez? And who should I send them to for the County of Maui?

Respectfully,

-Alan

| | |
|---|---|
| **From:** | Alan Beck |
| **To:** | Victoria Takayesu-hamilton; Thomas Kolbe; Kevin O'Grady; Paralegal 1 |
| **Subject:** | Fwd: Sb1230 First lawsuit Wolford COMPLAINT etc NO EXH Email 1 |
| **Date:** | Friday, June 23, 2023 10:51:13 AM |
| **Attachments:** | sb 1230 complaint FINAL w VERS.pdf |
| | SB1230 First lawsuit Civil Cover sheet 22Jun23.pdf |
| | Summons AG.pdf |
| | Summons Maui.pdf |

This is the 1st of several emails that contains the finalized documents we will be filing shortly.

--------- Forwarded message ---------
From: **Kevin O'Grady** <kevin@kevinogradylaw.com>
Date: Fri, Jun 23, 2023 at 1:15 PM
Subject: Sb1230 First lawsuit Wolford COMPLAINT etc NO EXH Email 1
To: Alan Beck <alan.alexander.beck@gmail.com>, Paralegal 1
<paralegal1@kevinogradylaw.com>, Kevin O'Grady <kevin@kevinogradylaw.com>

Respectfully,

Kevin O'Grady, Esquire

The Law Office of Kevin O'Grady, LLC

1164 Bishop Street

Suite 1605

Honolulu, Hawaii 96813

Telephone 808-521-3367

800-DUI-CASE

Facsimile 808-521-3369

WWW.KevinOGradyLaw.Com

U.S. Law Shield Attorney- Hawaii

Member –

United States Supreme Court

United States Court of Appeals for the Ninth Circuit

United States District Court for the Northern District of Texas

United States District Court for the District of Hawaii

Hawaii State Bar Association

National Association of Criminal Defense Lawyers

Hawaii Association of Criminal Defense Lawyers

National College For DUI Defense

American Council of Second Amendment Lawyers

| From: | Alan Beck |
|---|---|
| To: | Thomas Kothe; Victoria Takayesu-hamilton; McLean, Nicholas; Paralegal 1; Kevin O'Grady |
| Subject: | Fwd: SB1230 First Lawsuit Wolford Complaint Exhibits A |
| Date: | Friday, June 23, 2023 10:51:37 AM |
| Attachments: | EXh 1.pdf |
| | Exh 2.pdf |
| | Exh 3.pdf |
| | EXH 4 FINAL.pdf |

this is the second email with filings

---------- Forwarded message ---------
From: **Kevin O'Grady** <kevin@kevinogradylaw.com>
Date: Fri, Jun 23, 2023 at 1:20 PM
Subject: SB1230 First Lawsuit Wolford Complaint Exhibits A
To: Alan Beck <alan.alexander.beck@gmail.com>, Paralegal 1
<paralegal1@kevinogradylaw.com>, Kevin O'Grady <kevin@kevinogradylaw.com>

Respectfully,

Kevin O'Grady, Esquire

The Law Office of Kevin O'Grady, LLC

1164 Bishop Street

Suite 1605

Honolulu, Hawaii 96813

Telephone 808-521-3367

800-DUI-CASE

Facsimile 808-521-3369

WWW.KevinOGradyLaw.Com

U.S. Law Shield Attorney- Hawaii

Member –

United States Supreme Court

United States Court of Appeals for the Ninth Circuit

United States District Court for the Northern District of Texas

United States District Court for the District of Hawaii

Hawaii State Bar Association

National Association of Criminal Defense Lawyers

Hawaii Association of Criminal Defense Lawyers

National College For DUI Defense

American Council of Second Amendment Lawyers

| From: | Alan Beck |
|-------|-----------|
| To: | Thomas Kolbe; McLean, Nicholas; Victoria Takayesu-hamilton; Paralegal 1; Paralegal 2 |
| Subject: | Fwd: Sb12330 First Lawsuit Wolford Complaint exhibits 2 |
| Date: | Friday, June 23, 2023 10:51:23 AM |
| Attachments: | Exh 5.pdf |
| | Exh 7.pdf |
| | exhibit 6 finalb.pdf |
| | HIFICO DEC FINAL w sig.pdf |

third email with filings

---------- Forwarded message ---------
From: **Kevin O'Grady** <kevin@kevinogradylaw.com>
Date: Fri, Jun 23, 2023 at 1:45 PM
Subject: Sb12330 First Lawsuit Wolford Complaint exhibits 2
To: Paralegal 1 <paralegal1@kevinogradylaw.com>, Alan Beck
<alan.alexander.beck@gmail.com>, Kevin O'Grady <kevin@kevinogradylaw.com>

Respectfully,

Kevin O'Grady, Esquire

The Law Office of Kevin O'Grady, LLC

1164 Bishop Street

Suite 1605

Honolulu, Hawaii 96813

Telephone 808-521-3367

800-DUI-CASE

Facsimile 808-521-3369

WWW.KevinOGradyLaw.Com

U.S. Law Shield Attorney- Hawaii

Member –

United States Supreme Court

United States Court of Appeals for the Ninth Circuit

United States District Court for the Northern District of Texas

United States District Court for the District of Hawaii

Hawaii State Bar Association

National Association of Criminal Defense Lawyers

Hawaii Association of Criminal Defense Lawyers

National College For DUI Defense

American Council of Second Amendment Lawyers

| From: | Alan Beck |
|---|---|
| To: | McLean, Nicholas; Thomas Kolbe; Victoria Takayesu-hamilton; Paralegal 1; Kevin O'Grady |
| Subject: | Fwd: SB1230 First Lawsuit Wolford TRO (a) |
| Date: | Friday, June 23, 2023 10:51:31 AM |
| Attachments: | Koons Stay order.pdf |
| | SB1230 PMTfj for TRO+PINJ 23 Jun 23.pdf |
| | SB1230 TRO COS 23Jun23.pdf |
| | SB1230 TRO Final draft TC TA AB 22 Jun 23.pdf |

5th email with filings

---------- Forwarded message ---------
From: **Kevin O'Grady** <kevin@kevinogradylaw.com>
Date: Fri, Jun 23, 2023 at 1:47 PM
Subject: SB1230 First Lawsuit Wolford TRO (a)
To: Alan Beck <alan.alexander.beck@gmail.com>, Paralegal 1
<paralegal1@kevinogradylaw.com>, Kevin O'Grady <kevin@kevinogradylaw.com>

Respectfully,

Kevin O'Grady, Esquire

The Law Office of Kevin O'Grady, LLC

1164 Bishop Street

Suite 1605

Honolulu, Hawaii 96813

Telephone 808-521-3367

800-DUI-CASE

Facsimile 808-521-3369

WWW.KevinOGradyLaw.Com

U.S. Law Shield Attorney- Hawaii

Member –

United States Supreme Court

United States Court of Appeals for the Ninth Circuit

United States District Court for the Northern District of Texas

United States District Court for the District of Hawaii

Hawaii State Bar Association

National Association of Criminal Defense Lawyers

Hawaii Association of Criminal Defense Lawyers

National College For DUI Defense

American Council of Second Amendment Lawyers

| | |
|---|---|
| **From:** | Alan Beck |
| **To:** | Thomas Kolbe; McLean, Nicholas; Victoria Takayesu-hamilton; Paralegal 1; Kevin O'Grady |
| **Subject:** | Fwd: SB1230 First lawsuit Wolford TRO Decl |
| **Date:** | Friday, June 23, 2023 10:51:36 AM |
| **Attachments:** | EM frm Maui ack.pdf |
| | EM from Mclean response to ntc tro.pdf |
| | EM to Maui+AG Alert them of TRO.pdf |
| | Wolford Maui email for Declaration.pdf |
| | wolford SB1230 AB dec updated for TRO 23 Jun 23.pdf |

6th and final email with filings

--------- Forwarded message ---------
From: **Kevin O'Grady** <kevin@kevinogradylaw.com>
Date: Fri, Jun 23, 2023 at 1:48 PM
Subject: SB1230 First lawsuit Wolford TRO Decl
To: Alan Beck <alan.alexander.beck@gmail.com>, Paralegal 1
<paralegal1@kevinogradylaw.com>, Kevin O'Grady <kevin@kevinogradylaw.com>

Respectfully,

Kevin O'Grady, Esquire

The Law Office of Kevin O'Grady, LLC

1164 Bishop Street

Suite 1605

Honolulu, Hawaii 96813

Telephone 808-521-3367

800-DUI-CASE

Facsimile 808-521-3369

WWW.KevinOGradyLaw.Com

U.S. Law Shield Attorney- Hawaii

Member –

United States Supreme Court

United States Court of Appeals for the Ninth Circuit

United States District Court for the Northern District of Texas

United States District Court for the District of Hawaii

Hawaii State Bar Association

National Association of Criminal Defense Lawyers

Hawaii Association of Criminal Defense Lawyers

National College For DUI Defense

American Council of Second Amendment Lawyers

| From: | Alan Beck |
|---|---|
| To: | Thomas Kothe; McLean, Nicholas; Victoria Takayesu-hamilton; Paralegal 1; Kevin O'Grady |
| Subject: | there are only 5 emails total |
| Date: | Friday, June 23, 2023 11:38:07 AM |

My apologies.  I labeled the emails incorrectly.  The emails labeled I called the 5th and 6th emails are actually the 4th and 5th emails.  There are only 5 emails total.  You have all the finalized documents.

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1136 Union Mall, Suite 808
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | Civil Action No. _____ |
| Plaintiffs, | ) ) ) | CERTIFICATE OF SERVICE |
| v. | ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII. MAUI COUNTY, | ) ) ) ) ) | Judge: N/A Trial: N/A Hearing: N/A |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

5-ER-1135

I hereby certify that on the date noted below, the foregoing document was filed with this Court's ECF system, which generated a notice of filing, and a true and correct copy of the foregoing Motion, Memorandum in Support and Certificate of Service was emailed to the following counsel for Defendants:

CARON M. INAGAKI, ESQ.
ROBERT TADAO NAKATSUJI, ESQ.
NICHOLAS MCLEAN Esq
Deputy Attorneys General
Department of the Attorney
General, State of Hawaii
425 Queen Street
Honolulu, HI  96813
Email:       Caron.M.Inagaki@hawaii.gov
             Robert.t.nakatsuji@hawaii.gov
             Nicholas.mclean@hawaii.gov

THOMAS KOLBE
VICTORIA J. TAKAYESU
Maui Corporation Counsel
200 S High St, Wailuku, HI
96793
Email:       Thomas.Kolbe@co.maui.hi.us
             Victoria.Takayesu-
             hamilton@co.maui.hi.us

Dated: June 23, 2023.

Respectfully submitted,

*Counsel for Plaintiff*

/s/*Kevin Gerard O'Grady*
Kevin O'Grady

*/s/ Alan Beck*
Alan Alexander Beck

**5-ER-1136**

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, MAUI COUNTY | ) ) ) ) ) | |
| Defendants | ) ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, and HAWAII FIREARMS COALITION, by and through their undersigned counsel, and complains of the Defendants as follows:

## I

## PARTIES

**Plaintiffs**

1.  Plaintiff Jason Wolford (Jason Wolford) is a natural person, an adult male resident of the State of Hawaii and resides in Maui County and is a citizen of the United States. But for the laws challenged in this lawsuit, he would carry in all the places discussed in this lawsuit;

2.  Plaintiff Alison Wolford (Alison Wolford) is a natural person, an adult female resident of the State of Hawaii and resides in Maui County and is a citizen of the United States. But for the laws challenged in this lawsuit, she would carry in all the places discussed in this lawsuit;

3.  Plaintiff Atom Kasprzycki (Kasprzycki) is a natural person, an adult male resident of the State of Hawaii and resides in Maui county and is a citizen of the United States. But for the laws challenged in this lawsuit, he would carry in all the places discussed in this lawsuit;

4.  Plaintiff Hawaii Firearms Coalition (HIFICO) is a member

**5-ER-1138**

driven organization incorporated under the laws of the State of Hawaii with

its principal place of business in Honolulu, Hawaii, Hawaii Firearms

Coalition promotes legislative and legal action, as well as research,

publishing, and advocacy, in support of people's civil liberties.  Hawaii

Firearms Coalition litigates firearm-regulation cases, and it has consistently

advocated for a principled interpretation of the United States Constitution to

prevent government from violating the basic civil rights of its citizens.

Members of HFC have provided informed analysis in a variety of firearm

related cases, including *Roberts vs. City and County of Honolulu*, Civ. No.

15-00467 ACK-RLP, and *Roberts vs. Ballard*, et al., Civ. No. 18-00125.

HIFICO has over 416 members in Hawaii.  HIFICO has 33 members in

Maui and all the other Hawaiian Counties with valid concealed carry

permits. But for the laws challenged within this lawsuit, they would carry in

the challenged provisions. HIFICO brings this action on behalf of those

members with a Hawaii concealed carry permit, from any county, including

the named Plaintiffs herein;


**Defendants**

5.  Defendant Anne E. Lopez is the Attorney General of the State of Hawaii

("State") and is sued in her official capacity and is responsible for enforcing

the State of Hawaii's customs, policies, practices and laws related to the State of Hawaii on the acquisition, possession, registration, carrying of weapons openly and concealed, and criminal laws including those related to the carrying and use of firearms and private properties allowing or disallowing the carriage of arms. Defendant Lopez may be served at the Office of Attorney General located at 425 Queen St, Honolulu, Hawaii 96813;

6.  Defendant County of Maui ("County") is a municipal corporation incorporated under the laws of the State of Hawaii. The County is authorized by law to control and maintain the Maui Police Department, an agency of the County, who acts on the County's behalf in the area of law enforcement. Maui county also employs County Deputy prosecuting Attorneys who are responsible for initiating, through penal summons, law enforcement officer initiated tickets and citations, complaints, informations, and indictments, criminal charges against persons and entities.  The County is therefore ultimately responsible for Maui Police Department ("MPD"), and the Maui County Prosecutor's Office and their actions, and therefore, must assume the risks incidental to the maintenance of MPD, and the County Prosecuting Attorney's office, their employees, laws, customs and policies. The County can be served by serving the Department of the Corporation Counsel,

5-ER-1140

County of Maui at 200 South High Street, Kalana O Maui Bldg, 3rd Floor, Wailuku, HI 96793;

## II

## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988;

8.  Venue lies in this Court pursuant to 28 U.S.C. § 1391;

## III

## STATEMENT OF LAW

### SECOND AMENDMENT

9.  The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.";

10. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016);

11. Firearms are protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008);

12. The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).  The Fourteenth Amendment to the United States Constitution provides in pertinent part: No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

13. "[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135;

14.  In *Bruen*, the Supreme Court held unconstitutional New York's "good cause" licensing requirement because a State may not condition the right to publicly carry handguns on a citizen's "special need for self-defense." *Bruen*, 142 S.Ct. at 2135 n.8;

6

15.  The "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This is because the Second Amendment "presumptively protects" carrying firearms. *Id.* At 2129. To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129;

16.  It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127; *see also id.* At 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined;

17.  The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. In doing so, *Bruen* explicitly rejected New York's attempt to justify its restriction as analogous to a historical "sensitive place" regulation. 142 S.Ct.

at 2133-34. The Court explained that a state may not simply ban guns wherever people may "congregate" or assemble. A rule that "expand[ed] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S.Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id;*

18.  If a state seeks to restrict firearms in a particular location as a "sensitive place," then it must prove that its current restriction is sufficiently analogous to "well-established and representative historical analogue." In *Bruen*, the Court identified only five such locations that may have a historical basis: "schools and government buildings" as well as "legislative assemblies, polling places, and courthouses." *Id.* At 2133, citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). *Bruen* held that the lower "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id;*

19.  *Bruen* further establishes several requirements to determine whether a historical regulation is sufficiently analogous. First, the relevant time period

5-ER-1144

for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135-36. That is because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S.Ct. at 2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008). "20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28;

20. Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*. In other words, only those restrictions with roots at the time of the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961));

21. Second, the historical analogue must be "representative." Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156. Courts should not "uphold every modern law that remotely resembles a historical

analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson,* 9 f.4th 217 (3rd. Cir 2021),- individual self-defense is the central component of the Second Amendment right;

22.   Third, the historical analogue must be "relevantly similar," which is to say that it must burden ordinary, law-abiding citizens right to carry in a similar manner and for similar reasons. *Bruen*, 142 S. Ct. at 2132.  *Bruen* thus held that the inquiry into whether a proper analogue exists is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era.  *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. "Thus, 'postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.*, quoting *Heller v. District of Columbia*, 670 F.3d , 670 F.3d 1224, 1274, n.6 (Kavanaugh, J., dissenting);

**5-ER-1146**

23.  Fourth, the historical analysis required by the Supreme Court is fundamentally a legal inquiry that examines legal history, which is appropriately presented in briefs. See *Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal questions" that judges can address) (emphasis in original); see also id. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court;

24.  The text of the Second Amendment, as authoritatively interpreted by the Supreme Court, indisputably covers possession (keep) and the wear, carry, and transport (bear) of firearms, including handguns by ordinary, law-abiding citizens.  Beyond the five locations specifically identified by the Supreme Court in *Bruen* as possibly having an historical basis, the State bears the burden to demonstrate that there is an enduring, well-established, representative historical analogue to the restriction imposed by the government. And the historical analogue must be "relevantly similar" to the contemporary restriction imposed by the government, burdening the Second Amendment right in a similar manner and for similar reasons. Under this test established in *Bruen*, the State cannot meet its burden to justify its bans on

5-ER-1147

the wear, carry, and transport of firearms in or at the locations challenged

here;

## IV

## __INTRODUCTION__

### H.R.S. §134  Firearms

25.  Hawaii law, specifically Hawaii Revised Statutes Section 134 *et seq*, is

a comprehensive set of laws covering all aspects of firearms in Hawaii

including everything from acquisition, possession, ownership, usage and

carriage of arms;

26.  Prior to the United States Supreme Court decision in *Bruen*, Hawaii law,

specifically HRS 134-9, dealt with the carriage of weapons, and it read, and

today reads-

" **§134-9  Licenses to carry.**  (a)  In an exceptional case, when an
applicant shows reason to fear injury to the applicant's person or property,
the chief of police of the appropriate county may grant a license to an
applicant who is a citizen of the United States of the age of twenty-one years
or more or to a duly accredited official representative of a foreign nation of
the age of twenty-one years or more to carry a pistol or revolver and
ammunition therefor concealed on the person within the county where the
license is granted.  Where the urgency or the need has been sufficiently
indicated, the respective chief of police may grant to an applicant of good
moral character who is a citizen of the United States of the age of twenty-
one years or more, is engaged in the protection of life and property, and is
not prohibited under section 134-7 from the ownership or possession of a
firearm, a license to carry a pistol or revolver and ammunition therefor
unconcealed on the person within the county where the license is
granted.  The chief of police of the appropriate county, or the chief's

designated representative, shall perform an inquiry on an applicant by using the National Instant Criminal Background Check System, to include a check of the Immigration and Customs Enforcement databases where the applicant is not a citizen of the United States, before any determination to grant a license is made. Unless renewed, the license shall expire one year from the date of issue.

(b)  The chief of police of each county shall adopt procedures to require that any person granted a license to carry a concealed weapon on the person shall:

(1)  Be qualified to use the firearm in a safe manner;

(2)  Appear to be a suitable person to be so licensed;

(3)  Not be prohibited under section 134-7 from the ownership or possession

of a firearm; and

(4)  Not have been adjudged insane or not appear to be mentally deranged.

(c)  No person shall carry concealed or unconcealed on the person a pistol or revolver without being licensed to do so under this section or in compliance with sections 134-5(c) or 134-25.

(d)  A fee of $10 shall be charged for each license and shall be deposited in the treasury of the county in which the license is granted.";

27. Prior to *Bruen*, based upon information and belief, the counties only

issued open carry permits for armored vehicle drivers and not to the general

public;

28.  Prior to *Bruen*, the counties had only issued less than a half-dozen carry concealed permits in the prior decades, see *Young v. County of Hawaii*, 142 S.Ct. 2895[1];

29.  Because there was effectively not a single person in the State of Hawaii with a concealed permit to carry a firearm, there were no Hawaii Revised Statutes regarding where concealed arms could be carried, i.e. there were no "sensitive places" specified under the HRS- since Hawaii didn't let anyone carry a concealed weapon it was not necessary to specify where a concealed carry permit holder could carry a firearm;

30.  Following *Bruen*, while county police chiefs promulgated onerous and burdensome rules pursuant to HRS 134-9(b) and started to issue a handful of concealed carry permits, the State legislature met.

31.  In Maui County, presently, concealed carry permit applicants must pass a shooting test in order to qualify for a carry permit; and Plaintiffs Jason

_____

[1] *Young* was vacated and reversed by the U.S. Supreme Court following the *Bruen* decision. *See e.g. Young v. Hawaii*, 896 F.3d 1044, 1071 n.21 (9th Cir. 2018) ("Hawaii counties appear to have issued only *four* concealed carry licenses in the past *eighteen years. See* 2000 Haw. Att'y Gen. Reps., *Firearm Registrations in Hawaii, 2000 et seq*;").

Wolford, Alison Wolford and Atom Kasprzycki all have current, valid concealed carry permits.

32. The state legislature, in response to *Bruen* passed SB 1230 and on June 2, 2023 Governor Green signed the bill into law;

**SB1230**

33. SB1230 takes effect on July 1, 2023, except for Sections 4 and 7 which take effect on January 1, 2024 related to permits to acquire and permits to carry concealed and openly[2]. SB1230 created fifteen broad categories of sensitive places including adjacent land and parking lots that render carry concealed permits almost completely useless;

34. SB1230 creates HRS 134-A which reads-

"**Carrying or possessing a firearm in certain locations and premises prohibited; penalty.** (a) A person with a license issued under section 134-9, or authorized to carry a firearm in accordance with title 18 United States Code section 926B or 926C, shall not intentionally, knowingly, or recklessly

---

[2] The current counties' rules regarding the issuance of concealed carry permits and SB1230's laws regarding carry concealed permits, are all thoroughly strict and onerous but are not challenged here. The three natural person Plaintiffs all qualify currently and under SB1230's requirements as well.

carry or possess a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, while in any of the following locations and premises within the State:

(1)     Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for court proceedings, legislative business, contested case hearings, agency rulemaking, or other activities of state or county government;

(2)     Any public or private hospital, mental health facility, nursing home, clinic, medical office, urgent care facility, or other place at which medical or health services are customarily provided, including adjacent parking areas;

(3)     Any adult or juvenile detention or correctional facility, prison, or jail, including adjacent parking areas;

(4)     Any bar or restaurant serving alcohol or intoxicating liquor as defined in section 281-1 for consumption on the premises, including adjacent parking areas;

(5)     Any stadium, movie theater, or concert hall, or any place at which a professional collegiate, high school, amateur, or student sporting event is being held, including adjacent parking areas;

16

(6)     All public library property, including buildings, facilities, meeting

rooms, spaces used for community programming, adjacent grounds, and

parking areas;

(7)     The campus or premises of any public or private community college,

college, or university, and adjacent parking areas, including buildings,

classrooms, laboratories, research facilities, artistic venues, and athletic

fields or venues;

(8)     The campus or premises or any public school, charter school, private

school, preschool, summer camp, or child care facility as defined in section

346-151, including adjacent parking areas, but not including:

(A)     A private residence at which education is provided for children who

are all related to one another by blood, marriage, or adoption; or

(B)     A dwelling when not used as a child care facility;

(9)     Any beach, playground, park, or adjacent parking area, including any

state park, state monument, county park, tennis court, golf course, swimming

pool, or other recreation area or facility under control, maintenance, and

management of the State or a county, but not including an authorized target

range or shooting complex;

(10)    Any shelter, residential, or programmatic facility or adjacent parking

area operated by a government entity or charitable organization serving

17

unhoused persons, victims of domestic violence, or children, including children involved in the juvenile justice system;

(11)   Any voter service center as defined in section 11-1 or other polling place, including adjacent parking areas;

(12)   The premises of any bank or financial institution as defined in section 211D-1, including adjacent parking areas;

(13)   Any place, facility, or vehicle used for public transportation or public transit, and adjacent parking areas, including buses, paratransit vans, bus shelters and terminals (but not including bus stops located on public sidewalks), trains, rail stations, and airports;

(14)   Any amusement park, aquarium, carnival, circus, fair, museum, water park, or zoo, including adjacent parking areas;

(15)   Any public gathering, public assembly, or special event conducted on property open to the public, including any demonstration, march, rally, vigil, protest, picketing, or other public assembly, for which a permit is obtained from the federal government, the State, or a county, and the sidewalk or street immediately adjacent to the public gathering, public assembly, or special event; provided that there are signs clearly and conspicuously posted at visible places along the perimeter of the public gathering, public assembly or special event";

35. SB1230 HRS 134-A (b) provides that the areas in 134-A(a) shall not apply to a person in an exempt category, such as law enforcement officers;

36. SB1230 HRS 134-A(b) also provides affirmative defenses to carrying in the locations listed in 134-A(a);

37. SB1230 HRS 134-A(c) provides "The presence of a person in any location or premises listed in subsection (a) shall be prima facie evidence that the person knew it was a location or premises listed in subsection (a);

38. SB1230 HRS 134-A(d) provides "Where only a portion of a building or office is owned, leased, or used by the State or a county, this section shall not apply to the portion of the building or office that is not owned, leased, or used by the State or a county, unless carrying or possessing a firearm within that portion is otherwise prohibited by this section";

39. SB1230 HRS 134-A(f) provides "Any person who violates this section shall be guilty of a misdemeanor";

40. HRS 701-107 provides "(3) A crime is a misdemeanor if it is so designated in this Code or in a statute other than this Code enacted subsequent thereto, or if it is defined in a statute other than this Code which provides for a term of imprisonment the maximum of which is one year";

41.  SB1230 HRS 134-E provides "**Carrying or possessing a firearm on private property of another person without authorization; penalty.** (a) A person carrying a firearm pursuant to a license issued under section 134-9 shall not intentionally, knowingly, or recklessly enter or remain on private property of another person while carrying a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, unless the person has been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property.

(b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:

(1) Unambiguous written or verbal authorization; or

(2) The posting of clear and conspicuous signage at the entrance of the building or on the premises, by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

(c) For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or

administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person", means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner, lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(e) Any person who violates this section shall be guilty of a misdemeanor."

**V**

**CHALLENGED PROVISIONS OF SB1230**

42.  Plaintiffs do not challenge the prohibitions in all areas under SB1230, instead, Plaintiffs challenge only a limited subset that impose particularly egregious restrictions on their Second Amendment right to bear arms. Plaintiffs do not challenge all of SB1230 or all of the Hawaii Revised Statutes or every county code.  Plaintiffs do not concede that any part of SB1230 or any State law or county code is constitutional under the Second Amendment or in any other way;

43.  Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Complaint;

**Plaintiff Jason Wolford**

44.  Plaintiff Jason Wolford realleges and incorporates by reference all of the foregoing allegations of this complaint;

45.  Plaintiff Jason Wolford challenges the following provisions of SB1230-

A) SB1230 HRS 134-A(a)(1) Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for…, or other activities of state or county government, **only** *to the extent that there may be a building or office owned or leased or used by the State or a county, and adjacent grounds and*

**5-ER-1158**

*parking areas, including any portion of a building or office <u>used for other</u>*

*<u>activities of state or county government</u> when this provision overlaps or is*

*otherwise covered by any of the other challenged provisions below*;

B)  SB1230 HRS 134-A-(a)(4), specifically limited to "Any… restaurant

serving alcohol or intoxicating liquor as defined in section 281-1 for

consumption on the premises, including adjacent parking areas."

C)  SB1230 HRS 134-A-(a)(9), specifically limited to "Any beach, park, or

adjacent parking area, including any state park,…county park,…under

control, maintenance, and management of the State or county, …"

D)  SB1230 HRS 134-A-(a)(12), specifically limited to "The premises of

any bank or financial institution as defined in section 211D-1, including

adjacent parking areas."

E)  SB1230 HRS 134-E, "**<u>Carrying or possessing a firearm on private</u>**

**<u>property of another person without authorization; penalty.</u>** (a) A person

carrying a firearm pursuant to a license issued under section 134-9 shall not

intentionally, knowingly, or recklessly enter or remain on private property of

another person while carrying a loaded or unloaded firearm, whether the

firearm is operable or not, and whether the firearm is concealed or

unconcealed, unless the person has been given express authorization to carry

a firearm on the property by the owner, lessee, operator, or manager of the property.

(b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:

(1) Unambiguous written or verbal authorization; or

(2) The posting of clear and conspicuous signage at the entrance of the building or on the premises, by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

(c) For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person", means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner,

lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(e) Any person who violates this section shall be guilty of a misdemeanor."

**Plaintiff Alison Wolford**

46.    Plaintiff Alison Wolford realleges and incorporates by reference all of the foregoing allegations of this complaint;

47.    Plaintiff Alison Wolford challenges the following provisions of SB1230-

A) SB1230 HRS 134-A(a)(1) Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for…, or other activities of state or county government, ***only*** *to the extent that there may be a building or office*

*owned or leased or used by the State or a county, and adjacent grounds and*

*parking areas, including any portion of a building or office used for <u>other</u>*

*<u>activities</u> of state or county government when this provision overlaps or is*

*otherwise covered by any of the other challenged provisions below*;

B)  SB1230 HRS 134-A-(a)(4), specifically limited to "Any… restaurant

serving alcohol or intoxicating liquor as defined in section 281-1 for

consumption on the premises, including adjacent parking areas."

C)  SB1230 HRS 134-A-(a)(9), specifically limited to "Any beach, park, or

adjacent parking area, including any state park,…county park,…under

control, maintenance, and management of the State or county, …"

D)  SB1230 HRS 134-A-(a)(12), "The premises of any bank or financial

institution as defined in section 211D-1, including adjacent parking areas."

E)  SB1230 HRS 134-E, "**<u>Carrying or possessing a firearm on private</u>**

**<u>property of another person without authorization; penalty.</u>**

(a) A person carrying a firearm pursuant to a license issued under section

134-9 shall not intentionally, knowingly, or recklessly enter or remain on

private property of another person while carrying a loaded or unloaded

firearm, whether the firearm is operable or not, and whether the firearm is

concealed or unconcealed, unless the person has been given express

**5-ER-1162**

authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property.

(b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:

(1) Unambiguous written or verbal authorization; or

(2) The posting of clear and conspicuous signage at the entrance of the building or on the premises, by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

(c) For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person", means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner,

5-ER-1163

lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(e) Any person who violates this section shall be guilty of a misdemeanor."

### Plaintiff Atom Kasprzycki

48. Plaintiff Kasprzycki realleges and incorporates by reference all of the foregoing allegations of this complaint;

49. Plaintiff Kasprzycki challenges the following provisions of SB1230- A) SB1230 HRS 134-A(a)(1) Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for…, or other activities of state or county government, *only to the extent that there may be a building or office owned or leased or used by the State or a county, and adjacent grounds and*

*parking areas, including any portion of a building or office used for* <u>*other*</u>

<u>*activities*</u> *of state or county government when this provision overlaps or is*

*otherwise covered by any of the other challenged provisions below*;

B)  SB1230 HRS 134-A-(a)(4), specifically limited to "Any… restaurant

serving alcohol or intoxicating liquor as defined in section 281-1 for

consumption on the premises, including adjacent parking areas."

C)  SB1230 HRS 134-A-(a)(9), specifically limited to "Any beach, park, or

adjacent parking area, including any state park,…county park,…under

control, maintenance, and management of the State or county, …"

D)  SB1230 HRS 134-A-(a)(12), "The premises of any bank or financial

institution as defined in section 211D-1, including adjacent parking areas."

E)  SB1230 HRS 134-E, "**<u>Carrying or possessing a firearm on private</u>**

**<u>property of another person without authorization; penalty.</u>**

(a) A person carrying a firearm pursuant to a license issued under section

134-9 shall not intentionally, knowingly, or recklessly enter or remain on

private property of another person while carrying a loaded or unloaded

firearm, whether the firearm is operable or not, and whether the firearm is

concealed or unconcealed, unless the person has been given express

authorization to carry a firearm on the property by the owner, lessee,

operator, or manager of the property.

(b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:

(1) Unambiguous written or verbal authorization; or

(2) The posting of clear and conspicuous signage at the entrance of the building or on the premises, by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

(c) For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person", means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner, lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided

nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(e) Any person who violates this section shall be guilty of a misdemeanor."

## Plaintiff HIFICO

50.  Plaintiff HIFICO realleges and incorporates by reference all of

the foregoing allegations of this complaint;

51.  Plaintiff HIFICO challenges the following provisions of SB1230 on behalf of the named Plaintiffs, who are HIFICO members, and all HIFICO members with valid carry concealed permits within the state of Hawaii- A) SB1230 HRS 134-A(a)(1) Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for…, or other activities of state or county government, *only to the extent that there may be a building or office*

*owned or leased or used by the State or a county, and adjacent grounds and*

*parking areas, including any portion of a building or office used for <u>other</u>*

*<u>activities</u> of state or county government when this provision overlaps or is*

*otherwise covered by any of the other challenged provisions below*;

B)  SB1230 HRS 134-A-(a)(4), specifically limited to "Any… restaurant

serving alcohol or intoxicating liquor as defined in section 281-1 for

consumption on the premises, including adjacent parking areas."

C)  SB1230 HRS 134-A-(a)(9), specifically limited to "Any beach, park, or

adjacent parking area, including any state park,…county park,…under

control, maintenance, and management of the State or county, …"

D)  SB1230 HRS 134-A-(a)(12), "The premises of any bank or financial

institution as defined in section 211D-1, including adjacent parking areas."

E)  SB1230 HRS 134-E, "**<u>Carrying or possessing a firearm on private</u>**

**<u>property of another person without authorization; penalty.</u>** (a) A person

carrying a firearm pursuant to a license issued under section 134-9 shall not

intentionally, knowingly, or recklessly enter or remain on private property of

another person while carrying a loaded or unloaded firearm, whether the

firearm is operable or not, and whether the firearm is concealed or

unconcealed, unless the person has been given express authorization to carry

a firearm on the property by the owner, lessee, operator, or manager of the property.

(b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:

(1) Unambiguous written or verbal authorization; or

(2) The posting of clear and conspicuous signage at the entrance of the building or on the premises, by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

(c) For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person", means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner,

lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(e) Any person who violates this section shall be guilty of a misdemeanor."

## COUNT I

## U.S. CONST., AMEND. II

52. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein;

53. The State of Hawaii has not gotten the United States Supreme Court's message from *Bruen*. Prior to *Bruen*, Hawaii had treated, for more than a century, the Second Amendment as dead, buried and forgotten having almost never issued any concealed carry permits[3]. Once *Bruen* was decided and county police chiefs began to issue a trickle of concealed carry permits,

_____

[3] And apart from armored car drivers, no open carry permits.

under new county specific onerous carry concealed permit regulations, the state legislature acted to ensure that even if people managed to overcome the burdensome requirements to actually obtain a concealed carry permit, the permits would be rendered utterly useless. Hawaii merely switched gears from almost never issuing any concealed carry permits so that there was no one with a permit, to making permits now begrudgingly issued to be so limited as to make it so that permit holders could not carry anywhere.

Notwithstanding the United States Constitution and the Second Amendment and the *Bruen* decision, Hawaii just simply does not want anyone to be able to carry a firearm anywhere within the state- which is their fundamental, ancient, constitutionally protected and guaranteed right.

In response to *Bruen,* the state legislature has sought to severely restrict law abiding peoples' right to defend themselves in the event of confrontation. The legislature specifically found and stated that it intended to restrict carrying and possessing arms, which it characterized as "dangerous", by law-abiding persons with concealed carry licenses[4]. This included in areas "traditionally" restricted, without specific reference to *Bruen,* and expansively including "other places frequented by children", which could

_____

[4] The State believes that Second Amendment rights are by their very nature dangerous and that those who exercise Second Amendment rights are by their very nature dangerous people.

**5-ER-1171**

mean anywhere from grocery stores to beaches to shopping malls.  The legislature specifically referenced "…the risks to public health, safety, and welfare *associated with firearms* and gun violence,…" (Emphasis added), without examining, or even pretending to legislate with an eye toward crimes committed with or using a firearm[5].  Additionally, the legislature specifically stated that its act, specifically with regard to carrying on or in private property and the new requirement that a private property owner specifically "opt-in" with express authorization to exercise a constitutionally, protected right, is "…based on the legislature's assessment of public sentiment and broadly shared preferences within the State,…".  *Bruen* is <u>only</u> referenced when the court noted that the Second Amendment is not a "regulatory straightjacket" and that there can be a "variety" of gun regulations".  See SB 1230 Section 1.  The Second Amendment's ancient, protected, fundamental, constitutional, unqualified command and right and *Bruen*'s analysis is not ever otherwise mentioned.  The State of Hawaii's "public sentiment" has its roots in a century[6] of massive infringement and

_____

[5] See Exhibit 1 SB1230.  A search for the word "crime" only produces results associated with expanding the types of crimes that render a person disqualified from owning or possessing a firearm.

[6] In *Young* the State argued that arms could only be used in self-defense, under *Heller,* in one's own home.  This radical hostility to a fundamental constitutional right, that, even at the founding era was ancient, stems from some regrettable carryover from the former Hawaiian kingdom wherein a king disarmed everyone

utter annihilation of the Second Amendment and SB1230 is an extreme over-reaction to the *Bruen* decision and a desire to basically confine *Bruen* and the Second Amendment to one's own house. The State of Hawaii has not changed its tune and its Chief law Enforcement officer still relies on a king's prerogative to disarm his subjects[7]. The Attorney General's representative, in testimony regarding SB1230 stated, repeatedly, that Hawaii had a long history of more than a century, since 1852 when it was a kingdom, of eliminating Second Amendment rights (see Exhibit 2). Following *Bruen,* counties in Hawaii promulgated severely restrictive concealed carry licensure regulations. With SB1230, the state legislature enacted a set of comprehensive, strict and severe concealed carry regulations, in Section 4, set to take effect on January 1, 2024. Despite the onerous concealed carry regulations presently in place and soon to be in

---

except loyal subjects in 1852 in his newly minted and thankfully short-lived kingdom. SB1230 is squarely and broadly directed at law-abiding firearm owners and the law-abiding people in a massive effort to eliminate or reduce the number of people exercising their Second Amendment rights and locations where arms can be carried in the event of confrontation. SB1230 does not purport to address, at all, crimes committed with firearms such as murder or assault except that Terroristic Threatening, a class C felony is now elevated to a class B felony if committed with a firearm.

[7] See *Young* Amicus Brief of Hawaii Rifle Association at the United States Supreme Court proving that the 1852 penal code emanated from the prior kingdom constitutions wherein the king had all arms and weapons of war confined to himself and only loyal subjects, on the king's business, would be allowed to carry arms.

5-ER-1173

place, the legislature enacted further draconian restrictions, on those law-abiding people, who will have undergone some form of licensure to carry concealed in the state, as to when and where they can exercise their Second Amendment rights.  In fact, the sponsor of SB1230 has also even tried to repeal the Second Amendment.  See SCR #42 attached as Exhibit 3.

54.  This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, each of the Defendants have acted under "color of state law" within the meaning of Section 1983.  Each and every Defendant, in their various capacities, the Attorney General and the county police and prosecutors, have the statutory duty to enforce the criminal laws of Hawaii, including the restrictions set forth in SB1230, as alleged above, and they do indeed enforce and threaten to enforce these laws by virtue of their authority under the laws of Hawaii. As such, each and every Defendant acts under color of law within the meaning of 42 U.S.C. § 1983;

55.  The Second Amendment to the United States Constitution provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has squarely held that the Second Amendment bestows an

individual right to keep and bear arms and that right may be exercised by all responsible, law-abiding Americans. *District of Columbia v. Heller,* 554 U.S. 570 (2008). The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *Bruen*, the Supreme Court held that the Second Amendment right to keep and bear arms fully extends to general carry of arms in public;

56.   In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. It begins with the plain text. If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any distinction between locations at all. That makes the Second Amendment unlike other Amendments. *See* U.S. Const. amend. III ("No

Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). And it means that any locational restrictions on Second Amendment rights must come from history, not from the plain text.

57.   There is no "well-established, representative historical analogue" for the SB1230 bans on firearms or arms in and at –

(A) SB1230 HRS 134-A(a)(4) "Any… restaurant serving alcohol or intoxicating liquor as defined in section 281-1 for consumption on the premises, including adjacent parking areas." enacted pursuant to SB1230. This ban imposed by Section HRS 134-A(a)(4), as enacted by SB1230, and as specifically limited and specified herein, is facially unconstitutional under the Second Amendment in so far as it bans the possession, wear, carry, or transport of firearms by permit holders at these locations[8].   This ban imposed by Section HRS 134-A(a)(4), as enacted by SB1230, is also unconstitutional as applied to each Plaintiff;

---

[8] The exceptions located at SB1230 HRS 134-A(b) do not apply and are not at issue.

(B) SB1230 HRS 134-A-(a)(9), "Any beach[9], park, or adjacent parking area,

including any state park,…county park,…under control, maintenance, and

management of the State or county, …", as enacted by SB1230.  This ban

imposed by Section HRS 134-A(a)(9), as enacted by SB1230, and as

specifically limited and specified herein, is facially unconstitutional under

the Second Amendment in so far as it bans the possession, wear, carry, or

transport of firearms by permit holders at these locations[10].  This ban,

imposed by Section HRS 134-A(a)(9) is also unconstitutional as applied to

each Plaintiff;

(C) SB1230 HRS 134-A-(a)(12), "The premises of any bank or financial

institution as defined in section 211D-1, including adjacent parking areas."

as enacted by SB1230.  This ban imposed by Section HRS 134-A(a)(12), as

enacted by SB1230 is facially unconstitutional under the Second

---

[9] There are no private beaches in Hawaii.  See *Application of Ashford*, 50 Haw. 314 (1968).  Private land cannot extend closer to the ocean than the high water mark. What this means with regard to beaches, for example, is that where there is only a public beach a licensed carrier could not walk along or on the beach- at all, ever. The beach is also county or state land, as there are no private beaches, implicating HRS 134-A(a)(9) and since there may be a county or state structure, such as a life guard station or a police substation or a park ranger station, for other State or county "activities", along with a parking lot or "adjacent areas", HRS 134-A(a)(1) is also implicated to the extent raised by this lawsuit.

[10] The exceptions located at SB1230 HRS 134-A(b) do not apply and are not at issue.

Amendment in so far as it bans the possession, wear, carry, or transport of firearms by permit holders at these locations[11].  This ban, imposed by Section HRS 134-A(a)(12) is also unconstitutional as applied to each Plaintiff;

(D) SB1230 HRS 134-A-(a)(1), "Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for…, or other activities of state or county government, **only** *to the extent that there may be a building or office owned or leased or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for <u>other activities</u> of state or county government when this provision overlaps or is otherwise covered by any of the other challenged provisions herein*" as enacted by SB1230.  This ban imposed by Section HRS 134-A(a)(1), as enacted by SB1230 is facially unconstitutional under the Second Amendment in so far as it bans the possession, wear, carry, or transport of firearms by permit holders at these locations[12].  This ban, imposed by

---

[11] The exceptions located at SB1230 HRS 134-A(b) do not apply and are not at issue.

[12] The exceptions located at SB1230 HRS 134-A(b) do not apply and are not at issue.

5-ER-1178

Section HRS 134-A(a)(1) is also unconstitutional as applied to each

Plaintiff;

58.  There is no "well-established, representative historical analogue" for the

SB1230 requirement, under the new HRS 134-E, that private property

owners "opt-in" to allow the exercise of a fundamental constitutional right to

keep and bear arms and that those exercising their Second Amendment

rights may only enter, remain on or be on private property after having

received express authorization, as described and required herein;

59.  Plaintiff Jason Wolford, repeats and realleges the allegations of the

preceding paragraphs as if set forth herein and also states as follows and as

reflected in the attached declaration attached as Exhibit 4 (all facts and

statements contained in the declaration are incorporated herein and

henceforth as allegations in this paragraph in the complaint)-

A) Is a male, married, retired, United States citizen, resident of the state of

Hawaii, resident of the county of Maui;

B) is a law abiding citizen;

C) Is not legally prohibited from acquiring, owning, possessing, carrying[13] or lawfully using arms including firearms under current Hawaii and federal law and also under the proposed SB1230 HRS enactments;

D) Owns several firearms, lawfully, and is familiar with firearms and has the following training: USCCA Instructor- Training Counselor. Concealed Carry and Home Defense Fundamentals, Countering the Mass Shooter Threat, Emergency First Aid, Defensive Shooting Fundamentals (DSF) level 1, NRA Instructor-Pistol; Rifle; Shotgun; Chief Range Safety Officer, SASS Range Safety Officer; SABRE Civilian Pepper Spray Instructor;

E) Has a concealed carry permit issued from the county of Maui in 2022, a redacted copy of which is appended to his declaration, and will renew that one and will obtain another concealed carry permit once SB1230's concealed carry permit laws go into effect in January 2024, and he has been, is and expects to be fully qualified to obtain another concealed carry permit and has not been, is not now, nor expected to be disqualified from owning, possessing or carrying arms nor from obtaining a renewed or new concealed carry permit in the state of Hawaii or elsewhere ;

_____

[13] Except as indicated here specifically with regard not to him, but to the places he intends to carry concealed with a permit and activities he intends to perform but for the enactment of SB1230.

F) Has in the past regularly frequented the following beaches listed below, and has, as a carry concealed license holder since 2022, while armed, and will in the future, own, possess, and carry a firearm with his concealed carry permit. He has every intention and desire to continue to carry his personal firearm in and at all these locations in the future, as he has in the past, and places like them, but he will decline to do so because of the credible fear of arrest and prosecution after July 1, 2023, the effective date of SB1230. He intends to and will use his carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230;

i) Kahana Bay;

ii) Kaanapali Beach;

iii) Kapalua Beach;

iv) Napili Bay

v) Launiopoko

vi) DT Fleming park- This park has a county or state government lifeguard building on the grounds;

G) Jason Wolford has in the past regularly frequented the following areas which are listed as a "park", has in the past, as a carry concealed license holder since 2022, carried a concealed weapon with his permit in

45

these areas listed herein, and fully intends to in the future, own, possess, and carry a firearm with his concealed carry permit in these locations. He has every intention and desire to continue to carry his personal firearm in and at all these locations, and locations like them, with a permit, in the future but he will decline to do so because of the credible fear of arrest and prosecution after July 1, 2023, the effective date of SB1230. He intends to and will use his carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230;

i) Keopoulani Park;

ii) Napili Park;

iii) Rice Park;

iv) Lahaina Recreational Center;

v) Maui Lani Regional Park

vi) DT Fleming beach "park" has a county or state government lifeguard building on the grounds;

H) Jason Wolford has in the past regularly frequented the following areas which are, according to information and belief, restaurants that serves alcohol or intoxicating liquor as defined in section 281-1 for consumption on the premises, and he has, in the past carried a concealed

**5-ER-1182**

arm with his permit in the locations referenced herein, and he intends to, as a carry concealed license holder since 2022, in the future, own, possess, and carry a firearm with his concealed carry permit in these locations and locations like them. He has every intention and desire to continue to carry his personal firearm in and at all these locations, and locations like them, in the future but he will decline to do so because of the credible fear of arrest and prosecution after July 1, 2023, the effective date of SB1230. He intends to and will use his carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230;

i)  Monkey Pod;

ii)  Hula Grill;

iii) Down the Hatch;

iv) Tiffanys;

v)  Tante's;

vi) Ruth Chris;

vii)   Miko's


(I) Jason Wolford has in the past regularly frequented the following areas which are, according to information and belief, banks or financial

5-ER-1183

institutions as defined in section 211D-1, and has in the past carried a

concealed arm with his permit and intends to, as a carry concealed

license holder since 2022, in the future, own, possess, and carry a

firearm with his concealed carry permit in these locations and locations

like them.  He has every intention and desire to continue to carry his

personal firearm and permit in and at all these locations, and locations

like them, in the future but he will decline to do so because of the

credible fear of arrest and prosecution after July 1, 2023, the effective

date of SB1230. He intends to and will use his carry concealed permit to

carry arms concealed in the locations referenced herein, but for the

implementation and enactment of SB1230;

i)  First Hawaiian Bank (including specifically, but not limited to the

branches at Kahana, Lahaina and Kahului);

ii) Bank of Hawaii (including specifically, but not limited to the

branches at Kahana, Lahaina and Kahului);

J) Jason Wolford has in the past regularly frequented the following

areas which are, according to information and belief, all other locations

considered private property, not covered otherwise by HRS 134-A(a)

but specifically covered under HRS 134-E that requires private property

owners to "opt-in" and post signage allowing the exercise of the Second

Amendment right to carry an arm for self- defense or in case of confrontation, and he has carried a concealed arm with a permit in the past and intends to, as a carry concealed license holder since 2022, in the future, own, possess, and carry a firearm with his concealed carry permit in these locations and similar locations.  He has every intention and desire to continue to carry his personal firearm and permit in and at all these locations, and locations like them, in the future but he will decline to do so because of the credible fear of arrest and prosecution after July 1, 2023, the effective date of SB1230.  He intends to and will use his carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230;

i) Ace Hardware, which shares a parking lot with Maui County DMV, see Exhibit 5;

ii) Maui mall;

K) Jason Wolford has in the past regularly frequented adjacent properties and parking lots of all of the above locations with a firearm concealed with his concealed carry permit and fully intends to do so again, but for the enactment of SB1230.  Additionally, Jason Wolford has in the past regularly frequented adjacent properties and parking lots while not going to any of the above locations, such as a beach or park or

bank or restaurant, but the other location shares an adjacent property or parking lot, and he has carried a concealed weapon with his concealed carry permit and he fully intends to do so again the future, but for the enactment of SB1230. Those locations include the gym The Club Maui Kahana Location which shares a parking lot with two banks.

60. Plaintiff Alison Wolford, repeats and realleges the allegations of the preceding paragraphs as if set forth herein and also states as follows and as reflected in the attached declaration attached as Exhibit 6 (all facts and statements contained in the declaration are incorporated herein and henceforth as allegations in this paragraph in the complaint)-

A) Is a female, married, United States citizen, resident of the state of Hawaii, resident of the county of Maui who works for the Maui Memorial Medical center;

B) is a law abiding citizen;

C) Is not legally prohibited from acquiring, owning, possessing, carrying[14] or lawfully using arms including firearms under current Hawaii and federal law and also under the proposed SB1230 HRS enactments;

_____

[14] Except as indicated here specifically with regard not to her, but to the places and activities she intends to perform but for the enactment of SB1230.

D) Owns several firearms, lawfully, and is familiar with firearms and has the following training: NRA Instructor-Pistol; Rifle; Shotgun; CCW; Chief Range Safety Officer NRA Refuse to be a Victim; NRA Range Development USCCA Instructor-Concealed Carry Home Defense; Women's Firearms Training Counselor USCCA RSO SASS RSO;

E) Has a concealed carry permit issued from the county of Maui in 2022, a redacted copy of which is appended to her declaration, and will renew that one and will obtain another concealed carry permit once SB1230's concealed carry permit laws go into effect in January 2024, and she has been, is and expects to be fully qualified to obtain another concealed carry permit and has not been, is not now, nor expected to be disqualified from owning, possessing or carrying arms nor from obtaining a renewed or new concealed carry permit in the state of Hawaii or elsewhere ;

F) Alison Wolford has in the past regularly frequented the following beaches listed below, and has, as a carry concealed license holder since 2022, carried while armed and with her permit, and will in the future, own, possess, and carry a firearm with her concealed carry permit.  She has every intention and desire to continue to carry her personal firearm in and at all these locations in the future, and places like them, but she will decline to do so because of the credible fear of arrest and prosecution after July1, 2023, the effective

date of SB1230.  She intends to and will use her carry concealed permit to

carry arms concealed in the locations referenced herein, but for the

implementation and enactment of SB1230;

i)   Kahana Bay;

ii)  Kaanapali Beach;

iii) Airport Beach;

iv)  Kapalua Beach;

v)   Napili Bay;

vi)  Launiopoko;

vii)    DT Flemings beach park, which also has a county or state

lifeguard building on the grounds;

G) Alison Wolford has in the past regularly frequented the following

areas which are listed as a "park", has in the past, as a carry concealed

license holder since 2022, carried a concealed weapon with her permit

in these areas listed herein, and fully intends to in the future, own,

possess, and carry a firearm with his concealed carry permit in these

locations.  She has every intention and desire to continue to carry her

personal firearm concealed and with a permit in and at all these

locations, and locations like them, in the future but she will decline to

do so because of the credible fear of arrest and prosecution after July 1,

5-ER-1188

2023, the effective date of SB1230. She intends to and will use his carry

concealed permit to carry arms concealed in the locations referenced

herein, but for the implementation and enactment of SB1230;

i)   Keopoulani Park;

ii)  Napili Park;

iii) Rice Park;

iv)  Lahaina Recreational Center;

v)   DT Fleming (Beach park)

vi)  Maui Lani Regional Park

vii)    DT Fleming has a county or state government lifeguard building on

       the grounds;

H) Alison Wolford has in the past regularly frequented the following

areas which are, according to information and belief, restaurants that

serves alcohol or intoxicating liquor as defined in section 281-1 for

consumption on the premises, and she has, in the past carried a

concealed arm with her permit in the locations referenced herein, and

she intends to, as a carry concealed license holder since 2022, in the

future, own, possess, and carry a firearm with her concealed carry

permit in these locations and locations like them.  She has every

intention and desire to continue to carry her personal firearm in and at

53

all these locations, and locations like them, in the future but she will

decline to do so because of the credible fear of arrest and prosecution

after July 1, 2023, the effective date of SB1230. She intends to and will

use his carry concealed permit to carry arms concealed in the locations

referenced herein, but for the implementation and enactment of SB1230;

i)  Monkey Pod;

ii)  Hula Grill;

iii) Down the Hatch;

iv) Tiffanys;

v)  Tante's;

vi) Ruth Chris;

vii)   Miko's

I) Alison Wolford has in the past regularly frequented the following

areas which are, according to information and belief, banks or financial

institutions as defined in section 211D-1, and has in the past carried a

concealed arm with her permit and intends to, as a carry concealed

license holder since 2022, in the future, own, possess, and carry a

firearm with her concealed carry permit in these locations and locations

like them.  She has every intention and desire to continue to carry her

personal firearm in and at all these locations, and locations like them, in

the future but she will decline to do so because of the credible fear of
arrest and prosecution after July 1, 2023, the effective date of SB 1230.
Se intends to and will use his carry concealed permit to carry arms
concealed in the locations referenced herein, but for the implementation
and enactment of SB 1230;

i) First Hawaiian Bank (including specifically, but not limited to the
branches at Kahana, Lahaina and Kahului);

ii) Bank of Hawaii (including specifically, but not limited to the
branches at Kahana, Lahaina and Kahului);

iii) Maui Federal Credit Union (including specifically but not limited to
the branches at Lahaina, Kahului, and Wailuku);


J) Alison Wolford has in the past regularly frequented the following
areas which are, according to information and belief, all other locations
considered private property, not covered otherwise by HRS 134-A(a)
but specifically covered under HRS 134-E that requires private property
owners to "opt-in" and post signage allowing the exercise of the Second
Amendment right to carry an arm for self- defense or in case of
confrontation, and she has carried a concealed arm with a permit in the
past and intends to, as a carry concealed license holder since 2022, in

5-ER-1191

the future, own, possess, and carry a firearm with her concealed carry permit in these locations and similar locations. She has every intention and desire to continue to carry her personal firearm in and at all these locations, and locations like them, in the future but she will decline to do so because of the credible fear of arrest and prosecution after July 1, 2023, the effective date of SB1230. She intends to and will use his carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230;

i) Ross, See Exhibit 5, this location shares a parking lot with Maui DMV, and also see https://www.mauicounty.gov/2125/DMV-Wait-Timesm last accessed on June 21, 2023;

ii) Safeway

iii) Costco

61. Plaintiff Atom Kasprzycki, as reflected in the attached declaration attached as Exhibit 7 (all facts and statements contained in the declaration are incorporated herein and henceforth as allegations in this paragraph in the complaint)-

A) Is a male, married, self-employed, United States citizen, resident of the state of Hawaii, resident of the county of Maui;

B) is a law abiding citizen and member of HIFICO (see Exhibit 8);

C) Is not legally prohibited from acquiring, owning, possessing, carrying[15] or lawfully using arms including firearms under current Hawaii and federal law and also under the proposed SB1230 HRS enactments;

D) Owns several firearms, lawfully, and is familiar with firearms and has the following training: NRA Basic Pistol Safety Course Certificate of Completion, Concealed Carry Handgun Course, North Carolina CCW course, Nebraska Hunter's Education;

E) Has a concealed carry permit issued from the county of Maui in 2022, a redacted copy of which is appended to his declaration, and will renew that one and will obtain another concealed carry permit once SB1230's concealed carry permit laws go into effect in January 2024, and he has been, is and expects to be fully qualified to obtain another concealed carry permit and has not been, is not now, nor expected to be disqualified from owning, possessing or carrying arms nor from obtaining a renewed or new concealed carry permit in the state of Hawaii or elsewhere ;

F) Has in the past regularly frequented the following beaches listed below, and has, as a carry concealed license holder since 2022, carried a concealed weapon and permit, and will in the future, own, possess, and carry a firearm

_____

[15] Except as indicated here specifically with regard not to him, but to the places and activities he intends to perform but for the enactment of SB1230.

5-ER-1193

with his concealed carry permit.  He has every intention and desire to

continue to carry his personal firearm in and at all these locations in the

future, and places like them, but he will decline to do so because of the

credible fear of arrest and prosecution after July 1, 2023, the effective date of

SB 1230.  He intends to and will use his carry concealed permit to carry arms

concealed in the locations referenced herein, but for the implementation and

enactment of SB 1230;

i)  Kaopala Beach;

ii)  Kaanapali Beach;

iii) Launipoko Beach;

iv) DT Fleming beach park- This beach and park has a state or county

     lifeguard building on the grounds;

G) Atom Kasprzycki has in the past regularly frequented the following

areas which are listed as a "park", has in the past, as a carry concealed

license holder since 2022, carried concealed with his permit in these

areas listed herein, and fully intends to in the future, own, possess, and

carry a firearm with his concealed carry permit in these locations.  He

has every intention and desire to continue to carry his personal firearm

in and at all these locations, and locations like them, in the future but he

will decline to do so because of the credible fear of arrest and

prosecution after July1, 2023, the effective date of SB1230. But for

H.R.S. §134-A (9) he would carry in all these locations;

i)  Lauiupoko Park;

ii) Lahaina Baynan Court Park

iii)Lahaina Aquatic Center;

iv)DT Fleming (Beach park)- This beach and park has a county or state
    lifeguard building on the grounds;

H) Atom Kasprzycki has in the past regularly frequented the following

areas which are, according to information and belief, restaurants that

serves alcohol or intoxicating liquor as defined in section 281-1 for

consumption on the premises, and he has, in the past carried a concealed

arm with his permit in the locations referenced herein, and he intends to,

as a carry concealed license holder since 2022, in the future, own,

possess, and carry a firearm with his concealed carry permit in these

locations and locations like them.  He intends to and will use his carry

concealed permit to carry arms concealed in the locations referenced

herein, but for the implementation and enactment of SB1230. He has

every intention and desire to continue to carry his personal firearm in

and at all these locations, and locations like them, in the future but he

will decline to do so because of the credible fear of arrest and

prosecution after July1, 2023, the effective date of SB1230. But for H.R.S. §134-A (4) he would carry in all these locations;

i)  Sansei;

ii)  Alaloa Lounge;

iii) Maui Brewing company (This place shares a parking lot with the a medical facility and other private establishments)

I)      Atom Kasprzycki has in the past regularly frequented the following areas which are, according to information and belief, banks or financial institutions as defined in section 211D-1, and has in the past carried a concealed arm with his permit and intends to, as a carry concealed license holder since 2022, in the future, own, possess, and carry a firearm with his concealed carry permit in these locations and locations like them.  He intends to and will use his carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230. He has every intention and desire to continue to carry his personal firearm in and at all these locations, and locations like them, in the future but he will decline to do so because of the credible fear of arrest and prosecution after July1, 2023, the effective date of SB1230;

i)  First Hawaiian Bank (including specifically, but not limited to the

5-ER-1196

branches at Lahaina, Kahana, Kahului and Makawao);

ii) Bank of Hawaii (including specifically, but not limited to the branch at Kahana);

J) Atom Kasprzycki has in the past regularly frequented the following areas which are, according to information and belief, all other locations considered private property, not covered otherwise by HRS 134-A(a) but specifically covered under HRS 134-E that requires private property owners to "opt-in" and post signage allowing the exercise of the Second Amendment right to carry an arm for self- defense or in case of confrontation, and he has carried a concealed arm with a permit in the past and intends to, as a carry concealed license holder since 2022, in the future, own, possess, and carry a firearm with his concealed carry permit in these locations and similar locations.  He intends to and will use his carry concealed permit to carry arms concealed in the locations referenced herein, but for the implementation and enactment of SB1230. He has every intention and desire to continue to carry his personal firearm in and at all these locations, and locations like them, in the future but he will decline to do so because of the credible fear of arrest and prosecution after July1, 2023, the effective date of SB1230.  But for HRS 134-E he would carry in all these locations;

i) The Club Maui Kahana gym

ii) Kasprzycki's office, Kasprzycki Designs Inc, shares a parking lot

with a bank, Bank of Hawaii;

## VII

## COUNT II

**First Amendment, Fourteenth Amendment, Compelled Speech**

62.    Plaintiff Kasprzycki owns and operates his own business, Kasprzycki

Designs Inc;

63.  Kasprzycki owns the office space;

64.  Kasprzycki has many clients and some do not support the exercise of

Second Amendment rights through the carrying of concealed weapons with

a permit and some do support the exercise of Second Amendment rights

through the carrying of concealed weapons with a permit;

65.  Kasprzycki is an architect by trade and does not want to involve his

business and or his business property in issues related to the Second

Amendment and or the First Amendment and he does not wish to be forced

to express support or disapproval of the carrying of concealed arms with a

permit and he does not wish to be forced to post signage, or to otherwise be

forced to communicate with clients, to expressly consent to allow or

62

disallow the carrying of concealed arms with a permit. Once H.R.S. §134-E goes into effect, Kasprzycki will not put up a sign or otherwise give prior written or verbal consent to carry a firearm. But for H.R.S. §134-E Kasprzycki would allow people to carry firearms in his business.

66.  The First Amendment prohibits the State from telling people what they must say. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013);

66.  Kasprzycki's business property and office is open to the public for business purposes;

67.  SB1230's HRS 134-E compels the speech of private property owners and lessees.  It requires property owners and lessees to espouse a belief one way or the other on the carriage of firearms outside the home by requiring them to expressly consent or post a sign and therefore it is compelled speech and unconstitutional under the First and Fourteenth amendment;


### VIII

### (DECLARATORY JUDGMENT)

68.  Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein;

5-ER-1199

69. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a);

70. Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future;

71. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment;

72. This Court possesses an independent basis for jurisdiction over the parties;

73. Plaintiffs seek a judgment declaring that Defendants' policies/laws, including specifically those portions of SB1230 challenged herein, which deny Plaintiffs their Second Amendment rights to carry arms in case of confrontation in the locations specified herein are unconstitutional under the Second Amendment;

74. Alternatively, a declaration that those specified aspects of SB1230 herein are unconstitutional as applied to each Plaintiff;

75. A declaration and judgment that those portions of SB1230 specified herein are unconstitutional as violative of the Second Amendment;

76. A declaration and judgment that, with regard to Plaintiff Kasprzycki, SB1230's enactment of HRS 134-E, is facially unconstitutional under the First Amendment and Fourteenth amendment;

77. Alternatively, a declaration and judgment that, with regard to Plaintiff Kasprzycki, SB1230's enactment of HRS 134-E, is unconstitutional under the First Amendment and Fourteenth amendment as applied to him;

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Defendants' policies complained about above;

2. Plaintiffs request this Court, enjoin the above challenged SB1230 provisions and any other relevant provision of SB1230 and or Hawaii law, both facially and as applied to Plaintiffs;

3. Declaratory relief that the complained of SB1230 provisions and any related HRS provisions are unconstitutional both facially and as applied to Plaintiffs.

5-ER-1201

4.  Awarding Plaintiffs' attorney fees and costs pursuant to 42 U.S.C.
    §1988;

5.  Nominal Damages.

6.  Compensatory Damages

7.  Such other relief consistent with the injunction as appropriate; and

8.  Such other further relief as the Court deems just and appropriate.

Dated: June 23, 2023.

Respectfully submitted,


/s/ *Kevin O'Grady*

Kevin Gerard O'Grady

Law Office of Kevin O'Grady, LLC
1164Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com


/s/ *Alan Beck*

Alan Alexander Beck

Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

5-ER-1202

Counsel for Plaintiffs

**5-ER-1203**

## VERIFICATION

I, Jason Wolford, declare as follows:

1. I am the Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on June 22, 2023

JASON WOLFORD

68

**5-ER-1204**

## VERIFICATION

I, Alison Wolford, declare as follows:

1. I am the Plaintiff in the present case and a citizen of the United States of America.

2. I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on June 22, 2023

ALISON WOLFORD

**5-ER-1205**

## VERIFICATION

I, Atom Kasprzycki, declare as follows:

1. I am the Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on June 22, 2023

_____

ATOM KASPRZYCKI

5-ER-1206

**VERIFICATION**

I, Andrew Namiki Roberts, as Director of Hawaii Firearms Coalition, and on behalf of HIFICO members statewide, declare as follows:

1. I am the Director of the Hawaii Firearms Coalition as an institutional Plaintiff in the present case and a nonresident alien.

2. I have personal knowledge of myself, my activities, and my intentions, as well as the activities of HIFICO and its members, including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief*, and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions, and the activities of HIFICO and its members are true and correct.

Executed on June 22, 2023

ANDREW NAMIKI ROBERTS

71