No. 23-16164

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI;
HAWAII FIREARMS COALITION

*Plaintiffs-Appellees,*

v.

ANNE E. LOPEZ, in her official capacity as
the Attorney General of the State of Hawai'i,

*Defendant-Appellant*

————————————

On Appeal from the United States District Court
for the District of Hawai'i
Case No. 1:23-CV-00265 | The Honorable Leslie E. Kobayashi

————————————

## BRIEF OF PATRICK J. CHARLES AS
## *AMICUS CURIAE* SUPPORTING REVERSAL

————————————

Jeremy S. Smith
Patrick J. Fuster
Adrienne M. Liu
Eitan Arom
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
pfuster@gibsondunn.com

————————————

*Attorneys for Amicus Curiae Patrick J. Charles*

# TABLE OF CONTENTS

Page

INTEREST OF *AMICUS CURIAE* ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 3

ARGUMENT ........................................................................................... 5

I.    This Court should approach the historical tradition of
      firearms regulation in a contextual manner. .................................. 5

      A.    Context should inform this Court in deciding what
            counts as a historical tradition. ............................................ 7

      B.    This Court should draw analogies based on the purpose
            and substance of a given regulation. ................................... 13

II.   History and tradition support a robust understanding of the
      sensitive-places doctrine. .............................................................. 18

      A.    Governments consistently enacted location-based arms
            restrictions before, at the time of, and in the decades
            after the Second Amendment's ratification. ......................... 18

      B.    Courts uniformly upheld historical location-specific
            regulations of firearms possession. ..................................... 30

      C.    A contextual review of the longstanding historical
            regulations on public carriage suggests a broad
            conception of what counts as a sensitive place. .................... 33

CONCLUSION ....................................................................................... 36

CERTIFICATE OF COMPLIANCE ........................................................ 37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Andrews v. State,*
50 Tenn. 165 (1871).........................................................31, 34

*District of Columbia v. Heller,*
554 U.S. 570 (2008)...............................................13, 30, 31

*English v. State,*
35 Tex. 473 (1872).........................................................31, 34

*Hill v. State,*
53 Ga. 472 (1874) .........................................................31, 32

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019)................................................17

*McDonald v. Chicago,*
561 U.S. 742 (2010)................................................................16

*New York Rifle & Pistol Association, Inc. v. Bruen,*
142 S. Ct. 2111 (2022)...................................1, 3, 4, 5, 12, 13,
14, 15, 16, 18, 19,
21, 29, 30, 31, 34, 35

*Nunn v. State,*
1 Ga. 243 (1846) ..................................................................16

*Oregon v. Ice,*
555 U.S. 160 (2009).............................................................10

*Owens v. State,*
3 Tex. App. 404 (1878) .......................................................32

*Reynolds v. United States,*
98 U.S. 145 (1879)...............................................................16

*State v. Reando*
  (Mo. 1878) (unreported) ........................................................ 33

*State v. Shelby*,
  90 Mo. 302 (1886).......................................................... 32, 33

*United States v. Cruikshank*,
  92 U.S. 542 (1876) ............................................................ 19

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) ............................................... 17

## Constitutional Provisions

U.S. Const. amend. II ................................................................ 1

U.S. Const. amend. XIV ........................................................... 23

Del. Const. art. 28 (1776) ......................................................... 21

## Statutes

2 Edw. 3 c. 3 (1328)................................................................. 19

7 Rich. 2 c. 13 (1383).............................................................. 20

20 Rich. 2 c. 1 (1396).............................................................. 20

4 Hen. 4 c. 29 (1402) .............................................................. 20

26 Hen. 8 c. 6, § 3 (1534) ........................................................ 20

33 Hen. 8 c. 6, § 3 (1541) ........................................................ 20

1647 Md. Laws 216 ................................................................. 21

1650 Md. Laws 273 ................................................................. 21

1705 Pa. Laws ch. 128 at 30...................................................... 22

1763 N.Y. Laws ch. 1233 at 441–42........................................... 22

1786 Mass. Laws ch. 8 at 502–04 .............................................. 22

1786 Va. Acts ch. 49 at 35 .................................................................... 7

1797 N.J. Laws ch. 637 at 179–80 ..................................................... 22

Mass. Rev. Stat. ch. 134, § 16 (1836) ................................................ 7

1852 N.M. Laws § 3 at 69 .................................................................. 25

1867 Kan. Sess. Laws ch. 12, § 1 at 25 ............................................. 25

1868 Pa. Laws no. 1020, § 21 at 1088 ............................................... 24

1869 Tenn. Pub. Acts ch. 22, § 2 at 23–24 ....................................... 23

1870 Ga. Laws no. 285, § 1 at 421 .................................................... 23

1870 La. Acts no. 100, § 73 at 159–60 .............................................. 24

1871 Tex. Gen. Laws ch. 34, § 3 at 25–26 ....................................... 24

1874 Md. Laws ch. 250, § 1 at 366–67 .............................................. 24

1878 Miss. Laws ch. 46, § 2 at 175 .................................................... 25

Mo. Rev. Stat. ch. 24, § 1274 (1879) ................................................ 25

1883 Wis. Sess. Laws ch. 329, § 3 at 290 ........................................ 25

1886 Md. Laws ch. 189, § 1 at 315 .................................................... 24

1888 N.J. Laws ch. 325, § 47 at 501 ................................................... 9

1889 Ariz. Sess. Laws no. 13, § 3 at 30–31 ....................................... 24

1890 Okla. Stats. ch. 25, art. 47, § 7 at 496 ..................................... 24

1890 Okla. Stats. ch. 25, § 7 at 496 .................................................. 25

1905 Minn. Laws ch. 344, § 53 at 620 ............................................... 26

1917 Wis. Sess. Laws ch. 668, § 29.57(4) at 1243–44 ............................ 26

## Ordinances

Asheville, N.C., Ordinance § 61 (June 1, 1882)......................................29

Blackwell, Okla., Town Ordinance No. 21 § 3 (Aug. 7, 1894)................29

Brooklyn, N.Y., Sanitary Code § 174 (July 15, 1873) ............................28

Buffalo, N.Y., Park Ordinances ch. 1, § 1 (May 13, 1873) .....................28

Chadron, Neb., Ordinance No. 45 § 6 (Feb. 20, 1888)............................11

Chicago, Ill., Municipal Code art. 42, § 1690 at 391 (1881)...................28

Columbia, Mo., General Ordinances ch. 17, § 163 (May 22, 1890) ........27

Franklin, Ind., Ordinance No. 20 (Apr. 15, 1881)...................................10

Gainesville, Mo., Ordinance § 9 (May 26, 1896) ....................................26

Gaston County, N.C., Regulation no. 5 (Sept. 17, 1873)........................28

Grand Junction, Colo., Ordinance No. 83 § 6 (June 30, 1899) ..............29

Greenfield, Mo., Ordinance No. 39 § 1 (Jan. 4, 1886)......................27, 29

Harrisburg, Pa., Weapons Ordinance § 1 (Apr. 12, 1873) .....................29

Huntsville, Mo., Ordinance in Relation to Carrying Deadly
    Weapons § 1 (July 17, 1894)................................................................27

Lake Charles, La., Ordinance § 1 (June 20, 1874).................................29

Leonard, Mo., Ordinance No. 23 § 1 (July 6, 1891)................................27

Lincoln County, N.C., Regulation no. 5 (July 20, 1872) ........................28

Lyons, Kan., Ordinance No. 179 § 1 (Sept. 7, 1891) ..............................29

Marceline, Mo., Ordinance No. 9 § 8 (Mar. 12, 1892) ...........................27

Maysville, Ky., Ordinance § 22 (Nov. 25, 1895) .....................................11

New Haven, Conn., Rules and Regulations of the Park
   Commissioner no. 3 (1898) ................................................ 28

New Salem, Pa., Ordinance § 24 (Sept. 26, 1876) .................................. 29

New York, N.Y., Health Ordinances § 147 at 52 (1866) ......................... 28

Olympia, Wash., Ordinance No. 13 § 2 (Mar. 3, 1860) ........................... 26

Portland, Or., Ordinance No. 14027 § 1 (June 2, 1904) .......................... 11

Ridgeway, Mo., Town Ordinance No. 28 § 12 (Apr. 3, 1893) .................. 27

Rocheport, Mo., Ordinance § 2 (1895) .................................................... 29

Stockton, Kan., Ordinance No. 76 § 1 (July 1, 1887) .............................. 27

Tucson, Ariz., Ordinance No. 9 § 1 (Jan. 28, 1873) ................................ 26

Waco, Tex. Ordinance, art. 119a § 1 (July 9, 1891) ............................... 27

Wallace, Kan., Ordinance § 3 (Dec. 22, 1887) ....................................... 29

Wilmington, Del., Park Regulation no. 7 (July 13, 1888) ...................... 28

Yazoo, Miss., Ordinance § 2 (Sept. 17, 1890) ........................................ 11

## Other Authorities

A. Willinger, *The Territories under Text, History, and Tradition*,
   101 Wash. U. L. Rev. 1 (2023) ............................................ 16

E. Cheyney, *Law in History and Other Essays* (1927) ........................... 14

J.B. Bishop, *Commentaries on the Law of Statutory Crimes* (1873) ......... 9

J. Blocher, *Firearms Localism*, 123 Yale L. J. 82 (2013) ........................ 9

J. Blocher, J. Charles, and D. Miller, *"A Map Is Not the
   Territory": The Theory and Future of Sensitive Places
   Doctrine*, N.Y.U. L. Rev. Online (forthcoming) .................................. 35

J. Keble, *An Assistance to the Justices of the Peace for the Easier Performance of Their Duty* (1683)............................................. 20

L. Edwards & M. Cooper, *The Sounds of Silence: An Examination of Local Legal Records Reveals Robust Historical Regulation of the Public Peace*, Duke Center for Firearms Law (Aug. 18, 2023)............................................. 12

L.P. Hartley, *The Go-Between* (1953) ....................................................... 14

M. Dalton, *The Countrey Justice, Containing the Practices of the Justices of the Peace* (1666 ed.)....................................................... 20

P. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J. L. & Pub. Pol'y 323 (2011)................................. 22

P. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (2018) ............................ 1, 22, 23

P. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 Clev. St. L. Rev. 373 (2016) .............................................................. 8

P. Charles, *The Fugazi Second Amendment:* Bruen's *Text, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623 (2023) ........................ 7, 8, 9, 12, 15, 16, 28, 29

P. Charles, *Vote Gun: How Gun Rights Became Politicized in the United States* (2023) ....................................................................... 1

*Philadelphia Centennial Exposition*, Historical Society of Pennsylvania....................................................... 25

## INTEREST OF *AMICUS CURIAE*\*

This *amicus curiae* brief is submitted on behalf of historian and legal scholar Patrick J. Charles to provide a firearms historian's perspective about how best to apply the "historical tradition" approach espoused by *New York Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022), to the "sensitive places" doctrine.

Mr. Charles is the author of several books, including *Vote Gun: How Gun Rights Became Politicized in the United States* (2023) and *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (2018), as well as more than 20 articles on the history of the Second Amendment, firearm regulations, and the use of history as a jurisprudential tool. The federal courts of appeal and justices of the Supreme Court have cited and relied on Mr. Charles's scholarship. Mr. Charles currently serves as the Division Chief for the Air Force Historical Research Agency's (AFHRA) Oral History and Studies Division. For over a decade, Mr. Charles has served as a United States Air Force (USAF)

---

\* No party's counsel authored this *amicus curiae* brief in whole or in part, and no party, party's counsel, or any other person contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this *amicus curiae* brief.

historian in several capacities, including recently serving as the head of AFHRA's Research Division, where Mr. Charles oversaw all official historical information and archival requests for the USAF. This brief reflects the views of Mr. Charles, not those of the USAF or the Department of Defense.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Second Amendment litigation now proceeds by historical analogy. Under the Supreme Court's latest decision, modern gun laws must have some foundation in "this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). *Bruen* asks much from parties and judges—that they master the historical record, understand the laws in their original context, and extend those principles forward to this day and age.

That is no small feat: The past can be hard to uncover and, even then, often hard to understand. And past regulatory solutions never map perfectly onto today's problems, especially now that a single person with a semi-automatic firearm can cause immeasurably more damage in a blink of an eye than his musket-toting counterpart at the Founding. Still, *Bruen* does not ask *so* much from parties and judges that the Second Amendment eviscerates modern firearm regulations with a deep historical pedigree.

The Supreme Court has set forth general principles on how to analogize our present to the past. Under *Bruen*, the key questions are "how and why the regulations burden a law-abiding citizen's right to armed

self-defense." 142 S. Ct. at 2133. Reasonable similarity is the touchstone: A "modern-day regulation" need not be a "dead ringer for historical precursors," so long as the new and old share more than a "'remote[] resembl[ance].'" *Ibid.* In other words, "the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Ibid.* But apart from that general guidance, *Bruen* leaves much unanswered about how courts should determine (1) whether a tradition of regulation exists in the historical record and (2) whether a modern law falls in the sweep of that tradition.

In the first half of this brief, *amicus curiae* offers his views on how courts can implement *Bruen* in a workable fashion that takes history on its own terms, rather than on opportunistic pick-and-choose terms. Courts should rely on context to define the tradition at an appropriately high level of generality and reject attempts to infer an absence of authority to regulate firearms from gaps in the historical record. This approach not only is consistent with *Bruen*, but also adheres to rigorous historical methods that are less prone to manipulation in litigation and provides courts with a predictable template for deciding Second Amendment disputes going forward.

4

In the second half of this brief, *amicus curiae* details his research into the historical tradition of location-based restrictions on firearms possession. These laws did not use the nomenclature of "sensitive places." But the concept dates back at least to the early 14th century when Parliament restricted the carrying of arms into fairs and markets. Before and after the Founding, States, Territories, and municipalities alike regulated firearms in places where people assembled to conduct public business (e.g., statehouses, courts, and polling places), to engage in religious exercise (e.g., churches), to enjoy entertainment together (e.g., parks and town squares), and to consume alcohol (e.g., dancehalls and taverns). These historical laws, viewed holistically, support modern-day regulations of the carrying of dangerous weapons in a variety of places where people are known to congregate.

## ARGUMENT

### I. This Court should approach the historical tradition of firearms regulation in a contextual manner.

The Supreme Court in *Bruen* largely left for another day the question of how to define a "historical tradition" for purposes of analogizing to a modern regulation. 142 S. Ct. at 2131–33. One option, exemplified by the decision below, is to knock down each comparable regulation, one by

5

one, for arbitrary and even contradictory reasons. Here, the district court rejected various historical examples as "territorial laws" that predated statehood, 1-ER-57, "local ordinances, not state laws," 1-ER-67, or regulations of antiquated-sounding places (such as fairs or markets) rather than modern equivalents (such as banks), 1-ER-79, all without ever explaining *why* those distinctions undercut the tradition of firearms regulation. Only by nitpicking every example out of existence could the district court arrive at the remarkably wrong conclusion that restrictions on firearms possession in banks, bars, and beaches had *no* analogous predecessors in the historical record. 1-ER-59; 1-ER-74; 1-ER-77.

The other option—and the only one consistent with rigorous methods—is to perform a contextual review of all the historical evidence available, considering not just how many laws were on the books at a particular time, but why they were enacted, how they worked in the real world, and whether there was any serious legal argument that they violated the right to keep and bear arms. This approach accounts for absences, uncertainties, and shortcomings in the historical record, and recognizes the underlying conditions that caused traditions to shift and evolve. Only by accounting for this context and analyzing the historical record at an

6

appropriately high level of generality can courts predictably identify traditions of regulation in a way that is less susceptible to parties' opportunistic inferences from gaps in the record.

### A. Context should inform this Court in deciding what counts as a historical tradition.

Courts should rely on historical context to situate a tradition of regulation even where underlying conditions have changed, different levels of government have taken charge of policing the risks of firearms, and records have been lost to time.

To start, context can connect the dots between seemingly different laws, showing a consistent trend of regulation despite changing facts on the ground. Consider, for example, the demise of so-called surety laws. At the turn of the 18th century, a number of States enacted laws providing that a person who chose to go armed "without reasonable cause to fear an assault or other injury" could "be required to find sureties"—that is, to post a bond—"for keeping the peace." Mass. Rev. Stat. ch. 134, § 16 (1836); see, e.g., 1786 Va. Acts ch. 49 at 35; see also P. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623, 641 n.122 (2023) (collecting examples).

The surety-of-the-peace system worked well when people mostly lived (and stayed) in small communities, but that model of regulation broke down as the country's population exploded and people started to move around more. Charles, *The Fugazi Second Amendment*, *supra*, at 652. As a result, States and local governments began replacing surety laws with concrete punishments and armed-carriage licensing laws. P. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 Clev. St. L. Rev. 373, 419–22 (2016). The fact that surety laws are absent from the later record does not mean they were an isolated phenomenon that vanished after the Industrial Revolution, but rather that they were part of a tradition that endured as it evolved. And conversely, the fact that certain licensing laws are absent from the earlier record doesn't mean that people at the Founding thought that licensing laws violated the right to keep and bear arms, but rather that licensing is a later phase in an ongoing tradition of regulation that began with surety laws.

Another contextual point that courts should consider is that, before and after the Founding, most historical regulation occurred through local enforcement of common-law prohibitions and municipal laws, rather

8

than across-the-board enactments of Parliament, Congress, or state leg-islatures. Charles, *The Fugazi Second Amendment*, *supra*, at 650–53. Justices of the peace and constables enforced the common law of firearms regulation, which was flexible by design or, said otherwise, "adapted to the wants of every civilized community." J.B. Bishop, *Commentaries on the Law of Statutory Crimes* § 784 at 494 (1873). Often, cities with dense urban populations, such as London or New York City, also supplemented the common law with more specific prohibitions. J. Blocher, *Firearms Localism*, 123 Yale L. J. 82, 112–16 (2013).

Several States and Territories even explicitly delegated to munici-palities the authority to regulate the carrying of weapons within their borders. Charles, *The Fugazi Second Amendment*, *supra*, at 662 n.256, 685 n.406. For example, New Jersey devolved on towns the authority "to regulate or prohibit the use of firearms and the carrying of weapons of any kind." 1888 N.J. Laws ch. 325, § 47 at 501. So the absence of regu-lation at the *state* level doesn't tell us much about a tradition of firearms regulation at a time when most regulations across all subjects occurred at the *local* level. Courts will overlook the majority of firearms regulation

if they discount local examples in a single-minded search for state statutes.

Variation is also baked into the historical context for reasons other than the Second Amendment's legal constraints on the bounds of democratic lawmaking. States and municipalities frequently experimented with different policy responses to the same problem, as one would expect given the longstanding "role of the States as laboratories for devising solutions to difficult legal problems." *Oregon v. Ice*, 555 U.S. 160, 171 (2009). The decision to adopt one approach rather than another often reflected local conditions and preferences, not a hard-edged judgment about constitutional imperatives.

Take, for instance, age restrictions on firearms use. Based on *amicus curiae*'s 15 years of experience researching historical firearm regulations, age-based restrictions draw on one of the most robust traditions of firearms regulation in this Nation's history. But even these regulations varied from place to place. Although a majority of jurisdictions that passed such laws restricted firearms possession by those under 21, e.g., Franklin, Ind., Ordinance No. 20 (Apr. 15, 1881) (Ex. 8), some jurisdictions allowed firearms possession when a person turned 18, e.g.,

Portland, Or., Ordinance No. 14027 § 1 (June 2, 1904) (Ex. 25), or even as young as 14, e.g., Yazoo, Miss., Ordinance § 2 (Sept. 17, 1890) (Ex. 33). The laws also varied their means: Some jurisdictions enacted laws that forbade selling firearms to minors, e.g., Maysville, Ky., Ordinance § 22 (Nov. 25, 1895) (Ex. 20), while others regulated the age at which a person could carry or possess firearms, e.g., Chadron, Neb., Ordinance No. 45 § 6 (Feb. 20, 1888) (Ex. 5).

The point is not that there was no consistent history of firearms regulation for those under 21—the opposite was true. Yet these examples reveal that an approach that slices and dices the historical record based on irrelevant factors can manipulate away even the most entrenched traditions. If courts were to focus narrowly on whether there was a *uniform* historical tradition of forbidding firearms *possession* by (rather than sales to) those younger than 21 (rather than 18 or another age), the answer may, strangely enough, be no. But if courts frame the question at an appropriate level of generality—whether jurisdictions exercised the authority to impose reasonable age limits on firearms possession and sales—the answer is doubtless yes.

Context can also help courts to navigate around the inevitable shortcomings in the historical record. As mentioned, justices of the peace and other local officials enforced firearms regulations in a wide range of circumstances at the time of the Founding and for well over a century thereafter. These local decisions are an important source for defining the contours of the right to keep and bear arms because the Second Amendment was "meant to codify a *pre-existing* right" possessed by Englishmen. *Bruen*, 142 S. Ct. at 2130. But most of these records "have been lost to time," leaving only a "tiny fraction of the whole." Charles, *The Fugazi Second Amendment*, *supra*, at 671; see L. Edwards & M. Cooper, *The Sounds of Silence: An Examination of Local Legal Records Reveals Robust Historical Regulation of the Public Peace*, Duke Center for Firearms Law (Aug. 18, 2023), https://tinyurl.com/mr4pr2xh.

*Amicus curiae* can speak from his own experience to the difficulty of tracking down archival records scattered from jurisdiction to jurisdiction. For example, ordinances were sometimes published in local newspapers, which have largely not been preserved for posterity. See Addendum, *infra*. But the absence of records does not mean an absence of historical regulation. When historians, despite the long odds, are able to get

12

their hands on these records, they shed light on a legitimate tradition of regulation stretching back to before the Founding.

Only the context-based approach that *amicus curiae* proposes here can prevent *Bruen* from invalidating the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, [and] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" that the Supreme Court has also preserved. *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); see *Bruen*, 142 S. Ct. at 2133. Justice Kavanaugh, together with Chief Justice Roberts, joined the *Bruen* majority only on the understanding that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." 142 S. Ct. at 2162 (concurring opinion) (quoting *Heller*, 554 U.S. at 636). Courts should not read *Bruen* to obliterate its own limits.

## B. This Court should draw analogies based on the purpose and substance of a given regulation.

Once this Court has identified the relevant historical tradition, it should carry forward that same contextual understanding in drawing analogies to modern regulations. The analysis should not abstract away from a historical tradition to such a degree that *all* modern regulations are constitutional. But neither should courts get lost in minutiae of

exactly how the law operated—through surety, licensing, and so on. *Supra*, at 8. *No* modern regulations would survive this approach because the past and present are never identical in every way. See E. Cheyney, *Law in History and Other Essays* 27–28, 169 (1927). After all, "[t]he past is a foreign country: they do things differently there." L.P. Hartley, *The Go-Between* 1 (1953).

In general, courts should reason from historical traditions based on the purposes those traditions served. A modern law that serves the same purpose in substance as earlier regulations—say, by responding to a like risk—should be upheld as the next installment in an existing historical tradition. That is so even if the modern law uses superficially different means to achieve the same end.

This contextual approach is on all fours with *Bruen*. The Supreme Court recognized that courts drawing analogies from the historical record need "'some metric enabling the analogizer to assess which similarities are important and which are not.'" 142 S. Ct. at 2132. In deciding when a historical tradition is "relevantly similar" to a modern law, the Court stressed that the proper metrics are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

14

In other words, the Court endorsed an approach where historical analogies depend on a particular law's rationale and real-world impact rather than its precise form.

In addition, courts should assess the weight of the tradition of firearms regulation without turning the Second Amendment into a nose-counting competition. The Supreme Court has explained that if a new regulation "addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation" can suggest that governments believed that they didn't possess such power. *Bruen*, 142 S. Ct. at 2131. That means, necessarily, that if a risk *didn't* come into being until later, the absence of earlier regulation doesn't imply an absence of authority to regulate the later-arising risks. For instance, some firearms-related risks were specific to urban areas, which made up a tiny 5% slice of the overwhelmingly rural American population in 1790 and still only a quarter of Americans by 1880. A blinkered population-percentage approach can overlook that restrictions were prevalent where (and only where) they were needed. Charles, *The Fugazi Second Amendment*, *supra*, at 684 n.404. Modern lawmakers also face new risks that were not present at the Founding because of the massive advances in

firearms technology, such as lethality, firing rate, and firing range. *Id.* at 686.

Legal challenges (and the lack thereof) also provide critical context. Some types of regulations, even if "relatively few" in number, engendered "no disputes regarding [their] lawfulness." *Bruen*, 142 S. Ct. at 2133. The absence of such disputes is telling. In the 19th century, people who objected to state and local laws had ready access to state courts, which generally recognized both the federal and state constitutional rights to keep and bear arms even before the Supreme Court held that the Due Process Clause incorporates the Second Amendment against the States. *McDonald v. Chicago*, 561 U.S. 742, 777–78 (2010); see, e.g., *Nunn v. State*, 1 Ga. 243, 250 (1846). People also could bring Second Amendment challenges against territorial laws because the Bill of Rights has always applied in the Territories. E.g., *Reynolds v. United States*, 98 U.S. 145, 162 (1879) (so holding for First Amendment); see A. Willinger, *The Territories under Text, History, and Tradition*, 101 Wash. U. L. Rev. 1, 28–37 (2023). Courts that neglect the unchallenged nature of commonplace regulations and instead embrace litmus tests based on population or time

period are destined to invalidate settled, though not universal, traditions of regulation.

For example, the Eighth Circuit modeled proper analogical reasoning in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), which addressed whether the Second Amendment invalidated a federal prohibition on gun possession by felons whose drug offenses were not violent. *Id.* at 501. The Eighth Circuit saw a long tradition of disarming groups of people "who are not 'law-abiding.'" *Id.* at 502. That tradition, judged at the appropriate level of generality, supported the modern prohibition—even though the historical prohibitions did not concern drugs and even though some of them (religion- and race-based bans on gun possession) "would be impermissible today under *other* constitutional provisions." *Id.* at 502–04 (emphasis added); accord *Kanter v. Barr*, 919 F.3d 437, 456–58 & n.7 (7th Cir. 2019) (Barrett, J., dissenting).

Simply put, context and common sense dictate that there must be a line *somewhere*, based in historical tradition, that allows lawmakers to pass some firearms regulations but not others. The tools that allow courts to draw these lines are not novel. Courts are already well versed

in applying common sense and context. They should not check those skills at the door when it comes to the Second Amendment.

## II. History and tradition support a robust understanding of the sensitive-places doctrine.

The historical record confirms that governments have restricted the right to bear arms in a broad range of public places for centuries. The historical evidence, here as elsewhere, is never as complete as one would like. But what does exist in the historical record establishes a long tradition of unchallenged government regulations restricting arms carrying in a range of public places going back at least to 14th-century England. Given the Supreme Court's pronouncement that "sensitive places" restrictions are presumptively lawful in the absence of disputes to the contrary, *Bruen*, 142 S. Ct. at 2133, these historical regulations compel the conclusion that a wide variety of locations can count as "sensitive" for purposes of the Second Amendment today.

### A. Governments consistently enacted location-based arms restrictions before, at the time of, and in the decades after the Second Amendment's ratification.

Neither English law nor early American law explicitly recognized a formal "sensitive places" doctrine. But even though the label is new, the concept of location-based restrictions goes at least as far back as

Edward III's reign in the 14th century. Such restrictions have continued to evolve since the Founding in response to society's needs at a given time.

1. Location-based restrictions under English law are a natural starting point. That is true both chronologically and analytically. As the Supreme Court has recognized on multiple occasions, firearms restrictions under English law illuminate the scope of the Second Amendment's protections because the Amendment "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127; see, e.g., *United States v. Cruikshank*, 92 U.S. 542, 553 (1876). The Framers of course did not necessarily adopt every aspect of English custom. But English law nevertheless supplies the backdrop for the Second Amendment's ratification.

Parliament regulated arms bearing in a range of public spaces where people would frequently congregate. As early as 1328, Parliament enacted the Statute of Northampton, which prohibited people from going "armed by night nor by day, in Fairs, Markets, nor in the presence of the [King's] Justices and other Ministers." 2 Edw. 3 c. 3 (1328). Parliament reaffirmed the Statute of Northampton twice during Richard II's reign.

7 Rich. 2 c. 13 (1383); 20 Rich. 2 c. 1 (1396). Parliament later extended the prohibition on the bearing of arms from fairs and markets (places of commerce) to "Churches" and "Highways" (places of religious exercise and public travel). 4 Hen. 4 c. 29 (1402).

Location-based restrictions on the public carrying of firearms continued into the 16th and 17th centuries. In 1534, Parliament updated the Statute of Northampton to forbid arms in court (and within a two-mile radius of a court), as well as in "any towne, churche, fayre, markett or other congregacion." 26 Hen. 8 c. 6, § 3 (1534). Just a few years later, Parliament prohibited individuals from riding on highways with certain types of arms, including loaded guns. 33 Hen. 8 c. 6, § 3 (1541). And in the 17th century, justices of the peace had the power to arrest people who went "armed offensively . . . in Fairs, Markets, or elsewhere." M. Dalton, *The Countrey Justice, Containing the Practices of the Justices of the Peace* 38 (1666 ed.); accord J. Keble, *An Assistance to the Justices of the Peace for the Easier Performance of Their Duty* 224 (1683) (explaining that English law authorized arrest and forfeiture for those who "shall be so bold as to go or ride Armed, by night or by day, in Fairs, Markets, or any other places" against the Statute of Northampton).

In *Bruen*, the Supreme Court concluded that the Statute of Northampton did not provide a basis for categorically limiting the right to carry a firearm publicly "only to those who demonstrate some special need for self-protection." 142 S. Ct. at 2142. But the Court didn't consider any of the location-specific restrictions in follow-on revisions to the Statute of Northampton because *Bruen* did not present that question. As to this question of first impression regarding the sensitive-places doctrine, an unbroken series of English laws regulated firearms possession in a broad range of public places where people assembled to conduct business, hear mass, and partake in entertainment.

**2.** Location-specific restrictions soon crossed the Atlantic to the Colonies. In the mid-17th century, Maryland adopted two statutes forbidding individuals to bear arms in its legislative houses, much like the Statute of Northampton's prohibition on arms carrying in the presence of the King's justices and ministers. 1647 Md. Laws 216; 1650 Md. Laws 273. And in 1776, Delaware adopted a constitutional provision restricting the carrying of arms and gathering of militias at a then-new place of public congregation—polling places. Del. Const. art. 28 (1776) (providing

21

that "no persons shall come armed to any [elections], and no muster of the militia shall be made on that day").

More generally, States and local governments began enacting laws that cemented their authority to restrict armed assemblies that operated without government consent. See, e.g., 1705 Pa. Laws ch. 128 at 30; 1763 N.Y. Laws ch. 1233 at 441–42; 1786 Mass. Laws ch. 8 at 502–04; 1797 N.J. Laws ch. 637 at 179–80; see also P. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J. L. & Pub. Pol'y 323, 326–27, 374–90 (2011). Although these statutes didn't necessarily restrict arms carrying at *specific* locations, they confirmed the broader governmental authority underlying such restrictions—that regulations of firearms in public spaces are a proper exercise of the State's police power.

**3.** As American society evolved in the 19th and early 20th century, so too did the ways in which States and Territories exercised their longstanding authority to restrict firearms possession in public areas. The Nation's population was soaring, leading communities to find new ways and places to gather. See P. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141 (2018).

During the same period, firearms technology also developed apace, particularly in lethality, firing rate, and firing range. See *id.* at 150–56.

States and Territories responded to these changes by enacting laws that broadly restricted firearms possession in a range of public areas where people regularly congregated. Building on restrictions from England and Founding-era America, several of these laws banned the carrying of firearms in churches and polling locations. But many States and Territories also expanded their prohibitions to new gathering places, such as schools, event spaces, places of public assembly, and places where alcohol was consumed or sold.

The year after the ratification of the Fourteenth Amendment, which incorporated the Second Amendment against the States, Tennessee restricted the carrying of firearms into "any election . . . fair, race course, or other public assembly of the people." 1869 Tenn. Pub. Acts ch. 22, § 2 at 23–24. Georgia then prohibited the carrying of arms "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State." 1870 Ga. Laws no. 285, § 1 at 421. Texas also prohibited arms not just in places of worship and election precincts, but also in "any school room, or other place where persons

are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering" or "any other place where people may be assembled to muster, or to perform any other public duty, . . . or any other public assembly." 1871 Tex. Gen. Laws ch. 34, § 3 at 25–26. Arizona and Oklahoma soon followed these States' lead. Both Territories embraced not only time-tested bans on firearms in courthouses, places of worship, and polling places, but also similar restrictions for schools, places of public assembly, and social venues. 1889 Ariz. Sess. Laws no. 13, § 3 at 30–31; 1890 Okla. Stats. ch. 25, art. 47, § 7 at 496.

Other States adopted relatively more limited regulations in specific places. Louisiana forbade people to carry firearms "on any day of election during the hours the polls are open." 1870 La. Acts no. 100, § 73 at 159–60. Maryland also enacted prohibitions on carrying weapons on election days in Kent, Queen Anne's, Montgomery and Calvert Counties. 1874 Md. Laws ch. 250, § 1 at 366–67; 1886 Md. Laws ch. 189, § 1 at 315. And Pennsylvania forbade the carrying of firearms in Fairmount Park, the largest park in Philadelphia. 1868 Pa. Laws no. 1020, § 21 at 1088. Just eight years later, nine million visitors gathered in Fairmount Park for

the Centennial Exposition, the first world's fair held in the United States. See *Philadelphia Centennial Exposition*, Historical Society of Pennsylvania, https://tinyurl.com/mttca4sj (last visited Oct. 12, 2023).

A number of state and territorial laws curbed the potentially deadly mix of firearms and alcohol. New Mexico flatly prohibited people from carrying arms into certain places where "Liquors are sold." 1852 N.M. Laws § 3 at 69. Oklahoma also banned firearms in "any place where intoxicating liquors are sold" in its first legislative session as a newly created Territory. 1890 Okla. Stats. ch. 25, § 7 at 496. Kansas, Missouri, and Wisconsin took the somewhat different approach of banning intoxicated people in particular from bearing arms. 1867 Kan. Sess. Laws ch. 12, § 1 at 25; Mo. Rev. Stat. ch. 24, § 1274 (1879); 1883 Wis. Sess. Laws ch. 329, § 3 at 290. Mississippi, for its part, put the onus on merchants, banning the sale of arms to any intoxicated person. 1878 Miss. Laws ch. 46, § 2 at 175.

Still other States restricted *how* individuals could carry in public places in lieu of outright bans on possession. For example, Minnesota and Wisconsin allowed individuals to possess guns in state parks only if

they were unloaded.  1905 Minn. Laws ch. 344, § 53 at 620; 1917 Wis. Sess. Laws ch. 668, § 29.57(4) at 1243–44.

**4.**  Because firearms localism prevailed in the 19th and early 20th century, location-specific restrictions were even more common at the local level.  See *supra*, at 9–10.  But the limits of record-keeping mean that many local ordinances have been lost over time.  Fortunately, *amicus curiae* was able to locate some of the following examples through archival copies of local newspapers, which periodically published ordinances.

Several cities broadly prohibited firearms in locations where people would assemble for public or private purposes.  Olympia banned possession of deadly weapons "in the usual walks of life, within the limits of this town."  Olympia, Wash., Ordinance No. 13 § 2 (Mar. 3, 1860) (Ex. 24).  Tucson defined the firearms-free area as "the inhabited portions of [its] corporate limits."  Tucson, Ariz., Ordinance No. 9 § 1 (Jan. 28, 1873) (Ex. 29).  And Gainesville, Missouri, prohibited the carrying of firearms "into any public gathering or place where people are assembled for any lawful purpose."  Gainesville, Mo., Ordinance § 9 (May 26, 1896) (Ex. 9).

Other cities enumerated specific locations where people could not carry firearms (such as churches, places of worship, schools, courts,

election precincts, and places of public amusement) and even then often included a catchall ban on possession in public assemblies. E.g., Greenfield, Mo., Ordinance No. 39 § 1 (Jan. 4, 1886) (Ex. 12); Stockton, Kan., Ordinance No. 76 § 1 (July 1, 1887) (Ex. 28); Columbia, Mo., General Ordinances ch. 17, § 163 (May 22, 1890) (Ex. 7); Leonard, Mo., Ordinance No. 23 § 1 (July 6, 1891) (Ex. 16); Waco, Tex., Ordinance art. 119a § 1 (July 9, 1891) (Ex. 30); Marceline, Mo., Ordinance No. 9 § 8 (Mar. 12, 1892) (Ex. 19); Ridgeway, Mo., Town Ordinance No. 28 § 12 (Apr. 3, 1893) (Ex. 26). For example, Huntsville, Missouri banned all forms of carry "into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose." Huntsville, Mo., Ordinance in Relation to Carrying Deadly Weapons § 1 (July 17, 1894) (Ex. 14).

Other local governments adopted location-based arms restrictions presumably geared toward the highest-risk areas in those localities. For instance, two North Carolina counties that were home to religious

campgrounds prohibited arms carrying "within the incorporate limits of [the] Camp Ground" when people were "assembled for public worship." Gaston County, N.C., Regulation no. 5 (Sept. 17, 1873) (Ex. 10); Lincoln County, N.C., Regulation no. 5 (July 20, 1872) (Ex. 17). And many cities across the country, including Buffalo, Chicago, Wilmington, and New Haven, banned firearms from being carried or discharged in public parks. E.g., Buffalo, N.Y., Park Ordinances ch. 1, § 1 (May 13, 1873) (Ex. 4); Chicago, Ill., Municipal Code art. 42, § 1690 at 391 (1881) (Ex. 6); Wilmington, Del., Park Regulation no. 7 (July 13, 1888) (Ex. 32); New Haven, Conn., Rules and Regulations of the Park Commissioner no. 3 (1898) (Ex. 21); see Charles, *The Fugazi Second Amendment*, *supra*, at 710–12 nn.556–66 (more park bans).

Local governments also mirrored state restrictions related to the carrying of arms and the use of alcohol. New York City and Brooklyn enacted sweeping prohibitions on selling or otherwise providing arms to persons that posed "any danger to life," such as intoxicated persons. New York, N.Y., Health Ordinances § 147 at 52 (1866) (Ex. 23); Brooklyn, N.Y., Sanitary Code § 174 (July 15, 1873) (Ex. 3). Other jurisdictions adopted more specific bans that outright prohibited arms carrying by

those under the influence of alcohol. E.g., Greenfield, Mo., Ordinance No. 39 § 1 (Jan. 4, 1886) (Ex. 12); Wallace, Kan., Ordinance § 3 (Dec. 22, 1887) (Ex. 31); Rocheport, Mo., Ordinance § 2 (1895) (Ex. 27); Lyons, Kan., Ordinance No. 179 § 1 (Sept. 7, 1891) (Ex. 18); Grand Junction, Colo., Ordinance No. 83 § 6 (June 30, 1899) (Ex. 11); see also Blackwell, Okla., Town Ordinance No. 21 § 3 (Aug. 7, 1894) (Ex. 2) (forbidding public officers, the only people allowed to carry firearms within the town's borders, to carry firearms while intoxicated).

Many other cities simply prohibited all carrying within their corporate or commercial limits. E.g., Asheville, N.C., Ordinance § 61 (June 1, 1882) (Ex. 1); New Salem, Pa., Ordinance § 24 (Sept. 26, 1876) (Ex. 22); Lake Charles, La., Ordinance § 1 (June 20, 1874) (Ex. 15); Harrisburg, Pa., Weapons Ordinance § 1 (Apr. 12, 1873) (Ex. 13); see also Charles, *The Fugazi Second Amendment*, *supra*, at 708–710 nn.551–54. In *Bruen*, the Supreme Court refused to interpret the sensitive-places doctrine so broadly as to include "all places of public congregation," which would allow New York to "effectively declare the island of Manhattan a 'sensitive place.'" 142 S. Ct. at 2133–34. But there is no evidence that anyone questioned the legality of even these broad corporate- and commercial-

limit prohibitions, which lends strong support to the constitutionality of more tailored location-specific prohibitions.

<div align="center">*     *     *</div>

Despite the limitations in the historical record, what little has survived confirms that governments possessed (and often wielded) the authority to restrict public carriage in churches, schools, courthouses, polling places, places where large numbers of people congregated for amusement, and places where alcohol was purchased or consumed.

## B.  Courts uniformly upheld historical location-specific regulations of firearms possession.

The Supreme Court has deemed sensitive-places regulations "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26.  That presumption of constitutionality exists because the Court was "aware of no disputes regarding the lawfulness of such prohibitions" on "the carrying of firearms in sensitive places." *Bruen*, 142 S. Ct. at 2133.  By *amicus curiae*'s count, too, no court ever invalidated a historical restriction on firearms in public gatherings under the Second Amendment or a state constitution's equivalent.  Courts said just the opposite, time and again, when discussing these predecessors to the modern sensitive-places doctrine:

<div align="center">30</div>

- In *Andrews v. State*, 50 Tenn. 165 (1871), the Tennessee Supreme Court observed that "a man may well be prohibited from carrying his arms *to church, or other public assemblage*, as the carrying them to such places is not an appropriate use of them." *Id.* at 182 (emphasis added). The Supreme Court has relied on the *Andrews* decision. *Bruen*, 142 S. Ct. at 2147; *Heller*, 554 U.S. at 629.

- In *English v. State*, 35 Tex. 473 (1872), the Texas Supreme Court rejected a challenge to a statutory prohibition on carrying firearms in sensitive places, "confess[ing] that it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." *Id.* at 478–79.

- In *Hill v. State*, 53 Ga. 472 (1874), the Georgia Supreme Court upheld a law that prohibited the carrying of any weapon "'to any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this state, except

militia muster grounds.'" *Id.* at 474. This proto-sensitive-places law balanced the people's competing rights to access the courts, practice their religions, and cast their ballots, all of which would be "seriously interfered with if it is the right and the custom of 'people' to attend such meetings armed as though for battle." *Id.* at 478.

- In *Owens v. State*, 3 Tex. App. 404 (1878), the Texas Court of Appeals affirmed the conviction of a man who violated the state prohibition on the carrying of weapons into any public assembly whatsoever. *Id.* at 405–06. The court admonished that, even if the defendant was "in dread of an immediate and pressing attack" in a covered place—there, a ballroom—that would "afford[] no excuse" to "wear[] deadly weapons to church, or in a ballroom, or other places mentioned where [an] attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed." *Id.* at 407.

- In *State v. Shelby*, 90 Mo. 302 (1886), the Missouri Supreme Court upheld the prohibition on firearms possession by the intoxicated, noting that the "mischief to be apprehended from an

intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes [armed] into an assemblage of persons," which Missouri law likewise restricted. *Id.* at 305; see also *State v. Reando* (Mo. 1878) (unpublished decision upholding location bans) (Ex. 34).

In short, courts uniformly upheld location-specific regulations on the theory that the right to bear arms did not extend to places where people assembled in large numbers.

## C. A contextual review of the longstanding historical regulations on public carriage suggests a broad conception of what counts as a sensitive place.

The history of location-based firearms regulation, as well as the judicial decisions resoundingly batting back constitutional challenges, takes this Court much of the way to the finish line. What remains is the question whether the Hawaiʻi restrictions challenged in this case are analogous to longstanding traditions of location-specific firearms regulations. Although *amicus curiae* will not address the particulars of the challenged Hawaiʻi law, he does submit that a contextual reading of the historical record leaves States and cities ample leeway to define sensitive places where the carrying of firearms threatens health and safety.

33

The historical record compels a broad understanding of the types of places where governments can regulate the carrying of firearms consistent with the Second Amendment. At the very least, the doctrine would permit firearm restrictions in the same range of public places protected by the historical regulations, including courts, schools, places of public assembly and amusement, parks, and places where alcohol is consumed or sold. See *supra*, at 19–30. Modern restrictions in these sensitive areas are "a dead ringer for historical precursors" even though the Second Amendment does not demand such a close overlap. *Bruen*, 142 S. Ct. at 2133.

*Bruen* also expressly left the door open for "analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 142 S. Ct. at 2133. As *amicus curiae* understands the historical record, the location-specific regulations in fairs, city parks, religious campgrounds, and other places of public assembly were all animated by the same concern of reducing injury and violence in places where the public congregates. E.g., *Andrews*, 50 Tenn. at 182; *English*, 35 Tex. at 478–79. The "how and why" rule of thumb

from *Bruen* therefore suggests that courts should ask whether a state law similarly seeks to minimize firearm possession in public gatherings to reduce that same risk of violence or accidental injury. 142 S. Ct. at 2132–33; see J. Blocher, J. Charles, and D. Miller, *"A Map Is Not the Territory": The Theory and Future of Sensitive Places Doctrine*, N.Y.U. L. Rev. Online (forthcoming), https://tinyurl.com/bdenf25k (urging courts to consider *why* a location is sensitive, not precisely *what* place the prior laws regulated).

To be clear, governments can't deem any place where people are present to be a "sensitive place." The Supreme Court foreclosed any such interpretation of the Second Amendment. *Bruen*, 142 S. Ct. at 2133–34. Still, there is a world of difference between cutting the government a blank check and expecting the historical record to provide ready-made comparisons and perfect analogies. History is often uncertain, sparse, and even contradictory. But in the case of sensitive-places restrictions, a view that takes into account why regulations were passed, how they were understood, and how they evolved supports the conclusion that this tradition of firearms regulation was well settled and widespread.

**CONCLUSION**

This Court should adopt a contextual approach under the Second Amendment to drawing high-level analogies to historical firearms regulations and hold that the historical tradition of firearms regulation in a wide variety of public assemblies supports a broad conception of the modern sensitive-places doctrine.

Dated: October 12, 2023        Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:      /s/ Patrick J. Fuster

*Counsel for Amicus Curiae*
*Patrick J. Charles*

36

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,994 words, excluding the portions exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

The brief complies with the typeface and type-style requirements of Rule 32(a)(5)(A) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, New Century Schoolbook font.

Dated: October 12, 2023                    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:      /s/ Patrick J. Fuster
*Counsel for Amicus Curiae*
*Patrick J. Charles*

37

# ADDENDUM

1.  Asheville, N.C., Ordinance § 61 (June 1, 1882), reprinted in *The Asheville Weekly Citizen* (June 3, 1882)...........................4

2.  Blackwell, Okla., Town Ordinance No. 21 § 3 (Aug. 7, 1894), reprinted in *K County Democrat* (Aug. 23, 1894)............8

3.  Brooklyn, N.Y., Sanitary Code § 174 (July 15, 1873), reprinted in *The Brooklyn Daily Union* (Aug. 21, 1873)...........10

4.  Buffalo, N.Y., Park Ordinances ch. 1, § 1 (May 13, 1873), reprinted in *The Buffalo Commercial* (May 15, 1873)...............14

5.  Chadron, Neb., Ordinance No. 45 § 6 (Feb. 20, 1888), reprinted in *Chadron Democrat* (Mar. 1, 1888)........................16

6.  Chicago, Ill., Municipal Code art. 42, § 1690 at 391 (1881)........18

7.  Columbia, Mo., General Ordinances ch. 17, § 163 (May 22, 1890), reprinted in *General Ordinances of the Town of Columbia, in Boone County, Missouri* 34–35 (1890)................22

8.  Franklin, Ind., Ordinance No. 20 (Apr. 15, 1881), reprinted in *Franklin Democrat* (July 22, 1881)......................26

9.  Gainesville, Mo., Ordinance § 9 (May 26, 1896), reprinted in *Ozark County News* (June 4, 1896)......................28

10. Gaston County, N.C., Regulation no. 5 (Sept. 17, 1873), reprinted in *Southern Home* (Sept. 22, 1873)............................31

11. Grand Junction, Colo., Ordinance No. 83 § 6 (June 30, 1899), reprinted in *Grand Junction News* (July 8, 1899)..........33

12. Greenfield, Mo., Ordinance No. 39 § 1 (Jan. 4, 1886), reprinted in *Dade County Advocate* (Jan. 21, 1886).................36

13. Harrisburg, Pa., Weapons Ordinance § 1 (Apr. 12, 1873), reprinted in *A Digest of Laws and Ordinances for the Government of the Municipal Corporate of the City of Harrisburg, Pennsylvania* 557–58 (1906)..................................38

14. Huntsville, Mo., Ordinance in Relation to Carrying Deadly Weapons § 1 (July 17, 1894), reprinted in *The Revised Ordinances of the City of Huntsville, Missouri* 58–59 (1894)....42

15. Lake Charles, La., Ordinance § 1 (June 20, 1874), reprinted in *The Lake Charles Echo* (Jul. 18, 1874).................46

16. Leonard, Mo., Ordinance No. 23 (July 6, 1891), reprinted in *Shelby County Herald* (Jul, 29, 1891).......................................49

17. Lincoln County, N.C., Regulation no. 5 (July 20, 1872), reprinted in *The Charlotte Democrat* (July 30, 1872)...............51

18. Lyons, Kan., Ordinance No. 179 § 1 (Sept. 7, 1891), reprinted in *The Lyons Republican* (Sept. 10, 1891)................53

19. Marceline, Mo., Ordinance No. 9 § 8 (Mar. 12, 1892), reprinted in *The Marceline Journal-Mirror* (Oct. 28, 1892).....55

20. Maysville, Ky., Ordinance § 22 (Nov. 25, 1895), reprinted in *Evening Bulletin* (Dec. 10, 1895)..........................57

21. New Haven, Conn., Rules and Regulations of the Park Commissioner no. 3, reprinted in *The Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City* 293 (1898)........................60

22. New Salem, Pa., Ordinance § 24 (Sept. 26, 1876), reprinted in *The Democratic Press* (York, Pa.) (Oct. 27, 1876)................................................................63

23.  New York, N.Y., Health Ordinances § 147 at 52 (1866),
     reprinted in *Code of Health Ordinances and Rule and
     Sanitary Regulations, and Its Amendments* 52 (1866).............66

24.  Olympia, Wash., Ordinance No. 13 § 2 (Mar. 3, 1860),
     reprinted in *Washington Standard* (Dec. 29, 1860)..................69

25.  Portland, Or., Ordinance No. 14027 § 1 (June 2, 1904),
     reprinted in *The General Ordinances of the City of
     Portland, Oregon* 295–96 (1905)................................................72

26.  Ridgeway, Mo., Town Ordinance No. 28 § 12 (Apr. 3, 1893),
     reprinted in *The Ridgeway Journal* (Apr. 6, 1893)..................75

27.  Rocheport, Mo., Ordinance § 2 (undated),
     reprinted in *Rocheport Commercial* (Sep. 20, 1895)................78

28.  Stockton, Kan., Ordinance No. 76 § 1 (July 1, 1887),
     reprinted in *The Stockton Review and Rook County Record*
     (July 1, 1887)..............................................................................81

29.  Tucson, Ariz., Ordinance No. 9 § 1 (Jan. 28, 1873),
     reprinted in *The Citizen* (Tucson, Ariz.) (Feb. 8, 1873)............84

30.  Waco, Tex., Ordinance art. 119a § 1 (July 9, 1891), reprinted
     in *Waco Daily News* (Jul. 12, 1891)...........................................87

31.  Wallace, Kan., Ordinance § 3 (Dec. 22, 1887), reprinted in
     *Wallace County Register* (Dec. 24, 1887)...................................89

32.  Wilmington, Del., Park Regulation no. 7 (July 13, 1888),
     reprinted in *The Morning News* (July 13, 1888).......................91

33.  Yazoo, Miss., Ordinance § 2 (Sept. 17, 1890),
     reprinted in *Yazoo Herald* (Sept. 26, 1890)...............................93

34.  *State v. Reando* (Mo. 1878), reprinted in *State Journal*
     (Jefferson City, Mo.) (Apr. 12, 1878)...........................................95

Add. 3

# EXHIBIT 1

Newspapers
by ancestry
https://www.newspapers.com/image/61589420

The Asheville Weekly Citizen (Asheville, North Carolina) · Sat, Jun 3, 1882 · Page 1

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers
by ancestry

https://www.newspapers.com/image/61589420

The Asheville Weekly Citizen (Asheville, North Carolina) · Sat, Jun 3, 1882 · Page 1

Printed on Jun 25, 2023

placed under the Street Commissioner and compelled to work upon the public streets for a period not to exceed five days for each offense.

Sec. 61. That if any person or persons are found carrying pistols, bowie-knives, sling-shots, billeys, or other deadly weapons (officers excepted) within the corporate limits of the town of Asheville, every person so offending shall for every such offense forfeit and pay a sum of ten dollars—one-half to the informer.

Sec. 62. Persons conducting gift enterprises, or persons establishing or controling

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™
.com



Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 2

Newspapers
by ancestry

K County Democrat (Blackwell, Oklahoma) · Thu, Aug 23, 1894 · Page 8

https://www.newspapers.com/image/604120328

Printed on Jun 25, 2023

## TOWN ORDINANCE NO. 21.

An Ordinance regulating and prohibiting the carrying of deadly weapons:

Be it ordained by the Board of Trustees of the town of Blackwell:

SECTION 1:—It shall be unlawful for any person within the corporate limits of the town of Blackwell to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, boule knife, dirk, dagger, slung shot, billy, metal knucks, sand bag, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this ordinance provided.

SECTION 2:—It shall be unlawful for any person in the corporate limits of the town of Blackwell to carry upon or about his person any pistol, revolver, boule knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon except as in this ordinance provided.

SECTION: 3—Public officers, while in the discharge of their duties, or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances. Provided, however, that if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this ordinance as though he were a private person.

SECTION 4:—Persons shall be permitted to carry shotguns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or moving from one place to another, and not otherwise.

SECTION 5:—It shall be unlawful for any person to point any pistol, revolver, shot gun or rifle, whether loaded or not, at any other person or persons either in anger or otherwise.

SECTION 6:—Any person violating the provisions of any of the forgoing sections, shall upon conviction, be adjudged guilty of a misdemeanor and be punished by a fine of not less than five dollars and costs, nor more than ten dollars and costs, and shall be committed until said fine and costs are paid.

SECTION 7:—This ordinance shall be in full force and effect ten days after its publication in the K County DEMOCRAT.

Passed August 7th 1894.

JOHN R. MAY, President.

Attest: BEEL W. HOLT, Town Clerk.

Per T. M. JONES, Deputy Town Clerk.

[First published in the K County DEMOCRAT, August 9th 1894.]

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY

# EXHIBIT 3

Newspapers.com
by ancestry

https://www.newspapers.com/image/541935131

The Brooklyn Union (Brooklyn, New York) · Thu, Aug 21, 1873 · Page 1

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers.com
by ancestry

https://www.newspapers.com/image/541935131

The Brooklyn Union (Brooklyn, New York) · Thu, Aug 21, 1873 · Page 1

Printed on Jun 25, 2023



## BOARD OF HEALTH.

### SANITARY CODE.

#### ADOPTED JULY 15, 1873.

At a meeting of the Board of Health, for the city of Brooklyn, held at 66 Court street, on the 15th day of July, A. D., 1873.

Present—James Jourdan, the President of the Board of Health, Joseph C. Hutchinson, M. D., and J. R. Conkling, M. D., members of the said Board.

The said Board of Health by virtue of, and in pursuance of the authority conferred by section 9 of chapter 167 of the Laws of 1873, entitled " An act to establish a Board of Health in and for the city of Brooklyn, passed March 26, 1873," which said section declares that said Board shall possess within the city of Brooklyn, all the authority, and be charged with all the duties (unless otherwise provided for in this act) conferred or imposed upon the Metropolitan Board of Health, under an act entitled " An act to create a Metropolitan Sanitary District and Board of Health therein for the preservation of life and health; and to prevent the spread of disease," passed February twenty-sixth, eighteen hundred and sixty-six, chapter seventy-four, and also all the powers conferred by the amendments to said act, passed April nineteenth, eighteen hundred and sixty-six, and May twenty-fifth, eighteen hundred and sixty-seven, and also all the powers conferred by any act amendatory thereof, and also all the powers applicable to Brooklyn, conferred by an act for the regulation of tenement and lodging houses in the cities of New York and Brooklyn, passed May fourteenth, eighteen hundred and sixty-seven, and also all the powers conferred by an act to authorize the abatement and prevention of certain nuisances, deemed dangerous to the public health in the city of Brooklyn, passed April twenty-third, eighteen hundred and sixty-seven, and also all the authority, duty and powers, whether given by any law or by ordinance made thereunder heretofore (for the purpose of preserving or protecting life or health, or preventing disease) conferred upon or now belonging to or being exercised by the Board of Health of the city of Brooklyn, are hereby exclusively conferred upon, and shall hereafter be exclusively exercised by the aforesaid Board of Health of the city of Brooklyn, the members and officers thereof," do hereby direct, order, ordain and enact as follows :

#### DEFINITIONS OF TERMS.

SECTION 1. That the terms " Board," " this Board," and " said Board," shall be held to mean the " Board of Health of the City of Brooklyn ;" that the word " Department " wherever used herein, shall be held to mean the Board of Health of the City of Brooklyn ; that the words " person," " owner," " tenant," " lessee," " occupant," " contractor," " party," " manager," " Board," and " officer," shall respectively be held to apply to and include, both jointly and severally, each and all owners, part-owners, tenants, lessees, occupants, managers, contractors, parties in interest, persons, officers, boards and corporations who may sustain the relations, or may be in like position or any one or more thereof referred to in any ordinance or regulation ; that every order, ordinance or regulation declared applicable to the built-up portions of Brooklyn, shall, so far as the subject-matter thereof is applicable (save as to interments), and so far as this Board has authority to make the same, be held to include and apply to the built-up portions of said city ; that every word or phrase anywhere herein defined shall be held to include the same sense wherever used ; that the words " city," or " this city," or " said city," whenever used herein, shall be held to mean the city of Brooklyn ; that the word " regulations" shall be held to include " special regulation," (which latter will be from time to time issued, and will contain more detailed provisions that can be herein con-

Copyright © 2023 Newspapers.com. All Rights Reserved.


POWERED BY Newspapers.com

The Brooklyn Union (Brooklyn, New York) · Thu, Aug 21, 1873 · Page 1

https://www.newspapers.com/image/541935131

Printed on Jun 25, 2023

to a permit of the regulations of this Board, or
or fire any gun or other firearm or rock-blast in
any public street, alley, or place within the built-
up portions of said city, where any human life may
be imperilled.

SEC. 174. That no person shall sell, loan, or give
to, or allow to be taken by any other person, any
fire-arm, or other deadly or dangerous weapon,
when there shall be any reason for such first
named person to think or believe that any danger
to life may illegally result from the giving, loan-
ing, selling, or from the use of such arm or
weapon.

SEC. 175. That no large, or church bell shall be
rung or tolled at any funeral in said city without
a permit therefor from this Board, nor shall such
bell be rung or tolled at any other time therein to
the prejudice or peril of the life or health of any
human being.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 4

Case: 23-16164, 10/12/2023, ID: 12808632, DktEntry: 8, Page 60 of 142

Newspapers by ancestry

https://www.newspapers.com/image/264468532

The Buffalo Commercial (Buffalo, New York) · Thu, May 15, 1873 · Page 4

Downloaded on Mar 20, 2023





Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers

# EXHIBIT 5

Newspapers
by ancestry
https://www.newspapers.com/image/673612345

The Chadron Democrat (Chadron, Nebraska) · Thu, Mar 1, 1888 · Page 7

Printed on Sep 19, 2023



### Ordinance No. 45.

An Ordinance to prohibit the carrying of concealed weapons, discharging of firearms, discharge of toy pistols, carrying of toy pistols, purchasing of toy pistols, etc. by minors.

Be it ordained by the mayor and councilmen of the city of Chadron.

Sec. 1. Carrying Concealed Weapons. It shall be unlawful for any person or persons within the limits of the city of Chadron to carry on or about his or their person or persons any concealed weapon or weapons such as a pistol, bowie-knife, dirk, slungshot, metalic knuckles or any other concealed weapon or weapons, provided, that this section shall not be construed to prevent persons employed in the military service of the United States, or of the state of Nebraska, or to legally qualified officers of the law and peace officers for bearing arms necessary to his or their authority or authorities.

Sec. 2. For the purpose of this ordinance, a concealed weapon mentioned in section (1) of this ordinance shall mean a weapon or weapons that is or are carried in a scabbard or scabbards, pocket or pockets or any other places or places, on, around, about, and upon any person or persons, otherwise than in the hand or hands.

Sec. 3. Discharging Firearms, etc. It shall be unlawful for any person or persons within the limits of said city to discharge or cause to be discharged any pistol, gun, or other firearm or arms loaded with leaden or other missiles at any time under any circumstances, excepting officers of the law in the discharge of their duties.

Sec. 4. Discharge of Toy Pistols. It shall be unlawful for any person or persons to discharge or cause to be discharged any toy pistol, toy gun, or other toy arm or arms, or along shot, loaded with lead or other dangerous missiles, at any time or under any circumstances, within the limits of the said city of Chadron. Any person so offending shall, upon conviction thereof, be fined in any sum not exceeding fifty dollars for each offense, and stand committed until such fines and costs are paid or secured.

Sec. 5. Carrying Same. It shall be unlawful for any person or persons within the limits of the said city of Chadron to carry about his or her person any toy pistol, toy gun, or other toy arm or arms, or slung shots, out of or by which any leaden or other dangerous missiles may be discharged. Any person or persons so offending shall, upon conviction thereof, be fined in any sum not exceeding twenty dollars and stand committed until such fine and costs are paid or secured.

Sec. 6. Purchase of, etc. by Minors. It shall be unlawful for any parent, guardian, or other person having the care and custody of any minor, to purchase for or give to any such minor, or knowingly to permit any such minor to have any toy pistol, toy gun, or other toy arm or arms, or slung shot, out of which any leaden or other dangerous missile may be discharged. Any such person so offending shall, upon conviction thereof, be fined in any amount not exceeding twenty dollars and stand committed until such fines and costs are paid or secured.

Sec. 7. Any person convicted before the police court for the violation of sections 1 and 3 of this ordinance shall be deemed guilty of a misdemeanor and shall be fined in any sum not exceeding $50 and cost or be sentenced not more than 15 days in the city jail on bread and water, or both at the descretion of the court, and shall stand committed until such fine and costs are paid or sentence of imprisonment shall have been served.

Sec. 8. All ordinances passed by the city of Chadron in conflict or inconsistent herewith, be and the same are hereby repealed.

Sec. 9. This ordinance shall take effect and be in force from and after date of its approval and publication according to law.

Dated February 20th, 1888.
Passed February 20th, 1888.
Published March 1st, 1888.
Attest:       C. C. Hughes, Mayor.
R. G. Dorr, city clerk.

#### Commissioners Proceedings.

Office Board of Co. Commissioners

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers POWERED BY

# EXHIBIT 6

THE

# MUNICIPAL CODE

OF

# CHICAGO:

COMPRISING THE

LAWS OF ILLINOIS RELATING TO THE CITY OF CHICAGO,

AND THE

ORDINANCES OF THE CITY COUNCIL;

CODIFIED AND REVISED

BY

EGBERT JAMIESON AND FRANCIS ADAMS.

HALLIDIE LIBRARY
OF THE
UNIVERSITY
OF
CALIFORNIA

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

CHICAGO:
BEACH, BARNARD & CO., LEGAL PRINTERS,
1881.

Generated on 2023-09-22 23:23 GMT  /  https://hdl.handle.net/2027/uc2.ark:/13960/t1sf3960m
Public Domain  /  http://www.hathitrust.org/access_use#pd

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

person who shall be convicted of any such breach shall be adjudged to pay a fine of not less than three dollars nor more than one hundred dollars.

1683. In every prosecution brought for a violation of any ordinance of the city of Chicago, where the offense charged is one punishable under the laws of the State of Illinois as a misdemeanor, the court or magistrate trying the cause may upon conviction in lieu of the fine imposed by the ordinance or in addition thereto, cause the offender to be imprisoned in the house of correction for a period not exceeding three months.

1684. All the printed books containing the revised ordinances shall be deposited with the city comptroller. He shall deliver one copy thereof to each officer of the city, and to such other persons as the city council may direct.

1685. The mayor shall have power to extend to or reciprocate courtesies of other cities, by presenting to them a copy of the revised ordinances bound at the expense of the city in such manner as to him may seem suitable.

## Article XLIII.

### Parks and Public Grounds.

1686. The several public parks, squares and grounds in the city of Chicago, shall be known and designated by the names applied thereto respectively on the map of the city of Chicago published by J. Van Vechten and Snyder in the year 1877.

1687. It shall be the duty of the commissioner of public works to superintend all inclosed public grounds and keep the fences thereof in repair, the walks in order and the trees properly trimmed and improve the same according to plans approved by the city council. He shall likewise cause printed or written copies of prohibitions of this article to be posted in the said grounds or parks.

1688. No person shall enter or leave any of the public parks of the city of Chicago except by their gateways; no person shall climb or walk upon their walls or fences.

1689. Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of the said parks by any person.

1690. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface

Generated on 2023-09-22 21:53 GMT / https://hdl.handle.net/2027/uc2.ark:/13960/t1xt3860h
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF CALIFORNIA

the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon any of the said parks.

1691. No person shall converse with or in any way hinder those engaged in their construction.

1692. No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the commissioner of public works, nor shall any hawking or peddling be allowed therein.

1693. No threatening, abusive, insulting or indecent language shall be allowed in any part of either of the said parks whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

1694. In case of any emergency where life or property is endangered, all persons if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants and remain off the same until permission is given to return.

1695. The commissioner of public works may direct that any of the entrances to the public parks be closed at any time.

1696. No person shall bathe or fish in, or go or send or ride any animal in any of the waters of either of the said public parks, nor disturb any of the fish, water fowl or other birds in any of said parks, or any deer, sheep or other animal belonging to and preserved therein, nor throw or place any article or thing in the waters within either of said parks.

1697. No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within either of said parks nor upon any of the gates or inclosures thereof.

1698. No person shall without the consent of the commissioner of public works, play upon any musical instrument nor shall any person take into or carry or display in the said public parks any flag, banner, target or transparency. No military or target company civic or other shall be permitted to parade, drill or perform therein any military or other evolutions or movements. Nor shall any fire engine, hook and ladder truck, hose cart or other machine on wheels commonly used for the extinguishing of fires be allowed on any part of said parks without the previous consent of the commissioner of public works.

Generated on 2023-09-22 21:53 GMT / https://hdl.handle.net/2027/uc2.ark:/13960/t1xf3060h
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

# EXHIBIT 7

# GENERAL ORDINANCES, *etc.*

*Columbia, Mo.*

OF THE

# TOWN OF COLUMBIA,

IN

## BOONE COUNTY, MISSOURI,

REVISED, PUBLISHED AND PROMULGATED BY
AUTHORITY OF THE BOARD OF TRUS-
TEES OF SAID TOWN, IN
THE YEAR 1890.

———————

TO WHICH ARE APPENDED

THE PROVISIONS OF THE STATE CONSTITUTION RE-
SPECTING MUNICIPAL CORPORATIONS; ALSO THE
GENERAL AND SPECIAL CHARTERS
OF SAID TOWN.

———————

REVISED BY LEWIS M. SWITZLER.

———————

COLUMBIA, MO.:
STATESMAN BOOK AND JOB OFFICE PRINT.
1890.

Add. 23

34        GENERAL ORDINANCES.

or spirituous liquors, or any composition of which fermented, vinous or spiritous liquors form a part. *Provided,* that this section shall not be so construed as to prevent any druggist from selling or giving away, in good faith, wine for sacramental purposes, or alcohol for art, mechanical or scientific purposes on the applicant therefor, and seller thereof, complying with the laws of this state in such case made and provided; nor to prevent the selling or giving away by druggists of alcohol, or intoxicating liquors, on a written prescription, dated and signed, first had and obtained from some regularly registered and practising physician, and then only when such physician shall state in such prescription the name of the person for whom the same is prescribed and that such intoxicating liquor is prescribed as a necessary remedy in such case.

Sec. 159. Any person who shall sell or give away, to any person already intoxicated, any intoxicating liquor shall be deemed guilty of a misdemeanor and be fined if a druggist selling or giving away on prescription, not less than twenty-five dollars; if any other person, not less than forty dollars.

Passed May 22, 1890.

## CHAPTER XVII.

### CARRYING CONCEALED WEAPONS—FIRING GUNS, PISTOLS, FIRE CRACKERS, ETC.

*Be it ordained by the Board of Trustees of the Town of Columbia as follows:*

Sec. 160. Any person who shall fire or discharge, or who shall cause the same to be done by any person under his authority or control, any gun, pistol, cannon, anvil, or any device or contrivance, charged with any explosive, shall be deemed guilty of a misdemeanor and on conviction be fined not less than ten dollars for each offense.

Sec. 161. Any person who shall ignite or explode any explosive compound, or suffer the same to be done by any person under his control, or who shall fire, or cause to be fired or exploded, or suffer the same to be done by any person under his control, any fire cracker, or crackers, Roman candles, rockets, torpedoes, squibs, or any other kind of fireworks whatever, shall be deemed guilty of a misdemeanor and on conviction be fined not less than five dollars for each offense.

Add. 24

Generated on 2023-09-15 22:54 GMT / https://hdl.handle.net/2027/mdp.39015064423273
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

Case: 23-16164, 10/12/2023, ID: 12808632, DktEntry: 8, Page 70 of 142

Sec. 162. Any person who shall be guilty of carrying concealed upon or about his person any pistol, bowie knife, dirk, dagger, slung shot, or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than one hundred dollars for every such offense.

Sec. 163. Any person who shall go into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill, or meetings called under the militia laws of this state, carrying concealed or in sight upon or about his person, any fire arms or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred nor more than one hundred and fifty dollars for ever such offense.

Sec. 164. Any person who shall be guilty of exhibiting any fire arms, or other deadly or dangerous weapon in a rude, angry, or threatening manner; or who shall carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, shall be deemed guilty of a misdemeanor, and shall upon conviction be fined not less than fifty dollars for every such offense.

*Provided,* that the three last preceding sections shall not apply to police officers, nor to any officer whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to any posse when lawfully summoned and on duty; nor shall section 162 apply to persons moving or traveling peaceably through the state.

Passed May 22, 1890.

Add. 25

Generated on 2023-09-15 22:54 GMT / https://hdl.handle.net/2027/mdp.39015064423273
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# EXHIBIT 8

Newspapers
by ancestry
https://www.newspapers.com/image/940268496

The Democrat (Franklin, Indiana) · Fri, Jul 22, 1881 · Page 8

Downloaded on Sep 19, 2023

# ORDINANCE. XX.

Relating to the sale, gift or bartering of deadly weapons or ammunition therefor, to minors·

### PASSED APRIL 15TH, 1881.

SECTION 1. Be it ordained by the Common Council of the city of Franklin, that it shall be unlawful for any person, within the corporate limits of said city, to sell, barter or give to any other person, under the age of twenty-one years, any pistol, dirk or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried concealed upon or about the person, or to sell, barter, or to give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. Any person violating any provision of this ordinance, shall, upon conviction thereof, be fined in any sum not less than five dollars nor more than fifty dollars.

S. W. BLIZARD, Mayor.

Attest: W. C. THOMPSON, Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™

# EXHIBIT 9

Newspapers by Ancestry
https://www.newspapers.com/image/492594128

The Ozark County News (Gainesville, Missouri) · Thu, Jun 4, 1896 · Page 1
Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



# ORDINANCES.

## Of the Incorporation of the Town of Gainesville.

### Passed Upon by the Board of Trustees, May 26.

Be it ordained by the board of trustees of the inhabitants of the village of Gainesville; Missouri, as follows:.

Section 1. It shall be unlawful for any person within the corporate limits of the village of Gainesville of Missouri, to, directly, or indirectly sell intoxicating liquors in any quantity less than three gallons at retail or in the original package without taking out license as a dramshop keeper, and every person violating the provision of this section shall be deemed guilty of a misdemeanor and upon conviction, be punished by a fine of not less than forty nor more than two hundred dollars.

Section 2. It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to discharge any kind of fire-arms to the terror of the inhabitants of the village, or any one of them; and every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than five nor more than twenty-five dollars.

Section 3. It shall be unlawful for any person within the limits of the incorporation of the village of Gainesville, Mo., to play at any game whatsoever for money, property, or gain, with cards, dice, or any other device which may be adepted to, used in playing any game of chance or in which chance is a material element, or shall bet or wager on the hands of or cards or on the sides of such as do play, as aforesaid. Every such person shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than five nor more than twenty-five dollars.

Section 4. It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to make use of any loud, offensive or indecent language or to threaten, quarrel, or challenge to fight, or by fighting. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than five dollars nor more than forty dollars.

Section 5. It shall be unlawful for any person inside the corporate limits of the village of Gainesville, Mo., to run or cause to be run upon any of the public streets or alleys or upon any highway in common use inside of said corporate limits, of the village of Gainesville, Mo., any horse or horses so as to interupt travelers or persons thereon: he shall be adjudged guilty of a misdemeanor, and punished by a fine of not less than five nor more than twenty-five dollars.

Section 6. It shall be unlawful for any person inside of the corporate limits of the village of Gainesville, Mo., to keep open or cause to be kept open any store, shop, or other place of business, or labor himself or cause any other person to labor on the first day of the week, commonly called Sunday. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars.

Section 7. It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to set up or maintain any bowdy house or place of prostitution or whoredom, brothel or other place of ill fame, or for any person to frequent such place or places, and every person violating the provisions of this section shall be adjudged guilty of a misdemeanor and punished by a fine of not less than ten and not exceeding one hundred dollars.

Section 8. It shall be unlawful for any person within the corporate limits of the village of Gainesville. Mo., to practice catchi g a base ball or to practice staiking same on any of the public streets of the village of Gainesville. Any person violating the provisions of this section shall be adjudged guilty of a misdemeanor, and punished by a fine of not less than one and not more than five dollars.

Section 9. It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to carry concealed upon or about his person, any deadly or dangerous weapon, or to go into any public gathering or place where people are assembled for any lawful purpose, with any kind of fire-arms, bowie-knife, dirk, dagger slung-shot or other deadly weapon, or shall in the presence of one or more persons, exhibit any such weapons in a rude and angry manner, or shall have or carry any such weapons upon or about his person while intoxicated inside the corporate limits: any person violating the provisions of this section shall be adjudged guilty of a misdemeanor, and punished by a fine not less than ten nor more than twenty-five dollars.

Section 10. It shall be unlawful for any person within the corporate limits, or within half a mile of same, of the village of Gainesville, Mo., to sell or dispose of, or to give away any kind of wine, beer, or whiskey, or any other intoxicating spirits in any quantity without being authorized to do so as a druggist, as provided by law. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than fifty nor more than one hundred dollars.

Section 11. It shall be unlawful for any person or persons to camp on any of the streets or the public square in the village of Gainesville, Mo. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor, and fined not more than twenty-five dollars.

Section 12. It shall be unlawful for any person to give any public exhibition or show, circus or menagerie inside the corporate limits of the village of Gainesville, Mo., except exhibitions given for the benefit of religious, educational or charitable purposes, without first procuring a license from the marshal or said village. Every person violating the provisions of this section shall be deemed guilty of a misdemeanor and fined not more than twenty-five dollars.

Section 13. It shall be unlawful for any person within the corporate limits of the village of Gainesville, Mo., to appear upon any of the public streets while intoxicated or upon any of the alleys or commons of said village. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor and upon conviction be punished by a fine not exceeding five dollars.

State of Missouri, }
County of Ozark, } ss.

I, Y. S. McClendon, clerk of the village of the inhabitants of Gainesville, Missouri, do hereby certify that the foregoing is a true copy of the ordinances, passed and approved the Board of Trustees of the village of the inhabitants of Gainesville, M.

Children Cry for Pitcher's Castoria

THE CENTAUR COMPANY, 77 MURRAY STREET, N.Y.

Children Cry for Pitcher's Castoria

Children Cry for Pitcher's Castoria

Children Cry for Pitcher's Castoria

Add. 30

# EXHIBIT 10

Newspapers
by ancestry

https://www.newspapers.com/image/67814469

Printed on Sep 19, 2023



## STANLEY CREEK CAMP GROUND, Gaston County, N. C.—Laws and Regulations.

By Act of the General Assembly ratified the 28th day of February, 1873, Chapter 48th, page 441, Richard Rankin, Wm. T. Shipp, Robert Rutlege, Henry Rhyne, John Moore, James Rankin, A. W. Davenport, S. P. Sherrill, J. C. Jenkins and F. F. Wilkerson, were incorporated as Trustees of Stanley Creek Camp Ground, with power to establish such rules and regulations for the observance of order, decorum and removal of nuisances. The Trustees met at said Camp Ground, on Wednesday, the 17th September, 1873, and adopted the following regulations and bylaws:

1st. That if any persons shall violate or disturb public worship or the quiet of the people while assembled at this place for worship, and until all the people, who shall have been assembled for worship shall be removed therefrom, in any shape or form by behaving unseemly, or who shall appear drunk within the bounds of said Camp Ground, which, by law comprehends twenty-two acres, shall be arrested forthwith and brought before any magistrate of the county, and on conviction shall pay a fine of not less than ten, nor more than twenty-five dollars for each and every offence, or be imprisoned not less than one nor more than three months, or both at the discretion of the Court, to be sued for and recovered in the name of the Chairman of the Board, before any magistrate of Gaston County

2nd. That any person or persons refusing by force or threats, or by drawing of deadly weapons, such as pistols or knives, or any other dangerous weapon, to be arrested, shall, on conviction of these, or any one of these offences, be fined in addition not less than ten nor more than twenty-five dollars, or be imprisoned not less than one nor more than three months, or both at the discretion of the Court.

3rd. That if any person or persons shall sell or dispose of spirituous liquors, or if spirituous liquors be found in their possession in such a manner as to satisfy the investigators of said case, that it was for sale or disposal, or any spirituous liquors found out to belong to any person at, or on said Camp Ground, such persons as shall offend by selling or disposal, or by having in his or their possession, or being found to be the owners of said spirituous liquors in the incorporation while the people shall be assembled for public worship, shall be arrested, and on conviction be fined not less than ten, nor more than twenty-five dollars, or imprisoned not less than one nor more than three months, or both, at the discretion of the Court.

4th. That no person shall erect a stand for the selling or giving away any article or commodity, in the bounds of said incorporation, while the people may be assembled for public worship. Any person offending against this article, shall be arrested, and on conviction be fined not more than twenty-five dollars, or imprisoned not more than three months.

5th. That any person being found with or carrying guns or pistols within the incorporate limits of said Camp Ground, where the people may be assembled for public worship, shall be fined not less than ten, nor more than twenty-five dollars, or be imprisoned not less than one nor more than three months or both at the discretion of the Court.

6th. That any person shooting within said incorporation while the people shall be assembled for public worship, on said Camp Ground, shall be arrested, and on conviction, shall be fined not less than ten, nor more than twenty-five dollars, or be imprisoned not less than one, nor more than three months or both at the discretion of the Court.

7th. That it shall be the duty of the Chairman of this Board at each and every Camp Meeting, held at this place, to appoint five discreet and suitable persons as a Police Committee, who shall see that these orders are strictly enforced, and preserve the peace and quiet of the public worship, and cause to be enforced such other rules and orders as may be communicated to them from time to time by the Board.

A. W. DAVENPORT, Chairman.

WM. T. SHIPP, Secretary.

September 22—1t

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY

# EXHIBIT 11

Newspapers by Ancestry
https://www.newspapers.com/image/535862657

Grand Junction News (Grand Junction, Colorado) · Sat, Jul 8, 1899 · Page 7

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Add. 34

Grand Junction News (Grand Junction, Colorado) · Sat, Jul 8, 1899 · Page 7

https://www.newspapers.com/image/535862657

Printed on Jun 25, 2023

in the same manner as animals running at large.

Sec. 6.   No person not being then and there an officer in the proper exercise of his duty as such shall carry or have concealed upon or about his person any pistol, gun, bowie knife, dirk, dagger, slung shot, stone, bludgeon, billy, metal knuckles or any other deadly or dangerous weapon, nor shall exhibit any such weapon in a rude, angry or threatening manner, nor shall have or carry any such weapon or weapons on or about his person when drunk or in a state of intoxication, nor shall any person, directly or indirectly, sell, barter, loan or deliver any such weapon or weapons to any drunk or intoxicated person.

Sec. 7.   No person shall throw any stones or other missile upon or at any building, whether occupied or unoccupied, nor at any

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 12

Newspapers.com by ancestry
https://www.newspapers.com/image/587532621

Dade County Advocate (Greenfield, Missouri) · Thu, Jan 21, 1886 · Page 4

Printed on Jun 25, 2023



## Ordinance No. 38.

*Additional Penal Ordinance—Deadly or Dangerous Weapons—Malicious Mischief—Shop-lifting.*

Be it ordained by the Board of Aldmen of the City of Greenfield as follows:

Section I. If any person shall carry concealed upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day (whether National, State School or Municipal), or into any Court room during the setting of Court, or into any other public assemblage of persons met for any lawful purpose other than for Militia drill or meetings called under the militia laws of the state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor within the limits of the City of Greenfield) he shall upon conviction thereof be fined not less than Fifty Dollars, nor more than Two Hundred Dollars; or be imprisoned in the County Jail not longer than six months, or may be punished by both such fine and imprisonment.

Section II. Every person who shall wilfully and maliciously injure or remove any saddle, bridle, halter, hitch-rein, buggy or wagon harness, the personal property of another, or who shall wilfully and maliciously remove any tap or nut from the axle of any buggy, wagon or other vehicle, or otherwise injure the same, the personal property of another, or who shall wilfully or maliciously remove, deface or otherwise injure anything which is the personal property of another, and without the owners consent shall conceal, hide or do any act with the personal property of another, wilfully and maliciously which is calculated to annoy, damage or injure another or his property, shall upon conviction thereof be fined therefor in any sum not exceeding Fifty Dollars, or may be imprisoned in the County Jail not longer than six months, or may be punished by both such fine and imprisonment.

Section III. Every person who shall wilfully conceal about his person any article of personal property belonging to another, with intent to convert the same to his own use, or shall wilfully carry away from any dwelling house, shop or store, or from any public house any personal property not his own, or shall be guilty of any petit thievery ordinarily termed "Shop-lifting" shall upon conviction thereof be fined in any sum not exceeding One Hundred Dollars, or shall be committed to the County Jail for any term not exceeding six months or may be punished by both such fine and imprisonment.

Section IV. This ordinance shall be in full force and effect from and after its passage.

Passed and approved January 4th 1886.

WILL R. BOWLES, Mayor
W. R. McREYNOLDS,
President Board Aldermen.
Attest: Seymour Hoyt, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers.com POWERED BY

Add. 37

# EXHIBIT 13

# A DIGEST

OF THE

# Laws and Ordinances

FOR THE GOVERNMENT OF THE MUNICIPAL
CORPORATION OF THE

## CITY OF HARRISBURG

PENNSYLVANIA

IN FORCE AUGUST 1, A. D. 1906



PUBLISHED BY AUTHORITY OF CITY COUNCILS

## PART I.

By LOUIS RICHARDS, ESQUIRE
of the Berks County Bar

## PART II.

By JAMES M. LAMBERTON, ESQUIRE
of the Dauphin County Bar

NEWARK, N. J.
SONEY & SAGE
1906

LITTAUER LIBRARY, SSP
HARVARD UNIVERSITY

Add. 39

Generated on 2023-09-16 00:25 GMT / https://hdl.handle.net/2027/hvd.li2qgv
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google


Original from
HARVARD UNIVERSITY

**Fee for tapping.**

45. That hereafter the fees for tapping the city's water main pipes shall be as follows: One-half-inch taps, each, $3.25; three-quarters-inch taps, each, $4.25; one-inch taps, each, $5.25. All taps in excess of one inch shall be paid for at the rate established by the board of water commissioners, according to the size of the water main pipe desired to be tapped. 21 March, 1905. D, 282, §1.

**Taps, how made.**

46. No taps shall be made except in the presence of the duly authorized representative of the water board, after the fees aforesaid shall have been duly paid into the city treasury. Id., §2.

**Penalty.**

47. Any person violating any of the provisions of this ordinance, and being convicted thereof before the mayor or any alderman of the city, shall pay a fine of ten dollars for each offense, and in default of the payment thereof shall be imprisoned in the jail of Dauphin county for a period not exceeding thirty days. Id., §3.

**Repeal.**

48. That all ordinances or parts of ordinances in conflict herewith, be and the same are hereby repealed. Id., §4.

**Water districts.**

49. That for the purpose of electing a board of commissioners of the water and lighting department in accordance with the provisions of an Act of Assembly entitled "An Act providing for the incorporation and government of cities of the third class," approved May 23, A. D. 1889, the City of Harrisburg is hereby divided into three districts as follows, viz:

The First, Second and Ninth wards shall constitute the First district.

The Third, Fourth and Fifth wards shall constitute the Second district.

The Sixth, Seventh, Eighth and Tenth wards shall constitute the Third district. 30 Dec., 1904. D, 237, §1.

**Repeal.**

50. That all ordinances or parts of ordinances in conflict herewith, be and the same are hereby repealed. Id., §2.

# Water Closets.

[See Sewers.]

# Weapons.

**Carrying weapons regulated.**

1. That any person who shall carry any pistol, dirk-knife, slungshot or deadly weapon, within the city limits of Harrisburg, ex-

16

Generated on 2023-09-16 00:26 GMT / https://hdl.handle.net/2027/hvd.ll2qgv
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
HARVARD UNIVERSITY

558 WEAPONS—WIRES.

cept police officers, shall be deemed guilty of misdemeanor, **and** being convicted thereof, shall be sentenced to undergo an imprisonment or be fined in any sum not less than fifty dollars, or both, **at** the discretion of the court; and in case of non-payment of **the** fine so imposed, shall be imprisoned for a period of not less **than** three months, and be required to give security for future **good** behaviour. The fines collected shall be paid into the city treasury for the use of the city. 12 April, 1873. P. L. 735, §1.

## Wires.

[See POLES AND WIRES.]

Add. 41

Digitized by Google

Original from HARVARD UNIVERSITY

Generated on 2023-09-16 00:26 GMT / https://hdl.handle.net/2027/hvd.li2qgv
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# EXHIBIT 14

# THE REVISED ORDINANCES, *etc.*

## —OF THE—

# CITY OF HUNTSVILLE, MISSOURI,

## OF 1894.

COLLATED, REVISED, PRINTED AND PUBLISHED BY
AUTHORITY OF THE MAYOR AND BOARD OF
ALDERMEN OF THE CITY OF HUNTSVILLE,
MISSOURI, UNDER AN ORDINANCE OF
THE SAID CITY, ENTITLED:

"AN ORDINANCE IN RELATION TO ORDINANCES, AND
THE PUBLICATION THEREOF."   APPROVED ON
THE 11TH DAY OF JUNE, 1894.

HERALD PRINT.
HUNTSVILLE, MISSOURI:
1894.

Add. 43

## AN ORDINANCE IN RELATION TO BUTCHERS.

*Be it ordained by the Board of Aldermen of the City of Huntsville,*
*Missouri, as follows:*

SECTION 1.   No person shall carry on the business of a butcher
within the city without taking out license therefor, and no person
shall be permitted, under such license, to sell or dispose of meats at
more than one place or stand within the city.

SECTION 2.   For the purposes of this ordinance a butcher is defin-
ed to be any person engaged in selling or disposing of fresh meats for
food in quantities less than one quarter

SECTION 3.   Nothing herein contained shall be so construed as to
prevent any grocer, at his place of business, from selling game, poult-
ry or cured meats.

SECTION 4.   This ordinance shall take effect and be in force from
and after its passage, approval and publication, and any person
violating any provision of said ordinance shall be deemed guilty of a
misdemeanor and upon conviction shall be punished by a fine in any
sum not exceeding one hundred dollars.

S. G. RICHESON,
Pres. of the Board of Aldermen.

Approved July 17, 1894.

Attest:                                 S. G. RICHESON, Mayor.

J. A. HEETHER, Clerk.

———o———

## AN  ORDINANCE  IN  RELATION  TO  CARRYING  DEADLY WEAPONS.

*Be it ordained by the Board of Aldermen of the City of Huntsville.*
*Missouri, as follows:*

SECTION 1.   If within the city any person shall carry concealed
upon or about his person any deadly or dangerous weapon, or shall go
into any church or place where people have assembled for religious
worship, or into any school room or place where people are assembled
for educational, literary or social purposes, or to any election precinct
on any election day, or into any court room during the sitting of
court, or into any other public assemblage of persons met for any law-
ful purpose other than for militia drill or meetings called under
militia law of the state, having upon or about his person any kind of
fire-arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weap-

**Add. 44**

on, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permisson to any person to discharge gun, pistol or other fire-arms under proper circumstances shown to him.

SECTION 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or to make arrests, nor to persons moving or traveling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

SECTION 3. This ordinance shall take effect and be in force from and after its passage, approval and publication.

<div align="right">

S. G. RICHESON,

Pres. of the Board of Aldermen.
</div>

Approved July 17, 1894.

Attest:            S. G. RICHESON, Mayor.

J. A. HEETHER, Clerk.

————o————

## AN ORDINANCE IN RELATION TO THE USE OF FIRE-ARMS.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1. It shall be unlawful for any person to discharge or fire off any gun, pistol or other fire-arm or other explosive within the city limits, unless by written permission of the Mayor.

SECTION 2. Nothing in the preceding section shall be construed as applying to officers in the discharge of their duties, licensed shooting galleries, or military funerals.

SECTION 3. Any person violating the provisions of this ordinance shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine in any sum not exceeding one hundred dollars.

**Add. 45**

# EXHIBIT 15

The Lake Charles Echo (Lake Charles, Louisiana) · Sat, Jul 18, 1874 · Page 4

https://www.newspapers.com/image/348612058

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



The Lake Charles Echo (Lake Charles, Louisiana) · Sat, Jul 18, 1874 · Page 4

https://www.newspapers.com/image/348612058

Printed on Jun 25, 2023



On motion, an ordinance to prevent the carrying weapons within the corporate limits of the town of Lake Charles, was read twice and adopted, as follows :

Section 1st. Be it ordained by the board of Aldermen of the town of Lake Charles, that whoever shall carry a weapon or weapons upon his person, within the corporate limits of said town, such as Bowie knives, pistols, revolvers, dirks, brass-knuckles, slung-shots, or any other dangerous weapon or weapons, shall be fined not less than five dollars, and in default of payment of fine with all costs, he shall be imprisoned, in the parish jail, not less than twenty-four hours, and for a second offence the fine shall be double.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 16

Shelby County Herald (Shelbyville, Missouri) · Wed, Jul 29, 1891 · Page 4

https://www.newspapers.com/image/208831791

Printed on Jun 25, 2023



T. P. MANUEL, Chairman Board of Trustees.
I. N. WATSON, Village Clerk.

## ORDINANCE NO. 23.

### AN ORDINANCE CONCERNING THE CARRYING OF DEADLY WEAPONS.

Be it ordained by the Board of Trustees of the inhabitants of the Village of Leonard, Mo., as follows:

SECTION 1. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons, exhibit any such weapons in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction be punished by a fine of not less than fifty nor more than two hundred dollars.

SECTION 2. This ordinance shall be in force from and after its passage and publication.

Passed and approved July 6th, 1891.

T. P. MANUEL, Chairman Board of Trustees.
I. N. WATSON, Village Clerk.

## TRUSTEE'S SALE

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 17

The Charlotte Democrat, Charlotte, N.C.

## The Democrat.

*Office up stairs, corner of Granite Row, over Smith & Hammond's Drug Store.*

[PUBLISHED BY REQUEST.]

### Rock Spring Camp Ground, Lincoln Co., N. C.

*Law and Regulations.*

By act of the General Assembly of 1870–71, Chapter 87, page 151, I. Lowe, J B Shelton, F W Howard, F W Kelley, T J Thompson, J W Lowe, John R Asbury, T J Caldwell, G W Gabriel and Thomas Beatty, were incorporated as Trustees of the Rock Spring Camp Ground, with power to establish such rules and regulations for the observance of order, decorum and the removal of all nuisances. The Trustees met at said Camp Ground on Saturday the 20th July, 1872, and adopted the following regulations and by-laws:

1st. That if any person or persons shall violate or disturb public worship or the quiet of the people while assembled at this place for worship, and until all the people who shall have been assembled for worship shall be removed therefrom, in any shape or form by behaving unseemly, or who shall appear drunk within the bounds of said Camp Ground, which, by law, comprehends forty-five acres, shall be arrested forthwith and brought before any magistrate of this county, and on conviction shall pay a fine of not less than five nor more than twenty-five dollars for each and every offence, or be imprisoned not less than one nor more than three months, or both at the discretion of the court, to be sued for and recovered in the name of the Chairman of the Board before any magistrate of Lincoln county.

2d. That any person or persons refusing by force or threats, or by drawing of deadly weapons, such as pistols or knives, or any other dangerous weapon, to be arrested, shall, on conviction of these or any one of these offences, be fined not less than five nor more than twenty-five dollars, or be imprisoned not less than one nor more than three months, or both at the discretion of the court.

3d. That if any person or persons shall sell or dispose of spirituous liquors, or spirituous liquors be found in their possession in such a manner as to satisfy the investigators of said case that it was for sale or disposal, or any spirituous liquors found out to belong to any person at or on said Camp Ground, such persons as shall offend by selling or disposal, or by having in his or their possession, or being found to be the owners of said spirituous liquors on the incorporation while the people shall be assembled for public worship, shall be arrested, and on conviction be fined not less than ten nor more than twenty-five dollars, or imprisoned not less than one nor more than three months, or both, at the discretion of the court.

4th. That no person shall erect a stand for the selling or giving away any article or commodity in the bounds of said incorporation while the people may be assembled for public worship. Any person offending against this article shall be arrested, and on conviction shall be fined not more than twenty-five dollars or be imprisoned not more than three months.

5th. That any person being found with or carrying guns or pistols within the incorporate limits of said Camp Ground while the people may be assembled for public worship, shall be fined not less than five nor more than twenty-five dollars, or be imprisoned not less than one nor more than three months, or both, at the discretion of the court.

6th. That any person shooting within said incorporation while the people shall be assembled for public worship on said Camp Ground, shall be arrested, and on conviction shall be fined not less than five nor more than twenty-five dollars, or be imprisoned not less than one nor more than three months, or both, at the discretion of the court.

7th. That it shall be the duty of the Chairman of this Board, at each and every camp-meeting held at this place, to appoint five discreet and suitable persons as "a Police Committee," who shall see that these orders are strictly enforced, and preserve the peace and quiet of the public worship, and cause to be enforced such other rules and orders as may be communicated to them from time to time by the Board.

I. LOWE, Ch'n,

J. B. SHELTON, Sec'y.

### Mr Ashe in Catawba and Lincoln.

A correspondent of the Hickory Tavern Eagle speaks as follows of the reception of Hon. Thos. S. Ashe, our candidate for Congress, at Sherrill's Ford:

Thursday was a grand day—a day long to be remembered. The meeting on this day was at E. L. Sherrill's. Not less than 500 people were in attendance. Mr Ashe seemed to be almost overcome with feelings of joy at the unusual interest that our good people were taking in behalf of reform in public matters. Mr Ashe made one of the finest speeches I have heard since the war. He spoke two hours and a half. The people were perfectly delighted with his speech. He spoke nearly half an hour to the colored people, in such a manner as to satisfy them, I think, that their true interests were to be found in acting with the Conservatives. Many of them will vote the Conservative ticket.

After Mr Ashe concluded, the meeting adjourned for dinner, and such a dinner as had been prepared for the occasion, by Mrs Sherrill, I had never seen before. Everybody was carried away with delight and thankfulness. The Rev. Mr Ricaud, one of the ablest ministers in the State, assisted Mrs. Sherrill in waiting on the table. Our excellent Sheriff, Mr Cline, also assisted in waiting on the table. I cannot go into a detailed account of the good things and fine fixings at this dinner—suffice it to say that it would have done credit to a first class marriage table.

After dinner the other candidates spoke. There was a large number of beautiful ladies in attendance. Mr Ashe said, in his speech, that while the ladies were enlisted in our cause that we need have fears as to the justness of that cause. The Brass Band, composed as it is of clever and intelligent men, done itself honor, by enlivening the occasion with the finest music. Mr Ashe, Col. Steele, the Band and our people will never forget the kindness of Mr Sherrill and his good lady.

### The Abduction Case of Dr. Bratton of S. C.

The London Free Press published in Ontario, Canada, in its issues of July 16th and 17th, gives a detailed account of the proceedings in the trial of I. B. Cornwall on the charge of the forcible abduction of Dr. J. R. Bratton. The appearance of Dr. Bratton in court to give testimony took the defense completely by surprise, and an adjournment was asked for, but denied by the Judge.

The cabman Bates was first called, and testified as to having been engaged by Cornwall on the fourth of June last and recounted the circumstances of the arrest on that day. On being asked he denied having given any assistance to Cornwall in the matter, beyond performing his duties as driver.

Dr. James Rufus Bratton testified as follows:

On the afternoon in question he was walking out on Waterloo street. He saw a cab standing in the distance, and three men; two of them were standing in the road and the other was seated on the box; as he walked on the two men separated, one going towards Mr. Evan's kiln, the other coming towards him; the latter he recognizes as Cornwall. When within about six feet of him Cornwall sprang towards him and seized him in a rude and violent manner by the arm and shoulder, telling him he arrested him under a warrant. He (Bratton) demanded to hear the warrant read, and desired his assailant to show cause why he should be arrested. Cornwall returned that he would do that soon enough. Witness resisted and still demanded to know the reason of his arrest, but received no satisfaction beyond being told that he would find out soon enough. A struggle ensued, in the course of which both of them fell to the ground. Cornwall knelt on his body and arms, and proceeded to put manacles on him. He called the cabman to help.

Here Mr Barker asked him if he knew who the cabman was; if he could identify him in the Court room. Witness after closely scanning those in the room, and especially a number of people seated on a bench inside the railing, among whom was Bates, failed to identify the man, saying "his acquaintance with him had been too short."

Witness proceeded—As soon as he heard Cornwall call to the cabman, he called out to him that he (the cabman) should rather assist him (Bratton) for Cornwall did not know who he was arresting. After some further struggling, the cabman came to Cornwall's assistance, and held witness' arm; the handcuffs were then placed upon his (Bratton's) wrists, and he was led between the two men, Cornwall on the right and the cabman on the left, to the cab, into which he was pushed. Cornwall gave orders to drive to the station by the back streets. Witness asked that they should drive around by his boarding house on Wellington street, Mr Hill's, to get some of his clothes, but this was refused. While on the way witness repeatedly protested against the degradation of the irons upon his person, and demanded to know the authority upon which Cornwall proceeded. Cornwall told him to keep quiet, and not create any outcry lest he should expose himself with the handcuffs upon him. Witness returned that he did not fear to be taken before any Magistrate or Commissioner for examination, but objected to the humiliation of the irons. Upon again demanding to hear the warrant read, still protesting against the arrest, and telling Cornwall that it was not law, but force and violence, Cornwall read a warrant in his hearing. He (witness) then said the warrant did not embrace his name; did not call for him, and afforded no legal pretence whatever for his arrest. Cornwall then said that it was not his province to discriminate between persons; he (Bratton) would have to go to Windsor, where he would have a chance to vindicate himself before Mr Commissioner Caron, by whom the warrant was signed. Witness objected to go to Windsor, saying he was prepared to submit himself to any authority of this city, and he thought that in a place of 20,000 inhabitants there should be some authority competent to deal with him. He was told that Mr Caron was the only Commissioner for this district, and that he would have to go before him. He could also get good legal advice in Windsor. When the cab arrived at the station it stopped, and the driver said the train (Pacific Express) was late. They then drove up and down one of the back streets until the train arrived. Then the cab was stopped, and the driver came to the door and asked Cornwall for his money. Cornwall said, "You know me; I shall be back in the morning; then I shall pay you." After that he produced a $10 bill and asked him if he had change. The cabman got change, and some $3 or $4 was paid him. Cornwall then took witness to the Pullman car, and thrust him in the anterior part of it, into a small apartment with one or two seats. Afterwards the conductor provided them with a better apartment. I remember no one getting into this apartment except the porter on the train; Cornwall said we ought to get to Windsor by 10 o'clock; no one except the porter came into the compartment until we arrived at Detroit; Cornwall and the porter conversed together in the car, and after they had done, the porter locked the door; neither Cornwall or I had tickets, and I saw no money paid for our railway fares; I spoke to him of the various lawyers in Windsor, and he mentioned the names of O'Connor and Prince as two very able men. I had no other conversation with Cornwall except as to the lawyers, until we arrived in Detroit. I did not hear Windsor announced from the train either by the conductor or porter. When the conductor called Detroit, he could not get in, and Cornwall opened the door for him. So soon as the door was open, Hester, the detective, stepped in and said, "You go with me now." Witness here described Hester's appearance, which corresponded with the description of previous testimony. I saw Hester before the day I was arrested, once at the Corpus Christi festival at Mount Hope, and also on the G. W. R. station platform before we started. The same man was on the field at the time I was arrested. I replied to Hester when he said he wished me to go with him, "No, I'm under Canadian law, now; that warrant does not allow you to detain me here, and I, under protest, refuse to obey you; neither your government, or you, sir, have a right to detain me here, and if you do, you will pay for it."

At the conclusion of this sentence, the crowd in the Court made demonstrations of approval, which the Court immediately suppressed.

Witness continued—Hester then arrested me on a United States warrant, having the signature of the President of the United States written thereon; Hester, after I remonstrated with him, said "I will show you that I have a commission to arrest you," and we then proceeded to the room where there was a light; he then showed me a commission, both as Detective and United States Marshal, but my name was not on the warrant; Cornwall was present during this conversation; we then went to the police station, and all my papers, pocket-book, money, &c., were taken from me; I was afterwards put into a cell in the police station; I was there for an hour or two when Cornwall and Hester came and called me, and the Superintendent of Police let me out where Hester and Cornwall were; the former then asked me to go with him and Cornwall to a hotel, and I gladly accepted the invitation; we got a room in the hotel, with three beds in it; I told them if they had no objection, I would go to bed, and did so. Cornwall sat up all night, with the exception of a few minutes; there was a good deal of whispering between the two, with a third party at the door, but the conversation was inaudible to me; I do not know who the third party was; Hester frequently went out during the night; there was a rustling of paper and an examination of my memorandum book while I was in bed; I also heard in the room a sound as if some one was counting money—like as if a payment of bills was being made; there was very few papers in the book; the leaves of my memorandum book were too stiff to produce the sound I allude to; I did not see Cornwall put anything in his pocket at that time; between three and four o'clock in the morning Cornwall left the room, and before he left the two detectives had a whispering conversation; I saw no more of Cornwall after that; I was taken to Yorkville, South Carolina, by Hester, and was not allowed to come back to Canada; I was not taken before Commissioner Caron, at Windsor, nor any other Canadian magistrate; I certainly was taken across the lines out of Canada against my will on that occasion by Cornwall.

The following was the warrant upon which Cornwall made the arrest:

*To all or any of the Constables or other Peace Officers in the said County of Essex:*

Whereas, James William Avery, late of the State of South Carolina, hath this day been charged upon oath before the undersigned, a Commissioner for the purposes of the Act respecting the Treaty between Her Majesty and the United States of America, for the apprehension and surrender of certain offenders, for that he, on the second day of March, A. D., 1871, did, at the County of York, in the State of South Carolina, one of the United States of America, feloniously and of his malice aforethought, kill and murder one Anderson Brown, and hath on account of the said felony fled from the said State of South Carolina, and come into the Dominion of Canada, and is now residing at the city of London.

These are therefore to command you, in Her Majesty's name, forthwith to apprehend the same James William Avery, and bring him before me, or before the Judge of the County Court of the County of Essex, to answer unto the said charge, and to be further dealt with according to law.

Given under my hand and seal, this 21st day of April, A. D., 1872, at the town of Windsor, in the county of Essex aforesaid. FRANCOIS CARON.

Com'er under 31st Victoria, Cap. 94.

After the examination of witnesses, the case thus ended;

"Mr. Bartram then addressed the Court in a long speech on behalf of his client, contending that the case was not one of kidnapping; that Bratton went over to Detroit of his own accord, and that Cornwall relinquished possession and all care of him after the manacles were removed. He spoke for an hour.

Mr. Barker also reviewed the evidence, and showed most conclusively that the prisoner had committed the felony charged, and on both counts of which the evidence was very direct against him. He recounted the testimony adduced and mentioned that the evidence given by Bates and Bratton was similiar, except in those points where if the former had told what he really knew about the affair he would have criminated himself. The whole matter, he said, was so clearly proven, that no other conclusion could be arrived at than that the prisoner was guilty of the crime of which he was charged.

His Honor spoke of the offense in terms of condemnation, especially when the prisoner was known to be a man of undoubted ability, and well versed in criminal law. The supposition was that the deed had been committed for gain, and for his part, he could not, reviewing the evidence adduced, find any other verdict than that the prisoner was guilty of the crime.

Mr. Bartram—On both counts, your Honor.

His Honor—Yes; the charge on both counts has been clearly proven.

Mr. Barker asked that the judgment of the court might be pronounced upon Isaac Bell Cornwall, convicted of the crime of kidnapping.

His Honor enquired of the prisoner if he had anything to say why the sentence of the court should not be passed upon him, to which Mr. Cornwall replied "I have nothing to say, sir."

His Honor then prefacing the sentence with a few sympathetic remarks, sentenced the prisoner to three years' imprisonment in the Provincial Penitentiary.

SOUTH CAROLINA.—Judge Willard decides that the Revenue Bond Scrip is unconstitutional. This shucks off $1,800,000 of State debt. Major Corbin has submitted an argument to show that the guaranteed bonds of the Blue Ridge Railroad are invalid. This will wipe out $4,000,000 of contingent liability. At this rate, the total of the State debt will run down as quickly as it ran up.—*Lancaster Ledger.*

THE UNITED STATES COURT—Rumors have been in circulation for several days that the special term of the United States Circuit Court, which at the last term was ordered to be held at Columbia, on the first Monday of August, will not convene. The reason assigned for not holding the Court is that "a Judge cannot be found to preside."—*Yorkville Enquirer.*

### North Carolina News Items.

ANOTHER OUTLAW GONE UP.—*Tom Lowery Killed.*—On Thursday night the 18th, Mr. A. S. Wishart, brother of the late Col F. M. Wishart, who was so foully murdered by the outlaws three months ago, having called to his assistance a few resolute and daring young men, set out for Scuffletown to look after the outlaws, and, if possible, to avenge the death of his gallant and lamented brother. Proceeding to the neighborhood of the outlaws the gallant little band secreted themselves along the roads usually traveled by them in their walks about the country, and waited patiently for an opportunity to put their design in execution. Nothing was seen, however, of any of the gang, which now consists of three members, Stephen and Tom Lowery and Andrew Strong, until Saturday morning about 8 o'clock when Tom Lowery appeared in sight on his way to Union Chapel where the candidates were to meet and address the people on that day. Tom was armed with a rifle and three repeaters, and walked leisurely along unsuspecting of danger until at a point opposite where the young men were concealed he noticed the tracts they had made in crossing the road. He now seemed suddenly alarmed and commenced cursing bitterly, when suddenly the little band instantly discharged their pieces. Each of the four shots took effect, and uttering a yell of terror and pain the outlaw plunged into the swamp and ran about fifty yards when he fell down dead. Seizing the body they carried it upon their shoulders to the public road a distance of half a mile, where they pressed a passing wagon, and thus carried the dead body to Lumberton where it was delivered to the Sheriff. The names of the young men engaged in this gallant affair were: A. S. Wishart, Robert E. Wishart, James McKay and James Campbell. Their names will be remembered with gratitude by the people of Robeson, and their noble daring will be admired.—*Lumberton Robesonian.*

☞ About midnight on the night of the 19th inst., a kitchen and out house belonging to W. W. Munday, Esq., of Lincoln county, was destroyed by fire. The fire was wholly the result of accident or carelessness, and was not discovered until nearly the whole building was in flame. Two negro women were sleeping in the house, and narrowly escaped by jumping from the window.

☞ Catawba High School at Newton, Clapp & Finger proprietors, opened on the 18th, with the most flattering prospects. A large number of students from this and adjoining States are already in attendance.

SUDDEN DEATH.—Mr. J. H. Thompson, of Tyro, Davidson county, died at Morganton, N. C., on Tuesday night last. He was in this place on Monday, on his way to the mountains, whither he was going for his health, which had been unconfirmed for some weeks or months.—*Salisbury Watchman.*

### Important Decision by the Supreme Court of North Carolina.

*County Bonds pronounced constitutional.*

The following opinion was rendered by Judge Reade of the Supreme Court of N. C., on Monday, July 22d, which we publish in full:

The decision is on the constitutionality of the issue of County Bonds for Railroad purposes, and will put a quietus upon the feverish anxieties of many creditors similarly situated. The opinion of the Court will be found to contain a sufficient statement of the facts. John G. Hill vs. the Commissioners of Forsythe county.

The main question is whether the Legislature has the power to authorize the people of a county to take stock in a Railroad and to determine the question by a popular vote and to tax themselves to pay for it. The Legislature of 1852 authorized the town of Newbern to take stock in the Neuse River Navigation Company, for the use of the town, and issue bonds and levy a tax upon the property-holders of the town to pay them. One of the tax-payers filed a bill to enjoin the collection of the tax upon the ground that the act of the Legislature was unconstitutional. The question was fully argued and well considered and the discussion was in favor of the constitutionality of the act. Taylor vs. the *Commissioners of Newbern*, 2nd, Jones, Equity, p. 141.

And again in 1855, the Legislature chartered the Western N. C. R. R. Co., and authorized any county through which the road might pass to take stock if a majority of the Justices of the Peace and a majority of the voters should so determine, and to issue bonds and to levy a tax, &c. The county of Burke took stock and one of the tax payers filed a bill to enjoin upon the ground that the Act was unconstitutional; but this Court decided in favor of the Constitutionality of the Act.

The defendants' counsel cited also decisions in almost all the sister States to the same effect, so that we repeat what was said in Caldwell vs. Justices of Burke, that the question is settled. We suppose that the plaintiff's counsel felt at liberty to treat it as an open question, because in Caldwell vs. Justices of Burke, there was a dissenting opinion by the present Chief Justice, but the Court was unanimous upon this point. The dissenting opinion was only as to the power of a second vote of the people after they had rejected the proposition by a former vote.

There are divers other points, in the complaint which seemed to be unfounded, and besides they are unimportant. The main thing, the people's will, seems to have been fairly obtained; the stock was taken; bonds were issued; rights were vested; taxes have been levied and a portion of the instalments have been paid and taxes are now laid to pay other instalments. The Board of Commissioners who may be supposed to represent the popular will are anxious to meet the obligations incurred, and the Court will not allow technical and frivolous objections, calculated to impair public faith, to avail a few who are indulged with the privilege of sueing for a class. Only their substantial rights will be considered.

We agree with his Honor, that the injunction ought to have been dissolved. There is no error This will be certified.

### Fraud and Forgery.

*Infamous Scheme to Elect Grant.*

Read the following article taken from the Savannah News, giving the history of an infamous scheme now on foot to secure Gen. Grant's re-election and to involve in difficulty some of the officers of the late Confederacy.

Our readers will remember that recently a long letter from this same man Pickett, referred to below, was published. With the lights before them afforded by the article of the News, it is plain to see that this letter was part of the programme. Let us watch the plot as it unfolds itself.

*So-called Rebel Archives.*—A telegram was recently sent to the Southern Associated Press to the effect that Col. John T. Pickett, formerly of the Confederate army, had received seventy-five thousand dollars on the order of Boutwell for data from certain Confederate archives which he held in his possession, in regard to "loyal" claimants from the South. It is now stated that these archives are also to be used in the South for political purposes during the campaign in the interest of Grant. The pretended history of these documents is that when the military operations in front of Richmond assumed that threatening character which finally ended in the evacuation of the city, these archives were sent to North Carolina for safe keeping. There they fell into the hands of some irresponsible parties, who, amid the consternation attending the downfall of the Confederacy, escaped with them to Canada, where they had been kept and used for various speculative purposes, until the present time.

These historical "facts" are to be taken with large grains of allowance. The existence of these documents, if they are so important as is pretended, would have been generally known long ago. In this connection, a dispatch to the Western press says;

"Some time last winter the notorious Sanford Conover is reported to have offered Zack Chandler the details of a scheme which the two considered a good expedient for firing the Northern heart. It was submitted to Grant and Boutwell, and held in abeyance. Conover's idea was to go to Canada, find an accomplice, forge a lot of letters and official documents, purporting to belong to the Confederate State Department, and to the department managed by Jacob Thompson, and relating to the burning of Northern cities. It is known that there was quite a laugh over the idea. Morton insisted that, if it was carried out, Hendricks should be involved, and Cameron swore that if Bukalew was left out he would not contribute a cent. So the matter passed as a good joke. It seems now that what was begun in jest is to be carried out in earnest. The story is that the Administration is gradually preparing the country with the announcement that it has come into possession of a new lot of Confederate archives. These forged papers are then to be artfully put out, late in the canvass, so as to take the country by storm before there is time for investigation or reaction."

If bogus Confederate archives are the best campaign documents that Grant and his fellow-bummers can tramp up, they would do well to quit the business.

LIGHT COTTON CROP.—All the information in the possession of the agricultural department relative to the condition of the cotton crop of the South leads to the belief that the crop this year will at least be an average one. In some sections it is very poor, but on the whole there is no ground for the statement that it will be a failure.

### Registrars and Inspectors of ELECTION.

STATE OF NORTH CAROLINA, Mecklenburg County.

Ordered by the Board of County Commissioners that the following named persons be and they are hereby appointed Registrars of voters and Inspectors of an election to be held for said County on the first Thursday in August next, for a member of Congress and for State and County Officers, to-wit:

CHARLOTTE TOWNSHIP.

Ward No. 1—The polls will be opened at the office of the Rock Island Manufacturing Company—A H Martin, Registrar; F W Ahrens, W R Myers, B H Moore and W W Grier, Inspectors.

Ward No. 2—The polls will be opened at the Market House—Wm H H Houston, Registrar; Dr Wm Sloan, Rufus Barringer, B F Morrow and J L Morehead, Inspectors.

Ward No. 3—The polls will be opened at the Red House, opposite the Presbyterian Church—Jas H. Henderson, Registrar; J C Burroughs, Thos Grier, C J Cowles and John F Blume, Inspectors.

Ward No. 4—The poll will be opened at the Court House—Wm F Davidson, Registrar; T L Alexander, S B Alexander, R F Davidson and H B Peters, Inspectors.

BERRYHILL TOWNSHIP.

Polls opened at the usual place—R R Ray, Registrar; Sam'l Berryhill, G W McDonald, G W Sloan, John A Taggert, Inspectors.

STEEL CREEK TOWNSHIP.

Polls opened at the usual place—Thos P Grier, Registrar; A G Neal, M N Hart, J R Erwin and J M Potts, Inspectors.

SHARON TOWNSHIP.

Polls opened at the usual place—John W Hunter, Registrar; I N Alexander, J H Brown, J B Stewart and Ozwald Alexander, Inspectors.

PROVIDENCE TOWNSHIP.

Polls opened at Providence Church—Wm E Ardrey, Registrar; Jno O Alexander, J S Reid, A A Houston and H H Peoples, Inspectors.

CLEAR CREEK TOWNSHIP.

Polls opened at the usual place—Wm P Houston, Registrar; John C Dennis, John M Beaver, Robert Wilson and T A Jerrome, Inspectors.

CRAB ORCHARD TOWNSHIP.

Polls opened at the usual place—H M Dixon, Registrar; R B Wallace, F L Galloway, Wm McCombs and E P Cochran, Inspectors.

MALLARD CREEK TOWNSHIP.

Polls opened at the usual place—B H Garrison, Registrar; John Ochler, B S Ferrell, Nat Montieth and J D Kerns, Inspectors.

DEWESE TOWNSHIP.

No. 1—Polls opened at Mrs. Sue Johnstons—W W Hall, Registrar; H P Helper, J R Gillespie, J Lee Sloan and Martin Oehler, Inspectors.

No. 2—Polls opened at Ramah Church—E B D Sloan, Registrar; W A Sossaman, M E Caldwell, J S Barnett and John Stenhouse, Inspectors.

LEMLEY'S TOWNSHIP.

Polls opened at the usual place—Jos M Wilson, Registrar; W A Brown, W B Withers, Ezekiel Alexander and Frank Warsham, Inspectors.

LONG CREEK TOWNSHIP.

Polls opened at the usual place—C W McCoy, Registrar; Solomon Sifford, D F Dixon, R M Martin and John N Kerr, Inspectors.

PAW CREEK TOWNSHIP.

Polls opened at Cathey's Blacksmith Shop—Wm Todd, Registrar; T J Dunn, T T McCord, Thomas Phelan and J C Todd, Inspectors.

MORNING STAR TOWNSHIP.

Polls opened at Morning Star Church—Robert McEwen, Registrar; S N Stillwell, Jos H Irwin, David Hooks and C M Erwin, Inspectors.

PINEVILLE TOWNSHIP.

Polls opened at the usual place—W O Ruddock, Registrar; J W Morrow, John Yountz, Sam'l W Smith and James Hennegan, Inspectors.

Judges of Election will make due returns of said elections to the Board of County Commissioners at the Court House in Charlotte, by 12 o'clock M., on Friday, the 3d day of August, 1872.

THOS. L. VAIL, Chairman.

### Agricultural Report.

The July report of the Agricultural Bureau at Washington is as follows:

The reports of corn represent 986 counties, including an area usually producing seven hundred million bushels annually, and indicating an increase of 3 per cent. This is equivalent to more than three fourths of a million of acres, and the total area of this great crop of the country, which nearly equals in extent the aggregate of all other tilled crops together, is probably about thirty five million acres.

The States in which an increase of acreage is reported is as follows: New Jersey 2 per cent, Pennsylvania 2, South Carolina 2, Georgia 1, Alabama 3, Mississippi 1, Louisiana 8, Texas 8, Arkansas 4, West Virginia 2, Kentucky 2, Ohio 2, Michigan 10, Indiana 2, Illinois 1, Iowa 1, Missouri 4, Kansas 28, Nebraska 20, California 1. Diminution appears in Maine of 4 per cent, Vermont 2, Massachusetts 4, Rhode Island 5, Connecticut 6, New York 1, North Carolina 2, Tennessee 1, Wisconsin 4, Minnesota 3.

The area in the remaining States reported the same as last year. Of the reports from 989 counties, 263 place the condition above 100; 413 below 100. Illinois is represented by 50 counties, of which 22 stand above average, and 23 below. Of 34 counties in Missouri, the condition of corn is above average in 16, and below in 25. Of 36 counties in Kansas, 8 only send figures less than 100. In Iowa, where cool and cloudy weather generally prevailed in spring, followed by changeable weather, and in some sections heavy rains, only two reports of the condition are above 100, and in Ohio, where the drouth has been severe, but three reports of 45 gives figures higher than 100. The States making returns higher than 100 are, Vermont 101, North Carolina 101, Alabama 110, Mississippi 111, Louisiana 119, Texas 110, Kentucky 103, California 101.

**D. T. WILLIAMS,**
**Commission Merchant,**
*No. 1 Tobacco Exchange,* **Richmond, Va.**

SPECIALTY LEAF TOBACCO!

Parties shipping to me may rest assured of the best prices this market will afford, and immediate returns by express or otherwise as they may desire.

Refer to the entire business community of Richmond and Danville.

Either of the Bankers in Danville will cash all my checks for sales.

July 15, 1872 6m D. T. WILLIAMS.

**Pure Buck White Lead.**

We have in Store 6,000 pounds Pure Buck White Lead, which we will sell for Cash at as low prices as it can be laid down here from the manufacturers.

WILSON & BLACK,
July 15, 1872. Druggists.

**Private Residence.**

I will sell privately for cash, the new double Dwelling, corner of 6th and A. Street—8 rooms to each dwelling—also a large Dwelling on Church Street. A. SHORTER CALDWELL.
July 15 1872. tf

**Horse Stolen.**

A chesnut sorrell HORSE was stolen from the stable of Mrs. Rachael Cruse, six miles east of Concord, on Friday night the 19th inst. He was tracked towards Charlotte. The Horse has several saddle marks on the back and a skin mark on the rump—about 14 years old and in good order. The thief is thought to be a well-dressed white man who was traveling through the neighborhood, light complected and wore light-colored clothes and a white hat. Any information may be left at this Office or addressed to Wm. Propst at Concord, N. C.
July 22, 1872 pd

**Bagging and Ties.**

We have just received a large lot of BAGGING (heavy) and ARROW TIES, which we are offering cheap. We anticipate a material advance in these articles if prospects for a large Cotton crop continues, and we would suggest to Farmers to purchase their Bagging and Ties now. We have on hand a large lot of Ties left over from last season which cost us much less than present prices, and we will offer them cheap. Call on

GREGORY & WILLIAMSON,
July 22, 1872. Bryce's Building.

**Dales' Corn Killer**

Will give instant relief in all cases. Received to-day by BURWELL & CO.,
Springs' Corner.

**Landreth's Turnip Seed!**

All the different and most desirable varieties.
BURWELL & CO.,
July 15, 1872. Springs' Corner.

**For Sale for Division.**

Pursuant to a Decree of the Superior Court of Mecklenburg county, I shall proceed to sell at the Court House door in Charlotte, on the 10th day of August, being the second Saturday, on a credit of twelve months, with interest from date, (5 per cent of amount of sale in cash to pay expenses,) all that tract of LAND lying on the waters of Clear Creek, in Mecklenburg county, known as the Sugar Doolin place, containing about 240 acres. Said Land is sold for division among the heirs-at-law of said Doolin. A large proportion of the open Land of said Tract rates as No. 1 Cotton Land. It is a good neighborhood, tolerable Buildings with Orchard and Springs convenient, &c.

TERMS—Bond with good security and title retained until purchase money is paid.

F. S. DeWOLFE,
July 15, 1872 4w Commissioner.

**Be Careful.**

If you are told that Kerosene is as safe as Astral Oil, be careful, satisfy yourself before purchasing.
SMITH & HAMMOND,
July 22, 1872, Agents.

**Michigan Fine Cut Tobacco.**

Another lot of that popular brand received by
July 22, 1872. SMITH & HAMMOND.

**Family Flour.**

35 Sacks "Rowan Mills" best Family Flour, 20 Sacks "Catawba Mills" Family Flour, ground from new White Wheat (no better brands in this market,) for sale by
STENHOUSE, MACAULAY & CO.
July 15, 1872.

**North Carolina College,**
*Mount Pleasant, Cabarrus County, N. C.*

The next Session of this Institution will begin August 5th, 1872.

EXPENSES FOR TEN MONTHS:

| | |
|---|---|
| Board, including Washing, | $85 to $100 |
| Tuition and Room-rent, | 35 to 45 |
| Incidentals, | 15 to 20 |
| Total, | 135 to 165 |

The sons of Ministers of all denominations are charged half the regular rates of Tuition.

For Catalogue address,
REV. L. A. BIKLE,
July 8, 1872 6w President.

**To Rent.**

A first class Dwelling on Tryon street, between seventh and eighth streets, apply to
July 8, 1872. J. M. MILLER.

# EXHIBIT 18

Newspapers
by ancestry
https://www.newspapers.com/image/427118938

The Lyons Republican (Lyons, Kansas) · Thu, Sep 10, 1891 · Page 4

Printed on Jun 25, 2023



# ORDINANCE NO. 179.

[First published in the Lyons REPUBLICAN, September 10th, 1891.]

An Ordinance relating to carrying concealed weapons, and repealing Ordinance No. 70.

Be it ordained by the Mayor and Councilmen of the City of Lyons, Kansas.

Sec. 1. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, who shall be found within the limits of the City of Lyons, carrying on his person a pistol, bowie knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, or by imprisonment in the city jail not exceeding one month, or by both such fine and imprisonment.

Sec. 2. Ordinance number seventy of the ordinances of the City of Lyons is hereby repealed.

Sec. 3. This Ordinance shall take effect after its publication in the Lyons Republican.

Passed and approved, Sept. 7th, 1891.

[seal]          E. A. RICHARDS, Mayor.

Attest:—A. E. Magoffin, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.



Add. 54

# EXHIBIT 19

Newspapers™
by ancestry
https://www.newspapers.com/image/953638676

The Marceline Mirror (Marceline, Missouri) · Fri, Oct 28, 1892 · Page 8

Printed on Jun 25, 2023



## ORDINANCE NO. 9.

1. Penalty for violations of this ordinance.
2. Assault and battery.
3. Failing to assist in making arrests, etc.
4. Resisting arrest, etc.
5. Permitting games of chance.
6. Betting
7. Disturbing religious meetings, etc.
8. Carrying concealed weapons into assemblies, etc.
9. Section 8 not to apply to police, etc.
10. Conflicting ordinances repealed.
11. Ordinance to take effect, when.

**In Relation to Miscellaneous Offenses and Their Penalties.**

Be it ordained by the Board of Aldermen of the City of Marceline, as follows:

SECTION 1. It shall be unlawful for any person to commit any of the acts hereinafter mentioned or enumerated within the corporate limits of the City of Marceline, and any person so offending shall be deemed guilty of a misdemeanor against the ordinances of the city, and for each offense shall be punished as hereinafter provided.

SEC. 2. Every person who shall commit an assault and battery or a common assault upon another, or indecently expose his person, shall, upon conviction, be punished by a fine of not less than one, nor more than one hundred, dollars.

SEC. 3. Every person who, without reasonable cause, shall fail to assist in making an arrest or committing any person to the city jail when required to do so by any police officer of the city in the performance of his official duty, shall be punished by a fine of not less than five, nor more than twenty, dollars, for every such offense.

SEC. 4. Every person who shall resist or attempt to hinder any officer of the city in the performance of his official duty, shall be punished by a fine of not less than ten, nor more than one hundred, dollars.

SEC. 5. Every person who shall suffer or permit any game of chance, upon the result of which any money or property or valuable thing whatever is bet, to be played in any building or room or upon any premises of which such person is the owner or has possession or control, shall be punished by a fine of not less than ten, nor more than one hundred, dollars.

SEC. 6. Every person who shall bet any money or property or valuable thing whatever upon the result of any game of chance shall be punished by a fine of not less than five, nor more than twenty-five, dollars.

SEC. 7. Every person who shall willfully or contemptuously disquiet or disturb any congregation or assembly of persons met for religious worship, or for social or literary purposes, by making a noise or by rude or indecent behavior, or profane discourse within the place of assembly, or so near the same as to interrupt or disturb the order or solemnity thereof, or who shall willfully menace, threaten or assault any person there being, shall be punished by a fine of not less than one, nor more than one hundred, dollars.

SEC. 8. Every person who shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie-knife, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drink, or shall directly or indirectly sell or deliver, loan or barter, to any minor any such weapon without the consent of the parent or guardian of such minor, shall, upon conviction, be punished by a fine of not less than fifty, nor more than one hundred, dollars.

SEC. 9. The next preceding section shall not apply to any police officer, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or has good reason to carry the same in the necessary defense of his person, home or property.

SEC. 10. All ordinances and parts of ordinances in conflict with this ordinance are hereby repealed.

SEC. 11. This ordinance shall take effect and be in force from and after its passage.

Read three times and passed and approved this 12th day of March, 1892.          W. A. CATER, Mayor.
 [SEAL.]               AARON ROOTS, President of Board.
ATTEST: J. HEMMINGS, City Clerk.

Copyright © 2023 Newspapers.com. All Rights Reserved.


POWERED BY Newspapers™.com

# EXHIBIT 20

Case: 23-16164, 10/12/2023, ID: 12808632, DktEntry: 8, Page 103 of 142

Newspapers
by ancestry

The Evening Bulletin (Maysville, Kentucky) · Tue, Dec 10, 1895 · Page 4

https://www.newspapers.com/image/71044117

Downloaded on Sep 19, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

Powered by Newspapers

The Evening Bulletin (Maysville, Kentucky) · Tue, Dec 10, 1895 · Page 4

https://www.newspapers.com/image/71044117

Downloaded on Sep 19, 2023

than ten nor more than fifty days, or both so fined and imprisoned.

Sec. 22. Be it further ordained, That if any person shall, within the city of Maysville, carry concealed a deadly weapon upon or about his person other than an ordinary pocket-knife, or shall sell such weapon to a minor, other than an ordinary pocket-knife, shall be fined not less than twenty-five nor more than one hundred dollars and imprisoned not less than ten nor more than thirty days. If judgment shall be confessed under this section the highest penalty shall be imposed. Carrying concealed deadly weapons shall be lawful in the following cases: By Sheriffs, Constables, Marshals, Policemen and other ministerial officers when necessary for their protection in the discharge of their official duties; by United States mail carriers when actually engaged in their duties as such, and by agents and messengers of express companies when necessary for their protection in the discharge of their official duties

Sec. 23. Be it further ordained, That any person who shall suffer or permit any riotous or disorderly conduct, drunkenness, lewd or scandalous behavior in his house or on the premises in his control, shall be fined not less than twenty nor more than one hundred dollars

Sec. 24. Be it further ordained, That whoever shall be guilty of disorderly conduct in the city of Maysville shall be fined not exceeding twenty dollars.

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 21

New Haven

# CHARTER

AND

# ORDINANCES

OF THE

## CITY OF NEW HAVEN



TOGETHER WITH LEGISLATIVE ACTS AFFECTING SAID CITY.

REVISED TO FEBRUARY 1, 1898.

New Haven:

PRESS OF THE PRICE, LEE & ADKINS CO.

1898.

**REFORM CLUB,**
Committee on
MUNICIPAL ADMINISTRATION.

Add. 61

Generated on 2023-09-22 23:29 GMT / https://hdl.handle.net/2027/nnc1.cu56571828
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
COLUMBIA UNIVERSITY

Case: 23-16164, 10/12/2023, ID: 12808632, DktEntry: 8, Page 107 of 142

# NEW HAVEN PUBLIC PARKS.

### Rules and Regulations of the Park Commission.

1. No domestic animal, except dogs, shall be permitted to enter or to go at large in any of said parks, either with or without a keeper. Dogs must be held in leash by the owners, otherwise they may be killed by any park-keeper, special constable, or policeman.

2. No person shall pick any flowers, foliage or fruit, or cut, break, dig up, or in any manner mutilate or injure any tree, shrub, plant, grass, turf, railing, seat, fence, structure, or other thing in any of said parks, or cut, carve, paint, mark or paste on any tree, stone, fence, wall, building, monument, or other object therein, any bill, advertisement or inscription whatsoever.

3. No person shall carry or have any fire-arms on any of said parks, and no fire-arms shall be discharged from, or into any of the same. No stone or other missile shall be thrown or rolled from, into, within or upon any of said parks, except in such place as the commission may designate as a ball-field, in playing games in which a ball is used.

4. No person shall ride or drive on any road within any of said parks at a faster gait than eight miles per hour, and this shall apply to the use of cycles.

5. No threatening, abusive, boisterous, insulting or indecent language, or gesture shall be used on any of said parks, nor shall any oration, harangue, or other public demonstration be made, unless by special authority of said commission.

6. No person shall expose any article or thing for sale on any of said parks, unless licensed therefor by said commission.

7. No person shall bathe naked or otherwise in any waters in, or adjacent to any of said parks, or be naked within any of said parks, except in such places and subject to such regulations, as the commission may, from time to time, specially designate by a public notice set up for that purpose within the park.

8. No person, unless by authority of said commission, shall light, kindle, or use any fire on any of said parks.

9. No person shall ride or drive upon the grass, lawns, or foot-paths of any of said parks.

10. No person shall disturb or injure any bird, bird's nest or eggs, or any squirrel or other animal within any of said parks.

Add. 62

Generated on 2023-09-22 23:09 GMT / https://hdl.handle.net/2027/nnc1.cu56571828
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
COLUMBIA UNIVERSITY

# EXHIBIT 22

The Democratic Press (York, Pennsylvania) · Fri, Oct 27, 1876 · Page 3

https://www.newspapers.com/image/774003811

Printed on Sep 19, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



Newspapers
by ancestry

https://www.newspapers.com/image/774003811

The Democratic Press (York, Pennsylvania) · Fri, Oct 27, 1876 · Page 3

Printed on Sep 19, 2023

and, hief lect four ay a ame Con-

dollars, or more than twenty-five dollars for each and every offence, and in default of the payment of said fine, be committed to the Jail of York county for not less than five days nor more than thirty days.

hall e or hall the g a for ica l on nts, uch s he om- the the ila

SEC. 24. That if any person or persons found carrying any deadly weapons, such as Pistols, Revolvers, or Black Jacks within the limits of said Borough, shall pay a fine of not less than two dollars, and not exceeding five dollars for each and every offence, and in default of the payment of said fine be committed to the Jail of York county for not less than ten days and not more than thirty days.

SEC. 25. The several fines, forfeitures, and penalties and other sums of money imposed and directed to be paid by this act, and not herein directed to be otherwise recovered shall be levied and re-

Ashland Hoover and Su chester are of l who die leaving Hosler, leaving ing chil Martin, Clippin Pa.; Su Cumber Mr. — are of l ler and land co your p Daniel and stil dren. t Kauffm Martha are min and hav ip Hoo owing minor,

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 23

New York City Ordinances, etc

# METROPOLITAN BOARD OF HEALTH.

# CODE

OF

# HEALTH ORDINANCES,

AND

## Rules and Sanitary Regulations,

# 1866,

## And its Amendments.

New-York:

JOHN W. AMERMAN, PRINTER,

No. 47 CEDAR STREET.

1866.

**Add. 67**

Generated on 2023-09-15 23:56 GMT / https://hdl.handle.net/2027/njp.32101058288372
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

52

## Gas.

Valentine's
Laws N. Y.,
p. 1299.
Act 18th
May, 1845.
SEC. 146. That no person or company being a manu-
facturer of gas, or engaged about the manufacture
thereof, shall throw or deposit, or allow to run (or hav-
ing the right and power to prevent the same, shall
permit to be thrown or deposited) into any public waters,
river or stream, or into any sewer therewith connected,
or into any street or public place, any gas, tar or any
refuse matter of or from any gas house, works or manu-
factory ; nor shall any such person or company allow any
substance to escape from such house, works or manufac-
tory, (or make any gas of such ingredients or quality that
any substance shall escape therefrom or be formed in the
process of burning any gas,) which shall be needlessly
offensive or dangerous, or prejudicial to life or health.

## Fire Arms and Deadly Weapons.

Laws
Brooklyn,
pp. 336
339.
SEC. 147. That no person shall sell, loan or give to, or
to allow to be taken by any other person, any fire arm, or
other deadly or dangerous weapon, when there shall be
any reason for such first named person to think or believe
that any danger to life may illegally result from the giv-
ing, loaning, selling, or from the use of such arm or
weapon.

SEC. 148. That no person shall, except according to
a permit or the regulations of this Board, set off or fire
any gun or other fire arm, or rock blast in any public
street, alley or place within the built up portions of any
city in said District, unless pursuant to some competent
authority.

## Drink—Liquors.

SEC. 149. That no person shall sell or give to any other
person (or permit such other person to get, having the

Add. 68

Generated on 2023-09-15 23:57 GMT / https://hdl.handle.net/2027/njp.32101058288372
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google    Original from
PRINCETON UNIVERSITY

# EXHIBIT 24

## What our Cotemporaries say of Us.

WASHINGTON STANDARD.—As announced by us last week the first number of this paper made its appearance on Saturday last. In its address and appearance we are confident it has come up to the most sanguine expectations of its friends, and we hail it as a worthy cotemporary. The mechanical part of the paper exhibits neatness and good taste, being printed upon new type and of good *readable* size, while its editorial columns displays much ability and experience—particularly so for a young man. We acknowedge ourself gratified with its friendly intimations, and its pledge to continue in that happy state of mind; and we certainly at present know of no cause why we shall not remain personally friendly with its editor. That we may and will differ upon the various political topics that agitate the public mind is altogether probable, but let that difference be characterized by justice and moderation. An open manly opponent we admire; but with a hidden hypocritical sycophant we want nothing to do.—*Pioneer and Democrat.*

"WASHINGTON STANDARD."—The first number of this journal was placed on our table last Monday. Its typographical appearance is very good, and its original matter is marked by ability. In size it is the same as this paper, but is printed on larger type. Considering the short time allowed the publisher to issue the first number, since the receipt of the material, we are surprised at its creditable appearance. The tone of its articles is pleasing when we contrast it with the tone of the party press of Oregon. The *Washington Standard* promises to be a truthful exponent of the principles of the Republican party, and an important auxiliary in promoting the interests of the Territory. We extend to it a cordial welcome, and to its proprietor, Mr. John M. Murphy, our best wishes for his success.—*Herald.*

We received the first number of the *Washington Standard*, published at Olympia, Washington Territory, by JOHN M. MURPHY, Esq. It is a large paper, printed on new type, and looks well. Its editorials have the ring of the true metal. For the first time, a Republican paper has been published in Washington Territory. All the patronage and power of the administration has been used to crush out republicanism in that territory. The interests of the masses of the people of Washington Territory should make them Republicans. They are for free labor, free press, free speech and for free homesteads. We are glad to see the Republican *Standard* floating from its position at Olympia.—"Long may it wave!"—*Argus.*

THE WASHINGTON STANDARD.—The first number of this paper has been received, and we are happy to place it upon our exchange list. It is published at Olympia, Washington Territory, every Friday morning by John M. Murphy, Editor and Proprietor. We hail its advent with pleasure; and the editorial ability displayed in its columns, together with neatness of execution—excellent paper—typographical beauty and the large amount of valuable reading matter which it offers, will demand from a generous public the patronage which it justly merits. It will be a welcome guest in every family circle, and we predict for it a triumphant future. Success Brother.—*Press.*

WASHINGTON STANDARD.—We have before us the first number of a paper printed at the Capitol, bearing the above pertinent name. It is gotten up well, and its editorials are marked by ability. It unfurls the Republican banner to the breeze, and we congratulate Mr. MURPHY upon his advent as a supporter of principles no longer odious, and bespeak for him a cordial support. Kissed at its birth by the sun of political prosperity, may the lustre of its folds never be dimmed by a cloud. Here's our ☞—*North West.*

NEW PAPER.—We have received the first number of the Washington *Standard* printed at Olympia, W. T. It is a weekly journal, devoted to Republicanism. The editor and proprietor is John M. Murphy, formerly of Portland, a young man of ability and energy. The number before us presents a very creditable appearance. Much as we dislike the political complexion of the paper, we sincerely wish its young editor success in his enterprise, for we know him to be a worthy, honorable gentleman.—*Sentinel.*

The first and second numbers of the *Washington Standard*—published at Olympia, by J. M. Murphy—have been received. It is neatly printed, on new type, and judging from the copies before us, we predict it will assume a high place among the political journals of our land. It is Republican in politics, and published at $3 per year, in advance.—*Advocate.*

☞ We have received the first two numbers of the *Washington Standard*, a new Republican paper issued at Olympia, W. T. It is edited and published by J. M. Murphy, Esq., formerly employed in this city as a journeyman printer. The Republicans will doubtless exert themselves to sustain this paper, which is worthy their support.—*Times.*

WASHINGTON STANDARD.—We have received the first number of this paper just started at Olympia, W. T., by John M. Murphy, editor and proprietor. The *Standard* is printed on new material, and is neat in typographical appearance, speaking well for the taste of its proprietor. It is Republican in politics. We wish it a fair share of patronage.—*Farmer.*

We have received the first number of the *Washington Standard*. We wish the proprietor, Mr. Murphy, who is a typo, pecuniary success; but "darn" his politics.—*Democratic (Opp.) Herald.*

Gentlemen, our politest bow to you. We cordially reciprocate your kind wishes for our success, and trust that our relations to each other may ever continue pleasant. A happy New Year to ye all!

## Ordinances of the Town of Olympia.

### Ordinance No. 12.

An Ordinance to vacate the west seven feet of the north and south alley in Blocks number twelve (12) and thirteen, (13) on the Sylvester plat of the Town of Olympia.

Whereas, the lot holders owning property on the east side of Main Street, in the Town of Olympia, have surrendered seven feet of depth fronting on said street, and dedicated the same to the town, for the purpose of widening the said Main Street: And Whereas, the lot holders in blocks number twelve (12) and thirteen, (13) that is to say, the blocks fronting on the east side of said Main Street, between Second and Fourth Streets, have petitioned to the trustees of said town to vacate the west seven feet of the ten feet wide alley running north and south through said Blocks, and add the said seven feet to said lot holders who own land on the east side of Main Street, of the hearing of which petition due notice has been given according to law. Therefore,

§ 1. Be it ordained by the Board of Trustees of the Town of Olympia, That the west seven feet of the ten feet wide alleys running north and south through blocks twelve and thirteen of said town, that is to say, the west seven feet of the ten feet wide alley, between Main and Washington streets, running north and south from Second Street to Third Street, and the west seven feet of the ten feet wide alley between said Main and Washington Streets, running south from said Third Street to Fourth Street, be vacated hereafter as a public alley forever.

§ 2. The ground, or west seven feet of said alley so vacated by the first section of this Ordinance shall be annexed to and belong to the various persons owning ground bounding and bordering on the west side of said alley, and the west boundary line of lots two (2) and seven, (7) in said blocks twelve and thirteen, shall be removed seven feet to the eastward, thereby securing to the owners of lots one (1) and eight, (8) in said blocks, fronting on the east side of said Main Street, the original complement of ground granted by Edmund Sylvester to the various purchasers under him.

§ 3. The Clerk of the Board is hereby ordered to so change the plat of the said town as to show the said vacation of ground, and to so move the lines of the said respective lot holders as to conform the same to the vacation of said ground as an alley, and the annexation thereof to make up the deficiency to lot holders who have surrendered their western seven feet of ground to widen Main Street to its present width of seventy-seven feet.

§ 4. All town plats showing alleys in said blocks as boundary lines of lots hereinbefore recited, inconsistent herewith, are declared vacant, and must be modified to conform hereto.

Passed March 3d, 1860.

ELWOOD EVANS,
President of the Board of Trustees.

Attest: Richard Lane, Clerk.

### Ordinance No. 13.

An Ordinance to prohibit the use and carrying of Deadly Weapons, and the discharging of Fire Arms.

§ 1. Be it ordained by the Board of Trustees of the Town of Olympia, That any person who shall draw, exhibit, or attempt to use any deadly weapon within the corporate limits of this town, upon, to, or against another person, shall be liable to a fine of not more than fifty, nor less than twenty-five dollars.

§ 2. Any person who shall, in the usual walks of life, within the limits of this town, carry any deadly weapon, shall be liable to a fine of not more than ten, nor less than five dollars.

§ 3. Any person, who shall, within the following limits, to wit: between Budd's Inlet on the west and north, Adams street, on the east, and Union street, on the south, fire off or discharge any gun, pistol, or fire-arms of any kind, shall be liable to a fine of not less than five, and not more than ten dollars.

§ 4. All fines arising under this ordinance shall be assessed and collected as other fines are assessed and collected under the municipal regulations of this town; and it shall be the special duty of the Town Marshal to complain of all violations of this ordinance to the police magistrate of this town.

Passed March 3d, 1860.

ELWOOD EVANS,
President of the Board of Trustees.

Attest: Richard Lane, Clerk.

### Ordinance No. 15.

An Ordinance regulating the compensation of the Town Marshal as Supervisor of streets.

Be it ordained by the Trustees of the Town of Olympia, That the compensation of the Town Marshal for his services as Supervisor of Roads and Highways be, and the same is hereby declared to be five per centum on the amount of road taxes assessed and collected within the limits of said corporation, and disbursed by him during the year 1859.

Passed March 22, 1860.

ELWOOD EVANS,
President of the Board.

Attest: Richard Lane, Clerk.

### Ordinance No. 16.

An Ordinance in relation to Nuisances.

§ 1. Be it ordained by the Board of Trustees of the Town of Olympia, That it shall be the duty of the committee on health and police, and of every member thereof to examine into the state and condition of every place and part of the town where he shall suspect or be informed that there exists any matter or thing which is or may be prejudicial to the health of the inhabitants thereof.

§ 2. Whenever it shall appear to the satisfaction of either of the members of the committee on health and police, or of the town Marshal, that there exists upon any premises owned or occupied by any person, any dirt, offal or animal or vegetable matter, or the contents of any hog pen, privy, drain or vault, calculated to injure health, or by noxious air, to annoy the neighborhood, it shall be the duty of such member of said committee, or of the town Marshal to cause the owner or occupant of such premises to be notified either verbally or in writing, of the existence of such nuisance or annoyance, and directed forthwith to abate the same, and if such nuisance shall not be abated within twenty-four hours after such notice, the owner or occupant of such premises shall forfeit and pay a fine of not less than five, nor more than fifteen dollars, and the Town Marshal shall be authorized to cause such nuisance or annoyance to be abated, for the costs of which abatement, together with the penalty aforesaid, the said owner or occupant shall be liable, and the same shall be collected for the use of the town in the the same manner as other fines and penalties are collected under the municipal regulations of said town.

Passed May 17th, 1860.

ELWOOD EVANS,
President of the Board of Trustees.

Attest: Richard Lane, Clerk.

### San Francisco Agency.

THOS. BOYCE, Esq., N. E. corner of Montgomery and Washington Sts., and CHAS. A. CRANE, Esq., are our authorized Agents in San Francisco, to receive and receipt for Subscriptions and Advertising.

CHAS. BARRETT, Esq., News Agent, is authorized to transact business for us in Portland.

## TO ALL WHOM IT MAY CONCERN!!

KNOW YE that at the **Old Post Office,** Portland, all

**Descriptions of Stationery, Blank Books, &c., All Novels by the following Authors, viz:**

| | |
|---|---|
| Mrs. Southworth, | Sam Slick, |
| Miss Bremer, | James, |
| Mrs. Heutz, | Mrs. Gore, |
| Ann L. Stephens, | Mrs. Hofland, |
| Charles Dickens, | Wm. Howitt, |
| Bulwer, | Lagetchinikoff, |
| Miss Pardoe, | Spindler, |
| Reynolds, | Ward, |
| Emerson Bennett, | C. A. Murray, |
| Charles Lever, | Pierce Egan, |
| Alexander Dumas, | De Beauford, |
| Capt. Marryatt, | Anderson, |
| Smith, | Charles Rowcroft, |
| Arthur, | Mrs. Maberly, |
| Ainsworth, | Knowles, |
| Maitland, | De Vigny, |
| Eugene Sue, | Mrs. S. C. Hall, |
| D'Israeli, | Currer Bell, |
| E. J. Peterson, | D. Hennay, |
| Leigh Hunt, | Wharton, |
| Carlile, | Miss S. Ferrie, |
| Ellen Pickering, | Henry Fielding, |
| Lippard, | Mrs. Inchbald, |
| Frank Farleigh, | H. H. Milman, |
| Mrs. Gray, | G. H. Lewis, |
| Dr. Hollicut, | Mrs. Gaskell, |
| Geo. Sand, | Collins, |
| Tobias Smollett, | Mrs. Trollope, |
| | Thackeray, |

and of all other authors, copies of which will be sent by mail or express to any part of Oregon, or Washington Territory, on receipt of fifty cents per volume in postage stamps or cash.

N. B.—Liberal allowance to the Trade.

**ALSO**

Tales of the Sea,
Highwaymen,
Adventures,
Revolutionary Tales, Travels
Cook Books, &c., &c.

**Also the following new Novels:**

Royalists and Republicans, Fallen Stars, Gaelfatin, or the Death of Morgan, Dickens' Short Stories, Against Wind and Tide, The Haunted Homestead, The Old Stone Mansion, The Mill on the Floss, Anecdotes of Love, Adam Bedl, Minister's Wooing, Out of the Depths, Lucy Crofton, Self Help, Wild Sports of the South, Adventures of Jonathan Romebred, Lizzy Glenn, Love me little, love me long, Love—by Michelet, from the French, Woman—by Michelet, from the French, The Virginians.

All the above works are by the most noted authors in the world.

Also, Newspapers, Periodicals, &c. Agent for the San Francisco Bulletin, Alta California, and Washington Standard, the best papers on the Pacific coast.

A subscription list, with scale of prices, will be sent to any part, if desired.

Also dealer in Apples, Pears, Plums, &c., and all kinds of green and dried Fruits, Candies, Fish Sauces, Syrups, Powder and Shot.

☞ All of the above will be carefully packed and sent to any portion of the country desired.

CHARLES BARRETT, Pro.,
At the Old Post Office, Portland, Oregon.

November 17, 1860. 1:tf

## Notice to Donation Claimants
OF WASHINGTON TERRITORY.

MORE than Fourteen Hundred Donation Papers, (Notifications and Final Proofs,) are now lying in the pigeon-holes of the Register's Office, upon which certificates can be issued as soon as FULL and COMPLETE COPIES ARE MADE. To do the whole of that work would require the constant labor of the Register from two to three years, provided that he had no other duties to perform. But when it is known that two-thirds of his time is occupied with conflicting donations and pre-emption cases, persons having donation papers in the office may well look to the future for their certificates and Patents. Believing that many would prefer having their donations completed now, rater than wait for the indefinite "course of human events," and being well acquainted with the business, I am prepared to make out papers and procure Certificates for claimants in all parts of the Territory. I will also attend to the preparation and filing of declaratory statements and final proofs for pre-emptions, and drawing maps of claims and Townships, from the original surveys, for those desiring them. For preparing the papers and procuring a certificate for a donation claim, where there is no conflict, my charge is five dollars. For preparing and filing declaratory statements and paying the government fee, three dollars. For Township maps, five dollars, and claim maps one dollar each. In all cases the fee must come in advance.

Persons having bought land, acquired under the Donation Law, cannot be too careful to see Certificates are issued. A. M. POE,

Nov. 24, 1860. [3:tf] Olympia, W. T.

# QUINCY HALL

—THE—

**LARGEST**

## Clothing Emporium

IN

CALIFORNIA.

**147, 149 and 151 Washington St.,**

SAN FRANCISCO.

November 17, 1860. 1:m3

## ELWOOD EVANS,
## ATTORNEY AT LAW,
OLYMPIA, W. T.

Office in Wright's New Building, first door east of Main Street.

Nov. 14th, 1860. 1:ly

## Notice to Tax-Payers.

THE Delinquent Tax Roll of Thurston county will be kept at the store of Wm. G. Dunlap, in Olympia, from and after this date. All persons who have been called upon for their taxes, and have not paid the same, are requested to do so BEFORE THE 25TH DAY OF DECEMBER NEXT.

WILLIAM [illegible],
Sheriff of Thurston County, W. T.

Olympia, Nov. 25, 1860. 3:w4

## $615,000 to distributed in Gifts
JANUARY 5th, 1861.

GEORGE G. BRIGGS' GRAND VOCAL AND Dramatic Gift Entertainment will be given at the MARYSVILLE THEATRE, January 5th, 1861, on which occasion the following Magnificent Prizes will be distributed among the Ticket Holders. 412 Prizes. Tickets, $2!

LIST OF PRIZES.

FIRST PRIZE—Briggs' Old Orchard—This property consists of 165 acres of Yuba River Bottom Land, together with the House known as "Briggs' Hotel," and the Barns and Sheds attached thereto. The Orchard numbers 35,000 Trees, all of the choicest varieties, and is the largest orchard in the world, and probably the most productive property in the State. The Fruit from this orchard brought, in 1858, $70,000; in 1859, $100,000; in 1860, about $125,000. This property is valued at....................$210,000

SECOND PRIZE—Sacramento River Orchard—Containing 160 acres; 24,000 Fruit Trees in variety; planted in 1857–'58, most of which will be in good condition for bearing Fruit the coming year. Valued at....................$120,000

THIRD PRIZE—Oroville Orchard—Containing 200 acres; 18,000 Fruit Trees in variety; valued at....................$90,000

FOURTH PRIZE—Paxton Orchard, near Marysville—70 acres of Land, 12,000 Fruit Trees, House and Barn; valued at....................$72,000

FIFTH PRIZE—Haun Orchard, near Marysville—65 acres, 5,000 Fruit Trees, 20,000 Grape Vines; valued at....................$53,000

SIXTH PRIZE—Cole Orchard, near Marysville—41 acres, 7,000 Fruit Trees; valued at....................$42,000

SEVENTH PRIZE—Vineyard on the old Ranch, 2½ miles from Marysville, 10 acres, 8,000 Vines; valued at....................$8,000

EIGHTH PRIZE—Grain Field—part of old Ranch; 250 acres; valued at....................$6,000

NINTH PRIZE—Grain Field—part of old Ranch; 180 acres; valued at....................$4,000

TENTH PRIZE—Sacramento River Ranch—250 acres (Meadow); valued at....................$3,000

ELEVENTH PRIZE—Paxton Ranch—(Meadow); 50 acres; valued at....................$3,000

TWELFTH PRIZE—Feather River Ranch—(Meadow); 160 acres; valued at....................$2,000

100 Cash Gifts of $5 each, from Nos. 12 412..$2,000

Total....................$615,000

Comprising, altogether, 1601 acres of Land, 161,000 Fruit Trees, 28,000 Grape Vines, and $2,000 in Cash.

The lands upon which these Orchards are planted are all bottom lands, and as good as can be found in the State. Apples, Peaches, Apricots, Nectarines, Pears, Plums, Figs, Quince, Black Walnut, Almond, &c.; will be found in these Orchards in greatest variety and of the choicest kinds. The character of the Fruit is well known throughout the Northern and central portions of the State. All of the Vines and nearly all of the Fruit Trees will be of age to bear a good crop the coming year. We append the following certificate for the benefit of persons not well acquainted with the value of the property:

We, the undersigned, hereby certify that we are acquainted with most of the above described property, and that we do not believe its value, as above stated, is over estimated.

John C. Fall, Marysville.
Hon. S. M. Bliss, Marysville.
Wm. K. Hudson, "
D. W. C. Rice, "
John A. Paxton, "
John Q. Packard, "
S. P. Wells, "
J. B. Humphrey, "
Rev. E. B. Walsworth, Marysville.
J. F. Linthicum, Ed. Express.
B. P. Every, Ed. Appeal.
John R. Ridge, Ed. Democrat.
Charles Covillaud, Marysville.
Gen. John A. Sutter, Hock Farm.
Rev. O. C. Wheeler, Cor. Sec. Cal. State Ag. Society, Sacramento.
A. P. Smith, Sacramento.
Sidney Smith, "
J. Bryant Hill & Co., San Francisco.
J. L. Sanford, San Francisco.
Knapp, Burrill & Co., San Francisco.

The Distribution of the Gifts will be under the direction of a Committee of gentlemen chosen by the audience on the evening of the Concert.

GEORGE G. BRIGGS,
Proprietor.

Marysville, Oct. 23, 1860. 1:td.

## DR. ADOLPH'S
## Anti-Rheumatic Cordial and

HEALTH RESTORATIVE—IS THE MOST VALuable and unsurpassed remedy for Rheumatism and Gout to be found in the world and known at present. The discoverer of the above medicine does claim its infallibility in all cases of Rheumatism and Gout—when used according to direction—and does offer a reward of five thousand dollars to any medicine that will supersede it, and is entirely vegetable. The Doctor is enabled to offer the above reward on account of his having used the above for ten years in his practice, and has never known it to fail in the cure of the most protracted cases of Rheumatism and Gout. Dr. Adolphus is known and highly celebrated all over the State, for his cures in Rheumatism, Gout and Chronic Diseases.

In secondary and tertiary Syphillis, Scrofula, enlargement of the Glands, Dropsy, and all nervous and Cutaneous Diseases and the whole train of Chronic Diseases, whose very name is a terror as well to the Physician as to the patient, this medicine has proved to be superior to any in existence, and has cured them in so short a time that they appeared like being abolished by magic influence; in fact a few more such discoveries, and druggists will not need to keep a lot of useless medicines on hand, whenever they are prescribed once in a ten score, they have lost by time their properties, in which their value did reside, if there was actually any in them.

Take this medicine when your digestive organs are disordered and your blood is impure, and it will surely act on your bowels.

Take this medicine when your have a cold, and it will make you perspire freely.

Take this medicine when your urinary and absorbing organs are disordered and it will act on your kidneys, it penetrates every part of the body searches even the most remote and secret recesses of your system, and removes the diseases located there—it restores healthy action and give tone to every organ in the human body—therefore it has righteously deserved the name it bears HEALTH RESTORATIVE.

The Doctor, who is averse to all patent medicines, wishes to be understood that the above medicine is no such thing, but that he has through the introduction of this medicine with its treatise and direction for use, made every sufferer to be his own physician in the above named diseases.

Thinking it under my dignity to follow the mode of quacks by appending the certificates of physicians or private persons which it is too well known can be had for certain remunerations, applications of friends, or by the mode of boring a man half to death, for even the most worthless trash, I will therefore leave to those in want of medicine to enquire personally of men who have been cured by my medicines of the above diseases, and who can be found in almost every city and villiage throughout the State. I consider such personal conviction far more superior to certificates of persons that are far from being known to them in want of medical aid.

But should any one care for written testimonials or certificates regarding the cures performed by this medicine they call at my office and I will show them certificates of true merit, which have been sent to me voluntarily, without applying for them, or by boring individuals to get them.

For sale by

ADOLPHUS & JUNGERMAN,

46 Montgomery street, three doors from Bush, and by all the Duggists in the city.

AGENTS—Crowell & Crane, corner of Clay and Front streets—Redington & Co., Clay street—Morrill, corner of Washington and Battery sts., San Francisco. 1:1m

## WASHINGTON HOTEL,
SILAS GALLIHER, Pro.

CORNER OF SECOND AND MAIN STREETS,

Olympia, W. T.

Board per week.................... $5 00

Olympia, Nov. 23, 1860. 2:ly

## DR. J. C. YOUNG,
LATE PROFESSOR OF THE UNIVERSITY OF PENN.

Can be found at his

**Private Medical Office and Hospital,**
No. 210 CLAY STREET,

Opposite the southeast corner of the Plaza.

WHERE HE CAN BE CONSULTED PRIvately, and with the utmost confidence, by the afflicted, at all hours daily, from 8 A. M. to 8 P. M.

DR. YOUNG addresses those who are suffering under the affliction of private diseases, whether arising from impure connection or the terrible vice of self-abuse. Devoting his entire time to that particular branch of the profession, he feels warranted in GUARANTEEING A CURE IN ALL CASES, whether of long standing or recently contracted, entirely removing the dregs of disease from the system, and making a PERFECT and PERMANENT CURE.

He would call the attention of the afflicted to the fact of his long-standing and well-earned reputation, furnishing sufficient assurance of his skill and success.

Upwards of five thousand cases have been discharged cured in the year ending July 1st, 1860, showing a record surpassing any hospital in the United States.

CONSULTATION, by letter or otherwise, FREE.

CONSTITUTIONAL DEBILITY AND SEMINAL WEAKNESS.—Dr. Young addresses those who have injured themselves by private and improper indulgence in that secret and solitary habit which ruins the body and mind, unfitting them either for business or society, with the view to impress upon their minds, before it is too late, the absolute necessity of skillful medical treatment, and by a direct course of reasoning to show that although we may not be ungrateful for the health given us, that it cannot be sported or trifled with without loss; and when once engendered cannot be regained by mere abstinence from folly, or urgent and strong display of courage.

It may not be generally understood by the great majority of sufferers from mental depressions, that these dull and heavy sensations experienced in the head and about the chest, accompanied by feelings of anxiety and foreboding, arise from a disorganization of the important functions of the body.—Such, however, is the fact, and in latter years to such an extent has this been carried that our Insane Asylums are becoming filled with patients who owe to this cause alone their suffering. The study and practice of years has shown conclusively that to the weakness of the genital organs, superinduced far too often by self-abuse, which has become so apparent in the face; and where once our fathers stood giants in muscular force, the men of to-day are dwarfs in comparison.

The symptoms of the disease may be faint to-day, but so surely as you experience that weakness in the back and limbs, dimness of sight, nervousness, derangement of the digestive functions, and general debility, so surely will follow the harrowing mental prostration too awful to contemplate, and which will end only as the last breath comes struggling, gasping from the breast of the expiring victim. There is something noble in dying when the good fight has been fought, but what man can view a grave filled by one whose life dribbled out in pollution, without a feeling of disgust.

Do not hesitate, hoping that time will eradicate what it only strengthens, but call at once at my office, with the full assurance of a speedy and permanent cure. Let no sense of false shame deter you, but save yourself from the awful effects of this dread disorder, and regain the full strength of your manhood.

### Mercury in no form enters into the Remedies adopted by Dr. Young.

Mercury has been named, not inaptly, "The curse of Man," as, under the treacherous garb of a restorer, it bequeaths the most terrible disease. We do not see it at once, but hidden beneath the fair surface, it poisons the blood, destroys the nervous and muscular system, preventing the action of the joints, and rendering wretched, under the name of rheumatism, the life of the sufferes.—"The remedy is worse than the disease," as many a poor, crippled, miserable, toothless wretch will say, while pointing to his decayed jaws and ulcerous gums, he tells of its ravages—or at his swollen joints and body marked with purple or leaden colored sores which speak of his pains, and again at his impaired, ruined digestion, which tells of wretched days and sleepless nights.

All affections arising from the use of mercury perfectly eradicated and health fully restored.

**All diseases of a private nature** arising from impure connection, such as Ulcers, Swelling of the Groins, Ulcers in the Throat, Secondary Syphilis, Cutaneous Eruptions, Ulcerations, Tertiary Syphilil, Syphilis in Children, Mercurial Syphilitic Affections, Gonorrhœa, Gleet, Strictures, False Passages, Inflamation of the Bladder, and Prostrate Glands, Excoriations, Tumors, Pustules etc., treated in the most scientific manner.

### Cure always Guaranteed or no fee Required.

Dr. Young would state that he has been a professor of Obstetrics and Female diseases for the past fourteen years, and is fully qualified to administer in all cases both medically and surgically, not in a superficial, but in as thorough a manner as years of study and practice—both in hospitals and private families—can make. Therefore families can rely upon him as upon a father. All in affliction can find in him one who can feel and sympathise with, and befriend them in trouble—one in whose secresy the utmost bonfidence can be placed. Come, all ye that are afflicted and in trouble, and you will be relieved and cured.

### Ptivate Medical Office and Hospital
210 CLAY STREET,
Opposite southwest corner of the Plaza,
SAN FRANCISCO.
DR. J. C. YOUNG.

DR. J. C. YOUNG, who has become so celebrated for the thousands of cures which he has performed on old, chronic, mercuridl, syphilitic, and all private diseases, without mercury, is consulted daily at his office, 210 Clay st., from 9 A. M. to 8 P. M. A cure fuaranteed or no pay.

Dr. Young has probably had more practice in venereal diseases than any physician in California. He cures all the most aggravated cases of this disease, and mild ones he removes in from two to five days. The Doctor has for many years been known as the most eminent and successful physician practising in the United States, and what is more important to the patient, he always effects a speedy and permanent cure.

Travelers, seamen, miners ond others, who wish to be cured without mercury, hindrance from business, or exposure to friends, should apply to him as soon as possible, and a perfect cure guaranteed in all curable cases.

The following are a few of the many testimonials of Dr. Young's ability as a practitioner, which have appeared in the public journals of the last few years:

[FROM THE BOSTON MEDICAL JOURNAL.]

Although we are opposed to the system of advertising for good and sufficient reasons, still we deem it but justice to say that Dr. Young is one of the most industrious and indefatigable votaries of the medical science in the United States.

[FROM PROFESSOR JACKSON.]

The subscriber is personally acquainted with Dr. Young, and has seen much of his practice, and can bear testimony to his merits as a practitioner.

[FROM THE NEW YORK HERALD.]

The eminence of this distinguished gentleman in his profession, and the very extended opportunities possessed by him for the observance of venereal diseases, makes his services invaluable to those afflicted with the above complaints.

[FROM THE WHIG AND ADVERTISER.]

All afflicted with private complaints should, if possible, consult Dr. Young, whose medical education is not surpassed by any physician in the country. In his skill, honor and integrity all may rely with safety, while most of the medical practitioners in this city are without honesty or responsibility, their pretensions being grounded in ignorance and assumption.

### Important to Strangers and Others Requiring Medical Treatment.

Dr. Young is the pioneer Advertising Physician in California, and the only one now advertising who has received a regular medical education, which is requisite for the successful treatment of diseases. Because of his unparalleled success, there have sprung, from time to time, into existence, impostors, without character or education, who, by boasting have managed to deceive the unwary sufferer into the belief that they were respectable and scientific men. In so doing, they have scattered broadcast their nostrums among the honest and unsuspecting, to the destruction of health, and in some cases life itself. Beware of them as you would of the Upas tree, for they are as destructive. Dr. Young's office is at 210 CLAY ST., opposite the southwest corner of the Plaza.

With regard to remuneration, (an indispensable preliminary between patient and prescriber, and which no fastidiousness or false delicacy should set aside.) Dr. Young begs respectfully to state to those wishing to consult him, that in ordinary instances the usual fee is expected as by other practitioners; but where patients seek to entrust their cases to his entire management, he takes this opportunity of expressin his readiness to name a specific consideration to conduct the case for a determinate period, or to a successful issue, whereby the invalid is at once apprised of the extent of the expense to be incurred, and the physician secured the punctual attendance of his patient, which the golden toll often deters beyond the second or third interview, and which arrangement Dr. Young will be happy to apportion to the purse—length of the patient, as may be agreed at the first interview.

TO CORRESPONDENTS.

Patients residing in any part of the State, however distant, who may desire the opinion and advice of Dr. Young on their respective cases, and who think proper to submit a written statement of such, in preference to holding a personal interview, are respectfully assured that their communications will be held most sacred. Dr. Young takes this opportunity of observing that all letters are only opened and replied to by himself, and the latter as promptly as possible.

If the case be fully and candidly described, personal communication will be superseded, as instructions for diet, regimen, and the general treatment of the case itself, (including the remedies,) will be forwarded without delay, and in such a manner as to convey no idea of the letter or parcel so transmitted.

Consultation gratis. J. C. YOUNG, M. D.

### The French Lunar, or Female Monthly Pills.

The best remedy ever discovered for suppressed menses in females. They are safe and sure, acting in the most easy manner possible, never creating sickness, but renovating the system, and at the same time they remove any obstructions which may impede for the time the natural flow of the menses. No family should be without a box in the house, as they greatly assist in the delivery, at maturity, of the child. They should not be taken under some circumstances, in the early stages of pregnancy, which will appear plain to ladies.

Price $5 per box, with full directions, sent to any part of the Pacific coast upon receipt of the money. Address

J. C. YOUNG,
210 Clay street,
Opposite southwest corner of the Plaza,
San Francisco.

1:m3

## Sands' Sarsaparilla.

### The Great American Remedy For Purifying the Blood.

WILL BE FOUND

A CERTAIN CURE

FOR

Scrofula, Rheumatism, Salt Rheum, Fever Sores, Erysipelas, Pimples, Biles, Mercurial Diseases, Liver Complaint, Cutaneous Eruptions, Stubborn Ulcers, Loss of Appetite, General Debility, &c.

AS AN ALTERATIVE AND RENOVATING AGENT, IT IS UNEQUALLED!!!

A plentiful supply of pure blood is as essential to animal life as light, heat, and genial showers are to the vegetable kingdom. When the proper circulation of the vital fluid is impeded, sickness is the inevitable consequence, the secretions become unhealty, the liver becomes clogged with impure bile, which, forced into the system, vitiates and inflames the blood, engendering scrofula and cutaneous and biliary disorders. The experience of sixteen years has fully established the high reputation of this invaluable medicine: its curative powers have been thoroughly tested in long-standing and obstinate cases, with such invariable success as to call forth the most flattering commendations from eminent physicians throughout the country.

### MEDICAL TESTIMONY.

The following recommendation is from one of the oldest physicions in New London, Conn.:

Messrs. A. B. & D. SANDS:—Gentlemen:—Your Sarsaparilla has been very extensively used in this city and the neighboring towns, and so far as my knowledge extends, uniformly with success. In a great variety of diseases of long standing, and of a very distressing and dangerous character, which have resisted a long list of remedial agents, it has been used—in many of them with complete success, and in all with decided benefit. It is regarded by the medical profession as a medicine of great efficacy in a numerous class of diseases, such as inveterate constitutional complaints, when the system has been long diseased; in cases of long standing; in obstinate diseases of the skin; in enfeebled conditions of the system; in chronic abscesses, attended with profuse discharges; diseases of the bones; obstinate ulcers; chronic pulmonary affections, enlarged glands, and various other maladies connected with a depraved state of the system. Its use is usually followed with improvement of appetite and digestion, increase of strength and flesh, better rests at night, the production of a more healthy state of mind, and complete restoration to health.

Truly yours,
WM. STERNE, M. D.

Prepared and sold by A. B. & D. SANDS, wholesale druggists, 100 Fulton street, corner of William, New York.

For sale by H. JOHNSON & Co., and REDINGTON & Co., San Francisco; RICE & COFIN, Marysville; R. H. McDONALD & Co., Sacramento; and by druggists generally. 1:3m

### The Great Japanese Remedy.

THIS WONDERFUL REMEDY, CALLED THE Japanese Venereal SALVE, and used for the cure of Syphilitic Sores and procured at great trouble and expense, is now placed in the hands of druggists for sale, where persons afflicted can purchase it, and effect cures without the consequent mortification and heavy charges incurred by going to physicians. The ingredients procured from these scientific and wonderful people are such as have not been known to the rest of the world in the cure of loathsome corruptions, and far excels anything heretofore used. Testimonials of astonishing cures could be obtained if necessary, but it is only requisite to test it to prove its great healing qualities. The cost is nothing compared to its value. For sale at all the Druggists.

### THE JAPANESE SALVE,

For the cure of Cuts, Burns, Sprains, Gunshot Wounds, Piles, Boils, Chilblains, Bruises and all kinds of Sores, has been discovered to be the best and most wonderful prepration ever used. Its healing properties are astonishing, almost magical. It supersedes all salves now in use, and develops one great good that has resulted from the opening of Japanese ports to the commerce of the world, and will cause all that use it to rejoice that so desirable result has been accomplished. This salve has been sufficiently used to test its qualities.—Try it all—everybody. No family should be without it—and although the ingredients are rare and expensive, only FIFTY CENTS is charged for a box. It can be obtained of all the Druggists.

DR. KENT, Agent, Nevada. 1:m3

**The best purifier of the blood is Hall's Sarsaparilla

## Ordinance No. 13.

An Ordinance to prohibit the use and carrying of Deadly Weapons, and the discharging of Fire Arms.

§ 1. Be it ordained by the Board of Trustees of the Town of Olympia, That any person who shall draw, exhibit, or attempt to use any deadly weapon within the corporate limits of this town, upon, to, or against another person, shall be liable to a fine of not more than fifty, nor less than twenty-five dollars.

§ 2. Any person who shall, in the usual walks of life, within the limits of this town, carry any deadly weapon, shall be liable to a fine of not more than ten, nor less than five dollars.

§ 3. Any person, who shall, within the following limits, to wit: between Budd's Inlet on the west and north, Adams street, on the east, and Union street, on the south, fire off or discharge any gun, pistol, or fire-arms of any kind, shall be liable to a fine of not less than five, and not more than ten dollars.

§ 4. All fines arising under this ordinance shall be assessed and collected as other fines are assessed and collected under the municipal regulations of this town; and it shall be the special duty of the Town Marshal to complain of all violations of this ordinance to the police magistrate of this town.

Passed March 3d, 1860.

ELWOOD EVANS,
President of the Board of Trustees.

Attest: Richard Lane, Clerk.

# EXHIBIT 25

Thereupon the Council shall by ordinance declare such sum or sums so expended as aforesaid, a lien on the particular lot or parcel of land upon which the said sum was expended, and direct the Auditor to enter the same on the docket of city liens, and thereafter such liens shall be enforced against the property therein described in like manner and with like effect as a lien for the improvement of a street.

### (Penalty.)

SECTION 45. Any person violating any of the provisions of this Ordinance, the penalty of which is not otherwise herein provided, shall on conviction therefor before the Municipal Court, be fined not less than five nor more than three hundred dollars, or be imprisoned not less than five nor more than ninety days, or by both fine and imprisonment; provided, that if any person shall violate Section 13 or Section 14 of this Ordinance he shall, on conviction therefor before the Municipal Court, be fined not less than twenty-five nor more than two hundred dollars, or be imprisoned not less than fifteen nor more than ninety days, or by both fine and imprisonment.

Passed the Council, April 6, 1904.

Approved April 7, 1904.

GEO. H. WILLIAMS, Mayor.

### ORDINANCE No. 14027.

AN ORDINANCE prohibiting the sale of firearms or explosive cartridges to minors under the age of eighteen years.

*The City of Portland does ordain as follows:*

### (Sale of Firearms to Minors Prohibited.)

SECTION 1. It shall be unlawful for any person or persons within the corporate limits of the City of Portland to expose for sale, sell or offer for sale, barter, or exchange, or offer to sell, barter, or exchange, to or with any minor under the age of eighteen years, any pistol or firearm, or any toy pistol, or any imitation of any pistol or firearm, or instrument capable of receiving or discharging any charge of powder, cartridge, or other explosive, whether loaded with ball or not.

### (Unlawful to Have in Possession.)

SECTION 2. It shall be unlawful for any person under the age of eighteen years to have in his possession, expose, use, or discharge any pistol or other firearm, or toy pistol, or imitation of any pistol or other firearm, or any instrument capable of receiving or discharging of powder, cartridge, or other explosive, whether loaded with

Add. 73

Generated on 2023-09-15 04:05 GMT / https://hdl.handle.net/2027/mdp.39015809228704
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

ball or not, capable of being discharged or exploded by a pistol, toy pistol, or other firearm, or imitation thereof.

**(Penalty.)**

SECTION 3. Any one who shall violate any of the provisions of this Ordinance shall, upon conviction before the Municipal Court of the City of Portland, be subjected to a fine of not less than five dollars nor more than one hundred dollars, or by imprisonment in the city jail not to exceed ninety days, or by both fine and imprisonment.

Passed the Council, June 1, 1904.

Approved, June 2, 1904.

GEO. H. WILLIAMS, Mayor.

## ORDINANCE No. 14106.

AN ORDINANCE to prohibit the sale or use of certain firearms, crackers, and fireworks in the City of Portland, Oregon.

*The City of Portland does ordain as follows:*

**(Unlawful to Discharge Firearms and Explosives.)**

SECTION 1. That hereafter it shall be unlawful for any person within the City of Portland to shoot or discharge any gun, revolver, pistol, or firearms of any description or kind, whether the same be loaded with powder and ball or shot, or with loaded or blank cartridges, so-called, or any kind of explosive whatever; or to shoot or discharge any preparation of chlorate of potash, mixture of sulpher and saltpeter, or other dangerous explosive; or any mud cans, so-called, toy cannon, loaded anvils, loaded canes, or similar devices, or any giant or cannon crackers, Dewey chasers, so-called, or other fireworks of similar character, Chinese bombs, or any firecrackers exceeding four inches in length, or any kind of fireworks or explosives whatever dangerous to persons or property, and all such acts are hereby prohibited; provided, that this Ordinance shall not apply to any county or city official in the performance of his official duty.

**(Unlawful to Sell Firearms, Etc.)**

SECTION 2. That hereafter it shall be unlawful for any person or dealer therein to sell, expose, or offer for sale, or in any manner furnish or dispose of to any resident of the City of Portland, or to any other person for use in said city, or to any minor person at any time, any blank cartridge pistol or revolver, or any blank cartridges, or any of the explosives, firecrackers or fireworks, the use of which is prohibited in Section 1 of this Ordinance.

Add. 74

Generated on 2023-09-15 04:05 GMT / https://hdl.handle.net/2027/mdp.39015089228704
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google    Original from
UNIVERSITY OF MICHIGAN

# EXHIBIT 26

Newspapers
by ancestry

The Ridgeway Journal (Ridgeway, Missouri) · Thu, Apr 6, 1893 · Page 4

https://www.newspapers.com/image/858847805

Printed on Jun 25, 2023



**Harness, Saddles, Bridles, Halters, Robes, Pads,**

### TOWN ORDINANCE NO. XXVIII.

**NEW GOODS.**

**S. H. Coleman w**
**about them.   Watch.**

**SEE NEXT ISSU**



Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY
.com

The Ridgeway Journal (Ridgeway, Missouri) · Thu, Apr 6, 1893 · Page 4

https://www.newspapers.com/image/858847805

Printed on Jun 25, 2023

deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day in said village, or into any court room during the sitting of court, or into any public assemblage of persons met for any lawful purpose, other than military drill or meetings called under the military law of the state, having on or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon on or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of his parent or guardian, he shall, upon conviction, be adjudged guilty of a misdemeanor, and fined in a sum not less than twenty-five nor more than one hundred dollars, Provided that this section shall not apply to officers or persons whose duty it is to execute warrants or suppress breaches of the peace, nor to persons traveling peaceably through said village, not a resident of said county.

SEC. 13. Every person who shall play at any game of any kind whatsoever for money or property, with dice, cards or any other devise which may be used in playing any game of chance, or in which chance is an element, or shall bet or wager on the hands, or cards or sides of such as do play in said village, shall be deemed guilty of a misdemeanor and punished by a fine of not less than ten nor more than one hundred dollars.

SEC. 14. Every person who shall either labor himself or compel or permit his apprentice or

Copyright © 2023 Newspapers.com. All Rights Reserved.



# EXHIBIT 27

Newspapers™
by ancestry

https://www.newspapers.com/image/953556139

Rocheport Commercial (Rocheport, Missouri) · Fri, Sep 20, 1895 · Page 8

Printed on Jun 25, 2023



## An Ordinance.

### MISDEMEANORS.

Be it enacted by the Board of Trustees of the Town of Rocheport as follows:

SECTION 1. DISTURBING THE PEACE. Every person who shall willfully disturb the peace of any other person or persons, by loud and unusual noise, loud and offensive or indecent conversation, or by using any profane or offensive language calculated to provoke a disturbance of the peace, or by threatening, quarreling, challenging, or fighting, shall be deemed guilty of a misdemeanor and, upon conviction, fined not less than five dollars.

Sec. 2. CONCEALED WEAPONS. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any court room during the sitting of the court, or into any public assemblage of persons met for a lawful purpose, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slunk-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers™
POWERED BY

Rocheport Commercial (Rocheport, Missouri) · Fri, Sep 20, 1895 · Page 8

https://www.newspapers.com/image/953556139

Printed on Jun 25, 2023

about his person when intoxicated or under the influence of intoxicating drinks; or shall, directly or indirectly, sell or deliver, loan or barter, to any minor any such weapon without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and punished by a fine not less than ten dollars nor more than twenty-five dollars.

Sec. 3. Betting Prohibited. Any person who shall play at any game for money or property with cards, dice, or any other device, which may be adapted to or used in playing any game of chance, or shall, bet or wager on the hands, or cards, or sides of such as do play as aforesaid, shall be deemed guilty of a misdemeanor and, on conviction, be fined not less than five dollars.

Sec. 4. Reckless Riding and Driving. If any person shall unnecessarily ride or drive any horse or other animal upon or through any street or alley at a greater speed than a moderate gait, or shall so negligently ride or drive any such animal as to cause such animal, or the vehicle thereto attached, to come in contact with, or strike and injury any person or property; or shall, leave any such animal standing in any street, ally, or open lot, without being fastened or so guarded as to prevent its running away, or shall turn any such animal loose upon any street or alley, he shall be deemed guilty of a misdemeanor and, on conviction, be fined not less than five dollars for every such offense.

Sec. 5. Obstructing Passage on Streets. Whoever shall, upon or near a street or alley, fly a kite or engage in any sport or exercise likely to scare horses, injure persons passing upon such street, or embarrass the passage of vehicle, shall be deemed guilty of a misdemeanor, and, upon conviction, be fined not less than one dollar nor more than ten dollars for every such offense.

Sec. 6. Hitch Racks Any person who shall hitch any horse, mule, or other animal to any tree, post, block, fence, or other thing on Central street, between Third and Water streets, shall be deemed guilty of a misdemeanor, and fined not less than one dollar for every such offense. Provided, that this section shall not apply to doctors, nor to merchants, or butchers running a delivery wagon in connection with their business, and who shall be allowed to hitch such animals, so used in their business, to a post firmly set in the ground, at the edge of the sidewalk, immediately in front of their respective business houses. It shall be the duty of the Marshal to immediately remove or cause to be removed, all posts, rings, or other contrivances heretofore used for hitching purposes, except such as are herein provided for.

Sec. 7. Prisoners Refusing to Work. If any person adjudged to labor shall fail or refuse to obey any reasonable requirement of the Marshal, or to labor as directed, he shall be deemed guilty of a misdemeanor, and fined not less than ten dollars, for every such offense, to be enforced as other fines.

Sec. 8. Marshal Posse. If any person, over the age of eighteen years, who, when called upon by the Marshal or assistant Marshal, to act as a posse to aid him, in arresting and taking prisoner any offender, shall refuse or neglect to do so, he shall be guilty of a misdemeanor, and fined three dollars.

Copyright © 2023 Newspapers.com. All Rights Reserved.

# EXHIBIT 28

Newspapers by ancestry
https://www.newspapers.com/image/379709602

Downloaded on Oct 11, 2022

# ROOKS COUNTY RECORD.

VOL. VIII. NO. 26 — STOCKTON, KANSAS, FRIDAY, JULY 1, 1887. — W. L. CHAMBERS, Publisher.

THE BIG GUN WILL BOOM ON THE FOURTH OF JULY, AND THE Sham Battle Will be Fought, But ROSENBERG'S Battle against H. L. Prices.

Also a Full Line of Dry Goods, Ladies' and Gents' Furnishing Goods, Hats and Caps, at Correspondingly Low Prices.

S. Rosenberg.

Edson K. Fish

Direct from Eastern Parties.

Money at 7 per cent.; with small Commission.

CHOICE LOANS WANTED at 6 per cent.

RECORD OFFICE, ROOM "B." STOCKTON, KANSAS.

Lubricating Oils

COOLBAUGH Brothers'.

Eldorado Engine Oil, Golden Machine Oil, Atlantic Red Oil, Challenge Machine Oil, Castor and Cold-Pressed Castor Oils.

Sole Agents for the Celebrated Rubber Paints.

ALABASTINE AND KALSOMINING MATERIAL.

D. B. HURLBUT & BRO., Hardware Headquarters

Scythes. Bird Cages. Hose. Cutlery. Screen Wire. Hose Reels. Pumps. Lawn Sprinklers.

As City Plumbers we carry in Stock a Full Line of this class of goods, and have a practical workman, whose services may be secured on short notice, and at reasonable figures.

ORDINANCE NO. 76.

ORDINANCE NO. 77.

FARM LOANS.

BETZER BRO'S, STOCKTON, KANSAS.

We Loan Money on City Property.

FIRST NATIONAL BANK Of Stockton.

Paid up Capital $50,000.

Collections on all Points West and South.

STOCKTON, KANSAS.

SALESMEN WANTED.

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers

Newspapers by ancestry

https://www.newspapers.com/image/379709602

The Stockton Review and Rooks County Record (Stockton, Kansas) · Fri, Jul 1, 1887 · Page 1

Downloaded on Oct 11, 2022



[SEAL] F. A. CHIPMAN,
City Clerk.
C. W. SMITH,
Mayor.

Published July 1, 1887.

## ORDINANCE NO. 76.

AN ORDINANCE PROHIBITING CARRY-
ING DEADLY WEAPONS.

*Be it ordained by the Mayor and
Councilmen of the City of Stockton,
Kansas.*

SEC. 1.—If any person shall carry up-
on or about his person any deadly or
dangerous weapons, or shall go into
any church or place where people have
assembled for public worship, or into
any school room or place where people
have assembled for educational, liter-
ary or social purposes, or to any elec-
tion on any election day, or into any
court room during the sitting of court,
or into any other public assemblage of
persons not met for any unlawful pur-
pose, or shall go upon the public streets
or public places of the city having
upon or about his person any kind of
fire arms, bowie knife, dirk, dagger,
sling shot or other deadly weapon, or
shall in any of the places above named
exhibit such weapon in a rude, angry
or threatening manner, or shall direct-
ly or indirectly, sell or deliver, loan or
barter to any minor, any such weapon
without the consent of the parent or
guardian of said minor, he shall upon
conviction be punished by a fine of not
less than ten nor more than fifty dol-
lars. Provided, this ordinance shall
not apply to peace officers of the city
or state.

SEC 2.–This ordinance shall take effect
from and after its publication in The
Rooks County RECORD.

Approved, C. W. SMITH,
Mayor.
Attest, F. A. CHIPMAN,
City Clerk.

Copyright © 2022 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers.com™


# EXHIBIT 29

# THE CITIZEN.

Price per Year, $5; Six Months, $3

TUCSON, ARIZONA

Saturday, - - Feb. 8, 1873.

**To Cigar and Tobacco Dealers.**

By request and as a matter of some local interest, we give place to the following issued January 9, 1873, by L. M. Foulke, Supervisor of Internal revenue :

Manufacturers of cigars are cautioned to observe the law which requires them to record daily, in the prescribed book, all purchases of stock, all sales, and all goods manufactured. Manufacturers are also prohibited by law from selling, or disposing of in any manner, any tobacco scraps, waste or clippings, to any other licensed manufacturer, without special permit from the assessor of the district in which sold; and to any unlicensed parties whatever, for any purpose or under any pretense whatever, save and except only for use as shop wash; in which case, such scraps, waste or clippings must, "before such sale and removal," be "so thoroughly mixed with salt, bluestone, sulphur, or other similar substance, as to render them totally unfit for consumption in the ordinary mode in which they are consumed, and unfit for manufacturing purposes." All purchases of leaf tobacco are to be accounted for in the taxed products or inventory of each manufacturer. The use of old boxes for refilling with cigars, cheroots or cigarettes, is strictly prohibited by law. All stamps on tobacco, snuff and cigars must be affixed and cancelled according to law and regulations. The name of the manufacturer and date of cancellation must always be plainly written or imprinted on the stamp. Cigar manufacturers must box, label, brand and stamp their products strictly according to the law and regulations, or abide the penalties. Dealers in and consumers of cigars, tobacco, or snuff, are cautioned to obey the law which requires the total obliteration of the stamp when the box or package is emptied. Cigars and tobacco cannot lawfully be exposed for sale, except in and from the original stamped package. Dealers and others are prohibited by law from disposing of empty cigar boxes to any person whatever, unless the stamps thereon are first entirely obliterated. Assessors and their assistants, and all other internal revenue officers are instructed to note all violations of the law, and make report of the same to the proper officers, for enforcement of the legal penalties. Assessors and assistant assessors are instructed to see that a copy of this circular is placed in the hands of every manufacturer and dealer in their respective districts and divisions.

HANGING for murder is about played out, and imprisonment for life is ascertained to be confinement for an average of six years; whereas the man who steals a horse worth $2 50 or more, or robs his fellow man, or breaks into a house, or does some other crime insignificant in comparison with murder, is frequently put and kept in prison from five to thirty years. This latter kind of criminal may find it to his advantage to connect murder with his preferred pursuits, as murder seems to secure a larger share of official and popular sympathy for criminals than the moderate grade of outrages upon society.

ABOUT a week ago, James Beatty was killed by a man, name unknown to us, at Whitelow's station of Salt River below McDowell. The report is that the trouble began in a wordy dispute and that Beatty made the first move to shoot and got the worst of it—the other not getting hurt, and who afterwards surrendered himself for examination at Phenix.

About the same time, one Mexican killed another in a dance house at Phenix, as is reported in a most cold blooded and cowardly manner. The murderer is in jail at Phenix.

UNDER date of Wasnington, January 11, Ben C. Truman writes this to the Los Angeles Express :

The telegram from Salt Lake announcing the removal of Governor Safford of Arizona, is untrue, and entirely without foundation. The Government is well pleased with the chief executive of the house of the Apache and the land of the scalped.

**Pre-emption of Unoffered Lands—Important Decision.**

WASHINGTON, January 4, 1873. Register and Receiver, San Francisco, California—Gentlemen: Yours of the 18th ult., asking instructions concerning declaratory statements on unoffered lands, has been received.

You state "that the time for preemptors who filed prior to July 14, 1870, expires March 22, 1873." This is an error. The Act of March 22, 1872, providing that pre-emption claimants who had filed declaratory statements, prior to the passage of that Act, on lands in California, should have one year from date of said Act in which to make proof and payment, was for the relief of pre-emption settlers in the State of California," and hence cannot be construed to restrict to that date a claimant whose period for proof and payment would not otherwise expire until after March 22, 1873, while it does not extend such period to those whose time would otherwise expire prior to that date.

Any settler on unoffered surveyed lands in California, whose settlement ante-dates April 14, 1870, has until March 22, 1873, for proof and payment. If his settlement was subsequent to that date he has thirty-three (33) months from date thereof. Circular of July 20, 1872, is herewith enclosed, and your attention called to the last section of the same.

After a filing has expired by limitation of law, you are to treat the land described by it as if no filing had ever been made for it, save in the single instance of the party making it offering his proof and payment prior to the initiation of a valid adverse claim. In case of conflicting claimants for the same land, it is of course sufficient that they commence proceedings prior to the expiration of the period for proof and payment. Their action, however, must be regular and legal. Where pre-emptors are delayed in making their final proof, etc., by a suspension of the plats, they are entitled to the same period after their restoration as they would have had if such disability had not existed.

A claimant cannot be allowed to file a second time for the same land, on expiration of the legal period allowed for entry, alleging a new settlement. Such a declaration would be a manifest contradiction in terms of the facts alleged in his filing already of record, and would amount to a nullification of the claimant, which this office cannot legally permit. If parties, therefore, allow the legal limit to expire without making proof and payment, they do so at their own peril, and cannot be protected after such inches against an adverse interest legally acquired. On the contrary, the law will be strictly applied in favor of such adverse claimant, and his legal right will be secured to him whenever he shall present himself in conformity with the requirements of law and demand its recognition. Respectfully,

WILLIS DRUMMOND, Commissioner.

REFERRING to Colonel Baker's mining operations in Wallapai district in last week's CITIZEN, the memoranda before us led to an error regarding the product of bullion. Instead of eighty pounds of silver, it should have appeared the bars weighed about eighty pounds each. The first run of the furnace was upon ore from all the principal mines in the district, located over an area of ten by twenty miles. The capacity of the furnace as shown by the first run upon ores so obtained, is sixty bars of bullion in twenty-fours. This bullion is lead and silver, and one hundred and forty bars of the above mentioned weight was the result of the first trial of the furnace. The Cerbat Consolidated company, of which E. Martin Smith is manager, is about to purchase the Moss mill and works and erect them in Cerbat in March; and Colonel Baker has taken charge of the Elder furnace in Cerbat and intends to put it and others at work very soon.

These facts we got from Hon. W. F. Henning and Hon. George Gleason, of Mohave county. They assure us that the prospects of the Wallapai mines and works for reduction of the ores are very encouraging, and we are sure it is a pleasure to record such cheerful statements.

PRIVATE advices say that the railway engineers are making the progress on the preliminary line now being extended up the Gila from the Colorado river. The party must now be near 100 miles this side of Yuma.

HERE are some military items gleaned from our late exchanges:

January 9, Major Eugene A. Carr, Fifth cavalry, was promoted to lieutenant-colonel Fourth cavalry, vice James H. Carlton, deceased ; Colonel Thomas Duncan, Fifth cavalry, was placed on retired list on January 16, because of injuries during service ; resignation of Captain R. H. Pond, Twelfth infantry, was accepted to take effect February 1 ; by order of December 10, Captain Michael P. Small was to leave on next Newbern for Prescott on assignment as chief commissary of subsistence in Department of Arizona.

**DIED.**

At Sanford, February 1, 1873, William Richard, of acute bronchitis. [Mr. Richard was an early settler in Arizona, and was known as a man of extensive business and a good citizen. He was comparatively young and his death was quite sudden and unexpected. ED. CITIZEN.]

John L. Smyth, Captain of Company C, 23d Infantry, died at Camp McDowell, Maricopa county, A. T., January 23, 1873.

**NEW ADVERTISEMENTS.**

## ORDINANCE No. 9.

IT IS ORDAINED BY THE MAYOR and Council of the Village of Tucson :

CARRYING DEADLY WEAPONS.

Section 1.—Every person not being a peace officer, who shall wear or carry any dirk, dirk-knife, gun, pistol, sword in a cane, slung-shot or other dangerous or deadly weapon, contrary to the provisions of this ordinance, within the inhabited portions of the corporate limits of the Village of Tucson, shall upon conviction before the Recorder be fined in any sum not exceeding ten dollars, or be imprisoned for a period not exceeding ten days, or by both such fine and imprisonment in the discretion of the Court.

Sec. 2.—It shall be the duty of the Village Marshal or any peace officer to notify all persons who he may observe with any dangerous or deadly weapon, in violation of section one of this ordinance, to at once remove the same, stating to the person so notified that it is a violation of the ordinance of the Village of Tucson to carry any arms, dangerous or deadly, weapon, and if any person, after having been so notified by the Marshal or a peace officer, shall refuse, fail or neglect for a period of two hours to remove the same, it shall be the duty of the Marshal or peace officer to take any dirk, dirk-knife, gun, pistol, sword in a cane, slung-shot or other dangerous or deadly weapon from the party upon whose person it may be found, and arrest any such person so offending and take him before the Recorder, who shall fine the party so offending in any sum not exceeding ten dollars, or be imprisoned for any period not exceeding ten days, or by both such fine and imprisonment in the direction of the court ; provided, that nothing in this section contained shall be construed to prohibit the Marshal or any peace officer from disarming any person at once upon giving the notification hereinbefore required if he has good reason to believe that a breach of the peace is contemplated or may ensue.

Passed in the Common Council of the Village of Tucson, Jan. 28, A. D. 1873.

JAMES H. TOOLE, Mayor.

Attest:

WILLIAM J. OSBORN, Recorder. fe1-3t

## Notice of Administrator's Sale.

NOTICE IS HEREBY GIVEN, that in pursuance of the order of the Probate Court of the county of Pima, in the Territory of Arizona, made on the 17th day of January, A. D. 1873, in the matter of the estate of William McFarland, deceased, the undersigned administrator of said estate will sell at private sale to the highest bidder, in one parcel and subject to confirmation by said Probate Court on Thursday the 20th day of February, 1873, at 12 o'clock M., on the premises known as Santos station, in Pima county, all the right title and interest of said intestate at the time of his death, and all the right, title and interest that the said estate has by operation of law or otherwise acquired other than or in addition to that of said intestate at the time of his death, in and to the undivided half of that certain lot, piece or parcel of land situate, lying and being in the county of Pima, Territory of Arizona, and described as "Santos Station." Also, at the same time and place will be sold an undivided half interest in the following described property to-wit: House and kitchen furniture, blacksmith's tools, hay press, six wagons, four mules, three pairs of harness, one saddle, two bridles, one pair of platform scales, two counters and three goats and all other accounts and property of any class or description belonging to the firm of McFarland & Forbach at the time of the death of the said William McFarland, deceased.

JOHN D. WALKER, Administrator of the estate of William McFarland, deceased. [fe1-3t]

## U. S. Centennial Commission.

NOTICE IS HEREBY GIVEN THAT BOOKS OF SUBSCRIPTION

To the Stock of the

CENTENNIAL

BOARD OF FINANCE

HAVE BEEN RECEIVED,

And will be kept open at the office of the undersigned until further notice.

LIONEL M. JACOBS, Agent at Tucson, Arizona. Tucson, December 14, 1872. de14-tf

CIRCULATING LIBRARY —AT— fe3-tf News Depot.

**LORD & WILLIAMS**

ARE NOW OPENING AND

OFFERING FOR SALE

GENERAL MERCHANDISE

Ever before brought to the country.

To Cash Buyers they Extend the

Most Flattering Inducements.

Their stock of

DRY GOODS,

CLOTHING,

HATS & CAPS,

BOOTS & SHOES,

GROCERIES,

PROVISIONS,

WOODENWARE,

WILLOW-WARE,

HARDWARE,

CROCKERY,

DRUGS & MEDICINES,

PERFUMERY,

SUTLER'S GOODS,

They Defy Competition and are Determined to give Entire Satisfaction.

Having full faith in the country, they mean to stay by it until the day of general jubilee shall come, when all can rejoice together in its peace and prosperity.

Drop in and examine our stock.

Exchange sold on all parts of the world.

Telegraphic transfers made with any section of the country.

A few more of those "Don't mention them" left. Call quick if needed.

C. H. LORD. W. W. WILLIAMS.

---

**Wm. B. Hooper & Co.,**

IMPORTERS AND DEALERS IN

GENERAL MERCHANDISE,

San Francisco, Cal.,

EHRENBERG, A. T.,

—AND—

Arizona City, A. T.,

HAVING CLOSED OUR RE-tail Department,

We shall, from and after this date, attend exclusively to the wants of

OUR JOBBING CUSTOMERS

Throughout Arizona Territory and Sonora, Mexico.

To interior merchants, small dealers, station keepers, saloon keepers, ranch men, freighters, etc., who buy in quantities, we now offer our entire

STOCK OF GOODS AT COST.

We "guarantee" satisfaction in quality and price, and those desiring anything in stock, will not regret examining same before doing so in any other market.

Orders from parties at a distance will meet with the same care and attention as though themselves present.

The highest price paid for

BULLION, HIDES,

Or any other marketable article produced in the country.

Consigned merchandise, machinery, etc., will be promptly forwarded to destination, as usual, by careful and competent freighters, at current rates.

WM. B. HOOPER & CO. Arizona City, May 13, 1872. [my -tf

NOTICE :

TO THE PUBLIC.

WE very respectfully announce to the Public, and especially

To Travelers,

—That we now have at—

CAMP BOWIE,

A complete stock of

DRY GOODS, CLOTHING,

DRY GOODS, CLOTHING,

DRY GOODS, CLOTHING,

DRY GOODS, CLOTHING,

DRY-GOODS, CLOTHING,

BOOTS & SHOES, BOOTS & SHOES, BOOTS & SHOES,

GROCERIES & PROVISIONS

GROCERIES & PROVISIONS,

GROCERIES & PROVISIONS,

GROCERIES & PROVISIONS,

AND

MINERS' TOOLS,

which we offer at the lowest rates that such goods can be bought at in the Territory.

We would especially call the attention of Prospecting Parties and Emigrants, and the people of Ralston City, that we will

SELL AT LOWER RATES

Than they can buy the same on the Rio Grande, or in Tucson, and save them the great cost of transportation from either of the above mentioned places.

Give us a call and you will be satisfied with both goods and prices.

TULLY, OCHOA & CO.

FINE IMPORTED HAVANA CIGARS and best brands of Chewing and Smoking Tobacco to be had at J. S. MANSFELD'S Pioneer Cigar Store.

Add. 85

# ORDINANCE No. 9.

IT IS ORDAINED BY THE MAYOR and Council of the Village of Tucson:

### CARRYING DEADLY WEAPONS.

Section 1.—Every person not being a peace officer, who shall wear or carry any dirk, dirk-knife, gun, pistol, sword in a cane, slung-shot or other dangerous or deadly weapon, contrary to the provisions of this ordinance, within the inhabited portions of the corporate limits of the Village of Tucson, shall upon conviction before the Recorder be fined in any sum not exceeding ten dollars, or be imprisoned for a period not exceeding ten days, or by both such fine and imprisonment in the discretion of the court.

Sec. 2.—It shall be the duty of the Village Marshal or any peace officer to notify all persons who he may observe with any dangerous or deadly weapon, in violation of section one of this ordinance, to at once remove the same, stating to the person so notified that it is a violation of the ordinances of the Village of Tucson to carry any arms, dangerous or deadly, weapon, and if any person, after having been so notified by the Marshal or a peace officer, shall refuse, fail or neglect for a period of two hours to remove the same, it shall be the duty of the Marshal or peace officer to take any dirk, dirk-knife, gun, pistol, sword in a cane, slung-shot or other dangerous or deadly weapon from the party upon whose person it may be found, and arrest any such person so offending and take him before the Recorder, who shall fine the party so offending in any sum not exceeding ten dollars, or be imprisoned for any period not exceeding ten days, or by both such fine and imprisonment in the discretion of the court; provided, that nothing in this section contained shall be construed to prohibit the Marshal or any peace officer from disarming any person at once upon giving the notification hereinbefore required if he has good reason to believe that a breach of the peace is contemplated or may ensue.

Passed in the Common Council of the Village of Tucson, Jan. 28, A. D. 1873.

JAMES H. TOOLE,
Mayor.

Attest:

WILLIAM J. OSBORN, Recorder. fe1-3t

# EXHIBIT 30

Newspapers
by ancestry
https://www.newspapers.com/image/959921237

Waco Daily News (Waco, Texas) · Sun, Jul 12, 1891 · Page 8

Downloaded on Jul 12, 2023

## AN ORDINANCE.

Be it ordained by the city council of the city of Waco:

Section 1. That title "public peace and order" of the ordinance of the city of Waco be amended by adding thereto article 412, a.

Article 412 a. Any person who, in this city shall commit an aggravated assault or an aggravated assault and battery upon the person of another, shall upon conviction be fined in any sum not less than twenty-five nor more than one thousand dollars, or by imprisonment in the calaboose not less than one month nor more than two years, or by both such fine and imprisonment; but any one charged with a violation of this article shall be entitled to the same defenses that he would be entitled to under the statutes of the state as a justification or in mitigation of the penalty. An aggravated assault and aggravated assault and battery are such as defined in Title XV, Chapter 2 of the penal code of the state of Texas.

Section 2. That this ordinance take effect and be in force from and after ten days after its passage.

Passed July 9, 1891.
Approved.        C. C. McCulloch,
Attest:                        Mayor.
Joney Jones, City Secretary.

Be it ordained by the city council of the city of Waco:

Section 1. That whereas article 118 of the ordinance of the city of Waco as it now stands is inoperative and void by virtue of the action of the 20th Legislature of the state of Texas, in increasing the penalty for unlawfully carrying arms. Therefore article 118 shall hereafter read as follows, to-wit:

Article 118. If any person in this city shall carry on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, sling shot, sword cane, spear, or knuckles made of any metal or any hard substance, bowie-knife, or any other kind of a knife, manufactured for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the city calaboose not less than 20 nor more than 60 days, or both by such fine and imprisonment.

Sec. 2. Said ordinance as to deadly weapons shall be further amended by adding thereto article 1190, to read as follows:

Art. 119 a: If any person shall into any church or religious assembly, any schoolroom, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, or social party or social gathering or to any election precinct on the day or the days of any election, where any portion of the people of the State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, sling shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purpose of offense or defence, he shall be punished by fine of not less than Fifty nor more than Five hundred dollars.

Section 2. That this ordinance shall take effect and be in force from and after Ten days after its passage.

Passed July 9th, 1891. Approved
                        C. C. McCulloch,
                        Mayor.
Attest,
Joney Jones, City Secretary.

## Summer Days, Where Shall We Spend Them.

Half rate excursion tickets to Look out Mountain Tennessee, via, Cotton Belt Route. The only line with through sleeping car service to Memphis, and the only line delivering passengers for Lookout Mountain, to connecting lines at Memphis, without a long and disagreeable omnibus transfer.

Tickets will be sold July the 4th to 8th inclusive, good for return until September 30th, 1891. For further information write or call on any agent of the company.

W. H. Winfield,
General Passenger Agent,
Texarkana, Texas.

Drink "Tea Cup Tea," 50 cents per pound, at Joe S. Thompson's, The Grocer.

Choice baled millet at T. M. Sleeper & Co. only 40c. a bale.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers.com™

Add. 88

# EXHIBIT 31

Newspapers
by ancestry

https://www.newspapers.com/image/423668281

Wallace County Register (Wallace, Kansas) · Sat, Dec 24, 1887 · Page 7

Printed on Jun 25, 2023

Co's ... Owens lecture here before she leaves the Co.

Co ...
ous,
put-

x 8.

s of

y at

ap-
he

an-

s of

oli-
ing

el's

ber

ing

Co.

ave

at

ur-

sity
unt
nto
in-

all

.

of
to

ave
not

ave
ex-
ist,
and

nd

cks
K.

to

ne
nd
al,,

th
rsq
sd
ew
ed
der
nor
no:

AN ORDINANCE.—To prohibit intoxication breach of the peace, carrying of deadly weapons, the use of obscene language, the discharge of fire arms, and to close places of amusement on Sunday, in the city of Wallace Kansas, and to repeal certain ordinances in said city.

Be it ordained by the Mayor and Councilmen of the City of Wallace, in the State of Kansas.

Sec. 1. If any person shall be drunk in any highway, street or in any public place or building, or if any person shall be drunk in his own house or private building or place disturbing his family or others, he shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $25 or by imprisonment in the city jail for a period not exceeding 30 days.

Sec. 2. Any person who shall wilfully disturb the peace or quiet of any person, family or neighborhood, shall upon conviction thereof be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 3. Any person who shall, while intoxicated be found carrying on his person, a pistol, bowie-knife, dirk or other deadly weapon, shall upon conviction be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 4. Any person who shall carry concealed or otherwise upon his person, any pistol, bowie knife, dirk or deadly weapon, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months. Provided however, that this shall not apply to any peace officer, of the State, County or Cities of the State, and provided further that if it shall appear to the court trying offences under this section, that the accused was engaged in any legitimate business or calling, that would necessitate the carrying of any such weapon, such person shall be acquitted.

Sec. 5. Any person who shall discharge any fire arms, rockets, powder firework torpedoes or other dangerous or combustable material, upon any streets, lots, grounds, alleys or in the vicinity of any building, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months. Provided however, that it shall appear to the court, trying offences under this section, that the offence charged was committed by the accused in defence of his person or property or in celebrating any national holiday, public event, and that the same was done in such a manner as not to endanger the lives or property of another, such person shall be acquitted.

Sec. 6. Any person who shall speak, utter or use any indecent language in any public place in the presence and hearing of any female shall upon conviction be fined in any sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.

Sec. 7. Any person who shall on the first day of the week, commonly called Sunday, keep open any billiard room, ball or pin alley, skating rink, house, ground or other place of amusement, shall upon conviction be fined in any sum not exceeding $100, or by imprisonment, in the city jail not exceeding 3 months.

Sec. 8. Whoever shall aid assist, or counsel another to commit any of the offenses prohibited by this ordinance shall be deemed guilty of the same offense as the principal and punished accordingly notwithstanding, the principal may not have been charged with the offense.

Sec. 9. All fines and costs imposed by the Police Judge under this ordinance shall be by committment of the accused to the city jail until the same is paid and the offenses herein denominated and prohibited shall extend to all such acts committed within the corporate limits of the city of Wallace.

Sec. 10. That an ordinance entitled, an ordinance relating to the carrying of deadly weapons, passed Nov. 26th, 1887, and published Dec. 3rd, 1887, and an ordinance, without title passed Nov. 17th, 1887, published Nov. 19, 1887, are hereby repealed, and this ordinance shall take effect and be in force from and after its publication in the Wallace County Register.

Passed and approved Dec. 22nd, 1887.
Attest : GEO. W. EWEN, A. B. CHRYSLER,
Clerk Protem. Pres. of Council.

Copyright © 2023 Newspapers.com. All Rights Reserved.


POWERED BY Newspapers.com

# EXHIBIT 32

Case: 23-16164, 10/12/2023, ID: 12808632, DktEntry: 8, Page 137 of 142

Newspapers
by ancestry

The Morning News (Wilmington, Delaware) · Fri, Jul 13, 1888 · Page 4

https://www.newspapers.com/image/160109497

Downloaded on Mar 20, 2023

## Notices.

### NOTICE.

#### PARK REGULATIONS.

1st. No person shall ride or drive upon any other part of the park than upon such road as may be designated for such purposes. Penalty, $5.

2d. No person shall be permitted to bring led horses within the limit of the park, or to turn any horses, cattle, goats, swine, dogs or other animals loose in the park. Penalty, $5.

3d. No person shall indulge in any threatening, abusive, insulting or indecent language in the park. Penalty, $5.

4th. No person shall engage in gunning, or commit any obscene or indecent act in the park. Penalty, $10.

5th. No person shall go in to bathe in any of the waters within the park. Penalty, $5.

6th. No person shall throw any dead animal or offensive matter or substance of any kind into the Brandywine, or into any spring, brook or other water, or in any way foul any of the same, which may be within the boundaries of the park. Penalty, $5.

7th. No person shall carry fire-arms or shoot birds or other animals within the park, or throw stones or other missiles therein. Penalty, $5.

8th. No person shall disturb birds, or annoy, strike, injure, or kill any animal, whether wild or domesticated, within the park. Penalty, $5.

9th. No person shall cut, break, or in anywise injure or deface any trees, shrubs, plants, turf or rocks, or any buildings, fences, bridges, or other structures within the park. Penalty, $10.

10th. No person shall injure, deface, or destroy any notices, rules, or regulations for the government of the park, posted, or in any other manner permanently fixed, by order or permission of the Board of Park Commissioners or their officers or employes. Penalty, $10.

By order of the Board of Park Commissioners.
WILLIAM M. CANBY, President.

Attest: JOSEPH A. RICHARDSON, Secretary.
j12-3t

---

**NOTICE.—TAXPAYERS, TAKE NOTICE.**
City and school taxes for 1888. The undersigned, receivers of taxes for the city of Wilmington, will be at No. 10 East Sixth street, between

Copyright © 2023 Newspapers.com. All Rights Reserved.


POWERED BY
Newspapers.com™

Add. 92

# EXHIBIT 33

Newspapers
by ancestry

https://www.newspapers.com/image/264680514

The Yazoo Herald (Yazoo City, Mississippi) · Fri, Sep 26, 1890 · Page 2

Downloaded on Sep 19, 2023

## COUNCIL PROCEEDINGS.

Sept. 17, '90.

There were present, W. G. H. Barnwell, Owen Deles, M. A. Pickett and Geo. H. Brown, Aldermen.

The Board, Collins, E. H. Kelly, Jno. Lee, Alderman E. Lake.

The Mayor stated the object of the meeting to be for the purpose of passing upon certain ordinances which had been directed to have drawn up and other business which might come up.

The following ordinances were read, adopted and ordered published, to wit:

An ordinance on revenues (published in Yazoo City HERALD, Friday, Sept. 19, 1890.)

An ordinance in relation to carrying concealed weapons.

An ordinance in relation to unlawful dealing in liquors.

An ordinance in relation to larceny.

An ordinance in relation to misdemeanor.

The account of W. S. Epperson for $35, for drawing up ordinances, was allowed out of the general fund.

On motion the Board adjourned.

E. J. POURSINE, City Clerk.

### CARRYING CONCEALED WEAPONS.

Be it ordained by the Board of Mayor and Aldermen of Yazoo City in council convened, as follows, viz:

SECTION 1. If any person within the corporate limits of said city, shall carry concealed, in whole or in part, any pistol, bowie knife, dirk knife, or any sharp-edged or pointed iron or steel blade, not being a pocket knife of usual and ordinary size for common use; or sword cane, knucks of iron, brass, lead or other metallic or hard substance; slung shot or other deadly weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof in the city court, shall, for each offense, be fined in any sum not less than ten nor more than one hundred dollars and costs, or imprisoned in the city or county jail not less than five nor more than sixty days, or both, such fine and imprisonment at the discretion of the court; provided, if any person arrested for a violation of this ordinance shall plead and prove to the satisfaction of the court, that at the time of his arrest he was traveling or setting out on a journey—not being a tramp; or that he is an officer of the peace engaged in the discharge of the duties of his office, he shall not be liable to the punishment prescribed by this ordinance.

SEC. 2. Any father who shall knowingly suffer or permit any minor son under the age of 14 years to carry concealed in whole or in part any weapon of the kind described and mentioned in the first section of this ordinance, shall, on conviction thereof in the city court, be punished as prescribed in the first section hereof.

SEC. 3. Any student or pupil in any of the public schools of said city carrying into such school any weapon of the kind mentioned and described in the first section hereof, concealed in whole or in part; or any professor, teacher or instructor in such schools who shall knowingly suffer or permit any such student or pupil to carry any such weapon into such school, concealed as aforesaid, shall be guilty of a misdemeanor and on conviction thereof in the city court, shall be punished as provided in the first section of this ordinance.

### UNLAWFUL EXHIBITION OF DEADLY WEAPONS.

SEC. 4. If any person carrying any one or more of the weapons mentioned and described in the first section hereof, whether concealed in whole or part or not, and shall in the presence of two or more persons exhibit the same in said city in a rude, angry or threatening manner, and not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel in said city, shall, on conviction thereof in the city court, be punished as provided in the first section of this ordinance.

SEC. 5. This ordinance shall take effect from and after its adoption.

### UNLAWFUL DEALING IN LIQUORS.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers.com

# EXHIBIT 34

Newspapers
by ancestry

https://www.newspapers.com/image/68084065

The State Journal (Jefferson City, Missouri) · Fri, Apr 12, 1878 · Page 2

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.



The State Journal (Jefferson City, Missouri) · Fri, Apr 12, 1878 · Page 2

https://www.newspapers.com/image/68084065

Printed on Jun 25, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

