No. 23-16164

IN THE

# United States Court of Appeals for the Ninth Circuit

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI;
HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

*v.*

ANNE E. LOPEZ, in her official capacity as Attorney General
of the State of Hawaii,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Hawaii; No. 1:23-cv-00265-LEK-WRP;
Hon. Leslie E. Kobayashi

## JOINT BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS *AMICI CURIAE* FOR APPELLANT

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
 PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062

*Counsel for Amicus Curiae
Giffords Law Center to Prevent
Gun Violence*

Thomas M. Bondy
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street, NW
Washington, D.C. 20005
(202) 339-8400

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT
 GUN VIOLENCE
840 First Street, NE, Suite 400
Washington, D.C. 20002

*Counsel for Amicus Curiae Brady
Center to Prevent Gun Violence*

(*Additional Counsel on Next
Page*)

Amy K. Van Zant
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Melanie R. Hallums
Robert H. Owen
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
2121 Main Street
Wheeling, WV 26003

*Additional Counsel for Amicus
Curiae Brady Center to Prevent
Gun Violence*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................ii

INTEREST OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY ..................................................... 4

ARGUMENT ........................................................................................... 7

I.    The District Court Erred In Subjecting Hawaii's Gun Laws To An Overly Stringent Test Under *Bruen*. ................ 7

    A.    *Bruen* requires a historical inquiry, not a historical match. .................................................... 7

    B.    The district court did not properly apply *Bruen*'s historical test. .................................................. 10

II.    The District Court Erred In Effectively Construing The Second Amendment To Override The First Amendment. ................................................................... 21

    A.    Hawaii's parks and beaches are regularly used for First Amendment activities. ............................... 24

    B.    The district court's decision threatens to chill First-Amendment rights. .......................................... 28

III.    Hawaii's Interest In Protecting Public Safety Strongly Weighs Against A Preliminary Injunction .......................... 30

CONCLUSION ...................................................................................... 34

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ................................................................. 3

*Boland v. Bonta*,
No. 22-CV-01421, 2023 WL 2588565 (C.D. Cal. Mar. 20,
2023) .................................................................................... 18, 19, 20

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................ 1, 3, 13, 15, 17, 21, 23

*Grossman v. City of Portland*,
33 F.3d 1200 (9th Cir. 1994) .............................................................. 26

*Hague v. CIO*,
307 U.S. 496 (1939) ........................................................................... 26

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms &
Explosives*,
417 F. Supp. 3d 747 (W.D. Va. 2019) .................................................. 3

*Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*,
__ F. Supp. 3d __, 2023 WL 4373260 (D. Md. July 6, 2023).............. 16

*Maryland Shall Issue v. Hogan*,
353 F. Supp. 3d 400 (D. Md. 2018) ...................................................... 4

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......................................................................... 1, 3

*Nat'l Ass'n for Gun Rights v. Lamont*,
__ F. Supp. 3d __, 2023 WL 4975979 (D. Conn. Aug. 3, 2023)............. 3

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022)................. 1, 3, 4, 7-10, 13, 15-17, 19-21, 23, 27

ii

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018) ............................................................... 1

*Peruta v. County of San Diego*,
   824 F.3d 919 (9th Cir. 2016) ......................................................... 3, 4

*Renna v. Bonta*,
   No. 20-CV-2190, 2023 WL 2846937
   (S.D. Cal. Apr. 3, 2023) ...................................................... 18, 19, 20

*Stimmel v. Sessions*,
   879 F.3d 198 (6th Cir. 2018) ......................................................... 3, 4

*United States v. Cruikshank*,
   92 U.S. 542 (1875) ............................................................................ 23

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir. 2023) ...................................................... 20, 21

## Constitutional Provisions

U.S. Const. amend. I ............................................................... 5, 6, 22-30

U.S. Const. amend. II ........................................ 2-10, 13, 17, 21-23, 27-28

U.S. Const. amend. XIV ................................................ 4, 8, 11, 15, 16, 27

## Statutes

18 U.S.C. 922(g)(8) .......................................................................... 21

## Other Authorities

*Armed Assembly: Guns, Demonstrations, and Political
   Violence in America*, Everytown Rsch. & Pol'y (Aug. 23,
   2021), https://tinyurl.com/4p2838f7 ..................................................... 28

Arlin J. Benjamin, Jr. et al., *Effects of Weapons on
   Aggressive Thoughts, Angry Feelings, Hostile Appraisals,
   and Aggressive Behavior: A Meta-Analytic Review of the
   Weapons Effect Literature*, 22 Personality & Soc. Psych.
   Rev. 347 (2018), https://tinyurl.com/4vm4bzz2 ................................. 33

Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L. Rev. 101 (forthcoming 2023) https://tinyurl.com/ytrej3yd ................................................................ 23

Brief for the United States, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023) ....................................................................... 21

John J. Donahue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities*, Nat'l Bureau of Econ. Rsch., Working Paper No. 30190 (June 2022), https://tinyurl.com/mr2xfdsc ........................................................... 31

John J. Donahue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?*, Nat'l Bur. of Econ. Rsch., Working Paper No. 30190 (June 2023 rev.), https://tinyurl.com/4zw4z8y9 ........................................................... 32

Mitchell L. Doucette et al., *Impact of Changes to Concealed-Carry Weapons Laws on Fatal and Nonfatal Violent Crime, 1980-2019*, 192 Am. J. of Epidemiology 342 (Mar. 2023) ............................................................................................. 32

DPR, *Responsibilities* (updated Sept. 27, 2023), https://tinyurl.com/32txk6j6 ........................................................... 24

Grace Kay, *A Majority of Americans Surveyed Believe the US is in the Midst of a "Cold" Civil War*, Bus. Insider (Jan. 13, 2021), https://tinyurl.com/mrxpavt9; ........................................... 29

Ezra Klein, *Why We're Polarized* (2020) ................................................. 29

Dahlia Lithwick & Mark Joseph Stern, *The Guns Won*, Slate (Aug. 14, 2017), https://tinyurl.com/2zetvdwv .................................. 29

Tori Luecking, *DHS Launches Panel on Religious Security as Hateful Incidents Rise*, Wash. Post (Nov. 3, 2022), https://tinyurl.com/2m4rcanv .......................................................... 29

iv

Gregory P. Magarian, *Conflicting Reports: When Gun Rights Threaten Free Speech*, 83 Law & Contemp. Probs. 169 (2020) ............................................................................. 28

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (Dec. 2017) .................................... 32, 33

David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protestors*, Bloomberg News (May 14, 2020), https://tinyurl.com/53e9unpz .............................................................. 29

## INTEREST OF *AMICI CURIAE*[1]

The Brady Center to Prevent Gun Violence (Brady) is a nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is properly construed with the safety of our society in mind, and in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.

Brady has filed numerous briefs as *amicus curiae* in cases involving firearms regulations, including in this Court, *e.g.*, *Renna v. Bonta*, No. 23-55367 (9th Cir.), *Boland v. Bonta*, No. 23-55276 (9th Cir.), *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018), and in the United States Supreme Court, *e.g.*, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller*, 554 U.S. 570 (2008). For these reasons, Brady has a strong interest in the outcome of this appeal.

---

[1] The parties have consented to the filing of this *amici* brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

*Amicus curiae* Giffords Law Center to Prevent Gun Violence (Giffords Law Center) is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun-violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.[2]  The organization was founded more than 30 years ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.  Today, through partnerships with gun-violence researchers, public-health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.  Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that gun-safety legislation and community violence prevention strategies are not only

---

[2] Giffords Law Center's website, www.giffords.org/lawcenter, is the premier clearinghouse for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

consistent with the Second Amendment—they are essential to protecting the health, safety, and lives of Americans.

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Nat'l Ass'n for Gun Rights v. Lamont*, __ F. Supp. 3d __, 2023 WL 4975979, at *12 (D. Conn. Aug. 3, 2023); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754,

759 (W.D. Va. 2019); *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018).[3]

## INTRODUCTION AND SUMMARY

The Supreme Court has held that responsible law-abiding citizens have a general right to carry firearms, but it has emphasized that the right is not unlimited. In its recent decision in *New York State Rifle & Pistol Association v. Bruen*, the Court explained that courts should undertake a historical analysis when considering constitutional challenges to regulations that allegedly impinge upon the Second and Fourteenth Amendments. 142 S. Ct. 2111 (2022). The test begins with a threshold inquiry, identifying the relevant activity and asking whether the plain text of the Second Amendment protects that activity (an inquiry regarding which the plaintiff challenging the regulation bears the burden of proof). If yes, the analysis then proceeds to an inquiry comparing modern and historical laws. Recognizing that modern regulations often will not have a corresponding "historical twin," the Court endorsed an approach that allows for analogical

---

[3] Giffords Law Center filed the briefs in *Stimmel* and *Peruta* under its former name, the Law Center to Prevent Gun Violence.

4

reasoning, where courts assess whether modern gun regulations maintain the "balance struck by the founding generation" and later generations, including around the time of Reconstruction. *Id.* at 2133.

The standard under *Bruen* does not require that modern regulations present a precise historical match. Instead, the test is whether modern regulations are in line with the balance struck by earlier generations. The purposes underlying historical regulations and the methods used by those regulations will inform this inquiry.

The district court here failed to properly apply *Bruen*. In enjoining Hawaii's sensitive-places gun regulations, the district court in this case applied too demanding an analogical test and improperly discounted a raft of historical regulations that, properly considered, weigh heavily in the State's favor. Significantly, other district courts in this Circuit, in cases currently pending in this Court, have made similar errors in applying *Bruen*.

This case also raises important issues regarding the intersection of the First and Second Amendments. First Amendment rights, such as the right to free speech and assembly, can justify firearms restrictions in appropriate venues. Firearms can rightfully be restricted in

5

designated civic locations, such as public parks in particular, because of the important First Amendment activity that takes place there. In issuing its preliminary injunction, the district court gave no consideration to the chilling effect the presence of firearms in these public places will have on the exercise of critical First Amendment rights. The First Amendment and the Second Amendment do not override one another, and the district court's effective elevation of the Second Amendment above vital First Amendment concerns is unwarranted and contrary to the Constitution's structure and design.

Finally, in concluding that preliminary injunctive relief is appropriate, the district court gave too much weight to the proposition that individuals with gun permits are generally law-abiding. Scientific research provides critical evidence that courts should consider when analyzing gun regulations under *Bruen*. And the results of the research are clear: Having more guns in public spaces makes us less safe. This conclusion confirms that laws limiting public carry, like Hawaii's Act 52, are driven by a well-founded motivation to keep the public safe, a premise that has deep roots in the historical tradition of gun regulations in this country.

6

The district court here thus erred both in its analogical reasoning under *Bruen*, and in its failure to properly weigh pertinent public safety considerations. This Court should reverse.

## ARGUMENT

### I. The District Court Erred In Subjecting Hawaii's Gun Laws To An Overly Stringent Test Under *Bruen*.

In *Bruen*, the Supreme Court set out a historical test for evaluating the constitutionality of firearm regulations. 142 S. Ct. at 2126. The first question is whether the plain text of the Second Amendment covers an individual's conduct. If it does, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The district court failed to properly evaluate Hawaii's gun restrictions under *Bruen*. Had it done so, it would have concluded that these restrictions are consistent with the historical tradition of firearm regulation in this country.

### A. *Bruen* requires a historical inquiry, not a historical match.

*Bruen* requires courts to determine whether modern gun regulations are "relevantly similar" to historical regulations, particularly to those in effect around the time the Second and

7

Fourteenth Amendments were ratified (1791 and 1868, respectively).

*Bruen*, 142 S. Ct. at 2132.  If modern regulations are sufficiently

analogous to past ones, they likely will pass constitutional muster.

At the outset, the *Bruen* Court instructed that modern regulations

must be "*consistent with* this Nation's historical tradition of firearm

regulation."  *Id.* at 2126 (emphasis added).  A modern regulation is

"consistent" with this historical tradition if it is "analogous" to—even if

not a "twin" of or "dead ringer" for—historical regulations.  *Id.* at 2133

(emphasis omitted).  When explaining the analogical method required,

the Court identified two relevant metrics: the "how" and the "why" of

the regulation's effect on Second Amendment rights.  *Id.*  If the "how"

and "why" are comparable to historical regulations, then the regulation

is in keeping with the "balance struck by the founding generation," and

is constitutional.  *Id.* at 2133 n.7.

Determining whether a gun regulation's "how" and "why" are in

keeping with this balance requires courts to identify and apply the

relevant concerns that the legislatures considered.  On one side, for

example, is the overarching governmental interest in protecting public

safety, which is part of what *Bruen* calls the regulation's "why."  *See id.*

8

at 2133.  On the other side is the way in which the regulation limits

Second-Amendment rights to achieve that interest—what *Bruen* calls

the regulation's "how."  *Id.*  Courts applying *Bruen* must evaluate these

considerations and determine whether the modern and historical laws

are sufficiently analogous.  *Id.* at 2132-33.

The Supreme Court required an *analogical* inquiry, not a one-to-

one match or other more rigid method of comparison.  Indeed, *Bruen*

recognized the substantial differences between the circumstances faced

by 18th-, 19th-, and even early-20th-century legislatures, and those

faced by legislatures today.  *Id.* at 2132.  Technological and societal

changes have drastically altered the harms that legislators must

address with firearm regulations.  More than 150 or 200 years ago,

"[t]here was no analogue to the types of gun violence that plague

modern America."  3-ER-0456 (Cornell Declaration ¶ 24).

The greater the "unprecedented societal concerns or dramatic

technological changes" addressed by the modern legislature, the more

critical it is to use what the Court called a "more nuanced approach" to

the analogical inquiry.  *Bruen*, 142 S. Ct. at 2132.  And the *Bruen* Court

acknowledged the validity of a major, historical concern:  protecting

public safety in sensitive places. *Id.* at 2133. This is exactly what
Hawaii seeks to do through Act 52—protect public safety by restricting
firearms in specifically designated sensitive places—just as past
legislatures have historically and traditionally done.

### B. The district court did not properly apply *Bruen*'s historical test.

**1.** The district court failed to properly apply the analogical
framework dictated by *Bruen*. For example, the district court
disregarded historical evidence showing that guns have always been
restricted in public parks, since the point at which such parks first
existed in this country. As expert historian Saul Cornell has explained,
"[t]here were no modern-style parks in the era of the Second
Amendment." 3-ER-0483 (Cornell Decl. ¶ 55). During that time, "the
nation was still 90% rural, and the majority of the population was
engaged in agricultural pursuits," *id.*, so there was not a need for
designated public green spaces. "The creation of parks as we now know
them began in the middle of the nineteenth century," when they became
"places of refuge from the congestion, grime, and stresses of city life." 3-
ER-0484 (¶ 56). In the post-Civil War period, "[t]he expansion of urban

10

parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified." *Id.*

Firearms were not allowed in any of these parks, whether city, state, or federal. "From the outset modern parks banned firearms." 3-ER-0485 (¶ 57). Indeed, millions of Americans "lived under a firearms regulatory regime that prohibited firearms in parks." *Id.* And this made perfect sense: Public parks were viewed as "places of relaxation, repose, and recreation," and "there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks." 3-ER-0484-0485 (¶¶ 56-57). Thus, "limits on arms in public parks were the norm in America in the era of the Fourteenth Amendment." 3-ER-0486 (¶ 57).

Specifically, Hawaii presented evidence that the five largest cities prohibited guns in public parks in the post-Civil War era: New York (1861 law); Philadelphia (1869 law); Chicago (1881 law); St. Louis (1883 law); and Boston (1886 law). 3-ER-0485-0486 (¶ 57). Other cities, such as San Francisco, Boulder, and St. Paul, also prohibited guns in public parks. 3-ER-0485-0486 (¶ 57). "Statutes prohibiting possession of arms

11

in these important public spaces were enacted in major urban areas of every region of the nation." 3-ER-0486 (¶ 57).

"Given that arms have been tightly regulated, and in many instances prohibited in parks since their creation, Hawaii's statute limiting guns in parks is well within the long history of firearms regulation in America." 3-ER-0488 (¶ 61). But rather than acknowledging the direct parallels between Hawaii's gun restrictions in public parks and historical gun restrictions in public parks, the district court worked hard to find purported differences between them.

The district court discounted the importance of historical firearms bans in three of the oldest and most iconic public parks in the country—Manhattan's Central Park, Brooklyn's Prospect Park, and Philadelphia's Fairmount Park. It did so because it found that those restrictions reflected only New York and Pennsylvania's historical tradition of gun regulations, and those states represented "only about 4%" of the population. 1-ER-0067-0068 (Opinion).

As an initial matter, the district court got its math wrong and incorrectly calculated the population percentage of these states. By the district court's own numbers, New York and Pennsylvania in fact

12

represented *22%* of the total population of the United States. *See* 1-ER-0068 n.17 (New York and Pennsylvania had a combined population of 6,786,950, and the United States had a total population of 31,443,321).[4]

*Bruen* in any event did not endorse, much less require, this kind of strict population test. Rather, in explaining why certain historical regulations were not analogous to the modern ones challenged in *Bruen*, the Supreme Court said only that it would "not stake [its] interpretation [of the Second Amendment] on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradict the overwhelming weight' of other, more contemporaneous historical evidence." *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 632). The population of the territories considered in *Bruen* was not only much, much smaller than the population of New York and Pennsylvania, but it was also just one of many factors considered by the Court. And unlike here, those

---

[4] The district court likewise purported to dismiss historical regulations that banned guns in parks in the ten most populated cities because they "covered, at most, less than ten percent of the United States' population," and thus did not show "a national historical tradition of prohibiting the carrying firearms in parks." 1-ER-0072-0073.

13

territorial laws *contradicted* the weight of other relevant historical evidence. The historical evidence presented by Hawaii, in contrast, all points in the same direction: "From the outset, the regulations governing these spaces prohibited firearms." 3-ER-0488 (Cornell Decl. ¶ 61). The district court's skewed and arithmetically incorrect analysis improperly casts aside this directly apposite history and tradition.

    **2.** In considering Hawaii's restrictions on guns in sensitive places more generally, the district court likewise missed the forest for the trees, focusing on idiosyncratic rather than core features of the historical regulations. For example, regarding the challenged Hawaii restrictions pertaining to restaurants and bars, the district court considered an 1879 New Orleans law banning weapons in taverns to be "only … one city ordinance." 1-ER-0056-0057. In other words, the district court apparently found this law *too municipal*. It considered similar bans—an 1853 New Mexico law and an 1890 Oklahoma law—to be "western territorial laws" that did not deserve "too much weight." 1-ER-0057. The district court thus ostensibly found that these laws were *too Western*. To be sure, *Bruen* did treat certain "territorial restrictions" with skepticism. But it did so because those "localized restrictions"

14

could not "overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Bruen*, 142 S. Ct. at 2154.

The district court also disregarded "numerous local ordinances that regulated firearms in parks" because they were promulgated from 1872 through 1886, which was "after the Fourteenth Amendment's ratification in 1868." 1-ER-0068 n.18. The district court found that these laws were thus *too late*. But that is wrong as well, since the Supreme Court has explained that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation." *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 605) (emphasis in original). If post-ratification laws are consistent with prior ones, they can show a continuing tradition of regulation. *See id.* at 2131-32 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation.").

After improperly discounting post-ratification regulations, the district court then dismissed the remaining historical laws because

15

there were (in the court's view) *too few* of them. It disagreed with a Maryland court's finding, for example, that a host of laws demonstrated a national historical tradition of prohibiting carrying firearms in parks. 1-ER-0070-0071 (citing *Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*, __ F. Supp. 3d __, 2023 WL 4373260 (D. Md. July 6, 2023)). The district court stated that, of the seventeen laws reviewed by the Maryland court, only one local ordinance and one state law were enacted before or during the time of the Fourteenth Amendment's ratification. 1-ER-0072. Having thus winnowed the list of analogous laws down to two, the district court was "not convinced that evidence of one local ordinance and one state law is sufficient to find that there was a national historical tradition of prohibiting the carrying of firearms in parks." 1-ER-0072.

This results-oriented reasoning under which analogous historical regulations are picked off one by one, each for its own idiosyncratic reasons, is not how the *Bruen* analysis is supposed to work. The district court did not meaningfully explore whether the reasons behind modern and past restrictions on guns in sensitive places were analogous (the "why"). Nor did it properly evaluate the ways in which both modern

16

and historical regulations limited Second Amendment rights for public safety purposes (the "how"). *Bruen* makes clear that many modern regulations implicating Second Amendment rights will survive scrutiny under *Bruen*'s analytical framework. The majority opinion emphasized that the "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," and that many common regulations, such as restrictions on guns in sensitive places, can continue under *Bruen*. 142 S. Ct. at 2133-34. Likewise, the *Bruen* concurrences emphasized the Court's narrow focus. Justice Alito noted that the opinion "decides nothing" about who may possess a gun, what requirements must be met to purchase a gun, or the kinds of guns that people may possess. *Id.* at 2157 (Alito, J. concurring). And Justice Kavanaugh, joined by Chief Justice Roberts, summarized that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J. concurring) (quoting *Heller*, 554 U.S. at 636).

The majority in *Bruen* clearly expected many modern gun laws to survive its analytical test, including many public carry laws on the books around the country. *See id.* at 2138 n.9. The district court's

17

artificially crabbed methodology is unfaithful to that basic premise, and, in particular, the district court here required more or less exact historical matches in a way that *Bruen* specifically rejected.

**3.** It bears emphasis that other district courts in this Circuit have also misapplied *Bruen*'s historical test, and indeed have done so in cases currently pending in this Court. For example, two California district courts recently struck down provisions of California's Unsafe Handgun Act, which requires semi-automatic guns to have certain safety features to prevent accidental shootings. *See Renna v. Bonta*, No. 20-CV-2190, 2023 WL 2846937 (S.D. Cal. Apr. 3, 2023), *appeal docketed*, No. 23-55367 (9th Cir. Apr. 20, 2023); *Boland v. Bonta*, No. 22-CV-01421, 2023 WL 2588565, at *6 (C.D. Cal. Mar. 20, 2023), *appeal docketed*, No. 23-55276 (9th Cir. Mar. 27, 2023). To show that these requirements were consistent with this country's tradition of firearm regulation, California provided evidence of historical laws (i) requiring certain guns to be inspected to ensure their safety and efficacy (these were called "proving" laws), and (ii) requiring gun powder to be stored safely.

Despite having similar motivations and methods, the district courts found that these historical regulations were not sufficiently

analogous to the modern ones. The *Boland* court reasoned that the historical proving laws sought to "ensur[e] that each firearm's basic features were adequately manufactured for safe operation," whereas California's law required safety features to "help a user safely operate the handgun." *Boland*, 2023 WL 2588565, at *7. Finding these two sets of regulations to be "completely different," *id.*, the district court failed to recognize that both regulations shared the same end goal (public safety) and shared substantially similar methods of achieving that goal (enacting measures to prevent misfires and accidental discharges). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133.

Both the *Boland* and *Renna* district courts likewise assessed that historical gun-powder storage laws were "not analogues" to the challenged provisions of California's law. *Renna*, 2023 WL 2846937, at *13; *see also Boland*, 2023 WL 2588565, at *8. Although the *Renna* court recognized that both were "public safety" laws, it reasoned that the historical laws "regulated the storage of gunpowder and loaded firearms with gun powder for fire-safety reasons." 2023 WL 2846937, at

19

*13.  It found that California's law, by contrast, regulates the sale of handguns for "gun-operation safety reasons."  *Id.*  In other words, the court found that fire-safety was different in kind from gun-operation safety.  *See also Boland*, 2023 WL 2588565, at *8 (finding that "[t]he main goal of the gunpowder storage laws was to prevent fire," whereas California's "requirements are meant to provide inadvertent discharge or firing of the firearm.").  But neither district court explained why public safety laws that aimed to protect people from accidental fires are meaningfully different from laws aimed at protecting people from accidental discharges.  Nothing in *Bruen* requires more than "a *comparable* tradition of regulation."  142 S. Ct. at 2132 (emphasis added).

The district court in this case is thus not the only district court in this Circuit that has misread *Bruen*.  This Court should explain and make clear that *Bruen* does not prescribe as strict an analogical test as these courts have applied.[5]

---

[5] A recent case from the Fifth Circuit, now before the Supreme Court, further highlights the problem of the overly demanding historical matching game.  In *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023), the Fifth Circuit held that

## II. The District Court Erred In Effectively Construing The Second Amendment To Override The First Amendment.

The Supreme Court held in *Heller* and reaffirmed in *Bruen* that weapons may be altogether prohibited in "sensitive places," including schools, legislative assemblies, government buildings, polling places, and courthouses. *Bruen*, 142 S. Ct. at 2133. It is now settled law that firearms can be prohibited at those "sensitive places" consistent with the Second Amendment, and courts can use analogies "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

The Supreme Court did not comprehensively define "sensitive places" in *Bruen*, though it cautioned against construing the term so broadly as to include all places of "public congregation" where law-enforcement and other public-safety professionals are available. *Id.* at 2134. The entirety of New York City, for example, is not in all respects

---

18 U.S.C. 922(g)(8), which makes it a crime for a person under a domestic violence restraining order to have a gun, is unconstitutional under the Second Amendment. As the briefing in that case demonstrates, the Fifth Circuit's historical analysis contains some of the same flaws as the district court's decision here. *See* Brief for the United States, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023). *Rahimi* is currently scheduled for oral argument in the Supreme Court on November 7, 2023.

a "sensitive place" merely because its streetscape is generally a place of public congregation protected by the New York City Police Department. Such a construction, the Court reasoned, "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.*

By the same token, the term should not be construed so narrowly as to preclude the government from suitably regulating areas of public congregation *other than* schools, legislative assemblies, government buildings, polling places, and courthouses—particularly where the introduction of weapons at such locations would effectively curtail other constitutional protections. That, however, is in effect what the district court has done here. In awarding injunctive relief, the district court ruled in particular that Hawaii's public parks and beaches are not "sensitive places" where the government can regulate the possession of firearms. The ruling treats those locations merely as broad areas of public congregation, ignoring the traditional role these kinds of spaces serve, and always have served, as civic locations regularly used for activities protected under the First Amendment.

Firearms may be restricted in sensitive places at least in part because they are places of civic engagement, a core American value enshrined in the Constitution and long protected under the First Amendment. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626-27; *United States v. Cruikshank*, 92 U.S. 542, 552 (1875) ("a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs"). By recognizing sensitive places where people gather regularly and peacefully, the Supreme Court has confirmed that the Second Amendment is not meant to interfere with the government's ability to preserve our right to engage in civil discourse without being inhibited by the presence of dangerous weapons. Fundamentally, the exclusion of guns at "sensitive places" under *Bruen* reaffirms a common law history recognizing the government's authority to protect "a public sphere for democratic dialogue, democratic governance, and the reproduction of democratic community in which people can relate freely without intimidation or coercion." Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L. Rev. 101, 104 (forthcoming 2023),

https://tinyurl.com/ytrej3yd.  Hawaii's public parks and beaches are

well within that public sphere.

### A. Hawaii's parks and beaches are regularly used for First Amendment activities.

Honolulu's Department of Parks and Recreation (DPR) manages

402 park facilities within the City and County of Honolulu, including 62

beach parks, 162 playgrounds, 221 baseball or softball diamonds, and

767 outdoor play courts.  DPR, *Responsibilities* (updated Sept. 27,

2023), https://tinyurl.com/32txk6j6.  And at DPR's 62 beach parks, "the

'beach' and the 'park' are not two separate things.  Instead, the park

includes the beach—that is, the beach park includes the sand or rocks

constituting the beach, as well as some area that is not sand (such as

grass or other plants), as one 'park.'"  4-ER-0696 (Thielen Declaration

¶ 7).  "[T]here is no clear boundary between the 'beach' and the rest of

the park ...."  *Id.*  "Going to 'the beach' at one of these 62 beach parks

necessarily means going to 'the park.'"  *Id.*

The record makes abundantly clear that Hawaii's parks "are

heavily used for First Amendment activities."  4-ER-0699 (¶ 9).  Events

in these parks involving First Amendment-protected activities include a

24

whole range of protests, rallies, marches, church services, art

exhibitions, and concerts. *Id.* Recent examples include:

| 6/12/2022 | Parade | King Kamehameha Floral Parade | Kapiʻolani Park |
|---|---|---|---|
| 6/18/2022 | Event | Chaplain's Walk | Kapiʻolani Park |
| 6/24/2022 | March | Roe v. Wade support | Ala Moana Park |
| 6/25/2022 | Parade | AIDS Walk | Kapiʻolani Park |
| 6/28/2022 | Event | Papa Ola Lōkahi Meeting | Kapiʻolani Park |
| 7/1/2022 | Event | Lei draping and gathering at Gandhi Statue | Kapiʻolani Park |
| 7/7/2022 | Event | Music Recital | Kapiʻolani Park |
| 7/9/2022 | Parade | Family Day Parade – God's ʻOhana Day Parade | Atkinson to Kapiʻolani Park |
| 7/24/2022 | Event | Israeli Folk Dancing | Kapiʻolani Park |
| 7/31/2022 | Event | Lā Hoʻihoʻi Ea – Sovereignty Restoration Day | Thomas Square |
| 8/3/2022 | Event | Hula performance | Kapiʻolani Park |
| 8/20/2022 | Event | Celebration of Life | Kapiʻolani Park |
| 9/17/2022 | Rally | Freedom Rally | Kapiʻolani Park |
| 10/2/2022 | Parade | Komen Foundation More than Pink Walk | Kapiʻolani Park |
| 10/15/2022 | Parade | Honolulu Pride Parade | Kapiʻolani Park |
| 11/11/2022 | Event | Veteran's Day Ceremony | Atkinson to Kapiʻolani Park |
| 12/17/2022 | Parade | Chanukah Car Menorah Parade | King Kalakaua Park |
| 1/16/2023 | Parade | Martin Luther King Parade | Ala Moana Park to Kapiʻolani Park |
| 4/1-2/2023 | Event | Pow Wow in Paradise | Ala Moana Park |
| 4/23/2023 | Protest/ March | Red Hill Walk for Water | Ala Moana Park |
| 4/29/2023 | Event | Keiki Community Fair and Drag Story Hour | Aʻala Park |

| 4/29/2023 | Protest | Protest of Drag Story Hour | Aʻala Park |
| 5/17/2023 | Event | Kamehameha III Birthday Lei Draping | Thomas Square |
| 7/8/2023 | Parade | Family Day Parade – God's ʻOhana Day Parade | Atkinson to Kapiʻolani Park |
| 7/30/2023 | Event | Lā Hoʻioʻi Ea – Sovereignty Restoration Day | Thomas Square |
| 7/30/2023 | Event | Lā Hoʻioʻi Ea – Sovereignty Restoration Day | Pokai Bay |
| 8/26/2023 | Event | Celebration of Ukrainian Independence Day | Ala Moana Park |

*Id.* And there are "innumerable other events across Oʻahu within DPR's facilities that involve First Amendment projected activity," including church services, Alcoholics Anonymous meetings, art exhibitions, concerts, photography for weddings and engagements, and other events. 4-ER-0701 (¶ 10).

Hawaii is no outlier in this regard. Public parks in the United States are traditional First Amendment forums. As the Supreme Court and this Court have recognized, "[p]arks, in particular, 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Grossman v. City of Portland*, 33 F.3d 1200, 1204-05 (9th Cir. 1994) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). "This venerable tradition of

26

the park as public forum has—as suggested by the attendant image of the speaker on a soapbox—a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards." *Id.* at 1205.  As such, as noted above, "[f]rom the outset modern parks banned firearms," and regulations prohibiting guns in public parks "were the norm in America in the era of the Fourteenth Amendment."  3-ER-0485-0486 (Cornell Decl. ¶ 57).

Under *Bruen*, prohibiting firearms at events and activities occurring in courthouses, legislative assemblies, civic buildings, and analogous locations is well within the sphere of what governments can regulate without infringing on Second Amendment guarantees.  142 S. Ct. at 2133.  Hawaii's regulation prohibiting firearms at public parks and beaches extends that same reasonable, common-sense protection to other key venues for First Amendment assembly and speech.  There is no principled reason that the government can prohibit firearms at an event on the courthouse steps or in a legislative assembly but be held powerless to regulate the same activity at a public park, and such

27

regulations, which reflect in part fundamental First Amendment

concerns, are amply supported by longstanding history and tradition.

### B. The district court's decision threatens to chill First-Amendment rights.

The Second Amendment as interpreted by the district court—

without the historical limitations acknowledged in *Bruen*—risks a

direct collision with core First Amendment protections. If more people

are allowed to carry guns in public places where people typically gather

to exercise their rights of assembly and free speech, it will become more

dangerous to peaceably assemble, organize, march, rally, and express

ideas and beliefs in public settings. *See* Gregory P. Magarian,

*Conflicting Reports: When Gun Rights Threaten Free Speech*, 83 Law &

Contemp. Probs. 169, 169 (2020) ("In the real world, … guns far more

commonly impede and chill free speech than protect or promote it.").

Those who have historically been silenced may experience an especially

intense chilling effect. *See generally Armed Assembly: Guns,*

*Demonstrations, and Political Violence in America*, Everytown Rsch. &

Pol'y (Aug. 23, 2021), https://tinyurl.com/4p2838f7.

In practice, the abstract promise of First Amendment rights

affords little assurance against hostile listeners bearing guns. Recent

28

experience proves the point. *See* David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protestors*, Bloomberg News (May 14, 2020), https://tinyurl.com/53e9unpz; Dahlia Lithwick & Mark Joseph Stern, *The Guns Won*, Slate (Aug. 14, 2017), https://tinyurl.com/2zetvdwv ("When the police are literally too afraid of armed protesters to stop a melee, First Amendment values are diminished; discussion is supplanted by disorder and even death ….").

The problem is exacerbated in an increasingly polarized society. *See* Grace Kay, *A Majority of Americans Surveyed Believe the US is in the Midst of a "Cold" Civil War*, Bus. Insider (Jan. 13, 2021), https://tinyurl.com/mrxpavt9; Ezra Klein, *Why We're Polarized* (2020); *see also* Tori Luecking, *DHS Launches Panel on Religious Security as Hateful Incidents Rise*, Wash. Post (Nov. 3, 2022), https://tinyurl.com/2m4rcanv (noting that "FBI hate crime statistics show that incidents in churches, synagogues, temples and mosques increased 34.8 percent between 2014 and 2018"). Substantial experience and scientific research make clear that firearms are an unlikely antidote to the strife and polarization of our age. When carried

in public, they too often magnify the risk of violence where, instead, calm, peace, and order are needed.

Cities and states must be able to appropriately regulate firearms in modern First Amendment-protected spaces. The right to carry firearms should not be elevated above First Amendment rights, and communities should not be powerless to address the potential for gun violence, intimidation, and other misuse of firearms in parks and other civic forums. The district court erred in its contrary ruling.

## III. Hawaii's Interest In Protecting Public Safety Strongly Weighs Against A Preliminary Injunction.

In weighing whether a preliminary injunction was warranted, the district court ruled that Hawaii's interest in protecting public safety did not militate against injunctive relief, because "the vast majority of individuals in the United States with concealed carry permits are law-abiding." 1-ER-0093. The court stated that "because the challenged provisions only affect those individuals who have been granted a permit to carry firearms," and because those individuals are relatively "law-abiding," "the State's public safety argument is not persuasive." 1-ER-0093-0094. This reasoning is flawed.

30

Regardless of whether permit holders can be characterized as "law-abiding," common sense and a mountain of data demonstrate one simple fact: the more guns in a public space, the more dangerous that space becomes. Put simply, more guns mean higher safety risks. *See* John J. Donahue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities*, Nat'l Bureau of Econ. Rsch., Working Paper No. 30190, at 1 (June 2022), https://tinyurl.com/mr2xfdsc ("the predominant conclusion from studies in the last five years has been that [right-to-carry] laws increase violent crime").

Indeed, empirical analysis reveals persistent increases in violent crime rates in states with more permissive licensing regimes. For example, in a 2022 study analyzing data from 47 major U.S. cities, Stanford Professor John Donahue and his colleagues concluded that right-to-carry gun laws "increase overall firearm violent crime as well as the component crimes of firearm robbery and firearm aggravated assault by remarkably large amounts with an attendant finding of no sign of any benefit from [right-to-carry] laws." *Id.* at 25.

31

These findings are consistent with a 2017 study published by researchers at Boston University and Duke University. That study analyzed, for the first time, the impact of concealed carry laws on handgun and long-gun homicide rates. *See* Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (Dec. 2017). The study concluded that permissive right-to-carry laws were significantly associated with higher crime rates—in particular, 6.5 percent higher total homicide rates, 8.6 percent higher firearm-related homicide rates, and 10.6 percent higher handgun-specific homicide rates, as compared to states with stricter regulations. *Id.; see also* John J. Donahue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* at 4, Nat'l Bur. of Econ. Rsch., Working Paper No. 30190 (June 2023 rev.), https://tinyurl.com/4zw4z8y9 (introduction of right-to-carry laws in large urban centers increases violent crime by 20 percent); Mitchell L. Doucette et al., *Impact of Changes to Concealed-Carry Weapons Laws on Fatal and Nonfatal Violent Crime, 1980-2019*, 192 Am. J. of Epidemiology 342 (Mar. 2023) (adoption of shall-issue concealed carry laws was associated with significantly increased rates

32

of aggravated assault with a gun and homicide); Siegel, *supra* 32, at 1923 (shall-issue laws are associated with significantly higher rates of total, firearm-related, and handgun-related homicide).

Similarly, even if permit holders are generally "law-abiding," that does nothing to diminish the increased risk associated with introducing more firearms to bars, parks, beaches, and other sensitive places addressed in Act 52. Indeed, a broad body of behavioral research demonstrates that, even apart from the more concrete risks presented, merely seeing a weapon can increase a person's aggressive thoughts, hostility, and aggressive behavior. *See, e.g.,* Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 Personality & Soc. Psych. Rev. 347 (2018), https://tinyurl.com/4vm4bzz2.

In short, stronger restrictions on public carry reduce crime and enhance public safety. Hawaii's interest in public safety is thus entitled to substantial weight in the balance of relevant considerations, and strongly militates against injunctive relief. The district court erred in positing otherwise.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

*/s/ Esther Sanchez-Gomez*
Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062

*Counsel for Amicus Curiae*
  *Giffords Law Center to Prevent*
  *Gun Violence*

*/s/ Thomas M. Bondy*
Thomas M. Bondy
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
(202) 339-8400

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN
  VIOLENCE
840 First Street, NE, Suite 400
Washington, D.C. 20002

Amy K. Van Zant
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Melanie R. Hallums
Robert Owen
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2121 Main Street
Wheeling, WV 26003

*Counsel for Amicus Curiae Brady*
  *Center to Prevent Gun Violence*

October 12, 2023

34

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16164

I am the attorney or self-represented party.

**This brief contains 6262 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/*Thomas M. Bondy*      **Date** October 12, 2023
    *(use "*s/[typed name]*" to sign electronically-filed documents)*