No. 23-16164

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI,
HAWAIʻI FIREARMS COALITION,
PLAINTIFFS-APPELLEES,

v.

ANNE E. LOPEZ, in her official capacity as
Attorney General of the State of Hawaiʻi,
DEFENDANT-APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI
No. 1:23-CV-265, Hon. Leslie E. Kobayashi

**BRIEF FOR THE DISTRICT OF COLUMBIA AND ILLINOIS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND THE NORTHERN MARIANA ISLANDS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL IN PART**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

Office of the Attorney General for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

KWAME RAOUL
Attorney General for the State of Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
sarah.hunger@ilag.gov

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................... 1

SUMMARY OF ARGUMENT ...................................................................... 2

ARGUMENT ................................................................................................. 4

    I.    The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence ................................................. 4

    II.    Consistent With Regulations Adopted By Other States, Hawaiʻi's Designation Of "Sensitive Places" Protects Uniquely Vulnerable Locations And Populations ................................................. 8

    III.    Hawaiʻi's Private-Property Provision Reflects A Reasoned Policy Decision About How Best To Protect Public Safety And The Rights Of Property Owners ........................................................... 15

        A.    The private-property provision does not implicate Second Amendment rights because it merely sets a default rule .......... 15

        B.    Property owners have good reason to prefer a default rule that bars firearms without explicit permission.......................... 18

        C.    Other states have adopted similar presumptions for the carry of firearms on private property ........................................ 19

CONCLUSION ............................................................................................ 23

# TABLE OF AUTHORITIES

## *Cases*

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ................................................... 17

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
    704 S.E.2d 365 (Va. 2011) .................................. 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... 1, 4, 5, 6, 7, 8, 13

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012)............. 15, 16

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ................................... 8, 13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................... 2, 5, 6, 7

*Medtronic Inc. v. Lohr*, 518 U.S. 470 (1996) ........................................... 5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)..................................................... 1, 4, 5, 6, 7, 8, 9, 13, 16

*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) ...................................... 12

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019)....................................... 8, 13

*United States v. Morrison*, 529 U.S. 598 (2000) ......................................... 5

*Voisine v. United States*, 579 U.S. 686 (2016) ......................................... 9

*Wolford v. Lopez*, No. 1:23-CV-265,
    2023 WL 5043805 (D. Haw. Aug. 8, 2023) ................................................3, 4, 17

## *Statutes and Regulations*

D.C. Code § 7-2509.07 ....................................................................14, 20

Alaska Stat. § 11.61.220 ....................................................................14, 20

Ark. Code Ann. § 5-73-306 ....................................................................21

Cal. Code. Regs. tit. 14, § 4313 ................................................................ 14

Conn. Gen. Stat. § 53-202d ........................................................................20

Fla. Stat. § 790.06 ....................................................................................14

Haw. Rev. Stat. § 134-E ..................................................................2, 4, 16

Haw. Rev. Stat. § 134-A ..............................................................................2

Kan. Stat. Ann. § 75-7c24 .........................................................................22

Kan. Stat. Ann. § 75-7c10 .........................................................................22

Ky. Rev. Stat. § 244.125 ............................................................................14

La. Rev. Stat. Ann. § 40:1379.3 ................................................................20

Md. Code Ann., Crim. Law § 4-111 ..........................................................14

Me. Stat. tit. 17-A, § 402 ...........................................................................22

Mich. Comp. Laws Serv. § 750.234d ........................................................14

Mich. Comp. Laws Serv. § 28.425o ..........................................................14

Minn. Stat. § 97A.091 ...............................................................................14

Miss. Code Ann. § 45-9-101 ......................................................................14

Mo. Rev. Stat. § 571.107.1 ........................................................................14

Mont. Code Ann. § 45-8-328 .....................................................................14

Mont. Code Ann. § 87-5-401 .....................................................................14

N.D. Cent. Code § 20.1-11-13 ...................................................................14

N.D. Cent. Code § 62.1-02-04 ...................................................................14

N.J. Stat. § 2C:58-4.6 ................................................................................14

N.Y. Penal Law § 265.01-e ................................................................13, 14

Neb. Rev. Stat. § 28-1202.01 ................................................................14, 21

Okla. Stat. Ann. tit. 21, § 1272.1 ...............................................................14

Okla. Stat. Ann. tit. 21, § 1277 ..................................................................14

S.C. Code Ann. § 16-23-465.......................................................................14

S.C. Code Ann. § 23-31-225........................................................................20

Tex. Penal Code § 46.03 .............................................................................14

Tex. Penal Code § 30.05 ......................................................................21, 22

Tex. Penal Code § 30.06 ......................................................................21, 22

Tex. Penal Code § 30.07 ......................................................................21, 22

Va. Code Ann. § 18.2-308.01 ...................................................................21

Vt. Stat. Ann. tit. 10, § 5201 .....................................................................22

Wash. Rev. Code Ann. § 9.41.300............................................................14

Wyo. Stat. § 6-8-104 ..................................................................................14

430 Ill. Comp. Stat. 66/65(a-10) ..................................................14, 21, 22

2022 AB 4769 ..............................................................................................14

## Other

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for
    "No Carry" Defaults on Private Land*,
    48 J.L. Med. & Ethics 183 (Winter 2020) ........................... 17, 18, 21

Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual
    Consent*, 78 Va. L. Rev. 821 (1992) ........................................... 17, 18

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere:
    A New Account of Public Safety Regulation Under* Heller,
    116 Nw. U. L. Rev. 139 (2021) ................................................... 11, 13

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018)..................................................... 11

FBI, *Uniform Crime Reporting Statistics: Their Proper Use*, (May 2017)....................................................................................................... 14

Tyler Fedor *et al.*, *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022)............................................................. 10

Carina Bentata Gryting & Mark Frassetto, Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60 (2022) ............................................... 9

David Hemenway *et al.*, *Gun Use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263 (2000) ........................................... 10

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ...................................................................... 9

Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022) .............................. 10

Heather A. Turner *et al.*, *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (2019) .................................................................... 12

**INTEREST OF AMICI CURIAE**

Amici the District of Columbia, Illinois, California, Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the Northern Mariana Islands (collectively, "Amici States") submit this brief in support of defendant-appellant pursuant to Federal Rule of Appellate Procedure 29(a)(2).

As independent sovereigns, Amici States have a responsibility to protect the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. Amici States have historically fulfilled this responsibility by exercising their police powers to implement reasonable measures to regulate firearms, including by imposing location-based restrictions on carrying guns and setting presumptions for the carry of firearms on private property. Such regulation does not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "'right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,'" leaving states with the flexibility they need to protect their communities. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).

Indeed, the Second Amendment permits states to enact a variety of regulations to combat the misuse of firearms, making possible "solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). This flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality. Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities.

## SUMMARY OF ARGUMENT

In 2023, following the Supreme Court's opinion in *Bruen*, Hawaiʻi enacted comprehensive legislation reforming its public-carry regime. As part of that legislative enactment, which is referred to as "Act 52," Hawaiʻi identified a list of "sensitive places" in which firearms are prohibited and set a default rule that restricts carrying on private property without the owner's consent. *See* Haw. Rev. Stat. §§ 134-A (sensitive places), 134-E (private-property default rule).

Shortly after Act 52 was passed, plaintiffs sought a temporary restraining order to enjoin enforcement of the private-property provision and certain sensitive-place restrictions. The district court granted plaintiffs' motion in part and entered

2

an order enjoining defendants from enforcing various of Act 52's restrictions on public carrying in sensitive places—specifically, the prohibitions on carriage in parks, beaches, and their adjacent parking areas; on the premises of any bank or financial institution and their adjacent parking areas; in any bar or restaurant serving alcohol and their adjacent parking areas; and in parking areas that were adjacent to, but did not exclusively serve, government buildings. *See Wolford v. Lopez*, No. 1:23-CV-265, 2023 WL 5043805, at *2 (D. Haw. Aug. 8, 2023). The district court also enjoined enforcement of the default rule for carrying on private property as applied to property that is open to the public. *See id.* The temporary restraining order was converted into a preliminary injunction by joint stipulation, *see* Dkt. No. 80, and Hawaiʻi appealed.

Amici States agree with Hawaiʻi that the challenged provisions fit squarely within a long tradition of constitutionally acceptable regulations designed to meet states' responsibility to protect their residents and should not be enjoined. To start, the sensitive places challenged by plaintiffs are consistent with the types of locations that other states have designated as sensitive—designations that limit firearm possession in especially dangerous spaces, around vulnerable populations, and where individuals are exercising other constitutionally protected rights. As in other States, Hawaiʻi's sensitive-place designations protect the public from the heightened risk of gun violence in such locations.

3

Amici States further agree that Act 52's prohibition against the carrying of firearms on private property "unless the person has been given express authorization . . . by the owner, lessee, operator, or manager of the property," Haw. Rev. Stat. § 134-E(a), (c), does not burden anyone's Second Amendment rights.[1] Instead, it *protects* property owners' rights by allowing them to make an informed decision about whether and how firearms are brought on their property, and it does so by setting an easily altered presumption. This approach also accords with laws adopted by other states. Although state measures vary in form, they collectively demonstrate that setting presumptions for the carrying of firearms onto private property is well within states' traditional regulatory role.

## ARGUMENT

### I. The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence.

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried. *See Bruen*, 142 S. Ct. at 2145; *Heller*, 554 U.S. at 626-27. Act 52 is one in a long line of state regulations designed to make gun possession and use safer for the public, and it is a lawful exercise of Hawaiʻi's regulatory powers.

---

[1] Though the provision applies to private property whether it is open or closed to the public, the district court's injunction applies only to private property that is open to the public. *Wolford*, 2023 WL 5043805, at *2.

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). Enacting measures to promote public safety—particularly those that are tailored to local circumstances—falls squarely within the reasonable exercise of states' police powers. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed states' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*, 554 U.S. 570, *McDonald*, 561 U.S. 742, and *Bruen*, 142 S. Ct. 2111—the Court expressly acknowledged the important role states play in setting their own local policies to minimize the risk of gun violence, a role consistent with our Nation's historical tradition.

In *Heller*, the Court made clear that the Second Amendment right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although states may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens on the Second Amendment right, they still possess "a variety of

tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. *Id.* at 636. States may, for example, implement measures prohibiting certain groups of people from possessing firearms, and they may "forbid[] the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626-27.

The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785; *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute."). Recognizing that "conditions and problems differ from locality to locality," *id.* at 783, the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment," *id.* at 785 (brackets and internal quotation marks omitted).

The Court reaffirmed these principles in *Bruen*. It explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). And, building on *Heller*, the Court "assume[d] it settled" that prohibiting firearms in certain sensitive locations (including "schools and government buildings," "legislative assemblies, polling places, and courthouses"), as well as

6

analogous "new" sensitive locations, is constitutional. *Id*. at 2133. Indeed, the Court emphasized, the Second Amendment should not be understood to protect the "'right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id*. at 2128 (quoting *Heller*, 554 U.S. at 626-27).

These decisions make clear that states retain the power to enact laws to protect their residents and that those laws need not be uniform: states are free to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations appropriately and effectively address the specific circumstances in each state. *McDonald*, 561 U.S. at 785. In other words, as the Court stressed in *Bruen*, the Second Amendment is not a "regulatory straitjacket." 142 S. Ct. at 2133. On the contrary, states are permitted to enact a wide range of firearm regulations. *See id*. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

Nor must these state laws be frozen in time. In *Bruen*, for example, the Court instructed courts to "use analogies" to long-recognized sensitive places—such as schools and government buildings—to "determine [whether] modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." 142 S. Ct. at 2133-34; *see Heller*, 554 U.S. at 627 n.26 (noting that a list of "presumptively lawful regulatory measures," including

7

restrictions on firearms in schools and government buildings, contains only "examples" and is not "exhaustive").

In short, although the Supreme Court has defined the outer bounds of permissible regulations, it did not "abrogate" states' "core responsibility" of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. States retain not only the freedom, but also the fundamental responsibility, to implement reasonable measures designed to respond to the needs of their communities and to protect their residents from the harms associated with gun violence.

## II. Consistent With Regulations Adopted By Other States, Hawaiʻi's Designation Of "Sensitive Places" Protects Uniquely Vulnerable Locations And Populations.

As the Supreme Court has consistently recognized, the right to "bear" firearms in public has long been understood to permit restrictions on bearing arms in "sensitive places." *Heller*, 554 U.S. at 626; *see Bruen*, 142 S. Ct. at 2133 (reaffirming that in sensitive places, "arms carrying [can] be prohibited consistent with the Second Amendment"). Because people "can preserve an undiminished right of self-defense by not entering [such] places" or by "taking an alternate route," *United States v. Class*, 930 F.3d 460, 465-66 (D.C. Cir. 2019) (internal quotation marks omitted), laws restricting firearms in places identified as sensitive "neither

prohibit nor broadly frustrate any individual from generally exercising his right to bear arms," *Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J., dissenting). "[S]ensitive places" thus are "in effect exempt . . . from the Second Amendment." *Bruen*, 142 S. Ct. at 2133-34; *see* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 215 (2018) ("[T]he sensitive places doctrine is an exception to the general right to bear arms.").

Hawaiʻi's designation of various locations as sensitive places—including parks and beaches, the parking areas associated with government buildings, establishments where alcohol is consumed, and financial institutions—is a reasonable and appropriate response to the heightened risk associated with the presence of firearms in such locations. Without the power to institute such restrictions, Hawaiʻi and other states would be left unable effectively to prevent gun violence in particularly dangerous places, around vulnerable populations, or where individuals are exercising other constitutionally protected rights, putting the public at risk.

*First*, states frequently restrict the use of firearms in certain dangerous places where volatile conditions create special risks to health and safety. For example, states have designated areas as sensitive places to preserve order and diminish the risk of panic in crowded locations. *See* Carina Bentata Gryting & Mark Frassetto,

*NYRSPA* v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) ("The number of potential targets" and "the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place"). In bars, restaurants, beaches, and parking lots, firearm use is likely to end in tragedy—not only for the innocent bystanders who may be shot, but also for others who may be crushed or trampled by a panicked crowd. *See, e.g.*, Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022);[2] Tyler Fedor *et al.*, *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022) (noting that nine people were shot and five others were injured in the stampede that ensued during the gunfire).[3]

Likewise, when individuals consume alcohol—which impairs both judgment and dexterity—the risk of either accidental or intentional use of firearms increases. *See* David Hemenway *et al.*, *Gun Use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263, 266 (2000) ("Regular citizens with guns, who are sometimes tired, angry, drunk or afraid, and who are not trained in dispute resolution or when it is proper to use a firearm, have many opportunities for

---

[2]    *Available at* https://tinyurl.com/2xeuc7fj.

[3]    *Available at* https://tinyurl.com/5n8y2w62.

inappropriate gun use.").[4]  Physical jostling and emotional frustration are also not uncommon in spaces like bars and restaurants.  The presence of firearms would only make these situations more dangerous.  Indeed, given the "weapons effect," wherein the presence of a weapon intended to shoot human targets primes individuals to think and act more aggressively, allowing firearms in these spaces would make violence even more likely.  *See* Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018).[5]

Allowing firearms to be carried in certain locations can also jeopardize the effective operation of those locations.  The discharge of a firearm in—or in a parking lot adjacent to—a bank or government building could cause a costly and inconvenient shut-down, disrupting essential services.  And even the perceived risk of gun violence could cause social and economic repercussions, as individuals may be discouraged from visiting crowded or confined locations where they know others may be armed.  *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 141 (2021) ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping,

---

[4]     *Available at* https://tinyurl.com/3vnx7uc7.

[5]     *Available at* https://tinyurl.com/5ypudyhd.

going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.").

*Second*, designating parks, beaches, and similar locations as sensitive places helps protect particularly vulnerable populations, like children and their caretakers. Such individuals cannot easily defend themselves or escape a violent attack, should one occur. And even if they are not physically harmed by firearms, exposure to such violence can cause psychological harm. *See* Heather A. Turner *et al.*, *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881, 888 (2019) (finding that indirect exposure to gun violence, including witnessing violence or hearing gunshots, can be traumatic to children).[6] Indeed, both federal and state courts have recognized that the regular presence of children and other vulnerable people in a particular location is a strong indication that it is properly deemed sensitive for Second Amendment purposes. *See, e.g.*, *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (holding that "GMU is a 'sensitive place'" because it "is a school" with many students "under the age of 18," including "elementary and high school students" in the summer); *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) ("The [Supreme] Court listed schools and government

---

[6]      *Available at* https://tinyurl.com/ymn9jzf6.

buildings as examples[ of sensitive places], presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children).").

*Third*, states frequently designate sensitive places to protect the exercise of other constitutional rights. The Supreme Court has recognized that areas in which constitutionally protected activities occur, such as courthouses, polling places, and legislative assemblies, are quintessential examples of sensitive places. *See Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626-27. Firearms may be prohibited in these locations because of the risk that violence could threaten key government functions. The D.C. Circuit, for example, held that a parking lot near the Capitol could be designated a sensitive place because it enabled staffers to safely travel to and from their work operating the national legislature. *See Class*, 930 F.3d at 464. The same reasoning applies to areas—like public parks—in which individuals engage in other constitutionally protected activities, such as speech and political engagement. Not only are these locations often targets of violence, but the mere presence of firearms (and the implicit threat they communicate) could chill individuals' peaceful exercise of their rights. *See* Blocher & Siegel, *supra* at 141.

Given the importance of sensitive-place designations in protecting public safety, states have long exercised their authority to restrict firearms in sensitive locations similar to those challenged here. For instance, many states have enacted restrictions on carrying firearms in public and state parks, *see, e.g.*, N.Y. Penal Law

13

§ 265.01-e(2)(d); Minn. Stat. § 97A.091, subd.1(1); Cal. Code. Regs. tit. 14, § 4313, or on wildlife preserves, *see, e.g.*, Mont. Code Ann. § 87-5-401(1); N.D. Cent. Code § 20.1-11-13(3). Other states restrict carrying in banks, *see, e.g.*, Neb. Rev. Stat. § 28-1202.01; Mich. Comp. Laws Serv. § 750.234d(1), and in the parking lots of government buildings, *see, e.g.*, Okla. Stat. Ann. tit. 21, § 1277(B)(1); 430 Ill. Comp. Stat. 66/65(a)(3). And, in total, at least eighteen jurisdictions have passed laws restricting the carry of firearms in establishments primarily serving alcohol.[7]

The fact that the list of locations designated as sensitive may vary from state to state reflects both the need to tailor such designations to the specific characteristics of each community and a shared concern with minimizing the risk of gun violence. *See* FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) (noting that a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, the size of the youth population, poverty level, job availability, modes of transportation, climate, and cultural

---

[7]    *See* Alaska Stat. § 11.61.220(a)(2); D.C. Code § 7-2509.07(a)(7); Fla. Stat. § 790.06(12)(a)(12); Md. Code Ann., Crim. Law § 4-111(e); Ky. Rev. Stat. § 244.125(1); Mich. Comp. Laws Serv. § 28.425o(1); Miss. Code Ann. § 45-9-101(13); Mo. Rev. Stat. § 571.107.1(7); Mont. Code Ann. § 45-8-328(c); 2022 AB 4769 (amending N.J. Stat. § 2C:58-4.6); N.Y. Penal Law § 265.01-e(2)(o); Neb. Rev. Stat. § 28-1202.01; N.D. Cent. Code § 62.1-02-04; Okla. Stat. Ann. tit. 21, § 1272.1; S.C. Code Ann. § 16-23-465; Tex. Penal Code § 46.03(a)(7); Wash. Rev. Code Ann. § 9.41.300(1); Wyo. Stat. § 6-8-104(t)(vii).

characteristics).[8]  While firearms restrictions vary based on local conditions and needs, they collectively demonstrate that Hawaiʻi's law is precisely the kind of regulation that states have traditionally adopted to address the particular concerns associated with carrying firearms in sensitive places.

## III.  Hawaiʻi's Private-Property Provision Reflects A Reasoned Policy Decision About How Best To Protect Public Safety And The Rights Of Property Owners.

Act 52's private-property provision, which prohibits carrying arms on private property without the property owner's express permission, is also constitutionally valid.  In adopting a default rule that firearms are not allowed on private property without express permission, Hawaiʻi has chosen an approach that is tailored to the needs and characteristics of its community.  This rule is in line with the national consensus on such default rules, and it reflects the interest of landowners in protecting public safety and preventing gun violence on their property.  It also fits comfortably within the longstanding practice of states across the country, which have set similar presumptions for carrying firearms on private property.

### A.  The private-property provision does not implicate Second Amendment rights because it merely sets a default rule.

The Second Amendment does not confer a right to carry firearms on another person's private property without their consent.  *See GeorgiaCarry.Org, Inc. v.*

---

[8]  *Available at* https://tinyurl.com/2s3k6dxh.

*Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) (noting that the Second Amendment "does not include protection for a right to carry a firearm [on private property] against the owner's wishes"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Rather, when the Amendment was adopted, it incorporated longstanding principles of "property law, tort law, and criminal law" that recognized a private property owner's right to determine who may enter and whether they may be armed. *Id.* In light of these underlying principles, the Second Amendment was never understood to extend to private property on which the owner wished to exclude firearms. Hawai'i's private-property provision, which affirms property owners' decisions about whether to allow public carrying on their property, thus does not interfere with any Second Amendment rights.

Instead, Hawai'i's law merely regulates how property owners communicate their consent and clarifies the inference that can be drawn from a property owner's silence, setting a constitutionally permissible default rule. *See GeorgiaCarry.Org, Inc.*, 687 F.3d at 1264 ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right."). For instance, property owners in Hawai'i may communicate "express authorization" simply by posting signage at the entrance to their property. Haw. Rev. Stat. § 134-E(b)(2). This approach protects property owners' authority to make their own

16

decisions about whether to allow firearms on their grounds and ensures they have the information they need to make an informed choice. It neither predetermines whether firearms will be barred on private property nor impairs the right to carry a firearm for self-defense. Accordingly, the private-property provision falls outside the ambit of the Second Amendment. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.").

The district court's conclusion to the contrary is based on the flawed view that the private-property provision "remove[s] the presumption of the right to carry a firearm on private property held open to the public." *Wolford*, 2023 WL 5043805, at *27. But this reasoning misunderstands the operation of default rules. Default rules "govern parties in the absence of some explicit contrary agreement or altering action." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 183 (Winter 2020).[9] Because individuals can change or opt out of defaults like the challenged provision, it is "unrealistic" to view them "as being 'imposed upon' the parties." Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821, 865 (1992).[10] Rather, "one's silence in the face of default rules that

---

[9]    *Available at* https://tinyurl.com/bde2ab76.

[10]    *Available at* https://tinyurl.com/ytyztxsf.

one can change constitutes consent to the application of" rules like Hawaiʻi's. *Id.* at 906.

**B.    Property owners have good reason to prefer a default rule that bars firearms without explicit permission.**

Hawaiʻi's default rule also reflects the national consensus on default rules governing the carry of firearms on private property. In a national survey, a majority of respondents expressed support for a "no carry" default rule for residences, places of employment, and retail establishments. *See* Ayres & Jonnalagadda, *supra* at 186. Given these preferences, the private-property provision is an efficient policy choice, minimizing transaction costs by eliminating the need for most property owners to contract around the default (while leaving others free to allow firearms if they wish). *Id*. at 183.

Indeed, many property owners have good reason to prefer the default rule set by Hawaiʻi. Numerous privately owned locations have characteristics that make the presence of firearms more dangerous, similar to traditional "sensitive places," and property owners may share the concerns that motivate states to restrict firearms in such locations. *See supra* Section I. For instance, many places covered by the private-property provision, such as shopping malls and grocery stores, are crowded and confined spaces in which the presence of firearms poses a particular risk to public health and safety. In addition, a variety of places, including stores and fast-food restaurants, are frequented by vulnerable populations like children, whom

property owners may want to protect. And some private spaces may also be the site of constitutionally protected activity, which a property owner might fear will be disrupted by the presence of firearms. For example, political meetings and conventions often take place in private offices or business conference centers. Given these concerns, a property owner could reasonably determine that allowing firearms would be too dangerous or otherwise undesirable.

Thus, even though privately owned spaces may not be designated as sensitive places per se, private property owners may share the same concerns that motivate states to restrict firearms in those locations. Property owners may also have important reasons of their own to want to restrict firearms on their property. Setting a default rule that bars firearms on private property without the property owners' express permission respects the preferences of the majority of owners without precluding others from making a different decision, and in doing so fosters clarity for members of the public. It is a sensible and efficient measure that does not interfere with the rights of property owners to decide whether to exclude, or to allow, firearms on their property.

### C. Other states have adopted similar presumptions for the carry of firearms on private property.

Like Hawai'i, other states have made the policy choice to set a default rule for the carrying of firearms on private property. While the default rules in different locations vary based on local needs and conditions, Hawai'i's choice fits squarely

within the longstanding tradition of states regulating how and when private property owners exercise their right to exclude firearms.

Several states have enacted laws that, like Hawai'i's, provide that individuals may not carry a firearm onto another person's property without that person's express permission. For example, Connecticut provides that assault weapons may only be carried "on property owned by another person with the owner's express permission." Conn. Gen. Stat. § 53-202d(f)(1). And Alaska and Louisiana, among others, provide that a person may not carry a concealed weapon into the residence of another person without the express consent of someone who lives there. Alaska Stat. § 11.61.220(a)(1)(B); La. Rev. Stat. Ann. § 40:1379.3(O) ("No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the consent of that person."); *see* D.C. Code § 7-2509.07(b)(1) (providing that the carrying of a concealed pistol "on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner . . . and communicated personally to the licensee in advance of entry onto the residential property"); S.C. Code Ann. § 23-31-225 ("No person . . . may carry a concealable weapon into the residence or dwelling place of another person without the express permission of the owner or person in legal control or possession, as appropriate.").

Other states have flipped the presumption. Arkansas, for instance, sets a default that firearms are allowed in others' homes without express consent, but it requires that anyone who carries a concealed handgun into such a dwelling also notify the occupant. Ark. Code Ann. § 5-73-306(18). And Nebraska allows a permitholder to carry a concealed handgun "anywhere in Nebraska," excepting private property on which "the person, persons, entity, or entities in control of the place or premises or employer in control of the place or premises has prohibited the carrying of concealed handguns into or onto the place or premises." Neb. Rev. Stat. § 28-1202.01; *see also* 430 Ill. Comp. Stat. 66/65(a-10) (explaining that the owner of private real property may prohibit the carrying of concealed firearms on the property); Tex. Penal Code §§ 30.05(c), 30.06, 30.07 (criminalizing the open or concealed carry of a handgun on the property of another if the licensee does not have the owner's consent and has received notice that carry is forbidden); Va. Code Ann. § 18.2-308.01(c) (noting that a concealed handgun permit does not authorize possession of a handgun "in places where such possession . . . is prohibited by the owner of private property").

Similarly, states have created default rules for firearm-related activities on private property. For example, 25 states require that hunters obtain permission before entering private property. Ayres & Jonnalagadda, *supra* at 184. And again, other states have chosen the inverse default. Vermont, for example, requires that a

21

property owner who wishes to ban hunting post signs around their property line. Vt. Stat. Ann. tit. 10, § 5201; *see also* Me. Stat. tit. 17-A, § 402 (requiring that a property owner who wants to exclude individuals indicate that access is prohibited, either in general or for a specific activity like hunting).

In addition to setting default rules for carrying firearms on private property, several states have adopted detailed requirements regulating how a private property owner should communicate whether she allows firearms on her property. Texas, for example, requires that a notice prohibiting the carry of firearms use certain language, be posted conspicuously in both English and Spanish, and use print in contrasting colors with block letters at least one inch in height. Tex. Penal Code §§ 30.05(c), 30.06, 30.07. Kansas similarly regulates "the location, content, size and other characteristics" of signs barring firearms on private property, Kan. Stat. Ann. §§ 75-7c24, 75-7c10, as does Illinois, *see* 430 Ill. Comp. Stat. 66/65(d) (requiring that signs prohibiting firearms be conspicuously posted at building's entrance, meet design requirements established by state police, and be four by six inches in size).

In short, Hawai'i's private-property provision reflects the legislature's reasoned policy determination about how best to set the default rule for carrying firearms on private property and how property owners should communicate their decision about whether to exclude such weapons. Although this provision is not identical to provisions adopted by other states, it is similarly informed by and

tailored to local conditions and the needs of residents. The law therefore fits comfortably within both the longstanding practice of other states and the bounds of the Second Amendment.

## CONCLUSION

The Court should reverse the decision below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE[*]
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

October 2023

KWAME RAOUL
Attorney General for the State of
Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
sarah.hunger@ilag.gov

---

[*] The undersigned would like to thank law clerk Russell C. Bogue for his invaluable assistance in authoring this brief.

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes
Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty St.
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA  17120

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

EDWARD E. MANIBUSAN
*Attorney General*
*Commonwealth of the*
*Northern Mariana Islands*
Caller Box 10007, Capitol Hill
Saipan, MP 96950

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 12, 2023, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Ninth Circuit Rules 27-1 and 32-3(2) because it consists of 5,209 words, excluding the documents listed at Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f). This brief complies with the typeface and the type-style requirements of Federal Rule of Appellate Procedure 27 because it has been prepared in a proportionally spaced typeface using 14-point font.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE