No. 23-16164

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JASON WOLFORD, et al.,

*Plaintiffs-Appellees*,

*v.*

ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Hawaii, No. 1:22-CV-00265
Before the Hon. Leslie E. Kobayashi

**BRIEF FOR PROFESSORS OF PROPERTY LAW AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

SIMON B. KRESS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6711

ALAN SCHOENFELD
JOSHUA M. FEINZIG*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 937-7294

*\* Admitted to practice only in Washington, D.C. Supervised by members of the firm who are members of the New York bar.*

October 12, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF AMICI CURIAE .............................................................. 1

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................ 3

I.    HAWAII'S PRIVATE-PROPERTY DEFAULT RULE DOES NOT
IMPLICATE THE SECOND AMENDMENT ........................................... 3

    A.    The Right To Exclude Is Foundational To American Property
Law And Presumes State-Created Default Rules ................................ 4

    B.    A Constitutional Right To Carry A Weapon Onto
Another's Property Would Vitiate The Right To Exclude ................. 10

        1.    There is no constitutional right to carry onto private
property over an owner's objection ........................................ 11

        2.    Neither is there a constitutional right to the presumption
that a private owner welcomes firearms .................................. 15

    C.    Alternative Theories As To How The Rule Implicates
The Second Amendment Likewise Fail ........................................... 18

II.    THE DISTRICT COURT'S ANALYSIS OF *BRUEN* STEP ONE COMMITS
A VARIETY OF LEGAL ERRORS .................................................. 21

    A.    "Public" As Used In *Bruen* Does Not Refer To Private Property ...... 21

    B.    Tying The Second Amendment To The Concept Of "Open"
Private Property Would Be Unworkable And Internally
Contradictory ....................................................................... 26

    C.    The District Court's Attempt To Reconcile The Right To
Exclude With The Right To Carry By Formulating The
Right In Defeasible Terms Fails ................................................. 29

CONCLUSION ............................................................................. 29

CERTIFICATE OF BAR MEMBERSHIP ..................................................... i

CERTIFICATE OF COMPLIANCE .......................................................... ii

CERTIFICATE OF FILING AND SERVICE ................................................. iii

# TABLE OF AUTHORITIES

## CASES

Page

*Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968) ................................................... 16

*Baker v. Howard County Hunt*, 188 A. 223 (Md. 1936) ....................................... 12

*Breard v. Alexandria*, 341 U.S. 622 (1951) ................................................. 8, 14, 20

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ..................................... 2, 4

*Central Hardware Co. v. NLRB*, 407 U.S. 539 (1972) ......................................... 24

*Central Hardware Co. v. NLRB*, 439 F.2d 1321 (8th Cir. 1971) .......................... 16

*Christian v. Nigrelli*, 642 F. Supp. 3d. 393 (W.D.N.Y. 2022) .............................. 11

*College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999) ........................................... 11

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971) ........................................ 14

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ................... 12

*Hudgens v. NLRB*, 424 U.S. 507 (1976) .............................................................. 26

*Kipke v. Moore*, 2023 WL 6381503 (D. Md. Sept. 29, 2023) .............................. 11

*Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972) ........................... 4, 13, 16, 17, 26

*Maguire v. Hilton Hotels Corp.*, 899 P.2d 393 (Haw. 1995) ................................... 5

*Marsh v. Alabama*, 326 U.S. 501 (1946) ........................................................ 13, 16

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ............................................... 20

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) ...................................... 2, 3, 10, 12, 17, 18, 19, 21, 22, 25

*Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988) ................................ 25

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) ............................. 25

*Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*,
    36 U.S. (11 Pet.) 420, 1837 WL 3561 (1837).............................................25

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980)................. 4, 13, 24, 25

*Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970)...............................14

*Schwartz-Torrance Inv. Corp. v. Bakery & Confectionery Workers'*
    *Union, Local No. 31*, 394 P.2d 921 (Cal. 1964) .........................................16

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000)................15

*Shelly v. Kraemer*, 334 U.S. 1 (1948)....................................................................13

*Siegel v. Platkin*, 2023 WL 1103676 (D.N.J. Jan. 30, 2023)..................................11

*Southcenter Joint Venture v. National Democratic Policy Committee*,
    780 P.2d 1282 (Wash. 1989) .......................................................................16

*Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp.
    2d 304 (D. Mass. 2011)................................................................................14

*Spittler v. Charbonneau*, 449 P.3d 1202 (Haw. Ct. App. 2019)..............................6

*Spokeo v. Robins*, 578 U.S. 330 (2016).................................................................25

*State v. Viglielmo*, 95 P.3d 952 (Haw. 2004).........................................................6

*Sutherland v. Southcenter Shopping* Center, 478 P.2d 792 (Wash Ct.
    App. 1970)....................................................................................................16

*Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150
    (2002) ...........................................................................................................20

## STATUTES, RULES, AND REGULATIONS

Borough of Westville, NJ General Legislation (2007)
    § 187-1..........................................................................................................7
    § 187-2..........................................................................................................7

City of Jersey City, NJ Code of Ordinances § 245-7 (1978) ...................................7

Fla. Stat. § 934.50(3)(b) (2022)...............................................................................7

Haw. Rev. Stat.
    § 183D-26 ...................................................................................7
    § 134-E ........................................................................................1
    § 521-70(c) .................................................................................7

## OTHER AUTHORITIES

Ayres, Ian & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183 (Winter 2020) ...................................................... 9, 18, 19, 20, 27

Blocher, Joseph & Darrell A.H. Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295 (2016) ...................................................5

Cooley, Thomas, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* (1879) .........................................26

Ellickson, Robert C., *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623 (1986) ...........................7

The American Heritage Dictionary (4th ed. 2001) .................................24

Black's Law Dictionary (9th ed. 2009) ..................................................24

Black's Law Dictionary (11th ed. 2019) ...............................................23

Merriam Webster's Collegiate Dictionary (11th ed. 2014)....................24

Strahilevitz, Lior Jacob, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835 (2006) .......................................5

## INTEREST OF AMICI CURIAE[1]

Amici curiae are professors specializing in property law. Ian Ayres is Oscar M. Ruebhausen Professor at Yale Law School. Fredrick Vars is Ira Drayton Pruitt, Sr. Professor of Law at University of Alabama School of Law. Professors Ayres and Vars have written extensively on the relationship between property law and firearm regulation, including in their book *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020).

Amici have an interest in the issues implicated by this case, particularly as they relate to the constitutionality of Act 52's private-property default rule codified at Haw. Rev. Stat. § 134-E. Because longstanding principles of property law clarify that an individual's constitutional right to carry ends at another's property line, this Court should find that the default rule does not implicate the Second Amendment.

## INTRODUCTION

The legislative selection of default rules, including whether guns are presumptively permitted on private property, is part and parcel of States' enduring

---

[1] The views of the amici expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification. Pursuant to Federal Rule of Appellate Procedure 29, amici state that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. All parties consent to the filing of this brief.

prerogative to reinforce private owners' right to exclude. This selection does not implicate the Second Amendment's "plain text," *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2129-2130 (2022), because the right to carry is not a right to trespass and thus does not extend beyond another's private property line. Hawaii's private-property default rule, which construes a private owner's silence on the permissibility of firearms as disallowance while preserving the owner's ability to welcome firearms if they so choose, is thus constitutional.

As explained in Part I, the Second Amendment does not guarantee a right to carry onto another's private property over that owner's objection. The owner's right to exclude is "universally held to be a fundamental element of the property right," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), and necessarily encompasses the right to set terms of entry regarding firearms. *Bruen* did not announce a right so sweeping as to displace centuries-old property rights.

And just as there is no individual right to bear arms on another's private property over an owner's objection, neither is there a freestanding constitutional right to a presumption that a private owner welcomes firearms until they say otherwise. Constitutional rights do not operate in such a conditional manner. Were there a right to carry firearms onto another's private property, it would trump an owner's objection—not rise or fall with their preference. Such a sweeping right would vitiate the right to exclude.

As explained in Part II, the district court's approach was flawed. To avoid displacing the right to exclude, the court sought a doctrinal middle ground on two fronts: it diluted the right to public carry from a trump to a presumption, and then extended that presumption to "open" but not "closed" private property by reasoning that "open" private property is a "public" place and thus, according to *Bruen*, equivalent to governmental property from the standpoint of the Second Amendment. But this middle ground lacks constitutional or historical justification. This Court should reject the district court's approach to *Bruen* Step One and uphold the private-property default rule for "open" and "closed" property alike.[2]

## ARGUMENT

## I. HAWAII'S PRIVATE-PROPERTY DEFAULT RULE DOES NOT IMPLICATE THE SECOND AMENDMENT

Under *Bruen*, a court must first ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. 2111, 2129-2130 (2022). Only if the plaintiff has satisfied that inquiry does the burden shift to the government to show that the firearm regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Plaintiffs here have failed to carry their initial

---

[2] Though this brief focuses on the *Bruen* Step One question, amici fully agree with the State's *Bruen* Step Two historical analysis. *See* Appellants' Br. at 52-56. As described by the State, Hawaii's private-property default rule is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, and should thus be upheld if the Court were to reach Step Two.

burden because the right to exclude, which inheres in all private property ownership, forecloses any possibility of extending Second Amendment rights into the private property domain. There is neither a right to carry weapons onto another's property without permission, nor a freestanding right to have an owner's silence on the permissibility of guns construed in the pro-firearms direction. The selection of a default meaning of a private owner's silence is instead left to the States, consistent with their abiding prerogative to reinforce property owners' right to exclude.

### A. The Right To Exclude Is Foundational To American Property Law And Presumes State-Created Default Rules

The right to exclude is "one of the most treasured" rights of property ownership. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). It inheres in all forms of private property, regardless of whether property has been "opened" to the public to serve a commercial function, because property does not "'lose its private character merely because the public is generally invited to use it for designated purposes.'" *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980) (quoting *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 569 (1972)). And it means that private owners retain broad authority over who or what to admit onto their premises, and generally cannot be forced by the State to grant access to unwanted entrants. *See Cedar Point*, 141 S. Ct. at 2080 (a regulation granting a person even momentary access to another's property is a *per se* taking).

- 4 -

But an individual's constitutional right to exclude is not self-actualizing or exercised in isolation.  It is instead nested within a range of criminal, tort, and property laws that effectuate the right by regulating informational exchange between parties, imposing liability on those who violate an owner's terms of entry, and clarifying default rules around which owners and potential entrants can negotiate access.

*First*, States routinely shape how owners make decisions as to whom or what to exclude.  Legislation promoting the disclosure of information by prospective entrants can lower costs associated with the discovery of that information, enabling owners to execute terms of entry that more closely align with their preferences. *See* Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835, 1837-1838 (2006).  Similarly, tort rules imposing liability for wrongdoing or injury arising on an owner's premises can influence owners' decisions to exclude certain forms of behavior.  For instance, a private owner bears a duty to protect guests from foreseeable dangers present on the land or posed by other guests.  *See Maguire v. Hilton Hotels Corp.*, 899 P.2d 393, 396 (Haw. 1995). In the context of firearms possession, such a liability rule may affect owners' decisions to admit guns onto their premises even though it does not explicitly regulate guns as such.  *See* Blocher & Miller, *What Is Gun Control? Direct*

*Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 298 (2016).

*Second*, States have long enforced private exclusion decisions through the law of trespass. Trespass statutes peg an entrant's lawful status to the informed consent of the private owner, enabling owners to enforce their chosen terms of entry with the backing of the State's criminal sanction. *See, e.g.*, *State v. Viglielmo*, 95 P.3d 952, 955 (Haw. 2004) (upholding criminal trespass conviction of defendant who refused to stop peacefully protesting in a private shopping center). Civil trespass similarly reinforces an owner's chosen terms by empowering owners to demand compensation for unlawful entry. *See Spittler v. Charbonneau*, 449 P.3d 1202, 1208 (Haw. Ct. App. 2019).

*Third*, a private owner's right to exclude is enforced through default rules fashioned by State legislatures and courts. Default rules codify presumptions about an owner's terms of entry that govern unless the owner states otherwise. As such, every State has—and must have—default rules stipulating whether the absence of common signifiers of exclusion (*e.g.*, a physical fence) communicates consent to enter. States have also long adopted and reformulated default rules calibrated to specific activities. For example, most States over the course of the nineteenth century reversed the default rule as to whether domesticated cattle were permitted to graze on another owner's land, thereafter placing the burden on the

visiting rancher to obtain that owner's consent. *See* Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623, 660-661 & n.95 (1986). Realigning default rules with the needs and preferences of owners continues to be a critical means by which States support the integrity of private property. *See, e.g.*, Haw. Rev. Stat. Ann. § 183D-26 (2019) (prohibiting hunting on private property without the owner's consent); Borough of Westville, NJ General Legislation § 187-1, -2 (2007) (prohibiting graffiti on private property without owner's consent); Haw. Rev. Stat. Ann. § 521-70(c) (2019) (prohibiting tenant from using unit for a commercial purpose without owner's consent); City of Jersey City, NJ Code of Ordinances § 245-7 (1978) (prohibiting solicitation on private property without owner's consent); Fla. Stat. § 934.50(3)(b) (2022) (prohibiting drones over private property without owner's consent).

The significant variation in default rules, across American history and between the fifty States, makes evident that default rules are not and have never been fixed by the federal Constitution. This flexibility is understandable considering that default rules do not *ban* private behavior—they simply establish baseline terms from which owners can easily depart. It is also understandable considering that the regulation of private property is generally left to the States.

Indeed, States have always been free to tailor default rules to the expectations and preferences of private owners in order to reduce opt-out costs (thereby producing more efficient arrangements) and to better ensure that the flow of people and objects onto an owner's property is backed by the owner's informed consent. The Supreme Court recognized this very point in *Breard v. Alexandria*, 341 U.S. 622 (1951), a decision upholding a municipal default rule that disallowed door-to-door solicitation (a constitutionally protected activity) unless a private owner expressly consented. The Court understood that the City's selected default, rather than its opposite, made it more likely that owners would have their preferred terms of entry enforced: "A householder depends for protection on his city board rather than churlishly guarding his entrances with orders forbidding the entrance of solicitors. A sign would have to be a small billboard to make the differentiations between the welcome and unwelcome that can be written in an ordinance once cheaply for all homes." *Id.* at 640.

Hawaii's shift from a "yes-carry" to a "no-carry" default was driven by a similar concern: that guns are being brought onto private property without informed consent from landowners. For one, there has been widespread public misunderstanding about the state of the law across the Ninth Circuit and the country at large. Nearly 80 percent of respondents drawn from across the country in one nationwide study answered "I don't know" in response to the question of

whether a plumber is allowed to bring a gun without explicit permission into one's home, as did over 70 percent in response to whether a friend is allowed to bring a gun without permission into one's home, and over 65 percent in response to whether customers are allowed to bring guns without permission into private businesses. Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, tbl.A5 (Winter 2020).[3] And the small number of respondents who thought they knew the law were often mistaken—for instance, these respondents were nearly evenly split on the question of whether customers are presumptively allowed to bring guns into private businesses. *Id.* The upshot of this confusion has been that owners who prefer not to have concealed guns on their properties are often unknowingly permitting them. Moreover, the "yes-carry" default raises a host of monitoring anxieties for landowners, who have reason to fear that some carrying visitors will fail to notice "no firearms" signs and surreptitiously carry inside. Landowners may also reasonably fear that posting "no firearms" signs, even if reflective of their

---

[3] The Ayres study also breaks down the response data by State. *See id.* tbl.A5. Of the 2000 individual respondents, only 5 were from Hawaii. Though the Hawaii sample size is too small to draw precise conclusions about Hawaii in particular, there is no reason to believe that Hawaii diverges from national or regional rates.

underlying preferences, would lead potential criminals to infer that the owner is unarmed and the property vulnerable.

Given these circumstances, the "yes-carry" default is not just bad policy; it also imperils the right to exclude and its foundational status within our legal system. But the "no carry" default enhances the possibility of meaningful informed consent between landowner and entrant, thus bolstering the integrity of property ownership.

## B. A Constitutional Right To Carry A Weapon Onto Another's Property Would Vitiate The Right To Exclude

As a default rule, the private-property rule does not ban the carrying of firearms onto another's private property; it recasts the meaning of a private owner's silence on the issue. Because Plaintiffs bear the burden of demonstrating that "the Second Amendment's plain text covers [their] conduct," they must demonstrate that the act of carrying a gun onto another's property without first obtaining that owner's permission—the "conduct" encumbered by the rule—is "cover[ed]" by the plain text. *Bruen*, 142 S. Ct. at 2129-2130. For that to be so, one of the following two propositions must be true: either the Second Amendment provides a right to carry that trumps the objections of private owners, or the Second Amendment provides a standalone right to a rebuttable presumption that a private owner welcomes firearms until they state otherwise. Both propositions fail.

### 1. There is no constitutional right to carry onto private property over an owner's objection

Recognizing a constitutional right to carry onto another owner's property over their objection would be an unprecedented abrogation of the owner's right to exclude—the "hallmark of a protected property interest." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999). Such a public carry right would bar private owners from leveraging the law of trespass to keep firearms off their property. Understandably, this formulation of the right has been rejected by every court to address the relationship between the Second Amendment and private property after *Bruen*.[4]

To start, nothing in *Bruen* indicates that the public carry right extends onto another's private property. Construing *Bruen*'s use of the word "public" to include private property, even if limited to property open to the public, is at odds with basic tenets of our constitutional tradition. In codifying a pre-existing common-

---

[4] Every court to consider the constitutionality of private-property default rules has rejected the notion that the Second Amendment constrains owners from excluding firearms. *See, e.g.*, *Siegel v. Platkin*, 2023 WL 1103676, at *16 (D.N.J. Jan. 30, 2023) ("[T]he Second Amendment does not include protection for a right to carry a firearm in a place … against the owner's wishes."); *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407 (W.D.N.Y. 2022); *Kipke v. Moore*, 2023 WL 6381503, at *12 (D. Md. Sept. 29, 2023). Like the district court below, these courts have instead formulated the public carry right as a right to a *presumption* that an owner welcomes firearms *until they say otherwise*. But that formulation fails for a host of reasons, which become evident once the defects in this first formulation are appreciated. *See infra* Section I.B.2.

law right, the Second Amendment "did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights," including an "owner's exclusive right to be king of his own castle." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2111. Rather, the right was understandably circumscribed by the common law of trespass, which predated the Second Amendment and reflected an expansive right to exclude without any special carve-out for firearms. *See, e.g.*, *Baker v. Howard Cnty. Hunt*, 188 A. 223, 227-228 (Md. 1936) (surveying the history of "the relative rights of fox hunters" and finding "no doubt that … if the hunter himself goes on the lands of another against the owner's will, he is a trespasser").

The historical absence of any firearms-related exception to the right to exclude reflects the more general relationship between an owner's right to exclude and the rights of non-owners. Put simply, an entrant's constitutional rights *have virtually no bearing on another's use of their private property.* Amici are aware of only two potential instances where a private owner's use of their property has been constrained by the constitutional rights of non-owners: the enforcement of racially restrictive covenants and restrictions on street expression in company towns. But neither offers a rationale relevant to the Second Amendment.

- 12 -

In *Shelly v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court prohibited the judicial enforcement of a racially restrictive covenant because the "[t]he owners of the properties were willing sellers" and that "but for the active intervention of the state courts, … petitioners would have been free to occupy the properties in question without restraint." *Id*. at 19. In other words, *Kraemer* did not concern the owners' right to exclude; it instead pitted the sellers' common-law right to disposition of the property and the buyers' constitutional right to equal treatment against the rights of the other neighborhood residents to enforce the covenant. That property rights were involved on both sides of the ledger makes it additionally difficult to isolate the role of the equal-protection right in the Court's analysis.

*Marsh v. Alabama*, 326 U.S. 501 (1946)—which held that a company maintaining complete ownership over an Alabama town was barred by the First Amendment from forbidding street distribution of religious materials—is similarly inapposite. The Court later limited *Marsh*'s reach to the company towns of the past, having recognized that "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned." *Lloyd Corp.*, 407 U.S. at 568; *see PruneYard*, 447 U.S. at 81 ("[W]hen a shopping center owner opens his private property to the public for purpose of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression."). Entrants thus do not have rights of

expression on private property, regardless of whether the property is "open" or "closed" to the public. That remains true even though, of course, the text of the First Amendment—like that of the Second Amendment—does not draw an explicit distinction between public and private property.

Other First Amendment rights likewise end at the private property line, regardless of whether the property is "open" or "closed." *See, e.g.*, *Rowan v. U.S. Post Office Department*, 397 U.S. 728, 737-738 (1970) (holding that "[t]he asserted [First Amendment] right of a mailer [to send unwanted material to an unreceptive addressee] … stops at the outer boundary of every person's domain" because "[t]o hold less would tend to license a form of trespass"); *Breard*, 341 U.S. at 645 (upholding a municipality's no-solicitation default rule because "[i]t would be … a misuse of the great guarantees of free speech and free press to … force a community to admit the solicitors of publications to the home premises of its residents"); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment [right to newsgathering] is not a license to trespass[.]"); *Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304, 313 (D. Mass. 2011) (rejecting a defense to trespass based in the right to religious exercise).

In short, a private owner's fundamental control over their dominion means that they can prohibit firearms, just as they can prohibit handbill distributors,

association members, newsgathering journalists, or religious observers.  Had the Court in *Bruen* wished to upset the constitutional status of the right to exclude and private property at large, it would have said so.  *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

### 2.    Neither is there a constitutional right to the presumption that a private owner welcomes firearms

Plaintiffs argue that there is a constitutional right to a *presumption* to carry onto another's private property in the face of an owner's silence even if there is no *per se* right to carry onto another's property over the owner's opposition.  The district court reached a similar conclusion to its *Bruen* Step One analysis by reasoning that a commercial property owner can revoke an entrant's implied invitation to carry if the owner so chooses (*e.g.*, by posting a sign), even though the right to carry extends onto commercial property and thus bars the State from construing an owner's silence in the no-firearms direction.  *See* 1-ER-0081; *see also infra* Section II.C.  But this *presumption* formulation is analytically and doctrinally unworkable.

At the outset, nothing in the Supreme Court's constitutional jurisprudence suggests that an individual right can exist in the partial or defeasible form of a rebuttable presumption conditioning exercise on the permission of another individual.  If there truly were a right to carry onto private property, "open" or

otherwise, that *would* be a right to carry *against an owner's wishes*. Consider the brief historical period after *Marsh*, 326 U.S. 501, when the Court temporarily suggested that First Amendment rights can extend onto private commercial property in special circumstances. Before the Court reversed course and foreclosed any such possibility in *Lloyd Corporation v. Tanner*, 407 U.S. 551 (1972), it treated this right to free expression on private property as a *trump*—not a mere entitlement to a presumption in the pro-expression direction. That right supplied a constitutional defense to trespass actions and thereby prevented owners from invoking trespass laws to exclude unwanted forms of expression. *See Marsh*, 326 U.S. at 501 (overturning a criminal trespass conviction); *Amalgamated Food Emps. Union Loc. 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 319 (1968), *overturned by Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) (prohibiting the use of trespass laws "to exclude those members of the public wishing to exercise their First Amendment rights on the premises").[5] So too here: If this Court were to

---

[5] State courts and the lower federal courts similarly treated that right as a trump—never as a mere presumption—during this period. *See, e.g.*, *Schwartz-Torrance Inv. Corp. v. Bakery & Confectionery Workers' Union, Loc. No. 31*, 394 P.2d 921, 922 (Cal. 1964) (prohibiting an owner from enjoining as trespass a union protest); *Sutherland v. Southcenter Shopping Center*, 478 P.2d 792, 793 (Wash Ct. App. 1970) (holding that "unconsented invasion of the property rights of owners … to solicit signatures for an initiative is protected"), *overruled by Southcenter Joint Venture v. National Democratic Policy Committee*, 780 P.2d 1282 (Wash. 1989); *Central Hardware Co. v. NLRB*, 439 F.2d 1321, 1328 (8th Cir. 1971) (holding that solicitation on company premises in violation of employer's explicit

recognize a right to carry onto another's property, that right would likewise prevent owners from invoking trespass laws to exclude unwanted firearms.

The *presumption* formulation is further belied by *Bruen*'s command that Second Amendment rights be treated as trumps not subject to means-end scrutiny or balancing analysis. The Court was clear that *Heller* and *McDonald* "expressly rejected the application of any 'judge-empowering' interest-balancing inquiry." *Bruen*, 142 S. Ct. at 2129, 2130. Courts are thus not free to balance the purported right to carry onto private property against the owner's right to exclude firearms, with the aim of fashioning a presumption that stops short of a trump. Instead, considering that a Second Amendment right *where it does apply* is not to be modulated by competing individual rights and societal demands, lower courts must be extraordinarily careful to define the Second Amendment's initial scope without displacing other constitutional guarantees. Here that means rejecting the notion that the right to carry extends onto private property.

Moreover, imaginatively recasting the right as a presumption hardly salvages the right to exclude. In theory, owners with sophisticated legal knowledge might appreciate the need to affirmatively announce their opposition to firearms in a world where an unwritten constitutional presumption exists over their

_____

prohibition was protected), *vacated by Lloyd Corporation v. Tanner*, 407 U.S. 539 (1972).

property. But the widespread expectation that silence *does not* confer an implied license to bring firearms into one's home or business makes it unlikely that most owners seeking to exclude firearms will take an action necessary to override the presumption. *See* Ayres & Jonnalagadda, *Guests with Guns*, *supra*, tbl.A5. A constitutionalized presumption, like the *per se* formulation of the right, thus displaces owners' expectations and intentions regarding the uses of their property.

## C. Alternative Theories As To How The Rule Implicates The Second Amendment Likewise Fail

Even accepting that there is neither a right to carry onto another's private property over an owner's objection nor a right that identifies an owner's silence with affirmative consent, Plaintiffs may try to argue that the rule encumbers the right to carry because it may have the effect of reducing carry rates (*i.e.*, gun owners seeking to enter a mix of public and private properties in a day may personally decide to leave their guns at home). But any such "effects" theory of the Second Amendment is untenable.

*First*, aside from the Supreme Court's passing references to potential as-applied challenges to "shall-issue" licensing regimes that in practice operate as "may-issue" regimes, *see Bruen*, 142 S. Ct. at 2138 n.9; *id*. at 2162 (Kavanaugh, J., concurring), nothing in either *Heller* or *Bruen* indicates concern for a statute's downstream effects on ownership or carry rates. In fact, concern over a law's

indirect impact on protected conduct is characteristic of the means-end analysis emphatically rejected in *Bruen*. *See id.* at 2129.

*Second*, an effects theory would sweep whole swaths of State regulation into the Second Amendment context. Countless laws and regulations—including those that facially have nothing to do with firearms, like basic tort or criminal liability for injuries caused by accidental discharges—have significant, if not comparatively greater, disincentivizing effects. *See supra* Section I.A. Even a general criminal-trespass statute in combination with the old default rule (a "yes-carry" default) has a substantial disincentivizing effect, as countless storekeepers and landowners will continue to prohibit guns by leveraging trespass liability under either default rule. A criminal statute that prohibits the carrying of firearms over an owner's express objection would similarly have a significant disincentivizing effect and would likely be unconstitutional under such an "effects" theory.

*Third*, even if effects were to matter constitutionally, the relevant measurement is the reduction in carrying caused by owners who want to permit visitors to carry guns but for some reason fail to contract around the "no-carry" default. But the size of this effect is likely limited given the broad support for a "no carry" default. *See* Ayres & Jonnalagadda, *supra*, at 187-189, tbl.A4 (finding that only 27.8% of national respondents said that a plumber should be allowed to bring a gun onto one's premises without express permission, only 32.1% said that a

visiting friend should be allowed to bring a gun without express permission, and only 44.2% said that a customer should be allowed to bring a gun onto commercial property without express permission).

In a separate vein, Plaintiffs may suggest that the *Heller* right to possess guns on one's *own* property is implicated because the provision will purportedly impede owners' ability to invite guns onto their premises. But the rule in no way restricts an owner's choice to admit gun-carrying entrants. And as described above, the new rule is far less likely to effectuate a choice contrary to owners' preferences. *See* Ayres & Jonnalagadda, *supra*, at 187-189, tbl.A4. Instead, it alleviates the need for owners to closely monitor entrances for purposes of ensuring that carrying entrants have not ignored or overlooked a notice, while preserving the ultimate choice over the presence of firearms on their premises.[6]

---

[6] Again, because a default rule preserves an owner's ultimate choice to admit or exclude, it is constitutionally distinguishable from a *ban* or a law that reappropriates decisions over private entry to the *State*. It is for this reason that the Court has approved of no-solicitation default rules while striking down no-solicitation bans and licensing requirements. *Compare Breard v. Alexandria*, 341 U.S. 622 (1951) (upholding no-solicitation default), *with Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150 (2002) (striking down ordinance requiring that solicitors first obtain a City official's permission); *and Martin v. City of Struthers*, 319 U.S. 141, 143-144, 147 (1943) (striking down ban on handbill distribution because it "submits the distributor to criminal punishment … even though the recipient of the literature distributed is in fact glad to receive it" and thus no longer "leav[es] to each householder the full right to decide whether he will receive strangers as visitors").

## II.   THE DISTRICT COURT'S ANALYSIS OF *BRUEN* STEP ONE COMMITS A VARIETY OF LEGAL ERRORS

The district court's holding with respect to the private-property default rule consists of two parts.  First, the court determined that the right to carry extends onto "open" but not "closed" private property because, in the court's view, *Bruen*'s announcement of a "public" right to carry "naturally encompasses places that are generally held open to the public."  1-ER-0047.  Second, the court formulated the right to carry onto "open" property in conditional terms for purposes of squaring it with the right to exclude.  On the court's formulation, an owner of "open" property can announce a prohibition on guns and thereby defease the right within his or her establishment.  *See* 1-ER-0081-82.  But neither the distinction between "open" and "closed" private property, nor the *presumption* formulation of the right, has a constitutional basis—Second Amendment or otherwise.

### A.   "Public" As Used In *Bruen* Does Not Refer To Private Property

The district court reasoned that the private-property default rule with respect to "open" property implicates the Second Amendment's plain text because (1) *Bruen* states that there is "'a right to bear arms in public for self-defense,'" and (2) "public" should be understood to entail private real property held open to the public in addition to governmental property.  1-ER-0047 (quoting *Bruen*, 142 S. Ct. at 2135).  But the district court's expansive understanding of "public" finds no support in *Bruen* itself and conflicts with foundational tenets of constitutional

jurisprudence. "Public" simply refers to public property.

Attempting to read between *Bruen*'s lines, the district court began by focusing on the pronouncement that "[n]othing in the Second Amendment's text draws a home/public distinction." 1-ER-0047 (quoting *Bruen*, 142 S. Ct. 2134) (alteration in original). If there is no distinction between home and public, the court reasoned, then neither can there be "a distinction between public places" and so *Bruen* must support the right to carry onto another's property, too. 1-ER-0047. But this only begs the operative question of whether private property is a "public" place. *Bruen* did not involve a request to carry onto another's private property—it only considered whether the right is limited to the home or extends into "public" areas—and thus left this question unanswered. Moreover, the district court's holding that exercise of the right on private commercial property depends on the owner's implied approval—in contrast with exercise on governmental property, which does not so depend on a State official's implied approval—contradicts the court's premise that "open" private property and public property are for Second Amendment purposes constitutionally equivalent.

The district court next considered *Bruen*'s references to "'areas'" and "'locations frequented by the general community.'" 1-ER-0047-0048 (quoting *Bruen*, 142 S. Ct. at 2135, 2148). Because commercial private property is frequented by the general community, the court thought, it falls within the Second

Amendment's scope alongside governmental property. But neither *Bruen* passage suggests that an area's being frequented marks it as a relevant Second Amendment location; in those passages the Court only rejects New York's proposal that a lower standard of scrutiny be applied in crowded areas where safety concerns are pronounced. In other words, the fact that *an area covered by the Second Amendment* is crowded does not give the State additional leeway to regulate that area (*e.g.*, the right is not necessarily weaker in a public town square than in a public library). But this observation hardly sheds light on whether private property is one such covered "public" area. As before, it only begs the question.

*Bruen* itself thus provides no support for the district court's construction of "public." Perhaps recognizing that *Bruen* is underdetermining, the district court went on to consult extrinsic sources. But rather than consider the Court's longstanding position against extending non-owners' constitutional rights into the private-property domain, the district court oddly treated *Bruen* as if it were a *statute* amenable to methods of statutory construction. It cited a Black's Law Dictionary definition of "public" that defines the term as "[o]pen or available for all to use, share, or enjoy." 1-ER-0049 (citing *Public*, Black's Law Dictionary (11th ed. 2019)). But, setting aside the fact that no private commercial establishment is actually "available for all to use [or] share" (one cannot, for example, have a picnic in a grocery store), many other definitions equate "public"

with "governmental." *See, e.g.*, *Public*, Merriam Webster's Collegiate Dictionary (11th ed. 2014) ("of or relating to a government"); *Public*, Black's Law Dictionary (9th ed. 2009) ("Relating or belonging to an entire community, state, or nation"); *Public*, The American Heritage Dictionary (4th ed. 2001) ("noncommercial"). The district court went on to compare *Bruen*'s use of "public" to various federal and Hawaii statutes that define "public places" to include private businesses. *See* 1-ER-0049. But these statutory comparisons are hardly instructive. What matters for purposes of clarifying the geographic scope of the *Bruen* right is what the Supreme Court—not Congress or the Hawaii legislature—meant by "public."

Viewing *Bruen*'s references to "public" in the context of the Court's constitutional jurisprudence lends an obvious answer. For one, the Court has been careful to use qualified language like "property open to the public" when referring to private commercial establishments—suggesting that "public" has long been distinct from private property. *See, e.g.*, *Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The only fact relied upon for the argument that [private parking lots] have acquired the characteristics of a public municipal facility is that they are 'open to the public.'"); *PruneYard*, 447 U.S. at 81 (noting that private commercial property "does not 'lose its private character'"). And the construction "public *X*," as the Court used when referring to "right to public carry" or "public carry right" over fifty times across the *Bruen* majority opinion, *see* 142 S. Ct. at 2122-2156,

typically indicates that governmental property is at issue.  The "public right to navigability" presupposes as much.  *See Spokeo v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (discussing "public rights" like "free navigation of waterways" and "passage on public highways"); *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420, 1837 WL 3561, at *169 (1837) (Baldwin, J., concurring) (discussing how "the public right of passing over" navigable waters flows from the fact that "all navigable waters are public property").  So too, of course, do constitutionally inflected phrases like "public forum," *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 99 & n.6 (1972), or "public trust," *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 472 (1988).

More fundamentally, construing "public" to include private commercial property would mark a radical jurisprudential break.  As detailed in Section I.B above, an entrant's federal constitutional rights have never constrained another's use of their private property or the State regulation of another's property.  (The only potential exceptions—*Marsh* and *Kraemer*—are inapposite.  *See supra* Section I.B.1.)  For instance, the Court has stated decisively over the past fifty years that First Amendment rights—along which the Court modeled Second Amendment rights in both *Heller* and *Bruen*—end at another's property line regardless of whether the property is "open" or "closed" to the public.  *See, e.g.*,

*PruneYard*, 447 U.S. at 81 (1980); *Hudgens v. NLRB*, 424 U.S. 507, 516-517 (1976); *Lloyd Corp.*, 407 U.S. at 569 (1972). Because *Bruen* gives no indication that the relationship between private property and the Constitution calls for dramatic reconfiguring by the lower courts, the district court erred in straying from the ordinary and intuitive connection between "public carry" and public property.

### B. Tying The Second Amendment To The Concept Of "Open" Private Property Would Be Unworkable And Internally Contradictory

Setting aside the absence of any historical or constitutional basis for treating the level of "openness" of a private establishment as the cornerstone of Second Amendment doctrine, the district court's test is also unworkable in practice.

*First*, the district court assumed that owners of private commercial establishments confer a generalized license or invitation to enter *that in fact includes an invitation to carry a firearm. See* 1-ER-0081-82. But that assumption is dubious. An implied license is shaped by shared expectations as to permissible behavior (*e.g.*, a grocery store extends an implied license to shop but not to picnic) and is thus empirical and contextual. *See* Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* 303 (1879) (observing that the license to enter a commercial establishment "is limited by the purpose" of the establishment). But before the enactment of private-property default rules in Hawaii and other States, most people across the country had no idea whether a

general license to enter a commercial establishment included permission to bring a gun: namely, 65.7 percent of the 2,000 individuals polled in the Ayres study did not know whether "[c]ustomers are allowed to bring gun into business," and nearly half of those who believed they knew mistakenly thought that a "no-carry" default had already been law. *See* Ayres & Jonnalagadda, *supra*, at tbl.A5. If the scope of the public carry right is to be defined by the presence of an implied license, the uncertain existence of such a license undermines the district court's holding.

*Second*, the world of private property is not easily divided into "open" and "closed" establishments—making the court's test impossible to operationalize. The court reasoned that a business is "open" and thus constitutionally relevant unless it "restricts access to the public," at which point "the business would not be considered to be held open to the public" and the right would abate. 1-ER-0051-0052. But every private establishment "restricts access" along some dimension, thus begging the question: *how much* of a restriction is necessary? The court opined that the "open" status of an establishment "can change … if an owner of the private property rescinds a general license or invitation to enter the property: such as limiting entrance to members or prohibiting certain attire." 1-ER-0082. Does an establishment's rule against nakedness, public intoxication, stealing, or bringing in food or pets count? It is highly unlikely that courts—much less the citizens of

- 27 -

Hawaii—will consistently anticipate where on the "open/closed" binary an establishment falls.

And *third*, the district court's approach would render the mine run of the provision's applications constitutional (notwithstanding the court's representations to the contrary—though confusion as to the provision's present constitutional status is reason enough to find legal error). Consider a situation where a store owner tells an entrant to leave but because the entrant refuses to do so the police are called. It turns out that the entrant had carried a firearm into the store. Even if it could be said that the store is an "open" establishment where the right to carry operates, that license—and the attending constitutional protection—would be revoked the moment the entrant behaves unacceptably or refuses a directive to leave. *See* 1-ER-0048 (an implied license "is not absolute, of course, and may be revoked if, for example, an invitee or licensee is engaging in … behavior that the business deems unacceptable"). Because most arrests will be preceded by some form of unacceptable behavior or a directive to leave, there will be few situations where a defendant remains a lawful entrant with a claim to the related constitutional protection at the point of arrest.

- 28 -

### C. The District Court's Attempt To Reconcile The Right To Exclude With The Right To Carry By Formulating The Right In Defeasible Terms Fails

The district court insisted that its decision extending the right to carry onto private commercial property maintains, rather than displaces, the right to exclude because it continues to allow private owners to prohibit firearms on their premises. *See* 1-ER-0081-82. In other words, the court endorsed a right to a rebuttable presumption to carry onto commercial property rather than a right that trumps or overrides an owner's express opposition. But this formulation amounts to balancing the purported right to carry onto private commercial property against the owner's right to exclude: It suggests that, when the right to carry conflicts with an owner's right to exclude firearms, the right to exclude prevails. Again, that is an implausible conception of how Second Amendment rights work in view of *Bruen* and background constitutional principles. *See supra* Section I.B.

## CONCLUSION

Enduring principles of property law make clear that Hawaii's private-property default rule is constitutional. The Court should find the private-property default rule constitutional in full, and therefore affirm in part and reverse in part the district court's ruling.

- 29 -

Respectfully submitted.

/s/ Alan Schoenfeld

SIMON B. KRESS                          ALAN SCHOENFELD
WILMER CUTLER PICKERING                 JOSHUA M. FEINZIG*
   HALE AND DORR LLP                    WILMER CUTLER PICKERING
60 State Street                            HALE AND DORR LLP
Boston, MA  02109                       7 World Trade Center
(617) 526-6711                          250 Greenwich Street
                                        New York, NY 10007
                                        (212) 937-7294

                                        * *Admitted to practice only in Washington, D.C.*
                                        *Supervised by members of the firm who are*
                                        *members of the New York bar.*

October 12, 2023

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am counsel of record and a member in good standing

of the Bar of the United States Court of Appeals for the Ninth Circuit.

/s/ Alan Schoenfeld
ALAN SCHOENFELD

October 12, 2023

i

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 23-16164

I am the attorney or self-represented party.

**This brief contains** | 6,992 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Alan Schoenfeld | **Date** | October 12, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                          ii                          *Rev. 12/01/22*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 12th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Alan Schoenfeld

ALAN SCHOENFELD