No. 23-16164

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————————

JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI,
HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as Attorney General
of the State of Hawai'i,

*Defendant-Appellant.*

————————————————

On Appeal from the United States District Court
for the District of Hawai'i (No. 1:23-cv-00265-LEK-WRP)
(Hon. Leslie E. Kobayashi)

————————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANT-APPELLANT AND REVERSAL**

————————————————

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Kari L. Still
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 824-8201
psen@everytown.org

October 12, 2023

# CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

ARGUMENT ...................................................................................................2

  I.   The Correct Historical Analysis Center on the Reconstruction Era, Not the Founding Era .................................................................................2

  II.  This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as Insufficiently "Representative" ...........................................16

  III.  This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right ......20

CONCLUSION................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Hochul*,
  No. 1:22-cv-00986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *appeal docketed*, No. 22-2908 (2d Cir. Nov. 9, 2022)......................................................20

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007)................................................................................18

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................passim

*Dobbs v Jackson Women's Health Org.*
  142 S. Ct. 2228 (2022)...........................................................................19

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011). ..............................................................5, 8

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ................................................................18

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ...................................................................6

*Kipke v. Moore*
  Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md. Sept. 29, 2023)...............................................................7, 21, 23, 24

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
  No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023)...........................................7, 21

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)...........................................................................5, 18

*McIntyre v. Ohio Elections Comm'n*
  514 U.S. 334 (1995).............................................................................14

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314,
  2023 WL 4542153 (July 14, 2023) ................................................................. 7, 8

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) .................................................................................. passim

*Or. Firearms Fed'n v. Kotek*,
  No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed*,
  Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.) ................................. 3

*Shelby Cnty., Ala. v. Holder*,
  570 U.S. 529 (2013) ........................................................................................... 20

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ............................................................................... 6

*United States v. Meyer*,
  No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023) ....................... 11

*We the Patriots, Inc. v. Grisham*
  No. 1:23-cv-00773 (D.N.M. Oct. 11, 2023) ............................................... 7-8, 21

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ............... 11, 12

Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist.
  Rev. 365 (2012) .................................................................................................. 24

Ann Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century
  Boston, New York, and Philadelphia*, 40 Landscape J. 1 (2021) ................................. 23

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol
  Ass'n v. Bruen*, No. 20-843 (U.S.) ................................................................. 13, 16, 17

*Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at*
  https://bit.ly/3NPLSae ...................................................................................... 24

Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest
  Treasure* (2019) ............................................................................................. 22, 23

iv

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ........................................................13, 16, 17

David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* (1988) ...............................................................................22

Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022)..................................................................................19

Dorceta E. Taylor, *The Environment and the People in American Cities, 1600s-1900s: Disorder, Inequality, and Social Change* (2009).............................................24

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)......9

Everytown Center for the Defense of Gun Safety, *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ ...........................................................................4, 21, 26

Everytown Center for the Defense of Gun Safety, *Restrictions on Carrying in Sensitive Places or While Intoxicated*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places-and-carrying-while-intoxicated-restrictions/ ...................................................................................................4

Everytown Center for the Defense of Gun Safety, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ ...........................................................................................4

Frederick Law Olmsted, *The Justifying Value of a Public Park* (1881)..........................25

James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ...................................................19

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ...................................................... 8-9, 10

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .....11, 12

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) .....................................................................................................10

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ............................................................... 9

Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517 (2020) .................................................................................................... 24

National Park Service, *Firearms Regulations in the National Parks 1897-1936* (2008), *available at* https://perma.cc/5SRK-VYXZ ....................................... 26

State of Hawai'i, Dep't of Land & Nat. Res., *Welcome to Hawai'i State Parks* (2023), https://dlnr.hawaii.gov/dsp/ ............................................................ 26

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ............................................................ 9

Stephen T. Mather, *Progress in the Development of the National Parks* (U.S. Dep't of Interior 1916) ........................................................................................ 26

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ................. 9

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ............................................................................. 8

U.S. Bureau of the Census, *A Century of Population Growth* 9, Table 1 (1969), *available at* https://bit.ly/3QJizrn ........................................................... 17

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The provisions of Hawaiʻi's Act 52 (June 2, 2023) ("the Act") the district court enjoined are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons defendant-appellant ("the State") sets out in its brief. *See* Dkt. 6-1 ("State Br."). Everytown submits this amicus brief to expand on three points. *First*, in applying the historical inquiry of the *Bruen* framework—asking whether the

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Second*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary, and it does not require a government to prove that the laws it presents were statistically representative of the nation. *Third*, *Bruen*'s inquiry requires consideration not just of historical laws but also of the historical context within which states and localities chose to legislate (or not to legislate)—a point we illustrate with the historical context surrounding the regulation of firearms in parks.

## ARGUMENT

## I. The Correct Historical Analysis Centers on the Reconstruction Era, Not the Founding Era

After *Bruen*, this Court must first decide "whether the plain text of the Second Amendment protects" a person's "proposed course of conduct." *Bruen*, 142

S. Ct. at 2134.[2] If so, the burden shifts to the government to show its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Here, if the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on the Reconstruction Era—the years surrounding 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states—not the founding era. To be clear, this Court need not resolve the question of which time period is more relevant to its inquiry to reverse the decision below. In *Bruen*, the Supreme Court recognized "an ongoing scholarly debate" on the question but ultimately did "not address this issue" because, there, the "public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same." 142 S. Ct. at 2138. Here, too, as the State has shown, the historical tradition—from the founding era, to the 19th century, through Reconstruction, and into the 20th century—consistently demonstrates the constitutionality of the State's restrictions. *See, e.g.*, State Br. 27-30, 39-41, 43-48,

---

[2] As the State explains, this Court should resolve this case at the textual step of the inquiry because Plaintiffs have not carried their burden on this first question. *See* State Br. 20-21 & n.6, 49-52; *see also, e.g.*, *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5 n.4 (D. Or. July 14, 2023) (concluding that "the burden is on the plaintiff … to show that the challenged law implicates conduct covered by the plain text of the Second Amendment," in light of *Bruen*'s language and "first principles of constitutional adjudication" (internal quotation marks omitted)), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.).

3

52-53 (describing relevant historical laws from the founding era into the 20th century).[3] Accordingly, this Court need not resolve the issue of the correct time period. Nevertheless, if this Court wishes to resolve it to guide district courts in future cases, it should hold that the inquiry centers on 1868.[4]

To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The U.S. Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second,"142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the

---

[3] *See also, e.g.*, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ (citing, excerpting, and linking to a selection of historical sensitive places laws); *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (same, for restrictions on guns in parks); *Restrictions on Carrying in Sensitive Places or While Intoxicated*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places-and-carrying-while-intoxicated-restrictions/ (same, for additional restrictions on guns in other sensitive places, including places of public assembly for social purposes, and on carrying guns when intoxicated). All links were last visited October 12, 2023.

[4] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century and 20th-century history to clarify that meaning. *See infra* pp. 13-15.

originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

Several other circuits reached the same conclusion in analyzing the tradition of firearm regulation at the first, historical step of the pre-*Bruen* Second Amendment framework.[5] *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."). *Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").

A panel of the Eleventh Circuit recently reached the same conclusion post-*Bruen*, holding that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment

---

[5] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

applicable to the States." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir.

2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14,

2023). Although that panel opinion has now been vacated for rehearing en banc,

its analysis of the relevant time period remains sound and consistent with originalist

principles. As the panel explained:

> This is necessarily so if we are to be faithful to the principle that
> "[c]onstitutional rights are enshrined with the scope they were
> understood to have *when the people adopted them*." As with statutes, when a
> conflict arises between an earlier version of a constitutional provision
> (here, the Second Amendment) and a later one (here, the Fourteenth
> Amendment and the understanding of the right to keep and bear arms
> that it incorporates), "the later-enacted [provision] controls to the extent
> it conflicts with the earlier-enacted [provision]." … The opposite rule
> would be illogical.

61 F.4th at 1323-24 (alterations in original) (citations omitted); *see also Maryland Shall*

*Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md.

July 6, 2023) (concluding that "historical sources from the time period of the

ratification of the Fourteenth Amendment are equally if not more probative of the

scope of the Second Amendment's right to bear arms as applied to the states by the

Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023);

*Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at

*6 (D. Md. Sept. 29, 2023) ("[T]he Court agrees with the logic in *Maryland Shall*

*Issue* and will thus consider historical evidence from ratification of the Fourteenth

Amendment in 1868."); *We the Patriots, Inc. v. Grisham*, No. 1:23-cv-00773, Dkt. 27

at *16 (D.N.M. Oct. 11, 2023) ("[T]he Court agrees with" *Bondi* and *Maryland Shall Issue* that Reconstruction-era sources "are more probative" than founding-era sources as to Second Amendment's scope).

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from a radical one. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position leading scholars of originalist theory have taken. "Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see also* Josh

Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"). Others who have endorsed this view include Professors Michael Rappaport[6] and Stephen Siegel.[7] In sum, originalist analysis compels applying the 1868 understanding of the right to keep

---

[6] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008). Professor Rappaport directs the University of San Diego School of Law's Center for the Study of Constitutional Originalism.

[7] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

and bear arms in a case challenging a state law.[8]

A question raised by that conclusion (though one not directly presented in this case) is what the temporal focus should be in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify

---

[8] To be clear, we do not suggest that each of these scholars also believes that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 11-13.

applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

11

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[9] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and

---

[9] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

Further, while any historical inquiry this Court conducts should focus on the period around 1868, that date is neither a starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up)

---

[10] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

(quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory authority) settle the meaning of the Second Amendment right and demonstrate that the challenged laws are constitutional.

The court below erred on this point. It read *Bruen* as "constrain[ing]" it from considering post-ratification history and thus repeatedly declined to consider historical evidence later than 1868 on the mistaken belief that the Fourteenth Amendment's ratification constituted a sharp cut-off. ER 68; *see id.* at 57, 68 n.18, 72. That belief rests on the plainly implausible premise that the American people made the Second Amendment applicable to the states in 1868 and then *immediately* changed their minds about its meaning. To the contrary, as Justice Scalia himself explained, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting). That insight helps explain why, as just discussed, post-ratification

history is a "critical tool of constitutional interpretation," *Heller*, 554 U.S. at 605, and can "liquidate" and "settle" the meaning of constitutional terms, *Bruen*, 142 S. Ct. at 2136 (internal quotation marks omitted); *see also Heller*, 554 U.S. at 618-20 (canvassing, among others, treatises from 1873, 1880, and 1891); *Bruen*, 142 S. Ct. at 2153-54 (finding Texas's 1871 law and 1871 and 1875 decisions insufficient to justify New York's law not because they came too late, but because they were from a "single state" and "contradict[ed] the overwhelming weight of other evidence"). *See generally* State Br. 33 & n.12.

In short, to ensure that its interpretation of the right to keep and bear arms accords with the people's original understanding, this Court should train any historical inquiry on the period around 1868—when the Fourteenth Amendment was ratified and incorporated that right against the States. Here, state and local laws from that period—which are fully consistent with earlier regulations—demonstrate the constitutionality of the challenged provisions of Act 52. *See* State Br. 27-30, 40-41, 45-48, 53. And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like those challenged here.

15

## II.     This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as Insufficiently "Representative"

In its ruling enjoining enforcement of provisions in Act 52, the district court discounted the State's robust and extensive record of historical laws in part by characterizing some of those laws as outliers or insufficiently statistically "representative" of the nation. ER 86; *see id.* at 56-57, 67-68, 72-73. That was erroneous. *Bruen*'s discussion of the historical laws justifying sensitive-places restrictions demonstrates that a small number of laws can establish a tradition and that small-population jurisdictions matter.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Indep. Inst. *Bruen* Br. 11-12.[11] Moreover, the two laws both sources cited as

---

[11] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

prohibiting guns in legislative assemblies in the pages the Court referenced were enacted three years apart, in 1647 and 1650, in a single colony, Maryland, that made up an estimated 8.7 percent of the total population in 1650.[12] *See id.*; Kopel & Greenlee, 13 Charleston L. Rev. at 235. This analysis demonstrates that a small number of laws covering a small proportion of the nation's population can suffice to establish a tradition of regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. *See* State Br. 33-34 & n.13.[13]

---

[12] *See* U.S. Bureau of the Census, *Population in the Colonial and Continental Periods* 9, Table 1, in *A Century of Population Growth in the United States: From the First Census of the United States to the Twelfth: 1790-1900* (1969), *available at* https://www2.census.gov/library/publications/1909/decennial/century-populaton-growth-part02.pdf.

[13] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative comment should not be given undue weight given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is no such "overwhelming" evidence of a right to carry in any of the locations that Act 52 regulates. And—to be clear—even if there were evidence of a traditional *practice* of carrying in those locations, that would not be enough. *Compare* Kopel & Greenlee, 13 Charleston L. Rev. at 235 (arguing that Americans historically tolerated arms in legislative assemblies and that it was "common for Congressmen to be armed"), *with Bruen*, 142 S. Ct. at 2133 (relying on Kopel & Greenlee article in endorsing constitutionality of prohibiting arms in legislative assemblies).

Concluding that a small number of laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g., Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws

18

restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[14]

Courts should not reject historical laws merely because they covered a small percentage of the nation's population for at least two further reasons. *First*, as multiple historians have commented, the process of unearthing and understanding historical laws demands patience and openness to constant reevaluation.[15] Where a state—particularly in expedited preliminary litigation—has produced historical laws covering only a small percentage of the nation's population, newly-discoverable historical sources may later yield more examples and increase that percentage. To discard a state's proffered laws for failing to meet some unstated population threshold is to fundamentally misunderstand the gradual and

---

[14] Indeed, any such inference would be untenable in light of the Court's statement, in a case decided the day after *Bruen*, that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

[15] *See* Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022) (explaining that historical research under *Bruen* requires significant time); James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ("Interpretations of the past are subject to change in response to new evidence, new questions asked of the evidence, new perspectives gained by the passage of time.").

19

cumulative nature of historical research. *Second*, dismissing the laws of states with

smaller populations is in tension with what the Supreme Court has deemed a

"historic tradition" and "fundamental principle" of our constitutional bargain:

"that all the States enjoy equal sovereignty." *Shelby Cnty., Ala. v. Holder*, 570 U.S.

529, 540, 544 (2013) (citations omitted). If the people of a small state responded to

local needs by enacting certain policies, the fact that their neighbors in a larger

state chose a different path does not nullify the constitutional agency of the smaller

state.[16]

## III. This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right

In evaluating the historical laws the State has presented, this Court should

recognize that context matters. Close historical cousins to a modern regulation will

not exist before the societal or technological condition that prompted regulation

---

[16] As the State explains, *Bruen* "nowhere instructed judges to limit their historical analysis through arbitrary population thresholds." State Br. 31-32. The reasoning of the principal case to conclude otherwise was flawed. *See Antonyuk v. Hochul*, No. 1:22-cv-00986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *appeal docketed*, No. 22-2908 (2d Cir. Nov. 9, 2022). *Antonyuk* derived its population-based analysis from *Bruen*'s brief reference to laws covering "miniscule territorial populations," 142 S. Ct. at 2154. *See* 2022 WL 16744700, at *7. But the Supreme Court there was merely explaining why a handful of territorial carry restrictions did not counteract the "overwhelming evidence" it had already found in favor of "an otherwise enduring American tradition permitting public carry," *Bruen*, 142 S. Ct. at 2154. Accordingly, absent "overwhelming" evidence of a widespread contrary tradition, a jurisdiction's relatively small population size is no reason to deny it a role in the nation's historical tradition.

arose. Accordingly, regulations that emerged alongside or soon after a new condition should carry particular weight, and to the extent that a court seeks additional, older historical analogues, it must accept more distant cousins as sufficient. In *Bruen*'s words, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to history. 142 S. Ct. at 2132.

Act 52's restrictions on firearms in public parks exemplify this point. Scores of historical laws from the mid-19th century through the early 20th century establish that prohibiting firearms in parks is "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126; *see* State's Br. 40-41 & n.18 (citing numerous examples); *Maryland Shall Issue*, 2023 WL 4373260, at *11 (concluding that historical record establishes a tradition of "restricting firearm possession and carrying in public parks"); *Kipke*, 2023 WL 6381503, at *9-10 (same, for Maryland state parks and forests); *We the Patriots, Inc.*, No. 1:23-cv-00773, Dkt. 27 at *18-19 (denying request to preliminary enjoin prohibitions on carrying firearms in parks based on historical record).[17] Given that 1868 is the correct focus for this Court's analysis, these laws establish beyond doubt that prohibiting firearms in parks is constitutional. But even if the Court were to focus its analysis on an earlier period, it should still give these 19th- and 20th-century

---

[17] *See also, e.g.*, *Parks Restrictions*, *supra* note 3.

laws particular weight, because parks in the modern sense did not begin to emerge until the mid-19th century. *See generally* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 1-8 (1988) (describing emergence in 19th century of "new urban landscape," whose proponents urged establishment of public parks to "create[] communal spaces" where "rural scenery might sooth the 'nerves and mind' of visitors," and identifying Central Park as "the first major attempt to achieve" the proponents' goals); *see also* State Br. 39-40. Given Central Park's position as the foundational paradigm of this new movement, it is particularly significant that its original 1858 rules, brief enough to appear on a single sheet and "posted in conspicuous locations that would be easily seen by all visitors," Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* 26 (2019), forbade "[a]ll persons" to "carry fire-arms":



*Id.* at 27.

Below, Plaintiffs asserted that "[t]here is nothing new about parks" and that an absence of prohibitions on guns in colonial-era greens and commons—Boston Common and similar landscapes in New York City and Savannah—would establish their case. *See* Dist. Ct. Dkt. 7-1 at 19-20. A district court hearing a challenge to Maryland's post-*Bruen* sensitive places law recently rejected a similar argument, reasoning that Boston Common and similar early green spaces "did not resemble the modern, expansive State and federal park system that the United States has today." *See Kipke*, 2023 WL 6381503, at *9. The district court below likewise appeared to reject this argument, recognizing that "parks around 1791 were not comparable to modern day parks," but then it faulted the State for not presenting any 18th-century prohibitions on firearms in these spaces. ER 65-66. Plaintiffs (and the district court, to the extent it agreed) are mistaken on both points.

First, history confirms that early commons and greens were different in kind from modern-day parks.[18] Their core functions were very different—serving, for

---

[18] Even the article Plaintiffs relied on below (at Dist. Ct. Dkt. 7-1 at 19) in attempting to paint modern parks as no different from colonial-era green spaces acknowledges that "[p]ublic parks did not appear in the United States until the second half of the nineteenth century," and refers to those earlier green spaces as "prepark landscapes." Ann Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 1, 13 (2021).

instance, as sites to grow crops, graze livestock, and harvest firewood and other resources. *See* Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365, 370-73 (2012).[19] Boston Common, for example, was primarily used as shared grazing land during its first two centuries, and was also used for militia assembly and executions. *See, e.g.,* State Br. 39; *Kipke*, 2023 WL 6381503, at *9; Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517, 1556-57 (2020); *Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at* bit.ly/3NPLSae (Common was used for grazing and militia assembly "till a very recent date" and "not until 1859" was it "finally settled" that "Boston Common should be a public park"). By contrast, parks in the modern sense were developed in the 19th century to serve functions centered on "tranquilizing recreation" and natural beauty. Taylor, *supra*, at 228 (internal quotation marks omitted).[20]

Frederick Law Olmsted, Central Park's principal architect and first Commissioner, explained this evolution in 1881: "Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else. … Allow me to use the term *park movement*, with reference to what has thus

---

[19] They also served as "sites of executions, rallies, and protests; and homes for civic institutions." Dorceta E. Taylor, *The Environment and the People in American Cities, 1600s-1900s: Disorder, Inequality, and Social Change* 227 (2009).

[20] Far from enabling the extractive purposes that earlier commons had served, parks authorities prohibited visitors from disrupting the parks' beauty by harvesting flowers, fruits, or twigs. Taylor, *supra*, at 289.

recently occurred[.]" Olmsted, *The Justifying Value of a Public Park* 7-8 (1881). Olmsted explained that this notion of parks was revolutionary, not simply "an improvement on what we had before, growing out of a general advance of the arts applicable to them." *Id.* at 8. Parks in the modern sense were thus an "unprecedented societal concern[]" in the late 19th and early 20th centuries. Under *Bruen*, that is reason enough to conclude that the State's historical park regulations amply justify its current restriction, since those regulations appeared as soon as the new societal condition of modern parks emerged.

The second reason why Plaintiffs are mistaken is that even if, contrary to fact, colonial-era greens and commons had been analogous to modern parks, the fact that the historical record has not (yet) yielded a prohibition on carrying firearms in those places proves nothing about whether Bostonians, New Yorkers, or Savannahians historically understood the right to keep and bear arms to foreclose such a prohibition. If public carry in those cities was rare (because of social mores, limited availability of suitable firearms, carry regulations not specific to particular locations, or any other reason), then their inhabitants may have seen no need to enact sensitive-places prohibitions; or they simply may have chosen, for policy reasons, not to regulate (if that is what they chose) to the constitutionally permissible limit. *See supra* pp. 18-19 (federalism requires respect for decisions to legislate, or not, according to local needs).

25

Plaintiffs' remaining complaint below was that the State's parks restriction simply covered too large an area—applying to "vast expanses of the great outdoors." Dist. Ct. Dkt. 7-1 at 20 (citation omitted). Again, this nation's historical tradition of firearms regulation belies their objection. In 1897, when Yellowstone National Park regulations prohibited firearms,[21] the park covered over *two million* acres[22]—more than 66 times the *combined* size of Hawaiʻi's state parks.[23] Soon after, regulations prohibited firearms in Yosemite National Park's over 700,000 acres and in Glacier National Park's almost one million acres.[24] These regulations put beyond doubt that the generations that established national parks did not see any constitutional problem with prohibiting guns in genuinely "vast expanses of the great outdoors."

---

[21] *See* National Park Service, *Firearms Regulations in the National Parks 1897-1936* 1 (2008) ("*Firearms Regulations*"), *available at* https://perma.cc/5SRK-VYXZ.

[22] *See* Stephen T. Mather, *Progress in the Development of the National Parks* 28 (U.S. Dep't of Interior 1916) (reporting areas of national parks, in square miles, including: 3,348 for Yellowstone; 1,125 for Yosemite; and 1,534 for Glacier).

[23] *See* State of Hawaiʻi, Dep't of Land & Nat. Res., *Welcome to Hawaiʻi State Parks* (2023), https://dlnr.hawaii.gov/dsp/ (state park system comprises 50 parks encompassing 30,000 acres). *Kipke* approved firearms restrictions in parkland seven times that size. *See* Pls. Mem. Supp. Prelim. Inj., *Novotny v. Moore*, No. 1:23-cv-01295, Dkt. 24-1, at 24 (Maryland state parks cover 214,000 acres).

[24] *See Firearms Regulations*, *supra* note 21, at 15 (Yosemite 1902); *id.* at 42 (Glacier 1910); *supra* note 22. These are merely examples. *See also Firearms Regulations* (providing historical restrictions for 19 national parks plus 1936 Service-wide regulations); *Parks Restrictions*, *supra* note 3 (excerpting historical prohibitions on firearms in several state park systems).

**CONCLUSION**

This Court should reverse the judgment of the district court.

October 12, 2023                     Respectfully submitted,

                                    /s/ Priyanka Gupta Sen
                                    Janet Carter
                                    William J. Taylor, Jr.
                                    Priyanka Gupta Sen
                                    Kari L. Still
                                    Everytown Law
                                    450 Lexington Avenue, P.O. Box 4184
                                    New York, NY 10017

                                    *Counsel for amicus curiae*
                                    *Everytown for Gun Safety*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16164

I am the attorney or self-represented party.

**This brief contains** | 6,953 | **words,** including | 182 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Priyanka Gupta Sen | **Date** | October 12, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*