No. 23-16164

# In the United States Court of Appeals
## for the Ninth Circuit

---

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI;
HAWAII FIREARMS COALITION,
*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of
the State of Hawaii,
*Defendant-Appellant.*

**On Appeal from the United States District Court For the District of Hawaii
Civ. No. 1:23-cv-00265—LEK-WRP, Hon. Leslie E. Kobayashi**

---

**BRIEF OF PLAINTIFFS-APPELLEES**

---

KEVIN GERARD O'GRADY
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 968123
(808) 521-3367
Kevin@KevinOGradyLaw.Com

ALAN ALEXANDER BECK
Attorney at Law
2692 Harcourt Drive
San Diego, California 92123
(619) 905-9105
Alan.alexander.beck@gmail.com

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, a nongovernmental corporate party to an action must file a statement that identifies any parent corporation and any publicly held corporation that owns 10% or more of its stock or states that there is no such corporation. Plaintiff Hawaii Firearms Coalition states that that there is no such corporation. The other plaintiffs-appellees are individuals.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................................iv

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF ISSUE FOR REVIEW ..........................................................1

STATEMENT OF THE CASE.............................................................................1

A.    Statutory Framework ................................................................................1

B.    Statement of Facts....................................................................................3

C.    District Court Decision ............................................................................4

SUMMARY OF ARGUMENT ...........................................................................5

ARGUMENT .......................................................................................................6

A.    STANDARD OF REVIEW........................................................................6

B.    PLAINTIFFS HAVE STANDING ............................................................7

      1.    General Standing Principles .................................................................7

      2.    Parking Lots and Banks.........................................................................9

      3.    Plaintiffs' Standing Is Not Dependent on Permission of Third
            Parties ...............................................................................................13

C.    THE DISTRICT COURT DID NOT ERR IN HOLDING THAT
      PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS16

      1.    The *Bruen* Standard and Controlling Principles ..................................16

      2.    The Trial Court Correctly Held That Plaintiffs' Conduct Falls
            Within the Plain Text of the Second Amendment ..............................28

D.      THE STATE HAS NOT CARRIED ITS BURDEN ...................................29

      1.      General Principles ..................................................29

      2.      Parking lots adjacent to government buildings ....................31

      3.      Bars and restaurants serving alcohol............................32

      4.      Banks ........................................................36

      5.      Parks and Beaches .............................................40

      6.      The Default Rule ..............................................48

E.      THE REMAINING FACTORS FAVOR PLAINTIFFS.............................52

      1.      Irreparable Injury..............................................52

      2.      Public Interest/Balance of Equities .....................................53

CONCLUSION.................................................................57

STATEMENT OF RELATED CASES ...............................................59

CERTIFICATE OF COMPLIANCE .......................................................60

iii

# TABLE OF AUTHORITIES

## Cases

*Alaska v. Federal Subsistence Bd.*,
    544 F.3d 1089 (9th Cir. 2008) ..................................................................... 11, 12

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................................6

*Am. Trucking Ass'ns v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ................................................................................6

*Andrews v. McCraw*,
    2022 WL 19730492 (5th Cir. 2022) ....................................................................23

*Andrews v. State*,
    50 Tenn. 165 (1871)..............................................................................................40

*Antonyuk v. Hochul*,
    No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944,
    2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) .......................... 17, 33, 42, 48, 51

*B&L Productions, Inc. v. Newsom*,
    C.D. Cal. No. 8:22-cv-01518-JWH-JDE, Dkt. No. 43
    (October 30, 2023) ......................................................................................... 31, 43

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ...............................................................................53

*Bonidy v. U.S.P.S.*,
    790 F.3d 1121 (10th Cir. 2015) .............................................................. 31, 32, 43

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632, 658 (Del. 2017...............................................................................42

*Brown v. Enter. Merchs. Ass'n*,
    564 U.S. 786 (2011)...............................................................................................14

*Chalk v. U.S. District Court*,
840 F.2d 701 (9th Cir. 1998) .................................................................7

*Christian v. Nigrelli*,
No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652, 2022 WL 17100631
(W.D.N.Y. Nov. 22, 2022)...................................... 14, 17, 30, 48, 49

*Commercial Workers Union Local 751 v. Brown Group*,
517 U.S. 544 (1996)...............................................................................8

*Covenant Media of S.C., LLC v. City of N. Charleston*,
493 F.3d 421 (4th Cir. 2007) .............................................................. 11

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................... *passim*

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ...........................................................53

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ..............................................................11

*Elrod v. Burns*,
427 U.S. 347 (1976)..............................................................................52

*English v. State*,
35 Tex. 473 (1872)................................................................................40

*Espinoza v. Mont. Dep't of Rev.*,
140 S.Ct. 2246 (2020)...........................................................................21

*Ezell v. City of Chi.*,
651 F.3d 684 (7th Cir. 2011) .............................................................. 53

*FEC v. Wis. Right to Life, Inc.*,
551 U.S. 449 (2007)....................................................................... 56, 57

*FPC, Inc. v. McCraw*,
625 F. Supp. 3d 740 (N.D. Tex. 2022) ...............................................23

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) .................................................................6

*Gamble v. United States*,
   139 S.Ct. 1960 (2019) .........................................................................21

*GeorgiaCarry.Org, Inc. v. Georgia*,
   687 F.3d 1244 (11th Cir. 2012) ..........................................................52

*Hardaway v. Nigrelli*,
   No. 22-CV771 (JLS), 2022 U.S. Dist. LEXIS 200813, 2022 WL 16646220
   (W.D.N.Y. Nov. 3, 2022)................................................. 17, 19, 20, 30

*Hill v. State*,
   53 Ga. 472 (1874) ...............................................................................40

*Hirschfeld v. ATF*,
   5 F.4th 407 (4th Cir.), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021),
   *cert. denied*, 142 S.Ct. 1447 (2022) ...................................................22

*Hunt v. Washington State Apple Advert. Com'n.*,
   432 U.S. 333 (1977).................................................................................8

*Huntington Branch, NAACP v. Huntington*,
   689 F.2d 391 (2d Cir. 1982)................................................................14

*Index Newspapers 7 LLC v. U.S. Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) ..............................................................57

*Kennedy v. Louisiana*,
   554 U.S. 407 (2008).............................................................................24

*Kepo'o v. Watson*,
   87 Haw. 91 (1998) ...............................................................................11

*Kipke v. Moore*,
   Civil Action No. GLR-23-1293, --- F.Supp.3d ---, 2023 U.S. Dist. LEXIS
   174934, 2023 WL 6381503 (D. MD Sept. 29, 2023)................................. *passim*

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ...............................................................54

*Koons v. Platkin*,
2023 WL 3478604 (D.N.J. May 16, 2023).................................. *passim*

*Koons v. Att'y Gen.*,
No. 23-1900 (3d Cir. June 20, 2023) ........................................ 31, 48

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).................................................................................8

*McCutcheon v. FEC*,
572 U.S. 185 (2014)..............................................................................56

*McDonald v. Chicago*,
561 U.S. 742 (2010)................................................... 18, 22, 39, 40, 53

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ...............................................................52

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702 (9th Cir. 1997) ...............................................................53

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ............................................... 22, 23, 30

*Morris v. Army Corps of Eng'rs*,
60 F. Supp. 3d 1120 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289
(9th Cir. Dec. 15, 2017) .........................................................................42

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S.Ct. 2111 (2022).................................................................. *passim*

*Nordyke v. King*,
681 F.3d 1041 (9th Cir. 2012) .............................................................43

*People v. Chairez*,
2018 IL 121417 (2018) .........................................................................42

*Pimentel v. Dreyfus,*
670 F.3d 1096 (9th Cir. 2012) .................................................................6

*Preminger v. Principi,*
422 F.3d 815 (9th Cir. 2005) ................................................................54

*Presidio Historical Ass'n. v. Presidio Trust,*
811 F.3d 1154 (9th Cir. 2016) ...............................................................12

*Project 80s v. Pocatello,*
942 F.2d 635 (9th Cir. 1991) ................................................................49

*Ramos v. Louisiana,*
140 S.Ct. 1390 (2020)...........................................................................21

*Rodriguez v. Robbins,*
715 F.3d 1127 (9th Cir. 2013) ..............................................................54

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
547 U.S. 47 (2006)........................................................................ 12, 13

*Safeco Ins. Co. of America v. Schwab,*
739 F.2d 432 (9th Cir. 1984) ...............................................................11

*Santucci v. City & Cty. of Honolulu,*
2022 U.S. Dist. LEXIS 213030 (D. Haw. Nov. 23, 2022) ..................56

*Solomon v. Cook Cnty. Bd. of Comm'rs,*
559 F.Supp.3d 675 (N.D. Ill. 2021) ............................................. 42, 43

*Spencer v. Nigrelli,*
No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS 233341
(W.D.N.Y. Dec. 29, 2022) ....................................................................17

*State v. Oki,*
2023 WL 6130310 (Hawaii Intermediate Court of Appeals, Sept. 19, 2023).....10

*State v. Shelby,*
2 S.W. 468 (Mo. 1886) .........................................................................40

viii

*Steele v. City of Boston*,
128 Mass. 583 (1880) ............................................................45

*Stenberg v. Carhart*,
530 U.S. 914 (2000) ........................................................... 11

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023) ...................................... 22, 35

*Timbs v. Indiana*,
139 S.Ct. 682 (2019) ...........................................................21

*United Food and Commercial Workers Union Local 751 v. Brown Group*,
517 U.S. 544 (1996) ..............................................................8

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) .............................................29

*United States v. Alston*,
2023 WL 4758734 (E.D.N.C. July 18, 2023) ......................23

*United States v. Bartuci*,
2023 WL 2189530 (E.D. Cal. Feb. 23, 2023)......................23

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ............................................31

*United States v. Connelly*,
2022 WL 17829158 (W.D. Tex. Dec. 21, 2022) .................. 23

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) ..................... 22, 26, 32, 34, 35

*United States v. Dorosan*,
350 F. App'x 874 (5th Cir. 2009) .......................................32

*United States v. Harrison*,
2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) ....................32

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) (en banc) ..............................................5

*United States v. Kokinda*,
    497 U.S. 720 (1990).......................................................................43

*United States v. Price*,
    2022 WL 6968457 (S.D. W. Va. Oct. 12, 2022) ................................23

*United States v. Rowson*,
    2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) ......................................23

*United States v. Stambaugh*,
    2022 WL 16936043 (W.D. Okla. Nov. 14, 2022) ............................ 23

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ........................................................54

*Virginia v. Moore*,
    553 U.S. 164 (2008).......................................................................21

*Warth v. Seldin*,
    422 U.S. 490 (1975)...................................................................... 11

*White Tail Park, Inc. v. Stroube*,
    413 F.3d 451 (4th Cir. 2005) .........................................................11

*Worth v. Harrington*,
    2023 WL 2745673 (D. Minn. Mar. 31, 2023) ..................... 21, 25, 26

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017).......................................................30

*Young v. Hawaii*,
    896 F.3d 1044 (9th Cir. 2018) ........................................................5

*Young v. United States*,
    943 F.3d 460, 464 (D.C. Cir. 2019)................................................10

x

*Yukutake v. Conners*,
 554 F. Supp. 3d 1074 (D. Haw. 2021)...................................................35

*Zaitzeff v. City of Seattle*,
 484 P.3d 470 (2021)..........................................................................44

**Constitution and Statutes**

U.S. Const. Art. III..................................................................8, 12

U.S. Const. amend. II........................................................ *passim*

28 U.S.C. §1292(a)(1).......................................................................1

28 U.S.C. §1331..................................................................................1

28 U.S.C. §1343..................................................................................1

28 U.S.C. §2201..................................................................................1

28 U.S.C. §2202..................................................................................1

1859 Conn. Pub. Acts, ch. LXXXII, §5...............................................33

H.R.S. §134..................................................................... *passim*

Hawaii Laws 2023, ch. 52, eff. July 1, 2023 ................................ *passim*

1867 Kan. Sess. Laws 25 ...................................................................33

**Other Authorities**

1 LAWS OF THE STATE OF NEW JERSEY (Bloomfield ed., 1811) ................19

1 LAWS OF THE STATE OF NEW YORK (2d ed., Albany: Websters & Skinner
 1807) .........................................................................................19

2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds.,
 1797) .........................................................................................19

11A Charles Alan Wright et al., Federal Practice and Procedure (2d ed. 1995).... 52

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611
    (Watkins ed.,1800) ............................................................................19

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA
    (Davis ed., 1796)..............................................................................19

Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No
Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020).............. 50

Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of
    Arch. Hist. 47 (1961) ................................................................... 41, 42

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-
Century Boston, New York, and Philadelphia*, 40 Landscape J. 1 (2021) .........41

Br. of Ctr. for Hum. Liberty as Amicus Curiae, filed in *Antonyuk v. Hochul*, No.
    22-2908 (2d Cir. Feb. 9, 2023), ECF No. 313 ...................................................26

E.L. Carey & A. Hart, *Philadelphia in 1830-1* (1830) ...........................................45

Debunking the Myth of "Concealed-Carry Killers"
    https://herit.ag/3s9MeCa ......................................................................55

Departments of the Army, Navy, and Air Force, Operator's Manual: Pistol,
    Semiautomatic, 9mm, M9 (1005-01-118-2640) (1992) available at
    https://books.google.com/books/about/Operator_s_Manual.html?id=yXo9AAA
    AYAAJ................................................................................................ 27, 28

Daniel J. Elazar, *Banking and Federalism in the Early American Republic*, 28
    Huntington Libr. Q. 301 (1965).........................................................................38

https://en.wikipedia.org/wiki/Beretta_M9 ...........................................................27

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205
    (2018) ................................................................................. 19, 26, 27

James T. Mitchell et al., Statutes at Large of Pennsylvania from 1682 to 1801, vol. III (1896) ......................................................................... 51

*More Than 2,200 Non-Self Defense Deaths Involving Concealed Carry Killers Since 2007, Latest Violence Policy Center Research Shows*, Violence Pol'y Ctr. (Apr. 21, 2022), https://perma.cc/MXW4AWYD ...............................................54

N.Y. City Dep't of Parks, *Bowling Green*, https://rb.gy/9ujrg ...............................45

PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81 (Stanley Ray ed., 1904) ........................................................................19

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw ....................................................................20

*The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation, available at https://on.nyc.gov/3hBZXfe .............................................41

THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA (Grimke, ed. 1790) ....................................................................... 18, 19

Christine Sismondo, America Walks Into a Bar: A Spirited History of Taverns, Saloons, Speakeasies and Grog Shops (Oxford 2011) ................................. 33, 34

VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791 (Green ed., 1795) .......................................................................19

Wallack, Todd (December 20, 2011). "Which bank is the oldest? Accounts vary - The Boston Globe." The Boston Globe ..............................................37

Washington Park Newark, *History*, https://rb.gy/a4cwj .........................................46

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellees challenge the constitutionality of HRS §§134-A(a)(1), (4), (9), (12), and 134-E. The district court had jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343, 2201, 2202. On August 8, 2023, the district court issued a temporary restraining order enjoining the challenged provisions. 1-ER-0096-0097. On September 6, 2023, the district court then converted its TRO into a preliminary injunction. 1-ER-0003-0006. The defendant, the State of Hawaii ("Hawaii" or "the State"), filed a Notice of Appeal on September 7, 2023. 6-ER-1362-1365. This Court has jurisdiction over this appeal under 28 U.S.C. §1292(a)(1).

# STATEMENT OF ISSUE FOR REVIEW

Did the district court abuse its discretion in issuing a preliminary injunction on Second Amendment grounds against HRS §§134-A(a)(1), (4), (9), (12), and 134-E?

# STATEMENT OF THE CASE

## A. Statutory Framework

The Hawaiʻi Legislature responded to the Supreme Court's opinion in *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S.Ct. 2111 (2022), with the enactment of Hawaii Laws 2023, ch. 52, eff. July 1, 2023 ("ACT 52"). Prior to *Bruen*, the Hawaii carry permit statute, HRS §134-9, limited the right to obtain a carry permit outside the home to "an exceptional case, when an applicant shows reason to fear injury to

1

the applicant's person or property." ACT 52 removed that language but then conditioned the locations in which a permit holder may carry with the enactment of HRS §134-A and HRS §134-E.

The district court preliminarily enjoined enforcement of the following parts of HRS §134-A, as enacted by ACT 52:

> (a) A person with a license issued under section 134-9, or authorized to carry a firearm in accordance with title 18 United States Code section 926B or 926C, shall not intentionally, knowingly, or recklessly carry or possess a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, while in any of the following locations and premises within the State:
>
> (1) Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for court proceedings, legislative business, contested case hearings, agency rulemaking, or other activities of state or county government; or
>
> * * *
>
> (4) Any bar or restaurant serving alcohol or intoxicating liquor as defined in section 281-1 for consumption on the premises, including adjacent parking areas; or
>
> * * *
>
> (9) Any beach, playground, park, or adjacent parking area, including any state park, state monument, county park, tennis court, golf course, swimming pool, or other recreation area or facility under control, maintenance, and management of the State or a county, but not including an authorized target range or shooting complex; or
>
> * * *
>
> (12) The premises of any bank or financial institution as defined in section 211D-1, including adjacent parking areas.

2

The district court also preliminarily enjoined enforcement of HRS §134-E, as enacted by ACT 52. That section provides in relevant part:

> (a) A person carrying a firearm pursuant to a license issued under section 134-9 shall not intentionally, knowingly, or recklessly enter or remain on private property of another person while carrying a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, unless the person has been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property.
>
> (b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:
>
>> (1) Unambiguous written or verbal authorization; or
>>
>> (2) The posting of clear and conspicuous signage at the entrance of the building or on the premises, by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

## B. Statement of Facts

ACT 52 bill restricts the carrying of a handgun even with a valid concealed carry permit in 96.4% of the publicly accessible land in Maui County which is where Plaintiffs reside. [1] Plaintiffs are three residents of the County of Maui and an organizational Plaintiff who has members who have been issued concealed carry permits in Hawaii and elsewhere in the State of Hawaii. 5-ER-1138-1139. All

---

[1] This calculation is based off a map which Plaintiffs submitted to the trial court. 2-ER-308-318. The State has never disputed this figure. This figure includes private business which are impacted by the State's requirement that private businesses put a sign up in order to allow people to carry firearms.

3

individual Plaintiffs possess a valid license to carry a handgun. 5-ER-1150-1151. Prior to the enactment of ACT 52, all three individual Plaintiffs carried on beaches, parks, and their adjacent parking areas, bars and restaurants serving alcohol and their adjacent parking areas, banks and their adjacent parking areas, and parking areas adjacent government buildings, all within the County of Maui. 6-ER-13166-1327 (Declaration of Jason Wolford); 6-ER-1331-1342 (Declaration of Alison Wolford); 6-ER-1345-1355 (Declaration of Atom Kasprzycki). But for the challenged regulations, Plaintiffs would carry in all the areas at issue in this litigation. *Id.*

## C.   District Court Decision

On August 8, 2023, the district court issued a temporary restraining order enjoining the challenged provisions. 1-ER-0096-0097. The trial court found HRS §§134-A(a)(1), (4), (9), (12), and 134-E violated the Second Amendment to the United States Constitution. However, the trial court limited the injunction of H.R.S. §134-A (1) to "parking areas owned, leased, or used by the State or a county which share the parking area with non-governmental entities, are not reserved for State or county employees, or do not exclusively serve the State or county building." 1-ER-0097. The trial court also denied Plaintiffs' claim that H.R.S. §134-E violated the First Amendment to the United States Constitution. 1-ER-0095-0096.

4

## SUMMARY OF ARGUMENT

The Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022), compelled the State of Hawaii to issue permits to carry concealed handguns. Prior to *Bruen*, carry permits were almost never granted.[2] As a result of permits being issued, the Hawaii legislature passed ACT 52. ACT 52's dramatic restrictions on public carry cannot be squared with *Bruen's* holding that American's have a fundamental right to armed self-defense which extends outside the home.

The district court did not abuse its discretion by concluding that that Plaintiffs are likely to succeed in proving the challenged provisions of ACT 52 are unconstitutional. Hawaii articulates no actual error made by the district court, but, rather, merely cites multiple instances where it disagrees with the district court's conclusion or analysis regarding certain pieces of evidence. This is insufficient to establish that the district court's findings of fact and its application of the legal standard to those facts were "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc)). Hawaii's argument ultimately is that virtually all the publicly accessible land on Maui County is presumptively outside of Second Amendment regulation. That argument cannot be squared with *Bruen*. This Court

---

[2] *See Young v. Hawaii*, 896 F.3d 1044, 1071 n.21 (9th Cir. 2018).

should find the trial court did not abuse its discretion in preliminarily enjoining the challenged provisions of ACT 52.

## ARGUMENT

### A.    STANDARD OF REVIEW

The scope of this Court's review of a preliminary injunction decision is "narrow," and involves "only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015). The relevant factors for a preliminary injunction are (1) plaintiffs' likelihood of success on the merits, (2) plaintiffs' likelihood of irreparable harm absent preliminary relief, (3) the balance of the equities, and (4) whether an injunction serves the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Alternatively, an "injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted). "[A]t an irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012). "The basic function of a preliminary injunction is to preserve the status quo pending a

determination of the action on the merits." *Chalk v. U.S. District Court*, 840 F.2d 701, 704 (9th Cir. 1998).

## B.     PLAINTIFFS HAVE STANDING

### 1.     General Standing Principles

Plaintiffs are all residents of Maui County, Hawaii. 5-ER-1138. Each individual Plaintiff has a valid concealed carry permit issued to them by the Maui County Police Department. 5-ER-1179-1197. Associational Plaintiff Hawaii Firearms Coalition has members who have been issued concealed carry permits in Maui and elsewhere in Hawaii. 5-ER-1139. In Hawaii, handgun carry permits are issued by the county Chiefs of Police pursuant to H.R.S. §134-9. To acquire a handgun in Hawaii, applicants are fingerprinted, thoroughly investigated by the police and are required to undergo training. H.R.S. §134-2. Among other requirements, state law allows the county chiefs of police to promulgate procedures to determine that a carry permit applicant is "qualified to use the firearm in a safe manner" and "[a]ppear[s] to be a suitable person to be so licensed." *See* H.R.S. §134-9. In Maui County, carry permit applicants must pass a shooting test to qualify for a carry permit. 5-ER-1150.

Plaintiffs all regularly visit places within Maui County that are impacted by H.R.S. §134-E, private businesses that do not post signs giving consent to let people

7

carry, parks, beaches, restaurants that serve alcohol, banks and the accompanying parking lots of all of the aforementioned. 5-ER-1179-1197. And but for the challenged laws would carry while visiting these locations within Maui County. 5-ER-1179-1197. Plaintiffs indisputably have been injured under Article III by that impairment as the Hawaii law is directed at restricting the right that Plaintiffs would otherwise possess to carry in the locations at which carry is banned. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("Where "the plaintiff is himself an object of the action … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."). Plaintiff, the Hawaii Firearms Coalition ("HFC"), likewise has standing to sue on behalf its members who live in Hawaii and who are subject to the Hawaii law. *Hunt v. Washington State Apple Advert. Com'n.*, 432 U.S. 333, 342 (1977). HFC need only show that its membership includes "at least one member with standing to present, in his or her own right" in order to have standing. *United Food and Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 555 (1996). The individual Plaintiffs are all members of HFC. A consensus of courts have found standing in similar cases.[3]

---

[3] See footnote, 7, *infra.*

8

### 2. Parking Lots and Banks

The State argues that HRS §134-A(a)(1), does not prohibit the carrying of firearms in the parking lots at which Plaintiffs wish to carry, but only in parking lots which are adjacent exclusively to government buildings. Hawaii claims the same interpretation can be applied to HRS §134-A(a)(12)'s ban on carrying in banks, financial institutions, and their parking lots, contending that the "prohibition on carrying firearms in parking areas adjacent to sensitive places (including banks) applies only to parking areas that exclusively serve those places—not to shared parking areas like the one in which Plaintiff Kasprzycki wishes to carry." 2-ER-0108. Hawaii does not contest Plaintiffs' standing to challenge the parking lot bans for parking areas in which access is shared. Here, the district court sustained Plaintiffs' challenge to the ban on parking lots to the extent that a parking lot is shared by government buildings and private entities. 1-ER 40-41.

Plaintiffs give two examples of parking lots in which they would like to carry in their complaint. One is the parking lot located at DT Fleming Beach Park ("DT Fleming").[4] DT Fleming has a lifeguard building located in it. Therefore, anyone who wishes to park in the DT Fleming's parking lot is prohibited from carrying pursuant to HRS §134-A(a)(1). The same is true of many of the parks where

---

[4] https://bit.ly/479AMW0.

Plaintiffs wish to carry because they have ranger stations and visitor center buildings. Another example is the Lahaina DMV. It is located in a shopping center surrounded by private businesses. https://bit.ly/3QeagUn. Similarly, Plaintiff Kasprzycki partially owns one of the bank parking areas in which he would like to carry. 5-ER-1198. He would like to carry in the parking lot of his business, but he shares the parking lot with a bank. 5-ER-1198.

HRS §134-A(a)(1) prohibits the carry of firearms by permit holders in "[a]ny building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas." 4-ER-0707. This language facially encompasses "any" building "used" by the State or a county and expressly includes "adjacent grounds and parking areas." Similarly, HRS §134-A(a)(12), unambiguously bans carry on "[t]he premises of any bank or financial institution as defined in section 211D-1, including adjacent parking areas." Neither section limits its scope to parking lots exclusively adjacent to government buildings or banks. As the district court ruled, "Section 134-A(a)(1) as written does not stand for what the State now claims it does." ER 41. Under Hawaii law, as elsewhere, the meaning of a statute is controlled by the text of the statute. *State v. Oki*, 2023 WL 6130310 at *9 (Hawaii Intermediate Court of Appeals, Sept. 19, 2023) ("'The purpose of a statute, even if remedial, cannot overcome the plain meaning of the statute's text.'"), quoting *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). This Court has long accepted district

10

court interpretations of state law unless that interpretation is "clearly wrong." *Safeco Ins. Co. of America v. Schwab,* 739 F.2d 432, 432 n.1 (9th Cir. 1984). The district court was not "clearly wrong" in rejecting Hawaii's non-textual interpretation of its law.

Moreover, the scope of Hawaii's law is a merits issue, not a standing issue. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); *Covenant Media of S.C., LLC v. City of N. Charleston,* 493 F.3d 421, 429 (4th Cir. 2007) ("A plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case" because otherwise "'every unsuccessful plaintiff will have lacked standing in the first place.'"), quoting *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 461 (4th Cir. 2005)). Accord *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 665 (9th Cir. 2021).

Hawaii purports to rely on an interpretation rendered by the Hawaii Attorney General for this case. Hawaii Br. at 9. But the Supreme Court has "warn[ed] against accepting as 'authoritative' an Attorney General's interpretation of state law." *Stenberg v. Carhart*, 530 U.S. 914, 940 (2000).[5] Indeed, this circuit has refused to accord deference to more limited "litigation positions" in other contexts. *Alaska v.*

---

[5] Similarly, Attorney General opinions "are not binding" as a matter of Hawaii law, *Kepo'o v. Watson*, 87 Haw. 91, 99 n.9 (1998).

*Federal Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008) (holding that the court owed "no deference" to an agency's non-binding "litigation position" interpretation that was "developed during the course of the present case."); *Presidio Historical Ass'n. v. Presidio Trust*, 811 F.3d 1154, 1166 (9th Cir. 2016) (rejecting any "special deference" to "a convenient litigating position" where it was proffered "the first time on appeal").

Even if Hawaii's standing argument was correct, Plaintiffs have standing to challenge HRS §134-A(a)(12) because Plaintiff Kasprzycki partially owns one of the bank parking areas in which he would like to carry. 5-ER-1198.[6]  As alleged in the complaint, Plaintiff Kasprzycki owns the portion of the building in which his business is located. 5-ER-1198. He would like to carry in the parking lot of his business, but he shares the parking lot with a bank. 5-ER-1198. Therefore, there can be no dispute that he has a right to challenge the bank restriction. As a tenant in common with the bank with an equal possessory interest in the parking lot, Kasprzycki does not need to seek permission from the bank. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47,

---

[6] *See also* 2-ER-0377 (clarifying that the bank in his building is a Valley Isle Community Federal Credit Union).

52 n.2 (2006). Therefore, even under the State's standing theory, Plaintiffs have standing to challenge HRS §134-A(a)(12).

### 3. Plaintiffs' Standing Is Not Dependent on Permission of Third Parties

The State contends that Plaintiffs lack standing to challenge the presumptive ban on carry on private property otherwise open to the public as imposed by Hawaii law because they have not shown private businesses would allow them to carry. But once again, the State misconstrues the scope of the right to carry at issue and substitutes standing with the merits. The right to carry in public recognized in *Bruen* extends to all areas outside the home that are otherwise open to the public, including the areas where Plaintiffs wish to carry. *See Bruen*, 142 S.Ct. at 2122 ("In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree . . ."); *Id.*, 142 S.Ct. at 2135 (The Second Amendment "presumptively guarantees" citizens the right to carry arms "in public for self-defense." Plaintiffs have standing to challenge restrictions on the exercise of that right, as thus construed in *Bruen*. The State's argument that the right does not extend to private property in the absence of prior permission is a merits argument, not a standing argument.

That injury is directly traceable to the ban imposed by the Hawaii law and the injunction sought would obviously redress that injury. For example, in *Kipke v.*

13

*Moore*, --- F.Supp.3d ---, 2023 WL 6381503 at \*12 (D. MD Sept. 29, 2023), the court rejected the same standing argument made by the State here. The court found injury, traceability and redressability where the plaintiffs challenged the State's presumptive ban on carry in privately owned buildings otherwise open to the public where the plaintiffs had previously carried in such private buildings in the absence of prior permission and would carry in such locations but for the State law at issue. So too here for the same reasons.

Plaintiffs also have standing because "[i]nvalidation of the challenged ordinance, therefore, would tangibly improve the chances of" them carrying in the various locations they declared they want to carry in. *Huntington Branch, NAACP v. Huntington*, 689 F.2d 391, 395 (2d Cir. 1982). It is the Anti-Carry Default that prohibits firearm carry on the property absent such consent. *See Christian*, 2022 WL 17100631, at \*9 (noting that "carrying on private property" is "generally permitted absent the owner's prohibition"); *cf. Brown v. Enter. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (noting that laws "ma[king] [it] criminal to admit a person under 18 to church" would "not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto," and as such would be subject to constitutional challenge).

Hawaii contends "the district court mistakenly relied on declarations from owners of businesses to conclude that Plaintiffs have standing to challenge HRS

14

§134-E," arguing that these particular owners have indicated that carry on their premises with a permit is permissible without first seeking permission. Opening Brief at 19. The district court properly rejected that argument. 1-ER 0033. The injury to Plaintiffs is the unconstitutional imposition of a requirement to seek prior permission, not merely whether carry would ultimately be successful with such permission. *See e.g.*, Declaration of Gregory L. Howeth (stating "I have otherwise not given consent to the public to carry firearms on my property and/or business.") 2-ER-0346-0348. And Plaintiffs have all alleged in their supplemental declaration that they would go armed to Mr. Howeth's shop but for HRS §134-E. 2-ER-0368-2-ER-0378. There is no reasonable reading of these declarations that support the State's interpretation. And Plaintiffs' harm to that right to carry in privately owned locations is not limited to these particular locations, as the Hawaii statute requires prior approval for all such privately owned locations. This facial challenge is not limited to these particular locations.

Even if the State were correct, Plaintiffs would still have standing to challenge §134-E. As one district court stated in rejecting the same argument, the injury here "is not merely the inability to carry in privately-owned buildings" but rather "is the threat of prosecution for carrying firearms in places that, under prevailing law, they have previously had the presumptive right to do so absent express prohibition by the property owner." *Kipke*, 2023 WL 6381503 at *13. So too here.

15

## C. THE DISTRICT COURT DID NOT ERR IN HOLDING THAT PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS

### 1. The *Bruen* Standard and Controlling Principles

In *Bruen* the Supreme Court made it clear that "the Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may 'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S.Ct. at 2156 (emphasis added). To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

142 S.Ct. at 2129–30.

It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127; *see also id.* at 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden." ) If the State fails to meet its burden, then the State's restrictions must be enjoined.

16

The district court correctly found that the portions of ACT 52 challenged in this litigation violate the Second Amendment because these provisions are not consistent with this Nation's historical tradition of firearms regulation. In doing so it joined a consensus of courts that have found similar laws unconstitutional.[7] And, these courts have explicitly or implicitly rejected similarly standing arguments.

In *Bruen*, the Supreme Court only endorsed three sensitive places "where weapons were altogether prohibited," namely "legislative assemblies, polling places, and courthouses." *Id.* at 2133. The Court stated explicitly that "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). In so holding, the Court made clear that the government may not ban arms simply because the public

---

[7] *Kipke v. Moore*, Civil Action No. GLR-23-1293, 2023 U.S. Dist. LEXIS 174934 (D. Md. Sep. 29, 2023) (granting preliminary injunction on default rule and other aspects of Maryland law); *Antonyuk v. Hochul,* No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022)(granting preliminary injunction on much of New York's sensitive places law); *Hardaway v. Nigrelli*, No. 22-CV771 (JLS), 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022) (granting preliminary injunction as to New York' ban on carry in churches); *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov. 22, 2022) (granting preliminary injunction on New York's private property default ule); *Spencer v. Nigrelli*, No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS 233341 (W.D.N.Y. Dec. 29, 2022) (granting preliminary injunction on ban on carrying in churches); *Koons v. Platkin*, No. CV 22-7463 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023) (granting preliminary injunction against many aspects of New Jersey's sensitive places law).

may "congregate" or gather in a given location. *Id.,* at 2134. Like New York's attempt to effectively render Manhattan a gun-free zone Hawaii's bans at these locations sweep so broadly that they effectively "eviscerate" the "general right to publicly carry arms for self-defense." *Id*.

*Bruen* explained that the analogical inquiry is guided by two "metrics": "how and why" any restriction was historically imposed during the Founding era. *Id*. at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id*. (emphasis in original) (quoting *McDonald v. Chicago,* 561 U.S. 742, 767 (2010). For example, historical poaching and hunting restrictions are generally insufficient to demonstrate the constitutionality of a modern-day restriction on carrying firearms during day-to-day life. Both how hunting laws burdened the right to carry firearms for self-defense (when hunting) and why they did so (to regulate hunting and reduce the taking of certain animals in certain places during certain seasons) have nothing to do with restricting the right of self-defense in modern-day Hawaii. *See, e.g.*, *Koons v. Platkin,* 2023 WL 3478604, at *64-*65 (D.N.J. May 16, 2023).

The foremost factor that is the linchpin between these few locations is the long tradition of the government exclusively providing comprehensive security, *see, e.g.* THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke, ed.

1790) ("The said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts."),[8] because, for example, government officials are "at acute personal risk of being targets of assassination," David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 290 (2018); *see also Hardaway v. Nigrelli*, 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022).

At the Founding, comprehensive security meant officials who were armed and able to control every point of access at a court or legislature. Today, it still means security akin to that provided before entering courthouses or the legislature, i.e., armed government guards and metal detectors at a minimum at every point of entry.

---

[8] Other examples of Founding Era regulations in these places: VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791, at *2 (Green ed., 1795) (appointing sergeant at arms and door-keeper for state legislature); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Stanley Ray ed., 1904) ("sergeant-at-arms" and "door-keeper" for legislature); 1 LAWS OF THE STATE OF NEW YORK 176 (2d ed., Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons… . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796) (court's "serjeant at arms"); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed.,1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); 1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) (polling places); 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (polling places).

TSA "officers, air marshals, police officers, metal detectors, and luggage scanners all check people and their baggage for weapons and dangerous devices, like explosives."); *Hardaway*, 2022 WL 16646220, at *14 (explaining sensitive places are "typically secured locations"). That the government can prohibit firearms in these governmental sensitive places makes sense. The historic central purpose of the Second Amendment is ensuring Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 142 S.Ct. at 2150. But when the government secures a courthouse or legislature and protects Americans, there is less of a need for ordinary, law-abiding Americans to be ready to defend themselves. Governments may bar the carrying of firearms in only "*exceptional* circumstances." *Bruen*, 142 S.Ct. at 2138 (emphasis added). The exception cannot become the rule.

The relevant time period for the historical analogue is the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135–36; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw. That is because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S.Ct. at 2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–35) (2008). Although the Court in *Bruen* noted an academic debate surrounding whether courts should look to 1868 and Reconstruction (when

20

the Fourteenth Amendment was adopted), the Court found no need to address the point as the result with respect to carry was the same. *Id.* at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." (emphasis added)). But the analysis of the Court was focused on 1791, and the Court has "assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 2137. *See Worth v. Harrington,* 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters").

This emphasis on Founding era evidence is fully in accord with past Supreme Court precedent. For example, in *Espinoza v. Mont. Dep't of Rev.*, the Court held that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding era practice. 140 S.Ct. 2246, 2258–59 (2020); *see also Ramos v. Louisiana*, 140 S.Ct. 1390, 1396 (2020); *Timbs v. Indiana*, 139 S.Ct. 682, 687–88 (2019); *Gamble v. United States*, 139 S.Ct. 1960, 1975–76 (2019); *Virginia v. Moore*, 553 U.S. 164, 168 (2008). Indeed, any holding that 1868 controls would upend 80 years of

21

Supreme Court jurisprudence that that looked to 1791 in construing the scope of incorporated constitutional provisions. The Second Amendment is not a special case. *Bruen*, 141 S.Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"), quoting *McDonald*, 561 U.S. at 780.

In decisions rendered since *Bruen*, this Court and the Fifth Circuit have thus looked to 1791 when assessing the scope of the Second Amendment. *See Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (holding that butterfly knives were protected arms and that the State had failed to show that a ban was justified by a historical analogue dating back to the Founding); *United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) ("Even if the public understanding of the right to bear arms did evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791."). *See also Hirschfeld v. ATF*, 5 F.4th 407, 419 (4th Cir.), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied,* 142 S.Ct. 1447 (2022) (""[w]hen evaluating the original understanding of the Second Amendment, 1791—the year of ratification—is 'the critical year for determining the amendment's historical meaning.'"), quoting *Moore v. Madigan*,

702 F.3d 933, 935 (7th Cir. 2012). The post-*Bruen* decisions of the district courts in

this Circuit and elsewhere have also uniformly looked to 1791.[9]

The historical analogues proffered by the State must be "well-established,"

"enduring" and "representative" and thus "outlier" requirements of a few

jurisdictions or of territorial governments are to be disregarded. *Bruen*, 142 S.Ct. at

2133, 2153-54, 2147 n.22 & 2156. This means regulations from only a handful of

---

[9] *See, e.g.*, *United States v. Alston*, 2023 WL 4758734, at *5 (E.D.N.C. July 18, 2023) ("The further a historical practice strays from 1791—the year in which the Second Amendment was adopted—the less probative it is when determining whether a law complies with the Amendment's command."); *United States v. Bartuci*, 2023 WL 2189530, at *6 (E.D. Cal. Feb. 23, 2023) ("the best way to do the historical analysis is by understanding the scope the Second Amendment had when it was adopted in 1791 and to look to 1868 when the Fourteenth Amendment was adopted as potentially confirmative evidence"); *United States v. Rowson*, 2023 WL 431037, at *22 (S.D.N.Y. Jan. 26, 2023) ("Viewing these laws in combination, the above historical laws bespeak a 'public understanding of the [Second Amendment] right' in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness."); *United States v. Connelly*, 2022 WL 17829158, at *2 n.5 (W.D. Tex. Dec. 21, 2022) (rejecting the government's reliance on "several historical analogues from 'the era following ratification of the Fourteenth Amendment in 1868'"); *United States v. Stambaugh*, 2022 WL 16936043, at *2 (W.D. Okla. Nov. 14, 2022) ("the government must identify a historical analogue in existence near the time the Second Amendment was adopted in 1791") (citation omitted); *United States v. Price,* 2022 WL 6968457, at *1 (S.D. W. Va. Oct. 12, 2022) ("Because the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional then can be constitutional now."); *FPC, Inc. v. McCraw,* 625 F. Supp. 3d 740, 756 (N.D. Tex. 2022), appeal dismissed sub nom. *Andrews v. McCraw*, 2022 WL 19730492 (5th Cir. 2022). While some of these cases involved federal statutes, *Bruen* makes clear that the Second Amendment has "the same scope" as against the States. 142 S.Ct. at 2137.

states or those that cover only a small portion of the population or only persist for a few years are not enough to demonstrate that modern regulations are consistent with the Second Amendment. *Id.* at 2155. *Bruen* categorically rejected reliance on laws enacted in the Territories, including expressly "Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are *most unlikely* to reflect 'the origins and continuing significance of the Second Amendment'" *Id*. at 2154 (quoting *Heller*, 554 U.S. at 614) (emphasis added). The historical analogues must be "distinctly similar," which is to say that they must burden ordinary, law-abiding citizens' right to carry for self-defense in a similar manner and for similar reasons. *Id*. at 2132.[10]

*Heller* and *Bruen* make clear that the constitutionality of a ban on carrying in a particular location must be supported, like any law burdening Second Amendment rights, by a "historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126; id. at 2156 (explaining that only "an American tradition" could establish "the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials"). Recognizing that it did not "undertake an exhaustive historical analysis," *Heller* left open the extent to which

---

[10] And even if modern laws alone could demonstrate a broad tradition of a regulation, there must at least be a strong showing that such laws are common in the states, *i.e.*, many more than six states. *See Kennedy v. Louisiana*, 554 U.S. 407, 423–26 (2008) (only six states permitting death penalty for child rapists shows national consensus against it).

government may prohibit carrying "in sensitive places such as schools and government buildings." 554 U.S. at 626. It reserved "expound[ing] upon the historical justifications" for future cases. *Id*. at 635.

*Bruen* elaborated that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were *altogether* prohibited—e.g., legislative assemblies, polling places, and courthouses." 142 S.Ct. at 2133 (emphasis added). And only because of both historical support and lack of "disputes regarding the lawfulness of such prohibitions" did the court "assume" that bans in those "relatively few," "exceptional" places were constitutional. *Id.* at 2133, 2156. *Heller* and *Bruen* thus confirm that a "sensitive place" ban must be supported by a well-established, representative historical tradition. *Koons*, 2023 WL 3478604, at *55 (explaining that a sensitive place ban must be supported by "a historical tradition that is well-established and representative").

Hawaii points out that *Heller* and *Bruen* mentions "schools and government buildings," as well as "legislative assemblies, polling places, and courthouses," *Bruen*, 142 S.Ct. at 2133, and claims that "[s]chools, for example, are sensitive because children are especially vulnerable to gun violence." *Id.* But that conclusion and rationale ignores history. Founding era laws restricting firearms on campus and in schools applied only to **students**, not to faculty, staff, or visitors, pursuant to the schools *in loco parentis* authority. *See Worth v. Harrington*, No. 21-cv-1348, 2023

25

WL 2745673 at *12–14 (D. Minn. Mar. 31, 2023); See Kopel & Greenlee, 13 CHARLESTON L. REV. 204, 249–52 (2018); Br. of Ctr. for Hum. Liberty as Amicus Curiae 20–22, *filed in Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Feb. 9, 2023), ECF No. 313 (collecting laws). For a place truly to be sensitive, the government must treat it as such. This is demonstrated by the enhanced government-provided security present at polling places, legislative assemblies, and courthouses at the Founding. Ctr. for Hum. Liberty Br. 8-17.

The State also argues *Bruen*'s passage about "unprecedented societal concerns" and "technological changes" "provides additional support" for their position. Opening Br. at 24. But *Bruen* suggested that "a more nuanced approach" may be appropriate in cases involving "unprecedented societal concerns or dramatic technological changes," 142 S.Ct. at 2132, but when a regulation purports to address "a general societal problem" that was also present during the Founding the historical analogues must be "distinctly similar," *Id.* at 2131. *Daniels*, 77 F.4th at 342.

Here, the State says that the goal of ACT 52 is "to mitigate the serious risks of firearms and gun violence." Opening Br. at 6. There is nothing new about "handgun violence" -- it is a societal problem that existed at and since the Founding. See *Bruen*, 142 S.Ct. at 2131-32, quoting *Heller*, 554 US. at 634. Accordingly, this Court must "consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id*. In such cases,

"the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131. For example, the Founders protected vulnerable populations by requiring the bearing of arms because disarming the vulnerable and their caretakers makes them more defenseless, not less. See Kopel & Greenlee, 13 CHARLESTON L. REV. at 232–34 & n.108, 244. Under *Bruen*, if earlier generations addressed the societal problem, but did so through materially different means, that is evidence that a modern regulation is unconstitutional. 142 S.Ct. at 2131. Hawaii ignores this history.

The challenged restrictions in this case also are not based on any "dramatic technological change." *Id*. at 2132. Seizing on this language Hawaii argues that modern firearms are different because at the "Founding, firearms were "accurate to only about one hundred" yards, *id*. at 19, and that an "assault rifle can still penetrate steel" at that distance," *id.* at 24. But there is nothing "dramatic" about the evolution of firearms technology or the "regulatory challenges" posed by ordinary firearms regulated by the State's laws. Afterall, ACT 52 regulates concealed *handgun* carry *by permit holders* in its quest to "mitigate" gun violence. A handgun typically has a maximum effective range of 50 meters. (54.68 yards).[11] That is far less range than

---

[11] The M9 Berretta is the United States military's primary service pistol. https://en.wikipedia.org/wiki/Beretta_M9. The maximum effective range of the M9 is 50 meters (54.68 yards). *Id*. *See also* Departments of the Army, Navy, and Air

colonial firearms. *Heller* and *Bruen* hold that all bearable modern firearms in common use by law-abiding Americans are protected arms. *Id*.; *Heller*, 554 U.S. at 582. Neither decision supports the notion that handguns in common use today represent some sort of dramatic technological change requiring a "more nuanced" approach.

### 2. The Trial Court Correctly Held That Plaintiffs' Conduct Falls Within the Plain Text of the Second Amendment

The first inquiry under *Bruen* is whether the conduct falls within the text of the Second Amendment's right to "keep and bear arms." *Bruen*, 142 S.Ct. at 2126. *Bruen* holds "the Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "*exceptional* circumstances" as to which the **State** has the burden of proof. *Bruen*, 142 S.Ct. at 2156 (emphasis added).

Hawaii argues that there is a difference between a "right to carry firearms in *public*" and a right to "*property* held open to the public" but that contention runs contrary to *Bruen's* holding and the holdings of every post-*Bruen* case. *Bruen* held

---

Force, Operator's Manual: Pistol, Semiautomatic, 9mm, M9 (1005-01-118-2640) (1992) at *10 available at https://books.google.com/books/about/Operator_s_Manual.html?id=yXo9AAAAY AAJ . (last visited 10/10/2023).

that "the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." 142 S.Ct. at 2134. The general right to "bear arms" thus textually covers carry in "public" which includes every location otherwise open to the public. Full stop.

Hawaii also misinterprets this Court's holding in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023), arguing that *Alaniz* holds "Plaintiffs must show that their specific "proposed course of conduct"—carrying firearms into the challenged sensitive locations—"falls within the Second Amendment." *Alaniz*, 69 F.4th at 1128 (internal quotation marks omitted)". Opening Br. at 21. Nonsense. The issue in *Alaniz* was whether U.S.S.G. §2D1.1(b)(1), which requires "an enhancement of the Guidelines calculation if a defendant possessed a dangerous weapon at the time of a felony drug offense, is constitutional under the Second Amendment following [*Bruen*]." 69 F.4th at 1126. In answering that question, the Court merely "assume[d], without deciding, that step one of the *Bruen* test"—i.e., whether "the Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S.Ct. at 2129-30—was "met." *Alaniz*, 69 F.4th at 1129.

## D.    THE STATE HAS NOT CARRIED ITS BURDEN

### 1.    General Principles.

Under *Bruen*'s unambiguous directions, "the burden falls on [the State] to show that [the challenged ban] is consistent with this Nation's historical tradition of

firearm regulation." *Id.* at 2135; *see also Koons v. Platkin*, 2023 WL 3478604, at *62 (D.N.J. May 16, 2023); *Christian v. Nigrelli*, 2022 WL 17100631, at *7 (W.D.N.Y. Nov. 22, 2022); *Hardaway*, 2022 WL 16646220, at *13. Notably, the citation of just any historical regulation will not satisfy the State's burden under *Bruen*. As explained, one must look to the Colonial Era to determine the constitutionality of Second Amendment challenges. *See Wrenn v. District of Columbia*, 864 F.3d 650, 668 (D.C. Cir. 2017) ("our opinion does little more than trace the boundaries laid in 1791 and flagged in *Heller I*"). *See also Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) ("1791, the year the Second Amendment was ratified—the critical year for determining the amendment's historical meaning…"). Both *Moore* and *Wrenn* were cited with approval in *Bruen*. 142 S.Ct. at 2127, 2135.

There is no historical tradition of prohibiting firearm carry in parking lots, establishments that serve alcohol, banks, parks, or beaches or on privately held property otherwise open to the public. On the merits, this Nation's traditional regulatory approach, which has entrusted "private property owners" with principal responsibility to exercise the "right to exclude others from their property" throughout American history. *Christian*, 2022 WL 17100631 at *9. The historical default rule has been that "carrying on private property" is "generally permitted absent the owner's prohibition." *Id*. (emphasis added). Indeed, Hawaii's argument

failed in the trial court and has been rejected by every court which reached the merits in similar Second Amendment cases. Notably the Third Circuit in *Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023) denied the State of New Jersey's motion to stay as to preliminary injunction granted as to New Jersey's default rule which is virtually identical to Hawaii's.

### 2. Parking lots adjacent to government buildings

As noted above, HRS §134-A(a)(1) prohibits carry in the parking lots Plaintiffs wish to carry in. The parking lot at DT Flemming beach is not a sensitive place just because there is a lifeguard building adjacent to it. *See B&L Productions, Inc. v. Newsom*, C.D. Cal. No. 8:22-cv-01518-JWH-JDE, Dkt. No. 43, p. 26 (October 30, 2023). ("[T]here is no historical basis for a public space such as the Orange County Fairgrounds to be designated as a sensitive space"). The parking lot of Ross and Ace Hardware is similarly not a sensitive place simply because it is shared with the Lahaina DMV. Hawaii cites two pre-*Bruen* cases for support. *United States v. Class* reasoned that guns could be banned in a parking lot 1,000 feet from the U.S. Capitol's entrance, but expressly noted that this area could be easily avoided and thus did not affect carry elsewhere in the District. 930 F.3d 460, 466 (D.C. Cir. 2019).

Two other decisions held that guns could be restricted in U.S. Postal Service parking lots. Br. 30 (citing *Bonidy v. U.S.P.S.*, 790 F.3d 1121 (10th Cir. 2015) and

*United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009)). These parking lot bans do not compare to the sweeping burdens on the right of self-defense imposed by ACT 52. See *Bruen*, 142 S.Ct. at 2133 ("the right of armed self-defense and whether the burden is comparably justified are '*central'* considerations when engaging in an analogical inquiry" (emphasis in original)). Indeed, *Bonidy* upheld the parking lot carry ban only by applying "intermediate scrutiny," *Id.* at 1126, a mode of analysis abrogated by *Bruen*. 142 S.Ct. at 2126. More to the point, Hawaii has not pointed to a historical tradition of prohibiting carry in parking lots analogous to the parking lots at issue here. And that is their burden under *Bruen*. The trial court did not abuse its discretion in finding Plaintiffs are likely to succeed in their challenge to HRS §134-A(a)(1).

### 3.    Bars and restaurants serving alcohol

The trial court did not abuse its discretion in finding that Plaintiffs are likely to prevail in their challenge to HRS §134-A(a)(4)'s ban on carrying in restaurants, bars and their parking lots. If Hawaii had chosen merely to ban carry while intoxicated in public, it might have found some support in the historical record. *See, e.g., United States v. Daniels*, 77 F.4th 337, 346 (5th Cir. 2023); *United States v. Harrison*, 2023 WL 1771138, at *7 (W.D. Okla. Feb. 3, 2023) (both discussing mid-to-late 19th-century prohibitions on carrying a firearm while intoxicated). But under ACT 52, even those who never drink will still be prohibited from exercising their

right of armed self-defense while taking their families out to dinner at a restaurant that also happens to serve liquor.

There is no historical basis for such a prohibition. Striking down a similar ban, the *Antonyuk* court said of New York's similar law that it "did not criminalize becoming intoxicated while carrying a firearm. It criminalized a license holder's mere presence at an establishment licensed for the on-premises consumption of alcohol while carrying concealed – regardless of whether he or she is consuming alcohol there." 2022 WL 16744700, at *72. And in *Koons*, New Jersey relied on a historical law barring the possession of pistols by intoxicated persons, 1867 Kan. Sess. Laws 25, and a law barring the sale of alcohol near a military encampment. 1859 Conn. Pub. Acts, ch. LXXXII, §5, at 62. Neither affected the carry rights of people who were not intoxicated. New Jersey also cited a lone law from the Oklahoma territory that banned firearms from places where liquor was sold, but the *Koons* court rightly noted that the law was an outlier, concluding that "the State has not shown that well-established and representative historical firearm laws support Chapter 131's handgun ban at bars and restaurants that serve alcohol." 2023 WL 3478604, at *86. See also *Kipke*, 2023 WL 6381503 at *11 ("Those historical statutes prevented only intoxicated individuals from carrying firearms").

"In all states" during the Founding era, "tavern legislation was involved and constantly changing." Christine Sismondo, America Walks Into a Bar: A Spirited

History of Taverns, Saloons, Speakeasies and Grog Shops 15 (Oxford 2011). Yet, the State has not cited a single ban on mere possession of firearms in these places. The absence of any Founding era analogues is dispositive. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131. And even if there were, there certainly were never regulations which prohibited the carry of firearms in the parking lot of a place that sold alcohol. Establishments licensed to serve alcohol have existed for centuries.

The district court thus correctly rejected the States's reliance on colonial militia laws regulating the use of alcohol while on militia duty. "Founding-era statutes concerning guns and alcohol were few" and "had two primary concerns: (1) the misuse of weapons while intoxicated and (2) the discipline of state militias. *Daniels*, 77 F.4th at 345. These laws "only prevented firing guns (not possessing them); and it applied only to those under the influence, not habitual drinkers." *Id*. at 346.The State argues that "there is no reason to believe that trained militia members would pose greater risks in proximity to alcohol than other members of the public." Opening Br. at 31. Whether or not that is true is beside the point. The purpose of these laws was to maintain military discipline -- not to "mitigate gun violence," writ large. And of course, the historical law did not prohibit non-servicemen from

34

peaceably carrying their arms in bars, pubs, or taverns. Thus, the how and why are thus different. "At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public." *Daniels,* 77 F.4th at 346. "Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence." *Id* at 349. "[T]he purpose and scope of these colonial-era militia laws are too dissimilar to the State of Hawaii's laws to justify them. *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1087 (D. Haw. 2021).

What remains are a handful of outlier municipal and territorial ordinances. "[O]ne solitary statute is not enough to demonstrate a *tradition* of an arms regulation." *Teter,* 76 F.4th at 952 (emphasis in original). Similarly, the handful of ordinances produced is insufficient to produce a historical tradition. The remainder of the laws cited by Hawaii are of too recent vintage to be relevant. Hawaii argues that the trial court erred in its analysis because it required a historical twin. That is entirely untrue. It correctly found the militia laws cited too were not relevantly similar because they had a different how and why.

Certainly, there is no "unprecedented social concern" or "dramatic technological changes" with respect to carrying handguns in banks. Banks existed in the 18th and 19th centuries, and establishments which serve alcohol have always existed in the United States. "[W]hen a challenged regulation addresses a general

societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131. Thus, Hawaii's attempt to rely on a few outlier laws which prohibited carry in other social settings is inapposite and are of too recent vintage. Hawaii attempts to rely on certain municipal and territorial laws. However, *Bruen* already discounted the use of "localized" and territorial laws. *Bruen*, 142 S.Ct. 2111, 2154-55.

Hawaii complains that the trial court enjoined the entirety of HRS §134-A(a)(1)(4), but nothing in that subsection purports to address actual consumption of alcohol; it broadly bans all carry by permit holders in a *location* (a bar or restaurant that serves alcohol); it does not bar drinking while carrying. It is thus facially unconstitutional because it lacks any supporting historical analogue establishing an enduring, well-established National tradition. Plaintiffs did not object to any statute that purported to bar consumption of alcohol while carrying, but no such ban is presented by this case.

### 4. Banks

H.R.S. §134-A (12) bans the carry of handguns on the premises of any bank or financial institution including adjacent parking areas. Plaintiffs wish to carry both at their banks and in the parking lot of their banks. Banks have always existed in the

United States. And historically, the government always allowed private banks to determine for themselves whether or not individuals could carry firearms there. The first bank in the U.S. was the Bank of North America in Philadelphia, which was chartered by the Continental Congress in 1781; Alexander Hamilton, Thomas Jefferson and Benjamin Franklin were among its founding shareholders.[12] Wallack, Todd (December 20, 2011). "Which bank is the oldest? Accounts vary - The Boston Globe." The Boston Globe. In February 1784, The Massachusetts Bank in Boston was chartered. *Id.*[13] Thus, banks have existed in this country since the time of the Founding. However, Hawaii has not found any historical laws banning the carry of firearms at banks. And there certainly were none in the parking lot of banks. Thus, this Court should find both the restriction on carry at banks and separately the ban on carry in their parking lots unconstitutional.

The State claims that banks at the time of the Founding were government instrumentalities. Even if this were true, that is insufficient to uphold a flat ban on carrying at private banks in the modern era. As shown above, most government buildings did not ban the carrying of firearms in the relevant historical period. The State is required to show a historical tradition of banning carry in banks. That, it has not done. More to the point, even the State's own sources show that some banks

---

[12] *See* https://bit.ly/473C44A

[13] *See also* https://bit.ly/3SijqCb.

were privately owned. *See* Daniel J. Elazar, *Banking and Federalism in the Early American Republic*, 28 Huntington Libr. Q. 301, 303-04 (1965) ("the great majority of American banks" in the early Republic "were either state-owned joint stock companies in which the state was a major shareholder or were controlled by the state through special charter provisions,"). Moreover, for those where the state had an ownership interest, this does not support any tradition of the government being able to prohibit carry in those locations. A state-owned or controlled entity is, by definition, a separate legal personality from the government. Its buildings are not government buildings. Hawaii's argument that carry can be banned in private banks because some banks were historically controlled by the government holds no water.

Hawaii relies on colonial restrictions on carrying at markets and fairs. Opening Brief at 43-44. In the trial court, Hawaii claimed that "ACT 52's restriction on guns in banks and financial institutions is constitutional because it fits within a long historical tradition of prohibiting firearms in sensitive commercial centers." 3-ER-0407. Now, Hawaii appears to acknowledge that these laws only "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." Opening Brief at 43; *Bruen,* 142 S.Ct. at 2145. Carry for self-defense was not banned by these laws. *Id*. at 2133. Again, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical

38

inquiry." *Bruen*, 141 S.Ct. at 2133, quoting *McDonald*, 561 U.S. at 767 (emphasis in original). These laws are not remotely similar to Hawaii law which completely bans the carry of firearms in banks, financial institutions and their parking lots.

Additionally, markets and fairs are not "distinctly similar" to banks and financial institutions. Hawaii claims that they are because both impact "economic activity," but that argument sweeps so broadly that it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen* 141 S.Ct. at 2134. As banks existed at the time of the Founding and there were no government restrictions on their carry, this court need go no further in finding Hawaii's law unconstitutional. *A fortiori* there is no basis for bans in the parking lots of banks. Such a ban would effectively disarm an individual withdrawing money from an ATM, or one who is leaving his business late at night and entering a parking lot that happens to be shared with a bank.

With no "distinctly similar" evidence, Hawaii attempts to rely on isolated municipal and territorial laws. However, *Bruen* already discounted the use of territorial laws. *Bruen*, 142 S.Ct. 2111, 2155. Moreover, Hawaii's examples from late 19th century, such as the 1889 Arizona law, are "belated innovations" and cannot alone establish a historical tradition, *Bruen*, 142 S.Ct. at 2137. As in *Bruen*, "the bare existence of these localized restrictions" are insufficient to establish an

enduring National historical tradition of banning carry in or around banks. *Bruen*, 141 S.Ct. at 2154.

Hawaii relies on three 19th century cases which are all easily distinguishable. *Bruen* denounced the state's lead precedent—*English v. State*, 35 Tex. 473 (1872)— as an "outlier[]." 142 S.Ct. at 2153. Moreover, as the Declaration of Clayton Cramer explains, "the statute and decision both postdate the ratification of the 14th Amendment". 2-ER-0302. Hawaii's attempt to distinguish *Bruen's* analysis fails because *Bruen* was refuting the propriety of *English's* analysis in its entirety. Another—*Hill v. State*, 53 Ga. 472 (1874)—embraced a militia-based view of the Second Amendment that *Heller* rejected (hence its appearance only in Supreme Court dissents), *see McDonald*, 561 U.S. at 937 (Breyer, J., dissenting). Another— *Andrews v. State*, 50 Tenn. 165 (1871)—briefly opined on the permissibility of firearms in places likes churches. And another—*State v. Shelby*, 2 S.W. 468 (Mo. 1886)—opined on the constitutionality of various locational prohibitions only in passing when upholding a prohibition on carrying a firearm while intoxicated. These cases thus cannot be used to restrict the right recognized in *Bruen*.

## 5. Parks and Beaches

There is nothing new about parks and beaches and there is nothing new about potential violence in parks or public green spaces set aside by the government generally. The State claims that "there is a robust historical tradition of restricting

guns in places like parks and beaches." Opening Brief at 39. However, as the Declaration of Clayton Cramer demonstrates, Hawaii's expert only produced one ordinance from before 1868. *See* 2-ER-0289 ("Curiously, the only such ordinance in his Table 2 before 1868 is New York City's 1861 measure. He provides no citation for such an ordinance. All the smaller cities that Cornell lists in n. 93 have ordinance dates after 1868."). These "localized" restrictions do not establish a national tradition, much less one dating from the Founding.

Boston Common is considered "America's oldest park" and was established in 1634. Not only was it commonly used for militia purposes (making it *not* a gun-free zone), "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021). In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation, available at https://on.nyc.gov/3hBZXfe (last visited May 23, 2022). New York's Bowling Green Park was established "for the Recreation & Delight of the Inhabitants of [New York] City" in 1733. *Id.* In the South, Savannah was planned around public squares—open green spaces which became the landscaped parks that residents know today. *See* Turpin Bannister,

*Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47, 48 (1961) **(**noting Savannah's squares started initially as "open, unplanted plazas" and were "remodel[ed] . . . around 1800 . . . into landscaped neighborhood parks"). And of course, public beaches have always existed in the United States. Despite the existence of parks and beaches dating to the Founding, there is no relevantly similar historical tradition of banning firearms by ordinary, law-abiding citizens. Moreover, much of the land covered by H.R.S. §134-A are "vast expanses" of the great outdoors "where people are generally free to roam." *Antonyuk*, 2022 WL 16744700 at *66.

Even prior to *Bruen*, courts had rejected such locations as "sensitive places." *See*, *e.g.*, *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) (holding that State parks and State forests were not "sensitive places" and that the State's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158, 1176 (2018) (holding that an Illinois statute that banned the possession of a firearm within 1000 feet of a public park violated the Second Amendment, rejecting the argument that the area was a "sensitive" place); *Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120, 1123–25 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15, 2017), (rejecting the government's argument that U.S. Army Corps of Engineers' outdoor recreation sites were sensitive places); *Solomon*

42

*v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp.3d 675, 690–96 (N.D. Ill. 2021) (finding a forest preserve district was not a "sensitive place").

Hawaii's primary argument in defending its ban on beaches and parks is that it does not need to respect Plaintiffs' rights on land owned by the State. That is not correct. Applied to the First Amendment, that would mean Hawaii can ban protests on all public land. Even when acting as a proprietor, Hawaii "is a state actor rather than a private business, so its actions must comply with the Constitution." *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015). Hawaii's reliance on *Nordyke* is particularly misplaced. In *Nordyke*, "Plaintiffs' Second Amendment challenge was based solely on their inability to conduct a successful gun show on county property." *Nordyke v. King*, 681 F.3d 1041, 1045 (9th Cir. 2012) (O'Scannlain concurring). In the midst of litigation, the defendant interpreted its ordinance to allow for the sale of firearms. *Id.* at 1044. Thus, this Court found there was no Second Amendment violation. That is the entirety of the holding. There is nothing within *Nordyke* that supports Hawaii's theory. *See B&L Productions, Inc. v. Newsom*, C.D. Cal. No. 8:22-cv-01518-JWH-JDE, Dkt. No. 43, p. 26 (October 30, 2023). (finding ban on gun shows Orange County Fairgrounds unconstitutional and discussing *Nordkye*).

In fact, the cases Hawaii cites support the opposite conclusion. *Id.* at 1045. *See e.g., United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even

43

when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]") Hawaii's argument proves too much. Hawaii also "owns" sidewalks and streets, but the government cannot simply ban firearm carry there. *See Bruen*,142 S.Ct. at 2135. *Bruen* gave specific examples of types of government buildings where firearms could be prohibited: legislative assemblies, polling places, and courthouses. By analogy "to those historical regulations," the State can potentially justify new sensitive places. *Id.* at 2133 (emphasis added), but that analogy cannot extend to all public places owned by the government without eviscerating the right, a result rejected in *Bruen*. 141 S.Ct. at 2133-34.

Hawaii's failure to cite a single Founding era law is alone enough for the Court to find that Hawaii has failed to satisfy its burden. The State's reliance on *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (2021), is misplaced. There the court found carrying in parks is part of the Second Amendment right and applied the now rejected "intermediate scrutiny." *Id*. at 479. Also inapposite is the handful of outlier city ordinances from the mid to late 1800s. Localized outlier regulations do not establish a national tradition. *Bruen*, at 2133, 2153-54, 2156, 2147 n.22.[14] Even if this Court were

---

[14] *Bruen* rejected New York's reliance on three colonial statutes (1686 East New Jersey, 1692 Massachusetts, 1699 New Hampshire), *id*. at 2142–44, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *id*. at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West Virginia), *id*. at

44

to find Hawaii's ban justified as to urban parks, that does not justify their wholesale ban on beaches and parks in Hawaii, especially on the outer islands, which are much less urban than on the mainland. Many of the beaches and parks Plaintiffs frequent are located away from town such as Launiupoko Beach Park and Rice Park. 5-ER-1179-5-ER-1197. Additionally, Kasprzycki goes to Waihou Spring Trail and Polipoli Spring State Park which both have little traffic. *See* 2-ER-0377.

Hawaii is also wrong that colonial parks were not used for leisure. Boston Common has served "as a place of public resort for the recreation of the people" "from time immemorial." *Steele v. City of Boston*, 128 Mass. 583, 583 (1880). The founders of New York City's Bowling Green specifically established it as a place for the "Recreation & Delight of the Inhabitants of this City." N.Y. City Dep't of Parks, *Bowling Green*, https://rb.gy/9ujrg (last visited Oct 12, 2023). Contemporaneous accounts of Philadelphia in the early Republic described it as a city "preeminently fortunate" to have so many "public squares, and gardens" for "general resort" and "promenade." E.L. Carey & A. Hart, *Philadelphia in 1830-1*, at 145-46 (1830). And Newark's Washington Park has functioned as "a space for recreation" for over two

---

2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *id.* at 2154–55, and one19th-century Western State law (1881 Kansas), *id.* at 2155–56.

centuries too. *See* Washington Park Newark, *History*, https://rb.gy/a4cwj (last visited Oct. 12, 2023).

In the trial court, Hawaii relied on local ordinances from Philadelphia and New York City to justify its scheme. Hawaii claims the trial court erred in finding that these ordinances only affected 4% of the U.S. Opening Brief at 42. The population of New York City in 1860 was 813,669 [15]    The population of Philadelphia in 1860 was 565,529.[16]  Combined these cities constituted roughly 4% of the U.S. population at the time. Hawaii is using the population of the ***States*** of New York and Pennsylvania to claim these ordinances impacted 22% of the U.S. population. However, the ordinances at issue only affected the residents of the ***cities*** of New York and Philadelphia.  Thus, the trial court correctly found that only 4% of the population was impacted by these ordinances.

The State argues that beaches and parks are sensitive because "children and families" in Hawai'i sometimes "congregate" there. Opening Brief at 37. *Bruen* rejected this theory. *See* 142 S.Ct. at 2133 (places are not sensitive just because they are "places where people typically congregate"). The State is not free to ban carry wherever children and families may visit because doing so would "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S.Ct. at 2134. In

---

[15] https://www.biggestuscities.com/ny/1860
[16] https://www.biggestuscities.com/pa/1860

particular, Hawaii may not ban firearms "where large groups and vulnerable populations congregate." Opening Br. 1. That rationale is flatly inconsistent with *Bruen*'s holding that banning arms in locations merely because they are crowded construes the narrow sensitive places exception "far too broadly." 142 S.Ct. at 2133–34. As noted *supra*, "vulnerability" is an historically permissible reason **to require** the carriage of arms, it is not an historical reason **to ban** arms.

Hawaii's final argument is the status of beaches in economic, cultural, and social life fundamentally changed in the late nineteenth and twentieth centuries, especially in Hawai'i", thus, firearm carry can be regulated there to a greater degree than at the Founding. First off, this statement shows a fundamental misunderstanding of the outer islands of Hawaii. It is true that some beaches in Hawaii are often visited by tourists. However, that is truer of Oahu than Maui County.[17] The island of Molokai which is part of Maui County is rarely visited.[18] And even on the islands which are frequently visited many of the beaches are rarely visited. Despite this, HRS §134-A(a)(9) does not distinguish between rarely visited and densely crowded beaches. Hawaii's argument could not justify a ban on the carry of firearms on sparsely populated

---

[17] https://bit.ly/49ga8wz (showing 5,552,271 domestic seats sold in 2022 to Oahu) (last visited 10/12/2023).

[18]https://bit.ly/3QiZY5k (showing monthly visits to Molokai range from the double digits to low hundreds).

beaches. Hawaii has not pushed this argument for Hawaii's ban on the many thousands of acres of park land. It has no applicability there.

A mere increase in use is not an "unprecedented social concern" or "dramatic technological changes". There were crowded places at the time of the Founding. Merely being crowded was not an accepted rationale for banning firearm carry at the time of the Founding. *See Bruen* 142 S.Ct. at 2133 (places are not sensitive just because they are "places where people typically congregate"). Hawaii's arguments about technological changes must be rejected for many reasons.

### 6. The **Default Rule**

H.R.S. §134-E is unconstitutional. Plaintiffs refer to this law as the default rule because it reverses the default that citizens have a right to exercise their Second Amendment rights on private land open to the public. Five federal courts have preliminary enjoined virtually identical laws in New York, New Jersey and Maryland. [19] A three judge motions panel of the Third Circuit unanimously voted to deny a motion to stay the preliminary injunction granted against the State of New Jersey's default rule. *Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023). No court has upheld a similar law.

---

[19] *Kipke v. Moore*, Civil Action No. GLR-23-1293, 2023 U.S. Dist. LEXIS 174934 (D. Md. Sep. 29, 2023) *Antonyuk v. Hochul,* No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022) *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov. 22, 2022) *Koons v. Platkin*, No. CV 22-7463 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023)

ACT 52 enacts, for the first time in Hawaii's history, a presumption against carrying firearms in private property open to the public. This would not be allowed under First Amendment jurisprudence and it should not be allowed here. *See, e.g., Project 80s v. Pocatello*, 942 F.2d 635, 639 (9th Cir. 1991). Hawaii will be unable to demonstrate that this new Anti-Carry Default "permissibly regulates the right to carry for self-defense in public." *Koons*, 2023 WL 3478604 at *68. The main reason is that the Anti-Carry Default is the *exact opposite* of this Nation's traditional regulatory approach, which has entrusted "private property owners" with principal responsibility to exercise the "right to exclude others from their property" throughout American history. *Christian*, 2022 WL 17100631 at *9. The historical default rule has been that "carrying on private property" is "generally permitted absent *the owner*'s prohibition." *Id.* (emphasis added).

This concept is basic to the law of trespass. "[T]the well-developed concept of implied license . . . operates to grant permission to enter another's premises according to custom or other indicia of consent." *Koons*, 2023 WL 3478604 at *58. As to property otherwise open to the public, "the public has the implied consent to enter, unless such consent is conditioned or subsequently revoked by the property owner." *Id. Bruen* confirms that there is a "general right to publicly carry arms for self-defense." 142 S.Ct. at 2134. That "general right" necessarily means that "[t]he right to armed self-defense follows the individual everywhere he or she lawfully

49

goes" in public outside of "exceptional circumstances." *Koons*, 2023 WL 3478604 at *61; *Bruen*, 142 S.Ct. at 2155. The right to carry for self-defense thus extends to private property open to the public, "presumptively," unless the owner affirmatively "withdraw[s] consent." *Koons*, 2023 WL 3478604 at *61.

The academic proponents behind the Anti-Carry Default rule conceded that implementing it would be a novel and significant departure from this Nation's history of firearm regulation. In their book expanding on anti-carry default rules, the proponents stated that "[a]n implied condition of every invitation [onto another's property] is that the invitee is welcome to bring a firearm." *Koons*, 2023 WL 3478604 at *58 n.35. In fact, as of 2020, "*no state* ha[d] adopted generalized 'no carry' defaults for retail establishments." Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020) (emphasis added).

At bottom, Hawaii's attempt to change the default rule for carrying firearms in property open to the public should be seen for what it is: a desperate attempt to ban the exercise of constitutional right by any means possible. But the Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense." *Bruen*, 142 S.Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Because of "this balance—struck by the traditions of the American

people," *id*., — "certain policy choices" have been definitively taken "off the table," *Heller*, 554 U.S. at 636. Among these policy choices is establishing a presumption against carrying in buildings open to the public because the Second Amendment itself establishes a presumption that Plaintiffs and other licensed, law-abiding citizens have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135. Hawaii may not flip a presumption codified in the Constitution.

The few historical examples of anti-poaching laws requiring permission before carrying a gun onto private property did not deal with places of business accessible to the public. For example, a 1721 Pennsylvania statute provided that "if any person or persons shall presume . . . to carry any gun or hunt on the improved or enclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation . . . he shall for every such offense forfeit the sum of ten shillings." James T. Mitchell et al., Statutes at Large of Pennsylvania from 1682 to 1801, vol. III, at 254 (1896). Such a restriction on enclosed private lands where unauthorized hunting could be excluded is obviously not analogous to a modern coffee shop or grocery store.

The State's citations are to a handful of early American laws which the *Antonyuk* Court already recognized dealt with hunting on others' property. *See Antonyuk,* 2022 WL 16744700, at *79. The plain purpose of these laws was to deal with poaching or trespass on enclosed land that was not otherwise open to the

public. Plaintiffs know of no relevant historical examples of laws that generally barred carrying in all businesses open to the public unless the person carrying a firearm first received permission from the owner.

Hawaii's reliance on *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), a pre-*Bruen* decision, is misplaced. The Eleventh Circuit framed that case as one that pitted the right to carry against the right to exclude by privately owned places of worship, holding that "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship *against the owner's wishes*," a right that Plaintiffs do not assert. *Id.* at 1265. (emphasis added). The trial court did not abuse its discretion in finding Plaintiffs are likely to succeed on this issue.

## E. THE REMAINING FACTORS FAVOR PLAINTIFFS

### 1. Irreparable Injury

Plaintiffs readily satisfy the other requirements for a preliminary injunction, and the district court certainly did not abuse its discretion in finding them satisfied. Plaintiffs indisputably face an irreparable injury due to their constitutional injury. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976); 11A Charles Alan Wright et al., Federal Practice and Procedure §2948.1 (2d ed. 1995) ("When an alleged

deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

This Court has imported the First Amendment "irreparable-if-only-for-a-minute" rule to other rights and, in doing so, has held deprivation of those rights is irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The Second Amendment should be treated no differently. *Ezell v. City of Chi.,* 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable and having no adequate remedy at law."). Most recently, the Ninth Circuit within the context of a Second Amendment case reaffirmed the importance of the likelihood of the success on the merits step, explaining that "[i]f a plaintiff bringing such a [constitutional] claim shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). *See also McDonald,* 561 U.S. at 780 (refusing to treat the Second Amendment as a second-class right subject to different rules). This Court should find that Plaintiffs are suffering irreparable harm.

**2.     Public Interest/Balance of Equities**

The public interest and balance of equities elements merge when the government is the defendant. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor

of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). "[A]ll citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). The State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable . . . to allow the state . . . to violate the requirements of federal law." (Citations omitted)). On the other hand, granting an injunction will end the ongoing violation of Plaintiffs' rights. *Id*.

Hawaii attempts to rebut this precedent by relying on *More Than 2,200 Non-Self Defense Deaths Involving Concealed Carry Killers Since 2007, Latest Violence Policy Center Research Shows*, Violence Pol'y Ctr. (Apr. 21, 2022), https://perma.cc/MXW4AWYD . And it argues that concealed carry permit holders have been "responsible for thousands of deaths nationwide over the past decade and a half." Opening Brief at 57. But the author of the study "defines "non-self-defense incident" to include virtually any fatality involving a concealed-carry permit holder, including ones that do not remotely resemble the type of intentional homicide

evoked by the Violence Policy Center's strong claims about public safety."[20] "For example, roughly 40% of the deaths (534 of 1,335) are suicides."[21] "The Violence Policy Center includes many fatalities where the shooter's concealed-carry permit was irrelevant because he or she did not carry a concealed weapon in public while perpetrating the crime."[22] "Also of dubious inclusion are at least 10 cases that involve someone other than the permit holder using the permit holder's firearm, and a number of cases where the individual's permit either should have been suspended or was actually suspended under state law at the time of the death. Finally, despite the Violence Policy Center's claim that it only analyzed non-self-defense shootings, in 72 of the 801 homicide deaths included in the database, the shooter's claim of self-defense is still pending in court."

H.R.S. §134-7(c)(3) as amended by Act 52, prohibits firearm ownership by those with or treated for "a medical, behavioral, psychological, emotional, or mental condition or disorder that causes or is likely to cause impairment in judgment, perception, or impulse control to an extent that presents an unreasonable risk to public health, safety, or welfare." H.R.S. §134-7(c)(3) provides, "in order to apply

---

[20] Debunking the Myth of "Concealed-Carry Killers" https://herit.ag/3s9MeCa.

[21] *Id.*

[22] *Id.*

for a permit to acquire a firearm, [a]n applicant for a permit shall sign a waiver at the time of application, allowing the chief of police of the county issuing the permit access to any records that have a bearing on the mental health of the applicant. The permit application form and the waiver form shall be prescribed by the attorney general and shall be uniform throughout the State." *See* H.R.S. §134-2, "The waiver form would provide HPD with authority to access "any and all records which have a bearing on [the applicant's] mental health for the strict purpose of determining [his] qualification to acquire, own, possess, or have under [his] control, a firearm." *Santucci v. City & Cty. of Honolulu*, 2022 U.S. Dist. LEXIS 213030, at *5-6 (D. Haw. Nov. 23, 2022).

This waiver also allows the issuing county to inform an applicant's "doctor that he is purchasing a firearm" and request information as part of this investigation. *Id* *19. Hawaii's waiver requirement is unique. And thus, statistics from other states concealed carry permit holders are not relevant to analyzing the conduct of Hawaii concealed carry permit holders. That is because even if the suicide deaths could be used to justify a public safety argument regarding concealed carry, Hawaii already has mechanisms in place to prevent individuals prone to suicide from owning a firearm. Hawaii's public interest argument hinges on a "prophylaxis-upon-prophylaxis approach" which is disfavored by the courts. *See McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 479

(2007)). In reality, concealed carry holders are extremely law abiding. In the trial court, Plaintiffs relied on the arguments made in the amicus brief of *Gun Owners of America, Inc., et al.* to argue this. *See* Trial Court Dkt. No. [53]. And the trial court expressly endorsed this argument. 1-ER-0094. That factual finding was not clearly erroneous.

The district court found that "[t]he public has an interest in preventing constitutional violations, and the State has not established a factual basis for the public safety concerns regarding permit-carrying gun-owners who wish to exercise their Second Amendment right to carry a firearm in public." 1-ER-0094-0095. The trial court already appropriate weighted evidence and this finding was not clearly erroneous. This Court should not overturn that finding. Rather it should find that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers 7 LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020).

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

_/s/ Kevin G. O'Grady_                    _/s/ Alan A. Beck_

KEVIN GERARD O'GRADY              ALAN ALEXANDER BECK
Law Office of Kevin O'Grady, LLC      Attorney at Law
1164 Bishop Street, Suite 1605          2692 Harcourt Drive
Honolulu, Hawaii 96813                     San Diego, California 92123
Telephone: (808) 521-3367              Telephone: (619) 905-9105
Kevin@KevinOGradyLaw.Com          Alan.alexander.beck@gmail.com

_Counsel for Plaintiffs-Appellees_

## STATEMENT OF RELATED CASES

There are no related cases in this circuit.

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of 9th Cir. R. 32-1 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,973 words, which is less than the limit of 14,000 words.

This document also complies with the typeface requirements of Fed. R. App. P. 32(a) (5) and the type-style requirements of Fed. R. App. P. 32(a) (6) because this document has been prepared in a proportionally spaced typeface using 14 pt. Times New Roman font.

*/s/ Alan A. Beck*
ALAN ALEXANDER BECK
Attorney at Law