## No. 23-16164

### IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees,*

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaii,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of Hawaii
Case No. 1:23-cv-00265
District Judge Leslie E. Kobayashi

### BRIEF OF AMICUS CURIAE STATE OF MONTANA, IDAHO, AND 15 OTHER STATES SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE

RAÚL R. LABRADOR
  *Attorney General of Idaho*
JOSHUA N. TURNER
  *Acting Solicitor General*
IDAHO OFFICE OF THE
ATTORNEY GENERAL
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208)-334-2400
josh.turner@ag.idaho.gov
*Counsel for Amicus Curiae
State of Idaho*

AUSTIN KNUDSEN
  *Attorney General of Montana*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406)-444-2026
peter.torstensen@mt.gov
*Counsel for Amicus Curiae
State of Montana*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

INTERESTS OF AMICI CURIAE ..................................................... 1

SUMMARY OF ARGUMENT ......................................................... 2

ARGUMENT ................................................................................. 5

I.  Hawaii fails to show that its sensitive-places restrictions align with
    this Nation's historical tradition of firearm regulations. ................... 8

   A.  Hawaii's reliance on late-nineteenth century restrictions
    fails to show a historical tradition of public-carry bans in
    public parks and beaches. ........................................................ 10

   B.  Hawaii fails to produce relevantly similar historical public-
    carry restrictions in banks and financial institutions ............... 18

   C.  Hawaii's limited historical evidence fails to establish a
    historical tradition of public-carry bans in bars and
    restaurants serving alcohol ...................................................... 23

CONCLUSION ............................................................................ 28

ADDITIONAL COUNSEL ............................................................ 31

CERTIFICATE OF COMPLIANCE ............................................... 32

TABLE OF AUTHORITIES

## Cases

*Andrews v. State*,
   50 Tenn. 165 (1871) ..................................................................... 20-21

*Atkinson v. Garland*,
   70 F.4th 1018 (7th Cir. 2023) ............................................... 12, 14, 18

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................ *passim*

*English v. State*,
   35 Tex. 473 (1872) ............................................................................. 21

*Gamble v. United States*,
   139 S. Ct. 1960 (2019) ...................................................................... 29

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ................................................. 9-10, 22

*Hill v. State*,
   53 Ga. 472 (1874) ............................................................................. 21

*Konigsberg v. State Bar of Cal.*,
   36 U.S. 36 (1961) ............................................................................. 5-6

*Koons v. Platkin*,
   2023 U.S. Dist. LEXIS 85235 (D.N.J. May 16, 2023) ...................... 12

*McDonald v. City of Chi.*,
   561 U.S. 742 (2010) .............................................................. 1, 23, 29

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
   2023 U.S. Dist. LEXIS 117902 (D. Md. July 6, 2023) ................ 13-14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ........................................................... *passim*

*Range v. Att'y Gen.*,
   69 F.4th 96 (3d Cir. 2023) ........................................................ 22-23

ii

*State v. Shelby*,
2 S.W. 468 (Mo. 1886) ............................................................... 22, 23

*State v. Wilforth*,
74 Mo. 528 (1881) ........................................................................ 22

*Young v. Hawaii*,
896 F.3d 1044 (9th Cir. 2018) ...................................................... 21

## OTHER

### Hawaii Revised Statutes

Haw. Rev. Stat. § 134-A(a)(1) ............................................................ 3

Haw. Rev. Stat. § 134-A(a)(4) ............................................................ 3

Haw. Rev. Stat. § 134-A(a)(9) ............................................................ 3

Haw. Rev. Stat. § 134-A(a)(12) .......................................................... 3

Haw. Rev. Stat. § 134-E ................................................................... 3

### PUBLICATIONS

David B. Kopel & Joseph G.S. Greenlee, *The 'Sensitive Places' Doctrine*, 13 Charleston L. Rev. 205 (2018) .......................... 8

William Baude, *Constitutional Liquidation*,
71 Stan. L. Rev. 1 (2019) ............................................................... 10

### INTERESTS OF AMICI CURIAE

Little more than a year ago, the Supreme Court again reminded lower courts that the right to keep and bear arms "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022) (quoting *McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010) (plurality op.)). Yet in many cases, district courts across the country continue to defer to legislative "judgments regarding firearm regulations" despite *Bruen*'s declaration that "judicial deference to legislative interest balancing … is not [the] deference that the [Second Amendment] demands." *Id.* at 2131. But not here: the district court deferred instead to the balance struck by the American people—"'the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

To address public concerns about public safety and gun violence, the Hawaii legislature banned the public carry of firearms in certain "sensitive places," including parks, beaches, banks, financial institutions, and bars and restaurants serving alcohol. No doubt that courts may use analogies to "historical regulations of 'sensitive places' to determine that

modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133. But that analogical inquiry requires courts to determine whether a modern and historical regulation are "relevantly similar"—that is, whether they impose a comparable burden and are comparably justified. *Id.* at 2132–33. States may not "expand[] the category of 'sensitive places' [too broadly]—*i.e.*, to "all places of public congregation"—as that would "exempt cities from the Second Amendment" and "eviscerate the general right to publicly carry arms for self-defense." *See id.* 2134. To ensure that courts properly employ the "nuanced approach" that *Bruen*'s analogical inquiry requires, as the district court did here, the States of Montana, Idaho, Alabama, Alaska, Arkansas, Georgia, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Oklahoma, South Carolina, Utah, West Virginia, and Wyoming ("Amici States") submit this amicus brief in support of Plaintiffs-Appellees. Amici States urge this Court to affirm the decision below.

## SUMMARY OF ARGUMENT

In June 2023, Hawaii's legislature acted to address concerns about public safety and gun violence by enacting Act 52 (codified at Haw. Rev.

Stat., ch. 134), which prohibits the carry or possession of firearms in designated sensitive places. Act 52 prohibits, as relevant here, firearms in government buildings, *see* Haw. Rev. Stat. § 134-A(a)(1), bars and restaurants serving alcohol, *see id.* § 134-A(a)(4), parks and beaches, *id.* § 134-A(a)(9), banks and financial institutions, *id.* § 134-A(a)(12), and adjacent parking areas. Act 52 also prohibits carrying a firearm on another's property without express authorization. *Id.* § 134-E. Act 52's sweeping restrictions seek to convert many traditional public spaces into so-called "sensitive places" where firearms "could be prohibited consistent with the Second Amendment." *See Bruen*, 142 S. Ct. at 2133.

Plaintiffs Jason Wolford, Alison Wolford, Atom Kasprzycki, and Hawaii Firearms Coalition ("Plaintiffs"), allege that these sensitive-place restrictions violate their "constitutional right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156. And Plaintiffs sought a temporary restraining order ("TRO") and preliminary injunction ("PI") to enjoin Hawaii[1] from enforcing the foregoing provisions of Act 52. 1-ER-8–9 & n.2. The district court considered only Plaintiffs' request for a TRO, and it in

---

[1] For ease of reference, this brief refers to Defendant-Appellant as "Hawaii" unless otherwise indicated.

3

large part granted their requested relief, enjoining § 134-A(a)(4) and (12), enjoining § 134-A(a)(1) as to parking lots shared by government and non-government agencies, enjoining § 134-A(a)(9) as to parks and beaches, and enjoining § 134-E as to private property held open to the public. 1-ER-8–10 & n.2. By stipulation, the district court converted the TRO into a PI, *see* 1-ER-4–6, and Hawaii appealed, *see* 6-ER-1362–65.

Hawaii failed to "affirmatively prove that its [sensitive-place] regulation[s are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. *Bruen* demonstrated that the historical record supports a broad right to carry firearms in public, subject to well-defined restrictions on the manner of carry and permissible arms, as well as *some* longstanding "sensitive locations" where firearms could be largely prohibited. *See id.* at 2133, 2138, 2150, 2156. But as the district court correctly held, Hawaii's historical evidence fails to establish an "enduring American tradition" of restricting the right to carry in public parks, beaches, banks, financial institutions, or bars and restaurants serving alcohol. *See id.* at 2155–56.

ARGUMENT

After *Bruen*, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, "the Constitution presumptively protects that conduct." *Id.* And here, the Amendment's plain text "protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense."[2] *Id.* at 2134. To justify its sensitive-place restrictions, Hawaii "must demonstrate that the regulation[s are] consistent with this Nation's historical tradition of firearm regulation"—only then "may a court conclude that [Plaintiffs' proposed] conduct falls outside the Second Amendment's 'unqualified

---

[2] Hawaii argues that the district court impermissibly expanded the right to carry a firearm in public to "right to carry firearms on *all property* held open to the public." Opening.Br.20. Not so. To hold that the public-carry right doesn't extend to property held open to the public would, as the district court rightly recognized, conflict with the common understanding of the term "public" in state and federal law. *See* 1-ER-48–51.

command.'" *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).[3]

*Bruen*'s historical inquiry varies based on whether a challenged regulation addresses a longstanding "societal problem" or "unprecedented societal concerns or dramatic technological changes." *Id.* at 2131–32. In both cases, courts must compare modern regulations with similar historical regulations, but the difference is the fit necessary to show that a modern regulation aligns with our Nation's historical tradition of firearm regulation. *See id.* When a modern regulation addresses an issue that has persisted since the eighteenth century, the modern and historical regulations should be a close fit. *See id.* at 2131 (explaining that, in these "straightforward" cases, the "lack of ... distinctly similar historical

---

[3] Hawaii also argues that the district court failed to heed *Heller*'s "admonition that sensitive-place restrictions are 'presumptively lawful," and had it done so, it should have found that Hawaii's "[sensitive-place] restrictions fall outside the scope of the Second Amendment." Opening.Br.20–21. But that puts the cart before the horse. *Heller* and *Bruen* identified a list of "settled" sensitive places where firearms could be prohibited—a list that doesn't include parks, beaches, banks, or bars and restaurants. *See Heller*, 554 U.S. 626–27 & n.26; *Bruen*, 142 S. Ct. at 2133. So Hawaii must show that its sensitive-place restrictions adhere to this Nation's historical tradition of firearm regulation—it can't avoid *Bruen*'s step-two inquiry by using the label, "sensitive-place restrictions." *Bruen*, 142 S. Ct. at 2131–32.

regulation[s]" addressing the same problem or the presence of regulations addressing it "through materially different means" is relevant evidence that the modern regulation is unconstitutional).

But when evaluating modern regulations addressing "unprecedented societal concerns or dramatic technological changes" "that were unimaginable at the founding," courts must employ "a more nuanced approach." *See id.* at 2132. In these cases, the fit need not be so close: the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. Even so, *Bruen*'s analogical inquiry requires courts to determine that a modern regulation is "relevantly similar" to a proposed historical analogue—that is, that the "modern and historical regulations impose a *comparable burden* on the right of armed self-defense and … [are] *comparably justified*." *Id.* at 2133 (emphasis added).

Whether the modern regulation addresses longstanding or new societal problems, discerning "the *original meaning* of the Constitution" remains the guiding light of *Bruen*'s analogical inquiry. *Id.* at 2162 (Barrett, J., concurring).

To be sure, *Bruen* assumed that "it [was] settled" that certain loca-
tions—including schools, government buildings, and polling places—
were "sensitive places" where carrying a firearm "could be prohibited con-
sistent with the Second Amendment." *Id.* at 2133. But *Bruen*'s list of
"settled" sensitive places *omits* public parks, beaches, banks, financial
institutions, and bars and restaurants serving alcohol, so Hawaii must
still show that its modern sensitive-place regulations are sufficiently
analogous to the locations *Bruen* and *Heller* assumed were settled.[4] And
*Bruen*'s (and *Heller*'s) omission of these locations from the list of "settled"
sensitive places suggests at a minimum that they haven't historically
been viewed as sensitive places.

## I. Hawaii fails to show that its sensitive-places restrictions align with this Nation's historical tradition of firearm regulations.

*Heller* and *Bruen* chart the course for determining whether modern
firearm regulations are consistent with the Second Amendment's text
and history. And that course requires courts to compare Hawaii's

---

[4] Some scholars are skeptical that there is a persuasive "rationale for ex-
tending the 'sensitive places' doctrine to places that are not schools or
government buildings." David B. Kopel & Joseph G.S. Greenlee, *The
'Sensitive Places' Doctrine*, 13 CHARLESTON L. REV. 205, 289 (2018).

8

historical evidence with the "'historical precedent' from before, during, and even after the founding" to see if those historical materials show "a comparable tradition of regulation." *Id.* at 2131–32.

Even though Hawaii's obligation to respect Plaintiffs' right to keep and bear arms flows from the Fourteenth Amendment, not the Second, the rights enumerated in the Bill of Rights and incorporated against the States after the Fourteenth Amendment's adoption "have the same scope as against the Federal Government." *Id.* at 2137. And the scope of that right is generally "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*; *see also id.* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (internal quotations omitted) (emphasis in original)).

*Bruen* cautioned courts "against giving postenactment history more weight than it can rightly bear." *Id.* at 2136. So while a regular course of conduct *can* sometimes "liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution," *id.* (cleaned up), "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome

9

or alter that text," *id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–14 (2019) (liquidation requires indeterminacy because "[i]f first-order interpretive principles make the meaning clear in a given context, there is no need to resort to liquidation").

To determine whether Hawaii has carried its burden to "affirmatively prove that its [sensitive-place] regulation[s are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, this Court must evaluate the historical evidence Hawaii offered in support of its restrictions in (a) public parks and beaches; (b) banks and financial institutions; and (c) bars and restaurants serving alcohol.

### A. Hawaii's reliance on late-nineteenth century restrictions fails to show a historical tradition of public-carry bans in public parks and beaches.

*Heller* found that the Second Amendment, ratified in 1791, "codified a preexisting right" that is "rooted in 'the natural right of resistance and self-preservation.'" *Id.* at 2157 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 594). So historical evidence close in time to the Amendment's

10

adoption provides the most relevant insight into its original meaning. *See id.* at 2137 (quoting *Heller*, 554 U.S. at 614). Yet Hawaii offers *only limited evidence* of historical regulations of public parks between 1791 and 1868. Because Hawaii bears the burden to rebut Plaintiffs' presumptively constitutional right to bear arms in public, *see supra* note 2, including at public parks and beaches,[5] its failure to produce adequate evidence of relevantly similar laws during this period strongly suggests no such tradition existed. *Bruen*, 142 S. Ct. at 2150 (not the court's burden "to sift the historical materials for evidence to sustain" the regulation).

But even if historical evidence closer in time to the ratification of the Fourteenth Amendment is as probative of the scope of the Second

---

[5] Hawaii relied on historical regulations of public parks as analogues to support its prohibition of public carry on beaches, so the district court applied the same analysis to evaluate both location-based restrictions. *See* 1-ER-63.

Amendment's right to bear arms,[6] Hawaii's historical evidence still fails to support the existence of a historical tradition of relevantly similar public-park restrictions. *Bruen* directs courts to canvas the period from the founding through Reconstruction for similar regulations, always with an eye to "what the Founders understood the Second Amendment to mean." *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023). Because public parks have existed, in one form or another, since the founding, *see, Koons v. Platkin*, 2023 U.S. Dist. LEXIS 85235, at *250–55 (D.N.J. May 16, 2023) (tracing historical evidence for parks, or their analogues, to the establishment of Boston Common in 1634), Hawaii must point to "distinctly similar regulation[s] addressing *that* problem." *Atkinson*, 70 F.4th at 1021 (emphasis added).

But Hawaii only points to *two* pre-1868 local ordinances adopted by the boards of commissioners of two New York parks—the first, in New

---

[6] This is a shaky proposition at best. *See Bruen*, 142 S. Ct. at 2137 (explaining that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources'" (quoting *Heller*, 554 U.S. at 614)); *see also Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (explaining that "the pertinent question … is what the Founders understood the Second Amendment to mean" and noting that Bruen "cautioned against giving too much weight to laws passed [long] before or after the Founding").

York City's Central Park, was enacted in 1857; the second, in Brooklyn's Prospect Park, was enacted in 1866—that prohibited carrying firearms in the parks. 1-ER-66–67. And it points to *one* Pennsylvania state law, enacted in 1868, prohibiting persons from carrying fire-arms or shooting birds in Fairmont Park. 1-ER-67. But "the bare existence of [three] localized restrictions" between 1791 and 1868 "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Bruen*, 142 S. Ct. at 2154. Hawaii's failure to point to more than three restrictions (each of only a single park) during this time falls far short of affirmatively establishing a national historical tradition of restricting public carry in public parks.

Even so, Hawaii seeks to show a historical tradition through local ordinances passed after 1868. 1-ER-68. But it points only to a handful of local ordinances enacted in the decade after the Fourteenth Amendment's adoption, and to about twenty more local ordinances enacted between 1881 and 1899. *See* Opening.Br.40-41 & n.18 (collecting local ordinances). Hawaii also relied on a recent district court decision finding a historical tradition of regulating firearms in public parks. *See* 1-ER-69 (citing *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 2023 U.S. Dist. LEXIS

13

117902 (D. Md. July 6, 2023) *appeal docketed*, 23-1719 (4th Cir. July 10, 2023) ("*MSI*")).

But neither the evidence that Hawaii offers nor the record considered in *MSI* shows that the *original understanding* of the Second Amendment excluded a right to carry in public parks. 1-ER-72 (rejecting *MSI*'s reliance on "one local ordinance and one state law … to find that there was a national historical tradition of prohibiting the carrying of firearms at parks at the time of the Fourteenth Amendment's ratification").

For two reasons, Hawaii fails to establish a historical tradition of "relevantly similar" regulations. *First*, nearly all of the local ordinances and state laws Hawaii points to were enacted well after Reconstruction, so even if Reconstruction-era evidence is probative, the district court rightly refused to give that evidence "more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136; *see also Atkinson*, 70 F.4th at 1020 (*Bruen*'s analogical inquiry must be conducted with an eye to "what the Founders understood the Second Amendment to mean").

For pre-1868 analogues, Hawaii offered two local ordinances banning public carry in New York parks and a Pennsylvania state law banning public carry in a single state park. 1-ER-66–67; *see also* 1-Add-268

14

(New York City's Central Park); 1-Add-273 (Brooklyn's Prospect Park); 1-Add-280 (Fairmount Park in Pennsylvania). And it pointed to four more local ordinances banning public carry in parks that were enacted in the following decade. 1-Add-285 (1872 San Francisco ordinance); 1-Add-289 (1873 Chicago ordinance); 1-Add-295 (1875 South Park, Illinois ordinance); 2-Add-368 (1878 Phoenixville, Pennsylvania ordinance).

Every other state law or local ordinance that Hawaii identified was passed between 1881 and 1899—*13 to 31 years after Reconstruction*. *See* Opening.Br.40-41 & n.18. The statutes and local ordinances relied on in *MSI* were even farther removed: they were all passed between 1888 and 1921—*20 to 53 years following Reconstruction*. *See* 1-ER-70–72. At most, Hawaii identifies seven similar restrictions—the three pre-1868 regulations and four close-in-time local ordinances discussed above—but that record is not enough to establish the existence of a *national* tradition of similar regulations. *See Bruen*, 142 S. Ct. at 2154. And the remaining restrictions Hawaii identifies, even if relevantly similar, are far too late-in-time to establish the existence of a historical tradition of public-carry restrictions in parks.

*Second*, many of these state laws and local ordinances either didn't impose a comparable burden on the public-carry right or weren't comparably justified. *See Bruen*, 142 S. Ct. at 2133. Some of these restrictions allowed for public carry in parks if the person obtained permission beforehand. *See* 2-Add-389 (1891 Springfield, Massachusetts ordinance banning public carry in public parks "except with prior consent of the Board"); 2-Add-417 (1895 Michigan law banning public carry in Detroit parks "without the permission of said commissioners"); 2-Add-423–24 (1896 Rochester, New York ordinance banning public carry in parks "without the consent of [the] Board"); 2-Add-428 (1898 Kansas City, Missouri ordinance banning carry in public parks "except upon a permit first duly obtained or authority granted by [the] board"). So these restrictions imposed less of burden on the right than § 134-A(a)(9)'s complete ban.

Many other restrictions appear to have been justified on different grounds that the public safety interest that § 134-A(a)(9) targets. *See* Opening.Br.34-39. For example, some restrictions appear tailored to prevent unlawful hunting in public parks or to protect wildlife. *See* 1-Add-300 (1881 St. Louis ordinance) (in section entitled "protection of birds," prohibiting the use or possession of "air gun[s] or other contrivance[s] for

ejecting" certain items capable of inflicting injury); 2-Add-379 (1888 St. Paul, Minnesota ordinance) (shall not "carry firearms or shoot birds in any Park" or "kill any animal kept by the direction of the Board"); 2-Add-381 (1890 Trenton, New Jersey ordinance) (same); 2-Add-398 (1893 Pittsburgh ordinance) (shall not "carry firearms," "shoot or … set snares for birds, rabbits, squirrels, or fish"); 2-Add-400 (1893 Wilmington, Delaware ordinance) (shall not "carry fire-arms or shoot birds or other animals within the Park"); *see also* 1-Add-280 (1868 Pennsylvania law) (shall not "carry fire arms or shoot birds in the park"); 2-Add-368 (1878 Phoenixville, Pennsylvania ordinance) (same).

And other public-carry restrictions appear targeted to preserving the physical condition of the public parks. *See* 2-Add-398 (1893 Pittsburgh ordinance) (ordinance expressly providing for the "control, maintenance, supervision and preservation of the public parks"); 2-Add-370 (1893 Danville, Illinois ordinance) (similar); 2-Add-410 (1895 Canton, Illinois ordinance) (similar); *see also* 2-Add-368 (1878 Phoenixville ordinance) (prohibition appears alongside restrictions that prohibit defacing trees, plants, property, signs, and that otherwise preserve or protect the park's physical condition); 2-Add-376 (1888 Salt Lake City ordinance)

17

(similar); 2-Add-379 (1888 St. Paul ordinance) (similar); 2-Add-381 (1890 Trenton ordinance) (similar); 2-Add-394–95 (1892 Spokane, Washington ordinance) (similar); 2-Add-400 (1893 Wilmington ordinance) (similar) These different justifications diminish the weight of Hawaii's evidence.

All told, Hawaii identifies three arguably similar restrictions enacted before 1868—restrictions that *may* shed light on the Second Amendment's original meaning. *See Atkinson*, 70 F.4th at 1020. For the reasons discussed above, Hawaii's other evidence warrants little weight in *Bruen*'s inquiry, so the district court rightly held that Hawaii failed to meet its burden. *See* 1-ER-74–75.

### B. Hawaii fails to produce relevantly similar historical public-carry restrictions in banks and financial institutions.

Even though "banks and firearms existed at the time of the Second Amendment's ratification," and then, as now, there was an "elevated risk of danger in bank crimes that involve firearms," Hawaii introduced no evidence of any firearm restrictions in banks. 1-ER-76–77. Given the lack of any distinctly similar historical regulations, the district court rightly found that Hawaii failed to meet its burden. 1-ER-77; *see also Bruen*, 142 S. Ct. at 2131 (in "straightforward" cases, failure to point to

18

regulations addressing the same problem is relevant evidence that the modern regulation is unconstitutional).

Hawaii instead argues that § 134-A(a)(12) shouldn't be enjoined because it is "relevantly similar" to historical regulations prohibiting public carry in fairs and markets. 1-ER-77–78; Opening.Br.43-45. The district court rightly rejected this argument. And as shown below, Hawaii fails to establish that § 134-A(a)(12) is relevantly similar to historical regulations imposed on public carry in fairs or markets, which raise distinct issues from those in banks or financial institutions because of the high concentration of people in fairs or markets. *See* 1-ER-78–79. Even if historical regulations of fairs and markets were a proper analogue—and Hawaii has made no such showing here—the difference in congestion between fairs and markets, on one hand, and banks and financial institutions, on the other, is enough to support the district's court's conclusion that those restrictions aren't relevantly similar to § 134-A(a)(12).

Hawaii offers several more state laws that it claims imposed a more substantial burden on the public-carry right than § 134-A(a)(12)—specifically, laws barring firearms in places where people "assembled for commercial or social purposes." Opening.Br.45. But even if this Court

weighs these additional proposed analogues, they lend no historical support to Hawaii's restriction. Hawaii points to seven state laws, passed between 1817 and 1889, banning firearms in ballrooms, fandangos, fairs, race courses, social gatherings, or similar places of public assembly. *See* Opening.Br.45-46 (citing 1-Add-316 (1817 New Orleans law); 1-Add-262 (1853 New Mexico law); 1-Add-319 (1869 Tennessee law); 1-Add-322 (1870 Georgia law); 1-Add-325 (1870 Texas law); 1-Add-327–38 (1875 Missouri law); 1-Add-333 (1889 Arizona law)). Even if these laws are relevantly similar (they're not), only the New Orleans and New Mexico laws pre-date Reconstruction. And both the New Mexico and the Arizona laws were territorial statutes, which were often short-lived and thus less likely to be "part of an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155.

The remaining laws—from Tennessee, Georgia, Texas, and Missouri—rest on far shakier constitutional ground than Hawaii claims. *See* Opening.Br.46-47. While the courts in Tennessee, Georgia, and Texas upheld these laws against constitutional challenges, each understood the Second Amendment to secure only a militia-connected right to keep and bear arms. *See, e.g., Andrews v. State*, 50 Tenn. 165, 177–78 (1871)

(holding a state law unconstitutional to the extent that it bars the public carry of a "soldier's weapon"); *Hill v. State*, 53 Ga. 427, 475 (1874) ("In what manner the right to keep and bear these pests of society [dirks, bowie knives, and more], can encourage or secure the existence of a militia, and especially of a well regulated militia, I am not able to d[i]vine."); *English v. State*, 35 Tex. 473, 476 (1872) ("The word 'arms' in the connection we find it in the Constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense.").[7]

But *Heller* and *Bruen* both soundly rejected this conception of the right. *See, e.g., Young v. Hawaii*, 896 F.3d 1044, 1057–58 (9th Cir. 2018) (explaining that "Heller knocks out the load-bearing bricks in the foundation" of cases holding that the Second Amendment was only a right to be exercised in connection with a militia). Because these cases reflect a conception of the Second Amendment that's "*inconsistent* with the original meaning of the constitutional text," the Tennessee, Georgia, and Texas laws provide no historical support for § 134-A(a)(12)'s complete

---

[7] *English* even appears to concede that the law under review "was an *innovation* upon the customs and habits of the people." 35 Tex. at 479 (emphasis added). It justified that "innovation" because "the latter half of the nineteenth century is not too soon for Christian and civilized States to legislate against any and every species of crime." *Id.* at 479–80.

21

ban on public carry in banks and financial institutions. *See Bruen*, 142 S. Ct. at 2137 (quoting *Heller*, 670 F.3d at 1274 n.6). These state laws lend Hawaii no more support than the state law *Bruen* rejected.

Hawaii's reliance on the Missouri Supreme Court's decision in *State v. Shelby*, 2 S.W. 468 (Mo. 1886) fares no better. *See* Opening.Br.47. *Shelby* grounded its decision—which upheld a state statute prohibiting the concealed carry of firearms by intoxicated persons—in the distinct rights created under an analogous provision in Missouri's state constitution. *Id.* at 469. But more importantly, *Shelby* reasoned that its decision did not rest on the Second Amendment, which "is a restriction upon the powers of the national government only, and *is not a restriction upon state legislation*." *Id.* at 469 (emphasis added); *see also State v. Wilforth*, 74 Mo. 528, 531 (1881) (observing that whether statutes regulating the manner of carry "are or are not in conflict with the federal constitution, is an open question so far as the federal courts are concerned," but concluding that the challenged statute, which regulated concealed carry, was "valid and binding" under the Missouri's analogous constitutional provision). So "it's unclear what [Missouri's] law[] prove[s] about the contours of the *Second Amendment* right." *Range v. Att'y Gen.*, 69 F.4th 96, 108

22

(3d Cir. 2023) (en banc) (Porter, J., concurring), *cert. docketed*, No. 23-374 (U.S. Oct. 10, 2023).[8]

### C. Hawaii's limited historical evidence fails to establish a historical tradition of public-carry bans in bars and restaurants serving alcohol.

There is no question that taverns and firearms existed at the time of the Second Amendment's ratification—Hawaii even points to several laws before the founding that regulated militia members and taverns, *see* 1-Add-90 (1746 New Jersey law); 1-Add-97 (1756 Delaware law); 1-Add-112 (1756 Maryland law); 1-Add-151, -154 (1780 Pennsylvania law). So the district court rightly required a close fit between § 134-A(a)(4) and the proposed historical analogues. *See* 1-ER-52–55; *see also Bruen*, 142 S. Ct. at 2131 ("lack of evidence of ... distinctly similar historical regulation[s]" addressing an issue that has persisted since the founding is relevant evidence that the modern regulation is unconstitutional). Even

---

[8] Of course, Missouri courts were mistaken that, after the adoption of the Fourteenth Amendment, the Second Amendment was "not a restriction upon state legislation." *Shelby*, 2 S.W. at 469; *see McDonald*, 561 U.S. at 750 ("the Second Amendment right is fully applicable to the States"). And because *Shelby*'s understanding of the Second Amendment was "*inconsistent* with the original meaning of the constitutional text," the Missouri statute it reviewed lends no historical support for § 134-A(a)(12)'s public-carry ban in banks. *See Bruen*, 142 S. Ct. at 2154.

though Hawaii points to some "relevantly similar" historical regulations, it still fails to show a *national* historical tradition of regulating public-carry in bars or restaurants that serve alcohol. *See id.* at 2132–33, 2154.

To start, Hawaii points to three state laws, passed between 1853 and 1890, banning firearms in places where alcohol was sold—restrictions that largely mirror § 134-A(a)(4). As discussed, relying on post-ratification regulations like the New Mexico and Oklahoma laws and on territorial statutes provides little relevant support. *See supra* Sect.I.B. Even if these three laws are "relevantly similar" to § 134-A(a)(4)—and they at least facially appear to be[9]—"the bare existence of [three] localized restrictions" on their own "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Bruen*, 142 S. Ct. at 2154.

To bolster its historical record, Hawaii identifies four more state laws that it claims "more broadly restricted the carrying of firearms in places where people regularly assembled for commercial or social

---

[9] *See* 1-Add-262 (1853 New Orleans law prohibiting firearms in "Ball or Fandango … or room adjoining said ball where Liquors are sold"); 1-Add-265 (1879 New Orleans ordinance banning firearms in taverns); 1-Add-253 (1890 Oklahoma territorial law banning firearms in "any place where intoxicating liquors are sold").

purposes" than § 134-A(a)(4). Opening.Br.28. Specifically, it points to four state laws, passed between 1817 and 1889, banning firearms in ballrooms, social gatherings, or similar places of public assembly. *See* Opening.Br.28 (citing 1-Add-316 (1817 New Orleans law); 1-Add-325 (1870 Texas law); 1-Add-327 (1875 Missouri law); 1-Add-333 (1889 Arizona law)). Even if these laws were relevantly similar, only the New Orleans law pre-dates Reconstruction. The Arizona law receives diminished weight in *Bruen*'s inquiry because it was a territorial statute, and both the Texas and Missouri laws survived constitutional challenges based on an understanding of the Second Amendment soundly rejected in both *Heller* and *Bruen*. *See supra* Sect.I.B

Hawaii also leans on several laws passed before and after the founding that regulate the use of and access to alcohol by members of the militia. *See* Opening.Br.28-30. Some of these laws forbid the sale of alcohol to members of the militia or prohibited militia members from getting drunk. *See* 1-Add-90 (1746 New Jersey law forbidding sale of "any strong Liquor" to militia members); 1-Add-112 (1756 Maryland law prohibiting militia members from getting "drunk on any Muster-day"); 1-Add-151 (1780 Pennsylvania law forbidding "any non-commissioned officer or

private" from getting drunk).  Others prohibited setting meeting locations near taverns or other locations that sold alcohol.  *See* 1-Add-97 (1756 Delaware law); 1-Add-112 (1756 Maryland law); 1-Add-154 (1780 Pennsylvania law); 1-Add-166 (1852 Vermont law); 1-Add-180 (1853 Rhode Island law).  And others excluded "common drunkards" from the militia.  *See* 1-Add-191 (1837 Massachusetts law providing measures to exclude "common drunkards" from the militia); *see also* 1-Add-199 (1837 Maine law) (similar); 1-Add-211 (1840 Rhode Island law) (similar).  The most that can be said about these laws is that they support a historical tradition of regulating the use of or access to alcohol by militia members (who were no doubt armed).  But as the district court explained, they don't support the existence of a historical tradition of regulating members of the public from carrying firearms in bars and restaurants, without regard for whether they are consuming alcohol.  *See* 1-ER-53-55.

Hawaii leans on a handful of other state laws it claims "regulat[e] the interaction of firearms and alcohol."  Opening.Br.29-30.  But none of these other laws are remotely analogous to § 134-A(a)(4).  *First*, it points to two state restrictions—an 1851 Chicago law and an 1858 St. Paul ordinance—that forbid granting "retailer[s] of intoxicating liquors" a

permit to keep or sell gunpowder. *See* Opening.Br.30 (quoting 1-Add-237 (Chicago law); 1-Add-242 (St. Paul ordinance)). By rejecting the relevance of these restrictions, the district court did not, as Hawaii claims, require a "dead ringer," *see Bruen*, 142 S. Ct. at 2133—indeed, it's difficult to see how regulating permits for liquor retailers to store gunpowder is similar *at all* to § 134-A(a)(4).

*Second*, it points to three state laws prohibiting carrying firearms *while intoxicated* and another state law forbidding the sale of firearms to any *intoxicated person*. Opening.Br.30 (citing 1-Add-244 (1867 Kansas law prohibiting carry of firearms while intoxicated); 1-Add-246 (1883 Missouri law) (same); 1-Add-248 (1883 Wisconsin law) (same); 1-Add-255 (1878 Mississippi law banning sale of firearms to intoxicated persons)). But as the district court explained, § 134-A(a)(4) completely restricts the public-carry right in bar and restaurants that serve alcohol, even if the person carrying is not consuming alcohol. *See* 1-ER-55. And for that reason, § 134-A)(a)(4) does not impose a comparable burden to these proposed analogues. *See Bruen*, 142 S. Ct. at 2132–33.

In sum, Hawaii identifies three state laws arguably similar to § 134-A(a)(4), but for the reasons discussed above, the remaining laws it

leans on for support either imposed different burdens or were justified on different grounds. And when states address an issue that has persisted since the founding, like the public carry of firearms in places serving alcohol, three state laws of questionable relevance do not establish the *national* historical tradition Hawaii needs to meet its burden. *Bruen*, 142 S. Ct. at 2131 ("lack of evidence of ... distinctly similar historical regulation[s]" is strong evidence that the modern regulation is unconstitutional). Given the limited number of arguably similar restrictions identified, the district court correctly held that Hawaii failed to meet its burden. *See* 1-ER-53–57, -59.

## CONCLUSION

As *Bruen* explained, "when it comes to interpreting the Constitution, not all history is created equal." 142 S. Ct. at 2136. Rather, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634–35 (emphasis in original)). So evidence closer in time to the Second Amendment's adoption is most relevant for understanding the Amendment's scope. Of course, evidence of historical regulations through the end of the nineteenth century *could* be relevant, but only to the extent

28

that it confirms what prior evidence "already … established." *Id.* at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)).

The Second Amendment protects the right to possess handguns, both in the home and in public, for the purpose of self-defense. *McDonald*, 561 U.S. at 767; *Bruen*, 142 S. Ct. at 2156. With few exceptions, Hawaii relies on out-of-date historical analogues passed well after Reconstruction—"surely too slender a reed on which to hang a historical tradition of restricting the right to public carry" in the locations challenged here. *See Bruen*, 142 S. Ct. at 2149. Even if Reconstruction-era statutes and local ordinances can provide probative evidence of the Second Amendment's original meaning, Hawaii's evidence *still fails* to identify relevantly similar historical analogues for Act 52's sensitive-place restrictions discussed above. Sweeping aside Hawaii's irrelevant evidence leaves little remaining historical support for Act 52's sensitive-place restrictions, and the district court refused to give Hawaii's evidence "more weight than it can rightly bear." *Id.* at 2136. This Court should affirm.

DATED this 7th day of November, 2023.

AUSTIN KNUDSEN
  *Montana Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

/s/ *Peter M. Torstensen, Jr.*

PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
p. 406.444.2026
peter.torstensen@mt.gov

*Attorneys for the State of Montana*

RAÚL R. LABRADOR
  *Idaho Attorney General*

/s/ *Joshua N. Turner*

JOSHUA N. TURNER
  *Acting Solicitor General*
Office of the Idaho Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
p. 208.334.2400
josh.turner@ag.idaho.gov

*Attorneys for the State of Idaho*

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of*
*Alabama*

TREG TAYLOR
*Attorney General of*
*Alaska*

TIM GRIFFIN
*Attorney General of*
*Arkansas*

CHRISTOPHER M. CARR
*Attorney General of*
*Georgia*

THEODORE E. ROKITA
*Attorney General of*
*Indiana*

BRENNA BIRD
*Attorney General of*
*Iowa*

KRIS KOBACH
*Attorney General of*
*Kansas*

JEFF LANDRY
*Attorney General of*
*Louisiana*

LYNN FITCH
*Attorney General of*
*Mississippi*

ANDREW BAILEY
*Attorney General of*
*Missouri*

GENTNER F. DRUMMOND
*Attorney General of*
*Oklahoma*

ALAN WILSON
*Attorney General of*
*South Carolina*

SEAN D. REYES
*Attorney General of*
*Utah*

PATRICK MORRISEY
*Attorney General of*
*West Virginia*

BRIDGET HILL
*Attorney General of*
*Wyoming*

31

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Peter M. Torstensen, Jr., an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,174 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(3).

/s/ *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.