No 23-16164

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

————————

JASON WOLFORD, et al.,
*Plaintiffs-Appellees,*

*v.*

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i,
*Defendant-Appellant.*

————————

On Appeal from the United States District Court
for the District of Hawai'i
No. 1:23-cv-00265-LEK-WRP
Hon. Leslie E. Kobayashi

————————

**BRIEF FOR ANGUS KIRK MCCLELLAN, FPC ACTION FOUNDATION, FIREARMS POLICY COALITION, CALIFORNIA GUN RIGHTS FOUNDATION, THE CENTER FOR HUMAN LIBERTY, AND CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

————————

Bradley A. Benbrook
Stephen M. Duvernay
BENBROOK LAW GROUP, PC
701 University Avenue
Suite 106
Sacramento, CA  95825
(916) 447-4900
brad@benbrooklawgroup.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, counsel for *amici curiae* hereby state that the Firearms Policy Coalition, FPC Action Foundation, California Gun Rights Foundation, the Center for Human Liberty, and Citizens Committee for the Right to Keep and Bear Arms have no parent corporations and have issued no stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 3

ARGUMENT ............................................................................................................ 5

I.     This Court Should Focus Its Historical Analysis On The Founding Era ....... 5

II.    Hawaii's New "Sensitive Places" Are Inconsistent With The Nation's Historical Tradition Of Firearm Regulation ................................................... 9

      A.     The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were All Secured By Guards, Thus Reducing The Imperative Of Carrying For Self Defense .................................................................. 9

            1.     Legislatures ............................................................................ 10

            2.     Courthouses ........................................................................... 13

            3.     Polling Places ........................................................................ 16

      B.     The Supposed Sensitive Places At Issue Here Cannot Be Analogized To The Founding Era Sensitive Places Identified In *Heller* And *Bruen* ........................................................................... 18

      C.     Historical Restrictions On Hunting And The Discharge Of Firearms Confirm There Is No Basis To Ban Carrying Firearms On Private Property Altogether ................................................................. 23

CONCLUSION ..................................................................................................... 27

CERTIFICATE OF COMPLIANCE ..................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Crawford v. Washington*,
   541 U.S. 36 (2004) .............................................................................6, 7

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ..............................................................4, 5, 20, 25

*Espinoza v. Montana Dep't of Revenue*,
   140 S.Ct. 2246 (2020) .............................................................................7

*Gamble v. United States*,
   139 S.Ct. 1960 (2019) .............................................................................7

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) .............................................................7

Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97
   INDIANA L. J. 1439 (2022) .....................................................................5

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ...............................................................................8

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) ...............................................................................6

*Nevada Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011) ...............................................................................6

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S.Ct. 2111 (2022) .................................................................. passim

*Ramos v. Louisiana*,
   140 S.Ct. 1390 (2020) .............................................................................8

*Timbs v. Indiana*,
   139 S.Ct. 682 (2019) ..............................................................................8

*Virginia v. Moore*,
   553 U.S. 164 (2008) ...............................................................................6

*Wolford v. Lopez*,
   2023 WL 5043805 (D. Haw. Aug. 8, 2023) ....................20, 23, 25, 26

**Other Authorities**

AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION (1998) ...................5

iii

Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014) ................................................................20

Schlesinger, *Political Mobs and the American Revolution, 1765-1776*, 99 PROCEEDINGS OF THE AM. PHILOSOPHICAL SOC'Y 244 (1955) ..............................10

Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (manuscript posted Nov. 4, 2022, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297) ..........................6

WALKER & KATZ, THE POLICE IN AMERICA (2013) ..................................................19

**Regulations**

1 Laws of the State of New York (1807) ................................................................14

1 Records Of The Colony Of Rhode Island And Providence Plantations, In New England (Bartlett 1856) ............................................................................................21

1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature (Hening 1808) ...........................................22

10 The Statutes at Large of Pennsylvania From 1682 to 1801 (1779–1781) ..........11

1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1 to 3 ...................................................24

1812 Del. Laws 329.................................................................................................24

1818 Vermont Acts & Resolves 64, § 42 ...............................................................25

1823 N.H. Laws 73–74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4 .................................................24

2 Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven (1797) ............................................................11

2 Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven (1797) ....................................................14, 17

5 Laws Of The Colony Of New York (1894)..........................................................24

A Collection Of All Such Acts Of the General Assembly Of Virginia (1803).......14

A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive (1812).....................12

A Digest of the Laws of the State of Georgia (1800).......................................15, 17

A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire (1808) ...................................................................13

A Manual Of The Laws Of North Carolina (1814)...................................26

A Manual of The Laws of North-Carolina (3d ed. 1814).........................16

Abridgement Of The Public Permanent Laws Of Virginia (1796) .........17

Abridgment of the Permanent Laws of Virginia (1796) .........................26

Acts and Laws of the State of Connecticut, In America (1784)..............15

Acts and Resolves of Massachusetts, 1786–87 (1893) ...........................15

An Act for the Support of Government, in 1 Laws of the State of New York (2nd ed. 1807) .................................................................................12

Connecticut, Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony (Brown & Parsons 1850) ....................................................................................21

Digest Of The Laws Of Georgia (1800)...................................................26

Laws of the State of New Jersey (Bloomfield, ed. 1811).........................17

Maryland, 3 Archives of Maryland (Browne 1885)................................21

Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England (White 1853)...................21

Md. Const. art. 1, §§ 3 & 14 (1776) .......................................................17

New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the Authority of the Legislature (Joseph Bloomfield, 1811) .....................14

Ordinances of the City of New York, § 6 (1763) ....................................24

Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October 1775 (1835) .................................................................................12

The Laws of Maryland to which are prefixed The Original Charter, with an English translation, v. 1, ch. XXV (1799) (1779 law) ......................................15

The Laws of the State of New-Hampshire (1797)....................................16

The Laws of the State of Vermont, vol. II (1808)............................13, 16

The Public Laws of the State of Rhode-Island (1798) ......................11, 16

The Public Laws Of The State Of Rhode-Island And Providence Plantations (1798) ....................................................................................23

The Public Laws of the State of South-Carolina (1790) ............................12, 13, 18

The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X (Wm. Stanley Ray 1904)........................................................................................................14

Virginia, Journal of the House of Delegates of the Commonwealth of Virginia (Printed by Thomas W. White, 1828)....................................................................12

Votes and Proceedings of the House of Delegates of the State of Maryland, October Session, 1780 (1781)..............................................................................13

Votes and Proceedings of the Senate of the State of Maryland, November Session, 1791 (1792)......................................................................................................13

## INTEREST OF *AMICI CURIAE*

Angus Kirk McClellan is a former college professor and gun writer whose scholarship has centered on Anglo-American legal history from the 18th and 19th centuries. Today he works as an independent scholar in Virginia. Dr. McClellan has a strong interest in this case because of the Court's reliance upon these areas of law and history for determining the scopes of firearm rights, and he hopes his familiarity with these topics will help to provide the Court with greater insight into how and where such rights were regulated circa 1791.

FPC Action Foundation ("FPCAF") is a nonprofit organization dedicated to restoring human liberty and protecting the rights enshrined in the Constitution. FPCAF conducts charitable research, education, public policy, and legal programs. The Foundation's scholarship and *amicus* briefs, including that of the Foundation's Director of Constitutional Studies, Joseph Greenlee, have been cited by the Supreme Court and this Circuit on multiple occasions.

Firearms Policy Coalition, Inc. ("FPC") is a nonprofit membership organization incorporated in Delaware with a primary place of business in Clark County, Nevada. FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to

1

keep and bear arms and protect the means by which individuals may exercise the right to carry and use firearms. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

California Gun Rights Foundation ("CGF") is a nonprofit foundation incorporated under the laws of California with its principal place of business in Sacramento, California. CGF serves its members, supporters, and the public through educational, cultural, and judicial efforts to defend and advance Second Amendment and related rights.

The Center for Human Liberty ("CHL") is a nonprofit organization dedicated to defending and advancing individual liberty and freedom, including the rights and liberties protected by the Constitution. Consistent with this purpose, CHL engages in legal efforts, including the submission of *amicus* briefs, to promote the protection of liberty.

The Citizens Committee for the Right to Keep and Bear Arms ("CCRKBA"), a nonprofit organization, seeks to preserve Second Amendment rights through education and advocacy. It strives to ensure that the Second Amendment is not misinterpreted in derogation of the people's right to keep and bear arms for self-defense and other constitutional purposes. CCRKBA's programs are designed to

help all Americans understand the importance of the Second Amendment and its role in keeping Americans free.

*Amici* are interested in this case to ensure that Hawaii's regulation of firearms is consistent with the original meaning of the Second Amendment as the Framers understood it.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* offer this brief to assist the Court's consideration of the historical evidence of "sensitive place" restrictions on the right to carry firearms. *Bruen*, like *Heller* before it, stressed that the scope of the Second Amendment's protection must be determined by historical analysis:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government … must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022) (citation omitted).

---

[1] No party's counsel authored this brief in whole or part and, apart from the Constitutional Defense Fund, Inc., no person (including any party or party's counsel) contributed money to fund its preparation or submission. Defendant-Appellant has consented to the brief's filing. Plaintiffs-Appellees have not consented.

*Amici* begin by emphasizing that the Founding-era understanding of the "sensitive places" doctrine controls. The "scholarly debate" referenced in *Bruen*—whether a court should look to the understanding of the Second Amendment's scope in 1791 or 1868—provides no basis for straying from the Court's consistent practice. The "scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S.Ct. at 2137–38.

The locations Hawaii now hopes to treat as "sensitive" cannot possibly be analogized to the core founding-era sensitive locations recognized in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The historical record shows that, at the founding, carry restrictions were strictly limited to locations where the government provided comprehensive security, which stands in stark contrast to Hawaii's sweeping restrictions.

Indeed, early Americans were *required* by law to carry firearms in public assemblies, where the State now seeks to disarm individuals altogether. Hawaii's current impulse to protect potential victims by disarming everyone at public gatherings thus runs directly contrary to the Founders' and Framers' solution: Where contained spaces could not be comprehensively secured by government-provided protection, the people were instructed to be ready to defend themselves in the event of violence.

4

Hawaii's bans fail *Bruen*'s test. The injunction should not be disturbed.

## ARGUMENT

**I.   This Court Should Focus Its Historical Analysis On The Founding Era.**

*Bruen* cautioned lower courts to remember that, when they analyze history to evaluate whether the government has met its burden, "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in *Bruen*). Although the Court "acknowledge[d] that there is an ongoing scholarly debate on whether courts should rely primarily on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," 142 S.Ct. at 2138,[2] all signs demonstrate that this "debate" must be settled in favor of 1791.

Hawaii's effort to focus the Court's attention on Reconstruction-era laws cannot be squared with the Supreme Court's approach. Appellants' Opening Br. at 27 n.8 & 32–33.[3] *Bruen* stressed that "we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the

---

[2] Citing AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998), and Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, now published 97 INDIANA L. J. 1439, 1441 (2022).

[3] *See also* ECF No. 12, Am. Br. of Everytown for Gun Safety at 2–15.

Fourteenth Amendment *have the same scope* as against the Federal Government." 142 S.Ct. at 2137 (emphasis added and citations omitted). And it cautioned that the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." 142 S.Ct. at 2137–38.[4] In other words, the Fourteenth Amendment's passage did not change the scope of incorporated rights. *See* Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (manuscript posted Nov. 4, 2022, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297).

*Bruen* further affirmed that post-founding-era regulations are relevant only to the extent they *confirm* traditions from the founding, so courts must "guard against giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. Thus, while it is *permissible* for courts to consider post-founding-era historical regulations, that review is limited to determining whether such regulations *confirm*

---

[4] *Bruen* cited *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (scope of Sixth Amendment right to confrontation governed by "founding generation's" understanding); *Virginia v. Moore*, 553 U.S. 164, 168–69, 172 (2008) (scope of Fourth Amendment determined in "founding era") (citation omitted); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–23 (2011) (founding-era treatment "dispositive" on scope of First Amendment). *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 359 (1995) (Thomas, J. concurring) (First Amendment must be interpreted based on its "original meaning" by "seek[ing] the original understanding" of Framers).

6

a founding-era tradition. *Bruen*, 142 S.Ct. at 2136.[5] Nineteenth-century laws that regulated firearms in a manner that broke with founding-era traditions do not establish a "tradition" that could narrow the scope of the Second Amendment's protection. *Bruen*, 142 S.Ct. at 2137 ("'[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text'") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).[6]

These principles doom the eccentric theory that the Second Amendment's original meaning could be "transformed" by Civil War-era regulations that were inconsistent with founding-era practices. "Incorporation" simply asks whether a

---

[5] *See also Gamble v. United States*, 139 S.Ct. 1960, 1975–76 (2019) (observing that, in *Heller*, "19th-century treatises were treated as mere *confirmation* of what the Court thought had already been established") (emphasis added); *see also* Smith, *Not All History is Created Equal*, *supra*, manuscript at 4–5 ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the founding, remained consistent with the public understanding in 1791."); *Crawford*, 541 U.S. at 47, 50 (citing 19th-century treatises that "confirm[ed]" founding-era rule).

[6] *Bruen* also cited *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2258–59 (2020) (rejecting argument that 30 states' late-19th-century adoption of "no aid" laws that are inconsistent with founding-era understanding of Free Exercise Clause could overcome original understanding). Justice Barrett cited this analysis from *Espinoza* in stressing that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'" 142 S.Ct. 2163 (Barrett, J., concurring).

particular limitation on the *Federal* government in the Bill of Rights also applies against state and local governments because it is a "fundamental" right. *McDonald v. City of Chicago*, 561 U.S. 742, 764 (2010). And because incorporation assumes and accepts that the right has restricted the federal government *since the founding*, "incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government." *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020). Their meanings did not *change* in the 19th century with the adoption of the Fourteenth Amendment. *McDonald*, 561 U.S. at 788 ("[R]elationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle."); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) ("[I]f a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."); Smith, *Not All History is Created Equal*, *supra* at 4–5.

*   *   *

Limiting the use of 19th-century evidence to only confirm the founding-era understanding plays a critical role here, as Hawaii invites this Court to rely heavily on Reconstruction-era and late 19th-century laws to defend the constitutionality of its sweeping restrictions. Appellant's Opening Br. at 27–28, 30, 33, 40–41, 46–47,

53. As shown below, however, these 19th-century laws were not consistent with the tradition of sensitive-place regulation in the founding era.[7]

## II. Hawaii's New "Sensitive Places" Are Inconsistent With The Nation's Historical Tradition Of Firearm Regulation.

Founding-era history demonstrates that Hawaii cannot justify its modern list of locations banning the carriage of firearms.

### A. The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were All Secured By Guards, Thus Reducing The Imperative Of Carrying For Self Defense.

In *Bruen*, the Court identified three types of "sensitives places" where historical regulations traditionally prohibited the possession of weapons: "legislative assemblies, polling places, and courthouses." 142 S.Ct. at 2133 (citing Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 203, 229–236, 244–247 (2018) and Br. for Independent Institute as *Amicus Curiae* in Supp. of Petitioners at 11–17). Review of these regulations illuminates the limits of the so-called sensitive places doctrine and provides the historical context for the analogical inquiry *Bruen* prescribes for analyzing Hawaii's restrictions in this case.

---

[7] Although the district court ultimately reached the correct conclusion when enjoining each of the restrictions that are at issue in this appeal, the court could have reached that conclusion more swiftly—and consistently with *Bruen*—by dismissing the mid- and late-19th century regulations that were inconsistent with regulations (or lack of regulations) at the founding.

The defining characteristic for each of the sensitive places acknowledged by *Bruen* is the presence of comprehensive government security. So, for example, the government may have chosen to secure locations such as legislatures, courthouses, and polling places because such locations involved deliberative processes central to the republican democracy. *See* Kopel & Greenlee, 13 CHARLESTON L. REV. at 205 ("Protecting government deliberation from violent interference is the core of the sensitive places tradition.").[8] Indeed, substantial historical evidence demonstrates that each of these places was, in contrast to virtually all other locations, well secured by the presence of armed guards, which significantly impacts a prohibition's burden on Second Amendment protected rights. In such places, the *need* for armed self-defense by the public was significantly reduced. As shown below, the presence of comprehensive government security at these locations prevents Hawaii from analogizing its widespread bans to the founding era tradition.

  **1. Legislatures.** The historical record reflects a uniform tradition of providing publicly funded or publicly administered physical security in legislative assemblies throughout the nation. Legislative records from all around the United States during the founding era reflect the presence of sergeants-at-arms and door-

---

[8] To that end, concern over potential intimidation was justified: The founding generation was acutely aware of mob violence routinely breaking out over political matters. *See*, *e.g.*, Schlesinger, *Political Mobs and the American Revolution, 1765-1776*, 99 PROCEEDINGS OF THE AM. PHILOSOPHICAL SOC'Y 244, 244–50 (1955).

keepers at legislative proceedings, which is evidenced through public funding and legislative journals detailing the appointment of these officers:

- In Rhode Island, sheriffs, town sergeants, and constables were paid for attending the General Assembly. The Public Laws Of The State Of Rhode-Island 220, 222 (1798) ("The Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly").

- Delaware provided for public payment of fees to the legislature's sergeant-at-arms and door-keepers. 2 Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven, pp. 1100, 1118 (1797) ("[T]he fees belonging to the Sergeant at Arms shall be as follow … Taking any person into custody, Thirty-31 three Cents," "Fees to the Door-keepers of the respective Houses—For every day's attendance, One Dollar").

- Pennsylvania appropriated funds for the assembly's sergeant-at-arms and door-keepers in 1781: "The sergeant-at-arms, for every day's attendance, the sum of ten shillings. The door-keeper of the council and the door-keeper of the house of assembly, each the sum of ten shillings for every day's attendance." 10 The Statutes at Large of Pennsylvania From 1682 to 1801, pp. 376, 378 (1779–1781).

- South Carolina provided for the payment of door-keepers in 1787. The Public Laws of the State of South-Carolina, pp. 426, 427 (1790) ("Two Door-keepers £50 each per annum").

- New York legislated that "there shall also be allowed and paid to the serjeant at arms and the door keepers of the senate and assembly, each the sum of two dollars for every day they shall attend the legislature" An Act for the Support of Government, in 1 Laws of the State of New York, p. 532 (2nd ed. 1807).

- Georgia appropriated funds for the legislature's door-keepers in 1808: "[T]o the messenger and door-keeper of the Senate, and messenger and door-keeper of the House of Representatives, three dollars each per day." A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive, pp. 372–73 (1812).

- New Jersey provided for payment "[t]o the door keeper, the sum of five shillings per diem, for each day that he hath or shall attend this Congress." Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October 1775, pp. 239, 240 (1835).

- Virginia provided for "allowances" for the sergeant-at-arms and door-keepers' "services" to the General Assembly in 1783. Virginia, Journal of the House of Delegates of the Commonwealth of Virginia, p.77 (Printed by Thomas W. White, 1828).

- Vermont compensated sheriffs and constables "[f]or attendance on the general assembly" in 1798. The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808).[9]

     **2.     Courthouses.** The historical record likewise confirms that States provided for the securing of courthouses during the Founding Era by requiring law enforcement officials (sheriffs or constables) to attend court.

- South Carolina directed that "sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts." The Public Laws of the State of South-Carolina, pp. 268, 271 (1790).

- Virginia enacted a 1792 law providing that "[t]he keeper of the public jail, shall constantly attend the General Court, and execute the commands of the Court," and further providing that "the Sheriff, or so many of the Under-Sheriffs as shall be thought necessary, of the County where such Court may be held, shall attend

---

[9] *See also* Votes and Proceedings of the House of Delegates of the State of Maryland, October Session, 1780, p. 2 (1781) ("The house appointed … Mr. Robert Reynolds sergeant at arms, and Mr. Cornelius Mills door-keeper."); Votes and Proceedings of the Senate of the State of Maryland, November Session, 1791, p. 1 (1792) ("Edward Roberts [was appointed] door-keeper"); A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire, p. 6. (1808) ("Voted that Mr. James Buswell be door-keeper for the Senate the present Session.").

13

the said Court during their Sessions." A Collection Of All Such Acts Of the General Assembly Of Virginia, pp. 69–71 (1803).

- Delaware, in a 1793 law, directed that "the Sheriff of Kent county … shall be attendant on the said High Court of Errors and Appeals during the sitting thereof, and be the officer for the purpose of executing the orders and process of the said court." 2 Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, pp. 1088, 1091 (1797).

- New Jersey, in 1798, mandated that "the constables of the several townships in such county shall be the ministerial officers of the said court" and provided that the constable "shall be appointed to attend the jury." New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the Authority of the Legislature, pp. 49, 50, 58 (Joseph Bloomfield, 1811).

- New York, in 1801, required "sheriffs and their officers" to attend court proceedings "to do those things which to their officers shall appertain." 1 Laws of the State of New York, p. 172 (1807).

- Pennsylvania, in 1780, provided courts with "the power to … compel the attendance of sheriffs, coroners, constables, and other ministerial officers require sheriffs, constables, and other officers." The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X, p. 57 (Wm. Stanley Ray 1904).

14

Beyond these requirements, the legislative record in other early American jurisdictions shows that law enforcement officials were compensated for attending judicial proceedings, which provides further evidence that courthouses were secured by the government:

• Connecticut's legislative record includes a fee schedule for sheriffs and constables attending court proceedings. Acts and Laws of the State of Connecticut, In America, pp. 63–65 (1784).

• Georgia provided in a 1792 law for fees to sheriffs and constables for court proceedings. A Digest of the Laws of the State of Georgia, pp. 471, 473, 474, 478 (1800).

• Maryland law provided for compensation "to the Sheriff," including for "Empanelling" and "Swearing" juries and for "Attendances, per day." The Laws of Maryland to which are prefixed The Original Charter, with an English translation, v. 1, ch. XXV (1799) (1779 law).

• Massachusetts provided for payment to "[e]very Constable who shall attend the Supreme Judicial Court, or Court of General Sessions of the Peace, or Common Pleas." Acts and Resolves of Massachusetts, 1786–87, p. 235 (1893) (1786 law).

- New Hampshire law provided for "Sheriff's fees" "[f]or every trial," "[f]or attending the grand jury," and "[f]or attending the petit jury." The Laws of the State of New-Hampshire, pp. 112–16 (1797).

- North Carolina allocated payment to sheriffs "[f]or summoning, impannelling and attending on every jury in every cause in court" and "[f]or attendance of a constable every court when summoned by the sheriff." A Manual of The Laws of North-Carolina, pp. 190, 191, 196 (3d ed. 1814).

- Rhode Island directed that "[t]he Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly, the Supreme Judicial Court, and the Courts of Common Pleas, by the day." The Public Laws of the State of Rhode-Island, pp. 220, 222 (1798).

- Vermont provided for payment of fees to sheriffs and constables "[f]or attending before a justice's court, when required," "[f]or attending freeholders' courts," and "[f]or attendance on the general assembly, or supreme or county court." The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808) (1798 law).

3. **Polling Places.** The founding-era record reveals a similarly robust tradition of stationing government-funded officers at polling places to oversee elections, maintain order, and provide security:

16

- Georgia law required sheriffs to attend elections "for the purpose of enforcing the orders of the presiding magistrates in preserving good order." A Digest of the Laws of the State of Georgia, p. 611 (1800).

- Virginia provided in 1778 that "[t]he sheriff shall attend and take the poll at such election, entering the names of the persons voted for." Abridgement Of The Public Permanent Laws Of Virginia, p. 325 (1796).

- An 1807 New Jersey statute provided constables and other elections officers with authority to detain "riotous" or "disorderly" people for up to 24 hours to preserve "good order" and "for the security of the election officers from insult and personal abuse." Laws of the State of New Jersey, p. 36 (Bloomfield, ed. 1811).

- Maryland's constitution mandated that "the Sheriff of each county, or … his Deputy … shall be the judges of the election" for the house of delegates, and "the Sheriff of each county, or … his Deputy … shall hold and be judge of the said election" for senate." Md. Const. art. 1, §§ 3 & 14 (1776).

- Delaware law authorized "the Sheriffs" and other officials "to attend, conduct, and regulate the election." 2 Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, p. 984 (1797).

- South Carolina's laws contain a "Table of Fees" that includes payment to the sheriff for "publishing writs for electing members of the General Assembly,

17

taking the ballots and returning the writ." The Public Laws of the State of South-Carolina, pp. 386–88 (1790).

In short, the government's provision of armed security is an essential component of the narrowly defined categories of "sensitive" places.

### B. The Supposed Sensitive Places At Issue Here Cannot Be Analogized To The Founding Era Sensitive Places Identified In *Heller* And *Bruen*.

For a historic law to serve as a "proper analogue" to a modern firearm regulation under *Bruen*, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2132–33. On that score, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citations omitted). Hawaii cannot carry its burden of analogizing the narrow categories of sensitive places to the locations where the State has sought to disarm citizens, including public assemblies, bars and restaurants, beaches and parks, and banks and financial institutions.

1. The context of the founding era's narrow categories of "sensitive places" was unique. The government exercised a heightened level of control to secure the proper operation of government (*i.e.*, safeguarding the legislature's business, promoting free election, or securing legal proceedings). Each of the areas

was self-contained such that government officers actually could provide for the safety of the individuals in the area. With that guarantee of personal protection, the burden on a citizens' right to armed self-defense was significantly reduced: If violence broke out, government security was present and ready to quell it, so there was a vastly reduced *need* to carry arms for self-defense.

This stands in stark contrast to the supposed "sensitive" locations where Hawaii has sought to disarm citizens. The State's bans encompass a broad swath of locations that ordinary individuals visit on a routine basis. Most important, these locations lack ubiquitous state-provided security in any way comparable to armed security in contained locations such as courthouses or legislative assemblies. Modern policing does not remotely compare to the level of security provided at founding-era sensitive places. *Cf. Bruen*, 142 S.Ct. at 2133–34 ("[T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department.").[10] As such, all of the locations enjoined by the district court plainly flunk the "how" test.

---

[10] Since the founding, Americans have been their own first responders outside of the few sensitive locations described above. Advancements in professional policing have not remotely changed this condition: Citizens remain primarily responsible for their own defense. *See, e.g.,* WALKER & KATZ, THE POLICE IN AMERICA 4 (2013) (noting the "enduring myth[] that police are primarily crime fighters," even though "[o]nly about one-third of a patrol officer's activities are devoted to criminal law enforcement").

**2.** Hawaii argues that parks and beaches are properly designated as "sensitive places" because they "often host crowded gatherings," Appellant's Opening Br. at 37, and it justifies its ban on carrying in banks and financial institutions by analogizing them to places of public assembly, *id*. at 45–47. These arguments fail *Bruen*'s history test for a separate important reason. The district court correctly rejected these analogies in holding that Hawaii failed to show a historical tradition justifying either of these bans. *Wolford v. Lopez*, 2023 WL 5043805, at *21–25 (D. Haw. Aug. 8, 2023) (parks and beaches); *id.* at *26 (banks and financial institutions). Indeed, the historical evidence runs directly counter to the State's efforts to justify its modern bans by saying these places are "crowded" and "congested." Evidence from the founding demonstrates that, instead of general bans on firearms at assemblies, there was a tradition of either allowing or even *requiring* citizens to be armed when they came to church, where they most consistently "assembled" together. Indeed, *Heller* cited a 1770 Georgia law that required men to carry firearms "to places of public worship." 554 U.S. at 601; *see also* Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (reviewing colonial- and founding-era historical precedent for requiring firearms at church services). And colonists were not required to arm themselves only at church: There is a robust tradition in Colonial and early America requiring the carrying of arms not only to religious services, but to public

20

assemblies more broadly. Laws dating back across the colonial period required the carry of firearms in assemblies or at church services precisely because of the risk of violence in those locations.

• Connecticut ordered "that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting." Connecticut, Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, p. 95 (Brown & Parsons 1850) (1643 order).

• Colonial Massachusetts ordered that "all such persons … shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets … ." Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England, p. 190 (White 1853) (1639 order).

• Colonial Maryland ordered that every man "able to bear arms" must carry a firearm when at church. Maryland, 3 Archives of Maryland, p. 103 (Browne 1885) (1642 order).

• Rhode Island prescribed in 1639 that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 Records Of The Colony Of Rhode Island And Providence Plantations, In New England, p. 94 (Bartlett 1856).

- Virginia enacted multiple similar requirements. 1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature, p. 174 (Hening 1808) (1631 law requiring "[a]ll men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1642 act requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.*, vol. VI, p. 534 (1755 law "providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches").

This widespread precedent confirms that Hawaii's effort to ban firearms at "congested" locations or "crowded" places of public assembly conflicts with the Nation's history and tradition. Where Hawaii's solution to the risk of violence at public assemblies is that *no one* may lawfully carry, the Founders and Framers took precisely the opposite approach: Where public spaces could not be comprehensively secured by government-provided protection, the people were instructed to carry arms so they could defend themselves in the event of violence. The Founding Era's solution—not Hawaii's—controls under *Bruen*.

22

**C.     Historical Restrictions On Hunting And The Discharge Of Firearms Confirm There Is No Basis To Ban Carrying Firearms On Private Property Altogether.**

Beyond the so-called "sensitive places" discussed above, Hawaii has attempted to effectively ban firearms on all privately-owned property unless the property owner explicitly provides consent or posts a sign authorizing carry. *See Wolford*, 2023 WL 5043805, at *26–27 (discussing the "default rule" prohibiting carry of a concealed handgun on private property without "express authorization"); Appellant's Opening Br. at 48–56 (defending the private property "default rule"). Two facets of historical regulation show how this broad effort to disarm Hawaiians is unconstitutional.

First, founding-era regulations consistently focused on restricting *discharge* (not possession of arms) if indiscriminate firing posed a problem at a particular location. Such restrictions were often imposed in city limits or particular public spaces, but they did not prohibit carry more broadly. Several states restricted discharge in this manner:

•     Rhode Island prohibited the discharge of a firearm "in or across any road, street, square or lane," punishable by fine. The Public Laws Of The State Of Rhode-Island And Providence Plantations, p. 568 (1798).

23

- Delaware prohibited the "fir[ing] or discharg[ing]" of a firearm "within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State." 1812 Del. Laws 329.

- New Hampshire generally restricted firearm discharge within a "quarter mile from the nearest building of any such city, town, village or station." 1823 N.H. Laws 73–74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

- Colonial New York enacted a similar restriction. 5 Laws Of The Colony Of New York, p. 12 (1894) (1769 law).

- New York City in 1763 prohibited the "Fire and discharge of any gun" by "any Children, Youth, apprentices, Servants, or other persons … at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk." *See* Supp. App'x of New York City, *NYSRPA v. New York*, No. 18-280 at SA6 (U.S. 2019) (reprinting Ordinances of the City of New York, § 6 (1763)).

- Massachusetts enacted similar restrictions. 1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1–3 ("no person or persons, from and after the publication of this act, shall presume to discharge or fire off any cannon laden with shot, from any wharf or

24

vessel," and "no person shall … discharge any gun or pistol, charged with shot or ball, in the town of Boston, or in any part of the Harbor … .").

- Vermont law provided that "[n]o non-commissioned officer, private or citizen shall unnecessarily fire a gun, single musket or pistol in any public road or near any house, or place of parade … ." 1818 Vermont Acts & Resolves 64, § 42.

These discharge restrictions are not analogous to modern regulations banning firearms in a particular location. After all, a restriction on discharging firearms presupposes individuals possess firearms. And in a related context, *Heller* recognized that it would be "implausible" for such discharge restrictions to "have been enforced against a citizen acting in self-defense." 554 U.S. at 633.

Second, founding-era regulations restricted hunting and poaching on private land, rather than prohibiting carry altogether. In addition to the laws identified by Hawaii in the district court,[11] laws from other states confirm that firearm restrictions on private land generally prohibited trespassing, *i.e.*, hunting on someone else's land without permission. A 1784 North Carolina law, for example, prohibited "hunt[ing] with a gun or dogs on the lands of any other person, without leave obtained from the owner of the said land," so long as "the owner of the land shall, by advertisement posted up in two or more public places, have forbid the persons so hunting by name,

---

[11] *Wolford*, 2023 WL 5043805, at *28–29 (reviewing Hawaii's historical evidence to support the "default rule").

or all persons generally to hunt on his land, previous to the offence." North Carolina, A Manual Of The Laws Of North Carolina, p. 236 (1814). And Virginia similarly established a fine "[i]f any person or persons, shall at any time shoot, hunt, or range upon the lands or tenements … included within the bounds of any other person or persons, without license first obtained of the owner of such lands." Virginia, Abridgment of the Permanent Laws of Virginia, pp. 157–58 (1796); *accord* Georgia, Digest Of The Laws Of Georgia, p. 428 (1800) (1790 law making it punishable by fine to "hunt with a gun by fire light or kill any deer so hunting by fire light in the night time without his or their own enclosures").

For its part, Hawaii relied on several anti-poaching regulations to justify its private property "default rule"—and the district court rightly rejected this gambit. *Wolford*, 2023 WL 5043805, at *28–29 (identifying five 18th-century hunting restrictions).[12] These regulations show that when the founding generation considered banning firearms in particular types of property, they only did so in a very narrow circumstance (hunting), and they did not ban carry in these locations for self-defense. These restrictions provide no support for Hawaii's private-property restriction. As

---

[12] Hawaii also relied on three Reconstruction-era laws restricting the carry of firearms on certain private property. *Wolford*, 2023 WL 5043805, at *28. The district court held that because these laws "concern prohibiting carrying firearms on enclosed premises or plantations," they did not show "a historical tradition of prohibiting the carrying of firearms on private property held open to the public" as the State claimed. *Id.* at 29.

the district court observed, at most, these laws "prohibited carrying firearms on private property that consisted of fenced off lands or estates," and "did not likely concern private property that was generally held open to the public." *Id.* at 29.

In short, founding-era historical precedent regulating hunting and firearm discharge provides no support for Hawaii's broad carry bans on private property.

## CONCLUSION

This Court should affirm.

Dated:  November 9, 2023          Respectfully submitted,

Benbrook Law Group, PC
Bradley A. Benbrook

s/ Bradley A. Benbrook
Attorneys for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this amicus brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,126 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Fed. R. of App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  November 9, 2023                    Respectfully submitted,

                                            Benbrook Law Group, PC
                                            Bradley A. Benbrook


                                            s/ Bradley A. Benbrook
                                            Attorneys for *Amici Curiae*