**No. 23-16164**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JASON WOLFORD, et al.,

*Plaintiff-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as Attorney General of the
State of Hawaii,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Hawaii
No. 1:23-cv-00265—Hon. Leslie E. Kobayashi

# NATIONAL RIFLE ASSOCIATION OF AMERICA INC.'S AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFF-APPELLEES AND IN SPORT OF AFFIRMANCE

Erin M. Erhardt
Michael T. Jean
National Rifle Association of America –
Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA, 22030
703-267-1158
EErhardt@nrahq.org
MJean@nrahq.org

*Attorney for Amicus Curiae National Rifle
Association of America*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Fed. R. App. P. 26.1(a), Amicus Curiae National Rifle Association of America, Inc., ("NRA") submits the following Corporate Disclosure Statement:

NRA is a nonprofit membership association incorporated in the state of New York. NRA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Date: November 9, 2023

*/s/ Erin M. Erhardt*
Erin M. Erhardt

*Attorney for Amicus Curiae the National Rifle Association of America*

## TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** .................................................. ii

**TABLE OF CONTENTS** ........................................................................... iii

**TABLE OF AUTHORITIES** ..................................................................... iv

**INTEREST OF AMICUS CURIAE** .............................................................. 1

**INTRODUCTION AND SUMMARY OF THE ARGUMENT** ...................... 1

**ARGUMENT** ............................................................................................ 3

   **I.   THE SECOND AMENDMENT PROTECTS THE RIGHT OF THE PEOPLE TO CARRY A HANDGUN OUTSIDE THE HOME FOR SELF-DEFENSE, EXCEPT IN LIMITED "SENSITIVE PLACES."** ..................... 5

   **II.   HISTORY AND TRADITION DO NOT SUPPORT EXTENDING THE "SENSITIVE PLACE" DESIGNATION TO THE CHALLENGED LOCATIONS.** ............................................................................ 6

      **A.   Haw. Rev. Stat. § 134-E – Private Property and Express Authorization** ................................................................ 6

      **B.   Haw. Rev. Stat. § 134-A(a)(1) – Government Building and Adjacent Parking Areas** .......................................................... 17

      **C.   Haw. Rev. Stat. § 134-A(a)(4) – Bars and Restaurants Serving Alcohol and Adjacent Parking Areas** .................................... 22

**CONCLUSION** ...................................................................................... 28

**CERTIFICATE OF COMPLIANCE** ......................................................... 30

**CERTIFICATE OF SERVICE** ................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*A.C.L.U. of Nevada v. City of Las Vegas*,
466 F.3d 784 (9th Cir. 2006) .................................................................... 15, 16

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*,
570 U.S. 205 (2013) ........................................................................................ 14

*Antonyuk v. Hochul*,
635 F. Supp. 3d 111 (N.D.N.Y. 2022) .......................................................... 11

*Arkansas Game & Fish Comm'n v. Murders*,
938 S.W.2d 854 (Ark. 1997) .......................................................................... 12

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) .................................................... 17, 18, 19, 20

*Cheboygan Sportsman Club v. Cheboygan Cnty. Prosecuting Atty*,
858 N.W.2d 751 (Mich. Ct. App. 2014) ........................................................ 12

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................................ 17, 23, 26

*Ex parte W.F.*,
214 So. 3d 1153 (Ala. 2015) .......................................................................... 12

*Jencks v. Coleman*,
13 F. Cas. 442, 2 Sumn. 221 (C.C.D.R.I. 1835) .............................................. 8

*Kipke v. Moore*,
1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ....................passim

*Koons v. Platkin*,
1:22-cv-07463, 2023 WL 3478604 (D.N.J. May 16, 2023) ......................passim

*Markham v. Brown*,
8 N.H. 523 (1837) ............................................................................................ 8

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......................................................................................... 8

iv

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
  618 F. Supp. 3d 901 (N.D. Cal. 2022) ............................................................26

*Nat'l Inst. Of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ...................................................................................16

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ............................................................................passim

*Range v. Att'y Gen. United States of Am.*,
  69 F.4th 96 (3d Cir. 2023) ................................................................................ 5

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) .........................................................................................15

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
  487 U.S. 781 (1988) .........................................................................................14

*Solomon v. Cook Cnty. Bd. Of Comm'rs*,
  559 F. Supp. 3d 675 (N.D. Ill. 2021) ..............................................................11

*State v. Gibson*,
  95 A.3d 110 (N.J. 2014) ...................................................................................15

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) .........................................................................................14

*U.S. v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ...................................................................20, 21

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980) ......................................................................................9, 16

*Wooley v. Maynard*,
  430 U.S. 705 (1977) .........................................................................................14

*Young v. Hawaii*,
  896 F.3d 1044 (9th Cir. 2018) ........................................................................... 2

**Statutes**

1715 Md. Laws 90 ........................................................................................10, 12

1721 Pa. Laws, c. 142 ...................................................................................10, 12

1722 N.J. Law 141 .......................................................................................10, 12

1746, NJ, An Act for better settling and regulating the Militia ............................25

1763 N.Y. Laws 441 ..........................................................................................11

1771 N.J. Laws 343-347 ...................................................................................10

**Other Authorities**

Cody J. Jacobs, *Guns in the Private Square*, 2020 U. Ill. L. Rev. 1097 (2020)....... 8

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Place Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018)..................................................................................................18

Eric T. Freyfogle & Dale D. Goble, *Wildlife Law: A Primer* (2009) ....................11

Frederick Bernay Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181 (1940) ...........................................................................................25

Leo Bernabei, *Taking Aim at New York's Concealed Carry Improvement Act*, 92 Fordham L. Rev. 103 (2023) ...........................................................................11

**Rules**

Fed. R. App. P.  29................................................................................................ 1

## INTEREST OF AMICUS CURIAE[1]

The National Rifle Association of America, Inc., ("NRA") is America's oldest civil-rights organization and is widely recognized as America's foremost defender of Second Amendment rights. The NRA was founded in 1871 by Union generals who, based on their experiences in the Civil War, desired to promote marksmanship and expertise with firearms among the citizenry. Today, the NRA has over 4 million members, and its programs reach millions more. The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement.

The NRA has a significant interest in this case because it has members in Hawaii who legally carry firearms in public places for self-defense and wish to continue to do so—something Act 52 makes virtually impossible. And the NRA is involved in litigation involving similar "sensitive places" regulations in other states.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Second Amendment "presumptively guarantees ... a right to 'bear' arms

---

[1] All parties have consented to the filing of this brief in accordance with Fed. R. App. P. 29(a)(2). No counsel for a party authored this brief in whole or in part. No party or party's counsel made contributions to fund the preparation or submission of this brief. No person, other than the NRA, its members or its counsel, made contributions to fund the preparation or submission of this brief.

in public for self-defense." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2135 (2022). Hawaii, however, does not respect that fundamental right. Until *Bruen*, Hawaii employed a "proper cause" standard to obtain a license to carry a firearm. *Id*. at 2124. That standard eviscerated the ability to carry a firearm—only four concealed-carry licenses were issued between 2000 and 2018, and only security guards were issued open-carry licenses. *Young v. Hawaii*, 896 F.3d 1044, 1070, 1071 n.21 (9th Cir. 2018), *on reh'g en banc*, 992 F.3d 765 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).

*Bruen* held that "proper cause" standards like Hawaii's are unconstitutional. 142 S. Ct. at 2138. In response, Hawaii enacted Act 52, which, *inter alia*, prohibits carrying firearms in myriad locations Hawaii deems "sensitive." These locations amount to the vast majority of the state. Essentially, Hawaii replaced a regime under which no one could obtain a license to carry a firearm with a regime under which there is almost nowhere a person can legally carry. It amounts to the same thing: an almost complete evisceration of the fundamental right to carry a firearm outside the home for self-defense.

This brief addresses a few of the locations where carrying a firearm is banned under Act 52. First, § 134-E, which requires affirmative permission from the prop-

2

erty owner before carrying a firearm onto private property held open to the public, upends longstanding tenants of property law and the right to exclude and violates both the First and Second Amendments. Second, Hawaii has not demonstrated a historical tradition that supports banning firearms in parking lots of government buildings, specifically parking lots shared between government agencies and non-government businesses. Finally, Hawaii has not demonstrated a historical tradition that supports banning firearms in all bars and restaurants that serve alcohol for onsite consumption, even by those who are not themselves consuming. Therefore, the district court's entry of a preliminary injunction should be affirmed.

## ARGUMENT

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30. *Bruen* already answered the first question: The Second Amendment's plain text covers carrying a firearm outside the home for self-defense. *Id*. at 2135.

That places the burden on Hawaii to justify Act 52 by demonstrating it is historically moored. *Bruen*, 142 S. Ct. at 2130. *Bruen* identified two alternative histor-

3

ical inquiries. First is the "fairly straightforward" inquiry. *Id*. at 2131. This applies "when a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id*. Under this inquiry, the Court looks to "the lack of a distinctly similar historical regulation addressing that problem" or "if earlier generations addressed the societal problem … through materially different means." *Id*.

The second approach is the "more nuanced approach," which gets applied in "cases implicating unprecedented societal concerns." *Id*. at 2132. But again, "history guide[s] our consideration of modern regulations that were unimaginable at the founding." *Id*. Under this approach, the government can satisfy its burden by "identify[ing] a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original). The analogue must do more than "remotely resemble" the modern regulation, but it does not have to be a "dead ringer." *Id*. (citations omitted). The analogue's similarity is measured by "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id*.

Hawaii cannot meet its burden under either analysis. Act 52 does not "impose

4

a comparable burden on the right of armed self-defense" as Hawaii's purported historical analogues, nor is the burden "comparably justified."

**I.  The Second Amendment protects the right of the people to carry a handgun outside the home for self-defense, except in limited "sensitive places."**

*Bruen* plainly established that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. True, *Bruen* also recognized the existence of certain "sensitive places" "where arms carrying could be prohibited consistent with the Second Amendment." 142 S. Ct. at 2133. But "historical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there." *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc) (citing *Bruen*, 142 S. Ct. at 2134). Instead, modern "sensitive places" must be historically moored, and "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 142 S. Ct. at 2133. These places include "'schools and government buildings,'" and "legislative assemblies, polling places, and courthouses." *Bruen*, 142 S. Ct. at 2133 (citation omitted).

The myriad locations that Hawaii designated as "sensitive places" effectively

bans the right to carry throughout the state. This goes much further than the historical record allows and flagrantly disregards the Supreme Court's holdings that (1) there are "relatively few" "sensitive places." *id.*, and (2) "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place,'" *id.* at 2134.

Moreover, Hawaii's contention that the "sensitive-place restrictions at issue are 'presumptively lawful," Def.'s Br. at 11, is wrong. A state cannot merely call a place "sensitive" and claim a presumption of constitutionality. *See Bruen*, 132 S. Ct. at 2133 (directing courts to "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.").

## II. History and tradition do not support extending the "sensitive place" designation to the challenged locations.

### A. Haw. Rev. Stat. § 134-E – Private Property and Express Authorization

The Supreme Court has made it clear that "[t]he Second Amendment's plain text thus presumptively guarantees ... a right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. Hawaii turned that presumption on its head through § 134-E, which presumes there is no right to carry in places open to the

6

public without affirmative consent. This is not only inconsistent with the Second Amendment, but it also upends traditional rules of trespass and violates the First Amendment. Hawaii cannot show that this is constitutionally permissible.

### i.  § 134-E Upends the Traditional Right to Exclude

Hawaii claims that "§ 134-E does no more than vindicate the traditional right to exclude by preventing Plaintiffs from carrying firearms onto private property without consent." Def.'s Br. at 60. This characterization—that Plaintiffs seek to carry firearms over the objection of the property owner—is a mischaracterization at best and disingenuous at worst. Other courts have rejected this characterization on its face because "[t]he right to exclude presumes that individuals may carry a gun unless the property owner prohibits it." *Kipke v. Moore*, 1:23-cv-01293, 2023 WL 6381503, at *12 n.8 (D. Md. Sept. 29, 2023); *Koons v. Platkin*, 1:22-cv-07463, 2023 WL 3478604, at *59 (D.N.J. May 16, 2023) ("By arguing that the Default Rule is a mere extension of landowners' right to exclude, the State and its amici do not seem to appreciate that it is the State's sweeping revocation of the public's longstanding limited implied license to enter others' property without trespass liability solely because of the exercise of a constitutional right."). Indeed, Hawaii has singled out the Second Amendment for special treatment under this new-found theory of the

7

right to exclude.[2] That is impermissible. *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)) ("The constitutional right to bear arms in public for self-defense is not 'a second-class right.'").

Far from "vindicating" private property owners' rights, § 134-E imputes Hawaii's preferred policy onto property owners.[3] Without a historical tradition justifying that imputation (which Hawaii has not shown, *see infra* p. 7–8), Hawaii cannot deem firearms carriers trespassers by default. "The *landowners* must *affirmatively modify* the terms of the implied invitation to enter *on their own*, especially where the right to carry for self-defense is burdened with criminal sanctions just because it occurs on private property." *Koons*, 2023 WL 3478604, at *60 (emphases added); *see also* Cody J. Jacobs, *Guns in the Private Square*, 2020 U. Ill. L. Rev. 1097, 1131 (2020) ("A business prohibiting firearms ... is simply not a limitation on personal

---

[2] Not only is this a new interpretation of the right to exclude, but the right to exclude is a relatively modern property right that did not carry the same weight when the Second Amendment was ratified. *Markham v. Brown*, 8 N.H. 523, 529–30 (1837); *Jencks v. Coleman*, 13 F. Cas. 442, 443, 2 Sumn. 221 (C.C.D.R.I. 1835) (Story, J.).

[3] Indeed, given the opportunity, it is clear that Hawaii would ban—or presumptively ban—the carry of firearms in the entire state: on all private property held open to the public without express authorization, § 134-E; and on all government property under the government-as-proprietor theory, *see* Def.'s Br. at 32. This is not constitutionally permissible.

8

liberty in the same way that a government prohibition on carrying firearms is.").

Moreover, Hawaii is incorrect that § 134-E does not implicate the Second Amendment. Def.'s Br. at 59. *Cf. Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 624, 636 (1980) (striking an ordinance requiring charitable organizations soliciting contributions door-to-door to obtain a permit because the village's interests "could be sufficiently served by measures less destructive of First Amendment interests."). Thus, Hawaii must show that § 134-E is consistent with this "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. It is not.

### ii. § 134-E Violates the Second Amendment Because There is No Historical Tradition of Requiring Special Permission to Carry Firearms on Private Property Held Open to the Public

Hawaii cites five laws from the decades before America's founding and three laws from the Reconstruction era in support of a "historical tradition" of governmental prohibitions on carrying firearms on private property held open to the public without the property owner's affirmative consent. But these laws are anti-poaching regulations and primarily applied only to enclosed lands and private estates (plantations)—not to private property held open to the public.

Hawaii claims that both § 134-E and the historical laws it presents are "rooted in respect for private property rights." Def.'s Br. at 64. But this ignores the context

of the historical laws. Left out of Hawaii's brief is that four of the five colonial-era laws were anti-poaching regulations. *See* 1715 Md. Laws 90 ("And, to prevent the abusing, hurting or worrying of any stocks of hogs, cattle or horses, with dogs, or otherwise"); 1721 Pa. Laws, c. 142, p.254 ("An Act to Prevent the Killing of Deer out of Season, And Against Carrying of Guns or Hunting by Persons not qualified"); 1722 N.J. Law 141 ("An Act to Prevent the Killing of Deer out of Season, and Against Carrying of Guns and Hunting by Persons not Qualified"); *id*. ("And whereas divers Abuses have been committed, and great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to Hunt on other People[']s Land"); 1771 N.J. Laws 343-347, ch. 540 ("An Act for the Preservation of Deer, and other game, and to prevent trespassing with guns).[4] The purpose of the fifth law

---

[4] While the 1722 New Jersey statute prohibits "carry[ing] any Gun, or Hunt[ing] on the Improved or Inclosed Lands in any Plantation, and on other than his own" without permission, the updated 1771 New Jersey statute simply prohibits "carry[ing] any gun on any lands not his own" without permission. Hawaii, through the declarations of Professor Hendrik Hartog, claims that this change extended the carry prohibition to typical business of the era, like blacksmiths. Def.'s Br. at 64–65. Not only does this interpretation disregard the title of the 1771 statute, which specifically references hunting and the preservation of deer, but at least one court has already noted that "Professor Hartog's opinion in this regard, however, appears to be based on his interpretation of the law's theoretical application to such categories; the Court is not presented with primary evidence suggesting that ... the 1771 law ... w[as] enforced in, for instance, businesses held open to the public." *Koons*, 2023 WL 3478604, at *63.

10

Hawaii offers, from New York in 1763, "was to protect farmland." Leo Bernabei, *Taking Aim at New York's Concealed Carry Improvement Act*, 92 Fordham L. Rev. 103, 130 (2023). "Its preamble stated that the law's purpose was to combat the longstanding 'Practice of great Numbers of idle and disorderly Persons in and about the City of *New-York*, and the Liberties thereof, to hunt with Fire-Arms, and to tread down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures [sic] there.'" *Id.* (quoting 1763 N.Y. Laws 441, *reprinted in 2 Laws of New-York from the Year 1691, to 1773 Inclusive* 441–42 (Hugh Gaine ed., 1774)).

Clearly, the primary purpose—the "why"—of Hawaii's proffered colonial laws was to prevent unauthorized hunting and to protect farmland. Other courts examining these statutes have found this to be the case. *See Solomon v. Cook Cnty. Bd. Of Comm'rs*, 559 F. Supp. 3d 675, 691 (N.D. Ill. 2021); *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 147–48 (N.D.N.Y. 2022); *Kipke*, 2023 WL 6381503, at *13; *Koons*, 2023 WL 3478604, at *64–65.[5] This purpose is not present in § 134-E.

---

[5] The fact that some of these statutes refer to carrying a gun or hunting does not mean that poaching was not the issue the statutes sought to address. Poaching is a hard crime to police and prosecute: it generally takes place in remote areas without witnesses and requires proof beyond a reasonable doubt. Eric T. Freyfogle & Dale D. Goble, *Wildlife Law: A Primer* 143 (2009). Hunting regulations are often drafted overly broad, where possession of a firearm in areas where wildlife is present is prima facie evidence of hunting, and courts routinely take a narrow reading of these

11

Moreover, three of these laws were limited to plantations. *See* 1715 Md. Laws 90 (prohibiting carry "upon any person's land, *whereon there shall be a seated plantation*, without the owner's leave") (emphasis added)[6]; 1721 Pennsylvania (prohibiting unauthorized carry "on the improved or inclosed lands *of any plantation* other than his own") (emphasis added); 1722 New Jersey (prohibiting unauthorized carry "on the Improved or Inclosed Lands *in any Plantation*") (emphasis added). Thus, these laws applied to private estates—not to private property held open to the public. They are therefore not comparable to the portion of § 134-E challenged by Plaintiffs: a presumptive ban on carrying on private property that *is* held open to the public.

---

regulations. For instance, a Michigan court found that a statute in the natural resources code that prohibited hunting or discharging a firearm within 150 yards of a dwelling was strictly limited to hunting and did not apply to shooting ranges. *Cheboygan Sportsman Club v. Cheboygan Cnty. Prosecuting Atty*, 858 N.W.2d 751, 757 (Mich. Ct. App. 2014); *see also Arkansas Game & Fish Comm'n v. Murders*, 938 S.W.2d 854, 855 (Ark. 1997) (striking a restriction on hunting on or across a road as overbroad because the plain language of the restriction prohibited possessing a firearm on a public road, which was otherwise lawful); *Ex parte W.F.*, 214 So. 3d 1153, 1159 (Ala. 2015) (reversing lower court's holding that being present with a firearm after dark in an area where wildlife was present was prima facie evidence that the accused was night hunting).

[6] Through misleading editing, Hawaii quotes the Maryland law as prohibiting "carry[ing] a gun, upon any person's land, ... without the owner's leave," Def.'s Br. at 62, omitting the qualifying phrase "whereon there shall be a seated plantation."

12

Hawaii's proffered Reconstruction-era laws hold up no better. Two of the three laws—1867 Texas and 1893 Oregon—prohibited carrying only on enclosed lands; the Texas law was specifically limited to plantations. The 1865 Louisiana law is broader, restricting carry on any "premises or plantations," not merely enclosed lands. But this single law, left standing alone, cannot establish a historical tradition. *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.). Additionally, the Louisiana and Texas statutes were "part of their discriminatory 'Black Codes,' which sought to deprive African Americans of their rights." *Kipke*, 2023 WL 6381503, at *13; *Koons*, 2023 WL 3478604, at *68. "The Supreme Court has cautioned against relying on such laws." *Kipke,* 2023 WL 6381503, at *13 (citing *Bruen*, 142 S. Ct. at 2149).

In sum, Hawaii has not carried its burden of demonstrating a historical tradition of the government prohibiting the carry of firearms on private property held open to the public unless the property owner affirmatively states otherwise. At most, Hawaii has established that there was a historical tradition prohibiting unauthorized hunting on enclosed areas of property. But that is not the purpose of § 134-E. And § 134-E goes much further, banning carry without express authorization not just on

13

land where it is possible to hunt but on all private property held open to the public. Thus, Plaintiffs are likely to succeed on their Second Amendment challenge to § 134-E.

### iii. § 134-E Violates the First Amendment Because It Compels Speech and Is Not the Least Restrictive Means of Achieving Hawaii's Interest

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 570 U.S. 205, 213 (2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). Section 134-E strikes at this heart: property owners must now affirmatively invite individuals exercising their Second Amendment-protected rights onto their property—even if they wish to allow those individuals to enter their property without making a statement.

"Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988); *see also Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (state could not require drivers to display state motto on their license plates). "Content-based laws ...

14

are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The law must also be the least restrictive means of advancing that interest. *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 797 (9th Cir. 2006) (citation omitted).

Hawaii claims that § 134-E "merely establishes a background presumption," Def.'s Br. at 60, and that there must necessarily be a background presumption that either presumptively allows or bans carrying firearms. Hawaii poses these alternative presumptions as constitutionally equivalent. *Id.* But only the latter presumption implicates the First Amendment.

Requiring a property owner to provide notice to assert his right to exclude someone from his property—either for simple trespass or because a person is invited but for his exercise of a constitutionally-protected right—is well rooted in law and history. *See State v. Gibson*, 95 A.3d 110, 116 (N.J. 2014) ("[W]here a landowner wishes to assert his right to exclude from open land and to have the backing of the criminal law it is not too much to ask him to give notice.") (citation omitted). It is how a property owner asserts his right to exclude. Such notice is akin to a warning that delivers factual and noncontroversial information, which is not compelled

15

speech. *See Nat'l Inst. Of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2376 (2018).

Moreover, a blanket presumptive ban on firearm carry, which requires business owners to affirmatively invite the exercise of a constitutional right, is not "the least restrictive means," *A.C.L.U. of Nevada*, 466 F.3d at 797, of vindicating the traditional right to exclude. In *Village of Schaumburg*, the Supreme Court struck an ordinance requiring "[e]very charitable organization, which solicits ... contributions from persons in the village by door-to-door solicitation" to obtain special permission—a permit—because the village's interests "could be sufficiently served by measures less destructive of First Amendment interests." 444 U.S. at 623, 636. The Court specifically noted that "permitting homeowners to bar solicitors from their property by posting signs reading 'No Solicitors or Peddlers Invited' was a "less intrusive and more effective measure[]." *Id*. at 639. So too, allowing property owners to post 'No Firearms' signs is a less intrusive measure than allowing Hawaii to upend traditional rules of trespass and require property owners to affirmatively invite the exercise of Second Amendment-protected rights.

Therefore, this Court should find that Plaintiffs are likely to succeed on the merits of their First Amendment challenge to § 134-E.

### B. Haw. Rev. Stat. § 134-A(a)(1) – Government Building and Adjacent Parking Areas

Section 134-A(a)(1) prohibits those otherwise authorized to carry firearms from carrying in:

> Any building or office owned, leased, or used by the State or a county, *and adjacent grounds and parking areas*, including any portion of a building or office used for court proceedings, legislative business, contested case hearings, agency rulemaking, or other activities of state or county government.

Act 52, § 2 (emphasis added). Plaintiffs challenge this provision as it applies to parking lots that are shared between government agencies (like a Department of Motor Vehicles office) and private businesses. Pls.' Br. at 45. Hawaii has not shown that there is a historical tradition of deeming such parking lots "sensitive," and therefore Plaintiffs' challenge is likely to succeed on the merits.

A secondary location, like a parking lot, is not "sensitive" merely because it is adjacent to a "sensitive place." *Heller* and *Bruen* listed some "presumptively regulable" locations, such as government buildings, "plac[ing] a thumb on the scale in favor of considering them sensitive." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136 (10th Cir. 2015) (citing *District of Columbia v. Heller*, 554 U.S. 570, 627 & n.27 (2008)) (Tymkovich, J., concurring in part and dissenting in part); *see also Bruen*, 142 S. Ct. at 2133. But "no such thumb on the scale exists for those

17

locations"—like parking lots—"on which *Heller* expressed no view." *Bonidy*, 790 F.3d at 1136–37 (Tymkovich, J., concurring in part and dissenting in part). Rather, to be treated as "sensitive," those locations "must stand or fall on their own." *Id.* at 1137. In other words, each ancillary location must be considered individually, based on the specific characteristics of the location.

"Parking lots, whether they are garages or just opened paved areas, can be part of their building's sensitivity *if* access to the lot is controlled by the same kind of security that is used for the building itself." David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Place Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 293 (2018). This should be the standard for determining whether an adjacent location is "sensitive"—whether the adjacent location is subject to the same security and control as the sensitive location itself.

In 2015, the Tenth Circuit upheld a regulation banning firearms in a post office parking lot. *Bonidy*, 790 F.3d at 1125. Judge Tymkovich would have invalidated that regulation. He presciently provided a spectrum for determining whether locations which are adjacent to accepted "sensitive places" are themselves sensitive. *Id*. at 1137 (Tymkovich, J., concurring in part and dissenting in part).

18

On one end of the spectrum are locations like the White House lawn: "The White House lawn, although not a building, is just as sensitive as the White House itself. Consequently, the presumption of lawfulness for a regulation penalizing firearm possession there might approach the categorical." *Id*. This is supported by the government's treatment of the White House lawn: it is protected by the same fences, limited entry points, and security as the White House itself. Judge Tymkovich continued:

> At the spectrum's other end we might find a public park associated with no particular sensitive government interests—or a post office parking lot surrounding a run-of-the-mill post office. Perhaps such locations are "sensitive" in the sense that the government always has an interest in protecting its property or visitors. But without more concrete evidence of *particular vulnerability*, any presumption of lawfulness for a firearm regulation cannot control.

*Id*. (emphasis added). The parking lots in the instant case are much closer to this latter end of the spectrum. They are not exclusive to government use. They enjoy no special protection or limited entry. Hawaii has offered no evidence that they have any "particular vulnerability." Nor has Hawaii offered any historical support for its contention that even "parking lots that *exclusively* serve government buildings," without more, "are sensitive to the same extent as the buildings themselves." Def.'s Br. at 35 (emphasis added). Hawaii has not shown that a parking lot—especially a

nonexclusive and unsecured parking lot—is "sensitive" merely because it is adjacent to a government office.

To support its regulation, Hawaii merely points to two pre-*Bruen* cases that upheld firearm bans in parking lots. Def.'s Br. at 35. But the parking lots at issue in those cases are distinguishable from the parking lots challenged in the instant case. *See U.S. v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019); *Bonidy*, 790 F.3d at 1125.

*Class* concerned a parking lot adjacent to the U.S. Capitol. That parking lot could "be used during work hours only by Capitol employees with a permit," was "close to the Capitol and legislative office buildings," and was "on land owned by the government." 930 F.3d at 464. Conversely, the parking lots at issue in the instant case are not exclusive to government buildings and their permitted employees. Rather, they are shared by government agencies and private businesses and are generally open to the public.

*Bonidy* considered the parking lot at issue to be part of a government building—a post office—because there was "a drop-off box for the post office in the parking lot, meaning that postal transactions took place in the parking lot as well as in the building." 790 F.3d at 1125. In the instant case, Hawaii has provided no evidence that governmental business takes place in the challenged parking lots.

20

Moreover, *Class* and *Bonidy* are no longer good precedent to the extent they conflict with *Bruen.* In fact, *Bruen* specifically abrogated *Class* to the extent it discussed means-end scrutiny for firearms regulations—despite *Bruen*'s clear guidance that "legislative assemblies" are "sensitive places." 142 S. Ct. at 2126–27 & n.4, 2133.

*Class* was also incorrect in its conclusion "that the Capitol Grounds ban does not impinge upon a right protected by the Second Amendment." 930 F.3d at 463 (cleaned up). *Bruen* was clear that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2126. Carrying a firearm outside the home for self-defense is covered by the plain text of the Second Amendment. *Id.* at 2135. Thus, Second Amendment-protected rights are implicated—and impinged—when a place is deemed "sensitive" and firearms are banned. It is then the government's burden to "justify its regulation by demonstrating that it is consistent with the Nation's historic tradition of firearm regulation." *Id.* at 2130.

Hawaii has not carried its burden. It has provided no historical analogues nor any controlling precedent to support its conclusion that non-exclusive and unsecured parking lots outside government buildings are "sensitive places." Plaintiffs are there-

21

fore likely to succeed on the merits in their challenge to § 134-A(a)(1).

### C. Haw. Rev. Stat. § 134-A(a)(4) – Bars and Restaurants Serving Alcohol and Adjacent Parking Areas

Section 134-A(a)(4) prohibits licensed firearms owners from carrying in "[a]ny bar or restaurant serving alcohol or intoxicating liquor ... for consumption on the premises, including adjacent parking areas." The plain language of the Second Amendment covers carrying in public places for purposes of self-defense, *Bruen*, 142 S. Ct. at 2135, which includes carrying in bars and restaurants which serve alcohol for on-premise consumption (at least to the extent the firearms carriers themselves are not consuming intoxicants). Therefore, Hawaii must show that § 134-A(a)(4) is consistent with historical tradition. It has not done so.

Bars, restaurants, and taverns enjoy a long history in American life, and in colonial America specifically. *See* Vaugn Scribner, *Drunks and democrats*, Aeon (Nov. 23, 2020), https://aeon.co/essays/taverns-and-the-complicated-birth-of-early-american-civil-society. On April 19, 1775, minute men gathered at Buckman Tavern in Lexington, Massachusetts, before fighting British troops. *Id*. After driving the British from New York City in November 1783, General George Washington held a farewell party at Fraunces Tavern. *Id*. And in 1787, to celebrate the signing of the Constitution, Washington held a party at City Tavern in Philadelphia, where "55

22

people manage to drink 114 bottles of wine, eight bottles of whiskey, 30 bottles of ale and cider, 12 pitchers of beer, and seven bowls of rum punch." *Id*.

Tellingly, however, Hawaii's proposed historical analogues—which it claims "are nearly identical to HRS § 134-A(a)(4)," Def.'s Br. at 37—do not come from colonial cities such as Lexington, New York, or Philadelphia. Nor do they come from the colonial era, which should be the end of the matter under the straightforward approach. Instead, Hawaii offers two territorial laws and one local ordinance, all from the second half of the nineteenth century.

Hawaii provided two laws from then-U.S. territories: an 1853 New Mexico law that prohibited carrying firearms at a "Ball or Fandango, ... or room adjoining said ball where Liquors are sold," 1-Add-262, and an 1890 Oklahoma law that prohibited carrying firearms in "any place where intoxicating liquors are sold," 1-Add-253. But *Bruen* made clear that late-nineteenth-century territorial analogues are insufficient to establish a historical tradition of firearms regulations because they were temporary and transitional in nature, applied to less than one percent of the population, and "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Bruen*, 142 U.S. at 2154 (quoting *Heller*, 554 U.S. at 614). Additionally, "because these territorial laws were rarely subject to judicial scrutiny,

23

we do not know the basis of their perceived legality." *Id*. at 2155.

Like the Supreme Court, this Court should not stake its interpretation on two territorial regulations. *See Kipke*, 2023 WL 6381503, at *11 ("The Supreme Court has already identified Oklahoma as a non-representative jurisdiction ... and thus the Court will not interpret the Oklahoma statute as evincing the nation's tradition of firearm regulation."); *see also Koons*, 2023 WL 2478604, at *86 (same).

That leaves Hawaii to rely on a single local regulation, from New Orleans in 1879, which prohibited carrying any "dangerous weapon, concealed or otherwise, into any ... tavern." 1-Add-265. Even if the New Orleans regulation is sufficiently analogous, it is not enough to establish a historical tradition. A "lone late-19th-century state law ... does not ... demonstrate a broad tradition" of restricting carry. *Bruen*, 142 S. Ct. at 2156.

Hawaii next attempts to support § 134-(A)(a)(4) by analogy to several other types of restrictions involving firearms and alcohol. All of these analogies fail.

*First*, Hawaii cites a handful of regulations involving alcohol and militiamen. Def.'s Br. at 39. But these regulations did not broadly ban carrying firearms in places that sold alcohol—rather, they merely limited who could be served. In essence, these were regulations on who could consume alcohol, not on who could carry firearms or

24

where. Indeed, the purpose of these laws—the "why" under *Bruen*—appears to have been to keep militiamen from parading or mustering while drunk. In fact, Hawaii notes "a 1746 New Jersey law prohibited selling 'any strong Liquor' to members of the militia," *id.*, but fails to include that the prohibition only lasted "until after they are dismissed [from Muster or Training] for that Day." 1746, NJ, An Act for better settling and regulating the Militia, at § 23. And it does not appear that these laws were strictly enforced. Frederick Bernay Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 187 (1940) ("[T]he militia was, in most communities, mustered once a year. At these occasions, so far as can now be ascertained, Mars was less in evidence than Bacchus.").

*Second*, Hawaii cites two regulations—from Chicago in 1851 and St. Paul, Minnesota, in 1858—that ban "retailer[s] of intoxicating liquors" from obtaining a permit to keep or sell gunpowder. Def.'s Br. at 40. These regulations say nothing about customers carrying firearms at those retailers, the conduct regulated by § 134-(A)(a)(4). Moreover, both gunpowder and alcohol are highly flammable. Thus, these regulations are akin to fire-safety laws regulating the storage of excess gunpowder, not regulations on the carriage of firearms. *See Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 916 (N.D. Cal. 2022) ("[Gunpowder storage] reg-

25

ulations themselves were often specific to gunpowder and not easily translatable to firearm regulations."); *see also Heller*, 554 U.S. at 632 ("gunpowder-storage laws" which "did not clearly prohibit loaded weapons" were not comparable to the handgun ban at issue); *see also Koons*, 2023 WL 3478604, at *96 ("States and local governments historically enacted gunpowder storage laws because gunpowder has 'a dangerous potential to [detonate] if exposed to fire or heat'.... The State has presented no evidence that the same problems exist for firearms and encased ammunition stored in a vehicle.").

*Third*, Hawaii points to various regulations prohibiting the carrying of firearms while intoxicated. Def.'s Br. at 40. But there is a difference between banning people from carrying firearms while consuming alcohol or intoxicated thereby and banning anyone from carrying in a place that sells alcohol. "[H]istorical statutes prevent[ing] only intoxicated individuals from carrying firearms" "do not impose a 'comparable burden on the right of armed self-defense'" as prohibitions on "all people present at locations selling alcohol." *Kipke*, 2023 WL 6381503, at *11 (quoting *Bruen*, 142 S. Ct. at 2133).

*Fourth*, Hawaii points to four nineteenth-century laws that "more broadly restricted the carrying of firearms in places where people regularly assembled for com-

26

mercial or social purposes, which could include assemblies of persons in bars and restaurants." Def.'s Br. at 38. These regulations prohibited firearms in "ball rooms," "social part[ies]," and "public assembl[ies]." *See id*. Other than a naked assertion that these regulations *could* include people assembled at bars and restaurants, Hawaii provides no analysis into how or why these regulations may be analogous to a modern-day prohibition on firearm carry anywhere alcohol is sold for consumption. The most notable of these regulations is from New Orleans in 1817—if only because § 134-A(a)(4) goes much further. That regulation essentially provided for a coat check system for arms. 1817, LA, An Ordinance respecting public Balls. That ordinance prohibited weapons solely in the ball rooms themselves, and provided attendees a place to store their weapons while in the ball room. By contrast, § 134-(A)(a)(4) not only prohibits carrying firearms in bars and restaurants, but also prohibits having a firearm in adjacent parking lots—essentially forcing patrons to leave their firearms at home, refusing them the option of a "self-serve" coat check: leaving their firearms locked in their vehicles.

*Finally*, Hawaii avers that "much firearm regulation during the Founding and Reconstruction Eras took place at the local level" and "much of that regulation either was never recorded or was lost to time." Def.'s Br. at 42. Hawaii then claims that

27

the district court "mistakenly" relied on "recorded state laws and judicial decisions interpreting those laws" "to the exclusion of local regulations." *Id.* at 43. But it is unclear what local regulations Hawaii wishes the district court had relied on. Before this Court, at least, Hawaii has proffered primarily state laws. And to the extent the historical regulations Hawaii assumes existed were unrecorded or have been "lost to time," the regulations are irrelevant. It is Hawaii's burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Theoretical regulations that *might* have existed at some point in history—which have not been found, have not been brought before this Court, and are necessarily no longer in force—do not meet that burden.

Because Hawaii has failed to demonstrate a historical tradition of prohibiting the carry of firearms at bars and restaurants that sell alcohol for onsite consumption, even by those who are not consuming alcohol, Plaintiffs are likely to succeed on the merits in their challenge to § 134-A(a)(4).

## CONCLUSION

For the foregoing reasons, the District Court's entry of preliminary injunction should be affirmed.

Date: November 9, 2023          Respectfully submitted:

28

*/s/ Erin M. Erhardt*
Erin M. Erhardt
Michael T. Jean
National Rifle Association of America –
Institute for Legislative Action
11250 Waples Mill Road
Fairfax, VA, 22030
703-267-1158
EErhardt@nrahq.org
MJean@nrahq.org

*Attorney for Amicus Curiae the National Rifle Association of America*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16164

I am the attorney or self-represented party.

**This brief contains** | 6,397 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Erin M. Erhardt | **Date** | 11/9/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                          *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: November 9, 2023

/s/ *Erin M. Erhardt*
Erin M. Erhardt

*Attorney for Amicus Curiae the National Rifle Association of America*