## No. 23-16164

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI;
HAWAII FIREARMS COALITION,
*Plaintiffs-Appellees,*

v.

ANNE E. LOPEZ,
in her official capacity as the Attorney General of the State of Hawaii,
*Defendant-Appellant.*

*Appeal from the United States District Court for Hawaii (Honolulu),*
*The Honorable Leslie E. Kobayashi, District Judge, No. 1:23-cv-00265-LEK-WRP*

## BRIEF OF *AMICUS CURIAE* THE SECOND AMENDMENT FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

EDWARD ANDREW PALTZIK
  *Counsel of Record*
MEREDITH LLOYD
  *Admission forthcoming*
SERGE KRIMNUS
**BOCHNER PLLC**
1040 Avenue of the Americas, 15th Floor
New York, NY 10018
Telephone: (516) 526-0341
edward@bochner.law

*Counsel for Amicus Curiae*

 

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................... 1

SUMMARY OF ARGUMENT .................................................................. 1

ARGUMENT .............................................................................................. 5

I.    The Proper Analytical Framework For Determining Whether
There Are Any Historical Analogues Relevant to The Regulation
of Firearms in "Sensitive Places" ................................................... 5

    A.    The Proper Analytical Standards ........................................... 5

    B.    The Proper Analytical Timeframe .......................................... 6

II.    The "Sensitive Places" Created by H.R.S. § 134-(A)(a)(9) Are
Inconsistent with the Nation's Historical Tradition of Firearms
Regulation ....................................................................................... 9

    A.    Pre-Colonial Regulations ...................................................... 9

    B.    Founding Era ........................................................................ 12

        i.    Restrictions on Firearms In Proximity to Buildings ... 12

        ii.    Restrictions on Using Firearms on Certain Dates
and at Certain Times ................................................... 13

    C.    Antebellum Period ............................................................... 16

    D.    Reconstruction Era .............................................................. 19

    E.    Post-Reconstruction to Modern-Day ................................... 23

III.    How and Why ................................................................................ 25

CONCLUSION ........................................................................................ 26

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Atkinson v. Garland,*
    70 F. 4th 1018 (7th Cir. 2023)......................................................19

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..........................................................*passim*

*Gamble v. United States,*
    139 S. Ct. 1960 (2019) ....................................................7, 8

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ..........................................4, 5, 6, 25

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ......................................................*passim*

*Range v. Att'y Gen. United States of Am.,*
    53 F.4th 266 (3d Cir. 2023) ............................................15

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023)..........................................23

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023)..........................................5

**CONSTITUTIONS**

Del. Const. of 1776, art. 28....................................................14

**STATUTES**

54 U.S.C. § 104906...............................................................25

Haw. Rev. Stat. § 134-(A)(a)(9) ...........................................*passim*

**REGULATIONS**

1 Fed. Reg. 672 (June 27, 1936) ...........................................24

36 C.F.R. § 2.4....................................................................25

## OTHER AUTHORITIES

1 By-Laws and Ordinances of the City of Pittsburgh, and the Acts of Assembly Relating Thereto 30-31 (Johnston & Stockton eds., 1828) (1774) ............................................................ 13

1 Laws of the Commonwealth of Pennsylvania 421-22 (1810) ............. 14

1 Private and Special Statutes of the Commonwealth of Massachusetts 259 (1805) (1790 Massachusetts) .......................... 15

2 Laws of N.H. 348 (Albert Stillman Batchellor, Litt. D., ed., 1913) ..... 10

2 Statutes at Large of Pennsylvania 254, (James T. Mitchell & Henry Flanders, eds., 1887) ............................................................ 9

42 Ohio Laws, ch. 13, § 4 (1788) ............................................ 13

1652 N.Y. Laws 138 ................................................................ 14

1722 New Jersey Laws 101 (Marlborough Wiltshire ed., Adam Matthew Digital 2018) ................................................ 9

1762 R.I. Pub. Laws 132 ........................................................ 11

1768 N.C. Sess. Laws 168 ...................................................... 14

1868 Pa. Laws 1088 ............................................................... 21

Acts of the General Assembly of the Province of New Jersey 344 (Samuel Allinson ed., 1776) (1771 New Jersey) ........................... 14

Bd. Comm'rs Cent. Park, Minutes Proc. for Year Ending April 30, 1858, Regular Meeting (March 16, 1858) ..................................... 17

Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111–24, 123 Stat. 1734 (2009) ........................ 24

D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 CHARLESTON L. REV. 205, 261 (2018) ...................................... 24

David T. Hardy, Dred Scott: The Inside Story (2019) ........................ 16

Del. Laws 329, § 1 (1812) ....................................................... 18

*Fourth Annual Report of the Buffalo Park Commissioners* 24 (1874) ................................................................ 21

J. Brevard, *An Alphabetical Digest of The Public Statute Law of South Carolina Malicious Mischief* § 13 (Charleston, S.C., John Moff 1814) .......................................................................... 9, 10

John Purdon, *A digest of the laws of Pennsylvania* 270 (5th ed. 1837) ............................................................................ 10

*Laws and Ordinances Governing the City of Chicago* 88 (1873) ........... 21

*Laws and Ordinances Governing the Village of Hyde Park* 310 (1875) .......................................................................... 20

*Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonality of the City of New York* (Samuel Loudon & John Loudon, 1786) ........................................ 12

Letter from Thomas Jefferson to Peter Carr, (August 19, 1785) (on file with Founders Online) ........................................................ 15

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022) ................................................................ 8

Matthew E. Thomas, *Historic Powder Houses of New England: Arsenals of American Independence*, (Arcadia Publishing, Nov. 5, 2013) ................................................ 11

N.H. Laws 525 (1795) ...................................................................... 13

Ordinance No. 2, *San Francisco Municipal Reports for the Fiscal Year* 1874-75 (1875)........................................................ 20

Park Ordinance, No. 1, *Annual Reports of the Brooklyn Park Commissioners* 1861-1873 (1873) .................................................. 20

R.I. Pub. Laws 289, § 3 (1819) ...................................................... 18

Richard Varick, *Laws and Ordinances Ordained and Established by the Mayor, Aldermen and Commonalty of the City of New York* 57 (1793) .................................................................. 14

The State Records of North Carolina 219 (Walter Clark ed., 1904) (1745 North Carolina) .................................................................. 14

Vt. Acts & Resolves 64-65, § 42 (1818) ...................................... 18

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

**The Second Amendment Foundation** ("SAF"), is a non-profit membership organization founded in 1974 with over 720,000 members and supporters in every State of the Union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms. Amicus Curiae has an intense interest in this case because it has many members who reside in the state of Hawaii who are prevented from exercising their right to keep and bear arms under the statute at issue, H.R.S. § 134-(A)(a)(9), contrary to "the Second Amendment's text, as informed by history." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

## SUMMARY OF ARGUMENT

*District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) held that restrictions on the right to keep and bear arms in "sensitive places" are "presumptively lawful." However, in *Bruen*, the Court observed that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited – e.g., legislative

---

[1] All parties received timely notice and consented to the filing of this brief. No counsel for any party authored the brief in whole or in part. Only *amicus curiae* funded its preparation and submission.

assemblies, polling places, and courthouses. . . ." *Bruen*, 142 S. Ct at 2127.

*Bruen* also clarified the appropriate standard for determining if a modern restriction on the right to bear arms is constitutionally valid, stating that "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2118. Consistent with this demand, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

With its enactment of H.R.S. § 134-(A)(a)(9), Hawaii has adopted an untenably broad definition of "sensitive places" where carry of firearms is forbidden, including, among other places, all public beaches and public parks. This statute severely burdens the core of the right to bear arms because it prohibits the carriage of weapons for self-defense in a broad swath of public locations affecting the entire law-abiding adult population of Hawaii. Specifically, the statute at issue prohibits:

> carry or possess[ion] of a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, while in… Any beach, playground, park, or adjacent parking area, including any state park, state monument, county park, tennis court, golf course, swimming pool, or other recreation area or facility under control, maintenance, and management of the State or a county, but not including an authorized target range or shooting complex;

Haw. Rev. Stat. § 134-(A)(a)(9).

As Plaintiffs-Appellees have convincingly argued, Hawaii's firearms ban at public, outdoor locations including beaches and parks effectively eviscerates the constitutional right to carry arms for self-defense in public. Brief of Plaintiffs-Appellees at 44, *Wolford et al. v. Lopez*, No. 23-16164 (9th Cir. Nov. 2, 2023). Moreover, the statute at issue expands the definition of "sensitive places" far beyond the scope of any constitutionally permissible historical restriction on the right to keep and bear arms.

So-called "sensitive places" regulations have historically related to buildings and adjacent areas where the government had an enhanced security interest. *Bruen*, 142 S. Ct. at 2133. Review of "founding-era historical precedent," *Heller*, 554 U.S. at 570—or lack thereof—reveals that H.R.S. § 134-(A)(a)(9) lacks *any* "well-established and representative historical *analogue*" from the Founding Era or prior. *Bruen*, 142 S. Ct. at 2133 (emphasis in original). To the extent any laws adopted during or immediately leading up to the Founding prohibited the use of firearms in "sensitive places," those sensitive places were tightly limited to spaces

3

near buildings, and even commonly were limited in applicability to certain dates and/or times.

This brief explores the history of firearms regulation in outdoor recreation spaces and explains why there are very few possibly relevant historical analogues to H.R.S. § 134-(A)(a)(9). Moreover, Founding-Era law was devoid of *any* firearms regulation directed to outdoor recreation spaces.[2] Since any "sensitive places" regulations from the Founding Era arose in contexts entirely separate from outdoor recreation spaces, they are not a proper analogue to H.R.S. § 134-(A)(a)(9). Similarly, to the extent it should be considered, law from outside the Founding Era cannot demonstrate a historical tradition as is required by *Bruen*.

Given the lack of any analogous firearms regulations from the Founding Era, it is clear that H.R.S. § 134-(A)(a)(9) is not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Accordingly, H.R.S. § 134-(A)(a)(9) violates the Second Amendment right of the people to keep and bear arms as set forth in *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and most

---

[2] For purposes of this analysis, beaches and parks will be consolidated and addressed as public outdoor recreation spaces.

recently, *Bruen*. This Court should affirm the reasoned decision of the district court.

## ARGUMENT

### I.   The Proper Analytical Framework For Determining Whether There Are Any Historical Analogues Relevant to The Regulation of Firearms in "Sensitive Places"

#### A. The Proper Analytical Standards

To satisfy its burden of proof as emphasized in *Bruen*, the government must point to "historical precedent . . . [that] evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32 (internal quotation marks omitted). "[W]e are not obliged to sift the historical materials for evidence to sustain [a regulation]. That is [the] Government's burden." *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2150), *cert. granted*, No. 22-915, 143 S.Ct. 2688 (2023).

The government need not identify a "historical *twin*"; rather, a "well-established and representative historical *analogue*" suffices. *Bruen*, 142 S. Ct. at 2133 (emphasis in original). In *Bruen*, the Court identified two metrics for comparison of analogues proffered by the government against the challenged law: "*how* and *why* the regulation burdens a law-abiding citizen's right to armed self-defense." *Id*. (citing *McDonald*, 561

U.S. at 767, and *Heller*, 544 U.S. at 599) (emphasis added). "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (internal quotation marks and emphasis omitted). The key question is whether the challenged law and proffered analogue are "relevantly similar." *Id.* at 2132.

Here, the relevant questions are how H.R.S. § 134-(A)(a)(9) burdens the right to armed self-defense, why it burdens that right, and whether it is relevantly similar to any historical analogue. Comparison to the "sensitive places" regulations throughout this nation's history is instructive in answering these questions.

### B. The Proper Analytical Timeframe

Beyond identification of appropriate analogues, it is also imperative that this Court look to the proper historical period to ascertain what similar laws, or historical analogues, were in existence that the Government may rely upon to justify H.R.S. § 134-(A)(a)(9). Indeed, in *Bruen*, the Supreme Court enumerated five categories of historical references, each to be afforded different weight in this analysis, including

"(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." *Bruen*, 142 S. Ct at 2135-36. But the Court emphasized that "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634-35) (emphasis added).

The Founding Era is the proper historical period for the *Bruen* analysis. The Second Amendment was adopted in 1791. The Supreme Court has explained that 1791 is the controlling time for interpreting the Second Amendment. *See*, *e.g.*, *Heller*, 554 U.S. at 625 (adopting "the original understanding of the Second Amendment"); *Gamble v. United States*, 139 S. Ct. 1960, 1975-76 (2019) (explaining *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Bruen*, 142 S. Ct. at 2132 (the Second Amendment's "meaning is fixed according to the understandings of those who ratified it" in 1791).

Defendant-Appellant Attorney General Lopez (and by extension, the state of Hawaii) may prefer that this Court look to the ratification of the Fourteenth Amendment in 1868, or some or all of the rest of the 19th

century, as the controlling time for interpretations of the relevant history. Such analysis is improper because "when it comes to interpreting the Constitution, *not all history is created equal*." *Bruen*, 142 S. Ct. at 2137 (emphasis added). Therefore, the Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is *pegged to the public understanding of the right when the Bill of Rights was adopted in 1791*."[3] *Id*. (emphasis added)

Here, since the laws of the Founding Era lack any statute or other regulation prohibiting the carry and use of firearms in outdoor recreation spaces, this Court should find that no appropriate historical analogue exists to support the constitutionality of H.R.S. § 134-(A)(a)(9) under the *Bruen* analysis.

---

[3] In *Bruen*, the Supreme Court acknowledged "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Second Amendment was adopted in 1791. 142 S. Ct. at 2138. But the Court, importantly, did not question its own precedent that adopted the "original understanding of the Second Amendment, *Heller*, 554 U.S.at 625, and "the public understanding in 1791 of the right codified by the Second Amendment," *Gamble*, 139 S. Ct. at 1975; *see also* Mark W. Smith, Attention Originalists: The Second Amendment was adopted in 1791, not 1868, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022).

II.     **The "Sensitive Places" Created by H.R.S. § 134-(A)(a)(9) Are Inconsistent with the Nation's Historical Tradition of Firearms Regulation**

> **A. Pre-Colonial Regulations**

As a preliminary matter, the laws addressed in this section should be afforded less weight than those of the Founding Era under the hierarchy of historical periods as set forth in *Bruen*, 142 S. Ct. at 2137.

To the extent pre-Founding laws should be considered, the vast majority of the firearms regulations that existed during this period restricted the use of firearms *only* at particular times or on particular dates. For example, a 1700 statute from the Colony and Province of Massachusetts Bay prohibited firing weapons at night. The Charters and General Laws of the Colony and Province of Massachusetts Bay 343 (1814). Additionally, statutes from the 1720's in Pennsylvania and the 1740's in New Jersey restricted hunting deer out of season on property belonging to another. *See* 2 Statutes at Large of Pennsylvania 254, (James T. Mitchell & Henry Flanders, eds., 1887); 1722 New Jersey Laws 101 (Marlborough Wiltshire ed., Adam Matthew Digital 2018). These types of statutes were highly limited and entirely contextual. As another example, a 1740 South Carolina statute only proscribed firearms-related conduct that was "without necessity." *See* J. Brevard, *An Alphabetical*

*Digest of The Public Statute Law of South Carolina* Malicious Mischief § 13 (Charleston, S.C., John Moff 1814); *see also* 2 Laws of N.H. 348 (Albert Stillman Batchellor, Litt. D., ed., 1913) ("[N]o person or persons… shall during the time of War, or of keeping a military Watch… presume to discharge or shoot off any Gun or Guns after the Sun setting, or before the Suns rising; Unless in case of Alarum, approach of an enemy, or other necessary defence."). A 1760 Pennsylvania statute prohibited persons from presuming to "shoot at, or kill with a fire arm, any pigeon, dove, partridge, or other fowl, in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures, adjoining upon and belonging to any of the dwelling-houses within the limits of the said city, or suburbs thereof, or any of the boroughs or towns within this province. . . ." John Purdon, *A digest of the laws of Pennsylvania* 270 (5th ed. 1837). This statute addressed conduct prohibited in "gardens, orchards, and inclosures," which could be considered analogous to modern-day parks, such as those regulated by H.R.S. § 134-(A)(a)(9). But this statute only prohibited certain hunting-related *uses* of firearms in such areas. It follows, then, that other uses, such as the use of arms for self-defense purposes, were considered lawful and permitted under this same statute.

10

Total disarmament of law-abiding individuals in public parks was certainly not the goal of this 1760 statute.

Other colonies adopted statutes focused on accident prevention and general reduction of hazards. In 1762, Rhode Island enacted a statute which stated that "no person whatsoever shall fire a gun or other fireworks within one hundred yards of the said powder house, upon the penalty of paying a fine…" 1762 R.I. Pub. Laws 132, "An act, providing in case of fire breaking out in the town of Newport. . . ." Powder houses were common in the colonies, and were used to store the collective gunpowder, guns, and armaments of any particular town. Matthew E. Thomas, *Historic Powder Houses of New England: Arsenals of American Independence*, Matthew E. Thomas (Arcadia Publishing, Nov. 5, 2013). This fire prevention statute differs from H.R.S. § 134-(A)(a)(9) in both purpose and execution. It did not restrict the carry of firearms in a particular outdoor space, since restricting the transport of arms to powder houses would have rendered them useless. More importantly, this statute was enacted against a backdrop of an interest in protecting critical arms assets in view of growing conflict with the British at the time. *Id*.

### B. Founding Era

In the early days of this Nation's existence, there were very few laws made regarding firearms in outdoor recreation spaces. Importantly, Defendant-Appellant has identified *zero* laws from the Founding Era that purport to regulate the possession or use of firearms on beaches or in parks. Instead, Founding Era laws regulated possession and use of firearms within certain distances of buildings and on certain dates. For this reason, no Founding Era law can offer a historical analogue to H.R.S. § 134-(A)(a)(9) since they were adopted for different purposes and imposed different burdens on the Second Amendment rights of law-abiding citizens at the time.

### i. Restrictions on Firearms In Proximity to Buildings

In 1785, New York became the first state to adopt a regulation prohibiting the use of any "guns, pistols, rockets, squibs, and other fire-works 'within one-quarter mile of any building,' on pain of fines." *Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonality of the City of New York* (Samuel Loudon & John Loudon, 1786). Shortly thereafter, Ohio followed suit and enacted a similar law restricting the firing of arms within a certain distance of a building and

imposing an additional fine for firing a weapon at nighttime. 42 Ohio Laws, ch. 13, § 4 (1788). In 1795, New Hampshire enacted a law which imposed a penalty for firing a weapon on a "public road, in or near to any house, or on near to the place of parade, unless leave therefore be first had from a commissioned officer." N.H. Laws 525 (1795). Each of the foregoing regulations was explicitly tied to one or more buildings in which people may assemble. Rather than premise firearms regulation at the time on the recreation status of outdoor space, the historical tradition of the time required that any area subject to restriction be within a certain proximity *of a building*. H.R.S. § 134-(A)(a)(9) does exactly the opposite.

### ii. Restrictions on Using Firearms on Certain Dates and at Certain Times

Turning to the remaining use and carry regulations of the time, firearms were commonly prohibited during the period surrounding the New Years' holiday. The city of Pittsburgh adopted an ordinance in 1774 which imposed penalties for firing weapons during the period from December 31 until January 2. 1 By-Laws and Ordinances of the City of Pittsburgh, and the Acts of Assembly Relating Thereto 30-31 (Johnston & Stockton eds., 1828) (1774). The scope of the regulation was widened in 1775, when the Commonwealth prohibited firing arms during the

13

same period "within the inhabited parts of this province." 1 Laws of the Commonwealth of Pennsylvania 421-22 (1810). Indeed, New York acknowledged the superfluous nature of a year-round restriction and narrowed the scope of its 1785 prohibition, imposing penalties for the firing of "guns, pistols, rockets, squibs and other fire-works," but only "within a quarter mile of any building" "on certain days." Richard Varick, *Laws and Ordinances Ordained and Established by the Mayor, Aldermen and Commonalty of the City of New-York* 57 (1793). Delaware adopted a different approach, restricting firearms "at the time and place of holding the said elections" for the purpose of "prevent[ing] any violence or force being used at the said elections." DEL. CONST. of 1776, art. 28.

In addition, several laws during the Founding Era prohibited hunting at particular times or in particular places. Penalties for illegal hunting included, in some instances, forfeiture of the *individual* firearm used in the hunt, not a permanent removal of the rights belonging to the hunter. *See, e.g.*, 1652 N.Y. Laws 138; 1768 N.C. Sess. Laws 168; 23 The State Records of North Carolina 219 (Walter Clark ed., 1904) (1745 North Carolina); Acts of the General Assembly of the Province of New Jersey 344 (Samuel Allinson ed., 1776) (1771 New Jersey) (only nonresidents

14

had to forfeit the arms used to hunt illegally); 1 Private and Special Statutes of the Commonwealth of Massachusetts 259 (1805) (1790 Massachusetts). "[T]hese laws involved the isolated disarmament of the firearm involved in the offense, not a ban on possession." *Range v. Att'y Gen. United States of Am.*, 53 F.4th 266, 281 n.25 (3d Cir. 2023), *overruled by Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc). Although these laws technically temporarily disarmed individuals as to that particular firearm, they did not impose any restrictions on obtaining or carrying additional firearms, nor did they restrict the ownership of other, separate arms.

By enacting these date and location-specific restrictions, Founding Era legislatures demonstrated their intent to permit the carry and use of firearms at all other times and places. It was common practice during the Founding Era to carry firearms as part of daily life. As Thomas Jefferson famously wrote, "Let your gun therefore be the constant companion of your walks." Letter from Thomas Jefferson to Peter Carr, (August 19, 1785) (on file with Founders Online). Even the United States Congress had no rules against possession of arms in legislative chambers, and it is well-documented that Congressmen were frequently

armed while in session from the founding up until the mid-nineteenth century.[4]

In summary, the laws of the Founding Era did not regulate carry or use of firearms in outdoor recreation spaces. To the extent that outdoor use of firearms was restricted, the prohibitions were either limited to buildings and the area immediately appurtenant thereto, to three days of the year when people tended to engage in particularly risky use of firearms, or to specific situations such as hunting. None of these circumstances are analogous to H.R.S. § 134-(A)(a)(9), which imposes a year-round complete ban on carry and use of firearms for all purposes in all Hawaii outdoor recreation spaces.

### C. Antebellum Period

As acknowledged by Defendant-Appellant, there were virtually no parks and beaches regulations until the Antebellum period. Opening Brief of Defendant-Appellant at 41, *Wolford et al. v. Lopez*, No. 23-16164

---

[4] For example, after pro-slavery U.S. Rep. Preston Brooks (D-S.C.) assaulted and nearly killed anti-slavery Sen. Charles Sumner (R-Mass.) by beating him with a cane, Brooks threatened Rep. Calvin Chafee. Chafee responded by buying a revolver and putting it in his desk on the floor of the House. As the Springfield Republican newspaper observed, "After that, Dr. Chaffee's southern friends were not only civil but cordial." David T. Hardy, Dred Scott : The Inside Story, (2019).

(9th Cir. Oct. 5, 2023). Even then, the first regulation explicitly prohibiting firearms in a park was not enacted until 1858, 67 years after the adoption of the Second Amendment. Bᴅ. Cᴏᴍᴍ'ʀs Cᴇɴᴛ. Pᴀʀᴋ, Mɪɴᴜᴛᴇs Pʀᴏᴄ. ғᴏʀ Yᴇᴀʀ Eɴᴅɪɴɢ Aᴘʀɪʟ 30, 1858, Regular Meeting, at 166-67 (Mar. 16, 1858). This regulation prohibited "carry[ing] firearms or throw[ing] stones or missiles within" Central Park. *Id.* While this regulation, promulgated by the Board of Commissioners of Central Park, is somewhat analogous to H.R.S. § 134-(A)(a)(9), it is far from sufficient to establish a "tradition" as is required by *Bruen*. The fact that the 1858 New York statute restricted conduct only in a single park in one city is also telling of the legislature's hesitancy to impose an outright ban on firearms in outdoor recreation spaces.

Also within this time period, the state of Delaware adopted a statute that prohibited the

> fire or discharge of any gun, ordinance, musket, fowling piece, fuse or pistol within any of the towns or villages of this State or within the limits thereof, or where the limits cannot be ascertained, within one quarter mile of the centre of such town or village… or within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this state… or within one hundred yards of any mill–dam, over or across where any of the main public or State roads may go or pass…

17

Del. Laws 329, § 1 (1812). Like the Founding Era regulations, this law sought to control the use of firearms in and around buildings, rather than having a focus on solely outdoor conduct as is proscribed by H.R.S. § 134-(A)(a)(9). Vermont and Rhode Island followed Delaware's lead, each enacting a similar statute that restricted the right to use firearms in and around buildings. *See* R.I. Pub. Laws 289, § 3 (1819) ("[I]f any person or persons shall, at any time hereafter, fire any gun or pistol in any of the streets, roads, lanes, buildings, or from any of the walls thereto contiguous, and within the compact part of said town, without justifiable cause, such person or persons shall… pay a fine."); Vt. Acts & Resolves 64-65, § 42 (1818). Importantly, the Vermont statute was even more limited, prohibiting arms in "any public road, or near any house or place of parade, on the evening preceding, on the day or evening of the same, on which any troop company, battalion or regiment shall be ordered to assemble for military duty…" *Id.*

The fact that a single park was considered worthy of regulation in the Antebellum period does not rise to the level of demonstrating the existence of an adequate "historical tradition" of restriction of a fundamental right as is required by *Bruen*. The remaining statutes

18

identified in this section are not analogous to H.R.S. § 134-(A)(a)(9) since they prohibited arms in spaces that are substantially distinct from modern-day parks. Moreover, since parks were separately regulated at the time, this Court should not interpret the outdoor spaces defined in Vermont, Rhode Island, and Delaware during this Era to be outdoor recreation spaces. Additionally, as discussed *supra*, these regulations should not be afforded any significant weight since they are not informative of the historical tradition at the time of adoption of the Second Amendment, nor are they informative of historical tradition at the time of the adoption of the Fourteenth Amendment.

## D. Reconstruction Era

*Bruen* directs courts to canvas the period around the Founding Era and through Reconstruction for similar regulations, always with an eye to "what the Founders understood the Second Amendment to mean." *Atkinson v. Garland*, 70 F. 4th 1018, 1020 (7th Cir. 2023). However, "not all history is created equal," and as indicated in *Bruen*, "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2138. As stated in *Heller* and reiterated in *Bruen*, "because post-Civil War discussions of the right to keep and bear arms 'took place 75

19

years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.' *Bruen*, 142 S. Ct. at 2137 (internal citation omitted) (citing *Heller,* 554 U.S., at 614).

The "sensitive places" regulations of this era banned firearms in very few isolated parks, rather than restricting firearms across an entire state's public outdoor recreation space. For example, an ordinance adopted by the South Park Commissioners (located in Chicago, IL) from 1875 held that "all persons [we]re forbidden to carry fire arms, or to throw stones or other missiles within said park." Laws and Ordinances Governing the Village of Hyde Park 310 (1875). Similarly, San Francisco adopted a firearms restriction which prohibited carry of firearms within Golden Gate and Buena Vista Parks. Ordinance No. 2, *San Francisco Municipal Reports for the Fiscal Year 1874-75*, at 887 (1875) (§ 2, pt. 2). As another example, an ordinance adopted by the Brooklyn Park Commissioners (located in Brooklyn, NY) from 1866 held that "all persons [we]re forbidden… to carry firearms, or to throw stones or other missiles within the park." Park Ordinance, No. 1, *Annual Reports of the Brooklyn Park Commissioners 1861-1873*, at 136 (1873). These park-specific ordinances were not always adopted by boards of commissioners.

In 1868, the Pennsylvania state legislature imposed a restriction in Philadelphia when it dictated that "No person shall carry fire arms… in [Fairmount Park] or within fifty yards thereof[.]" 1868 Pa. Laws 1088, 1020.

It is noteworthy that several municipalities did adopt ordinances prohibiting arms within their local parks systems. Indeed, in 1873, nearly one hundred years after the Second Amendment was ratified and adopted, Chicago banned carry "within any one of the public parks." *Laws and Ordinances Governing the City of Chicago* 88 (1873). The widest prohibition on firearms in parks from this era was enacted in Buffalo, New York around the same time, and stated that "All persons are forbidden to carry fire-arms . . . within the several parks, approaches thereto or streets connecting the same." *Fourth Annual Report of the Buffalo Park Commissioners* 24 (1874). The regulations from this period that could be considered analogous to H.R.S. § 134-(A)(a)(9) were isolated instances of burdening the right to bear arms at public outdoor recreation spaces.

Accordingly, the firearms regulations of the Reconstruction Era were hardly comprehensive. A cursory review of Hawaii's historical

precedent reveals feeble support for a historical tradition of categorically banning carry in public parks. Moreover, not a single regulation has been identified to support regulating the carry of firearms on beaches. Even if such laws established a national tradition of analogous legislation—which they do not—the measures adopted during the Reconstruction Era which regulated the carry of firearms in outdoor recreation spaces, including beaches and parks, were inconsistent with the original meaning of the constitutional text and would therefore fall outside the scope of consideration as dictated by *Bruen*.

Assuming, *arguendo*, that consideration of Reconstruction Era laws is appropriate for this analysis, the state statutes and local ordinances cited herein applied to several isolated municipalities, which amounted to a tiny percentage of the nation's population, and accordingly did not establish the existence of a *national* tradition of similar regulations. *See Bruen*, 142 S. Ct. at 2154. Indeed, the Supreme Court acknowledged two cases that could have been construed to support the regulation struck down in *Bruen*. *Id.* However, as the Court stated, "these decisions were outliers and therefore provide[d] little insight into how postbellum courts viewed the right to carry protected arms in public." *Id.* (citing *Heller*, 554

U.S. at 632). The infrequency of these laws demonstrates that the vast majority of the nation's legislators were silent on the issue of firearms in public outdoor recreation spaces and left the rest of the United States under a presumed right of public carry. *See United States v. Daniels*, 77 F.4th 337, 344 (5th Cir. 2023) (finding that *Bruen* requires courts to construe "silence" in the historical record "as evidence that the public did not approve of such a regulation" so long as "the public experienced the harm the modern-day regulation attempts to address.")

Similar to the Antebellum period, the firearms regulations as related to outdoor recreation spaces in the Reconstruction Era were highly localized, limited in scope, and excluded an overwhelming majority of the nation from their purview.

### E. Post-Reconstruction to Modern-Day

In both party briefs, much of the history of regulating firearms in outdoor recreation spaces is found in the period beginning in the late 19th century and extending to the present. As discussed *supra*, consideration of this period is inappropriate under the *Bruen* historical analogue test. However, it is worth noting that the modern federal policy specifically allows for carry at outdoor recreation spaces of national significance.

The first federal firearms regulation to apply generally to national parks was adopted in 1936. 1 Fed. Reg. 672, 673-4 (June 27, 1936). It declared: "Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian." *Id*. The prohibitions on "traps, seines, and nets" indicate that a major concern in the national parks was poaching and other illicit hunting—a common activity during the Great Depression. *See* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 CHARLESTON L. REV. 205, 261 (2018). Importantly, the federal government has recently revised its policy, *permitting* firearms in national parks. In 2009, Congress enacted legislation to allow the possession and carrying of loaded firearms in the National Park System and the National Wildlife Refuge System—provided that the individual is legally allowed to own a firearm, and that the possession or carrying of the firearm is compliant with the laws of the host state. *See* Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111–24, § 512(b), 123 Stat. 1734, 1765 (2009) ("The Secretary of the Interior shall not promulgate or enforce any regulation that prohibits an individual from possessing a firearm . . . in any unit of the National Park

System . . . if . . . the individual is not otherwise prohibited by law from possession the firearm; and ... the possession of the firearm is in compliance with the law of the State in which the unit of the National Park System . . . is located."); 54 U.S.C. § 104906; *See also* 36 C.F.R. § 2.4 (regulation implementing new law).

## III. How and Why

Having reviewed the other potential historical analogues, the final step of the analysis is assessment of the "how" and "why" of H.R.S. § 134-(A)(a)(9) versus the "how" and "why" of the "sensitive places" regulations identified above. *Bruen*, 142 S. Ct. at 2133 ("*how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right.") *Id.* (citing *McDonald*, 561 U.S. at 767, and *Heller*, 544 U.S. at 599).

As H.R.S. § 134-(A)(a)(9) burdens the right to self-defense by *prohibiting possession and use of firearms in outdoor recreation spaces*, applicable to the targeted individual personally *and* that individual's firearms and ammunition, the "how" is therefore not analogous to any of these historical laws, which were far more limited in scope. *Bruen*, 142 S. Ct. at 2133 (citing *McDonald*, 561 U.S. at 767; *Heller*, 544 U.S. at 599). Indeed, H.R.S. § 134-(A)(a)(9) burdens the right to self-defense by

restricting the possession and use of firearms in *all* outdoor recreation areas, at *all* times, for *all* purposes. This is highly dissimilar when compared to the limited historical restrictions reviewed *supra*.

Moreover, the "whys" of H.R.S. § 134-(A)(a)(9) and the historical "sensitive places" laws are not analogous. H.R.S. § 134-(A)(a)(9) burdens the right to self-defense in order to mitigate the perceived danger of individuals possessing and/or bearing arms in outdoor recreation spaces, regardless of their intended use or the concealed status of the firearm. In contrast, the reasons behind the historical "sensitive places" laws were specific, and related to considerations of proximity to buildings, specific perceived dangers related to holidays, or matters specific to hunting. *Supra* § 2(B). Since the statutes and local ordinances did not impose a comparable burden and were not comparably justified, they are not historical analogues to H.R.S. § 134-(A)(a)(9).

## CONCLUSION

Under *Bruen*, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. With respect to H.R.S. § 134-(A)(a)(9), Hawaii cannot identify any appropriate analogue in order to carry its burden because the historical tradition

26

overwhelmingly demonstrates that (1) there were very few laws that wholly restricted possession of firearms in outdoor recreation spaces; and (2) to the extent any laws restricted the possession and/or use of firearms in such spaces, these restrictions were limited to particular dates, times, or narrow locations or situations, implying that in all other circumstances, carry and use of firearms was lawful. The historical tradition of "sensitive places" firearms regulation clearly indicates that sweeping disarmament in outdoor recreation spaces is without historical analogue from the appropriate period. Accordingly, this Court should not permit Hawaii to render the Second Amendment dead letter on beaches and in parks.

For these reasons, the decision below should be affirmed.

Dated: November 9, 2023

Respectfully Submitted,

/s/ EDWARD ANDREW PALTZIK
EDWARD ANDREW PALTZIK
  *Counsel of Record*
MEREDITH LLOYD
SERGE KRIMNUS
BOCHNER PLLC
1040 Avenue of the Americas,
15th Floor
(516) 526-0341
edward@bochner.law

*Counsel for Amicus Curiae*

27

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16164

I am the attorney or self-represented party.

**This brief contains** | 5,535 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Edward Andrew Paltzik | **Date** | November 9, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*