No. 23-16164

In the United States Court of Appeals
for the Ninth Circuit

_____

Jason Wolford; Alison Wolford; Atom Kasprzycki;
Hawaii Firearms Coalition,
*Plaintiffs-Appellees,*

v.

Anne E. Lopez, in her official capacity as the Attorney General of
the State of Hawaii,
*Defendant-Appellant.*

_____

On Appeal from the
United States District Court for the District of Hawaii
Case No. 1:23-cv-00265-LEK-WRP
Honorable Leslie E. Kobayashi

_____

**BRIEF OF AMICI CURIAE GUN OWNERS OF AMERICA, INC.,
SECOND AMENDMENT LAW CENTER, HAWAII RIFLE
ASSOCIATION, CALIFORNIA RIFLE & PISTOL ASSOCIATION, GUN
OWNERS OF CALIFORNIA, AND GUN OWNERS FOUNDATION IN
SUPPORT OF APPELLEES**

_____

C.D. Michel
Anna M. Barvir
Konstadinos T. Moros
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
562-216-4444
cmichel@michellawyers.com
*Counsel for Amici Curiae*

November 9, 2023

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that Gun Owners of America, Inc., Second Amendment Law Center, Hawaii Rifle Association, California Rifle & Pistol Association, Incorporated, Gun Owners of California, and Gun Owners Foundation are nonprofit organizations and thus have no parent corporations and no stock.


Date: November 9, 2023               MICHEL & ASSOCIATES, P.C.


/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ................................................................ i

Table of Contents ...................................................................................... ii

Table of Authorities ................................................................................. iii

Interest of Amici Curiae ............................................................................ 7

Introduction ............................................................................................... 8

Argument ................................................................................................... 9

I. Second Amendment Historical Analysis Required by Bruen .............................. 9

II. *Bruen* Is Clear that True "Sensitive Places" Are Rare as Hens' Teeth, If They Exist At All ........................................................................ 12

III. Hawaii Cannot Simply Declare That All Publicly Owned Property Is "Sensitive" ..................................................................................... 14

IV. There Is Neither a Historical Nor a Modern Tradition of Banning Carry in Banks ........................................................................ 17

V. Hawaii's "Vampire Rule" Is Unsupported by History and Has Already Been Rejected by Five Courts .......................................................... 19

VI. Population Metrics Are Relevant to Whether Proposed Historical Analogues Are Representative of Our Historical Tradition; The District Court Made No Population Figure Errors ................................................... 23

VII. Hawaii Tries to Capitalize on Suicide Victims to Disparage Americans with Carry Permits, a Group That Is Overwhelmingly Law-Abiding ....................... 26

Conclusion ............................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonyuk v. Hochul,*
   639 F. Supp. 3d 232 (N.D.N.Y. 2022) ...................................................... 14, 16, 24, 25

*B&L Productions, Inc. v. Newsom,*
   2023 WL 7132054 (C.D. Cal. Oct. 30, 2023) ............................................ 16

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023) ..................................................................... 28

*Bonidy v. U.S. Postal Serv.,*
   790 F.3d 1121 (10th Cir. 2015) .................................................................. 15

*Carrillo v. Penn Nat'l Gaming, Inc.,*
   172 F. Supp. 3d 1204 (D.N.M. 2016) ........................................................ 22

*Christian v. Nigrelli,*
   642 F. Supp. 3d 393 (W.D.N.Y. 2022) ...................................................... 14, 24, 25

*Columbia Hous. & Redevel. Corp. v. Braden,*
   2022 Tenn. App. LEXIS 395 (Ct. App. Oct. 13, 2022) ............................ 16

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...................................................................................... 9, 10, 12

*Drummond v. Robinson Twp.,*
   9 F.4th 217 (3d Cir. 2021) .......................................................................... 11

*Espinoza v. Mont. Dep't of Revenue,*
   140 S. Ct. 2246 (2020) ................................................................................ 26

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) ................................................................. 12

*Kipke v. Moore,*
   2023 WL 6381503 (D. Md. Sept. 29, 2023) ............................................. 14, 24

*Koons v. Platkin,*
   2023 WL 3478604 (D.N.J. May 16, 2023) ................................................ 14, 17, 24

*Morris v. U.S. Army Corps of Engineers,*
   60 F. Supp. 3d 1120 (D. Idaho 2014) ....................................................... 16

iii

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................ 28

*Oliver v. United States*,
    466 U.S. 170, 193 (1984) ................................................................ 21

*Peruta v. Cnty. of San Diego*,
    824 F.3d 919 (9th Cir. 2016) ........................................................... 32

*Project 80s v. Pocatello*,
    942 F.2d 635 (9th Cir. 1991) ........................................................... 22

*United States v. Kokinda*,
    497 U.S. 720 (1990) ........................................................................ 17

**Statutes**

1895 Mich. Local Acts 596, § 44 ........................................................... 28

Cal. Fish & Game Code § 6883 ............................................................. 27

H.R.S. § 134-A ....................................................................................... 15

H.R.S. §134-E .................................................................................. 21, 22

Mich. Comp. Laws Serv. § 750.234d ..................................................... 20

Neb. Rev. Stat. § 69-2441 ....................................................................... 20

Senate Bill 1230 ("Act 52") ............................................................... 8, 17

**Other Authorities**

Acts of the General Assembly of the Provinces of New Jersey, from the Surrender
    of the Government to Queen Anne, on the 17th Day of April, in the Year of Our
    Lord 1702, to the 14th Day of January 1776, p. 343, ch. DXL, An Act for the
    Preservation of Deer and Other Game, and to Prevent Trespassing with Guns
    (Dec. 21, 1771), https://firearmslaw.duke.edu/wp-
    content/uploads/2023/04/1771-NJ-Acts-of-the-General-Assembly-of-NJ-
    Penalty-for-Setting-Loaded-Guns-1763-1775-N.J.-Laws-346-ch.-539-§-10.pdf...... 23

Britannica Online, *Wells Fargo* (last updated Nov. 1, 2023),
    https://www.britannica.com/topic/Wells-Fargo-American-corporation (last
    visited Nov. 9, 2023) ....................................................................... 20

Center for Disease Control and Prevention, National Center for Health Statistics, *Assault or Homicide*, https://www.cdc.gov/nchs/fastats/homicide.htm (last visited Nov. 9, 2023) ............................................................................................ 31

Charter of the City of Wilmington, Part VII, § 7, Rules and Regulations of the Board of Park Commissioners (1893) ....................................................................... 27

Daughtery, Greg, *Butch Cassidy and the Sundance Kid: Their Biggest Heists*, History Channel (last updated Aug. 29, 2023), https://www.history.com/news/butch-cassidy-sundance-kid-robberies-death (last visited Nov. 9, 2023) ........................................... 19

Donohue, John J., et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* 3 (Nat'l Bur. of Econ. Rsch., Working Paper No. 30190, 2023), https://perma.cc/QD3C-4DBF .................................................................... 31

Eckart, Kim, *More US Adults Carrying Loaded Handguns Daily, Study Finds*, U. of Wash. News (Nov. 16, 2022), https://www.washington.edu/news/2022/11/16/more-u-s-adults-carrying-loaded-handguns-daily-study-finds/ ............................................ 31

*Enclose*, Black's Law Dictionary (11th ed. 2019) ................................................. 22

Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* (March 2021) ..................................................... 18

Harvard University, T.H. Chan School of Public Health, *Basic Suicide Facts: Where Do Suicides Occur?*, https://www.hsph.harvard.edu/means-matter/basic-suicide-facts/where/ ....................................................................................... 30

https://concealedcarrykillers.org/ (last visited Nov. 9, 2023) ....................................... 29

Johnson, Samuel, *A Dictionary of the English Language* (1773) ........................................ 22

Kopel, David B. & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 250 (2018).................... 14

Lott, John R., *Concealed Carry Permit Holders Across the United States: 2022* (Oct. 31, 2022), https://ssrn.com/abstract=4279137 ................................................... 31

Mitchell, James T., et al., *Statutes at Large of Pennsylvania from 1682 to 1801*, vol. III, p. 254 (1896) ................................................................................. 23

National Park Service, *Stories Beyond the Battlefield*, https://www.nps.gov/mocr/learn/historyculture/sbtb.htm (last updated Dec. 22, 2021) ..................................................................................... 24

O'Toole, Megan, et al., *Gun Thefts from Cars: The Largest Source of Stolen Guns*, Everytown Research & Policy (May 9, 2022) .............................................................. 32

PBS American Experience, *Jesse James' Bank Robberies*, https://www.pbs.org/wgbh/americanexperience/features/james-robberies/ (last visited Nov. 9, 2023) ......................................................................................... 19

Smith, Mark W., *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J. L. & Pub. Policy Per Curiam 31 (2022) ..................................... 12

U.S. Census Bureau, *Population of the United States in 1860; Complied from the Original Returns of the Eighth Census, Under the Direction of the Secretary of the Interior* 337, tbl. 1 (1864), https://www.census.gov/library/publications/1864/dec/1860a.html (follow "New York [3.9 MB]" hyperlink) ..................................................................... 26

Violence Policy Center, *Concealed Carry Killers Background*, https://concealedcarrykillers.org/concealed-carry-killers-background/ (last visited Nov. 9, 2023) ............................................................................................................. 29

## INTEREST OF AMICI CURIAE[1]

Gun Owners of America, Inc. ("GOA") is a California nonprofit corporation exempt from federal income taxation under IRC 501(c)(4) formed in 1976. It was founded by the late Sen. H.L. (Bill) Richardson to preserve and defend the Second Amendment rights of gun owners. GOA sees firearms ownership as an issue of freedom and works to defend that freedom through lobbying, litigation, and outreach. GOA has served as a party or amicus in Second Amendment challenges across the nation to protect gun owners' rights. GOA has also worked with members of Congress, state legislators, and local citizens to protect gun ranges and local gun clubs from closure.

The Second Amendment Law Center, Inc. ("2ALC") is a nonprofit corporation headquartered in Henderson, Nevada. 2ALC is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

Hawaii Rifle Association ("HRA") is a membership organization with the stated mission "[t]o protect [members'] Second Amendment Right to Keep and Bear Arms, and protect Hawaii's hunting and shooting traditions."

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

Founded in 1875, the California Rifle and Pistol Association, Incorporated, ("CRPA") is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, CRPA regularly participates as a party or amicus in firearm-related litigation. CRPA has been a party to or amicus in various Second Amendment challenges.

Gun Owners of California ("GOC") is a 501(c)(4) not-for-profit entity founded in 1975 to oppose infringements on Second Amendment rights. GOC is dedicated to the unequivocal defense of the Second Amendment and America's extraordinary heritage of firearm ownership. Its advocacy efforts regularly include participation in Second Amendment litigation, having filed amicus briefs in numerous cases, including cases before the U.S. Supreme Court.

Gun Owners Foundation ("GOF") was incorporated in Virginia in 1983. It exists to educate the public about the importance of the Second Amendment and to provide legal, expert, and support assistance for law-abiding individuals involved in firearms-related cases. GOF is exempt from federal income taxation under IRC section 501(c)(3) charitable organization.

## INTRODUCTION

In enacting Senate Bill 1230 ("Act 52"), Hawaii followed New York, New Jersey, and Maryland in adopting a radical plan designed to undermine the Supreme Court's *Bruen* ruling and the right to "bear" arms it confirmed. As the *Wolford* Appellees convincingly argue, the district court's ruling should be upheld.

With this brief, Amici seek to assist this Court by reinforcing Appellees' arguments as to why there is no historical tradition of barring carry on all public property, in banks, and on private property open to the public. Amici also will address Hawaii's erroneous arguments that questioned the relevancy of historical population counts as an analytical tool. Finally, although the issue of supposed harm to Hawaii's interests is not relevant to success on the merits under *Bruen*, it relates to the *Winter* factors the Court considers in granting injunctive relief. As they did in the district court, Amici will demonstrate that Americans with concealed handgun licenses ("CCW permits") commit crimes at rates far less than the general population, making them among the most law-abiding of any demographic.

## ARGUMENT

## I. SECOND AMENDMENT HISTORICAL ANALYSIS REQUIRED BY BRUEN

Last year, the Supreme Court reaffirmed the *Heller* test—"text as informed by history"—for analyzing Second Amendment challenges, applying that test to hold that the Second Amendment protects the right to armed self-defense in public just as much as it does in the home. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127, 2134-35 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008). The *Bruen* Court reiterated that, contrary to the popular belief in the lower courts, judges may not apply a "means-ends" "interest-balancing" test in Second Amendment cases. 142 S.Ct at 2129. Instead, the government must affirmatively prove that regulations implicating the right to keep and bear arms reflect the original meaning of the Second Amendment as understood by its Framers. *Id.* at 2129-30.

9

The Court articulated in crystal-clear language just how a proper Second Amendment analysis is to be applied:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (emphasis added).

As to methodology, *Bruen* made emphatically clear that, whenever "the Second Amendment's plain text covers an individual's conduct," the government shoulders the burden of justifying a restriction on the Second Amendment by proving that a longstanding American tradition supports that restriction. Lest there be any confusion, the Court explained the burden on the government repeatedly: "[T]he *government* must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added); *see also id.* at 2127, 2130, 2149 & n.25, 2150, 2156.

But even if there were *some* relevant history of a type of gun control law, mere outliers will not overcome the presumption that the activity is protected by the Second Amendment's unqualified command. Historical laws must be "well-established and representative." *Id.* at 2133. Courts may not uphold a challenged law just because a few similar laws may be found in the past because doing so "'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021). For example, in *Bruen*,

New York presented, and the Court analyzed, three laws from the colonial era, three turn-of-the-18th-century laws, three 19th-century laws, and five late-19th-century regulations from the Western Territories. *Id.* at 2138-56. The Court held that all that history was not enough to uphold New York's Sullivan Act.

The Court also explained that late-19th-century evidence is relevant only if it provides confirmation of what had been established before: "'postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).[2] Twentieth-century antecedents are even less relevant; the Court relegated its discussion of such laws to one brief footnote. *Id.* at 2154 n.28.

Finally, *Bruen*'s observation that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to determining whether a law is consistent with historical tradition does not apply here. 142 S. Ct. at 2132. This case is "fairly straightforward," just like *Heller* and *Bruen* were, because Act 52 purportedly "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131; *see also id.* ("The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities.... New York's proper-cause requirement concerns the same alleged societal problem addressed in *Heller*:

---

[2] *See also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J. L. & Pub. Policy Per Curiam 31 (2022) ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791").

'handgun violence'....''). In these cases, the Supreme Court made clear that the "lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added).

These parameters create what is, no doubt, an exacting test that is difficult for a government to meet. And that is as it should be, given that what is at stake is an enumerated constitutional right that expressly commands that it "shall not be infringed."

## II. *BRUEN* IS CLEAR THAT TRUE "SENSITIVE PLACES" ARE RARE AS HENS' TEETH, IF THEY EXIST AT ALL

As to outlier locations where the right to bear arms might be restricted, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited ...." *Bruen*, 142 S. Ct. at 2133. And importantly, even when providing examples of certain places that might qualify, the Court never made a *conclusive* determination about any of them, but invited future challenges—under the *Bruen* framework. The Court further cautioned that:

> [E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly ... [it] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id.* at 2133-34. Apparently anticipating future shenanigans from anti-gun states, the Court explicitly warned that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2118-19.

12

Likewise, there is no basis for Hawaii to limit carry just about everywhere except for some streets and sidewalks, as well as a few private businesses that make the effort to put up signs allowing carry. Appellees.Br.3 ("Act 52 bill [sic] restricts the carrying of a handgun even with a valid concealed carry permit in 96.4% of the publicly accessible land in Maui County which is where plaintiffs reside.").

The Court's "sensitive places" language is intended to be, at most, a narrow exception to the rule that firearms may be carried everywhere, as only "relatively few" places existed historically that might be considered "sensitive places." *Id.* at 2133. Aside from schools,[3] the Court identified, in dicta, just three categories of places where the historical record *might* justify a carry ban—legislative assemblies, polling places, and courthouses. *Id.* (citing Kopel & Greenlee, *supra*, at 244-47). Beyond that, the Court identified no other well-represented examples that even conceivably might meet *Bruen*'s exacting test.[4]

Hawaii engaged in no thoughtful *Bruen* analysis when considering and adopting Act 52. Rather, the law bans carry in virtually every public place in the state except for

---

[3] As explained by a law review article cited by the Supreme Court in *Bruen*, historically, the limitation on firearms in schools only applied to students to prevent things like dueling. It did not apply to adults, and only applied to public institutions, not private schools. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 250 (2018).

[4] Besides the court below, district courts in New York and New Jersey have addressed near-identical questions as those presented here, after both states had passed similar laws in response to *Bruen. See Antonyuk v. Hochul,* 639 F. Supp. 3d 232 (N.D.N.Y. 2022); *Christian v. Nigrelli,* 642 F. Supp. 3d 393 (W.D.N.Y. 2022); *Koons v. Platkin,* 2023 WL 3478604 (D.N.J. May 16, 2023). Only one district court has thus far mostly upheld a similar state law, though even that court struck down Maryland's ban on carrying in locations that sell alcohol, the private property default rule, and within 1,000 feet of public demonstrations. *Kipke v. Moore*, 2023 WL 6381503, at *17 (D. Md. Sept. 29, 2023).

some roads and sidewalks with complete disregard to what sorts of characteristics exist that might make a place *so sensitive that the exercise of enumerated constitutional rights could be prohibited*. Certainly, Hawaii's mere declaration that a place is "sensitive" does not make it so. As one judge has explained, "most places are 'sensitive' for someone. If a declaration were all that was required, … the government [would have] untrammeled power to restrict Second Amendment rights in any place even plausibly considered 'sensitive.'" *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136-37 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part).

Hawaii's attempt to restrict firearm possession in so many places that Hawaiians visit every day illustrates well the concern Judge Tymkovich identified in *Bonidy*. And it flouts the Supreme Court's command that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Bruen*, 142 S. Ct. at 2134.

## III. HAWAII CANNOT SIMPLY DECLARE THAT ALL PUBLICLY OWNED PROPERTY IS "SENSITIVE"

H.R.S. § 134-A(a)(1) prohibits the carry of firearms by permit holders in "[a]ny building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas." 4-ER-0707. Appellees challenge that ban as it pertains to parking lots adjacent to government buildings, such as an Ace Hardware store that shares a parking lot with a DMV office. Appellees.Br.31. In support of that restriction, Hawaii argues that, when the government acts as a proprietor, firearms may be restricted at that location. HI.Br.22.

14

But just because an area is "public property" does not make it a "sensitive area" where Second Amendment rights can be restricted, as several recent court decisions have held. For instance, the Tennessee Court of Appeals ruled just last year that tenants in public housing did not forfeit their Second Amendment rights. *Columbia Hous. & Redevel. Corp. v. Braden*, 2022 Tenn. App. LEXIS 395, at *10 (Ct. App. Oct. 13, 2022). The District of Idaho held, in *Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120, 1125 (D. Idaho 2014), that "[t]he regulation banning the use of handguns on Corps' property by law-abiding citizens for self-defense purposes violates the Second Amendment...." And just days ago, the Central District of California, deciding the constitutionality of a ban on gun shows, explained that "there is no historical basis for a public space such as the Orange County Fairgrounds to be designated as a sensitive space." *B&L Productions, Inc. v. Newsom*, 2023 WL 7132054, at *16 (C.D. Cal. Oct. 30, 2023). In short, the mere fact that the government manages property on behalf of the public does not exempt it from constitutional strictures.

In the *Bruen*-response context, the *Antonyuk* court ruled that New York may not ban public carry of firearms on various types of public property, including public parks and buses. 639 F. Supp. 3d 232, 324-326, 331. The *Koons* court correctly held the same when referring to government-owned property:

> [T]he Second Amendment cases that the State cites do not support the sweeping proposition that carrying for self-defense in public does not extend to any location in which the government owns the land. In each of the cases cited, the courts found that the government property was integrally connected to a government building that it regarded as a "sensitive place" where prohibition on carrying firearms is presumptively lawful.

*Koons*, 2023 WL 3478604, at \*54.

The government-as-proprietor argument did not change these courts' analysis. As the *Koons* court noted, "[w]hile it is certainly true that 'the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers .... [just] as a private individual' may … the State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property." 2023 WL 3478604, at \*51 (citations omitted); *see also United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]").

The district court below explained the ramifications of an expansive reading of the government-as-proprietor argument:

> If the government's capacity to act as a proprietor was a determinative factor in the first step of the analysis, then the fundamental right of public carry—as expressed fully in *Bruen*—would be jeopardized. Indeed, under such a theory, an argument could be made that the government possesses the unfettered power to restrict public carrying of firearms in many—if not most—public places because it has a proprietary interest in those areas. Whether the government acted as a proprietor may have been relevant when assessing Second Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the *Bruen* analysis.

1-ER-0061.

In sum, there is a crucial distinction between the Supreme Court's discussion of certain *government buildings* and Act 52's prohibition of carrying on *any government property* and *everywhere* the government acts as a proprietor, including parking lots merely adjacent to public property. Hawaii would never dare suggest that it can bar a prayer

16

group from meeting at a public park or search all vehicles that enter the parking lot at a local beach. The enumerated right to bear arms is no "second-class right," and its "unqualified command" cannot tolerate such treatment either. *Bruen*, 142 S. Ct. at 2156.

## IV.   THERE IS NEITHER A HISTORICAL NOR A MODERN TRADITION OF BANNING CARRY IN BANKS

There is no historical tradition of barring the carrying of arms in banks. Banks have existed since the Founding[5] (and long before), yet there are no contemporaneous regulations on carrying arms in such locations. Realizing that historical support for its position is barren, Hawaii attempted to analogize its restricting carry in banks to laws restricting carry in fairs or markets.[6] The district court rejected the proposed analogues as inadequate, given that banks existed at the time (and thus present no new societal concerns). 1-ER-0076. Unfazed, Hawaii repeats to this Court the same "fairs or markets" argument insisting that, despite *Bruen*'s rejection of them as analogues, they are still relevant here because they are "quintessential centers of commerce." HI.Br.42.

Setting aside that there is not even a historical tradition of banning guns in "centers of commerce," Hawaii has no grounds to engage in *Bruen*'s "more nuanced approach" at all, as that is reserved only for cases "implicating unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132. As mentioned, banks

---

[5] Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* (March 2021).

[6] And while the district court did not mention it, even these historical restrictions typically only applied to those carrying in a way that would terrorize people, as was discussed in *Bruen*. 142 S. Ct. at 2144-45.

have existed since well before the Founding. Likewise, bank robberies involving firearms were such a prevalent problem that famous outlaws of the 19th century became household names.[7] Yet Hawaii does not point to a single law from the 18th century, or even the (analytically irrelevant) 19th century, restricting the peaceable carry of firearms in banks, let alone a well-represented and enduring tradition of such laws that dates to the Founding. *Bruen* was clear that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

In fact, Hawaii would fail to show even a *modern* tradition of such restrictions. Prior to *Bruen*, not one state completely restricted the carrying of firearms in banks and, to Amici's knowledge, only two states partially restricted the practice. *See* Mich. Comp. Laws Serv. § 750.234d(1) (allowing concealed carry but not open carry); Neb. Rev. Stat. § 69-2441 (a) (allowing open carry but not concealed carry). This does not include the recent *Bruen*-response bills from Hawaii, New York, New Jersey, California, and Maryland, which included banks (among many other places)—all of which are facing Second Amendment challenges.

---

[7] PBS American Experience, *Jesse James' Bank Robberies*, https://www.pbs.org/wgbh/americanexperience/features/james-robberies/ (last visited Nov. 9, 2023); Greg Daughtery, *Butch Cassidy and the Sundance Kid: Their Biggest Heists*, History Channel (last updated Aug. 29, 2023), https://www.history.com/news/butch-cassidy-sundance-kid-robberies-death (last visited Nov. 9, 2023).

Hawaii also argues that, while government-operated banks existed at the Founding, privately owned banks were not common until later. HI.Br. 48. As explained in Part III above, the government has no blanket authority to violate the right to carry just because it acts as a proprietor. Yet even if it were relevant that most (but, as Hawaii concedes, not all) banks were operated by the government during the Founding era, the State provides no historical evidence that any jurisdiction banned carry in government-owned banks. Nor does Hawaii cite a single law barring carry in privately owned banks when those did begin to proliferate in the 19th century.[8] And Hawaii is not shy about relying on enactments adopted as late as 1899. *See, e.g.*, HI.Br.41, n.18 (citing over a dozen ordinances ranging from 1878 through 1899, none of which concerned restrictions on carry in banks, whether private or public). Hawaii has failed to meet its burden under *Bruen*.

## V. HAWAII'S "VAMPIRE RULE" IS UNSUPPORTED BY HISTORY AND HAS ALREADY BEEN REJECTED BY FIVE COURTS

Perhaps the most extreme aspect of Hawaii's law is H.R.S. §134-E, which proscribes carrying "on the private property of another person without authorization." This prohibition applies to all private property, including all businesses open to the public. While the parties here refer to it as the "default rule," such a prohibition is also often called the "vampire rule," because the law requires that

---

[8] *See, e.g.*, Britannica Online, *Wells Fargo* (last updated Nov. 1, 2023), https://www.britannica.com/topic/Wells-Fargo-American-corporation (last visited Nov. 9, 2023) ("The founders of the original company were Henry Wells (1805-78) and William George Fargo (1818-81), who had earlier helped establish the American Express Company. They and other investors established Wells, Fargo & Company in March 1852 to handle the banking and express business prompted by the California Gold Rush.").

people with carry permits be invited in, just like mythological vampires who could not enter otherwise. The requirement flips the traditional rule for private property on its head—especially as to businesses that serve the public.

Usually, a private property owner who desires to exclude certain people must post signs letting the public know who or what actions are *prohibited*. While some spaces are so obviously private that there need not be signage to announce they exclude people, such as fenced-off private property or a home, this does not apply to places of business open to the public. Such businesses are "by positive law and social convention, presumed accessible to members of the public unless the owner manifests his intention to exclude them." *Oliver v. United States*, 466 U.S. 170, 193 (1984) (Marshall, J., dissenting).

Moreover, while *businesses* open to the public have a broad right to exclude people from their establishments (even on bases that might otherwise be unconstitutional if done by the government), *Carrillo v. Penn Nat'l Gaming, Inc.*, 172 F. Supp. 3d 1204, 1217 (D.N.M. 2016), under H.R.S. §134-E, the *State* decides who to exclude unless the business owner overrides the government's default rule and publicly states otherwise. This sort of unprecedented inversion of an enumerated right has already been rejected in the First Amendment context—even under standards of review *less* stringent than that of the Second Amendment. *See, e.g.*, *Project 80s v. Pocatello*, 942 F.2d 635, 639 (9th Cir. 1991) ("Under the Idaho Falls and Pocatello ordinances, residents who wish to receive uninvited door-to-door solicitors must post a 'Solicitors Welcome' sign. The government's imposition of affirmative obligations on the residents' first amendment rights to receive speech is not permissible.").

20

The few historical examples of anti-poaching laws requiring permission before carrying a gun onto private property did not deal with places of business open to the public. For example, a 1721 Pennsylvania statute provided that "if any person or persons shall presume ... to carry any gun or hunt on the improved or inclosed lands of any plantation[9] other than his own, unless he have license or permission from the owner of such lands or plantation ... he shall for every such offense forfeit the sum of ten shillings." James T. Mitchell et al., *Statutes at Large of Pennsylvania from 1682 to 1801*, vol. III, p. 254 (1896). Such a restriction on enclosed private lands where unauthorized hunting could be conducted is in no way analogous to a law banning concealed, permitted carry in a modern coffee shop or grocery store for self-defense.

The same applies to the historical laws cited by Hawaii. HI.Br.53-55. Without exception, all of them deal with enclosed land or other private property not open to the public. Moreover, their purpose was almost uniformly to curb unpermitted hunting or poaching. Hawaii complains that its historian concluded differently, claiming, for instance, that a 1771 New Jersey law preventing "trespassing with guns, traps, and dogs" applied to private businesses of the time. HI.Br.54 (citing 1-Add-

---

[9] Hawaii quibbles with the district court for citing the modern Black's Law Dictionary for the meaning of terms like "enclose" and "plantation." HI.Br.55. Citing a modern dictionary may make a difference in some instances, but it makes no difference here. The modern definition of "enclose" is "[t]o surround or encompass; to fence or hem in all sides." *Enclose*, Black's Law Dictionary (11th ed. 2019). Samuel Johnson's Founding-era dictionary (which the Supreme Court cited in *Heller* for the definition of "arms") similarly defined "enclose" to mean "[t]o part from things or grounds common by a fence" or "[t]o environ; to encircle; to surround." Samuel Johnson, *A Dictionary of the English Language* (1773). While language may evolve, not every word meaningfully changes over time. And Hawaii does not explain why the definitions the district court used would have been incorrect in the Founding era or whether a different definition would change our understanding of the historical enactment. HI.Br.55.

351). That's an astonishing claim to make about a law whose very title states it is concerned with "the Preservation of Deer and other Game."[10] Reading through the enactment in full, it is clear it is entirely concerned with trespassing on the lands of another for illegal hunting. While it does refer to a prohibition on a person carrying on "any Lands not his own," the forty-shilling fine for violating the law was paid to the "Owner of the Soil." If the law was intended to apply to all private property, including businesses open to the public, referring to "soil" (and not simply "property") would be an odd choice. Even still, Hawaii's retained historian contends that the law would have applied, for example, to a blacksmith's shop. HI.Br.54-55. But he did not cite a single example of anyone being charged with violating the law for carrying arms into such a business.

In summary, if private businesses choose to post signs telling people with CCW permits they are not welcome, they of course may do so. But that is based on private property principles, not because the business is a so-called "sensitive place." What Hawaii cannot do is preemptively declare all private businesses to be "sensitive places" unless the proprietors post signs saying otherwise. Besides the district court below, all four other district courts to examine this question have agreed. *See Antonyuk*, 2022 WL 16744700, at *79; *Christian*, 2022 WL 17100631, at *9; *Koons*, 2023 WL 3478604, at *67; *Kipke*, 2023 WL 6381503, at *14.

---

[10]  Acts of the General Assembly of the Provinces of New Jersey, from the Surrender of the Government to Queen Anne, on the 17th Day of April, in the Year of Our Lord 1702, to the 14th Day of January 1776, p. 343, ch. DXL, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns (Dec. 21, 1771), https://firearmslaw.duke.edu/wp-content/uploads/2023/04/1771-NJ-Acts-of-the-General-Assembly-of-NJ-Penalty-for-Setting-Loaded-Guns-1763-1775-N.J.-Laws-346-ch.-539-§-10.pdf.

The vampire rule—perhaps more than any other component of Act 52—offends the *Bruen* Court's conclusion that there are "relatively few" places where the historical record supports prohibiting carry. 142 S. Ct. at 2133. The district court's ruling should be upheld.

## VI. POPULATION METRICS ARE RELEVANT TO WHETHER PROPOSED HISTORICAL ANALOGUES ARE REPRESENTATIVE OF OUR HISTORICAL TRADITION; THE DISTRICT COURT MADE NO POPULATION FIGURE ERRORS

Other rulings following *Bruen* have agreed that more than a mere smattering of historical laws is required to uphold a modern law that implicates the Second Amendment right. *See, e.g.*, *Antonyuk*, 639 F. Supp. 3d at 231-32 (laws that affected 6% of the population of the United States cannot constitute a well-established historical tradition); *Christian*, 642 F. Supp. 3d at 407 ("'[T]he notion of a 'tradition' is the opposite of one-offs, outliers, or novel enactments. 'Tradition' requires 'continuity.'").

Hawaii argues that the district court erred in rejecting two of the historical laws it presented because the court miscalculated the population. HI.Br.56-57 (citing 1858 and 1866 New York City ordinances and an 1868 Pennsylvania law). According to Hawaii, "[t]he district court dismissed these historical regulations because the ordinances banning firearms in the Nation's first modern parks in New York and Pennsylvania covered States with 'only about 4% of this Nation['s]' population.… But according to the very population estimates the district court cited, these States had nearly 22% of the Nation's population, not 4%." *Id.* (citations omitted).

But there was no material error by the district court. The district court wrote that "the State's evidence establishes that, at the time of the Fourteenth Amendment's

ratification in 1868, only about 4% of this Nation had a historical tradition of prohibiting carrying firearms in parks." 1-ER-0067. That's correct because as the State openly acknowledges, *the laws and ordinances it cited applied to certain parks in New York City and Philadelphia only, not the entire states of New York and Pennsylvania.* The district court's only error was citing sources for the 1860 *state* populations of New York and Pennsylvania, instead of sources for the *city* populations of New York City and Philadelphia. *Id.* at n.17. It is true that the states of New York and Pennsylvania accounted for about 22% of the population in 1860—a total of 6,786,950 people out of 31,443,321 who lived in the United States at the time. *Id.* But the population of New York City in 1860 was 805,658.[11] And the population of Philadelphia was 565,527.[12] By simply adding those two figures and dividing them by the 1860 U.S. population of 31,443,321, we come to 4.36%. In other words, the district court got its math right, even if its footnote explaining it could have been a bit clearer.

At bottom, the New York City ordinances and the Pennsylvania law applied only to three parks in two cities, and thus affected mainly just the residents of those cities, who constituted about 4% of the U.S. population. These regulations did not affect *every* park in each state (or even those cities), let alone in any of the other states, none of which had similar enactments. Had Hawaii banned carry only in a certain park within the city of Honolulu, that might arguably be analogous to the old

---

[11] U.S. Census Bureau, *Population of the United States in 1860; Complied from the Original Returns of the Eighth Census, Under the Direction of the Secretary of the Interior* 337, tbl. 1 (1864), https://www.census.gov/library/publications/1864/dec/1860a.html (follow "New York [3.9 MB]" hyperlink).

[12] *Id.* at 432, tbl. 1, https://www.census.gov/library/publications/1864/dec/1860a.html (follow "Pennsylvania [5.3 MB]" hyperlink).

Pennsylvania law barring carry in Fairmount Park (assuming satisfaction of *Bruen*'s "how" and "why" metrics, of course). But such an enactment still would be unconstitutional because the Pennsylvania law is a late-in-time outlier that is unrepresentative of our historical tradition.

But whether 22% or 4%, Hawaii argues population is irrelevant because *Bruen* "nowhere instructed judges to limit their historical analysis through arbitrary population thresholds." HI.Br.32. But Hawaii should read *Bruen* more closely; the *Bruen* Court engaged in precisely the sort of analysis the district court conducted below. *See* 142 S. Ct. at 2154 (analyzing population data to conclude that certain analogues "were irrelevant to more than 99% of the American population"); *see also id.* at 2155 ("[W]e will not stake our interpretation on a handful of temporary territorial laws that … governed less than 1% of the American population.").

That is because, in order to save Act 52, the historical laws Hawaii presents must be "well-established and *representative*" historical analogues. *Id.* at 2133 (emphasis added). How could a set of enactments be representative of our historical tradition if they only affected a tiny minority of our population? For instance, no one would say that California's law forbidding eating frogs that died in frog-jumping contests is "representative" of American law generally. Cal. Fish & Game Code § 6883. That law is a comical outlier; it does not demonstrate an American tradition of respecting the remains of deceased amphibians. Similarly, the Central Park and Fairmount Park restrictions are not representative of what most of the country was doing at the time.

The fact of the matter is the overwhelming majority of 19th-century Americans could carry firearms for self-defense in their local parks, beaches, and similar places.

Some cities (post-Reconstruction era) barred carrying in certain areas for the limited purpose of hunting, *see, e.g.*, Charter of the City of Wilmington, Part VII, § 7, Rules and Regulations of the Board of Park Commissioners (1893), while others prohibited discharging firearms, *see, e.g.*, 1895 Mich. Local Acts at 596, § 44, but none fully banned the peaceable carry of firearms in all public places including for self-defense. Hawaii cannot demonstrate any historical analogues that are "well-established and representative." *Bruen*, 142 S. Ct. at 2133.

## VII. HAWAII TRIES TO CAPITALIZE ON SUICIDE VICTIMS TO DISPARAGE AMERICANS WITH CARRY PERMITS, A GROUP THAT IS OVERWHELMINGLY LAW-ABIDING

The Supreme Court has repeatedly banned interest-balancing analyses in Second Amendment cases. *Id.* at 2127. That said, at the preliminary injunction stage, courts must consider the public interest and balance of hardships between the parties, which merge "[w]hen, like here, the nonmovant is the government." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009). In addressing this point, the district court rightly considered state-level data presented by these Amici below. *See* 1-ER-0094.

Hawaii did not rebut that data in its reply brief below. Nor does it do so in its opening brief on appeal. Instead, it claims that "concealed carry permit holders have been responsible for thousands of deaths nationwide over the past decade and a half." HI.Br.56-57. In support of this stunning assertion, Hawaii cited the propaganda website, *Concealed Carry Killers*, created by the anti-gun Violence Policy Center. But according to the website itself, of the 2,490 total people purportedly killed by "concealed carry killers" from May 2007 to May 2023, over 1,500 were suicide victims

who killed no one but themselves:[13]



Violence Policy Center: Status of Concealed Carry Killers, May 2007 – May 2023

"committed suicide as part of a murder-suicide" is its own small category differentiated from all the other suicides.[14]

Amici will not mince words. The Violence Policy Center's *Concealed Carry Killers* site exploits the deaths of those who died by suicide to inflate its count in service of its anti-rights goals. Worse yet, it disparages their memory by calling them "killers," no different than criminals who intentionally harm others. They are *not* the same, and their deaths do not support the notion that concealed carry permit holders present a grave risk to the public at large.

In any event, this data, even taken at face value, does not support Hawaii's arguments in support of a ban on public carry of firearms in so-called "sensitive

---

[13] Violence Policy Center, *Concealed Carry Killers Background*, https://concealedcarrykillers.org/concealed-carry-killers-background/ (last visited Nov. 9, 2023); *see also* https://concealedcarrykillers.org/ (last visited Nov. 9, 2023) (confirming that 1,505 of the "concealed carry killers" died by suicide, distinct from the 64 that perpetrated a murder-suicide).

[14] Note also how only slightly over 500 of these "killers" have been convicted. Others that the Violence Policy Center counts as "killers" those who fired in self-defense until they are acquitted, those still under investigation, and unintentional shootings.

places." For one, the data does not say where these killings took place. Presumably, the overwhelming majority of those who died by suicide (who also make up most of the deaths reported by Violence Policy Center) died in their own homes.[15] This makes much of the data entirely irrelevant to Hawaii's concerns about carry of firearms in public places. As for the rest of the reported killings, it is unclear whether they were committed in what would be a "sensitive place" under Act 52 (and not the home, for example). Hawaii should have presented that data for important context.

In any case, what is most remarkable is that the *Concealed Carry Killers* data supports *Appellees*, not Hawaii. After removing the 1,505 suicide victims from the data, 985 total people killed by "concealed carry killers" remain. As noted previously, only 512 of these are killings with resulting convictions. The rest are some mix of unintentional shootings, murder-suicides, claimed self-defense shootings, and cases still under investigation. But for the sake of argument, Amici will assume that all 985 involved cold-blooded killers.

From May 2007 to May 2023, 985 killings across 16 years is an average of about 62 killings per year. To put this figure in its proper context, one must compare it to the number of Americans who lawfully carry firearms. According to data from the University of Washington, "in 2019 approximately 16 million adult handgun owners had carried a loaded handgun on their person in the past month."[16] According to the

---

[15] Harvard University, T.H. Chan School of Public Health, *Basic Suicide Facts: Where Do Suicides Occur?*, https://www.hsph.harvard.edu/means-matter/basic-suicide-facts/where/ ("About three-quarters of suicide incidents occur at home.").

[16] Kim Eckart, *More US Adults Carrying Loaded Handguns Daily, Study Finds*, U. of Wash. News (Nov. 16, 2022), https://www.washington.edu/news/2022/11/16/more-u-s-adults-carrying-loaded-handguns-daily-study-finds/.

Crime Prevention Research Center, the figure has risen to 22 million as of 2022. John R. Lott, *Concealed Carry Permit Holders Across the United States: 2022* (Oct. 31, 2022), https://ssrn.com/abstract=4279137.

Going with the lower 2019 figure for the sake of argument, if about 16 million Americans legally carry, and 62 killings result, that is an annual homicide rate of around 0.39 per 100,000 people. According to the CDC, the overall national homicide rate was 7.8 per 100,000 people in 2021.[17] In other words, according to the *Concealed Carry Killers* data, Americans who legally carry firearms are about *20 times less likely* to commit homicide than the general population. This hardly supports Hawaii's claim that such persons are uniquely dangerous that they must be disarmed in public.

Hawaii also cites various studies purporting to show that widespread concealed carry increases crime. HI.Br.57-58. But crucially, none of the studies the State cites claim that *people with carry permits* are the ones committing a significant share of any increased crime. At most, one study claimed that permit holders were much more likely to be the victims of firearm theft, which in turn could be used by the thief to commit crimes. John J. Donohue et al., *Why Does Right-to-Carry Cause Violent Crime to Increase?* 3 (Nat'l Bur. of Econ. Rsch., Working Paper No. 30190, 2023), https://perma.cc/QD3C-4DBF. But even if this is true, it means there should be *fewer* places where carry is prohibited, not more. By creating so many "sensitive places," Hawaii forces permit holders to leave their firearms in their cars far more often,

---

[17] Center for Disease Control and Prevention, National Center for Health Statistics, *Assault or Homicide*, https://www.cdc.gov/nchs/fastats/homicide.htm (last visited Nov. 9, 2023).

exposing them to an increased chance of theft.[18]

Lastly, Hawaii cites a pre-*Bruen* en banc concurrence arguing that CCW permit holders are a dangerous threat as another reason to reject the existence of the right to carry. Yet that concurrence also relied on the *Concealed Carry Killers* website and presented only anecdotes, not data showing that those with CCW permits are more likely to commit crime. *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (Graber, J., Thomas, C.J., and McKeown, J., concurring).

The evidence from five other states that maintain data on crimes committed by CCW permit holders, which Amici presented to the district court, confirms that people with CCW permits are overwhelmingly peaceable and law-abiding. There are probably other states with similar data, but the five examples Amici provided to the district court make the point. Even if Hawaii could use "public safety" as a reason to curtail the right to carry in places that are not truly sensitive (and it cannot because *Bruen* forbids such interest balancing), the reality is that people with carry permits are dramatically *more* law-abiding than the population as a whole, and are thus very unlikely to pose a criminal threat. The criminals Hawaii should worry about are already carrying illegally, they do not bother to obtain permits, and they do not care what places Act 52 declares off limits to them. With Act 52, the State is punishing the law-abiding—those who have already subjected themselves to an onerous legal process to exercise a constitutional right.

---

[18] Even a major gun control group acknowledges that cars are the biggest source of stolen guns. *See* Megan O'Toole et al., *Gun Thefts from Cars: The Largest Source of Stolen Guns*, Everytown Research & Policy (May 9, 2022), https://everytownresearch.org/gun-thefts-from-cars-the-largest-source-of-stolen-guns/ (last visited Nov. 9, 2023).

## CONCLUSION

For these reasons and those discussed in Appellees' brief, this Court should affirm the district court.

Dated: November 9, 2023    Respectfully submitted,

/s/ C.D. Michel
C.D. Michel
Anna M. Barvir
Konstadinos T. Moros
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Email: cmichel@michellawyers.com
*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16164

I am the attorney or self-represented party.

**This brief contains** | **6,990** | **words,** including | 40 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/C.D. Michel | **Date** | November 9, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*