No. 23-16164

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII
FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of
Hawaiʻi,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Hawaiʻi
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

## REPLY BRIEF OF DEFENDANT-APPELLANT ANNE E. LOPEZ

ANNE E. LOPEZ
  *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
  *Solicitor General*
NICHOLAS M. MCLEAN
  *First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
  *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
ALEXANDRA LICHTENSTEIN
   *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
   *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as the Attorney General of the State of Hawai'i*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ..................................................................................1

ARGUMENT .........................................................................................3

    I.    Plaintiffs Are Not Likely to Succeed on Their Challenges
          to Act 52. ..........................................................................3

          A.    Plaintiffs Lack Standing to Challenge HRS §§ 134-A(a)(1),
                (12), and 134-E. .......................................................3

          B.    Plaintiffs Are Not Likely to Succeed on Their Challenges to the
                Sensitive-Place Provisions. .......................................6

          C.    Plaintiffs Are Not Likely to Succeed on Their Challenge to the
                Private Property Default Rule. ..................................26

    II.    The Other Injunction Factors Favor the State. ....................29

CONCLUSION ....................................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871)....................................................26

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022)............... 11, 22, 24, 25

*Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022) ........................ 15, 22, 24

*Anyonyuk v. Nigrelli*, No. 22A557 (U.S. Jan. 11, 2023) .........................................16

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ............................23

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ............................................................26

*Bonidy v. USPS*, 790 F.3d 1121 (10th Cir. 2015)............................................ 18, 23

*Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886 (1961).....................23

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ......................5

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
    No. 1:22-cv-00951, 2023 WL 2655150 (D. Del. Mar. 27, 2023)......................12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................................7

*Duncan v. Bonta*, 83 F.4th 803 (9th Cir. 2023) (en banc) .....................................29

*English v. State*, 35 Tex. 473 (1872)......................................................................25

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .........................................12

*Freedom from Religion Found., Inc. v. Mack*, 49 F.4th 941 (5th Cir. 2022) .........11

*Frey v. Nigrelli*,
    No. 7:21-cv-05334, 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023) ...................11

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................23

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012)....................28

*Goldstein v. Hochul*,
    No. 1:22-cv-08300, 2023 WL 4236164 (S.D.N.Y. June 28, 2023)....................11

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) .......................................................12

*Hanson v. District of Columbia*,
    No. 1:22-cv-02256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ........................11

*Hill v. State*, 53 Ga. 472 (1874) ..............................................................................26

*Kipke v. Moore*,
    No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) .......... 11, 16, 24

*Koons v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023)............................... 16, 24

*Koons v. Platkin*,
    No. 1:22-cv-07464, 2023 WL 3478604 (D.N.J. May 16, 2023) ................. 11, 24

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010).......................................................3

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
    No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023)............. 11, 16, 24

*Matter of McLinn*, 739 F.2d 1395 (9th Cir. 1984) (en banc)....................................3

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) .................. *passim*

*Nat'l Ass'n for Gun Rts. v. Lamont*,
    No. 3:22-cv-01118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023).......................12

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
    No. 22-cv-00501, 2023 WL 4552284 (N.D. Cal. July 13, 2023) ........................11

*Novak v. United States*, 795 F.3d 1012 (9th Cir. 2015)............................................5

*NRA v. Bondi*, 61 F.4th 1317 (11th Cir.),
    *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023)...........11

*Or. Firearms Fed'n v. Kotek*,
    No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023) ........................11

*Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635 (9th Cir. 1991) ....................27

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ..........................................................10

*Safeco Insurance Co. of America v. Schwab*, 739 F.2d 431 (9th Cir. 1984).............3

*State v. Shelby*, 2 S.W. 468 (Mo. 1886).................................................................26

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ........................................................10

*Torres v. Madrid*, 141 S. Ct. 989 (2021) ..............................................................10

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023)........................................16

*United States v. Allam*,
    No. 1:23-cr-00010, 2023 WL 5846534 (E.D. Tex. June 14, 2023).............. 18, 19

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019)....................................... 9, 18

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ..........................................19

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ..........................................12

*United States v. James*,
    No. 3:19-cr-00079, 2023 WL 3996075 (D.V.I. June 14, 2023) ........................11

*Wade v. Univ. of Michigan*,
    No. 330555, 2023 WL 4670440 (Mich. Ct. App. July 20, 2023).......................16

*We the Patriots, Inc. v. Grisham*,
    No. 1:23-cv-00773, 2023 WL 6622042 (D.N.M. Oct. 11, 2023).......... 11, 16, 24

**Statutes**

HRS § 134-A(a)(1)..................................................................... 3, 4, 6, 18

HRS § 134-A(a)(12)........................................................................ *passim*

HRS § 134-A(a)(4)............................................................................ 6, 19

HRS § 134-A(a)(9)........................................................................ *passim*

HRS § 134-E ................................................................................ *passim*

**Other Authorities**

Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the*
    *Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government*
    *Security Approach*, 63 B.C.L. Rev. E-Supplement I.-60 (2022)......................8, 9

iv

Darrell A. H. Miller & Jennifer Tucker,
*Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) ....... 14

David B. Kopel & Joseph G.S. Greenlee,
*The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*,
13 Charleston L. Rev. 205 (2018) ........................................................................ 7

Declaration of Hendrik Hartog, *Koons v. Platkin*,
No. 1:22-cv-07464 (D.N.J. Feb. 13, 2023), ECF No. 84 ............................. 20, 28

*Guns in Bars*, Everytown Rsch. & Pol'y (July 9, 2015),
https://perma.cc/RBZ2-DJRH ............................................................................ 21

John Gramlich, *What the Data Says About Gun Deaths in the U.S.*,
Pew Rsch. Ctr. (Apr. 26, 2023), https://perma.cc/B85K-FRLV ......................... 15

Julia A. Wolfson et al., *US Public Opinion on Carrying Firearms in Public Places*,
107 AJPH 929 (2017) ......................................................................................... 29

Katherine Schaeffer, *U.S. School Security Procedures Have Become More
Widespread in Recent Years but Are Still Unevenly Adopted*, Pew Rsch. Ctr.
(July 27, 2022), https://perma.cc/RPW9-HV45 .................................................... 9

Letter from B. Henry Latrobe, Surveyor of the Pub. Bldgs., to Speaker, U.S. House
of Reps. (Oct. 27, 1807), *in 1 American State Papers: Miscellaneous* 482
(Walter Lowrie & Walter S. Franklin eds., 1834) ................................................ 9

Patrick J. Charles, *Racist History and the Second Amendment: A Critical
Commentary*, 43 Cardozo L. Rev. 1343 (2022) .................................................... 8

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History
Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) ............. 15

Priya Satia, *Empire of Guns* (2018) ....................................................................... 14

*Top 100 Biggest US Cities in the Year 1860*, Biggest US Cities,
https://www.biggestuscities.com/1860 ................................................................ 22

Transcript of Oral Argument, *United States v. Rahimi* (No. 22-915) ........ 13, 14, 25

Ward Research Inc., *Public Opinion of Gun Safety Laws (Online Survey of
Hawai'i Residents)* (Feb. 2023), https://perma.cc/DSD3-6X59 ......................... 29

# INTRODUCTION

Plaintiffs offer an extraordinarily broad reading of the Second Amendment that would put governments in the very "regulatory straightjacket" *Bruen* disclaimed. In their effort to defend the district court's sweeping preliminary injunction, Plaintiffs urge the adoption of a series of extreme theories that are untethered from history, inconsistent with *Bruen* and other case law, and contrary to common sense. For example:

- According to Plaintiffs, sensitive places must have "enhanced government-provided security," Answering Brief ("AB") 26, with "armed" "officials" "control[ling] every point of access," AB19. This argument is ahistorical, disregards the reality of the sensitive places that *Bruen* and *Heller* recognized, and ignores the many sensitive places in the eighteenth and nineteenth centuries that did not have armed guards controlling all access.

- On Plaintiffs' theory, even schools apparently could not be deemed sensitive. Schools certainly did not have heighted security historically (and many still do not). And in light of Plaintiffs' unsupported view that "Founding era laws restricting firearms on campus and in schools applied only to *students*, not to faculty, staff, or visitors," AB25, Plaintiffs' theory, if adopted, would make it unconstitutional to prevent even school "visitors" from carrying guns.

- According to Plaintiffs, only history from 1791 matters, and all other historical evidence should simply be disregarded. *See* AB20-23. That blinkered approach is far too narrow. It is inconsistent with how most courts have applied *Bruen* and with the range of sources the Supreme Court itself considered in cases like *Heller*, *McDonald*, and *Bruen*.

- According to Plaintiffs, a sensitive place's parking lot must be subjected to a separate historical analysis, also focusing on 1791. *See* AB30, 32, 34, 37. But that is the wrong level of generality for assessing the scope of sensitive places. Instead, a parking lot is properly deemed sensitive to the same degree as the building it serves. Modern cases, and the scope of historical sensitive-place regulations, illustrate this principle. *See infra* pp. 18-19.

Plaintiffs mischaracterize case law, the historical record, and the arguments made in the Opening Brief ("OB"), and they rely on district court injunctions that have been stayed by their respective appellate courts. Plaintiffs also repeatedly urge the adoption of unreasonable readings of *Bruen*'s legal framework. This Court should reject Plaintiffs' arguments and vacate the preliminary injunction.

## ARGUMENT

### I.  Plaintiffs Are Not Likely to Succeed on Their Challenges to Act 52.

#### A.  Plaintiffs Lack Standing to Challenge HRS §§ 134-A(a)(1), (12), and 134-E.

Plaintiffs lack standing to challenge HRS §§ 134-A(a)(1), (12), and 134-E. *See* OB16-19.  Plaintiffs incorrectly claim that the State has not contested their standing "to challenge the parking lot bans for parking areas in which access is shared."  AB9.  The State has not conceded standing; instead, it has explained that § 134-A(a)(1) does not even apply to shared parking lots.  Thus, there is no "ban" for Plaintiffs to challenge.[1]

Citing *Safeco Insurance Co. of America v. Schwab*, 739 F.2d 431 (9th Cir. 1984), Plaintiffs assert that Ninth Circuit law provides that this Court must accept the district court's contrary interpretation of § 134-A(a)(1) unless it is "clearly wrong."  AB11 (quoting *Safeco*, 739 F.2d at 433 n.1).  That is not the law.  In this Court, as elsewhere, "questions of state law are reviewable under the same independent de novo standard as are questions of federal law."  *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir. 1984) (en banc).  Moreover, the State's interpretation of § 134-A(a)(1)—and the consequent disclaimer of intent to enforce

---

[1]  Plaintiffs argue that "the scope of Hawaii's law is a merits issue, not a standing issue."  AB11.  But pre-enforcement standing requires a proposed course of conduct that is "proscribed by" the challenged law.  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (internal quotation marks omitted).  If the conduct at issue is not proscribed, then there is no injury and thus no standing.

the statute in the (incorrect) manner Plaintiffs posit—is entirely reasonable, and aligns with legislative intent, constitutional avoidance, and the rule of lenity. *See* 2-ER-0108 (reply in support of stay motion); 2-ER-0209-0210 (argument at TRO hearing).[2]

Plaintiffs' standing theories regarding firearms in banks and financial institutions, *see* § 134-A(a)(12), are no more persuasive. Plaintiffs do not dispute that they have failed to identify a single financial institution that would allow them to carry firearms on its property in the absence of the provision. They argue instead that Plaintiff Kasprzycki has standing to challenge § 134-A(a)(12) because his business shares a parking lot with a bank. This is unavailing. As explained above, § 134-A applies only to parking lots that exclusively serve places designated as sensitive under that provision, and it does not apply to parking lots that are shared by banks and non-sensitive businesses.

Finally, with respect to the private property default rule, *see* § 134-E, Plaintiffs assert that they have established traceability and redressability because they previously carried firearms in private businesses without consent and will be

---

[2] Plaintiffs assert standing to challenge § 134-A(a)(1) on the theory that the provision applies to parking areas adjacent to parks and beaches that contain structures like lifeguard buildings. AB9-10. But it is § 134-A(a)(9), not § 134-A(a)(1), that prohibits firearms in parking areas adjacent to parks and beaches.

4

unable to do so going forward. AB14.[3] But Plaintiffs' inability to carry firearms in non-sensitive businesses is caused solely by third parties' independent decisions not to authorize carrying firearms on their property. *See* OB17-19; *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) ("There is no standing if, following a favorable decision, whether the injury would be redressed would still depend on the unfettered choices made by independent actors not before the courts." (internal quotation marks omitted)).

Plaintiffs now suggest that their injury "is the unconstitutional imposition of a requirement to seek prior permission, not merely whether carry would ultimately be successful with such permission." AB15. But Plaintiffs never alleged in their complaint or stated in their declarations that obtaining consent would constitute an independent burden. *See* 2-ER-0109 n.1. Although Plaintiffs belatedly asserted in their reply in support of their TRO that § 134-E's consent requirement inflicted injury, *see* 2-ER-0239-0240, the case on which they relied—*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009)—is inapposite. *See* 2-ER-0109 n.1 (explaining that *Common Cause* involved a denial-of-equal-treatment

---

[3] Perplexingly, Plaintiffs assert that "[t]he State's argument that the [Second Amendment] right does not extend to private property in the absence of prior permission is a merits argument, not a standing argument." AB13. The State agrees that this is a merits argument. *See* OB48-56 (argument presented in merits section). The State's *standing* argument, by contrast, is that the alleged injuries Plaintiffs attribute to § 134-E are neither traceable to State action nor redressable by this Court. *See* OB17-19.

claim). Moreover, while Plaintiffs assert that an injunction against enforcement of § 134-E "would tangibly improve the chances of them carrying in the various locations they declared they want to carry in," AB14 (internal quotation marks omitted), it is constitutionally irrelevant whether § 134-E has the downstream effect of reducing carrying rates, *see* Property Law Professors' Br. 18-19.

## B. Plaintiffs Are Not Likely to Succeed on Their Challenges to the Sensitive-Place Provisions.

Even if Plaintiffs have standing, they are not likely to succeed on the merits. Plaintiffs fail to show that the plain text of the Second Amendment protects the specific course of conduct covered by §§ 134-A(a)(1), (4), (9), and (12). *See* OB20-21. Moreover, these provisions are "consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022); *see* OB21-25.

### 1. Plaintiffs Misapply *Bruen*.

The State's Opening Brief explains why the legal framework the district court applied was erroneous and why reversal is required. Plaintiffs, by contrast, propose an analytical framework that reflects at least seven serious methodological errors, each discussed below. Plaintiffs' proposed framework would go far beyond *Bruen* in limiting governments' ability to protect their citizenry.

*First*, Plaintiffs wrongly suggest that the only sensitive places the Supreme Court has recognized are legislative assemblies, polling places, and courthouses.

6

*See* AB17, 24-25.  *Heller* clearly indicated, however, that its reading of the Second Amendment did not "cast doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and that its list of such "presumptively lawful regulatory measures" did "not purport to be exhaustive," *id.* at 627 n.26.  And *Bruen* approvingly cited "*Heller*'s discussion of longstanding laws forbidding the carrying of firearms in sensitive places *such as schools and government buildings*." 142 S. Ct. at 2133 (emphasis added) (internal quotation marks omitted).

*Second*, Plaintiffs incorrectly assert that historical prohibitions on firearms at schools applied only to students.  *See* AB25-26.  In fact, there is a robust historical tradition of prohibiting *all* persons from carrying firearms at schools.  *See, e.g.*, 5-ER-1029 (1870 Texas law); 5-ER-1031 (1875 Missouri law); 5-ER-1037 (1889 Arizona law); 4-ER-0955 (1890 Oklahoma law).  Nor do Plaintiffs provide any basis for their assertion that "the Founders protected vulnerable populations by requiring the bearing of arms."  AB27.  The law review article Plaintiffs cite for that proposition simply describes laws that required people to carry at churches and certain public meetings, but says nothing about a broader policy of protecting vulnerable populations by arming their caretakers.  *See id.* (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 233-34 & n.108, 244 (2018)).

In any event, it appears that these bring-your-gun-to-church laws were motivated at least in part by a desire "to quell potential slave revolts."  Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary*, 43 Cardozo L. Rev. 1343, 1351 (2022).  They have no bearing on the tradition of governments protecting vulnerable individuals from firearms by designating sensitive places.

*Third*, Plaintiffs wrongly theorize that the universe of sensitive places is defined by a "long tradition of the government exclusively providing comprehensive security."  AB18; AB19 ("At the Founding, comprehensive security meant officials who were armed and able to control every point of access at a court or legislature.").  This theory is completely ahistorical.  OB23-24; *see* 2-ER-0111-0113; 3-ER-0469 (Cornell Decl. ¶ 42); Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L. Rev. E-Supplement I.-60, I.-62 (2022).  Not even the sources Plaintiffs cite support it.[4]  And Plaintiffs' theory is fatally undermined by the fact that many sensitive places historically did not have anything remotely like the "comprehensive

---

[4]  For example, Plaintiffs cite a 1790 South Carolina law that required sheriffs or their deputies to "attend all courts," and a 1791 Maryland law that appointed a sergeant-at-arms and door-keeper for the state legislature.  AB18-19 & n.8. Plaintiffs provide no evidence, however, that sergeants-at-arms or similar officers were required to carry firearms, and there is no indication that these laws contemplated armed security at all access points.

security" Plaintiffs posit—including the White House and the Capitol. *See* Gryting & Frassetto, *supra*, at I-65; Letter from B. Henry Latrobe, Surveyor of the Pub. Bldgs., to Speaker, U.S. House of Reps. (Oct. 27, 1807), *in* 1 *American State Papers: Miscellaneous* 482, 483 (Walter Lowrie & Walter S. Franklin eds., 1834) ("[E]very one, without discrimination, had access to all the passages of the building. It was, indeed, impossible to distinguish those who *ought* from those who *ought not* to have entered.").

Plaintiffs' theory also cannot be squared with the sensitive places *Heller* and *Bruen* identified—many of which had no heightened security, let alone armed guards at every access point. *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) ("Many 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in [*Heller*]—are open to the public, without any form of special security or screening."). It has only been recently—in response to an explosion of gun violence—that some sensitive places have begun to institute security screening measures. *See, e.g.*, Katherine Schaeffer, *U.S. School Security Procedures Have Become More Widespread in Recent Years but Are Still Unevenly Adopted*, Pew Rsch. Ctr. (July 27, 2022), https://perma.cc/RPW9-HV45.

*Fourth*, Plaintiffs are wrong to suggest that 1791 is the only period that matters when conducting *Bruen*'s historical inquiry. *See* AB20-23. The State and

its *amici* have explained why the inquiry is not so limited, *see* 3-ER-0395-0397; Everytown Br. 2-15, and Plaintiffs' arguments to the contrary are unavailing.

For example, Plaintiffs mischaracterize *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *en banc petition pending*, as an example of this Court "look[ing] to 1791 when assessing the scope of the Second Amendment," AB22. *Teter* stated that the government could "meet its burden by citing analogous regulations that were enacted close in time to the Second Amendment's adoption in 1791 *or* the Fourteenth Amendment's adoption in 1868." 76 F.4th at 950-51 (emphasis added). Elsewhere in the opinion, *Teter* "express[ed] no view" on whether 1791 or 1868 should be the focus of the *Bruen* analysis, *id.* at 948 n.7, but that does not support Plaintiffs' theory that *only* Founding-era history matters.

Plaintiffs assert that an "emphasis on Founding era evidence is fully in accord with past Supreme Court precedent," AB21, but what Plaintiffs propose is not simply putting "emphasis" on 1791; it is the *exclusion* of subsequent history, *see* AB34 ("The absence of any Founding era analogues is dispositive."); AB39, 41, 44 (similar). And the Supreme Court regularly looks to later sources when interpreting the Bill of Rights. *See, e.g.*, *Torres v. Madrid*, 141 S. Ct. 989, 996-97 (2021) (consulting Reconstruction-era sources when interpreting Fourth Amendment); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 n.18 (2020) (same when interpreting Sixth Amendment).

Plaintiffs also rely on decisions involving *federal* firearms prohibitions to support their only-1791-matters theory. *See* AB22-23 & n.9. This includes all but one of the cases that Plaintiffs cite in support of their argument that "post-*Bruen* decisions of the district courts in this Circuit and elsewhere have also uniformly looked to 1791." AB23 & n.9. But a host of post-*Bruen* decisions—especially in cases involving challenges to state laws—have looked to both the Founding and Reconstruction eras,[5] and it is certainly not true that post-*Bruen* cases have

_____

[5] *See, e.g.*, *NRA v. Bondi*, 61 F.4th 1317, 1322-24 (11th Cir.), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023); *We the Patriots, Inc. v. Grisham*, No. 1:23-cv-00773, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023); *Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023); *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *44 (D. Or. July 14, 2023); *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, No. 22-cv-00501, 2023 WL 4552284, at *5 (N.D. Cal. July 13, 2023); *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023), *motion for injunction pending appeal denied*, No. 23-1719 (4th Cir. Oct. 5, 2023); *Goldstein v. Hochul*, No. 1:22-cv-08300, 2023 WL 4236164, at *11 (S.D.N.Y. June 28, 2023); *United States v. James*, No. 3:19-cr-00079, 2023 WL 3996075, at *10 n.15 (D.V.I. June 14, 2023); *Koons v. Platkin*, No. 1:22-cv-07464, 2023 WL 3478604, at *84 (D.N.J. May 16, 2023); *Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL 3019777, at *16 (D.D.C. Apr. 20, 2023); *Frey v. Nigrelli*, No. 7:21-cv-05334, 2023 WL 2473375, at *13 (S.D.N.Y. Mar. 13, 2023); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 323 (N.D.N.Y. 2022); *cf. Freedom from Religion Found., Inc. v. Mack*, 49 F.4th 941, 951 n.7 (5th Cir. 2022) ("We consider evidence from the period leading to incorporation because the Supreme Court has considered the understanding of the ratifiers of the Fourteenth Amendment relevant to understanding this country's history and tradition." (internal quotation marks and citations omitted)).

"uniformly" focused solely on 1791. Pre-*Bruen* cases also looked to the Reconstruction era when defining the scope of the Second Amendment.[6] And many cases have appropriately looked beyond 1868 as well. *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-01118, 2023 WL 4975979, at *31 n.51 (D. Conn. Aug. 3, 2023) ("Nowhere does *Bruen* forbid consideration of any regulations or history after the end of the 19th century, and the Court will consider evidence from this period as it relates to, either confirming or contradicting, earlier Founding, antebellum, and Reconstruction-era evidence."); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-cv-00951, 2023 WL 2655150, at *9 (D. Del. Mar. 27, 2023) (emphasizing that regulations from 1791 and 1868 "are not the only relevant historical evidence" under *Bruen*).

*Fifth*, Plaintiffs argue that historical state laws are relevant only if they applied to a large percentage of the Nation's population, and they urge the Court to discount or disregard local and territorial regulations. *See* AB23-24, 35-36, 39-41, 44. But *Bruen* imposes no such restrictions. *See* OB31-33; Everytown Br. 16-20. *Bruen* included an offhand statement about population percentages and dismissed certain territorial laws that "contradic[ted] the overwhelming weight of other, more contemporaneous historical evidence." 142 S. Ct. at 2155 (internal quotation

---

[6] *E.g.*, *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011).

marks omitted). But nothing in *Bruen* warrants disregarding territorial laws, or imposing across-the-board population thresholds that historical analogues must satisfy. Sensitive-place regulations certainly do not "contradict" history; to the contrary, *Bruen* and *Heller* made clear that restrictions on sensitive places are fully consistent with the Second Amendment. *See id.* at 2133.

Plaintiffs acknowledge that *Bruen* identified a number of illustrative sensitive places even though "the historical record yields relatively few 18th- and 19th-century" examples of such regulations. AB25 (quoting *Bruen*, 142 S. Ct. at 2133). Indeed, the sources on which *Bruen* relied to support its list of sensitive places included "*only two laws* naming legislative assemblies and *two laws* naming courthouses." Everytown Br. 16. And the laws naming legislative assemblies "were enacted three years apart, in 1647 and 1650, in a single colony, Maryland, that made up an estimated 8.7 percent of the total population." *Id.* at 17. In light of this, *Bruen* cannot be read as imposing a population test for sensitive-place laws.

*Sixth*, Plaintiffs misapply *Bruen* by advancing an inappropriately narrow view of the historical record. As the Solicitor General recently explained at oral argument in *United States v. Rahimi*, No. 22-915, *Bruen* requires courts to use history and tradition to identify "the enduring principles that define the scope of the Second Amendment right." Transcript of Oral Argument at 40. Those principles are then applied to the modern law being challenged, taking into account

13

"the justifications and the evidence before the legislature" that enacted the law. *Id.* at 14. For sensitive-place restrictions, the relevant constitutional principle is that a legislature can restrict firearms "where carrying weapons will pose unique dangers," *id.* at 12, and the task for courts is to "look at the justifications and the evidence before the legislature" and ask whether "that place [is], in fact, dangerous if there are weapons there," *id.* at 14.

*Seventh*, Plaintiffs resist the commonsense premise that firearms technology has changed dramatically since the Founding and Reconstruction eras. *See* AB26-28. Plaintiffs instead argue that "[t]here is nothing new about handgun violence," AB26 (internal quotation marks omitted), and even suggest that modern handguns are technologically inferior in certain respects to colonial firearms, *see* AB27-28. As should be obvious, though, "weapons have increased sharply in lethality from the mid-nineteenth century"—and certainly from the late eighteenth century. Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2509 (2022); *see* OB24-25. At the Founding, "[g]uns did not have much to do with murder," because "[t]he very nature of the slow, mechanical process for loading and triggering made [a firearm] a weapon of cool threat rather than hot-blooded violence." Priya Satia, *Empire of Guns* 228-29 (2018). Today, there are over 20,000 gun-related murders per year in the United States, and over half of those for which there is data involve handguns. *See* John

14

Gramlich, *What the Data Says About Gun Deaths in the U.S.*, Pew Rsch. Ctr. (Apr. 26, 2023), https://perma.cc/B85K-FRLV. At the Founding, "the standard rifleman could discharge, on average, two or three rounds per minute dependent upon the skill of the shooter." Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 47 (2012). Today, "a standard handgun can fire … over a dozen bullets … and can be easily loaded in seconds." *Id.* This evolution has had significant ramifications for public safety, and for the types of people and activities that are susceptible to the risks of firearms. Accordingly, "a more nuanced approach" is required when assessing whether a particular location may be deemed sensitive. *Bruen*, 142 S. Ct. at 2132.[7]

Plaintiffs suggest that the district court "joined a consensus of courts" when it enjoined the challenged provisions. AB17. But of the six cases Plaintiffs cite, AB17 n.7, four are from district courts in the Second Circuit, which has stayed injunctions against sensitive-place provisions and a private property default rule pending appeal, *see, e.g.*, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022),

---

[7] In addition to the arguments above, Plaintiffs attack Act 52 on the ground that it supposedly restricts carry in "96.4% of the publicly accessible land in Maui County." AB3. The State cannot evaluate this calculation because Plaintiffs have not provided sufficient information regarding their methodology. Moreover, the calculation appears to be an overestimate, as Plaintiffs state that they have classified private businesses as publicly accessible land.

*application to vacate stay denied sub nom. Anyonyuk v. Nigrelli*, No. 22A557 (U.S.

Jan. 11, 2023); one has been stayed in relevant part by the Third Circuit, *see Koons*

*v. Att'y Gen.*, No. 23-1900 (3d Cir. June 20, 2023); and one was a split decision

that enjoined some provisions but not others, *see Kipke*, 2023 WL 6381503.

Plaintiffs also ignore several decisions that have *declined* to enjoin sensitive-place

provisions following *Bruen*.  *See, e.g.*, *Maryland Shall Issue*, 2023 WL 4373260;

*We the Patriots*, 2023 WL 6622042; *Wade v. Univ. of Michigan*, No. 330555, 2023

WL 4670440 (Mich. Ct. App. July 20, 2023).

### 2. Plaintiffs' Conduct Does Not Fall Within the Plain Text of the Second Amendment.

Under a proper understanding of *Bruen*, the challenged provisions are

constitutional.  First, Plaintiffs have failed to show that their "proposed course of

conduct"—carrying firearms into the sensitive places at issue—"falls within the

Second Amendment," *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023)

(internal quotation marks omitted); *see* OB20-21.[8]  Plaintiffs attempt to shift the

burden of proof entirely to the State, *see* AB28, but it is only once Plaintiffs have

satisfied *Bruen*'s initial textual requirement that "[t]he government must *then*

justify its regulation by demonstrating that it is consistent with the Nation's

---

[8]  It is irrelevant that *Alaniz* assumed without deciding that *Bruen*'s initial textual requirement had been satisfied.  *See* AB29; *Alaniz*, 69 F.4th at 1129.  *Alaniz* discussed how *Bruen*'s textual requirement works, and that discussion is instructive.  *See* 69 F.4th at 1128.

historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130 (emphasis added). Plaintiffs fail at step one, simply equating *Bruen*'s holding that "the Second Amendment guarantees a general right to public carry" with a blanket rule that the Amendment's plain text covers all places open to the public. AB28 (internal quotation marks omitted). This defies *Bruen*'s instruction to "rel[y] on history to inform the meaning of constitutional text." 142 S. Ct. at 2130. Sensitive-place restrictions are "presumptively lawful" and thus fall outside the scope of the Second Amendment as originally understood. *See* OB20.

Plaintiffs also argue, without citation, that "the holdings of every post-*Bruen* case" are consistent with their position that the right to carry firearms in public encompasses the right to carry firearms on private property. AB28. As explained above, however, nearly all of the sensitive-place cases on which Plaintiffs rely have been stayed in relevant part pending appeal. *See supra* p. 15-16.

### 3. HRS §§ 134-A(a)(1), (4), (9), and (12) Are Consistent with the Nation's Historical Tradition of Firearms Regulation.

Even if Plaintiffs were correct that the plain text of the Second Amendment covers their conduct, the State has amply demonstrated that the challenged provisions are consistent with the Nation's historical tradition of firearms regulation. *See* OB21-48.

###### a. Parking lots

Properly interpreted, § 134-A(a)(1) prohibits carrying firearms in parking lots that exclusively serve government buildings. OB25-26. There is nothing unconstitutional about that prohibition, because government parking lots are sensitive to the same extent as the buildings themselves. *See Class*, 930 F.3d at 464; *Bonidy v. USPS*, 790 F.3d 1121, 1125 (10th Cir. 2015). Plaintiffs attempt to distinguish *Class* and *Bonidy* by highlighting irrelevant details of those decisions— the distance of the parking lot in *Class* and an alternative holding in *Bonidy*. *See* AB31-32. But those cases stand for the commonsense proposition that a parking lot is sensitive when it is "a single unit with" the government building it serves. *Class*, 930 F.3d at 464; *Bonidy*, 790 F.3d at 1125. That supports the limited restriction in § 134-A(a)(1).

Nor is Plaintiffs' narrow approach to defining the scope of sensitive places consistent with how sensitive places were defined historically. Historical laws protecting polling places, for example, prohibited firearms both at the polling places themselves and in adjacent areas. The 1776 Delaware Constitution provided that "Militias could not assemble within one mile of a polling place" during elections. *United States v. Allam*, No. 1:23-cr-00010, 2023 WL 5846534, at *22 (E.D. Tex. June 14, 2023) (internal quotation marks omitted). Likewise, in Maryland, "an 1886 statute outlawed bearing arms within 300 yards of the polls on

election day in Calvert County." *Id.* at \*23 (internal quotation marks and alteration omitted). And "[i]n 1873, Texas also prohibited a person from carrying a firearm within a half-mile of a polling place during polling hours." *Id.* (internal quotation marks omitted). If these historic polling places had had adjacent parking lots, the prohibitions on firearms in adjacent areas would have covered them. In short, it is readily apparent "that this Nation is no stranger to prohibiting individuals from possessing or carrying firearms, or other weapons for that matter, *within a certain proximity of sensitive places*." *Id.* (emphasis added).

### b.  Bars and restaurants serving alcohol

Plaintiffs also fail to meaningfully respond to the wealth of historical analogues the State provided in support of § 134-A(a)(4). To begin, Plaintiffs have offered nothing to defend the district court's decision to enjoin the provision as to bars, even though Plaintiffs challenged it only as to restaurants. *See* OB26. It is no response to say that § 134-A(a)(4) "does not bar drinking while carrying." AB36. That is irrelevant to the district court's erroneous award of relief that Plaintiffs never requested.

Plaintiffs try to discredit Founding-era militia laws by arguing that those laws "only prevented firing guns (not possessing them)," and "applied only to those under the influence." AB34 (quoting *United States v. Daniels*, 77 F.4th 337, 346 (5th Cir. 2023)). The laws the State identified, however, say nothing about

19

firing guns. *See* OB29. And the two laws that had provisions regulating intoxicated individuals also had provisions that applied regardless of intoxication. *See* 4-ER-0814 (1756 Maryland law); 4-ER-0853-0856 (1780 Pennsylvania law). More generally, Plaintiffs provide no basis for their argument that "[t]he purpose of these laws was to maintain military discipline—not to 'mitigate gun violence,' writ large." AB34. As the State explained, "[i]t was common for 18th and early 19th century statutes to have multiple goals." OB54 (quoting Declaration of Hendrik Hartog ¶ 23, *Koons*, No. 1:22-cv-07464 (D.N.J. Feb. 13, 2023), ECF No. 84 ("Hartog Decl.")).

Plaintiffs also try to minimize the State's nineteenth-century laws—several of which are historical twins, *see* 4-ER-0964 (1853 New Mexico law); 4-ER-0967 (1879 New Orleans ordinance); 4-ER-0955 (1890 Oklahoma law)—by arguing that they constitute "a handful of outlier municipal and territorial ordinances" and are "of too recent vintage to be relevant." AB35. Again, Plaintiffs' conception of the range of permissible historical sources is too narrow. *See supra* pp. 9-14; OB31-32. Where, as here, the government offers state, local, and territorial laws that form an unbroken tradition stretching back to and beyond the Founding, those laws can and should be considered. That is particularly true where, as here, the laws were not controversial or viewed as unconstitutional when enacted. *See* OB28.

Finally, Plaintiffs assert that "there is no 'unprecedented social concern' or 'dramatic technological changes' with respect to carrying handguns in" establishments that serve alcohol. AB35. As already explained, handgun technology has developed significantly since the Founding and Reconstruction eras. *See supra* pp. 14-15; OB24-25. These developments—particularly the exponentially greater ease and speed with which handguns can be fired—radically increase the risks that firearms pose in alcohol-fueled environments. *See generally Guns in Bars*, Everytown Rsch. & Pol'y (July 9, 2015), https://perma.cc/RBZ2-DJRH.

### c. Parks and beaches

Plaintiffs incorrectly characterize firearms prohibitions in the first modern parks as " 'localized' restrictions" that "do not establish a national tradition." AB41. But these early examples served as models for all subsequent parks. *See* 3-ER-0632 (Young Decl. ¶ 19). And the decisions to ban firearms in parks in New York City, Brooklyn, and Philadelphia in the 1850s and 1860s were followed in other cities across the Nation throughout the nineteenth century, and in state and national parks thereafter. *See* OB40-41 & n.18. Although nothing in *Bruen* requires that historical analogues cover a particular percentage of the Nation's population, *see supra* pp. 12-13, it is worth noting that even Plaintiffs' preferred sources agree that New York City, Philadelphia, and Brooklyn were the three

largest American cities at the time, *see* AB46 & nn.15-16; *Top 100 Biggest US Cities in the Year 1860*, Biggest US Cities, https://www.biggestuscities.com/1860, (last visited Nov. 21, 2023).[9]  Prohibitions on firearms in these cities' parks—which were among the first modern parks—cannot reasonably be characterized as a "handful of outlier city ordinances from the mid to late 1800s."  AB44.

Plaintiffs argue that § 134-A(a)(9) is unconstitutional for the added reason that it covers " 'vast expanses' of the great outdoors 'where people are generally free to roam.' "  AB42 (quoting *Antonyuk*, 639 F. Supp. 3d at 325, *stayed in relevant part*, No. 22-2908); *id.* at 45, 47-48 (similar argument regarding less-frequented beaches).  But the size and density of the first parks is not what made them sensitive.  As expert evidence in the record explains, the creation of state and national parks—many of which are large and sparsely populated—was motivated by the same goals that drove the creation of urban parks: "they were romantic places for quiet and passive contemplation."  3-ER-0627 (Young Decl. ¶ 10).  To preserve these "places of repose and recreation," "arms have been tightly

---

[9]  Plaintiffs try to salvage the district court's mathematical errors by pointing to a new source representing the populations of New York City and Philadelphia.  *See* AB46.  But those numbers are not reflected in the district court's cited source.  *See* 1-ER-0068 n.17.  And as already explained, the district court expressly relied on estimates for "New York's population" and "Pennsylvania's population," *id.*, which together made up nearly 22% of the Nation's population, *see* OB42.

regulated, and in many instances prohibited in parks since their creation."  3-ER-0488 (Cornell Decl. ¶ 61).

Section 134-A(a)(9) is also justified by the State's authority to regulate as a proprietor.  *See* OB34-35.  Plaintiffs selectively quote *Bonidy* for the proposition that Hawai'i "is a state actor rather than a private business, so its actions must comply with the Constitution."  AB43 (quoting 790 F.3d at 1126).  But Plaintiffs omit the next two sentences: "However, the fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis.  The government often has more flexibility to regulate when it is acting as a proprietor …."  *Bonidy*, 790 F.3d at 1126.  The State is not claiming the authority to ban firearms on all public property, but simply the authority "to manage the internal operation" of its system of parks and beaches.  *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 896 (1961).  To maintain these systems in a way that fosters recreation, relaxation, public safety, and expressive activity, the State has reasonably elected to restrict firearms.[10]

---

[10]  Plaintiffs wrongly suggest that the State's position "would mean Hawaii can ban protests on all public land."  AB 43.  Not so.  Regulations on expressive activity present entirely different considerations—inapplicable here—and even in the First Amendment context, courts recognize that the government has greater authority to restrict expressive activity when it acts as a proprietor.  *E.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) (nonpublic forum); *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (government employer).

Section 134-A(a)(9) is constitutional for the additional reason that children and families congregate at parks and beaches. *See* OB36-37. It is not the mere fact that "people" congregate there that make them sensitive; it is the application of the principle—illustrated by the examples identified in *Heller* and *Bruen*—that a place is sensitive if the people found there are particularly susceptible to the risks of gun violence. *See* OB22.

Finally, Plaintiffs suggest that state and lower federal courts have supported their position that parks and beaches are not sensitive. *See* AB42-43. Again, that is wrong. Since *Bruen*, a number of district courts have declined to enjoin laws prohibiting firearms in public parks. *See, e.g.*, *Maryland Shall Issue*, 2023 WL 4373260, at *11-12; *Kipke*, 2023 WL 6381503, at *9-10; *We the Patriots*, 2023 WL 6622042, at *9. The only post-*Bruen* injunctions against restrictions on guns in parks have been stayed by appellate courts. *See Antonyuk*, 639 F. Supp. 3d at 326, *stayed in relevant part*, No. 22-2908; *Koons*, 2023 WL 3478604, at *85, *stayed in relevant part*, No. 23-1900.

### d. Banks and financial institutions

Plaintiffs seek to limit the historical analogy that the State has drawn between § 134-A(a)(12) and the centuries-long tradition of prohibiting firearms in sensitive commercial centers. *See* OB43-45. They argue that this tradition prohibited carry only when individuals acted to terrify others. *See* AB38. But

24

these early laws are relevant because they singled out "Fairs" and "Markets," which were quintessential centers of commerce. *See* OB43; *Antonyuk*, 639 F. Supp. 3d at 292 n.66. Furthermore, the relevant "enduring principle[ ]" is that such centers are sensitive because they are particularly susceptible to the risks and dangers of firearms. *See* Transcript of Oral Argument at 40, *Rahimi*, No. 22-915. And when § 134-A(a)(12) was enacted, "the justifications and the evidence before the legislature," *id.* at 14, showed that the risk of robbery and other crime would be heightened if firearms were permitted in banks and financial institutions, given the large amounts of cash on hand, OB44-45 (testimony of key stakeholders).

Section 134-A(a)(12) is also consistent with numerous nineteenth-century laws prohibiting the carrying of firearms in places where people assembled for commercial or social purposes. *See* OB45-47. Plaintiffs' renewed effort to dissect this robust tradition and dismiss its constituents as "isolated municipal and territorial laws" and "belated innovations," AB39 (internal quotation marks omitted), fails for reasons already discussed, *see supra* pp. 9-14. Plaintiffs are also unable to counter the contemporaneous body of case law that recognized the constitutionality of these laws. *See* AB40.[11]

---

[11] As already explained, *see* OB46-47 & n.20, *Bruen* cast no doubt on the relevant discussion from *English v. State*, 35 Tex. 473 (1872). And Plaintiffs' purported

Finally, § 134-A(a)(12) is supported by the State's prerogative to restrict firearms in government buildings because banks were understood to be government instrumentalities at the Founding.  *See* OB48.  Plaintiffs try to draw a distinction between "government buildings"—on the one hand—and buildings owned by a "state-owned or controlled entity" that is "a separate legal personality from the government"—on the other.  AB38.  But while "[e]very government corporation has such a distinct personality … such an instrumentality—created and operated to fulfill a public function—nonetheless remains (for many purposes at least) part of the Government itself."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2367 (2023) (internal quotation marks and citation omitted).

### C.   Plaintiffs Are Not Likely to Succeed on Their Challenge to the Private Property Default Rule.

Even assuming Plaintiffs have standing to challenge the private property default rule, they have failed to show that the plain text of the Second Amendment covers their conduct.  The record also makes clear that the default rule is consistent with the Nation's historical tradition of firearm regulation.

---

bases for distinguishing *Hill v. State*, 53 Ga. 472 (1874), *Andrews v. State*, 50 Tenn. 165 (1871), and *State v. Shelby*, 2 S.W. 468 (Mo. 1886), *see* AB40, do not undermine those decisions' approval of laws prohibiting firearms in commercial and social assemblies.

### 1. Plaintiffs' Conduct Does Not Fall Within the Plain Text of the Second Amendment.

The right to public carry does not include a right to carry on other people's private property. *See* OB49-52; Property Law Professors' Br. 21-26. *Bruen*'s holding that the "definition of 'bear' naturally encompasses public carry," 142 S. Ct. at 2134, does not change this. Plaintiffs suggest that the "concept of implied license operates to grant permission to enter another's premises according to custom or other indicia of consent," AB49 (internal quotation marks and alteration omitted), but the relevant "custom" and "indicia" are defined by state law, which requires authorization to carry on private property. Whether to authorize firearms is a choice that belongs to property owners. Because Plaintiffs have no Second Amendment right to carry firearms on others' private property, they have no right to a legal rule that requires property owners to authorize carry in a particular way.[12] Nothing in the Constitution's text, or in *Bruen*, suggests that the Second Amendment was intended to federalize rules of state property law in the manner Plaintiffs have urged.

---

[12] Plaintiffs cite *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635 (9th Cir. 1991), but that case is distinguishable. The Court held that it was unconstitutional to require residents to post a "Solicitors Welcome" sign to receive uninvited door-to-door solicitors on the ground that the city could not impose "affirmative obligations on the *residents'* first amendment rights to *receive* speech." *Id.* at 639 (emphases added). No such right is implicated here.

### 2. HRS § 134-E Is Consistent with the Nation's Historical Tradition of Firearms Regulation.

Numerous historical laws prohibited carrying firearms on private property without consent. *See* OB52-56. Plaintiffs mischaracterize these as "anti-poaching laws," AB51, but even the example cited by Plaintiffs states that no one shall "carry any gun *or* hunt" absent authorization, *id.* (quoting 5-ER-1045) (emphasis added). The historical analogues in question prohibited carrying firearms onto private property without consent; they *also*, in some cases, regulated hunting. *See* OB54; Hartog Decl. ¶¶ 21-23.

Plaintiffs take issue with the State's reliance on *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), noting that "[t]he Eleventh Circuit framed that case as one that pitted the right to carry against the right to exclude by privately owned places of worship." AB52. So it did. The issue in *GeorgiaCarry.Org* was the constitutionality of a Georgia statute that, like § 134-E, restricted carrying firearms in a private establishment without authorization. 687 F.3d at 1248-49. The court held that the law was not unconstitutional on its face because it was "capable of numerous constitutional applications," including where the establishment denied authorization. *Id.* at 1266. Here, at a minimum, Plaintiffs' request for facial relief must likewise be rejected because § 134-E is constitutional as applied to property owners who affirmatively deny authorization.

## II.     The Other Injunction Factors Favor the State.

The balance of the equities and the public interest also weigh strongly in the State's favor given the State's significant interest in enforcing its duly enacted laws.  The Legislature—in accordance with the overwhelming preference of Hawai'i's residents[13]—made a careful and reasoned judgment that the public interest favors restricting firearms in certain sensitive locations where firearms present special dangers.  That assessment of the public interest is an important consideration when deciding whether to enter an injunction because "[t]he public has a compelling interest in promoting public safety."  *Duncan v. Bonta*, 83 F.4th 803, 807 (9th Cir. 2023) (en banc).

Plaintiffs advance various arguments about the exact number of deaths that concealed carry permit holders have been responsible for, and they discuss laws pertaining to those with certain medical conditions.  *See* AB54-57.  But they do not address the other sources, cited at OB57-58, that show that increases in concealed carrying can lead to increases in crime and violence through a variety of

---

[13] *E.g.*, Ward Research Inc., *Public Opinion of Gun Safety Laws (Online Survey of Hawai'i Residents)* 11 (Feb. 2023), https://perma.cc/DSD3-6X59 (91% favor prohibiting firearms in playgrounds and places serving alcohol; 90% favor prohibiting firearms in government buildings); Julia A. Wolfson et al., *US Public Opinion on Carrying Firearms in Public Places*, 107 AJPH 929, 935 (2017) ("The American public, including gun owners, overwhelmingly prefers to prohibit gun carrying in places where alcohol is served and tensions can sometimes run high, such as bars ….").

mechanisms.  And Plaintiffs miss the broader point that the State has a compelling interest in regulating the presence of guns in places where they present special dangers to public safety.

## CONCLUSION

The Court should vacate the district court's preliminary injunction. At a minimum, the injunction should be narrowed.

Dated: November 21, 2023

ANNE E. LOPEZ
  *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
  *Solicitor General*
NICHOLAS M. MCLEAN
  *First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
ALEXANDRA LICHTENSTEIN
  *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

Respectfully submitted,

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
DANA A. RAPHAEL
  *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

BEN GIFFORD
  *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16164

I am the attorney or self-represented party.

**This brief contains** | 6,940 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [         ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Neal Kumar Katyal | **Date** | 11/21/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 21, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal