No. 23-16164

# In the United States Court of Appeals
## for the Ninth Circuit

―――――――――――

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI;
HAWAII FIREARMS COALITION,
*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of
the State of Hawaii,
*Defendant-Appellant*.

**On Appeal from the United States District Court For the District of Hawaii
Civ. No. 1:23-cv-00265—LEK-WRP, Hon. Leslie E. Kobayashi**

―――――――――――

**COMBINED PETITION FOR PANEL REHEARING
AND PETITION FOR REHEARING *EN BANC***

―――――――――――

KEVIN GERARD O'GRADY
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Kevin@KevinOGradyLaw.Com

ALAN ALEXANDER BECK
Attorney at Law
2692 Harcourt Drive
San Diego, California 92123
(619) 905-9105
Alan.alexander.beck@gmail.com

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

FRAP 35(b) STATEMENT ........................................................................1

BACKGROUND ........................................................................................2

REASONS FOR GRANTING REHEARING EN BANC .......................................3

    I.     The Panel Opinion Conflicts With *Bruen*, *Rahimi* And *Antonyuk* ...........................................................................................3

         A.     The Panel's Decision Conflicts With *Antonyuk* ........................3

         B.     The 1865 Louisiana and the 1771 New Jersey Laws Are Not Proper Analogues Under *Bruen* and *Rahimi* ......................6

         C.     The Panel Opinion Makes It Impossible to Carry a Firearm for Lawful Self-Defense As A Practical Matter..........10

    II.     The Panel's Decision Conflicts With *Bruen*, *Rahimi* And The Holdings Of Three Other Circuits ........................................................13

CONCLUSION ........................................................................................16

CERTIFICATE OF COMPLIANCE ........................................................................17

OPINION

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023), *vacated and remanded*,
    144 S.Ct. 2709 (2024)............................................................................1, 4, 11

*Antonyuk v. Hochul*,
    639 F.Supp.3d 232 (N.D.N.Y. 2022) ...........................................................1

*Antonyuk v. James*,
    144 S.Ct. 2709 (2024).....................................................................................4

*Cedar Point Nursery v. Hassid*,
    141 S.Ct. 2063 (2021)....................................................................................11

*Christian v. Nigrelli*,
    642 F.Supp.3d 393 (W.D.N.Y. 2022).....................................................1, 9, 10

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..........................................................................................6

*Espinoza v. Montana Department of Revenue*,
    591 U.S. 464 (2020)........................................................................................12

*Kipke v. Moore*,
    695 F.Supp.3d 638 (D.Md. 2023), *appeals pending*
    No. 24-1799(L) (4th Cir.) ........................................................................1, 4, 6

*Koons v. Platkin*,
    673 F.Supp.3d 515 (D.N.J., 2023), *appeal pending*
    No. 23-1900 (3d Cir.) ..............................................................................*passim*

*Lara v. Commissioner Pennsylvania State Police*,
    91 F.4th 122 *rehearing en banc denied*, 97 F.4th 156 (3d Cir.),
    *petition for cert. filed*, No. 24-93 (U.S. July 25, 2024) ............................2, 15

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..................................................................................... 6, 7

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    597 U.S. 1 (2022)....................................................................................*passim*

*United States v. Connelly*,
    --- F.4th ----, 2024 WL 3963874 (5th Cir. Aug. 28, 2024) ..................2, 8, 16

*United States v. Henry*,
    688 F.3d 637 (9th Cir. 2012) ..........................................................15

*United States v. Rahimi*,
    144 S.Ct. 1889 (2024).................................................1, 8, 13, 14

*Worth v. Jacobson*,
    108 F.4th 677 (8th Cir. 2024), *rehearing en banc denied*,
    2024 WL 3892865 (8th Cir. Aug. 21, 2024).............................................2, 16

*Zimmerman v. Oregon Dept. of J.,*
    170 F.3d 1169 (9th Cir. 1999) ........................................................4

## COURT RULES

Federal Rules of Appellate Procedure, rule 35(b)(1)(A) ...........................................1

Federal Rules of Appellate Procedure, rule 35(b)(1)(B) ......................................2, 4

## STATUTES

Haw. Rev. Stat.§ 134-9.1(a) .......................................................................2

Haw. Rev. Stat.§ 134-9.5.......................................................................3, 12

Haw. Rev. Stat.§ 134-9.5(b)......................................................................2

## OTHER AUTHORITIES

https://bit.ly/3XptQAC...........................................................................6

https://bit.ly/4e9y5Hs...........................................................................7

https://lasc.libguides.com/c.php?g=1331841&p=9819838 ......................................6

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for
    "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183
    (2020).....................................................................................11, 12

Ian Ayres and Robert Gertner, *Filling Gaps in Incomplete Contracts:
    An Economic Theory of Default Rules*, 99 Yale L J 87 (1989).....................11

Joseph Blocher & Darrell A. H. Miller, *What is Gun Control? Direct Burdens Incidental Burdens, and the Boundaries of the Second Amendment*, 83 University of Chicago Law Review 295 (2016) .................12

Petition for Certiorari in No. 23-910, *Antonyuk v. James*, https://bit.ly/4gwBbr4 (last viewed September 13, 2024)..............................4

## FRAP 35(b) STATEMENT

In this case, the Panel upheld Hawaii's ban on carrying firearms on private property open to the public ("the default rule"). That holding conflicts with every court which has reviewed a similar law. And it effectively stripped Hawaiians of the "general right" to carry firearms in public protected by the Second Amendment as construed and applied by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S.Ct. 1889 (2024). Rehearing en banc is thus appropriate under Rule 35(b)(1)(A), FRAP.

The Panel's ruling also directly conflicts with *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *vacated and remanded*, 144 S.Ct. 2709 (2024),[1] as well as with district court rulings in Maryland and New Jersey. *See Kipke v. Moore*, 695 F.Supp.3d 638, 646 (D.Md. 2023), *appeals pending* No. 24-1799(L) (4th Cir.) (consolidated); *Koons v. Platkin*, 673 F.Supp.3d 515, 607 (D.N.J., 2023), *appeal pending* No. 23-1900 (3d Cir.).[2] The Panel gave equal and decisive weight to Reconstruction and post-Reconstruction era laws, and those rulings conflict with

---

[1] The Second Circuit affirmed rejection of New York's default rule in *Christian v. Nigrelli,* 642 F.Supp.3d 393, 398 (W.D.N.Y. 2022) and in *Antonyuk v. Hochul*, 639 F.Supp.3d 232, 248 (N.D.N.Y. 2022).

[2] The Third Circuit unanimously voted to deny a motion to stay the preliminary injunction granted against New Jersey's default rule. *Koons v. Att'y Gen.,* No. 23-1900, ECF # 29 (3d Cir. June 20, 2023).

*Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122, 134 (2024), *Worth v. Jacobson*, 108 F.4th 677, 696 (8th Cir. 2024), and *United States v. Connelly*, --- F.4th ----, 2024 WL 3963874 (5th Cir. Aug. 28, 2024), all of which reject according such weight to Reconstruction era laws in applying *Bruen* and *Rahimi*. These inter-circuit conflicts present questions of "exceptional importance" under Rule 35(b)(1)(B), FRAP.

## BACKGROUND

In 2023, the Hawaii legislature enacted Act 52, specifically to counter *Bruen*. The statute generally criminally prohibits a person with a carry permit from bringing a handgun onto fifteen types of property. Haw. Rev. Stat.§ 134-9.1(a). The law also flips the default rule on all private property. Whereas the old rule allowed a person with a carry permit to bring firearms onto private property unless the owner prohibited it, the new rule generally prohibits the carry of firearms onto private property unless the owner affirmatively gives permission by "[u]nambiguous written or verbal authorization" or by the "posting of clear and conspicuous signage." *Id.* § 134-9.5(b).

ACT 52 bill restricts the carrying of a handgun even with a valid concealed carry permit in 96.4% of the publicly accessible land in Maui County which is where the individual plaintiffs reside. 2-ER-308-318. Plaintiffs are three residents of the County of Maui and an organizational plaintiff which has members who have been

issued concealed carry permits in Hawaii. 5-ER-1138-1139. All individual plaintiffs possess a valid license to carry a handgun. 5-ER-1150-1151. Prior to the enactment of ACT 52, all three individual plaintiffs carried handguns at beaches, parks, restaurants that serve alcohol and on private property locations otherwise open to the public. 6-ER-13166-1327 (Declaration of Jason Wolford); 6-ER-1331-1342 (Declaration of Alison Wolford); 6-ER-1345-1355 (Declaration of Atom Kasprzycki). But for the challenged regulations, Plaintiffs would carry in all the areas at issue in this litigation. *Id.*

## REASONS FOR GRANTING REHEARING EN BANC

### I.   The Panel Opinion Conflicts With *Bruen*, *Rahimi* And *Antonyuk*

####    A.   The Panel's Decision Conflicts With *Antonyuk*

The Panel struck down California's default rule, but sustained Hawaii's default rule on the grounds that in "California, a property owner may consent to the carrying of firearms only by 'clearly and conspicuously post[ing] a sign at the entrance of the building or on the premises indicating that license holders are permitted to carry firearms on the property.' *Id.* Other forms of permission, such as oral or written consent, do not suffice." Slip op. at 20. The Panel found Hawaii's default rule constitutional because Hawaii's law permitted a private property owner to consent to carry either through posting a sign, verbally or in writing. *See* H.R.S. § 134-9.5. Slip op. at 67. The Panel did not dispute that Hawaii's law is identical to

the New York law enjoined in *Antonyuk v. Chiumento,* 89 F.4th at 379, as well as by district courts in Maryland, *Kipke,* 695 F.Supp.3d at 646 (describing Maryland law as requiring either a posted sign or express consent to carry a firearm on private property), and in New Jersey, *Koons v. Platkin,* 673 F.Supp.3d at 607 (same). Until now, no court has sustained such a default rule.

The Panel acknowledged "that our primary holding—that a national tradition likely exists of prohibiting the carrying of firearms on private property without the owner's oral or written consent—differs from the decisions by the Second Circuit and some district courts." Slip op. 68. That recognized circuit split is enough to warrant rehearing en banc. See Rule 35(b)(1)(B), FRAP. This Court has long recognized that creating a circuit split should be done "only after the most painstaking inquiry" *Zimmerman v. Oregon Dept. of J.,* 170 F.3d 1169, 1184 (9th Cir. 1999). The Panel's decision fails that test.

While *Antonyuk* was vacated by the Supreme Court and remanded for further consideration in light of *Rahimi*, *Antonyuk v. James,* 144 S.Ct. 2709 (2024), the plaintiffs in *Antonyuk* did not seek review of the Second Circuit's decision with respect to the default rule and the State of New York did not file a cross-petition.[3] Nothing in *Rahimi* addressed the Second Circuit's application of *Bruen* with respect

---

[3] *See* Petition for Certiorari in No. 23-910, *Antonyuk v. James*, https://bit.ly/4gwBbr4 (last viewed September 13, 2024).

to the default rule. There is no reason to think that the Second Circuit will revisit its prior ruling on that point on remand after *Rahimi*.

Quite to the contrary. New York's default rule was challenged in both *Antonyuk* and in *Christian*, and New York's appeal in *Christian* was consolidated with its appeal in *Antonyuk*. But only the *Antonyuk* plaintiffs sought Supreme Court review and thus the Second Circuit has reinstated its mandate in *Christian*. See *Antonyuk v. James*, No. 22-2908(L), ECF # 437 (2d Cir. August 30, 2024). With the reissuance of the court's mandate in *Christian*, the Second Circuit's invalidation of the default rule became binding circuit precedent. The conflict with *Antonyuk* on the default rule is thus unaffected by the remand ordered in *Rahimi* with respect to the *Antonyuk* plaintiffs.

The default rule is also pending before the Third Circuit in *Koons v. Att'y Gen.,* No. 23-1900 (3d Cir. June 20, 2023), in an appeal from the district court's decision invalidating New Jersey's law in *Koons,* 673 F.Supp.3d at 607-623. Oral argument in that appeal was held October 25, 2023, and a decision by the Third Circuit is likely quite soon. To avoid unnecessary or ill-advised circuit splits, the Court should, at the very least, hold this petition pending the Third Circuit's decision in *Koons* and then reexamine its ruling once the Third Circuit issues its decision.

5

**B.** **The 1865 Louisiana and the 1771 New Jersey Laws Are Not Proper Analogues Under *Bruen* and *Rahimi***

After correctly finding that carrying on private property falls within the scope of the Second Amendment right, the Panel also correctly held that "those laws likely did not apply to property that was generally open to the public" and that "the primary aim of some of those laws was to prevent poaching." Slip op. at 66. However, the Panel went astray when it relied on two laws, a New Jersey law enacted in 1771 and a Louisiana law enacted in 1865, to sustain Hawaii's default rule. Slip op. at 67. The Panel's decision was based *solely* on these two laws and that reliance was error for multiple reasons.

First, the Louisiana 1865 law was part of the Louisiana Black Codes,[4] and was enacted right after the Civil War before Louisiana was readmitted to the Union.[5] The Black Codes were designed to deprive newly freed slaves of their civil rights, including the right to keep and bear arms otherwise protected by State law. See *McDonald v. City of Chicago*, 561 U.S. 742, 771, 779 (2010); *District of Columbia v. Heller,* 554 U.S. 570, 614 (2008). This Court should "not infer a historical tradition of regulation consistent with the private building consent rule" from such a statute. *Kipke,* 695 F. Supp. at 659, citing *McDonald*, 561 U.S. at 771. *See also Koons*, 673 F. Supp.3d at

---

[4] See https://lasc.libguides.com/c.php?g=1331841&p=9819838.

[5] Louisiana was readmitted to the Union on July 9, 1868. https://bit.ly/3XptQAC

568-69. To our knowledge, *no court* has relied on any Black Codes statute as a suitable analogue under *Bruen*, especially where such a law was enacted by a former Confederate State *prior to* being readmitted to the Union and before Congress had enacted The Freemen's Bureau Act of 1866 or the Civil Rights Act of 1866. *See McDonald*, 561 U.S. at 774-75. The Panel's decision is the first. A law designed to disarm former slaves in a Confederate State cannot be a proper part of our nation's historical tradition of regulation. Full stop. The Panel erred by giving weight (and this Court's official imprimatur) to such a law.

That leaves only New Jersey's 1771 law[6] which generally banned "the carrying of firearms on any lands owned by another." Slip op. at 65. That law is both an outlier and not comparable to Hawaii's law. An analogue need not be a "historical twin," but it must be "well-established and *representative,*" and it can serve as an analogue only if it "distinctly similar" and comparable to "how" and "why" a law restricted the general right to carry in public. *Bruen*, 597 U.S. at 29-30 (emphasis added). *Bruen* expressly rejected placing "meaningful weight" on a "solitary statute," 597 U.S. at 49, and further held that "three colonial regulations" were insufficient "to show a tradition of public-carry regulation. 597 U.S. at 46.

---

[6] The full text of the law is available at https://bit.ly/4e9y5Hs.

Similarly, in *Rahimi*, the surety and affray laws on which the Court relied were rooted in the common law at the time of founding *and* codified in founding era statutes in "at least four States—Massachusetts, New Hampshire, North Carolina, and Virginia." *Rahimi,* 144 S.Ct. at 1901. "Outlier" regulations do not and cannot establish a national tradition. *Bruen*, 597 U.S. at 30, 55 n.22, 65, 70. *See also United States v. Connelly*, --- F.4th ----, 2024 WL 3963874 at *9 (5th Cir. Aug. 28, 2024) (rejecting the use of "three states, between 1868 and 1883, [which] barred citizens from carrying guns while drunk: Kansas, Missouri, and Wisconsin").

New Jersey's 1771 law is not a proper analogue for other reasons. To be a relevant analogue a law must impose "a comparable burden on the right of armed self-defense" and that "burden" must be "comparably justified" and that means "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen,* 597 U.S. at 29. "Why and how the regulation burdens the right are central to this inquiry." *Rahimi*, 144 S.Ct. at 1898 (citation omitted). The New Jersey "why" for its 1771 ban was to stop people from *trespassing* on private land with firearms and to prevent *poaching*. The 1771 law was entitled: "An ACT for the Preſervation of Deer and other Game, and to prevent treſpaſing with Guns." The Panel thus rightly found that "the purpose of that specific provision—found in Section 1 of the Act— was '*to prevent trespassing with Guns*'" and "to preserve game," found in Section 2. Slip op. at 66 (emphasis added) (quoting Section 1 of the law).

8

The "why" of the 1771 law is not remotely comparable to the "why" of Hawaii's law. A person on private property otherwise open to the public is simply not "trespassing," much less poaching. *See Koons*, 673 F.Supp.3d at 612-13; *Christian*, 642 F.Supp.3d at 407-408. There is no evidence that the 1771 New Jersey law was "ever enforced" against anyone who was neither a poacher nor a trespasser. *See Bruen*, 597 U.S. at 58 (looking to enforcement history). *Bruen* holds that "[t]o the extent there are multiple plausible interpretations of [statutes]," a court must "favor the one that is more consistent with the Second Amendment's command." *Id*. at 597 U.S. at 44 n.11. The Panel did the opposite.

Certainly, nothing in history or tradition supports the Panel's distinction between California's default rule, properly struck down by the Panel, and Hawaii's default rule. Slip op. at 67. While the burdens on the Second Amendment right may be ever so slightly less under Hawaii's law, the relative burdens are *irrelevant* under *Bruen*. 597 U.S. at 29 n.7 ("courts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry"). What matters here is the law of "trespass" and a "trespass" does not turn in the slightest on the size of the sign or whether permission is given orally or otherwise. Hawaii's law fails for the same reasons California's law fails.

9

**C.    The Panel Opinion Makes It Impossible to Carry a Firearm for Lawful Self-Defense As A Practical Matter**

*Bruen* held that "the Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." 597 U.S. at 33. Private property open to the public are part of that "public" space. As *Bruen* held, "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." 597 U.S. at 31. *Bruen* found that such a rule swept "far too broadly" because it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." Hawaii's rule effectively does the same thing and is unconstitutional for the same reasons.

At the founding, "private property owners" had the sole right to "exclude others from their property" and thus carry on private property was "generally permitted absent the owner's prohibition." *Christian,* 642 F. Supp. 3d at 407, *affirmed in relevant part*, *Antonyuk*, 89 F.4th. at 386. That conclusion flows from the law of trespass, specifically "the well-developed concept of implied license." *Koons*, 2023 WL 3478604 at *58. Generally, the public has implied consent to enter property open to the public, "unless such consent is conditioned or subsequently revoked by the property owner." *Id.* And because "[t]he right to armed self-defense follows the individual everywhere he or she lawfully goes" in public, carrying on

10

property open to the public is permitted unless the owner "withdraw[s] consent[.]" *Id.* at *61.

To be sure, there is a historical tradition of allowing private-property owners to decide whether to exclude firearms and people from their property. *See Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). But that power resides with the *property owner*, not the government. There is no comparable historical—or even modern-day—tradition of allowing the government to create a no-carry default for private property open to the public. *Antonyuk*, 89 F.4th. at 386 ("The State has produced no evidence that those terms were in fact otherwise understood to apply to private property open to the public or that the statutes were in practice applied to private property open to the public."). "The Nation's historical tradition is that individuals may carry arms on private property unless the property owner chooses otherwise." *Christian*, 642 F.Supp.3d at 407 n.19. The "general right to public carry" cannot be restricted absent "*exceptional circumstances*" and Hawaii's default rule is not such an "exceptional circumstance." *Bruen*, 597 U.S. at 38 (emphasis added).

Default rules are inherently sticky. *See generally* Ian Ayres and Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 Yale L J 87 (1989). The default rule was designed to make carrying firearms very inconvenient, so that fewer people will carry them. Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults*

*on Private Land*, 48 J.L. Med. & Ethics 183, 184 (2020). As the Panel noted (slip op. at 62), Hawaii adopted its default rule knowing that it would be an effective means of discouraging lawful carry. *See* Joseph Blocher & Darrell A. H. Miller, *What is Gun Control? Direct Burdens Incidental Burdens, and the Boundaries of the Second Amendment*, 83 University of Chicago Law Review 295, 316 (2016) ("Though both of these rules give business owners the final say over whether to permit guns, the former regime would almost certainly result in less gun carrying overall due to the inevitable stickiness of default rules."). That purpose, which is to discourage the exercise of a constitutional right, is illegitimate. *See, e.g., Espinoza v. Montana Department of Revenue*, 591 U.S. 464, 478 (2020).

The record bears out this practical reality. In the trial court, Plaintiffs submitted the declarations of business owners who would be willing to let people carry firearms in their stores but have not put up a sign. 2-ER-0319-0360 (Declarations of Maui Business Owners). As the Panel noted, "many property owners will not post signs of any sort or give specialized permission, regardless of the default rule" and that reality was "the impetus" for Hawaii's rule. Slip op. at 62. The net result of §134-9.5 is that Hawaiians, including Plaintiffs, no longer may carry firearms for lawful self-defense in tens of thousands of private property locations in Hawaii. That result is impossible to square with the "general right" to carry in public recognized in *Bruen*.

12

II.     **The Panel's Decision Conflicts With *Bruen*, *Rahimi* And The Holdings Of Three Other Circuits**

Noting that "the laws at issue here are *state* laws," the Panel stated "[w]e thus agree with the Second Circuit [in *Antonyuk*] that, at least when considering the "sensitive places" doctrine, we look to the understanding of the right to bear arms *both* at the time of the ratification of the Second Amendment in 1791 and at the time of the ratification of the Fourteenth Amendment in 1868." Slip op. 36 (emphasis the Panel's). The Panel then applied that ruling across the board to parks and beaches (slip op. at 41, 45), restaurants that serve alcohol (*id.* at 47-48), and places of amusement (*id.* at 50-51). In each instance, the Panel looked to and heavily relied on Reconstruction and/or post-Reconstruction era laws. The Panel's holding cannot be reasonably based on *Antonyuk*, as the Panel supposed. The plaintiffs in *Antonyuk* sought Supreme Court review *on this very question*. *See* note 5, *supra*. Thus, the GVR in *Antonyuk* must be read as a direction to the Second Circuit to reconsider its holding on this very point in light of *Rahimi*.

*Rahimi* addressed this issue directly, holding that judges are required to apply "'faithfully the balance struck *by the founding generation* to modern circumstances.'" *Rahimi*, 144 S.Ct. at 1891, quoting *Bruen*, at 29 n.7 (emphasis added). That focus on "the balance struck by the founding generation" is repeated throughout the opinion where the *Rahimi* Court relied exclusively on founding era analogues and traditions. *Id.* at 1896-99, 1901. While the Court in *Rahimi* found it

13

"unnecessary" to decide formally whether courts should "primarily rely on the prevailing understanding" in 1789 or 1868 (*id.* at 1898 n.1), the Court did not even cite a *single* Reconstruction era or later statute, practice or tradition.

*Rahimi*'s focus on the founding was not by accident. Justice Barrett explored this issue of the relevant era at length in her concurrence. 144 S.Ct. at 1924 (Barrett, J., concurring ("the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law"), as did Justice Gorsuch, 144 S.Ct. at 1908 (Gorsuch, J. concurring) ("litigants and courts alike must consult history when seeking to discern the meaning and scope of a constitutional provision" and they "'must exercise care'" in doing so) (quoting Justice Barrett's concurrence, at 1925 n.*). Not a single Justice suggested that a different inquiry was appropriate for state laws. The GVR in *Antonyuk* told the Second Circuit to address this point in a state law context. The Panel acknowledges none of this analysis. This Court should at least hold this petition until the Second Circuit has had an opportunity to reconsider its ruling as ordered by the Supreme Court.

*Rahimi*'s focus on the founding faithfully applied *Bruen* which held that "we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 597 U.S. at 37. *Bruen* explains that "post-

Civil War discussions of the right to keep and bear arms 'took place 75 years [or more] after the ratification of the Second Amendment,'" so "'they do not provide as much insight into its original meaning as earlier sources.'" *Bruen,* 597 U.S. at 66. Thus, a right incorporated under the Fourteenth Amendment brings with it the *original* meaning of the right as it was understood at the time of the founding, not some new version based on 1868 understandings. *Bruen* makes that clear, stating "we have generally assumed that the scope of the protection applicable to the Federal Government *and States* is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." 597 U.S. at 37 (emphasis added). That this case involves a state law is thus irrelevant, and the Panel erred in holding to the contrary. That error led to the Panel's extensive and misplaced reliance on Reconstruction and post-Reconstruction era laws.

The Panel's approach not only conflicts with *Bruen's* and *Rahimi*'s reasoning,[7] but it also created a split with the decisions of **three** other circuits, two of which were decided post-*Rahimi*. In *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122, 134, *rehearing en banc denied*, 97 F.4th 156 (3d Cir.), *petition for cert. filed*, No. 24-93 (U.S. July 25, 2024), the Third Circuit held, in a state law case, that "the Second Amendment should be understood according to its public meaning in 1791."

---

[7] Supreme Court reasoning is binding in this circuit. *See*, *e.g.*, *United States v. Henry*, 688 F.3d 637, 641-42 (9th Cir. 2012).

Likewise in *Worth v. Jacobson*, 108 F.4th 677, 696 (8th Cir. 2024), *rehearing en banc denied*, 2024 WL 3892865 (8th Cir. Aug. 21, 2024), the Eighth Circuit affirmed, in a state law case post-*Rahimi*, the district court's refusal to consider Reconstruction era and later statutes, holding that "it is questionable whether the Reconstruction era sources have much weight." In *Connelly*, the Fifth Circuit refused to give any weight, post-*Rahimi*, to Reconstruction era and later laws proffered by the government. *Connelly*, 2024 WL 3963874, at *9 ("Offering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin."). The Panel ignored *Lara*, *Worth*, and *Connelly*, and thus failed to conduct the required "painstaking inquiry" with respect to this critically important doctrinal point. Rehearing en banc is appropriate to address these conflicts.

## CONCLUSION

For the foregoing reasons, the petition for rehearing or rehearing en banc should be granted.

Dated: September 17, 2024.          Respectfully submitted,

/s/ *Kevin O'Grady*

Kevin Gerard O'Grady

/s/ *Alan Beck*

Alan Alexander Beck

Counsel for Plaintiffs

16

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

**9th Cir. Case Number(s)** 23-16164

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[XX] Prepared in a format, typeface, and type style that complies with Fed. R. App.
P.

32(a)(4)-(6) and **contains the following number of words:** 3,867**.**

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[  ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.


Dated: September 17, 2024.           Respectfully submitted,


                                     /s/ *Alan Beck*
                                     Alan Alexander Beck
                                     Counsel for Plaintiffs

# OPINION

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, | No.23-16164 |
| | D.C. No. 1:23-cv-00265-LEK-WRP |
| *Plaintiffs-Appellees*, | |
| v. | |
| | OPINION |
| ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaii, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the District of Hawaii
Leslie E. Kobayashi, District Judge, Presiding

| | |
|---|---|
| MARCO ANTONIO CARRALERO; GARRISON HAM; MICHAEL SCHWARTZ; ORANGE COUNTY GUN OWNERS PAC; SAN DIEGO COUNTY GUN OWNERS PAC; CALIFORNIA GUN RIGHTS FOUNDATION; FIREARMS | No. 23-4354 |
| | D.C. No. 8:23-cv-01798-CJC-ADS |

2                     WOLFORD V. LOPEZ

POLICY COALITION, INC.,

            *Plaintiffs - Appellees*,

    v.

ROB BONTA, in his official capacity
as Attorney General of California,

            *Defendant – Appellant*.


RENO MAY, an
individual; ANTHONY MIRANDA,
an individual; ERIC HANS, an
individual; GARY BRENNAN, an
individual; OSCAR A. BARRETTO,
Jr., an individual; ISABELLE R.
BARRETTO, an individual; BARRY
BAHRAMI, an individual; PETE
STEPHENSON, an
individual; ANDREW HARMS, an
individual; JOSE FLORES, an
individual; Dr. SHELDON HOUGH,
DDS, an individual; SECOND
AMENDMENT
FOUNDATION; GUN OWNERS
OF AMERICA, INC.; GUN
OWNERS FOUNDATION; GUN
OWNERS OF CALIFORNIA,
INC.; LIBERAL GUN OWNERS
ASSOCIATION; CALIFORNIA
RIFLE & PISTOL ASSOCIATION,

No. 23-4356

D.C. No.
8:23-cv-01696-
CJC-ADS

*Plaintiffs - Appellees*,

v.

ROBERT BONTA, in his official
capacity as Attorney General of the
State of California,

*Defendant - Appellant*,

DOES, 1-10,

*Defendant*.

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted April 11, 2024
San Francisco, California

Filed September 6, 2024

Before: Mary M. Schroeder, Susan P. Graber, and Jennifer
Sung, Circuit Judges.

Opinion by Judge Graber

## SUMMARY[*]

### Second Amendment

The panel affirmed in part and reversed in large part district court orders preliminarily enjoining the implementation or enforcement of several provisions of Hawaii and California laws that prohibit the carry of firearms at sensitive places.

Hawaii generally prohibits a person with a carry permit from bringing a firearm onto fifteen types of property, and generally prohibits the carry of firearms onto private property unless the owner allows it.

California generally prohibits a person with a concealed-carry permit from carrying a firearm onto more than two dozen types of property. California also generally prohibits the carry of firearms onto private property that is open to the public unless the owner allows it by clearly posting a sign at the entrance to the premises indicating that licenseholders are permitted to carry firearms onto the property.

Plaintiffs, individuals with concealed-carry permits and various organizations whose members hold concealed-carry permits, brought actions against the Attorney General of the State of Hawaii and the Attorney General of the State of California, alleging that the laws violate their Second Amendment right to keep and bear arms.

Applying the guidance in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), on how to determine

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

what kinds of places qualify as sensitive places such that firearms may be prohibited, the panel held that some—but not all—of the places specified by the Hawaii and California laws likely fall within the national tradition of prohibiting firearms at sensitive places.

The panel concluded that the proper approach for determining whether a place is sensitive is as follows: For places that have existed since the Founding, it suffices for Defendants to identify historical regulations similar in number and timeframe to the regulations that the Supreme Court cited as justification for designating other places as sensitive. For places that are newer, Defendants must point to regulations that are analogous to the regulations cited by the Supreme Court, taking into account that it is illogical to expect a government to regulate a place before it existed in its modern form. Historical regulations need not be a close match to the challenged law; they need only evince a principle underpinning our Nation's historical tradition of regulating firearms in places relevantly similar to those covered by the challenged law.

Applying these principles to the Hawaii statute, the panel affirmed the district court's preliminary injunction to the extent that it enjoins restrictions on firearms at financial institutions, parking lots adjacent to financial institutions, and parking lots shared by government buildings and non-governmental buildings. The panel reversed the preliminary injunction to the extent that it enjoins restrictions on firearms at bars and restaurants that serve alcohol; at beaches, parks, and similar areas; and in parking areas adjacent to all of those places. The panel also reversed the preliminary injunction with respect to the new default rule prohibiting the carry of firearms onto private property without consent.

Applying these principles to the California statute, the panel affirmed the district court's preliminary injunction to the extent that it enjoins restrictions on firearms at hospitals and similar medical facilities, public transit, gatherings that require a permit, places of worship, financial institutions, parking areas and similar areas connected to those places. The panel also affirmed the district court's preliminary injunction with respect to the new default rule as to private property. The panel reversed the preliminary injunction to the extent it enjoins restrictions prohibiting firearms at bars and restaurants that serve alcohol, playgrounds, youth centers, parks, athletic areas, athletic facilities, most real property under the control of the Department of Parks and Recreation or the Department of Fish and Wildlife, casinos and similar gambling establishments, stadiums, arenas, public libraries, amusement parks, zoos, and museums; parking areas and similar areas connected to those places; and all parking areas connected to other sensitive places listed in the statute.

---

## COUNSEL

Alan A. Beck (argued), Law Offices of Alan Beck, San Diego, California; Kevin G. O'Grady, Law Office of Kevin O'Grady LLC, Honolulu, Hawaii; for Plaintiffs-Appellees.

Neal K. Katyal (argued) and Dana A. Raphael, Hogan Lovells US LLP, Washington, D.C.; Benjamin A. Gifford, Alexandra Lichtenstein, Mary McCord, and Shelby Calambokidis, Georgetown University Law Center, Institute for Constitutional Advocacy and Protection, Washington, D.C.; Nicholas M. McLean, First Deputy Solicitor General; Kalikoʻonālani D. Fernandes, Deputy Solicitor General;

Anne E. Lopez, Hawaii Attorney General, Office of the Attorney General Hawaii, Honolulu, Hawaii; for Defendant-Appellant.

Thomas M. Bondy, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; Melanie Hallums, Orrick Herrington & Sutcliffe LLP, New York, New York; Esther Sanchez-Gomez, Giffords Law Center to Prevent Gun Violence, San Francisco, California; Douglas N. Letter and Shira Lauren Feldman, Brady Center to Prevent Gun Violence, Washington, D.C.; for Amici Curiae Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence.

Ashwin P. Phatak, Principal Deputy Solicitor General; Caroline S. Van Zile, Deputy Attorney General; Brian L. Schwalb, Attorney General for the District of Columbia; Office of the District of Columbia Attorney General, Washington, D.C.; Sarah A. Hunger, Deputy Solicitor General; Jane E. Notz, Solicitor General; Kwame Raoul, Attorney General for the State of Illinois; Office of the Illinois Attorney General, Chicago, Illinois; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; Philip J. Weiser, Attorney General of Colorado, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Attorney General of Connecticut, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General of Delaware, Office of the Delaware Attorney General, Wilmington, Delaware; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Attorney General of Maryland, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Attorney General of Massachusetts, Office of the

Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General of Michigan, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Attorney General of Minnesota, Office of the Minnesota Attorney General, St. Paul, Minnesota; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Letitia James, Attorney General of New York, Office of the New York Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General of Oregon, Office of the Oregon Attorney General, Salem, Oregon; Michelle A. Henry, Attorney General of Pennsylvania, Office of Harrisburg, Pennsylvania; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General; Charity R. Clark, Attorney General of Vermont, Office of the Vermont Attorney General, Montpelier, Vermont; Robert M. Ferguson, Attorney General of Washington, Office of the Washington Attorney General, Olympia, Washington; Edward E. Manibusan, Northern Mariana Islands Attorney General, Office of the Northern Mariana Islands Attorney General, Saipan, Northern Mariana Islands; for Amici Curiae The District of Columbia and Illinois, California, Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the Northern Mariana Islands.

Alan E. Schoenfeld and Joshua M. Feinzig, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Simon B. Kress, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; for Amici Curiae Professors of Property Law.

Priyanka G. Sen, Kari L. Still, William J. Taylor Jr., and Janet Carter, Everytown Law, New York, New York; for Amicus Curiae Everytown for Gun Safety.

Jeremy S. Smith, Patrick J. Fuster, Adrienne M. Liu, and Eitan Arom, Gibson Dunn & Crutcher LLP, Los Angeles, California; for Amicus Curiae Patrick J. Charles.

Peter M. Torstensen Jr., Deputy Solicitor General; Christian B. Corrigan, Solicitor General; Austin Knudsen, Montana Attorney General; Office of the Montana Attorney General, Helena, Montana; Joshua N. Turner, Acting Solicitor General; Raul R. Labrador, Idaho Attorney General; Idaho Office of the Attorney General, Boise, Idaho; for Amicus Curiae State of Montana, Idaho and 15 other States.

Erin M. Erhardt and Michael T. Jean, NRA Office of the General Counsel, Fairfax, Virginia; for Amicus Curiae National Rifle Association of America Inc..

Edward A. Paltzik, Meredith Lloyd, and Serge Krimnus, Bochner PLLC, New York, New York, for Amicus Curiae The Second Amendment Foundation.

Sebastian D. Torres, Gatlin Voelker PLLC, Covington, Kentucky; for Amicus Curiae National Association for Gun Rights.

Carl D. Michel, Anna M. Barvir, and Konstadinos T. Moros, Michel & Associates PC, Long Beach, California; for Amicus Curiae Gun Owners of America Inc., Second Amendment Law Center, Hawaii Rifle Association, California Rifle & Pistol Association, Gun Owners of California; and Gun Owners Foundation.

Bradley A. Benbrook and Stephen M. Duvernay, Benbrook Law Group PC, Sacramento, California; for Amici Curiae

Angus Kirk McClellan, FPC Action Foundation, Firearms Policy Coalition, California Gun Rights Foundation, The Center for Human Liberty, and Citizens Committee for the Right to Keep and Bear Arms.

Alexander A. Frank (argued), C.D. Michel, Joshua R. Dale, and Konstadinos T. Moros, Michel & Associates PC, Long Beach, California; Donald Kilmer, Law Offices of Donald Kilmer APC, Caldwell, Idaho; for Appellees.

Peter A. Patterson (argued), David H. Thompson, and Kate Hardiman, Cooper & Kirk PLLC, Washington, D.C.; Bradley A. Benbrook and Stephen M. Duvernay, Benbrook Law Group PC, Sacramento, California; for Plaintiffs-Appellees.

Robert L. Meyerhoff (argued), Todd Grabarsky, Jane Reilley, Lisa J. Plank, and Carolyn Downs, Deputy Attorneys General; Mark R. Beckington and R. Matthew Wise, Supervising Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; United States Department of Justice, Office of the California Attorney General, Los Angeles, California; for Defendant-Appellant.

Sarah A. Hunger, Deputy Solicitor General; Jane E. Notz, Solicitor General; Kwame Raoul, Illinois Attorney General; Office of the Illinois Attorney General, Chicago, Illinois; Russell C. Bogue, Assistant Attorney General; Ashwin P. Phatak, Principal Deputy Solicitor General; Caroline S. Van Zile, Solicitor General; Brian L. Schwalb, Attorney General for the District of Columbia; Office of the District of Columbia Attorney General, Washington, D.C.; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of

the Delaware Attorney General, Wilmington, Delaware; Anne E. Lopez, Hawaii Attorney General, Office of the Hawaii Attorney General, Honolulu, Hawaii; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea Joy Campell, Commonwealth of Massachusetts Attorney General, Office of the Commonwealth of Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Ellen F. Rosenblum, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Michelle A. Henry, Commonwealth of Pennsylvania Attorney General, Office of the Commonwealth of Pennsylvania Attorney General, Harrisburg, Pennsylvania; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Robert W. Ferguson, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; Edward E. Manibusan, Commonwealth of the Northern Mariana Islands Attorney General, Office of the Commonwealth of the Northern Mariana Islands Attorney General, Saipan, Northern Mariana Islands; for Amici Curiae District of

Columbia, Illinois, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and the Northern Mariana Islands.

Janet Carter, William J. Taylor, Jr., and Priyanka G. Sen, Everytown Law, New York, New York, for Amicus Curiae Everytown for Gun Safety.

Stephanie Yonekura, Hogan Lovells US LLP, Los Angeles, California; Rachel M. Bayer and Diala Alqadi, Hogan Lovells US LLP, New York, New York; Joshua Schulster, Hogan Lovells US LLP, Miami, Florida; Jonathan L. Diesenhaus, Hannah M. Graae, and Allisa Newman, Hogan Lovells US LLP, Washington, D.C.; Elizabeth A. Och, Hogan Lovells US LLP, Denver, Colorado; Alex Ervin, Hogan Lovells US LLP, Philadelphia, Pennsylvania; for Amici Curiae March for Our Lives.

David E. Mastagni, Mastagni Holstedt APC, Sacramento, California; Timothy K. Talbot, Rains Lucia Stern St. Phalle & Silver PC, Pleasant Hill, California; for Amici Curiae Peace Officers Research Association of California, California State Sheriff's Association, California Association of Highway Patrolmen, and Crime Prevention Research Center.

## OPINION

GRABER, Circuit Judge:

In its modern decisions concerning the Second Amendment, the Supreme Court has emphasized that its rulings do not call into question longstanding laws prohibiting the carry of firearms at sensitive places such as schools and government buildings. New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 30 (2022); McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) (plurality opinion); District of Columbia v. Heller, 554 U.S. 570, 626 (2008); see also United States v. Rahimi, 602 U.S. –, 144 S. Ct. 1889, 1923 (2024) (Kavanaugh, J., concurring) (stressing this point); Bruen, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (same). In Bruen, the Court provided specific guidance on how to determine what kinds of places qualify as "sensitive places" such that firearms may be prohibited. 597 U.S. at 30–31. Applying that guidance to laws recently enacted by the Hawaii and California legislatures, we conclude that some—but not all—of the places specified by those laws likely fall within the national tradition of prohibiting firearms at sensitive places.

Parks in modern form, for example, first arose in the middle of the 19th century; governments throughout the nation immediately imposed prohibitions on firearms in parks; the constitutionality of those bans was unquestioned; and those regulations are akin to laws recognized by Bruen as sufficiently representative to qualify a location as a "sensitive place." States permissibly may prohibit firearms in most parks. By contrast, banks have existed throughout our Nation's history, but the historical record does not

demonstrate a comparable national tradition of banning firearms at banks. Applying Bruen's guidance, we conclude that the Second Amendment likely prohibits a State from banning firearms in banks. But that conclusion is less restrictive than it may appear at first glance. As the owner or operator of private property, a bank may prohibit firearms as a matter of the ordinary property-law right to exclude. And if a State operates a bank, the State, too, may exercise its proprietary right to exclude, just as a private property owner may. See Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc., 507 U.S. 218, 231–32 (1993) (explaining that a State generally may "manage its own property when it pursues its purely proprietary interests . . . where analogous private conduct would be permitted"). But we conclude that, because there is no comparable historical tradition as required by Bruen, a State may not prohibit a bank's owner from permitting the carry of firearms if the bank's owner wishes to allow patrons to carry firearms into the bank.

In the cases before us, the district courts preliminarily enjoined the implementation or enforcement of several provisions of the Hawaii and California laws. Because we conclude that the district courts erred in applying Bruen with respect to most of those provisions, we reverse in large part. But because Plaintiffs are likely to prevail with respect to some aspects of the laws, we also affirm in part.

## FACTUAL AND PROCEDURAL HISTORY

### A. Factual and Procedural Background in Hawaii

In 2023, the Hawaii legislature enacted Act 52, which has been codified, as relevant here, in Hawaii Revised Statutes sections 134-9.1 and 134-9.5. The statute generally prohibits a person with a carry permit from bringing a

firearm onto fifteen types of property.  Haw. Rev. Stat.
§ 134-9.1(a).  A violation of the law is a misdemeanor.  Id.
§ 134-9.1(f).

The law also flips the default rule on all private property:
Whereas the old rule allowed a person with a carry permit to
bring firearms onto private property unless the owner
prohibited it, the new rule generally prohibits the carry of
firearms onto private property unless the owner allows it.  Id.
§ 134-9.5(a).  Under Hawaii's law, an owner may consent
either by "[u]nambiguous written or verbal authorization" or
by the "posting of clear and conspicuous signage."  Id.
§ 134-9.5(b).  A violation of the law is a misdemeanor.  Id.
§ 134-9.5(e).

We reproduce the relevant portions of Hawaii's law.
Section 134-9.1 states, in relevant part:

> (a) A person with a license issued under
> section 134-9, or authorized to carry a firearm
> in accordance with title 18 United States
> Code section 926B or 926C, shall not
> intentionally, knowingly, or recklessly carry
> or possess a loaded or unloaded firearm,
> whether the firearm is operable or not, and
> whether the firearm is concealed or
> unconcealed, while in any of the following
> locations and premises within the State:
>
> (1) Any building or office owned, leased, or
> used by the State or a county, and adjacent
> grounds and parking areas, including any
> portion of a building or office used for court
> proceedings, legislative business, contested

> case hearings, agency rulemaking, or other
> activities of state or county government;
>
> . . . .
>
> (4) Any bar or restaurant serving alcohol or
> intoxicating liquor as defined in section 281-
> 1 for consumption on the premises, including
> adjacent parking areas;
>
> . . . .
>
> (9) Any beach, playground, park, or adjacent
> parking area, including any state park, state
> monument, county park, tennis court, golf
> course, swimming pool, or other recreation
> area or facility under control, maintenance,
> and management of the State or a county, but
> not including an authorized target range or
> shooting complex;
>
> . . . .
>
> (12) The premises of any bank or financial
> institution as defined in section 211D-1,
> including adjacent parking areas;
>
> . . . .
>
> (f) Any person who violates this section shall
> be guilty of a misdemeanor.

Id. § 134-9.1. Section 134-9.5 states:

> (a) A person carrying a firearm pursuant to a
> license issued under section 134-9 shall not
> intentionally, knowingly, or recklessly enter
> or remain on private property of another

person while carrying a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, unless the person has been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property.

(b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:

(1) Unambiguous written or verbal authorization; or

(2) The posting of clear and conspicuous signage at the entrance of the building or on the premises,

by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

(c) For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person" means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner, lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided that nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(e) Any person who violates this section shall be guilty of a misdemeanor.

Id. § 134-9.5.

In Wolford, Plaintiffs Jason Wolford, Alison Wolford, and Atom Kasprzycki live in Maui, and each individual Plaintiff has a concealed-carry permit. Plaintiff Hawaii Firearms Coalition is incorporated in Hawaii and has 33

members who possess valid concealed-carry permits. Plaintiffs allege, among other claims, that the quoted portions of the new law are unconstitutional restrictions on their Second Amendment right to keep and bear arms. Plaintiffs brought this 42 U.S.C. § 1983 action against Defendant Anne E. Lopez, in her official capacity as Attorney General of Hawaii.

Plaintiffs moved for a temporary restraining order and a preliminary injunction. Plaintiffs challenged only a limited subset of the law's provisions. The district court granted in part and denied in part a temporary restraining order. Wolford v. Lopez, 686 F. Supp. 3d 1034 (D. Haw. 2023). The court later converted the temporary restraining order into a preliminary injunction. In particular, the court enjoined the law's prohibition on the carrying of firearms in parking lots shared by government buildings and non-government buildings; banks, financial institutions, and their adjacent parking areas; public beaches, public parks, and their adjacent parking areas; and bars, restaurants that serve alcohol, and their adjacent parking areas. Id. at 1076–77. The court also enjoined the new default rule for private property but limited the injunction to private property held open to the public. Id. at 1077.

Defendant timely appeals. Before us, Defendant has not sought a stay of the injunction on appeal. Plaintiffs have not filed a separate appeal or a cross-appeal challenging the district court's partial denial of a preliminary injunction.

B. Factual and Procedural Background in California

Also in 2023, the California legislature enacted Senate Bill 2, which has been codified, as relevant here, in California Penal Code section 26230. The law generally prohibits a person with a concealed-carry permit from

carrying a firearm onto more than two dozen types of property. Cal. Penal Code § 26230(a). The law also flips the default rule on all private property that is open to the public. Id. § 26230(a)(26). But California's statute is stricter than Hawaii's law with respect to how a private-property owner may overcome the new default rule prohibiting firearms. In California, a property owner may consent to the carrying of firearms only by "clearly and conspicuously post[ing] a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property." Id. Other forms of permission, such as oral or written consent, do not suffice.

We reproduce the relevant parts of California Penal Code section 26230:

> (a) A person granted a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person pursuant to Section 26150, 26155, or 26170 shall not carry a firearm on or into any of the following:
>
> (1) A place prohibited by Section 626.9.
>
> (2) A building, real property, or parking area under the control of a preschool or childcare facility, including a room or portion of a building under the control of a preschool or childcare facility. Nothing in this paragraph shall prevent the operator of a childcare facility in a family home from owning or possessing a firearm in the home if no child under child care at the home is present in the

home or the firearm in the home is unloaded, stored in a locked container, and stored separately from ammunition when a child under child care at the home is present in the home so long as the childcare provider notifies clients that there is a firearm in the home.

(3) A building, parking area, or portion of a building under the control of an officer of the executive or legislative branch of the state government, except as allowed pursuant to paragraph (2) of subdivision (b) of Section 171c.

(4) A building designated for a court proceeding, including matters before a superior court, district court of appeal, or the California Supreme Court, parking area under the control of the owner or operator of that building, or a building or portion of a building under the control of the Supreme Court, unless the person is a justice, judge, or commissioner of that court.

(5) A building, parking area, or portion of a building under the control of a unit of local government, unless the firearm is being carried for purposes of training pursuant to Section 26165.

(6) A building, real property, and parking area under the control of an adult or juvenile detention or correctional institution, prison, or jail.

(7) A building, real property, and parking area under the control of a public or private hospital or hospital affiliate, mental health facility, nursing home, medical office, urgent care facility, or other place at which medical services are customarily provided.

(8) A bus, train, or other form of transportation paid for in whole or in part with public funds, and a building, real property, or parking area under the control of a transportation authority supported in whole or in part with public funds.

(9) A building, real property, and parking area under the control of a vendor or an establishment where intoxicating liquor is sold for consumption on the premises.

(10) A public gathering or special event conducted on property open to the public that requires the issuance of a permit from a federal, state, or local government and sidewalk or street immediately adjacent to the public gathering or special event but is not more than 1,000 feet from the event or gathering, provided this prohibition shall not apply to a licensee who must walk through a public gathering in order to access their residence, place of business, or vehicle.

(11) A playground or public or private youth center, as defined in Section 626.95, and a street or sidewalk immediately adjacent to the playground or youth center.

(12) A park, athletic area, or athletic facility that is open to the public and a street or sidewalk immediately adjacent to those areas, provided this prohibition shall not apply to a licensee who must walk through such a place in order to access their residence, place of business, or vehicle.

(13) Real property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife, except those areas designated for hunting pursuant to Section 5003.1 of the Public Resources Code, Section 4501 of Title 14 of the California Code of Regulations, or any other designated public hunting area, public shooting ground, or building where firearm possession is permitted by applicable law.

(14) Any area under the control of a public or private community college, college, or university, including, but not limited to, buildings, classrooms, laboratories, medical clinics, hospitals, artistic venues, athletic fields or venues, entertainment venues, officially recognized university-related organization properties, whether owned or leased, and any real property, including parking areas, sidewalks, and common areas.

(15) A building, real property, or parking area that is or would be used for gambling or gaming of any kind whatsoever, including, but not limited to, casinos, gambling establishments, gaming clubs, bingo

operations, facilities licensed by the California Horse Racing Board, or a facility wherein banked or percentage games, any form of gambling device, or lotteries, other than the California State Lottery, are or will be played.

(16) A stadium, arena, or the real property or parking area under the control of a stadium, arena, or a collegiate or professional sporting or eSporting event.

(17) A building, real property, or parking area under the control of a public library.

(18) A building, real property, or parking area under the control of an airport or passenger vessel terminal, as those terms are defined in subdivision (a) of Section 171.5.

(19) A building, real property, or parking area under the control of an amusement park.

(20) A building, real property, or parking area under the control of a zoo or museum.

(21) A street, driveway, parking area, property, building, or facility, owned, leased, controlled, or used by a nuclear energy, storage, weapons, or development site or facility regulated by the federal Nuclear Regulatory Commission.

(22) A church, synagogue, mosque, or other place of worship, including in any parking area immediately adjacent thereto, unless the operator of the place of worship clearly and

conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property. Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size.

(23) A financial institution or parking area under the control of a financial institution.

(24) A police, sheriff, or highway patrol station or parking area under control of a law enforcement agency.

(25) A polling place, voting center, precinct, or other area or location where votes are being cast or cast ballots are being returned or counted, or the streets or sidewalks immediately adjacent to any of these places.

(26) Any other privately owned commercial establishment that is open to the public, unless the operator of the establishment clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property. Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size.

(27) Any other place or area prohibited by other provisions of state law.

(28) Any other place or area prohibited by federal law.

> > (29) Any other place or area prohibited by
> > local law.

Id. § 26230(a).

In May and Carralero, Plaintiffs Marco Antonio
Carralero, Garrison Ham, Michael Schwartz, Reno May,
Anthony Miranda, Eric Hans, Gary Brennan, Oscar A.
Barretto, Jr., Isabelle R. Barretto, Barry Bahrami, Pete
Stephenson, Jose Flores, Andrew Harms, and Dr. Sheldon
Hough, DDS, live in California and have concealed-carry
permits. Plaintiffs Orange County Gun Owners PAC, San
Diego County Gun Owners PAC, California Gun Rights
Foundation, Firearms Policy Coalition, Inc., Second
Amendment Foundation, Gun Owners of America, Gun
Owners Foundation, Gun Owners of California, Inc., the
Liberal Gun Owners Association, and the California Rifle &
Pistol Association, Inc., have members who hold concealed-
carry permits. Plaintiffs allege that many provisions of the
new law are unconstitutional restrictions on their Second
Amendment right to keep and bear arms. Plaintiffs brought
two separate actions, pursuant to 42 U.S.C. § 1983, against
Defendant Rob Bonta, in his official capacity as Attorney
General of California.

Plaintiffs moved for a preliminary injunction, seeking to
enjoin many parts of section 26230. The district court issued
an opinion addressing the motions in both cases, and the
court granted in full the requested injunctive relief. May v.
Bonta, Nos. SACV 23-01696-CJC (ADSx) & SACV 23-
01798-CJC (ADSx), 2023 WL 8946212 (S.D. Cal. Dec. 20,
2023). In particular, the court enjoined Defendant from
implementing the law concerning California's ban on
concealed carry in hospitals; playgrounds; public transit;
parks and athletic facilities; property controlled by the Parks

and Recreation Department; bars and restaurants that serve alcohol; gatherings that require a permit; libraries; casinos; zoos; stadiums and arenas; amusement parks; museums; places of worship; banks; and all parking lots adjacent to sensitive places, including sensitive places unchallenged by Plaintiffs. The court also enjoined the new default rule for private property held open to the public.

Defendant timely appealed in both California cases, and we consolidated the appeals. In order to preserve the status quo, we denied Defendant's request for a stay pending appeal.

## STANDARDS OF REVIEW

We review de novo whether Plaintiffs have standing. Tucson v. City of Seattle, 91 F.4th 1318, 1324 (9th Cir. 2024). We review for abuse of discretion the district court's grant of a preliminary injunction. Id. "A district court abuses its discretion if it rests its decision on an erroneous legal standard or on clearly erroneous factual findings." Am. Beverage Ass'n v. City & County of San Francisco, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (citation and internal quotation marks omitted).

## DISCUSSION

To warrant the extraordinary relief of a preliminary injunction, Plaintiffs must show a likelihood of success on the merits, irreparable harm in the absence of preliminary relief, a favorable balance of the equities, and favorable public interest in an injunction. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Because the government is a party, the "last two factors merge." Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014).

We address together the issues from the Hawaii case and the California cases, differentiating where appropriate. For each case, we have considered only the <u>evidence</u> in the record in that case. <u>See, e.g.</u>, <u>Bruen</u>, 597 U.S. at 25 n.6 (holding that courts are "entitled to decide a case based on the historical record compiled by the parties"). With respect to <u>legal</u> sources, however, we may—but are not required to—consider laws and other legal sources whether or not the parties have focused on those specific laws or judicial decisions. <u>See id.</u> at 60 (conducting independent legal research as a matter of discretion). Similarly, context dictates whether our references to "Defendant," "Defendants," or "Plaintiffs" pertain to the parties in the Hawaii case, the California cases, or the cases in both states.

A. <u>Likelihood of Success on the Merits</u>

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Amendment creates an individual right to keep and bear arms for self-defense. <u>Heller</u>, 554 U.S. at 602. The right applies against States via the Fourteenth Amendment. <u>McDonald</u>, 561 U.S. at 750, 791.

In <u>Bruen</u>, the Supreme Court announced the appropriate general methodology for deciding Second Amendment challenges to state laws:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is

> consistent with the Nation's historical
> tradition of firearm regulation.

597 U.S. at 24.  With respect to the historical analysis at
Bruen's second step, the Court required a different showing
depending on whether the government's regulation
addresses a societal problem that has persisted since the
Founding or one that is more modern:

> [W]hen a challenged regulation addresses a
> general societal problem that has persisted
> since the 18th century, the lack of a distinctly
> similar historical regulation addressing that
> problem is relevant evidence that the
> challenged regulation is inconsistent with the
> Second Amendment.  Likewise, if earlier
> generations addressed the societal problem,
> but did so through materially different means,
> that also could be evidence that a modern
> regulation is unconstitutional.  And if some
> jurisdictions actually attempted to enact
> analogous regulations during this timeframe,
> but those proposals were rejected on
> constitutional grounds, that rejection surely
> would provide some probative evidence of
> unconstitutionality.

Id. at 26–27 (emphasis added).  We refer to this standard as
the "distinctly similar" test.

By contrast, "cases implicating unprecedented societal
concerns or dramatic technological changes may require a
more nuanced approach."  Id. at 27.  "When confronting
such present-day firearm regulations, this historical inquiry

that courts must conduct will often involve reasoning by analogy . . . . [D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" Id. at 28–29 (citation omitted). "[T]wo metrics" guide this comparison: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 29. In other words, we assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Id. Analogical reasoning "is neither a regulatory straightjacket nor a regulatory blank check." Id. at 30. The government must "identify a well-established and representative historical analogue, not a historical twin" or a "dead ringer." Id.

Rather than taking the "more nuanced approach," the Supreme Court applied the "distinctly similar" test in both Heller, which concerned a ban on handguns, and Bruen, which concerned conditions for obtaining a concealed-carry permit. Id. at 27. In applying that test in Bruen, the Court was strict in its search for a distinctly similar regulation that could justify New York's "proper cause" concealed-carry permitting requirement. Id. at 11, 39–70. In an exhaustive historical analysis, the Court held that no early law was analogous to the "proper cause" requirement, and the Court also noted that several state courts had ruled in ways that were contrary to a "proper cause" requirement. Id. at 39–55. Although the Court ruled that the defendants' proffered colonial laws were not on point, the Court began its analysis with this dictum: "For starters, we doubt that three colonial regulations could suffice to show a tradition of public-carry regulation." Id. at 46. The Court next acknowledged that an

1871 Texas law and a pair of Texas court decisions supported New York's law. Id. at 64–65. But the Court dismissed that evidence as insufficient in light of the weighty conflicting evidence; that is, the Texas examples were "outliers." Id. at 65. Similarly, the Court discounted the significance of several late-1800s territorial laws because they "contradicted earlier evidence." Id. at 66. The Court explained that the territories were not part of the Union at the time; the laws governed "miniscule" populations; the laws were rarely subject to judicial scrutiny, so we do not know if or how the laws were viewed as constitutional; and the laws were short-lived. Id. at 67–70. In sum, Heller and Bruen imposed a challenging burden on the government where the regulation in question addressed an issue that has existed since the Founding, had not been affected by a technological change, and did not concern a uniquely modern problem. In that context, Bruen instructs that historical analogues inconsistent with the "overwhelming weight of other evidence" are undeserving of much weight, especially those laws that governed only a few colonies or territories, affected a small population, or were enacted in the late 19th century or later. Id. at 66 (quoting Heller, 554 U.S. at 632).

The Court's analysis in Bruen misled some courts into imposing too rigid a test when considering historical sources. In Rahimi, the Court clarified that Bruen did not require stringent adherence to Founding-era laws, emphasizing that its "precedents were not meant to suggest a law trapped in amber." 144 S. Ct. at 1897. Instead of looking for a precise historical match, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Id. at 1898. The Court emphasized that a challenged law "must comport with the principles

underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" Id. (quoting Bruen, 597 U.S. at 30).

The Court went on to demonstrate how such principles may be derived from historical analogues. The law challenged in Rahimi prohibits persons subject to a domestic-violence order from possessing any firearm. Id. at 1895. The Court considered two types of historical analogues that were "by no means identical" to the challenged law: (a) historical surety laws that targeted the misuse of firearms but imposed no firearms restrictions at all and (b) "going armed" laws that regulated only publicly threatening conduct, including a threatening use of firearms, and that imposed criminal penalties only after a trial with full constitutional protections. Id. at 1899–1901; see id. at 1938–43 (Thomas, J., dissenting) (describing the historical laws). From those laws, the Court distilled the principle that it is consistent with the Second Amendment to disarm individuals when they pose a clear threat of violence to another. Id. at 1901. Because the challenged law restricts the use of firearms to mitigate demonstrated threats of violence, the Court held that the law fits within the national tradition of regulating firearms. Id. at 1901–02. Rahimi therefore instructs that, even where historical analogues are not close matches to the challenged law, they may evince principles underpinning our Nation's regulatory tradition, and it is sufficient for the government to show that its law is consistent with those principles.

In addition to laying out this approach, the Court has provided specific guidance on the appropriate analysis when

assessing the regulation of firearms in sensitive places in particular.  In <u>Heller</u>, the Court wrote:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . .

554 U.S. at 626; <u>see also</u> <u>id.</u> at 627 n.26 (emphasizing that the list is not exhaustive).  In <u>McDonald</u>, the Court expressly "repeat[ed] those assurances" and quoted the passage from <u>Heller</u>.  561 U.S. at 786 (plurality opinion).

In <u>Bruen</u>, the Court elaborated on the appropriate methodology for assessing whether a place qualifies as a "sensitive place":

> Consider, for example, <u>Heller</u>'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."  554 U.S. at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions.  <u>See</u> D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13

> Charleston L. Rev. 205, 229–236, 244–247
> (2018); <u>see also</u> Brief for Independent
> Institute as Amicus Curiae 11–17. We
> therefore can assume it settled that these
> locations were "sensitive places" where arms
> carrying could be prohibited consistent with
> the Second Amendment. And courts can use
> analogies to those historical regulations of
> "sensitive places" to determine that modern
> regulations prohibiting the carry of firearms
> in <u>new</u> and analogous sensitive places are
> constitutionally permissible.

597 U.S. at 30 (one citation omitted). The following
regulations justified the Court's conclusion that legislative
assemblies, polling places, courthouses, and schools were
"sensitive places" where firearms could be banned: a pair of
Maryland statutes from 1647 and 1650 banning arms at
legislative assemblies; a 1776 Delaware law and a 1787 New
York law prohibiting arms at polling places, as well as some
state laws enacted after 1868; a single 1786 Virginia law
prohibiting arms at courthouses and a 19th century Georgia
law prohibiting weapons in a court of justice; and localized
bans on the carry of firearms at a few schools beginning in
1824. Kopel, The "Sensitive Places" Doctrine, 13
Charleston L. Rev. at 229–236, 244–247; Brief for
Independent Institute as Amicus Curiae, pp. 11–17, <u>Bruen</u>,
597 U.S. 1; <u>see also</u> <u>Antonyuk v. Chiumento</u>, 89 F.4th 271,
303–04 (2d Cir. 2023) (examining these same sources),
<u>petition for cert. granted, decision vacated, & case remanded</u>
<u>sub nom.</u> <u>Antonyuk v. James</u>, No. 23-910, 2024 WL

3259671 (U.S. July 2, 2024);[1] Goldstein v. Hochul, 680 F.
Supp. 3d 370, 392–93 & n.12 (S.D.N.Y. June 28, 2023)
(same), appeal filed, No. 23-995 (2d Cir. July 6, 2023).

We pause to note the difference between the "distinctly
similar" test applied in Bruen to New York's law and the
more lenient standard that applies when analyzing the
regulation of firearms at "sensitive places." After all, only
one or two colonial laws provided sufficient justification for
the Court to designate several places as sensitive. The Court
placed schools in this category, even though no law
prohibited firearms in schools until more than thirty years
after the ratification of the Second Amendment. By contrast,
when Bruen applied the "distinctly similar" test to New
York's probable-cause law, the Court's analysis was more
stringent. It noted, for example, that "we doubt that three
colonial regulations could suffice to show a tradition of
public-carry regulation," 597 U.S. at 46, and insisting on a
close match between the historical regulation and the
modern one, e.g., id. at 47–50.

The "proper cause" requirement at issue in Bruen
addressed a societal problem that had been present since the
Founding, which caused the Court to apply the stricter
"distinctly similar" test. Id. at 26–27. Moreover, Bruen
emphasized that much evidence—primarily state court
decisions—weighed strongly against the constitutionality of
New York's law. In that circumstance, a few outlier statutes,
especially in places with tiny populations and especially

---

[1] Throughout this opinion, we cite the Second Circuit's pre-Rahimi
decision in Antonyuk for its persuasive value. Except as specifically
noted otherwise, we conclude that the reasoning of Antonyuk is
consistent with the Supreme Court's decision in Rahimi and therefore
retains its persuasive worth.

when enacted well after the Founding, did not suffice to identify a national historical tradition.

With respect to sensitive places, however, those concerns are diminished. Our Nation has a clear historical tradition of banning firearms at sensitive places. Bruen, 597 U.S. at 30; McDonald, 561 U.S. at 786 (plurality opinion); Heller, 554 U.S. at 626. When examining whether a particular place falls within that tradition, a small number of laws, even localized laws, can suffice, if those laws were viewed as non-controversial. Nor did the Founders have a rigid conception of what kinds of places qualified as sensitive. The Supreme Court held that schools qualify as sensitive places because of localized, non-controversial laws that prohibited firearms at a few schools, and those laws were first enacted in 1824—more than three decades after the ratification of the Second Amendment. The relevant tradition—regulation of firearms at sensitive places— existed at the Founding. Whether a place falls within that tradition requires an examination of laws, including 19th-century laws.

It bears emphasizing that the laws at issue here are state laws. The Second Amendment applies to the States because of the Fourteenth Amendment's ratification in 1868. McDonald, 561 U.S. at 750. We thus agree with the Second Circuit that, at least when considering the "sensitive places" doctrine, we look to the understanding of the right to bear arms both at the time of the ratification of the Second Amendment in 1791 and at the time of the ratification of the Fourteenth Amendment in 1868. Antonyuk, 89 F.4th at 304–05. "[T]he understanding that prevailed when the States adopted the Fourteenth Amendment . . . is, along with the understanding of that right held by the founders in 1791, a relevant consideration." Id. at 305 (citations and internal

quotation marks omitted); see McDonald, 561 U.S. at 778 (plurality opinion) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." (emphasis added)).

We conclude that the proper approach for determining whether a place is sensitive is as follows. For places that have existed since the Founding, it suffices for Defendant to identify historical regulations similar in number and timeframe to the regulations that the Supreme Court cited as justification for designating other places as sensitive. For places that are newer, Defendant must point to regulations that are analogous to the regulations cited by the Court, taking into account that it is illogical to expect a government to regulate a place before it existed in its modern form. For example, it makes little sense to ask whether the Founders regulated firearms at nuclear power plants.

For both types of places, historical regulations need not be a close match to the challenged law; they need only evince a principle underpinning our Nation's historical tradition of regulating firearms in places relevantly similar to those covered by the challenged law. Rahimi, 144 S. Ct. at 1898. A key factor is whether the constitutionality of the historical regulations was disputed. A dispute as to constitutionality may tip the scales in favor of Plaintiffs, particularly if the evidence in favor of Defendants is weak. Bruen, 597 U.S. at 27. By the same token, if the constitutionality of historical laws went undisputed in the courts in the Nation's early years, that evidence suggests that the laws were constitutional. Id. at 30. Similarly, if courts unanimously confirmed laws as constitutional, that evidence, too, suggests that the laws were constitutional; the fact that a

criminal defendant or two raised a Second Amendment
argument that courts quickly rejected does not create a
meaningful dispute as to the constitutionality of the law.

In sum, one way that Defendants can show a historical
tradition is by establishing that, when a type of place first
arose, or first arose in modern form, states and municipalities
began to regulate the possession of firearms at that type of
place, the regulations were considered constitutional at the
time, and the regulations were comparable to a tradition of
regulating a similar place or places in the earlier years of the
Nation.

Before turning to the specific challenges here, we
address a few general arguments made by the parties. First,
some Plaintiffs assert that the only type of sensitive place
that qualifies is a place that has "armed government guards
and metal detectors at a minimum at every point of entry."
That assertion flatly contradicts Bruen. Many schools and
polling places have few security measures—now or in the
past—yet the Supreme Court listed those places as
conclusively sensitive. Id. Put simply, lack of
comprehensive government security is not a determinative
factor.

Other Plaintiffs suggest that, whatever bans may have
been enacted with respect to the general population, there is
no national historical tradition of banning the carry of
firearms by those who have concealed-carry permits. We
reject that suggestion as illogical. The issue in this case
concerns categories of property, not categories of people. If
a particular place is a "sensitive place" such that firearms
may be banned, then firearms may be banned—for everyone,
including permit holders—consistent with the Second
Amendment. The Nation also has a tradition of requiring

concealed-carry permits, as <u>Bruen</u> recognized, <u>id.</u> at 38 & n.9, and that tradition is an <u>additional</u> permissible restraint on the carry of firearms.  But just because a person has qualified for a concealed-carry permit does not give that person the right to carry at a banned location.  Persons in California or Hawaii need a permit to carry a concealed weapon; that Plaintiffs have permits does not affect the constitutional analysis as to whether those States may ban the carry of firearms at specific locations like schools and government buildings.

For their part, Defendants suggest that, if a place shares some characteristic with one of the sensitive places identified by the Supreme Court, then that place, too, necessarily is a sensitive place—without much, or any, need to show relevant historical analogues.  That view also is inconsistent with <u>Bruen</u>.  For example, it is true that schools contain children, who are a vulnerable population.  But it does not follow that all possible locations that serve children or another vulnerable population are necessarily sensitive places.  Similarly, people gather at polling places, one of <u>Bruen</u>'s sensitive places, but that fact does not mean that all places where people gather are necessarily sensitive places.  The historical record, in addition to those facts, must inform the analysis.

With those principles in mind, we turn to the specific challenges here.  We address the injunctions with respect to: (1) parks and similar areas; (2) playgrounds and youth centers; (3) bars and restaurants that serve alcohol; (4) places of amusement; (5) parking areas connected to sensitive places; (6) the default rule on private property; (7) places of worship; (8) gatherings that require a permit; (9) financial institutions; (10) hospitals and other medical facilities; and (11) public transit.

### 1. Parks and Similar Areas

Both state laws prohibit the carry of firearms in a "park." Haw. Rev. Stat. § 134-9.1(a)(9); Cal. Penal Code § 26230(a)(12). Plaintiffs in both cases brought facial challenges to the relevant provision, and the district courts in both cases concluded that Plaintiffs are likely to succeed on their facial claims. We disagree.

Parks in modern form are outdoor gathering places where people engage in social, political, and recreational activities. On the present record, Plaintiffs are unlikely to succeed in their assertion that the public green spaces that existed in 1791 were akin to a modern park. In the Hawaii case, the district court concluded that "parks around 1791 were not comparable to modern parks," Wolford, 686 F. Supp. 3d at 1064, a determination amply supported by the record. The district court in the California cases did not address that issue specifically, but significant evidence in the record in that case, too, suggests that modern parks differ from the green spaces that existed in 1791. Plaintiffs point to Boston Common as an example of a "park" at the time of the Founding, but the record in each case establishes that Boston Common was used primarily for grazing animals and for holding military exercises and was not akin to modern parks. Nor does the record in either case contain evidence of any other public green space akin in use and purpose to a modern park. We agree with the Second Circuit, and at least one district court, that such examples from the Founding were not relevantly similar to parks in their modern form. Antonyuk, 89 F.4th at 361–62; Kipke v. Moore, 695 F. Supp. 3d 638, 654 (D. Md. 2023).

As soon as green spaces began to take the shape of a modern park, in the middle of the 19th century,

municipalities and other governments imposed bans on carrying firearms into the parks.  Central Park in New York City is perhaps the Nation's first modern public park.  In 1858—the year the park opened—New York prohibited the carrying of firearms in Central Park.[2]  Governments enacted similar prohibitions as parks emerged across the Nation, including at Prospect Park (New York City, 1866); Fairmount Park (Pennsylvania, 1868); Golden Gate and Buena Vista Parks (San Francisco, 1872); and Liberty Park (Salt Lake City, 1888).  Many municipalities, including major cities, prohibited the carry of firearms at all parks: Chicago (1872); South Park, Illinois (1875); Phoenixville, Pennsylvania (1878); Saint Louis (1881); Danville, Illinois (1883); Boston (1886); Reading, Pennsylvania (1887); St. Paul, Minnesota (1888); Trenton, New Jersey (1890); Grand Rapids, Michigan (1891); Springfield, Massachusetts (1891); Lynn, Massachusetts (1892); Spokane, Washington (1892); Pittsburg, Pennsylvania (1893); Wilmington, Delaware (1893); Canton, Illinois (1895); Detroit, Michigan (1895); Indianapolis, Indiana (1896); Kansas City, Missouri (1898); New Haven, Connecticut (1898); and Boulder, Colorado (1899).  See Md. Shall Issue, Inc. v. Montgomery County, 680 F. Supp. 3d 567, 585–86 (D. Md. July 6, 2023) (summarizing similar evidence concerning parks), appeal filed, No. 23-1719 (4th Cir. July 6, 2023); Kipke, 695 F. Supp. 3d at 654–55 (same).  Despite the widespread nature of the laws, Plaintiffs have not pointed to—and we have not found—any evidence that those laws were questioned as unconstitutional.

---

[2] Unless otherwise noted, the historical laws cited in this opinion are found in the Excerpts of Record and Addenda filed by the parties.

Because many laws prohibited carrying firearms in parks, and the constitutionality of those laws was not in dispute, we agree with the Second Circuit and several district courts that the Nation's historical tradition includes regulating firearms in parks. Antonyuk, 89 F.4th at 355–63; Kipke, 695 F. Supp. 3d at 654–55; Md. Shall Issue, 680 F. Supp. 3d at 585–88. Contra Koons v. Platkin, 673 F. Supp. 3d 515, 639–42 (D.N.J. 2023), appeal filed, No. 23-2043 (3d Cir. June 9, 2023); Springer v. Grisham, No. 1:23-cv-00781 KWR/LF, 2023 WL 8436312, at *5–*8 (D.N.M. Dec. 5, 2023), appeals filed, No. 23-2192 (10th Cir. Dec. 11, 2023) and No. 23-2194 (10th Cir. Dec. 15, 2023).

Plaintiffs' arguments to the contrary are unpersuasive. It is irrelevant that many of the ordinances were local, and not state, laws. Parks are fundamentally local, and it is unsurprising—and, in our view, constitutionally insignificant—that the first modern parks were regulated, as parks are regulated today, primarily by municipalities rather than by States.

Similarly, it makes little sense to focus on the population of a particular city compared to the population of the nation as a whole, and then to dismiss the significance of the law because the resulting ratio is small. By contrast to regulations that apply broadly, such as the concealed-carry restrictions at issue in Bruen, the regulations here governed very specific places. For example, when New York banned firearms from Central Park in 1858, no other city (or town) in New York had a modern park. It makes little sense to say that only a small number of people in New York were subject to a park regulation; 100 percent of parks were regulated.

Plaintiffs overlook that the Supreme Court designated schools as sensitive places, even though less historical

support justified that designation.  The relevant historical
analogues were limited to a few local laws that post-dated
the ratification of the Second Amendment and governed only
a very small percentage of the national population.  The
numerous historical laws prohibiting the carry of firearms in
parks share some of these characteristics and similarly
support designating parks as sensitive places.

We acknowledge that many of the laws cited above were
implemented in the years immediately following the
ratification of the Fourteenth Amendment.  But we conclude
that those postbellum laws carry meaningful evidentiary
weight.  The ordinances were fully consistent with pre-
ratification practice, they emerged shortly following
ratification, and Plaintiffs have not offered any evidence that
anyone anywhere viewed the laws as unconstitutional or
even questionably constitutional.

In sum, as soon as modern parks arose, municipalities
and states enacted laws prohibiting the carrying of firearms
into parks.  Those laws both pre-dated and post-dated 1868,
and nothing in the record suggests that courts considered the
laws unconstitutional.  The laws are analogous to other
historical laws establishing a national historical tradition of
banning firearms at sensitive places.  Plaintiffs are unlikely
to succeed on their facial challenge as to parks.

Some Plaintiffs suggest that, even if the analysis above
permits the conclusion that regulating firearms at urban
parks falls within the Nation's historical tradition, the
analysis does not justify the conclusion that States may ban
firearms at large, rural, and sparsely visited parks. Plaintiffs
then leap to the conclusion that, because some parks might

fall outside the national historical tradition,[3] Plaintiffs
<u>prevail</u> on their <u>facial</u> claim.

Plaintiffs have the analysis with respect to a facial claim
precisely backward.  To succeed on a facial challenge,
Plaintiffs must show either that the law is "unconstitutional
in every conceivable application" or that the law "seeks to
prohibit such a broad range of protected conduct that it is
unconstitutionally overbroad."  <u>Foti v. City of Menlo Park</u>,
146 F.3d 629, 635 (9th Cir. 1998) (citation omitted); <u>see also</u>
<u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987) ("A facial
challenge to a legislative Act is, of course, the most difficult
challenge to mount successfully, since the challenger must
establish that no set of circumstances exists under which the
Act would be valid.").  Indeed, the Supreme Court recently
reiterated this principle in <u>Rahimi</u>, holding in the specific
context of a Second Amendment challenge that, "to prevail,
the Government need only demonstrate that [a challenged
law] is constitutional in some of its applications."  144 S. Ct.
at 1898.  As discussed above, because of the national
historical tradition of banning firearms at a wide array of
parks, the state laws here are constitutionally valid with
respect to many, if not all, of the parks in Hawaii and
California.  Accordingly, Plaintiffs' facial challenges fail.
We therefore hold that Plaintiffs are unlikely to succeed with
respect to the challenged state laws' provisions concerning
parks.[4]

---

[3] We need not, and do not, reach whether the ban on firearms comports
with the Second Amendment with respect to each individual park in
Hawaii and California.

[4] To the extent that Plaintiffs argue that the aggregate effect of Hawaii's
law is to ban firearms across much of Maui County, such that the law

Our conclusion with respect to parks applies equally to other, related places. In the Hawaii case, the district court began its analysis by agreeing with Defendant that public beaches in Hawaii are akin to parks. The court "therefore consider[ed] the issue of beaches and parks as operating under the same analysis." Wolford, 686 F. Supp. 3d at 1063. The record supports the conclusion that modern-day beaches in Hawaii, particularly in urban or resort areas, often resemble modern-day parks far more than they resemble, say, beaches at the Founding, and we do not read Plaintiffs' brief as challenging that conclusion or as raising an independent argument as to beaches. We therefore conclude that, for the same reasons just discussed with respect to parks, Plaintiffs are unlikely to succeed on their claim as to beaches.

In the California cases, in addition to holding that Plaintiffs are likely to succeed with respect to parks specifically, the district court reached the same conclusion as to three separate park-like areas: "athletic areas," "athletic facilities," and most real property "under the control of the Department of Parks and Recreation or Department of Fish and Wildlife." May, 2023 WL 8946212, at *12–*13. We see no reason why the analysis with respect

---

must be unconstitutional, we reject that argument for two main reasons. First, because we affirm parts of the injunction, and because Plaintiffs have raised only facial challenges to most aspects of the law at this preliminary stage, the precise reach of Hawaii's law is uncertain. Second, because Plaintiffs may take their firearms onto the public streets and sidewalks throughout Maui County (and elsewhere in Hawaii), as well as into many commercial establishments and other locations, the situation in this case is unlike the argument that Bruen rejected, which would have meant, effectively, that firearms could be banned from the entire island of Manhattan. Bruen, 597 U.S. at 31.

to parks does not apply equally to those places as well, and
Plaintiffs have not argued on appeal that those places differ
meaningfully from parks. We therefore hold that Plaintiffs
are unlikely to succeed in their challenges with respect to
athletic areas, athletic facilities, and real property controlled
by the specified agencies.

### 2. Playgrounds and Youth Centers

In the California cases, the district court held that
Plaintiffs are likely to succeed in their challenge to
California Penal Code section 26230(a)(11), which prohibits
carry in "[a] playground or public or private youth center, as
defined in Section 626.95, and a street or sidewalk
immediately adjacent to the playground or youth center."
Except for the district court in this case, every court has
rejected the argument that firearms must be allowed on
playgrounds. Antonyuk v. Hochul, 639 F. Supp. 3d 232, 324
(N.D.N.Y. 2022) (unchallenged on appeal), aff'd in part,
vacated in part, and remanded sub nom. Antonyuk v.
Chiumento, 89 F.4th 271, 293; Koons, 673 F. Supp. 3d at
639; Siegel v. Platkin, 653 F. Supp. 3d 136, 152 (D.N.J.
2023); We the Patriots USA, Inc. v. Grisham, No. 1:23-cv-
00773-DHU-LF, 2023 WL 6377288, at *3 (D.N.M. Sept. 29,
2023). Those other decisions are persuasive. Playgrounds
did not exist in modern form at the time of the Founding (or
even at Reconstruction); playgrounds are found primarily at
schools and parks; both categories of places qualify as
"sensitive places" that have a historical tradition of firearm
bans; by extension, there is a historical tradition of banning
firearms at playgrounds. Plaintiffs do not present any
separate argument concerning youth centers, which are akin
to schools. In sum, Plaintiffs are unlikely to succeed on
these claims.

### 3. Bars and Restaurants that Serve Liquor

In the Hawaii case, the district court held that Plaintiffs are likely to succeed in challenging Hawaii Revised Statutes section 134-9.1(a)(4), which prohibits the carrying of firearms into "[a]ny bar or restaurant serving alcohol or intoxicating liquor." Haw. Rev. Stat. § 134-9.1(a)(4). In the California cases, the district court ruled that Plaintiffs are likely to succeed in challenging California Penal Code section 26230(a)(9), which prohibits carry in establishments "where intoxicating liquor is sold for consumption on the premises." We disagree.

Establishments serving alcohol have existed since the Founding. In determining whether a place that serves alcohol qualifies as a "sensitive place," we find relevant three sets of historical regulations. First, in a long line of regulations dating back to the colonial era, colonies, states, and cities have regulated in ways reflecting their understanding that firearms and intoxication are a dangerous mix. Some cities—for example, Chicago in 1851 and St. Paul, Minnesota, in 1858—prohibited retailers of liquor from keeping gunpowder. Some states—Kansas in 1867, Missouri in 1883, and Wisconsin in 1883—prohibited the carry of firearms while intoxicated. Several colonial laws separated the militia—which at the time included nearly all men, Heller, 554 U.S. at 595–96—from liquor: A 1746 New Jersey law prohibited the sale of liquor to members of the militia while on duty; a 1756 Delaware law prohibited the militia from meeting within half a mile from a tavern and prohibited the sale of liquor at any militia meeting; and a 1756 Maryland law prohibited the sale of liquor within five miles of a training exercise for the militia. That line of regulations is not directly on point; the legislatures may have had several purposes, and those laws did not prohibit

firearms at all places serving alcohol.  But the regulations show that, from before the Founding and continuing throughout the Nation's history, governments have regulated in order to mitigate the dangers of mixing alcohol and firearms.  We are not aware of any dispute as to the constitutionality of the laws just listed or of any similar law.

The second line of regulations, which we discuss in more detail elsewhere in this opinion, broadly prohibited the carry of firearms at ballrooms and at social gatherings.  For example, New Orleans prohibited firearms at ballrooms in 1817, as did Texas in 1870.  And other states, such as Missouri in 1875, prohibited firearms at public assemblies of persons.  These laws, too, are not directly on point. Bars and restaurants are not ballrooms; and although people gather socially at restaurants, restaurants do not always contain a gathering of people.  But these laws show a well-established tradition of prohibiting firearms at crowded places, which included, at times, bars and restaurants.  And, as with the other laws, we are not aware of any question as to the constitutionality of those laws.

Third, and perhaps most importantly, Defendants point to several laws that are directly on point.  In 1853, New Mexico prohibited firearms at a "Ball or Fandango"[5] and at any "room adjoining said ball where Liquors are sold."  In 1870, San Antonio, Texas, banned firearms at any "bar-room" or "drinking saloon."  In 1879, New Orleans banned firearms at any "public hall" or "tavern."  In 1890, Oklahoma

---

[5] The term "fandango" as used in New Mexico at the time meant a social gathering akin to a ball; an "assembl[y] where dancing and frolicking are carried on."  See Fandango, Dictionary of American Regional English (1991) (citing 19th century sources pertaining to New Mexico usage of the term).

banned firearms at "any place where intoxicating liquors are sold."  No evidence in the record suggests that anyone disputed the constitutionality of those laws.

When considered in conjunction with the other two lines of regulations, we conclude that those laws establish that bars and restaurants that sell alcohol are among the Nation's "sensitive places" where firearms may be prohibited.  The four on-point laws were enacted both before and soon after the ratification of the Fourteenth Amendment and are similar in all material respects to Hawaii's and California's modern laws; the historical laws are consistent with and related to the similar traditions of separating firearms and the intoxicated and of separating firearms and crowds; and no evidence suggests that any of the laws was viewed as unconstitutional.  It is true that the four on-point laws post-dated the ratification of the Second Amendment, governed only a small population, and were, to some extent, localized.  But the laws provide support analogous to that provided by the few, local, post-ratification regulations that justified designating schools as sensitive places.  In sum, Hawaii's and California's modern laws are "consistent with the principles that underpin our regulatory tradition," Rahimi, 144 S. Ct. at 1898, of prohibiting the carry of firearms at sensitive places.

Our conclusion that places that serve alcohol fall within the national historical tradition of prohibiting firearms at sensitive places comports with the only other circuit decision to have reached the issue.  In Antonyuk, the Second Circuit held that the plaintiffs were unlikely to succeed in a challenge to New York's law that prohibits firearms at places with a liquor license.  89 F.4th at 365–69.

For all of those reasons, we hold that Plaintiffs are unlikely to succeed on their claims with respect to places that serve alcohol.

### 4. Places of Amusement

In the California cases, the district court held that Plaintiffs are likely to succeed in challenging California Penal Code section 26230(a) with respect to places of amusement: casinos, stadiums, amusement parks, zoos, museums, and libraries. The parties and the district court did not distinguish among the first three types of places, each of which is a modern social gathering place for amusement. We follow the parties' lead in analyzing those places as a group. We also include zoos, museums, and libraries, which are places visited for both amusement and educational purposes. As noted below, historical laws banning firearms frequently classified those categories of places together. We hold that Plaintiffs are unlikely to prevail on these claims.

Defendant has put forth persuasive evidence that casinos, stadiums, amusement parks, zoos, museums, and libraries did not exist in modern form at the Founding. Instead, those venues are modern forms of Founding-era places where balls, fandangos, and other social gatherings for amusement occurred. Accordingly, we look to the historical record for analogous regulations of those places.

Convincing evidence supports the conclusion that prohibitions on firearms at places of amusement fall within the national historical tradition of prohibiting firearms at sensitive places. Both before and shortly following the ratification of the Fourteenth Amendment, cities, states, and territories prohibited firearms at a wide range of places for social gathering and amusement that are analogous to modern casinos, stadiums, amusement parks, zoos,

museums, and libraries.  In 1817, New Orleans prohibited firearms at any public ballroom.  In 1853, New Mexico prohibited firearms at any ball or fandango.  In 1869, Tennessee prohibited firearms at any fair or race course.  In 1870, Georgia prohibited firearms at some specified places and "any other public gathering."  That same year, Texas prohibited firearms at any ballroom, "social party," or "other social gathering" and at any "place where persons are assembled for educational, literary or scientific purposes."  The next year, in 1871, Texas amended its law to ban firearms also specifically at "any circus, show, or public exhibition of any kind."  In 1875, Missouri banned firearms at any gathering for educational, literary, or social purposes, including any non-military public assembly.[6]  In 1879, reflecting the evolution of places of amusement occurring in the Nation, New Orleans expanded its list of places where firearms are prohibited to include any "place for shows or exhibitions," as well as any "house or other place of public entertainment or amusement."  In 1889, Arizona prohibited firearms at any ballroom, social party, or social gathering; any other place of amusement, including "any circus, show or public exhibition"; and any place where people are gathered for educational or scientific purposes.  In 1890, Oklahoma prohibited firearms at the same general list of places:  any ballroom, social party, or social gathering; other places of amusement, including "any circus, show, or public exhibition of any kind"; and any place where people are

---

[6] In 1874, Missouri had banned only concealed carry at those locations, and the Missouri Supreme Court upheld the constitutionality of that statute.  Missouri amended the statute the next year to prohibit all forms of carry at those locations.

gathered for educational or scientific purposes. In 1903, Montana prohibited firearms at the same list of places.

The evidence suggests that courts were in agreement that those laws were constitutional. Indeed, state court decisions at the time rejected arguments that the provisions conflicted with the Second Amendment. See, e.g., Hill v. State, 53 Ga. 472, 476 (1874) (rejecting a Second Amendment challenge and opining that "the bearing [at a concert] of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners"); English v. State, 35 Tex. 473, 478–79 (1871) (holding that it was "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into . . . a ball room . . . or any other place where ladies and gentlemen are congregated together"); Andrews v. State, 50 Tenn. 165, 182 (1871) (holding, in the context of a Second Amendment challenge, that "a man may well be prohibited from carrying his arms to . . . [a] public assemblage"). State courts also regularly upheld convictions for violating the statutes without even questioning the constitutionality of the laws. See, e.g., Wynne v. State, 51 S.E. 636, 637 (Ga. 1905) ("carrying about his person a shotgun to a public gathering"); State v. Pigg, 85 Mo. App. 399, 402 (1900) ("going into the dwelling house of Josiah Jones, where there was a social gathering, having about his person a deadly weapon"); Maupin v. State, 17 S.W. 1038, 1039 (Tenn. 1890) (carrying a pocket-pistol at a grist mill that was "a public place,–a place to which customers were constantly invited and daily expected to go"); Alexander v. State, 11 S.W. 628, 629 (Tex. Ct. App. 1889) ("the defendant went into a place where persons were assembled for

amusement, carrying about his person a pistol"); Owens v. State, 3 Tex. App. 404, 405 (1878) ("did unlawfully and willfully go into a ball-room with a pistol about his person").

The extensive set of historical regulations banning firearms at places of amusement and social gathering, consistently upheld and accepted as constitutional, justifies the conclusion that modern-day places of amusement such as casinos, stadiums, amusement parks, zoos, museums, and libraries fall within the national historical tradition of prohibiting firearms at sensitive places. The regulations date from before and shortly after the ratification of the Fourteenth Amendment, and the laws governed in cities, states, and territories. Those laws provide more evidence of a tradition of prohibiting firearms in places of amusement than the few, local regulations that evinced a tradition of prohibiting firearms in schools.

For two of the places of amusement—zoos and libraries—we note that the historical practice of banning firearms at these locations extends even further back. As other courts have noted, many of the first modern zoos were located in parks, and some of those parks banned firearms. Koons, 673 F. Supp. 3d at 637. "Those parks, and in effect zoos, did ban firearms." Id. We agree with the Second Circuit: "That zoos were unproblematically covered by the firearm regulations of their surrounding parks tends to show that our forebearers took no Second Amendment issue with the regulation of firearms at zoos." Antonyuk, 89 F.4th at 364. Similar reasoning applies to libraries. Many libraries are housed in schools and courthouses, for example, and regulation of firearms in those places is plainly constitutional and within the Nation's historical tradition.

Our holding that places of amusement likely fall within the historical tradition of regulating sensitive places comports with the Second Circuit's decision concerning similar provisions in New York's law. In Antonyuk, the Second Circuit held that the plaintiffs were unlikely to succeed on a challenge to New York's ban on firearms at theaters and zoos. 89 F.4th at 363–64, 373–76. The court looked to many of the same laws that we listed above and concluded that a ban on firearms at theaters was justified as part of a tradition of banning firearms at "discrete, densely crowded physical spaces wherein people assemble for amusement." Id. at 375; see also Kipke, 695 F. Supp. 3d at 652 (holding that Maryland's "prohibition on carrying in museums is supported by a representative number of historical statutes that demonstrate a historical tradition of firearm regulation in places of gathering for education, literary, or scientific purposes"); id. at *15 (holding that Maryland's "regulations restricting firearms in stadiums, racetracks, amusement parks, and casinos are analogous to historical statutes banning [firearms] in gathering places for entertainment"); Md. Shall Issue, 680 F. Supp. 3d at 588 (holding that "a representative number of historical statutes . . . demonstrate a historical tradition of firearm regulation in places of gathering for literary or educational purposes, including public libraries"). But see Koons, 673 F. Supp. 3d at 646–47 (holding that the plaintiffs were likely to succeed on a challenge to New Jersey's ban on firearms at entertainment facilities); Siegel, 653 F. Supp. 3d at 156–57 (same district judge as in Koons reaching the same conclusion with respect to casinos).

In sum, we hold that Plaintiffs are unlikely to prevail in challenging California's law with respect to casinos, stadiums, amusement parks, zoos, museums, and libraries.

### 5.  Parking Areas Connected to Sensitive Places

The topic of parking areas connected to sensitive places arises in both the California and Hawaii cases, but the issues on appeal are distinct, so we address them separately.

#### a.  California Cases

California Penal Code section 26230(a) prohibits concealed carry in many parking areas associated with the sensitive places listed in that section. See, e.g., Cal. Penal Code § 26230(a)(20) (prohibiting carry at any "building, real property, or parking area under the control of a zoo or museum"); id. § 26230(a)(24) (prohibiting carry at any "parking area under control of a law enforcement agency"). The district court held that Plaintiffs are likely to succeed in challenging the entire California Penal Code section 26230 as it pertains to all parking areas listed in that section. May, 2023 WL 8946212, at *16–*17. The preliminary injunction therefore allows concealed carry in the parking areas at most listed places, even those not challenged by Plaintiffs. In other words, in addition to parking areas at most of the sensitive places discussed in this opinion, the injunction applies to parking areas at preschools, childcare facilities, government buildings, courthouses, jails, prisons, juvenile detention centers, schools, airports, nuclear power plants, and police stations. Cal. Penal Code § 26230(a)(2)–(6), (14), (18), (21), (24). We reject the district court's sweeping conclusion, and we hold that Plaintiffs are unlikely to succeed on this claim.

Some parking areas—such as a parking garage located in the basement of a courthouse or jail—are likely so intertwined with the main structure as to be considered part of the sensitive area itself. Other parking areas—such as a student-only parking area at a school or a fenced, gated,

parking lot at a jail or nuclear power plant—likely fall within
a reasonable buffer zone such that firearms may be
prohibited there. We agree with those courts that have held
that, depending on the factual circumstances, firearms may
be prohibited at some parking areas connected to sensitive
places. See, e.g., Bonidy v. U.S. Postal Serv., 790 F.3d
1121, 1125 (10th Cir. 2015) (holding, "on the facts of this
case, that the parking lot should be considered as a single
unit with the postal building itself to which it is attached and
which it exclusively serves"); United States v. Dorosan, 350
F. App'x 874, 875 (5th Cir. 2009) (per curiam)
(unpublished) ("Given this usage of the parking lot by the
Postal Service as a place of regular government business, it
falls under the 'sensitive places' exception recognized by
Heller."); United States v. Allam, 677 F. Supp. 3d 545, 578
(E.D. Tex. 2023) ("[T]his Nation is no stranger to
prohibiting individuals from possessing or carrying firearms,
or other weapons for that matter, within a certain proximity
of sensitive places."); Md. Shall Issue, 680 F. Supp. 3d at
589 (finding "numerous examples of laws prohibiting
firearms in buffer zones of a certain distance around a
'sensitive place' or other location at which the government
could prohibit the carrying of firearms"); United States v.
Walter, No. 3:20-cr-0039, 2023 WL 3020321, at *7 (D.V.I.
Apr. 20, 2023) ("Not only is there historical evidence of
regulation on firearms in sensitive places, but there is also
evidence of laws creating 'buffer zones' around those places
as well."). Thus, to the extent that Plaintiffs suggest that
firearms may never be prohibited in parking areas, no matter
the circumstances, we reject that extreme position.

Plaintiffs primarily argue that some parking areas are
insufficiently connected to a sensitive place such that the
parking area is not reasonably covered by the ban on

firearms at the sensitive place. For example, a parking area that is shared with ordinary businesses or a parking area that is geographically remote from the sensitive place might fall outside the Nation's tradition of regulating sensitive places and the corresponding buffer zones. Plaintiffs contend that, because it would be unconstitutional to ban concealed carry in some parking areas, California's ban must fail on its face. That mode of analysis is contrary to the proper analysis of a facial challenge. Rahimi, 144 S. Ct. at 1898. We easily conclude that the ban on firearms at some parking lots— parking garages under government buildings, fenced parking areas adjacent to nuclear power plants, student-only parking areas at schools, and so on—are permissible. This is particularly true because, with few exceptions, persons may store their firearms securely in their vehicles in the parking areas of a location where firearms are otherwise prohibited. Cal. Penal Code § 26230(c)(2). Because the law's reach is constitutional in many legitimate instances, the facial challenge must fail. Rahimi, 144 S. Ct. at 1898; Foti, 146 F.3d at 635. Plaintiffs could have asked, as the Plaintiffs in the Hawaii case did, for more tailored relief with respect to parking areas, but they did not.

In the California cases, we hold that Plaintiffs are unlikely to prevail on their facial challenge with respect to parking areas at all sensitive places.

b. Hawaii Case

By contrast to the injunction entered in the California cases, the district court in the Hawaii case enjoined Defendant solely from enforcing the law in parking areas shared by governmental buildings and non-governmental buildings: "parking areas owned, leased, or used by the State or a county which share the parking area with non-

governmental entities, are not reserved for State or county employees, or do not exclusively serve the State or county building."[7]  Wolford, 686 F. Supp. 3d at 1076–77.  Neither party appears to dispute that persons may carry firearms onto that subset of parking areas, but the parties disagree as to why.  In Defendant's view, the state law prohibits persons from bringing firearms only into areas used exclusively by the State.  Plaintiffs want to bring their firearms only onto shared lots, not exclusive lots.  Defendant thus urges us to conclude that Plaintiffs lack standing to challenge the law with respect to shared lots.  In Plaintiffs' view, the law appears to proscribe their desired conduct, so they have standing to seek injunctive relief.  And the injunction is proper because they prevail on the merits of the Second Amendment challenge with respect to the law's apparent prohibition on carrying firearms onto shared lots.  On appeal, Defendant has not challenged meaningfully the Second Amendment analysis as to shared parking lots; we hold that,

---

[7] The district court also enjoined the enforcement of the ban in parking areas adjacent to parks, beaches, bars, restaurants that serve alcohol, and financial institutions.  As discussed earlier, we hold that Plaintiffs are unlikely to succeed on their claim as to the first four of those places: parks, beaches, bars, and restaurants that serve alcohol.  Plaintiffs do not argue that they are likely to succeed independently as to the parking areas adjacent to those places.  For the reasons that we just discussed with respect to the parking areas at issue in the California cases, we conclude that Plaintiffs in the Hawaii case are unlikely to succeed on their challenge to the parking areas adjacent to parks, beaches, bars, and restaurants that serve alcohol.

Similarly, as we discuss later, we hold that Plaintiffs are likely to succeed on their challenge as to financial institutions.  The ban on firearms at the adjacent parking areas is justified only if financial institutions qualify as a "sensitive place."  We accordingly hold that Plaintiffs are likely to succeed on their challenge as to parking areas adjacent to financial institutions.

at least for the purpose of the preliminary injunction, Defendant has forfeited any argument as to the merits. Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999).

Because standing is a jurisdictional requirement, though, we must address the issue. Friery v. L.A. Unified Sch. Dist., 448 F.3d 1146, 1148 (9th Cir. 2006). Plaintiffs do not allege an actual injury; they allege an imminent future injury— criminal prosecution for taking their firearms onto shared lots. For that reason, Plaintiffs have standing only if: "(1) [they] ha[ve] alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest;' (2) but the conduct is 'proscribed by a statute;' and (3) 'there exists a credible threat of prosecution thereunder.'" Isaacson v. Mayes, 84 F.4th 1089, 1098 (9th Cir. 2023) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014)) (some internal quotation marks omitted). As several courts have remarked in similar circumstances, the situation is peculiar in that "the would-be sanctioned party . . . must argue that the law does apply, while the would-be enforcing party, the Attorney General, could defeat standing by conceding that the law does not apply." Peace Ranch, LLC v. Bonta, 93 F.4th 482, 489 (9th Cir. 2024); see FEC v. Cruz, 596 U.S. 289, 299–300 (2022) (describing the reversed roles in similar terms). We follow the approach taken in Peace Ranch and, as we did there, conclude that Plaintiffs have standing. 93 F.4th at 489; see also Cruz, 596 U.S. at 301–02 (holding that the plaintiffs had standing in similar circumstances); Antonyuk, 89 F.4th at 333–36 (concluding that the plaintiffs had standing to challenge New York's sensitive-places law, describing the Supreme Court's analysis and holding in Babbitt v. United Farm Workers National Union, 442 U.S. 289 (1979), and concluding that

the inquiry in this context sets a "low" bar and requires a "quite forgiving" approach).

All three requirements are met here. First, Plaintiffs intend to take their firearms onto shared parking lots, an action that is affected by a constitutional interest. Second, Plaintiffs have alleged that the state law <u>arguably</u> proscribes their proposed conduct. <u>Peace Ranch</u>, 93 F.4th at 489 (citing <u>Driehaus</u>, 573 U.S. at 162). The broad text of the law prohibits the carrying of firearms onto "[a]ny building or office owned, leased, or used by the State or a county, and <u>adjacent grounds and parking areas</u>." Haw. Rev. Stat. § 134-9.1(a)(1) (emphasis added). Parking areas adjacent, that is, next to, government buildings fall, without qualification, within the text of the law. Defendant suggests that the Hawaii legislature in fact intended a narrower meaning of "adjacent" that encompasses only those areas both "next to" and "<u>exclusively serving</u>" the sensitive place. Defendant may be right that the legislature intended a specialized use of the word, but Plaintiffs' interpretation is a reasonable one, so the statute "arguably" proscribes their conduct. <u>Peace Ranch</u>, 93 F.4th at 489. Finally, given Plaintiffs' strong textual argument and the variety and number of shared parking areas in the state of Hawaii that might lead to a prosecution, we conclude that Plaintiffs have alleged a sufficiently credible threat of prosecution.

Accordingly, we agree with the district court that Plaintiffs have standing. Because Defendant has forfeited any argument on the merits challenging the injunction as to shared parking lots, we also agree with the district court that Plaintiffs are likely to succeed on the merits with respect to shared parking lots. Notably, the injunction has no effect, under Defendant's interpretation of state law, on any parking area covered by the state law. On remand, Defendant is free

to raise any relevant argument with respect to this topic.  If, for example, Defendant disavows enforcement of the law in the relevant respect, Plaintiffs' challenge in this regard may become moot.  See id. at 490 (holding that the plaintiffs' standing "often rises or falls with the enforcing authority's willingness to disavow enforcement").

### 6.  Private-Property Default Rule

In both the Hawaii case and the California cases, the district courts held that Plaintiffs are likely to succeed on their challenges to the respective bans on the carry of firearms on private property held open to the public unless the owner or operator consents.  Haw. Rev. Stat § 134-9.5(a); Cal. Penal Code § 26230(a)(26).[8]  Although the state statutes are similar, they differ in one key respect.  Hawaii's law allows a property owner to consent orally, in writing, or by posting appropriate signage on site.  Haw. Rev. Stat. § 134-9.5(b).  California's law, by contrast, allows a property owner to consent only by "clearly and conspicuously post[ing] a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property."  Cal. Penal Code § 26230(a)(26).

---

[8] California's law applies only to "privately owned commercial properties open to the public."  Cal. Penal Code § 26230(a)(26). Hawaii's law applies more broadly, to nearly all private property, Haw Rev. Stat. § 134-9.5(a), but the district court preliminarily enjoined enforcement of that provision only with respect to private property "open to the public."  Wolford, 686 F. Supp. 3d at 1077.  Plaintiffs did not file a cross-appeal challenging the district court's holding that the Second Amendment does not apply to private property not open to the public. We therefore address only whether Hawaii's law comports with the Second Amendment with respect to private property that is open to the public.

As an initial matter, we hold that Plaintiffs have standing.  Defendant in the Hawaii case contends that Plaintiffs lack standing to challenge the private-property rule because Hawaii's law does not prevent Plaintiffs from carrying firearms on any particular property; a property owner's choice to withhold consent prevents Plaintiffs from doing so.  We agree with the courts that have unanimously and persuasively rejected this argument. Antonyuk, 89 F.4th at 379–80; Kipke, 695 F. Supp. 3d at 656–58; Koons, 673 F. Supp. 3d at 598; Frey v. Nigrelli, 661 F. Supp. 3d 176, 191–92 (S.D.N.Y. 2023), appeal filed sub nom. Frey v. Bruen, No. 23-365 (2d Cir. Mar. 16, 2023).  Plaintiffs' injury does not depend on the decisions of property owners.  Plaintiffs allege that they intend to continue carrying firearms on private property, and the law requires that they seek permission before doing so, placing a new burden on their right to carry.  If they carry firearms on private property without first seeking consent, as they have alleged, they will violate the law and will face a threat of criminal prosecution, whether the owner decides to grant or withhold consent.  Moreover, Plaintiffs plausibly allege that many property owners will not post signs of any sort or give specialized permission, regardless of the default rule.  Indeed, that group of owners appears to be the impetus for Hawaii to enact the law; if that group were small or did not exist, Hawaii's law would accomplish little or nothing.  On a practical level, then, Plaintiffs plausibly attest that they lawfully visit many places with firearms but that, under Hawaii's new law, they will not be able to visit those places lawfully with firearms.

They are thus injured by the law, and a court can redress the injury.  Plaintiffs have standing.[9]

For similar reasons, we conclude that the conduct proscribed by the state laws falls within the text of the Second Amendment at the first step of the Bruen analysis. Plaintiffs allege that, but for the challenged laws, they would be able to carry firearms onto many private properties that are open to the public.  The Supreme Court held that the Second Amendment's text covers carrying firearms publicly outside the home, Bruen, 597 U.S. at 24, so carrying onto properties held open to the public is conduct that likely falls within the plain text of the Second Amendment. Accordingly, courts unanimously have concluded that a law changing the default rule on private property falls within the text of the Second Amendment. Antonyuk, 89 F.4th at 379–84; Kipke, 695 F. Supp. 3d at 658 n.9; Koons, 673 F. Supp. 3d at 607–15.

We are unpersuaded that the Second Amendment is limited strictly to property that is publicly owned.  The text of the Second Amendment does not limit the right to bear arms to publicly owned spaces.  Bruen's repeated mention of "public carry" or "carry in public" appears to encompass the right to carry firearms on private property that is open to the public. See, e.g., Bruen, 597 U.S. at 33 (quoting a party's brief concerning "areas 'frequented by the general public'"); id. at 56 (discussing restrictions on "public carry in locations frequented by the general community").  We agree with the Second Circuit and with the district court's thoughtful

---

[9] Our holding that Plaintiffs have standing also applies to other aspects of this case, such as Plaintiffs' standing to challenge the provisions prohibiting the carry of firearms in banks and other commercial establishments open to the public.

analysis in the Hawaii case that the Second Amendment encompasses the right to bear arms not only in publicly owned spaces, but also on private property that is generally open to the public. Wolford, 686 F. Supp. 3d at 1057–59; Antonyuk, 89 F.4th at 383–84; see also Antonyuk v. Hochul, 639 F. Supp. 3d at 316–17 (concluding that the right extends to private property open to the public). No court appears to have embraced the narrow view that the Second Amendment applies only on public property. Plaintiffs are likely to succeed on the argument that the Second Amendment encompasses a right to bear arms on private property held open to the public.

Equally clear, however, is the right of a private property owner to exclude others, including those bearing arms. See, e.g., Cedar Point Nursery v. Hassid, 594 U.S. 139, 150 (2021) ("[T]he right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176, 179–180 (1979))). Nothing in the text of the Second Amendment or otherwise suggests that a private property owner—even owners who open their private property to the public—must allow persons who bear arms to enter. See, e.g., Siegel, 653 F. Supp. 3d at 158 ("[T]he pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place against the owner's wishes." (ellipsis and emphasis omitted)); Kipke, 695 F. Supp. 3d at 658 n.9 ("Again, private property owners can freely exclude firearms . . . ."). With that understanding, we hold that Plaintiffs are likely to succeed at the first step of the Bruen analysis, and we turn to whether Defendants have shown a relevant national historical tradition.

We categorize the pertinent colonial and state laws into two sets. The first set of laws prohibited the carry of firearms onto subsets of private land, such as plantations or enclosed lands. In 1721, Pennsylvania prohibited "carry[ing] any gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation." In 1722, New Jersey prohibited persons from "carry[ing] any Gun, or Hunt[ing] on the Improved or Inclosed Lands in any Plantation, . . . unless he have License or Permission from the owner of such Lands or Plantation." In 1763, New York criminalized "carry[ing], shoot[ing], or discharg[ing] any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever . . . without Licence in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor [of the land]." Finally, in 1893, Oregon provided that it is unlawful for a person "being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."

The second set of laws contained broader prohibitions, banning the carrying of firearms onto <u>any</u> private property without the owner's consent. In 1771, New Jersey amended its laws to prohibit the carrying of firearms on any lands owned by another: "to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." Similarly, in 1865, Louisiana prohibited "carry[ing] fire-arms on the premises or plantation of any citizen, without the consent of the owner or proprietor."

The record—in these cases or in any other case, so far as
we can tell—contains no evidence whatsoever that these
laws were viewed as controversial or constitutionally
questionable. Instead, they were viewed as falling well
within the colony's or the State's ordinary police power to
regulate the default rules concerning private property.

We acknowledge that the first set of laws likely was
limited to only a subset of private property; those laws likely
did not apply to property that was generally open to the
public.**[10]** Similarly, the primary aim of some of those laws
was to prevent poaching. But those limitations did <u>not</u> apply
to the second set of laws. New Jersey's 1771 law applied to
<u>all</u> private property, and the purpose of that specific
provision—found in Section 1 of the Act—was "to prevent
trespassing with Guns." The New Jersey law also sought to
preserve game, but the provisions effecting that aim were
found in a separate provision—Section 2 of the Act. The
1865 Louisiana law, too, applied to <u>all</u> private property,
encompassing any citizen's "premises or plantation." <u>See,
e.g.</u>, <u>Bailey v. Quick</u>, 28 La. Ann. 432, 433 (1876)
(describing "a room at No. 90 Baronne street" as the "leased
premises"); <u>Westermeier v. Street</u>, 21 La. Ann. 714, 714–15
(1869) (discussing the "the delivery of the premises to the
lessee [who was a business owner] in a leaky and otherwise
untenantable condition"); <u>Reynolds v. Swain</u>, 13 La. 193,
194 (1839) (referring to a brick building operated by
apothecaries as the "leased premises"). And the law made

---

[10] Defendant in the Hawaii case has argued that "inclosed" lands were
not necessarily those lands physically enclosed by a fence or waterway;
instead, they encompassed any property where, for example, the owner
paid taxes. We need not consider that argument because, for the reasons
described in text, we hold that Plaintiffs in the Hawaii case are unlikely
to prevail.

no mention of hunting or game; the sole stated purpose of the law was to "prohibit the carrying of fire-arms on premises or plantations of any citizen without the consent of the owner."

We conclude, then, that the Nation has an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property. Collectively, the laws establish that colonies and States freely arranged the relevant default rules. And the 1771 New Jersey law and the 1865 Louisiana law are historical "dead ringers": they simply prohibited the carry of firearms on private property without consent. Those laws—enacted shortly before the ratification of the Second Amendment and very shortly before the ratification of the Fourteenth Amendment—were uncontroversial. They are easily analogous to the "sensitive places" laws mentioned by the Supreme Court.

Hawaii's modern law falls well within the historical tradition. The law prohibits the carrying of firearms onto private property unless the owner has posted signs, otherwise has given written consent, or has given oral consent. We therefore conclude that Plaintiffs in the Hawaii case are unlikely to succeed on the merits.

But we conclude that California's law falls outside the historical tradition. As noted at the outset of this section, California prohibits the carry of firearms on private property only if the owner has consented in one specific way: posting signs of a particular size. We find no historical support for that stringent limitation. Although two of the laws mentioned above required a person to obtain consent in writing, all of the other laws allowed a person to obtain consent in any manner. None of the laws forbade a person

from obtaining permission only by convincing the owner to post signs of a specific size. Nor do modern circumstances appear to justify California's imposing a much more stringent consent requirement; ordinary signs existed in 1791, in 1868, and today.

We recognize that a historical twin is not required. Rahimi, 144 S. Ct. at 1898. But California's law differs substantially from the historical laws. Under the historical laws, a property owner could give on-the-spot, granular permission to a particular person or persons for a specified time: "Sure, you may carry your musket on my property, but only this week and only one musket." Under California's law, by contrast, permission may not be given on the spot: a property owner must post a public sign of a specific size and with other attributes to be defined by a state agency. Nor may permission be granular: the sign must allow all licenseholders to carry and must allow them to carry whatever firearms are permissible under state law. Nor may permission be given specific to a particular timeframe, unless the owner laboriously posts and unposts the required sign. For all of those reasons, we conclude that Plaintiffs in the California cases are likely to succeed on the merits.

We acknowledge that our primary holding—that a national tradition likely exists of prohibiting the carrying of firearms on private property without the owner's oral or written consent—differs from the decisions by the Second Circuit and some district courts. Antonyuk, 89 F.4th at 384–86; Kipke, 695 F. Supp. 3d at 658–59; Koons, 673 F. Supp. 3d at 615–23. In reaching our limited conclusion, we carefully have examined the record in the Hawaii case and, to the extent that our decision conflicts with the analysis by other courts addressing the likelihood of success in those

cases, we respectfully disagree with their preliminary, pre-Rahimi analyses.

7. Places of Worship

In the California cases, the district court held that Plaintiffs are likely to succeed in challenging California Penal Code section 26230(a)(22), which prohibits the carry of firearms at places of worship.  Although the issue is a close one, we agree with the district court's conclusion in this regard.

Places of worship indisputably have been around since the Founding, and much earlier, of course.  We must examine whether the Nation has a tradition of banning firearms in places of worship, comparable to the regulations banning firearms at schools, polling places, and the like. Bruen, 597 U.S. at 30.  We conclude that Plaintiffs are likely to succeed on their challenge.

From the colonial times through the ratification of the Second Amendment and continuing through the ratification of the Fourteenth Amendment, Defendant has not pointed to a single regulation banning firearms at places of worship or at any analogous place.  The lack of any regulation is especially probative given the prevalence of places of worship during that period.  We acknowledge that, shortly after ratification of the Fourteenth Amendment, several States and two territories prohibited firearms at places of worship specifically.  In particular, in 1870, Georgia prohibited firearms at any "place of public worship"; that same year, Texas prohibited firearms at any "church or religious assembly"; in 1875 Missouri banned firearms at any "church or place where people have assembled for religious worship"; in 1878 Virginia banned guns at "any place of worship while a meeting for religious purposes is

being held at such place"; in 1889 Arizona banned firearms at "any church or religious assembly"; and in 1890 Oklahoma enacted the same prohibition.[11]

In our view, though, those regulations do not evince a historical tradition similar to the tradition of regulating firearms at sensitive places. For polling places and other locations, the Supreme Court noted the existence of at least one colonial regulation on point. Bruen, 597 U.S. at 30. And the bans on firearms at schools began in 1824—a few decades after the ratification of the Second Amendment and nearly a half-century before the ratification of the Fourteenth Amendment.

Plaintiffs also point out that some colonial regulations required certain people to bring firearms to church services. We conclude that those regulations have limited importance in the Bruen analysis here because they differ from California's law in "how" and "why" they burden the right to bear arms. 597 U.S. at 29. Those laws clearly addressed a different perceived societal problem—protection of the colony from raids by Native Americans and from slave revolts. California's law is aimed at guaranteeing a congregant's ability to worship safely and without concern that firearms are present and may cause harm. But we nonetheless conclude that Plaintiffs are likely to succeed because of the lack of any prohibition on the carry of firearms in places of worship until after the ratification of the Fourteenth Amendment.

---

[11] An English law from 1403 banned weapons at "Merchant Towns Churches." But that very old regulation, which was not brought to the colonies, carries little weight. Bruen, 597 U.S. at 40–41.

District courts have divided on this question. Compare Spencer v. Nigrelli, 648 F. Supp. 3d 451, 467–68 (W.D.N.Y. 2022) (holding that the plaintiffs were likely to succeed on a Second Amendment challenge to a ban on firearms at places of worship because of the insufficiency of the historical laws offered by the defendant), affirmed on other grounds by Antonyuk v. Chiumento, 89 F.4th 271; Hardaway v. Nigrelli, 639 F. Supp. 3d 422, 439–43 (W.D.N.Y. 2022) (same), affirmed in part, vacated in part, and remanded by 89 F.4th 271; and Antonyuk v. Hochul, 639 F. Supp. 3d at 319–22 (same); with Goldstein, 680 F. Supp. 3d at 389–97 (reaching the opposite conclusion); Md. Shall Issue, 680 F. Supp. 3d at 584–85 (same). For its part, the Second Circuit declined to reach the issue. Antonyuk, 89 F.4th at 346. The court vacated the injunctions in two cases because of mootness and the court affirmed the injunction in one case as to New York's ban on the carry of firearms at places of worship—but on First Amendment grounds, declining to reach the Second Amendment question. Antonyuk, 89 F.4th at 345–52.

In sum, places of worship have been prevalent throughout our Nation's history, but no colony, state, or territory banned firearms at places of worship until after the ratification of the Fourteenth Amendment. At this preliminary stage, we conclude that Plaintiffs are likely to succeed on their Second Amendment challenge with respect to California Penal Code section 26230(a)(22).

We emphasize two points. First, nothing in the law and nothing in this opinion prevents the owner or operator of a place of worship from prohibiting the carry of firearms as a matter of ordinary property law, consistent with the requirements of state law. The preliminary injunction means only that the State cannot ban firearms from places of

worship where the owner or operator wishes to allow firearms at the place of worship.  Second, our ruling in this regard is merely a prediction of Plaintiffs' likelihood of success.  As in all instances, we express no view on the constitutional analysis once the parties have had a full opportunity to present and brief the issue.  Further Supreme Court and circuit-court guidance also may affect the ultimate resolution of this issue.

  8.  Gatherings that Require a Permit

In the California cases, the district court held that Plaintiffs are likely to succeed in challenging California Penal Code section 26230(a)(10), which prohibits carry in:

> [a] public gathering or special event conducted on property open to the public that requires the issuance of a permit from a federal, state, or local government and sidewalk or street immediately adjacent to the public gathering or special event but is not more than 1,000 feet from the event or gathering, provided this prohibition shall not apply to a licensee who must walk through a public gathering in order to access their residence, place of business, or vehicle.

Cal. Penal Code § 26230(a)(10).  Defendant does not argue that there is a national tradition of banning firearms specifically at permitted public gatherings.  Instead, Defendant argues that there is a national tradition of banning firearms at public gatherings in general and, because permitted gatherings are a subset of all public gatherings, the challenged provision falls within the tradition.  We agree with the district court that Plaintiffs are likely to succeed.

Public gatherings have existed since before the Founding, so Defendant must show an enduring national tradition with respect to public gatherings. As with places of worship, Defendant cannot point to a single regulation of public gatherings until after the ratification of the Fourteenth Amendment. Shortly after 1868, several States and territories prohibited the carry of firearms at public gatherings: Georgia and Texas in 1870, Missouri in 1879, Arizona in 1889, Oklahoma in 1890, and Montana in 1903.**[12]** We agree with Defendant that those statutes carry some evidentiary weight, particularly because they were enacted soon after the ratification of the Fourteenth Amendment. But, as we determined with respect to places of worship, we conclude that Plaintiffs are likely to succeed because of the lack of any prohibition on the carry of firearms in public gatherings until <u>after</u> the ratification of the Fourteenth Amendment.

Our conclusion is buttressed in part by the Supreme Court's admonition not to interpret the "sensitive places" doctrine too broadly. <u>See</u> <u>Bruen</u>, 597 U.S. at 31 (rejecting as "far too broad[]" the notion that "all places of public congregation that are not isolated from law enforcement" could qualify as "sensitive"). California's law applies to all gatherings that require any governmental permit, as well as to the adjoining sidewalk or road.

---

[12] Defendant also points to colonial laws in Virginia and North Carolina that were successors to the Statute of Northampton. But the Supreme Court has explained that those laws prohibited the carry of firearms only to the "terror" of the people or for a "wicked purpose"; lawful carry was permitted. <u>Bruen</u>, 597 U.S. at 49–51; <u>see also</u> <u>Rahimi</u>, 144 S. Ct. at 1901 (describing these laws).

Our holding is consistent with the only other decisions to have addressed similar issues. In <u>Koons</u>, the district court held that the plaintiffs were likely to succeed on a Second Amendment challenge to New Jersey's law that, like California's law, broadly prohibits the carry of firearms at permitted public gatherings. 673 F. Supp. 3d at 627–36. And in <u>Antonyuk v. Hochul</u>, the district court enjoined the provision of New York's law that prohibits the carry of firearms at any assembly or protest. 639 F. Supp. 3d at 335–39. For its part, the Second Circuit did not reach the question of the constitutionality of New York's law, holding instead that the plaintiffs lacked standing to challenge the provision. <u>Antonyuk</u>, 89 F.4th at 376–79.

In sum, because no jurisdiction had prohibited the carry of firearms at public gatherings until after the ratification of the Fourteenth Amendment, we hold that Plaintiffs are likely to succeed on their challenge to California Penal Code section 26230(a)(10).

9. <u>Financial Institutions</u>

In both the Hawaii case and the California cases, the district courts held that Plaintiffs are likely to succeed in challenging the relevant provisions of state law that prohibit the carry of firearms in financial institutions such as banks: Hawaii Revised Statutes section 134-9.1(a)(12) and California Penal Code section 26230(a)(23). We agree with the district courts.

The district court in the Hawaii case found that "banks and firearms existed at the time of the Second Amendment's ratification." <u>Wolford</u>, 686 F. Supp. 3d at 1068. Defendant did "not challenge Plaintiffs' contention" that private banks existed at the time of the Founding. <u>Id.</u> Defendant "also d[id] not make any argument that [the district court] should

analogize to different historical regulations because banks at
the time of the Second Amendment's ratification are
substantially different than modern banks." Id. at 1069. In
short, modern banks are roughly the same as banks in 1791.
Nor do we understand Defendant in the California case to be
making an argument to the contrary.

Regardless of the similarity between banks now and in
1791, Defendants have not pointed to any evidence of a
historical regulation—or even a more modern regulation—
prohibiting the carry of firearms in banks. And Defendants
have not pointed to a historical regulation prohibiting carry
in another type of place analogous to a bank or financial
institution. Regulations concerning robust events such as
fairs and markets, or balls and other social or political
gatherings, are not "analogous enough" to an ordinary
commercial establishment such as a bank. Bruen, 597 U.S.
at 30. A dynamic, congested gathering of persons with
commercial, political, and social elements is not particularly
analogous to a trip to a bank to deposit a check. Nor do
federal laws criminalizing bank robberies or requiring banks
to take measures to prevent robberies justify a complete ban
on firearms. Finally, even assuming that a ban on firearms
in most governmental buildings is constitutional, those laws
are not analogous because financial institutions generally are
privately owned and operated and because they serve a
commercial, non-governmental purpose.

In sum, we agree with the district courts in both cases
that Plaintiffs are likely to succeed on the challenge to the
prohibition on carrying firearms in financial institutions. We
note that, as with places of worship, nothing in this opinion
precludes a financial institution from banning firearms as a
matter of property law, consistent with applicable state law.

The preliminary injunction means merely that any bank operator who wishes to allow firearms on site may do so.

### 10. Hospitals and Other Medical Facilities

In the California cases, the district court held that Plaintiffs are likely to succeed in their challenges to California Penal Code section 26230(a)(7), which prohibits carry in "[a] building, real property, and parking area under the control of a public or private hospital or hospital affiliate, mental health facility, nursing home, medical office, urgent care facility, or other place at which medical services are customarily provided." We agree with the district court.

Defendant likely is correct that, as his expert states, modern hospitals and medical facilities do not resemble the hospitals at the Founding. But medical facilities of some sort have existed since colonial times. As the district court here concluded, Defendant has not introduced any evidence of a historical ban on firearms in medical facilities of any type. May, 2023 WL 8946212, at *7; see also Koons, 673 F. Supp. 3d at 651 ("This Court has uncovered no laws from the 18th or 19th centuries that banned firearms at hospitals, almshouses, asylums, or other medical facilities.").

Defendant points, instead, to a few late 19th-century laws, enacted after the ratification of the Fourteenth Amendment, that banned firearms in places where people assembled for "educational" or "scientific" purposes. Even assuming that medical facilities in the 19th century were understood to perform educational or scientific services, we decline to find, as discussed above, a national historical tradition of regulation from a few post-Fourteenth-Amendment enactments. We also acknowledge that, just as schools contain children, which are a vulnerable population, hospitals and other medical facilities contain medical

patients, another vulnerable population. But, at least for the purpose of preliminary relief, we find it unlikely that Defendant will establish a tradition of regulating firearms at all places that contain a vulnerable population. The Supreme Court did not hold that schools were sensitive solely because they contain a vulnerable population; instead, the Court pointed to 19th century laws specifically regulating firearms in or near schools. Bruen, 597 U.S. at 30.

District courts have divided on the question whether a national historical tradition of banning firearms at medical facilities exists. Compare Koons, 673 F. Supp. 3d at 651–52 (holding that the plaintiffs were likely to succeed on a challenge to New Jersey's law); with Kipke, 695 F. Supp. 3d at 653 (reaching the opposite conclusion with respect to Maryland's law); and Md. Shall Issue, 680 F. Supp. 3d at 590–92 (same). The Second Circuit held that the plaintiffs were likely to succeed with respect to a challenge to New York's prohibition on firearms at locations providing behavioral health and chemical dependent care or services. Antonyuk, 89 F.4th at 337–42. But the court's analysis focused on historical laws—not mentioned by Defendant here—concerning persons with mental or chemical-dependency issues.[13] Id.

On the current record, and for the purpose of preliminary relief, we hold that Plaintiffs are likely to succeed on their challenge to California's prohibition of firearms at hospitals

---

[13] Although New York's law covers locations also providing undifferentiated "health" services, the plaintiff had standing only with respect to locations providing "behavioral health, or chemical dependence care or services," and the district court and the Second Circuit limited their analyses and holdings to those locations. Id. at 294, 337, 342.

and other medical facilities. We emphasize that nothing prevents an operator of a medical facility—whether privately owned or State-run—from banning firearms under ordinary principles of property law. See Bldg. & Constr. Trades Council, 507 U.S. at 231 (explaining that a State generally may "manage its own property when it pursues its purely proprietary interests . . . where analogous private conduct would be permitted"). The preliminary injunction means only that a medical-facility operator may allow firearms at its facility.

11. Public Transit

In the California cases, the district court held that Plaintiffs are likely to prevail on their challenge to California Penal Code section 26230(a)(8), which prohibits carry in "[a] bus, train, or other form of transportation paid for in whole or in part with public funds, and a building, real property, or parking area under the control of a transportation authority supported in whole or in part with public funds." Unlike other parts of the law, section 26230(a)(8) contains no exceptions for carrying an unloaded and secured firearm. Because the ban is categorical, we agree with the district court that Plaintiffs are likely to succeed on this challenge.

Public transit did not exist in modern form until the 20th century, so Defendant has to point only to a relevantly similar historical regulation, not a dead ringer. Rahimi, 144 S. Ct. at 1898. Defendant relies primarily on the rules and regulations of some private railroad operators in the 19th century. As one scholar has explained, six railroad companies in the 19th century regulated the carry of firearms on trains. Joshua Hochman, Note, The Second Amendment

on Board: Public and Private Historical Traditions of
Firearm Regulation, 133 Yale L. J. 1676, 1690–96 (2024).

We agree with Defendant's premise that, in examining
historical evidence, rules and regulations by private entities
may inform the historical analysis, particularly where, as
with train companies operating on the public right of way,
the "private" entities were providing essentially a public
service and were more properly characterized as mixed
public-private entities. But our examination of the relevant
regulations suggests that California's law is too broad; the
historical regulations are insufficiently analogous. In
particular, most of the companies appeared to prohibit only
carriage without pre-boarding inspection, carriage in the
passenger cars (the firearms had to be checked as luggage),
carriage of <u>loaded</u> firearms, or carriage of "dangerous"
weapons, such as rifles with bayonets attached. <u>Id.</u>
Moreover, several States enacted a "traveler's exception,"
whereby persons traveling longer distances could carry their
firearms on board. <u>Id.</u> at 1696–97.

We conclude from our examination of the 19th century
railroad rules that Defendant likely has proved a historical
tradition of prohibiting the carry of loaded firearms or the
carry of firearms not properly stored. But California's broad
law does not fit that more limited tradition. California's law
provides exceptions applicable to the carry of firearms in
<u>private</u> vehicles. First, the law allows a person to transport
a firearm in a private vehicle if the firearm is locked in an
appropriate lock box. Cal. Penal Code § 26230(b). Second,
the law allows a person to store a firearm in a private vehicle
in most parking areas where carriage of a firearm is
otherwise prohibited, provided that certain requirements are
met. <u>Id.</u> § 26230(c). But California's law does not appear
to have—and Defendant has not argued that California's law

has—a similar exception on public transit, allowing (for example) the carry of an unloaded and secured firearm on a bus.[14]   The lack of such an exception appears particularly concerning in this context.   For those who cannot afford private transportation, a complete ban on carry in public transit effectively disarms those persons entirely when they leave home in a vehicle.   In other words, unlike a ban on carrying at, say, the circus, a ban on carrying on public transit unavoidably affects some persons' rights to bear arms on a nearly daily basis.

We acknowledge that public transit bears some features common to other sensitive places, such as government buildings and schools.   Transit facilities are often crowded, they serve some vulnerable populations, and they are State-owned.   But the breadth of California's law—in particular the lack of any exception allowing the carry of any firearm in any manner—persuades us that Plaintiffs are likely to prevail on this claim.   Finally, we note that our holding is consistent with the district court's holding here and with two other district court decisions.   See Koons, 673 F. Supp. 3d at 649–50 (holding that the plaintiffs are likely to succeed on their challenge to New Jersey's ban on firearms at airports to the extent that the ban does not exempt firearms properly secured and intended to be checked as luggage); Antonyuk v. Hochul, 639 F. Supp. 3d at 328–31 (holding that the plaintiffs are likely to succeed on their challenge to New York's ban on firearms on buses and vans); but see Kipke,

---

[14] Hawaii's law, by contrast, does have an exception for public transit. See Haw. Rev. Stat. § 134-9.1(b)(8) (providing an affirmative defense for a person who is "[p]ossessing a firearm in an airport or any place, facility, or vehicle used for public transportation or public transit; provided that the firearm is unloaded and in a locked hard-sided container for the purpose of transporting the firearm").

695 F. Supp. 3d at 655–56 (holding that the plaintiffs are unlikely to prevail on the challenge to Maryland's ban on firearms at mass transit facilities). The Second Circuit did not reach this issue because, although the New York State defendants appealed every <u>other</u> ruling in the plaintiffs' favor, they did not appeal the district court's injunction as to buses and vans. <u>Antonyuk</u>, 89 F.4th at 294.

In sum, we hold that Plaintiffs are likely to succeed in their challenge to California's broad prohibition on the carry of firearms on public transit. But we emphasize that our holding hinges on the law's categorical nature. A ban on the carry of firearms on public transit almost certainly would be constitutionally permissible if the law allowed the carry of unloaded and secured firearms.

B. The Remaining *Winter* Factors

In addition to showing a likelihood of success, Plaintiffs must demonstrate that they will suffer irreparable harm in the absence of preliminary relief and that injunctive relief is consistent with the equities and the public interest. <u>Winter</u>, 555 U.S. at 20. For the challenges as to which Plaintiffs have failed to show a likelihood of success, we reverse the preliminary injunction. <u>Id.</u>; <u>see</u> <u>Garcia v. Google, Inc.</u>, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) ("[W]hen a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining [<u>Winter</u> factors]." (citation and internal quotation marks omitted)).

For the challenges as to which Plaintiffs have shown a likelihood of success, we affirm the preliminary injunction. Our reasoning is threefold. First, we review for abuse of discretion the grant of a preliminary injunction. <u>Tucson</u>, 91 F.4th at 1324. Second, each claim alleges a violation of a constitutional right, which strongly suggests that the

remaining <u>Winter</u> factors are met.  <u>Melendres v. Arpaio</u>, 695 F.3d 990, 1002 (9th Cir. 2012).  Finally, the injunction here merely preserved the status quo before each law was set to go into effect.  <u>City & County of San Francisco v. USCIS</u>, 944 F.3d 773, 789 (9th Cir. 2019).  We have considered carefully    Defendants'    counter-arguments    but    are unpersuaded that the district courts abused their discretion in granting preliminary relief.

## CONCLUSION

In <u>Wolford</u>, we affirm the preliminary injunction with respect to financial institutions, parking lots adjacent to financial institutions, and parking lots shared by government buildings and non-governmental buildings.  We otherwise reverse the preliminary injunction, thereby reversing the injunction with respect to bars and restaurants that serve alcohol; beaches, parks, and similar areas; parking areas adjacent to all of those places; and the new default rule prohibiting the carry of firearms onto private property without consent.  More specifically, we affirm the injunction insofar as it enjoins Hawaii Revised Statutes section 134-9.1(a)(12) and "the portions of [Hawaii Revised Statutes section 134-9.1](a)(1) that prohibit carrying firearms in parking areas owned, leased, or used by the State or a county which share the parking area with non-governmental entities, are not reserved for State or county employees, or do not exclusively serve the State or county building."  We reverse the injunction insofar as it enjoins Hawaii Revised Statutes sections 134-9.1(a)(4), 134-9.1(a)(9), and 134-9.5.

In <u>May</u> and <u>Carralero</u>, we affirm the injunction with respect to hospitals and similar medical facilities, public transit, gatherings that require a permit, places of worship, financial institutions, parking areas and similar areas

connected to those places, and the new default rule as to
private property. We otherwise reverse the preliminary
injunction, thereby reversing the injunction with respect to
bars and restaurants that serve alcohol, playgrounds, youth
centers, parks, athletic areas, athletic facilities, most real
property under the control of the Department of Parks and
Recreation or Department of Fish and Wildlife, casinos and
similar gambling establishments, stadiums, arenas, public
libraries, amusement parks, zoos, and museums; parking
areas and similar areas connected to those places; and all
parking areas connected to other sensitive places listed in the
statute. More specifically, we affirm the injunction insofar
as it enjoins Defendant from implementing or enforcing
California Penal Code sections 26230(a)(7), (8), (10), (22),
(23), and (26). We reverse the injunction insofar as it enjoins
Defendant from implementing or enforcing California Penal
Code sections 26230(a)(9), (11), (12), (13), (15), (16), (17),
(19), and (20) and insofar as it enjoins Defendant from
implementing or enforcing California Penal Code section
26230(a) with respect to parking areas connected to sensitive
places.

Having concluded the historical analysis required by
Bruen and the Supreme Court's other Second Amendment
cases, we close with a few general observations. First,
taking a step back from the historical analysis, the lists of
places where a State likely may ban, or may not ban, the
carry of firearms appear arbitrary. A State likely may ban
firearms in museums but not churches; in restaurants but not
hospitals; in libraries but not banks. The deep historical
analysis required by the Supreme Court provides the missing
link, but the lack of an apparent logical connection among
the sensitive places is hard to explain in ordinary terms. In
addition, the seemingly arbitrary nature of Second

Amendment rulings undoubtedly will inspire further litigation as state and local jurisdictions attempt to legislate within constitutional bounds.

Second, we stress that owners of private property remain free to ban the carry of firearms on their private property. Nothing in the Second Amendment disturbs that basic background principle of property law. For the places where we hold that the States likely may not prohibit the carry of firearms, the practical effect of our ruling is merely that private-property owners may choose to allow the carry of firearms. Owners of hospitals, banks, and churches, for example, remain free to ban firearms at those locations.

Finally, we emphasize that an analysis about the constitutional limits of what a State may ban has no effect whatsoever on the choice by legislatures in other States not to ban the carry of firearms. See generally Bianchi v. Brown, 2024 WL 3666180, at *5 (4th Cir. Aug. 6, 2024) (en banc) (opinion by Wilkinson, J.) (making this same general point), petition for cert. filed sub nom., Snope v. Brown, No. 24-203 (U.S. Aug. 21, 2024). That is, a ruling that California permissibly may ban the carry of firearms in, for example, museums does not have any effect on the choice by other States not to ban firearms in museums. Persons residing in other States are unaffected by California's law or Hawaii's law—or our decision—unless, of course, they choose to travel to California or Hawaii with firearms.

**AFFIRMED IN PART AND REVERSED IN PART.** The parties shall bear their own costs on appeal.

# CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 17, 2024.     Respectfully submitted,

/s/ *Alan Beck*

Alan Alexander Beck

Counsel for Plaintiffs