No. 23-16164

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Hawai'i
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

## DEFENDANT-APPELLANT ANNE E. LOPEZ'S OPPOSITION TO PLAINTIFFS-APPELLEES' COMBINED PETITION FOR PANEL REHEARING AND PETITION FOR REHEARING EN BANC

ANNE E. LOPEZ
   *Attorney General of the State of Hawai'i*
KALIKO'ONĀLANI D. FERNANDES
   *Solicitor General*
STATE OF HAWAI'I
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
   *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
ALEXANDRA LICHTENSTEIN
   *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
   *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as the*
*Attorney General of the State of Hawaiʻi*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ..................................................................................1

ARGUMENT ........................................................................................2

I. The Private Property Default Rule Is Constitutional ...........................2

    A. The Panel Correctly Held That the Default Rule Falls Within the Nation's Historical Tradition of Firearm Regulation ...........2

    B. The Panel Opinion Does Not Conflict with *Antonyuk*...............6

II. Under *Bruen*, Courts Should Consider Historical Analogues from Both the Founding and Reconstruction Eras ...................................................................................8

    A. The Panel Looked to the Correct Time Periods.........................8

    B. The Panel Opinion Does Not Conflict with Any Supreme Court or Court of Appeals Decisions..................................................12

III. The Court Should Not "Hold" Plaintiffs' Petition .............................14

CONCLUSION ...................................................................................15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. James*, 144 S. Ct. 2709 (2024) ............................................................7

*Antonyuk v. James*, No. 22-2908, 2023 WL 11963034 (2d Cir. Oct. 24, 2024) ...7, 8

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) ...............................................6

*Coal. for Econ. Equity v. Wilson*, 122 F.3d 718 (9th Cir. 1997) ............................15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................6

*Garland v. Range*, 144 S. Ct. 2706 (2024) .............................................................11

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012).......................6

*Kipke v. Moore*, No. 24-01799 (4th Cir.)................................................................14

*Koons v. Att'y Gen.*, No. 23-1900 (3d Cir.) ...........................................................14

*Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024) ..............13

*Lawrence v. Chater*, 516 U.S. 163 (1996) (per curiam) .........................................11

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ................... passim

*Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) .......................13

*Slovik v. Yates*, 556 F.3d 747 (9th Cir. 2009) .......................................................1, 3

*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024) ......................................13

*United States v. Rahimi*, 144 S. Ct. 1889 (2024)............................................ passim

*Vincent v. Garland*, 144 S. Ct. 2708 (2024) ..........................................................11

*Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) .................................... 12, 13, 14

**Statutes**

Haw. Rev. Stat. § 134-9.1(a)(4)...............................................................................1

Haw. Rev. Stat. § 134-9.1(a)(9)...............................................................................1

Haw. Rev. Stat. § 134-9.5 ...................................................................................1

**Other Authorities**

Declaration of Hendrik Hartog, *Koons v. Platkin*, No. 1:22-cv-07464 (D.N.J. Feb. 13, 2023), ECF No. 84 .....................................................................................5

Kurt Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .........10

**Rules**

9th Cir. R. 35-1 ....................................................................................................1

Fed. R. App. P. 35(b)(1)........................................................................................1

Fed. R. App. P. 40(a)(2) ........................................................................................1

Fed. R. App. P. 41(b) ..........................................................................................14

# INTRODUCTION

Following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), the Hawai'i Legislature undertook a comprehensive reevaluation of its firearms laws. The product of this effort was Act 52, which sought to mitigate the serious risks of firearms and gun violence, while simultaneously deeply respecting the limits that *Bruen* imposed. As relevant here, Act 52 restricted firearms in parks, beaches, and bars and restaurants serving alcohol, and it prohibited carrying firearms on the private property of another person without authorization. *See* Haw. Rev. Stat. §§ 134-9.1(a)(4), (9), 134-9.5.

The panel correctly held that these provisions are likely lawful under *Bruen*, and Plaintiffs have failed to identify any "point of law or fact" that the panel "overlooked or misapprehended." Fed. R. App. P. 40(a)(2). Plaintiffs here instead relitigate points that the panel thoroughly considered and rejected. And to the extent Plaintiffs raise new arguments in their petition, those arguments have been forfeited. *See Slovik v. Yates*, 556 F.3d 747, 751 n.4 (9th Cir. 2009).

Plaintiffs have also failed to identify any conflict between the panel opinion and decisions of the Supreme Court or other courts of appeals. *See* Fed. R. App. P. 35(b)(1); 9th Cir. R. 35-1. The panel correctly held that the challenged provisions are likely constitutional under *Bruen* and *United States v. Rahimi*, 144 S. Ct. 1889

1

(2024). And the court of appeals decisions that Plaintiffs discuss either have been vacated or do not raise a conflict with the panel opinion.

Plaintiffs ask in the alternative for the Court to "hold" their petition for the resolution of Second Amendment cases currently pending before other courts of appeals. But Plaintiffs are not willing, while waiting, to lift the injunction currently barring Hawai'i, a sovereign State, from implementing an act of its legislature, even though the panel has held that the challenged provisions are likely constitutional. Because Plaintiffs have not provided any grounds warranting panel rehearing or rehearing en banc, the petition should be denied.

## ARGUMENT

### I. The Private Property Default Rule Is Constitutional

#### A. The Panel Correctly Held That the Default Rule Falls Within the Nation's Historical Tradition of Firearm Regulation

As the panel explained, Hawai'i's private property default rule is supported by a historical tradition of firearm regulation stretching back to the 1700s. *See* Op. 65–67. Indeed, the panel noted, the State exceeded its burden under *Bruen* by identifying "dead ringers," including a 1771 New Jersey law and an 1865 Louisiana law. *Id.* at 67. "Those laws—enacted shortly before the ratification of the Second Amendment and very shortly before the ratification of the Fourteenth Amendment—were uncontroversial," and "[t]hey are easily analogous to the 'sensitive places' laws mentioned by the Supreme Court." *Id.*

Plaintiffs criticize the panel for relying on only "two laws," Pet. 6, but that is exactly the number of laws the Supreme Court relied on when it concluded that legislative assemblies and courthouses are sensitive, *see* Op. 34; Everytown Br. 16–17. Also, the State offered additional examples of laws regulating firearms on "inclosed" property, and the panel reserved the question of whether those laws applied to private property open to the public. Op. 66 n.10. As the State has explained, the answer to that question is yes, *see* OB54–55, and those laws thus provide further support for the default rule.

In addition to faulting the panel for considering too few laws in general, Plaintiffs take issue with each of those laws specifically. With respect to the 1865 Louisiana law, Plaintiffs argue for the first time in their petition that the regulation, even though nondiscriminatory on its face, should be disregarded because it was part of the Black Codes. *See* Pet. 6–7. This new argument is forfeited, *see Slovik*, 556 F.3d at 751 n.4, but it is also unavailing. As one of the State's experts explained in the district court, opponents of Black Codes agreed that the Second Amendment was limited by the rights of private property owners: Union General Daniel Sickles, for example—whose views on the Second Amendment were cited approvingly in *Bruen*, 597 U.S. at 62–63—issued an order preempting South Carolina's Black Codes that recognized that "the constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but made clear

that this right did not "authorize any person to enter with arms on the premises of another against his consent." 3-ER-0480-0481 (Cornell Decl. ¶ 52) (internal quotation marks and alteration omitted). Sickles's order is yet further evidence that private property default rules reflect "a constitutional consensus deeply rooted in text, history, and tradition," 3-ER-0480, and Plaintiffs' efforts to discredit these rules are unpersuasive.

Turning to the 1771 New Jersey law, Plaintiffs argue that the regulation "is both an outlier and not comparable to Hawaii's law." Pet. 7. The panel correctly held, however, that New Jersey's law fell within "an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property." Op. 67. And New Jersey's law is analogous to Hawaiʻi's in terms of both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. As for "how," the New Jersey law imposed an even greater burden than Hawaiʻi's because it required written consent, whereas Hawaiʻi's law allows for "written *or verbal* authorization." OB53 (internal quotation marks omitted). As for "why," both regulations are "rooted in respect for private property rights." OB54. Plaintiffs try to distinguish New Jersey's law on the ground that it was focused on "trespassing." *See* Pet. 8–9. But to the extent Plaintiffs suggest that the law applied only to people otherwise unlawfully on private property, that suggestion is belied by the law's text, which

4

contains no limitation, and which generally regulates—as Hawaiʻi's law does—the carrying of firearms on private property without permission. *See* 5-ER-1055; *see also* Declaration of Hendrik Hartog ¶ 34, *Koons v. Platkin*, No. 1:22-cv-07464 (D.N.J. Feb. 13, 2023), ECF No. 84 (explaining that, under the 1771 New Jersey law, "if one entered a blacksmith's shop, one needed the permission of the blacksmith or his agents if one meant to enter the space armed").

Finally, Plaintiffs contend that Hawaiʻi's default rule "makes it impossible to carry a firearm for lawful self-defense as a practical matter." Pet. 10 (capitalization altered). Pointing to *Bruen*'s observation that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place,'" 597 U.S. at 31, Plaintiffs assert that "Hawaii's rule effectively does the same thing and is unconstitutional for the same reasons," Pet. 10. As the panel explained, however, "Plaintiffs may take their firearms onto the public streets and sidewalks throughout Maui County (and elsewhere in Hawaii), as well as into many commercial establishments and other locations." Op. 45 n.4. Accordingly, "the situation in this case is unlike the argument that *Bruen* rejected." *Id.*

At bottom, Plaintiffs' disagreement with the default rule is a policy dispute. They argue that "[d]efault rules are inherently sticky" and that "fewer people will carry" firearms if they are required to obtain permission. Pet. 11. The question for this Court, though, is not whether default rules are "sticky," or whether it would be

a bad thing if they were. It is whether Hawai'i's law is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. The Supreme Court has explained that "[t]he Second Amendment 'is the very *product* of an interest balancing by the people.'" *Bruen*, 597 U.S. at 26 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). And when "our Founding Fathers drafted the Second Amendment," they did so against the backdrop of "property law, tort law, and criminal law" that existed at the time. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). One essential component of that backdrop was the right to exclude, which was "universally held to be a fundamental element of the property right." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) (internal quotation marks omitted). Both before and after the Founding, governments reinforced private property rights, not just through the criminal offense of trespass, but also through laws like New Jersey's that required guests to obtain permission before carrying firearms on private property. Those laws reflect the "balance . . . struck by the traditions of the American people" that the Constitution preserves. *Bruen*, 597 at 26. And there is no room to second-guess that balance because one would have struck it differently.

## B. The Panel Opinion Does Not Conflict with *Antonyuk*

Plaintiffs also argue that the Court should grant their petition because the panel opinion conflicts with the Second Circuit's decision in *Antonyuk*, which held

6

that New York's private property default rule was likely unconstitutional as applied to private property open to the public.[1]  As the State has explained, however, *see* Dkt. 68, 92, *Antonyuk*'s holding regarding New York's default rule was tied to the record in that case.  Critical to the Second Circuit's decision was the fact that New York had "produced no evidence" that the historical analogues it proffered in support of its rule—including the 1771 New Jersey law and the 1865 Louisiana law relied upon by the panel in this case—were "understood to apply to private property open to the public or that the statutes were in practice applied to private property open to the public."  2023 WL 11963034, at *78.  And the court stated that "*[a]s it has been developed thus far*, the historical record indicates that 'land,' 'improved or inclosed land' and 'premises or plantations' would have been understood to refer to private land not open to the public."  *Id.* (emphasis added).

Here, by contrast, the State has offered evidence that its historical analogues applied to private property open to the public.  Before the district court and the panel, the State cited a declaration submitted by Professor Hendrik Hartog in *Koons*, which explained that the 1771 New Jersey law discussed in *Antonyuk* and the panel opinion "extended to all varieties of real property, including the typical

---

[1] The Supreme Court vacated *Antonyuk* following *Rahimi*.  *See Antonyuk v. James*, 144 S. Ct. 2709 (2024).  The Second Circuit has since issued a new opinion, in which it reached the same conclusions as its original opinion.  *See Antonyuk v. James*, No. 22-2908, 2023 WL 11963034 (2d Cir. Oct. 24, 2024).

'businesses' of the times." OB54 (internal quotation marks omitted); *see also* 2-ER-0116-0117. Professor Hartog also explained that the phrase "improved or inclosed lands in any Plantation," as used in a different historical analogue, did not limit that provision to fenced-in land. *See* OB55; 2-ER-0117. The Second Circuit did not have this evidence before it when it decided *Antonyuk*, and it might have viewed the default rule differently if it had been presented with a more "developed . . . historical record." 2023 WL 11963034, at *78. The panel here, moreover, made clear that its own decision depended on "carefully hav[ing] examined the record in the Hawaii case," and that it disagreed with *Antonyuk* only "to the extent that our decision conflicts with the analysis" of the Second Circuit. Op. 68–69. Given the record-specific nature of the courts' respective decisions regarding the Hawai'i and New York default rules, there is no conflict between the panel opinion and the analysis in *Antonyuk*.

## II. Under *Bruen*, Courts Should Consider Historical Analogues from Both the Founding and Reconstruction Eras

### A. The Panel Looked to the Correct Time Periods

The panel correctly held that "when considering the 'sensitive places' doctrine, we look to the understanding of the right to bear arms *both* at the time of the ratification of the Second Amendment in 1791 *and* at the time of the ratification of the Fourteenth Amendment in 1868." Op. 36. In reaching this conclusion, the panel explained that "[o]ur Nation has a clear historical tradition of

8

banning firearms at sensitive places," and that "tradition . . . existed at the Founding." *Id.* Because of this longstanding tradition, state and local governments do not need to prove that challenged sensitive-place classifications have analogues that existed at the Founding in particular. Instead, they must merely show that a given location falls within the broader sensitive-place tradition recognized by the Supreme Court, which they can do by offering "a small number of laws," including "localized laws" and "19th-century laws," if "those laws were viewed as non-controversial." *Id. Compare Bruen*, 597 U.S. at 46 ("doubt[ing] that *three* colonial regulations could suffice to show a tradition of public-carry regulation"), *with id.* at 30 ("assum[ing] it settled" based on only a couple 18th- and 19th-century analogues that certain sensitive-place restrictions were constitutional, where there were "no disputes regarding the lawfulness of such prohibitions").

In arguing for a myopic focus on the Founding Era, Plaintiffs rely heavily on a single paragraph from *Bruen*. *See* Pet. 14–15. There the Court explained that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," and the Court stated that it therefore "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. From these statements, Plaintiffs infer

9

that "a right incorporated under the Fourteenth Amendment brings with it the *original* meaning of the right as it was understood at the time of the founding, not some new version based on 1868 understandings." Pet. 15.

This argument ignores the Court's more specific discussion of sensitive-place restrictions. *See Bruen*, 597 U.S. at 30. And it fails to address the subsequent paragraph in *Bruen*, which highlighted the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Id.* at 37. Although the Court found it unnecessary to weigh in on that debate—and thus expressly left open the question of whether 1791 or 1868 understandings should govern—it quoted from a secondary source that argued that "[w]hen the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." *Id.* at 38 (quoting Kurt Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* 2 (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917). As the State and its *amici* have explained, *see* RB9–12; Everytown Br. 2–15, the best understanding of *Bruen* is that courts can look to both Founding- and Reconstruction-era laws.

Plaintiffs also fail to explain how *Rahimi* could have changed the relevant analysis. *Rahimi* involved a challenge to a federal law, not a state or local law,

10

and, as in *Bruen*, the Court expressly declined to weigh in on the time-period debate. *See* 144 S. Ct. at 1898 n.1. Plaintiffs argue that the Supreme Court's decision to grant, vacate, and remand (GVR) in *Antonyuk* "must be read as a direction to the Second Circuit to reconsider its holding on this very point in light of *Rahimi*." Pet. 13. But all that can be read from a GVR is the Court's determination that there is "a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration." *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam). Following *Rahimi*, the Court GVR'd petitions in a number of Second Amendment cases—including cases on opposite sides of particular splits, *compare Garland v. Range*, 144 S. Ct. 2706 (2024), *with Vincent v. Garland*, 144 S. Ct. 2708 (2024)—which makes sense given that *Rahimi* provided generally applicable guidance about how courts should interpret *Bruen*. Those GVRs were clearly intended to allow lower courts to implement the guidance from *Rahimi*. They do not suggest the Court intended to signal its views on specific questions presented.

Even if Plaintiffs were correct that *Bruen* and *Rahimi* prioritized Founding-over Reconstruction-era history, it would not affect the challenged aspects of the panel opinion. As the panel explained, the restriction on firearms in bars and restaurants serving alcohol and the private property default rule are justified by regulations stretching back to the 1700s. *See* Op. 48 ("[F]rom before the Founding

and continuing throughout the Nation's history, governments have regulated in order to mitigate the dangers of mixing alcohol and firearms."); *id.* at 67 ("Collectively, the laws establish that colonies and States freely arranged the relevant default rules.").  And although firearms were not restricted in parks until the 1800s, that is because modern parks did not exist before that time.  *See id.* at 40–41.  Regardless of whether the Second Amendment's meaning was fixed in 1791 or 1868, *Bruen* and *Rahimi* make clear that laws cannot be struck down simply because they regulate phenomena whose existence post-dates the relevant time period.  *See Bruen*, 597 U.S. at 28 ("[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."); *Rahimi*, 144 S. Ct. at 1897–98 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.").

### B.  The Panel Opinion Does Not Conflict with Any Supreme Court or Court of Appeals Decisions

For the reasons just discussed, the panel opinion does not conflict with *Bruen* or *Rahimi*.  Nor have Plaintiffs identified any conflict with decisions from other courts of appeals, and their cited cases do not even involve sensitive-place laws.  Plaintiffs point to the Eighth Circuit's decision in *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024), but the court there assumed that it could consider Reconstruction-era sources, and it rejected those sources on the ground that they were not sufficiently analogous to the challenged age restriction on public carry,

*see id.* at 696–98. Plaintiffs also suggest that the panel opinion conflicts with the Fifth Circuit's decision in *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024), but that case involved a challenge to a federal law, not a state or local law. Its analysis of the relevant time period is therefore inapplicable here.

Finally, Plaintiffs cite the Third Circuit's decision in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *see* Pet. 15, but after Plaintiffs filed their petition, *Lara* was vacated in light of *Rahimi*, *see Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024). Even if *Lara* had not been vacated, it would not have conflicted with the panel opinion because *Lara* involved an age restriction on public carry, not a sensitive-place law. As already explained, *see supra* pp. 8–9, the question in a sensitive-places case is whether a location falls within the recognized historical tradition that has existed since the Founding. The Supreme Court has looked to later regulations, including from the 1800s, to determine whether a location is sensitive. *See* Op. 36 (noting that "[t]he Supreme Court held that schools qualify as sensitive places because of localized, non-controversial laws that . . . were first enacted in 1824"). While *Lara* focused on Founding-era sources when assessing a different type of law, it is an open question whether the Third Circuit would impose a similar temporal restriction in a sensitive-places case. Indeed, the Eighth Circuit in *Worth*, which also considered

an age restriction on public carry, noted that public-carry prohibitions are "much different in scope than" sensitive-place laws. *See* 108 F.4th at 696.

### III. The Court Should Not "Hold" Plaintiffs' Petition

In the alternative, Plaintiffs ask this Court to "hold" their petition pending the Third Circuit's decision in *Koons v. Attorney General*, No. 23-1900. *See* Pet. 5.[2] But the en banc standard looks to whether a present conflict exists among the circuits, not whether a hypothetical one may arise in the future. Plaintiffs cite no similar instances in which this Court has held petitions for rehearing pending the resolution of cases in other courts of appeals, let alone where those other cases involved different States' laws. Plaintiffs' proposal has no limiting principle, as the logic of their request would seem to apply equally to other pending sensitive-place appeals, *see, e.g.*, *Kipke v. Moore*, No. 24-01799 (4th Cir.), or even to other pending Second Amendment appeals more generally.

Consider what would happen in the interim while waiting for the Third Circuit (and possibly others) to rule. As long as Plaintiffs' petition remains pending, the mandate remains with this Court. *See* Fed. R. App. P. 41(b). And as long as the mandate remains with this Court, the State remains bound by the district court's injunction. This Court declined a similar request in *Coalition for*

---

[2] Plaintiffs also asked the Court to hold their petition for *Antonyuk*, *see* Pet. 14, but, as noted, the Second Circuit has since issued an amended opinion in that case.

*Economic Equity v. Wilson*, 122 F.3d 718 (9th Cir. 1997), after a panel vacated an injunction that had been entered against California.  In denying a subsequent motion to stay the mandate, the Court explained that a stay "would be tantamount to extending the preliminary injunction entered by the district court . . . , which we have already held rests on an erroneous legal premise." *Id.* at 719.  And the Court held that "the State has demonstrated the clear possibility of irreparable injury to its citizens if a stay of the mandate is granted; it is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Id.*  The same is true here.  Each day that the mandate sits with this Court, the State is barred from enforcing duly enacted laws that the panel held were likely constitutional.  That these laws promote a critical public safety interest further underscores the importance of denying Plaintiffs' petition expeditiously.

## CONCLUSION

For the foregoing reasons, the Court should deny the petition for rehearing and rehearing en banc.

Dated: October 29, 2024

Respectfully submitted,

/s/ Neal Kumar Katyal

ANNE E. LOPEZ
    *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
    *Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

MARY B. MCCORD
RUPA BHATTACHARYYA
SHELBY B. CALAMBOKIDIS
ALEXANDRA LICHTENSTEIN
    *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

NEAL KUMAR KATYAL
DANA A. RAPHAEL
    *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

BEN GIFFORD
    *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  23-16164

I am the attorney or self-represented party.

**This brief contains** 3,673 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated 10/8/2024 .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Neal Kumar Katyal **Date** 10/29/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 29, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal